UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------- x
In re                                          :        **Chapter 11**
                                               :
**KABBAGE, INC. D/B/A KSERVICING,** *et al.*, :        **Case No. 22-10951 (      )**
                                               :
                                               :        **(Joint Administration Requested)**
            **Debtors.**[1]                    :
---------------------------------------------------------- x

## DECLARATION OF DEBORAH RIEGER-PAGANIS IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST-DAY PLEADINGS

I, Deborah Rieger-Paganis, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director at AlixPartners LLP ("**AlixPartners**") and have served as a restructuring advisor to Kabbage, Inc. d/b/a KServicing (the "**Company**" or "**KServicing**") and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors-in-possession (collectively, the "**Debtors**") since April 2022.

2.      I have overseen (and continue to oversee) the services provided by AlixPartners, which include: designing, negotiating and implementing a restructuring strategy designed to maximize enterprise value; evaluating the Debtors' cash-flow projections and identifying liquidity-enhancing opportunities; contingency planning; developing a revised wind down plan and other related forecasts and financial analyses; coordinating and providing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

administrative support for developing the Debtors' chapter 11 plan of liquidation; preparing the necessary components of a disclosure statement and chapter 11 plan; assisting with electronic data collection; and assisting with vendor payments.  In my capacity as the Debtors' financial advisor, I am generally knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases.  I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtors.

3.       I have been employed by AlixPartners since 2002 and have served as a Managing Director of AlixPartners since 2015.  I have more than 30 years of experience serving in a variety of roles, including as interim Chief Financial Officer for various chapter 11 debtors, Vice President of Restructuring for the wind down estate of JCPenney, senior Vice President of Financial Planning and Analysis at MasterCard, and Vice President of Finance at Ann Taylor corporate.  I have a Bachelor of Science in accounting from State University of New York at Albany and am a certified public accountant in the State of New York.

4.       AlixPartners has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases, including recent filings in this District:  *In re MD Helicopters, Inc.,* No. 22-10263 (KBO) (Bankr. D. Del. Apr. 25, 2022); *In re Alto Maipo Delaware LLC*, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 16, 2021); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Dec. 8, 2021); *In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. D. Del. Sept. 15, 2021); *In re Nine Point Energy, LLC*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 20, 2021); *In re HighPoint Res. Corp.*, No. 21-10565 (CSS) (Bankr. D. Del. Apr. 13, 2021); *In re Mallinckrodt plc*, No. 20-12522 (JTD) (Bankr. D. Del. Nov. 19, 2020); *In re RGN-*

2

*Grp. Holdings, LLC*, No. 20-11961 (BLS) (Bankr. D. Del. Sept. 15, 2020); *In re Skillsoft Corp.*, No. 20-11532 (MFW) (Bankr. D. Del. July 23, 2020); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 3, 2020); *In re Bumble Bee Parent, Inc.*, No. 19-12505 (LSS) (Bankr. D. Del. Dec. 26, 2019); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 1, 2019; *In re David's Bridal,* No. 18-12635 (LSS) (Bankr. D. Del. Dec. 18, 2018); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018); *In re Am. Tire Distribs.*, No. 18-12221 (KJC) (Bankr. D. Del. Nov. 1, 2018); *In re The Bon-Ton Stores, Inc.,* No. 18-10248 (MFW) (Bankr. D. Del. Mar. 6, 2018; *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 20, 2018); and *In re Prospector Offshore Drilling S.à r.l.*, No. 17-11572 (CSS) (Bankr. D. Del. Oct. 2, 2017).

      5.      On the date hereof (the "**Petition Date**"), the Debtors commenced with this court (the "**Bankruptcy Court**") voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and the Debtors' books and records, information provided to me by the Debtors, or advisors to the Debtors, and/or my opinion based upon my experience, knowledge, and information concerning the Debtors and the small-business loan-originating and servicing industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

      6.      I submit this Declaration to apprise the Bankruptcy Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases and in

support of the motions and applications that the Debtors have filed with the Bankruptcy Court,

including the "first-day pleadings" (the "**First-Day Pleadings**").[2]

7.      This Declaration is divided into five sections:

(a)     <u>Section I</u> provides an overview of the Debtors and these Chapter 11 Cases;

(b)     <u>Section II</u> describes the Debtors' business, its history, and its current operations;

(c)     <u>Section III</u> summarizes the Debtors' corporate and capital structures;

(d)     <u>Section IV</u> describes the circumstances that led to the commencement of these Chapter 11 Cases; and

(e)     <u>Section V</u> provides a summary of the First-Day Pleadings, the factual bases for the relief requested therein, and other information related to these Chapter 11 Cases.

8.      The Debtors have requested various relief in the First-Day Pleadings to ensure uninterrupted business operations throughout the Chapter 11 Cases. I am familiar with the contents of each First-Day Pleading, and I believe the relief sought therein is necessary to enable the Debtors to effectuate a seamless transition into and out of these Chapter 11 Cases. I further believe that the relief requested in the First-Day Pleadings will preserve the value of the Debtors' estates and therefore maximize value for all parties in interest.

## I.      <u>PRELIMINARY OVERVIEW</u>

9.      The Company, an online loan servicer founded in 2008, is in the process of winding down its business after the sale of substantially all of its assets to affiliates of American Express ("**AmEx**") in October 2020 (the "**AmEx Transaction**"),[3] and now files these Chapter 11

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the respective First-Day Pleadings.

[3] The legacy entities remaining after the close of the AmEx Transaction are the Debtors in these Chapter 11 Cases. Notably, no directors or executive officers remain today from the pre-sale entity, and an entirely new leadership

Cases to implement the wind down of these businesses pursuant to a chapter 11 plan and the Bankruptcy Code.  Following the AmEx Transaction, the Company's business solely consists of servicing its loan portfolio, which, as of the Petition Date, contains (a) loans issued to small businesses under the Paycheck Protection Program (the "**PPP**" and the loans provided thereunder, the "**PPP Loans**") during the height of this country's public health and economic crisis caused by COVID-19, with an aggregate outstanding principal amount of approximately $1.3 billion, and (b) a relatively small portfolio of non-PPP small business loans (the "**Legacy Loans**" and, together with the PPP Loans, the "**Loan Portfolio**"), with an aggregate outstanding principal amount of approximately $17 million. The loans in the Loan Portfolio are scheduled to mature by 2026.

10.     With over a decade of experience building and operating a sophisticated online platform to lend to, and service loans for, small- and mid-sized businesses, the Company was uniquely positioned to fulfill the U.S. government's urgent need to quickly distribute billions of dollars of aid to small businesses during the pandemic.  Indeed, the Company was an established lender for small businesses for years before getting involved in the PPP.  The U.S. Small Business Administration (the "**SBA**") launched the PPP in April 2020 shortly after the U.S. government's initial directive under the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**") to distribute emergency funds to small businesses.  The SBA needed lending partners for the PPP and the Company, with a proven track record and experience with the exact target demographic, provided an optimal pairing.

11.     The Company became an authorized PPP lender pursuant to an agreement with the SBA on April 9, 2020.  Like similarly situated participating institutions, the Company

---

team and board, including independent directors, is in place today.  As used herein, the "**Company**" shall refer to either the pre-sale or post-sale entity, as applicable.

was willing to participate in the PPP because of two very important features of the program. Specifically, the PPP requires the SBA to (a) forgive PPP Loan amounts that borrowers have spent on payroll and other eligible expenses ("**Loan Forgiveness**"), and (b) fully guarantee PPP Loans and purchase them upon certain borrower delinquency events—including borrower nonpayment ("**Guaranty Purchase**").  The Company and other lenders were also inclined to participate in the PPP because the SBA made it abundantly clear that a relaxed underwriting process was to be applied and, so long as the process guidelines were adhered to, the lenders would have no liability. The Company would not have participated in the PPP absent the "minimal review" involved in processing PPP Loan applications, each lender's ability to rely on borrower certifications and representations, the express written assurances from the SBA that the U.S. government will not challenge action by PPP lenders that conform to the SBA's guidance, and the SBA's Guaranty Purchase obligation—all of which mitigated the risks attendant in quickly processing loan applications and distributing funds in furtherance of the government's mandate.

12.    In committing to partner with the SBA and participate in the PPP, the Company restructured its lending platform and developed new automated systems to expeditiously collect, analyze, verify, and approve PPP Loan applications consistent with the U.S. government's public mandate to quickly get funds in the hands of borrowers in the midst of a pandemic.  The new system allowed the Company to execute the SBA's minimal underwriting process which was expressly limited to: (a) confirming receipt of borrower certifications; (b) confirming receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020; (c) confirming the dollar amount of average monthly payroll costs; and (d) following applicable Bank Secrecy Act requirements (collectively, "**Borrower Diligence**").  From April 2020 to September 2021, the Company delivered more than

$7 billion in PPP Loan funds to more than 300,000 borrowers, making it the second largest PPP lender in the nation by application volume.[4]

13.    Unequivocally, the Company provided a lifeline to small businesses, sole proprietors, and non-employer firms that historically have had difficulty accessing capital, and for which such access was made even more challenging during the COVID-19 pandemic. Unlike institutional lenders and other servicers that limited PPP relief to existing borrowers (or marginally participated in the PPP because of the relatively nominal fees associated with originating or servicing PPP loans and the low interest rate of PPP Loans, among other reasons),[5] approximately 98 percent of the Company's PPP Loans consisted of borrowers without an existing relationship with the Company.  Despite constantly changing rules and guidance from the SBA in the midst of a global pandemic, the Company met the SBA and U.S. government's demands to distribute the emergency relief as quickly and widely as possible to eligible borrowers. As the nation witnessed the disastrous impact of COVID-19, the Company was instrumental in getting necessary funds to small businesses as quickly as the SBA desired and as a result preserved hundreds of thousands of jobs.

14.    Of the over $7 billion of PPP Loans the Company originated, as of the Petition Date, the Company has successfully serviced approximately 80 percent, by aggregate principal amount; meaning, borrowers either repaid their respective PPP Loans, Loan Forgiveness

---

[4]  The Company participated in the first two rounds of the PPP.  The first round of the PPP, each of which occurred in response to Congress's decision to increase the amount of funds available to provide necessary relief to small businesses.  The first round of the PPP will be referred herein as "**Round 1**".  The second round of the PPP will be referred herein as "**Round 2**".

