# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re                                           :        **Chapter 11**

                                 :

**KABBAGE, INC. d/b/a KSERVICING,** *et al.,*      :        **Case No. 22-10951 (CTG )**

                                 :

                                 :

               **Debtors.**[1]              :        **(Jointly Administered)**

-------------------------------------------------------- x

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION KABBAGE, INC. (d/b/a KSERVICING) AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Candace M. Arthur
Natasha S. Hwangpo
Chase A. Bentley
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

Dated: October 5, 2022
       Wilmington, Delaware

---

**THIS IS NOT A SOLICITATION OF VOTES OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF KABBAGE, INC. (d/b/a KSERVICING) AND ITS AFFILIATED DEBTORS (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME).

---

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING EASTERN TIME, ON [●], 2022, UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS [●], 2022 (THE "<u>VOTING RECORD DATE</u>").

---

### RECOMMENDATION BY THE DEBTORS

The Board of Directors of Kabbage, Inc. (d/b/a KServicing) and the board of directors, managers or members, as applicable, of each of its affiliated Debtors have unanimously approved the transactions contemplated by the Plan (as defined herein).  The Debtors believe the Plan is in the best interest of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

# DISCLAIMER

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") TO CERTAIN HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF KABBAGE, INC. (D/B/A KSERVICING) AND ITS AFFILIATED DEBTORS (THE "PLAN"), WHICH PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THE DOCUMENTS NECESSARY TO EFFECTUATE THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE CONSIDERABLE EFFORTS TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO MATERIALLY AFFECT THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ALL PERSONS OR ENTITIES

ii

SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER SECTION 27A AND SECTION 21E OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. FURTHER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER OF ANY CLAIM.

ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT AND THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED AMENDED DISCLOSURE STATEMENT IF NECESSARY.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE VI OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO DISCLOSE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND ANY TRANSACTIONS CONTEMPLATED THEREBY.

iv

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................... 3
    A.    Overview of the Plan ............................................................................................ 6
    B.    Toggle Implementation ........................................................................................ 7
    C.    Overview of the Plan and Summary of Plan Treatment ...................................... 8
    D.    Inquiries ............................................................................................................. 12

II. OVERVIEW OF COMPANY'S OPERATIONS...................................................................... 12
    A.    The Debtors' Legacy Business .......................................................................... 12
    B.    The Debtors' PPP Business ............................................................................... 13

III. CORPORATE AND CAPITAL STRUCTURE ..................................................................... 17
    A.    Corporate Structure ........................................................................................... 17
    B.    Management........................................................................................................ 17
    C.    Prepetition Capital Structure ............................................................................. 17

IV. CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES ................................... 18
    A.    Lack of Clarity in SBA Guidance ..................................................................... 18
    B.    The Disputes ...................................................................................................... 19
    C.    Liquidity Constraints ......................................................................................... 23
    D.    Debtors' Prepetition Settlement Efforts ............................................................ 24

V. FIRST-DAY PLEADINGS...................................................................................................... 25
    A.    First Day Motions .............................................................................................. 25
    B.    Procedural Motions ............................................................................................ 25
    C.    Retention of Chapter 11 Professionals .............................................................. 26
    D.    Cash Collateral ................................................................................................... 26

VI. SUMMARY OF PLAN ......................................................................................................... 26
    A.    Administrative Expenses and Priority Claims .................................................. 26
    B.    Treatment of Claims and Interests .................................................................... 29
    C.    Means for Implementation ................................................................................. 33
    D.    Distributions....................................................................................................... 42
    E.    Procedures for Disputed Claims ........................................................................ 45
    F.    Executory Contracts and Unexpired Leases ...................................................... 47
    G.    Conditions Precedent to the Effective Date ...................................................... 51
    H.    Effect of Confirmation....................................................................................... 52
    I.    Retention of Jurisdiction ................................................................................... 56
    J.    Miscellaneous Provisions .................................................................................. 58

**VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN ............................... 60**

    A.    Consequences to the Debtors ......................................................................... 61

    B.    Consequences to Holders of Allowed General Unsecured Claims .................................... 64

    C.    Tax Treatment of the GUC Trust and the Holders of Beneficial Interests ...................... 65

**VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ......................................................... 67**

    A.    Certain Bankruptcy Law Considerations ......................................................... 68

    B.    Additional Factors ........................................................................................ 70

**IX. VOTING PROCEDURES AND REQUIREMENTS ................................................................ 71**

    A.    Voting Deadline ............................................................................................ 71

    B.    Voting Procedures .......................................................................................... 72

    C.    Parties Entitled to Vote ................................................................................. 73

**X. CONFIRMATION OF PLAN ............................................................................................... 75**

    A.    Confirmation Hearing .................................................................................... 75

    B.    Objections to Confirmation ............................................................................ 75

    C.    Requirements for Confirmation of Plan .......................................................... 76

**XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ...................... 80**

    A.    Alternative Plan ............................................................................................ 80

    B.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ................................. 81

**XII. CONCLUSION AND RECOMMENDATION ....................................................................... 81**

EXHIBIT A:    Plan

EXHIBIT B:    Organizational Structure Chart

EXHIBIT C:    Liquidation Analysis

# I. INTRODUCTION

Kabbage, Inc. (d/b/a KServicing) ("**KServicing**") and its affiliated debtors (collectively, the "**Debtors**" and together with their non-debtor affiliates, the "**Company**") submit this Disclosure Statement (as amended, modified, or supplemented) pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of votes with respect to the *Joint Chapter 11 Plan of Liquidation Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors*, dated October 3, 2022 (as amended, modified, or supplemented, the "**Plan**") [Docket No. 14].[2] The Plan is annexed hereto as **Exhibit A** and is incorporated herein by reference. The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on October 3, 2022 (the "**Commencement Date**").

The purpose of this Disclosure Statement, including the exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

The Company, an online loan servicer founded in 2008, is in the process of winding down its business after the sale of substantially all of its assets to affiliates of American Express ("**AmEx**") in October 2020 (the "**AmEx Transaction**"),[3] and filed these Chapter 11 Cases to implement the wind down of these businesses pursuant to a chapter 11 plan and the Bankruptcy Code. Following the AmEx Transaction, the Company's business solely consists of servicing its loan portfolio, which, as of the Commencement Date, contains (a) loans issued to small businesses under the Paycheck Protection Program (the "**PPP**" and the loans provided thereunder, the "**PPP Loans**") during the height of this country's public health and economic crisis caused by COVID-19, with an aggregate outstanding principal amount of approximately $1.3 billion, and (b) a relatively small portfolio of non-PPP small business loans (the "**Legacy Loans**" and, together with the PPP Loans, the "**Loan Portfolio**"), with an aggregate outstanding principal amount of approximately $17 million. The loans in the Loan Portfolio are scheduled to mature by 2026.

With over a decade of experience building and operating a sophisticated online platform to lend to, and service loans for, small- and mid-sized businesses, the Company was uniquely positioned to fulfill the U.S. government's urgent need to quickly distribute billions of dollars of aid to small businesses during the pandemic. Indeed, the Company was an established lender for small businesses for years before getting involved in the PPP. The U.S. Small Business Administration (the "**SBA**") launched the PPP in April 2020 shortly after the U.S. government's initial directive under the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**") to distribute emergency funds to small businesses. The SBA needed lending partners for the PPP, and the Company, with a proven track record and experience with the exact target demographic, provided an optimal pairing. The Company became an authorized PPP lender pursuant to an agreement with the SBA on April 9, 2020.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan and the *Declaration of Deborah Rieger-Paganis in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (the "**First Day Declaration**"). To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

[3] The legacy entities remaining after the close of the AmEx Transaction are the Debtors in these Chapter 11 Cases. Notably, no directors or executive officers remain today from the pre-sale entity, and an entirely new leadership team and board, including independent directors, is in place today. As used herein, the "**Company**" shall refer to either the pre-sale or post-sale entity, as applicable.

Unequivocally, the Company provided a lifeline to small businesses, sole proprietors, and non-employer firms that historically have had difficulty accessing capital, and for which such access was made even more challenging during the COVID-19 pandemic. Unlike institutional lenders and other servicers that limited PPP relief to existing borrowers (or marginally participated in the PPP because of the relatively nominal fees associated with originating or servicing PPP loans and the low interest rate of PPP Loans, among other reasons),[4] approximately 98 percent of the Company's PPP Loans consisted of borrowers without an existing relationship with the Company.  Despite constantly changing rules and guidance from the SBA in the midst of a global pandemic, the Company met the SBA and U.S. government's demands to distribute the emergency relief as quickly and widely as possible to eligible borrowers. As the nation witnessed the disastrous impact of COVID-19, the Company was instrumental in getting necessary funds to small businesses as quickly as the SBA desired and as a result preserved hundreds of thousands of jobs.

Of the over $7 billion of PPP Loans the Company originated, as of the Commencement Date, the Company has successfully serviced approximately 80 percent, by aggregate principal amount; meaning, borrowers either repaid their respective PPP Loans, Loan Forgiveness applications were successfully processed, or the PPP lenders were otherwise paid through Guaranty Purchase. As of September 30, 2022, the Company's Loan Portfolio contains approximately 48,000 PPP Loans with an aggregate outstanding principal amount of approximately $1.3 billion.  Although the successful processing of over 270,000 PPP Loans by a new management team and the materially leaner workforce put in place following the AmEx Transaction is a testament to the Company's capabilities and good faith participation in the PPP, processing the remaining PPP Loans has presented a number of challenges for the Company, particularly in light of the extreme administrative and cost burden placed on the Company due to issues discussed herein.

Initially heralded for staving off the potentially deleterious effects of COVID-19 health measures on small businesses, the now-concluded PPP faces scrutiny due to lender confusion with deciphering unclear and frequently-evolving SBA guidance, or lack thereof, limited information technology systems, and incidents of borrower misrepresentations.  In addition to the operational hurdles in processing the balance of its Loan Portfolio, the Company is currently embroiled in a number of discussions and disputes related to its participation in the PPP—nearly all of which are vigorously disputed by the Company.

Despite adherence to express SBA guidance, the Company is embroiled in government investigations, litigations, and stakeholder disputes related to the PPP program.  The hindsight investigations and misdirected scrutiny severely hamper the Company's ability to accomplish its mission of servicing the balance of the PPP Loans in its Loan Portfolio and have caused significant additional costs to winding down its business.  The overall impact of the Disputes on the Company's operations is compounded by the Company's limited go-forward cash flows,[5] inability to originate any new loans due to non-compete covenants contained in documentation associated with the AmEx Transaction, inability to obtain certain accommodations needed to address the expiration of applicable Loan Forgiveness and Guaranty Purchase

---

[4] The SBA paid lenders the following fees for processing PPP Loans: five percent for PPP Loans of not more than $350,000; three percent for PPP Loans of more than $350,000 and less than $2,000,000; and one percent for PPP Loans of at least $2,000,000.  The interest rate on PPP Loans is one percent.  Lenders were not otherwise allowed to collect any fees from borrowers.

[5] The Company received all of its servicing fees for the Partner Bank PPP Loans as a percentage of loan principal at or near the time of origination, with the exception of certain outstanding receivables from CUBI, as discussed herein. The Company's sole remaining sources of cash flow are the interest received on its Pledged PPPLF Loans and the principal and interest received on its KS PPP Loans and Legacy Loans, which collectively are insufficient to support the Company's ongoing operations.

application deadlines that can only be granted by the SBA,[6] and a substantially new workforce in place following the AmEx Transaction that has limited firsthand knowledge of the Company's legacy operations.

Prior to commencing these Chapter 11 Cases, the Debtors, led by a new management team and board that were put in place at various times following the AmEx Transaction, expended substantial time addressing information requests and subpoena demands, engaged with all stakeholders party to a Dispute in an attempt to reach workable resolutions. Despite the Debtors' best efforts, nearly all of the Disputes remain pending and the Debtors forecast that given their limited resources (the Debtors have approximately $11 million of unrestricted cash on-hand) they will be unable to service their remaining Loan Portfolio until the latest maturity, which occurs in 2026.

With limited options, the Debtors have engaged in good faith negotiations with their constituents prior to filing these Chapter 11 Cases and have filed a chapter 11 plan contemporaneously herewith that addresses two potential scenarios.

- First, the proposed chapter 11 plan provides for the servicing of the Loan Portfolio throughout the Chapter 11 Cases in the following ways and at the option of each of the Partner Banks and the Federal Reserve Bank of San Francisco (the "**Reserve Bank**"):  (a) the Company continues to service the remaining Loan Portfolio after the plan effective date, but with each applicable Partner Bank and the Reserve Bank paying post-effective date servicing costs; or (b) the Company and each applicable Partner Bank and the Reserve Bank work cooperatively to transfer after the plan effective date servicing to a third-party loan servicer, including contribution and payment of transfer costs by the Partner Banks and the Reserve Bank, as applicable.

- Alternatively, the proposed chapter 11 plan provides that if the Debtors are unsuccessful in securing funding through negotiations with the Reserve Bank and CUBI in the early days of the Chapter 11 Cases, and thus are unable to service the Loan Portfolio for the duration of the Chapter 11 Cases, the Debtors' proposed chapter 11 plan provides for (a) the rejection of the servicing agreements with the Partner Banks, and (b) servicing its PPPLF Portfolio (as defined below), and on the contemplated plan effective date, the Debtors will transfer the PPPLF Collateral (as defined below) to the Reserve Bank in satisfaction of its claims under the PPPLF Documents (as defined below).

Notably, as of the Commencement Date, the Debtors were quite close to an agreement with the Reserve Bank, and discussions with CUBI had progressed significantly in the days leading up to filing these Chapter 11 Cases.  Further, in both scenarios, any costs associated with the transfer of servicing obligations will not be borne by the Debtors, and the Debtors will make commercially reasonable efforts to assist the Partner Banks and the Reserve Bank, as applicable, with such transfer of the Debtors' servicing obligations to a third-party loan servicer prior to the applicable transfer date.

Given the Debtors' financial distress, they are utilizing the bankruptcy process to obtain a respite from having to constantly defend against the Disputes, to provide a single forum to address the Disputes, and to hopefully emerge in a position to complete their wind down efforts for the benefit of tens of thousands of remaining borrowers and the Debtors' stakeholders that provided those loans to the borrowers.

The Debtors believe that the Plan is fair and equitable, provides for a larger distribution to the Debtors' creditors and Interest holders than would otherwise result from any other transaction or a liquidation under chapter 7 of the Bankruptcy Code, and maximizes the value of the Debtors' Estates.  For the reasons

---

[6] The deadline to submit a Loan Forgiveness application is the maturity date of the loan.  Further, the SBA is not obligated to honor the Guaranty Purchase if a PPP lender does not apply within 180 days following maturity.  Loan maturities can be extended with cooperation from the SBA.

described herein, the Debtors recommend that each party entitled to vote on the Plan vote to accept the Plan.

Section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements and includes, without limitation, information about:

- the Debtors' business, including their corporate history and organizational structure, business operations, and prepetition capital structure and indebtedness (section III hereof);

- key events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (section IV hereof);

- anticipated events during the Chapter 11 Cases (section V hereof);

- a summary of the Plan, including the classification and treatment of Claims and Interests under the Plan, who is entitled to vote on the Plan, and how to vote thereon (section VI hereof);

- certain tax consequences of the Plan (section VII hereof);

- certain risk factors holders of Claims should consider before voting to accept or reject the Plan (section VIII hereof);

- voting procedures and requirements for the Plan (section IX hereof);

- Plan confirmation procedures (section X hereof);

- alternatives to the confirmation and consummation of the Plan (section XI hereof); and

- the Debtors' conclusion and recommendation (section XII hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

### A.    Overview of the Plan

Given the Debtors' limited time and resources, the Debtors filed a proposed chapter 11 plan on the Petition Date that provides two options for implementation, depending on its ability to secure funds through negotiations with the Reserve Bank and CUBI to operate its Loan Portfolio during these Chapter 11 Cases. The proposed plan, with the ability to toggle between two scenarios depending on the facts and circumstances, is the Debtors' best option for mitigating potential disruption to PPP borrowers and to maximize the value of its estates.

**B.**  **Toggle Implementation**

**i.**  **Funded Transaction.**

In the event where the Debtors have sufficient funding (e.g. the Reserve Bank remits to the Debtors on a regular basis, 100% of the Remittance Amounts for the duration of the Chapter 11 Cases and Wind Down, and the CUBI Receivable is recovered (with no more than [●]% discount to the full CUBI Receivable)), then, KServicing shall continue to service all PPPLF Collateral loans, all CRB PPP Loans, and all CUBI PPP Loans in the ordinary course and in accordance with the PPPLF documents, CRB Agreements and CUBI Agreements, respectively, until the earlier of (1) [●], and (2) the PPPLF Servicer Transfer Date for the PPPLF Collateral loans, the CRB Servicer Transfer Date for the CRB PPP Loans, and the CUBI Servicer Transfer Date for the CUBI PPP Loans.

