# EXHIBIT A

**PowerPoint Demonstrative**



# First Day Hearing Presentation
October 6, 2022



# Roadmap

| | |
|---|---|
| 1 | KServicing Background |
| 2 | Circumstances Leading to these Chapter 11 Cases |
| 3 | Chapter 11 Plan Overview |
| 4 | Path Forward |



# About KServicing

- Kabbage, Inc. d/b/a KServicing (the "**Company**") was founded as an online lending and servicing platform for small businesses.
  - The Company has been in wind down since selling substantially all of its assets to affiliates of American Express ("**AmEx**") in October 2020 (the "**AmEx Transaction**").
  - Approximately 99% of the Company's outstanding loan servicing portfolio is comprised of loans issued under the Paycheck Protection Program (the "**PPP**" and the loans issued thereunder, the "**PPP Loans**"), with the remaining 1% being non-PPP loans issued to small businesses prior to the AmEx Transaction (the "**Legacy Loans**").
- The U.S. Small Business Administration ("**SBA**") launched the PPP in April 2020 in connection with the enactment of the CARES Act, which authorized hundred of billions of dollars of government aid to small businesses reeling from the onset of the COVID-19 global pandemic.
  - The SBA partnered with private lenders and servicers, including the Company, to process loan applications on a highly expedited timeline to get funding to small businesses desperately in need of working capital.
  - The Company filled a void in the PPP by providing loans to small businesses that did not have access to PPP Loans provided by the largest financial institutions participating in the PPP.
  - With over a decade of experience building and operating a sophisticated online lending platform, the Company was uniquely positioned to fulfill the U.S. government's urgent need to quickly distribute aid to small businesses.
- The Company ultimately became the second largest PPP lender by application volume, delivering more than $7 billion in PPP Loan funds to more than 300,000 small businesses.
- To date, the Company has successfully processed approximately 80% of its PPP Loan portfolio, and seeks to wind down its operations, resolve remaining claims, and utilize the tools available in chapter 11 to distribute its assets through a chapter 11 plan.



# Loan Portfolio Summary

| | Completed Loan Processing to Date | | |
|---|---|---|---|
| | Total Origination Principal and Loan Count | Forgiven or Guaranty Purchased Loans | Percentage Forgiven or Guaranty Purchased |
| **PPPLF** | | | |
| Principal | $1,623 M | $1,011 M | 62.3% |
| Loan Count | 97,000 | 74,000 | 76.3% |
| **CUBI** | | | |
| Principal | $2,585 M | $2,342 M | 90.6% |
| Loan Count | 99,000 | 91,000 | 91.5% |
| **CRB** | | | |
| Principal | $3,048 M | $2,328 M | 76.4% |
| Loan Count | 122,000 | 99,000 | 81.1% |
| **KS PPP** | | | |
| Principal | $9 M | $ < 1 M | 5.0% |
| Loan Count | < 1,000 | < 1,000 | 11.7% |
| **Total** | | | |
| Principal | $7,266 M | $5,682 M | 78.2% |
| Loan Count | 319,000 | 264,000 | 82.8% |



4

# Key Parties

The Company's Board of Directors is comprised of four (4) directors, all of which have been appointed after the AmEx Transaction. Three (3) of the directors are independent. All of the Company's management were appointed after the AmEx Transaction.

| Company's Management | |
|---|---|
| Chief Executive Officer, Director | Laquisha Milner |
| Interim Chief Financial Officer | David Walker |
| Vice President of Operations | Donna Evans |
| General Counsel | Holly Loiseau |
| Deputy General Counsel | Salim Kafiti |
| **Party** | **Advisors, if known** |
| Company Professionals | Weil, Gotshal & Manges, LLP (Proposed Counsel) <br> Richards, Layton & Finger, P.A. (Proposed Co-Counsel) <br> AlixPartners LLP (Proposed Financial Advisor) |
| Federal Reserve Bank | Cleary Gottlieb Steen & Hamilton LLP |
| Customers Bank | Holland & Knight LLP |
| Cross River Bank | Quinn Emanuel Urquhart & Sullivan, LLP |
| U.S. Department of Justice | |
| U.S. Small Business Administration | |
| Federal Trade Commission | |



