## EXHIBIT A

**Motion**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------- x

In re                                                  :        **Chapter 11**
                                                       :
**KABBAGE, INC. D/B/A KSERVICING, *et al.*,** :        **Case No. 22-10951 (      )**
                                                       :
                                                       :
Debtors.[1]                                            :        **(Joint Administration Requested)**

------------------------------------------------------- x

### MOTION OF DEBTORS FOR INTERIM AND FINAL
### ORDERS AUTHORIZING DEBTORS TO (I) CONTINUE SERVICING
### AND SUBSERVICING ACTIVITIES AND (II) PERFORM RELATED OBLIGATIONS

Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"), respectfully move and represent as follows in support of this motion (this "**Motion**"):[2]

### Preliminary Statement

1.      As COVID-19 spread across the country, state and local governments implemented public health measures that mandated businesses of all sizes to immediately close their doors or substantially curtail operations. On March 27, 2020, in an emergency attempt to support small businesses with evaporating revenues and to avoid mass layoffs of the U.S. workforce, the federal government enacted the Coronavirus Aid, Relief, and Economic Security

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] The facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Deborah Rieger-Paganis In Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "**Rieger-Paganis Declaration**") sworn to on the date hereof and filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Rieger-Paganis Declaration.

Act (the "**CARES Act**").  Among other measures, the CARES Act authorized the provision of nearly $1 trillion in government aid to small businesses under the Paycheck Protection Program (the "**PPP**" and the loans provided thereunder, the "**PPP Loans**").  The CARES Act directed the U.S. Small Business Administration (the "**SBA**") to administer the PPP by partnering with private lenders and servicers to process loan applications and deliver funds to small businesses as quickly as possible.  Notably, PPP borrowers would be eligible for forgiveness of their loan if they used the PPP funds for "qualifying payroll costs" ("**Loan Forgiveness**"), and in the event a PPP Loan was not eligible for forgiveness pursuant to the SBA guidelines, the SBA nevertheless guaranteed its purchase of 100% of the PPP Loan from the originating lender (a "**Guaranty Purchase**").

2.      Prior to the Petition Date (as defined herein), the Company partnered with the SBA to administer the PPP by, among other things, processing loan applications and delivering funds to small businesses.  In the ordinary course of business, the Company maintains and services a PPP Loan portfolio comprising approximately 99 percent of the Company's loan servicing portfolio by outstanding principal amount as of September 30, 2022, with non-PPP Loans (the "**Legacy Loans**") comprising the remainder.

3.      The Company services two primary types of PPP Loans:[3]

(a)     PPP Loans that the Company originated and pledged to the Federal Reserve Bank's (the "**Federal Reserve**") Paycheck Protection Program Liquidity Facility (the "**PPPLF**," the portfolio of loans, the "**PPPLF Portfolio**," and the loans thereunder, the "**Pledged PPP Loans**"); and

(b)     PPP Loans owned by Customers Bank ("**CUBI**") and Cross River Bank ("**CRB**" and, together with CUBI, the "**Partner Banks**"), which the

---

[3] In addition to the PPPLF Portfolio and Partner Bank Portfolio, the Company originated, funded, and services, as of September 30, 2022, approximately 80 PPP Loans with approximately $1.6 million in outstanding principal amount (the "**KS PPP Portfolio**," and the loans thereunder, the "**KS PPP Loans**," and the KS PPP Portfolio together with the PPPLF Portfolio and the Partner Bank Portfolio, the "**PPP Portfolio**").  The KS PPP Portfolio comprises approximately 0.1 percent of the Company's PPP by outstanding principal amount.

Company subservices for the Partner Banks (the "**Partner Bank Portfolio**" and the loans thereunder, the "**Partner Bank Loans**").

4.      As part of its PPP Loan servicing activities, the Company, among other things: collects and accounts for borrower payments—including payments of principal and interest, assists borrowers in completing their Loan Forgiveness applications, completes Guaranty Purchase applications on account of Pledged PPPLF Loans and KS PPP Loans and assists the Partner Banks in completing their Guaranty Purchase applications and other reports, and provides a software platform to facilitate collections, Loan Forgiveness, and Guaranty Purchase activities, all as described more fully herein.

5.      In addition to PPP Loans, the Company subservices a small portfolio of Legacy Loans (the "**Legacy Loan Portfolio**"), all of which are owned by Celtic Bank ("**Celtic**"). The Company marketed these loans, performed diligence on applicants to ensure compliance with Celtic's screening procedures, and currently services these loans, with Celtic as the lender of record.  Once the Company identified an eligible borrower, the Company established a loan account and Celtic made available all funds needed to extend credit to the borrower.  The Company purchased from Celtic participation interests in receivables on these loans, effectively retaining the rights to borrower principal and interest payments.

6.      As a company that was already in wind down prior to the filing of these chapter 11 cases, the Company is not generating significant cash on a go-forward basis; in fact, the Company collected all of its fees from the Partner Bank Portfolio at or near the time a loan was originated.[4]  Given that the PPP ended on May 31, 2021, the Company does not anticipate earning additional cash in connection with servicing newly-originated PPP Loans.  Likewise, the Company

---

[4] With the exception of the CUBI Receivable, as explained herein and in paragraphs 51-53 of the Rieger-Paganis Declaration.

3

is not permitted to originate any new Legacy Loans due to non-compete covenants contained in documentation associated with the Company's sale of its legacy online lending platform to affiliates of American Express (the "**AmEx Transaction**"), whereby the Company agreed not to engage in any business that provides products or services of the type offered by the Company prior to the AmEx Transaction. This leaves the Company with two potential sources of cash flow on a go-forward basis: (a) interest earned on the PPPLF Portfolio, subject to an agreement with the Federal Reserve on the Debtors' use of its cash collateral and/or an order by the Court approving such use, and KS PPP Portfolio, and (b) interest and principal earned on the Legacy Loan Portfolio.[5] Exacerbating the Company's already limited revenue streams is approximately $31 million of servicing fees that remain outstanding from CUBI as of September 30, 2022.[6] Given the significant time and costs required to continue servicing the PPP Portfolio, the limited incoming cash, and shrinking pot of resources, the Company may soon be forced to seek Court approval to change its servicing arrangements. Until that time—however short (or long) it may be—the Debtors seek authority to continue their ordinary course loan servicing operations and provide approximately 48,000 PPP Loan borrowers with outstanding balances comfort that there

---

[5] When a Legacy Loan payment becomes 180 days delinquent, the Company, in the ordinary course of business, requests certain collection agencies (the "**Collection Agencies**") to collect borrower interest and principal payments on behalf of the Company. If and when a Collection Agency is able to collect borrower payments, it remits such payments to the Company after deducting a collection fee (the "**Collection Fee**").

