1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
2

3    IN RE:                      .  Chapter 11
                                 .  Case No. 22-10951 (CTG)
4    KABBAGE, INC., d/b/a        .  (Jointly Administered)
     KSERVICING,                 .
5                                .  Courtroom No. 7
                                 .  824 Market Street
6              Debtors.          .  Wilmington, Delaware 19801
                                 .
7                                .  Thursday, October 6, 2022
     . . . . . . . . . . . . . . . .  9:30 a.m.
8
                 TRANSCRIPT OF ZOOM HEARING
9        BEFORE THE HONORABLE CRAIG T. GOLDBLATT
              UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

     For the Debtors:        Daniel J. DeFranceschi, Esquire
12                           RICHARDS, LAYTON & FINGER, PA
                             One Rodney Square
13                           920 North King Street
                             Wilmington, Delaware 19801
14
                             -and-
15
                             Ray C. Schrock, Esquire
16                           Natasha S. Hwangpo, Esquire
                             Chase A. Bentley, Esquire
17                           Elizabeth A. Ruocco, Esquire
                             WEIL, GOTSHAL & MANGES, LLP
18                           767 Fifth Avenue
                             New York, New York 10153
19

20   Audio Operator:         Brandon J. McCarthy, ECRO

21   Transcription Company:  Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the Federal
   Reserve Bank of
3  San Francisco:          Sean T. Greecher, Esquire
                           YOUNG CONAWAY STARGATT & TAYLOR, LLP
4                          Rodney Square
                           1000 North King Street
5                          Wilmington, Delaware 19801

6                          -and-

7                          Lisa M. Schweitzer, Esquire
                           CLEARY GOTTLIEB STEEN
8                            & HAMILTON, LLP
                           One Liberty Plaza
9                          New York, New York 10006

10

   For Cross River Bank:   Susheel Kirpalani, Esquire
11                         QUINN EMANUEL URQUHART
                             & SULLIVAN, LLP
12                         51 Madison Avenue
                           22nd Floor
13                         New York, New York 10010

14

   For Customers Bank:     John J. Monaghan, Esquire
15                         HOLLAND & KNIGHT, LLP
                           10 St. James Avenue
16                         11th Floor
                           Boston, Massachusetts 02116

17

18 For American Express:   James L. Bromley, Esquire
                           SULLIVAN & CROMWELL, LLP
19                         125 Broad Street
                           New York, New York 10004

20

21 For the United States
   of America:             Alastair Gesmundo, Esquire
22                         UNITED STATES DEPARTMENT OF JUSTICE
                           1100 L Street, NW
23                         Washington, DC 20005

24

25

1  APPEARANCES (CONTINUED):

2  For the US Trustee:        Richard L. Schepacarter, Esquire
                             Rosa Sierra-Fox, Esquire
3                            UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
4                            J. Caleb Boggs Federal Building
                             844 King Street
5                            Suite 2207, Lockbox 35
                             Wilmington, Delaware 19801

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 9:    Motion of Debtors for Entry of Interim and      49
4               Final Orders (I) Authorizing Debtors to (A)
                Continue Using Existing Cash Management System,
5               Bank Accounts, and Business Forms, (B) Implement
                Changes to Cash Management in the Ordinary
6               Course of Business; and (II) Granting Related
                Relief [Docket No. 12 – filed October 3, 2022]
7
                Court's Ruling:                               51
8

9    Agenda
     Item 10:   Motion of Debtors for Entry of Interim and      51
10              Final Orders Establishing Notification
                Procedures and Approving Restrictions on
11              Certain Transfers of Interests in the Debtors
                [Docket No. 6 – filed October 3, 2022]
12
                Court's Ruling:                               52
13

14   Agenda
     Item 11:   Motion of Debtors for Entry of Interim and      52
15              Final Orders (I) Authorizing Debtors (A) to
                Pay Certain Prepetition Taxes and Assessments
16              And (B) Granting Related Relief
                [Docket No. 9 – filed October 3, 2022]
17
                Court's Ruling:                               53
18

19   Agenda
     Item 12:   Motion of Debtors for Entry of Interim and      54
20              Final Orders (I) Authorizing Debtors to (A)
                Pay Prepetition Wages, Salaries, Employee
21              Benefits, and Other Compensation and (B)
                Maintain Employee Benefit Programs and Pay
22              Related Obligations and (II) Granting Related
                Relief [Docket No. 10 – filed October 3, 2022]
23
                Court's Ruling:                               55
24
25

1                                    INDEX

2    MOTIONS:                                                          PAGE

3    Agenda
     Item 13:   Motion of Debtors for Entry of Interim and            55
4               Final Orders (I) Approving Debtors' Proposed
                Form of Adequate Assurance of Payment to
5               Utility Providers, (II) Establishing Procedures
                for Resolving Objections by Utility Providers,
6               (III) Prohibiting Utility Providers from
                Altering, Refusing, or Discontinuing Service,
7               and (IV) Granting Related Relief
                [Docket No. 8 – filed October 3, 2022]
8
                Court's Ruling:                                        56
9
     Agenda
10   Item 14:   Motion of Debtors for Entry of Interim and            56
                Final Orders (I) Authorizing (A) Debtors to
11              Continue Insurance Policies, and (B) Pay All
                Obligations with Respect Thereto, and (II)
12              Granting Related Relief
                [Docket No. 7 – filed October 3, 2022]
13
                Court's Ruling:                                        58
14

15   Agenda
     Item 15:   Motion of Debtors for Interim and Final               58
16              Orders Authorizing Debtors to (I) Continue
                Servicing and Subservicing Activities and
17              (II) Perform Related Obligations
                [Docket No. 11 – filed October 3, 2022]
18
                Court's Ruling:                                        62
19

20   Agenda
     Item 16:   Application of Debtors Pursuant to 11 U.S.C.          62
21              § 105(a) and 28 U.S.C. § 156(c) for
                Appointment of Omni Agent Solutions, Inc. as
22              Claims and Noticing Agent Effective as of the
                Petition Date
23              [Docket No. 4 – filed October 3, 2022]

24              Court's Ruling:                                        64

25

1                          INDEX

2   MOTIONS:                                          PAGE

3   Agenda
    Item 17:   Motion of Debtors for Entry of an Order (I)   64
4              Authorizing the Debtors to (A) File and
               Maintain Consolidated Creditor Lists, and (B)
5              Redact Certain Personal Identification
               Information for Individuals, (II) Approving
6              Special Electronic Noticing Procedures, and
               (III) Granting Related Relief
7              [Docket No. 5 – filed October 3, 2022]

8              Court's Ruling:                               68

9

10                        EXHIBITS

11  DECLARATIONS:                                     PAGE

12  1) Declaration of Deborah Rieger-Paganis           48

13  2) Declaration of Paul Deutch                      63

14  Transcriptionist's Certificate                     71

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commenced at 9:30 a.m.)

2           THE COURT:  Good morning, all.  This is Judge

3   Goldblatt and we are on the record in, In re Kabbage, Inc.,

4   which is Case Number 22-10951.  We are proceeding this

5   morning by way of Zoom.  As a result, I ask, as I think you

6   folks know, that I ask that folks leave your microphones

7   muted unless you're addressing the Court.  That when you do

8   address the Court, that you introduce yourself for the record

9   each time.  And, finally, that folks generally leave your

10  cameras off, unless you're, either, addressing the Court or

11  wish to be recognized, mostly because I find the device of

12  having you turn your camera on to be a helpful way to signal

13  to me that you'd like to be recognized, in which case, I will

14  then recognize you.

15          So, with that, why don't I pass the virtual podium

16  to counsel for the debtor to take us through this morning's

17  agenda.  So, whoever's going to take the lead.

18          MR. DEFRANCESCHI:  Good morning, Your Honor.

19          Although I won't be taking the lead, that'll be my

20  friend and proposed co-counsel, Ray Schrock.  I did want to

21  say good morning.  Thank you, Your Honor, for hearing us

22  today, and essentially turn it over to Mr. Schrock.

23          THE COURT:  Okay.  Thank you, Mr. DeFranceschi.

24          Mr. Schrock?

25          MR. SCHROCK:  Good morning, Your Honor.

1        Can you hear me okay?

2        THE COURT:  I can, thank you.  You can proceed.

3        MR. SCHROCK:  Okay, great.  Thank you.

4        First of all, it's a pleasure to be before you

5   again and thank you for hearing us for this first day

6   hearing.  I'd like to thank the Court, of course, for working

7   with us on scheduling this hearing, including for the bridge

8   order on the cash management over the last day.  That was

9   extremely helpful.  I would also like to thank the U.S.

10  Trustee for working with us on the first day relief.

11        I think that the only open issue, subject to

12  somebody correcting me later on, of course, is a new one for

13  me, but just the creditor matrix and -- and kind of deciding

14  how do we want to effectuate service, in light of the fact

15  that this is an online service loan servicing platform.

16        And, also, I would be remiss if I didn't thank our

17  constituents, a number of whom we've been working with prior

18  to commencing these cases.  I can't say that I'm sure this is

19  a surprise -- the cases are a surprise to the key parties in

20  this case.  We've definitely been working with everyone, you

21  know, in the days and weeks leading up to these cases.

22        Your Honor, I'd also like to introduce my

23  colleagues.  I have Candace Arthur.  I believe she has her

24  camera on.  She's be working with me on this case.  Natasha

25  Hwangpo, who will be, you know, up here in a few minutes.

1  And also my litigation partner, Ted Tsekerides, who will be

2  handling any witness work and is also leading the Amex

3  investigation for us internally.

4        Your Honor, we did file an amended agenda at

5  Docket 47.  We filed a few affidavits of service yesterday at

6  Docket 59.  We filed the NOL affidavit of service just to

7  make sure that that was out separately.  And then just

8  related to the first day hearing, we had, you know, the

9  petitions and the original agenda at Docket 55 and then we

10 filed an amended agenda, just that fifth -- or the notice of

11 affidavit of service at 56, so that it was just to cover

12 things off, just to tidy it up.

13       Your Honor, in terms of how we would like to

14 proceed, I would like to, you know, go through a

15 demonstrative that we filed at Docket 64 if that would be

16 acceptable, just to give you and the parties in interest an

17 overview of the case.  I will try not to repeat a lot of the

18 things that we put into the first day declaration, but I

19 think it will be helpful to see and understand the structure

20 of what we're attempting to do here.

21       And then I'll turn it over to my colleague Chase

22 Bentley, who will be working through a few matters on the

23 agenda and we'll kind of progress on from there, if that

24 would be acceptable?

