## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KABBAGE, INC. d/b/a KSERVICING, *et al.*, | Case No. 22-10951 (CTG) |
| Debtors.[1] | (Jointly Administered) |

## PROOF OF PUBLICATION

Attached hereto as Exhibit A is a Proof of Publication for the Notice of Interim NOL Order and Approved Procedures from the following:

| Publication | Publication Date | Exhibit |
|---|---|---|
| **The New York Times** | **October 17, 2022** | **A** |

/s/ Randy Lowry
Randy Lowry
Omni Agent Solutions
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300
*Claims, Noticing, and Administrative Agent for the Debtor*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a/ KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

## EXHIBIT A



The New York Times
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Oct-17, **20** 22

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of *The New York Times* a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of *The New York Times* on the following date or dates, to wit on

Oct 17, 2022, NYT & Natl, pg B7

Sworn to me this 17th day
of October, 2022

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF STOCK ISSUED BY KABBAGE, INC. D/B/A KSERVICING:**

Upon the motion (the "**Motion**") of Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"), on October 3, 2022, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), having jurisdiction over the chapter 11 cases of the Debtors, captioned as *In re Kabbage, Inc. d/b/a KServicing, et al.,* No. 22-10951 (CTG) (the "**Chapter 11 Cases**"), entered an interim order establishing procedures with respect to transfers in the beneficial ownership (including directly or indirectly) of common stock of the Debtors ("**Common Stock**") and options to acquire beneficial ownership of Common Stock, and scheduling a hearing on a final order with respect to such procedures.

In certain circumstances, the procedures restrict transactions involving, and require notices of the holdings of and proposed transactions by, any person, group of persons, or entity that either (i) is a Substantial Stockholder of the Common Stock or (ii) as a result of such a transaction, would become a Substantial Stockholder of the Common Stock. For purposes of the procedures, a "**Substantial Stockholder**" is any person or entity (within the meaning of applicable regulations promulgated by the U.S. Department of the Treasury, including certain persons making a coordinated acquisition of stock) that beneficially owns (including options to acquire and direct or indirect ownership) at least 1,848,370 shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock as of the Petition Date). *Any prohibited acquisition or other transfer of Common Stock (including options to acquire beneficial ownership of Common Stock) will be null and void ab initio and may lead to contempt, compensatory damages, punitive damages, or sanctions being imposed by the Bankruptcy Court.*

*The procedures, as approved on an interim basis and as requested on a final basis, are available on the website of Omni Agent Solutions, Inc., the Debtors' Court-approved claims agent, located at https://omniagentsolutions.com/kservicing, and on the docket of* the Chapter 11 Cases, Docket No. 71, which can be accessed via PACER at https://pacer.gov.

A direct or indirect holder of, or prospective holder of, Common Stock should call or become a Substantial Stockholder should consult the procedures.

**PLEASE TAKE NOTICE** that the final hearing on the Motion shall be held on **November 7, 2022, at 1:00 p.m. (Prevailing Eastern Time)**, and any objections or responses to the Motion shall be in writing, filed with the Court (with a copy delivered to Chambers), and served upon (i) (x) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Natasha S. Hwangpo and Chase A. Bentley); and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Amanda R. Steele and Zachary I. Shapiro); (b) the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Wilmington, Delaware 19801 (Attn: Richard L. Schepacarter and Rosa Sierra-Fox); in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on October 31, 2022.**

**PLEASE TAKE FURTHER NOTICE** that the requirements set forth in the procedures are in addition to the requirements of and applicable securities, corporate, and other laws and do not excuse non-compliance therewith.
Dated: Wilmington, Delaware        **BY ORDER OF THE COURT**
October 11, 2022

