## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re                                           :       **Chapter 11**
                                                :
**KABBAGE, INC. d/b/a KSERVICING** *et al.,*    :       **Case No. 22-10951 (CTG)**
                                                :
                                                :
Debtors.[1]                                     :       **(Jointly Administered)**
                                                :
                                                :       **Obj. Deadline: October 31, 2022 at 4:00 p.m. (ET)**
                                                :       **Hearing Date: November 7, 2022 at 1:00 p.m. (ET)**

------------------------------------------------------------ x

## MOTION OF DEBTORS
## FOR ENTRY OF ORDER (I) AUTHORIZING
## DEBTORS' LIMITED USE OF CASH COLLATERAL,
## (II) GRANTING ADEQUATE PROTECTION TO SECURED LENDER,
## (III) MODIFYING AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"), respectfully move and represent as follows in support of this motion (this "**Motion**"):[2]

### Relief Requested

1.      By this Motion, the Debtors request authority, pursuant to sections 105, 361, 362, and 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express.  The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] The facts and circumstances supporting the relief requested herein are set forth in the Rieger-Paganis Declaration (as defined below) filed contemporaneously herewith.

Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware  (the "**Local Rules**") to:

    i. use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), solely in accordance with the terms of the proposed order in the form annexed hereto as **Exhibit A** (the "**Proposed Order**");[3]

    ii. provide adequate protection to the Federal Reserve Bank of San Francisco (the "**Reserve Bank**");

    iii. grant adequate protection liens on the proceeds and property recovered in respect of the PPPLF Collateral, the Debtors' unencumbered property and assets owned or held as of the Petition Date and all property acquired or obtained after the Petition Date, and junior liens on all of the Debtors' property and assets encumbered as of the Petition Date; *provided* that such replacement liens shall not apply to any borrower payment remittances due to Cross River Bank or Customers Bank, subject to and limited only to the extent of diminution of value, if any;

    iv. modify the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Proposed Order;

    v. except to the extent of the Carve Out (as defined below), grant the waiver of all rights to surcharge any PPPLF Collateral (as defined below) under section 506(c) and the equities of the case exception under section 552(b) of the Bankruptcy Code or any other applicable principle of equity or law;

    vi. waive any applicable stay with respect to the effectiveness and enforceability of the Proposed Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

    vii. grant related relief.

2.      In support of the Motion, the Debtors submit the Declaration of Deborah Rieger-Paganis (the "**Rieger-Paganis Declaration**"), the Debtors' restructuring advisor.  A copy of the Rieger-Paganis Declaration is annexed hereto as **Exhibit B.**

---

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Proposed Order.

RLF1 28146913v.1

**Jurisdiction and Venue**

3.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.   Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

4.    On October 3, 2022 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

5.    The Chapter 11 Cases are being jointly administered pursuant to rule 1015(b) of the Bankruptcy Rules.  Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Deborah Rieger-Paganis In Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 13] (the "**First Day Declaration**").

**Bankruptcy Rule 4001 and Local Rule 4001–2 Concise Statements**

6.      Pursuant to Bankruptcy Rules 4001(b) and (d) and Local Rule 4001-2(a),

the Debtors submit the following concise statement of the material terms of the Proposed Order.[4]

| Summary of Material Terms | | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The Federal Reserve Bank of San Francisco | ¶ D |
| **Purposes for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(ii) | To provide access to funds necessary for the Debtors to pay the expenses incurred to administer the Debtors' Chapter 11 Cases and working capital necessary to operate its business, including to service loans and pay related fees and expenses associated with the administration of the Chapter 11 Cases and effectuate an organized wind down of its business. | ¶ F |
| **Cash Collateral Budget** Bankruptcy Rule 4001(b)(1)(B)(ii) | A 13-week cash distribution and receipts budget (the "**Cash Collateral Budget**") is attached as Exhibit 1 to the Proposed Order.  The Budget is subject to Permitted Variances as set forth in Paragraph 2 of the Proposed Order. | ¶ G, 2 |
| **Termination Events** Bankruptcy Rule 4001(b)(1)(B)(iii), Local Rule 4001-2(a)(i)(M) | The Debtors' right to use the Cash Collateral will terminate automatically and without the need for notice or demand by the Reserve Bank or any further order of the Court upon the occurrence of any of the following, unless waived by the Reserve Bank: <br><br>(a) The appointment of a chapter 11 trustee or of an examiner with expanded powers in the Chapter 11 Cases (having powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); <br>(b) The conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; <br>(c) The dismissal of the Chapter 11 Cases; <br>(d) A determination by the Court that a material violation or breach of any of the provisions of the Proposed Order has occurred; <br>(e) Any other (i.e., not material) violation or breach of any of the provisions of the Proposed Order that is not disputed or cured within five (5) business days of written notice from the Reserve Bank; <br>(f) If any claim or lien having a priority superior or *pari passu* with those granted by the Proposed Order to the Reserve Bank is granted or permitted by an order of the Court or hereafter entered in the Chapter 11 Cases, which any of the Debtors' obligations pursuant to the Program Agreements are outstanding; <br>(g) If the rights, remedies, power, privileges, claims, liens, and priorities of the Reserve Bank provided for in the Proposed Order or otherwise are adversely modified, altered, eliminated, or impaired in any manner by any subsequent order or judgment (including, without limitation, by any confirmation order or sale order), by any plan of liquidation in the Chapter 11 Cases, by the dismissal or | ¶ 10, 16, 23 |

---

[4]  Any summary of the terms of the Proposed Order contained in this Motion is qualified in its entirety by reference to the provisions of the Proposed Order.  To the extent there is a conflict between the Motion and the Proposed Order, the Proposed Order will control.  The Debtors reserve the right to supplement the Bankruptcy Rule 4001 and Local Rule 4001–2 statements made herein.

