# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **KABBAGE, INC. d/b/a KSERVICING**, *et al.*, | : | **Case No. 22-10951 (CTG)** |
| | : | |
| | : | **(Jointly Administered)** |
| Debtors.[1] | : | Proposed Hearing Date:  Nov. 7, 2022 at 1:00 p.m. (ET) |
| | : | Proposed Obj. Deadline: Nov. 4, 2022 at 4:00 p.m. (ET) |

------------------------------------------------------------ x

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT AGREEMENT BETWEEN KSERVICING AND CUSTOMERS BANK AND (II) GRANTING RELATED RELIEF

Kabbage, Inc. d/b/a KServicing (the "**Company**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully move and represent as follows in support of this motion (this "**Motion**"):[2]

### Preliminary Statement

1.      By this Motion, the Debtors seek approval of a settlement (the "**Settlement Agreement**") that will resolve certain contractual disputes between the Company and Customers Bank ("**CB**" and, together with the Company, the "**Parties**") that arose in connection with the Parties' participation in the Paycheck Protection Program ("**PPP**") launched in April 2020 by the U.S. Small Business Administration (the "**SBA**") at the direction of Congress.  For more than 20 months the Company has attempted to recover approximately $65.5 million from CB on account of certain servicing and referral fees due to the Company and, in response, CB has alleged a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Deborah Rieger-Paganis in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 13] (the "**First Day Declaration**") or the Settlement Agreement (as defined below), as applicable.

number of claims against the Company in connection with the Company's performance of servicing obligations under the CB Agreements[3] (collectively, the "**Disputes**"). The Settlement Agreement reflects a comprehensive resolution of the various Disputes between the Parties and will result in the Company (i) recovering $58 million in outstanding fees, with an approximately $23 million cash infusion to the Debtors shortly upon and subject to approval of the Motion by the Court, (ii) receiving a release of potentially significant contingent and unliquidated claims asserted by CB against the Debtors and their estates, (iii) reaching an agreement with CB with respect to servicing obligations under applicable contracts, and (iv) ending the costs and expended resources attendant in protracted negotiations and litigation.

2.      The Settlement Agreement is a key step forward in the chapter 11 cases and reflects a reasonable exercise of the Debtors' business judgment. The proposed settlement provides critical liquidity necessary for the Debtors to administer the chapter 11 cases and effectuate an orderly wind down of their remaining Loan Portfolio for the benefit of all parties in interest. The Debtors commenced the chapter 11 cases with a proposed plan that describes two options for implementation and the determination of which option to pursue is dependent on the Debtors' ability to secure necessary funds from the Federal Reserve Bank of San Francisco (the "**Federal Reserve Bank**") and CB. The Debtors recently reached an agreement with the Federal Reserve Bank for use of cash collateral[4] and they now stand at the precipice of securing funds from CB through the Settlement Agreement, thus positioning themselves to put forward a more definitive plan and provide much needed clarity to their creditors. The proposed settlement with

---

[3] "**CB Agreements**" means, collectively, (i) the CB Processing and Servicing Agreement, dated April 27, 2020, as amended; (ii) the CB Sale and Servicing Agreement, dated February 2, 2021, as amended; and (iii) the CB SaaS Services Agreement, dated April 24, 2020, as amended.

[4] On October 24, 2022, the Debtors filed the *Motion of Debtors for Entry of Order (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to Secured Lender, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 143], scheduled to be heard on November 7, 2022.

2

CB is also in the best interests of the Debtors and their estates because it minimizes disruption to borrowers of PPP loans and it avoids the Debtors expending substantial time and costs that would be incurred in connection with any further litigation of the Disputes.  Accordingly, the Debtors respectfully submit that the relief requested by this Motion should be granted.

### Jurisdiction

3.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

4.       By this Motion, pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), (a) authorizing the Company's entry into that certain consensual Settlement Agreement, dated October 27, 2022, attached as **Exhibit 1** to the Proposed Order, by and between the Company and CB, and (b) granting related relief.

### Background

5.       On October 3, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue operating their business as debtors in possession

3

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Cases.

6.     The Debtors' cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

7.     On the Petition Date, the Debtors filed the *Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [Docket No. 14] (the "**Plan**").

8.     On October 5, 2022, the Debtors filed the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [Docket No. 63] (the "**Disclosure Statement**") in connection with the Plan.  The hearing on the adequacy of the Disclosure Statement is scheduled for November 21, 2022.

