**Exhibit 1**

**Revised Order**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
KABBAGE, INC. d/b/a KSERVICING, et al., : Case No. 22-10951 (CTG)
                                         :
                                         :
           Debtors.¹                     :    (Jointly Administered)
                                         :
                                         :    Re: Docket No. 143
                                         :
------------------------------------------------------------x
```

### ORDER UNDER 11 U.S.C. §§ 105, 361, 362, AND 363, AND BANKRUPTCY RULES 2002, 4001, 6004, AND 9014 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION TO SECURED LENDER

This matter is before the Court pursuant to the motion (the "Motion")[2] filed by Kabbage, Inc. d/b/a KServicing ("KServicing") and its Debtors affiliates, as Debtors and Debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), pursuant to sections 105, 361, 362 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other relief, the entry of an order (this "Order"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

(i)    authorizing the Debtors to use the Cash Collateral (as defined below) as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein effective as of the entry of the Order;

(ii)    subject to the Carve-Out, granting and affirming the adequate protection being given to the Federal Reserve Bank of San Francisco (the "Reserve Bank") with respect to Indebtedness (as defined below) owed under the Paycheck Protection Program Liquidity Facility (the "PPPLF") pursuant to (a) that certain Paycheck Protection Program Liquidity Facility Letter of Agreement (the "Letter of Agreement"), dated May 12, 2020 (as amended January 14, 2021), by and among KServicing and the Reserve Bank, and (b) the Federal Reserve's Operating Circular No. 10, effective July 16, 2013 (the "Operating Circular" and, together with the Letter of Agreement, the "Program Agreements"); and

(iii)    modifying the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h).

The Court having held a hearing on November 7, 2022 (the "Hearing") to consider the entry of this Order approving the Motion pursuant to Bankruptcy Rule 4001(b)(2), and having found that notice of the Motion and Hearing was provided as authorized by Bankruptcy Rule 4001(b)(3); and the Court having heard and resolved or overruled any and all objections to the relief requested in the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates (the "Estates"), and creditors; and upon the record herein and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.    <u>Petition Date</u>.  On October 3, 2022 (the "<u>Petition Date</u>"), the Debtors commenced this chapter 11 case (the "<u>Chapter 11 Case</u>") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").  The Debtors operates their business and manage their affairs as a Debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "<u>Creditors' Committee</u>") has been appointed in the Chapter 11 Case.

B.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over the Chapter 11 Case, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  The Court is a proper venue for the Chapter 11 Case and this Motion under 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>.  The Hearing was held pursuant to Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2(c).  Notice of the Motion and of the Hearing was given by the Debtors on October 24, 2022 (Docket No. 143).  Notice of the Motion was provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (iii) the Reserve Bank; (iv) Customers Bank; (v) Cross River Bank; (vi) the United States Department of Justice; (vii) the Federal Trade Commission; (viii) the Small Business Administration; (ix) the Internal Revenue Service; (x) the Securities and Exchange Commission; (xi) the United States Attorney's Office for the District of Delaware; (xii) the Banks; and (xiii) any party that has requested notice pursuant to Bankruptcy

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, and vice versa, pursuant to Bankruptcy Rule 7052.

Rule 2002, in each case by telecopy, email, overnight courier, and/or hand delivery and otherwise in accordance with Local Rule 9013(m) (together the "Notice Parties"). Notice of the Hearing and the relief requested in the Motion has been provided as authorized by Bankruptcy Rule 4001(b) and (d).

D.    Acknowledgments and Stipulations. Subject only to the rights of parties in interest specifically set forth in Paragraph 21 of this Order, in exchange for and as a material inducement for the Reserve Bank to agree to the relief sought herein, the Debtors acknowledge, represent, stipulate and agree as follows:

(i)    KServicing services a series of Paycheck Protection Program loans (the "PPP Loans") which are pledged as Collateral (as defined in the Operating Circular) for the Obligations (as defined in the Operating Circular) under the Program Agreements (including any proceeds and offspring of such Collateral, the "PPPLF Collateral") and are guaranteed by the U.S. Small Business Administration ("SBA").

(ii)    KServicing admits that, as of the Petition Date, KServicing was justly and lawfully liable to the Reserve Bank (x) in the aggregate principal amount of approximately $536,450,940 in respect of outstanding Advances under the Program Agreements, *plus* (y) accrued and unpaid interest and costs and expenses including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements and other obligations owing under the Program Agreements (collectively, the "Indebtedness").

(iii)    KServicing's Obligations under the Program Agreements are secured by the Reserve Bank's valid perfected first priority lien (the "Prepetition Lien") upon and in all of the PPPLF Collateral.

4

(iv)    Any payments to the Reserve Bank made on account of the Program Agreements before the Petition Date were (a) payments on account of the PPPLF Collateral or (b) otherwise not subject to any avoidance, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), recoupment, counterclaim, or defense (including, without limitation, under sections 105, 506, 510, 544, 547, 548, 549, 550, 552, and/or 553 of the Bankruptcy Code).

(v)    (a) all of the cash in the Debtors' Synovus Servicing Account[4] other than (1) cash proceeds (if any) on account of KS PPP Loans[5] (which funds (if any) shall be promptly segregated from proceeds of the PPPLF Collateral) and (2) any portion of the Additional Cash (as defined herein) held in the Synovus Servicing Account, (b) all of the cash in the Debtors' Primis Account[6] other than any portion of the Additional Cash and (c) all payments and proceeds received in respect of the PPP Loans that constitute PPPLF Collateral, wherever held, constitute PPPLF Collateral and Cash Collateral of the Reserve Bank, subject to the reservation of rights as set forth in Paragraph 19 herein.

(vi)    All outstanding Obligations under the Program Agreements to the extent under-secured shall at all times be entitled to priority treatment under section 507(a)(2) of the Bankruptcy Code (the "Reserve Bank Priority Claim") and shall have priority over any and all unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever.

---

[4] As defined in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management in the Ordinary Course of Business; and (II) Granting Related Relief* [Docket No. 12] (the "Cash Management Motion").

[5] As defined in the Cash Management Motion.

[6] As defined in the Cash Management Motion. The Primis Account is a correspondent bank account established in connection with the KServicing's participation in the PPPLF.

The Reserve Bank Priority Claim shall survive any conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or the dismissal of the Chapter 11 Case.

(vii)    In (a) making the decision to make the loans and financial accommodations under the Program Agreements, (b) administering the loans and financial accommodations extended under the Program Agreements, (c) making the decision to collect upon the indebtedness and Obligations of the Debtors, (d) cooperating in the Debtors' efforts toward the winddown of their operations in an orderly manner, or (e) otherwise engaging in transactions and communications with the Debtors, in each case prior to the entry of the Order, the Reserve Bank shall not by reason thereof be considered to have been or be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law or regulation, including, without limitation, any environmental law, any labor law, or any other statute, regulation, or doctrine.

(viii)   The Obligations are secured by valid, binding, enforceable, duly perfected and unavoidable security interests in and liens on the PPPLF Collateral, and the Obligations and Program Agreements and the security interests granted in respect thereof are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual, or otherwise), claims, counterclaims, cross claims, offsets, recoupment, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(ix)    The Debtors have waived, discharged, and released any right they may have to challenge the Obligations underlying the Program Agreements or the liens on the PPPLF Collateral, or to assert any offsets, recoupment, defenses, claims, objections, challenges, avoidance actions, causes of action, and/or choses of action against the Reserve Bank, with respect to their

6

obligations under the Program Agreements, the liens on the PPPLF Collateral, or any other matters arising therefrom or relating thereto.

