UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re                                                        :    Chapter 11
                                                             :
KABBAGE, INC. d/b/a KSERVICING, *et al.*,                    :    Case No. 22-10951 (CTG)
                                                             :
                                                             :    (Jointly Administered)
Debtors.[1]                                                  :
                                                             :    Re: Docket Nos. 172 & 206
                                                             :
------------------------------------------------------------ x

**DECLARATION OF LAQUISHA MILNER IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE SETTLEMENT AGREEMENT BETWEEN KSERVICING
AND CUSTOMERS BANK AND (II) GRANTING RELATED RELIEF**

I, Laquisha Milner, declare pursuant to 28 U.S.C. § 1746, under penalty of perjury to the best of my knowledge and belief, that:

1. I am the Chief Executive Officer of Kabbage, Inc. d/b/a KServicing (the "**Company**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"). I am also a member of the Company's Board of Directors.

2. I joined the Company in January 2021. Prior to my role as Chief Executive Officer, I served as the Company's Chief Operations Officer. I have over twenty years of experience in financial technology (fintech) operations. Before joining the Company, I was the Vice President of Project Management at Vector Solutions, and I also served in the roles of Head of Program Management, Head of Business Process Engineering, and Head of Platform

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

Implementations for Kabbage, Inc. (prior to the AmEx Transaction and the SBA's launch of the PPP) at various times over the course of eight years.

3.      I submit this declaration (this "**Declaration**") in support of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement between KServicing and Customers Bank and (II) Granting Related Relief* [Docket No. 172] (the "**Motion**")[2] and in response to the objection to the Motion [Docket No. 206] filed by Cross River Bank. I am knowledgeable about, and familiar with, the mediation and negotiations that led to the Settlement Agreement.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the underlying dispute with CB as well as my discussions with the Company's other officers, directors and its legal and financial advisors.  If called upon to testify, I would testify to the facts set forth in this Declaration.

## The CB Disputes

4.      The Company partnered with Customers Bank ("**CB**") during the height of the COVID-19 Pandemic in connection with the SBA's Paycheck Protection Program that was launched by the SBA in April 2020. The Parties' relationship is governed by a series of contracts (*i.e.*, the CB Agreements) pursuant to which CB would purchase PPP loans already issued by the Company and the Company would also process PPP loan applications and service the resulting loans that CB funded.  Approximately 99,000 PPP Loans with an aggregate outstanding principal amount of $2.585 billion were subject to the CB Agreements and, as of the Petition Date, there

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

were approximately 7,000 PPP loans with an outstanding aggregate principal amount of approximately $181 million remaining in their loan portfolio.

5.    There were two rounds of loans issued under the PPP and the Company and CB participated in both rounds. In accordance with the Round 1 CB Loans, the CB Agreements required CB to pay the Company approximately $47 million in servicing and loan referral fees and such amounts were due shortly after origination. These fees were timely paid by CB. After completing origination of Round 1 CB Loans, the Company and CB agreed to also participate in Round 2 and based upon the Round 2 CB Loans originated during Round 2, CB was obligated to pay the Company approximately $65.5 million of loan referral and servicing fees shortly after such loans were originated (the "**Outstanding CB Receivable**"). CB never paid the Company the Outstanding CB Receivable and, despite not receiving such funds, the Company continued to service the CB Loans in accordance with the CB Agreements.

