## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
--------------------------------------------------------- x
                                                          :
In re                                                     :      Chapter 11
                                                          :
KABBAGE, INC. d/b/a KSERVICING, et al.,                   :      Case No. 22-10951 (CTG)
                                                          :
                                                          :      (Jointly Administered)
                        Debtors.¹                         :
                                                          :      Re: Docket Nos. 172 & 206
--------------------------------------------------------- x
```

## DEBTORS' REPLY IN SUPPORT OF DEBTORS'
## MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
## AND APPROVING THE SETTLEMENT AGREEMENT BETWEEN
## KSERVICING AND CUSTOMERS BANK AND (II) GRANTING RELATED RELIEF

Kabbage, Inc. d/b/a KServicing (the "**Company**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this reply (the "**Reply**") in response to the objection [Docket No. 206] (the "**Objection**") filed by Cross River Bank ("**Cross River**") to the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Docket No. 172] (the "**Motion**").[2]

### Preliminary Statement

1.    The Motion seeks approval of a settlement (the "**Settlement**") between the Company and CB, the terms of which are memorialized in the Settlement Agreement. The

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion. The Company adopts and incorporates by reference the arguments in the Motion in their entirety, as if fully set forth herein.

Settlement Agreement is not only fair and reasonable, but necessary for the Company, its affiliated Debtors and their estates. The Settlement provides the Debtors with the liquidity needed to fund these chapter 11 cases in a manner that is in the best interests of PPP Loan borrowers and other parties in interest.  As evident from the Debtors' budget submitted with its motion for consensual use of cash collateral [Docket No. 143], absent the approximately $23.2 million to be paid immediately by CB as part of the Settlement, the Company would run out of cash by the end of December. In addition, while the Debtors believe that they are entitled to receive the entire $65.5 million in fees owed by CB under the CB Agreements, the Settlement reflects the reality that, as of the Petition Date, CB was continuing to refuse to pay the approximately $30.7 million it owed to the Company (the balance of the outstanding CB Receivable remaining after the Company withheld from CB approximately $34.8 million in amounts received for servicing CB PPP loans).

2.      The result of the Settlement is that the Company will retain the approximately $34.8 million comprising the Company Withholding, CB will pay the Company approximately $23.2 million of the total approximately $30.7 million remaining outstanding under the CB Receivable, and the Debtors will be released from all of CB's claims under the CB Agreements that arose prior to the Effective Date of the Settlement Agreement.  Approval of the Settlement results in the Company recovering approximately 89% of the total CB Receivable that it has been earnestly attempting to collect for over 20 months.  The Settlement also avoids the future significant expenses that would be required for the Company to litigate with CB in connection with retaining the Company Withholding and also recovering the approximately $30.7 million remaining on the balance of the CB Receivable. While the Debtors believe that they would have been successful in litigating the Disputes, the Company understood that CB would likely have aggressively litigated, including arguing that it could have used the doctrines of setoff and recoupment to offset amounts it contends it is owed against the CB Receivable.  Even if those

2

amounts could not be set off, CB would have had claims in these bankruptcy cases for those same amounts that are now being settled as part of the Settlement. The Settlement releases all of those claims. In short, the Debtors exercised sound business judgment in weighing all of the above factors in agreeing to the Settlement.

3.      The appropriateness of the Settlement is only further supported by the fact that no creditor has objected other than Cross River, who has asserted nearly identical claims against the Company to those being asserted by CB. The underlying issue for Cross River appears to be that the Company is settling CB's claims while Cross River's similar claims will need to be litigated or otherwise settled separately. Indeed, the Objection entirely ignores the Company's liquidity issues and the import of CB being in possession of the CB Receivable and instead argues that the Settlement should not be approved for two primary reasons.  First, Cross River asserts that the Debtors failed to meet their burden to prove that the Settlement meets the business judgment standard set forth under Bankruptcy Rule 9019. Second, based primarily on its view that CB is not entitled to any setoff against the CB Receivable (the Objection ignores recoupment), it appears to assert that the Company should not have agreed to any compromise whatsoever.  Neither of these arguments has any merit.

