<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .
 4   KABBAGE, INC. D/B/A          .  Case No. 22-10951 (CTG)
     KSERVICING, et al.,          .
 5                                .  (Jointly Administered)
                                  .
 6                                .  Courtroom No. 7
                                  .  824 Market Street
 7              Debtors.          .  Wilmington, Delaware 19801
                                  .
 8                                .  Monday, November 7, 2022
     . . . . . . . . . . . . . . .  1:00 p.m.
 9


10                        TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE CRAIG T. GOLDBLATT
11                 UNITED STATES BANKRUPTCY JUDGE

12
     APPEARANCES:
13

     For the Debtors:         Zachary Shapiro, Esquire
14                            RICHARDS, LAYTON & FINGER, P.A.
                              One Rodney Square
15                            920 North King Street
                              Wilmington, Delaware 19801
16
                              Candace Arthur, Esquire
17                            Natasha Hwangpo, Esquire
                              Richard Slack, Esquire
18                            WEIL GOTSHAL & MANGES LLP
                              767 Fifth Avenue
19                            New York, New York 10153

20   Audio Operator:          Theresa Mistretta

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

APPEARANCES (CONTINUED):

For Cross River Bank:      Issac Nesser, Esquire
                           QUINN EMANUEL URQUHART
                             & SULLIVAN LLP
                           51 Madison Avenue, 22nd Floor
                           New York, New York 10010

                           Matthew Scheck, Esquire
                           QUINN EMANUEL URQUHART
                             & SULLIVAN LLP
                           865 S. Figueroa Street
                           10th Floor
                           Los Angeles, California 90017

1                                  INDEX

2  MOTIONS:                                                    PAGE

3  Agenda
   Item 9:  Debtors' Motion for Entry of an Order (I)           4
4           Authorizing and Approving Settlement Agreement
            Between Debtors and Customers Bank and (II)
5           Granting Related Relief
            [Docket No. 172 - filed October 28, 2022]
6
            Court's Ruling:                                     93
7
   Agenda
8  Item 8:  Motion of Debtors for Entry of Order (I)           100
            Authorizing Debtors' Limited Use of Cash
9           Collateral, (II) Granting Adequate Protection
            to Secured Lender, (III) Modifying Automatic
10          Stay, and (IV) Granting Related Relief
            [Docket No. 143 - filed October 24, 2022]
11
            Court's Ruling:                                    102
12

13 WITNESSES CALLED
   BY THE DEBTORS:                                             PAGE
14
            LAQUISHA MILNER
15          Cross-examination by Mr. Nesser                     10
            Redirect examination by Slack                       53
16          Recross examination by Mr. Nesser                   64

17
   EXHIBITS:                                                   PAGE
18
   Debtor Exhibits                                              8
19
   Declaration of Laquisha Milner                               8
20
   Declaration of Deborah Rieger-Paganis                      101
21

22

23

24

25

1        (Proceedings commence at 1:00 p.m.)

2             THE COURT:  Be seated.  Thank you.

3             So good afternoon.  We are here in In Re Kabbage,

4  which is -- hold on -- Case Number 22-10951.

5             Counsel can bring us through the agenda.

6             MR. SHAPIRO:  Good afternoon, Your Honor.  For the

7  record, Zach Shapiro from Richards, Layton & Finger today, on

8  behalf of the debtors.

9             There are several items on the agenda, but only two

10  going forward, Number 8 and 9.

11             THE COURT:  Okay.

12             MR. SHAPIRO:  So I will, with that, turn the podium

13  over to Candace Arthur from Weil Gotshal, who will walk you

14  through those items.

15             THE COURT:  Okay.  Thank you, Ms. Shapiro.

16             Ms. Arthur.

17             MS. ARTHUR:  Good afternoon, Your Honor.  For the

18  record, Candace Arthur of Weil, Gotshal & Manges on behalf of

19  Kabbage, Inc., doing business as Kservicing, the debtors in

20  these cases.

21             Your Honor, as Mr. Shapiro noted, we do only have

22  two items to go forward with today on the agenda.  With your

23  indulgence, we would like to take them out of order and start

24  with the 9019 motion, just given the impact that it has on

25  the cash collateral motion.

1           THE COURT:  Okay.

2           MS. ARTHUR:  So I will, in that instance, cede the

3  podium to my partner Richard Slack, and he will go forward

4  with the submission of evidence for Your Honor.

5           THE COURT:  Okay.  Very well.  Thank you.

6           Mr. Slack.

7           MR. SLACK:  Good afternoon, Your Honor.  Richard

8  Slack from Weil.

9           Your Honor, what we would propose doing on the 9019

10  is to have the evidence come in.  We have a handful of

11  exhibits that were filed in our exhibit list, we've met and

12  conferred on those, so I'll go through those.

13           We have one witness, Your Honor.  We have Laquisha

14  Milner, who's the CEO.  And let me introduce her right now.

15  She is here in the courtroom.  And we've agreed that, again,

16  with your court's -- with the Court's permission, that her

17  declaration would be her direct testimony, and then she would

18  be available for cross-examination, you know, today.

19           So we would propose going forward with the evidence

20  and then having argument immediately after that.

21           THE COURT:  Okay.  That is fine with me.

22           MR. SLACK:  Great, Your Honor.

23           So, Your Honor, we have submitted an exhibit list,

24  we have a binder.  If I could approach, I can --

25           THE COURT:  Cert --

1           MR. SLACK:  -- I can hand you a binder.

2           THE COURT:  Certainly.  Thank you.

3       (Participants confer)

4           THE COURT:  And just -- Mr. Slack, just so I

5   follow, the parties have agreed that -- or are you to going

6   to walk me through --

7           MR. SLACK:  I'm going --

8           THE COURT:  -- what you've --

9           MR. SLACK:  -- to walk --

10          THE COURT:  -- agreed to?

11          MR. SLACK:  -- you through.

12          THE COURT:  Okay.

13          MR. SLACK:  But we do have agreement, Your Honor.

14  And there's a couple of just minor tweaks to it, which I'll

15  walk the Court through.

16          Your Honor, there's agreement that all of the

17  exhibits can come in, but I'm going to talk about some

18  limitations on a few of them.

19          THE COURT:  Okay.

20          MR. SLACK:  So, with respect to Item Number 3,

21  which is the case servicing white papers, the parties are

22  agreeing that that can come in to show, essentially,

23  Kabbage's position with respect to those claims, but not for

24  and we're not trying to bring it in for the truth of the

25  merits of those claims.

1          THE COURT:  Understood.

2          MR. SLACK:  Similarly, Your Honor, if you look to

3   Items 11, 12, 13, and 14, which are letters between Customers

4   Bank's counsel and counsel for Kabbage, again, we're agreeing

5   that those letters can come in for purposes of showing the

6   party's position and what they said to one another, again,

7   but not for the underlying truth of any of those statements.

8          And then the other very minor limitation is the

9   cash collateral budget, which is Item Number 4, which, as

10  Your Honor may note, is an exhibit to the order in the cash

11  collateral motion.  That parties would agree that that can

12  come in to show what the projections were, what the budget

13  was at the time, but again, not necessary -- not to show what

14  the actual results are.

15         THE COURT:  Understood.

16         MR. SLACK:  And so, with that, Your Honor, I'd move

17  all of the exhibits in the binder into evidence.

18         THE COURT:  Okay.  Any objection to those documents

19  being admitted with the caveats as expressed?

20         MR. SCHECK:  Matthew Scheck from Quinn Emanuel on

21  behalf of Cross River Bank.

22         No objections to the exhibits with the caveats

23  stated on the record.  Thank you.

24         THE COURT:  Okay.  Any other party-in-interest have

25  any objection?  If not, they will be admitted subject to

1  those caveats.

2       (Debtors' Exhibits received in evidence)

3            MR. SLACK:  Thank you very much, Your Honor.

4            So now, as I said, Your Honor, we also have Ms.

5  Milner, we put in her declaration.  And again, with the

6  Court's permission, we would ask that that be admitted into

7  evidence and be treated as her direct testimony.

8            THE COURT:  Any objection thereto?

9            MR. SCHECK:  Your Honor, no objection.

10           THE COURT:  Okay.

11       (Milner Declaration received in evidence)

12           MR. SLACK:  So, Your Honor, I have copies of that,

13  if you'd like a copy of the declaration.

14           THE COURT:  I don't think -- so this is the

15  declaration that's filed as --

16           MR. SLACK:  That's --

17           THE COURT:  -- Docket Item Number 211?

18           MR. SLACK:  That's correct, Your Honor.

19           THE COURT:  Okay.  Yeah, I don't need another copy

20  of that.

21           MR. SLACK:  So the other -- and the other thing is

22  I would ask that the witness be allowed to have her direct

23  testimony in front of her when she's on the stand.

24           THE COURT:  Any objection?

25           MR. SCHECK:  No objection, Your Honor.

1        THE COURT:  Okay.

2        MR. SLACK:  So, with that, Your Honor, we would

3   call Ms. Milner to the stand.

4        THE COURT:  Okay.  Ms. Milner.  And --

5        MR. SLACK:  And --

6        THE ECRO:  Please raise your right hand.

7   LAQUISHA MILNER, WITNESS FOR THE DEBTORS, AFFIRMED

8        THE ECRO:  Please state your full name and spell

9   your last name for the record.

10       THE WITNESS:  My name is Laquisha Milner, M-I-l-n-

11  e-r.

12       THE ECRO:  Thank you.  You may be seated.

13       THE WITNESS:  Thank you.

14       MR. SLACK:  And Your Honor, I'm going to approach

15  the witness and give her a copy of the declaration.

16       THE COURT:  Certainly.

17       MR. SLACK:  Thank you.

18       With that, Your Honor, we are -- we're going to

19  turn the witness over for cross-examination for whichever

20  parties would like to do that.

21       THE COURT:  Okay.  Is there cross-examination?

22       MR. NESSER:  Yes, Your Honor.  Isaac Nesser for

23  Cross River Bank.

24       Your Honor, before I begin, there was a document

25  not on the exhibit list, it's the first-day declaration,

1  October 3rd, 2022.  We -- I expect we'll be referring to that

2  in the course of the examination.  Would it be all right if

3  we provided the witness a copy?

4           THE COURT:  Certainly.

5           UNIDENTIFIED:  May I approach, Your Honor?

6           THE COURT:  Certainly.

7           UNIDENTIFIED:  Does Your Honor care for a copy?

8           THE COURT:  I actually have the first-day

9  declaration.  Hold on here, so I think I got it.

10          UNIDENTIFIED:  And anybody else require a copy?

11      (Participants confer)

12          THE COURT:  Okay.  You can proceed.

13                        CROSS-EXAMINATION

14  BY MR. NESSER:

15  Q    Good afternoon, Ms. Milner.

16  A    Good afternoon.

17  Q    You've submitted a declaration that we just discussed

18  opining on the settlement agreement that we're discussing

19  this afternoon, correct?

20  A    Correct.

21  Q    You signed that yesterday?

22  A    (No verbal response)

23  Q    You signed that agreement -- you signed that --

24  A    I --

25  Q    -- yesterday?

1  A    I did sign the agreement.

2  Q    I'm sorry.  You signed the declaration yesterday.

3  A    Yes.

4  Q    And in the declaration, you say that the settlement is

5  fair and reasonable, right?

6  A    Yes, the settlement is fair.

7  Q    And I'd like to discuss some of the factors that you

8  consider when assessing whether this settlement --

9  A    Uh-huh.

10 Q    -- or really any settlement is fair and reasonable.

11      So, to begin with, you need to know what the claim is,

12 right?

13 A    Yes.

14 Q    You need to know how large the claim is.

15 A    (No verbal response)

16 Q    Yes?

17 A    We need -- how large?  No.

18 Q    In order to assess whether a settlement is reasonable,

19 you need to know what the consideration is that's being

20 exchanged in the settlement, right?

21 A    Yes.

22 Q    And you need to know what the claim is and what the

23 consideration is in order to assess whether the settlement is

24 fair and reasonable, right?

25 A    Yes.

1    Q    And if the claim relates to events that may happen in
2    the future, you need to know what those things are, right?
3    A    We need to understand what the claims are, yes.
4    Q    And what the contingencies are, right?
5    A    Yes.
6    Q    And you need to know how likely those contingencies are
7    to occur.
8    A    No.
9    Q    You need to have some understanding or some assessment
10   of that issue.  Yes?
11   A    Yes.
12   Q    And again, you need to know those things in order to
13   assess --
14   A    Uh-huh.
15   Q    -- whether a settlement is fair and reasonable, right?
16   A    Yes.
17   Q    And once you know what the claim is and then you deal
18   with contingencies, you also need to assess whether the claim
19   is likely to succeed if it's litigated, right?
20   A    I -- I would not say that as a yes, no.
21   Q    You need to understand how strong the claim is, right?
22   A    I need to understand the claim, yes.
23   Q    And you need to understand whether you would prevail if
24   the claim were litigated, right?
25   A    Yes.

1  Q    And so you need to know, therefore, what the strength of

2  the claim is?

3  A    I need to understand the claim, yes.

4  Q    And you need to know what the defenses are.

5  A    Yes, I do need to understand the defenses.

6  Q    And you need to understand how strong the defenses are.

7  Yes?

8  A    Yes.

9  Q    All of that, again, in order to assess whether a

10 settlement is fair and reasonable.

11 A    Yes.

12 Q    One other thing.  In order to assess whether a

13 settlement is fair and reasonable, you also need to know what

14 the settlement is, right?  How much is --

15 A    Yes.

16 Q    How much is being exchanged and when it's -- and when

17 it's being paid, right?

18 A    Yes.

19 Q    Okay.  So, just to recap, and then we'll get into the

20 substance, to assess whether a settlement is fair and

21 reasonable, you need to consider, number one, the nature and

22 size of the claim; number two, any contingencies; number

23 three, any defenses; and then, number four, the nature of the

24 settlement, right?

25             MR. SLACK:  Your Honor, I object to that.  He's

1    saying -- he was repackaging, and I think the witness'

2    testimony was different and stands on its own.

