**Exhibit 1**

**Revised Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------ x
: 
In re : Chapter 11
: 
KABBAGE, INC. d/b/a KSERVICING, *et al.*, : Case No. 22–10951 (CTG)
: 
: 
Debtors.[1] : **(Jointly Administered)**
: Re: Docket Nos. 172, 206, 211 & 213
------------------------------------------------------------ x

### ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT AGREEMENT BETWEEN KSERVICING AND CUSTOMERS BANK AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**"),[2] of Kabbage, Inc. d/b/a KServicing (the "**Company**") and its debtor affiliates, as debtors and debtors in possession in the chapter 11 cases (collectively, the "**Debtors**"), requesting entry of an order (i) authorizing entry into and approval of the Settlement Agreement, between the Company and CB (together, the "**Parties**"), substantially in the form attached hereto as **Exhibit 1**, and (ii) granting related relief, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. 157(a)–(b) and 1334(b); and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having held a hearing on November 7, 2022 (the "**Hearing**") where it considered the relief requested in the Motion and *Cross River Bank's Objection to Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Docket No. 206] (the "**Objection**"), the *Debtors' Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Docket No. 213], the First Day Declaration, the *Declaration of Laquisha Milner in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Docket No. 211] and the statements of counsel and the evidence adduced with respect to the Motion at the Hearing; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

      IT IS HEREBY ORDERED THAT:

    1.    The Motion is GRANTED and the Objection is OVERRULED for the reasons set forth on the record at the Hearing.

    2.    The Company is hereby authorized to enter into the Settlement Agreement.

    3.    The Company is hereby authorized to enter into, perform, execute, and deliver all documents, and take all actions, necessary to immediately continue and fully implement

the Settlement Agreement in accordance with the terms, conditions, and agreements set forth in the Settlement Agreement, including entry into the Settlement Agreement, all of which are hereby approved.

4. The requirements of Bankruptcy Rule 6004(a) are waived.

5. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

6. The Debtors and CB are authorized to take all actions necessary or appropriate to carry out the relief granted in this Order.

7. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# Exhibit 1

## Settlement Agreement

# SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("<u>Agreement</u>") is entered into this 27th day of October, 2022, by and among the following parties (collectively, the "<u>Parties</u>"):

    (i)    Kabbage, Inc., d/b/a KServicing[1] ("<u>KServicing</u>"), a Delaware corporation; and

    (ii)    Customers Bank ("<u>CB</u>"), a state-chartered bank under the laws of Pennsylvania.

WHEREAS, KServicing is a loan processor and servicer headquartered in Atlanta, Georgia;

WHEREAS, CB is a bank whose business includes lending money to small businesses;

WHEREAS, in response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "<u>CARES Act</u>");

WHEREAS, the CARES Act provided for the Payment Protection Program ("<u>PPP</u>"), under which the United States Small Business Administration ("<u>SBA</u>") would forgive and/or guaranty loans issued to small businesses that met criteria set forth by the SBA in an effort to expeditiously provide support to small businesses and their employees;

WHEREAS, the SBA approved KServicing to make PPP loans and to process applications for PPP loans;

WHEREAS, KServicing desired to partner with a lender to fund PPP loans and CB desired to partner with a loan processor and servicer to assist CB with processing PPP applications and to service loans on CB's behalf;

WHEREAS, the Parties initially entered into that certain SAAS Services Agreement (as amended, the "<u>SaaS Agreement</u>"), dated April 24, 2020, and that certain Processing and Servicing Agreement Pursuant to Division A, Title I of the CARES Act (as amended, the "<u>Original PSA</u>"), dated April 27, 2020, under which KServicing would process loan applications from small businesses for approval by the SBA, CB would fund said loans, and KServicing would service said loans on CB's behalf;

WHEREAS, the Parties entered into an additional contract, that certain Sale and Servicing Agreement (as amended, the "<u>S&S Agreement</u>", and, collectively with the Original PSA and SaaS Agreement, the "<u>Contracts</u>" and the loans thereunder the "<u>CB PPP Loans</u>"), dated February 2, 2021, under which KServicing would sell PPP loans to CB that KServicing had issued and KServicing would service those loans for CB;

---

[1] Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express.