[5]  The SBA paid lenders the following fees for processing PPP Loans: five percent for PPP Loans of not more than $350,000; three percent for PPP Loans of more than $350,000 and less than $2,000,000; and one percent for PPP Loans of at least $2,000,000.  The interest rate on PPP Loans is one percent.  Lenders were not otherwise allowed to collect any fees from borrowers.

applications were successfully processed, or the PPP lenders were otherwise paid through Guaranty Purchase. As of September 30, 2022, the Company's Loan Portfolio contains approximately 48,000 PPP Loans with an aggregate outstanding principal amount of approximately $1.3 billion.  Although the successful processing of over 270,000 PPP Loans by a new management team and the materially leaner workforce put in place following the AmEx Transaction is a testament to the Company's capabilities and good faith participation in the PPP, processing the remaining PPP Loans has presented a number of challenges for the Company, particularly in light of the extreme administrative  and cost burden placed on the Company due to issues discussed herein.

15.    Initially heralded for staving off the potentially deleterious effects of COVID-19 health measures on small businesses, the now-concluded PPP faces scrutiny due to lender confusion with deciphering unclear and frequently-evolving SBA guidance, or lack thereof, limited information technology systems, and incidents of borrower misrepresentations.  To varying degrees, PPP lenders encountered challenges with, among other things, (a) discrepancies in borrower-submitted data, (b) difficulties in accounting for federal, state, and local taxes when calculating a borrower's overall payroll costs—which in turn determines the maximum allowable loan amount (the "**SALT Issue**"), (c) delayed processing of Loan Forgiveness and Guaranty Purchase applications currently held in abeyance due to being identified by the SBA, the U.S. Department of Justice, or loan servicers for potential borrower fraud prior to the scheduled maturity date, and (d) failures with the SBA's electronic application system, E-Tran, in tracking and assigning loan numbers to each PPP Loan as a means to avoid the issuance of duplicate loans (the "**E-Tran Issue**").  Although limited to a relatively small fraction of the population of the

overall PPP Loans it has serviced, the Company is confronted with many of these same challenges experienced by other lenders that participated in the PPP.

16.     In addition to the operational hurdles in processing the balance of its Loan Portfolio, the Company is currently embroiled in a number of discussions and disputes related to its participation in the PPP—nearly all of which are vigorously disputed by the Company—including, but not limited to:  (a) investigations by the Department of Justice offices in the District of Massachusetts (the "**MA DOJ**") and the Eastern District of Texas (the "**Texas DOJ**" and together with the MA DOJ, the "**DOJ**"), the United States House of Representatives Select Subcommittee on the Coronavirus Crisis (the "**Congressional Subcommittee**"), and the Federal Trade Commission (the "**FTC**") into the Company's PPP Loan program; (b) allegations by the SBA that the Company should be held liable for any loan amounts paid to borrowers that were in excess of what they were statutorily entitled to receive and that the SBA's Guaranty Purchase obligation would not apply to certain PPP Loans and/or excess loan amounts;[6] (c) a dispute between the Company and Customers Bank ("**CUBI**"), one of the two lenders the Company services PPP Loans on behalf of, in connection with the Company's demand for CUBI to remit approximately $65 million in loan referral and servicing fees contractually owed to the Company before the Company commenced providing services and which remains unpaid, and CUBI's allegations that the Company – despite not being paid the funds to perform its service obligations – failed to service CUBI's PPP Loans in adherence to certain PPP guidelines; (d) allegations by Cross River Bank ("**CRB**" and, together with CUBI the "**Partner Banks**"), the other lender the Company services PPP Loans on behalf of, that the Company did not adhere to certain PPP

---

[6] Generally, the PPP caps the loan amount at 2.5 times a borrower's monthly payroll and caps eligible salaries at $100,000 per employee.  Any amounts disbursed over this statutory cap is referred to as an "excess loan amount."

9

guidelines; (e) allegations by the Partner Banks that loan numbers the SBA produced but later deleted or re-assigned without knowledge of the Company are liabilities of the Company; (f) a class action lawsuit filed by certain PPP borrowers alleging that the Company did not properly process Loan Forgiveness applications; and (g) AmEx's refusal to honor its obligations under a Transition Services Agreement (the "**AmEx TSA**") between the Company and AmEx entered into in connection with the AmEx Transaction, which has affected the Company's ability to perform a number operational functions (collectively, the "**Disputes**").[7]

17.    Despite adherence to express SBA guidance, the Company is embroiled in government investigations, litigations, and stakeholder disputes related to the PPP program. The hindsight investigations and misdirected scrutiny severely hamper the Company's ability to accomplish its mission of servicing the balance of the PPP Loans in its Loan Portfolio and have caused significant additional costs to winding down its business. The overall impact of the Disputes on the Company's operations is compounded by the Company's limited go-forward cash flows,[8] inability to originate any new loans due to non-compete covenants contained in documentation associated with the AmEx Transaction, inability to obtain certain accommodations needed to address the expiration of applicable Loan Forgiveness and Guaranty Purchase

---

[7] The Company's board of directors (the "**Board**"), with the assistance of the Company's restructuring counsel, Weil, Gotshal & Manges LLP ("**Weil**"), has been reviewing the AmEx Transaction to evaluate whether there any viable causes of action with respect to the AmEx Transaction. Postpetition, the Board will continue to review the AmEx Transaction and determine appropriate action with respect thereto.

[8] The Company received all of its servicing fees for the Partner Bank PPP Loans as a percentage of loan principal at or near the time of origination, with the exception of certain outstanding receivables from CUBI, as discussed herein. The Company's sole remaining sources of cash flow are the interest received on its Pledged PPPLF Loans and the principal and interest received on its KS PPP Loans and Legacy Loans, which collectively are insufficient to support the Company's ongoing operations.

application deadlines that can only be granted by the SBA,[9] and a substantially new workforce in place following the AmEx Transaction that has limited firsthand knowledge of the Company's legacy operations.

18.    Prior to commencing these Chapter 11 Cases, the Debtors, led by a new management team and board that were put in place at various times following the AmEx Transaction, expended substantial time addressing information requests and subpoena demands, engaged with all stakeholders party to a Dispute in an attempt to reach workable resolutions, settled the SALT Issue with the SBA for $30 million in 2021, and allocated millions of dollars of its finite working capital to engage various professionals to address DOJ and SBA concerns of the Company's loan approval practices. Despite the Debtors' best efforts, nearly all of the Disputes remain pending and the Debtors forecast that given their limited resources (the Debtors have approximately $11 million of unrestricted cash on-hand) they will be unable to service their remaining Loan Portfolio until the latest maturity, which occurs in 2026.

19.    With limited options, the Debtors have engaged in good faith negotiations with their constituents prior to filing these Chapter 11 Cases and have filed a chapter 11 plan contemporaneously herewith that addresses two potential scenarios.  First, the proposed chapter 11 plan provides for the servicing of the Loan Portfolio throughout the Chapter 11 Cases in the following ways and at the option of each of the Partner Banks and the Federal Reserve Bank of San Francisco (the "**Federal Reserve**"):  (a) the Company continues to service the remaining Loan Portfolio after the plan effective date, but with each applicable Partner Bank and the Federal Reserve paying post-effective date servicing costs; or (b) the Company and each applicable Partner

---

[9] The deadline to submit a Loan Forgiveness application is the maturity date of the loan.  Further, the SBA is not obligated to honor the Guaranty Purchase if a PPP lender does not apply within 180 days following maturity.  Loan maturities can be extended with cooperation from the SBA.

11

Bank and the Federal Reserve work cooperatively to transfer after the plan effective date servicing to a third-party loan servicer, including contribution and payment of transfer costs by the Partner Banks and the Federal Reserve, as applicable.  Alternatively, the proposed chapter 11 plan provides that if the Debtors are unsuccessful in securing funding through negotiations with the Federal Reserve and CUBI in the early days of the Chapter 11 Cases, and thus are unable to service the Loan Portfolio for the duration of the Chapter 11 Cases, the Debtors' proposed chapter 11 plan provides for (a) the rejection of the servicing agreements with the Partner Banks, and (b) servicing its PPPLF Portfolio (as defined below), and on the contemplated plan effective date, the Debtors will transfer the PPPLF Collateral (as defined below) to the Federal Reserve in satisfaction of its claims under the PPPLF Documents (as defined below).  Notably, at the time of filing these Chapter 11 Cases, the Debtors were quite close to an agreement with the Federal Reserve, and discussions with CUBI had progressed significantly in the days leading up to filing these Chapter 11 Cases.  Further, in both scenarios, any costs associated with the transfer of servicing obligations will not be borne by the Debtors, and the Debtors will make commercially reasonable efforts to assist the Partner Banks and the Federal Reserve, as applicable, with such transfer of the Debtors' servicing obligations to a third-party loan servicer prior to the applicable transfer date.

20.     As noted above, the Debtors, an experienced lender to small businesses before the launch of the PPP, successfully distributed billions of dollars to the vulnerable population of small businesses with the expediency desired by the SBA, and as a result saved hundreds of thousands of businesses and jobs. The Debtors relied on the SBA underwriting guidelines and the Guaranty Purchase, among other things, to support their decision to participate in the PPP.  Nevertheless, the Debtors find themselves the target of hindsight investigations and scrutiny which threaten their ability to accomplish the PPP mission.  Given the Debtors' financial

12

distress, they are utilizing the bankruptcy process to obtain a respite from having to constantly defend against the Disputes, to provide a single forum to address the Disputes, and to hopefully emerge in a position to complete their wind down efforts for the benefit of tens of thousands of remaining borrowers and the Debtors' stakeholders that provided those loans to the borrowers.

## II.    THE DEBTORS' BUSINESS

### A.    The Debtors' Legacy Business[10]

21.    The Company began as an online lending platform for small businesses in 2008, using machine-learning algorithms, data from public profiles, and other factors to quickly and efficiently evaluate the financial health of loan applicants, significantly shortening loan approval and disbursement processes as compared to traditional banks.  Over the years, the Company added several lines of business, providing, among other things, access to flexible lines of credit, business checking accounts, online bill payment, cash flow visualization tools, and e-gift certificates through its website and app.  In October 2020, AmEx acquired a substantial majority of the Company's business for approximately $750 million.[11]  The AmEx Transaction specifically excluded a small portfolio of Legacy Loans and the Company's PPP business.  Today, all Legacy Loans the Company services are owned by Celtic Bank ("**Celtic**")  and governed by the Legacy Loan Agreement.[12] As of September 30, 2022, there were approximately 3,400 Legacy Loans

---

[10] The Company historically operated its legacy business through KServicing and each of the other Debtor entities.  As of the Petition Date, KServicing is the only entity with legacy operations remaining.  The other Debtor entities had various purposes, including loan securitization vehicles, or were otherwise formed but never conducted business.