By [●], 2022, each of the Reserve Bank, CRB, and CUBI shall elect to either fund the Wind Down Estate with $[●], which amount shall be allocated in the Wind Down Budget to allow for the continued servicing through a date to be mutually agreed, or take all steps necessary to transfer all of the Debtors' servicing obligations to a third-party loan servicer, to be selected with the applicable party's consent and direction by a date to be mutually agreed; provided that, for the avoidance of doubt, any fees associated with any transfer of servicing obligations shall not be borne by the Debtors.

On the Effective Date, the GUC Pool shall be funded in the aggregate amount of no less than the GUC Pool Amount.  And at the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Budget (other than amounts on account of Post-Effective Date Servicing Costs) shall be transferred to the GUC Pool.

Further, on the Effective Date, the Wind Down Estate shall be funded in accordance with the Wind Down Budget for (w) the Wind Down process and (x) any continued servicing of PPPLF Collateral loans, CRB PPP Loans, or CUBI PPP Loans, as applicable, and be funded with the Wind Down Amount; provided that any amounts on account of continued servicing of PPPLF Collateral loans, CRB PPP Loans, or CUBI PPP Loans, as applicable, shall be funded by the payment of applicable Post-Effective Date Servicing Costs. And at the conclusion of the Wind Down, any remaining assets and any Estate Causes of Action of the Debtors' Estates shall transfer to the Wind Down Estate automatically and without further action of the Bankruptcy Court, and any residual amounts remaining on account of Post-Effective Date Servicing Costs shall be distributed pro rata to the Reserve Bank, CRB, and CUBI, as applicable and proportionate to each party's Post-Effective Date Servicing Costs.

**ii.**  **Unfunded Transaction.**

In the event where the Debtors do not have sufficient funding (e.g. the Reserve Bank does not remit to the Debtors on a regular basis, 100% of the Remittance Amounts for the duration of the Chapter 11 Cases, and the CUBI Receivable is (a) not recovered or (b) recovered but with more than a [●]% discount to the full CUBI Receivable), then, no later than [●] days from the Commencement Date, the Debtors will have no choice but to file a motion to reject the (a) CUBI Agreements, and (b) CRB Agreements; provided, that, the Debtors shall make commercially reasonable efforts to assist CUBI (with respect to the CUBI PPP Loans) and CRB (with respect to the CRB PPP Loans) with the transfer of all of the Debtors' servicing obligations to a third-party loan servicer prior to the effective date or rejection of the CUBI Agreements or the CRB Agreements, as applicable; and the Debtors shall make commercially reasonable efforts to assist the Reserve Bank with the transfer of all of the Debtors' servicing obligations with respect to the PPPLF Loans to a third-party loan servicer prior to the Effective Date.

On the Effective Date, the Wind Down Estate shall have Wind Down Budget for the Wind Down process. At the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Budget shall be transferred to the GUC Trust.  And any remaining assets (other than amounts on account of the Wind Down Budget) and any Estate Causes of Action of the Debtors' Estates shall transfer to the GUC Trust automatically and without further action of the Bankruptcy Court.  The GUC Trustee shall be responsible for making Distributions to holders of Allowed General Unsecured Claims.

The Debtors believe that the Plan and the toggle structure contemplated therein provides the Debtors a path forward in both scenarios of their wind down—where sufficient funds are secured for an orderly wind down and potential post-effective date servicing, or where sufficient funds are not secured and the Debtors pursue an expedited path and near term wind down of their operations.  The Plan encompasses a comprehensive resolution of the largest outstanding Claims against the Debtors, and maximizes the value of the Debtor's remaining assets for the benefit of all creditors.

### C.    Overview of the Plan and Summary of Plan Treatment

Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in the following Classes are being solicited under, and are entitled to vote on, the Plan (together, the "**Voting Classes**"):

- Class 3 – Reserve Bank Claims; and
- Class 4 – General Unsecured Claims.

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan.  The table summaries are qualified in their entirety by reference to the Plan, which is attached hereto as **Exhibit A**.

| Class | Claim or Interest | Treatment | Impairment | Entitled to Vote on the Plan |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured | Unimpaired | No (presumed to accept) |

8

| Class | Claim or Interest | Treatment | Impairment | Entitled to Vote on the Plan |
|---|---|---|---|---|
| | | Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable: (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.<br><br>Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator. | | |
| 3 | Reserve Bank Claims | Except to the extent that a holder of an Allowed Reserve Bank Claim against the Debtors agrees to a less favorable treatment of such Claim, each holder of an Allowed Reserve Bank Claim in full and final satisfaction, compromise, settlement, release, and discharge in exchange for:<br><br>i.    Reserved Bank Secured Claims will receive:<br><br>    a.  if the Funded Transaction occurs and the Reserve Bank elects: (x) Post-Effective Date PPPLF Servicing, cash proceeds of the PPPLF Collateral or (y) PPPLF Transfer, the return of the PPPLF Collateral; or<br><br>    b.  if the Unfunded Transaction occurs (x) return of the PPPLF Collateral.<br><br>ii.   Reserve Bank Priority Claims will receive:<br><br>    a.  if the Funded Transaction occurs: GUC Pool Class A Claims, or<br><br>    b.  if the Unfunded Transaction occurs GUC Trust Beneficial A Interests. | Impaired | Yes |
| 4 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim will receive: | Impaired | Yes |

9

| Class | Claim or Interest | Treatment | Impairment | Entitled to Vote on the Plan |
|---|---|---|---|---|
| | | i.  <u>if the Funded Transaction occurs</u>, its *pro rata* share of the GUC Pool Class B Claims; or<br><br>ii.  <u>if the Unfunded Transaction occurs</u>, its *pro rata* share of the GUC Trust Beneficial B Interests. | | |
| 5 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will either be reinstated or cancelled and released at the option of the Debtors; *provided* that no such distributions shall be made on account of such Intercompany Claims on the Effective Date. | Impaired | No (deemed to reject) |
| 6 | Intercompany Interests | On the Effective Date, Intercompany Interests shall receive no recovery or distribution and be reinstated solely to maintain the Debtors' corporate structure, as necessary. | Unimpaired/ Impaired | No (deemed to accept/reject) |
| 7 | Subordinated Securities Claims | Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise. | Impaired | No (deemed to reject) |
| 8 | KServicing Equity Interests | Except to the extent that a holder of KServicing Equity Interests agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for KServicing Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all KServicing Equity Interests shall be cancelled and one share of KServicing common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of KServicing Equity Interests consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of KServicing Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such KServicing Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a KServicing Existing Equity Interests may receive its share of any remaining assets of KServicing consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that KServicing's Chapter 11 Case is closed in | Impaired | No (deemed to reject) |

10

| Class | Claim or Interest | Treatment | Impairment | Entitled to Vote on the Plan |
|-------|-------------------|-----------|------------|------------------------------|
|       |                   | accordance with <u>Section 5.14</u> of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect; *provided* that (i) such cancellation does not adversely impact the Debtors' Estates; and (ii) the continuing rights of former holders of KServicing Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent. | | |

> **THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL STAKEHOLDERS.**

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in Classes 3 and 4 (Reserve Bank and General Unsecured Claims) are the only Classes being solicited under, and the only Classes entitled to vote on, the Plan.

**THE PLAN PROVIDES THAT THE HOLDERS OF CLAIMS IN CLASS 3 (RESERVE BANK CLAIMS) AND CLASS 4 (GENERAL UNSECURED CLAIMS) WHO VOTE TO ACCEPT THE PLAN, OR WHO ABSTAIN FROM VOTING OR VOTE TO REJECT THE PLAN BUT DO NOT OPT-OUT OF THE RELEASES CONTAINED IN SECTION 10.5 OF THE PLAN, ARE DEEMED TO HAVE GRANTED THE RELEASES CONTAINED IN SECTION 10.6 OF THE PLAN.**

**PLEASE TAKE NOTICE THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS, INCLUDING BORROWERS OF LOANS SERVICED BY THE DEBTORS, THAT HOLD PREPETITION CLAIMS AGAINST ONE OR MORE OF THE DEBTORS WILL BE SUBJECT TO THE BAR DATE ORDER. IF YOU HOLD SUCH A CLAIM AND DO NOT FILE A PROOF OF CLAIM BY THE GENERAL BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER, YOUR CLAIM MAY BE DISCHARGED AND YOU MAY NOT BE ENTITLED TO A RECOVERY, IF ANY, ON SUCH CLAIM PURSUANT TO THE PLAN.**

**Any statement contained in a document incorporated or deemed to be incorporated herein by reference, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any**

11

**other subsequently dated or filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.**

**You should carefully read the entire Disclosure Statement and the documents incorporated by reference herein. Financial data included herein as of October 5, 2022 remains subject to the customary review procedures associated with the completion of the Company's public reporting requirements.**

### D.    Inquiries

If you have any questions about the packet of materials you have received, please contact Omni Agent Solutions, Inc. as its voting agent (the "**Voting Agent**"), at (866) 956-2138 (toll free) or (747) 226-5953. Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available upon written request made to the Voting Agent at the following address: 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367.

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website: (https://omniagentsolutions.com/kservicing).  **PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.**

## II.  OVERVIEW OF COMPANY'S OPERATIONS

### A.    The Debtors' Legacy Business

The Company began as an online lending platform for small businesses in 2008, using machine-learning algorithms, data from public profiles, and other factors to quickly and efficiently evaluate the financial health of loan applicants, significantly shortening loan approval and disbursement processes as compared to traditional banks.  Over the years, the Company added several lines of business, providing, among other things, access to flexible lines of credit, business checking accounts, online bill payment, cash flow visualization tools, and e-gift certificates through its website and app.  In October 2020, AmEx acquired a substantial majority of the Company's business for approximately $750 million.[7]  The AmEx Transaction specifically excluded a small portfolio of Legacy Loans and the Company's PPP business.  Today, all Legacy Loans the Company services are owned by Celtic Bank ("**Celtic**") and governed by the Legacy Loan Agreement.[8] As of September 30, 2022, there were approximately 3,400 Legacy Loans remaining in the Loan Portfolio with approximately $17 million in aggregate outstanding principal amount.

As a non-Federal Deposit Insurance Corporation insured financial institution, the Company partnered with Celtic in an arrangement whereby:  the Company processed Legacy Loan borrower applications, funded the Legacy Loans through the purchase of participation interests in loan receivables (the "**Participation Interests**")—effectively acquiring the rights to retain borrower principal and interest payments, with Celtic remaining as the lender of record—and subsequently serviced the Legacy Loans.[9]

---

[7] Approximately $38 million of the purchase price is currently held in escrow (the "**AmEx Escrow Fund**") for the benefit of the selling shareholders and, to the Debtors' knowledge, remains subject to certain unresolved claims by AmEx under the documents related to the AmEx Transaction.

[8] "**Legacy Loan Agreement**" means the *Program Management Agreement*, dated March 20, 2014, by and between Kabbage and Celtic, as amended.

[9] Following the purchase of Participation Interests under the Legacy Loan Agreement, the Company sold certain of the Participation Interests to third parties.  The Company continues to service these loans and receives servicing fees on a monthly basis.

The Company's servicing obligations involved marketing the Legacy Loans and conducting diligence on loan applicants to ensure compliance with Celtic's screening procedures. On account of the services rendered, the Company earned a fee calculated as a percentage of the principal amount of the underlying Legacy Loan upon origination (the "**KS Legacy Fee**"). Instead of collecting the servicing fee upfront, the fees were set off against the Participation Interest fees (the "**Celtic Legacy Fee**") that the Company paid to Celtic in connection with its purchase of Participation Interests. On a monthly basis, if the KS Legacy Fees exceeded the Celtic Legacy Fees, Celtic would remit the net amount to the Company. If the Celtic Legacy Fees exceeded the KS Legacy Fees, the Company would remit the net amount to Celtic.[10]

As of the Commencement Date, all such marketing fees, servicing fees, and monthly premiums have been paid, loans are no longer being originated pursuant to the Legacy Loan Agreement, and the Company is no longer purchasing Participation Interests from Celtic. Amounts collected from the Participation Interests accounted for 70 percent of the Company's year-to-date cash flow[11] through September 30, 2022, but that percentage is set to significantly decline as borrowers pay down their loans and the loans mature on a rolling basis. The Company's sole source of continuing cash flow from the Legacy Loan Portfolio is the Legacy Loan receivables that the Company retains on account of its Participation Interests. As collateral security for the Company's remaining servicing obligations under the Legacy Loan Agreement, Celtic currently holds approximately $2 million in an escrow account, the remaining amount of which Celtic is obligated to remit to the Company within five business days of the termination of the Legacy Loan Agreement.

### B.    The Debtors' PPP Business

Responding to the country's desperate need for private lenders to participate in the PPP, the Company partnered with the SBA to originate and service PPP Loans. The Company's participation in the PPP can be separated into three distinct categories:

(a)    PPP Loans that the Company originated with advanced funds from the Reserve Banks' Paycheck Protection Program Liquidity Facility (the "**PPPLF**"), which loans the Company owns, services for its own account, and has pledged as collateral to the Reserve Bank (the "**PPPLF Portfolio**" and the loans thereunder, the "**PPPLF Loans**");

(b)    PPP Loans owned by the Partner Banks, which the Company services for the Partner Banks (the "**Partner Bank Portfolios**" and the loans thereunder, the "**Partner Bank Loans**"); and

(c)    PPP Loans originated, funded, and serviced by the Company for its own account (the "**KS PPP Portfolio**" and the loans thereunder, the "**KS PPP Loans**").

The following table summarizes the Company's PPP participation for each of its PPP Loan portfolios and the approximate outstanding amounts. As of September 30, 2022, only 20 percent of the Company's Round 1 PPP Loans and 8 percent of the Company's Round 2 PPP Loans, by aggregate outstanding principal amount, remain outstanding.

---

[10] All KS Legacy Fees and Celtic Legacy Fees have been paid. Therefore, these monthly remittances no longer occur.

[11] As used herein, "cash flow" does not include amounts that the Company collects and subsequently remits to third parties.

RLF1 28052808v.1

| | PPP Loans at Origination | | | | PPP Loans Outstanding | | |
|---|---|---|---|---|---|---|---|
| | Round 1 | Round 2 | Total | | Round 1 | Round 2 | Total |
| **PPPLF** | | | | | | | |
| Principal | $1,519 M | $104 M | $1,623 M | | $534 M | $8 M | $541 M |
| Loan Count | 86,000 | 11,000 | 97,000 | | 21,000 | 1,000 | 22,000 |
| **CUBI** | | | | | | | |
| Principal | $1,767 M | $818 M | $2,585 M | | $111 M | $70 M | $181 M |
| Loan Count | 58,000 | 41,000 | 99,000 | | 3,000 | 4,000 | 7,000 |
| **CRB** | | | | | | | |
| Principal | $3,048 M | - | $3,048 M | | $604 M | - | $604 M |
| Loan Count | 122,000 | - | 122,000 | | 20,000 | - | 20,000 |
| **KS PPP** | | | | | | | |
| Principal | $9 M | $ <1 M | $9 M | | $2 M | $ <1 M | $2 M |
| Loan Count | < 1,000 | < 1,000 | < 1,000 | | < 1,000 | < 1,000 | < 1,000 |
| **Total** | | | | | | | |
| **Principal** | **$6,343 M** | **$923 M** | **$7,266 M** | | **$ 1,250 M** | **$78 M** | **$1,328 M** |
| **Loan Count** | **267,000** | **52,000** | **319,000** | | **44,000** | **4,000** | **48,000** |

\* Amounts outstanding is rounded to the nearest million
\*\* Number of loans is rounded to the nearest thousand

The following table summarizes Loan Forgiveness and Guaranty Purchase statuses of the PPP Loans in the Company's Loan Portfolio according to the Company's records, as of September 30, 2022.

| Completed Loan Processing to Date | | | |
|---|---|---|---|
| | Total Origination Principal and Loan Count | Forgiven and Guaranty Purchased Loans | Percentage Forgiven and Guaranty Purchased |
| **PPPLF** | | | |
| Principal | $1,623 M | $1,011 M | 62.3% |
| Loan Count | 97,000 | 74,000 | 76.3% |
| **CUBI** | | | |
| Principal | $2,585 M | $2,342 M | 90.6% |
| Loan Count | 99,000 | 91,000 | 91.5% |
| **CRB** | | | |
| Principal | $3,048 M | $2,328 M | 76.4% |
| Loan Count | 122,000 | 99,000 | 81.1% |
| **KS PPP** | | | |
| Principal | $9 M | $ <1 M | 5.0% |
| Loan Count | < 1,000 | < 1,000 | 11.7% |
| **Total[12]** | | | |
| **Principal** | **$7,266 M** | **$5,682 M** | **78.2%** |
| **Loan Count** | **319,000** | **264,000** | **82.8%** |

\* Amounts outstanding is rounded to the nearest million
\*\* Number of loans is rounded to the nearest thousand

On April 9, 2020, to support the effectiveness of the PPP, the Board of Governors of the Reserve Bank System, with the concurrence of the U.S. Treasury, authorized the establishment of the PPPLF, pursuant to which PPP-eligible lenders could enter into agreements with the Reserve Bank to obtain funding for PPP

---

[12] Approximately $310 million of the principal from the "Total Origination Principal and Loan Count Column" has been reduced on account of borrower payments of principal in the ordinary course.