## Circumstances Leading to these Chapter 11 Cases

The Company's plan has always been to wind down its loan portfolios to maturity and resolve all matters out-of-court. However, given the numerous claims and substantial resources needed to resolve those claims, the Company has determined that its optimal path to wind down operations and maximize recoveries for all stakeholders is pursuant to a chapter 11 plan and the commencement of these cases.

- Resources Available After AmEx Transaction

- Lack of Clarity in SBA Guidance

- Government Investigations and Attendant Stakeholder Disputes Have Caused a Substantial Drain on the Company's Resources

- Additional Issues Causing Liquidity Constraints



# Circumstances Leading to these Chapter 11 Cases (cont'd.)

### Resources Available After AmEx Transaction

- In October 2020, affiliates of AmEx acquired substantially all of the Company's assets, including the technology associated with the Company's loan servicing platform and historical books and records, for approximately $750 million.

- AmEx did not acquire the Company's remaining PPP Loan portfolio or Legacy Loan portfolio.

- Following the AmEx Transaction, the Company was left with $17 million of cash, a transition services agreement with American Express, and other constrained resources to wind down its business.

- The question facing the Company, among others, is whether those resources were enough to wind down the Company at the time of that transaction in light of what was known at the time or reasonably foreseeable.

- The Company's Board of Directors, with the assistance of the Company's advisors, has been investigating the AmEx Transaction.



# Circumstances Leading to these Chapter 11 Cases (cont'd.)

## Lack of Clarity in SBA Guidance

- In the first two months of the PPP, the government published 14 interim final rules and 48 FAQs, resulting in new SBA guidelines being issued on nearly a daily basis.

- Despite the lack of clarity, the U.S. government urged PPP lenders to process loans rapidly, even on the same day as the borrower's application.

- The Company heeded the government's call, and stepped in during a time of true national emergency, to help small businesses in desperate need of immediate financial assistance.

- Like the other PPP lenders, the Company was inclined to extend billions of dollars of unsecured loans to small businesses in large part because the SBA guidelines required "minimal review" of applications, permitted the lenders to rely on borrower representations, and, most importantly, because eligible PPP Loans were 100% backed by an SBA guaranty.



## Circumstances Leading to these Chapter 11 Cases (cont'd.)

> **Government Investigations and Attendant Stakeholder Disputes Have Caused a Substantial Drain on the Company's Resources**

- <u>DOJ Investigations</u>.  The U.S. Department of Justice offices in the District of Massachusetts and the Eastern District of Texas are investigating the Company's Borrower Diligence practices, alleging that the Company, among other things, improperly included excess amounts on PPP Loans.

- <u>CUBI Receivable Dispute</u>.  From April 2020 to May 2021, CUBI funded or originated over $2.5 billion in loans through its arrangements with the Company, generating tens of millions of dollars in fees payable.  While CUBI did pay the Company servicing fees for Round 1 PPP Loans, it has refused to pay any of the approximately $65 million in fees due for Round 2.

- <u>CRB Allegations</u>.  In various correspondence, CRB has asserted certain contractual claims against the Company, including obligations for repurchase, indemnification, remediation, and restitution.

- <u>Congressional and FTC Investigation</u>.  The United States House of Representatives Select Subcommittee on the Coronavirus Crisis and the Federal Trade Commission are similarly investigating the Company's borrower diligence practices and servicing.

- <u>Class Action Lawsuit</u>.  On March 20, 2022, certain PPP Loan borrowers filed a class action complaint against the Company in the United States District Court for the Northern District of Georgia, Atlanta Division alleging that the Company failed to timely and competently process loan forgiveness applications on behalf of borrowers.