[6] From April 2020 to May 2021, CUBI funded or originated over $2.5 billion in loans through its arrangements with the Debtors, generating tens of millions of dollars in fees payable to the Debtors under the CUBI Agreements, including approximately $65 million in servicing fees (the "**CUBI Receivable**") that CUBI has withheld from the Company, purportedly based on the possibility that CUBI may have claims against the Company. In response, as of September 30, 2022 the Debtors have withheld borrower payments due to CUBI in the amount of approximately $34 million (the "**KServicing Withholding**") to offset the CUBI Receivable. As of September 30, 2022, the CUBI Receivable exceeds the KServicing Withholding by approximately $31 million. The Company and CUBI are currently in discussions regarding the terms of a potential settlement related to the Company's collection of the CUBI Receivable.

will be no interruption in services on account of the chapter 11 filing, and provide the Federal Reserve and the Partner Banks with time to institute alternate servicing arrangements.

7.      The Company understands that there remains only a small population of existing PPP Loan servicers.  In light of the limited population of PPP Loan servicers, it may take a significant amount of time and resources to transfer servicing obligations for a PPP Loan portfolio of more than $1.3 billion in outstanding PPP Loan amounts.  It would be catastrophic for borrowers, the Federal Reserve, and the Partner Banks if the Company immediately stopped servicing loans with no alternative servicer (or at minimum, a plan for alternative servicing) in place.

8.      Therefore, the Debtors respectfully request out of an abundance of caution, that this Court authorize, but not direct, the Debtors to continue their servicing and Related Obligations (as defined herein) in the ordinary course of business in these Chapter 11 Cases (as defined herein) until such time that the Company seeks to transfer servicing.

## **Relief Requested**

9.      By this Motion, pursuant to sections 105(a), 362, 363(c), 1107(a), and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request authority, but not direction, to continue in the ordinary course of business and in the same manner as their prepetition practice:

(a)      servicing and subservicing PPP Loans, including, but not limited to, obligations related to collecting borrower payments, maintaining a borrower software platform, Loan Forgiveness, and Guaranty Purchase;

(b)      servicing and subservicing Legacy Loans, including, but not limited to, obligations related to collecting borrower payments and maintaining a borrower software platform;

5

(c)     remitting certain borrower overpayments to borrowers or the SBA, as applicable, and any reconciliation activities related thereto;

(d)     paying prepetition amounts owed to the Critical Vendors (as defined herein) on the terms and conditions described herein; and

(e)     fulfilling compliance and regulatory obligations, as described herein.

10.     The Debtors further request that the Court (a) authorize all applicable financial institutions (collectively, the "**Banks**") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent directed by the Debtors in accordance with any order granting the relief sought by this Motion and to the extent the Debtors have sufficient funds on deposit in their accounts with such Bank, whether such checks were presented or electronic requests were submitted before or after the date hereof, and (b) authorize all Banks to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

11.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**"), and a proposed form of order granting the relief requested herein on a final basis is annexed hereto as **Exhibit B** (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed Orders**").[7]

### Jurisdiction and Venue

12.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States

---

[7] Nothing contained in this Motion or the Proposed Orders shall be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under Section 365 of the Bankruptcy Code.

District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

13.      On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

14.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their Chapter 11 Cases pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Local Rules.

15.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the Rieger-Paganis Declaration and is incorporated herein by reference.

### I.      Enactment of the CARES Act and the Origin of PPP Loans

16.      Congress launched the PPP in the early weeks of an unprecedented global pandemic, during which vital public health measures forced businesses of all sizes in all sectors to shut down or substantially curtail operations virtually overnight. The PPP was the primary

mechanism through which the federal government sought to ensure businesses and families could survive.  To ensure widespread participation, the CARES Act directed the SBA to provide Loan Forgiveness and Guaranty Purchase to eligible borrowers and lenders, respectively.  Pursuant to CARES Act direction, the SBA issued guidance in the form of interim final rules, FAQs, and procedural notices detailing the processes and standards for determining eligible borrowers ("**Borrower Diligence**"), Loan Forgiveness, and Guaranty Purchase, as detailed further herein.

## II.    Debtors' PPP Loan Business

17.    The Company is party to three types of PPP Loan servicing arrangements: (a) servicing Pledged PPPLF Loans; (b) subservicing Partner Bank Loans; and (c) servicing KS PPP Loans.

### A.    PPPLF Portfolio

18.    On April 9, 2020, to support the effectiveness of the PPP, the Board of Governors of the Federal Reserve System, with the concurrence of the U.S. Treasury, authorized the establishment of the PPPLF, pursuant to which eligible lenders could enter into agreements with the Federal Reserve to obtain funding for PPP Loans.  To obtain PPPLF financing, the Company and the Federal Reserve entered into the *Paycheck Protection Program Liquidity Facility Letters of Agreement* (the "**Letter Agreements**"), dated May 12, 2020 and January 14, 2021.  The Letter Agreements incorporate the *Federal Reserve Banks Operating Circular No. 10*, dated July 16, 2013 (the "**Operating Circular**," and together with the Letter Agreements, the "**PPPLF Documents**"), which sets forth the universal terms and conditions for any party who obtained advances from, incurred liabilities to, or pledged collateral to, the Federal Reserve, and includes terms such as advance payment mechanics, requirements for collateral, and maintenance of lending documents.

8

19.    Under the PPPLF Documents, the Company was authorized to request advances (the "**PPPLF Advances**") from the Federal Reserve to fund PPP Loans originated by the Company.  The PPPLF Advances are fully secured by the underlying PPP Loans which the Company originated (the "**PPPLF Collateral**"), and mature on the respective maturity dates of the pledged PPP Loans.  Upon receipt of principal and interest payments from borrowers and payments from the SBA, including on account of Loan Forgiveness and Guaranty Purchase, the Company remits such amounts to the Federal Reserve on a weekly basis.[8]  These amounts are then used to set off obligations of the Company to the Federal Reserve.  In the event the Company fails to pay a PPPLF Advance on the maturity date, the Federal Reserve is required to first seek repayment from the PPPLF Collateral, including any proceeds received from the SBA.[9]

20.    Since the launch of the Company's PPP Loan program, it has originated approximately 97,000 Pledged PPPLF Loans, representing nearly $1.6 billion in aggregate loan principal.  As of September 30, 2022, approximately 22,000 Pledged PPPLF Loans remain outstanding, representing approximately $541 million in principal amounts.  Pledged PPPLF Loans comprise approximately 41 percent of the Company's PPP Loan servicing portfolio by outstanding principal amounts.

---

[8] Prior to the filing of these Chapter 11 Cases, pursuant to the PPPLF Documents, the Federal Reserve and the Company directed the SBA to make payments directly to the Federal Reserve (the "**SBA Direct Payment Processing**").  Although the Debtors and the Federal Reserve initiated the SBA Direct Payment Processing prepetition, the coordination process remains ongoing with the SBA and the parties are still in the process of documenting an agreement.  Once the SBA Direct Payment Processing is in place, the Federal Reserve will receive payments on account of the Pledged PPPLF Loans directly from the SBA, but the Company will still receive and remit borrower payments on account of the Pledged PPPLF Loans to the Federal Reserve

[9] Pursuant to the PPPLF Documents, the Federal Reserve may void the non-recourse provisions of the PPPLF Agreements and directly pursue payment from any of the Company's assets if, (a) in its sole discretion it deems that the Company engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance, or (b) the Company fails to meet any of the requirements of the Fed Agreements, including, but not limited to, breaches of any representations, warranties, or covenants.  On October 1, 2022, the Federal Reserve delivered a notice of default indicating that pursuant to the PPPLF Documents, the non-recourse provisions are void.