25       THE COURT:  Unless there's someone who wants to be

1   heard to the contrary, that's certainly acceptable from the

2   Court's perspective.  So, I'm happy to give you a chance to

3   walk through the slides.

4            MR. SCHROCK:  And then one other thing, Judge.  I

5   think that Ms. Schweitzer from -- who's representing the

6   Federal Reserve, also, after I give my opening -- I should

7   have -- should mention this, I think she wants to say a few

8   words to the opening, as well.  We've been working closely

9   with the Federal Reserve.

10            THE COURT:  Okay.  Certainly.  I think it makes

11  sense, Mr. Schrock, to give you a chance to do your opening

12  and then before we turn to the motions, if there's any other

13  party in interest who wants to chime in at that point, give

14  them such an opportunity, and then we can turn to the

15  motions, unless someone wants to be heard otherwise.

16            If not, let me give you a chance to do your

17  overview.

18            MR. SCHROCK:  Okay, great.  Thanks very much.

19            Your Honor, if I could ask for my colleague Chase

20  Bentley to be able to screen share just for the parties, that

21  would helpful.

22            THE COURT:  Certainly.  It looks like Mr. Bentley

23  should now have that ability.

24            MR. SCHROCK:  Okay.  Great.

25            THE COURT:  Mr. Schrock, just so folks are clear,

1  the slides you're showing, if I have this right, were filed

2  on the docket at D.I. 64; is that correct?

3           MR. SCHROCK:  That is correct, Your Honor.

4           THE COURT:  Okay.

5           MR. SCHROCK:  Thank you.

6           Okay.  Chase, go ahead and hit the next slide,

7  please.

8           So, in terms of a roadmap, what I'd like to cover

9  is just the basics around KServicing, who we are, make some

10 introductions for you with the management team, as well, the

11 circumstances leading up to these cases.

12          We do have a Chapter 11 plan that's on file and

13 because of the -- frankly, just because of the liquidity and

14 we want to have a tidy wind-down to the company, we wanted to

15 make sure that we put that out there, and I'm happy to take

16 you through it.  It's a basic pot plan with a toggle feature,

17 whether or not parties want to fund, and then a path forward,

18 and then we'll take it from there.

19          So, if you could flip to the next slide, please,

20 Chase.

21          So, Kabbage has been doing business as KServicing.

22 You know, it was founded as an online serving and, you know,

23 lending platform for small businesses.  This company has

24 been, effectively, in wind-down since selling substantially

25 all of its assets to the leads of American Express in October

 1  of 2020.  Now, about 99 percent of the company's outstanding

 2  loans or portfolios comprised of what we call the Paycheck

 3  Protection Program, the Triple P loan program, with the

 4  remaining 1 percent being non-PB loans, issued to small

 5  businesses, prior to the Amex transaction.

 6             As Your Honor and probably everybody is all too

 7  aware, the U.S. small businesses, the SBA launched the Triple

 8  P program in April 2020 in connection with enactment of the

 9  CARES Act, which authorized hundreds of billions of dollars

10  of government aid to small businesses reeling from the

11  pandemic.

12             The SBA partnered with private lenders and

13  servicers like Kabbage to process loans on a highly expedited

14  timeline to get funding to small businesses, desperately in

15  need of working capital.  As we all probably remember during

16  that time, in April of 2020, there's no other way to say it:

17  It was a national emergency at that time.  There was extreme

18  pressure to get these loans out to people who needed them.

19             I certainly remember everything that we were

20  hearing from government officials and, you know, Kabbage was

21  really on the front lines of helping those small businesses

22  make it through the pandemic and get back on their feet.  The

23  company ultimately became the second-largest Triple P lender

24  by application filing and delivered more than 7 billion in

25  Triple P loan funds to more than 300,000 small businesses.

1   And to date, we have successfully processed about 80 percent

2   of the Triple P loan portfolio.  I'm going to go through some

3   details with you and we're really here to seek a wind-down of

4   operations resolved for many claims and utilize the tools

5   available in Chapter 11 to distribute the assets for a

6   Chapter 11 plan.

7            Now, we've been working with the company for

8   several months and, you know, when you're looking to winding

9   down a company, as we were explaining to the board and

10  management, it's just not as easy as turning off the lights,

11  the last one out the door, and, you know, going through this.

12  It's a, especially with the consumer-facing businesses like

13  this, where we're still, you know, processing -- we're still

14  servicing over 50,000 loans with a principal balance in

15  excess of $1.3 billion, it is difficult and especially has

16  been complicated by a number of the, you know, investigations

17  and kind of what I'll call the looks by the federal

18  government to ensure that the Triple P loan servicing

19  portfolio has been, you know, serviced and administered to,

20  according to rules and laws.

21            Next slide, please.

22            So, just an overview.  I think this will be

23  helpful as we kind of think about just the buckets of loans

24  that are out there.  The Triple P, LF loans, those are the

25  loans that came through the paycheck protection loan

1  program -- loan facility that was given by the actual Federal

2  Reserve.  So, those are the loans that, you know, we

3  originated at KServicing, Kabbage.  We actually went through

4  and those loans are still owned by the Federal Reserve or,

5  sorry, owned by KServicing, but there's a first priority

6  security interest in those loans that has been granted to the

7  Federal Reserve.  So, they are our largest creditor.  It's in

8  excess -- the total loan balance is outstanding, still, is in

9  excess of, you know, over $500 million.  But those are the

10  loans, the biggest batch of loans that are really on the

11  balance sheet of Kabbage.

12       The other batch of loans that they can kind of

13  think of, although not on our balance sheet, but are, you

14  know, kind of more or less owned by Kabbage, are the legacy

15  loans that are not on this page but it's about $17 million,

16  3400 loans, small loans.  But those are really from our

17  business, prior to the payroll protection program [sic]

18  enactment.  So, those are loans that, you know, were --

19  they're going to be running off, essentially, over the next

20  several months.

21       But for me, at least, when you think about the

22  loans that are on the balance sheet, it's those two big

23  batches and then you have a very small batch, which is what's

24  called the "KS PPP" down here.  Those are just loans that we

25  originated on our own.  I actually think there's less than a

1  hundred, I know we said, that are still outstanding and, you

2  know, it's just a very small balance of a couple million

3  dollars or, you know, between one and two million dollars

4  that is really outstanding.

5        THE COURT:  So, Mr. Schrock, just to make sure

6  that I'm following --

7        MR. SCHROCK:  Yes.

8        THE COURT:  -- for the PPPLF loans where the

9  Federal Reserve is the underlying supplier of liquidity, as

10 far as the borrower is concerned, it's got a contractual

11 agreement with Kabbage, which is its lender, essentially, so

12 therefore those loans are on your balance sheet, and I guess

13 the same is true for those two other smaller buckets that you

14 described.  So, there, the borrower has a contractual

15 relationship, a lender/borrower relationship with Kabbage

16 itself and, essentially, the underlying provider of capital

17 is effectively behind the scenes, as far as the borrower is

18 concerned?

19        MR. SCHROCK:  That's correct.

20        THE COURT:  Okay.

21        MR. SCHROCK:  And then, you know, I would also say

22 that even with respect to what I'm going to call, you know,

23 the "partner bank loans," which were where we're just purely

24 a servicer, which includes Customers Bank, which, you know,

25 those of us who have been working on the matter for a while,

1    "Cubby" is, you know, how people refer to them and they're

2    represented by Holland & Knight and then you've got Cross

3    River Bank, represented by Quinn Emanuel, those are -- it's

4    just a purely servicing relationship that, you know, where

5    those loans are owed by them, but we're still the customer-

6    facing, you know, party that is dealing with the borrowers,

7    ensuring that we're working through the forgiveness process.

8    If they're not forgiven, making sure we're -- are.

9              THE COURT:  Okay.  There, it works the same way

10   any other servicing relationship works, where the underlying

11   obligation --

12             MR. SCHROCK:  Right.

13             THE COURT:  -- is at least in the first instance,

14   due to the lender, subject to whatever contractual

15   arrangements are made to manage the servicing?

16             MR. SCHROCK:  Yes, that's correct, Your Honor.

17             THE COURT:  Okay.

18             MR. SCHROCK:  That's correct, yeah.

19             And so, when you think about these loans, and

20   you'll learn a lot more about this as we move forward, you

21   know, there's a couple of big buckets of debt that the Triple

22   P program that went out.  You had the April, you know, batch

23   that went out when there's, you know, just an immense amount

24   of loans that were originated and distributed.  That's what

25   we call "round one" and then there's round two.  Round two

1  was, you know, you may remember, came out in the December

2  time frame of 2020, but actually, most of those loans are

3  actually originated in December of, or say January of 2021.

4             And where all of the -- you know, the great

5  majority of the issues with, you know, the SBA and all the

6  parties, have been with the round one loans.  It's not in all

7  instances, but, you know, I'm trying to generalize so you

8  understand at least from the parties' perspectives -- and

9  they can certainly correct me, but I'm trying to be fair -- I

10 think that's where people saw, you know, listen, there's a

11 lot of -- that's been the toughest batch to process and where

12 a lot of the efforts and the Government have been focused on.

13            The round two have been pretty clean.  You know,

14 lots of -- you know, and not surprisingly, right.  We were a

15 little bit farther into the pandemic.  We had people, you

16 know, we weren't in an emergency.  We aren't working on, you

17 know, when you just think about the conditions under which

18 this company had to work in April 2020 trying to disburse

19 these loans, it's almost hard to fathom.  There was -- was so

20 much pressure to get these loans out, get them out the same

21 day.  We have to get it in the hands of the people that need

22 them.  People were, you know, people were under an extreme

23 amount of pressure and this meant everything.

24            Traditional banks, they just didn't have these

25 relationships.  You know, they didn't have the ability to,

1  you know, process everything, you know, and with the KYC, you

2  know, requirement, frankly, with, you know, U.S. Bank holding

3  companies.  There was a, you know -- and so companies like

4  Kabbage, you know, really, like, bore the, you know, the

5  lion's share of putting a lot of these loans out there.

6         And I'm not here to say that everything is perfect

7  in the midst of a global pandemic when the world is shut

8  down, that there can't ever be an error, but certainly, we --

9  this company has been solely focused on making sure they're

10 doing their job and doing the right thing for these

11 borrowers, doing the right things by the Government.  They're

12 trying to wind-down.

13        And it just, frankly, you know, it just became so

14 much, you know, it's dealing with -- we're like a pinata

15 almost here between all the various agencies.