**RICHARDS, LAYTON & FINGER, P.A.,** Daniel J. DeFranceschi, Esq. (No. 2732), Amanda R. Steele, Esq. (No. 5530), Zachary I. Shapiro, Esq. (No. 5103), Matthew P. Milana, Esq. (No. 6681), One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Telephone: (302) 651-7700, E-mail: defranceschi@rlf.com, steele@rlf.com, shapiro@rlf.com, milana@rlf.com -and- **WEIL, GOTSHAL & MANGES LLP,** Ray C. Schrock, P.C., Candace M. Arthur, Esq., Natasha S. Hwangpo, Esq., Chase A. Bentley, Esq., 767 Fifth Avenue, New York, New York 10153, Telephone: (212) 310-8000, E-mail: ray.schrock@weil.com, candace.arthur@weil.com, natasha.hwangpo@weil.com, chase.bentley@weil.com, *Proposed Attorneys for Debtors and Debtors in Possession*

As of the Petition Date, there were 38,913,048 shares of common stock outstanding.

## TRAVEL | RETAIL

**TRIPPED UP**

# Help! A Rental Car Company Charged Me For Speeding Tickets I Never Received.

Dear Tripped Up,

In September 2021, I rented a car from Europcar in Paris, used it for a day and returned it. The next month, I saw two charges from Europcar of 45 euros each on my credit card. I wrote to ask what the charges pertained to and received a response that seemed to imply (although it did not categorically state) that the charges were fees related to traffic tickets issued to me while I had the car. Yet I received no traffic tickets. When I asked Europcar for details, I was told they couldn't tell me because of privacy regulations. I found that highly doubtful — and somewhat akin to going to a doctor who claimed she couldn't tell me my diagnosis for privacy reasons! My credit card reversed the charges, but Europcar has since sent a collection agency after me. Can you help? HENRY, SAN FRANCISCO



PETE RYAN

Dear Henry,

Renting a car abroad can be tricky business. Even if you're fine with stick shifts and aren't in one of the many countries where people drive on the left (Japan! Barbados!), you still have to contend with differing traffic laws, confusing insurance requirements, baffling road signs and an appalling lack of Cheetos at highway rest stops.

But you, sir, have stumbled upon a perfect storm of car rental trouble — not a scam, but a nightmarish intersection of European privacy laws, molasses-like bureaucracy, international snail mail and French customer service agents whose English could be clearer.

First, some good news. I had a very long video call with a friendly and forthcoming Europcar official — who asked not to be identified because it is against company policy to speak publicly — and he told me the company made some mistakes in your case and would end its attempts to recover money from you. And some even better news — you actually ended up 45 euros ahead of where you started. (More on that in a bit.)

Let's dissect what happened. On Sept. 15, 2021, the car you were driving was flagged by two different traffic cameras at 2:17 and 2:22 p.m. This much you already know, from the sparse details Europcar originally sent to you.

Had this happened in the United States or many other countries, the process would have been straightforward. Police run the license plate, connect it to the rental company, send over the details of your misdeeds (often with a grainy photo of your car, caught in the act). The rental company charges your credit card for the fine, plus an administrative fee and pays the government. Case closed.

But things in the European Union are more complicated, thanks in part to a 2018 law called the General Data Protection Regulation. At least as interpreted by French authorities, it prohibits government from sharing data with a third party, in this case, Europcar, about where you were and what you did. "The regulatory framework is so strict that you are always on the verge of infringing G.D.P.R.," said the Europcar official. That's why all the company could tell you at first is the time and date of your offenses, although it eventually determined they were speeding infractions of some kind — but would not tell me how they got the additional information.

As required by law, Europcar turned over your name and San Francisco address to the French Interior Ministry, which should have sent you an avis de contravention — the violation notice — by mail. But you told me you haven't received it, which is not surprising. In reporting on your story, I spoke to several people who received traffic violation notices up to 18 months after renting a car in Europe. That jarred a memory from my own travels, and I unearthed an email I received in July 2018 from Sixity By Car, charging me a 60-euro processing fee for an unspecified traffic fine that I never received.

Whether 45 (or 60) euros is an appropriate fee for simply passing along an address is an open question, but Europcar and Sixity By Car both disclose this policy in their terms and conditions, and companies worldwide have similar policies. In fact, as Europcar told you in one exchange, their policy is to refund that fee upon request if the customer does not receive the violation notice in one year. For you, Henry, that year actually expired earlier this month, though the point is moot since you got your bank to reverse the charges.