RLF1 28146913v.1

| Summary of Material Terms | Location |
|---|---|
| conversion of the Chapter 11 Cases, or in any Successor Case, or to the extent the Debtors commence, support, or join in a motion, suit or other proceeding against the Reserve Bank that seeks such relief (with (d) - (g) constituting an "**Event of Default**"); and<br><br>(h) The effective date of any plan of liquidation in the Chapter 11 Cases that has been confirmed by an order of the Court.<br><br>The date of which the earliest of the foregoing clauses occur constituting the "**Termination Date.**" | |
| **Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) | In addition to all the existing security interests and liens granted to or for the benefit of the Reserve Bank in and with respect to the PPPLF Collateral, as adequate protection for, and as an inducement to the Reserve Bank to permit the Debtors' use of the Cash Collateral as provided for in the Proposed Order:<br><br>(a) the Debtors working cooperatively with the Reserve Bank to timely implement direct payments from the SBA to the Reserve Bank on all PPP loans constituting PPPLF Collateral by November 7, 2022 (or as soon as practicable thereafter solely to the extent that such delay is solely on account of any action or inaction by the SBA) including, but not limited to, (a) delivering written instructions to the SBA to direct all payments on KS PPP Loans to the Reserve Bank and (b) delivering a list to the Reserve Bank of all the KS PPP Loans, in each case, in a form and manner reasonably acceptable to the Reserve Bank<br><br>(b) The Debtors not, at any point, depositing or maintaining proceeds of the PPPLF Collateral in any other account, and if such funds are received in any other account, KServicing immediately (within one business day) remitting such funds to the Reserve Bank or to the Synovus Servicing Account (as defined in the First Day Declaration) for the sole benefit of the Reserve Bank or another segregated bank account satisfactory to the Reserve Bank.<br><br>(c) the Debtors shall provide weekly reporting (including bank balances) on all amounts in the Synovus Servicing Account, including whether any payments in connection with KS PPP loans have been deposited in, or transferred from, the Synovus Servicing Account.<br><br>(d) the Debtors continuing to service the PPP Loans constituting PPPLF Collateral in the ordinary course in accordance with the Program Agreements and remitting all payments received to the Reserve Bank weekly, subject to the terms of the Proposed Order, including Paragraph 19 of the Proposed Order.<br><br>(e) subject to the receipt of underlying reports and data from the SBA, the Debtors deliver to the Reserve Bank on Monday of each week (a) PPPLF reduction reports ("**PPPLF Reduction Reports**") and (b) a list of KS PPP Loans on which SBA has made payments and, for each such loan, the amount paid by the SBA during the prior week ("**KS PPP Loan Payment Report**"), in each case, in a form and manner acceptable to the Reserve Bank.<br><br>(f) the Debtors working cooperatively with the Reserve Bank to identify potential third party loan servicers for the remaining PPP Loans that constitute PPPLF Collateral and cooperate and reasonably assist in the transfer of the loan portfolio to a third-party servicer; subject to the parties determining the costs of such transfer and how such costs to effectuate such transfer shall be borne.<br><br>(g) the Debtors not granting any liens or security interests with respect to the PPPLF Collateral. | ¶ H, 5 |