9.     On October 24, 2022, the Debtors filed a motion [Docket No. 143] (the "**Cash Collateral Motion**") seeking the consensual use of cash collateral in which the Federal Reserve Bank holds an interest.  The Cash Collateral Motion is scheduled to be heard at the Hearing.  The Cash Collateral Budget (as defined in the Cash Collateral Motion) is premised on approval of the Settlement Motion and receipt of the Settlement Payment (as defined below).

10.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the First Day Declaration.

## Facts Relevant to Settlement Agreement

### A.     CB Agreements

11.     The SBA launched the PPP on April 3, 2020, shortly after the U.S. government's initial directive under the Coronavirus Aid, Relief, and Economic Security Act to

4

distribute emergency funds to small businesses.  Within a week of the PPP launch, the Company

became an authorized PPP lender pursuant to an agreement with the SBA.  As part of its

participation in the PPP, the Company processed loan applications, originated PPP Loans, and now

services those PPP Loans, on behalf of itself and also in partnership with a number of financial

institutions, including CB.

12.    The Company participated in both rounds of the PPP—referred to herein as

"**Round 1**" and "**Round 2**", respectively:

     i.    Round 1 encompasses PPP Loans issued in the early stages of the PPP, from April 2020 through the remainder of 2020.  In Round 1, the Company partnered with the Federal Reserve Bank and both Partner Banks.

     ii.    Round 2 PPP Loans were issued in early-to-mid 2021.  In Round 2, the Company again partnered with the Federal Reserve Bank and CB but not Cross River Bank.

13.    Through their partnership in Round 1, CB and the Company originated

approximately $1.8 billion in PPP Loans (the "**Round 1 CB Loans**").  Pursuant to the CB

Agreements in place for Round 1, the Company earned approximately $47 million in servicing

fees, which were due shortly after origination of the Round 1 CB Loans.  These fees were timely

paid by CB.  After completing origination of Round 1 CB Loans, the Company and CB mutually

decided to extend their partnership into Round 2 and originated approximately $800 million in

new PPP Loans (the "**Round 2 CB Loans**" and, together with the Round 1 CB Loans, the "**CB

Loans**") beginning in January 2021.  The Company earned approximately $65.5 million of loan

referral and servicing fees upon the origination of the Round 2 CB Loans (collectively, the "**CB

Receivable**"); however, CB never paid those fees and asserted that nonpayment was on account

of alleged failures in the Company's processing of PPP Loans.

5

B.     **The Disputes**

14.     Notwithstanding CB's failure to remit the CB Receivable, the Company continued to service the CB PPP Loans.   In furtherance of mitigating the outstanding CB Receivable, the Company withheld certain amounts collected under the CB PPP Loans that would have otherwise been paid to CB absent its failure to pay for the Company's servicing.   For the avoidance of doubt, the Company's mitigation efforts have only had an impact on remittances to CB—the borrower accounts reflect receipt of collections from borrowers and, as such, the mitigation efforts had no impact on borrowers.   As of the Petition Date, the Debtors have withheld cash in an aggregate amount of approximately $34 million to offset the CB Receivable, comprised of: (i) origination fees due to CB, (ii) borrower collections on CB Loans, and (iii) CB funds related to cancelled or returned loans (the "**Company Withholding**").

15.     On May 25, 2022, the Company filed a complaint against CB for breach of contract in the District Court for the Northern District of Georgia (the "**CB Lawsuit**").   Shortly thereafter, the Parties entered into mediation.   On August 11, 2022, the Company and CB, together with their respective litigation counsel, attended the initial mediation in which the Parties engaged in potential settlement discussions.   On August 16, 2022, the Parties exchanged mediation statements and on August 23, 2022, mediation between the Parties continued.   Resolution was not achieved in the mediation and, thereafter, the Company and CB continued settlement discussions under the mediation framework in efforts to come to a mutual resolution.   On September 19, 2022, the Parties entered into a tolling agreement to continue settlement discussions without the burden of the court-imposed deadlines in the CB Lawsuit, and in connection therewith the Company filed a notice of dismissal of the CB Lawsuit without prejudice.