E.     _Cash Collateral_.  For purposes of this Order, the term "_Cash Collateral_" shall mean all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the Reserve Bank holds a lien, security interest, or other interest, whether existing on the Petition Date, arising pursuant to this Order, or otherwise, namely:

(i)     all cash proceeds of the PPP Loans that comprise the PPPLF Collateral;

(ii)     (a) all cash held in any Synovus Servicing Account other than (1) cash proceeds on account of KS PPP Loans[7] (which funds shall be promptly segregated from proceeds of the PPPLF Collateral), (2) any portion of the Additional Cash held in the Synovus Servicing Account, and (b) all cash held in the Primis Account other than any portion of the Additional Cash held in the Primis Account; and

(iii)     cash held as of the Petition Date or received thereafter in the Debtors' general operating accounts, disbursement-only accounts, and custody accounts as it relates to the PPP Loans that comprise the PPPLF Collateral or proceeds thereof;

The Debtors represent and stipulate that all of the Debtors' cash, cash equivalents, deriving from the above-mentioned accounts as it relates to the PPPLF Collateral, constitute Cash Collateral.

F.     _Use of Cash Collateral_.  The terms of the use of Cash Collateral pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute fair consideration.  Good and sufficient cause has been shown for entry of this Order.  The Debtors have a need to use a portion of the Cash Collateral, in

---

[7] As defined in the Cash Management Motion.

accordance with the terms and limitations set forth herein, to operate their business and effectuate an organized wind-down of their business, which will be used in accordance with the terms of this Order and consistent with the Cash Collateral Budget subject to any Permitted Variance. The Debtors intend to use Cash Collateral for general corporate purposes, including to service loans and pay related fees and expenses associated with the administration of the Chapter 11 Case, which will aid in an efficient wind-down of the Debtors' business. The adequate protection provided herein is consistent with and authorized by the Bankruptcy Code and adequately protects the Reserve Bank's interests in the PPPLF Collateral. The Debtors will not have sufficient sources of working capital to operate their business in the ordinary course of business, including to service the PPP Loans that are pledged as PPPLF Collateral, throughout the Chapter 11 Case without authorized use of Cash Collateral. Absent authorization to use Cash Collateral, the Debtors, their Estates, their creditors, and the borrowers of the PPP Loans would suffer immediate and irreparable harm.

G.    <u>Cash Collateral Budget</u>. The Reserve Bank is willing to consent to the Debtors' use of Cash Collateral solely in accordance with the Cash Collateral Budget (as defined herein) as set forth in Paragraph 2 herein (as such budget may be modified from time to time by the Debtors upon prior written consent as set forth in this Order, the "<u>Cash Collateral Budget</u>"), including the limited use of the Cash Collateral as provided in the Cash Collateral Budget during the Budget Period (as defined herein), solely upon the protections, terms and conditions provided for in this Order.

H.    <u>Adequate Protection</u>. The Reserve Bank shall receive, pursuant to sections 361 and 363(e) of the Bankruptcy Code, adequate protection in the form of:

(i)    the Debtors working cooperatively with the Reserve Bank to timely implement direct payments from the SBA to the Reserve Bank on all PPP loans constituting PPPLF Collateral by November 7, 2022 (or as soon as practicable thereafter solely to the extent that such delay is solely on account of any action or inaction by the SBA) including, but not limited to, (a) delivering written instructions to the SBA to direct all payments on KS PPP Loans to the Reserve Bank and (b) delivering a list to the Reserve Bank of all the KS PPP Loans, in each case, in a form and manner reasonably acceptable to the Reserve Bank.

(ii)    the Debtors not, at any point, depositing or maintaining proceeds of the PPPLF Collateral in any other account, and if such funds are received in any other account, KServicing immediately (within one business day) remitting such funds to the Reserve Bank or to the Synovus Servicing Account for the sole benefit of the Reserve Bank or another segregated bank account satisfactory to the Reserve Bank.

(iii)    the Debtors shall provide weekly reporting (including bank balances) on all amounts in the Synovus Servicing Account, including whether any payments in connection with KS PPP loans have been deposited in, or transferred from, the Synovus Servicing Account.

(iv)    the Debtors continuing to service the PPP Loans constituting PPPLF Collateral in the ordinary course in accordance with the Program Agreements and remitting all payments received to the Reserve Bank weekly, subject to the terms hereof, including Paragraph 19 hereof.

(v)    subject to the receipt of underlying reports and data from the SBA, the Debtors deliver to the Reserve Bank on Monday of each week (a) PPPLF reduction reports ("PPPLF Reduction Reports") and (b) a list of KS PPP Loans on which SBA has made payments

and, for each such loan, the amount paid by the SBA during the prior week ("KS PPP Loan Payment Report"), in each case, in a form and manner acceptable to the Reserve Bank.

(vi)     the Debtors working cooperatively with the Reserve Bank to identify potential third party loan servicers for the remaining PPP Loans that constitute PPPLF Collateral and cooperate and reasonably assist in the transfer of the loan portfolio to a third-party servicer; subject to the parties determining the costs of such transfer and how such costs to effectuate such transfer shall be borne.

(vii)     the Debtors not granting any liens or security interests with respect to the PPPLF Collateral.

(viii)     the Debtors obtaining the consent of the Reserve Bank (such consent not to be unreasonably withheld, conditioned, or delayed) with respect to any settlement with Cross River Bank, Customers Bank, or any non-governmental party.

(ix)     the Debtors providing to the Reserve Bank (a) any accounting or financial disclosures provided to the U.S. Department of Justice ("DOJ") and/or the Borrower's Depository Institution (as defined in the Letter of Agreement), or any successor thereof, and (b) any additional reporting with respect to the PPPLF Collateral and the Debtors' administration of the processing of PPP Loans in connection therewith as may be reasonably requested by the Reserve Bank from time to time.

(x)     to the extent not included in (ix), the Debtors providing the Reserve Bank with a weekly report of their cash balances including both PPP Loan proceeds that constitute PPPLF Collateral as well as other cash through to the earlier of (x) the closing of the Chapter 11 Case or (y) if applicable, the date on which all Indebtedness has been indefeasibly paid in full;

*provided* that weekly reporting of borrower payment remittances due to Cross River Bank or Customers Bank shall not be provided to the Reserve Bank.

(xi)    the Debtors providing real-time weekly reporting to the Reserve Bank on all payments to the Debtors or their affiliates from the SBA, recipients of the PPP Loans (the "PPP Borrowers") or any other source with regard to the PPP Loans that constitute PPPLF Collateral.