6.    CB withheld and continues to withhold the Outstanding CB Receivable on the basis, which the Company contests, that the Company breached the CB Agreements by allegedly failing to adequately perform its servicing obligations and such actions resulted in significant liability exposure to CB. Specifically, CB contends that the Company is liable to it for claims that primarily fall in four buckets. First, CB contends that the Company is liable to it for the repayment of principal, interest and tax payments, as well as origination fees, associated with PPP loans that are missing SBA loan numbers that should have been assigned by the SBA's electronic application system, E-Tran (the "**Missing in E-Tran Loans**"). Absent the SBA reinstating a Missing in E-Tran Loan, the lender, like CB, can only look to the borrower for repayment and would not have the benefit of the SBA Guaranty Purchase. Second, CB contends that the Company is liable to it for potential claims on account of the SBA alleging that the Debtors

improperly included individuals with compensation of more than $100,000 in its payroll calculations (the "**$100k Issue**"). Third, CB contends that the Company is liable to it for potential claims on account of the Company allegedly failing to exclude ineligible expenses from applicants' Box 4 submissions in making PPP Loan eligibility determinations (the "**Form 940 Issue**"). Fourth, CB Contends that the Company is liable to it for potential claims arising from any DOJ investigations relating to the $100k Issue, the Form 940 Issue, or any pending False Claims Act case or related investigation involving the Company that is being pursued by the U.S. Attorney's Office in the District of Massachusetts.

7. Although CB has not quantified all of its claims asserted against the Debtors with specificity, it has represented to the Company in discussions between the Parties that its claims against the Debtors are potentially equal to the remainder of its outstanding portfolio, which was approximately $181 million as of the Petition Date. With respect to CB's claims associated with Missing in E-Tran Loans, the Company calculated the aggregate outstanding principal amount of such PPP loans as of October 11, 2022 at approximately $13.7 million. As described in the Settlement Agreement, CB has also asserted that the Company has potential incremental liability for Missing in E-Tran Loans on account of tax liabilities borrowers may incur if CB forgives their loans. In connection with the $100k Issue and the Form 940 Issue, the potentially impacted CB Loans, as determined by the Company in conjunction with alleged excess loan analysis conducted by Forensic Risk Analysis on or about June 24, 2022, have a potential excess amount of approximately $5 million. I understand that there remains uncertainty with respect to the ultimate amount at issue in the Disputes as the Company, CB and the government may have different views.

8.  As part of its efforts to mitigate not receiving the Outstanding CB Receivable, the Company withheld approximately $34.8 million of amounts that it would have otherwise turned over to CB under the CB Agreements, comprised of: (i) origination fees due to CB, (ii) borrower collections on CB Loans, and (iii) CB funds related to cancelled or returned loans. Although the Company withheld such amounts, any payments collected from borrowers were reflected on the borrower's accounts to ensure that the Company Withholding had no impact on PPP borrowers.

9.  As of the date hereof, the Company continues to service the CB Loans remaining its portfolio without receipt of the Outstanding CB Receivable (less amounts attributable to the Company Withholding). The Company has aggressively sought in earnest to recover the Outstanding CB Receivable for over 20 months. It has engaged in negotiations through outside counsel and members of management, made written demands, commenced a lawsuit in United States District Court for the Northern District of Georgia, participated in mediation, and ultimately commenced these chapter 11 cases in the face of increasingly limited cash flow and numerous disputes, including the Disputes with CB.  Nearly $1 million in outside legal fees have been expended to collect the Outstanding CB Receivable and the Company's operations and legal departments have spent significant time and resources pursuing collection of the Outstanding CB Receivable and addressing CB's demands related to the servicing of CB Loans. It is my understanding that absent this Settlement, the Company would have to expend potentially millions of additional dollars to commence and litigate with CB concerning whether the Company breached any of the CB Agreements, whether the Company was entitled to mitigate its damages by withholding from CB amounts received from borrowers, whether CB is entitled to use setoff or

recoupment to offset amounts owed to the Company under the CB Agreements, and whether CB has valid claims against the Company.

## The Settlement

10.    It is the Company's position that CB failed to remit the Outstanding CB Receivable when due and that there is no legitimate defense to CB failing to pay. The Company unequivocally believes that it is entitled to receive the entire Outstanding CB Receivable. Nevertheless, a compromise has been reached – memorialized in the Settlement Agreement – whereby the Company may recover approximately 89% of the Outstanding CB Receivable (comprised of amounts retained because of the Company Withholding and the incremental cash payment provided under the Settlement Agreement of approximately $23.2 million), obtain a release of potentially significant claims, avoid further extensive legal fees associated with recovering the Outstanding CB Receivable, and have the funds necessary to continue to service its loan portfolio and effectuate an orderly transition of such services at the appropriate time.