4.      The Motion clearly demonstrates that the Company exercised sound business judgment in agreeing to the Settlement.  As set forth in the Motion and in the record of these chapter 11 cases, the Debtors have demonstrated the need for the liquidity provided by the Settlement and that the underlying claims raised by CB are complex and of potentially significant magnitude. As a result, the Settlement Agreement is a tremendous and necessary achievement in these chapter 11 cases.  From the outset of these chapter 11 cases, the Debtors have been transparent with respect to the nature and scope of the claims asserted against them by various stakeholders, including CB and Cross River in their capacity as Partner Banks.

3

5.      The Settlement resolves claims that have been asserted by CB against the Company at various times over the course of more than 20 months in connection with CB's refusal to pay the Company the approximately $65.5 million due to it under the CB Agreements.  CB's claims are described in the Settlement Agreement, the First Day Declaration, and the Debtors' *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [Docket No. 63] (the "**Disclosure Statement**").  As reflected in each of the aforementioned filings that are part of the record of these chapter 11 cases, the Debtors recognize that the claims are complex – in part due to the vague and uncertain guidance from the SBA in connection with the implementation of the PPP, and the involvement of various governmental entities with respect to determining the liability exposure being asserted by CB against the Company.  The filings also include a discussion of the Debtors' defenses to such claims.  Thus, Cross River's contention that it does not understand the basis for the claims asserted by CB which are the subject of the Settlement is particularly disingenuous.

6.      In addition to Cross River being very familiar with CB's claims, since early 2021 the Debtors and Cross River have been in nearly constant discussion about the same issues raised by CB in its claims in connection with Cross River's own PPP Loan Portfolio.  Furthermore, before Cross River filed the Objection, counsel to the Debtors initiated discussions with Cross River's counsel to ensure it had the information needed to assess the Settlement and, indeed, the Debtors provided prompt responses to each of Cross River's requests. In addition, in an effort to streamline the hearing on the Motion and the Objection, the Debtors have also submitted concurrently with this Reply the *Declaration of Laquisha Milner in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* (the "**Milner Declaration**").  Any argument by Cross River that it and the Court lack the facts necessary to evaluate the

4

Settlement is belied by the record of these chapter 11 cases, the engagement between the Company and Cross River both pre- and postpetition and both pre- and post-filing of the Motion, and Cross River's own knowledge of the substance of the claims at issue.

7.      Cross River's argument that the Debtors should not have settled because CB is not entitled to setoff also misses the mark. While the Debtors agree that CB should not be entitled to setoff (or recoup) amounts it claims it is owed under the CB Agreements to reduce the approximately $65.5 million owed to the Company, through mediation discussions and subsequent settlement negotiations, the Debtors understand that it is likely that CB would have argued that its claims are not contingent, such claims can be liquidated, it is entitled to setoff or recoupment, and because it is entitled to setoff it is a secured creditor pursuant to section 506(a) of the Bankruptcy Code. Further, in the event that the Debtors are unable to improve their liquidity with the Settlement Payment, they will likely reject the CB Agreements, among others, and face the possibility of CB filing rejection damage claims against them and improving its position with respect to being entitled to setoff (or recoup) its claims against the CB Receivable. To be clear, the Debtors disagree with these contentions—but that is the nature of a dispute.

8.      The Settlement Agreement is a fair and reasonable resolution of complex disputes between the Company and CB, especially in light of the Debtors' need for the liquidity provided by the $23.2 million payment, and is well above the lowest point in the range of reasonableness.  Indeed, absent approval of the Settlement Agreement, the Debtors will not have sufficient liquidity to continue servicing its remaining Loan Portfolio—including those PPP Loans owned by Cross River through the end of December 2022.  Unlike other debtors who may have access to debtor-in-possession financing from third parties, the Debtors have no viable sources of additional liquidity outside their very limited ongoing revenue streams and reaching settlements with the Federal Reserve and CB.

9.      In short, the Settlement Agreement easily meets the standard for approval of settlements; it is fair, falls well above the lowest point in the range of reasonableness, is a sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their estates, creditors, and all parties in interest.  Accordingly, the Debtors respectfully request that the Court grant the Motion, enter the Proposed Order and overrule the Objection.

## **Debtors' Reply**

**A.      The Debtors Have Provided More Than Adequate Information Supporting the Settlement**

10.      Cross River contends that the Motion does not adequately disclose relevant facts related to the claims being settled to determine whether the settlement is "fair and equitable" and asserts that the Debtors failed to disclose information such as the magnitude of CB's claims, the merits of those claims and defenses related thereto, and a substantive legal analysis of CB's right to setoff.  Objection ¶¶ 14-15.  Those assertions are both inaccurate and grossly misconstrue the Debtors' burden in seeking approval of a settlement pursuant to Bankruptcy Rule 9019.