3            THE COURT:  What's your response to the objection?

4            MR. NESSER:  I don't believe it misstated in any

5    respect the testimony.

6            THE COURT:  Let me -- I'll let you ask the question

7    again and give the witness a chance to answer it.

8    BY MR. NESSER:

9    Q    So, Ms. Milner, we talked about four types of factors,

10   right?  Just now, that we've talked about as necessary to

11   consider when assessing whether a settlement is fair and

12   reasonable.  We -- again, we talked about four of them:

13        The first one you'll agree with me is you have to know

14   the nature and size of the claim, right?

15   A    Please ask that again.

16   Q    We can continue.

17   A    Yeah.

18   Q    But the factors that we were talking about just now, and

19   you identified a number of them that you agree would have to

20   be considered in order to assess whether a settlement is fair

21   and reasonable.  Can we talk -- like can we just call those,

22   for the purposes of the next little while, the

23   "reasonableness factors"?  Is that okay with you?

24   A    Yes.

25   Q    So let's turn now to the settlement with Customers Bank.

1   A     Uh-huh.

2   Q     In Paragraph 6 of your declaration, you say that "CD

3   contends" -- this is a quote:

4          "CB contends that the Company is liable to it for

5   claims that primarily fall in four buckets."

6          Yes?

7   A     Yes.

8   Q     And the first bucket relates to missing e-tran loans?

9   A     Yes.

10  Q     Second bucket relates to the hundred-thousand-dollar

11  issue?

12  A     Yes.

13  Q     The third relates to the Form 940 issue.  Yes?

14  A     Yes.

15  Q     And the fourth bucket relates to potential claims

16  arising from certain DOJ investigations, right?

17  A     Yes.

18  Q     Now we said earlier that, in order to assess whether a

19  settlement was fair and reasonable, you need to know what the

20  claims are that are being settled, right?

21  A     Yes.

22  Q     And those four buckets that we just talked about, those

23  four buckets are the claim that you determined the settlement

24  here would fairly and reasonably resolve, correct?

25  A     Please ask that again.

1  Q    Yeah.

2  A    I didn't hear you.

3  Q    When you were assessing whether the settlement here was

4  fair and reasonable --

5  A    Uh-huh.

6  Q    -- you were considering those four buckets of claims,

7  right?

8  A    I was considering a number of things to determine if it

9  was reasonable.

10  Q    I understand.  But what -- I'm saying the first factor

11  we talked about is what is the claim that we're talking

12  about, right?  What is it that we're settling?

13  A    Yes.

14  Q    Okay.  And when you were attempting to determine what it

15  is that you're settling, you identify four buckets in your --

16  A    Uh-huh.

17  Q    -- declaration, right?

18  A    I did.

19  Q    And those are the buckets that you considered in

20  determining what is it that we're settling, right?

21  A    Yes.

22  Q    Okay.  And there's nothing else in your declaration

23  where you say here's a fifth bucket, right?

24  A    These are the four that we've stated, yes.

25  Q    Okay.  And so let's talk about the first bucket, which

1  is the missing e-tran loans, right?  According to your

2  declaration, the issue there is that the SBA should have

3  assigned loan numbers to certain loans, but it didn't do so.

4  Is that fair?

5  A    Yes.

6  Q    And --

7  A    That -- that's fair.

8  Q    And you say that -- I'm quoting now from Paragraph:

9         "Absent the SBA reinstating a missing in e-tran

10 loan, the lender, like Customers Bank, can only look to the

11 borrower for repayment and would not have the benefit of the

12 SBA guaranty purchase."

13        Yes?

14 A    Potentially, yes.

15 Q    What do you mean by "potentially"?

16 A    Meaning, if the -- if the bank does not, in this

17 instance, get the funds back from the borrower, then it would

18 not be honored, as of now, by the SBA.  That's what that's

19 saying.

20 Q    As of now, right?  And so --

21 A    Uh-huh.

22 Q    -- the SBA also may change its mind on that issue.  Yes?

23 A    They could.

24 Q    Yeah.  So, when you say -- well, let's continue.

25        So Customers Bank has asserted that these e-tran loans,

1  these missing e-tran loans, may not be eligible in whole or

2  in part for guarantee or forgiveness, right?

3  A    Correct.

4  Q    And they haven't taken a position on whether it's in

5  whole or in part, right?

6  A    No.

7  Q    So, for all we know, it could be that the issue on the

8  e-tran loans is the full face amount of those loans or it

9  could be some subsidiary part of those e-tran loans, right?

10 A    Correct.

11 Q    And do you have an opinion on that issue?

12 A    I have an opinion that we are not liable for those, as

13 we have operated in conjunction with the program, with PPP;

14 however, it is a claim.

15 Q    If that claim is permitted to proceed, though, is it

16 your belief that it should be permitted with respect to the

17 whole face amount or some smaller subset of the face amount?

18 A    I don't think I can speak to that right now.

19 Q    Okay.  And --

20 A    I don't have --

21 Q    -- do you --

22 A    -- enough --

23 Q    -- have any --

24 A    -- information.

25 Q    -- assessment of how a court might resolve that issue?

1  A    I -- I have -- no.

2  Q    And again, Customers Bank has not told you how it feels

3  about that issue.

4  A    No.

5  Q    Okay.  And you say also that the aggregate outstanding

6  principal amount of the PPP loan subject to this e-tran

7  issue, as of October 11, 2022, was approximately $13.7

8  million.  Yes?

9  A    That is our calculation based on the population of the

10  loans and the amounts --

11  Q    Right.

12  A    -- that is ours.  Uh-huh.

13  Q    And we agreed before that, in assessing whether a

14  settlement is fair and reasonable, one thing to consider is

15  what the contingencies might be, right?

16  A    I don't think I understand.

17  Q    One of the --

18  A    Can you --

19  Q    -- things we --

20  A    -- explain it again?

21  Q    -- discussed is you have to know if the claim relates to

22  something that might happen in the future, you need to know

23  what that might is and what the likelihood of it happening

24  is, right?

25  A    I don't think I have enough to -- to answer that.  I

1  mean -- I mean, we definitely assessed what the population

2  was and we understood that this was our --

3  Q    Uh-huh.

4  A    -- view of it and that CB and the SBA may have another

5  view, which could be much, much larger.

6  Q    Sure.

7  A    But given the data that we have, we were able to assess

8  at the 13.7 million, knowing it could be more.

9  Q    Has Customers ever told you that they ascribe a much

10 larger number to this bucket of claims?

11 A    Customers Bank did not tell me directly.

12 Q    So the only number you have is 13.7, right?

13 A    No.  In my declaration, in Paragraph 7 --

14 Q    Uh-huh.

15 A    -- it goes to talk about that the -- CB says that the

16 claims that they have asserted could be the remainder of its

17 outstanding portfolio --

18 Q    Sure.

19 A    -- which is approximately 181 million at the petition

20 date.

21 Q    Sure.  But I'm talking just about the e-tran issue.  Yo

22 have a --

23 A    I --

24 Q    -- 13.7 --

25 A    I do not have a number exactly from --

1  Q    And you don't know what Customers' number is.

2  A    I do not know what that number is was what I'm saying, I

3  don't know what Customers' number is.  My end is 13.7.

4  Q    Did you ever ask what Customers' number is?

5        MR. SLACK:  Your Honor, I just want to point out

6  something that -- is that there was a mediation which counsel

7  knows very well that's covered by the mediation privilege.

8  And there -- you know, I -- so I would say, Your Honor, that

9  the -- and he can ask the witness.  But the information that

10 was in the mediation was not put in our papers.  There was a

11 discussion, obviously, about the mediation.  And you know, so

12 I would just, you know, counsel, you know, maybe the, you

13 know, counsel here and the witness not to disclose what's in

14 the mediation because we're not at liberty to do that.

15       THE COURT:  All right.  So I understand you're

16 preserving the mediation privilege.  And to the extent you

17 hear a question that calls for an answer that would divulge,

18 you can --

19       MR. SLACK:  Yeah.  The hard part is, Your Honor, if

20 you get a question that doesn't say what did you learn in the

21 mediation, but did you know X, and that information comes in

22 the mediation, you know, you can't answer that, that

23 question.  And I -- there hasn't been a foundation.  But I

24 would just say, Your Honor, that that kind of a question,

25 when there's been an extensive mediation and extensive

1  mediation submissions, which, again, counsel knows, you know,

2  is a little -- is, I think, a little misleading.

3       THE COURT:  All right.  Do you have a proposal of

4  how to navigate the mediation privilege in this context?

5       MR. SLACK:  Your Honor, in Paragraph 19 of the

6  reply, the debtors explicitly rely on extensive discussions

7  during mediation, based on which the debtors expect that CB

8  will argue that it's entitled to setoff and/or recoup from

9  the approximately sixty-five-and-a-half-million-dollar

10 receivable amounts, et cetera.

11      Given that they're explicitly relying on the

12 mediation, I don't know how --

13      THE COURT:  I think that the fact of the mediation

14 is disclosed and is understood, but that doesn't waive the

15 privilege as to every communication that took place in the

16 mediation.

17      MR. NESSER:  Sure.

18      THE COURT:  So ...

19      MR. NESSER:  Well, the -- maybe I can take it step

20 by step then.

21      THE COURT:  That's fine.

22      MR. NESSER:  The witness has already indicated that

23 -- actually, I think we're fine.

24      THE COURT:  Okay.

25 BY MR. NESSER:

1  Q    So you don't -- just to recap where we were.  You don't

2  know what Customers Bank's number is on this e-tran issue.

3  Yes?

4  A    I do not know that.

5  Q    Okay.  And if borrowers repay the loans that are the

6  subject to the e-tran issue, what happens to your 13.7-

7  million-dollar number?

8  A    That particular number decreases.

9  Q    And by the way, if a borrower, does not pay its loan,

10 that's a default that shows up on their credit report and so

11 forth, right?

12 A    I cannot say that.  I -- I don't have that information -

13 -

14 Q    You don't know.

15 A    -- in front of me.  No, I do not know that.

16 Q    And borrowers, in fact, have been repaying many of the

17 PPP loans that Kabbage has been servicing, right?

18 A    Yes.

19 Q    And --

20 A    Borrowers make payments, yes.

21 Q    And in the first-day declaration, in fact, you say that

22 -- or the declarant says that approximately $256 million of

23 principal of the loans that Kabbage was servicing have been

24 reduced on account of borrower payments of principal in the

25 ordinary course.  Does that sound about right to you?

1  A    I cannot testify to that.  I did read it, but I do not

2  know that fact off the top of my head.

3  Q    Do you have any reason to disbelieve that statement?

4  A    No --

5  Q    Okay.

6  A    -- I do not.

7  Q    And if -- but borrowers repaying is a contingency that

8  would affect how much that claim is worth on the e-tran

9  loans, right?

10  A    It could, yes.

11  Q    And likewise, the SBA could agree to honor its -- honor

12  the guarantee on those loans, right?

13  A    Could, but none of that -- I mean, that has not

14  happened.

15  Q    Right.  But that -- but if that were to happen, what

16  would happen to your 13.7-million-dollar number?

17  A    I cannot state what would happen exactly.  What's the

18  question again?

19  Q    If SBA --

20  A    I'm sorry.

21  Q    If SBA honored the guarantee --

22  A    Okay.

23  Q    -- on the loans --

24  A    Uh-huh.

25  Q    -- that are -- that comprise that $13.7 million --

1  A    Uh-huh.

2  Q    -- in principal amount --

3  A    Uh-huh.

4  Q    -- then the size of Customers' claim against Kabbage on

5  the e-tran loans would decrease, right?

6  A    Well, again, I don't know the size of the Customers

7  claim, but the 13.7 would decrease.

8  Q    Right.  In fact, it could go away entirely, right?

9  A    If every borrower paid?

10  Q    No.  If the SBA agreed to honor the guarantee on all of

11  those loans.

12  A    I can't say it would go away completely?  I'm -- I mean,

13  all -- I can't speak to that --

14  Q    If you --

15  A    -- exactly what would happen for each and every loan.

16  Every loan is different.

17  Q    If the SBA agreed to honor the guarantee --

18  A    Uh-huh.

19  Q    -- on all of the loans --

20  A    Uh-huh.

21  Q    -- that have a missing e-tran number --

22  A    Yes.

23  Q    -- how could it be that Customers Bank would still have

24  a claim against you on those loans?

25  A    What I can say is, if the SBA agreed to honor the

1  guarantee, we would process those loans as we do in normal

2  course.

3  Q    And it may be that there's some other issue that impacts

4  whether those loans ultimately are guaranteed, right?

5  A    It could be.

6  Q    But the actual e-tran issue would vanish.

7  A    If they decided to honor, again, yes.

8  Q    Yes.

9  A    We would part -- yeah --

10 Q    And --

11 A    -- process --

12 Q    And that issue is in limbo right now, right?

13 A    We do not have an answer on that.

14 Q    And it's fair to say that that issue is in limbo, right?

15 A    It is fair to say that.  Yes, we don't, yes, have an

16 answer on that from the SBA.

17 Q    I'm sorry.  It's fair to say that issue is in limbo,

18 right?

19 A    Can you define what you think is "limbo"?  I'm sorry.  I

20 want to make sure.

21 Q    Do you not understand what the word "limbo" means?

22 A    I do, for me.  But before I agree, I just would like to

23 ask, please --

24 Q    Why don't you turn to Paragraph 47 of the first-day

25 declaration?

1  A    Uh-huh.

2        (Pause in proceedings)

3  A    I'm there.

4  Q    And do you see there it says:

5            "Importantly, the SBA has communicated to the

6  company, that, at this time, it will not guarantee any excess

7  loan amounts stemming from the hundred-thousand-dollar issue

8  or the Form 940 issue; therefore, the fate of these amounts,

9  the company, and the partner banks, and the Federal Reserve

10 remain in limbo until such a time as the SBA makes clear its

11 final position with respect to the excess loan amounts" --

12       And it goes on.

13       Do you see that?

14 A    I do not, but -- on Page 47?

15 Q    Paragraph 47.

16 A    Oh, Paragraph 47.

17 Q    Page 28.

18 A    Okay.

19       (Pause in proceedings)

20 A    Okay.  Yes, I believe -- this matter is unresolved, yes.

21 We can -- sure, we can say "limbo."

22 Q    Okay.  And just so we don't have to do it again --

23 A    Yes.

24 Q    -- that's the case for the e-tran issue and the Form 940

25 issue and the hundred-thousand-dollar issue, right?