WHEREAS, various disputes (collectively, the "Disputes") arose between the Parties in relation to the Contracts, including:

(A) CB contends that KServicing is improperly withholding from CB the Disputed KServicing Holdbacks; KServicing contends it is properly withholding from CB the Disputed KServicing Holdbacks;

(B) CB contends that, as a result of failures by KServicing in processing loan applications, the Missing in E-Tran Population may not (in whole or in part) be subject to guaranty or forgiveness by the SBA in an amount for which CB contends that KServicing is liable to CB;

(C) CB contends that, as to the Missing in E-Tran Population, CB has additional exposure because the borrowers of those loans, who were informed that they would not face any liability if they complied with the SBA's requirements, will have tax liabilities if CB forgives their loans and CB contends that KServicing is in turn liable to CB for any such amounts;

(D) CB contends that, as a result of KServicing's aforementioned failures in processing loan applications in relation to the Missing in E-Tran Population, CB did not receive its share of origination fees that would otherwise have been due to CB under the Contracts, an amount for which CB contends that KServicing is liable to CB;

(E) KServicing contends that any and all liability on account of the Missing in E-Tran Population is the SBA's and is not on account of any failures by KServicing;

(F) CB contends that KServicing's failure to adequately perform its servicing obligations made it necessary for CB to hire outside consultants to perform some of the loan servicing functions that KServicing contracted to perform, at a cost for which CB contends KServicing is liable to CB;

(G) KServicing contends that no failure to adequately perform its servicing obligations has occurred or resulted in the need for CB to hire any outside consultant to perform KServicing's services;

(H) CB contends that it faces additional exposure in an unknown amount, for which CB contends KServicing is liable to CB, because of KServicing's failure to prevent loan applications from including amounts earned by any employee of a borrower above $100,000 annually, which was not permitted by SBA guidance (the "$100k Issue"), with the result that CB is currently the lender of record on certain loans that were issued with principal amounts in excess of the amount that would have been approved by the SBA if SBA guidance had been fully complied with (the "$100k Population"), which the United States Department of Justice ("DOJ") is currently investigating (the "$100k Investigation"), and for which the SBA has indicated it is not currently willing to forgive or guaranty the "excess" part of any loan within the $100k

      Population, for the amount of which loans and any potential DOJ or SBA penalties or assessments CB contends KServicing is liable to CB;

(I)    CB contends that it faces additional exposure in an unknown amount, for which CB contends KServicing is liable to CB, because of KServicing's failure to ensure that loan applications properly took account of SBA guidance relating to the use of certain information on Federal Tax Form 940 (the "Form 940 Issue"), with the result that CB is currently the lender of record on certain loans that were issued with principal amounts in excess of the amount that would have been approved by the SBA if SBA guidance had been fully complied with (the "Form 940 Population"), which the DOJ is currently investigating (the "Form 940 Investigation" and together with the $100k Investigation and any pending False Claims Act case or related investigation involving Kabbage being pursued by the U.S. Attorney's Office in the District of Massachusetts, collectively the "DOJ Investigations"), and for which the SBA has indicated it is not currently willing to forgive or guaranty the "excess" part of any loan within the Form 940 Population, for the amount of which loans and any potential DOJ or SBA penalties or assessments CUBI contends KServicing is liable to CB; and

(J)    KServicing contends that it is not liable to CB for the $100k Issue, the Form 940 Issue, or any of the DOJ Investigations, and that it properly relied on borrower representations made in loan applications and at all times complied with the PPP lending requirements in approving borrower loan applications pursuant to the guidance published by the SBA.

      WHEREAS, KServicing continues to service a portfolio of outstanding CB PPP Loans, constituting all loans for which CB is the lender of record that CB made or acquired pursuant to the Contracts (such loans as of the Effective Date, the "Remaining Loan Population");

      WHEREAS, on May 25, 2022, KServicing filed a lawsuit against CB in the Northern District of Georgia, styled *Kabbage, Inc. d/b/a KServicing v. Customers Bank*, No. 1:22-cv-02101-JPB (the "Lawsuit");

      WHEREAS, the Parties participated in a mediation of the Disputes on August 23, 2022 and a resolution was not reached;