[11] Approximately $38 million of the purchase price is currently held in escrow (the "**AmEx Escrow Fund**") for the benefit of the selling shareholders and, to the Debtors' knowledge, remains subject to certain unresolved claims by AmEx under the documents related to the AmEx Transaction.

[12] "**Legacy Loan Agreement**" means the *Program Management Agreement*, dated March 20, 2014, by and between Kabbage and Celtic, as amended.

remaining in the Loan Portfolio with approximately $17 million in aggregate outstanding principal amount.

22.    As a non-Federal Deposit Insurance Corporation insured financial institution, the Company partnered with Celtic in an arrangement whereby:  the Company processed Legacy Loan borrower applications, funded the Legacy Loans through the purchase of participation interests in loan receivables (the "**Participation Interests**")—effectively acquiring the rights to retain borrower principal and interest payments, with Celtic remaining as the lender of record—and subsequently serviced the Legacy Loans.[13]  The Company's servicing obligations involved marketing the Legacy Loans and conducting diligence on loan applicants to ensure compliance with Celtic's screening procedures.  On account of the services rendered, the Company earned a fee calculated as a percentage of the principal amount of the underlying Legacy Loan upon origination (the "**KS Legacy Fee**").  Instead of collecting the servicing fee upfront, the fees were set off against the Participation Interest fees (the "**Celtic Legacy Fee**") that the Company paid to Celtic in connection with its purchase of Participation Interests.  On a monthly basis, if the KS Legacy Fees exceeded the Celtic Legacy Fees, Celtic would remit the net amount to the Company.  If the Celtic Legacy Fees exceeded the KS Legacy Fees, the Company would remit the net amount to Celtic.[14]

23.    As of the Petition Date, all such marketing fees, servicing fees, and monthly premiums have been paid, loans are no longer being originated pursuant to the Legacy Loan Agreement, and the Company is no longer purchasing Participation Interests from Celtic.

---

[13] Following the purchase of Participation Interests under the Legacy Loan Agreement, the Company sold certain of the Participation Interests to third parties.  The Company continues to service these loans and receives servicing fees on a monthly basis.

[14] All KS Legacy Fees and Celtic Legacy Fees have been paid.  Therefore, these monthly remittances no longer occur.

14

Amounts collected from the Participation Interests accounted for 70 percent of the Company's year-to-date cash flow[15] through September 30, 2022, but that percentage is set to significantly decline as borrowers pay down their loans and the loans mature on a rolling basis. The Company's sole source of continuing cash flow from the Legacy Loan Portfolio is the Legacy Loan receivables that the Company retains on account of its Participation Interests. As collateral security for the Company's remaining servicing obligations under the Legacy Loan Agreement, Celtic currently holds approximately $2 million in an escrow account, the remaining amount of which Celtic is obligated to remit to the Company within five business days of the termination of the Legacy Loan Agreement.

### B.    The Debtors' PPP Business

24.    Responding to the country's desperate need for private lenders to participate in the PPP, the Company partnered with the SBA to originate and service PPP Loans. The Company's participation in the PPP can be separated into three distinct categories:

(a)    PPP Loans that the Company originated and pledged to the Federal Reserve's Paycheck Protection Program Liquidity Facility (the "**PPPLF**," the portfolio of loans, the "**PPPLF Portfolio**," and the loans thereunder, the "**Pledged PPP Loans**");

(b)    PPP Loans owned by the Partner Banks, which the Company services for the Partner Banks (the "**Partner Bank Portfolio**" and the loans thereunder, the "**Partner Bank Loans**"); and

(c)    PPP Loans originated, funded, and serviced by the Company for its own account (the "**KS PPP Portfolio**" and the loans thereunder, the "**KS PPP Loans**").

25.    The following table summarizes the Company's PPP participation for each of its PPP Loan portfolios and the approximate outstanding amounts. As of September 30, 2022,

---

[15] As used herein, "cash flow" does not include amounts that the Company collects and subsequently remits to third parties.

only 20 percent of the Company's Round 1 PPP Loans and 8 percent of the Company's Round 2

PPP Loans, by aggregate outstanding principal amount, remain outstanding.

| PPP Loan Summary* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | PPP Loans at Origination | | | | PPP Loans Outstanding | | |
| | Round 1 | Round 2 | Total | | Round 1 | Round 2 | Total |
| **Pledged PPPLF** | | | | | | | |
| Principal | $1,519 M | $104 M | $1,623 M | | $534 M | $8 M | $541 M |
| Loan Count | 86,000 | 11,000 | 97,000 | | 21,000 | 1,000 | 22,000 |
| **CUBI** | | | | | | | |
| Principal | $1,767 M | $818 M | $2,585 M | | $111 M | $70 M | $181 M |
| Loan Count | 58,000 | 41,000 | 99,000 | | 3,000 | 4,000 | 7,000 |
| **CRB** | | | | | | | |
| Principal | $3,048 M | - | $3,048 M | | $604 M | - | $604 M |
| Loan Count | 122,000 | - | 122,000 | | 20,000 | - | 20,000 |
| **KS PPP** | | | | | | | |
| Principal | $9 M | $ <1 M | $9 M | | $2 M | $ <1 M | $2 M |
| Loan Count | < 1,000 | < 1,000 | < 1,000 | | < 1,000 | < 1,000 | < 1,000 |
| **Total** | | | | | | | |
| **Principal** | **$6,343 M** | **$923 M** | **$7,266 M** | | **$ 1,250 M** | **$78 M** | **$1,328 M** |
| **Loan Count** | **267,000** | **52,000** | **319,000** | | **44,000** | **4,000** | **48,000** |

\* Principal amounts are rounded to the nearest million and loan counts are rounded to the nearest
   thousand.

26.     The following table summarizes Loan Forgiveness and Guaranty Purchase statuses of the PPP Loans in the Company's Loan Portfolio according to the Company's records, as of September 30, 2022.

| Completed Loan Processing to Date* | | | |
|---|---|---|---|
| | **Total Origination Principal and Loan Count** | **Forgiven or Guaranty Purchased Loans** | **Percentage Forgiven or Guaranty Purchased** |
| **Pledged PPPLF** | | | |
| Principal | $1,623 M | $1,011 M | 62.3% |
| Loan Count | 97,000 | 74,000 | 76.3% |
| **CUBI** | | | |
| Principal | $2,585 M | $2,342 M | 90.6% |
| Loan Count | 99,000 | 91,000 | 91.5% |
| **CRB** | | | |
| Principal | $3,048 M | $2,328 M | 76.4% |
| Loan Count | 122,000 | 99,000 | 81.1% |
| **KS PPP** | | | |
| Principal | $9 M | $ <1 M | 5.0% |
| Loan Count | < 1,000 | < 1,000 | 11.7% |
| **Total[16]** | | | |
| **Principal** | **$7,266 M** | **$5,682 M** | **78.2%** |
| **Loan Count** | **319,000** | **264,000** | **82.8%** |

* Principal amounts are rounded to the nearest million and loan counts are rounded to the nearest thousand.

27.     On April 9, 2020, to support the effectiveness of the PPP, the Board of Governors of the Federal Reserve System, with the concurrence of the U.S. Treasury, authorized the establishment of the PPPLF, pursuant to which PPP-eligible lenders could enter into agreements with the Federal Reserve to obtain funding for PPP Loans.  To obtain PPPLF financing, the Company entered into the *Paycheck Protection Program Liquidity Facility Letters of Agreement* (the "**PPPLF Letter Agreement**"), dated May 12, 2020 and amended as of January

---

[16] Approximately $256 million of the principal from the "Total Origination Principal and Loan Count Column" has been reduced on account of borrower payments of principal in the ordinary course.

17

14, 2021, with the Federal Reserve.  The PPPLF Letter Agreement incorporates the *Federal Reserve Banks Operating Circular No. 10*, dated July 16, 2013 (the "**Operating Circular**," and together with the PPPLF Letter Agreement, the "**PPPLF Documents**"), which sets forth the universal terms and conditions for any party who obtained advances from, incurred liabilities to, or pledged collateral to, the Federal Reserve, and includes terms such as advance payment mechanics, requirements for collateral, and maintenance of lending documents.

28.     Under the PPPLF Documents, the Company was authorized to request advances (the "**PPPLF Advances**") from the Federal Reserve that were secured by certain PPP Loans originated by the Company.  Pursuant to the PPPLF Documents, the PPPLF Advances are fully secured by the underlying PPP Loans that the Company originated using funding from the PPPLF (the "**PPPLF Collateral**"), and mature on the respective maturity dates of the pledged PPP Loans.  Historically, the Company repaid the PPPLF Advances by making weekly remittances to the Federal Reserve for all payments received on account of the Pledged PPPLF Loans, including borrower payments and payments received from the SBA on account of Loan Forgiveness and Guaranty Purchase, including the 0.35 percent of interest per annum on the Pledged PPPLF Loans received from the SBA, but not including the remaining 0.65 percent of interest per annum on the Pledged PPPLF Loans received from the SBA.  The Federal Reserve has asserted that various defaults have occurred under the PPPLF Documents and memorialized its position in a correspondence sent to the Company on October 1, 2022 (the "**Default Notice**").

29.     In September 2022, pursuant to its rights under the PPPLF Documents, the Federal Reserve initiated a change in the remittance procedures whereby the SBA will begin making payments on the Pledged PPPLF Loans directly to the Federal Reserve (the "**SBA Direct Payment Processing**").  Although the Debtors and the Federal Reserve initiated the SBA Direct

Payment Processing prepetition, the coordination process remains ongoing with the SBA and the parties are still in the process of documenting an agreement. Once the SBA Direct Payment Processing is in place, the Federal Reserve will receive payments on account of the Pledged PPPLF Loans directly from the SBA, but the Company will still receive and remit borrower payments on account of the Pledged PPPLF Loans to the Federal Reserve. In connection with the SBA Direct Payment Processing, the Company and the Federal Reserve have been in discussions regarding the treatment of the Company's allocation of interest received from the SBA on account of Pledged PPPLF Loans, among other portions of the SBA remittances.