Loans.  To obtain PPPLF financing, the Company entered into the *Paycheck Protection Program Liquidity Facility Letters of Agreement* (the "**PPPLF Letter Agreement**"), dated May 12, 2020 and amended as of January 14, 2021, with the Reserve Bank.  The PPPLF Letter Agreement incorporates the *Federal Reserve Banks Operating Circular No. 10*, dated July 16, 2013 (the "**Operating Circular**," and together with the PPPLF Letter Agreement, the "**PPPLF Documents**"), which sets forth the universal terms and conditions for any party who obtained advances from, incurred liabilities to, or pledged collateral to, the Reserve Bank, and includes terms such as advance payment mechanics, requirements for collateral, and maintenance of lending documents.

Under the PPPLF Documents, the Company was authorized to request advances (the "**PPPLF Advances**") from the Reserve Bank that were secured by certain PPP Loans originated by the Company.  Pursuant to the PPPLF Documents, the PPPLF Advances are fully secured by the underlying PPP Loans that the Company originated using funding from the PPPLF (the "**PPPLF Collateral**"), and mature on the respective maturity dates of the pledged PPP Loans.  Historically, the Company repaid the PPPLF Advances by making weekly remittances to the Reserve Bank for all payments received on account of the Pledged PPPLF Loans, including borrower payments and payments received from the SBA on account of Loan Forgiveness and Guaranty Purchase, including the 0.35 percent of interest per annum on the Pledged PPPLF Loans received from the SBA, but not including the remaining 0.65 percent of interest per annum on the Pledged PPPLF Loans received from the SBA.  The Reserve Bank has asserted that various defaults have occurred under the PPPLF Documents and memorialized its position in a correspondence sent to the Company on October 1, 2022 (the "**Default Notice**").

In September 2022, pursuant to its rights under the PPPLF Documents, the Reserve Bank initiated a change in the remittance procedures whereby the SBA will begin making payments on the Pledged PPPLF Loans directly to the Reserve Bank (the "**SBA Direct Payment Processing**").  Although the Debtors and the Reserve Bank initiated the SBA Direct Payment Processing prepetition, the coordination process remains ongoing with the SBA and the parties are still in the process of documenting an agreement.  Once the SBA Direct Payment Processing is in place, the Reserve Bank will receive payments on account of the Pledged PPPLF Loans directly from the SBA, but the Company will still receive and remit borrower payments on account of the Pledged PPPLF Loans to the Reserve Bank.  In connection with the SBA Direct Payment Processing, the Company and the Reserve Bank have been in discussions regarding the treatment of the Company's allocation of interest received from the SBA on account of Pledged PPPLF Loans, among other portions of the SBA remittances.

## 1.    The Partner Bank Portfolio

Between April 2020 and February 2021, the Company entered into various PPP Loan-related agreements with its Partner Banks.  While there are nuanced differences in, among other things, how the underlying PPP Loans are originated—some were originated by the Company and sold to the Partner Banks, while others were originated by the Partner Banks— and how servicing fees are calculated, as well as the Company's servicing obligations related to Loan Forgiveness and Guaranty Purchase, the ultimate relationship established between the Company and each of its Partner Banks is fundamentally the same.

15

Under the CUBI Agreements[13] and the CRB Agreements[14] (together, the "**Partner Bank Agreements**"), the Partner Banks funded the PPP Loans and the Company services the loans as described below. On account of the services it provides, the Company was to receive all of its servicing fees at or near the time of origination of the underlying PPP Loan. To date, the Company continues to service the CUBI PPP Loans, and CUBI has not paid approximately $65 million (plus any applicable interest) of loan referral and servicing fees owed to the Company, despite the fact that the Company has processed more than 90 percent of CUBI's PPP Loan portfolio. As of the Commencement Date, the Company has set off approximately $34 million from amounts that would be payable to CUBI as reasonable compensation for the Company performing services for which CUBI has not paid.

Customers Bank. On April 24, 2020, the Company and CUBI entered into the CUBI SaaS, pursuant to which the Company is obligated to provide SaaS Services to facilitate CUBI's PPP Loan program. Three days later, the Company and CUBI entered into the CUBI PSA, pursuant to which the Company is obligated to: (a) market CUBI's PPP Loan program; (b) provide funding reports to CUBI to facilitate CUBI's origination of PPP Loans (the "**CUBI Originated Loans**"); (c) subservice PPP Loans originated by CUBI; (d) process PPP Loans as CUBI's agent, including performing Borrower Diligence in accordance with the CARES Act and SBA guidelines, assisting borrowers in their submissions for Loan Forgiveness, and assisting CUBI in its submissions for Guaranty Purchase; and (e) submit reports regarding loan-level data and complaints, among other things. On February 2, 2021, the Company and CUBI entered into the CUBI SAS, pursuant to which the Company sold certain PPP Loans it originated (the "**CUBI Sold Loans**," and together with the CUBI Originated Loans, the "**CUBI Loans**") to CUBI and is obligated to subservice those CUBI Sold Loans.

Cross River Bank. On April 13, 2020, the Company and CRB entered into the CRB LPA, pursuant to which the Company is obligated to (a) market CRB's PPP Loan program; (b) provide funding reports to CRB to facilitate CRB's origination of PPP Loans; (c) subservice PPP Loans originated by CRB (the "**CRB Originated Loans**"); (d) process PPP Loans as CRB's agent, including performing Borrower Diligence in accordance with the CARES Act and SBA guidelines, assisting borrowers in their submissions for Loan Forgiveness, and assisting CRB in its submissions for Guaranty Purchase; (e) submit reports regarding loan-level data and complaints, among other things; and (f) provide SaaS Services to facilitate CRB's PPP Loan program. On May 6, 2020, the Company and CRB entered into the *Sale and Servicing Agreement* CRB SAS, pursuant to which the Company sold certain PPP Loans it originated (the "**CRB Sold Loans**," and together with the CRB originated Loans, the "**CRB Loans**") to CRB and is obligated to subservice those loans.

## 2.    The KS PPP Portfolio

In addition to the PPPLF Portfolio and Partner Bank Portfolio, the Company originated, funded, and currently services approximately 80 KS PPP Loans with approximately $1.6 million in outstanding loan amount. The KS PPP Loans makes up less than one percent of the Company's PPP Loans by aggregate outstanding principal amount.

---

[13] "**CUBI Agreements**" means (i) the CUBI Processing and Servicing Agreement, dated April 27, 2020, by and between Kabbage and CUBI (together with its amendments, the "**CUBI PSA**"); (ii) the CUBI Sale and Servicing Agreement, dated February 2, 2021, by and between Kabbage and CUBI (the "**CUBI SAS**"); and (iii) the CUBI SaaS Services Agreement, dated April 24, 2020, by and between Kabbage and CUBI (together with its amendments, the "**CUBI SaaS**").

[14] "**CRB Agreements**" means (i) the CRB Loan Program Agreement, dated April 13, 2020, by and between Kabbage and CRB (together with its amendments, the "**CRB LPA**"); and (ii) the CRB Sale and Servicing Agreement, dated May 6, 2020, by and between Kabbage and CRB (the "**CRB SAS**").

## III.  CORPORATE AND CAPITAL STRUCTURE

### A.    Corporate Structure

KServicing owns 100% of the ownership interest in each of the other Debtors.  KServicing owns 100% of the ownership interest in Kabbage Financial Services Limited ("**Kabbage UK**"), which owns 99.9% of the ownership interest in Kabbage India Private Limited ("**Kabbage India**").  Kabbage UK and Kabbage India are the only non-Debtor affiliates of the Debtors.  The corporate structure chart, attached hereto as **Exhibit B**, illustrates the Debtors' organizational structure as of the Commencement Date.

### B.    Management

The following table sets forth the names of KServicing's current executive officers:

| Name | Position |
| --- | --- |
| Laquisha Milner | President and CEO |
| David Walker | Interim CFO |
| Donna Evans | Vice President of Operations |
| Holly Loiseau | General Counsel, Chief Compliance Officer, Chief Privacy Officer, Secretary |
| Salim Kafiti | Deputy General Counsel, Assistant Secretary |
| Ian Cox | BSA/AML and OFAC Officer[15] |

### C.    Prepetition Capital Structure

PPPLF Advances.  The total amount of PPPLF Advances borrowed by KServicing pursuant to the PPPLF Documents is approximately $1.6 billion.  As of September 30, 2022, approximately $541 million in PPPLF Advances remain outstanding.  KServicing's obligations under the PPPLF Documents mature on the maturity date of the underlying PPP Loan.  The PPPLF Advances are not guaranteed by any of KServicing's Debtor or non-Debtor affiliates, although the Reserve Bank also has recourse against the Company under the PPPLF Documents subject to the terms thereof and as described below.

The PPPLF Advances and all obligations under the PPPLF Documents are secured in accordance with the PPPLF Documents, pursuant to which the Reserve Bank was granted first-priority liens on the underlying PPP Loans and all proceeds thereof.  In the event KServicing fails to repay a PPPLF Advance on the applicable maturity date, the Reserve Bank must first seek repayment on a non-recourse basis, by realization on the PPPLF Collateral absent a default.  Notably, the Reserve Bank may pursue payment directly from KServicing—if: (a) in its sole discretion the Reserve Bank deems KServicing to have engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance, or (b) KServicing fails to meet any of the requirements of the PPPLF Documents, including, but not limited to, breaches of any representations, warranties, or covenants.  The Reserve Bank has notified KServicing it has determined such events have occurred pursuant to the Default Notice.

---

[15] "**BSA**" means Bank Secrecy Act. "**AML**" means Anti-Money Laundering. "**OFAC**" means Bank's office of Foreign Assets Control.

Equity Ownership.  As of the Commencement Date, the outstanding shares of common stock, par value $0.001 per share of KServicing (the "**KS Common Stock**") are held (either directly or through subsidiaries or affiliates) as follows:

| Holder | Outstanding KS Common Stock |
|---|---|
| Softbank Vision Fund (AIV M2) L.P. | 14.62% |
| Blue Run Ventures IV, L.P. | 13.60% |
| MDV IX, L.P. | 12.08% |
| Thomvest Ventures Ltd. | 11.47% |
| SoftBank PrinceVille Investments, L.P. | 5.17% |
| Less than 5% holders | 43.06% |
| **Total** | **100%** |

KServicing does not have any other classes of stock outstanding.

## IV.  CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

The Debtors are filing these Chapter 11 Cases to implement and complete the wind down of their business, which has been well underway since the October 2020 AmEx Transaction.  The benefits and protections of chapter 11 are critical to achieving the Debtors' goals of maximizing creditor recoveries, providing for an equitable distribution to their stakeholders, and, perhaps most importantly, insulating the good-faith PPP Borrowers from any repercussions of the Disputes—primarily, interruptions to loan servicing—to the greatest extent possible.  Given the Company's finite resources, limited liquidity and revenue generating ability, and numerous ongoing investigations and related demands, absent a capital injection or significant reduction in operations, the Company cannot sustain its businesses through the duration of the wind down.

### A.    Lack of Clarity in SBA Guidance

Speed was the watchword of the PPP.  Delays in processing and funding loans would undermine the efficacy of the "stay at home" posture that public health authorities believed was the most effective means of slowing the spread of a disease that threatened millions of lives.  To induce lenders to make *hundreds of billions* of dollars in unsecured loans to small and mid-size businesses (many of which had ceased operating due to government mandates), the CARES Act provided that all PPP Loans would be backed by a 100% SBA guaranty of repayment, and participating lenders were directed to forego the typical underwriting process, in favor of "minimal review" of PPP Borrower calculations in which lenders (per published SBA guidance) were permitted to rely on PPP Borrower representations, including specific representations as to "amounts required to be excluded" from PPP Borrower calculations of qualifying payroll costs.

However, there was a distinct lack of clarity and guidance from the SBA during the PPP's initial rollout. New rules and guidance were issued on a near daily basis during the first few months of the PPP Loan Program.  In the first month of the PPP Loan Program, the government published six interim final rules and 42 FAQs.  In the first two months of the program, those numbers increased to 14 interim final rules and 48 FAQs.  Despite this lack of clarity, government officials publicly expressed to participating lenders that time was of the essence with regards to administering loans, at times even asking lenders to process loans to eligible PPP Borrowers on the same day that they applied.  There was no other way to objectively view those facts and circumstances—it was a national emergency.  Under the most difficult of circumstances, the Company processed loan applications in good faith, in accordance with the framework established by the CARES Act, SBA's PPP implementing regulations, and the SBA's written guidance concerning lender obligations under the PPP.

B.        **The Disputes**

Notwithstanding the Company's compliance with SBA guidance, the Company remains the subject of numerous Disputes, which requires the Company to expend a significant amount of time and resources defending itself across multiple costly fronts.  Such time and resources are finite—the Company already is in wind down, is not originating or processing any new loans, and generates limited cash flow from a dwindling Legacy Loan Portfolio and a subset of its PPP Loans.  The Company is overburdened despite its focus on servicing its remaining Loan Portfolios, ensuring the timeliness of submission of Loan Forgiveness and Guaranty Purchase applications, and prioritizing uninterrupted processing.  In the face of the Disputes, the Company's servicing operations have evolved into a significantly more time intensive and costly enterprise.  For example, submissions to the SBA for Loan Forgiveness or Guaranty Purchase for "excess amounts" has required months of back and forth with the DOJ and the SBA, responding to extensive and burdensome information requests, borrower fraud and suspicious activity analysis, engagement of professionals for review of the Loan Portfolios, and more.  Even then, the issue of "excess amounts" as processed by the SBA remains unresolved.  Further, responding to and participating in the Disputes and defending against false allegations has required expenditure of significant amounts.  Balancing their limited resources with ballooning costs from litigations and investigations—and unable to reach consensual out-of-court resolutions—the Debtors commenced these Chapter 11 Cases to preserve their assets and utilize the protections and tools of chapter 11 to optimize their ability to continue providing services to borrowers and their remaining wind down efforts.

The DOJ and the SBA.  On December 28, 2020 and July 11, 2021, the MA DOJ and Texas DOJ, respectively, initiated investigations into whether the Debtors' performance of Borrower Diligence violated the False Claims Act and the Financial Institutions Reform, Recovery, and Enforcement Act.  It is the Company's position that the DOJ's allegations are wholly without merit.

Under the PPP Loan program, a borrower's maximum loan amount was 2.5 times the amount of the Borrower's average monthly payroll costs.  Qualifying payroll costs consisted of employee compensation and payments for certain benefits, among other things, but the CARES Act required exclusion of compensation of an individual employee in excess of an annualized salary of $100,000 prorated for the covered period.  Further, in guidance issued on April 24, 2020, the SBA instructed Borrowers to compute payroll costs by adding 2019 gross wages and tips paid to employees together with fringe benefits, which are excluded from taxable Medicare wages and tips.  Using the Internal Revenue Service Form 940, Box 4 ("**Box 4**") as a guide to calculate these costs complied with such guidelines because virtually all fringe benefits exempt under the Federal Unemployment Tax Act—and thus which an employer would list in Box 4—are also excluded from Medicare tax.[16]

At all times, the Company complied with PPP lending requirements.  With respect to approving loan applications in which the borrower failed to exclude employee compensation in excess of $100,000, the Company was entitled to rely on borrower representations and certifications regarding amounts required to be excluded from the calculation of payroll costs.  Any loan amounts resulting from borrowers' inclusion of individual employee compensation in excess of $100,000 were attributable to the borrowers' failure to follow PPP requirements.  Notably, the publicly-reported maximum amount of a PPP Loan for a small business with one employee was $20,833, whereas the average loan amount for PPP Loans processed by the Company was $23,546.  Additionally, allowing borrowers to use Form 940, Box 4 in their payroll-cost calculations was a reasonable effort to implement PPP requirements, and was consistent with SBA guidance on calculating loan amounts.  The proper and intended manner for the program to deal with excess loan

---

[16] In addition, given the urgency of getting money in the hands of businesses in need and the deferred tax deadlines passed by Congress in response to the pandemic, the SBA expressly permitted Round 1 PPP lenders to originate PPP Loans based on *draft* tax documents.

amounts was for lenders to seek identification of excess amounts when borrowers applied for forgiveness, and then collect excess amounts from borrowers with SBA's guaranteed purchase of the excess amount still intact. Requiring more would de facto impose more than "minimal review" requirements on lenders, and transfer risk to them that the PPP rules did not contemplate.

Despite the Company's compliance with SBA guidance, the DOJ is alleging that the Debtors improperly included individuals with compensation of more than $100,000 in its payroll calculations (the "**$100k Issue**"), and failed to exclude ineligible expenses from applicants' Box 4 submissions in making PPP Loan eligibility determinations (the "**Form 940 Issue**").[17] The DOJ flagged approximately 6,200 loans totaling $120 million of principal amount in connection with the $100k Issue and Form 940 Issue (the "**DOJ-Flagged Loans**") and instructed the Company not to process those loans for Loan Forgiveness. Further, in response to the DOJ's allegations, the SBA stopped processing Loan Forgiveness for DOJ-Flagged Loans, with little indication of when or under what circumstances processing would resume. The Company was not permitted to discuss these investigations with concerned borrowers, who became increasingly frustrated and brought escalations and claims against the Company. Only recently— after weeks of discussions with the Company, shared documentation, and analysis—did the SBA provide the Company with the clarity needed to submit DOJ-Flagged Loans for Loan Forgiveness and Guaranty Purchase. Importantly, the SBA has communicated to the Company, that, at this time, it will not guarantee any excess loan amounts stemming from the $100k Issue or the Form 940 Issue; therefore, the fate of these amounts, the Company, and the Partner Banks and the Reserve Bank remain in limbo until such a time as the SBA makes clear its final position with respect to the excess loan amounts, and it appears the SBA is deferring to the DOJ in many respects as the DOJ investigation continues.