# Circumstances Leading to these Chapter 11 Cases (cont'd.)

## Additional Issues Causing Liquidity Constraints

- <u>Limited Cash Flow</u>.  As a company already in wind down, and restricted from generating any new business by the AmEx Transaction, the Company has limited and dwindling sources of incoming cash.

    - However, the Company has made significant progress in discussions with the Federal Reserve regarding the use of certain PPPLF cash proceeds to help fund the administration of these cases and the servicing of the Company's loan portfolio.

- <u>CUBI Receivable</u>.  The $65 million in servicing fees owed by CUBI are an essential source of cash that the Company must access to continue servicing its loan portfolio.  The Company is still negotiating a potential interim settlement with CUBI, which it hopes to resolve in the coming days.

- <u>Expensive Loan Servicing Platforms</u>.  The Company licenses the servicing platform it sold to AmEx in 2020, and must also supplement that platform with additional services, due to AmEx's refusal to revamp the legacy platform to meet revised SBA processes—significantly increasing the technology cost to service its loan portfolios.

- <u>Defending Against Investigations and Disputes</u>.  The Company has participated in over 100 formal discussions with dispute counterparties, and has been forced to engage several professional firms to properly defend itself from the barrage of attacks.

- <u>Increased Servicing Costs</u>.  The DOJ investigation and the SBA's refusal to process DOJ-flagged loans created a flood of data requests and demands for additional reporting from the Company's Partner Banks.  To field and respond to the overwhelming requests, the Company has had to expand its lean staff, which has dramatically increased operating costs.



# Illustrative Timeline



## Proposed Chapter 11 Toggle Plan

|  | Funded Transaction | Unfunded Transaction |
|---|---|---|
| Cash Assumptions | • Federal Reserve permits access to certain PPPLF cash proceeds<br>• CUBI receivable is recovered (with no more than a [25]% discount to the full receivable) | • Federal Reserve permits access to certain PPPLF cash proceeds<br>• No recovery of the CUBI receivable |
| Illustrative Case Duration | 180-day case | 100-day case |
| Implementation | • Servicing Election: By [•], 2022, the Federal Reserve and Partner Banks shall each elect to either (i) fund the Wind Down Estate with $[•], which shall be used for the continued servicing of the their respective loans through a date mutually agreed, or (ii) take all steps necessary to transfer all of the Company's servicing obligations with respect to their loans to a third-party loan servicer.<br><br>• Loan Servicing: Company continues to service all loans until the earlier of a date certain and the date on which the Federal Reserve, CUBI, or CRB elect to transfer their respective loans to an alternate servicer.<br><br>• Cooperation: The Company will use commercially reasonable efforts to assist in transferring loans to an alternate servicer. For the avoidance of doubt, the Company will not be responsible for any costs associated with transferring the servicing obligations. | • Rejection of Partner Bank Contracts: Shortly after the petition date, the Company will file a motion seeking rejection of the CUBI and CRB servicing agreements.<br><br>• Servicing of PPPLF Loans: Company continues to service all PPPLF Loans until emergence from chapter 11, at which time the Company will transfer all PPPLF loans to the Fed.<br><br>• Cooperation: The Company will use commercially reasonable efforts to assist in transferring loans to an alternate servicer. For the avoidance of doubt, the Company will not be responsible for any costs associated with transferring the servicing obligations. |