21.    The Debtors' activities with respect to servicing the Pledged PPPLF Loans in the ordinary course of business include, among other things:

(a)    collecting and accounting for payments received from borrowers, including payments of principal and interest ("**Collections**");

(b)    maintaining a software platform for borrowers ("**SaaS Services**");[10]

(c)    assisting borrowers in completing Loan Forgiveness applications ("**Forgiveness Assistance**");

(d)    submitting Guaranty Purchase applications to the SBA;

(e)    subject to the completion of SBA Direct Payment Processing, depositing Loan Forgiveness and Guaranty Purchase amounts received from the SBA and Pledged PPPLF Loan payments received from borrowers into the correspondent bank account;[11] and

(f)    conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing (all of the foregoing, the "**PPPLF Obligations**").

22.    Therefore, through this Motion, the Debtors seek authority, but not direction, to continue their PPPLF Obligations in the ordinary course of business.

## B.    Partner Bank Portfolio

23.    Between April 2020 and February 2021, the Company entered into various PPP Loan-related agreements with the Partner Banks.  While there are nuanced differences in, among other things, how the underlying PPP Loans are originated (some were originated by the Company and sold to the Partner Banks, while others were originated by the Partner Banks), how servicing fees are calculated, and what the Company's obligations are with respect to Loan

---

[10] The main borrower software platform (the "**AmEx Platform**") is under the control of affiliates of American Express ("**AmEx**") in accordance with the terms of the AmEx Transaction.  The Company accesses the AmEx Platform pursuant to a Transition Services Agreement (the "**AmEx TSA**") with AmEx.  The Company uses a separate third-party platform, Biz2Credit, to process Loan Forgiveness applications.

[11] For the avoidance of doubt, once SBA Direct Payment Processing is established, the Company will only deposit borrower principal and interest payments into the correspondent bank account, and all SBA payments will be remitted directly to the Federal Reserve by the SBA.

RLF1 28018237V.1

Forgiveness and Guaranty Purchase, the ultimate relationship established between the Company and each of its Partner Banks is fundamentally the same. Under the applicable CUBI Agreements[12] and CRB Agreements[13] (together, the "**Partner Bank Agreements**"), generally, the Partner Banks funded the loans and the Company services the loans.

24. Since the launch of the Company's PPP Loan program, it has originated, in conjunction with the Partner Banks, approximately 221,000 Partner Bank Loans, representing approximately $5.6 billion in aggregate loan principal. As of September 30, 2022, there are approximately 27,000 Partner Bank Loans with approximately $785 million in outstanding PPP Loan amounts remaining. 77 percent of the Partner Bank Loans by outstanding principal amount are owned by CRB (the "**CRB Loans**") and 23 percent of the Partner Bank Loans by outstanding principal amount are owned by CUBI (the "**CUBI Loans**"). Partner Bank Loans make up approximately 59 percent of the Company's PPP Loan portfolio by outstanding principal amount.

25. The Debtors' activities with respect to servicing the Partner Bank Loans in the ordinary course of business include, among other things:

    (a)    performing Collections;

    (b)    providing SaaS Services;

    (c)    performing Forgiveness Assistance;

    (d)    assisting the Partner Banks in their submissions for Guaranty Purchase by (i) under the CRB LPA, establishing and maintaining a servicing file, which contains the documentation necessary to be submitted to the SBA in order

---

[12] "**CUBI Agreements**" means (i) the CUBI Processing and Servicing Agreement, dated April 27, 2020, by and between Kabbage and CUBI (together with its amendments, the "**CUBI PSA**"); (ii) the CUBI Sale and Servicing Agreement, dated February 2, 2021, by and between Kabbage and CUBI (the "**CUBI SAS**"); and (iii) the CUBI SaaS Services Agreement, dated April 24, 2020, by and between Kabbage and CUBI (together with its amendments, the "**CUBI SaaS**").

[13] "**CRB Agreements**" means (i) the CRB Loan Program Agreement, dated April 13, 2020, by and between Kabbage and CRB (together with its amendments, the "**CRB LPA**"); and (ii) the CRB Sale and Servicing Agreement, dated May 6, 2020, by and between Kabbage and CRB (the "**CRB SAS**").

for the PPP Loan to be eligible for Guaranty Purchase; and (ii) under the CUBI PSA, filling in applicable fields on the Guaranty Purchase application; and

(e)    conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing (all of the foregoing, the "**Partner Bank Obligations**").

26.    As compensation for performing the Partner Bank Obligations, the Company received all of its fees at or near the time of origination of the underlying PPP Loan, with the exception of the approximately $65 million in fees due from CUBI.  Nevertheless, failing to perform the Partner Bank Loans Obligations—in particular without a process to transfer servicing to an alternative servicer—would be at the direct detriment to borrowers.  Therefore, through this Motion, the Debtors seek authority, but not direction, to continue its Partner Bank Obligations in the ordinary course of business.

### C.    KS PPP Portfolio

27.    In addition to the PPPLF Portfolio and Partner Bank Portfolio, the Company originated, funded, and currently services approximately 80 KS PPP Loans with approximately $2 million in outstanding loan amount.  The KS PPP Loans makes up approximately 0.1 percent of PPP Loans by outstanding principal amount.

28.    The Debtors' activities with regards to the KS PPP Portfolio are similar to the PPPLF Obligations and include, among other things:

(a)    performing Collections;

(b)    providing SaaS Services;

(c)    performing Forgiveness Assistance; and

(d)    submitting Guaranty Purchase applications to the SBA; and

(e)    conducting loan reviews, responding to inquiries, and engaging in other activities in connection with the foregoing (all of the foregoing, the "**KS PPP Obligations**").

12

29.     Through this Motion, the Debtors seek authority, but not direction, to continue their KS PPP Obligations in the ordinary course of business.

### D.    Summary

30.     The following table summarizes the outstanding PPP Loan portfolio of the Company as of September 30, 2022:

|  | Pledged PPPLF Loans | CRB Loans | CUBI Loans | KS PPP Loans |
|---|---|---|---|---|
| **Number of Loans\*** | 22,000 | 20,000 | 7,000 | <1,000 |
| **% of Total PPP Loans** | 44.2% | 41.3% | 14.4% | 0.1% |
| **Amounts Outstanding\*\*** | $541 million | $604 million | $181 million | $2 million |
| **% of Total PPP Loans** | 40.8% | 45.5% | 13.6% | 0.1% |

\*Number of loans is rounded to the nearest thousand.
\*\*Amounts outstanding is rounded to the nearest million.