16        THE COURT:  So, Mr. Schrock, your papers are very

17 good and very clear and I think you tell a compelling story

18 that says, Look, in April of 2020, there was a national

19 emergency.  You know, people's ability to feed their children

20 depended on this cash getting out the door and no one thought

21 you should be overly persnickety about that at the time,

22 because we were dealing with a time of crisis.

23        And you say that the current investigations you're

24 dealing with are now essentially, you know, hindsight

25 criticism.  And I don't think any of the relief that you're

1  asking me on the first day asks me to form a judgment on any

2  of this, but I do understand that narrative and you tell it

3  very compellingly in your papers.

4          MR. SCHROCK:  Okay, thanks.  I will move on.

5  Thanks.

6          Let's go ahead and flip the slide, please, Chase.

7          Your Honor, I want to make sure I can make some

8  introductions just to folks that are going to be, you know,

9  here with you.  Laquisha Milner is the CEO of Kabbage.  I'm

10 not sure if she has a camera up, but I wanted to make sure

11 that you knew Ms. Milner.  You know, she's really our

12 captain, you know, pushing us through, you know, this on a

13 day-to-day basis and making sure that we're doing everything

14 we can.

15         You know, our general counsel is Holly Loiseau --

16 and I'm sorry, Holly -- by the way, you know, this -- we --

17 she's our general counsel and she's been instrumental,

18 obviously, in pushing us through.

19         Sal Kafiti, also our deputy general counsel, has

20 been extremely involved.

21         And then Deborah Rieger-Paganis is our first day

22 declarant from AlixPartners, and she is available and able to

23 answer any questions for the Court, and I will try and move

24 her, the admission of her first day declaration at the

25 conclusion of my presentation.

1          THE COURT:  Okay.  For now, I'd like to welcome

2    everyone, virtually, to Wilmington.

3          MR. SCHROCK:  Thanks, Your Honor.  We're looking

4    forward to seeing you in person.

5          The company's professionals are set forth there.

6    The Federal Reserve Bank, as I noted, is represented by

7    Cleary Gottlieb, Ms. Schweitzer.  Customers Bank is

8    represented by Holland & Knight.  Cross River Bank, Quinn

9    Emanuel, Mr. Kirpalani.  And then I should also note for the

10   company's professionals, Jones Day has been handling the DOJ

11   civil investigation and Ms. Janelle Hall has been, you know,

12   taking the laboring oar on that.  But those are the key

13   players that you're likely to hear from.  There'll be others,

14   I'm sure, but those are the key ones.

15         Let's keep going, please.

16         So, this -- I'm going to move through this

17   relatively quickly, just especially in light of the comments

18   that Your Honor made.  But the circumstances leading these

19   cases are set forth here and we'll try and talk just a little

20   bit about this to give you a little bit more clarity, in

21   particular, about the Amex transaction.

22         Next slide, please.

23         So, in October 2020, affiliates of Amex acquired

24   all, you know, substantially all the company's assets,

25   including the technology associated with the company's loan

1  serving platform for approximately 750 million.  We do have a

2  transition services agreement with Amex.  Yeah, we're still

3  working together on that.

4          But, you know, notably, when you think about those

5  two batches of loans that I mentioned, Your Honor, the round

6  one and the round two, this transaction took place in between

7  the round one and round two.  So, you know, originally, I

8  think the company was, you know, planning on looking at this

9  and saying, Listen, we're going to wind-down.  They heeded

10 the Federal Government's call to go to round two and

11 that's -- frankly, it's glad, you know, the company is

12 fortunate that it did, because I think that it's really round

13 two where, you know, we have a much higher processing rate

14 that it was able to provide the company with additional

15 liquidity for the wind-down.  So, I think that certainly was

16 a smart move, but this transaction happened in between those

17 two things.

18         You know, there's an investigation and I think

19 it's set forth there and, you know, we're working on that and

20 we'll need to continue working with Amex on that.  I believe

21 that Sullivan & Cromwell, Mr. Bromley, is representing

22 American Express, as well, Your Honor, and certainly, he's

23 (indiscernible) and I looking forward to working with him.

24         Next slide, please.

25         You know, we've talked about in our pleadings, the

1   lack of SBA guidance.  I think I'm going to just note here

2   that we believe we did everything that we were supposed to.

3   We think this is revisionist history and, you know, I don't

4   want to see this company in the midst of its final days to be

5   used as a scapegoat, because that's not fair, it's not

6   correct.

7          Let's keep going.

8          When I think about what happened here, why are we

9   here in Chapter 11, as opposed to just trying to do this, you

10  know, and make a final distribution to shareholders, the

11  government investigations here have been an immense drain on

12  the company's resources.  There's no other way to put it.  I

13  think that there's a lot to that.  There's been a lot of

14  professional assistance that's been needed.  It's kind of

15  frozen the company in its ability to get more -- to get these

16  loans, you know, processed.

17         And, you know, as a result, it caused friction

18  with customers.  On the Cubby receivable dispute, I think one

19  important thing for you to know, Judge, is, one, we're

20  working with Cubby.  We're trying to get to a deal.  We're

21  still working with the Federal Reserve, you know, and I'm

22  optimistic we're going to have a deal and then we're going to

23  be talking more about a funded transaction, rather than

24  unfunded.

25         But with the Cubby receivable dispute, you know, I

1  think that we were paid, you know, and we got paid servicing

2  fees in advance for a lot of our customers.  We were paid for

3  the servicing fee advance on round one.

4          Round two, we haven't been -- you know, other than

5  what we set off prior to the commencement of these cases, we

6  haven't been paid anything.  And, you know, we're working on

7  it, but, you know, notably, I think that Cubby is trying to

8  set off for round two, you know, with a round two servicing

9  fee for issues they see with round one.  And so, that's one

10  of the things that in the days and weeks ahead, we'll try

11  to -- try and work through.  And so, that's -- you know, but

12  that's something that we -- it's a critical issue.  All the

13  parties are aware of it and I think that, you know, if we

14  didn't commence these cases, we just didn't have the

15  funneling mechanism to make sure that everybody understood

16  the company's only got limited liquidity.

17          And I do want to note, Your Honor, that one thing

18  that's been very clear from all of the customers, they want

19  the company to continue to do its job.  They want us to

20  finish the job of continuing to service these loans.  This is

21  not a case where you need a, in our view, like an investment

22  banker to go market the loan servicing platform.

23          These -- if you go talk to people about, Will you

24  take on these loans, the first thing you're going to hear is,

25  Well, how much are you going to pay me to do that?

1    It's not like there's a, you know, there's a real

2  marketability to a Triple P loan servicing portfolio.  But

3  we're willing to work with people to transition.  We're

4  willing to work with people to continue to service those

5  loans on a wind-down.  But it's certainly -- we're willing to

6  do it one way or the other.

7    And then the ST -- the congressional and FTC

8  investigations have just been ongoing.  You know,

9  occasionally, we're getting subpoenas.  We're getting --

10  we're being, you know, requested to do those things, as well.

11  And then there's a class-action lawsuit that is now going to

12  be subject to the stay and, you know, we hope to resolve just

13  any claims that are resulting from that as part of these

14  cases.

15    As I do mention in the first day declaration, Your

16  Honor, all the management and board, they were put in place

17  after the Amex transaction.  So, I do want to note for

18  everyone, this is just people trying to do the right thing

19  here.  A lot of the board meetings, without divulging

20  confidences are, you know, Gee, we're really trying to do the

21  right thing here.  We weren't involved in this.  We're trying

22  to get these loans serviced.  They're greatly concerned about

23  running out of liquidity and not being able to service these

24  borrowers.  And I think for everyone's sake, the Government,

25  you know, the partners, we all have to find a solution here,

1   but we have to do it pretty quickly.

2           Next slide, please.

3           The additional issues, you know, causing liquidity

4   constraints are listed here.  I don't think I'm going to hit

5   anything else here on these.  I'll just note those.  These

6   are highlights from the first day declaration.

7           Keep going.

8           So, when we talk about a plan, we filed a plan

9   because we want to maintain control of our own destiny to be

10  able to wind-down this company, you know, quickly, but also,

11  you know, for the benefit of all stakeholders and maximize

12  value.  So, we have a plan.  You know, there's a disclosure

13  statement and we're going to be pressing people to, you know,

14  let's come to an agreement here rather quickly.

15          On the bottom is the unfunded transaction.  So, if

16  we don't reach any agreements with the Federal Reserve, if we

17  can't reach agreements with Cubby, we don't have any choice,

18  but to move to transition those loans to another servicer and

19  move to distribute the company's assets, pursuant to the

20  Bankruptcy Code's priority scheme.

21          I don't think that anybody really wants that, you

22  know, but it is a forcing mechanism to try and make sure that

23  everybody is focused that we have to reach these agreements

24  quickly.  We're very close to an agreement with the Federal

25  Reserve.  I think if we reach an agreement with Cubby, you

1  know, that, you know, in some regard, even on an interim

2  basis, saying, Here's the things we can agree on so that we

3  have funding, and we'll resolve the other issues through

4  either by mediating them or, you know, dealing with it in

5  front of the Court, that we're really on the top line in

6  terms of a funded transaction.

7          THE COURT:  So, Mr. Schrock, as I read -- I just

8  worked my way through the plan briefly and obviously saw the

9  description in the first day declaration, it sounds like

10  your -- the unfunded version is essentially the tantamount to

11  your saying, Look, if we can't get to a deal, we're just

12  going to throw the case back at you and best of luck.

13          Is that essentially what that looks like?

14          MR. SCHROCK:  Essentially, Judge, yes.  I mean, we

15  have to, because we just wouldn't have -- we wouldn't have

16  enough liquidity to continue servicing those loans.  And we

17  made very clear to our partners that that's not what we want.

18  But when I just look at the cash available on the company's

19  balance sheet, there's no other choice --

20          THE COURT:  Okay.

21          MR. SCHROCK:  -- and that's why the Board, you

22  know, is, frankly, pressing and said, Listen, we have to get

23  on with it and make sure that we do the right thing here by

24  everyone.

25          You know, there's been a lot of discussion on the

1  funded transaction to least making sure that the company can

2  service loans through the end of March and whether or not

3  it's going to make sense to transfer the loans, even in a

4  funded transaction or have the company to do it, these are

5  things I think we just, frankly, have to work through and

6  we're willing to work with all of our parties on a consensual

7  basis for issues related to that.

8          And, you know, I think that that's essentially

9  what we're dealing with on the toggle plan between the

10  unfunded and the funded transaction.