The French Interior Ministry told me that fines must be issued within a year of the infraction, so you're almost off the hook. If they were mailed by Sept. 15 and eventually find their way to you, though, you'll have to decide whether to pay or contest them. I should note that a lot of people ignore fines they get on vacation, but I cannot recommend you take that route (though I admit I did scan the 1996 extradition treaty between the United States and France and unearthed no references to speeding violations).

That explains what was supposed to happen, but as your exchanges with Europcar show, and the official at Europcar admitted, things got very confusing. The whole process got off to a bad start last October when Europcar notified you to communicate in English with English speakers. After you got your credit card to reverse those charges, the company wrote to you in December to seek payment (again in French), though, for some confusing reason, they asked for just 45 euros, not the total 90 euros you had originally been charged. In January, they started responding to your protests in English, but things soon got weirder.

On Jan. 7, they sent you a confusing "invoice" for "-45 euros," which turns out to have been a credit to your account, on top of the money you had already been refunded by your credit card. Four days later came a truly confusing exchange of messages, including one implying you owed them 45 euros from before and another in muddled English that read: "Regarding the invoice 100229951324, the customer service canceled, but after your rejection you were refunded an amount that you did not pay."

Is there anything Americans can do to avoid troubles with international rentals? In general, I recommend favoring companies based in the United States, because it is easier to deal with customer service if something goes wrong after you're back home. Jonathan Weinberg, the founder and chief executive of AutoSlash, a discount car rental site, agrees with my tactics but for a different reason. "The major rental companies tend to behave in a more customer-friendly way," he said, referring to the familiar brands owned by umbrella companies Enterprise, Avis and Hertz. "They are more permissive about small dents and dings."

Neil Abrams, a longtime consultant to the rental car industry, had another sensible tip, though it wouldn't help with traffic violations: Even if you are skeptical of insurance add-ons on domestic car rentals (perhaps because your credit card or own car insurance policy offers some coverage) be less stingy abroad, so you don't have to spend months seeking documentation to be reimbursed. "You don't want to deal with these international government agencies and police," he said. "It's just too much of a pain."

Also, be sure to read up on local regulations before you travel (starting on this State Department page) and once you arrive, ask locals about speed cameras — even in the United States and even places you've been before. For example, in San Jose, New York City started operating 750 school zone speed cameras 24 hours a day. And the N.Y.P.D. will almost certainly find you much faster than the French.

SETH KUGEL

---

FROM FIRST BUSINESS PAGE

# How Supermarket Merger Could Change Landscape For Stores and Consumers

Teeter.

Albertsons, based in Boise, Idaho, and founded in 1939, runs 2,200 supermarkets under names like Albertsons, Safeway and Vons. It has a market capitalization of roughly $15 billion.

Together, the grocers said on Friday, they will be able to save millions in operating costs and have stronger bargaining power with suppliers. Analysts said total cost savings, which the retailers said could top $1 billion, was likely a driver for the deal.

**What will this deal do for food prices?**

Kroger and Albertsons argue that their increased size and bargaining power will help them reduce prices, and that the savings can then be passed on to their customers. But lawmakers, regulators and consumer advocates often sound skeptical that simply redirect any increase in profit to shareholders.

A 2008 study conducted by Orley C. Ashenfelter, an economist at Princeton, and Daniel S. Hosken of the Federal Trade Commission, found that in four of the five mergers they evaluated, prices appeared to have increased between 3 and 7 percent. The authors cautioned that the study was not necessarily a reflection of the impact of all deals. It is unclear whether the dynamics have changed in the years since.

But any increase in prices now could have a painful impact, as food prices in general continue to shoot up. The cost of food across the United States last month rose 11 percent from the year before, according to the Bureau of Labor Statistics.

The companies for their part suggested on Friday that cost savings might not be the same everywhere.

"It is market-by-market in terms of what we feel like we need to invest to be able to get pricing where we feel comfortable," Rodney McMullen, Kroger's chief executive, said in an analyst call.

**What will the political reaction be?**

Likely hot, given the focus on inflation, food prices and corporate consolidation — all right before the midterm elections. Senator Bernie Sanders, independent of Vermont, called the deal an "absolute disaster."