| Summary of Material Terms | Location |
|---|---|
| (h) the Debtors obtaining the consent of the Reserve Bank (such consent not to be unreasonably withheld, conditioned, or delayed) with respect to any settlement with Cross River Bank, Customers Bank, or any non-governmental party. <br><br> (i) the Debtors providing to the Reserve Bank (a) any accounting or financial disclosures provided to the U.S. Department of Justice ("**DOJ**") and/or the Borrower's Depository Institution (as defined in the Letter of Agreement), or any successor thereof, and (b) any additional reporting with respect to the PPPLF Collateral and the Debtors' administration of the processing of PPP Loans in connection therewith as may be reasonably requested by the Reserve Bank from time to time. <br><br> (j) to the extent not included in (i), the Debtors providing the Reserve Bank with a weekly report of their cash balances including both PPP Loan proceeds that constitute PPPLF Collateral as well as other cash through to the earlier of (x) the closing of the Chapter 11 Case or (y) if applicable, the date on which all Indebtedness has been indefeasibly paid in full; *provided* that weekly reporting of borrower payment remittances due to Cross River Bank or Customers Bank shall not be provided to the Reserve Bank. <br><br> (k) the Debtors providing real-time weekly reporting to the Reserve Bank on all payments to the Debtors or their affiliates from the SBA, recipients of the PPP Loans (the "**PPP Borrowers**") or any other source with regard to the PPP Loans that constitute PPPLF Collateral. <br><br> (l) the Debtors' payment of the Reserve Bank's professional fees in the amounts not to exceed the amounts set forth in the Cash Collateral Budget and solely from the Cash Collateral, of each of (i) Cleary Gottlieb Steen & Hamilton LLP, (ii) Young Conaway Stargatt & Taylor, LLP, and (iii) Chilmark Partners LLC in connection with the Chapter 11 Case (collectively, the "**Reserve Bank Professional Fees**"), subject to reasonableness review solely as set forth in the Proposed Order.[5] <br><br> (m) the Debtors granting to the Reserve Bank valid perfected first priority replacement liens on all of the Debtors' unencumbered property and assets owned or held as of the Petition Date and all property acquired or obtained after the Petition Date, and junior liens on all of the Debtors' property and assets encumbered as of the Petition Date, subject to and limited to the extent of any diminution in value, which may result from the Debtors' use of Cash Collateral; *provided* that such replacement liens shall not apply to any borrower payment remittances made in accordance with the Partner Bank Agreements[6] due to Cross River Bank or Customers Bank; *provided* further that nothing herein shall limit the Debtors' right to seek recharacterization of adequate protection as being applied to the Obligations. | |
| **Carve Out** <br> Bankruptcy Rule 4001(b)(1)(B)(iii) | The Proposed Order provides for a "**Carve Out**" for certain statutory fees and allowed professional fees of the Debtors and any Creditors' Committee appointed pursuant to section 1103 of the Bankruptcy Code, including Professional Fees incurred prior to delivery of a Carve Out Notice and a $500,000 Post-Carve Out Notice Cap for Professional Fees incurred after delivery of the Carve Out Notice, as more fully detailed in the Proposed | ¶ 8 |

---

[5] Nothing in the Proposed Order limits or waives the Reserve Bank's right to assert a claim for any unpaid professional fees that are owed under the PPPLF.

[6] As defined in the *Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations* [Docket No. 11].

| Summary of Material Terms | Location |
|---|---|
| Order. | |

| Local Rule 4001-2 Concise Statements | Location |
|---|---|
| **The Amount of Cash Collateral the Debtors Seek Permission to Use** <br> Local Rule 4001–2(a)(i)(A) | The Debtors shall be allowed to use Cash Collateral in the amount set forth in the Cash Collateral Budget subject to the Permitted Variance (defined below). | ¶ 2 |
| **Fees** <br> Local Rule 4001–2(a)(i)(B) | None. | N/A |
| **Provisions that Limit the Court's Discretion** <br> Local Rule 4001–2(a)(i)(C) | None. | N/A |
| **Funding of Non-Debtor Affiliates With Cash Collateral** <br> Local Rule 4001–2(a)(i)(D) | N/A | N/A |
| **Budget, Reporting, and Variance Covenants** <br> Local Rule 4001–2(a)(i)(E) | Attached as <u>Exhibit 1</u> to the Proposed Order is the Cash Collateral Budget, including anticipated uses of the Cash Collateral for such designated period. <br><br> For each rolling four-week testing period, with the first such period beginning with the week in which the Proposed Order is entered and ending four weeks thereafter (and each week thereafter) (each four-week period, a "**Testing Period**"), the actual disbursements for the line items labeled: "Operating Expenses (Incl. Payroll)," "Insurance (Incl. Incremental D&O)," and "Taxes" (together the "**Tested Disbursement Line Items**") of the Debtors for such Testing Period on an aggregate basis shall not be greater than 115% of the amount estimated therefore set forth in the Budget for such period (such percentage, a "**Permitted Variance**"). <br><br> No later than Friday of the fourth week covered by the Initial Budget (and every fourth week after), the Debtors shall provide to the Reserve Bank a proposed updated 13-week cash flow forecast, substantially in the form of the Initial Budget, which updated Budget shall only become the Budget upon the prior express written consent of the Reserve Bank to be granted in its sole discretion (but shall not be required to be filed with the Court); provided, that if the Reserve Bank does not object to the proposed updated 13-week cash flow forecast by the following Friday or such later time as agreed to by the Debtors and the Reserve Bank, the updated Budget shall become the Budget. <br><br> On Wednesday of each calendar week, the Debtors shall provide the Reserve Bank, Chilmark Partners LLC, and Cleary Gottlieb Steen & Hamilton LLP with a variance report comparing, on an aggregate and line item basis, actual results for the previous individual | ¶ 2 |