WEIL:\98805043\13\55894.0003

16.     After extensive, good faith, arm's-length negotiations, on October 27, 2022, the Company and CB memorialized the terms of an agreed upon settlement in the Settlement Agreement. The Settlement Agreement will enable the Debtors to consensually resolve the Disputes with one of its largest stakeholders, and provide the Debtors with sufficient liquidity to pursue an orderly wind down of its business.

### C.     Proposed Settlement Agreement

17.     The following table summarizes the key terms of the Settlement Agreement:[5]

| SUMMARY OF MATERIAL TERMS OF SETTLEMENT AGREEMENT | |
|---|---|
| **Effective Date** (Settlement Agreement Opening Recital) | • The Settlement Agreement shall be effective on the date on which the Bankruptcy Court approves the Settlement Agreement. |
| **Settlement Amount** (Settlement Agreement § 1(G)) | • $58 million in total, which shall be comprised of the Settlement Payment and the Disputed KServicing Holdbacks. |
| **Settlement Payment** (Settlement Agreement § 8) | • Within three (3) business days of the Effective Date, CB shall pay to the Company in immediately available funds an amount equal to the Settlement Payment.<br><br>• The Settlement Payment is expected to be approximately $23 million. |
| **Disputed KServicing Holdbacks** (Settlement Agreement §§ 1(C), 1(E)) | • "Disputed KServicing Fee Holdback" means the amount that constitutes SBA loan origination fees due to CB under the S&S Agreement. As of the Petition Date, CB contends that the Disputed KServicing Fee Holdback is approximately $8.3 million.<br><br>• "Disputed KServicing Remittance Holdback" means the amount that constitutes funds (i) collected from borrowers that the Company is required to remit to CB under the Original PSA and S&S Agreement, and (ii) held by CB on account of cancelled loans. For the avoidance of doubt, Disputed KServicing Remittance does not include any Borrower Overpayments. As of the Petition Date, CB contends that the Disputed KServicing Remittance Holdback is approximately $26.5 million. |
| **Reconciliation** (Settlement Agreement §§ 3(A)-(B)) | • Following the execution of the Settlement Agreement through the Effective Date, the Parties shall work together in good faith to promptly reconcile the amounts of the Disputed KServicing Fee Holdback and the |

[5] This summary of the Settlement Agreement is qualified in its entirety by the Settlement Agreement, as attached to the Proposed Order as Exhibit 1, and in the event of any inconsistency the Settlement Agreement shall govern. Capitalized terms used in this summary but otherwise not defined shall have the meaning ascribed to such terms in the Settlement Agreement.

| SUMMARY OF MATERIAL TERMS OF SETTLEMENT AGREEMENT | |
|---|---|
| | Disputed KServicing Remittance Holdback as of the Petition Date to determine the appropriate amount of the Settlement Payment. |
| **Servicing Plan** (Settlement Agreement §§ 4(A), 4(B), 4(C), 4(E), 4(F)) | • The Company agrees that it shall take commercially reasonable efforts to maintain the current levels of PPP Loan servicing with respect to the Remaining Loan Population from the Effective Date through the earlier of (i) March 31, 2023 and (ii) the date of transfer of the Company's servicing obligations to an alternative servicer acceptable in all respects to CB (the "Servicing Termination Date"). The Servicing Plan shall not govern servicing of the Remaining Loan Population after the Servicing Termination Date. <br><br> • The Company shall not be responsible for any incremental costs above its ordinary course operating expenses, including payroll, required to comply with its obligations under the Servicing Plan, associated with any transfer of the Company's servicing obligations for the Remaining Loan Population to an alternative servicer. <br><br> • The Company will provide CB with three (3) business days' notice of its intent to incur any third-party costs for which reimbursement by CB will be requested, during which period CB may, at its sole discretion, direct the Company to engage an alternative provider identified by CB at CB's expense. <br><br> • The Company shall provide to CB the Servicing Plan Reports described on Exhibit A of the Settlement Agreement. <br><br> • Beginning as of the Petition Date, the Company has and shall continue to deposit any and all borrower collections received on or after the Petition Date into a segregated account in the name of and for the benefit of CB and shall provide CB with the account information regarding the segregated account, shall hold such funds in trust for the benefit of CB, and shall promptly, but within ten (10) Business Days of the end of each month, or such other timing as mutually agreed upon in writing by the Parties, transfer all such funds to CB. <br><br> • CB shall not challenge the Servicing Plan or the sufficiency of the Servicing Information provided by the Company in support thereof. |
| **Communications to Borrowers** (Settlement Agreement § 6) | • CB shall have control over the timing and content of all communications to borrowers of CB PPP Loans regarding cancelation of the loans, tax liability regarding such cancelation, or any other aspect of resolving all or any portion of a CB PPP Loan which the SBA has at the time of the communication refused to recognize as a valid SBA PPP loan, and will use commercially reasonable efforts to provide advance notice to the Company of such communications, and the Company will use commercially reasonable efforts to facilitate such communications. Nothing in the Settlement Agreement shall affect the Company's ability to communicate with borrowers (i) as necessary to comply with its obligations in the Chapter 11 Case, and (ii) in the ordinary course of servicing the Remaining Loan Population. |