(xii)    the Debtors' payment of the Reserve Bank's professional fees in the amounts not to exceed the amounts set forth in the Cash Collateral Budget and solely from the Cash Collateral, of each of (i) Cleary Gottlieb Steen & Hamilton LLP, (ii) Young Conaway Stargatt & Taylor, LLP, and (iii) Chilmark Partners LLC in connection with the Chapter 11 Case (collectively, the "Reserve Bank Professional Fees"), subject to reasonableness review solely as set forth in this Order.[8]

(xiii)    the Debtors granting to the Reserve Bank valid perfected first priority replacement liens on all of the Debtors' unencumbered property and assets owned or held as of the Petition Date and all property acquired or obtained after the Petition Date, and junior liens on all of the Debtors' property and assets encumbered as of the Petition Date, subject to and limited to the extent of any diminution in value, which may result from the Debtors' use of Cash Collateral; *provided* that such replacement liens shall not apply to any borrower payment remittances made in accordance with the Partner Bank Agreements[9] due to Cross River Bank or Customers Bank; *provided* further that nothing herein shall limit the Debtors' right to seek recharacterization of adequate protection as being applied to the Obligations.

---

[8]  Nothing in this Order limits or waives the Reserve Bank's right to assert a claim for any unpaid professional fees that are owed under the PPPLF.

[9]  As defined in the *Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations* [Docket No. 11].

(xiv)   Entry of this Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' business and enhance the prospects of a successful chapter 11.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.    <u>Disposition</u>.  The Motion is granted on the terms set forth in this Order.  Any objection to the relief sought in the Motion that has not previously been withdrawn or resolved is hereby overruled on its merits.

2.    <u>Authorization for Use of Cash Collateral</u>.  Subject to the terms and conditions of this Order, including the Cash Collateral Cap established under Paragraph 4, and upon entry of this Order, the Debtors are hereby authorized to use the Cash Collateral in accordance with the terms, conditions, and limitations set forth in this Order, during the period beginning on the date of entry of this Final Order until the occurrence of the Termination Date (as defined below) (the "<u>Budget Period</u>"), subject to the terms and conditions of this Final Order and in accordance with the 13-week budget attached as **<u>Exhibit 1</u>** to this Final Order (the "<u>Initial Budget</u>," as such budget may be extended or modified from time to time in accordance herewith, the "<u>Cash Collateral Budget</u>"); *provided* that for each rolling four-week testing period, with the first such period beginning with the week in which this Final Order is entered and ending four weeks thereafter (and each week thereafter) (each four-week period, a "<u>Testing Period</u>"), the actual disbursements for the line items labeled: "Operating Expenses (Incl. Payroll)," "Insurance (Incl. Incremental D&O)," and "Taxes" (together the "<u>Tested Disbursement Line Items</u>") of the Debtors for such Testing Period on an aggregate basis shall not be greater than 115% of the amount estimated therefore set

forth in the Budget for such period (such percentage, a "Permitted Variance").    No later than

Friday of the fourth week covered by the Initial Budget (and every fourth week after), the Debtors

shall provide to the Reserve Bank a proposed updated 13-week cash flow forecast, substantially in

the form of the Initial Budget, which updated Budget shall only become the Budget upon the prior

express written consent of the Reserve Bank to be granted in its sole discretion (but shall not be

required to be filed with the Court); *provided*, that if the Reserve Bank does not object to the

proposed updated 13-week cash flow forecast by the following Friday or such later time as agreed

to by the Debtors and the Reserve Bank, the updated Budget shall become the Budget.    Further, on

Wednesday of each calendar week, the Debtors shall provide the Reserve Bank, Chilmark Partners

LLC, and Cleary Gottlieb Steen & Hamilton LLP with a variance report comparing, on an

aggregate and line item basis, actual results for the previous individual week and cumulative

preceding weeks (up to four consecutive weeks) to the amounts set forth in the Budget for such

periods.  Each variance for Tested Disbursement Line Items in excess of 5% shall be accompanied

by a qualitative explanation.  The expenditures authorized in the Cash Collateral Budget shall be

adhered to on a line-by-line basis, on a cumulative basis during the Budget Period (i.e. unused

amounts shall carry forward to successive weeks on a line-by-line basis), with no carry-over

surplus to any other line item(s) or to a subsequent budget period, if any, except to the extent

agreed to in writing as set forth in this paragraph.  The Reserve Bank may, in its sole discretion,

agree in writing to the use of Cash Collateral in a manner or amount which does not conform to

the Cash Collateral Budget (each such use of Cash Collateral, a "Non-Conforming Use").  If such

written consent is given, the Debtors shall be authorized pursuant to this Order to expend Cash

Collateral for such Non-Conforming Use without further Court approval, and the Reserve Bank

shall be entitled to all of the protections specified in this Order for any such Non-Conforming Use.

3.      Approved Budget.  Cash Collateral used pursuant to this Order shall be used by the

Debtors only in accordance with the Cash Collateral Budget and this Order.

4.      Scope of the Cash Collateral.  For purposes of the Cash Collateral Budget, the Cash

Collateral available to the Debtors during the Budget Period shall be (a) amounts held by the

Debtors in the Synovus Servicing Account and Primis Account as of the Petition Date, totaling

$1,468,882 ("Additional Cash");[10] and (b)(x) payments that constitute Agreed Cash Amounts (as

defined herein) held by the Debtors as of the Petition Date totaling $631,854; and (y), without

duplication of (a) or (b)(x), amounts actually and subsequently paid to the Debtors after the Petition

Date that in each case of (x) and (y) constitute Agreed Cash Amounts (as defined in this

paragraph): (i) amounts actually paid by the SBA or the relevant PPP Borrower representing

interest on any PPP Loans pledged as PPPLF Collateral that is in excess of 35 basis points per

annum; (ii) without duplication of the amounts in (i), the "Excess Amounts,"[11] not to exceed

$6,611,980 in the aggregate, which constitute excess state and local tax amounts as agreed by the

Debtors and the Reserve Bank ("SALT"); and (iii) without duplication of the amounts in (i),

amounts actually paid by the SBA or the relevant PPP Borrower relating to principal and interest

payments for each PPP Loan not to exceed $7,725,403 in the aggregate (where (i), (ii) and (iii)

shall collectively constitute the "Agreed Cash Amounts"); *provided that* absent further prior

written consent from the Reserve Bank, the aggregate total Cash Collateral available during the

---

[10] Without limiting the Debtors' rights to use such amounts in accordance with the terms of this Order, the Debtors
and the Reserve Bank each reserve their rights with respect to whether the Additional Cash constitutes Cash
Collateral and PPPLF Collateral.

[11] For purposes of this subsection (ii), the "Excess Amount" for each "Inactive Loan" means any amount actually paid
by the SBA or the relevant PPP Borrower on such PPP Loan following the Petition Date. The "Excess Amount" for
each "Active Loan" means any amount actually paid by the SBA or the relevant PPP Borrower on such PPP Loan
following the Petition Date after such payments are first applied to make a payment of (1) principal on the Advances
in an amount equal to the "Net Balance Amount" for such PPP Loan, and (2) interest due and payable on the
Advances related to such payment of principal.

Budget Period, including in respect of any payments received from the Reserve Bank pursuant to Paragraph 18 hereunder, shall be the capped amount as set forth in the Cash Collateral Budget (the "Cash Collateral Cap"); *provided further that*, remittances of amounts in (ii) would not be made until the Advances under the Program Agreements are indefeasibly repaid in full; *provided further that*, the Reserve Bank shall remit any Agreed Cash Amounts no later than seven (7) calendar days following (1) the receipt of such amounts by the Reserve Bank and (2) the delivery of the PPPLF Reduction Report by the Debtors to the Reserve Bank on account of such amounts with no discrepancies.  Any such Agreed Cash Amounts remitted to the Debtors shall be segregated and held in the Synovus Servicing Account until such time that any such Agreed Cash Amounts is required to be used by the Debtors, in accordance with the Budget, Cash Collateral Cap and this Order.  With respect to PPP Loan payments received directly by the Reserve Bank from the SBA, the Reserve Bank shall remit any funds that constitute Agreed Cash Amounts up to the Cash Collateral Cap (less any Agreed Cash Amounts received directly and retained by the Debtors consistent with the terms of the Cash Collateral Budget and this Order.