11.    After extensively negotiating at arm's length the terms of a consensual settlement, the Parties agreed to resolve the Disputes by, among other things (i) CB paying the Company approximately $23.2 million in connection with the balance of the Outstanding CB Receivable owed after deducting the Company Withholding, (ii) allowing the Company to keep approximately $34.8 million the Company withheld from CB, which CB claimed the Company had improperly setoff and could not use as general operating funds, (iii) the Parties reaching an understanding with respect to servicing expectations with  respect to CB Loans, as set forth on

Exhibit A of the Settlement Agreement, and (iv) the Parties granting each other mutual releases for all claims arising prior to the Effective Date of the Settlement Agreement.

## Best Interests of Debtors and their Estates

12.     The Company has received advice from advisors, including experienced legal counsel, with respect to the Settlement Agreement. After receiving such advice, both management and the board of directors of the Company have concluded that the Settlement Agreement represents a fair and reasonable compromise that is in the best interests of the Debtors' estates and all stakeholders.  The Company weighed various considerations, including (i) the risks and costs attendant in litigating the Disputes in connection with opposing the validity of CB's claims of setoff, (ii) the timing of collecting on a judgment granted in the Company's favor in light of the liquidity needs to effectively administer the chapter 11 cases, and (iii) the ultimate benefits to the Company's stakeholders. The Settlement Agreement is the culmination of a prepetition lawsuit and mediation, multiple rounds of negotiations, several iterations of forms of agreements, numerous calls between the Parties' respective counsel, and extensive discussions among principals from each Party.

13.     Importantly, the Settlement Agreement provides the Debtors with sufficient liquidity to continue winding down its business in an orderly manner for the benefit of borrowers. Based on information received from our retained financial advisor, absent the near term infusion of the $23.2 million obtained through the Settlement Agreement, the Company will run out of cash before the end of December 2022.  Accordingly, absent the Settlement Agreement, the Company would be in the untenable position of having to reject its servicing contracts and immediately take measures to transfer the servicing obligations of its entire PPP Loan Portfolio.  I understand that, outside of the Company, there remains only a small population of existing PPP Loan servicers.  In

light of the limited population of PPP Loan servicers, it may take a significant amount of time and resources to transfer servicing obligations for the Company's significant remaining PPP Loan portfolio. An expedited servicing transition would likely result in service disruptions and be to the detriment of borrowers and those parties that rely on the Company to service its respective loan portfolios, particularly given that the Company is currently in the midst of processing Guaranty Purchase applications for Round 1 PPP Loans that have fast approaching expiration deadlines.

14. The Settlement Agreement also avoids the unnecessary expense and distraction of litigating the Disputes with CB. Although the Company believes it would prevail in litigation of the Disputes, such outcome is far from certain and it may take several months or longer to obtain a judgment, which judgment could be the subject of an appeal, and collect on such judgment. Engaging in further litigation with CB would risk the Company's ability to service the balance of its Loan Portfolio for the benefit of all borrowers and counterparties, as well as cause uncertainty and delay at this critical juncture in the Debtors' chapter 11 cases. The Debtors believe that the resolution of the Disputes will ultimately preserve estate resources.

## Conclusion

15. As the Company's Chief Executive Officer, I concluded that, given the current circumstances—including the inherent risks in litigating the Disputes—and based on my observations, the terms of the Settlement Agreement are fair, reasonable, based upon sound business judgment, and are in the best interest of the Debtors and their estates.

Dated: November 6, 2022

By: /s/ *Laquisha Milner*
Laquisha Milner
Chief Executive Officer