11.      In the First Day Declaration, the Debtors describe the various Disputes involving CB and for which they have spent immense time and resources defending themselves over the past two years.   More specifically, the Debtors describe the principles and allegations underlying the four primary issues raised by CB: the Missing in E-Tran Loan issue, the $100k Issue, the Form 940 Issue, and the DOJ Investigations.  First Day Declaration ¶¶ 47-48.

- First, repayment of principal, interest and tax payments, as well as origination fees, associated with PPP loans that are missing SBA loan numbers that should have been assigned by the SBA's electronic application system, E-Tran (the "**Missing in E-Tran Loans**").  Absent the SBA reinstating a Missing in E-Tran Loan, the lender, like CB, can only look to the borrower for repayment and would not have the benefit of the SBA Guaranty Purchase.

6

- Second, potential claims on account of the SBA alleging that the Debtors improperly included individuals with compensation of more than $100,000 in its payroll calculations (the "**$100k Issue**").

- Third, potential claims on account of the Company allegedly failing to exclude ineligible expenses from applicants' Box 4 submissions in making PPP Loan eligibility determinations (the "**Form 940 Issue**").

- Fourth, potential claims arising from any DOJ investigations relating to the $100k Issue, the Form 940 Issue, or any pending False Claims Act case or related investigation involving the Company that is being pursued by the U.S. Attorney's Office in the District of Massachusetts.

12.    In addition to the record of the chapter 11 cases that already provides adequate information on CB's claims, the recitals to the Settlement Agreement, attached to the Motion, describe the disputes between CB and the Debtors.  Settlement Agreement at 2-3.  The record is clear that CB is asserting that it is withholding payment to the Company of the CB Receivable as a direct result of its perceived failures by the Company in servicing CB's Loan Portfolio.  The Debtors deny those allegations.

13.    In considering the merits of a settlement, a bankruptcy court does not need a full recitation of the facts and legal arguments underlying the applicable claims, rather the court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd sub nom. Pulver.com v. MediaLive Int'l, Inc. (In re Key3Media Grp., Inc.)*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).  The Court is not required to determine the merits of CB's claims.  *See In re NovaPro Holdings*, LLC, 815 Fed. Appx. 655, 658 (2020) ("The Bankruptcy court need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement; rather avoiding litigating the issues is one of the main advantages of settlement.").

7

14.     Cross River relies on *In re Spansion* and *In re Trout* to support its contention that the Debtors' failure to recite the precise magnitude of the CB Potential Claims is fatal to the Motion.  Objection ¶ 15.  In its citation to *Trout*, Cross River conveniently omits the fact that the *Trout* court's requirement of "full disclosure" is in reference to the *terms of the settlement*, not the nature or amount of the claims in dispute.  Immediately prior to the sentence cited by Cross River, the *Trout* court states: "Achieving these results mandates that there be **complete disclosure of the settlement terms** by the parties to the settlement." *In re Trout,* 108 B.R. 235, 239 (Bankr. D.N.D. 1989) (emphasis added).  The Debtors have attached the entire executed Settlement Agreement, without any redactions, to the Motion—they could not possibly have been more transparent about the terms of the settlement.  In *Spansion*, the debtor's flaw identified by the court was that the debtor's executive that approved the settlement terms did not consider the merits of the underlying litigation himself.  *See In re Spansion, Inc.*, 2009 WL 1531788, at *7-8 (denying a Rule 9019 motion because, among other things, the debtor's executive "testified that in reviewing the Settlement Agreement and making his proposal to the Board of Directors, he did not rely upon advice received from counsel... Under these circumstances, it seems unlikely that a reasonable evaluation of the merits of litigation of this nature and extent could have been made without taking into account the advice of patent litigation counsel.").  The record in these chapter 11 cases establishes a clear distinction in the Debtors' consideration of the facts and legal arguments underlying the Dispute, including extensive discussions with counsel.