1  A     Yes.

2  Q     Okay.  What is the status of your discussions with the

3  SBA on those issues?

4  A     Ongoing.

5  Q     When is the most recent time you heard from them?

6  A     The most recent time I heard from them?  Probably -- I

7  don't have an exact date, but within the last 21 days.

8  Q     And when we say -- and when I ask -- I'm asking, of

9  course, about Kabbage, in general.  Yes?

10  A     Okay.  I don't have that exact answer then.

11  Q     But --

12  A     Uh-huh.

13  Q     So your best -- the best you can say, sitting here now

14  without looking at calendars, is that you think, in the last

15  three weeks or so --

16  A     Yes.  Yes.

17  Q     -- is the last time that SBA has communicated with

18  Kabbage on these issues or with its outside counsel.  Yes?

19  A     Yes.

20  Q     And what did SBA say at that time?

21  A     I do not know exactly what was said at that time.

22  Q     Who participated in those discussions?

23  A     I'm not sure as -- yeah.  I'm not sure.

24  Q     How do you know that those discussions occurred?

25  A     Because I know what events are occurring, but I do not

1  know exactly what, you know, internal counsel, outside

2  counsel who led the conversations.

3  Q    So what do you believe is the likelihood that SBA will

4  ultimately honor these loans?  Do you have --

5  A    I don't --

6  Q    -- a basis to make --

7           MR. SLACK:  Objection --

8  Q    -- an assessment?

9           MR. SLACK:  -- to the form of the question.

10          THE COURT:  What's your response?

11          MR. NESSER:  I can rephrase it.

12 BY MR. NESSER:

13 Q    You know that the SBA communicated with Kabbage in the

14 last few weeks on this issue, right?

15 A    I know that, yes.

16 Q    But you don't know what was said in that discussion.

17 A    No.

18 Q    But you're generally familiar that those discussions are

19 ongoing.

20 A    Correct.

21 Q    Do you know whether SBA said anything in those

22 discussions about what its plans are with respect to these

23 loans?

24 A    No.

25 Q    Isn't that an important thing to understand if you're

1  settling a claim based on that issue?

2  A    It is -- I am aware that we are conversation because

3  this is an ongoing, important topic.  I am aware of that.

4  Q    When will those discussions resolve?

5  A    I do not yet have a date for that.

6  Q    When will you have that date?

7  A    We are working on it as a high priority of the company.

8  But again, it's working with SBA, so I cannot say when they

9  will have a decision.

10  Q    So, on the e-tran and the Form 940 and the hundred-

11  thousand-dollar issue --

12  A    Uh-huh.

13  Q    -- if SBA decides to honor its guarantee, all of those

14  issues go away, right?

15  A    I can't say that all of the issues go away.  I would

16  hope they would.

17  Q    Those three issues go away, right?

18  A    I -- I cannot state that they all go away.  If they

19  honor the guarantee, yes, we will process the loans according

20  to the guidelines of the program.

21  Q    If SBA honors its guarantee on the e-tran loans, then

22  customers can't sue you for an issue on -- for that issue on

23  the e-tran loans, right?

24  A    I can't answer that.

25  Q    And if SBA honors the guarantee on the hundred-thousand-

1  dollar issue loans, customers can't sue you on the basis that

2  customers incurred liability on the hundred-thousand-dollar

3  issue, right?

4  A    If we are allowed to process, that should not be an

5  issue.

6  Q    Right.

7       And the same on the 940, right?

8  A    I would say yes.

9  Q    And by the way, those --

10 A    Uh-huh.

11 Q    -- SBA issues would resolve, not only the claims here,

12 but they would resolve other claims in this bankruptcy that

13 are relevant to the bankruptcy, also, right?

14 A    So there are claims that, if you go back to my

15 declaration, talk about point four where you have got the DOJ

16 claim for anything that could come up that is false claims.

17 This settlement helps to resolve that, but I can't say about

18 what Customers Bank if it would solve everything.

19 Q    Sure.  All I mean is that, for example, Cross River has

20 started similar claims against Kabbage on the E-Tran issue,

21 and the Form 940 issue, and the $100,000 issue, right?

22 A    Mm-hmm.

23 Q    And if the SBA were to resolve those three issues it

24 would not only address those claims in so far as they're

25 pending with customers, but it would also deal with the Cross

1  River piece, right?

2  A    Yes.  Yes.  It would help.

3  Q    So that issue is really at the center of this bankruptcy

4  in a lot of ways, right?

5  A    No.  This particular bankruptcy is three-fold.  This is

6  a holistic bankruptcy and settlement, and this is why we're

7  here.

8       First, if you look at the settlement what it says is

9  that we have a liquidity issue that this particular

10  settlement helps us to resolve.  This liquidity is also

11  important because Customers Bank owes us a total of $65.5

12  million; $34 million of that we withheld.  That $23.2 million

13  that they are going to write us a check for immediately helps

14  us to get about 90 percent of the total amount of the claim.

15       That is why this settlement is so important to the

16  organization.  Getting that $23.2 million in also allows the

17  company to continue servicing its loans and it ensures that

18  borrowers are able to continue to get service and we process

19  them through forgiveness.

20       Lastly --

21  Q    How long --

22  A    I'm sorry.

23  Q    -- will you be able to service the loans if you get --

24          MR. SLACK:  Your Honor, I think the witness should

25  be allowed to finish her testimony and not be interrupted.

1    MR. NESSER:  Your Honor, respectfully, the witness

2  is giving a speech that is not responsive to the question

3  asked.

4    THE COURT:  So I agree that what she said was

5  interesting, but not directly responsive to the question.  So

6  I will allow the counsel to ask a new question.

7  BY MR. NESSER:

8  Q    In your testimony just now you talked about the value of

9  the settlement as providing liquidity, and enabling Kabbage

10  to continue servicing loans, right?

11  A    Mm-hmm.

12  Q    How long will Kabbage be able to continue servicing its

13  entire loan portfolio if this deal gets done?

14  A    We will be able to service through March and then two

15  months after that for a transition.

16  Q    And is that correct as to the Cross River loans as well

17  as the Customers loans?

18  A    It's all of the loans in our portfolio.

19  Q    Have you committed anywhere in writing that if this deal

20  gets done you will continue to service Cross River's loans

21  through, I guess the end of May 2023?

22  A    What we said is that this funding allows us to continue

23  business as usual and that includes servicing the Cross River

24  loans as well.

25  Q    Are you testifying here today as a factual matter that

1   if the settlement gets done Kabbage will continue to service

2   Cross Rivers loans until the end of May 2023?

3   A    Yes.  I am testifying that the $23.2 million will allow

4   us to continue servicing all the loans in our portfolio

5   through March.

6   Q    Are you making that commitment on the record today that

7   Cross River can rely on that?

8   A    Yes.

9   Q    What about past May of 2023?

10  A    I don't have the details on any budget past then.

11  Q    So if the deal doesn't get done when does your liquidity

12  run out?

13  A    If this deal does not get done the company drops below

14  $5 million the second week of December and the company is

15  negative by the end of December.  So we will not have any

16  funding at the end of December.

17  Q    So this settlement buys you five months of additional

18  servicing from December till the end of May?

19  A    Yes.

20  Q    And past that it's anybody's guess, right?

21  A    Past that it will be further conversations.

22  Q    And so we may well be back here in May, June saying we

23  have to transition servicing, we're out of money, we need to

24  do something, right?

25  A    What I am saying is that this $23.2 million allows us to

1  get through these Chapter 11 proceedings and then continue

2  servicing through the end of March and then two months of

3  transition.

4  Q    Okay.  Ms. Milner, have you heard that the SBA is

5  considering a settlement in which you would honor the

6  gaurantee on loans subject to -- I'm sorry, on loans that are

7  pledged to the Federal Reserve?

8  A    I do not have details on that?

9  Q    Have you heard that generally?

10 A    No.

11 Q    If Kabbage wanted to resolve the issues with the SBA

12 Kabbage could bring a proceeding against the SBA, right, and

13 seek to have resolution of those issues?

14 A    I am not sure what the steps would be other than the

15 ones that we continue to take which is, you know, reaching

16 out, having meetings, walking through it.

17 Q    Well you could raise them with the Court, for example.

18 A    I would have to defer to counsel on next steps and what

19 that would be.

20 Q    Ms. Milner, we agreed before that another one of the

21 factors you might consider in assessing reasonableness is the

22 strength of any defenses, right?

23 A    Yes.

24 Q    And Kabbage believes it had strong defenses on the E-

25 Tran issue, right?

1   A      It does, on all issues.

2   Q      Kabbage has strong defenses on all of the issues.  And

3   Kabbage has never conceded that it violated the PPP Program

4   requirements as to any of the issues, right?

5   A      No.

6   Q      And likewise Kabbage has never conceded that it has

7   liability to Customers Bank, right?

8   A      No.

9   Q      Because even if there was a violation of the SBA rules

10  you still have to determine whether there was a violation of

11  your contract with Customers Bank, right?

12  A      We stand firm that we have not violated any rules.

13  Q      And you have also not breached your contract?

14  A      No.

15  Q      So just to make sure we're on the same page the $13.7

16  million number that is in your declaration is not discounted

17  to account for the contingency of borrowers repaying, right?

18  A      No.

19  Q      Or for the contingency of the SPA reinstating the loans?

20  A      No.

21  Q      Or for any legal defenses, right?

22  A      No.

23  Q      And your declaration doesn't specify what that number

24  would be if it were discounted to account for all of those

25  issues, right?

1  A     There's no discounts. It represents the population of

2  loans that are impacted by E-Tran.  That is what the $37 --

3  Q     Your declaration also doesn't specify how much

4  consideration Kabbage is giving to Customers in exchange for

5  releasing the missing E-Tran claim, right?

6  A     Consideration.  Can you please explain what you mean by

7  that?

8  Q     What is Customers Bank getting in exchange for releasing

9  its claims on the missing E-Tran loans?

10 A     This settlement ensures that we continue to process

11 loans through the period that we discussed.

12 Q     I'm sorry, maybe you didn't hear my question.  Your

13 declaration doesn't specify what Customers Bank is receiving

14 in exchange for releasing its claims on the E-Tran loans,

15 right?

16 A     No.

17 Q     No as in your agreeing with me?

18 A     No.  I am saying that they're not getting -- I don't

19 think I understand the question.

20 Q     Customers Bank has a claim against Kabbage, right?

21 A     Correct.

22 Q     And the claim relates to these missing E-Tran loans,

23 among other things, right?

24 A     Yes.

25 Q     And we know that the face amount of those loans, in your

1  calculation, is $13.7, right?

2  A    For E-Tran only, yes.

3  Q    And if you were to take some discounts you would wind-up

4  at some lower number, right?

5  A    It does not state any discounts in my declaration.

6  Q    Okay.  But how much money is Customers Bank receiving on

7  this claim in the settlement that you are --

8  A    I am not giving Customers Bank any money in this

9  settlement.

10  Q    So they're getting nothing for the release of this

11  claim?

12  A    I am saying I am not -- again, this settlement is

13  allowing KServicing to get the $23.2 million in cash and keep

14  the $34 million that we have withheld which brings us to the

15  $58 million. So I am not giving --

16  Q    When you were deciding how much to settle for what value

17  did you place on the E-Tran issue?

18  A    We didn't place a value just on E-Tran.  We looked at

19  this as a holistic settlement with all the parts that I have

20  discussed before including liquidity, including the ability

21  to continue to service, and also the claims.  We just did not

22  focus on one thing.  And the releases.  So it was all of that

23  to determine that this was a good and fair settlement. We

24  stand behind that.

25  Q    Ms. Milner, let's talk about the 100,000 issue and the

1  940 issue a little bit more.

2       In your declaration you say that:

3       "The potentially impacted loans, as determined by the

4  company, following analysis, have a potential excess amount

5  of approximately $5 million."

6       Yes?

7  A    Yes.  I state that.

8  Q    And then you say you understand that there remains

9  uncertainty with respect to that amount, right?

10  A    Correct.

11  Q    And so this is -- just so we're clear at the start this

12  is a potential claim involving a potential excess amount of

13  approximately $5 million, but that is all uncertain, yes?

14  A    Correct.

15  Q    So the $5 million number is the potential size of

16  Customers claim, not the actual claim?

17  A    No.  So, again, the $5 million is our view after working

18  with FRA on just the excess amount on the loan and that is

19  what we calculated. Customers Bank could think something

20  different, other parties could think other things different,

21  but that just only represents the excess part of the loan.

22  Q    Has Customers Bank ever told you what it believes this

23  claim is worth?

24  A    I do not have that information.

25  Q    Again, the $5 million in your declaration is just the

1  excess amount.  It's not a prediction about what that claim

2  actually is worth, right?

3  A    No.  It's the excess amount for those particular loans.

4  Q    It's not a prediction about what the claim is worth,

5  right?

6  A    No.

7  Q    You are agreeing with me, yes.

8  A    I am agreeing that it represents the excess for the

9  loans that we have identified that could be impacted by the

10 100,000/940.  It is our calculation.

11 Q    Is it your calculation of the value of the claim or of

12 the excess amount?

13 A    The excess.

14 Q    Okay.  So that approximate, potential, uncertain $5

15 million number that is not actual the value of the claim that

16 comes down if the SBA agrees to honor its gaurantee.  We

17 talked about that before, right?

18 A    It could.

19 Q    And that is a contingency, yes?

20 A    Mm-hmm.

21 Q    And likewise, on defenses, Kabbage has defenses on these

22 two issues, right?

23 A    Yes.

24 Q    Okay.  As with the E-Tran issue you don't have a number

25 that you can give us in which you say here is how much we are

1  paying to resolve the 940 issue, right?

2  A    No because I am not paying to resolve the 940 issue.

3  Q    And there is no number that you can say here is how much

4  we are paying to resolve the --

5  A    No.  This is, again, holistic settlement not focused on

6  the one area.