      WHEREAS, the Parties entered into a tolling agreement, pursuant to which KServicing filed a notice of dismissal without prejudice of the Lawsuit on September 19, 2022;

      WHEREAS, on October 3, 2022, KServicing filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United Stated Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement its wind down strategy (any such case, the "Chapter 11 Case");

WHEREAS, prior to entry into this Agreement, KServicing has provided CB with information (the "Servicing Information") to support its forecasted performance under the Servicing Plan (as defined below); and

WHEREAS, the Parties desire to settle the Disputes and, to the extent possible, to minimize risk to the Parties, to minimize potential harm to borrowers of CB PPP Loans from the Disputes, and to maximize the value of KServicing's estate;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, it is agreed by and among the Parties as follows:

1. Definitions.

(A) "Borrower Overpayments" means amounts collected from a borrower on account of a CB PPP Loan (i) already purchased by the SBA, thus resulting in such collected amounts being payable by KServicing to the SBA, (ii) where such amounts are in excess of the required minimum loan payments, including payments on forgiven loans, thus resulting in such collected amounts being payable by KServicing to the applicable borrower, or (iii) that is ultimately forgiven by the SBA, thus resulting in such collected amounts being payable by KServicing to the applicable borrower, or (iv) any other overpayments received by KServicing from any source that must be returned or otherwise paid to a borrower or the SBA.

(B) "Disputed CB Holdback" means the approximately $65.5 million that constitutes loan origination and servicing fees due to KServicing under the Original PSA and SaaS Agreement as of the Petition Date.

(C) "Disputed KServicing Fee Holdback" means the amount that constitutes SBA loan origination fees due to CB under the S&S Agreement. As of the Petition Date, CB contends that the Disputed KServicing Fee Holdback is approximately $8.3 million.

(D) "Disputed KServicing Holdbacks" means, collectively, the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback.

(E) "Disputed KServicing Remittance Holdback" means the amount that constitutes funds (i) collected from borrowers that KServicing is required to remit to CB under the Original PSA and S&S Agreement, and (ii) held by KServicing on account of cancelled loans. For the avoidance of doubt, Disputed KServicing Remittance Holdback does not include any Borrower Overpayments. As of the Petition Date, CB contends that the Disputed KServicing Remittance Holdback is approximately $26.5 million.

(F) "Missing in E-Tran Population" means the loans intended to qualify for the PPP program that CB issued and/or purchased from KServicing that currently do not have SBA-recognized "E-Tran" numbers.

(G) "Settlement Amount" means $58,000,000.

(H) "Settlement Payment" means an amount equal to the Settlement Amount *less* the amount of the Disputed KServicing Holdbacks as of the Petition Date.

2. Effective Date. This Agreement shall be effective on the date on which the Bankruptcy Court approves this Agreement pursuant to Paragraph 5 (the "Effective Date").

3. Reconciliation.

(A) Following the execution of this Agreement through the Effective Date, the Parties shall work together in good faith to promptly reconcile the amounts of the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback as of the Petition Date to determine the appropriate amount of the Settlement Payment.

4. Servicing Plan.

(A) KServicing agrees that it shall take commercially reasonable efforts to maintain the current levels of PPP loan servicing with respect to the Remaining Loan Population (the "Servicing Plan") from the Effective Date through the earlier of (i) March 31, 2023 and (ii) the date of transfer of KServicing's servicing obligations to an alternative servicer acceptable in all respects to CB (the "Servicing Termination Date"); *provided*, that the Servicing Plan shall not govern servicing of the Remaining Loan Population after the Servicing Termination Date and any such continued servicing by KServicing of the Remaining Loan Population shall be subject to separate agreement.

(B) The Parties agree that KServicing shall not be responsible for any incremental costs above its ordinary course operating expenses, including payroll, required to comply with its obligations under the Servicing Plan, associated with any transfer of KServicing's servicing obligations for the Remaining Loan Population to an alternative servicer; *provided*, that KServicing will provide CB with three (3) business days' notice of its intent to incur any third-party costs for which reimbursement by CB will be requested, during which period CB may, at its sole discretion, direct KServicing to engage an alternative provider identified by CB at CB's expense. For the avoidance of doubt, the Servicing Plan does not contemplate the provision of additional services or reporting by KServicing for the purpose of transferring servicing obligations.