(i)      **The Partner Bank Portfolio**

30.      Between April 2020 and February 2021, the Company entered into various PPP Loan-related agreements with its Partner Banks. While there are nuanced differences in, among other things, how the underlying PPP Loans are originated—some were originated by the Company and sold to the Partner Banks, while others were originated by the Partner Banks— and how servicing fees are calculated, as well as the Company's servicing obligations related to Loan Forgiveness and Guaranty Purchase, the ultimate relationship established between the Company and each of its Partner Banks is fundamentally the same. Under the CUBI Agreements[17] and the CRB Agreements[18] (together, the "**Partner Bank Agreements**"), the Partner Banks funded the PPP Loans and the Company services the loans as described below. On account of the services it provides, the Company was to receive all of its servicing fees at or near the time of origination of

---

[17] "**CUBI Agreements**" means (i) the CUBI Processing and Servicing Agreement, dated April 27, 2020, by and between Kabbage and CUBI (together with its amendments, the "**CUBI PSA**"); (ii) the CUBI Sale and Servicing Agreement, dated February 2, 2021, by and between Kabbage and CUBI (the "**CUBI SAS**"); and (iii) the CUBI SaaS Services Agreement, dated April 24, 2020, by and between Kabbage and CUBI (together with its amendments, the "**CUBI SaaS**").

[18] "**CRB Agreements**" means (i) the CRB Loan Program Agreement, dated April 13, 2020, by and between Kabbage and CRB (together with its amendments, the "**CRB LPA**"); and (ii) the CRB Sale and Servicing Agreement, dated May 6, 2020, by and between Kabbage and CRB (the "**CRB SAS**").

19

the underlying PPP Loan. To date, the Company continues to service the CUBI PPP Loans, and CUBI has not paid approximately $65 million (plus any applicable interest) of loan referral and servicing fees owed to the Company, despite the fact that the Company has processed more than 90 percent of CUBI's PPP Loan portfolio. As of the Petition Date, the Company has set off approximately $34 million from amounts that would be payable to CUBI as reasonable compensation for the Company performing services for which CUBI has not paid.

31.     _Customers Bank_. On April 24, 2020, the Company and CUBI entered into the CUBI SaaS, pursuant to which the Company is obligated to provide SaaS Services to facilitate CUBI's PPP Loan program. Three days later, the Company and CUBI entered into the CUBI PSA, pursuant to which the Company is obligated to: (a) market CUBI's PPP Loan program; (b) provide funding reports to CUBI to facilitate CUBI's origination of PPP Loans (the "**CUBI Originated Loans**"); (c) subservice PPP Loans originated by CUBI; (d) process PPP Loans as CUBI's agent, including performing Borrower Diligence in accordance with the CARES Act and SBA guidelines, assisting borrowers in their submissions for Loan Forgiveness, and assisting CUBI in its submissions for Guaranty Purchase; and (e) submit reports regarding loan-level data and complaints, among other things. On February 2, 2021, the Company and CUBI entered into the CUBI SAS, pursuant to which the Company sold certain PPP Loans it originated (the "**CUBI Sold Loans**," and together with the CUBI Originated Loans, the "**CUBI Loans**") to CUBI and is obligated to subservice those CUBI Sold Loans.

32.     _Cross River Bank_. On April 13, 2020, the Company and CRB entered into the CRB LPA, pursuant to which the Company is obligated to (a) market CRB's PPP Loan program; (b) provide funding reports to CRB to facilitate CRB's origination of PPP Loans; (c) subservice PPP Loans originated by CRB (the "**CRB Originated Loans**"); (d) process PPP Loans

20

as CRB's agent, including performing Borrower Diligence in accordance with the CARES Act and SBA guidelines, assisting borrowers in their submissions for Loan Forgiveness, and assisting CRB in its submissions for Guaranty Purchase; (e) submit reports regarding loan-level data and complaints, among other things; and (f) provide SaaS Services to facilitate CRB's PPP Loan program.  On May 6, 2020, the Company and CRB entered into the *Sale and Servicing Agreement* CRB SAS, pursuant to which the Company sold certain PPP Loans it originated (the "**CRB Sold Loans**," and together with the CRB originated Loans, the "**CRB Loans**") to CRB and is obligated to subservice those loans.

(ii)    **The KS PPP Portfolio**

33.    In addition to the PPPLF Portfolio and Partner Bank Portfolio, the Company originated, funded, and currently services approximately 80 KS PPP Loans with approximately $1.6 million in outstanding loan amount.  The KS PPP Loans makes up less than one percent of the Company's PPP Loans by aggregate outstanding principal amount.

### III.    CORPORATE AND CAPITAL STRUCTURE

A.    **Corporate Structure**

34.    KServicing owns 100% of the ownership interest in each of the other Debtors.  KServicing owns 100% of the ownership interest in Kabbage Financial Services Limited ("**Kabbage UK**"), which owns 99.9% of the ownership interest in Kabbage India Private Limited ("**Kabbage India**").  Kabbage UK and Kabbage India are the only non-Debtor affiliates of the Debtors.  The corporate structure chart, attached hereto as **Exhibit A**, illustrates the Debtors' organizational structure as of the Petition Date.

B.    **Management**

35.    The following table sets forth the names of KServicing's current executive

officers:

| Name | Position |
|------|----------|
| Laquisha Milner | President and CEO |
| David Walker | Interim CFO |
| Donna Evans | Vice President of Operations |
| Holly Loiseau | General Counsel, Chief Compliance Officer, Chief Privacy Officer, Secretary |
| Salim Kafiti | Deputy General Counsel, Assistant Secretary |
| Ian Cox | BSA/AML and OFAC Officer[19] |

C.    **Prepetition Capital Structure**

36.    <u>PPPLF Advances</u>.   The total amount of PPPLF Advances borrowed by

KServicing pursuant to the PPPLF Documents is approximately $1.6 billion.  As of September 30,

2022, approximately $541 million in PPPLF Advances remain outstanding.   KServicing's

obligations under the PPPLF Documents mature on the maturity date of the underlying PPP Loan.

The PPPLF Advances are not guaranteed by any of KServicing's Debtor or non-Debtor affiliates,

although the Federal Reserve also has recourse against the Company under the PPPLF Documents

subject to the terms thereof and as described below.

37.    The PPPLF Advances and all obligations under the PPPLF Documents are

secured in accordance with the PPPLF Documents, pursuant to which the Federal Reserve was

granted first-priority liens on the underlying PPP Loans and all proceeds thereof.  In the event

KServicing fails to repay a PPPLF Advance on the applicable maturity date, the Federal Reserve

must first seek repayment on a non-recourse basis, by realization on the PPPLF Collateral absent

---

[19] "**BSA**" means Bank Secrecy Act.  "**AML**" means Anti-Money Laundering.  "**OFAC**" means the Office of Foreign Assets Control.

a default.  Notably, the Federal Reserve may pursue payment directly from KServicing—if: (a) in its sole discretion the Federal Reserve deems KServicing to have engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance, or (b) KServicing fails to meet any of the requirements of the PPPLF Documents, including, but not limited to, breaches of any representations, warranties, or covenants.  The Federal Reserve has notified KServicing it has determined such events have occurred pursuant to the Default Notice.

38.    <u>Equity Ownership</u>.  As of the Petition Date, the outstanding shares of common stock, par value $0.001 per share, of KServicing (the "**KS Common Stock**") are held (either directly or through subsidiaries or affiliates) as follows:

| Holder | Outstanding KS Common Stock (%) |
|---|---|
| Softbank Vision Fund (AIV M2) L.P. | 14.62% |
| Blue Run Ventures IV, L.P. | 13.60% |
| MDV IX, L.P. | 12.08% |
| Thomvest Ventures Ltd. | 11.47% |
| SoftBank PrinceVille Investments, L.P. | 5.17% |
| Less than 5% holders | 43.06% |
| **Total** | **100%** |

39.    KServicing does not have any other classes of stock outstanding.

**IV.    CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES**

40.    The Debtors are filing these Chapter 11 Cases to implement and complete the wind down of their business, which has been well underway since the October 2020 AmEx Transaction.  The benefits and protections of chapter 11 are critical to achieving the Debtors' goals of maximizing creditor recoveries, providing for an equitable distribution to their stakeholders, and, perhaps most importantly, insulating the good-faith PPP Borrowers from any repercussions of the Disputes—primarily, interruptions to loan servicing—to the greatest extent possible.  Given the Company's finite resources, limited liquidity and revenue generating ability, and numerous

ongoing investigations and related demands, absent a capital injection or significant reduction in operations, the Company cannot sustain its businesses through the duration of the wind down.

A.    **Lack of Clarity in SBA Guidance**

41.    Speed was the watchword of the PPP. Delays in processing and funding loans would undermine the efficacy of the "stay at home" posture that public health authorities believed was the most effective means of slowing the spread of a disease that threatened millions of lives. To induce lenders to make *hundreds of billions* of dollars in unsecured loans to small and mid-size businesses (many of which had ceased operating due to government mandates), the CARES Act provided that all PPP Loans would be backed by a 100% SBA guaranty of repayment, and participating lenders were directed to forego the typical underwriting process, in favor of "minimal review" of PPP Borrower calculations in which lenders (per published SBA guidance) were permitted to rely on PPP Borrower representations, including specific representations as to "amounts required to be excluded" from PPP Borrower calculations of qualifying payroll costs.

42.    However, there was a distinct lack of clarity and guidance from the SBA during the PPP's initial rollout.  New rules and guidance were issued on a near daily basis during the first few months of the PPP Loan Program.  In the first month of the PPP Loan Program, the government published six interim final rules and 42 FAQs.  In the first two months of the program, those numbers increased to 14 interim final rules and 48 FAQs.  Despite this lack of clarity, government officials publicly expressed to participating lenders that time was of the essence with regards to administering loans, at times even asking lenders to process loans to eligible PPP Borrowers on the same day that they applied.  There was no other way to objectively view those facts and circumstances—it was a national emergency.  Under the most difficult of circumstances, the Company processed loan applications in good faith, in accordance with the framework

established by the CARES Act, SBA's PPP implementing regulations, and the SBA's written guidance concerning lender obligations under the PPP.