SALT Issue. In 2021, the Company was engaged in extensive discussions with the SBA regarding approximately 53,000 PPP Loans processed by the Company on its behalf and on behalf of the Partner Banks that may have been originated in amounts involving duplicate counting of state and local income taxes. The duplicate calculation resulted in borrowers receiving PPP Loans in excess of the maximum amount they were eligible to receive under the program rules. Any such error also potentially resulted in the Company and/or the Partner Banks collecting processing fees from the SBA that were in excess of amounts that should have been paid. On May 3, 2021, the SBA and the Company entered into an interim voluntary agreement related to the SALT Issue. For approximately three months, while the SBA and the Company discussed the SALT Issue, and the Company engaged an independent third-party to assess the reasonableness of the Company's methodology in identifying the potentially affected loans, the SBA took unilateral action and paused Loan Forgiveness processing for the Company's entire PPP Loan portfolio. The SBA paused Loan Forgiveness processing on 53,000 PPP Loans for an additional five months. On October 25, 2021, the Company and the SBA entered into a final settlement agreement in resolution of the SALT Issue (the "**SBA SALT Settlement Agreement**") and pursuant to which the Company paid the SBA $30 million (the "**SBA SALT Settlement Amount**") and, in exchange, the SBA resumed Loan Forgiveness processing for all PPP Loans in the Company's Loan Portfolio, which ensured that borrowers would not be further impacted.[18] Payment of the SBA SALT Settlement Amount significantly impacted the Company's already dwindling liquidity.[19] Further, despite a degree of involvement in discussions regarding the SALT

---

[17] The DOJ has also alleged that the Company improperly counted state and local taxes twice in calculating payroll costs, resulting in additional excess loan amounts. As noted previously, the DOJ elected not to participate in the SALT Settlement between the Company and the SBA on October 25, 2021.

[18] The Partner Banks did not contribute settlement amounts. The Partner Banks did not incur any direct liability on the SALT Issue once the PPP Loans were cleared for full processing.

[19] To address Pledged PPPLF Loans affected by the SALT Issue, the Company paid the Reserve Bank the full amount outstanding under such loans without regard for any excess amounts. Any payments thereafter received by the

20

Issue and the ultimate resolution reached with the SBA – including payment of the SBA SALT Settlement Amount, the DOJ has subsequently alleged claims against the Company under the False Claims Act on account of the same SALT Issue.

Conflicting Agency Positions.  As maturity dates for certain of the Company's 24-month PPP Loans approached, the Company found itself in the untenable position of addressing the deadline for Pledged PPPLF Loan repayment obligations, which the Reserve Bank has not extended, for loans where the Company had yet to receive funds from the borrower in satisfaction of the outstanding amount due or payment from the SBA due to its Guaranty Purchase obligations.  The implicated Pledged PPPLF Loans were generally delayed in processing because either the DOJ/SBA directed that such loans not be processed, or the Company needed additional time to address SBA issued "hold codes" placed on the applicable forgiveness or guaranty purchasing applications to the extent the SBA's automated screening tool identified the borrower as potentially being ineligible for the loan (or the loan amount) it received.  Failure to pay the outstanding PPPLF obligations by the maturity date was a default under the PPPLF Documents.  Despite the need for accommodations to be made such that PPPLF maturities reflect the delay in SBA processing of Pledged PPPLF Loans, this did not occur.  In certain instances the Debtors advanced millions of dollars of their own funds to satisfy amounts due on PPPLF obligations to avoid defaulting under the PPPLF Documents and to provide borrowers with a bridge in time so that they may address their respective loan obligations through self-payment, loan forgiveness or the SBA paying under its Guaranty Purchase obligation.  The Company found itself in the middle of conflicting agency positions which resulted in adverse consequences to its already depleting liquidity and its ability to serve borrowers.

Congressional Subcommittee Investigation.  On May 27, 2021, the Congressional Subcommittee notified the Company that it was investigating potential waste, fraud, and abuse in connection with the PPP Loan program.  The Congressional Subcommittee requests extensive document production, including documents and policies related to the Company's PPP Loan program, training materials provided to employees and contractors, and communications concerning potential fraud or other financial crime related to PPP Loans, among other things.  The Company is producing these documents on a rolling basis and continues to communicate with the Congressional Subcommittee regularly.

Federal Trade Commission Investigation.  On February 8, 2021, the Company received a Civil Investigative Demand (a "**CID Letter**") from the FTC alleging that the Company engaged in deceptive and/or unfair acts or practices under the Federal Trade Commission Act and the COVID-19 Consumer Protection Act in connection with the Company's advertising, marketing, underwriting, originating, and servicing of PPP Loans.  In the CID Letter, the FTC requested that the Company produce, among other things, PPP Loan statistics and Borrower information, technical errors detected in the Company's PPP Loan platform, and descriptions of the Company's PPP Loan policies, among other things.  As of September 7, 2022, the Company has produced approximately 32,000 documents to the FTC and is undertaking a privilege review of approximately 17,000 additional documents.  The Company is continuing to communicate with the FTC and producing documents on a rolling basis.

Customers Bank.  From April 2020 to May 2021, CUBI funded or originated over $2.6 billion in loans through its arrangements with the Debtors, generating tens of millions of dollars in fees payable to the Debtors under the CUBI Agreements, including approximately $65 million in loan referral and servicing fees (the "**CUBI Receivable**") in connection with Round 2 PPP Loans.  CUBI's withholding of the CUBI Receivable for over 20 months has caused a significant financial strain on the Company.  In response, as of September 30, 2022 the Debtors withheld certain payments due to CUBI in the amount of approximately $34 million (the "**KServicing Withholding**") to offset the CUBI Receivable (all of the foregoing, the

---

Company on account of borrower repayment or through the SBA Guaranty Purchase have been retained by the Company to satisfy recoupment of the amounts paid to the Reserve Bank.

"**CUBI Dispute**").  The Company has already expended a significant amount of its depleted resources in addressing the CUBI Dispute, increasing the servicing costs associated with the CUBI Loans.

On May 25, 2022, the Company filed a complaint in the United States District Court for the Northern District of Georgia, Atlanta Division (the "**Georgia Action**"), alleging breach of contract under the CUBI Agreements for CUBI's withholding of the CUBI Receivable.  On August 16, 2022, the Debtors and CUBI held a mediation in an effort to resolve the CUBI Dispute.

After months of negotiations, CUBI and the Company are still discussing terms of a potential settlement, which would bring much needed cash flow to the Company and put the Debtors in a position to pursue a more consensual plan confirmation process, as described in more detail herein.

Cross River Bank.  In correspondence beginning August 12, 2022, CRB has asserted various contractual claims under the CRB Agreements, including repurchase obligations and a right to indemnification under the CRB SAS, and a right to indemnification and remediation and or/restitution under the CRB LPA.  In addition, CRB has requested that the Company provide sufficient data to identify 100k Loans and Form 940 Loans (as defined herein), and assurances that the Company will be able to meet its obligations to CRB. In response, the Company has provided the requested information and explained its position that repurchase obligations were not triggered and the Company does not owe any indemnification, remediation, or restitution under the CRB Agreements.  The Company has already expended a significant amount of its depleted resources in responding to CRB's allegations and document requests, increasing the servicing costs associated with the CRB Loans.  Nevertheless, the Company plans to continue discussions with CRB in an effort to reach a consensual resolution of CRB's demands.

Borrower Class Action Lawsuit.  On March 20, 2022, named plaintiffs Jason Carr, Vicki LeMaster, Edward Ford Services LLC, Carlton Morgan, 365 Sun LLC, and Candice Worthy (the "**Class Action Plaintiffs**") filed a class action complaint (the "**Class Action Complaint**") against the Company in the Georgia District Court, alleging that the Company failed to timely and competently process Loan Forgiveness applications on behalf of Borrowers.  The Class Action Complaint seeks injunctive relief directing the Company to review and process Loan Forgiveness in accordance with SBA regulations, disgorgement of PPP Loan origination fees on theories of unjust enrichment, and damages in accordance with state consumer protection statutes.  On May 31, 2022, the Company moved to dismiss the class action in its entirety on the basis that the Class Action Plaintiffs did not allege facts sufficient to establish legal claims against the Company and also that private individuals do not have standing to pursue the alleged causes of action.[20] This motion has been fully briefed and the parties are awaiting decision from the Georgia District Court. The Company has cooperated with all required initial disclosures.

American Express.  To further exacerbate the aforementioned difficulties, the Company has experienced significant operational hurdles to even the simplest of corporate tasks by virtue of a lack of cooperation or delay from AmEx.  In connection with the AmEx Transaction, the parties entered into the AmEx TSA pursuant to which, among other things, AmEx provides the Company with information and access to books and records necessary and critical to run its PPP business and access to the Company's legacy software, which provides PPP Loan and Legacy Loan borrowers a platform to submit payments and supports PPP-related processes such as Guaranty Purchase (with the key exception of Loan Forgiveness processes, as explained herein) (the "**AmEx Platform**").

With the incredibly voluminous information production requests from the DOJ and various other stakeholders in connection with the Disputes, AmEx's performance under the AmEx TSA is more important

---

[20] See Defendant Kabbage, Inc., d/b/a KServicing's Motion to Dismiss and Request for Oral Argument, filed May 31, 2022 (Case 1:22-cv-01249-VMC, ECF No. 12).

than ever.  Nevertheless, retrieving documents from AmEx has and continues to be difficult and requires concerted effort as responses are often delayed and incomplete.  Further, when the SBA issued a revised Loan Forgiveness application form in early 2021, AmEx was required to revise the AmEx Platform to accommodate the revisions pursuant to the terms of the AmEx TSA, and it refused to do so.  AmEx's refusal forced the Company to engage a third-party vendor, Biz2Credit, to process Loan Forgiveness applications.

The Debtors are hopeful that the flow of information with AmEx will improve during the Chapter 11 Cases so that they may have, at a minimum, the books and records necessary to conduct their operations; but to the extent necessary, the Debtors are prepared to use the tools provided to debtors-in-possession to seek out any required information, including through Bankruptcy Rule 2004 discovery.  The Debtors are cognizant of the importance of the AmEx Transaction to the administration of these Chapter 11 Cases and, as described above, the transaction and any causes of action related thereto are under review by the Board.

C.    **Liquidity Constraints**

Given that it has been winding down its operations, the Company is not entering into any new business and therefore is limited in its ability to independently source funds to support its remaining servicing and wind down operations, which also makes the chances of securing third-party funding highly improbable.  Further, the Company's remaining operations generate only immaterial revenue and cash flow.  As described in detail herein, (a) the PPPLF Portfolio and Legacy Loan Portfolio generate modest income and cash flow as the Company's servicing fees earned in connection with the Partner Bank Portfolio (as defined below) were paid up-front,[21] and (b) this modest income is declining as borrowers pay down their loans and the loans mature on a rolling basis.

In addition to the withholding of the CUBI Receivable and the Company's lack of go-forward cash flows under its servicing agreements, its liquidity is being significantly impacted by two major items:  (a) the Company's fees payable to AmEx under the AmEx TSA and to Biz2Credit for services that AmEx was obligated, but refused, to provide under the AmEx TSA; and (b) the cost of defending against the Disputes, which includes increased servicing and administration costs in connection thereto.  The net result is that the Company is rapidly burning through its remaining cash and has no ability to originate more loans or otherwise create new income streams.

Fees Payable to AmEx and Biz2Credit.  As described above, in connection with the AmEx Transaction, the Company and AmEx entered into the AmEx TSA whereby AmEx agreed to provide services pivotal to the Company's operations, which includes, among other things, access to and maintenance of the AmEx Platform, certain cloud services, and documents and files transferred to AmEx that the Company needs to process its PPP Loans and Legacy Loans and otherwise wind down the remaining loan portfolios (the "**AmEx Services**").  The Company relies heavily on AmEx to access the services, documents, and files necessary to service PPP Loans, wind down the business, and facilitate these Chapter 11 Cases.  Notably, around February 2021 when the SBA issued a revised Loan Forgiveness application form, AmEx refused to revamp the AmEx Platform to accommodate the updated form, as required under the terms of the AmEx TSA.  The Company subsequently scrambled to find a third-party service provider, and engaged Biz2Credit to provide a platform for Loan Forgiveness activities (the "**B2C Platform**").[22]

---

[21] With the exception of the CUBI Receivable.

[22] Because the SBA would no longer accept the old Loan Forgiveness form, borrowers were unable to submit their applications for Loan Forgiveness for nearly three months while the Company identified and prepared the B2C Platform for the Company's PPP program.

23

Put simply, the AmEx Services and B2C Platform are expensive.  As of the Commencement Date, the Company has spent a combined $7 million in 2022 on the AmEx Services and the B2C Platform.  The Company estimates that it will pay between $275,000 and $375,000 per month on the AmEx Services and B2C Platform, collectively, during these Chapter 11 Cases.

<u>Cost of Defending Against the Disputes</u>.  The Company has expended tremendous amounts of time and resources to address the Disputes.  In response to document requests from Dispute counterparties, the Company has produced hundreds of thousands documents to date and voluminous amounts of electronic data.  The Company has participated in over 100 formal meetings, in person and virtual, and phone calls with Dispute counterparties, which does not include countless emails and other forms of correspondence.  Additionally, to demonstrate that the Company's Borrower Diligence processes complied with SBA guidance, the Company hired forensic accountants to analyze the DOJ-Flagged Loans for potential excess amounts.

As of the Commencement Date, the Company has spent approximately $19 million in 2022 on professional fees in connection with the Disputes.  This amount does not include the considerable amount of time and attention the Company's employees—including its directors and officers—have had to spend addressing the Disputes, away from the Company's regular operations and wind down.

<u>Increased Servicing and Administration Costs</u>.  The Disputes—and more specifically the DOJ investigations and the SBA's refusal to process DOJ-Flagged Loans for Loan Forgiveness and Guaranty Purchase—have significantly increased the time and resources required to process PPP Loans.  To continue its regular operations, implement internal processes and controls to account for the DOJ-Flagged Loans (by, for example, flagging such loans internally for special processing, suspending Loan Forgiveness review activity at the request of the SBA and the DOJ, performing special review activity and heightened underwriting standards at the Loan Forgiveness stage that are not contemplated by SBA guidance, and adjusting deadlines for Loan Forgiveness and Guaranty Purchase) and respond to document requests, among other things, the Company has had to augment its staff with additional contractors.  As of the Commencement Date, the Company has spent approximately $11 million in 2022 on staffing firms, and a majority of such amounts can be attributed to increased demand to process document requests, submit reports, and respond to inquiries in connection with the Disputes.

<u>Expending Resources on Subpoena Responses</u>.  The Company is the recipient of more than 100 subpoenas per week in connection with borrower bankruptcies and other court proceedings related to the Company's PPP Loans.  Responding to these subpoenas requires the production of loan files and certifications of authenticity of business records, as well as the provision of witnesses at evidentiary hearings and trials to testify as to the authenticity of business records and the loan origination process.  The Company employs a dedicated staff of approximately five employees to deal with such subpoenas and related matters.

> ### D.    Debtors' Prepetition Settlement Efforts

Prior to the filing of these Chapter 11 Cases, the Company sought to resolve the Disputes with its key stakeholders and obtain a workable framework to wind down the Company's operations.  In the months leading up to these Chapter 11 Cases, the Company engaged with key stakeholders with the goal of building consensus around an efficient and effective wind down framework.  The Debtors intend to continue their efforts to obtain consensus among the relevant parties.  As previously stated herein, the Company is seeking to maximize the value of a finite pool of resources, and seeking a path forward that insulates, where possible, the PPP and Legacy Loan borrowers.

## V.  FIRST-DAY PLEADINGS

### A.    First Day Motions

On the Commencement Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").  A detailed description of the First Day Motions is set forth in the First Day Declaration. The First Day Motions include:

- *Motion of Debtors for Interim and Final Orders Authorizing Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations* (the "**Loan Servicing Motion**") [Docket No. 11];

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management in the Ordinary Course of Business; and (II) Granting Related Relief* (the "**Cash Management Motion**") [Docket No. 12];

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Obligations and (II) Granting Related Relief* (the "**Wages Motion**") [Docket No. 10];

- *Motion of Debtors for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors*  (the "**NOL Motion**") [Docket No. 6];

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Pay Certain Prepetition Taxes and Assessments and (B) Granting Related Relief* (the "**Taxes and Fees Motion**") [Docket No. 9];

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing (A) Debtors to Continue Insurance Policies and (B) Pay All Obligations With Respect Thereto, and (II) Granting Related Relief* (the "**Insurance Motion**") [Docket No. 7]; and

- *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Resolving Objections by Utility Providers, (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief* (the "**Utilities Motion**") [Docket No. 8].