## Proposed Chapter 11 Toggle Plan (cont'd.)

|  | Funded Transaction | Unfunded Transaction |
|---|---|---|
| **Claims to be Restructured** | • Reserve Bank Claims:<br>　• *Reserve Bank Secured Claims*: any secured claims held by the Reserve Bank arising and payable under and in accordance with the PPPLF documents on account of PPPLF Advances and any interest, costs, and fees thereunder<br>　• *Reserve Bank Priority Claims*: deficiency claims on account of the PPPLF Advances entitled in right of priority under section 507(a)(2) of the Bankruptcy Code.<br>• General Unsecured Claims: Any claim against the Debtors (other than Intercompany Claims) as of the petition date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any final order by the Bankruptcy court. | |
| **Treatment of Restructured Claims** | • Reserve Bank Secured Claims:<br>　• *If Post-Effective Date Servicing*: Cash proceeds of the PPPLF collateral<br>　• *If Transfer Servicing*: Return of the PPPLF collateral<br><br>• Reserve Bank Priority Claims: Recover from the GUC Pool assets; entitled to recovery of full claim before any General Unsecured Claims recover from the GUC Pool<br>• General Unsecured Claims: Each holder will receive its pro rata share of the GUC Pool, after distributions are made on account of Reserve Bank Priority Claims from the GUC Pool<br><br>• GUC Pool: Amount equal to any remaining net cash proceeds, provided that at the conclusion of the wind down, any residual amounts remaining in the Wind Down Budget shall be transferred to the GUC Pool, except for any such amounts reserved for post-effective date servicing costs | • Reserve Bank Secured Claims: Return of the PPPLF collateral<br><br><br><br><br>• Reserve Bank Priority Claims: Recover from the GUC Trust assets; entitled to recovery of full claim before any General Unsecured Claims recover from the GUC Trust<br>• General Unsecured Claims: Each holder will receive its pro rata share of the GUC Trust, after distributions are made on account of Reserve Bank Priority Claims from the GUC Trust<br><br>• GUC Trust: On the effective date, the Debtors will transfer all estate causes of action to the GUC Trust |



13

# Proposed Chapter 11 Toggle Plan (cont'd.)

| | Funded Transaction | Unfunded Transaction |
|---|---|---|
| Treatment of Other Claims | <ul><li>Administrative, Priority Tax, and Priority Non-Tax Claims: Paid in-full.</li><li>Fee Claims: Paid in-full.</li><li>Other Secured Claims: Payment in full in cash, or such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.</li><li>Intercompany Claims: Each claim will either be reinstated or cancelled and released at the option of the Debtors, provided, that no distributions shall be made on account of Intercompany Claims on the effective date.</li><li>Intercompany Interests: Shall receive no recovery or distributions and be reinstated solely to maintain the Debtors' corporate structure.</li><li>Subordinated Securities Claims: Shall not receive or retain any property under the Plan. On the effective date, all claims shall be deemed cancelled.</li><li>KServicing Equity Interests: On the effective date, all claims shall be deemed cancelled.</li></ul> | |
| Wind Down Estate | The Wind Down Estate shall:<ul><li>continue performing any remaining servicing obligations; or</li><li>transfer its servicing obligations with respect to the Fed, CRB, and CUBI loans to a third-party servicer.</li></ul>The Wind Down Estate shall have a budget for:<ul><li>the wind down process; and</li><li>any continued servicing of loans.</li></ul>At the conclusion of the wind down, any residual amounts remaining shall be distributed to the Federal Reserve, CUBI, and CRB, as applicable. | The Wind Down Estate shall process the wind down, dissolve and liquidate the estates, and make any distributions not otherwise distributed on the effective date.<br><br>On the plan effective date:<ul><li>remaining assets of the Debtors' estates shall transfer to the wind down estate; and</li><li>any remaining estate causes of action shall transfer to the GUC Trust automatically.</li></ul> |



14

# Path Forward

| | |
|---|---|
| 1 | Continue servicing loan portfolio in the ordinary course |
| 2 | Finalize agreement with Federal Reserve to use certain PPPLF cash proceeds |
| 3 | Collect the CUBI receivable |
| 4 | Advocate for the SBA to honor its PPP loan purchase guaranty in-full |
| 5 | Confirm chapter 11 Plan and prepare for emergence in coordination with stakeholders |
| 6 | Service the loans to maturity or otherwise transfer servicing obligations |



15