### E.    Process for Issuing PPP Loans

31.     Applicants for PPP Loans ("**Applicants**") had to first populate the *Paycheck Protection Program Borrower Application Form* (the "**Loan Application**") and submit the Loan Application to an "SBA Participating Lender" (*i.e.,* the Company and the Partner Banks).  In their Loan Applications, Applicants provided information such as purpose of the loan and average monthly payroll, and supporting documentation such as tax forms and bank statements.  Notably, the Loan Application required Applicants to provide certifications that the information provided was "true and accurate in all material respects" and that the Applicant was "eligible to receive a loan under the rules in effect at the time" the Loan Application was submitted.  As compensation for their participation in the PPP, the lenders received one (1) percent interest on the PPP Loan principal amount and a bank processing fee from the SBA, calculated as a percentage of the PPP Loan amount.  For all PPP Loans in the PPP Portfolio, the Company performed Borrower Diligence in accordance with SBA guidelines to determine borrower eligibility for PPP Loans.

### F.    Process for Loan Forgiveness

32.    Borrowers may apply for Loan Forgiveness once all PPP Loan proceeds have been used at any time up to the maturity date of their loan.  For PPP Loans issued in the first round of the PPP in 2020, maturities were either 24 months or 60 months (depending on the date of issuance) from the issue date.  For PPP Loans issued in the second round of the PPP in 2021, all maturities were 60 months from the issue date.  When a PPP Loan was disbursed to a borrower, the borrower elected a "Covered Period" between 8 and 24 weeks (depending on the date of disbursement and the election of the borrower) during which time only eligible expenses paid and certain eligible expenses incurred but not paid, were eligible for Loan Forgiveness.  Eligible expenses under the PPP include, but are not limited to: payroll expenses, rent, operations expenditures, mortgage interest, and utility payments.    To maximize potential for Loan Forgiveness, borrowers must adhere to the SBA's requirements.

33.    As part of the PPP, the SBA offered participating lenders the ability to elect whether their borrowers would directly submit Loan Forgiveness applications to the SBA ("**Direct Submission**") or submit them through the lenders.  With respect to the Pledged PPPLF Loans and the KS PPP Loans, the Company did not make the Direct Submission election.  With respect to most of the Partner Bank Loans within the Partner Bank Portfolio, the Partner Banks did not make the Direct Submission election.  Therefore, borrowers with loans in the PPPLF Portfolio and KS PPP Portfolio and most of the borrowers with loans in the Partner Bank Portfolio submit their Loan Forgiveness applications through the Company's Loan Forgiveness platform, Biz2Credit.    For all PPP Loans, the Company reviews and provides comments to these applications, often requesting additional information from borrowers prior to submissions depending on Company review and SBA instruction.  Further, once the SBA receives a Loan Forgiveness application, it may request follow-up documentation that the Company assists

14

borrowers in providing. Once the SBA relays its decision to the Company, the Company notifies

the borrowers of the decision, informs them of their right to appeal, and provides additional support

if they choose to appeal. These are iterative processes that can take several months or longer.

G.    **Process for Guaranty Purchase**

34.    PPP Loans are guaranteed by the SBA. Following certain borrower

delinquency events, PPP lenders are entitled to submit a request to the SBA for Guaranty Purchase.

Applicable borrower delinquency events include, but are not limited to, (a) a 60-day borrower

payment delinquency, (b) a borrower filing for chapter 7 bankruptcy (or chapter 11, 12, or 13

bankruptcy, under certain circumstances); or (c) a borrower being indicted for or convicted of a

felony related to the PPP Loan. If a PPP lender does not apply for Guaranty Purchase within 180

days following maturity of the underlying loan, the SBA is not legally obligated to honor the

Guaranty Purchase.

35.    For each Pledged PPPLF Loan that meets Guaranty Purchase eligibility, the

Company applies to the SBA for Guaranty Purchase. If the application is approved (whether in

full or in part), the Company receives a Guaranty Purchase payment directly from the SBA and

deposits such amounts into a correspondent bank account in accordance with the terms of the

PPPLF Documents.[14] For the Partner Bank Loans, the Company's obligations with respect to

Guaranty Purchase differ in accordance with the terms of the agreement the specific Partner Bank

Loan is governed by, as discussed in paragraph 25 above.

---

[14] Prior to the filing of these chapter 11 cases, pursuant to the PPPLF Documents, the Federal Reserve and the Company directed the SBA to make payments directly to the Federal Reserve. Although the Debtors and the Federal Reserve initiated the SBA Direct Payment Processing prepetition, the coordination process remains ongoing with the SBA and the parties are still in the process of documenting an agreement. Once the SBA Direct Payment Processing is in place, the Federal Reserve will receive payments on account of the Pledged PPPLF Loans directly from the SBA, but the Company will still receive and remit borrower payments on account of the Pledged PPPLF Loans to the Federal Reserve

RLF1 28018237V.1

### III.    The Debtors' Legacy Loan Business

36.    All Legacy Loans the Company services are owned by Celtic and governed by the Legacy Loan Agreement.[15]    As a non-Federal Deposit Insurance Corporation-insured financial institution, the Company partnered with Celtic in an arrangement whereby the Company processed borrower Legacy Loan applications and funded the Legacy Loans through the purchase of participation interests in loan receivables (the "**Participation Interests**")[16]—effectively acquiring the rights to retain borrower principal and interest payments—with Celtic as the lender of record.    The Company services the Legacy Loans, provides an online platform for borrowers, performs loan reviews, responds to inquiries, and engage in other activities in connection with the foregoing (the "**Celtic Obligations**").

37.    In addition, the Company marketed the Legacy Loans and performed diligence on loan applicants to ensure compliance with Celtic's screening procedures.    Once the Company identified an eligible borrower, the Company established a loan account and Celtic made available all funds needed to extend credit to the borrower.    On account of the services rendered, the Company earned a fee calculated as a percentage of the principal amount of the underlying Legacy Loan upon origination (the "**KS Legacy Fee**").    Instead of collecting the servicing fee upfront, the fees were set off against the Participation Interest fees (the "**Celtic Legacy Fee**") that the Company paid to Celtic in connection with its purchase of Participation Interests.    On a monthly basis, if the KS Legacy Fees exceeded the Celtic Legacy Fees, Celtic would remit the net

---

[15] "**Legacy Loan Agreement**" means the *Celtic Program Management Agreement*, dated March 20, 2014, by and between Kabbage and Celtic (as amended).