11          The remainder of the presentation just takes you

12  through what is essentially a pot plan.  I don't think that

13  there's anything that's really controversial in that pot plan

14  in terms of, you know, being able to toggle between an

15  unfunded and funded.  But, you know, depending on how

16  negotiations go here over the next couple of weeks, we're

17  going to be back in front of the Court, you know, requesting,

18  here's the schedule that we really need to move this case

19  forward expeditiously, and I'm hopeful that we can reach an

20  agreement and that everyone can be reasonable and just

21  realize that, you know, you've got a company and management

22  team and board and professionals that want to do the right

23  thing by everyone and get through this as quickly as

24  possible.

25          It is a lot of whether or not there's going to be

1   significant shortfalls and there's going to have to be, you

2   know, additional funds contributed.  It comes down to whether

3   or not, you know, the SBA is going to honor a lot of these

4   guarantees on these loans for the round one loans that have

5   been flagged.  I think that's why the customers are, you

6   know, a little bit reserving rights and saying, Gee, you

7   know, we can't be stuck on shorthand, that's why the Federal

8   Reserve is doing there, and it's, you know, any time you're

9   dealing with a complicated loan portfolio, you know, a

10  government loan program it is -- but it is -- it's not lost

11  on me that whether or not the SBA honors loans means

12  everything to whether or not the Federal Reserve recovers on

13  its loan portfolio.

14          So, this is the system we have and we're working

15  within it, but it is complicated, despite the fact that it's,

16  you know, in the final stages of the company's existence.

17          So, with that, Your Honor, I thank you for

18  indulging me on this, but I really thought that, you know,

19  kind of teasing some of these issues out would be helpful for

20  you.  And I don't -- I'm trying to be objective about it.  I

21  understand people are going to have different views, but

22  hopefully (indiscernible) I've been fair about presenting the

23  issues to you.

24          THE COURT:  Okay.  Thank you, Mr. Schrock.

25          I will say that I do find presentations of this

1  kind to be very helpful and this was among them, particularly

2  helpful, so I do appreciate that.  But I also want to be fair

3  to others who have a different perspective.

4         Again, no one should feel they need -- nothing --

5  none of this is with prejudice to anything, but to the extent

6  there's someone who would like the opportunity to be heard,

7  I'll give them that chance.

8         Ms. Schweitzer, I think you were first and then

9  we'll go to Mr. Greecher and Mr. Kirpalani.

10         MR. GREECHER:  Oh, Your Honor, if I could just --

11  Sean Greecher from Young Conaway -- we are co-counsel with

12  Cleary Gottlieb for the Federal Reserve Bank and as

13  Mr. Schrock said, Ms. Schweitzer would like to make some

14  remarks.

15         We did file a pro hac motion.  I don't believe

16  that order's been entered, but we ask Your Honor's indulgence

17  to allow us to uh --

18         THE COURT:  Certainly.  So, to the extent there

19  are any *pro hacs*, and, yet, we'll address them when they come

20  in, and no concerns there for today's purposes.  So, thank

21  you for that, Mr. Greecher.

22         And Ms. Schweitzer, you can proceed.

23         MS. SCHWEITZER:  Thank you, Judge.

24         It's, for the record, Lisa Schweitzer from Cleary

25  Gottlieb Steen & Hamilton, here on behalf of the Federal

1  Reserve Bank of San Francisco in this Chapter 11 case.  And

2  as Mr. Greecher noted, our co-counsel is the Young Conaway

3  firm.

4       I recognize we don't need campaign speeches today.

5  This is all for background.  But given that the Federal

6  Reserve Bank is, as Mr. Schrock noted, the largest creditor

7  in the case, and their largest secured creditor, I thought it

8  made sense just to walk you through a little bit of the

9  history of the PPPLF, trying not to be redundant on things

10 you've heard before.  Lots of acronyms, so feel free to ask

11 questions, but I just find to say it a couple times helps, at

12 least, me, because there's a lot of different programs going

13 on.

14       And so, just by way of background, as Mr. Schrock

15 noted, the CARES Act is what established the I understand

16 Paycheck Protection Program to provide loans that are fully

17 guaranteed, in this case, by the Small Business

18 Administration, or SBA, and they were provided to eligible

19 small businesses and not-for-profits that were adversely

20 impacted by the COVID-19 pandemic.

21       The Board of Governors at the Federal Reserve

22 system and the U.S. Treasury established the Paycheck

23 Protection Program liquidity facility, or what we call the

24 "PPPLF," to bolster the effectiveness of the PPP by providing

25 liquidity support for the PPP program by making loans to PPP

1  lenders that are secured by PPP loans.

2  So, just for the sake of clarity, the PPPLF, which

3  is a Federal Reserve facility, and the PPP, or the Paycheck

4  Protection Program, are different programs.  The rules and

5  requirements regarding the PPP lending and servicing PPP

6  loans are administered by the SBA, and under the PPPLF, the

7  Federal Reserve Bank has provided term financing to PPP

8  lenders.  Supplying PPP lenders with additional liquidity

9  helped increase their capacity to make PPP loans.

10  Kabbage, which is one of the debtors in this case

11  are specifically from the Federal Reserve Bank of San

12  Francisco.  The PPPLF has not made new extensions of credit

13  since July 2021, but in total, the PPPLF lent $208 billion

14  across the country and today, only a total of only 14 billion

15  remains outstanding.  So, that has been a quite successful

16  program.

17  Under the PPPLF, the Federal Reserve Banks,

18  including the Federal Reserve Bank of San Francisco, would

19  lend dollar-for-dollar against PPP loans that were originated

20  by an institution authorized to make PPP loans, including

21  non-depository institutions, such as Kabbage.

22  Kabbage participated in the PPPLF program through

23  the execution of a letter of agreement and, which along with

24  the Federal Reserve Bank's operating circular Number 10,

25  governs their participation in that program.

1            The Federal Reserve Bank extended approximately

2   $1.62 billion to Kabbage in financing advances that were

3   secured by PPP loans owned by Kabbage and pledged to the

4   Federal Reserve Bank, as well as the proceeds of those loans.

5   These PPP loans, which include two-year loans and five-year

6   loans, are guaranteed by the SBA under the PPP program, as

7   Mr. Schrock noted, as long as they meet the eligibility

8   requirements for those guarantees.

9            As of the petition date, the outstanding principal

10  balance of the PPPLF advances to Kabbage is approximately

11  $540 million.  Prior to the filing of the cases, certain

12  events of default occurred under the PPPLF agreements, to

13  which Kabbage is a party.  The defaults -- and I won't go

14  into much detail here -- some of the issues that you see in

15  the first day declaration, but the defaults related to

16  payment maturity date, Kabbage's ability to continue

17  servicing the loans, and insolvency, and other breaches of

18  reps, warranties, and covenants.

19           The PPPLF does not require a notice of default to

20  be served; however, on October 21st, 2022, as noted in the

21  first day declaration, the Federal Reserve sent Kabbage a

22  letter identifying these and other defaults, and the Reserve

23  Bank's right to recourse against Kabbage in light of the

24  defaults.

25           As a result of the defaults, the Reserve Bank is

1  entitled to receive all the proceeds of the PPP loans pledged

2  as collateral under the PPPLF and the advances are all due;

3  however, prior total Chapter 11 filing, the Reserve Bank

4  engaged in discussions with Kabbage regarding actions that

5  can be taken to ensure orderly repayment of the PPPLF and the

6  continued servicing of the PPP loans pledged to the Reserve

7  Bank.

8          Of course, the Reserve Bank did not, and doesn't

9  now, waive any rights or remedies under the PPPLF, and just

10 for the benefit of today's hearing and expedition, I'll save

11 Mr. Schrock from having to jump up.  Everything I'm saying is

12 our view and perspective.  He reserves all rights.  We're not

13 having final hearings on it, but we think it's helpful for

14 you to hear the facts as we (indiscernible) them.

15         And more recently, as Mr. Schrock has indicated,

16 as well, the Reserve Bank has been engaged with Kabbage's

17 advisors regarding the potential limited use of the Reserve

18 Bank's cash collateral during the Chapter 11 case, again, to

19 further an orderly repayment of the PPPLF and the PPP loans

20 that constitute the collateral pledged to the Federal

21 Reserve, with a goal of ensuring that the full amount of

22 financing extended under the PPPLF (indiscernible) and

23 there's no interruption in servicing of the underlying PPP

24 loans.

25         The Reserve Bank is continuing to have discussions

1   with Kabbage on these matters and we hope an agreement can be

2   reached that allows for an orderly case and full repayment of

3   the PPPLF.  As Mr. Schrock noted, this (indiscernible) a

4   consensual first day hearing.  The Reserve Bank doesn't

5   oppose the first day relief that's being sought by Kabbage or

6   we'd note that Kabbage has accepted the Reserve Bank's

7   comments to their motions and proposed orders, particularly

8   the loan servicing and cash management motions and has

9   confirmed that the proceeds of the PPP loans that were

10  pledged to the Reserve Bank will be segregated, to the extent

11  that they're paid directly to Kabbage, as the parties discuss

12  the potential use of cash collateral.

13          Finally, as Mr. Schrock noted, the debtors have

14  filed a proposed plan, what they call the "toggle plan" where

15  either the loans stay with the company, serviced by the

16  company, or on an unfunded plan, where it looks like they

17  would turn over the loans and the collateral to either the

18  Reserve Bank and turn over the other loans to the other

19  parties.

20          We have only started reviewing the plan.  This is

21  for other days.  It's not before the Court today.  The

22  Reserve Bank, obviously, reserves all of its rights.  We hope

23  we can all work towards a consensual plan, where the Reserve

24  Bank will receive full repayment on its outstanding secured

25  claims, although, obviously, these discussions are all

1  ongoing with all the parties.

2          Unless Your Honor has any further questions, I

3  just wanted to give you our view with respect to this,

4  straight from the Federal Reserve's point of view.

5          THE COURT:  So, thank you, Ms. Schweitzer.  That's

6  very helpful and it does help give context to what I had

7  thought I understood when I got on the bench.  So, I

8  appreciate that.  It's very helpful and I don't have any

9  other questions.

10          MS. SCHWEITZER:  Thank you, Your Honor.

11          THE COURT:  Thank you, Ms. Schweitzer.

12          Mr. Kirpalani?

13          MR. KIRPALANI:  Good morning, Your Honor.

14          Susheel Kirpalani from Quinn Emanuel Urquhart &

15  Sullivan, on behalf of the Cross River Bank.  It's very nice

16  to appear before you.

17          I'll just say I wanted to give Your Honor a bit of

18  a macro perspective from what I think is the largest

19  unsecured creditor of the debtors.  I agree with a lot of

20  what Mr. Schrock said in terms of what has happened so far,

21  but I just wanted to make a finer point on a couple of

22  things.