The top Republican on a Senate antitrust subcommittee, Mike Lee of Utah, said in a statement on Friday that he would do everything in his power to "protect consumers from anticompetitive mergers that could further exacerbate the financial strain we already feel in the grocery store checkout aisle."

A White House official said the administration did not comment on "specific transactions that could be subject to review by federal agencies." Peter Kaplan, a spokesman for the Federal Trade Commission, declined to comment.

**What do the companies plan to do to appease regulators?**

To address likely concerns from regulators that the two grocers will have too much overlap in certain areas of the country, particularly on the West Coast, Kroger and Albertsons said they planned to sell stores to competitors. They said they would also consider spinning off up to 375 stores into a separate, stand-alone company, if needed.

Analysts on Friday, however, pushed Kroger executives over whether that plan was sufficient, and they questioned whether they might be required to part with more stores.

Regardless, legal experts said it might be difficult for Kroger and Albertsons to make a case that they can foster competition while they simultaneously grow to better take on Walmart.

"The argument kind of says we're going to give up on a lot of competition and there are only going to be a couple of big players who effectively compete for most consumers," said Daniel Rubinfeld, a law professor at New York University who has reviewed mergers.

Investors do not seem optimistic about the companies' chances of a successful merger. Shares of Kroger ended trading on Friday down more than 7 percent. Shares of Albertsons dropped more than 8 percent.

**What will regulators be scrutinizing?**

Through mergers over the past few decades, the grocery industry has consolidated in big ways, and many have worried that too much power to set prices rests in the hands of too few corporations.

Kroger and Albertsons have been among the most active acquirers in recent years, including through an $8 billion deal for Fred Meyer (Kroger in 1998), a $2.5 billion purchase of Harris Teeter (Kroger in 2013) and a $9 billion deal for Safeway (Albertsons in 2015).

The F.T.C. will most likely look at what claims the chains made about those earlier deals — and whether they have followed through on them. It will also look intently at whether Kroger and Albertsons can leave room for a viable competitor in markets in which they overlap by selling off stores.

The track record on such efforts is rocky. Smaller competitors do not always have the means to expand into those markets, and the companies selling those stores may not truly want a new viable



A Kroger store in a suburb of Cincinnati, where the company is headquartered. Kroger and Albertsons could save over $1 billion in total costs with the deal. ANDREW SPEAR FOR THE NEW YORK TIMES

competitor. In 2014, Haggen, a retailer in Bellingham, Wash., bought more than 100 stores that Albertsons had sold to win approval for its merger with Safeway.

A year later, Haggen filed for bankruptcy and blamed Albertsons for the breakdown of its business. (Albertsons later bought back 33 of those stores from the bankrupt company.)

**What happens now?**

The boards of both companies unanimously approved the deal. So what remains is regulatory approval.

It is unclear if the F.T.C. or another agency will try to stop the deal. But in an attempt to do so, a regulator can sue to block the merger, forcing companies to decide whether they want to pursue the long and costly process of a trial to prove it is better for them, their shareholders and their customers to combine. Sometimes, they walk away to avoid that hassle.

The F.T.C. has directly — or indirectly — blocked a number of retail deals. The two biggest food distribution companies, Sysco and US Foods, called off their $3.5 billion deal in 2015 after a federal judge had ruled in favor of the F.T.C.'s decision to block it. That same year, the F.T.C. blocked a second attempt by Office Depot and Staples to merge. Rite Aid and Walgreens walked away from their $9.4 billion deal in 2015 after the F.T.C. had a chance to officially weigh in.

Kroger will pay Albertsons $600 million if the deal falls apart over antitrust issues, according to the deal's terms.

*Reporting was contributed by Michael D. Shear, David McCabe, Julie Creswell and Jordyn Holman.*

ATTENTION: DIRECT AND INDIRECT HOLDERS OF AND PROSPECTIVE HOLDERS OF STOCK ISSUED BY KARBAAGE, INC. D/B/A KSERVICING.

[legal notice text — advertisement]