| Local Rule 4001-2 Concise Statements | Location |
|---|---|
| week and cumulative preceding weeks (up to four consecutive weeks) to the amounts set forth in the Budget for such periods.<br><br>Each variance for Tested Disbursement Line Items in excess of 5% shall be accompanied by a qualitative explanation.  The expenditures authorized in the Cash Collateral Budget shall be adhered to on a line-by-line basis, on a cumulative basis during the Budget Period (i.e. unused amounts shall carry forward to successive weeks on a line-by-line basis), with no carry-over surplus to any other line item(s) or to a subsequent budget period, if any, except to the extent agreed to in writing as set forth in the Proposed Order.<br><br>The Reserve Bank may, in its sole discretion, agree in writing to the use of Cash Collateral in a manner or amount which does not conform to the Cash Collateral Budget (each such use of Cash Collateral, a "**Non-Conforming Use**").  If such written consent is given, the Debtors shall be authorized pursuant to the Proposed Order to expend Cash Collateral for such Non-Conforming Use without further Court approval, and the Reserve Bank shall be entitled to all of the protections specified in this Order for any such Non-Conforming Use. | |
| **Carve Out**<br>Local Rule<br>4001–2(a)(i)(F) | Any security interests or claims granted herein as Adequate Protection shall be subject in all respects and subordinate to the following (the "**Carve Out**"):<br><br>(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below);<br><br>(ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);<br><br>(iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "**Debtors Professionals**") and the Creditors' Committee (the "**Committee Professionals**" and, together with the Debtors Professionals, the "**Professional Persons**") appointed in the Chapter 11 Case pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the Reserve Bank of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and without regards to whether such fees and expenses are provided for in the Cash Collateral Budget; and<br><br>(iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the Reserve Bank, as applicable, of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (iv), the "**Post-Carve-Out Trigger Notice Cap**"). | ¶ 8 |
| **Liens on Unencumbered Assets**<br>Local Rule<br>4001–2(a)(i)(G) | As adequate protection against, and limited to the extent of, any diminution in value, the Reserve Bank is hereby granted, subject and subordinate to the Carve-Out, replacement liens on all of the Debtors' unencumbered property and assets owned or held as of the Petition Date and all property acquired or obtained after the Petition Date, including without limitation, proceeds of claims and causes of actions arising under chapter 5 of the Bankruptcy Code, and junior liens on all of the Debtors' property and assets encumbered as of the Petition Date; *provided* that such replacement liens shall not apply to any borrower payment remittances due to Cross River Bank or Customers Bank.  For the avoidance of doubt, the Reserve Bank's existing liens will attach to any proceeds or offspring of the PPPLF Collateral, pursuant to section 552 of the Bankruptcy Code. | ¶ 5(b) |

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| | | |
| **Milestones**<br>Local Rule 4001–2(a)(i)(H) | N/A | N/A |
| **Prepayment Penalty**<br><br>Local Rule 4001–2(a)(i)(I) | N/A | N/A |
| **Joint Liability**<br><br>Local Rule 4001–2(a)(i)(J) | N/A | N/A |
| **Payment of Secured Parties' Fees Without Review**<br><br>Local Rule 4001–2(a)(i)(K) | Payment of the secured parties' fees and expenses are subject to reasonableness review by the Debtors, the U.S. Trustee and the Creditors Committee (if one is appointed) as set forth in the Proposed Order. | ¶ H(xii), 22 |
| **Use of Estate Funds for Investigations**<br><br>Local Rule 4001–2(a)(i)(L) | No PPPLF Collateral (including, without limitation, the Cash Collateral) may be used to request authorization from the Court to obtain any postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code without the consent of the Reserve Bank or with respect to the investigation or the prosecution of the validity, perfection, enforceability, and extent of the Obligations and valid perfected first priority liens in the PPPLF Collateral or any potential claims of the Debtors' estates against the Reserve Bank in respect of the Program Agreements, or any other claims, causes of action, or defenses under chapter 5 of the Bankruptcy Code or any other claims and causes of action.<br><br>Up to $25,000 will be made available to any Committee solely for investigation costs, as described in Paragraph 21 of the Proposed Order. | ¶ 7, 21(b) |
| **Cross-Collateralization and Administrative Expense Status**<br><br>Local Rule 4001–2(a)(i)(N) | The Proposed Order does not provide for cross-collateralization, other than replacement liens as adequate protection. | N/A |
| **Roll Up**<br><br>Local Rule 4001–2(a)(i)(O) | N/A | N/A |