8

| SUMMARY OF MATERIAL TERMS OF SETTLEMENT AGREEMENT | |
|---|---|
| | • In no circumstances shall either Party's borrower communications (a) seek to disparage, blame, or allocate liability to the other for any action or inaction in connection with the Company's provision of loan processing services, or (b) result in any liability to the Company, including as a result of any mistakes in the content or delivery of such communications. |
| **Agreement Contingent on Bankruptcy Court Approval** (Settlement Agreement § 7) | • The Settlement Agreement is subject to approval by the Bankruptcy Court. |
| **Mutual Release** (Settlement Agreement § 9) | • Each Party agrees to release the other Party (inclusive of certain other related persons and entities, except that with respect to entities released by CB, American Express is expressly not included) and its affiliates from, and covenants not to sue the other Party for, any and all actual or potential actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or in equity, whether contractual, extra-contractual, in tort or otherwise, arising out of the Disputes, the Contracts or the PPP prior to the Effective Date; *provided, however*, that nothing in the Settlement Agreement shall constitute a release of the Parties' respective obligations under the Settlement Agreement. |
| **PSA Submission to SBA** (Settlement Agreement § 10) | • On account of the SBA's direction to the Parties to submit a new processing and servicing agreement for reconsideration, the Original PSA shall be submitted to the SBA and any restated agreement (the "**Restated PSA**") resulting from such submission shall not otherwise change, renew, or otherwise impact the respective Parties' rights, obligations, claims, defenses and legal positions. Any representations or warranties made in connection with the Restated PSA will continue to be made as of the date of the Original PSA or its constituent amendments was executed, and submission to the SBA of any other version of a processing and servicing agreement dated subsequent to the Original PSA, or any Restated PSA resulting therefrom, shall not constitute a bring-down of such representations or warranties |

18.    In their business judgment, the Debtors believe that the Settlement Agreement represents a fair and reasonable compromise that is in the best interests of the Debtors' estates and all stakeholders.  The Settlement Agreement provides the Debtors with sufficient liquidity to continue winding down its business and will avoid an "unfunded transaction" whereby on account of insufficient resources, the Debtors must pursue an expedited chapter 11 timeline,

9

reject its servicing contracts, and move to transfer servicing obligations as soon as possible. Although an expedited timeline is reasonable and arguably the only path forward if the Debtors lack sufficient liquidity, it will likely result in service disruptions and be to the detriment of borrowers and those parties that rely on the Company to service its respective loan portfolios.  In contrast, a "funded transaction" where each of the Debtors' key stakeholders has additional servicing time (throughout the duration of the chapter 11 cases) and sufficient wherewithal to prepare for the orderly transfer of their loan portfolios, is beneficial to all, including most importantly the borrowers.

19.    The Settlement Agreement also avoids the unnecessary expense and distraction of litigating the Disputes, as well as the associated uncertainty and delay at this critical juncture in the Debtors' Chapter 11 Cases.  The Debtors believe that the resolution of the Disputes will ultimately preserve estate resources and provide higher distributions to the Debtors' stakeholders.

20.    For all the reasons discussed herein, the Debtors believe the Settlement Agreement is critical to the success of these Chapter 11 Cases.  Accordingly, the Debtors seek (a) approval of the Settlement Agreement, and (b) authority for the Company to enter into the Settlement Agreement and implement its terms.