5.      Adequate Protection for the Reserve Bank.  The Reserve Bank submits that Adequate Protection, in accordance with Paragraph H hereunder, is required to avoid a diminution of value of its PPPLF Collateral, if any; the Debtors (on their own behalf and on behalf of their Estates) reserve the right to contest the Reserve Bank's position with respect to potential diminution in value, and by this Order the Court makes no findings with respect to diminution in value, if any; however, as a compromise and settlement, to address any potential diminution in value, the Reserve Bank is hereby granted the following (which shall be referred to collectively as the "Adequate Protection Rights"):

a.      _Adequate Protection Payments_.   Pursuant to sections 361(1) and 363(e) of the Bankruptcy Code, the Debtors shall pay, transfer, or otherwise convey from the Cash Collateral to the Reserve Bank adequate protection payments in the form of all Reserve Bank Professional Fees in the amounts not to exceed the amounts set forth in the Cash Collateral Budget incurred before or after the Petition Date in connection with the Program Agreements, as provided in this Order, subject to the procedures set forth in Paragraph 22 herein.

b.      _Replacement Liens_.   As further adequate protection against, and limited to the extent of, any diminution in value, the Reserve Bank is hereby granted, subject and subordinate to the Carve-Out, replacement liens on all of the Debtors' unencumbered property and assets owned or held as of the Petition Date and all property acquired or obtained after the Petition Date, including, without limitation, proceeds of claims and causes of actions arising under chapter 5 of the Bankruptcy Code, and junior liens on all of the Debtors' property and assets encumbered as of the Petition Date; _provided_ that such replacement liens shall not apply to any borrower payment remittances due to Cross River Bank or Customers Bank.   Notwithstanding anything to the contrary set forth in this Order, the liens granted to the Reserve Bank in this Order shall not prime the liens, if any, that exist in favor of Synovus Bank pursuant to the agreements governing the Debtors' accounts with Synovus Bank (as described in the _Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management in the Ordinary Course of Business; and (II) Granting Related Relief_ [Docket No. 12]) and otherwise applicable law; _provided that_, for purposes of the replacement liens granted to the Reserve Bank in this Order, any such liens in favor of Synovus Bank shall be limited to cash in the Main Operating Account (as defined in the Cash Management Motion); _provided further_, that for the

16

avoidance of doubt, any such liens in favor of Synovus Bank shall not attach to any amounts that are not property of the Debtors' estate.  For the avoidance of doubt, the Reserve Bank's existing liens will attach to any proceeds or offspring of the PPPLF Collateral, pursuant to section 552 of the Bankruptcy Code.

        c.    <u>Other Adequate Protections</u>.  The Debtors also agree to provide the Adequate Protections in accordance with Paragraph H hereof.

        6.    <u>Survival of Adequate Protection Rights</u>.  The Adequate Protection Rights shall continue in the Chapter 11 Case and in any successor case under the Bankruptcy Code (a "<u>Successor Case</u>"), and shall be and remain valid and enforceable (i) against any chapter 11 trustee appointed in the Chapter 11 Case, (ii) against any chapter 7 trustee appointed in a Successor Case, (iii) against any other representative of the Debtors' estates or any assignee of assets or rights of the Debtors' estates, and (iv) upon any conversion or dismissal of the Chapter 11 Case or any Successor Case; and all security interests shall maintain their perfected status and respective priority as provided in this Order until the Adequate Protection obligations have been indefeasibly paid in full in cash and satisfied.

        7.    <u>Restrictions on Use of Cash Collateral</u>. Notwithstanding anything to the contrary in this Order, no PPPLF Collateral (including, without limitation, Cash Collateral) may be used to request authorization from the Court to obtain any postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code without the consent of the Reserve Bank or with respect to the investigation or the prosecution of the validity, perfection, enforceability, and extent of the Obligations and valid perfected first priority liens in the PPPLF Collateral or any potential claims of the Debtors' estates against the Reserve Bank in respect of the Program Agreements, or any other claims, causes of action, or defenses under chapter 5 of the

Bankruptcy Code or any other claims and causes of action, in each case in respect of the Program Agreements.

8.    <u>Carve-Out</u>.  Any security interests or claims granted herein as Adequate Protection shall be subject in all respects and subordinate to the Carve-Out.  "<u>Carve-Out</u>" shall mean the sum, without duplication, of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final compensation order, all unpaid fees and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "<u>Debtors Professionals</u>") and the Creditors' Committee (the "<u>Committee Professionals</u>" and, together with the Debtors Professionals, the "<u>Professional Persons</u>") appointed in the Chapter 11 Case pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day after delivery by the Reserve Bank of a Carve-Out Trigger Notice (defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and without regards to whether such fees and expenses are provided for in the Cash Collateral Budget; and (iv) Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the Reserve Bank, as applicable, of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (iv), the "<u>Post-Carve-Out Trigger Notice Cap</u>"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Reserve

Bank, to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post- Carve-Out Trigger Notice Cap has been invoked.

a.      The Debtors shall establish a segregated trust account not subject to the control of any party, including the Reserve Bank (the "Professional Fee Reserve Account") for the sole purpose of paying unpaid Professional Fees.  The Debtors shall, by no later than the end of the calendar week in which this Order is entered, transfer from cash on hand into the Professional Fee Reserve Account, the Professional Fees set forth in the Cash Collateral Budget for the preceding calendar week into the Professional Fee Reserve Account, provided that the Debtors' obligations to pay Professional Fees shall not be limited or deemed limited to funds held in the Professional Fee Reserve Account. The Professional Fee Reserve Account (including any and all funds held therein) shall not be property of the Debtors' estates and shall not be subject to the control of any party, but shall be held in trust exclusively for the benefit of Professional Persons.  Professional Fees shall be first paid from the Professional Fee Reserve Account.  Notwithstanding the foregoing, the Reserve Bank shall retain a residual interest in the Professional Fee Reserve Account (and any funds therein) to the extent such funds are not used to pay Professional Fees under the terms of this Order.