15.     In fact, the court in *In re Key3Media Grp., Inc.*, a case that Cross River cited to in its own Objection, clearly states: "[i]n its efforts to resolve the matter, it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement." 336 B.R. 87, 93 (Bankr. D. Del. 2005).  The recitation of the Disputes

8

related to CB in the Motion and Settlement Agreement (and also as described in the First Day Declaration and the Disclosure Statement) are sufficient to meet the Debtors' burden. However, in an effort to be responsive to the Objection, the Debtors have also provided to the Court through the Milner Declaration the range of the potential amounts of the CB Counterclaims as alleged by CB and the amounts of CB's primary claims based on the Debtors' calculation of those relevant loan populations, among other information. Notably, the Debtors voluntarily provided this very same information to Cross River four days before the hearing on the Motion in response to information discovery requests.

16.     Cross River's argument appears to be that the Debtors are not permitted to settle claims that are contingent and unliquidated (or at least that the Debtors contend are contingent and unliquidated) because the Debtors cannot know the precise amount of the claims they are settling. That is certainly not the law and there is no support for it offered by Cross River. Although CB has not quantified all of its claims asserted against the Debtors with specificity, it has represented to the Company in discussions between the Parties that its claims against the Debtors are potentially equal to the remainder of its outstanding loan portfolio, which was approximately $181 million as of the Petition Date. With respect to CB's claims associated with Missing in E-Tran Loans, the Company calculated the aggregate outstanding principal amount of such PPP loans as of October 11, 2022 at approximately $13.7 million. As described in the Settlement Agreement, CB has also asserted that the Company has potential incremental liability for Missing in E-Tran Loans on account of tax liabilities borrowers may incur if CB forgives their loans. In connection with the $100k Issue and the Form 940 Issue, the potentially impacted CB Loans, as determined by the Company in conjunction with alleged excess loan analysis conducted by Forensic Risk Analysis on or about June 24, 2022, have a potential excess amount of approximately $5 million.

9

17.     To that end, Cross River's accusation that it does not have sufficient information with which to assess the magnitude of CB's potential claims is meritless.  In addition to the First Day Declaration's recitation of the nature and size of the loan populations flagged by the DOJ for potential excess loan amounts, the Debtors voluntarily provided further detailed information to Cross River before they even filed the Objection.  More specifically, before the Motion was filed, the Debtors' counsel reached out to Cross River's counsel to let them know of the anticipated filing.  It was not until after the Motion was filed that Cross River responded and, notably, did not object to having the Motion heard on shortened notice despite being served with both the Motion and the related motion to shorten notice. The Debtors provided Cross River with the information it requested relating to the nature and scope of the Disputes involving CB and the Debtors' defenses in response.  It is clear that Cross River's Objection has nothing to do with understanding the claims, merits, or defenses—they simply just do not like that CB's claims are being settled (for what they perceive as 100 cent dollars) while Cross River's claims are not afforded the same treatment. But that is not an appropriate basis to oppose a 9019 motion.

18.     Indeed, as noted above, it is disingenuous for Cross River to suggest that it does not have sufficient information about the underlying claims to assess the reasonableness of the Settlement Agreement.  Cross River is intimately familiar with the facts underlying these claims; Cross River has described them extensively in its own letter-writing campaign to the Debtors, and, most importantly, Cross River has spent dozens, perhaps hundreds, of hours discussing these very issues with the Debtors through counsel and otherwise both prior to and during these chapter 11 cases.

## B.     Setoff and Recoupment

19.     It is the Debtors' position that CB owes the Company the entirety of the CB Receivable. Nevertheless, based on extensive discussions during mediation (which are confidential

10

and privileged), the Debtors expect that CB will argue that it is entitled to setoff and/or recoup from the approximately $65.5 million CB Receivable amounts it contends that the Company owes to it based on the various claims it has asserted in the Disputes. Cross River seems to contend in its Objection that the Debtors should have wholly discounted CB's arguments that it was entitled to setoff (Cross River does not address recoupment) because CB's setoff claims fail presumably as a matter of law. *Id.* ¶ 19.

20.     While the Debtors agree with Cross River that CB *should not* be able to setoff (or recoup) where they have only contingent and unliquidated claims, the position of CB is very different.  First, the Debtors anticipate that CB will contend that, as a matter of fact, the claims they assert are not wholly contingent and unliquidated. CB would likely argue that where a loan has not been approved (in whole or in part) by the SBA, it does not need to wait and see whether the borrower pays on the claim in order for CB to be damaged. Rather, CB is likely to assert that if the portfolio of such loans would be valued lower because of the lack of SBA backing then CB is damaged already. The Debtors disagree with this position on several grounds, including that if the borrowers pay their loans then CB will suffer no damage – even if those loans are not SBA backed. In any event, absent the Settlement, the issue of whether the CB's claims are, in fact, contingent and unliquidated would almost certainly have to be litigated.