7  Q    And there is no number that you can give me in which you

8  say, well, here is how much I believe all of these claims

9  together would be worth if account for contingencies and

10  discounts, right?

11  A    No.

12  Q    That number is not in your declaration and you don't

13  have that number, right?

14  A    I do not have a total number because, again, in my

15  declaration, especially on point four, it talks about the DOJ

16  and other things.  There is no number there at all.  So I do

17  not have a total number.

18  Q    Yeah, so let's talk about the fourth bucket.  So the

19  fourth bucket you say relates to potential claims arising

20  from any DOJ investigations relating to the $100,000 issue,

21  the Form 940 issue or any pending False Claims Act case or

22  related investigation involving the company that is being

23  pursued by the U.S. Attorney's Office in Massachusetts,

24  right?

25        So those are potential claims arising from pending

1  investigations, right?

2  A    Correct.

3  Q    There is no current liability to the Government, right?

4  A    They think there is.  These are claims.

5  Q    The Government hasn't sued anyone, right?

6  A    No.  The Government has not sued us.

7  Q    And have you received any written communication from the

8  Government in which they say here is how much you owe on

9  these issues?

10 A    I can't speak to that.

11 Q    Okay.  Has Customers Bank ever gotten a communication?

12 A    I don't know that.

13 Q    Did Customers Bank ever tell you, look, here is how much

14 the U.S. Attorney's Office has told me I owe it in connection

15 with these issues?

16 A    I do not know that answer.

17 Q    And, in fact, we can go further, Customers Bank has said

18 that this bucket involves claims in an unknown amount, right?

19 A    Correct.

20 Q    They use that phrase "unknown amount."

21 A    Correct.

22 Q    So this is a claim that is potential, and pending, it

23 could be nothing, it's not anything right now, yes?

24 A    We don't know that.  Our thoughts is because there isn't

25 a number it could be very -- it could be large.  It could be

1  large.

2  Q     "Could" be, yeah.

3  A     Could be.

4  Q     Did you ever assess the likelihood that it could be

5  large?

6  A     We have looked into the things that we have.  We don't

7  have a number for it.

8  Q     Okay.

9  A     These are claims.

10  Q     Did you ever assess the defenses that you --

11  A     We did not litigate this, so we did not do -- you know,

12  it wasn't litigated in Court.  Like we haven't gone through

13  any discovery on this case.  We didn't do -- you know, it

14  wasn't taken to Court yet.

15  Q     So you haven't really analyzed it?

16  A     No.  We have analyzed it.  We have, you know, taken it

17  in, looked at it.  We understand that there are claims and

18  that is why this settlement is good because it provides a

19  release for these claims. So it also allows us to get the

20  liquidation that we need.

21        So, again, this settlement is good because it's not just

22  about the claims. It's about the claims and all the other

23  areas.

24  Q     We talked about that you agreed with me at the very

25  outset that in order to assess whether a settlement is fair

1  and reasonable you need to know what the claim is, we need to

2  know the contingencies, you need to know the defenses, right?

3  A    Yes.

4  Q    And as to this fourth bucket we don't know what the

5  claim is because you have said it may not exist, right?

6  A    We know that there is a claim.

7  Q    But it is an unknown amount.

8  A    It's an unknown amount.

9  Q    And the -- as to the contingency you don't know what the

10 likelihood is that this would actually come to pass, right?

11 A    I don't know.

12 Q    And as to defenses you are not able to tell me right now

13 how strong or weak your defenses might be, yes?

14 A    I am not.

15 Q    So in light of all of that how can you possibly

16 determine that this is a fair and reasonable settlement as to

17 the fourth bucket?

18 A    Because it includes -- it is a good settlement because

19 we know that there are claims.  The cost to discover and

20 litigate this is expensive.  We hold firm that we haven't

21 done anything wrong. We have abided by all of the rules, but

22 in order to get to an answer we would have to litigate.

23     So in looking at the potential cost of litigation and

24 discovery for this, and the fact that we get releases from

25 all claims, and we get the liquidity we have assessed that

1  this is a good and fair settlement for us to continue to

2  service as our borrowers.

3  Q    To service your borrowers for the next few months?

4  A    To service our borrowers and get through these Chapter

5  11 proceedings.

6  Q    And you talked just now about the cost of litigation.

7  How much would it cost to litigate these claims?

8  A    I don't have an exact number.

9  Q    Let's move on for a minute.  In Paragraph 7 of your

10  declaration you say that, and you refer to this earlier,

11  that:

12      "Although CB has not quantified all of its claims

13  asserted the debtors with specificity it has represented to

14  the company, in discussions between the parties, that its

15  claims against the debtors are potentially equal to the

16  remainder of its outstanding portfolio which was

17  approximately $181 million as of the petition date."

18      Yes?

19  A    Correct.

20  Q    Now when did -- did they make that representation to you

21  during a mediation?

22  A    I don't know what occurred during mediation. I was not

23  there.

24  Q    Okay.  But was that representation made to Kabbage

25  during a mediation?

1  A    I can't answer that.

2  Q    When was that representation made?

3  A    I don't know the exact date and time.

4  Q    Do you know the general date and time?

5  A    I don't.

6  Q    Who made the representation?

7  A    I know that the representation was made, I spoke with

8  counsel and my advisors, but I don't know the exact date in

9  which that happened.

10  Q    And you also don't know who made the representation in

11  particular?

12  A    I don't know who said it exactly.

13  Q    Was that a representation made in writing?

14  A    I can't say if it was made in writing or not, but it's

15  something that was said and that is a claim that they have

16  made.

17  Q    Did they provide any backup to support the $181 million

18  number?

19  A    It's their belief.  So I personally did not get -- I

20  don't know that.

21  Q    Kabbage didn't get anything either?

22  A    I can't say that we did not.  I cannot say that we

23  didn't.

24  Q    But you signed the declaration here and you're

25  testifying here today?

1  A     Oh, yes.

2  Q     And your position is that the settlement is fair and

3  reasonable, correct?

4  A     It is.  I believe that.

5  Q     One of the reasons you think it's fair and reasonable is

6  because Customers has told you that its claim might be as

7  much as $181 million?

8  A     Yes.

9  Q     But you don't know whether Kabbage has any documentation

10 that would support a claim of $181 million, right?

11 A     Well because the claim or the support is that they are

12 outstanding portfolio.  I know that that was the outstanding

13 portfolio at that time.  So I am representing that that is a

14 claim that they have made. It could be equal to that amount.

15 Q     What was the value of the outstanding portfolio on the

16 date that they made the representation?

17 A     I don't know that exact number off the top of my head.

18 Q     But it would have been higher, right?

19 A     It could have been.

20 Q     And if we wait another two months it will continue to go

21 down, right?

22 A     If we wait another two months this organization will not

23 be in existence.

24 Q     But did Customers Bank tell you that the size of my

25 claim is going to decrease as the size of the face amount

1  decreases or did it say that my claim is $181 million and it

2  will always remain $181 million?

3  A    It was $181 million at the time of this petition.

4  Q    But you don't even know whether it was $181 at the time

5  they made the representation?

6  A    I know that this was the size of their portfolio at the

7  time of the petition date and that is why we -- I state here

8  that the potentially equal to the remainder of this

9  outstanding portfolio.

10 Q    But you don't know what the outstanding size of the

11 portfolio was on the date that they made this representation,

12 right?

13          MR. SLACK:  Your Honor, it's been asked and

14 answered.  Now this is the fourth time that the witness has

15 answered the question.

16          MR. NESSER:  I can move on.

17 BY MR. NESSER:

18 Q    Customers has said that its total claims, right, you say

19 are potentially equal to $181?

20 A    Yes.

21 Q    What does that mean "potentially?"

22 A    Potentially equal to being that it's the remainder of

23 their outstanding portfolio.  So in their mind the claim

24 could be, at least, that amount.

25 Q    Might be, but not that it actually is?

1  A     Potentially.

2  Q     Right.  So they have never actually said their claim is

3  $181 million?

4  A     I do not have that.  I have what they said was

5  potentially equal and that is why it's in the declaration.

6  Q     Okay.  So the -- you have identified three categories

7  of, sort of, loan specific issues and then you have this

8  fourth bucket of this unknown potential number, right?  In

9  order for you to have $181 million of liability that would

10 have to mean that you are paying them money on loans that are

11 outside of the first three buckets, right?

12 A     I am not sure that I understand the question.

13 Q     Sure.  The $181 million number does that involve only

14 the loans subject to the E-Tran, and 940, and $100,000 issue?

15 A     It represents all of their claims.  Again, if you refer

16 to the declaration --

17 Q     Yeah.

18 A     -- it says that the claim against the debtors are

19 potentially equal. It doesn't say which of the claims. It

20 says the claims, so all of them.

21 Q     Right.  But do they have claims on the loans other than

22 the loans in those three buckets?

23 A     That, again, could be covered in bucket four, but those

24 are the main claims.  There could be potentially other

25 claims, but as part of this settlement it resolves that and

1  that is, again, one of the reasons why this is a fair

2  settlement because it resolves all of the claims.

3  Q    In exchange for a few months of servicing?

4  A    It resolves the claims because the main focus is getting

5  in our receivable which is owed to us.

6  Q    Ms. Milner, Kabbage has its own portfolio of loans, yes?

7  A    Excuse me.

8  Q    Kabbage has a portfolio of loans that it issued and it

9  services, right?

10  A    Yes.

11  Q    And those are separate from any loans that were done

12  with partner banks, right?

13  A    What do you mean separate?

14  Q    In the first day declaration it says that PPP loan

15  originated, funded, and serviced by the company for its own

16  account are among the loans that are being serviced by

17  Kabbage today?

18  A    Yes. We service our loans as well.

19  Q    Do any of those loans -- are any of those loans subject

20  to the E-Tran, or 940, or $100,000 issue?

21  A    Yes.

22  Q    And how are you marking those loans on your books?

23  A    I cannot exactly answer that question.  All of the loans

24  are handled in the same way.

25  Q    Can you generally answer the question?

1  A    So it was missing a -- I don't think I understand the
2  question.  Please as it again.
3  Q    Well, let's actually be more specific.  So in the loan -
4  - in the Kabbage loan portfolio are there any loans that are
5  subject to the E-Tran issue?
6  A    Yes.
7  Q    Are there any loans that are subject to the 940 issue?
8  A    Yes.
9  Q    Are there any loans that are subject to the $100,000
10 issue?
11 A    Yes.
12 Q    And Kabbage -- if the SBA doesn't honor its gaurantee,
13 and if those borrowers don't pay Kabbage is going to take a
14 loss on those loans, right?
15 A    Yes.
16 Q    Is there any indication in Kabbage's books and records
17 about the likelihood that Kabbage will take a loss on those
18 loans?
19 A    No.  Again, we are -- we have identified those loans.
20 We know what the population is and we know what the value is,
21 but at this point, because it's unresolved, we don't know
22 what is going to happen with those.
23 Q    So are you assuming in your books that Kabbage is going
24 to get paid on those loans?
25 A    I don't have the details of our books and how it is set,

1  but we know what the loans are and we understand the

2  potential exposure of that.

3  Q    But you have no idea what Kabbage is assuming regarding

4  the likelihood that it's going to --

5  A    Not at this time.

6  Q    Have you -- you don't know whether those loans have been

7  marked down or impaired for accounting or financial purposes?

8  A    I do not.

9  Q    Who would know the answer to that?

10 A    We would have to talk to someone in our finance

11 department.

12 Q    Ms. Milner, there isn't a number in your declaration

13 that I can point to and say here is how much Customers Bank

14 is actually demanding on these issues, right, in total?

15 A    No.  I don't have that number.

16 Q    And there is not a number in your declaration that I can

17 point to and say here is how much we are -- here is how we

18 are accounting for the contingencies and defenses, right?

19 A    There is not a number.

20 Q    On a holistic basis, which is --

21 A    So the -- I don't think I understand the question.

22 Q    On a holistic basis is there a number anywhere in the

23 declaration that I can point to and say, oh, here is how

24 Kabbage is valuing --

25 A    So, yes, it's the $13.74 E-Tran is the $5 million for

1   the $100,000 and 940.  We don't have a value for the bucket,

2   but we understand it could potentially be --

3   Q    Right.

4   A    -- large.

5   Q    I mean the contingencies and the discounts for --

6   A    No.  I don't have that number.

7   Q    For the entire claim?

8   A    No.

9   Q    And there is not a number in your declaration that I can

10  point to and say here is how much Kabbage is proposing to pay

11  to resolve the four buckets, right?

12  A    No.

13              MR. NESSER:  Nothing further.

14              THE COURT:  Mr. Slack, redirect?

15              MR. SLACK:  Yes, Your Honor, a few questions.

16                         REDIRECT EXAMINATION

17  BY MR. SLACK:

18  Q    Good afternoon.

19       So you were asked on cross-examination about the four

20  buckets of claims by customers that you put in your

21  declaration.  Do you generally remember early on being asked

22  about those four buckets?

23  A    Yes.

24  Q    And -- now are the claims -- those four buckets, are

25  those the only claims, the only issues that the company is

1  addressing in the settlement?

2  A    No. It could be future, right.  The settlement says that

3  we resolve, especially in bucket four, any issues that come

4  up, you know, later and we get releases on everything.  So it

5  could also have an impact on some future claims.

6  Q    Putting aside claims by Customers are there other things

7  in this settlement --

8  A    Yes.

9  Q    -- that are getting resolved.

10  A    Yeah, so --

11  Q    So can you explain to the Court what are the "things,"

12  what are the other elements of the settlement other than

13  claims by Customers against the company that are being

14  resolved?

15  A    The items that are being resolved in this settlement

16  are, one, we are getting in the receivable which, again, was

17  $65.5 million, we are getting to keep the $34 million that we

18  withheld, and we are receiving a full cash payment of $23

19  million.  That is important because that means that we now

20  have a total of $58 million which represents almost 90

21  percent of the 65.  That is one thing.