(C) As part of the Servicing Plan, KServicing shall provide to CB the reports described on Exhibit A hereto (the "Servicing Plan Reports"). KServicing agrees to provide the Servicing Plan Reports from the data systems described on Exhibit A (collectively the "Data Delivery Requirements").

    (D)    The Parties agree to hold weekly meetings, as needed or reasonably requested by either Party, from the date of this Agreement through the Servicing Termination Date to review matters relating to the Remaining Loan Population.

    (E)    For the avoidance of doubt, pursuant to the Servicing Plan, beginning as of the Petition Date, KServicing has and shall continue to deposit any and all borrower collections received on or after the Petition Date into a segregated account in the name of and for the benefit of CB (separate and apart from any other funds or assets) and shall provide CB with the account information regarding the segregated account, shall hold such funds in trust for the benefit of CB, and shall promptly, but in any event within ten (10) Business Days of the end of each month, or such other timing as mutually agreed upon in writing by the Parties, transfer all such funds to CB.

    (F)    CB agrees to and accepts the Servicing Plan, including that the Servicing Plan as set forth in this Agreement includes sufficient provisions for the retention of personnel to meet the Servicing Plan and Data Delivery Requirements. CB shall not challenge the Servicing Plan or the sufficiency of the Servicing Information provided by KServicing in support thereof.

5.    <u>Motion to Approve Agreement</u>. Within no more than seven (7) business days following the execution of this Agreement, KServicing shall file motions with the Bankruptcy Court, each in form and substance reasonably acceptable to CB, seeking (i) entry of a final order approving and authorizing the settlement of the Disputes as memorialized by this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>9019 Motion</u> and the related order, the "<u>9019 Order</u>") and (ii) entry of a final order shortening the notice period for the hearing on the 9019 Motion and the related response deadline (the "<u>Motion to Shorten Order</u>"). KServicing shall use commercially reasonable efforts to promptly obtain the 9019 Order and the Motion to Shorten Order, and CB will provide to KServicing such commercially reasonable assistance in that effort as KServicing may reasonably request.

6.    <u>Communications to Borrowers</u>. Following the Effective Date, CB shall have control over the timing and content of all communications to borrowers of CB PPP Loans regarding cancelation of the loans, tax liability regarding such cancelation, or any other aspect of resolving all or any portion of a CB PPP Loan which the SBA has at the time of the communication refused to recognize as a valid SBA PPP loan, and will use commercially reasonable efforts to provide advance notice to KServicing of such communications, and KServicing will use commercially reasonable efforts to facilitate such communications; *provided*, that nothing in this Agreement shall affect KServicing's ability to communicate with borrowers (i) as necessary to comply with its obligations in the Chapter 11 Case, and (ii) in the ordinary course of servicing the Remaining Loan Population. In no circumstances shall either Party's borrower communications (a) seek to disparage, blame, or allocate liability to the other for any action or inaction in connection with KServicing's provision of loan processing services, or (b) result in any liability to KServicing, including as a result of any mistakes in the content or delivery of such communications. As requested by CB, KServicing shall place automated holds and/or other systematic restrictions on collection notices to all CB PPP Loan borrowers, except for CB PPP

Loan borrowers who are already on an agreed list of "in collections" CB PPP Loan borrowers as determined by the Parties in writing; *provided further*, that if the conditions set forth in this Paragraph 6 cause a guaranty submission to be untimely, it shall be without prejudice to KServicing.

7. Agreement Contingent on Bankruptcy Court Approval. This Agreement is subject to approval by the Bankruptcy Court. Should the Bankruptcy Court deny entry of the 9019 Order, in whole or in part, this Agreement shall be void and of no legal effect, except that the Confidentiality provision set forth in Paragraph 27 of this Agreement shall continue in effect.

8. Settlement Payment. Within three (3) business days following the Effective Date, CB shall pay to KServicing in immediately available funds an amount equal to the Settlement Payment.

9. Mutual Release.

    a. Definitions.