###### B.    The Disputes

43.    Notwithstanding the Company's compliance with SBA guidance, the Company remains the subject of numerous Disputes, which requires the Company to expend a significant amount of time and resources defending itself across multiple costly fronts.  Such time and resources are finite—the Company already is in wind down, is not originating or processing any new loans, and generates limited cash flow from a dwindling Legacy Loan Portfolio and a subset of its PPP Loans.  The Company is overburdened despite its focus on servicing its remaining Loan Portfolios, ensuring the timeliness of submission of Loan Forgiveness and Guaranty Purchase applications, and prioritizing uninterrupted processing.  In the face of the Disputes, the Company's servicing operations have evolved into a significantly more time intensive and costly enterprise.  For example, submissions to the SBA for Loan Forgiveness or Guaranty Purchase for "excess amounts" has required months of back and forth with the DOJ and the SBA, responding to extensive and burdensome information requests, borrower fraud and suspicious activity analysis, engagement of professionals for review of the Loan Portfolios, and more.  Even then, the issue of "excess amounts" as processed by the SBA remains unresolved.  Further, responding to and participating in the Disputes and defending against false allegations has required expenditure of significant amounts.  Balancing their limited resources with ballooning costs from litigations and investigations—and unable to reach consensual out-of-court resolutions—the Debtors commenced these Chapter 11 Cases to preserve their assets and utilize the protections and tools of chapter 11 to optimize their ability to continue providing services to borrowers and their remaining wind down efforts.

25

44.    <u>The DOJ and the SBA</u>.  On December 28, 2020 and July 11, 2021, the MA DOJ and Texas DOJ, respectively, initiated investigations into whether the Debtors' performance of Borrower Diligence violated the False Claims Act and the Financial Institutions Reform, Recovery, and Enforcement Act.  It is the Company's position that the DOJ's allegations are wholly without merit.

45.    Under the PPP Loan program, a borrower's maximum loan amount was 2.5 times the amount of the Borrower's average monthly payroll costs.  Qualifying payroll costs consisted of employee compensation and payments for certain benefits, among other things, but the CARES Act required exclusion of compensation of an individual employee in excess of an annualized salary of $100,000 prorated for the covered period.  Further, in guidance issued on April 24, 2020, the SBA instructed Borrowers to compute payroll costs by adding 2019 gross wages and tips paid to employees together with fringe benefits, which are excluded from taxable Medicare wages & tips.  Using the Internal Revenue Service Form 940, Box 4 ("**Box 4**") as a guide to calculate these costs complied with such guidelines because virtually all fringe benefits exempt under the Federal Unemployment Tax Act—and thus which an employer would list in Box 4—are also excluded from Medicare tax.[20]

46.    At all times, the Company complied with PPP lending requirements.  With respect to approving loan applications in which the borrower failed to exclude employee compensation in excess of $100,000, the Company was entitled to rely on borrower representations and certifications regarding amounts required to be excluded from the calculation of payroll costs.  Any loan amounts resulting from borrowers' inclusion of individual employee compensation in

---

[20] In addition, given the urgency of getting money in the hands of businesses in need and the deferred tax deadlines passed by Congress in response to the pandemic, the SBA expressly permitted Round 1 PPP lenders to originate PPP Loans based on *draft* tax documents.

26

excess of $100,000 were attributable to the borrowers' failure to follow PPP requirements. Notably, the publicly-reported maximum amount of a PPP Loan for a small business with one employee was $20,833, whereas the average loan amount for PPP Loans processed by the Company was $23,546. Additionally, allowing borrowers to use Form 940, Box 4 in their payroll-cost calculations was a reasonable effort to implement PPP requirements, and was consistent with SBA guidance on calculating loan amounts. The proper and intended manner for the program to deal with excess loan amounts was for lenders to seek identification of excess amounts when borrowers applied for forgiveness, and then collect excess amounts from borrowers with SBA's guaranteed purchase of the excess amount still intact. Requiring more would de facto impose more than "minimal review" requirements on lenders, and transfer risk to them that the PPP rules did not contemplate.

47.    Despite the Company's compliance with SBA guidance, the DOJ is alleging that the Debtors improperly included individuals with compensation of more than $100,000 in its payroll calculations (the "**$100k Issue**"), and failed to exclude ineligible expenses from applicants' Box 4 submissions in making PPP Loan eligibility determinations (the "**Form 940 Issue**").[21]  The DOJ flagged approximately 6,200 loans totaling $120 million of principal amount in connection with the $100k Issue and Form 940 Issue (the "**DOJ-Flagged Loans**") and instructed the Company not to process those loans for Loan Forgiveness. Further, in response to the DOJ's allegations, the SBA stopped processing Loan Forgiveness for DOJ-Flagged Loans, with little indication of when or under what circumstances processing would resume. The Company was not permitted to discuss these investigations with

---

[21] The DOJ has also alleged that the Company improperly counted state and local taxes twice in calculating payroll costs, resulting in additional excess loan amounts. As noted previously, the DOJ elected not to participate in the SALT Settlement between the Company and the SBA on October 25, 2021.

concerned borrowers, who became increasingly frustrated and brought escalations and claims against the Company.  Only recently—after weeks of discussions with the Company, shared documentation, and analysis—did the SBA provide the Company with the clarity needed to submit DOJ-Flagged Loans for Loan Forgiveness and Guaranty Purchase.  Importantly, the SBA has communicated to the Company, that, at this time, it will not guarantee any excess loan amounts stemming from the $100k Issue or the Form 940 Issue; therefore, the fate of these amounts, the Company, and the Partner Banks and the Federal Reserve remain in limbo until such a time as the SBA makes clear its final position with respect to the excess loan amounts, and it appears the SBA is deferring to the DOJ in many respects as the DOJ investigation continues.

48.    <u>SALT Issue</u>.  In 2021, the Company was engaged in extensive discussions with the SBA regarding approximately 53,000 PPP Loans processed by the Company on its behalf and on behalf of the Partner Banks that may have been originated in amounts involving duplicate counting of state and local income taxes.  The duplicate calculation resulted in borrowers receiving PPP Loans in excess of the maximum amount they were eligible to receive under the program rules.  Any such error also potentially resulted in the Company and/or the Partner Banks collecting processing fees from the SBA that were in excess of amounts that should have been paid.  On May 3, 2021, the SBA and the Company entered into an interim voluntary agreement related to the SALT Issue.  For approximately three  months, while the SBA and the Company discussed the SALT Issue, and the Company engaged an independent third-party to assess the reasonableness of the Company's methodology in identifying the potentially affected loans, the SBA took unilateral action and paused Loan Forgiveness processing for the Company's entire PPP Loan portfolio.  The SBA paused Loan Forgiveness processing on 53,000 PPP Loans for an additional five months.  On October 25, 2021, the Company and the SBA entered into a final settlement agreement in

resolution of the SALT Issue (the "**SBA SALT Settlement Agreement**") and pursuant to which the Company paid the SBA $30 million (the "**SBA SALT Settlement Amount**") and, in exchange, the SBA resumed Loan Forgiveness processing for all PPP Loans in the Company's Loan Portfolio, which ensured that borrowers would not be further impacted.[22]  Payment of the SBA SALT Settlement Amount significantly impacted the Company's already dwindling liquidity.[23] Further, despite a degree of involvement in discussions regarding the SALT Issue and the ultimate resolution reached with the SBA – including payment of the SBA SALT Settlement Amount, the DOJ has subsequently alleged claims against the Company under the False Claims Act on account of the same SALT Issue.

49.    <u>Conflicting Agency Positions</u>.    As maturity dates for certain of the Company's 24-month PPP Loans approached, the Company found itself in the untenable position of addressing the deadline for Pledged PPPLF Loan repayment obligations, which the Federal Reserve has not extended, for loans where the Company had yet to receive funds from the borrower in satisfaction of the outstanding amount due or payment from the SBA due to its Guaranty Purchase obligations.  The implicated Pledged PPPLF Loans were generally delayed in processing because either the DOJ/SBA directed that such loans not be processed, or the Company needed additional time to address SBA issued "hold codes" placed on the applicable forgiveness or guaranty purchasing applications to the extent the SBA's automated screening tool identified the borrower as potentially being ineligible for the loan (or the loan amount) it received.  Failure to

---

[22] The Partner Banks did not contribute settlement amounts.  The Partner Banks did not incur any direct liability on the SALT Issue once the PPP Loans were cleared for full processing.

[23] To address Pledged PPPLF Loans affected by the SALT Issue, the Company paid the Federal Reserve the full amount outstanding under such loans without regard for any excess amounts. Any payments thereafter received by the Company on account of borrower repayment or through the SBA Guaranty Purchase have been retained by the Company to satisfy recoupment of the amounts paid to the Federal Reserve.

pay the outstanding PPPLF obligations by the maturity date was a default under the PPPLF Documents.  Despite the need for accommodations to be made such that PPPLF maturities reflect the delay in SBA processing of Pledged PPPLF Loans, this did not occur.  In certain instances the Debtors advanced millions of dollars of their own funds to satisfy amounts due on PPPLF obligations to avoid defaulting under the PPPLF Documents and to provide borrowers with a bridge in time so that they may address their respective loan obligations through self-payment, loan forgiveness or the SBA paying under its Guaranty Purchase obligation. The Company found itself in the middle of conflicting agency positions which resulted in adverse consequences to its already depleting liquidity and its ability to serve borrowers.

50.    <u>Congressional Subcommittee Investigation</u>.    On May 27, 2021, the Congressional Subcommittee notified the Company that it was investigating potential waste, fraud, and abuse in connection with the PPP Loan program.  The Congressional Subcommittee requests extensive document production, including documents and policies related to the Company's PPP Loan program, training materials provided to employees and contractors, and communications concerning potential fraud or other financial crime related to PPP Loans, among other things.  The Company is producing these documents on a rolling basis and continues to communicate with the Congressional Subcommittee regularly.