### B.    Procedural Motions

On the Commencement Date, the Debtors filed various motions regarding procedural issues that are common to Chapter 11 Cases of similar size and complexity as these Chapter 11 Cases, which includes:

- *Motion of Debtors for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* (the "**Joint Admin Motion**") [Docket No. 3];

- *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) File and Maintain Consolidated Creditor Lists, and (B) Redact Certain Personal Identification Information for*

25

*Individuals, (II) Approving Special Electronic Noticing Procedures, and (III) Granting Related Relief* (the "**Creditor Matrix Motion**") [Docket No. 5].

### C.    Retention of Chapter 11 Professionals

The Debtors have filed several applications to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases, which includes (i) Weil Gotshal & Manges, LLP ("**Weil**"), as counsel to the Debtors; (ii) Richards, Layton & Finger, P.A., as co-counsel to the Debtors; (iii) AlixPartners, LLP, as financial advisor; and (iv) Omni Agent Solutions, LLC, as claims, noticing, and administrative agent.

### D.    Cash Collateral

To the extent the Debtors are able to negotiate for the consensual use of cash collateral with the Reserve Bank, the Debtors also intend to bring a motion seeking Bankruptcy Court approval of a cash collateral order. Access to the use of cash collateral is critical to ensure that the Debtors have liquidity to operate their business and implement the Unfunded Transaction.

## VI.  SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class. Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (ii) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class. Only holders of Claims in Class 3 and Class 4 are entitled to vote to accept or reject the Plan. Ballots are being furnished herewith to all holders of Claims in Class 3 or Class 4 that are entitled to vote to facilitate their voting to accept or reject the Plan. Holders of Claims in Classes 1, 2, and 6 (if so treated) are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan. Holders of Claims and Interests in Classes 5, 6 (if so treated), 7, and 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### A.    Administrative Expenses and Priority Claims

#### 1.    Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator agree to different treatment, the Debtors (or the Plan Administrator, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such other date or terms as may be mutually agreed upon between the holder of such an Allowed Administrative Expense Claim and the Debtors or the Plan Administrator, as applicable; provided that, Allowed Administrative Expense Claims

26

representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

  **2.**  **Treatment of Fee Claims**

   (a)  All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (ii) shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) allowing any such postpetition, estate-retained professional fee and expense claim (A) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (B) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Plan Administrator, as applicable. The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

   (b)  On or about the Effective Date, holders of Fee Claims shall provide a reasonable estimate of unpaid Fee Claims incurred in rendering services before the Effective Date to the Debtors and the Debtors or the Plan Administrator, as applicable, shall separately escrow such estimated amounts in the Fee Escrow Account (less any amounts already reserved for such professional in the Fee Escrow Account) for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtors or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim. When all such Allowed Fee Claims have been paid in full, any remaining amount in such escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Wind Down Estates and the Plan Administrator without any further action or order of the Bankruptcy Court.

   (c)  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' estates or property of the Wind Down Estate, but shall revert to the Wind Down Estate only after all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for estate-retained professionals and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.

  **3.**  **Treatment of Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the sole option of the Debtors or the Plan Administrator, as applicable, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

4.        **Classification in General**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

5.        **Grouping of Debtors for Convenience Only**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under the Plan.  Each Class of Claims will be deemed to contain sub-classes for each of the Debtors, to the extent applicable for voting and distribution purposes.  To the extent there are no Allowed Claims or Interests with respect to a particular Debtor, such Class is deemed to be omitted with respect to such Debtor. Except as otherwise provided herein, to the extent a holder has a Claim that may be asserted against more than one Debtor, the vote of such holder in connection with such Claims shall be counted as a vote of such Claim against each Debtor against which such holder has a Claim.  Except as provided in Section 5 of the Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

6.        **Summary of Classification**

The following table designates the Classes of Claims against, and Interests in, each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in <u>Section 3.5</u> of the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | Reserve Bank Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Intercompany Claims | Impaired | No (Deemed to reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | No (Deemed to accept/reject) |
| 7 | Subordinated Securities Claims | Impaired | No (Deemed to reject) |
| 8 | KServicing Equity Interests | Impaired | No (Deemed to reject) |

7.        **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

RLF1 28052808v.1

### 8. Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 9. Voting Class; Presumptions

(a) **Acceptance by Certain Impaired Classes.** Only holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Classes 3 and 4 shall receive Ballots containing detailed voting instructions.

(b) **Presumed Acceptance by Unimpaired Classes.** Holders of Claims and Interests in Classes 1, 2, and 6 (if so treated) are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c) **Deemed Rejection by Certain Impaired Classes.**  Holders of Claims and Interests in Classes 5, 6 (if so treated), 7, and 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

### 10. Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Section 12.4 of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### 11. No Waiver

Nothing contained in the Plan shall be construed to waive a Debtor's, the Plan Administrator's, or other Person's right to object on any basis to any Claim.

### B. Treatment of Claims and Interests

### 1. Class 1: Priority Non-Tax Claims (Class 1)

(a) *Classification*:  Class 1 consists of Priority Non-Tax Claims against the Debtors.

29

(b)    *Treatment*:  On or as soon as practicable after the Effective Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each holder thereof shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired, and holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

**2.    Class 2: Other Secured Claims (Class 2)**

(a)    *Classification*:  Class 2 consists of the Other Secured Claims against the Debtors. To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment:*

(i)    Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is thirty (30) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive, on account of such Allowed Claim, at the sole option of the Debtors or the Plan Administrator, as applicable:  (i) Cash in an amount equal to the Allowed amount of such Claim; (ii) such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(ii)    Except as otherwise specifically provided herein, upon the payment in full in Cash of an Other Secured Claim, any Lien securing an Other Secured Claim that is paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Plan Administrator, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Plan Administrator.

(c)    *Voting:*  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

**3.    Class 3: Reserve Bank Claims (Class 3)**

(a)    *Classification:*  Class 3 consists of the Reserve Bank Claims.

(b)    *Allowance:*

(i)    The Reserve Bank Secured Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against the Debtors in the aggregate principal amount of $[●] plus

30

all accrued but unpaid interest, costs, fees, and expenses then outstanding under the PPPLF Documents.

(ii)    The Reserve Bank Priority Claims are Allowed pursuant to section 507(a)(2) of the Bankruptcy Code against the Debtors in the aggregate amount of $[●].

(c)    *Treatment:*  Except to the extent that a holder of an Allowed Reserve Bank Claim against the Debtors agrees to a less favorable treatment of such Claim, each holder of an Allowed Reserve Bank Claim in full and final satisfaction, compromise, settlement, release, and discharge in exchange for:

(d)    Reserved Bank Secured Claims will receive:

(i)    if the Funded Transaction occurs and the Reserve Bank elects: (x) Post-Effective Date PPPLF Servicing, cash proceeds of the PPPLF Collateral or (y) PPPLF Transfer, the return of the PPPLF Collateral; or

(ii)    if the Unfunded Transaction occurs (x) return of the PPPLF Collateral.

(e)    Reserve Bank Priority Claims will receive:

(i)    if the Funded Transaction occurs: GUC Pool Class A Claims, or

(ii)    if the Unfunded Transaction occurs GUC Trust Beneficial A Interests.

(f)    *Voting:*  Class 3 is Impaired, and the holders of Reserve Bank Claims are entitled to vote to accept or reject the Plan.

### 4.    Class 4: General Unsecured Claims (Class 4)

(a)    *Classification:*  Class 4 consists of General Unsecured Claims against the Debtors.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, each holder of an Allowed General Unsecured Claim will receive:

(i)    if the Funded Transaction occurs, its *pro rata* share of the GUC Pool Class B Claims; or

(ii)    if the Unfunded Transaction occurs, its *pro rata* share of the GUC Trust Beneficial B Interests.

(c)    *Voting:*  Class 4 is Impaired, and the holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 5.    Class 5: Intercompany Claims (Class 5)

(a)    *Classification*:  Class 5 consists of Intercompany Claims against the Debtors.

(b)    *Treatment*:  On or after the Effective Date, all Intercompany Claims will either be reinstated or cancelled and released at the option of the Debtors; *provided* that no such distributions shall be made on account of such Intercompany Claims on the Effective Date.

31

(c)    *Voting*:  Class 5 is Impaired, and the holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

6.    **Class 6: Intercompany Interests (Class 6)**

(a)    *Classification*:  Class 6 consists of Intercompany Interests in the Debtors.

(b)    *Treatment*:  On the Effective Date, Intercompany Interests shall receive no recovery or distribution and be reinstated solely to maintain the Debtors' corporate structure, as necessary.

(c)    *Voting*:  Allowed Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such Intercompany Interests conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Interests.

7.    **Class 7: Subordinated Securities Claims (Class 7)**

(a)    *Classification*:  Class 7 consists of Subordinated Securities Claims against the Debtors.

(b)    *Treatment*:  Holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Subordinated Securities Claims.  On the Effective Date, all Subordinated Securities Claims shall be deemed cancelled without further action by or order of the Bankruptcy Court, and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(c)    *Voting*:  Class 7 is Impaired, and the holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Subordinated Securities Claims.

8.    **KServicing Equity Interests (Class 8)**

(a)    *Classification*: Class 8 consists of KServicing Equity Interests.

(b)    *Treatment*:  Except to the extent that a holder of KServicing Equity Interests agrees to less favorable treatment, in full and final satisfaction and release of, and in exchange for KServicing Equity Interests, each such holder thereof shall receive the following treatment: (i) on the Effective Date, all KServicing Equity Interests shall be cancelled and one share of KServicing common stock (the "**Single Share**") shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of KServicing Equity Interests consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of KServicing Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such KServicing Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a KServicing

Existing Equity Interests may receive its share of any remaining assets of KServicing consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that KServicing's Chapter 11 Case is closed in accordance with Section 5.14 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect; *provided* that (i) such cancellation does not adversely impact the Debtors' Estates; and (ii) the continuing rights of former holders of KServicing Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

(c)    *Voting*: Class 8 is Impaired, and the holders of KServicing Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of KServicing Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such KServicing Equity Interests.

## C.    Means for Implementation

### 1.    No Substantive Consolidation

The Plan is being proposed as a joint chapter 11 plan of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims of Interests set forth in the Plan.

### 2.    Sources of Consideration for Plan Distribution

The Debtors and the Plan Administrator, as applicable, shall fund Distributions under the Plan with the Net Cash Proceeds. In the event of a Funded Transaction, the Debtors and the Plan Administrator shall fund Distributions under the Plan also with proceeds from Estate Causes of Action. In the event of an Unfunded Transaction, the GUC Trust shall fund Distributions to holders of Allowed General Unsecured Claims from proceeds of the GUC Trust Assets.

### 3.    Toggle Implementation

(a)    In the event where (y) the Reserve Bank remits to the Debtors on a regular basis, 100% of the Remittance Amounts for the duration of the Chapter 11 Cases and Wind Down, and (z) the CUBI Receivable is recovered (with no more than a [●]% discount to the full CUBI Receivable) (the "**Funded Transaction**"), then:

(i)    KServicing shall continue to service all PPPLF Collateral loans, all CRB PPP Loans, and all CUBI PPP Loans in the ordinary course and in accordance with the PPPLF documents, CRB Agreements and CUBI Agreements, respectively, until the earlier of (1) [●], and (2) the PPPLF Servicer Transfer Date for the PPPLF Collateral loans, the CRB Servicer Transfer Date for the CRB PPP Loans, and the CUBI Servicer Transfer Date for the CUBI PPP Loans; and

(ii)    By [●], 2022:

1.    The Reserve Bank shall elect in writing to the Debtors to either (w) fund the Wind Down Estate with $[●] (the "**Reserve Bank Servicing Costs**"), which amount shall be allocated in the Wind Down Budget to allow for the continued servicing of PPPLF Collateral loans through a date to be mutually agreed ("**Post-Effective Date PPPLF Servicing**"), after which the Reserve

33

Bank shall have no further obligation to fund the Wind Down Estate; *provided*, that, the foregoing shall not affect the Reserve Bank remitting to the Debtors on a regular basis, 100% of the Remittance Amounts,  or (x) take all steps necessary to transfer all of the Debtors' servicing obligations with respect to the PPPLF Collateral loans to a third-party loan servicer (the "**PPPLF Transfer**"), to be selected with the Reserve Bank's consent and direction by a date to be mutually agreed (the completion date of such transfer, the "**PPPLF Servicer Transfer Date**"); *provided* that, for the avoidance of doubt, any fees associated with any transfer of servicing obligations shall be borne by the Reserve Bank; and

> 2.      CRB shall elect in writing to the Debtors to either (w) fund the Wind Down Estate with $[●] (the "**CRB Servicing Costs**"), which amount shall be allocated in the Wind Down Budget to allow for the continued servicing of CRB PPP Loans through a date to be mutually agreed, or (x) take all steps necessary to transfer all of the Debtors' servicing obligations with respect to the CRB PPP Loans to a third-party loan servicer to be selected with CRB's consent and direction by a date to be mutually agreed; *provided* that, for the avoidance of doubt, any fees associated with any transfer of servicing obligations shall be borne by CRB (the completion date of such transfer, the "**CRB Servicer Transfer Date**").

> 3.      CUBI shall elect in writing to the Debtors to either (w) fund the Wind Down Estate with $[●] (the "**CUBI Servicing Costs**"), which amount shall be allocated in the Wind Down Budget to allow for the continued servicing of CUBI PPP Loans through a date to be mutually agreed, or (x) take all steps necessary to transfer all of the Debtors' servicing obligations with respect to the CUBI PPP Loans to a third-party loan servicer to be selected with CUBI's consent and direction by a date to be mutually agreed; *provided* that, for the avoidance of doubt, any fees associated with any transfer of servicing obligations shall be borne by CUBI (the completion date of such transfer, the "**CUBI Servicer Transfer Date**").

> (iii)      On the Effective Date, the GUC Pool shall be funded in the aggregate amount of no less than the GUC Pool Amount; for the avoidance of doubt, the Plan Administrator shall be responsible for making Distributions to holders of Allowed General Unsecured Claims.

> (iv)      On the Effective Date, the Wind Down Estate shall be funded in accordance with the Wind Down  Budget for (w) the Wind Down process and (x) any continued servicing of PPPLF Collateral loans, CRB PPP Loans, or CUBI PPP Loans, as applicable, and be funded with the Wind Down Amount; *provided* that any amounts on account of continued servicing of PPPLF Collateral loans, CRB PPP Loans, or CUBI PPP Loans, as applicable, shall be funded by the payment of applicable Post-Effective Date Servicing Costs.

> (v)      On the Effective Date, any remaining assets and any Estate Causes of Action of the Debtors' Estates shall transfer to the Wind Down Estate automatically and without further action of the Bankruptcy Court.

> (vi)      At the conclusion of the Wind Down: (w) any residual amounts remaining in the Wind Down Budget (other than amounts on account of Post-Effective Date Servicing Costs) shall be transferred to the GUC Pool, and (x) any residual amounts remaining on account of Post-Effective Date Servicing Costs, shall be distributed *pro rata* to the Reserve Bank, CRB, and CUBI, as applicable and proportionate to each party's Post-Effective Date Servicing Costs.

(b)        In the event where (i) the Reserve Bank does not remit to the Debtors on a regular basis, 100% of the Remittance Amounts for the duration of the Chapter 11 Cases, and (ii) the CUBI Receivable is (a) not recovered or (b) recovered but with more than a [●]% discount to the full CUBI Receivable (the "**Unfunded Transaction**"), then:

(i)        No later than [●] days from the Commencement Date, the Debtors shall file a motion to reject the (a) CUBI Agreements, and (b) CRB Agreements; *provided*, that, the Debtors shall make commercially reasonable efforts to assist CUBI (with respect to the CUBI PPP Loans) and CRB (with respect to the CRB PPP Loans) with the transfer of all of the Debtors' servicing obligations to a third-party loan servicer prior to the effective date or rejection of the CUBI Agreements or the CRB Agreements, as applicable; *provided* further that, for the avoidance of doubt, any fees associated with any transfer of servicing obligations shall be borne by CUBI or CRB, as applicable.

(ii)        The Debtors shall make commercially reasonable efforts to assist the Reserve Bank with the transfer of all of the Debtors' servicing obligations with respect to the PPPLF Loans to a third-party loan servicer prior to the Effective Date; *provided* further that, for the avoidance of doubt, any fees associated with any transfer of servicing obligations shall be borne by the Reserve Bank, as applicable.

(iii)        On the Effective Date, the Wind Down Estate shall have Wind Down Budget for the Wind Down process. At the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Budget shall be transferred to the GUC Trust.

(iv)        On the Effective Date, any remaining assets (other than amounts on account of the Wind Down Budget) and any Estate Causes of Action of the Debtors' Estates shall transfer to the GUC Trust automatically and without further action of the Bankruptcy Court.  The GUC Trustee shall be responsible for making Distributions to holders of Allowed General Unsecured Claims.