[16] Following the purchase of Participation Interests under the Legacy Loan Agreement, the Company's records show that it sold some of the Participation Interests to HCG Business Credit III Trust and Stone Ridge Trust V.

amount to the Company.  If the Celtic Legacy Fees exceeded the KS Legacy Fees, the Company would remit the net amount to Celtic.[17]

38.     The Company continues to receive principal and interest payments on account of the Celtic Portfolio, including payments of Collection Fees from the Collection Agencies.  Therefore, the cessation of the Celtic Obligations would be costly to the Debtors, as the Debtors would be required to indemnify Celtic for its losses if the Debtors fail to perform its obligations.  Celtic currently holds $2 million in escrow as collateral security for potential claims Celtic may have under the Legacy Loan Agreement, the remaining amount of which Celtic is obligated to remit to the Company within five business days of the termination of the Legacy Loan Agreement.

39.     As of September 30, 2022, there are approximately 3,400 Legacy Loans with approximately $17 million in outstanding loan amounts.   Legacy Loans make up approximately 1 percent of the Company's loan servicing portfolio by outstanding principal amount.  Through this Motion, the Debtors seek authority, but not direction, to continue the Celtic Obligations.

## IV.     <u>Other Matters Related to the Company's Loan Servicing Business</u>

40.     To facilitate their PPP Loan and Legacy Loan servicing activities, there are several related obligations that the Debtors request authority, but not direction, to continue in the ordinary course of business, including processing Borrower Overpayments (as defined herein), paying and honoring prepetition obligations owed to Critical Vendors (as defined herein), and

---

[17] All KS Legacy Fees and Celtic Legacy Fees have been paid.  Therefore, these monthly remittances no longer occur.

activities related to compliance and regulatory obligations (all of the foregoing, the "**Related Obligations**").

### A. Borrower Overpayments

41.    At times, borrowers make payments to the Company in the following scenarios: (a) in excess of the required minimum loan payments on account of both PPP Loans and Legacy Loans ("**Regular Overpayments**"), (b) on account of PPP Loans that are ultimately forgiven by the SBA ("**Forgiveness Overpayments**"), and (c) on account of PPP Loans that the SBA has already granted Guaranty Purchase ("**Guaranty Overpayments**," and together with Regular Overpayments and Forgiveness Overpayments, the "**Borrower Overpayments**").

42.    In the case of Forgiveness Overpayments and Guaranty Overpayments, the Company may at times remit the overpayment to the Federal Reserve or the Partner Banks, as applicable, as part of regularly scheduled remittances while the SBA is still considering whether to forgive or purchase the applicable PPP Loan or, in the case of a Guaranty Overpayment, the SBA has already purchased the applicable PPP Loan.  As part of its ordinary course servicing practices, the Company reconciles such remittances to the Federal Reserve and the Partner Banks with the Forgiveness Overpayments and the Guaranty Overpayments that need to be refunded to the applicable borrower or passed on to the SBA, and accounts for the appropriate discrepancy by either (a) offsetting future remittances to the Federal Reserve and the Partner Banks, as applicable, or (b) refunding to the applicable borrower or passing on to the SBA the amounts remitted by the Federal Reserve or the Partner Banks, as applicable, in furtherance of such overpayments ("**Overpayment Reconciliation**").

43.    In the ordinary course of business, the Company (a) remits Regular Overpayments and Forgiveness Overpayments to borrowers, (b) may adjust regular remittances to the Federal Reserve and the Partner Banks or coordinate borrower refunds with the Federal

Reserve and the Partner Banks according to Overpayment Reconciliation, and (c) remits Guaranty Overpayments to the SBA (collectively, the "**Overpayment Procedures**").  Consequently, the Debtors request that the Court authorize, but not direct, the Debtors to continue engaging in activities related to the Overpayment Procedures.

### B.  Critical Vendors

44.     In connection with its general corporate, servicing and subservicing activities, the Debtors utilize the services of numerous third-party vendors, service providers, and other providers that are critical to its operations (collectively, the "**Critical Vendors**").  The Critical Vendors perform a variety of necessary functions, including services such as critical software, information technology, security, and Internet systems and support tools to manage a pipeline of over 48,000 PPP Loans and 3,400 Legacy Loans.

45.     Expenses for the Critical Vendors (the "**Critical Vendor Expenses**") are paid directly by the Company, and are generally part of the Company's corporate overhead.

46.     Employing these specialized Critical Vendors is more cost-effective than performing such activities in-house; indeed, replacing certain of these Critical Vendors would not only be difficult and disruptive, but also cost-prohibitive.  The Debtors have developed long-standing relationships with their Critical Vendors, which has enabled them to negotiate favorable pricing and terms.  Any failure to timely honor the Debtors' obligations to the Critical Vendors could jeopardize these relationships, and any interruption of their services for even a short period of time would impair the Debtors' operations and the value of the enterprise.

47.     In light of the above, through this Motion, the Debtors request authority, but not direction, to continue to employ and pay the prepetition obligations of the Critical Vendors in the Debtors' sole discretion.  Furthermore, the Debtors estimate that as of the Petition Date, **<u>approximately $75,000</u>** (the "**Prepetition Vendor Amounts**") in aggregate prepetition payments

19

remain outstanding to the Critical Vendors.  Subject to Court approval, the Debtors seek to pay the Prepetition Vendor Amounts to Critical Vendors during the first thirty (30) days of the Chapter 11 Cases.  Without the requested relief, the Critical Vendors may refuse to continue providing services to the Debtors on a post-petition basis or may impose unfavorable trade terms.

48.    The Debtors propose to condition payment of the prepetition claims of Critical Vendors on the agreement of individual Critical Vendors to continue providing services to the Debtors pursuant to the parties' customary trade terms, practices, and programs (including credit limits, pricing, timing of payments, allowance, normal availability, and other applicable terms and programs) under which such Critical Vendors provided services to the Debtors prior to the Petition Date (such terms, the "**Customary Trade Terms**"), or pursuant to such other trade practices and programs that are acceptable to the Debtors.  The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any prepetition claim.  If a Critical Vendor refuses to supply services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of full or partial payment on its prepetition claim, then the Debtors' rights to treat any payment made pursuant to this Interim Order as an unauthorized postpetition transfer and to exercise any and all appropriate remedies are expressly reserved.

### C.  Compliance and Regulatory Obligations

49.    The Debtors and certain of their affiliates are subject to various federal and state regulatory requirements including certain lending, Bank Secrecy Act/Anti-Money Laundering, and Office of Foreign Assets Control regulations and requirements incorporated into the PPP.  The Debtors are also subject to various regulatory audits and reviews and are called to respond to duly-issued government subpoenas investigating potential borrower loan fraud, all of which may carry certain costs and expenses. Further, to the extent that the Debtors identify,

whether through internal or external audits, regulatory agencies, investors, client complaints, litigation, or other means, origination or servicing errors or lack of compliance with state or federal laws or regulations, the Debtors are obligated to remediate such errors or violations, as applicable. Such remedial measures may require the Debtors to (a) make payments to borrowers (*e.g.*, in the form of reimbursements, refunds, and/or out-of-pocket expenses), (b) forgive past due amounts and/or assessed but unpaid fees or other charges, (c) pay fees, fines, and/or penalties, either directly to the applicable authority or through a Critical Vendor, (d) incur and pay certain expenses, (e) pay the costs and expenses of state and federal regulatory examinations, or (f) take such other measures as may be required by, or agreed to with, state and federal regulators.