23          We don't know exactly what decision-making

24  occurred to permit $750-plus million to come into the debtors

25  and then go out to the debtors' shareholders just two years

 1  ago.  We do know that some pocket change was left behind to

 2  handle all of the debtors' go-forward servicing obligations

 3  and other obligations, whether it's regulators or anyone

 4  else.

 5            I think what makes Cross River Bank different

 6  from, you know, the other so-called partner banks, which was

 7  a little bit lumped together in the first day papers, but I

 8  wanted to make sure that Your Honor was clear as to the

 9  pretty big difference between Cross River Bank and, as Mr.

10  Schrock calls it "Cubby."

11            Cross River Bank already paid for all of its

12  servicing and so, unlike the other partner bank who owes the

13  estate tens of millions of dollars, it's the other way

14  around, potentially, when it comes to the relationship

15  between Cross River Bank and the debtors.  And, you know, I

16  appreciate that Weil Gotshal is doing an investigation into

17  American Express, I certainly hope that investigation also

18  includes the former directors and officers of the debtor,

19  because, certainly, as between those directors and officers,

20  certainly under Delaware law, and innocent third-party

21  creditors like my client, I think the burden falls on the

22  directors and officers to make sure that the company retains

23  more than just pocket change in order to honor all of its

24  commitments and obligations.

25            I'll just say that I met Mr. Schrock yesterday and

1  he mentioned that he thinks with respect to funds that are

2  received by the debtors from borrowers that are really Cross

3  River Bank's borrowers, that all amounts have been paid over

4  to Cross River Bank before the filing.  I just wanted to

5  mention we're still reconcile some numbers.  I hope that's

6  the case.  I'm not sure that's the case.

7            And with respect to the plan that's on file, we

8  also haven't had a chance to really dive into it, but I

9  certainly hope it's not, you know, that toggle plan that is

10 really a toggle between a rock and a hard place for creditors

11 who have already paid for the servicing.  I appreciate that,

12 you know, there's only a little bit of money left in the

13 debtors' estate, but, you know, there was a lot of money in

14 this debtor just two years ago.

15            And with that, I'll reserve comments as the case

16 unfolds.  But thank you, very much, Your Honor, for letting

17 me speak.

18            THE COURT:  Okay.  Thank you, Mr. Kirpalani.

19            Mr. Schepacarter?

20            MR. SCHEPACARTER:  Thank you, Your Honor.

21            Can Your Honor hear me clearly?

22            THE COURT:  I can.

23            MR. SCHEPACARTER:  All right.  Thank you.

24            For the record, Richard Schepacarter for the

25 United States Trustee.  Just a couple of comments and maybe

1   even questions for Mr. Schrock.  One is that the -- we

2   understand the demonstrative and we actually agreed ahead of

3   time that that would not be moved into evidence, but we do

4   reserve our right with respect to the first day declaration,

5   because as Your Honor pointed out, it's kind of their story

6   more than some testimony and, frankly, if we were to hear --

7   be here to cross-examine the witness on that, we might be

8   here for a couple of days.

9           THE COURT:  All right.  Well, when we get to the

10  motions, we can address any evidentiary concerns about the

11  testimony.

12          MR. SCHEPACARTER:  Right.  Thank you.

13          So, having said that, we wouldn't have any

14  objection to it being admitted, subject to all of those

15  reservations, and basically that it's for today -- for

16  today's purposes, so that they can get through the door and

17  move on with this case.

18          The second part of it is I have a question that

19  kind of just sort of popped up from listening to Mr. Schrock

20  and then to Mr. Kirpalani, is that the American Express

21  investigation, I guess we'll call it, it sounded like

22  Mr. Schrock's firm and maybe some people from his firm are

23  undertaking that investigation, and I just wanted to

24  understand if that's the case, and who else may be

25  undertaking that investigation of the, I guess we'll call it

1   the "American Express transaction."  I'm not sure what falls

2   under that, but just at this point in time, at this early

3   point in time, just to get an understanding as to what's

4   going on.  Thank you.

5            THE COURT:  Thank you, Mr. Schepacarter.

6            Mr. Schrock, if you want to respond, I'll give you

7   that chance.

8            MR. SCHROCK:  Sure.  So, Mr. Schepacarter, yes, it

9   is, you know, given that we're relatively new to the scene

10  from April of this year, we're handling the investigation.  I

11  also think AlixPartners is providing some assistance related

12  to that, but we don't intend on, you know, having another

13  firm, you know, handle that investigation.

14           THE COURT:  Okay.  Mr. Schepacarter, anything

15  further from your perspective?

16           MR. SCHEPACARTER:  Not at this point.  If

17  something pops up, I'll -- and I think Ms. -- I have, also,

18  Ms. Rosa Sierra-Fox is also handling part of this case with

19  me and she may have some comments later on when we get to the

20  creditor matrix.

21           THE COURT:  Okay.  Ms. Sierra-Fox, anything at

22  this point?

23       (No verbal response)

24           THE COURT:  It looks like that was a no.

25           Okay.  Is there any other party in interest that

1  would like the opportunity to be heard?

2          Mr. Monaghan?

3          MR. MONAGHAN:  Thank you, Your Honor.

4          John Monaghan from Holland & Knight, and we are

5  counsel to Customers Bank.  I hoped not to play a speaking

6  role today and right from Mr. Schrock's presentation, I

7  thought that I had accomplished that goal, but Mr. Kirpalani

8  made a couple of statements that all I will do is state for

9  the record that in the view of Customers Bank, there is no

10 set of circumstances in which Customers Bank owes the debtor

11 tens of millions of dollars.  So, as not to poison the

12 ongoing negotiations, that I agree with Mr. Schrock, are

13 ongoing and have been for some time, I'll note -- not go

14 further than that, but to say that I have no doubt that if

15 called upon to demonstrate the existence of a *bona fide*

16 dispute, there would be that demonstration and it would be

17 successful.

18          THE COURT:  Okay.  I don't think anyone is asking

19 me to resolve anything today, so I will allow all of you to

20 continue talking and we'll take up any question that's put in

21 front of me if and when it's put in front of me.

22          Is there anything further, Mr. Monaghan, or was

23 that the substance of what you wanted to convey?  Okay --

24          MR. MONAGHAN:  Your Honor, there's nothing

25 further, Your Honor.

1            THE COURT:  Okay.  Thank you, Mr. Monaghan.

2            Let me just ask, is there any other party in

3 interest that wants to be heard as a preliminary overview

4 matter?

5       (No verbal response)

6            THE COURT:  Okay.  If not, Mr. Schrock, I'm happy

7 to pass the baton back to you or any of your colleagues, to

8 whom you pass the baton further, to proceed as you deem

9 appropriate.

10           MR. SCHROCK:  Thanks very much, Your Honor.

11 Again, Ray Schrock, Weil Gotshal, proposed counsel for the

12 debtors.

13           At this point, I would like to move into evidence

14 the first day declaration of Ms. Deborah Rieger-Paganis.  She

15 is from AlixPartners.  I heard the reservations that are

16 already put on, you know, by Mr. Schepacarter, which are just

17 fine with us.  We just wanted to make sure that we could get

18 it into evidence for the purposes of first day hearing, for

19 purposes of getting the necessary evidentiary record to get

20 the relief, you know, in front of us.

21           I appreciate that there are things in there that,

22 you know, that the declaration go to the story of the case

23 and we're certainly not seeking to have, you know, a lot of

24 that admitted for the truth of the matter asserted.  It's for

25 the, you know, for the convenience of the parties, and as I

1  understand it, any of the debtors' story coming into these

2  cases.

3           THE COURT:  Okay.  Let me --

4           MR. SCHROCK:  It's at Docket 13, and I think we

5  can put -- if Deborah can please go on camera.

6           THE COURT:  And Mr. Schrock, do you intend to do

7  any direct or are you simply moving the declaration into

8  evidence?

9           MR. SCHROCK:  Just moving the declaration into

10  evidence, Your Honor.

11           THE COURT:  Okay.

12           MR. SCHROCK:  She is available for cross-

13  examination.

14           THE COURT:  Okay.  Hold on one second.

15           MR. SCHROCK:  (Indiscernible.)

16           THE COURT:  My apologies.

17           MR. SCHROCK:  No worries.

18       (Pause)

19           THE COURT:  Okay.  So, let me ask this question:

20  Is there any party in interest that would like to be heard,

21  with respect to the admissibility of Ms. Rieger-Paganis'

22  first day declaration, which is filed at D.I. 13?

23           Mr. Schepacarter?

24           MR. SCHEPACARTER:  Thank you, Your Honor.

25           For the record, Richard Schepacarter, for the

1  United States Trustee.  As Mr. Schrock put on the record,

2  that I put on the record, my reservation of rights, given

3  that statement and the fact that I think that we all

4  understand that this document is being moved for today's

5  purposes only and has a lot of background information, given

6  that, and that all the parties, even parties who haven't

7  appeared today, everybody's rights are reserved, we have no

8  objection to the entry of it today for these purposes.  Thank

9  you.

10         THE COURT:  All right.  Is there any other party

11  in interest that would like to be heard with respect to the

12  admissibility into evidence for today's purposes of the first

13  day declaration?

14     (No verbal response)

15         THE COURT:  Okay.  Seeing no one --

16         MR. BROMLEY:  Your Honor?

17         THE COURT:  Oh, I'm sorry, Mr. Bromley.

18         MR. BROMLEY:  Yes, good morning, Your Honor.

19         James Bromley of Sullivan & Cromwell, on behalf of

20  American Express and related entities.  Just with respect to

21  the first day declaration, there are certain statements that

22  are background in nature as Mr. Schrock noted that reference

23  American Express.  We don't believe that they should be

24  admitted for any purpose today and they are irrelevant to any

25  of the relief that's being sought.  So, we have an objection

1  to anything being admitted with respect to the first day

2  declaration that is -- makes any statement with respect to

3  American Express.

4           THE COURT:  Okay.  Mr. Schrock?

5           MR. SCHROCK:  That's fine, Your Honor.

6           THE COURT:  Okay.  So, let me ask the question

7  this way:  Is there any party in interest that would object

8  to the admissibility into evidence of the first day

9  declaration, which is filed on the docket at D.I. 13, with

10 the understanding that, A, it's admitted only for the purpose

11 of today's hearing and, B, that any statement that relates to

12 American Express is stricken?

13          MR. KIRPALANI:  Your Honor?

14          THE COURT:  Mr. Kirpalani?

15          MR. KIRPALANI:  Yeah, I certainly have no

16 objection to what Mr. Bromley asserts, by my understanding of

17 the first day declaration, which has been the way that I've

18 dealt with first day declarations for many years is just

19 because a party doesn't object to a specific characterization

20 of events with respect to their client, doesn't mean that

21 that characterization is correct.  And of course

22 Mr. Schrock's clients submitted a declaration saying that

23 everything my client has asserted is bogus, so, obviously,

24 I'm not going to say we have to strike everything in the

25 declaration that relates to Cross River Bank, but I think

1   it's the way things normally operate, but that's not being

2   accepted for its truth because it's not relevant to any of

3   the relief being sought today.