RLF1 28146913v.1

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| **Non-Consensual Priming Liens**<br><br>Local Rule 4001–2(a)(i)(P) | The Proposed Order does not provide for non-consensual priming of any existing lien. | N/A |
| **Binding Effect of the Debtors' Stipulations on Third Parties**<br>Local Rule 4001–2(a)(i)(Q) | Paragraph D of the Proposed Order contains various stipulations regarding, among other things, the amount, validity, enforceability, perfection, and priority of the claims and liens of the Reserve Bank.  The Stipulations shall be binding upon each other party in interest, including, without limitation, a Creditors' Committee, unless, and only to the extent that, a Challenge (defined below) is commenced by a party with standing within the Challenge Period and a final, non-appealable order is entered sustaining any such Challenge. | ¶ D |
| **Challenge Period**<br><br>Local Rule 4001–2(a)(i)(Q) | The stipulations contained in the Proposed Order are binding upon the Debtors.<br><br>Parties in interest may investigate the stipulations set forth in the Proposed Order until 75 days from entry of the Proposed Order, provided, however, that if a trustee is appointed prior to the expiration of the challenge period, such trustee will have until the later of the expiration of the challenge period or ten (10) days after appointment to assert a challenge.<br><br>Additionally, the Debtors and the Reserve Bank each reserve their rights with respect to whether the Agreed Cash Amounts constitute Cash Collateral, and all rights and defenses thereto of each other Debtors and the Reserve Bank are preserved; provided that any such challenge to the validity of the lien, the scope of the PPPLF Collateral and rights, in each instance, with respect to the Agreed Cash Amounts shall be brought prior to the end of the Challenge Period; provided further that to the extent the outstanding Indebtedness is indefeasibly paid in full and following expiration of the Challenge Period and resolution of all timely Challenges, any remaining Agreed Cash Amounts shall not constitute Cash Collateral. | ¶¶ 19, 21 |
| **Provisions Approving all Terms of the Loan Agreement**<br>Local Rule 4001–2(a)(i)(R) | N/A | N/A |
| **Waiver/Modification of Automatic Stay**<br>Local Rule 4001–2(a)(i)(S) | The automatic stay provisions of section 362 of the Bankruptcy Code modified as follows:<br><br>(i) to permit the Reserve Bank upon, or at any time after, the occurrence of any Termination Date (including, without limitation, as a result of the occurrence of any Event of Default under the Proposed Order) to deliver written notice by electronic mail to counsel for the Debtors, counsel for any Creditors' Committee, counsel for any trustee, and counsel for the U.S. Trustee, stating that the Reserve Bank elects to commence the exercise of rights and remedies in respect of the Proposed Order and the Program Agreements, and under applicable bankruptcy and non-bankruptcy law;<br><br>(ii) following the fifth (5th) business day following the delivery by the Reserve Bank of a Remedies Notice (the "**Remedies Notice Period**"), and in the event that the Debtors have not delivered notice of intent to contest the Remedies Notice or cured the alleged Event of Default within five (5) business days following delivery of the Remedies Notice ("**Remedies Objection Deadline**"), to permit the Reserve Bank to exercise all rights and remedies provided for in the Proposed Order or in the Program Agreements or under applicable bankruptcy or non-bankruptcy law; | ¶ 11 |

10

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| | (iii) following the expiration of the Remedies Notice Period, and in the event that the Debtors have not delivered notice of intent to contest the Remedies Notice prior to the Remedies Objection Deadline or cured the alleged Event of Default, the Debtors (or any trustee in the Chapter 11 Case or in a Successor Case) shall cooperate with the Reserve Bank in connection with its exercise of rights and remedies by, among other things, (a) providing access to the PPPLF Collateral and the Debtors' premises to the Reserve Bank and its representatives and agents, (b) providing access to the Debtors' books and records to the Reserve Bank and its representatives and agents, (c) providing any information or documents reasonably requested by the Reserve Bank or its representatives or agents, (d) performing the other obligations of the Debtors in connection with the Reserve Bank's exercise of rights and remedies as required by the Program Agreements, (e) taking reasonable steps to safeguard and protect the assets and property subject to the liens in the PPPLF Collateral, and (f) refraining from any interference with (and from any encouragement of others to interfere with) the Reserve Bank's enforcement of its rights and remedies. | |
| **Provisions Limiting Arguments**<br><br>Local Rule 4001–2(a)(i)(T) | None. | N/A |
| **Liens on Avoidance Actions**<br><br>Local Rule 4001–2(a)(i)(U) | The Proposed Order grants liens on all of the Debtors unencumbered property, which includes the proceeds or property recovered in respect of any of the Debtors' avoidance actions. | ¶ H(xiii), 5(b) |
| **Section 506(c) Waiver**<br><br>Local Rule 4001–2(a)(i)(V) | The Debtors waive any right to surcharge any PPPLF Collateral. | ¶ 13 |
| **Section 552(b) Waiver**<br><br>Local Rule 4001–2(a)(i)(W) | The "equities of the case" exception under section 522(b) of the Bankruptcy Code will not apply to the Reserve Bank. | ¶ 15 |
| **Marshalling Waiver**<br><br>Local Rule 4001–2(a)(i)(X) | The Reserve Bank shall not be subject to the equitable doctrine of "marshaling" or any seminal doctrine with respect to any of the assets or property subject to the liens in the PPPLF Collateral or otherwise. | ¶ 14 |

7.     As explained below and in the Rieger-Paganis Declaration, the Debtors' use of Cash Collateral is necessary to avoid immediate and irreparable harm; absent consensual use of Cash Collateral, the Debtors will lose access to necessary liquidity.  Based on the Company's Cash Collateral Budget, access to Cash Collateral is necessary to maintain operations in the ordinary

course and ensure the viability of the Company without significant deterioration to the detriment of all stakeholders.

8.      The Debtors have determined, in an exercise of their business judgment and following good-faith, arms'-length negotiations, that the Reserve Bank would only consent to the Debtors' use of Cash Collateral if the Proposed Order included the foregoing provisions. Accordingly, the Debtors submit that the terms and conditions of the Proposed Order are appropriate under the facts and circumstances of the Chapter 11 Cases.

**Debtors' Prepetition Capital Structure**

9.      As of the Petition Date, the Debtors were indebted to the Reserve Bank (i) in the aggregate principal amount of approximately $536,450,940 in respect of outstanding Advances under the Program Agreements (each as defined below) plus (ii) accrued and unpaid interest and costs and expenses including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements and other obligations owing under the Program Agreements (collectively, the "**Indebtedness**").