## Relief Requested Should Be Granted

### A.    The Settlement Agreement Is Appropriate under Bankruptcy Rule 9019 and Should Be Approved

21.    Bankruptcy Rule 9019(a) provides that on motion and after notice and a hearing, "the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a). Settlements are generally favored and encouraged in bankruptcy proceedings.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Will v. Northwestern Univ. (In re*

10

*Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."); *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) ("[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.") (alteration in original) (*quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

22.     The decision of whether to approve a particular settlement lies within the sound discretion of the bankruptcy court. *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).  In evaluating the settlement, the Court should consider whether "the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's Inc*., 211 B.R. 798, 801 (D. Del. 1997).  Importantly, the bankruptcy court's discretion should be exercised "in light of the general public policy favoring settlements." *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010).  In considering the merits of the settlement, a bankruptcy court does not need to be convinced that the settlement is the best possible outcome for the parties, rather the court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd sub nom. Pulver.com v. MediaLive Int'l, Inc. (In re Key3Media Grp., Inc.)*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).

23.     In determining whether a proposed settlement is fair, reasonable, and in the best interests of the estate, courts in this circuit consider the following four factors:  "(1) the

11

probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393; *see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *In re eToys, Inc.*, 331 B.R. 176, 198 (Bankr. D. Del. 2005). "The court must also consider 'all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.'" *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *Anderson*, 390 U.S. at 424). The Settlement Agreement is consistent with the objectives of chapter 11 and satisfies each of the *Martin* factors as described below.

a.  Probability of Success of Litigation. The likelihood of success in litigating the Disputes is uncertain with respect to cost and outcome. Such uncertainty would continue to distract the Debtors' management team from operating the business and divert necessary resources away from the Chapter 11 Cases. Having the benefit of certainty and prior agreement between the Company and CB is preferable to what could otherwise be, costly, time-consuming, and distracting litigation. Accordingly, the first *Martin* factor favors approval of the Settlement Agreement.

b.  Difficulties Associated with Collection. The Debtors reasonably determined that collection on account of a judgment obtained through litigating the Disputes could take significant time to realize. The Parties are early in the litigation process and additional papers and argument would need to be made prior to any judgments. Such review could delay not only the Debtors' ability to collect on a judgment, but also the Debtors' more basic need to wind down their estates. Accordingly, the second *Martin* factor favors approval of the Settlement Agreement.

c.  Complexity of Litigation and Attendant Expense, Inconvenience, and Delay. The Settlement Agreement puts an end to protracted lengthy disputes regarding the CB Receivable and the Company Withholding, and eliminates the possibility of future litigation in connection therewith. Further, the Disputes would create a complex case given the various claims, causes of action, and counterclaims asserted by the Parties, which are all disputed by the respective counterparties. Engaging in litigation related to the Disputes would cause significant delay of the administration of the Debtors' estates and result in significant legal expenses. Instead, the Settlement Agreement allows the Debtors to maximize value for their

12

estates and stakeholders by conserving their limited financial resources. Accordingly, the third *Martin* factor weighs heavily in favor of approval of the Settlement Agreement.

d.   Paramount Interest of Creditors.   The Settlement Agreement serves the paramount interests of creditors because, if approved, the Settlement Agreement will pave the way for the Debtors to proceed to confirmation of a plan of liquidation, and emerge from chapter 11 with adequate funding to wind down the business.   Approval of the Settlement Agreement will also eliminate a dispute with one of the Debtors' largest stakeholders, which will ultimately provide a higher distribution to the Debtors' creditors. Accordingly, the fourth *Martin* factor supports approval of the Settlement Agreement.

24.    As shown in the foregoing analysis of the *Martin* factors, the Debtors believe that the Settlement Agreement falls well above the lowest point in the range of reasonableness and for these reasons, the Settlement Agreement is in the best interests of the Debtors and their estates. Therefore, the Settlement Agreement should be approved pursuant to Bankruptcy Rule 9019(a).