b.      On the day on which a Carve-Out Trigger Notice is given by the Reserve Bank to the Debtors with a copy to counsel to the Committee (the "Carve-Out Trigger Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash in the Professional Fee Reserve Account, and, to the extent there are remaining unpaid Professional Fees following the depletion of the Professional Fee Reserve Account, cash on hand as of such date and

any available cash thereafter held by any Debtors to increase the Professional Fee Reserve Account in an amount equal to the then unpaid amounts of the Professional Fees *plus* the Post-Carve-Out Trigger Notice Cap; *provided* that for the avoidance of doubt, (i) Post-Carve-Out Trigger Notice Cap amounts shall be available only for payment of Professional Fees accrued after the Carve-Out Trigger Declaration Date, and (ii) "available cash," with respect to proceeds of PPPLF Collateral, shall consist only of Agreed Cash Amounts held as of the Petition Date or actually received by the Debtors after the Petition Date and prior to the Carve-Out Trigger Declaration Date. The Debtors shall hold such amounts in trust to pay such Professional Fees prior to any and all other claims. Notwithstanding anything to the contrary in this Order, following delivery of a Carve-Out Trigger Notice, the Reserve Bank shall not foreclose on cash held by the Debtors (or KS PPP Loan proceeds held by the Reserve Bank in trust to be remitted to the Debtors pursuant to Paragraph 20 herein) until the Professional Fee Reserve Account has been fully funded in the total amount of outstanding Professional Fees as of the Carve-Out Trigger Declaration Date *plus* the Post-Carve-Out Trigger Notice Cap.  Further, notwithstanding anything to the contrary in this Order, (1) the failure of the Professional Fee Reserve Account amounts to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out, and (2) in no way shall the Cash Collateral Budget, Carve-Out, the Post-Carve-Out Trigger Notice Cap or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order (x) funds transferred to the Professional Fee Reserve Account shall not be subject to any liens or claims granted to the Reserve Bank and shall not constitute Cash Collateral or Adequate Protection collateral, although the Reserve Bank shall retain a residual interest in the Professional Fee Reserve Account (and any funds therein) to the extent such funds are not used to pay Professional Fees under the terms of

this Order and (y) the Carve-Out shall be senior to any and all forms of adequate protection, liens, or claims securing the Obligations.

      c.     So long as the Carve-Out Trigger Notice has not been delivered in accordance with this Order, the Debtors shall be permitted to pay administrative expenses of Professional Persons allowed and payable under the Bankruptcy Code, as the same may become due and payable, including on an interim basis. Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Declaration Date in respect of any Professional Fees shall not reduce the Carve-Out.

      d.     The Reserve Bank shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Case or any Successor Case, and for the avoidance of doubt, shall not be responsible for the payment of any amounts to the Debtors or any Professional Person to the extent the Professional Fee Reserve Account is not actually funded in the amounts authorized by this Order. Nothing in this Order or otherwise shall be construed to obligate the Reserve Bank, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

      e.     Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Declaration Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out shall be entitled to the protections granted under this Order, the Bankruptcy Code, and applicable law.

      9.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

10.     <u>Termination; Events of Default</u>. The Debtors' right, and the right of any other representative of the Estates, to use the Cash Collateral under this Order shall terminate, automatically and without the need for notice or demand by the Reserve Bank or any further order of the Court upon the occurrence of any of the following, unless waived by the Reserve Bank: (a) the appointment of a chapter 11 trustee or of an examiner with expanded powers in the Chapter 11 Case (having powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (b) the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (c) the dismissal of the Chapter 11 Case; (d) a determination by the Court that a material violation or breach of any of the provisions of this Order has occurred; (e) any other (i.e. not material) violation or breach by the Debtors of any of the provisions of this Order that is not disputed or cured within five (5) business days of written notice from the Reserve Bank (either (d) or (e), an "<u>Event of Default</u>"); and (f) the effective date of any plan of liquidation in the Chapter 11 Case that has been confirmed by an order of the Court. The date on which the earliest of clauses (a) through (f) occurs is referred to as the "<u>Termination Date</u>."

11.     <u>Remedies and Stay Modification</u>.

a.     The automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed, and are hereby, modified, without the need for further order of the Court, solely to permit the Reserve Bank upon, or at any time after, the occurrence of any Termination Date (including, without limitation, as a result of the occurrence of any Event of Default under this Order) to deliver written notice by electronic mail to counsel for the Debtors, counsel for any Creditors' Committee, counsel for any trustee, and counsel for the U.S. Trustee, stating that the Reserve Bank elects to commence the exercise of rights and remedies in respect of this Order and the Program Agreements, and under applicable bankruptcy and non-bankruptcy law (a "<u>Remedies Notice</u>").

b.      Following the fifth (5th) business day following the delivery by the Reserve Bank of a Remedies Notice (the "Remedies Notice Period"), and in the event that the Debtors have not delivered notice of intent to contest the Remedies Notice or cured the alleged Event of Default within five (5) business days following delivery of the Remedies Notice ("Remedies Objection Deadline"), the automatic stay provisions of section 362 of the Bankruptcy Code shall be deemed, and are hereby, modified, without the need for further order of the Court, to permit the Reserve Bank to exercise all rights and remedies provided for in this Order or in the Program Agreements or under applicable bankruptcy or non-bankruptcy law.  The Reserve Bank and the Debtors reserve their respective rights to schedule an expedited hearing on any Event of Default (including whether an Event of Default has occurred or is continuing) or for the contested use of Cash Collateral following the termination of the Remedies Notice Period.

c.      Following the expiration of the Remedies Notice Period, and in the event that the Debtors have not delivered notice of intent to contest the Remedies Notice prior to the Remedies Objection Deadline or cured the alleged Event of Default, the Debtors (or any trustee in the Chapter 11 Case or in a Successor Case) shall cooperate with the Reserve Bank in connection with its exercise of rights and remedies by, among other things, (i) providing access to the PPPLF Collateral and the Debtors' premises to the Reserve Bank and its representatives and agents, (ii) providing access to the Debtors' books and records to the Reserve Bank and its representatives and agents, (iii) providing any information or documents reasonably requested by the Reserve Bank or its representatives or agents, (iv) performing the other obligations of the Debtors in connection with the Reserve Bank's exercise of rights and remedies as required by the Program Agreements, (v) taking reasonable steps to safeguard and protect the assets and property subject to the liens in the PPPLF Collateral, and (vi) refraining from any interference with (and from any

encouragement of others to interfere with) the Reserve Bank's enforcement of its rights and remedies.

       d.      This Court shall retain jurisdiction to hear and resolve any disputes arising under or related to this Order, including, without limitation, matters relating to the application or continuation of the automatic stay of section 362(a) of the Bankruptcy Code or any other injunctive relief that may be requested in accordance with this Order (together, the "Remedies Procedures").

       12.     Application of Collateral Proceeds.  Following the occurrence of any Termination Date (including without limitation, as a result of the occurrence of any Event of Default under this Order) and the expiration of the Remedies Notice Period, and in the event that the Debtors have not delivered notice of intent to contest the Remedies Notice or cured the alleged Event of Default, the Debtors or any subsequent agent or trustee thereof shall remit to the Reserve Bank one-hundred percent (100%) of all collections on, and proceeds of, the PPPLF Collateral, including, without limitation, all Cash Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified, without the need for further order of the Court, to permit the Reserve Bank to retain and apply all such collections, proceeds, and Cash Collateral to satisfy or reduce the Obligations in accordance with the Program Agreements, until the Obligations are indefeasibly satisfied in full.  In furtherance of the foregoing, each bank, brokerage firm, and other financial institution with an account of the Debtors is hereby authorized to comply (without the need for consent of the Debtors or any other representative of the estates) with any instructions originated by the Reserve Bank (or its designee) to such bank, brokerage firm, or financial institution directing the disposition of cash, checks, instruments, securities, investment property, or other items deposited by the Debtors (or other representative of the estates) from time to time, including, without limitation, any instruction to send to the Reserve Bank (or its designee) by wire transfer

(to such account as the Reserve Bank (or its designee) shall specify) or in such other manner as the Reserve Bank (or its designee) shall direct, all cash and other property held for, or owed by it to (or for the credit or benefit of), the Debtors or the estates.