21.     Even if the Court concluded that the claims were wholly unliquidated, the Debtors expect that CB would also argue that Pennsylvania law (the law that CB contends applies to the key CB Agreements) is sparse as to whether such unliquidated claims can be setoff or recouped and this sparsity of law creates uncertainty as to the outcome of the issue.  Where the setoff rights sound in contract, Delaware courts will apply the choice of law provision in the underlying contract to the setoff claim. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006) ("The Note included a choice of law provision stating that it is governed by Texas Law"

11

and setoff claimant's "action is a breach of contract claim," thus court assessed whether claimant had a setoff right as a matter of Texas state law); *see also In re Lason, Inc.*, 314 B.R. 296, 296 n.3 & 304 (Bankr. D. Del. 2004) (noting in a footnote that the contract had a Georgia choice of law provision and then applying Georgia law to analyze the right of setoff without discussion of choice of law principles).

22.    The cases under Pennsylvania state law on the subject of setoff and recoupment are very old. *See, e.g.*, *Hunt v. Gilmore*, 59 Pa. 450, 450 (1868) ("Unliquidated damages arising *ex contractu* from any bargain, may be set off under the Pennsylvania Defalcation Act, wherever they are capable of liquidation by any known legal standard"); *Leas v. Laird*, 1820 WL 1828, at *1 (Pa. 1820) (holding that "defendants could not avail themselves of this set-off" where the subject obligation owed to them was contingent).  Not only is Pennsylvania law limited, but it is also unclear whether a contingent and unliquidated claim may be subject to recoupment. *See, e.g.*, *Kline v. Blue Shield of Pa.*, 383 Pa. Super. 347, 355, 556 A.2d 1365, 1369 (1989) (finding that insurer properly withheld contract payments to doctors to offset amount owed by doctors to insurance where a judgment already existed and finding this a recoupment, not a setoff); *see also Life & Health Ins. Co. of Am. V. Fed. Ins. Co.*, No. CIV.A. 92-6736, 1994 WL 125212, at *2 (E.D. Pa. Apr. 13, 1994) ("The doctrine of recoupment is premised on there being an alleged indebtedness owed by plaintiff to defendant which defendant can recover by deducting the amount of such indebtedness from the amount of damages plaintiff recovers from the defendant."). Nevertheless, Pennsylvania law must be considered because section 553 merely preserves setoff rights based on state law. "Bankruptcy has long recognized the equitable right to setoff mutually offsetting debt. 11 U.S.C. § 553 . . . preserves these rights, as well as those setoff rights available by law. But it does not create any setoff rights on its own. It only vivifies pre-existing rights . . . [and] jurisdictions have varying approaches to setoff rights." *In re LTC Holdings, Inc.*, 597 B.R.

12

565, 572-73 (Bankr. D. Del. 2019), *aff'd*, No. AP 15-51889 (CSS), 2020 WL 5576850 (D. Del. Sept. 17, 2020), *aff'd sub nom. In re LTC Holdings, Inc.*, 10 F.4th 177 (3d Cir. 2021).

23.     To be sure, the Debtors agree with Cross River that the law *should not* support a valid setoff and recoupment argument here, but that issue would almost certainly have been subject to extensive litigation in the Bankruptcy Court.

**C.     Entry Into the Settlement Agreement is a Sound Exercise of the Debtors' Business Judgment**

24.     The Settlement Agreement constitutes a sound exercise of the Debtors' business judgment and should be approved under section 363(b)(1) of the Bankruptcy Code. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that a debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp; (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted).  Contrary to Cross River's arguments, this court has held that the standard, as applied to proposed settlement agreements is a deferential one.  See *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006) (Courts generally evaluate proposed settlements "giv[ing] deference to a Debtor's business judgment.").