22      The second thing it resolves is our liquidity.  Because

23  the company is at a point where the cash, which is the $23

24  million, is important so that we can continue to service our

25  loans. This particular settlement allows us to get that in at

1   one time.  The cash comes in the door.  We continue to

2   operate.

3        Then, again, it helps with the releases on both parties.

4   Then, again, it resolves those claims as well. So all of

5   those things are involved in why this settlement is good and

6   fair.

7   Q    Now you were asked some questions about the liquidity

8   issues and after asking the questions Mr. Nesser made some

9   comment about having a runway of only four or five weeks. I

10  think I may be off.

11            MR. NESSER:  It was months.

12  BY MR. SLACK:

13  Q    So can you take a look at Exhibit 4.  Do you have the

14  exhibit binder in front of you?

15            MR. SLACK:  Can I approach, Your Honor, with the

16  exhibit binder?

17            THE COURT:  Of course.

18  BY MR. SLACK:

19  Q    Ms. Milner, if you take a look at Exhibit 4, and I

20  recognize this is very small, so I need my glasses to be able

21  to see it, but do you recognize this as the budget that was

22  attached to the cash collateral motion?

23  A    Yes.

24  Q    And you are generally big picture familiar with this

25  budget?

1  A    Yes.

2  Q    So if you take a look at the column that is November

3  25th, 2022 and you go down and see a $23 million entry, do

4  you see that?

5  A    I do.

6  Q    So is it fair to say that this budget reflects the $23

7  million that Customers Bank is promising to pay as part of

8  the settlement?

9  A    Yes, it does.

10 Q    And then if you look at the very bottom of that column,

11 all the way to the bottom, it says current cash balance.  Do

12 you see that?

13 A    I do.

14 Q    So it reflects that when the company gets in the $23

15 million, according to this budget, the company would have $28

16 million, roughly, in cash, correct?

17 A    Correct.

18 Q    And using this -- again, I hope it's not too small, at

19 what point does this budget show that the company, absent the

20 $23 million, if you back that out, would be lower than a $3

21 million cushion for the company to operate?

22 A    It looks like 12/2, I think I can see that.  Yes, absent

23 of that if we do not receive it on 11/25 then -- I'm sorry, I

24 think that's 12.

25 Q    Just an entry, right, in 12/2?

1    A     Yes.

2    Q     The company goes below $3 million.

3              MR. NESSER:  Objection, Your Honor.

4              THE COURT:  I'm sorry, what is the basis for the

5    objection?

6              MR. NESSER:  It was leading, Your Honor.

7              THE COURT:  I'm sorry.

8              THE WITNESS:  Oh, I'm sorry, I couldn't see it.

9              MR. NESSER:  Leading.

10             THE COURT:  I will -- why don't you ask the

11   question again in a way that doesn't suggest --

12   BY MR. SLACK:

13   Q    So, Ms. Milner, can you point to the Judge on what date

14   the company goes below $3 million in cash cushion if the

15   settlement is not approved?

16   A    On 12/2.

17   Q    And at what point does the company goes cash negative

18   according to this budget if the settlement doesn't go

19   through?

20   A    If the settlement does not go through by the end of the

21   month 12/23 we began to go cash negative.

22   Q    So it's fair to say, right, that according to this

23   budget by the end of this calendar year the company will go

24   cash negative without the settlement, correct?

25   A    That is correct.

1  Q    One last thing, if you look at the end of this budget,

2  which is February 1st, can you tell the Court what is the

3  cash balance at that time?

4  A    If I receive the -- if I don't receive it its negative

5  $1.

6  Q    Let me ask it differently.  So if you do receive -- if

7  the company does receive, and the Court approves it and you

8  receive the $23 million from Customers Bank how much money

9  will the company continue to have to operate at the end of

10 this budget according to this budget in February of 2023?

11 A    It's still $18 million.

12 Q    And in your view is that sufficient capital cash cushion

13 for the company to be able to service its loans through the

14 Chapter 11?

15 A    Yes, it is.

16 Q    Now you were asked a number of questions by Mr. Nesser

17 and you understand that Mr. Nesser's client is Cross River

18 Bank, correct?

19 A    I do.

20 Q    I think Mr. Nesser asked you whether Cross River Bank

21 had similar claims.  Do you remember that roughly?

22 A    I do.

23 Q    And Cross River does have very similar claims to those

24 of Customers, correct?

25 A    Correct.

1  Q    Are you aware of any communications that Cross River has

2  had with the company where Cross River has sought to resolve

3  the same claims that have been made by Customers?

4  A    No.

5  Q    Do you know whether your lawyers have had any

6  communication with Cross Rivers lawyers about resolving the

7  Cross River claims?

8  A    I think very early on there was one conversation, but I

9  am not aware of anything recent.  I know that that they have

10  these claims.

11          MR. SLACK:  Your Honor, I would like to put into

12  evidence an August 12th, 2022 letter from Quinn Emanuel to

13  Davis Polk.

14          MR. NESSER:  Are these on the exhibit list?

15          MR. SLACK:  What's that?

16          MR. NESSER:  Are these on the exhibit list?

17          MR. SLACK:  They are not.  They are being used for

18  redirect.

19          MR. NESSER:  Just to be clear, you're impeaching

20  the witness with these documents?

21          MR. SLACK:  No. I am engaging in appropriate

22  redirect with respect to these documents.

23          MR. NESSER:  Your Honor, I object to the

24  introduction of these documents.

25          MR. SLACK:  Can I approach?

1          THE COURT:  Let me look at the document and

2   understand the context.

3          MR. SLACK:  Your Honor, can I make a proffer on

4   this?

5          THE COURT:  You can make a proffer, yes.

6          MR. SLACK:  So, Your Honor, there was a whole

7   series of questions where Mr. Nesser was trying to suggest

8   that nobody could ever try to resolve claims that are wholly

9   contingent and unliquidated that are like the Customer ones.

10  I think if I could I could put in front of you, Your Honor, a

11  whole series of letters, which I am prepared to do, where

12  counsel for Quinn Emanuel has done exactly that.

13         So I think it's completely appropriate for redirect

14  given the questions that were asked on cross for the Court to

15  be able to take into consideration that counsel for Cross

16  River has also sought to resolve those claims that it now is

17  trying to assert shouldn't even be the subject of any

18  discussions and resolutions until the SBA decides this and we

19  figure out two months down the road that.

20         THE COURT:  Okay.

21         MR. NESSER:  Your Honor, if Mr. Slack wants to

22  swear and testify to those facts I suppose that is something

23  we can discuss.  The witness was asked whether she is aware

24  of this and the witness said she is not aware of any of this.

25  There is no foundation for putting any of this in front of

the witness. It goes way beyond the scope of the cross-examination and it’s inappropriate.

THE COURT: So let me tell you where I am. I think that it doesn’t go beyond the scope because I think on cross you said it’s impossible to resolve a claim that is so uncertain. So it’s a fair response. Where, I think, your right is I don’t see how you use this document with this witness who says she has never seen this document before.

So I am not going to admit the document into evidence with this witness despite its apparent relevance because I don’t think you have got a basis to do it with this witness.

MR. SLACK: So, Your Honor, I think we have put in our witness list that for rebuttal that we would call witnesses. I would note that Mr. Nesser is a CC on this. So I would ask to call Mr. Nesser solely for the --

THE COURT: Right now you have got a witness on the stand. So why don’t you deal with that and we can come back to your additional evidence if and when we get there.

MR. SLACK: Okay.

THE COURT: And let me just suggest for the benefit of all the parties that the point that is at issue here strikes the Court as sufficiently commonsensical that having an evidentiary fight about it strikes me as tempest in a teapot. I will let you all decide how to put on your case,

 1  but to the extent that observation is helpful let me put it

 2  out there.

 3          MR. SLACK:  So just a couple more questions for Ms.

 4  Milner.

 5  BY MR. SLACK:

 6  Q    Ms. Milner, I know you have had the opportunity to say

 7  much of this in different pieces, but in your own words can

 8  you explain why this settlement today is an important one for

 9  the company?

10  A    Yes.  This settlement is important for the company

11  because it represents a year and a half of work that myself

12  and the board have done to try and get the $65.5 in

13  receivables.  We have gone through a lot of conversations.

14  We sued.  We are now here.  This settlement is good because

15  we will be able to get back $58 million of the funds.

16          Like the $23 million will be in cash received to us.

17  Looking at the budget its cash that will go directly to

18  servicing our borrowers and insuring that we can continue to

19  do what we were here to do in the first place which is

20  service our borrowers.  Again, it also allows us to resolve

21  the, you know, claims issues and get releases from Customers

22  Bank.

23          And the board and I have reviewed this, we have thought

24  about it extensively, we have conferred with our legal

25  counsel and our financial analysis.  We believe that this is

1 a good and a fair deal.  The cash at the door it removes all

2 of our liquidity issues and, again, allows us to get back and

3 receive 90 percent of the outstanding receivables.  So I

4 stand behind that this is a good and fair deal.  And I think

5 that it would be good for us to move forward with it.

6 Q    And, Ms. Milner, as you dealt with the process of this

7 with the board you mentioned that this had been going on.

8 Can you describe for the Court the process by which you and

9 the board went through over this time and then ultimately

10 resulted in the board approving this settlement?

11 A    Yes, as stated --

12         MR. NESSER:  Your Honor, objection; it's beyond the

13 scope.

14         THE COURT:  I think that is a close question, but I

15 do think the cross suggested that the analysis was

16 superficial and that this responds to that question.  So I

17 will allow it.

18         THE WITNESS:  As I stated we have been going back

19 and forth with Customers for over a year and a half.  We have

20 initial started out sending letters.  It was business to

21 business.  We then sent demand letters.  We also filed a

22 lawsuit to try and get this money.  We went to mediation and

23 talked through it.  We then reviewed settlements, some of

24 which, you know, of course we did not take.  This was a back

25 and forth process over a long period of time.

1    Most recently when we got to this settlement we

2 talked to counsel, we talked to our advisors, and, you know,

3 some of the settlements weren't great and we did not take

4 those settlements.  We made sure that this was the best deal

5 because it has a cash pay-out immediately.  Again, that is

6 exactly what we wanted, that is what we needed, and that is

7 in the best interest of the company.

8    So the board, again, after several conversations

9 talking with our counsel and our advisors, looking at our

10 operations, met and decided that this particular deal was the

11 best, and it was fair, and it would be in the best interest

12 of the company to take it.  So we did.

13    MR. SLACK:  Your Honor, I don't have any further

14 questions.

15    THE COURT:  Okay.  Thank you, Mr. Slack.

16    Mr. Nesser, any recross?

17    MR. NESSER:  Just a couple.

18                   RECROSS-EXAMINATION

19 BY MR. NESSER:

20 Q    Ms. Milner, your declaration says nothing about other

21 settlements that you did not take, right?

22 A    No.

23    MR. NESSER:  That's all I have.

24    THE COURT:  Okay.

25    Mr. Slack, any further evidence?

1          MR. SLACK:  So, let me just ask counsel whether

2   they're going to allow that letter to come in or not.

3          MR. NESSER:  Come in for what?

4          I think His Honor is clear that there's no dispute

5   that the letters are the letters.  If the judge wants to look

6   at the letters, he can look at the letters.

7          MR. SLACK:  Well, we're not putting it in for the

8   truth.  We're putting it in for the --

9          MR. NESSER:  Maybe we can talk about this after

10  the witness is off?  I don't see the reason why we're

11  having -- why there's a need for any controversy about this.

12          MR. SLACK:  Well, I would just say this, Your

13  Honor, if Your Honor will indulge literally 30 seconds of

14  direct from --

15          THE COURT:  Let me ask this question.

16          MR. SLACK:  Yes?

17          THE COURT:  Is there anything further for this

18  witness?

19          MR. SLACK:  No, there's not, Your Honor.  Thank

20  you.

21          THE COURT:  Okay.  So, thank you, Ms. Milner, for

22  your testimony.  You can step down.  Not that it isn't fun

23  for everyone to spend the day in the witness box.

24      (Witness excused)

25          MR. NESSER:  Your Honor, if the Court wants to

1  consider the letters, we have no objection to that.

2          THE COURT:  Does that moot your concern,

3  Mr. Slack?

4          MR. SLACK:  That takes care of it, Your Honor.

5  Thank you.

6          THE COURT:  Okay.  Any further evidence on behalf

7  of the Debtor?

8          MR. SLACK:  No, Your Honor.  Thank you.

9          THE COURT:  Okay.  Mr. Nesser -- oh, I'm sorry.

10         Any -- do you, on behalf of the Objectors, do you

11  have an evidentiary case?

12         MR. NESSER:  Nothing further.

13         THE COURT:  Okay.

14         MS. ARTHUR:  So, thank you, again, Your Honor.

15         And for the record, once again, Candace Arthur,

16  Weil, Gotshal & Manges, on behalf of the Debtors.

17         So, Your Honor, what you have before you is a

18  global settlement that is not complex, despite the

19  complexities of the claims involved.  Importantly, the

20  settlement has three main components and we do believe that

21  one should not evaluate the agreement outside of those three

22  components.  It should be considered together.

23         First, the company is owed $65.5 million from

24  Customers Bank and that's full stop.  That being said, the

25  seller provided the company will receive 58 million, which as

1   Ms. Milner noted, is merely a 90 percent recovery on a

2   collections claim that the company has attempted to address

3   for nearly two years.

4           Second, the settlement, unequivocally addresses

5   liquidity circumstances that the company is facing, which is

6   such that absent receipt of the cash component of the

7   settlement agreement, that's the $23 million, absent receipt

8   of it, the company will have less than $3 million the first

9   week of December and it will also fall below that again.

10          THE COURT:  So, can I -- look, let me just

11  describe how, in broad strokes I think I'm thinking about the

12  issue in front of me --

13          MS. ARTHUR:  Yes.

14          THE COURT:  -- and tell me if you think I'm

15  thinking about it wrong.  To me, there are sort of two

16  severable issues, which is, one, do we liquidate today, the

17  claim that Customers asserts against you, as opposed to

18  letting it play out and maybe taking advantage of the ability

19  to, Well, you know, you lose your setoff right because your

20  claim never became fixed before the end of the bankruptcy or

21  do you choose to liquidate it?  And there, I take it your

22  argument is, essentially, Look, I can't afford to play it

23  out.  I need the cash.