    For the purposes of this Agreement:

    i. "KServicing Parties" means KServicing and its direct and indirect current and former affiliates, parents, partners, members, managers, subsidiaries, successors, assigns, and shareholders, and their respective current and former shareholders, owners, investors, members, directors, officers, partners, predecessors in interest, successors, assigns, investors, executors, administrators, managers, principals, agents, representatives, attorneys, advisors, divisions, employees, independent contractors, and all related entities of any kind or nature, and all persons acting by, through, under or in concert with them, but expressly excludes American Express.

    ii. "CB Parties" means CB, its direct and indirect, current and former affiliates, parents, partners, members, managers, subsidiaries, successors, assigns, and shareholders, and their respective current and former shareholders, owners, investors, members, directors, officers, partners, predecessors in interest, successors, assigns, investors, executors, administrators, managers, principals, agents, representatives, attorneys, advisors, divisions, employees, independent contractors, and all related entities of any kind or nature, and all persons acting by, through, under or in concert with them.

    b. KServicing Parties' Release

        i. KServicing hereby releases the CB Parties from, and covenants not to sue the CB Parties for, any and all actual or potential actions, causes of

action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or in equity, whether contractual, extra-contractual, in tort or otherwise, arising out of the Disputes, the Contracts or the PPP prior to the Effective Date, provided, however, that nothing herein shall constitute a release of the CB Parties' obligations under this Agreement.

c. CB Parties' Release

i. The CB Parties hereby release the KServicing Parties from, and covenant not to sue the KServicing Parties for, any and all actual or potential actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or in equity, whether contractual, extra-contractual, in tort or otherwise, arising out of the Disputes, the Contracts or the PPP prior to the Effective Date, provided, however, that nothing herein shall constitute a release of the KServicing Parties' obligations under this Agreement.

10. <u>PSA Submission to the SBA</u>.  On account of the SBA's direction to the Parties to submit a new processing and servicing agreement for reconsideration, the Parties hereby agree that the Original PSA shall be submitted to the SBA and any restated agreement resulting from such submission (the "<u>Restated PSA</u>") is not intended to, and shall not otherwise change, renew, or otherwise impact the respective Parties' rights, obligations, claims, defenses and legal positions. For the avoidance of doubt, any representations or warranties made in connection with the Restated PSA will continue to be made as of the date of the Original PSA or its constituent amendments was executed, and submission to the SBA of any other version of a processing and servicing agreement dated subsequent to the Original PSA, or any Restated PSA resulting therefrom, shall not constitute a bring-down of such representations or warranties. Notwithstanding the date on which the Parties execute or otherwise submit the Restated PSA, the Parties agree and acknowledge that for all purposes the Original PSA was entered into before the Petition Date and the Restated PSA shall not in any way abridge the Debtors' rights under the Bankruptcy Code with respect to the rejection, assumption or assumption and assignment of the Original PSA and the Restated PSA.   For the duration of this Agreement, CB agrees to take commercially reasonable efforts to assist and support KServicing in maintaining its status as an approved loan service provider with the SBA.

11. <u>No Assignment.</u> The Parties represent and warrant that there has been no, and agree that there will be no, assignment or other transfer of any interest, claim, or right with respect to any of the Disputes or claims under the Contracts arising prior to the Effective Date, which are being fully released and fully discharged pursuant to this Agreement; *provided*, that, for the avoidance of doubt, nothing herein shall prohibit KServicing from seeking leave of the Bankruptcy Court to transfer (i) the Contracts and KServicing's rights and obligations thereunder nor prohibit CB from objecting to any such transfer, or (ii) this Agreement pursuant to a chapter 11 plan.  Each

Party agrees to protect, indemnify, reimburse and hold harmless the others from any claim or action that has arisen or may arise based upon any assignment or transfer made in contravention of these representations and warranties.

12. <u>Entire Agreement.</u> The Parties agree and acknowledge that this Agreement constitutes the entire agreement among the Parties regarding the resolution of the Disputes and settlement and release of the matters specified herein, and that this Agreement shall not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a duly executed writing by all of the Parties. The Parties further acknowledge that they have made an investigation of the facts pertaining to this Agreement as deemed necessary, and, further, acknowledge that they have not relied upon any statement or representation of others, other than as expressly set forth herein.