51.    <u>Federal Trade Commission Investigation</u>.    On February 8, 2021, the Company received a Civil Investigative Demand (a "**CID Letter**") from the FTC alleging that the Company engaged in deceptive and/or unfair acts or practices under the Federal Trade Commission Act and the COVID-19 Consumer Protection Act in connection with the Company's advertising, marketing, underwriting, originating, and servicing of PPP Loans.  In the CID Letter, the FTC requested that the Company produce, among other things, PPP Loan statistics and

Borrower information, technical errors detected in the Company's PPP Loan platform, and descriptions of the Company's PPP Loan policies, among other things.  As of September 7, 2022, the Company has produced approximately 32,000 documents to the FTC and is undertaking a privilege review of approximately 17,000 additional documents.  The Company is continuing to communicate with the FTC and producing documents on a rolling basis.

52.    <u>Customers Bank</u>.    From April 2020 to May 2021, CUBI funded or originated over $2.6 billion in loans through its arrangements with the Debtors, generating tens of millions of dollars in fees payable to the Debtors under the CUBI Agreements, including approximately $65 million in loan referral and servicing fees (the "**CUBI Receivable**") in connection with Round 2 PPP Loans.  CUBI's withholding of the CUBI Receivable for over 20 months has caused a significant financial strain on the Company.  In response, as of September 30, 2022 the Debtors withheld certain payments due to CUBI in the amount of approximately $34 million (the "**KServicing Withholding**") to offset the CUBI Receivable (all of the foregoing, the "**CUBI Dispute**").  The Company has already expended a significant amount of its depleted resources in addressing the CUBI Dispute, increasing the servicing costs associated with the CUBI Loans.

53.    On May 25, 2022, the Company filed a complaint in the United States District Court for the Northern District of Georgia, Atlanta Division (the "**Georgia Action**"), alleging breach of contract under the CUBI Agreements for CUBI's withholding of the CUBI Receivable.  On August 16, 2022, the Debtors and CUBI held a mediation in an effort to resolve the CUBI Dispute.

54.    After months of negotiations, CUBI and the Company are still discussing terms of a potential settlement, which would bring much needed cash flow to the Company and

31

put the Debtors in a position to pursue a more consensual plan confirmation process, as described in more detail herein.

55.    <u>Cross River Bank</u>.  In correspondence beginning August 12, 2022, CRB has asserted various contractual claims under the CRB Agreements, including repurchase obligations and a right to indemnification under the CRB SAS, and a right to indemnification and remediation and or/restitution under the CRB LPA.  In addition, CRB has requested that the Company provide sufficient data to identify 100k Loans and Form 940 Loans (as defined herein), and assurances that the Company will be able to meet its obligations to CRB.  In response, the Company has provided the requested information and explained its position that repurchase obligations were not triggered and the Company does not owe any indemnification, remediation, or restitution under the CRB Agreements.  The Company has already expended a significant amount of its depleted resources in responding to CRB's allegations and document requests, increasing the servicing costs associated with the CRB Loans.  Nevertheless, the Company plans to continue discussions with CRB in an effort to reach a consensual resolution of CRB's demands.

56.    <u>Borrower Class Action Lawsuit</u>.  On March 20, 2022, named plaintiffs Jason Carr, Vicki LeMaster, Edward Ford Services LLC, Carlton Morgan, 365 Sun LLC, and Candice Worthy (the "**Class Action Plaintiffs**") filed a class action complaint (the "**Class Action Complaint**") against the Company in the Georgia District Court, alleging that the Company failed to timely and competently process Loan Forgiveness applications on behalf of Borrowers.  The Class Action Complaint seeks injunctive relief directing the Company to review and process Loan Forgiveness in accordance with SBA regulations, disgorgement of PPP Loan origination fees on theories of unjust enrichment, and damages in accordance with state consumer protection statutes.  On May 31, 2022, the Company moved to dismiss the class action

in its entirety on the basis that the Class Action Plaintiffs did not allege facts sufficient to establish legal claims against the Company and also that private individuals do not have standing to pursue the alleged causes of action.[24]   This motion has been fully briefed and the parties are awaiting decision from the Georgia District Court.  The Company has cooperated with all required initial disclosures.

57.    American Express.  To further exacerbate the aforementioned difficulties, the Company has experienced significant operational hurdles to even the simplest of corporate tasks by virtue of a lack of cooperation or delay from AmEx.  In connection with the AmEx Transaction, the parties entered into the AmEx TSA pursuant to which, among other things, AmEx provides the Company with information and access to books and records necessary and critical to run its PPP business and access to the Company's legacy software, which provides PPP Loan and Legacy Loan borrowers a platform to submit payments and supports PPP-related processes such as Guaranty Purchase (with the key exception of Loan Forgiveness processes, as explained herein) (the "**AmEx Platform**").

58.    With the incredibly voluminous information production requests from the DOJ and various other stakeholders in connection with the Disputes, AmEx's performance under the AmEx TSA is more important than ever.  Nevertheless, retrieving documents from AmEx has and continues to be difficult and requires concerted effort as responses are often delayed and incomplete.  Further, when the SBA issued a revised Loan Forgiveness application form in early 2021, AmEx was required to revise the AmEx Platform to accommodate the revisions pursuant to

---

[24] *See Defendant Kabbage, Inc., d/b/a KServicing's Motion to Dismiss and Request for Oral Argument*, filed May 31, 2022 (Case 1:22-cv-01249-VMC, ECF No. 12).

the terms of the AmEx TSA, and it refused to do so.  AmEx's refusal forced the Company to engage a third-party vendor, Biz2Credit, to process Loan Forgiveness applications.

59.    The Debtors are hopeful that the flow of information with AmEx will improve during the Chapter 11 Cases so that they may have, at a minimum, the books and records necessary to conduct their operations; but to the extent necessary, the Debtors are prepared to use the tools provided to debtors-in-possession to seek out any required information, including through Bankruptcy Rule 2004 discovery.  The Debtors are cognizant of the importance of the AmEx Transaction to the administration of these Chapter 11 Cases and, as described above, the transaction and any causes of action related thereto are under review by the Board.

### C.    Liquidity Constraints

60.    Given that it has been winding down its operations, the Company is not entering into any new business and therefore is limited in its ability to independently source funds to support its remaining servicing and wind down operations, which also makes the chances of securing third-party funding highly improbable.  Further, the Company's remaining operations generate only immaterial revenue and cash flow.  As described in detail herein, (a) the PPPLF Portfolio and Legacy Loan Portfolio generate modest income and cash flow as the Company's servicing fees earned in connection with the Partner Bank Portfolio (as defined below) were paid up-front,[25] and (b) this modest income is declining as borrowers pay down their loans and the loans mature on a rolling basis

61.    In addition to the withholding of the CUBI Receivable and the Company's lack of go-forward cash flows under its servicing agreements, its liquidity is being significantly impacted by two major items:  (a) the Company's fees payable to AmEx under the AmEx TSA

---

[25] With the exception of the CUBI Receivable.

and to Biz2Credit for services that AmEx was obligated, but refused, to provide under the AmEx TSA; and (b) the cost of defending against the Disputes, which includes increased servicing and administration costs in connection thereto.  The net result is that the Company is rapidly burning through its remaining cash and has no ability to originate more loans or otherwise create new income streams.

62.     Fees Payable to AmEx and Biz2Credit.  As described above, in connection with the AmEx Transaction, the Company and AmEx entered into the AmEx TSA whereby AmEx agreed to provide services pivotal to the Company's operations, which includes, among other things, access to and maintenance of the AmEx Platform, certain cloud services, and documents and files transferred to AmEx that the Company needs to process its PPP Loans and Legacy Loans and otherwise wind down the remaining loan portfolios (the "**AmEx Services**").  The Company relies heavily on AmEx to access the services, documents, and files necessary to service PPP Loans, wind down the business, and facilitate these Chapter 11 Cases.  Notably, around February 2021 when the SBA issued a revised Loan Forgiveness application form, AmEx refused to revamp the AmEx Platform to accommodate the updated form, as required under the terms of the AmEx TSA. The Company subsequently scrambled to find a third-party service provider, and engaged Biz2Credit to provide a platform for Loan Forgiveness activities (the "**B2C Platform**").[26]

63.     Put simply, the AmEx Services and B2C Platform are expensive.  As of the Petition Date, the Company has spent a combined $7 million in 2022 on the AmEx Services and the B2C Platform.  The Company estimates that it will pay between $275,000 and $375,000 per month on the AmEx Services and B2C Platform, collectively, during these Chapter 11 Cases.

---

[26] Because the SBA would no longer accept the old Loan Forgiveness form, borrowers were unable to submit their applications for Loan Forgiveness for nearly three months while the Company identified and prepared the B2C Platform for the Company's PPP program.

35

64.     <u>Cost of Defending Against the Disputes</u>.    The Company has expended tremendous amounts of time and resources to address the Disputes.  In response to document requests from Dispute counterparties, the Company has produced hundreds of thousands documents to date and voluminous amounts of electronic data.  The Company has participated in over 100 formal meetings, in person and virtual, and phone calls with Dispute counterparties, which does not include countless emails and other forms of correspondence.  Additionally, to demonstrate that the Company's Borrower Diligence processes complied with SBA guidance, the Company hired forensic accountants to analyze the DOJ-Flagged Loans for potential excess amounts.

65.     As of the Petition Date, the Company has spent approximately $19 million in 2022 on professional fees in connection with the Disputes.  This amount does not include the considerable amount of time and attention the Company's employees—including its directors and officers—have had to spend addressing the Disputes, away from the Company's regular operations and wind down.

66.     <u>Increased Servicing and Administration Costs</u>.    The Disputes—and more specifically the DOJ investigations and the SBA's refusal to process DOJ-Flagged Loans for Loan Forgiveness and Guaranty Purchase—have significantly increased the time and resources required to process PPP Loans.  To continue its regular operations, implement internal processes and controls to account for the DOJ-Flagged Loans (by, for example, flagging such loans internally for special processing, suspending Loan Forgiveness review activity at the request of the SBA and the DOJ, performing special review activity and heightened underwriting standards at the Loan Forgiveness stage that are not contemplated by SBA guidance, and adjusting deadlines for Loan Forgiveness and Guaranty Purchase) and respond to document requests, among other things, the

36

Company has had to augment its staff with additional contractors.  As of the Petition Date, the Company has spent approximately $11 million in 2022 on staffing firms, and a majority of such amounts can be attributed to increased demand to process document requests, submit reports, and respond to inquiries in connection with the Disputes.