4.        **Plan Administrator**

(a)        *Appointment*.  The Plan Administrator's retention shall commence on the Effective Date and shall continue until: (i) the Bankruptcy Court enters an order closing the Chapter 11 Cases; (ii) the Bankruptcy Court enters an order removing the Plan Administrator for cause (as defined below); or (iii) the Plan Administrator voluntarily resigns, upon notice filed with the Bankruptcy Court, and a successor Plan Administrator is appointed in accordance with the Plan.

(b)        *Authority*.  Subject to Section 5.4(c) of the Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)        subject to Section 7 of the Plan, except to the extent Claims have been previously Allowed or in the event of the Unfunded Transaction solely with respect to General Unsecured Claims, control and effectuate the Claims reconciliation process in accordance with the terms of the Plan, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(ii)        make Distributions to holders of Allowed Claims (other than General Unsecured Claims in the event of an Unfunded Transaction)  in accordance with the Plan;

35

(iii)    exercise its reasonable business judgment to direct and control the Wind Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)    prepare, file, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(v)    in the event of a Funded Transaction, other than any Causes of Action released by the Debtors pursuant to the Plan or otherwise, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors and their Estates;

(vi)    retain professionals to assist in performing its duties under the Plan;

(vii)    maintain the books and records and accounts of the Debtors;

(viii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(ix)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(x)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xi)    pay statutory fees in accordance with Section **Error! Reference source not found.** of the Plan;

(xii)    perform other duties and functions that are consistent with the implementation of the Plan; and

(xiii)    close the Chapter 11 Cases.

(c)    *Boards of Directors and Officers.*

(i)    The officers and directors of the Debtors existing prior to the Effective Date shall be relieved of any and all duties with the respect to the Debtors as of the Effective Date.

(ii)    Upon the Effective Date, the New Board shall consist of one or more directors selected by the Debtors, which shall be announced by notice filed with the Bankruptcy Court prior to the Confirmation Hearing.

36

(iii)    Upon the Effective Date, the new governance structure of KServicing will be set forth in the Amended Organizational Documents.

(iv)    The New Board shall, among other things, oversee and direct the Plan Administrator and the administration of the Wind Down Estates in accordance with the Plan.  On the Effective Date, or as soon as is reasonably practicable thereafter, the New Board shall establish, in consultation with the Plan Administrator, such procedures and protocols as it deems necessary to carry out its duties.

(d)    *Wind Down.*  After the Effective Date, pursuant to the Plan, the Plan Administrator shall effectuate the Wind Down according to the Wind Down Budget without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Wind Down (as determined for federal income tax purposes) shall occur in an expeditious but orderly manner after the Effective Date.

(e)    *Indemnification.*  Each of the Wind Down Estates shall indemnify and hold harmless the New Board and the Plan Administrator solely in their capacities as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or the New Board's bad faith, gross negligence, willful misconduct or criminal conduct.

(f)    *Dissolution*.  After the Effective Date, the Plan Administrator shall, subject to applicable non-bankruptcy law and consistent with the implementation of the Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Wind Down Estate) and complete the winding up of such Wind Down Estate as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Wind Down Estate or its shareholders or members, as applicable, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Wind Down Estate.  The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Wind Down Estate as a corporate entity in good standing until such time as such Wind Down Estate is dissolved or merged out of existence in accordance with the Plan.

## 5.    GUC Trust

(a)    In the event of an Unfunded Transaction, on the Effective Date the GUC Trust shall be established. In accordance with Section 1141 of the Bankruptcy Code, all of the GUC Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Trust Assets, shall vest in the GUC Trust, for the benefit of the GUC Trust Beneficiaries.  The GUC Trustee shall determine whether to enforce, settle, release, or compromise the GUC Trust Causes of Action (or decline to do any of the foregoing).  The Plan Administrator shall not be subject to any claims or counterclaims with respect to the GUC Trust Causes of Action, or otherwise.  In the event of any conflict between the terms of the Plan and the terms of the GUC Trust Agreement, the terms of the Plan shall govern.

(b)    The GUC Trustee shall be the exclusive administrator of the GUC Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Trustee's duties under the GUC Trust Agreement.  The GUC Trust shall be governed by the GUC Trust Agreement and administered by the GUC Trustee.  The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section 5.5.  The GUC Trustee shall hold and distribute the GUC Trust Assets in accordance with the provisions of the Plan and

37

the GUC Trust Agreement. Other rights and duties of the GUC Trustee shall be as set forth in the GUC Trust Agreement. After the Effective Date, the Debtors and the Plan Administrator shall have no interest in the GUC Trust Assets except as set forth in the GUC Trust Agreement.

(c)    The GUC Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as (i) the GUC Trustee determines that the pursuit of additional GUC Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (ii) all Plan Distributions required to be made by the GUC Trustee under the Plan have been made. Upon dissolution of the GUC Trust, any remaining GUC Trust Assets shall be distributed to holders of Allowed General Unsecured Claims in accordance with the Plan and the GUC Trust Agreement, as appropriate.

(d)    *U.S. Federal Income Tax Treatment of GUC Trust*. In furtherance of <u>Section 5.3(b)</u> of the Plan, (i) the GUC Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of Allowed Reserve Bank Priority Claims and Allowed General Unsecured Claims (whether Allowed on or after the Effective Date), consistent with the terms of the Plan; (ii) the holders of Reserve Bank Priority Claims and General Unsecured Claims shall be treated as the beneficiaries and grantors of the GUC Trust; (iii) the sole purpose of the GUC Trust shall be the liquidation and distribution of the GUC Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtors and the Estates, holders of General Unsecured Claims, the GUC Trustee, and holders of Reserve Bank Priority Claims) shall report consistently with such treatment (including the deemed receipt of the GUC Trust Assets, subject to applicable liabilities and obligations, by the holders of General Unsecured Claims and Reserve Bank Priority Claims, followed by the deemed transfer of such GUC Trust Assets to the GUC Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation of the GUC Trust Assets transferred to the GUC Trust as determined by the GUC Trustee (or its designee); (vi) the GUC Trustee shall be responsible for filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); (vii) the GUC Trustee shall annually send to each holder of an interest in the GUC Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; (viii) all items of income, deductions, and credit loss of the GUC Trust shall be allocated for federal income tax purposes to the holders of General Unsecured Claims and Reserve Bank Priority Claims based on their respective interests in the GUC Trust, including the holders of General Unsecured Claims holding Disputed Claims, in such manner as the GUC Trustee deems reasonable and appropriate; and (ix) subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Trustee of a private letter ruling if the GUC Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Trustee), the GUC Trustee may timely elect to (x) treat any portion of the GUC Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (y) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made for all or any portion of the GUC Trust, all impacted parties (including the Debtors and the Estates, and, to the extent applicable, holders General Unsecured Claims, and the GUC Trustee), and solely with respect to the impacted assets, shall report for United States federal, state, and local income tax purposes consistently with such election.

(e)    *Expedited Determination*. The GUC Trustee may request an expedited determination of taxes of the GUC Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

(f)     Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Trust.

## 6.     Corporate Action

Upon the Effective Date, by virtue of entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Debtors or the Estates.

## 7.     Withholding and Reporting Requirements

(a)     *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)     *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator, Wind Down Estates, or such other Person designated by the Plan Administrator or Wind Down Estates (which entity shall subsequently deliver to the Plan Administrator any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt  from information reporting under the Tax Code and provides to the Plan Administrator notice and evidence of such exemption.  If such request is made by the Plan Administrator, Wind Down Estates, or such other Person designated by the Plan Administrator or Wind Down Estates and the holder fails to comply within ninety (90) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Wind Down Estate and any Claim in respect of such distribution shall be forever barred from assertion against any Debtor, the applicable Wind Down Estate and their respective property.

## 8.     Exemption From Certain Transfer Taxes

To the maximum extent provided by section 1146(a) of the Bankruptcy Code: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in

39

connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 9. Effectuating Documents; Further Transactions

(a)     On or as soon as practicable after the Effective Date, the Plan Administrator shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order, or rule; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the Plan without the need for any approvals, authorizations, actions, or consents; and (vi) all other actions that the applicable Entities determine to be necessary or appropriate.

(b)     Each officer, manager, or member of the board of directors of the Debtors is (and each officer, manager, or member of the board of directors of the Plan Administrator, if applicable, shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of, the Wind Down Estates, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors, or the Wind Down Estates) except for those expressly required pursuant to the Plan.

(c)     All matters provided for herein involving the corporate structure of the Debtors or the Wind Down Estates, to the extent applicable, or any corporate or related action required by the Debtors or the Wind Down Estates in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, members, or directors or managers of the Debtors and with like effect as though such action had been taken unanimously by the stockholders, members, directors, managers, or officers, as applicable, of the Debtors or the Wind Down Estates.

## 10. Preservation of Rights of Action

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, transferred or settled pursuant to the Plan, the Confirmation Order, or by another Bankruptcy Court order, the Debtors reserve any and all Causes of Action. On and after the Effective Date, in a Funded Transaction, the Plan Administrator and in an Unfunded Transaction, the GUC Trustee, may pursue such

40

Causes of Action in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Plan Administrator or GUC Trustee, as applicable will not pursue any and all available Causes of Action against them.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, in a Funded Transaction, the Plan Administrator and in an Unfunded Transaction, the GUC Trustee, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion, subject to the Plan, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing, as the Plan Administrator or GUC Trustee, as applicable may determine is in the best interest of the Estates, without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

### 11.    Certificate of Incorporation and By-Laws

As of the Effective Date, the certificate of incorporation and by-laws, or other organizational documents, as applicable, of the Debtors shall be amended to the extent necessary to carry out the provisions of the Plan.  Such amended organizational documents (if any) shall be filed with the Bankruptcy Court in advance of the Effective Date.

### 12.    Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

### 13.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 14.    Nonconsensual Confirmation

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject, or are deemed to reject, the Plan.

### 15.    Closing of Chapter 11 Cases

After an Estate has been fully administered, the applicable Wind Down Estate or Plan Administrator shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

41

### 16.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 17.    Corporate Form

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator in accordance with the terms of the Plan and applicable law.

### 18.    Separability

Notwithstanding the combination of the separate plans of liquidation for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still, subject to the consent of the applicable Debtors, confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### D.    Distributions

### 1.    Distributions Generally

Except as otherwise provided in the Plan, one or more Disbursing Agents shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 2.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests.  The Debtors, the Plan Administrator, or the GUC Trustee, as applicable, shall have no obligation to recognize any transfer or designation of such Claims or Interests occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or Assumption Disputes, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 3.    Date of Distributions

(a)    Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on or about the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Section 4 of the Plan; *provided*, that the Plan Administrator or the GUC Trustee, as applicable, shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate.

(b)    In the event of the Funded Transaction (i) prior to any distributions to the GUC Pool, the Plan Administrator, shall reserve an amount sufficient to pay holders of Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Priority Non-Tax Claims, and Disputed Priority Tax

42

Claims, and (ii) prior to any distributions by the Plan Administrator to the holders of General Unsecured Claims, the Plan Administrator shall reserve an amount sufficient to pay holders of any Disputed General Unsecured Claims, in each case, the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims.  After the resolution of a Disputed Administrative Expense Claim, Disputed Secured Claim, Disputed Priority Non-Tax Claim, and Disputed Priority Tax Claims, the Plan Administrator shall treat any amounts that were reserved on account of such Disputed Claim that is Disallowed or does not become an Allowed Claim as Net Cash Proceeds.

(c)     In the event of the Unfunded Transaction, <u>Section 6.3(b)</u> of the Plan shall not apply to Plan Distributions to holders of Allowed General Unsecured Claims, which will be governed by <u>Section 5.5(a)</u> and the GUC Trust Agreement.

## 4.     Disbursing Agent

Other than as contemplated in <u>Section 6.2</u> of the Plan, all distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Plan Administrator shall use all commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the books and records of the Debtors or the Wind Down Estates, as applicable.  The Plan Administrator shall cooperate in good faith with the applicable Disbursing Agent to comply with the reporting and withholding requirements outlined in <u>Section 5.7</u> of the Plan.

## 5.     Rights and Powers of Disbursing Agent

(a)     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against, and Interests in, the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.  No holder of a Claim or Interest, or other party in interest, shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

(b)     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or GUC Trust Agreement, as applicable, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

## 6.     Expenses of Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash.  <u>Section 6.6</u> of the Plan shall not apply to post-Effective Date expenses of the GUC Trustee, which shall be governed by <u>Section 5.5(a)</u> of the Plan and the GUC Trust Agreement.

43

### 7. No Postpetition Interest on Claims

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

### 8. Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtors. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until such Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 5.7 of the Plan.

### 9. Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 10. Unclaimed Property

Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors, Wind Down Estate, or GUC Trust, as applicable, until such time as a distribution becomes deliverable or the holder accepts the distribution, or such distribution reverts back to the Debtors, Wind Down Estate, or GUC Trust, as applicable, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days from the date of distribution. After such date all unclaimed property or interest in property shall revert to the Wind Down Estates and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 11. Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Wind Down Estates, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

12.    **Manner of Payment Under Plan**

Except as otherwise specifically provided in the Plan, at the option of the Debtors, Plan Administrator, or GUC Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer, or ACH transfer, or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

13.    **Satisfaction of Claims**

Except as otherwise specifically provided for in the Plan and to the extent permitted by law, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction of, and exchange for, such Allowed Claims.

14.    **Minimum Cash Distributions**

The Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to Section 6.14 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

15.    **Setoffs and Recoupments**

The Debtors, Wind Down Estates, or GUC Trust, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors, Wind Down Estates, or GUC Trust, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or its successor or assign may possess against the holder of such Claim.

16.    **Allocation of Distributions between Principal and Interest**

Except as otherwise required by law (as reasonably determined by the Wind Down Estates or GUC Trustee, as applicable), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

17.    **No Distribution in Excess of Amount of Allowed Claim**

Except as provided in Section 6.7 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

E.    **Procedures for Disputed Claims**

1.    **Objections to Claims**

(a)    The Debtors or the Plan Administrator on behalf of each of the Wind Down Estates shall exclusively be entitled to object to Claims. After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to proofs of Claim shall be served

45

and filed on or before the later of (a) one hundred eighty (180) days after the Effective Date, and (b) on such later date as ordered by the Bankruptcy Court for cause.

(b)     In the event of the Unfunded Transaction on and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall exclusively be entitled to object to object to General Unsecured Claims.  After the Effective Date, the GUC Trustee shall have and retain any and all rights and defenses that the Debtors had with regard to any General Unsecured Claim to which they may object, except with respect to any General Unsecured Claim that is Allowed.

### 2.      Resolution of Disputed Claims

(a)     The Plan Administrator, on behalf of each of the Wind Down Estates, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims without approval of the Bankruptcy Court, other than with respect to Fee Claims.  Further, in the event of the Funded Transaction on and after the Effective Date, the Plan Administrator, on behalf of each of the Wind Down Estates, shall also have the authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims, upon the establishment of the GUC Pool, without approval of the Bankruptcy Court, other than with respect to Fee Claims.

(b)     In the event of the Unfunded Transaction on and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, shall have authority to compromise, settle, otherwise resolve, or withdraw any objections to General Unsecured Claims, upon the establishment of the GUC Trust, without approval of the Bankruptcy Court.

### 3.      Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 4.      Distributions After Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan, without interest, as provided in Section 7.8 of the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 5.      Estimation of Claims

In the event of a Funded Transaction, the Debtors or Plan Administrator (on behalf of each of the Wind Down Estates), as applicable, shall determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims.  In the event of an Unfunded Transaction, the Debtors or Plan Administrator (on behalf of each of the Wind Down Estates), as applicable, shall still determine, resolve and otherwise adjudicate all such Claims, except for Disputed General Unsecured Claims, which shall be determined, resolved and otherwise adjudicated by the GUC Trustee.  The Debtors, Plan Administrator (on behalf of each of the Wind Down Estates), or GUC Trustee (on behalf of the GUC Trust), as applicable, with respect to such Disputed Claims, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of

46

the Bankruptcy Code or otherwise, including to establish a reserve for distribution purposes, regardless of whether such, or any, Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors, Plan Administrator, or GUC Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### 6.        No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.        Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 8.        Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section 6.7 of the Plan.

### 9.        Insured Claims

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such satisfaction, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## F.        Executory Contracts and Unexpired Leases

### 1.        Rejection of Executory Contracts and Unexpired Leases

(a)        As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in Section 8.4 of the Plan; or (v) is identified for assumption on the Assumption Schedule included in the Plan Supplement.