50.    Through this Motion, the Debtors seek authority, but not direction, to continue in the ordinary course of business to (a) fulfill federal and state regulatory requirements and pay related obligations, (b) submit to, and comply with, any regulatory exams and audits and to pay related obligations, costs, and expenses, and (c) remediate errors and/or lack of compliance with laws or regulations.

## V.    Applicable Authority

### A. The Court Should Authorize the Debtors to Continue Servicing and Subservicing Activities to PPP Loans and Legacy Loans and Perform the Related Obligations in the Ordinary Course

51.    As set forth above, through this Motion, the Debtors seek authority, but not direction, to continue their servicing and subservicing activities in the ordinary course of business, and to honor and pay the Prepetition Vendor Amounts.  The requested relief is both appropriate and necessary as it (a) falls squarely within sections 363(c)(1), 1107(a), and 1108 of the Bankruptcy Code, which, taken together, authorize a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business and (b) protects and conserves the value

21

of the Debtors' estate, including by providing invaluable comfort to parties doing business with the Debtors.

*(i)  The Debtors' Activities Satisfy Ordinary Course of Business Standard*

52.    Section 363 of the Bankruptcy Code provides for a debtor's use, sale, or lease of property in the ordinary course of business, pursuant to section 363(c)(1).  In particular, section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  The purpose of this section is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *See In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets") (internal quotations marks omitted); *In re Vision Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same).

53.    Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions."  *See, e.g., In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions); *Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.").  Here, continuing the Debtors' servicing of PPP Loans and

22

Legacy Loans and performance of Related Obligations are the types of ordinary-course, routine transactions contemplated by section 363(c)(1) of the Bankruptcy Code.

54.    Further, similar relief has been granted in the chapter 11 cases of numerous other loan originators, lenders, and/or servicers. *See, e.g., In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Feb. 11, 2019) [Docket No. 224] (authorizing debtors to continue, among other things, (a) forward mortgage origination activities; (b) forward mortgage servicing activities; (c) honoring compliance and regulatory obligations; and (d) paying prepetition amounts due to critical vendors); *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Feb. 11, 2019) [Docket No. 229] (authorizing debtors to continue, among other things, (a) servicing reverse mortgages, (b) honoring compliance and regulatory obligations, and (c) paying prepetition amounts due to critical vendors); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 401] (authorizing debtors to continue, among other things, (a) servicing government sponsored loans, and (b) paying certain prepetition amounts due to critical servicing vendors); *In re Residential Capital*, LLC, No. 12-12020 (MG) (Bankr. S.D.N.Y. Jun. 15, 2012) [Docket No. 402] (authorizing debtors to continue, among other things, servicing private label mortgage loans); *In re Capmark Fin. Grp. Inc.*, Case No. 09-13684 (CSS) (Bankr. D. Del. Nov. 24, 2009) [Docket No. 334] (authorizing debtors to continue, among other things, operating their servicing business in the ordinary course of business); *In re Thornburg Mort., Inc.*, No. 09-17787 (DWK) (Bankr. D. Md. May 6, 2009) [Docket No. 49] (authorizing debtors to continue, among other things, mortgage loan servicing, auditing, and fulfillment services in the ordinary course of business); *In re Aegis Mortg. Corp.*, No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007) [Docket No. 35] (authorizing debtors to, among other things, (a) continue performing under existing subservicing agreements, and (b) enter into new subservicing agreements); *In re*

*Am. Home Mortg. Holdings, Inc.*, Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7. 2007) [Docket No. 66] (authorizing debtors to, among other things, perform their securitization servicing functions); *In re Mortg. Lenders Network USA, Inc.*, No. 07-10146 (PJW) (Bankr. D. Del. Mar. 19, 2007) [Docket No. 304] (authorizing debtors to, among other things, pay amounts or honor liabilities accrued prepetition in the ordinary course of its loan servicing business).

55.      Accordingly, 363(c)(1) authorizes continuation of the Debtors' servicing activities and related obligations thereto without this Court's approval.

  *(ii) Payment of Critical Vendor Claims is Warranted Under Sections 363(b)(1) and 105(a) of the Bankruptcy Code, and the Doctrine of Necessity*

56.      A bankruptcy court may authorize a debtor to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code. 11 U.S.C. § 363(b)(1).  Section 363(b) provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve the use of assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

57.      In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to "protect and preserve the estate, including an operating business'

24

going-concern value," on behalf of a debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (citations omitted); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

58.    Furthermore, in a long line of well-established decisions, courts consistently have permitted payment of prepetition obligations that are necessary to preserve or enhance the value of a debtor's estate.  *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), cert. denied 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

59.    In addition, the Court may rely on its equitable powers under section 105(a) of the Bankruptcy Code and the doctrine of necessity to authorize the payment of prepetition claims when such payment is essential to the continued operation of a debtor's business.  *See, e.g., Just for Feet*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides statutory basis for payment of prepetition claims under the doctrine of necessity particularly when such payment is necessary for the debtor's survival during chapter 11); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine

of necessity is standard for enabling a court to authorize payment of prepetition claims before confirming a plan).

60.     The Critical Vendor relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 363(b) and 105(a) of the Bankruptcy Code. As set forth above, the Critical Vendors provide services that are vital to the day-to-day operations of the Debtors' loan servicing business and cannot be transitioned without severe disruption to the Debtors' operations.  The Debtors' inability to pay the Critical Vendors on account of obligations incurred prior to the Petition Date may result in the Critical Vendors refusing to provide key services to the Debtors postpetition.   Any such refusal by the Critical Vendors would have immediate and severe repercussions, including, but not limited to, (a) the Debtors' inability to service loans, jeopardizing their already limited cash flows; (b) the pursuit of contractual remedies by not only the Critical Vendors, but the Federal Reserve, the Partner Banks, and Celtic, for the Debtors' inability to service their loans; and (c) the economic impact on borrowers, the Federal Reserve, the Partner Banks, and Celtic to find alternate solutions in facilitating loan repayments. Accordingly, authorizing the Debtors to pay the Critical Vendor Claims is in the best interests of the Debtors, their estates, and their economic stakeholders.

**B. Cause Exists to Authorize Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

61.     The Debtors anticipate having sufficient funds to pay the amounts described herein in the ordinary course of business using expected cash flows from ongoing business operations.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify whether checks or wire transfer requests are payments authorized by the relief requested in this Motion.  Accordingly, the Debtors believe that checks or wire transfer requests,

other than those relating to authorized payments, will not be honored inadvertently and that the Court should authorize the Banks, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the relief requested herein, to the extent the Debtors have sufficient funds on deposit in their accounts with such Banks, and such Banks may rely on the representations of the Debtors without any duty of further inquiry and without liability for following the Debtors' instructions.