4           But if I'm required to make an objection with a

5   move to strike to trike things that relate to whether the

6   debtors have complied with their obligations to Cross River

7   Bank, then I would make that objection.

8           THE COURT:  So, look, here's where we are.

9   Mr. Schepacarter has asked, and the debtors agreed that the

10  declaration be admitted only for the purposes of today.  So,

11  it's being admitted only for the purposes of an evidentiary

12  basis for the relief sought in the various first day motions.

13          What you say, Mr. Kirpalani, about whether it was

14  necessary to strike the references to Amex is a fair point,

15  but the proponent of the testimony agreed to strike it and so

16  there we are.  You can either ask -- let me strike the

17  references to Cross River Bank or you could accept the

18  correctness of what you said, which is it doesn't matter.

19          Either way, it's fine with me.  I'm here to

20  resolve disputes that are put in front of me, so if you've

21  got an objection, I'll give you a chance to make it and if

22  you think it doesn't matter and you'll move on, that's okay,

23  too.

24          MR. KIRPALANI:  It doesn't matter and I'll move

25  on.  Thank you.

1          THE COURT:  Okay.

2          MR. SCHROCK:  And, Your Honor, just to be clear, I

3    thought that what Mr. Bromley was saying was that it doesn't

4    going to be admitted into evidence.  I didn't realize that we

5    were actually be striking the statement from, you know, from

6    the record.

7          THE COURT:  Well, I think that's --

8          MR. SCHROCK:  And so I think (indiscernible).

9          THE COURT:  Mr. Bromley, let me ask you this

10   question:  For the purposes of today's proceeding, I

11   understood your motion to object to its admission into

12   evidence, which I thought meant that it's stricken from the

13   declaration.  If you'd live with what Mr. Kirpalani agreed to

14   on behalf of his client, that's also fine with the Court.

15         Let me make sure I understood what your objection

16   was.

17         MR. BROMLEY:  Your Honor, you understood my

18   objection entirely.  There was no basis on which to make any

19   statements with respect to American Express.  There is no

20   competency, with respect to this witness, and there's no

21   relevance to any statements with respect to American Express

22   to any of the relief that's being sought.

23         THE COURT:  So, Mr. Schrock, I think the relevance

24   objection is fair one, which is it doesn't make -- it doesn't

25   bear on the statements made with respect to American Express,

1  as I see it, don't bear on whether you are or aren't entitled

2  to any of the first day relief that you're seeking and

3  therefore I was comfortable striking it on that basis.  It

4  doesn't mean it's false or that it's true; it just means it's

5  not part of the record on the first day hearing.

6           If you want to argue for a different outcome, I'll

7  give you that opportunity.

8           MR. SCHROCK:  Your Honor, I think for purposes of

9  today's hearing, that fine.  It can be -- I hear Mr. Bromley

10  end up being stricken.  Of course my comments are not

11  testimony but, certainly, you know, we certainly stand behind

12  everything that we've said.

13           THE COURT:  I understand that and none of what I'm

14  ruling bears on the truth or falsity of any of the statements

15  that have been made.

16           MR. SCHROCK:  Yeah.

17           THE COURT:  Okay.

18           MR. SCHROCK:  Very good.

19           THE COURT:  So, is there any objection to

20  admitting the declaration, subject to the caveats just

21  described on the record?

22      (No verbal response)

23           THE COURT:  Okay.  Hearing none, it'll be

24  admitted, subject to those reservations and limitations.

25           And, Mr. Schrock, I'll allow you to proceed.

1          (Rieger-Paganis Declaration received in evidence)

2               MR. SCHROCK:  Fantastic.  Thanks, Judge.

3               So, I think at this point, I'll be turning it over

4    to my colleague Mr. Chase Bentley, who's going to be taking

5    you through the next item on the agenda and thanks very much,

6    Your Honor.

7               I'm going to transfer rooms back down with my

8    colleagues down there in 24(b).

9               THE COURT:  Okay, thank you.

10              Let me just say the following.  I didn't yet ask

11   anyone if they wanted to cross-examine the witness.  It seems

12   to me appropriate that to the extent anyone seeks to cross-

13   examine the witness with respect to any particular motion, I

14   ask that you, when I ask whether anyone wants to be heard,

15   with respect to the motion, if someone seeks cross-

16   examination, let me ask that you seek to do it then and then

17   you'll be permitted to do that, but that it makes

18   servicemembers to consider that, to the extent that it arises

19   in connection with particular motions and not in the

20   abstract.

21              So, with that, why don't I allow Mr. Schrock to

22   pass the virtual podium and to proceed through the motions.

23              MR. SCHROCK:  Okay.  To you, Mr. Bentley.  Thank

24   you, Your Honor.

25              THE COURT:  Okay.  Mr. Bentley?

1       MR. BENTLEY:  Thank you.  Good morning, Your

2   Honor.

3       Are you able to hear he clearly?

4       THE COURT:  I can.

5       MR. BENTLEY:  Great.  Your Honor, Chase Bentley of

6   Weil Gotshal, proposed counsel on behalf of at debtors.  I'll

7   be addressing Agenda Items 9, 10, and 11 from the amended

8   agenda that was filed yesterday at Docket 47.  Those motions

9   are cash management, tax attributes, and taxes, respectively.

10      Your Honor, first, I'll address Agenda Item 9,

11  which is cash management.  The motion was filed at Docket 12.

12      I'd also note that Your Honor entered an emergency

13  bridge order at Docket 43 last night on an interim basis,

14  pending this hearing.

15      Your Honor, through this motion, the debtors

16  request authority on an interim basis to consider to maintain

17  its cash management system and to pay outstanding pre-

18  petition bank fees and (indiscernible) expenses, including

19  those that arise during the interim period.

20      Your Honor, no formal objections were filed to

21  this motion; however, we did have informal discussions with

22  both, the U.S. Trustee and as Ms. Schweitzer, on behalf of

23  the Federal Reserve, referred to earlier, the Federal

24  Reserve.  So, their initial comments were incorporated into

25  the motion in the proposed order that was filed with that

1  motion; however, after the filing of the motion, we did

2  receive further comments from the Federal Reserve.

3           The debtors filed a revised, proposed order at

4  Docket 62, together with a redline against the proposed order

5  that was filed with the initial motion.

6           Your Honor, if you'd like, I'm happy to walk

7  through those changes for you.  I do note that Ms. Schweitzer

8  did preview them, but I'm happy to walk through them in a

9  more detail.

10           THE COURT:  So, Mr. Bentley, I received that

11  redline this morning before taking the bench and have

12  reviewed them, so I don't, myself, have sort of independent

13  concerns about any of those changes, so I don't think you

14  need to walk through them, unless there's anything that you

15  feel a need for the sake of the record, to put forward.

16           MR. BENTLEY:  No, Your Honor.  I think that the

17  revised, proposed order speaks for itself and we've spoken

18  with the Fed at length about the details that go behind that

19  language, and I think unless Ms. Schweitzer wants to say

20  anything, then we are okay to move on.

21           THE COURT:  Okay.  Ms. Schweitzer?

22           MS. SCHWEITZER:  No, Your Honor.  I don't believe

23  I need to address it anymore.

24           THE COURT:  Okay.  So let me ask this:  Is there

25  any other party in interest that would like the opportunity

1  to be heard with respect to the cash management motion?

2      (No verbal response)

3          THE COURT:  Okay.  Seeing no one, Mr. Bentley,

4  I've reviewed the motion, the original order, the revised

5  order.  I'm satisfied the relief that is sought is customary

6  and appropriate and don't, myself, have any concerns, so we

7  will go ahead and enter that revised order.

8          MR. BENTLEY:  Thank you very much, Your Honor.

9          THE COURT:  And that's obviously on an interim

10 basis.

11         MR. BENTLEY:  Sorry.  Oh, correct.  Thank you very

12 much.

13         Next, I'll address Agenda Item 10, which is the

14 debtors' tax attributes or is commonly known as "net

15 operating loss" motion.  The motion was filed at Docket 6.

16         Your Honor, through this motion, the debtor is

17 seeking interim relief to protect potential value of

18 consolidated tax attributes, including net-operating losses.

19 The debtors have not received any formal objections to this

20 motion.

21         Similar to the cash management motion, we did have

22 discussions with the U.S. Trustee, primarily pertaining to

23 informal comments and questions.  Those were addressed,

24 without a need to revision of the motion that was filed.

25         One comment that I would like to call out, though,

1  in particular, from the U.S. Trustee for Your Honor is that

2  the U.S. Trustee requested that notice be provided to all

3  substantial stockholders, as that term is used in the motion,

4  either for such holders, and debtors did, indeed provide that

5  service, as evidenced in the affidavit of service, which was

6  filed on the docket yet at Docket 54.

7      Unless Your Honor has any further questions or

8  comments, we'd request that you enter an order approving this

9  motion on an interim basis.

10     THE COURT:  Okay is there any party in interest

11 that would like the opportunity to be heard with respect to

12 the NOL motion?

13     (No verbal response)

14     THE COURT:  Okay.  Seeing no one, I've reviewed

15 the motion, appreciate that this relief is customary and

16 appropriate.  I don't have any independent concerns with

17 respect to the relief sought therein, and we will go ahead

18 and enter that order and, again, on an interim basis.

19     MR. BENTLEY:  Thank you, Your Honor.

20     The next and final item that I'll personally

21 address is Agenda Item 11, which is the debtors' tax motion.

22 That motion was filed at Docket 9.

23     Your Honor, through this motion, the debtor is

24 seeking interim relief to pay certain pre-petition taxes

25 outstanding and fees in amount of $67,000, including any of

1  those that come due during the interim period.

2          Again, similar to the prior motions, we have

3  received no formal objections on the tax motion and we did

4  just have informal discussions with the U.S. Trustee prior to

5  filing the motion, and so the motion and the proposed order

6  on the docket do reflect the U.S. Trustee's comments.