**A.  The PPPLF Portfolio**

10.      The Debtors' business solely consists of servicing its loan portfolio, which, as of the Petition Date, consists in part of loans issued to small businesses under the Paycheck Protection Program (the "**PPP**" and the loans provided thereunder, the "**PPP Loans**") with an aggregate outstanding principal amount of approximately $1.3 billion.  The Debtors partnered with the Small Business Association ("**SBA**") to originate and service PPP Loans, which consisted partly of PPP Loans that the Debtors originated pursuant to the Reserve Bank's Paycheck Protection Program Liquidity facility (the "**PPPLF**").  The Debtors own and service such loans and have pledged these loans ("**Pledged PPPLF Loans**") as collateral to the Reserve Bank (the "**PPPLF Collateral**"), which are guaranteed by the SBA.

11.    On April 9, 2020, to support the effectiveness of the PPP, the Board of Governors of the Federal Reserve System, with the concurrence of the U.S. Treasury, authorized the establishment of the PPPLF, pursuant to which PPP-eligible lenders could enter into agreements with the Reserve Bank to obtain funding for PPPLF loans.  To obtain PPPLF financing, the Company and the Federal Reserve entered into the *Paycheck Protection Program Liquidity Facility Letters of Agreement* (the "**Letter of Agreement**"), dated May 12, 2020 and amended as of January 14, 2021.  The Letter of Agreement incorporates the *Federal Reserve Banks Operating Circular No. 10*, dated July 16, 2013 (the "**Operating Circular**," and together with the Letter of Agreement, the "**Program Agreements**"), which sets forth the universal terms and conditions for any party who obtained advances from, incurred liabilities to, or pledged collateral to, the Reserve Bank, and includes terms such as advance payment mechanics, requirements for collateral, and maintenance of lending documents.

### B.  The Indebtedness

12.    Under the Program Agreements, the Debtors were authorized to request advances (the "**Advances**") from the Reserve Bank that were secured by the PPPLF Collateral and mature on the respective maturity dates of such collateral.  Proceeds of the PPPLF Collateral include (a) borrower collections, (b) payments received from the SBA for principal balances on account of loan forgiveness and guaranty purchase, and (c) the interest paid by the SBA on the principal amount of the PPPLF loans (which accrued at the rate of 1.00% per annum).  Historically, the Debtors repaid the Advances by making weekly remittances to the Reserve Bank for all payments received on account of the PPPLF Collateral, including borrower payments and payments received from the SBA on account of loan forgiveness and guaranty purchase, but the Debtors only remitted 0.35 percent of interest per annum on the PPPLF Collateral received from the SBA, and retained the remaining 0.65 percent of interest per annum on the PPPLF Collateral

received from the SBA.  The Reserve Bank has asserted that various defaults have occurred under the PPPLF Documents and memorialized its position in a correspondence sent to the Company on October 1, 2022 (the "**Default Notice**").

13.     The total amount of the Advances borrowed by the Debtors pursuant to the Program Agreements is approximately $1.6 billion.  The Advances are not guaranteed by any of the Debtors or non-debtor affiliates, although the Reserve Bank has recourse against the Debtors under the Program Agreements subject to the terms thereof.  The Advances are secured in accordance with the Program Agreements, pursuant to which the Reserve Bank was granted first-priority liens on the underlying PPPLF Collateral and all proceeds thereof.  In the event the Debtors fail to repay an Advance on the applicable maturity date, the Reserve Bank must first seek repayment on a non-recourse basis, by realization on the PPPLF Collateral absent a default. Notably, the Reserve Bank may pursue payment directly from the Debtors if (a) in its sole discretion, the Reserve Bank deems the Debtors to have engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance, or (b) the Debtors fail to meet any of the requirements of the Program Agreements, including, but not limited to, breaches of representations, warranties, or covenants.  The Reserve Bank has notified KServicing it has determined such events have occurred pursuant to the Default Notice.

C.      **SBA Direct Payment Processing**

14.     In September 2022, pursuant to its rights under the PPPLF Documents, the Reserve Bank initiated a change in the remittance procedures whereby the SBA will begin making payments on the Pledged PPPLF Loans directly to the Reserve Bank (the "**SBA Direct Payment Processing**").  Although the Debtors and the Reserve Bank initiated the SBA Direct Payment Processing prepetition, the coordination process remains ongoing with the SBA and the parties are still in the process of documenting an agreement. Once the SBA Direct Payment Processing is in

place, the Reserve Bank will receive payments on account of the Pledged PPPLF Loans directly from the SBA, but the Company will still receive, segregate, and remit borrower payments on account of the Pledged PPPLF Loans to the Reserve Bank.

15.     In connection with the SBA Direct Payment Processing, the Company and the Reserve Bank have been in discussions regarding the treatment of the Agreed Cash Amounts (as defined below).  Additionally, in connection with the SBA Direct Payment Processing, given the circumstances (including but not limited to, the SBA's inability to process multiple payments from one processing account, time sensitivity on account of upcoming guaranty purchase deadlines on 24-month PPP Loans, and technological changes that require testing), the Reserve Bank, and the Company, have agreed to direct all payments on account of both the Pledged PPP Loans and the KS PPP Loans to the Reserve Bank.  In turn, with respect to any KS PPP Loan Proceeds, the Reserve Bank agrees that: (w) the KS PPP Loans and the KS PPP Loan Proceeds are not proceeds of Pledged PPPLF Loans, (x) any KS PPP Loan Proceeds received by the Reserve Bank are property of the Debtors and shall be held in trust, exclusively for the benefit of the Debtors until such amounts are remitted to the Debtors pursuant to the terms of the Proposed Order, and (y) any KS PPP Loan Proceeds received by the Reserve Bank shall be remitted, without offset or recoupment, to the Debtors.  The Reserve Bank shall remit any KS PPP Loan Proceeds no later than seven (7) calendar days after receiving (i) such KS PPP Loan Proceeds and (ii) the KS PPP Loan Payment Report relating to such KS PPP Loan Proceeds with no discrepancies.