**B.    Entry Into and Performance Under the Settlement Agreement is a Sound Exercise of the Debtors' Business Judgement**

25.    Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.   In addition, section 105(a) of the Bankruptcy Code offers the necessary authority to effectuate the provisions of section 363(b) and provides, in relevant part, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."   11 U.S.C. § 105(a).   To approve the use, sale, or lease of property outside the ordinary course of business, courts require only that a debtor "show that a sound business purpose justifies such actions."   *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *see also Myers v.*

13

*Martin (In re Martin)*, 91 F. 3d 389, 395 (3rd Cir. 1996); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

26.     The Debtors respectfully submit that there is a good business reason for the Settlement Agreement.  In particular, the Settlement Agreement represents a fair and reasonable compromise of the outstanding disputes among the Parties and will deliver significant value to the Debtors and their estates, which will inure to the benefit of stakeholders.  In the Debtors' business judgment, the Debtors believe the Settlement Agreement will be beneficial to the Chapter 11 Cases by providing the Debtors' and their estates with necessary funds to continue servicing the PPP Loans and to effectuate the wind down of the Debtors and their estates, and a fair opportunity to resolve any remaining issues within a constructive framework.  Coming to an agreement regarding the Disputes will ensure the Debtors know the extent of their liability with regard to the CB Agreements, while also allowing for operations to continue through the Debtors' wind down.

27.     Importantly, the Settlement Agreement is the result of extensive good-faith, arm's-length negotiations between sophisticated parties, each advised by competent and experienced counsel and other professionals.  The Settlement Agreement, if approved by the Court, will allow the Parties to resolve the Disputes between the Parties arising under various agreements, and avoid potentially costly, time-consuming, and distracting litigation.  Accordingly, the Debtors respectfully request that the Court enter the Proposed Order, and authorize the Company to enter into and perform under the Settlement Agreement as such action is a reasonable exercise of the Debtors' business judgment and in the best interest of their estates.  Moreover, the Settlement Agreement avoids the unnecessary expense and distraction of extensive and expensive litigation over the CB Receivable at this critical juncture in the Debtors' Chapter 11 Cases.

28.      Additionally, the Settlement Agreement provides for the exchange of consensual mutual releases between the Debtors and CB, and their respective affiliates, with respect to claims relating to or arising from the Disputes, and any liability in connection therewith. The releases granted in the Settlement Agreement serve as a bar to any of the Parties asserting any claim or cause of action released thereby.  Absent the mutual releases, which were negotiated by sophisticated Parties and their experienced professionals, the Parties would not have entered into the Settlement Agreement to resolve the Disputes.  The Bankruptcy Court should approve the mutual releases because they are a vital part of the overall agreement between the Parties and are (i) consensual, (ii) supported by adequate consideration, (iii) a necessary and integral part of the Settlement Agreement, (iv) given and made after extensive arm's-length negotiations, (v) in conformity with industry standards, and (vi) fair and equitable and in the best interests of the Debtors.  As a direct result of the mutual releases, the Debtors can conduct the Chapter 11 Cases in the most efficient manner possible without the threat of future costly litigation with CB, and with a newfound certainty as to their path to exit chapter 11.

29.      Accordingly, the Debtors respectfully request that the Court enter the Proposed Order, and authorize the Company to enter into and perform under the Settlement Agreement as such action is a reasonable exercise of the Debtors' business judgment and in the best interest of their estates.

### **Request for Bankruptcy Rule 6004 Waivers**

30.      The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), to the extent applicable.  The relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the

15

notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

### Reservation of Rights

31.    The Debtors reserve all rights in connection with the Settlement Agreement, including any claims, equitable remedies, causes of action, or otherwise, and any right of estoppel if the Settlement Agreement is not approved or otherwise does not become effective.  Nothing contained in this Motion or any actions taken by the Debtors and CB pursuant to the relief granted is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, or (ii) a waiver or limitation of the Parties' rights under the CB Agreements; the Bankruptcy Code; and other applicable law, including, but not limited to, with respect the chapter 11 plan of liquidation, except as agreed to under the Settlement Agreement.

### Notice

32.    Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Federal Reserve Bank; (d) Customers Bank; (e) Cross River Bank; (f) the United States Department of Justice; (g) the Federal Trade Commission; (h) the Small Business Administration; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the United States Attorney's Office for the District of Delaware; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors believe that no further notice is required.

WEIL:\98805043\13\55894.0003

**<u>No Prior Request</u>**

33.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[remainder of page intentionally left blank]*

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: October 27, 2022
Wilmington, Delaware

/s/ Zachary I. Shapiro
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
            steele@rlf.com
            shapiro@rlf.com
            milana@rlf.com

*Proposed Attorneys for Debtors
and Debtors in Possession*

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
E-mail:        ray.schrock@weil.com
               candace.arthur@weil.com
               natasha.hwangpo@weil.com
               chase.bentley@weil.com

*Attorneys for Debtors
and Debtors in Possession*

18