13.     <u>Limitation on Section 506(c) Claims</u>.  No costs or expenses of administration that have been or may be incurred in the Chapter 11 Case or in any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the Reserve Bank, or any of its claims, or any assets or property subject to the PPPLF Collateral, pursuant to section 506(c) or section 105 of the Bankruptcy Code or otherwise.  No action, inaction, or acquiescence by the Reserve Bank shall be deemed to be, or shall be considered evidence of, any alleged consent to a surcharge against the Reserve Bank, any of its claims, or any assets or property subject to the PPPLF Collateral.  The Debtors and the Reserve Bank agree to have good faith discussions regarding the potential transfer of the servicing of the PPP Loans pledged as PPPLF Collateral following the effective date of a plan of liquidation (to the extent such transfer of servicing or the indefeasible payment in full of the Indebtedness has not occurred earlier) and with respect to a reasonable budget for the orderly winddown of the Chapter 11 Cases.

14.     <u>No Marshaling</u>.  The Reserve Bank shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the assets or property subject to the liens in the PPPLF Collateral or otherwise.  Without limiting the generality of the foregoing, no party other than the Reserve Bank shall be entitled, directly or indirectly, to direct the exercise of rights or remedies or to seek (whether by order of this Court or otherwise) to marshal or otherwise control the enforcement of the PPPLF Collateral.

15.     <u>Equities-of-the-Case Waiver</u>.  The Reserve Bank shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no person may assert an "equities of

the case" claim under section 552(b) of the Bankruptcy Code against the Reserve Bank with respect to any proceeds, product, offspring, or profits of any of the PPPLF Collateral, or otherwise.

16.    <u>Restrictions on Granting Post-Petition Liens</u>.  Except as otherwise provided in this Order, it shall be an Event of Default (subject to the Remedies Procedures) if any claim or lien having a priority superior or *pari passu* with those granted by this Order to the Reserve Bank is granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Case, while any portion of the Debtors' obligations pursuant to the Program Agreements are outstanding.

17.    <u>Additional Perfection Measures</u>.

a.    If the Reserve Bank, in its sole and absolute discretion, chooses to take any action to obtain consents from any other party in interest, or to file or record any mortgages, financing statements, notices of lien, or other notices, documents, or instruments, or to otherwise record or perfect such security interests and liens (in each case subject to the terms and scope of the liens granted to secure the PPPLF Collateral), the Reserve Bank is hereby authorized, but not directed, to take such action and/or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized to take such action) and: (i) any such notices, documents, or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Order; and (ii) no defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted under this Order.

b.    In lieu of obtaining such consents or filing or recording any such mortgages, financing statements, notices of lien, or similar documents or instruments, the Reserve Bank may, in its sole and absolute discretion, choose to file or record a true and complete copy of this Order in any place in which any such documents or instruments would or could be filed, together with a

description of collateral, and such filing by the Reserve Bank shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien, or similar documents or instruments had been filed or recorded at the time and on the date of entry of this Order.

18.    <u>Delivery of Reports, Pleadings, and Documents</u>.  In addition to all other requirements set forth in this Order, the Debtors shall contemporaneously deliver to the Reserve Bank all financial reports, budgets, and forecasts delivered by the Debtors to the U.S. Trustee, DOJ or to any Creditors' Committee, its professionals, or advisors.

19.    <u>Assignment and Reservation of Rights</u>.  Pursuant to the Program Agreements, the Reserve Bank hereby instructs and the Debtors irrevocably assign to the Reserve Bank all of its right, title and interest in and to any and all amounts to which the Debtors are or may become entitled related to the PPPLF Collateral, including without limitation, all amounts paid or payable by any borrower in respect of PPP Loans that are pledged as PPPLF Collateral, and all amounts paid or payable by the SBA in respect of such PPPLF Collateral, including any loan forgiveness, guarantee amounts, or payments by PPP Borrowers in respect of the PPP Loans comprising the PPPLF Collateral.  Without limiting the foregoing, in connection with the relief granted hereunder, the Reserve Bank agrees to remit to the Debtors for the Budget Period the Agreed Cash Amounts, subject to the Cash Collateral Cap (less any Agreed Cash Amounts received directly and retained by the Debtors) and the terms and limitations of this Order.  Such Cash Collateral shall be used only in accordance with and subject to the Cash Collateral Budget.  The Debtors and the Reserve Bank each reserve their rights with respect to whether the Agreed Cash Amounts constitute Cash Collateral, and all rights and defenses thereto of each other Debtors and the Reserve Bank are preserved; *provided* that any such challenge to the validity of the lien, the scope of the PPPLF Collateral and rights, in each instance, with respect to the Agreed Cash Amounts shall be brought

prior to the end of the Challenge Period (as defined herein); *provided* further that to the extent the outstanding Indebtedness (as defined herein) is indefeasibly paid in full and following expiration of the Challenge Period and resolution of all timely Challenges, any remaining Agreed Cash Amounts shall not constitute Cash Collateral.

      a.      <u>KS PPP Loans</u>.  With respect to any KS PPP Loan Proceeds, the Reserve Bank agrees that: (w) the KS PPP Loans and the KS PPP Loan Proceeds are not proceeds of Pledged PPPLF Loans, (x) any KS PPP Loan Proceeds received by the Reserve Bank are property of the Debtors and shall be held in trust, exclusively for the benefit of the Debtors until such amounts are remitted to the Debtors pursuant to the terms of this Order, and (y) any KS PPP Loan Proceeds received by the Reserve Bank shall be remitted, without offset or recoupment, to the Debtors.  The Reserve Bank shall remit any KS PPP Loan Proceeds no later than seven (7) calendar days after receiving (i) such KS PPP Loan Proceeds and (ii) the KS PPP Loan Payment Report relating to such KS PPP Loan Proceeds with no discrepancies.

      20.      <u>Reservation of Certain Third-Party Rights and Bar of Challenges and Claims</u>.

      a.      The Debtors' acknowledgements, stipulations, and releases set forth in Paragraph D above (collectively, the "<u>Stipulations</u>") are final and binding upon the Debtors.  The Stipulations shall be binding upon each other party in interest, including, without limitation, a Creditors' Committee, unless, and only to the extent that, a Challenge (defined below) is commenced by a party with standing within the Challenge Period and a final, non-appealable order is entered sustaining any such Challenge.

      b.      No more than $25,000 of the proceeds of Cash Collateral may be used by the Creditors' Committee, solely to investigate, within the Challenge Period the Debtors' stipulations.

"Challenge" shall mean an adversary proceeding or contested matter against the Reserve Bank challenging the admissions, stipulations, findings, or releases included in the Stipulations.

       c.     Any Challenge under this paragraph must be commenced by a party in interest, including, but not limited to, any Creditors' Committee, with standing and requisite authority to bring the Challenge by no later than the seventy-fifth (75th) calendar day following the entry of the Order (the "Challenge Period"), provided, however, that if a trustee is appointed prior to the expiration of the Challenge Period, such trustee will have until the later of the expiration of the Challenge Period or twenty (20) days after appointment (subject to a further order of this Court) to assert a Challenge.  If any such adversary proceeding or contested matter is timely filed and remains pending and the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estate.  For the avoidance of doubt, any trustee appointed or elected in the Chapter 11 Case shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Order.