25.     The Debtors have determined that the Settlement Agreement will, without question, provide substantially more value to the estate than if the Settlement Agreement were not approved and the Debtors were forced to litigate the Disputes to judgment and incur millions of dollars in legal fees to do so. Liquidity and financial resources are always a concern for companies operating in chapter 11.  The Debtors, however, are in a particularly dire financial position and

13

have no ability to change it without recovering a significant portion of the CB Receivable.  As previously noted and demonstrated in the budget annexed to the Debtors' motion for consensual use of cash collateral [Docket No. 143], absent the $23.2 million to be paid under the Settlement Agreement, the Debtors are forecasted to run out of cash by the end of December.  That means, the Debtors would be forced to abruptly stop servicing its loan portfolio by that date, a concern that CRB itself expressed at the first day hearing after reviewing the Debtors' chapter 11 plan. *See* First Day Hr'g Tr. at 37:7-11 ("And with respect to the plan that's on file, we also haven't had a chance to really dive into it, but I certainly hope it's not, you know, that toggle plan that is really a toggle between a rock and a hard place for creditors who have already paid for the servicing.").

26.    The Debtors have been clear since day one of these chapter 11 cases— absent reaching a deal with CB to recover the CB Receivable, it would be faced with no choice but to reject its servicing contracts and seek to transfer the PPP Loans immediately. Notwithstanding that the Debtors have reiterated this reality on the record and to Cross River in multiple conversations, Cross River ignores the liquidity issues in its Objection and still seeks to block the Settlement Agreement.   The failure to approve the Settlement would have significant consequences, in particular because the Debtors are currently in the midst of processing a significant number of loans for Loan Forgiveness and Guaranty Purchase by the SBA ahead of very tight expiration deadlines.[3]  As the Debtors have already made clear in the record of these chapter 11 cases, "[f]ailure to process a loan in a timely manner could result in the SBA refusing to forgive the loan, which directly impacts borrowers, or refusing to purchase the loan, which directly impacts the Federal Reserve and the Partner Banks."  First Day Declaration ¶ 82.  If the

---

[3] As described in the First Day Declaration: "[t]he deadline to submit a Loan Forgiveness application is the maturity date of the loan. Further, the SBA is not obligated to honor the Guaranty Purchase if a PPP lender does not apply within 180 days following maturity.".  First Day Declaration. ¶ 17 fn. 9.

14

Settlement Agreement is not approved, then processing will cease, and those deadlines will surely be missed, creating immediate and irreparable harm.

27.     The decision to enter into the Settlement Agreement was made after significant deliberation and after receiving the advice of experienced advisors, including counsel and financial advisors.  Moreover, when considering the risks associated with not reaching a settlement, the Debtors' realized that absent the Settlement Agreement they would face an adversary proceeding with all of the attendant costs and uncertainty associated with litigation, the inability to continue servicing the PPP loans through the plan effective date, and a greater burden and strain on their already limited resources, all of which would likely diminish the Debtors' estates and leave less resources available to effectuate a successful wind down.  After carefully balancing the pros and cons of the Settlement Agreement, the Debtors concluded that the Settlement is a far better outcome than the alternatives available.

28.     In sum, the Court should find that the Settlement Agreement represents a fair and reasonable resolution of the Disputes. For the reasons set forth in the Motion and the Milner Declaration, the Debtors submit that the Settlement Agreement should be approved under section 363(b) of the Bankruptcy Code as a sound exercise of their business judgment.

## Conclusion

29.     For the reasons set forth in the 9019 Motion, the First Day Declaration, the Milner Declaration, and herein, the Settlement Agreement is reasonable, fair, and justified under the circumstances of the Chapter 11 Cases.  Accordingly, the Court should overrule the Objection and enter the Proposed Order approving the Settlement Agreement.

## Reservation of Rights

30.     The Debtors reserve all rights in connection with the Settlement Agreement, including any claims, equitable remedies, causes of action, or otherwise, and any right of estoppel

15

if the Settlement Agreement is not approved or otherwise does not become effective. Nothing contained in this Reply or any actions taken by the Debtors and CB pursuant to the relief granted is intended or should be construed as: (i) an admission as to the validity of any claim against the Debtors, or (ii) a waiver or limitation of the Parties' rights under the CB Agreements; the Bankruptcy Code; and other applicable law, including, but not limited to, with respect the chapter 11 plan of liquidation, except as agreed to under the Settlement Agreement.

*[Remainder of Page Intentionally Left Blank]*

16

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: November 6, 2022
Wilmington, Delaware

/s/ Matthew P. Milana

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
        steele@rlf.com
        shapiro@rlf.com
        milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
E-mail:     ray.schrock@weil.com
        candace.arthur@weil.com
        natasha.hwangpo@weil.com
        chase.bentley@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*