24          Question two, then, is, Okay, if we're going to

25  liquidate it now and give them the right to set off the claim

1  in what amount, is the $8 and a half million essential

2  settlement of their potential claims within the range of

3  reasonable?

4            Let me pause there.  And is that way -- is that

5  frame of thinking about the question in front of me a

6  reasonable way to think about it?

7            MS. ARTHUR:  I think so, Your Honor, so long as

8  when you mention their claims, it's inclusive of the

9  universe.

10           THE COURT:  All -- the global settlement,

11 including complete releases.

12           MS. ARTHUR:  Of course.

13           THE COURT:  And I understand you can't really

14 separate the two pieces and that part of the reason you might

15 settle it at one amount as opposed to another is because

16 getting cash today has a value to you.

17           MS. ARTHUR:  Well, because they have my money, but

18 yes.

19           THE COURT:  So, I understand that.

20           Can you just walk me through what the record tells

21 me as to why, in light of the merits, just using the Martin

22 factors --

23           MS. ARTHUR:  Yes.

24           THE COURT:  -- I don't need to be slavish about

25 the multi-part test, because I think that it, you know,

1  basically, I'm supposed to use common sense and ask the

2  question:  Would a reasonable person in the position of the

3  Debtor, who was being diligent and competent and well-

4  informed, make a decision like this?

5          So, I don't think we need to overcomplicate the

6  analysis, but just walk me through the evidence that says,

7  you know, a diligent person in the Debtors' position would

8  reasonably decide that resolving -- that $8 and a half

9  million is a fair number in light of the strength of the

10  claims against the Debtor.

11          MS. ARTHUR:  Sure thing, Your Honor.

12          I'll take the claims first.  In the first

13  instance, the Debtors have a collection claim of the

14  65 million and it would be great and ideal if we got all of

15  that, all those -- all that amount; instead, there is a

16  haircut that the Debtors are forced to take on it.

17          And second, we look at some of the counterclaims

18  that Customers Bank has asserted against us in connection

19  with their defense as to why they're withholding the money.

20  That includes, not only the Form 940 issue and the 100k

21  issue, as well as the missing E-Tran loan population and the

22  claims against the pending DOJ investigations, but in

23  addition, the $34 million that the company is withholding.

24          In terms of the record before the Court, we have

25  described the nature of those claims and the scope of it in

1 the first day declaration in the disclosure statement and the

2 settlement agreement itself.  Our defenses --

3          THE COURT:  So, can I pause -- stop you there.

4          So, the first day declaration, in fairness, let me

5 offer one observation, just for what it's worth.  The first

6 day declaration describes the government investigations.  I

7 didn't read the first day declaration to describe, for me,

8 the claims that Customers was asserting against the Debtor.

9 I saw a discussion of the outstanding, the $65 million issue

10 and I saw a discussion of the government claims against the

11 Debtor.

12          And maybe if I were brighter, I would have figured

13 out that because the Government asserts those claims against

14 the Debtor, that could give rise to claims by the lenders

15 against the Debtor, but that wasn't laid out really clearly,

16 is observation A.

17          Observation B, which is more important, is, you

18 know, when you filed this motion, you knew it was objected to

19 because you had conversations with Cross River before.  But

20 the motion was quite bare-bones and left, really, all of the

21 work of justifying what you're doing to the reply.

22          And we are where we are, and I'm going to address

23 this on the merits, but just as a point going forward, when

24 you're the Debtor and you're filing and seeking relief and

25 you know there's someone who's appropriate, I don't think

1  it's appropriate to keep your cards sort of hidden and wait

2  until the reply to lay it out.

3          We are where we are and, fortunately, in this

4  case, opposing counsel is extremely capable and I don't think

5  any prejudice occurred as a result.  But just in terms of

6  laying out my expectations, I just want to be clear about

7  that.

8          MS. ARTHUR:  Yes, Your Honor.

9          And for sure, in no way were the Debtors trying to

10  hold their cards, particularly against a counterparty that

11  has asserted the same exact claims and that we provided

12  information to well in advance of any of the deadlines.

13          THE COURT:  I understand.  I'm not saying there's

14  procedure here.

15          MS. ARTHUR:  Apologies, though, to the extent --

16  yes.

17          THE COURT:  I just say that only so that --

18          MS. ARTHUR:  Of course.

19          THE COURT:  -- if that happens again, I get to be

20  mad about it.

21      (Laughter)

22          MS. ARTHUR:  Fair enough, Your Honor.  We only

23  make a mistake once, so that's fair enough.

24          But, Your Honor, in looking at the breadth of

25  those claims, you know, Customers Bank did assert that, on

1  the maximum end, it would be $181 million.  As Ms. Milner

2  noted, we did some of our own calculations when it came to

3  certain of the other buckets, the E-Tran for one, Form 940,

4  and, as well as the 100k issue, and for that, at minimum, it

5  was about $20 million.

6              Taking that range alone, the $8 million that

7  Customers Bank would retain in connection with a release of

8  their claims, was more than fair and reasonable to the

9  Debtors, particularly when they exercise their sound business

10  judgment in agreeing to enter into the settlement.

11              Also (indiscernible) Your Honor, in connection

12  with the claims and the assessment, the company also

13  (indiscernible) defenses and it considered not only the

14  strength of the defenses because it believes, and it still

15  believes today, that it would prevail, but the time --

16              THE COURT:  Right.  So, Ms. Arthur, so, look, it's

17  always unfair to ask a Debtor to support a settlement in

18  which it's settling a claim that it believes that it owes

19  nothing and it should win everything.  And it's not really

20  fair to make you explain why you think you might lose.  And I

21  get that dynamic and you're doing the best you can and that's

22  just the nature of the beast.

23              But, in fairness, isn't Mr. Nesser's point the

24  $20 million number, sure, that's the outside exposure, but

25  that goes down for lots of different reasons.  It goes down

1  as cash comes in the door in the ordinary course.  It goes

2  down if it turns out the SBA agrees to honor the guaranty in

3  any event, and that it's not really like someone has a $20

4  million claim that you're settling at 40 cents, because if

5  you were to, in any rational way, try to ask yourself, What's

6  the most likely number -- if we did something wrong, which we

7  don't think we did, how much do we owe?

8          It's not like anyone thinks that number is really

9  $20 million, right.  We don't know how much less than that it

10 is, but it's clearly some amount less than that; isn't that

11 right?

12         MS. ARTHUR:  Well, Your Honor, I would

13 respectfully disagree as to whether or not it would be less

14 than 20 million, only because the truth of the matter is,

15 regardless of whether you're right or you're wrong, it

16 doesn't mean that you would not have to cut a check for

17 something.  That's just, you know, the American jurisprudence

18 right.

19         THE COURT:  Oh, I understand that.

20         MS. ARTHUR:  That being said, you know, in

21 connection with the Martin factors and looking at, you know,

22 whether or not there's a success, the probability of success

23 in the litigation, you know, courts, importantly, look at the

24 time that's available to collect on this, the time that's

25 going to be taking for judgment.  And if it's taken two

```
 1  years, including a pre-petition period, where we attempted to
 2  resolve these very claims, not only with Customers Bank, but
 3  with the other key stakeholders, they're clearly complex and
 4  it's clearly not going to be a cut-and-dried answer.
 5          THE COURT:  No, I understand that.
 6          Okay.  I'm sorry.
 7          MS. ARTHUR:  So, to that point, Your Honor, when
 8  looking at the range and Mr. Nesser's point as to, Well, why
 9  don't you wait it out and why don't you, you know, wait to
10  see what the SBA does, wait to see what the DOJ does, we
11  can't afford to do that anymore.  So, the time component is
12  incredibly important.
13          And that being said, the time component, in
14  addition with our liquidity, you know, we have to take a fair
15  and honest assessment, ourselves, as Debtors as to what is
16  going to be appropriate for the borrowers, as well.  And the
17  inability to service them for those two months in a proper
18  manner, the inability to fulfill our obligations is something
19  that the company and the CEO, particularly, took very
20  seriously, when weighing these options.
21          In terms of the claims, as well, and the strength
22  of it, in bankruptcy, just as in any other courts, Your
23  Honor, when it comes to a settlement and a compromise, we're
24  giving more than we would want to give and that's just the
25  nature of what's before us.  But it doesn't mean it's wrong
```

1   and it doesn't mean it doesn't, you know, meet the standards

2   that the Court has articulated in Martin or otherwise, and it

3   doesn't mean that there's not going to be an aggrieved party.

4           If Customers Bank were to stand up today, I think,

5   Your Honor, they would say their claims aren't contingent and

6   that they're not the same as Cross River's, because they're a

7   secured creditor.  They would say that the landscape of what

8   was available to them is different because they had the

9   company's money.  They had the $65.5 million.  It changes the

10  discussion with them.  As a result, it changes what we can

11  push forward.

12          And so, when it comes to how we're going to treat

13  the same claims, the Debtors have to treat them differently

14  because Customers Bank is in a different position and I think

15  that it is -- it certainly meets the Debtors' business

16  judgment in doing so and I think it certainly satisfies the

17  Martin factors, as well, in doing so.

18          So, that's how we're kind of looking at the

19  claims, Your Honor, in that assessment.

20          THE COURT:  I understand that.  That's very

21  helpful.

22          Thank you, Ms. Arthur.

23          MS. ARTHUR:  And I'm happy to go through the

24  Martin factors on, you know, each floor.  I think we stand on

25  all four corners on them, but I'm happy to do so if that's

1 | helpful for Your Honor, and for the record, as well.

2 | THE COURT: I don't -- I've seen the briefing and

3 | I don't think an articulation of each of the four factors is

4 | separate, at least for the purpose of argument, necessary.

5 | MS. ARTHUR: And so, Your Honor, one other thing I

6 | would want to make sure I mention for the Court is when it

7 | comes to the needs that we've been mentioning in terms of

8 | liquidity, and I know you've heard it *ad nauseam* by now and

9 | it's been written in many of our briefings in terms of the

10 | need, the financial need, those funds do get the company

11 | through that six-month period for administering the

12 | Chapter 11 cases.

13 | That being said, and I do want to clear it up,

14 | because I know there was a bit of a back-and-forth on the

15 | stand earlier, when it comes to any guaranties or as to what

16 | the company is going to be able to do in connection with its

17 | servicing obligations and the contracts, you know, the

18 | Debtors aren't standing up today, in any way, and waiving

19 | their rights, whether it be under 365 or otherwise, as to

20 | what happens.

21 | MR. NESSER: Objection.

22 | MS. ARTHUR: I don't know if you're going to

23 | object. I'm doing an argument.

24 | MR. NESSER: Your Honor, the witness literally

25 | waived those rights.

1          THE COURT:  I'll give you -- look, nothing that

2    counsel is going to say is going to change the witness'

3    testimony, but the context -- you can all put it in context.

4    You're both entitled to put it in context.

5          MR. NESSER:  I apologize.

6          MS. ARTHUR:  So, Your Honor, to that point, in

7    terms of the Debtors' intentions, when it comes to whatever

8    the plan that's going to come before you and whatever it

9    states, the funds allow us to be able to have those

10   discussions, to be able to meet the with parties, to be able

11   to put forth a confirmable plan.  What it doesn't do is

12   provide any commitments to certain parties to service their

13   loans through May.

14         That being said, does it provide for the company

15   for sure to service obligations through the end of March?  It

16   does, and that's what was intended, and that's been stated,

17   but I don't want there to be confusion as to whether or not

18   the Debtors are foregoing any of the tools in the Chapter 11

19   toolbox that they have available to them.

20         THE COURT:  Okay.  Understood.

21         I think we can address a future dispute about

22   that, if one were to ripen.

23         MS. ARTHUR:  I think so, too, Your Honor.

24         So, Your Honor, that being said, and just to kind

25   of bring it back to the settlement before you, you know, it's

1  the Debtors' position that the evidence that has been

2  submitted today, as well as the record before the Court,

3  supports a finding that the Debtors exercised sound business

4  judgment in entering into the agreement and that the

5  settlement, itself, is fair and reasonable, and it surely

6  reaches the lowest prongs of reasonableness, as well.

7         Your Honor, it's in the best interests of the

8  estates.  Absent this settlement, the Debtors would have to

9  take immediate action to address the service obligations that

10  it has, not just for Customers Bank, but for Cross River, as

11  well, and the Federal Reserve and its entire loan portfolio,

12  and that is something that the Debtors have been very

13  transparent about from the beginning and the outset of this

14  case.

15         So, you know, that being said, Your Honor, I would

16  also respectfully request that the Court overrule the

17  objection.  I think the objection incorrectly focuses on just

18  the resolution of Customers Bank's claims, instead of what is

19  actually at play here, which are the different components

20  that we mentioned, which the settlement revolves.  The

21  settlement completely resolves our liquidity situation.  It

22  addresses a collections issue.  And it does resolve

23  potentially sizable claims.

24         Absent -- you know, having a contrary finding to

25  this, Your Honor, would create a standard where parties are

1  not able to compromise on contingent and unliquidated claims,

2  and that cannot be the case.  It can't be a situation where a

3  party is incapable of resolving claims that are contingent

4  and unliquidated.  In fact, the amount of money and expenses

5  that the company has already expended in addressing and

6  defending against these claims makes it very clear that there

7  is, in fact, some value that is being obtained if they

8  weren't released and if they were, in fact, addressed through

9  settlement or otherwise.

10           So, with that, Your Honor, I'll respectfully cede

11  the (indiscernible) to my opposing counsel.

12           THE COURT:  Okay.  Thank you, Ms. Arthur.

13           Counsel?

14           MR. SCHECK:  Good afternoon, again, Your Honor.

15           Matthew Scheck from Quinn Emanuel for Cross River.

16  Your Honor, I think it's well-accepted that settlements are

17  favored -- nobody's questioning that -- but a Debtor or a

18  trustee still has to prove the settlement meets the standards

19  that are established by the Supreme Court in TMT Trailer and

20  Martin by the Third Circuits and that includes, and I'll

21  quote from TMT Trailer:

22           "All facts necessary for an intelligent and

23  objective opinion of the probabilities of ultimate success,

24  should the claim be litigated."