13. <u>No Admission of Liability.</u> The Parties agree that this Agreement has been negotiated between the Parties as a compromise of disputed claims, in order to avoid further expense and uncertainty, and that the Parties do not admit any liability by entering into this Agreement. The existence of this Agreement shall have no meaning or implication outside of this Agreement, and it may not and shall not be used, construed as, or offered as an admission of liability or wrongdoing by any of the Parties.

14. <u>Reservation of Rights.</u> Nothing in this Agreement, nor any payment made pursuant to this Agreement, is intended to be or shall be (i) deemed to waive or release any Party's rights, remedies, claims, defenses and legal positions, except as specifically set forth herein or (ii) construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

15. <u>Enforcement.</u> The terms and conditions of this Agreement shall be enforceable by any of the Parties and their respective successors, representatives, and assigns. This Agreement is and may be pleaded as a full and complete defense to, and is and may be used as a basis for, an injunction against the prosecution of any claim or action that seeks recovery or relief contrary to the terms of this Agreement.

16. <u>No Release.</u> Nothing contained in this Agreement shall release any of the Parties from the Parties' covenants, obligations and agreements set forth in this Agreement.

17. <u>Construction.</u> This Agreement shall not be construed in favor of any particular Party to this Agreement but shall be construed as if it were drafted by all Parties to this Agreement. Underlined headings are included for the convenience of the Parties only and shall not be interpreted to have any effect on the meaning of the paragraphs that they accompany.

18. <u>Severability.</u> Any term, paragraph, or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term

or provision in any other situation or in any other jurisdiction.  If any provision hereof would, under applicable law, be invalid or unenforceable in any respect, then the Parties intend that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  Notwithstanding the foregoing, the Parties acknowledge and agree that the conditioning of relief upon the Bankruptcy Court's approval of this Agreement set forth in Paragraph 5 above and the mutual releases set forth in Paragraph 12 above are necessary to this Agreement, without which the Parties would not have entered into this Agreement.

19.    Finality of Release. The Parties intend this instrument to be effective as a full and final accord and satisfaction of the matters expressly released herein.  The Parties to this Agreement understand and acknowledge that they may later discover facts different from, or in addition to, those they now know or believe to be true, or may identify claims different from or in addition to those they now know of with respect to the matters expressly released herein.  Notwithstanding any such different or additional facts and claims, the Parties expressly accept and agree that this Agreement shall be and remain effective and binding.  It is the intention of the Parties that, notwithstanding the possibility that they or their counsel may discover or gain a more complete understanding of the facts, events or law which, if presently known or fully understood, would have affected the foregoing release, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth herein, notwithstanding the discovery or existence of any additional or different facts, events or law.  The Parties further represent that they have carefully read and understood all the provisions of this Agreement, have made their own investigation of the facts and are relying solely upon their own knowledge and the advice of legal counsel, and are not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Agreement.  Accordingly, the Parties expressly and knowingly waive (1) any claim that this Agreement was induced by any misrepresentation, omission, or nondisclosure and (2) any right to rescind or avoid this Agreement based upon presently existing facts, known or unknown.

20.    Governing Law. This Agreement, in all respects, shall be interpreted, enforced and governed by and under the laws of the State of Pennsylvania.

21.    Jurisdiction/Dispute Resolution.  Any dispute based hereon, or arising out of, under, or in connection with this Agreement will be resolved by the Bankruptcy Court, except as otherwise set forth herein.

22.    Parties to Bear Own Costs. The Parties shall bear their own costs and expenses incurred in connection with the preparation, execution and performance of this Agreement and the investigation of the matters related hereto, including without limitation expenses of legal counsel, agents and other representatives.

23. <u>Advice of Counsel</u>. The Parties hereby acknowledge that they have been represented and advised by counsel in connection with the execution of this Agreement.

24. <u>Counterparts</u>. The Parties agree that this Agreement may be executed in one or more counterparts, and in both original form and one or more photocopies, each of which shall be deemed to be an original, but all of which shall be deemed to be and constitute one and the same instrument.

25. <u>Execution</u>. Each person signing this Agreement warrants and represents that he or she has read this Agreement and has the necessary authority to execute this Agreement individually and on behalf of his or her respective principals, if any.

26. <u>Good Faith.</u> The Parties enter into this Agreement in good faith for the purpose of resolving all matters relating to the Disputes or otherwise addressed in this Agreement.