67.     <u>Expending Resources on Subpoena Responses</u>.  The Company is the recipient of more than 100 subpoenas per week in connection with borrower bankruptcies and other court proceedings related to the Company's PPP Loans.  Responding to these subpoenas requires the production of loan files and certifications of authenticity of business records, as well as the provision of witnesses at evidentiary hearings and trials to testify as to the authenticity of business records and the loan origination process.  The Company employs a dedicated staff of approximately five employees to deal with such subpoenas and related matters.

**D.     Debtors' Prepetition Settlement Efforts**

68.     Prior to the filing of these Chapter 11 Cases, the Company sought to resolve the Disputes with its key stakeholders and obtain a workable framework to wind down the Company's operations.  In the months leading up to these Chapter 11 Cases, the Company engaged with key stakeholders with the goal of building consensus around an efficient and effective wind down framework.  The Debtors intend to continue their efforts to obtain consensus among the relevant parties. As previously stated herein, the Company is seeking to maximize the value of a finite pool of resources, and seeking a path forward that insulates, where possible, the PPP and Legacy Loan borrowers.

69.     As described above, given the Debtors' limited time and resources, the Debtors filed a proposed chapter 11 plan contemporaneously herewith that provides two options for implementation, depending on its ability to secure funds through negotiations with the Federal Reserve and CUBI to operate its Loan Portfolio during these Chapter 11 Cases.  The proposed

37

plan, with the ability to toggle between two scenarios depending on the facts and circumstances, is the Debtors' best option for mitigating potential disruption to PPP borrowers and to maximize the value of its estates.

## V.    FIRST-DAY PLEADINGS

70.    The Debtors have filed their First-Day Pleadings contemporaneously herewith to facilitate a smooth transition into these Chapter 11 Cases and minimize disruption to the Debtors' business operations.  I am familiar with the contents of each First-Day Pleading and believe that the relief sought in each First-Day Pleading is necessary to enable the Debtors to operate with minimal disruption, and effectively focus its limited team of resources on a value maximizing transaction for the benefit of all parties in interest.  The facts set forth in each First-Day Pleading are incorporated herein by reference.  Capitalized terms used, but not otherwise defined in this section, shall have the meanings ascribed to such terms in the relevant First-Day Pleading.

### A.    Administrative Motions

**i.    Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Admin Motion")**

71.    The Debtors request entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), and that the Bankruptcy Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Kabbage, Inc., d/b/a KServicing.  Although the lead Debtor is listed, for tax identification purposes, as "Kabbage, Inc.," the lead Debtor also does business under the trade names "KServicing" "KServicing, Inc." and "KService Corp."  Accordingly, the proposed case caption for the jointly-administered cases will reflect the trade name "KServicing" to, among other things, preserve familiarity with the Debtors' businesses for all interested parties.

72.     I believe joint administration of the Chapter 11 Cases will provide significant administrative efficiencies, as it will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders.  Further, joint administration will relieve the Bankruptcy Court of entering duplicative orders and maintaining duplicative files and dockets.  The U.S. Trustee, creditors, and other parties in interest will similarly benefit from joint administration of these Chapter 11 Cases, as it will spare them the time and effort of reviewing duplicative pleadings and papers.

73.     I believe joint administration of these Chapter 11 Cases will not adversely affect creditors' rights because the Joint Admin Motion requests administrative consolidation of the Debtors' estates for procedural purposes only.  The relief requested in the Joint Admin Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate their businesses in chapter 11 with the least disruption.

    **ii.**     **Motion of Debtors for Entry of Order (I) Authorizing the Debtors to (A) File and Maintain Consolidated Creditor Lists, and (B) Redact Certain Personal Identification Information for Individuals, (II) Approving Special Electronic Noticing Procedures, and (III) Granting Related Relief (the "Creditor Matrix Motion")**

74.     The Debtors request entry of an order (i) authorizing the Debtors to (a) file and maintain a single, consolidated creditor matrix in these cases (the "**Creditor Matrix**"), and to file a single, consolidated list of the Debtors' 30 largest unsecured creditors, in lieu of filing and maintaining separate creditor lists and mailing matrices for each Debtor, and (b) redact certain personal identification information for individuals, (ii) approving special electronic noticing procedures (the "**Special Electronic Noticing Procedures**"), and (iii) granting related relief.

75.     I believe permitting the Debtors to file and maintain a single, consolidated Creditor Matrix, and file a single, consolidated list of the Debtors' 30 largest unsecured creditors, in lieu of filing and maintaining separate creditor lists and mailing matrixes for each Debtor entity is warranted under the circumstances of these Chapter 11 Cases.  Specifically, maintaining a single consolidated Creditor Matrix will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings.

76.     Cause exists to authorize the Debtors to redact address information of individual creditors and interest holders—many of whom are the Debtors' employees and the Debtors' current and former Borrowers (as defined in the Motion)—and interest holders from the creditor list because such information is unnecessary to disclose, sensitive, and could be used to perpetrate identity theft.  The Debtors propose to provide, on a confidential basis, an unredacted version of the Creditor Matrix and any other applicable filings to the Debtors' claims and noticing agent, the U.S. Trustee, any official committee of unsecured creditors appointed in these Chapter 11 Cases, any subsequently appointed trustee, the Court, and any party in interest upon reasonable request.  In addition, any party in interest that is not provided with an unredacted version of the applicable document upon request may file a motion with the Court to obtain such documents.

77.     Allowing the Debtors to abide by the Special Electronic Noticing Procedures with regard to Borrowers is appropriate in these Chapter 11 Cases.  The Debtors have approximately 456,000 current and former Borrowers identified on the Creditor Matrix.  The cost of postage alone to mail the Case Commencement Notice to 456,000 Borrowers would exceed $500,000.  The Debtors intend to provide email notice to Borrowers, and to the extent the Debtors do not have an email address on file, or to the extent the Debtors receive a "bounce-back" or similar

40

error message in response to the electronic service of the Case Commencement Notice, the Debtors will serve the Case Commencement Notice via first-class mail directed to the last known physical address maintained in their books and records for such Borrower. The Special Electronic Noticing Procedures will substantially reduce administrative burdens, and moreover, no parties in interest will be prejudiced by the relief requested in the motion as it only applies to the claims of Borrowers. The Debtors will also publish the Case Commencement Notice in both *The New York Times* and *USA Today*. In the event any Borrower has filed a notice of appearance or a proof of claim in these Chapter 11 Cases, the Debtors will provide such party with notice as required under Bankruptcy Rule 2002.

### B. Operational Motions Requesting Immediate Relief

#### i. Motion of Debtors for Interim and Final Orders Authorizing Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations (the "Loan Servicing Motion")

78. The Debtors request entry of an order authorizing, but not directing, the Debtors to continue in the ordinary course of business to: (a) service and subservice PPP Loans and Legacy Loans; (b) remit certain overpayments to borrowers and the SBA, as applicable, and any reconciliation activities related thereto; (c) pay prepetition amounts owed to critical vendors on the terms and conditions described in the Loan Servicing Motion; and (d) fulfill compliance and regulatory obligations. Each of the activities for which the Debtors seek Court authority to continue are consistent with both the Debtors' prepetition conduct and with customary practices in the loan servicing industry.

79. Servicing PPP Loans and Legacy Loans accounts for all of the Debtors' revenue and all of the Debtors' customers depend on the Debtors continuing to perform their servicing functions. Indeed, the focus of much discussion with the Debtors' customers has, not surprisingly, been on the need to continue servicing loans. Accordingly, continuing to service PPP

41

Loans and Legacy Loans is a vital component of the Debtors' business and essential to a successful wind down. The failure to comply with the terms and conditions set forth in the applicable servicing agreements may trigger additional, costly obligations upon the Debtors, harm borrowers and their customers, and obligations to indemnify. I believe it is imperative that the Debtors be permitted to continue to perform under its agreements with the Federal Reserve, the Partner Banks, and Celtic, which will allow the Debtors to operate their business in the ordinary course without interruption, and preserve the value of the estate for its stakeholders. Nothing in the Loan Servicing Motion is intended or shall be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

80.     In connection with their general corporate activities, as well as their origination and servicing businesses, the Debtors utilize the services of numerous third-party vendors and service providers that are critical to operations (collectively, "**Critical Vendors**"), who perform a variety of critical functions for the Debtors.

81.     I believe employing these specialized vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these vendors would not only be difficult and disruptive, but also cost-prohibitive. The Debtors have developed long-standing relationships with their Critical Vendors, which has enabled them to negotiate favorable pricing, credit terms, and priority scheduling. Any failure to timely honor the Debtors' prepetition obligations to the Critical Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair the Debtors' operations and the value of the enterprise.

82.    The Debtors' PPP servicing activities are carried out in a highly orchestrated and sequenced manner, so that the Debtors can comply with PPP requirements, SBA guidelines, and the terms of their agreements with the Federal Reserve and the Partner Banks—and most importantly, so that Loan Forgiveness and Guaranty Purchase applications are processed on time. Adherence with SBA proscribed deadlines is critical.  Failure to process a loan in a timely manner could result in the SBA refusing to forgive the loan, which directly impacts borrowers, or refusing to purchase the loan, which directly impacts the Federal Reserve and the Partner Banks.  The importance of timely processing of PPP loans cannot be understated and any disruption in the Debtors' PPP servicing business caused by the refusal or delay of even a single Critical Vendor in performing its services could have severe and irreversible impacts on the Debtors and their PPP borrowers and other stakeholders. Through the Loan Servicing Motion, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of, in the Debtors' sole discretion, the Critical Vendors.  The Debtors seek to pay (a) up to approximately $75,000 of such prepetition amounts (which constitutes approximately seven percent of the Debtors' prepetition trade vendor balance) to Critical Vendors during the first thirty days of these Chapter 11 Cases.  Without the requested relief, I believe the Critical Vendors may refuse to continue providing services to the Debtors postpetition or may impose unfavorable trade terms.

83.    Accordingly, I believe the Debtors' continued servicing of its PPP Loans and Legacy Loans in the ordinary course of business and continued employment of, and payment of prepetition amounts due to, Critical Vendors are vital to the Debtors' business operations and success of these Chapter 11 Cases.

ii.      **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management in the Ordinary Course of Business; and (II) Granting Related Relief (the "Cash Management Motion")**

84.      The Debtors request entry of an order (a) authorizing them to (i) continue using their existing cash management system, (ii) implementing changes to their cash management system in the ordinary course of business, and (b) granting related relief.