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that Wind Down Estates, as applicable, have provided adequate assurance of future performance under such assumed executory contracts and unexpired leases.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Wind Down Estates, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## 2.      Determination of Assumption Disputes and Deemed Consent

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)     The Debtors shall file, as part of the Plan Supplement, the Assumption Schedule. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Wind Down Estate, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Wind Down Estates, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section 8.2(b) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided*, that the Debtors or Wind Down Estates, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior

48

to the resolution of the Assumption Dispute; *provided*, that the Debtors or the Wind Down Estate, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor or the Wind Down Estate, as applicable). The Debtors or Wind Down Estates, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### 3.     Rejection Damages Claims

**In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages shall be classified and treated in Class 4 (General Unsecured Claims). A proof of such Claim must be filed with the Bankruptcy Court by the later of (i) thirty (30) days after the filing and service of the notice of occurrence of the Effective Date; (ii) the general bar date or governmental bar date, as applicable; and (iii) thirty (30) days following service of an Order approving rejection of any executory contract or unexpired lease of the Debtors if such contract or lease is the subject of a pending Assumption Dispute.**

### 4.     Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice, or claim objection, and any other document related to any of the foregoing, and any other order of the Bankruptcy Court, on the Effective Date: (a) all insurance policies issued or providing coverage to the Debtors shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code, and, in the event of a Funded Transaction, coverage for defense costs and indemnification under the D&O Policies shall remain available to all individuals within the definition of "Insured" in the D&O Policies, and Wind Down Estates, or Plan Administrator, as applicable, shall remain liable in full for any and all now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of any of the Debtors under such insurance policies, without the need or requirement for an insurer to file a Proof of Claim, Administrative Expense Claim or objection to any cure amount; (b) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (c) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable nonbankruptcy law to proceed with their claims; (ii) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to

proceed with its claim, and (III) all costs in relation to each of the foregoing; (iii) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies; and (iv) holders of Allowed Claims to pursue insurance recovery to the extent allowed or required by Section 7.9 of the Plan.

### 5.    Intellectual Property Licenses and Agreements

Notwithstanding anything to the contrary in the Definitive Documents, the Plan, the Plan Supplement, any bar date notice or claim objection, and any other document related to any of the foregoing, all intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed assumed by the Debtors and the Wind Down Estates and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Wind Down Estates, and the Wind Down Estates may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 6.    Assignment

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 7.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 8.    Reservation of Rights

(a)    The Debtors may amend the Assumption Schedule and any cure notice until five (5) Business Days immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assumption or assumption and assignment and/or (ii) amend the proposed cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent

50

adjournments of the Confirmation Hearing.  The Debtors shall provide notice of such amendment to any affected counterparty as soon as reasonably practicable.

(b)      Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors, or Wind Down Estates, or their respective affiliates have any liability thereunder.

(c)      Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and Wind Down Estates, under any executory or non-executory contract or any unexpired or expired lease.

(d)      Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, Wind Down Estates, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

### G.      Conditions Precedent to the Effective Date

#### 1.      Conditions Precedent to the Effective Date

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)      the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and no stay of the Confirmation Order shall be in effect;

(b)      all agreements necessary to implement the Plan, shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(c)      in the event of a Funded Transaction, the GUC Pool shall have been created and funded by the GUC Pool Amount;

(d)      in the event of an Unfunded Transaction, the GUC Trust shall have been established; and

(e)      notwithstanding when a condition precedent to the Effective Date occurs, for purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided*, that to the extent a condition precedent (a "***Prerequisite Condition***") may be required to occur prior to another condition precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to a Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

#### 2.      Waiver of Conditions Precedent

(a)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent in Section 9.1 of the Plan other than the conditions set forth in Sections 9.1(b) may be waived in writing by the Debtors without leave of or order of the Bankruptcy Court.

51

(b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 3.      Effect of Failure of Conditions to Effective Date

Unless otherwise extended by the Debtors, if the Effective Date does not occur on or before the date that is one hundred and eighty (180) days after the date on which the Confirmation Order is entered or if the Confirmation Order is vacated, (a) no distributions under the Plan shall be made, (b) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (c) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

### H.      Effect of Confirmation

### 1.      Vesting of Assets

(a)     On the Effective Date and solely with respect to the Funded Transaction, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the Debtors' Estates and any Estate Causes of Action shall vest in the Wind Down Estates free and clear of all Claims, Liens, encumbrances, charges, and other interests, subject to treatment of Other Secured Claims under the Plan. On and after the Effective Date, the Wind Down Estates may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Wind Down Estates may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. Notwithstanding the foregoing, vesting of property in which any governmental unit holds an interest, and for which title vests in the Debtors subject to regulatory requirements under a governmental grant or award, including but not limited to, the requirements of 10 C.F.R. 600.321, shall be limited to the extent of the Debtors' interest in such property; and the Wind Down Estates may only take action, including but not limited to the use, acquisition, sale, lease, and disposition of such property, in accordance with applicable non-bankruptcy law.

(b)     On the Effective Date and solely with respect to the Unfunded Transaction, the GUC Trust Assets, as well as the rights and powers of the Debtors' Estates applicable to the GUC Trust Assets, shall vest in the GUC Trust, for the benefit of the GUC Trust Beneficiaries free and clear of all Claims, Liens, encumbrances, charges, and other interests.

### 2.      Term of Injunction of Stays

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and

effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**3.      Injunction**

(a)      **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)      **Except as expressly provided in the Plan, the Definitive Documents, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are treated by the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Wind Down Estates, the Plan Administrator, the GUC Trust, or the GUC Trustee, as applicable, or the property of any of the Debtors, the Wind Down Estates, the Plan Administrator, the GUC Trust, or the GUC Trustee, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Wind Down Estates, the Plan Administrator, the GUC Trust, or the GUC Trustee; or the property of any of the Debtors, the Wind Down Estates, or the GUC Trust, as applicable; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Wind Down Estates, the GUC Trust, or the property of any of the Debtors, the Wind Down Estates, the Plan Administrator, the GUC Trust, or the GUC Trustee, as applicable; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Wind Down Estates, or the GUC Trust, as applicable, or against property or interests in property of any of the Debtors, the GUC Trust, or the Wind Down Estates, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)      **By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in <u>Section 10</u>.3 of the Plan.**

(d)      **The injunctions in Section 10.3 of the Plan shall extend to any successors of the Debtors, the Wind Down Estates, or the GUC Trust, as applicable, and their respective property and interests in property.**

(e)      **Notwithstanding the foregoing, nothing in <u>Section 10.3</u> of the Plan shall enjoin the assertion of a defensive right of recoupment.**

53

4.      **Binding Effect**

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan; (b) deemed to accept or reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) received any distribution under the Plan.

5.      **Releases by the Debtors**

**As of the Effective Date, the Debtors, and each of their respective Affiliates, on behalf of themselves and their respective Estates, including any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, including the Wind Down Estate, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of the Debtors and their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for acts or omissions of a Released Party arising out of or related to acts or omissions that constitute actual fraud, gross negligence, criminal misconduct or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not be construed as releasing any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

6.      **Releases by Holders of Claims and Interests**

**As of the Effective Date, except (a) for the right to enforce the Plan or (b) as otherwise expressly provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the date upon which the Bankruptcy Court enters the Confirmation Order, on or after the Effective Date, the Released Parties shall be deemed expressly, conclusively, absolutely, unconditionally, irrevocably and forever, released, waived, and discharged by the Releasing Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of the Debtors and their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of**

54

property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing, except for acts or omissions of a Released Party arising out of or related to acts or omissions that constitute actual fraud, gross negligence, criminal misconduct or willful misconduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not be construed as releasing any post-Effective Date obligations of any party or entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 7.    Exculpation

To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, arising between the Commencement Date and the Effective Date, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, the pursuit of confirmation of the Plan, the solicitation of votes on the Plan, the pursuit of consummation of the Effective Date, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Commencement Date and the Effective Date related or relating to the foregoing, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.

The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above shall not be construed as exculpating any party or entity from its post-Effective Date obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 8.    Waiver of Statutory Limitation on Releases

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER SECTION 10 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH

UNKNOWN LOSSES OR CLAIMS.    WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 10 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 9.    Solicitation of the Plan

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have previously solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 10.    Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred on the Effective Date and shall be in effect, without any requirement of further action by the Debtors or the Estates.

### I.    Retention of Jurisdiction

### 1.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order, including to ensure that an Allowed Claim does not receive consideration in excess of the Allowed amount of such Claim, and to adjudicate any and all disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Class of Claims;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all proceedings, if any, to approve Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)    to hear, adjudicate, decide, or resolve any and all matters related to **Error! Reference source not found.** of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)    to resolve disputes concerning Disputed Claims or the administration thereof;

(o)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)    to enter one or more final decrees closing the Chapter 11 Cases;

(q)      to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located and adjudicate any disputes with respect thereto;

(r)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose; and

(s)      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

### 2.      Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## J.      Miscellaneous Provisions

### 1.      Payment of Statutory Fees

On the Effective Date and thereafter as may be required, the Debtors or the Plan Administrator, as applicable, shall pay all Statutory Fees that are due and payable, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.  The obligations under Section **Error! Reference source not found.** of the Plan shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

### 2.      Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.      Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee, if any, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided,* however*,* that after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation by the Debtors without the need for further application to the Bankruptcy Court with respect to all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings.

### 4.      Amendments

(a)      *Plan Modifications*.  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy

Code, and (ii) after entry of the Confirmation Order, the Debtors may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)　*Other Amendments*. Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

### 5.　Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, in each case with respect to a Debtor, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

### 6.　Severability of Plan Provisions upon Confirmation

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Wind Down Estates (as the case may be); and (3) nonseverable and mutually dependent.

### 7.　Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

8.      **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

9.      **Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest are authorized to prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

10.      **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Wind Down Estates, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

11.      **Successors and Assigns**

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.      **Entire Agreement**

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or deemed to reject the Plan.  This discussion also does not address the U.S. federal income tax consequences to the holders of the Reserve Bank Claims because the Reserve Bank, as the sole holder of such claims, is a U.S. governmental agency or authority.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, current and proposed U.S. Treasury regulations promulgated thereunder (the "**Treasury regulations**"), judicial

authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS or any other taxing authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances, or to a holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated investment companies, tax-exempt organizations, trusts, governmental authorities or agencies, dealers and traders in securities, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in foreign currency, persons who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income and accrual method taxpayers that report income on an "applicable financial statement"). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes (including by way of distributions to the GUC Trust) such that the Debtors themselves will be the Wind Down Estates (and not any successor, by merger, consolidation or otherwise, to the Debtors) and that all distributions to holders of Claims will be taxed accordingly. Thus, all references in this summary to the Debtors as relates to periods after the Effective Date should be considered references to the Wind Down Estates as a continuation of the Debtors.

Additionally, this discussion assumes that: (i) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND KSERVICING EQUITY INTERSTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### A.  <u>Consequences to the Debtors</u>

For U.S. federal income tax purposes, KServicing is a standalone corporation, and each of its U.S. subsidiaries are disregarded as separate from KServicing. The Debtors estimate that, as of the Commencement Date, KServicing had net operating loss ("**NOL**") carryforwards of approximately $53 million in addition to other tax attributes (including tax basis in assets) for U.S. federal income tax purposes.

The amount of any such NOL carryforwards and other tax attributes remain subject to audit and adjustment by the IRS.

As indicated above, the Debtors intend to treat the Plan as a plan of liquidation for U.S. federal income tax purposes, meaning the Debtors will remain in existence following the Effective Date solely for the purpose of winding up their affairs, regardless of whether the Plan is implemented through a Funded Transaction or Unfunded Transaction.  In a Funded Transaction, the Debtors will either continue to service all existing PPPLF Collateral loans, CRB PPP Loans, and CUBI Loans in accordance with their terms or transfer such servicing obligations to a third-party loan servicer(s), wind up their affairs and make Distributions to holders of Allowed Claims and Interests.  In an Unfunded Transaction, the Debtors will cease to service the CRB PPP Loans and CUBI Loans, make commercially reasonable efforts to assist the transfer of such CRB PPP Loans, CUBI Loans, and PPPLF Collateral loans to third-party loan servicers prior to the Effective Date, wind up their affairs and, on the Effective Date, transfer any remaining assets (other than amounts on account of the Wind Down Budget) and any Estate Causes of Action to the GUC Trust.

The U.S. federal income tax impact of the Plan on the Debtors is discussed further below.  The U.S. federal income tax consequences to the Debtors may differ depending on whether a Funded Transaction or Unfunded Transaction is consummated.

### 1.        Recognition of Income, Gain, or Loss

In a Funded Transaction, the Debtors would continue to service the existing PPPLF Collateral loans, CRB PPP Loans, and CUBI Loans after the Effective Time.  The Debtors are expected to generate income and incur expenses related to such servicing activity, which may result in future taxable income.  In addition, if Debtors transfer their servicing obligation under all or some of the existing loans (whether such transfers are pursuant to the Funded Transaction or Unfunded Transaction), Debtors may recognize gain or loss pursuant to such transfers.

In an Unfunded Transaction, in addition to a potential transfer of the Debtors' servicing obligations to third-party servicers, all of the Debtors' remaining assets as of the Effective Date assets (other than amounts on account of the Wind Down Budget) will be transferred to the GUC Trust. The GUC Trust is expected to qualify as a liquidating trust for U.S. federal income tax purposes.  For U.S. federal income tax purposes, the transfer of assets to a liquidating trust generally is treated equivalent to a sale of the assets at then-fair market value.  Consequently, the Debtors may recognize taxable income in such transfer to the extent the fair market value of the transferred assets exceed the Debtors adjusted tax basis in such assets.

As discussed below, although the Debtors may recognize taxable income in either a Funded Transaction or Unfunded Transaction in connection with the above activities or transactions, the Debtors expect to have sufficient available NOL carryforwards and/or other tax attributes to avoid any meaningful U.S. federal income tax liability.

### 2.        Cancellation of Debt and Availability of Tax Attributes

In general, a debtor recognizes income, generally referred to as cancellation of debt ("**COD**") income, upon the cancellation or reduction of debt for insufficient consideration.  The Tax Code provides an exception to such income recognition for any COD arising pursuant to a bankruptcy court order or confirmed Chapter 11 plan or to the extent the debtor is insolvent immediately prior to the cancellation or reduction of the debt, but requires the debtor to reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of such COD.  COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in

62

exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (including where the payment of the cancelled debt would have given rise to a tax deduction). Any reduction in tax attributes under the COD rules does not occur until the end of the tax year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs.

In the event of an Unfunded Transaction, substantially all of the Debtors assets will be transferred or disposed of on or before the Effective Date. In the event of a Funded Transaction, the Debtors expect, consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, that no COD should be incurred as a result of the implementation of the Plan prior to the disposition by the Debtors of all or substantially all of their assets (other than to the extent any Allowed Claim's distribution is subject to a maximum amount, or has been or is separately settled). So treated, the reduction of tax attributes resulting from any COD pursuant to the Plan (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs) generally should not have a material impact on the Debtors. However, there can be no assurance that all or a substantial amount of the COD will not be incurred earlier due to, among other things, a lack of direct authoritative guidance as to when COD occurs in the context of a liquidating Chapter 11 plan.

KServicing's ability to utilize its NOL carryforwards and certain other tax attributes could be subject to limitation if it underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code by reason of the implementation of the Plan or otherwise. The Debtors believe that no ownership change under section 382 of the Tax Code has occurred to date. In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors requested on the Commencement Date entry of interim and final orders from the Bankruptcy Court authorizing a protective equity trading order. Moreover, pursuant to the Plan, the holders of KServicing Equity Interests will maintain their economic interests in any residual assets of the Debtors after the satisfaction of all Allowed Claims, which economic interests will be nontransferable (except by operation of law). Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not believe that no ownership change should occur as a result of the implementation of the Plan. Nevertheless, there can be no assurance that the IRS will not successfully take a contrary position (including with respect to the treatment for federal income tax purposes of the holders of Claims as continuing creditors and not as effective equity holders of LBHI throughout the liquidation process).

If notwithstanding the Debtors' positions COD were incurred prior to the Debtors' complete liquidation or an ownership change were considered to occur, the Debtors could incur a material amount of U.S. federal income tax in respect of the continuance of its servicing obligations, transfer of such servicing obligations, or sale or other disposition of their assets depending, in part, on the amount of servicing income and related expenses and amount realized upon the disposition of such assets and the then-tax basis of the assets.

### 3.    Potential Alternative Minimum Tax

On August 16, 2022, President Biden signed into law the Inflation Reduction Act of 2022, which, among other thing, generally imposes a 15% corporate alternative minimum tax on corporations with book net income (subject to certain adjustments) exceeding on average $1 billion over any three-year testing period (taking into account any predecessor), effective for taxable years beginning after December 31, 2022 (the "New AMT"). Whether and how the New AMT applies to a particular corporation remains, in significant respects, uncertain. However, the Debtors do not expect to be subject to the New AMT

B.        **Consequences to Holders of Allowed General Unsecured Claims**

This summary discusses the U.S. federal income tax consequences to holders of Allowed General Unsecured Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders.  As used herein, the term "U.S. Holder" means a beneficial owner of Allowed General Unsecured Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;
- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or
- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Allowed General Unsecured Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

In the event a Funded Transaction occurs, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Pool Class B Claims.  In the event an Unfunded Transaction occurs, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such Claim, its *pro rata* share of the GUC Trust Beneficial B Interests.  Unless otherwise stated, the U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed General Unsecured Claims generally does not depend on whether a Funded Transaction or Unfunded Transaction occurs.

1.        **Recognition of Gain or Loss**

The federal income tax consequences of the implementation of the Plan to a holder of an Allowed General Unsecured Claim will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim, and in the case of a Funded Transaction, whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes.