### Scope of Motion

62.     This Motion does not cover all aspects of the Debtors' business.  Whether or not a business activity is described in this Motion, and whether or not the Debtors seek an order with respect to the continuation of such activity, if the activity is of the nature of those that the Debtors conduct in the ordinary course of business, the Debtors intend to continue to conduct such activity after the Petition Date pursuant to the authority granted to them by section 363(c) of the Bankruptcy Code.  Absence of a description of a particular activity or request for a specific relief related to the Debtors' servicing business shall not limit the rights of the Debtors to conduct their business and manage their assets in the ordinary course without prior Court approval.

### Reservation of Rights

63.     Nothing contained herein is intended or shall be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

27

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

64.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  As described above, and in the Rieger-Paganis Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors believe that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

**Bankruptcy Rules 6004(a) and (h)**

65.     To implement the foregoing successfully, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As described above, and in the Rieger-Paganis Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Notice**

66.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (c) the Federal Reserve Bank; (d) Customers Bank; (e) Cross River Bank; (f) Celtic Bank; (g) HCG Business Credit III Trust; (h) Stone Ridge Trust V; (i) the

RLF1 28018237V.1

United States Department of Justice; (j) the Federal Trade Commission; (k) the Small Business

Administration; (l) the Internal Revenue Service; (m) the Securities and Exchange Commission;

(n) the United States Attorney's Office for the District of Delaware; (o) the Banks; and (p) any

party that is entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice**

**Parties**").  As this Motion is seeking "first-day" relief, the Debtors will serve copies of this Motion

and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  The Debtors

believe that no further notice is required.

**No Prior Request**

67.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: October 3, 2022
       Wilmington, Delaware