7          Unless Your Honor has any further questions or

8  comments, I would ask that you please enter an order

9  approving this motion on an interim basis.

10          THE COURT:  Let me ask this:  Is there any party

11  in interest that would like the opportunity to be heard with

12  respect to the motion to pay pre-petition taxes?

13      (No verbal response)

14          THE COURT:  Okay.  Seeing none, again, I've

15  reviewed that motion and order and agree that it is standard,

16  customary, and appropriate, and in the absence of any

17  objection, we will enter that order on an interim basis.

18          MR. BENTLEY:  Thank you, Your Honor.

19          And with that, Your Honor, I'll turn over the

20  podium, which for us is real, but for others, is virtual.  Up

21  next is my colleague Elizabeth Ruocco, who will address the

22  next items on the agenda.

23          THE COURT:  Okay.  Thank you, Mr. Bentley.

24          And, I'm sorry, I -- if you'd just introduce

25  yourself for the record, then you can proceed.

1          MS. RUOCCO:  Thank you, Your Honor.

2          Elizabeth Ruocco of Weil, Gotshal & Manges,

3 proposed attorneys for the debtors and debtors-in-possession.

4          THE COURT:  Okay.

5          MS. RUOCCO:  I would like to start by, of course,

6 thanking the Court for its time this morning and I would also

7 like to thank the Office of the United States Trustee, who

8 worked closely with us to address and incorporate any

9 comments leading into the October 3rd filing.

10          And with respect to the three motions that I will

11 be addressing, I believe we have addressed the U.S. Trustee's

12 comments to their satisfaction.

13          Your Honor, I'll be presenting three motions,

14 which relate to wages, utilities, and insurance, in that

15 order.  Beginning with the wages motion, Your Honor, this can

16 be found at Docket 10.  Through the interim order, the

17 debtors request authorization to pay prepetition wages,

18 salaries, and benefits, and maintain these compensation and

19 benefit programs in the ordinary course.

20          A few things to note for the Court with respect to

21 the relief sought are that the debtors are seeking a total of

22 approximately 1.5 million for interim relief comprised of

23 compensation and benefit related obligations.  A few other

24 things, Your Honor, with respect to the relief sought, the

25 debtors do not request any relief with respect to an employee

1  bonus program, or KERP, during the interim order, and just

2  for added color, the debtors have approximately 20 employees

3  and 163 contractors, all of which are vital to continued

4  operations.

5         Unless the Court has any questions, I would

6  request enter of the interim order, Your Honor.

7         THE COURT:  Okay.  Is there any party in interest

8  that would like to be heard with respect to the employee wage

9  and benefit motion?

10     (No verbal response)

11        THE COURT:  Okay.  Seeing none, I have reviewed

12  the motion and proposed order and don't independently have

13  concerns about the relief sought therein, which strikes the

14  Court as standard and customary under the circumstances, and

15  so we will enter that order on an interim basis.

16        MS. RUOCCO:  Thank you, Your Honor.

17        Turning the utilities motion, which can be found

18  at Docket 8, through this motion, the debtors seek enter of

19  an interim order authorizing approval of its proposed forms

20  of adequate assurance, as well as procedures for settling any

21  requests related to additional adequate assurance.

22        Just further color for the Court, through this

23  order, the debtors are proposing to deposit $12,300 in a

24  separate escrow account as adequate assurance for the utility

25  providers.  And that amount was calculated by a historical

1  lookback period of six months many and represents the average

2  two-week cost for each utility provider.

3         The utility providers can request additional

4  adequate assurance by adhering to the procedures set forth in

5  a proposed interim order.  Of course, unless the Court has

6  any questions I'm happy to answer; if not, we would request

7  enter of the interim order.

8         THE COURT:  Okay.  Is there any party in interest

9  that would like to be heard, with respect to the utilities

10 motion?

11     (No verbal response)

12        THE COURT:  Okay.  Seeing none, again, I've

13 reviewed the motion and proposed order, believe the relief

14 sought is appropriate, and will -- we will enter that order

15 on an interim basis, following this morning's hearing.

16        MS. RUOCCO:  Thank you, Your Honor.

17        Turning last to the insurance motion, which is

18 located at Docket 7, through the interim order, the debtors

19 seek authorization to maintain their existing coverage and

20 pay related obligations, as well as to renew, supplement, and

21 modify additional coverage in the ordinary course of

22 business.

23        As the Court may have seen in the motion, the

24 debtors maintain various insurance, which relate to liability

25 and property coverage, cybersecurity, director and officer,

1  as well as attorney liability.  A few things to note for the

2  Court are that the debtors are not seeking to pay anything in

3  the interim period, but in the event it is uncovered that

4  there was a pre-petition obligation, the debtors have a line

5  or item in the interim order which seeks authorization to pay

6  that up to a $25,000 cap.

7             And one other thing to note for the Court is that

8  the cyber insurance policy is set to expire during the

9  interim period on October 16th, 2022, so the debtors do

10 intend to renew that policy during the interim period.

11            I'm happy to answer any further questions the

12 Court may have with respect to the relief sought, and if not,

13 we would request enter of the interim order.

14            THE COURT:  Just to make sure that I follow, so,

15 as I read the motion, it's not actually asking for any

16 particular relief, as I understand it, right.  You're asking

17 to maintain your insurance program in the ordinary course,

18 which, as your motion explains, you don't really need my

19 authority to do.  And you say there's nothing that's due as

20 of the petition date, so you're not asking for authority to

21 pay anything, but what you're really asking for is, gee, if

22 it turns out we discover we have a pre-petition amount, we

23 want that authority.  So, it's, in that sense, essentially, a

24 comfort order just in case.  Do I understand the relief

25 correctly?

1          MS. RUOCCO:  Yes, Your Honor; that's fair.

2          THE COURT:  Okay.  That doesn't particularly

3  trouble or concern me, but let me ask, is there any other

4  party in interest or any party in interest that would like

5  the opportunity to be heard, with respect to the insurance

6  motion?

7          (No verbal response)

8          THE COURT:  Okay.  If not, I'm satisfied that the

9  relief sought is appropriate, certainly in the absence of any

10  objection thereto, and we will go ahead and enter that order,

11  again, on an interim basis.

12          MS. RUOCCO:  Thank you, Your Honor.  We appreciate

13  it.  And with that, I will cede the podium to my colleague,

14  Ms. Natasha Hwangpo, who will present the remaining items on

15  the agenda.

16          THE COURT:  Okay.  Thank you very much.

17          MS. HWANGPO:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MS. HWANGPO:  Natasha Hwangpo, of Weil, Gotshal &

20  Manges, proposed counsel to the debtors.

21          Bringing up the rear, I will be handling the last

22  three agenda items, which I believe are Numbers 15 through

23  17.  Starting with the loan servicing motion, Your Honor, at

24  Agenda Item 15, Docket 11, we're calling this motion

25  essentially, our "loan servicing motion" and it's stylized as

1  a *status quo* motion seeking authority, but not direction to

2  continue running our business in the ordinary course.

3         As with any comfort motion, many of our borrowers

4  and counterparties have already found comfort that we're

5  seeking to continue the authority to continue servicing our

6  loans, again, in the ordinary course.  That is, at least,

7  until our cash position restricts us, but at that point, Your

8  Honor, we will come back to the Court and keep, of course,

9  you apprised of any changes.

10         But back to the motion itself, Your Honor, the

11  debtors are requesting authority, but not direction, to

12  continue with the ordinary course servicing and subservicing

13  their loan portfolio, including their PPP loans and their

14  legacy loans.  And, of course, remitting borrower --

15  overpayments to borrowers, the SBA, as applicable, and doing

16  any reconciliation activities related thereto.

17         We also are seeking in the ordinary course to

18  continue fulfilling our compliance and regulatory

19  obligations, as further described in the motion.  One thing

20  of note, Your Honor, in the loan servicing motion, we're also

21  seeking to pay pre-petition vendor amounts up to a cap of

22  $75,000 of note that accounts were approximately 7 percent of

23  the debtors' outstanding vendor payables.

24         As you know, Your Honor, the company is an online

25  financial services company.  The majority of our vendors are

1  service providers and any disruption on account of vendor-

2  related refusal or delay could cause irreparable harm and

3  irreversible impacts on the debtors and through a waterfall,

4  their customers and the borrowers.

5           One thing we also wanted to note, Your Honor, is

6  that before the hearing commenced, we did receive some

7  comments from the SBA through the Department of Justice.  We

8  have not yet been able to get through the can comments that

9  they've sent, but what we would like to do and propose, if

10 Your Honor is agreeable, that we would discuss with the SBA,

11 again, through the DOJ, their comments, and then submit a

12 revised order, pursuant to a COC.

13           THE COURT:  Okay.  Before I get to that, let me

14 ask if there's any other party in interest that would like

15 the opportunity to be heard with respect to the motion.

16           Mr. Gesmundo?

17           MR. GESMUNDO:  Good morning, Your Honor.

18           THE COURT:  And apologies if I mispronounced your

19 name.

20           MR. GESMUNDO:  Not a problem.

21           Alastair Gesmundo on behalf of the United States

22 of America.  I appreciate Ms. Hwangpo noting that inquiry and

23 that ask for some proposed language did come to me, and so

24 I'm in support of her proposed plan of action and submitting

25 revised language under COC.

1          THE COURT:  Okay.  Thank you, Mr. Gesmundo.

2          Ms. Schweitzer?

3          MS. SCHWEITZER:  Thank you, Judge Goldblatt.

4          It's Lisa Schweitzer.  And I'm sure Ms. Hwangpo

5   would have done it anyway, but we would just ask that we be

6   able to see any changes to the order before it's submitted.

7   And as she noted, we were comfortable with the order with the

8   additional language put in, protective of our collateral.

9   So, I just wanted to make that comment on the record.

10          THE COURT:  Okay.  Thank you, Ms. Schweitzer.

11          Is there any other party in interest that would

12   like to be heard, with respect to the motion to continue loan

13   servicing in the ordinary course?

14          Mr. Kirpalani?

15          MR. KIRPALANI:  Thank you, Your Honor.

16          Susheel Kirpalani from Quinn Emanuel, on behalf of

17   Cross River Bank.  We also seek a copy before it is submitted

18   to the Court under a certificate of no objection.

19          THE COURT:  Okay.  Ms. Hwangpo, take it that's

20   agreeable to the debtor?

21          MS. HWANGPO:  Yes, we will do so.

22          THE COURT:  Okay.

23          MR. GESMUNDO:  Your Honor, Alastair Gesmundo,

24   again, on behalf of the United States.