RLF1 28146913v.1

### Debtors' Proposed Use of Cash Collateral

16.    "Cash Collateral" constitutes: (a) all cash proceeds of the PPP Loans that comprise the PPPLF Collateral; (b) all cash held in any Synovus Servicing Account[7] other than (i) cash proceeds (if any) on account of KS PPP Loans[8] (which funds (if any) shall be promptly segregated from proceeds of the PPPLF Collateral) and (ii) any portion of the Additional Cash held in the Synovus Servicing Account, (b) all cash held in the Debtors' Primis Account[9] other than any portion of the Additional Cash; and (c) cash held as of the Petition Date or received thereafter in the Debtors' general operating accounts, disbursement-only accounts, and custody accounts as it relates to the PPP Loans that comprise the PPPLF Collateral or proceeds thereof.

17.    For purposes of the Cash Collateral Budget, the Cash Collateral available to the Debtors during the Budget Period shall be (x) amounts held by the Debtors in the Synovus Servicing Account and Primis Account as of the Petition Date, totaling $1,468,882; (y) payments that constitute Agreed Cash Amounts held by the Debtors as of the Petition Date totaling $631,854; and (z), without duplication of (x) and (y), amounts actually and subsequently paid to the Debtors after the Petition Date that in each case of (x) and (y) constitute Agreed Cash Amounts: (i) amounts actually paid by the SBA or the relevant PPP Borrower representing interest on any PPP Loans pledged as PPPLF Collateral that is in excess of 35 basis points per annum; (ii) without duplication of the amounts in (i), the "Excess Amounts,"[10] not to exceed $6,653,313 in the aggregate, which

---

[7] As defined in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management in the Ordinary Course of Business; and (II) Granting Related Relief* [Docket No. 12] (the "**Cash Management Motion**").

[8] As defined in the Cash Management Motion.

[9] As defined in the Cash Management Motion.

[10] For purposes of this subsection (ii), the "Excess Amount" for each "Inactive Loan" means any amount actually paid by the SBA or the relevant PPP Borrower on such PPP Loan following the Petition Date. The "Excess Amount" for each "Active Loan" means any amount actually paid by the SBA or the relevant PPP Borrower on such PPP Loan

constitute excess state and local tax amounts as agreed by the Debtors and the Reserve Bank ("**SALT**"); and (iii) without duplication of the amounts in (i), amounts actually paid by the SBA or the relevant PPP Borrower relating to principal and interest payments for each PPP Loan not to exceed $7,725,403 in the aggregate (where (i), (ii) and (iii) shall collectively constitute the "**Agreed Cash Amounts**"); *provided that* absent further prior written consent from the Reserve Bank, the aggregate total Cash Collateral available during the Budget Period, including in respect of any payments received from the Reserve Bank pursuant to Paragraph 18 hereunder, shall be the capped amount as set forth in the Cash Collateral Budget (the "**Cash Collateral Cap**"); *provided further that*, payments of amounts in (ii) would not be made until the Advances under the Program Agreements are indefeasibly repaid in full; *provided further* that, the Reserve Bank shall remit any Agreed Cash Amounts no later than seven (7) calendar days following (i) the receipt of such amounts by the Reserve Bank and (ii) the delivery of the PPPLF Reduction Report by the Debtors to the Reserve Bank on account of such amounts with no discrepancies.  With respect to PPP Loan payments received directly by the Reserve Bank from the SBA, the Reserve Bank shall remit any funds that constitute Agreed Cash Amounts up to the Cash Collateral Cap (less any Agreed Cash Amounts received directly and retained by the Debtors) consistent with the terms of the Cash Collateral Budget and the Proposed Order.

18.     Beginning in September 2022, the Debtors and the Reserve Bank engaged in extensive arms'-length negotiations regarding the terms and conditions of consensual use of Cash Collateral, culminating in the Proposed Order.  Following negotiations, the Debtors and the Reserve Bank have agreed upon an initial 13-week forecast set forth in the Cash Collateral Budget,

---

following the Petition Date after such payments are first applied to make a payment of (1) principal on the Advances in an amount equal to the "Net Balance Amount" for such PPP Loan, and (2) interest due and payable on the Advances related to such payment of principal.

which includes all reasonable and foreseeable expenses to be incurred by the Debtors for the applicable period.  As of the Petition Date, the Debtors had approximately $11 million of unrestricted cash on hand.  Given the Debtors are not generating cash throughout the Chapter 11 Cases, the Cash Collateral will provide the Debtors with incremental and necessary liquidity.

19.    If the Debtors are unable to access the Cash Collateral, they will be unable to continue servicing their loan portfolio, including servicing of the PPP Loans that are pledged as PPPLF Collateral, and will have to cease operations by abruptly transferring their servicing obligations to third parties in the immediate future.  Therefore, use of Cash Collateral is necessary to enable the Debtors to continue their ordinary course operations so that they can effectuate a value maximizing wind down for the benefit of all parties in interest.

## **Relief Requested Should be Granted**

### A.    **Use of Cash Collateral is Warranted and Should be Approved**

20.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that, a debtor may use cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363]." 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

21.    The Bankruptcy Code does not expressly define "adequate protection."  Section 361 of the Bankruptcy Code, however, provides a non-exhaustive list of examples of adequate protection, such as granting replacement liens and administrative priority claims. *See* 11 U.S.C. § 361.  Generally, courts decide what constitutes adequate protection on a case-by-case

basis. *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (*citing* 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

22.     In *Swedeland*, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland*, 16 F.3d at 564 (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *see also Shaw Indus., Inc. v. First Nat'l Bank of Pa. (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).

23.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code and should be authorized to use Cash Collateral.  As described above, the Debtors are providing the Reserve Bank with adequate protection in the form of, among other things: adequate protection liens, payment of professional fees, covenants (including working cooperatively with the Reserve Bank to identify potential third party loan servicers for the remaining PPP Loans that constitute PPPLF Collateral and to cooperate and reasonably assist in the transfer of the loan portfolio to a third-party servicer, and informational and reporting rights.

24.     Without access to Cash Collateral, the Debtors will be unable to continue operations that will maximize value for all parties in interest, including the borrowers of the PPP Loans.  In view of the fact that Cash Collateral is essential to ongoing operations and that the Reserve Bank has consented to the use thereof as provided in the Proposed Order, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

25.     The Debtors believe the adequate protection provided for in the Proposed Order is fair and reasonable under the circumstances, satisfies the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**B.      Proposed Carve-Out Is Reasonable and Appropriate**

26.     Any security interests or claims granted as Adequate Protection under the Proposed Order are subject to the Carve Out. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which such professionals may be paid in these Chapter 11 Cases may be restricted.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective

rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of fees of the Clerk of the Bankruptcy Court or the Office of the United States Trustee for the District of Delaware as well as fees of the Debtors' professionals and a statutory committee of unsecured creditors, if appointed.

**C.     Automatic Stay Should Be Modified on a Limited Basis**

27.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the liens described above to the Reserve Bank and to perform such acts as may be requested to assure the perfection and priority of such liens. Stay modifications of this kind are ordinary and standard features for the use of Cash Collateral, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.

**Bankruptcy Rule 4001(a)(3) Should Be Waived**

28.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As explained above and in the Rieger-Paganis Declaration, the use of Cash Collateral is essential to prevent irreparable damage to the Debtors' operations. Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

**Compliance with Bankruptcy Rule 6004(a)**
**and Waiver of Bankruptcy Rule 6004(h)**

29.     To implement the foregoing successfully, the Debtors request that the Court find

that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day

stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As

explained above and in the Rieger-Paganis Declaration, the relief requested herein is necessary to

avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify

finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to

grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice

requirements and such stay apply.

## Notice

30.     Notice of this Motion will be provided to (a) the Office of the United States

Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the

Debtors on a consolidated basis; (c) the Reserve Bank; (d) Customers Bank; (e) Cross River Bank;

(f) the United States Department of Justice; (g) the Federal Trade Commission; (h) the Small

Business Administration; (i) the Internal Revenue Service; (j) the Securities and Exchange

Commission; (k) the United States Attorney's Office for the District of Delaware; (l) all applicable

financial institutions (the "**Banks**") and (m) any party that is entitled to notice pursuant to Local

Rule 4001-2(c) (collectively, the "**Notice Parties**").  The Debtors believe that no further notice is

required.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: October 24, 2022
      Wilmington, Delaware

                */s/ Zachary I. Shapiro*
                RICHARDS, LAYTON & FINGER, P.A.
                Daniel J. DeFranceschi, Esq. (No. 2732)
                Amanda R. Steele, Esq. (No. 5530)
                Zachary I. Shapiro, Esq. (No. 5103)
                Matthew P. Milana, Esq. (No. 6681)
                One Rodney Square
                920 North King Street
                Wilmington, Delaware 19801
                Telephone: (302) 651-7700
                E-mail: defranceschi@rlf.com
                        steele@rlf.com
                        shapiro@rlf.com
                        milana@rlf.com

                *Proposed Attorneys for Debtors*
                *and Debtors in Possession*

                -and-

                WEIL, GOTSHAL & MANGES LLP
                Ray C. Schrock, P.C. (admitted *pro hac vice*)
                Candace Arthur (admitted *pro hac vice*)
                Natasha S. Hwangpo (admitted *pro hac vice*)
                Chase A. Bentley (admitted *pro hac vice*)
                 767 Fifth Avenue
                New York, New York 10153
                Telephone:    (212) 310-8000
                E-mail:        ray.schrock@weil.com
                            natasha.hwangpo@weil.com
                            chase.bentley@weil.com

                *Attorneys for Debtors*
                *and Debtors in Possession*