       d.     Absent the timely filing of a Challenge within the Challenge Period, upon the next calendar day following the expiration of the Challenge Period and for all purposes, including, without limitation, in the Chapter 11 Case and any Successor Case, (i) all payments made to or for the benefit of the Reserve Bank (whether prior to, on, or after the Petition Date) shall be indefeasible and shall not be subject to counterclaim, offset, recoupment, subordination,

recharacterization, defense, recovery, or avoidance; (ii) any and all Challenges not timely filed within the Challenge Period by any party whatsoever shall be deemed to be forever released, waived, and barred; (iii) the PPPLF shall be deemed to be secured by a valid, binding, enforceable, duly perfected, and non-avoidable security interests and liens in the PPPLF Collateral; and (iv) the Stipulations shall be binding on all parties whatsoever, including, without limitation, any Creditors' Committee and any trustee or trustees appointed in the Chapter 11 Case or in any Successor Case.

21.    <u>Review of Adequate Protection Professional Fee Payments</u>. The Debtors shall pay all reasonable and documented professional fees in accordance with Paragraph H of this Order within ten (10) business days of delivery of a monthly statement or invoice for such fees and expenses (it being understood that such statements or invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; *provided, however*, that such statements or invoices shall not be required to be maintained in any particular format and may be redacted to protect privileged, confidential, or proprietary information, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek the Court's approval of any such payments) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if one is appointed), unless, within such ten (10) business day period, the Debtors, the U.S. Trustee, or the Creditors' Committee (if one is appointed) serve a written objection upon the requesting party, in which case, the Debtors shall pay only such amounts that are not the subject of any objection and the withheld amount subsequently agreed by the objecting parties or ordered by the Court to be paid.

22.    <u>Binding Nature of Order; Successors and Assigns</u>. It shall be an Event of Default (subject to the Remedies Procedures) if the rights, remedies, powers, privileges, claims, liens, and

priorities of the Reserve Bank provided for in this Order or otherwise are adversely modified, altered, eliminated, or impaired in any manner by any subsequent order or judgment (including, without limitation, by any confirmation order or sale order), by any plan of liquidation in the Chapter 11 Case, by the dismissal or conversion of the Chapter 11 Case, or in any Successor Case, or to the extent the Debtors commence, support, or join in a motion, suit or other proceeding against the Reserve Bank that seeks such relief.  The provisions of this Order shall be binding upon, and shall inure to the benefit of, the Debtors, the Estates, the Reserve Bank, any Creditors' Committee, and each of their respective successors and assigns, including, without limitation, any trustee appointed under chapter 11 of the Bankruptcy Code, any examiner with expanded powers, any responsible officer, any estates administrator or representative, any liquidation trustee, and any similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code. The provisions of this Order shall also be binding on all of the Debtors' creditors and equity holders, and all other parties in interest.

23.   <u>No Waiver</u>. This Order shall not be construed in any way as a waiver or relinquishment of any rights that the Reserve Bank may have to raise any matter or be heard on any matter brought before the Court. Except as expressly provided in this Order, the Reserve Bank retains and reserves all of its rights and remedies.  For the avoidance of doubt, this Order and the transactions contemplated hereby shall  be without prejudice to (i) the rights of the Reserve Bank to seek (and the Debtors' ability to object to any such request for) additional or different adequate protections (including any amount equal to accrued and unpaid interest under the Program Agreements), move to vacate the automatic stay, move for the appointment of a trustee or examiner, move to dismiss or convert the Chapter 11 Case, or to take another action in the Chapter 11 Case and to appear and be heard in any matter raised in the Chapter 11 Case, (ii) the rights of

the Reserve Bank to assert claims, arising prior to or after the Petition Date, with regards to the PPPLF Collateral or Program Agreements, and (iii) any and all rights, remedies, claims and causes of action which the Reserve Bank may have against any other party liable for the Indebtedness.

24.    <u>Limits on Liability</u>. Nothing in this Order shall in any way be construed or interpreted to impose upon the Reserve Bank any liability for any claims arising from any activities by the Debtors in the operation of their business or in connection with their restructuring efforts.

25.    <u>Priority of Terms</u>. In the event of any conflict between (a) any term or provision of the Motion, on the one hand, and (b) the terms and provisions of this Order, on the other hand, the terms and provisions of this Order shall govern.

26.    <u>Survival</u>. Except as otherwise provided herein, or by a further order of this Court after notice to the Reserve Bank, the protections afforded under this Order, and any actions taken pursuant thereto, shall survive the entry of any order (a) dismissing the Chapter 11 Case or (b) converting the Chapter 11 Case to a case pursuant to chapter 7 of the Bankruptcy Code.  If any or all of the provisions of this Order are hereafter reversed, modified, vacated, stayed that action will not affect (i) the validity of any obligation, indebtedness or liability under this Order prior to the date of receipt of written notice to the Reserve Bank of the effective date of such action or (ii) the validity and enforceability of any lien, administrative expense, right, or priority authorized or created hereby or pursuant to this Order.

27.    <u>Adequate Notice</u>. The notice given by the Debtors of the Hearing was provided as authorized by Bankruptcy Rule 4001(b)(3).  The Debtors shall promptly mail copies of this Order to the Notice Parties.

28.    <u>Immediate Binding Effect</u>.  This Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy

Rules 4001(a)(3), 6003(b), 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby directed immediately to enter this Order on the Court's docket in the Chapter 11 Case.

29.   <u>Proof of Claim</u>. The Reserve Bank shall not be required to file a proof of claim in the Chapter 11 Case or in any Successor Case with respect to the Obligations. The Debtors' Stipulations shall be deemed to constitute a timely filed proof of secured claim for the Reserve Bank upon entry of the Order, and the Reserve Bank shall be treated under section 502(a) of the Bankruptcy Code as though it had filed a timely proof of claim, notwithstanding any order entered by the Court concerning the establishment of a bar date for the filing of proofs of claim in the Chapter 11 Case or in any Successor Case. The Reserve Bank is hereby authorized and entitled, in their sole discretion, but not required, to file a proof of claim in the Chapter 11 Case or in any Successor Case.

30.   <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Order.

31.   <u>SBA</u>.

a.   The relief granted herein is without prejudice to the SBA's authority and rights, and responsibilities to third parties, under the Small Business Act, including 15 U.S.C. §§ 636(a)(36), 636(a)(37) and 636m, and the regulations, FAQs, notices, forms and other guidance promulgated by SBA for the Paycheck Protection Program, including the SBA Form 3507 executed by the Debtor; and other applicable SBA Loan Program Requirements (as defined in 13 C.F.R. § 120.10); and other applicable federal law, including without limitation, the right of setoff, if any.  Other than the implementation of direct payments described in Section H(i) of this Order, nothing in this Order imposes any additional obligations on SBA.

b.    Nothing contained in this Order shall reduce, limit or release the Debtors' statutory, regulatory and/or contractual obligations to honor timely and in full its payment obligations to the SBA, if any.  For the avoidance of doubt, the Debtors shall continue to remit to the SBA the SBA share of any PPP Borrower payments received by the Debtors on a PPP loan after the SBA's guaranty purchase of the loan.

**Exhibit 1**

Cash Collateral Budget

**KServicing - Cash Collateral Budget**
USD
Actuals through: 10/7/2022

| Week Ending | 10/7/2022 | 10/14/2022 | 10/21/2022 | 10/28/2022 | 11/4/2022 | 11/11/2022 | 11/18/2022 | 11/25/2022 | 12/2/2022 | 12/9/2022 | 12/16/2022 | 12/23/2022 | 12/30/2022 | 1/6/2023 | 1/13/2023 | 1/20/2023 | 1/27/2023 | 2/3/2023 | 18 Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | Actual 0 | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Forecast 14 | Forecast 15 | Forecast 16 | Forecast 17 | |
| **Receipts** | | | | | | | | | | | | | | | | | | | |
| **Legacy Loans** | | | | | | | | | | | | | | | | | | | |
| From Borrower - KS-owned loans | 162 | 143 | 143 | 143 | 106 | 106 | 106 | 106 | 106 | 119 | 119 | 119 | 119 | 88 | 88 | 88 | 88 | 88 | 2,036 |
| From Collection Agencies - KS-owned loans | 147 | 239 | - | - | 238 | 385 | - | - | 308 | 462 | - | - | 385 | 385 | - | - | - | 77 | 2,625 |
| **PPP Loans** | | | | | | | | | | | | | | | | | | | |
| From Borrower - CUBI-owned loans | 224 | 68 | 55 | 39 | 57 | 54 | 79 | 40 | 37 | 60 | 66 | 53 | 50 | 58 | 62 | 58 | 51 | 42 | 1,153 |
| From Borrower - CRB-owned loans | 575 | 31 | 20 | 38 | 73 | 23 | 35 | 33 | 60 | 29 | 36 | 17 | 54 | 60 | 37 | 13 | 53 | 57 | 1,244 |
| From Borrower - KS-owned PPPLF loans (Excl. Interest) | 343 | 24 | 96 | 75 | 65 | 41 | 95 | 58 | 83 | 42 | 44 | 108 | 62 | 63 | 32 | 98 | 74 | 58 | 1,462 |
| From Borrowers - KS-owned PPPLF Interest (100bps) | 13 | - | - | 0 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 78 | 78 | 78 | 78 | 78 | 78 | 80 | 1,159 |
| From CUBI - Unpaid fees (Servicing and Referral Fees) | - | - | - | - | - | - | - | 23,000 | - | - | - | - | - | - | - | - | - | - | 23,000 |
| From Fed - Excess SALT, Out-of-Pocket, Interest (65bps) [1] | - | - | - | - | - | 1,983 | 398 | 397 | 259 | 292 | 292 | 285 | 282 | 267 | 268 | 309 | 308 | 309 | 5,651 |
| Professional Fee Retainer Release | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Synovus Bank Cash Collateral Release | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 15 |
| Total Receipts | 1,464 | 506 | 314 | 372 | 615 | 2,668 | 789 | 23,710 | 930 | 1,080 | 634 | 661 | 645 | 999 | 948 | 644 | 651 | 712 | 38,344 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | |
| **PPP Loans** | | | | | | | | | | | | | | | | | | | |
| To CUBI - CUBI-owned loans | - | - | - | - | (255) | - | - | - | - | (267) | - | - | - | (229) | - | - | - | - | (750) |
| To CRB - CRB-owned loans | - | - | - | - | (664) | - | - | - | - | (224) | - | - | - | (136) | - | - | - | - | (1,024) |
| To Fed "PPPLF" - KS-owned loans (Excl. Interest) | (11,161) | (11,106) | (1,158) | (0) | (75) | (65) | (41) | (95) | (58) | (83) | (42) | (44) | (108) | (62) | (63) | (32) | (98) | (74) | (24,462) |
| To Fed "PPPLF" - Interest (35bps) | (86) | (86) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (173) |
| SBA Refunds - KS-owned loans | - | - | (1,629) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (1,629) |
| Synovus Bank Cash Collateral | - | - | - | (770) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (770) |
| **Operating and Non-Operating Expenses** | | | | | | | | | | | | | | | | | | | |
| Operating Expenses (Incl. payroll) | (8) | (540) | (50) | (728) | (1,178) | (24) | (259) | (24) | (2,360) | (160) | (191) | (31) | (1,792) | (316) | (186) | (26) | (26) | (1,316) | (9,213) |
| Insurance (Incl. Incremental D&O) | - | - | (72) | - | - | - | - | - | - | - | - | - | - | - | - | (3) | - | - | (76) |
| Professional Fees | - | - | (191) | (2,607) | (1,535) | (1,219) | (1,024) | (849) | (1,479) | (681) | (873) | (681) | (1,236) | (681) | (903) | (699) | (864) | (1,113) | (16,632) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | (200) | - | - | - | - | - | (200) |
| Taxes | - | (67) | - | - | - | (301) | - | - | - | - | - | - | (300) | - | - | - | - | - | (668) |
| Winddown Contingency Reserves | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Disbursements | (11,256) | (11,799) | (3,101) | (4,201) | (3,707) | (1,308) | (1,625) | (968) | (3,897) | (1,413) | (1,105) | (756) | (3,637) | (1,424) | (1,152) | (756) | (991) | (2,503) | (55,598) |
| Net Cash Flow | (9,791) | (11,293) | (2,787) | (3,829) | (3,092) | 1,360 | (835) | 22,742 | (2,967) | (333) | (471) | (95) | (2,992) | (425) | (204) | (112) | (340) | (1,791) | (17,254) |
| **Liquidity Detail** | | | | | | | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | | | | | | | |
| Beginning Bank Cash | 37,457 | 27,666 | 16,373 | 13,586 | 9,757 | 6,665 | 8,025 | 7,190 | 29,932 | 26,965 | 26,632 | 26,161 | 26,066 | 23,074 | 22,649 | 22,445 | 22,333 | 21,994 | 37,457 |
| Net Cash Flow | (9,791) | (11,293) | (2,787) | (3,829) | (3,092) | 1,360 | (835) | 22,742 | (2,967) | (333) | (471) | (95) | (2,992) | (425) | (204) | (112) | (340) | (1,791) | (17,254) |
| Ending Bank Cash | 27,666 | 16,373 | 13,586 | 9,757 | 6,665 | 8,025 | 7,190 | 29,932 | 26,965 | 26,632 | 26,161 | 26,066 | 23,074 | 22,649 | 22,445 | 22,333 | 21,994 | 20,203 | 20,203 |
| **Adjustments to Current Cash Balance** | | | | | | | | | | | | | | | | | | | |
| Total Amounts due to Fed, SBA, CRB & CUBI | (15,961) | (4,892) | (2,275) | (2,331) | (1,531) | (1,584) | (1,752) | (1,788) | (1,910) | (1,468) | (1,572) | (1,706) | (1,764) | (1,517) | (1,584) | (1,722) | (1,802) | (1,885) | (1,885) |
| **Current Cash Balance** [2] | 11,705 | 11,481 | 11,311 | 7,425 | 5,133 | 6,441 | 5,437 | 28,144 | 25,056 | 25,164 | 24,589 | 24,360 | 21,310 | 21,132 | 20,861 | 20,612 | 20,192 | 18,318 | 18,318 |

[1] In accordance with the terms of the Cash Collateral Budget, the Cash Collateral Cap for the six-month budget shall be $8,500,000, where the Debtors and Reserve Bank also may agree in writing to a lower Cash Collateral Cap Amount for a period shorter than 6 months

[2] Current Cash Balance represents the cash balance after deductions for amounts owed to the Fed, SBA, CRB & postpetition amounts on account of CUBI