25           We don't have that here, Your Honor.  The Debtors

1  haven't given that to this Court.  When you asked for items

2  in the record about the merits, there's nothing.  The witness

3  could not testify at all about anything helpful to the Court

4  in assessing the merits, the strengths and weaknesses of the

5  claims and defenses.

6              THE COURT:  So, but let me ask this question.

7              MR. SCHECK:  Sure.

8              THE COURT:  I take it that Cross River -- I mean,

9  without having to fight about what's in the letter, Cross

10  River asserts similar claims, right?

11             MR. SCHECK:  That's absolutely true.  We put that

12  in our objection; absolutely, Your Honor.

13             THE COURT:  And you don't think those claims are

14  worthless, right?

15             MR. SCHECK:  No.

16             THE COURT:  They're -- they are -- the way I'm

17  thinking about the issue is at some level, imagine we had a

18  502(c) estimation, where someone wanted to resolve the claim,

19  right.  And it involves uncertainty and contingencies and

20  things that haven't happened and that's, like, just the

21  nature of life.

22             And so, you know, the facts of this are different

23  from TMT and what we've got here is a, you know, contingent

24  claim where there -- which involves events that might or

25  might not happen in the future, and therefore, there's more

1   guesswork, right, involved than there is, you know, if we had

2   an event -- an accident that occurred in the past and we've

3   got to resolve it, right.  So, that's just the nature of the

4   beast.  That doesn't mean you can't do it, it just means

5   you're left to do the best you condition with what you have,

6   right?

7          MR. SCHECK:  Understood, Your Honor.

8          And nobody's suggesting you can't settle

9   contingent or unliquidated claims.  You absolutely can.  Now,

10  you still have to put forward and prove your case in terms of

11  the settlement being reasonable.

12         And I think what the Debtors have done here is

13  they've said -- I think in their reply they said, Well, Cross

14  River ignores the liquidity issue.  But they have it

15  backwards.  We understand the liquidity issue, but the

16  Debtors are ignoring the merits.

17         And, Your Honor, it's as if a DIP lender came into

18  court -- I'm sorry, if a Debtor came into court seeking a DIP

19  loan and they said, Your Honor, we really need the money.

20  You have to approve this --

21         THE COURT:  Uh-huh.

22         MR. SCHECK:  -- and Your Honor said, What's the

23  interest rate, and they said, 40 percent, you still -- it

24  still has to be objectively reasonable.  You don't get to

25  approve a settlement or to have a settlement approved as the

1  Debtors, simply because you assert that you need the money.

2           THE COURT:  So, I agree with that.

3           But Mr. Scheck, do you have any reason to believe

4  that the Debtor here did anything other than the best it

5  could do by its lights to do what's right for the estate?

6           MR. SCHECK:  Well, I have -- yeah, I think the

7  record reflects that that, in fact, may not be the case and

8  we should talk about --

9           THE COURT:  Why?

10          MR. SCHECK:  They said that for 20 months, they've

11 been aggressively pursuing getting that money back that was

12 improperly withheld.  And they said in the letters that are

13 in evidence that it was improperly withheld under the

14 contract.

15          They waited 15 of those 20 months to file a

16 lawsuit at all.  No lawsuit.  A few letters back and forth --

17 we have them in the record.  They did not diligently pursue

18 that.

19          When the bankruptcy was filed, they could have

20 sought to tee up the legal issue:  Can you withhold funds on

21 the basis of a contingent claim?  Because I think that

22 drastically changes the settlement.

23          Because, Your Honor, what we're talking about

24 here, we talked about -- Your Honor, I think, very aptly, put

25 what the issues are, but, respectfully, I think there's sort

1 of a sub-issue under liquidating the claim, and that is

2 paying the claim.  This isn't effective distribution of

3 $8 million.

4         THE COURT:  Well, that's the cost of getting money

5 in the door, right.  Once the claim is liquidated and they're

6 getting paid on a claim by the Debtor, then a liquidated

7 claim against the Debtor is subject to setoff.  That's just

8 the price of poker, right?

9         MR. SCHECK:  Well, our contention, though, is that

10 this claim was not subject to setoff.

11         THE COURT:  Well, you say it's not subject to

12 setoff, because it's unliquidated, but even a liquidate --

13         MR. SCHECK:  No -- I'm sorry, I didn't mean to

14 interrupt you.

15         THE COURT:  No, go ahead.

16         MR. SCHECK:  We do not believe that the issue is

17 that it's unliquidated.  A contingent claim is not set up to

18 set off or --

19         THE COURT:  Okay.  I understand that.

20         Imagine that they're not going to get a check --

21         MR. SCHECK:  Yep.

22         THE COURT:  -- from Customers, you know.

23         Let me put it this way, the way I -- if you think

24 there's evidence to the contrary, tell me what it is, but it

25 seems to me they're not going to get cash from Customers,

1  absent a global settlement and they need the cash.

2          So, here we are.  And the question is, then, is it

3  reasonable to enter into a global settlement?  And unless you

4  can tell me otherwise, it seems to me the fact that they're

5  going to run out of cash in a few weeks, counsel's in favor

6  of the reasonableness of the judgment to get to a settlement.

7          Then the question is, is it -- is the settlement,

8  itself, within the range of reasonable?

9          And so, tell me -- I understand that the claim is

10  un -- the claim is contingent in the sense that it depends on

11  things happening in the future that haven't yet happened,

12  right.  And I get the notion at some level, right, that --

13  you know, look, if I issued a guaranty of a debt that hasn't

14  yet matured, that today, the beneficiary of the guaranty

15  doesn't (indiscernible) a setoff against me.

16          Here, we've got a claim that, sure, it's

17  contingent.  It might turn out to be nothing, but it also

18  might turn out to be something.  And what we've got is an

19  effort to use our business judgment to figure out what's a

20  fair way to resolve that in view of the uncertainties, and

21  what's wrong with that?

22          Isn't that what we do in bankruptcy every day?

23          MR. SCHECK:  Yes, but an informed judgment on how

24  to look at those uncertainties.  We heard from the witness,

25  this is the witness they put forward to support this motion,

1  the declaration, that there was no analysis, no knowledge

2  about the uncertainties, any probabilities.

3            We do our best --

4            THE COURT:  Well, in fairness --

5            MR. SCHECK:  -- but we still have to do it.

6            THE COURT:  -- in fairness, Mr. Scheck, look, this

7  is a little bit complicated and this is a hard problem,

8  right, because we have a policy that favors mediation and

9  there's a mediation privilege and this was mediated.

10            So, I hear you, that that creates a little bit

11  more of a black box problem than you would have in the

12  absence of that, and it is the Debtors' burden.  But don't I

13  take into account the fact of the mediation as something when

14  I think about the universe of evidence that I do have?

15            MR. SCHECK:  Sorry, Your Honor.

16            THE COURT:  Was that question coherent?

17            MR. SCHECK:  Yes, I understood the question.

18            And I think the issue, though -- and, Judge

19  Walrath actually dealt with this in a WaMu opinion, and I

20  wish I had the type of photographic memory to recite it --

21  but she dealt with the issue of, I don't need to bust into

22  the attorney-client privilege on a 9019.

23            And we can think about a mediation privilege

24  similarly, because the attorneys can argue the issues, the

25  issues of law to me, and they can establish if a defense is

1  strong or a claim is strong or weak.  And, again, that was

2  missing here.

3         Mr. Nesser with the witness, focused on the

4  declaration, but if we focus on the motion, and I'll even

5  grant the reply as being in support of the motion, there is

6  nothing here that the Debtors have given you from counsel,

7  from the witness to assess the actual merits of these claims.

8         And I think the letter -- I hate to bring up the

9  now-infamous Quinn Emanuel letter -- but this letter is

10  entirely irrelevant because we're not asking the Court to

11  approve a settlement.  There's no TMT Trailer or 9019 for

12  writing a letter.

13         And nobody said that this was in August, there was

14  no bankruptcy yet.  Nobody's suggesting that we had to

15  establish the reasonableness of that settlement, but they do.

16         And I also -- well, I should pause here, because I

17  don't want to move off the merits too quickly if Your Honor

18  has questions, but I also wanted to address the liquidity.

19         THE COURT:  Okay.  Why don't you turn to that.

20         MR. SCHECK:  Okay.  I think the first point I want

21  to make on the liquidity -- so, the Debtors justify, try to

22  justify the settlement on the basis of bringing in the

23  23 million, rather than the complete, what we say, 31 million

24  that's owed.

25         There's two problems with the argument.  The first

1  I won't belabor because I think I've already, you know,

2  argued it to the point, which is the fact that they need the

3  money is something we need to consider, but we do need to

4  still meet the standard on the merits.

5          THE COURT:  Okay.  Let me ask you this question:

6  Are you aware of another source of liquidity that's available

7  to the Debtors if they don't take the settlement?

8          MR. SCHECK:  Not at this time.

9          THE COURT:  Okay.

10         MR. SCHECK:  But I do want to address the

11 liquidity, because even with this settlement, it's not clear

12 for how long the Debtors will service loans.  We just saw a

13 pullback of any commitment.

14         We have a plan.  The disclosure statement

15 objections are due next week and we have a plan with blanks.

16 It has blanks for when they're going to service till.  We

17 have no idea.  They haven't committed to do anything.

18         So, it comes -- and, also, they went, at length,

19 in the first day declaration about the problems they're

20 having with American Express and the database.  How do we

21 have comfort that this settlement that's bringing in money is

22 going to provide us servicing through a certain date -- they

23 won't commit to it, they want to hold the rejection threat --

24 and we don't have comfort that they're actually going to

25 effectively service the loans and be able to transfer them.

1          THE COURT:  Okay.  But Mr. Scheck, if you are

2   given a choice between a chance of success and certain

3   failure, which is better?

4          MR. SCHECK:  Well, understood, but also, it's -- I

5   don't know that that's the only choices.  I don't know.

6          Customers Bank, and they're here and they may say

7   it -- I don't know -- but they have the same issue.  They

8   need the servicing, too.

9          And so, I don't know -- a denial of a settlement

10  is not a denial with prejudice, typically, and I don't know

11  what they could come to.  But I know that this settlement

12  purports to give a creditor -- the Debtor acknowledged

13  drove -- helped drive them into bankruptcy -- and, remember,

14  setoff and recoupment are equitable defenses -- helped drive

15  them into bankruptcy, gives them a preference by

16  distributing, and I know we talked about this point a little

17  bit, $8 million on a claim while unsecured creditors may

18  receive nothing or pennies, and that's a problem.  And so, I

19  don't know if that's the only two choices, but I fully

20  understand and acknowledge Your Honor's point.

21         But I do think it's important, Your Honor.  I

22  think we came into this settle -- this hearing, not fully

23  understanding the strengths and weaknesses, as asserted by

24  the Debtors, of the claims, but, importantly, I don't know

25  that we understand what this settlement is buying.

1          How many is the servicing going to be effective?

2          We're going to have to pay, apparently, for the

3    transfer at the end of this process.  So, again, I mean not

4    sure how far their liquidity argument goes.

5          Either way, though, they still need to meet the

6    standards and we submit they have not.

7          THE COURT:  Okay.  I understand your position.

8          Anything further by way of reply, Ms. Arthur?

9          MS. ARTHUR:  Thank you, Your Honor.  Very briefly.

10         Again, for the record, Candace Arthur of Weil, on

11   behalf of the Debtors.  Your Honor, what strikes me from what

12   counsel has, you know, just stated or described is a scenario

13   by mutual destruction here and he's requesting the Debtors

14   play a game of chicken with their own operations in order to

15   see who blinks first, whether it be Customers Bank or whether

16   it be Cross River, in terms of the settlement agreement.

17         And the settlement, itself, I think the liquidity

18   is not -- cannot be challenged.  The money is what it is.

19   The cash is what it is.  Its availability is what it is.

20         In terms of, you know, what strategies the Debtors

21   had available to it at the commencement of this case, they

22   were all explored.  They were all diligently looked into.

23         In terms of collecting on a breach of contract

24   claim, even if Your Honor gave us the judgment that we wanted

25   in connection with our 65.5 million, what -- in terms of

1  timing, when could we have actually been able to get that?

2  So, a lot of different things came into play.

3         In terms of the discussions with Customers Bank

4  that -- and I am being mindful of the mediation and the

5  privilege that shrouds it -- they would say here today that

6  they do have damages today, and that it's not contingent.

7  They would say that they've already been harmed and that

8  they -- they don't have to wait for the SBA and the DOJ to

9  make any further decisions because today they cannot sell

10 their loan portfolio because it's not backed.

11        So, to kind of postulate that, in any way, that

12 the Debtors have not looked at the defenses that have been

13 raised and not -- and thought to themselves, Even that being

14 said, should I take a deal that provides them with a

15 90 percent recovery?

16        It's shocking that anyone's saying that that's a

17 problem.  I think that that is actually shocking.  I'm

18 surprised that the motion, itself, is contested, given the

19 claims that they have, the familiarity with it that they

20 have.  They're the only creditor that has stood up and said

21 anything.

22        You know, I think, Your Honor, that's very

23 telling.  Similarly, as it's telling that, you know, I

24 believe that this is just an attempt for Cross River to be

25 able to take advantage of the situation in connection with

1  their own claims.

2          It's unfortunate, and I do agree with them, that

3  actions that were taken against the company have, in any way,

4  been beneficial to that -- to a party that agreed with the

5  company.  I completely agree with that.

6          But that being said, that's the nature of a

7  compromise and that's just where we are today.  So, Your

8  Honor, I do respectfully request that the Court grant the

9  motion, and I do believe that counsel, himself, provided

10 reasons for it, given the fact that there's a disclosure

11 statement -- it's pending before the Court -- there's a

12 Chapter 11 plan that does have to, you know, be amended to

13 address the things that we need.

14         Of course we couldn't fill in numbers, Your Honor;

15 we needed the settlement agreement.  We needed the money to

16 put in.  Of course, you know, counsel is asking, When can we

17 service it?  Well, we can service the loans and we'll have a

18 date for servicing the loans if we had the money in.  And

19 then we can make that determination.

20         And we think we've been very clear with everyone

21 that that was a toggle and that this case was commenced with

22 a toggle as a result.  So, the feigning of surprise and the

23 feigning of ignorance here as to what's, you know, what the

24 company is doing with the Debtors' plan, you know, I don't --

25 I feel is very disingenuous.

1          So, respectfully, Your Honor, we do request that
2   you overrule the objection and that you grant the motion.
3          THE COURT:  Okay.  Thank you, Ms. Arthur.
4          Is there anything further that I should hear
5   before taking it under advisement?
6          MR. SCHECK:  Your Honor, I won't belabor the
7   point.  I'm sure that it probably doesn't need to be said,
8   but the questioning of how genuine our objection was, I'd
9   probably leave it alone, but --
10          THE COURT:  Look, fair enough.  I'm assuming --
11  let me say this, I take this as a good faith dispute between
12  parties who are acting in good faith, so I'm not persuaded
13  that you are disingenuous.  I'm not (indiscernible) you're
14  right, either, but we'll get to that.  But I don't think you
15  stood at the podium and said something you knew to be false.
16          MR. SCHECK:  Understood.  And I just want to make
17  clear, though, it also ignores, I think, our position.  She
18  said -- I think counsel said that we're the only creditor
19  that stood up.  I think five creditors have made a notice of
20  appearance, including the SBA and the Fed Reserve.
21          And I think we're a significant creditor.  They're
22  a two-partner bank, so I think it is meaningful.
23          THE COURT:  I understand.
24          MR. SCHECK:  But understood, I won't belabor the
25  point.

1          THE COURT:  Okay.  The record there is what it is,
2  so --

3          MR. SCHECK:  Thank you, Your Honor.

4          THE COURT:  Okay.  So, here's where I am.  I think
5  this is a situation that would benefit from a prompt ruling.
6  I've heard a lot and I have a lot of notes.  I would like to
7  go process them.  What I -- I think it shouldn't take me long
8  to do.

9          Would it work for the parties if I took a half an
10  hour or so, got my thoughts in order and came back and read
11  something into the record?

12      (No verbal response)

13          THE COURT:  Okay.  So, why don't I do this, I'll
14  come back on at 3:30, which will not give me enough time to
15  actually be coherent, but I'll be less coherent that I would
16  otherwise be.

17      (Laughter)

18          THE COURT:  So, I'll do that.  I'll be back on at
19  3:30 and with that, we're in recess.  Thank you.

20          COUNSEL:  Thank you, Your Honor.

21      (Recess taken at 2:51 p.m.)

22      (Proceedings resumed at 3:31 p.m.)

23          THE COURT:  Okay.  Thanks, everyone, for your
24  patience.  I do appreciate the terrific arguments all around.
25  I am prepared to rule.

1          The Debtor Kabbage seeks approval of a settlement

2   with Customers Bank.  The motion is opposed by Cross River

3   Bank, which contends that it is the Debtors' largest

4   unsecured creditor.

5          This afternoon, the Court held a hearing on the

6   motion, which included the testimony of Laquisha Milner, the

7   Debtors' CEO, and the introduction into evidence of several

8   documents.  The Court heard spirited argument from very

9   capable counsel on both sides.

10          This oral ruling will constitute the Court's

11   findings of fact and conclusion of law under Federal Rule of

12   Bankruptcy Procedure 7014(c), which incorporates Federal Rule

13   of Civil Procedure 52.

14          For the reasons I will explain, I will grant the

15   motion.  So, the factual background is that Kabbage processed

16   loan applications, originated PPP loans, and serviced those

17   loans on behalf of itself and on behalf of other financial

18   institutions.  There's no dispute that the origination and

19   servicing of those loans has given rise to an array of

20   governmental investigations and potential claims.

21          Those claims include claims by the underlying

22   lenders.  Some of those claims are contingent.  Essentially,

23   if the borrower fails to pay and your wrongful conduct means

24   that the SBA is not obligated to honor its guaranty, we have

25   a claim against you for our losses.

1          It is at least arguable that some of those claims

2   are present claims, essentially, that our portfolio of loans

3   is worth less today in the open market than it would have

4   been, but for your allegedly wrongful conduct.

5          Because the claims are contingent, placing a value

6   on the claim requires more guesswork, which is to say,

7   predictions about the future, than does valuing the claim

8   that is entirely about events that occurred in the past.

9          According to the Debtors, Kabbage was entitled to

10  recover approximately $65.5 million from Customers Bank in

11  loan referral and servicing fees.  The Debtors stated that

12  Customers Bank never paid these fees to Kabbage and Customers

13  Bank said that it's nonpayment was on account of the alleged

14  failure in Kabbage's processing of the PPP loans.

15         Kabbage then, effectively, paid itself $34 million

16  of that amount to offset amounts that it otherwise owed to

17  Customers Bank.

18         In May, Kabbage sued Customers Bank for breach of

19  contract.  Following that lawsuit, there were settlement

20  discussions and a mediation.  The parties reached a

21  settlement, which the Debtor now asks this Court to approve.

22         The settlement has essentially four key

23  components.  The company will receive $23 million in cash

24  nearly immediately.  The Debtors and their estates will get a

25  release of the contingent and unliquidated claims that

1  Customers Bank was otherwise asserting.  The Debtors and

2  Customers Bank have an agreement on the servicing obligations

3  going forward.  And the parties will be able to avoid the

4  ongoing costs and risks associated with ongoing litigation.

5        At bottom, the settlement allows Customers Bank to

6  keep approximately $8 million that the Debtor contends was

7  otherwise due to it.

8        The fundamental question before this Court is

9  whether settling on those terms was a reasonable thing for

10  the Debtor to have done on all of the circumstances present

11  here.

12        The legal standards and familiar and undisputed.

13  The Court must be in a position to form an intelligent and

14  objective opinion about the probabilities of ultimate

15  success, should the claim be litigated.  That's from TMT

16  Trailer Ferry v Anderson, 390 U.S. 414, 424-425 (1968).

17        The Third Circuit's decision of In re Martin,

18  91 F.3d 389 (3d Cir. 1996) sets out the four-factor test that

19  controls, here in the Third Circuit.  The case makes clear

20  that while settlements are favored, courts need to take a

21  careful look to ensure that they're fair.

22        The four factors are the probability of success in

23  litigation, the likelihood of difficulty in collection, the

24  complexity of the litigation involved, and the expense and

25  inconvenience and delay that is necessarily attendant to

1   litigation, and the paramount interest of creditors.

2           Other cases like Judge Carey's decision in

3   Spansion and, Judge Walrath's opinion in Washington Mutual

4   both make clear that the Debtor has an evidentiary burden

5   that can't be met, simply with guesswork and speculation, but

6   there needs to be a factual basis to establish the

7   reasonableness of the settlement.

8           So, the Debtors do carry the burden of persuading

9   the Court that the settlement falls within the range of

10  reasonableness; though, in assessing that, the Debtors'

11  exercise of its business judgment is entitled to some measure

12  of respect from the Court.

13          Here, the Court is persuaded, based on the

14  evidence that it considered, that these factors counsel in

15  favor of settlement and that conclusion is driven by a number

16  of specific factors.  First, and perhaps most importantly,

17  the fact that the Debtor needs cash now supports the decision

18  to essentially liquidate the Customers' claim against the

19  estate now to get this matter tied up and, therefore, to

20  generate much-needed cash.  There is no suggestion that there

21  is any other source of funding available.

22          And so when asked whether the Debtors' decision is

23  reasonable, it seems to me that that needs to be viewed in

24  the context in which the Debtor finds it.  And what is

25  reasonable for someone to do when they are over a barrel may

1  be different from what is reasonable to do in other

2  circumstances.

3        There is no suggestion that a better deal might

4  have been available.  I'm satisfied, based on the testimony

5  of Ms. Milner and the evidence I reviewed, that this deal was

6  certainly reached at arm's-length, after extensive

7  negotiation, and the Debtor did the best it could to bring in

8  the best deal that it was able to bring in.

9        Would the Debtor have preferred to bring in more?

10  Of course, that's always true.

11        On the quantification and assessment of the risk,

12  look, I think that Customers -- I'm sorry -- that Cross River

13  Bank makes reasonable arguments that some additional evidence

14  about the realistic, worst-case possibility would have been

15  helpful.  That said, I'm satisfied that the evidence that was

16  presented is sufficient to meet the Debtors' burden.

17        We do know that the government investigations are

18  wide-ranging and allege an array of alleged misconduct.  We

19  do know that Customers asserts from Ms. Milner's declaration

20  that Customers asserted its potential claim could exceed the,

21  then-outstanding portfolio of loans, which on the petition

22  date was $181 million.

23        And the Court is moved here by the fact that at

24  the end of the day, what the Debtor needs to show is that,

25  essentially, valuing the claim of Customers Bank in these

1  circumstances at $8 million was a reasonable judgment for it

2  to make.

3          The claim asserted is in excess of $180 million.

4  The resolution brings in a receivable that was due to the

5  Debtor, it brings in, basically, more than almost 90 cents on

6  the dollar on that receivable, due to it from Customers.

7          Here, the cost of litigation, the Court can

8  conclude, based on simply the exercise of common sense, would

9  have been in the millions of dollars.

10         And the delay associated with litigating the claim

11 to judgment would likely have caused the company to run out

12 of money.  The record here is undisputed that the company is

13 going to run out of money in the absence of this settlement

14 in December.

15         Here we are, it's November 7th, and there's no

16 suggestion that there was any other source of cash, and so

17 the Court does believe that, in looking at the quantity and

18 quality of the evidence submitted in support of the

19 settlement, that it needs to be viewed in light of that

20 context.  And in light of that context, the Court is

21 persuaded that the evidence presented meets that burden.

22         So, on that record, and for those reasons, I'm

23 persuaded that the exercise of judgment was reason, that the

24 settlement falls within the range of reasonable, in light of

25 the circumstances the company faced, and for those reasons, I

1  will grant the Debtors' motion, and I ask that counsel for

2  the Debtors settle an order so providing.

3          Are there questions about that ruling?

4      (No verbal response)

5          THE COURT:  Okay.  If not, are there any other

6  ways the Court can be helpful to the parties while we are

7  here?

8          MS. ARTHUR:  There's one more motion.

9      (Laughter)

10          THE COURT:  Oh, you have another motion?

11      (Laughter)

12          THE COURT:  Let me let you -- why don't we proceed

13  on hearing that motion.

14          MS. ARTHUR:  So, Your Honor, there's one more item

15  on the agenda.  I will cede the podium to my partner,

16  Ms. Natasha Hwangpo to present.

17          THE COURT:  Okay.  Thank you very much, and thank

18  you for that correction.

19      (Laughter)

20          THE COURT:  I'm paying attention, I swear.

21          MS. HWANGPO:  Good afternoon, Your Honor.

22          Natasha Hwangpo, Weil, Gotshal & Manges, counsel

23  for the Debtors.

24          Last, but not least, we have Agenda Item 8, which

25  is the cash collateral motion.  Mindful of the time, and I'm

1   sure everyone trying to catch the next train out of here,

2   I'll keep this very short.

3           With the motion, Your Honor, just for a little bit

4   of housekeeping, as Exhibit B, we filed the Rieger-Paganis

5   declaration and Ms. Rieger-Paganis is with us in the

6   courtroom and available for questions.

7           So, at this time, we would request that that

8   declaration be admitted into evidence.

9           THE COURT:  Is there any objection to the

10  introduction of the declaration into evidence?

11      (No verbal response)

12          THE COURT:  Okay.  Hearing none, it will be

13  admitted.

14      (Rieger-Paganis Declaration received in evidence)

15          MS. HWANGPO:  Thank you, Your Honor.

16          Your Honor, the cash collateral motion is going

17  forward today on an uncontested basis and, further, given

18  Your Honor's ruling on the Cubby settlement, the cash

19  collateral budget, which was attached as Exhibit 1 to the

20  proposed order, remains unchanged.

21          So, unless Your Honor has any questions, I'm happy

22  to walk through the redline if Your Honor would like that,

23  but if not, we would ask that the order be entered.

24          THE COURT:  Let me take a quick look just to make

25  sure that I've seen -- so, the redline was filed?

1          MS. HWANGPO:  At Docket 208 with our revised,

2   proposed order.

3          THE COURT:  Let me just make sure I've seen that.

4   I confess, I paid more attention to the contested motion, so

5   I want to make sure I get this right.

6       (Pause)

7          THE COURT:  Okay.  I did review this before and I

8   don't have any further questions about the revised form of

9   cash collateral order.

10          MS. HWANGPO:  Great.  Thank you, Your Honor.

11          We ask that it be entered at your convenience.

12          THE COURT:  We will enter that order, yes.

13          That's been uploaded?

14          MS. HWANGPO:  Yes.

15          THE COURT:  Okay.

16          MS. HWANGPO:  Yes.

17          THE COURT:  Okay.  Then, we will enter that order.

18          Okay.  That brings me back to my earlier question,

19   which is:  Is there anything else that I can do to be helpful

20   to the parties today?

21       (Laughter)

22          MS. HWANGPO:  At this point, Your Honor, we are

23   done with the balance of our matters for today.

24          THE COURT:  Okay.  Any other party in interest

25   wish to be heard on any other matter?

1          (No verbal response)

2               THE COURT:  Okay.  If not, again, thanks to the

3    parties for today's argument.

4               We stand adjourned.  Thank you.

5               MS. HWANGPO:  Thank you, Your Honor.

6          (Proceedings concluded at 3:44 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of our

5     knowledge and ability.

6

7     /s/ William J. Garling                November 8, 2022

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12    /s/ Mary Zajaczkowski                 November 8, 2022

13    Mary Zajaczkowski, CET-531

14    Certified Court Transcriptionist

15    For Reliable

16

17    /s/ Coleen Rand                       November 8, 2022

18    Coleen Rand, CET-341

19    Certified Court Transcriptionist

20    For Reliable

21

22

23

24

25