27. <u>Confidentiality.</u> This Agreement and its terms and conditions, to the extent reasonably feasible, shall be treated hereafter by all Parties as confidential, except as agreed to by the Parties in writing or in the following circumstances: (i) to the extent required by law, including, as necessary, to effectuate this Agreement in the Chapter 11 Case; (ii) to employees, investors, agents, attorneys, advisors, accountants, and consultants whose duties require that they be privy to the terms of this Agreement; (iii) by either Party to any regulator or governmental entity who in that Party's good-faith judgment needs access to the terms of this Agreement; *provided*, that the other Party is promptly notified, but in no event notified less than one (1) business day prior such disclosure; and (iv) as may be requested or otherwise required by any potential acquirer, purchaser, or target in the course of due diligence or negotiations concerning the terms of any acquisition, merger, or sale of any Party, provided first that the potential acquirer, purchaser, target, or similar party to such transaction shall execute a non-disclosure agreement safeguarding the confidentiality of this Agreement to substantially the same extent as provided for in this paragraph. Prior to any disclosures to any court or pursuant to any subpoena or discovery demand under, the Party from whom disclosure is sought shall promptly notify the other Party of any request or motion seeking disclosure.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date set forth above.

                                                               KABBAGE, INC. D/B/A KSERVICING

Date: October 27, 2022                    By: _____

                                                             Its: Chief Executive Officer
                                                                  (Authorized to sign on its behalf)

CUSTOMERS BANK

Date: **10/26/22**    By: _____

Its: ___PRESIDENT_____
(Authorized to sign on its behalf)

**Exhibit A**

Servicing Plan Reports

1. <u>Monthly Borrower Remittance Reports</u>.  KServicing will continue to manually produce these reports within 5 business days of the close of each month in the format such reports are currently prepared.

2. <u>Daily Loan Trial Balance Reports</u>.  KServicing shall, on each business day, deliver a loan trial balance report reflecting all payments received on the trailing business day (the "<u>Daily Trial Balance Report</u>") for the entire CB originated loan population.  Daily Trial Balance Reports will continue to be generated automatically each business day from the CoreCredit system of record maintained by American Express in the format such reports are current prepared.  A supplemental report will be provided each business day for the entire originated portfolio that provides the bank total balance reflecting all payments types (*i.e.*, remittance, guaranty, forgiveness, return, fraud recovery, etc.). KServicing will perform reconciliation and implement appropriate controls to ensure data sets are harmonized

3. <u>Weekly Guaranty Exception Reporting</u>.  KServicing will continue to provide weekly updates to the master report maintained by and perform to the currently-established workflow regarding any loans subject to a guarantee exception.  KServicing will continue providing updates and mitigation workflow activities through the Servicing Termination Date or until such earlier time as both parties mutually agree that no further reports are necessary or productive.  Updates will be provided by end of business every Friday.

4. <u>Weekly/Work Daily Portfolio Report</u>.  KServicing will continue to provide a loan attribute report of all outstanding loans, in the format such reports are current prepared, including but not limited to information relating to the current forgiveness and/or guaranty purchase status, outstanding balance amounts, guaranty purchase deadline and inclusion in the $100k Population and the Form 940 Population.  This report will be reconciled to the daily loan trial to include all loans that have an outstanding balance in that report.  The report will be provided every Tuesday, by end of business.

5. <u>940 and $100k Report</u>.  KServicing will provide prompt updates to CB with its knowledge of the SBA's and DOJ's respective positions on the processing of loans in the $100k Population and the Form 940 Population.  All updates will occur between internal and/or external legal counsel.  The parties agree to cooperate to facilitate SBA ultimately honoring its guaranty purchase obligations for any excess amounts relating to potentially affected loans.

6. <u>Reconciliation of Servicing Plan Reports</u>.  Data contained in the reports described in <u>Paragraphs 1, 2 and 4</u> of this <u>Exhibit A</u> are to be delivered to CB via SFTP with consistent file naming convention, format and prior validation.  KServicing will make commercially reasonable efforts to reconcile the daily/weekly reports to its monthly reports and will make commercially reasonable efforts to reconcile all reports, or otherwise provide CB with consistent definitions, filters, or status description prior to sending reports to CB.