85.      The Debtors cash management system collects, concentrates, and disburses funds related to (a) servicing PPP Loans, (b) borrower payments made on account of PPP Loans, (c) Loan Forgiveness, (d) Guaranty Purchase, and (e) borrower payments on account of Legacy Loans.  A diagram of the cash management system is attached to the Cash Management Motion as <u>Exhibit D</u>.  I understand that the cash management system facilitates cash monitoring, forecasting, and reporting, and enables the Company to maintain control over the administration of its 15 bank accounts (the "**Bank Accounts**").  Of the Bank Accounts, thirteen are maintained at Synovus Financial Corp., one is maintained at Primis Bank, and one is maintained at Celtic Bank. Because the banks at which the Bank Accounts are maintained do not comply with section 345(b) of the Bankruptcy Code, the Debtors are seeking a 45 day extension of time from entry of the Interim Order to comply with the requirements of section 345(b) of the Bankruptcy Code while they discuss the issue with the U.S. Trustee and any statutory committee appointed in these cases.

86.      I understand that the Debtors also utilize a corporate credit card which permits employees to pay expenses related to office supplies and services as well as other work-related subscription costs in connection with their business.  Through the Cash Management Motion, the Debtors seek authority to continue this corporate credit card program.

87. The Debtors' cash management system is similar to those used by other lending and servicing businesses to collect, concentrate, and disburse funds. I believe any disruption or alteration to the Debtors' cash management system would alter the way in which they collect and disburse cash throughout the cash management system and disrupt their operations, particularly with respect to collection and processing of borrower payments. Further, without the Debtors' corporate credit card program, employees would have to pay work related expenses and services upfront and wait for reimbursement, thereby jeopardizing the Debtors' operational effectiveness.

88. I believe the Debtors' cash management system constitutes an ordinary course and essential business practice providing significant benefits to the Debtors. Accordingly, I believe the Debtors' continued use of their cash management system without interruption is vital to the Debtors' business operations and success of these Chapter 11 Cases.

iii. **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Obligations and (II) Granting Related Relief (the "Wages Motion")**

89. The Debtors request entry of an order (a) authorizing them to (i) pay prepetition wages, salaries, employee benefits, and other compensation, and (ii) maintain employee benefit programs and pay related obligations, and (b) granting related relief.

90. The Debtors' workforce is comprised of 18 full time employees paid on a salaried basis (the "**Salaried Employees**"), and two employees paid on an hourly basis, one of which is part time (the "**Hourly Employees**" and, together with the Salaried Employees, the "**Employees**") who are critical to the success of the Debtors' business and are responsible for ensuring, among other things, that the Debtors' operations continue to run smoothly and effectively. The Debtors also engage with various staffing agencies, and through those staffing

45

agencies utilize the services of approximately 163 independent contractors (the "**Contractors**," and together with the Employees, the "**Workforce**"), 159 of which are contracted out by the Employment Vendors (as defined in the Wages Motion). I believe that the failure to maintain the continued, uninterrupted services of the Workforce could upend the Debtors' wind down efforts and jeopardize the Debtors' ability to reach a consensual resolution with its key stakeholders.

91.     The Debtors maintain various programs for the Employees relating to compensation and benefits, including payroll processing, retirement savings plans, withholding obligations, reimbursable expenses, health insurance programs, life insurance and disability programs, retirement plans, and training and development programs (the "**Compensation and Benefits Programs**"), and pay various administrative fees and premiums in connection therewith. I believe that the vast majority of the Employees rely primarily on the Compensation and Benefits Programs to pay their daily living expenses and support their families. I believe that the Employees would face significant financial hardships if the Debtors are not permitted to continue administering the Compensation and Benefits Programs in the ordinary course of business. Further, the Debtors' failure to honor their obligations in connection with the Compensation and Benefits Programs could result in attrition at a time when the Debtors are relying on the Employees to perform at peak efficiency, and it would be difficult, if not impossible, to replace them in a timely fashion.

92.     Further, the Debtors also seek to compensate the Contractors through the staffing agencies in the ordinary course throughout the Chapter 11 Cases. Based on my personal experience, the continued services of the Contractors are essential to the Debtors' operations and any disruption to these services would adversely impact the Employees as well as the Debtors' ability to sustain business operations. The various components of the Compensation and Benefits

46

Programs are described in further detail in the Wages Motion and are incorporated herein by reference.

93.     I believe that the Debtors have substantial business justification for continuing to administer the Compensation and Benefit Programs and honoring their obligations in connection therewith, including the need to maintain Employee morale and reassure employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors.

94.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, and should be granted.

iv.     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Pay Certain Prepetition Taxes and Assessments and (B) Granting Related Relief (the "Taxes and Fees Motion")**

95.     The Debtors request that the Court (i) authorize the Debtors to pay certain prepetition Taxes and Assessments (as defined in the Taxes Motion) due and owing to various local, state, and federal taxing and other governmental authorities (collectively, the "**Taxing Authorities**") that arose prior to the Petition Date, and (ii) grant related relief.

96.     In the ordinary course of business, the Debtors collect, withhold, and incur an assortment of Taxes and Assessments that they remit periodically to the Taxing Authorities.  The Taxes and Assessments generally fall into the following categories, each of which is discussed in more detail in the Motion: (i) franchise taxes, (ii) personal property taxes, (iii) income taxes, and (iv) other fees (collectively, the "**Taxes and Assessments**").  The Debtors seek to pay certain prepetition Taxes and Assessments in order to, among other things, forestall Taxing Authorities from taking actions that might interfere with the Debtors' continued business

47

and operations, and potentially impose significant costs on the Debtors' estates. Such actions may include bringing personal liability actions against directors, officers, managers, and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors' creditors), or asserting liens on the Debtors' assets or seeking to lift the automatic stay. In addition, the non-payment of such Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, I believe the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm to the Debtors and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

> **v.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue Insurance Policies and Pay All Obligations With Respect Thereto and (II) Granting Related Relief (the "Insurance Motion")**

97.     The Debtors request that the Court (i) authorize the Debtors to (a) continue their Insurance Policies (as defined in the Insurance Motion) in accordance with the terms provided in the underlying agreements and to perform under the Insurance Policies in the ordinary course of business, and (b) pay any prepetition Insurance Obligations (as defined in the Insurance Motion) arising under the Insurance Policies, and (ii) grant related relief.

98.     I believe the continuation of the Debtors' Insurance Policies postpetition will be essential to the preservation of the value of the Debtors' business, properties and assets. In certain instances, continuation of the Insurance Policies are required by law. If any of the Debtors' Insurance Policies are terminated or lapse, the Debtors would be exposed to substantial liability to the detriment of all parties in interest and could be in violation of law. State law may prohibit the Debtors from operating without certain insurance. Additionally, given that the Debtors' Insurance Carriers and Insurance Brokers are intimately familiar with the Debtors' Insurance Policies, even

48

the temporary loss of their services would be detrimental to the Debtors' estates.  Accordingly, I believe authorization to continue to honor all Insurance Obligations, which includes continuing to pay the Insurance Brokers, is in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors, and critical to the continued operation of the Debtors' business.

> **vi.      Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Resolving Objections by Utility Providers, (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief (the "Utilities Motion")**

99.     The Debtors request that the Court enter orders (i) approving the Debtors' proposed form of adequate assurance of payment to Utility Providers (as defined in the Utilities Motion) (the "**Adequate Assurance Procedures**"), (ii) establishing procedures for resolving objections by the Utility Providers, and (iii) prohibiting the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these Chapter 11 Cases or outstanding prepetition invoices, and (iv) granting related relief.

100.     In the ordinary course of business, the Debtors incur expenses for telecommunications, cable, and internet.  Any interruption in Utility Services—even for a brief period of time—would seriously disrupt the Debtors' ability to continue servicing the loan portfolio, including important servicing of PPP Loans for the Federal Reserve and the Partner Banks.  Such a result could seriously jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries.

101.     Further, the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 wind down without unnecessary and costly disruptions on account of

discontinued Utility Services.  If the Adequate Assurance Procedures are not approved, the Debtors

likely will be confronted with and forced to address numerous requests by their Utility Providers

at a critical time for their business.  The Debtors' Utility Providers have unilateral discretion to

decide that they are not adequately protected and, therefore, may make exorbitant demands for

payment to continue providing service or discontinue providing service to the Debtors altogether.

Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize

the value of their estates.

102.    Accordingly, I believe the relief requested in the Utilities Motion is

necessary to avoid immediate and irreparable harm to the Debtors, is in the best interests of the

Debtors' estates, and should be granted.

I declare under penalty of perjury that, to the best of my knowledge and after

reasonable inquiry, the foregoing is true and correct.

Date:   October 3, 2022
        New York, New York


                                    _/s/ Deborah Rieger-Paganis_
                                    Deborah Rieger-Paganis
                                    Managing Director
                                    AlixPartners LLP

50

## Exhibit A

**Corporate Structure Chart**

# Kabbage, Inc. d/b/a KServicing
# Organizational Structure



**Kabbage, Inc. d/b/a KServicing***

Incorporated: Delaware
EIN Ending: 3937

**Kabbage Financial Services Limited**

Incorporated: UK
EIN Ending: N/A

**Kabbage Canada Holdings, LLC**

Incorporated: Delaware
EIN Ending: N/A

**Kabbage Asset Securitization LLC**

Incorporated: Delaware
EIN Ending: N/A

**Kabbage Asset Funding 2017-A LLC**

Incorporated: Delaware
EIN Ending: 4803

**Kabbage Asset Funding 2019-A LLC**

Incorporated: Delaware
EIN Ending: 8973

**Kabbage Diameter, LLC**

Incorporated: Delaware
EIN Ending: N/A

99.9%

**Kabbage India Private Limited**

Incorporated: India
EIN Ending: N/A

Debtor
Non-Debtor

All ownership is 100% unless otherwise noted.
* Kabbage, Inc. d/b/a KServicing, KServicing, Inc., KService Corp., and Kabbage Platform (Kabbage Platform used solely in the state of New York).