Generally, a U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss with respect to its Allowed General Unsecured Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property received by the U.S. Holder, including, as discussed below, any beneficial interests in the GUC Trust (other than any consideration attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed General Unsecured Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income).  As discussed below, the amount of Cash or other property received in respect of accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under its method of accounting.  *See* Section B.2.— "Allocation of Consideration to Interest."  In the event of a Funded Transaction, consistent with the intended treatment of

64

the Plan as a plan of liquidation for federal income tax purposes, any loss realized by a U.S. Holder of an Allowed General Unsecured Claim may not be recognizable until all of the distributions to such U.S. Holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed General Unsecured Claim disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year.  Each holder of an Allowed General Unsecured Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

In an Unfunded Transaction, as discussed below (*see* Section C.— "Tax Treatment of the GUC Trust and Holders of Beneficial Interests Therein"), each holder of an Allowed General Unsecured Claim that receives a beneficial interest in the GUC Trust (if and when established) will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the GUC Trust Assets (consistent with its economic rights in the trust).  Pursuant to the Plan, the GUC Trustee will in good faith value the assets transferred to the GUC Trust, and all parties to the GUC Trust (including U.S. Holders of Allowed General Unsecured Claims receiving GUC Trust Beneficial B Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A U.S. Holder's share of any proceeds received by the GUC Trust upon the sale or other disposition of the assets of the GUC Trust should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Allowed General Unsecured Claim but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying assets of the GUC Trust.  *See* Section C.— "Tax Treatment of the GUC Trust and Holders of Beneficial Interests Therein," below.

In an Unfunded Transaction, a U.S. Holder's aggregate tax basis in its respective share of the GUC Trust assets will equal the fair market value of its GUC Trust Beneficial B Interest increased by its share of the Debtors' liabilities to which the underlying assets remain subject upon transfer to the GUC Trust, and the U.S. Holder's holding period generally will begin the day following establishment of the GUC Trust.

### 2.      Allocation of Consideration to Interest

Pursuant to section 6.16 of the Plan, all distributions in respect of Allowed General Unsecured Claims will be allocated first to the principal amount of the Allowed General Unsecured Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  In general, to the extent any amount received (whether stock, cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder of an Allowed General Unsecured Claim is urged to consult its own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### C.      Tax Treatment of the GUC Trust and the Holders of Beneficial Interests

### 1.      Classification of the GUC Trust as a Liquidating Trust

In the event the Unfunded Transaction occurs, all of the Debtors' remaining assets as of the Effective Date assets (other than amounts on account of the Wind Down Budget) will be transferred to the GUC Trust.

The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The GUC Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) will be required to treat the transfer of the GUC Trust Assets to the GUC Trust as (1) a transfer of the GUC Trust Assets (subject to any obligations relating to those assets) directly to GUC Trust beneficiaries, followed by (2) the transfer by such beneficiaries to the GUC Trust of the GUC Trust Assets in exchange for interests in the GUC Trust. Accordingly, except in the event of contrary definitive guidance, holders of Allowed General Unsecured Claims receiving GUC Trust Beneficial B Interests (*i.e.*, beneficiaries of the GUC Trust) would be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the GUC Trust Assets.

Although the following discussion assumes that the GUC Trust will be treated as a liquidating trust for U.S. federal income tax purposes, no ruling will necessarily be requested from the IRS concerning the tax status of the GUC Trust as a grantor trust. Accordingly, there can be no assurance that the IRS will not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the GUC Trust and the U.S. Holders of Allowed General Unsecured Claims receiving interests in the GUC Trust could vary from those discussed herein.

## 2. General "Liquidating Trust" Tax Reporting by the GUC Trust and GUC Trust Beneficiaries

For all U.S. federal income tax purposes, all parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) must treat the GUC Trust as a grantor trust of which holders of beneficial interests in the GUC Trust (as determined for U.S. federal income tax purposes) are the owners and grantors. Accordingly, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust are treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the GUC Trust, consistent with their economic interests therein. The GUC Trustee will file tax returns for the GUC Trust treating the GUC Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations. The GUC Trustee also will annually send to each holder of a beneficial interest in the GUC Trust a separate statement regarding the receipts and expenditures of the GUC Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

All taxable income and loss of the GUC Trust will be allocated among, and treated as directly earned and incurred by, holders of beneficial interests in the GUC Trust with respect to such holder's undivided interest in the GUC Trust Assets (and not as income or loss with respect to its prior Claims). The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of Claims receiving interests in the GUC Trust.

As soon as reasonably practicable after the transfer of the GUC Trust Assets to the GUC Trust, the GUC Trustee will make a good faith valuation of the GUC Trust Assets. All parties to the GUC Trust (including, without limitation, the Debtors, holders of Allowed General Unsecured Claims receiving interests in the GUC Trust, and the GUC Trustee) must report consistently with such valuation for all U.S. federal income

66

tax purposes.  The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The U.S. federal income tax obligations of a U.S. Holder with respect to its beneficial interests in the GUC Trust are not dependent on the GUC Trust distributing any cash or other proceeds.  Thus, a U.S. Holder of Allowed General Unsecured Claims receiving interests in the GUC Trust may incur a U.S. federal income tax liability with respect to its allocable share of GUC Trust's income even if the GUC Trust does not make a concurrent distribution to the U.S. Holder.  In general, a distribution of cash by the GUC Trust will not be separately taxable to a beneficial owner of the GUC Trust since the beneficial owner is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by GUC Trust).

The GUC Trust will comply with all applicable governmental withholding requirements.  If any beneficiaries of the GUC Trust are not U.S. persons, the GUC Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).  As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the GUC Trust.

### 3. Information Reporting and Backup Withholding

Payments of interest or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

*The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder.  All holders of General Unsecured Claims are urged to consult their tax advisors concerning the federal, state, local, non U.S., and other tax consequences applicable under the Plan.*

### VIII.  CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement including any attachments, exhibits, or documents incorporated by reference.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.  NEW FACTORS, RISKS AND

67

UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.    Certain Bankruptcy Law Considerations

#### 1.    General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Company's business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Company's relationships with its key customers, borrowers, and employees. In addition, the bankruptcy proceedings may divert some of the attention of the Debtors' management away from business operations and the Company will incur additional expenses.

#### 2.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if the Voting Classes (defined below) voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

#### 3.    Risk of Failing to Satisfy Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Classes, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Reserve Bank Claims and General Unsecured Claims as those proposed in the Plan.

#### 4.    Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the request of the Debtors if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

#### 5.    Risk of Non-Occurrence of Effective Date

There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 9 of the Plan,

then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

6. **Risk Related to Parties in Interest Objecting to Debtors' Classification of Claims and Equity Interests**

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

7. **Risk Related to Possible Objections to Plan**

There is a risk that certain parties could oppose and object to the Plan in the Bankruptcy Court either in its entirety or to specific provisions of the Plan. While the Debtors believe that the proposed Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

8. **Conversion to Chapter 7 Case**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Article X hereof, as well as the liquidation analysis, which will be filed no later than the date on which the Plan Supplement is filed and served on holders of Claims in the Voting Class as promptly as practicable upon filing (the "**Liquidation Analysis**"), for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests on a Debtor-by-Debtor basis.

9. **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article X of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Wind Down Estate, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

10. **Risks Associated with the Debtors' Business and Industry**

The risks associated with the Debtors' businesses and industry include, but are not limited to, the following:

- risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business and operational relationships, to retain key employees and to maintain various licenses and approvals necessary for the Debtors to conduct the Debtors' business;

- increases in costs that could adversely affect the Debtors' operating results;

69

- the Debtors' dependence and relationship with their employees, independent contractors, and vendors;

- negative publicity about the Debtors' business;

- the Debtors' ability to generate sufficient cash flow to meet their commitments;

- the uncertainties associated with governmental regulation.

### 11.    Cash and Cash Collateral

The use of cash on hand (including cash collateral) is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If, among other things, the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their cash on hand (including cash collateral).  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise.  In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 12.    The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In addition to the various litigations described herein, in the future, the Wind Down Estates may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors or Wind Down Estates may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Debtors' businesses and financial stability, however, could be material.

### 13.    Risk that Debtors May Lose in Any of its Prepetition Litigation

As discussed in Article IV, Section B herein, the Debtors are currently engaged in ongoing litigation. Although the Debtors believe that they will succeed in the litigation, there is a risk that the Debtors may lose some or all of the issues, which, depending on the priority of the ultimate claims, could have substantial impact on the Debtors' administrative solvency.

### B.    <u>Additional Factors</u>

### 1.    Claims Could be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.   Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' feasibility analysis, and that variation may be material.

### 2.    Projections and Other Forward-Looking Statements are not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) projections which may be materially different from actual future experiences.  There are uncertainties associated with

any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 3.    Debtors Could Withdraw Plan

The Plan may be revoked or withdrawn prior to the Petition Date by the Debtors.

### 4.    Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 5.    No Representations Outside Disclosure Statement are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 6.    No Legal or Tax Advice is Provided by Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Claim or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 7.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

### 8.    Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII hereof.

## IX.  VOTING PROCEDURES AND REQUIREMENTS

### A.    <u>Voting Deadline</u>

Before voting to accept or reject the Plan, each Eligible Holder (defined below) as of the Voting Record Date should carefully review the Plan attached hereto as **<u>Exhibit A</u>**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots will be provided for holders of Voting Claims as of the Voting Record Date ([●], 2022/2023) to vote to accept or reject the Plan (a "**Ballot**").  Holders of Classes 3 and 4 (the "**Eligible Holders**") are entitled to vote to accept or reject the Plan.  Because Classes 1, 2, and 6 (if so treated)  are unimpaired and

71

deemed to accept, and Classes 5, 6 (if so treated), 7, and 8 are impaired but deemed to reject, only Classes 3 and 4 are entitled to vote.

The Debtors have engaged Omni Agent Solutions, Inc. as Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

EACH BALLOT CONTAINS DETAILED VOTING INSTRUCTIONS AND SETS FORTH IN DETAIL, AMONG OTHER THINGS, THE DEADLINES, PROCEDURES, AND INSTRUCTIONS FOR VOTING TO ACCEPT OR REJECT THE PLAN, THE VOTING RECORD DATE FOR VOTING PURPOSES, AND THE APPLICABLE STANDARDS FOR TABULATING BALLOTS.

THE VOTING DEADLINE IS 4:00 P.M., PREVAILING EASTERN TIME, ON [●], 2022, UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").

CLASSES 3 AND 4:  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE BALLOT AND RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE.

Delivery of a Ballot must conform to the instructions on the Ballot.  Mailed Ballots must be returned by the Voting Deadline with an original signed copy to:

**KSERVICING BALLOT PROCESSING**
**C/O OMNI AGENT SOLUTIONS, INC.**
**5955 De Soto Ave., Suite 100**
**Woodland Hills, CA 91367**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE EXECUTED IN ACCORDANCE WITH THE INSTRUCTIONS INCLUDED IN THE APPLICABLE BALLOT AND MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.  THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS.  THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.   AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

## B.    <u>Voting Procedures</u>

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record holders of the Reserve Bank Claims and the General Unsecured Claims.  In order to vote, holders of Reserve Bank Claims and General Unsecured Claims should provide all of the information requested by the Ballot and, as applicable, should complete and deliver their completed Ballots so that they are actually received by the Voting Agent no later than the Voting Deadline.

72

C.     **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Classes 3 (Reserve Bank Claims) and 4 (General Unsecured Claims) are impaired under the Plan and the only Classes of Claims or Interests entitled to vote to accept or reject the Plan (the "**Voting Classes**" or the "**Voting Claims**").

Claims and Interests in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote. For a detailed description of the treatment of Claims and Interests under the Plan, *see* Article VI of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all classes deemed to reject, Parent Equity Interests, and Subordinated Securities Claims. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Article VI of this Disclosure Statement.

1.     **Miscellaneous**

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Voting Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline

will be deemed to reflect your intent, and thus, will supersede any prior Ballot. If you cast Ballots received by the Voting Agent on the same day, but which are voted inconsistently, such Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying that amount by a factor that reflects all amounts accrued between the Voting Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only holders of the Reserve Bank Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 2.    Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtor of authority to so act. Authorized signatories should submit a separate Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORs RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 3.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (i) all of the terms of, and conditions to, the solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.3, 10.5, 10.6, and 10.7 of the Plan. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 4.    Change of Vote

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

5.        **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## X.  CONFIRMATION OF PLAN

A.        **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

B.        **Objections to Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must (a) be in writing; (b) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (c) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (d) conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (e) be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof; and (f) be served upon the following parties, including such other parties as the Bankruptcy Court may order:

> (a)        **The Debtor at:**
>
> Kabbage Inc. d/b/a KServicing
> 925B Peachtree Street NE, Suite 383
> Atlanta, GA 30309
> Attn:  Holly Loiseau, General Counsel
> Email: hloiseau@kservicecorp.com

(b)      **Office of the U.S. Trustee at:**

The Office of the United States Trustee
844 King Street, Suite 2207
Wilmington, DE 19801
Attn: Richard Schepacarter
Email: richard.schepacarter@usdoj.gov

(c)      **Counsel to the Debtors at:**

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:    Daniel J. DeFranceschi
         Amanda R. Steele
         Zachary I. Shapiro
         Matthew P. Milana
Email:  defranceschi@rlf.com
         steele@rlf.com
         shapiro@rlf.com
         milana@rlf.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray C. Schrock, P.C.
         Candace M. Arthur
         Natasha S. Hwangpo
         Chase A. Bentley
Email:   ray.schrock@weil.com
         candace.arthur@weil.com
         natasha.hwangpo@weil.com
         chase.bentley@weil.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**C.      Requirements for Confirmation of Plan**

**1.      Requirements of Section 1129(a) of Bankruptcy Code**

(a)      General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)      the Plan complies with the applicable provisions of the Bankruptcy Code;

76

(ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)     the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)     any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

(ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)      Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the Plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests, and (ii) the Liquidation Analysis (which will be filed no later than the date the Plan Supplement is filed and served on holders of Claims in the Voting Classes as promptly practicable upon filing).

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis will be provided solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein and will be on a Debtor-by-Debtor basis with a summary on a consolidated basis.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor of the Debtor (unless such liquidation or reorganization is proposed in the plan).  Because the Plan proposes a liquidation of all of the Debtor, for purposes of this test, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-confirmation date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds to liquidate the Debtors' remaining estates.  Accordingly, , the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

(d)      Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a

78

provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2. Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Claims in Class 5 (Intercompany Claims), Interests in Class 6 (Intercompany Interests), Class 7 (Subordinated Securities Claims) and Class 8 (KServicing Equity Interests) will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

### (a) Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. The Plan provides that Claims and Interests of equal priority will receive comparable treatment and the Debtors believe such treatment is fair under the circumstances. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

### (b) Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

#### (i) *Secured Creditors*

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)     *Unsecured Creditors*

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of liquidation.  The Plan provides that the holders of General Unsecured Claims in Class 4 will receive the treatment summarized above in Article VI of this Disclosure Statement.

(iii)     *Equity Interests*

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, all Intercompany Interests will receive no recovery or distribution and be reinstated solely to maintain the Debtors' corporate structure, as necessary.  Pursuant to the Plan, all KServicing Equity Interests shall receive the following treatment: (i) on the Effective Date, all KServicing Equity Interests shall be cancelled and a Single Share shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of KServicing Equity Interests consistent with their former relative priority and economic entitlements and the Single Share shall be recorded on the books and records maintained by the Plan Administrator; (ii) each former holder of KServicing Stock (through their interest in the Single Share, as applicable) shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such KServicing Stock; *provided*, that in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each former holder of a KServicing Existing Equity Interests may receive its share of any remaining assets of KServicing consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that KServicing's Chapter 11 Case is closed in accordance with Section 5.14 of the Plan, the Single Share issued on the Effective Date shall be deemed cancelled and of no further force and effect; *provided* that (i) such cancellation does not adversely impact the Debtors' Estates; and (ii) the continuing rights of former holders of KServicing Stock (including through their interest in Single Share or otherwise) shall be nontransferable except (A) by operation of law or (B) for administrative transfers where the ultimate beneficiary has not changed, subject to the Plan Administrator's consent.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

A.     **Alternative Plan**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of liquidation has expired, any other party in interest) could attempt to formulate a different plan of liquidation. The Debtors, however, do not believe that there are any practical alternative plans for the liquidation. The

80

Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### B.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code in which a chapter 7 trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests will be set forth in the Liquidation Analysis that the Debtors will file no later than the date that the Plan Supplement is filed.

As noted in Article X of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

### XII.
### CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 and Class 4 to vote in favor thereof.

Dated:  October 5, 2022

**DEBTORS**

**KABBAGE, INC. (D/B/A KSERVICING)**
**KABBAGE CANADA HOLDINGS, LLC**
**KABBAGE ASSET SECURITIZATION LLC**
**KABBAGE ASSET FUNDING 2017-A LLC**
**KABBAGE ASSET FUNDING 2019-A LLC**
**KABBAGE DIAMETER, LLC**

By:   /s/ *Laquisha Milner*
        Name: Laquisha Milner

        Title:   Chief Executive Officer

81