/s/ Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
        steele@rlf.com
        shapiro@rlf.com
        milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (*pro hac vice* admission pending)
Candace M. Arthur (*pro hac vice* admission pending)
Natasha S. Hwangpo (*pro hac vice* admission pending)
Chase A. Bentley (*pro hac vice* admission pending)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
E-mail:       ray.schrock@weil.com
              candace.arthur@weil.com
              natasha.hwangpo@weil.com
              chase.bentley@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                                  :
In re                                             :     Chapter 11
                                                  :
KABBAGE, INC. D/B/A KSERVICING, et al., :              Case No. 22-10951 (      )
                                                  :
                                                  :
              Debtors.¹                           :     (Jointly Administered)
                                                  :
------------------------------------------------------------ x
```

**INTERIM ORDER AUTHORIZING DEBTORS TO (I) CONTINUE SERVICING
AND SUBSERVICING ACTIVITIES AND (II) PERFORM RELATED OBLIGATIONS**

Upon the motion (the "**Motion**")² of Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the Chapter 11 Cases (collectively, the "**Debtors**"), for entry of orders authorizing the Debtors to continue in the ordinary course of business (a) servicing and subservicing PPP Loans; (b) servicing and subservicing Legacy Loans; (c) engaging in activities related to the Overpayment Procedures; (d) paying and honoring prepetition obligations to Critical Vendors; and (e) fulfilling compliance and regulatory obligations, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

² Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties under the circumstances, and it appearing that no other or further notice need be provided; and this Court having held a hearing to consider the interim relief requested in the Motion (the "**Hearing**"); and upon the Rieger-Paganis Declaration and the record of the Hearing; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Rule 6003 of the Federal Rules of Bankruptcy Procedure, and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT

1. The Motion is granted on an interim basis to the extent set forth herein.

### PPPLF Portfolio

2. The Debtors are authorized, but not directed, to continue in the ordinary course of business, servicing and subservicing their loan portfolio.

3. With regards to the PPPLF Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

    (a)    collecting and accounting for Pledged PPPLF Loan payments received from borrowers, including payments of principal and interest;

    (b)    maintaining a software platform for borrowers;

    (c)    assisting borrowers in the completion of their Loan Forgiveness applications;

    (d)    submitting Guaranty Purchase applications to the SBA;

    (e)    subject to the completion of SBA Direct Payment Processing, depositing Loan Forgiveness and Guaranty Purchase amounts received from the SBA

and Pledged PPPLF Loan payments received from borrowers into the correspondent bank account;[3] and

(f)   conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing.

**Partner Bank Portfolio**

4.   With regards to the Partner Bank Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)   collecting and accounting for Partner Bank Loan payments received from borrowers, including payments of principal and interest;

(b)   maintaining a software platform for borrowers;

(c)   assisting borrowers in the completion of their Loan Forgiveness applications;

(d)   assisting the Partner Banks in their submissions for Guaranty Purchase and other reports; and

(e)   conducting loan reviews, reconciling collections and remittances responding to inquiries, and engaging in other activities in connection with the foregoing.

**KS PPP Portfolio**

5.   With regards to the KS PPP Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)   collecting and accounting for KS PPP Loan payments received from borrowers, including payments of principal and interest;

(b)   maintaining a software platform for borrowers;

(c)   assisting borrowers in the completion of their Loan Forgiveness applications;

(d)   submitting Guaranty Purchase applications to the SBA; and

---

[3] For the avoidance of doubt, once SBA Direct Payment Processing is established, the Company will only deposit borrower principal and interest payments into the correspondent bank account, and all SBA payments will be remitted directly to the Federal Reserve by the SBA.

(e)     conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing.

## Legacy Loan Portfolio

6.      With regards to the Legacy Loan Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)     collecting and accounting for Legacy Loan payments received from borrowers, including payments of principal and interest;

(b)     maintaining a software platform for borrowers; and

(c)     conducting loan reviews, responding to inquiries, and engaging in other activities in connection with the foregoing.

## Borrower Overpayments

7.      The Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)     remitting Regular Overpayments to borrowers;

(b)     remitting Forgiveness Overpayments to borrowers;

(c)     adjusting remittances to the Federal Reserve and Partner Banks pursuant to Overpayment Reconciliation; and

(d)     remitting Guaranty Overpayments to the SBA.

## Critical Vendors

8.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors, upon such terms and in the manner provided in this Interim Order and the Motion; *provided*, that payments to Critical Vendors on account of prepetition claims shall not exceed $75,000 in the aggregate, absent further order of the Court.

4

9.      If a Critical Vendor refuses to supply services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its prepetition claim, the Debtors' rights to treat any payment made pursuant to this Interim Order as an unauthorized postpetition transfer and to exercise any and all appropriate remedies are expressly reserved.

10.     Notwithstanding entry of this Interim Order, the Debtors' rights to enforce the automatic stay provision of section 362 of the Bankruptcy Code with respect to any creditor who demands payments of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

## Compliance and Regulatory Obligations

11.     The Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)     fulfilling state licensing requirements and to pay related obligations;

(b)     submitting to, and complying with, state regulatory exams and audits and to pay related obligations, costs, and expenses; and

(c)     remediating errors and/or lack of compliance with laws or regulations.

## Other Relief

12.     Each of the Banks at which the Debtors maintain their accounts relating to payments on account of obligations related to servicing and subservicing PPP Loans and Legacy Loans and the Related Obligations are authorized to  (a) receive, process, honor, and pay all checks presented for payment, and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts, and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other

RLF1 28018237V.1

order of this Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty to inquire otherwise.

13.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds transfers, on account of obligations related to servicing and subservicing PPP Loans and Legacy Loans and the Related Obligations as set forth herein, and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' Chapter 11 Cases.

14.     Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, is intended to be or shall be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

15.     Nothing contained in the Motion or this Interim Order relieves the Debtors from any federal, state, or local regulatory requirements, including, but not limited to, any requirements to report or disclose information.

16.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

17.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

18.     Under the circumstances of these Chapter 11 Cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

19.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

20.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order.

21.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

22.     The final hearing to consider the relief requested in the Motion shall be held on _____, 2022 at _____ (Prevailing Eastern Time), and any objections or responses to the Motion shall be in writing, filed with the Court, and served on or prior to _____, 2022 at 4:00 p.m. (Prevailing Eastern Time).

7

**<u>Exhibit B</u>**

**Proposed Final Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re                                                 :        **Chapter 11**
                                                      :
**KABBAGE, INC. D/B/A KSERVICING,** *et al.*, :        **Case No. 22-10951 (      )**
                                                      :
                                                      :
           **Debtors.**[1]               :        **(Jointly Administered)**
------------------------------------------------------------- x

### FINAL ORDER AUTHORIZING DEBTORS TO (I) CONTINUE SERVICING AND SUBSERVICING ACTIVITIES AND (II) PERFORM RELATED OBLIGATIONS

Upon the motion (the "**Motion**")[2] of Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the Chapter 11 Cases (collectively, the "**Debtors**"), for entry of orders authorizing the Debtors to continue in the ordinary course of business (a) servicing and subservicing PPP Loans; (b) servicing and subservicing Legacy Loans; (c) engaging in activities related to the Overpayment Procedures; (d) paying and honoring prepetition obligations to Critical Vendors; and (e) fulfilling compliance and regulatory obligations, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Notice Parties under the circumstances, and it appearing that no other or further notice need be provided; and this Court having held hearing to consider the relief requested in the Motion on an interim basis, and, if necessary, a final basis (the "**Hearings**"); and upon the Rieger-Paganis Declaration and the record of the Hearings; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT

1.      The Motion is granted on a final basis to the extent set forth herein.

### PPPLF Portfolio

2.      The Debtors are authorized, but not directed, to continue in the ordinary course of business, servicing and subservicing their loan portfolio.

3.      With regards to the PPPLF Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

   (a)   collecting and accounting for Pledged PPPLF Loan payments received from borrowers, including payments of principal and interest;

   (b)   maintaining a software platform for borrowers;

   (c)   assisting borrowers in the completion of their Loan Forgiveness applications;

   (d)   submitting Guaranty Purchase applications to the SBA;

   (e)   subject to the completion of SBA Direct Payment Processing, depositing Loan Forgiveness and Guaranty Purchase amounts received from the SBA and Pledged PPPLF Loan payments received from borrowers into the correspondent bank account;[3] and

---

[3] For the avoidance of doubt, once SBA Direct Payment Processing is established, the Company will only deposit borrower principal and interest payments into the correspondent bank account, and all SBA payments will be remitted directly to the Federal Reserve by the SBA.

     (f)     conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing.

## Partner Bank Portfolio

4.     With regards to the Partner Bank Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

     (a)     collecting and accounting for Partner Bank Loan payments received from borrowers, including payments of principal and interest;

     (b)     maintaining a software platform for borrowers;

     (c)     assisting borrowers in the completion of their Loan Forgiveness applications;

     (d)     assisting the Partner Banks in their submissions for Guaranty Purchase; and

     (e)     conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing.

## KS PPP Portfolio

5.     With regards to the KS PPP Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

     (a)     collecting and accounting for KS PPP Loan payments received from borrowers, including payments of principal and interest;

     (b)     maintaining a software platform for borrowers;

     (c)     assisting borrowers in the completion of their Loan Forgiveness applications;

     (d)     submitting Guaranty Purchase applications to the SBA; and

     (e)     conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing.

**Legacy Portfolio**

6.      With regards to the Legacy Portfolio, the Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)      collecting and accounting for Legacy Loan payments received from borrowers, including payments of principal and interest;

(b)      maintaining a software platform for borrowers; and

(c)      conducting loan reviews, reconciling collections and remittances, responding to inquiries, and engaging in other activities in connection with the foregoing.

**Borrower Overpayments**

7.      The Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)      remitting Regular Overpayments to borrowers;

(b)      remitting Forgiveness Overpayments to borrowers;

(c)      adjusting remittances to the Federal Reserve and Partner Banks pursuant to Overpayment Reconciliation; and

(d)      remitting Guaranty Overpayments to the SBA.

**Critical Vendors**

8.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors, upon such terms and in the manner provided in this Final Order and the Motion; *provided*, that payments to Critical Vendors on account of prepetition claims shall not exceed $75,000 in the aggregate, during these Chapter 11 Cases absent further order of the Court.

9.      If a Critical Vendor refuses to supply services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its

prepetition claim, the Debtors' rights to treat any payment made pursuant to the relief granted in the Interim Order or this Final Order as an unauthorized postpetition transfer and to exercise any and all appropriate remedies are expressly reserved.

10.    Notwithstanding entry of this Final Order, the Debtors' rights to enforce the automatic stay provision of section 362 of the Bankruptcy Code with respect to any creditor who demands payments of its prepetition claims as a condition to doing business with the Debtors postpetition are preserved.

## Compliance and Regulatory Obligations

11.    The Debtors are authorized, but not directed, to continue in the ordinary course of business:

(a)    fulfilling state licensing requirements and to pay related obligations;

(b)    submitting to, and complying with, state regulatory exams and audits and to pay related obligations, costs, and expenses; and

(c)    remediating errors and/or lack of compliance with laws or regulations.

## Other Relief

12.    Each of the Banks at which the Debtors maintain their accounts relating to payments on account of obligations related to servicing and subservicing PPP Loans and Legacy Loans and the Related Obligations are authorized to  (a) receive, process, honor, and pay all checks presented for payment, and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts, and (b) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty to inquire otherwise.

RLF1 28018237V.1

Case 22-10951-CTG   Doc 89-1   Filed 10/06/22   Page 46 of 46

13.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic funds transfers, on account of obligations related to servicing and subservicing PPP Loans and Legacy Loans and the Related Obligations as set forth herein, and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' Chapter 11 Cases.

14.     Nothing contained in the Motion or this Final Order, nor any payment made pursuant to the authority granted by the Interim Order or this Final Order, is intended to be or shall be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

15.     Nothing contained in the Motion or this Final Order relieves the Debtors from any federal, state, or local regulatory requirements, including, but not limited to, any requirements to report or disclose information.

16.     Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

17.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

18.     Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

19.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order.

20.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

6