25          Just for everyone's comfort, no one is worried

1   that the language is a significant departure from what Ms.

2   Hwangpo described.  I appreciate her describing this as a

3   stylized -- stylized as a *status quo*, and I want to reassure

4   the other parties that the intent was just to clarify as

5   *status quo*.  Thank you.

6          THE COURT:  Okay.  Thank you Mr. Gesmundo.

7          Is there any other party in interest that would

8   like to be heard with respect to the loan servicing motion?

9      (No verbal response)

10         THE COURT:  Okay.  If not, I've seen the motion

11  and proposed order in its earlier form.  It looks like,

12  again, as counsel described, the only sort of substantive

13  relief that was really being sought was the authority to pay

14  $75,000 of critical vendor payments and that, otherwise, it

15  sought authority that Section 363 expressly provides.

16         That said, I have no concern about entering an

17  order that makes that clear, and subject to the parties

18  submitting further clarifying language under certification

19  and subject, of course, to the Court's review of that

20  language, we'd expect to enter that language when it is

21  submitted under certification.

22         MS. HWANGPO:  Thank you, Your Honor.

23         Moving on to the next item on the agenda at

24  Number 16, the application to appoint Omni as the debtors'

25  claims and noticing agent.  We filed that at Docket 4.

1          Also with the application, as Exhibit A, the

2   debtors filed the Deutch declaration and Mr. Paul Deutch, I

3   believe is with us here in the virtual courtroom is and

4   available for any questions.

5          At this time, Your Honor, I would request that the

6   declaration of Mr. Deutch be entered into evidence.

7          THE COURT:  Is there any party in interest that

8   would like to be heard, with respect to the admission of

9   Mr. Deutch's declaration that was submitted in connection

10  with the motion to retain Omni?

11      (No verbal response)

12          THE COURT:  Okay.  Seeing none, that declaration

13  will be admitted.

14      (Deutch Declaration received in evidence)

15          MS. HWANGPO:  Thank you, Your Honor.

16          The debtors believe that there are more than 200

17  creditors or parties in interest in the case and,

18  accordingly, the appointment of a claims and noticing agent

19  is required under Local Rule 2002-1.  The debtors believe

20  that appointing Omni as claims agent will help alleviate the

21  administrative burden on both, the Court and all parties in

22  interest, and the debtors solicited and received proposals

23  from three approved claims and noticing agents, and

24  ultimately selected Omni, based on its experience,

25  reputation, and competitive pricing.

1          Unless Your Honor has any questions, we'd

2  respectfully request that the order be entered.

3          THE COURT:  Is there any party in interest that

4  would like to be heard, with respect to the motion to appoint

5  Omni as claims agent?

6       (No verbal response)

7          THE COURT:  Okay.  Seeing none, I have reviewed

8  that motion and proposed order, including Mr. Deutch's

9  declaration and I am satisfied that that relief is

10 appropriate and we will enter that order.

11         MS. HWANGPO:  Thank you, Your Honor.

12         Last, but not least is Agenda Item 17, Docket 5,

13 the debtors' motion seeking authorization to file and

14 maintain a consolidated creditor list, redact personal

15 identification information, approving special electronic

16 noticing procedures.

17         I'd note, Your Honor, the debtors only seek to

18 apply the special electronic noticing procedures to their

19 borrowers and we believe the relief is appropriate as the

20 company is an online lending and servicing platform and the

21 primary means of communication with all borrowers is through

22 electronic mail; although, there are some inquiries that we

23 handle via telephone, but other than that, everything is

24 communicated via email.

25         The intent, Your Honor, is to provide as much

1 | notice as possible, but tailoring it to the mode of
2 | communication that the borrowers are already receiving and
3 | also the company's limited resources.  We've been working
4 | with the Office of the United States Trustee on this motion
5 | and incorporated comments to the motion and the proposed
6 | order, prior to filing, and since that time, we've continued
7 | to work with the U.S. Trustee and this morning, filed a
8 | revised form of order at Docket 66.
9 |      Your Honor, I am happy to walk through the few
10 | changes quickly.
11 |      THE COURT:  Sure.
12 |      MS. HWANGPO:  So, the first -- sorry.
13 |      THE COURT:  Let me let you do that.
14 |      MS. HWANGPO:  Okay.  Thank you, Your Honor.
15 |      So, we made one comment in the very beginning of
16 | the order and that was just to clarify, I think we missed a
17 | definition of "borrowers," so we made that clarification, and
18 | then also the addition of paragraph 9, which is the language
19 | the U.S. Trustee has sought to us include.
20 |      THE COURT:  Hold on.  Let me just pull it up
21 | quickly.
22 |      MS. HWANGPO:  And, Your Honor, perhaps I could
23 | just explain what paragraph 9 does, which is carves out the
24 | named plaintiffs in a putative class action and their
25 | counsel.

1          THE COURT:  Got it.  So, I did see that this

2   morning.  Okay.  So, what you've done is you've -- you're

3   providing actual mail service on the named plaintiffs in the

4   class-action lawsuit, but you proposed to provide electronic

5   service on other creditors who are otherwise your borrowers

6   and presumably have otherwise consented to receive notices

7   from the company electronically.

8          Is that, essentially, the ask?

9          MS. HWANGPO:  That is, Your Honor.

10          THE COURT:  Okay.

11          MS. HWANGPO:  One more thing, in addition.  As

12   part of our discussions with the United States Trustee, we

13   have said that we would make a statement on the record and

14   that statement is:

15          "To the best of our knowledge, the vast majority

16   of the company's borrowers, whether PPP or legacy, have

17   consented to the electronic transactions and noticing."

18          And with that, Your Honor, we understand that the

19   U.S. Trustee does not object to the relief.

20          THE COURT:  Okay.  Ms. Sierra-Fox?

21          MS. SIERRA-FOX:  Good morning, Your Honor.

22          Rosa Sierra-Fox on behalf of the United States

23   Trustee.  Counsel is correct, based on the representation

24   made on the record about the borrowers' consent to receive

25   electronic notice, while in doing their business with the

1   debtor and the addition of the language, carving out the

2   putative class action named plaintiffs and their counsel, our

3   issues were resolved.

4          We would just like to note that in the ordinary

5   course, and we usually prefer, and we think the rules

6   require, service by mail on parties in interest and parties

7   that are part of the creditor matrix.  We understand,

8   however, that there is a very large amount of borrowers

9   involved in this case and that they have otherwise, in the

10  ordinary course, conducted their business through email and

11  have otherwise, very important to our office, consented to

12  doing business that way.

13         And that's a big part of why we are not objecting

14  to the relief that they are seeking in this instance today,

15  without prejudice to any of their cases, and the usual

16  reservations.

17         THE COURT:  Okay.  Thank you, Ms. Sierra-Fox.

18         Is there any other party in interest that would

19  like the opportunity to be heard, with respect to the

20  creditor matrix and noticing motion?

21      (No verbal response)

22         THE COURT:  Okay.  If not, so, I've obviously

23  reviewed the motion and proposed order.  I understand

24  Ms. Sierra-Fox's point.  I do know what the language of Rule

25  2000(f) says; that said, in the absence of any party raising

1  any objection to the relief being sought today and without

2  prejudice to any party's right to come in and ask to modify

3  this order if a party so requests, I'm satisfied,

4  particularly in light of the representations of counsel and

5  the circumstances of this case, that the relief sought is

6  permissible.

7           So, we will go ahead and enter that order.

8           MS. HWANGPO:  Thank you, Your Honor.

9           I believe that takes us through the balance of the

10 agenda and unless Your Honor has any questions, I believe

11 we're complete.

12          THE COURT:  Okay.  Let me just make sure I

13 understand what I've already done.  The joint administration

14 motion that I entered yesterday, that wasn't an interim order

15 or is that just a bridge order, right; that was an actual

16 final order, providing for joint administration?

17          Ms. Barksdale is nodding her head, so that must be

18 the case.  Okay.  So, that's done and doesn't need to be

19 addressed further and the cash management, which was a bridge

20 order, we now have heard and we will enter that order.

21          So, I guess that takes us -- does that take us

22 through the agenda, then?

23          MS. HWANGPO:  Yes, sir.

24          THE COURT:  Okay.  Let me -- and I take it that

25 there have been dates that have been set for a second day,

1 | which I believe is October 26th, and there's an omnibus

2 | hearing set for November 7th.

3 |         Is that consistent with what the debtor has?

4 |         MS. HWANGPO:  Yes, Your Honor; that's our

5 | understanding.

6 |         THE COURT:  Okay.  Let me just -- that's now on

7 | the record so everyone is aware.

8 |         Is there -- let me ask this, from the debtors'

9 | perspective, is there anything else the Court can do to be

10 | constructive today?

11 |         MS. HWANGPO:  Not from our perspective, Your

12 | Honor.  We thank you for your time.

13 |         THE COURT:  This is my job, I'm very happy to do

14 | it.

15 |     (Laughter)

16 |         THE COURT:  Is there any other party in interest

17 | that would like the opportunity to be heard in any matter

18 | today?

19 |         Mr. Schepacarter?

20 |         MR. SCHEPACARTER:  Thank you, Your Honor.

21 |         For the record, Richard Schepacarter for the

22 | United States Trustee.  Just to advise the Court and all the

23 | parties in interest, we have dispatched questionnaires for

24 | the creditors committee to the top-30 list, those parties

25 | that can serve.

1         The return date for those to come back to our

2   office is October 11th, so hopefully, or we anticipate that a

3   committee will be formed sometime during the week of

4   October 10th.  That should be plenty of time, hopefully,

5   before the next omnibus hearing is coming.

6         I just wanted to let all the parties know that.

7   Thank you.

8         THE COURT:  Okay.  Thank you, Mr. Schepacarter.

9         Mr. Kirpalani?

10         MR. KIRPALANI:  No, Your Honor.  Mr. Schepacarter

11   answered my question.  Thank you.

12         THE COURT:  Okay.  Thank you.

13         Is there any other party in interest that would

14   like to be with heard on any other matter this morning before

15   we adjourn?

16     (No verbal response)

17         THE COURT:  Okay.  If not, let me thank all of the

18   parties for the -- obviously, this is a case in which a lot

19   of work happened before you came into our court and all of

20   that work did make the Court's job easier and is much

21   appreciated.  So, thank you to everyone on all sides of the

22   case for that. And with that, we will stand adjourned.  Thank

23   you.

24         COUNSEL:  Thank you, Your Honor.

25     (Proceedings concluded at 10:57 a.m.)

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

/s/ William J. Garling                          October 7, 2022

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable