# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---

| | |
|---|---|
| ------------------------------------------------------- x | |
| | **Chapter 11** |
| **In re** : | |
| : | **Case No. 22-10951 (CTG)** |
| **KABBAGE, INC. d/b/a KSERVICING,** *et al.*, : | |
| : | **(Jointly Administered)** |
| : | |
| **Debtors.**[1] : | **Objection Deadline: November 29, 2022 at 4:00 p.m. (ET)** |
| : | **Hearing Date: December 7, 2022 at 10:00 a.m. (ET)** |
| ------------------------------------------------------- x | |

## MOTION OF DEBTORS FOR ENTRY OF ORDER
### (I) APPROVING DEBTORS' RETENTION PROGRAM FOR CERTAIN NON-EXECUTIVE EMPLOYEES AND (II) GRANTING RELATED RELIEF

Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and collectively with their non-Debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Relief Requested

1.     By this Motion, the Debtors request, pursuant to sections 105(a), 363(b)(1), and 503(c) of title 11 of the United States Code (the "**Bankruptcy Code**"), entry of an order (i) approving the Debtors' retention program for certain non-executive employees and (ii) granting related relief.

2.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

3.       In support of this Motion, the Debtors submit the declarations of (i) Douglas Friske, a Managing Director at Willis Towers Watson US LLC ("**WTW**"), attached as **Exhibit B** (the "**Friske Declaration**"), and (ii) Marc Sullivan, the Debtors' Chief Financial Officer, attached as **Exhibit C** (the "**Sullivan Declaration**").

## Jurisdiction and Venue

4.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

5.       On October 3, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

6.       Pursuant to Bankruptcy Rule 1015(b), these Chapter 11 Cases are being jointly administered under the above captioned case.

7.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Deborah Rieger-Paganis in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 13] (the "**First Day Declaration**").[2]

### Preliminary Statement

8.     The Debtors' overriding goals for these Chapter 11 Cases are to preserve and maximize value and effectuate a successful wind down of their business – which may include a transfer of loan servicing operations to an alternative servicer – with minimal disruption to borrowers.  The Debtors' ability to achieve these goals depends in no small part on their ability to maintain a high level of business performance during the pendency of these Chapter 11 Cases, while also engaging with their stakeholders, and working closely with their advisors to implement an effective wind down, all of which requires the continued efforts, dedication, and support of certain of the Debtors' non-executive, non-insider employees.

9.     As of the Petition Date, the Debtors commenced these Chapter 11 Cases with a toggle chapter 11 plan, given the Debtors' potential settlement with Customers Bank and the ongoing negotiations with the Reserve Bank regarding the consensual use of cash collateral. Although the Debtors were hopeful that both issues would result in favorable outcomes for the Debtors and their estates, the ultimate conclusion remained uncertain.  Since that time, only six short weeks since the Petition Date, the Debtors have already made significant strides, securing a settlement with Customers Bank and this Court's approval thereof, which among other things injects $23 million of much-needed liquidity into the estates.  Simultaneously therewith, the

---

[2]  Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration.

Debtors also successfully negotiated the consensual use of cash collateral with the Reserve Bank, which provides access to amounts up to $8.5 million and secures sufficient liquidity for an orderly administration of an approximately six-month case rather than the toggle alternative of an expedited 100-day scenario.  In addition, the Debtors have also successfully transitioned the business into chapter 11, with the least amount of disruption possible to borrowers, employees, vendors, and stakeholders.  Further, the Debtors have obtained "first day" and "second day" relief necessary to stabilize their business and preserve ongoing operations, which are critical to preserving value for all stakeholders.

10.     Yet, notwithstanding the progress made to date, much work remains to be done.  Among other things, the Debtors must now: (a) coordinate with key stakeholders on the administration of these Chapter 11 Cases, (b) negotiate the terms of the chapter 11 plan and related disclosure statement, (c) identify potential third party servicers to prepare for, and reasonably assist in, the transfer of loan portfolios, as applicable, and (d) prepare for an orderly wind down.

11.     Recognizing that the continued success of these Chapter 11 Cases depends on the continued dedication of the Debtors' limited number of employees who must perform these remaining tasks – many of which are outside the ordinary scope of their duties – the Debtors seek authority to continue their prepetition key employee retention plan (the "**KERP**") to pay awards to only eleven (11) critical, non-insider, non-executive employees (collectively, the "**Non-Executive KERP Participants**").  The Non-Executive KERP Participants must not only manage their respective day-to-day duties and additional burdens and requirements of operating in chapter 11, but must also prepare for a potential transfer of operations and eventual wind down, all within a short window of time.  Essentially, the Non-Executive KERP Participants are being asked to

work themselves out of a job – if they are successful with the tasks at hand, eventually the Debtors will not exist.

12. To that end, the Debtors respectfully submit that the narrowly tailored Non-Executive KERP, with input from WTW, the Debtors' independent compensation consultant, was thoughtfully designed to increase the likelihood that the Non-Executive KERP Participants remain in the Debtors' employ, thereby preserving value for the Debtors, their estates, their creditors, and other parties in interest. After carefully evaluating the need for a retention plan, with input from the Debtors' management team as to personnel and business needs, the Debtors calculated the proposed amounts to be paid, and WTW evaluated their reasonableness, including scope and cost, by comparing the Non-Executive KERP to retention plans implemented in chapter 11 cases of similarly situated companies to ensure the Non-Executive KERP was consistent with market practices.

13. For the avoidance of doubt, with this Motion, the Debtors seek authorization, but not direction, to continue to honor obligations under the KERP with respect to *only* the Non-Executive KERP Participants. At a high level:

- The Non-Executive KERP includes eleven (11) Non-Executive KERP Participants.

- Each Non-Executive KERP Participant is eligible to earn an award in four equal installments. One installment was paid prepetition; three installments remain and will be paid post-petition in accordance with the requirements under the Non-Executive KERP.

- The aggregate remaining awards available to the Non-Executive KERP Participants total approximately $247,400, which includes $9,000 from the Discretionary Pool (as defined and further described in detail below) that has been allocated to two (2) Non-Executive KERP Participants and $63,000 from the Discretionary Pool that has yet to be allocated.

- To ensure the Debtors have sufficient personnel on hand to meet all of their chapter 11 goals, the Non-Executive KERP Participants' right to an award

5

under the Non-Executive KERP is conditioned on their continued employment with the Debtors.

14.    As demonstrated below, the Non-Executive KERP is appropriate, reasonable, well within the Debtors' business judgment, and, most importantly, is essential to preserving and maximizing value for the benefit of the Debtors' economic stakeholders.  The Non-Executive KERP Participants have knowledge of the Debtors' business operations and are vital to these Chapter 11 Cases.  It would be difficult and costly, if not impossible, to replace the Non-Executive KERP Participants at this juncture.  In particular, as a company in wind down, the Debtors already face difficulties recruiting, hiring, and maintaining employees.  Under these circumstances, providing the narrowly tailored, modest KERP to the limited pool of Non-Executive KERP Participants is critical and in the best interests of all stakeholders.  Accordingly, the Debtors respectfully request that the Court approve the Non-Executive KERP (as defined below).

## Key Employee Retention Program

### A.    Development of the Prepetition KERP

15.    Prior to the commencement of these Chapter 11 Cases, the Debtors maintained a prepetition employee bonus program (the "**Employee Bonus Program**") in the ordinary course of business.  As part of the Employee Bonus Program, employees were eligible to receive (i) annual discretionary bonuses based on performance, and (ii) referral bonuses upon referring someone who was hired into a full-time position.[3]  The Employee Bonus Program was an essential component of the Debtors' employees' aggregate compensation and was important in providing market-based compensation.  The Employee Bonus Program encouraged retention

---

[3]  For further details *see Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Obligations and (II) Granting Related Relief* [Docket No. 10].

among the Debtors' employees, which minimized costs associated with attrition and also ensured for continuity in the Debtors' business operations.  Sullivan Decl. ¶ 5.

16.    In the summer of 2022, with the goal of retaining certain key employees during the Debtors' wind down process, the Debtors' management, in consultation with AlixPartners, WTW, and Weil, undertook a review of their existing compensation programs to evaluate whether they were meeting their objectives of maintaining employee focus and retention. In particular, the Debtors were focused on (i) ensuring that their interests and the interests of their key employees were aligned to maximize value, (ii) preventing the loss of key employees during the wind down process, including to competitors, and (iii) accounting for the potential loss or delay of any bonus payments in the event of a potential chapter 11 filing.  Sullivan Decl. ¶ 6.  The Debtors' management, in consultation with AlixPartners, WTW, and Weil, therefore developed a proposed framework for the KERP which took into account, among other things, the Debtors' existing situation, market practices utilized in similar situations, and views of the Debtors' management concerning employee morale, expectations, and attrition risk.  *Id*.

17.    WTW's analysis of the KERP was all inclusive and reviewed the proposed terms and conditions relating to all aspects of the KERP, including the method of approval, scope of participants, total award pool, timing of proposed payments, retention periods and requirements, and related clawback provisions.  The Debtors' advisors also evaluated the KERP and advised the Debtors on legal, business, and practical considerations to take into account with respect to adoption of the KERP.  Ultimately, Weil, AlixPartners, and WTW recommended that the Debtors' Board of Directors (the "**Board**") review, consider, and approve the KERP.  Friske Decl. ¶ 7.

18.    The Board, following the advice of its advisors, effectively replaced the Employee Bonus Program with the KERP for fifteen (15) of the Debtors' critical, full-time

employees: four (4) executives (the "**Executive KERP Participants**," together with the Non-Executive KERP Participants, the "**KERP Participants**"), and eleven (11) Non-Executive KERP Participants.  Put differently, for any KERP Participant that signed a KERP agreement, such employee agreed to waive any awards attributable to the 2022 calendar year under the Employee Bonus Program.  Sullivan Decl. ¶ 6.

## B. Description of the Prepetition KERP

19.     The KERP contemplates an aggregate maximum payout of approximately $836,300 to 15 total employees: approximately $527,300 on account of Executive KERP Participants and approximately $309,000 on account of the Non-Executive KERP Participants, which includes a $75,000 Discretionary Pool, as explained further below.  Of the approximately $836,300, a total of approximately $589,000 was paid prepetition: with approximately $527,300 on account of executives, and approximately $61,500 on account of the first quarterly installment for the Non-Executive KERP Participants, which includes $3,000 from the Discretionary Pool.

20.     A summary table of the KERP is set forth below:

| KERP | | |
|---|---|---|
| | **Executive** | **Non-Executive** |
| Total Number of Participants | 4 | 11 |
| Aggregate Maximum Amount | $527,300* | $309,000* |
| Amount Left to be Paid Out | $0 | $247,400*[4] |
| Discretionary Pool | N/A | $75,000, of which, as of the Petition Date, $72,000 has yet to be paid and $63,000 remains available for allocation |
| *The asterisk denotes an approximate figure. | | |

---

[4] This figure includes three (3) remaining installments in the amount of approximately $61,500 each and the amount remaining for allocation from the Discretionary Pool (*i.e.,* $63,000).

i. *Executive KERP*

21.     At a high level, the prepetition executive KERP contemplated awards to four (4) key executive employees (the "**Executive KERP**").  Prepetition, the Executive KERP Participants received prepetition awards under the KERP, totaling approximately $527,300.  To ensure the Executive KERP Participants remain in the Debtors' employ through these Chapter 11 Cases and wind down of the business, the Executive KERP requires the Executive KERP Participants to continue working for the Debtors through the applicable retention period.

22.     For the avoidance of doubt, the Debtors are ***not*** seeking any relief with respect to the Executive KERP.

ii. *Non-Executive KERP*

23.     The non-executive KERP (the "**Non-Executive KERP**") is broken into three (3) tiers, divided by employment levels, with award amounts based on a percentage of base salary:

| Non-Executive KERP Tier | Award Amount as a % of Base Salary | Number of Participants | Approximate Aggregate Award Amount by Tier |
|---|---|---|---|
| Tier 1 | 30% | 2 | 104,000 |
| Tier 2 | 20% | 3 | 79,000 |
| Tier 3 | < 15% | 6 | 63,000 |
| | | **Total** | 246,000[5] |

a.     Non-Executive KERP Participants: eleven (11) Non-Executive KERP Participants

b.     Non-Executive KERP Awards: the maximum total cost of the Non-Executive KERP is approximately $309,000 (including the Discretionary Pool), with individual amounts ranging from 8% to 30% of each Non-Executive KERP Participant's annual salary. Of

---

[5] This figure includes all four (4) installments of the Non-Executive KERP, including the installment that was paid prior to the Petition Date, but does not include the remaining $63,000 that has yet to be allocated from the Discretionary Pool.

the approximate $309,000 total award pool, approximately $61,500 was paid on a prepetition basis as the first quarterly payment. Quarterly payments earned and paid are not subject to clawback; however, if any of the Non-Executive KERP Participants are terminated for any reason they will not be entitled to any future, remaining payments.

c.    <u>Award Timing</u>: the Non-Executive KERP provides for awards available in four quarterly payments (the first of which was paid prepetition). The three remaining installments are to be paid on or as soon as administratively practicable following each of: December 31, 2022, March 31, 2023, and June 30, 2023, subject to continued employment with the Company.

d.    <u>Acceleration</u>: remaining installments are subject to acceleration in the event of a "change of control."[6]

e.    <u>Effect on Severance and Other Compensation</u>: to receive a Non-Executive KERP award, each Non-Executive KERP Participant has agreed that the award is in lieu of any bonus compensation or award attributable to the 2022 calendar year or any severance pay or benefits at any time.

f.    <u>Discretionary Pool</u>: available for non-executive, non-insider employees who are critical but were not included in the original Non-Executive KERP Participant list.

24.    To account for special circumstances, the Non-Executive KERP also provides for an additional discretionary pool of $75,000 (the "**Discretionary Pool**"). From the Discretionary Pool, $12,000 was allocated prepetition on account of two (2) Non-Executive KERP Participants (of which $3,000 was paid to such participants), and $63,000 of the Discretionary Pool remains unallocated. With regard to future payments from the Discretionary Pool, the Debtors' Chief Executive Officer will determine which, if any, non-executive employees should

---

[6] "Change of Control" means (i) the sale, disposition, or transfer in one or a series of related transactions, of all or substantially all of the servicing obligations of the Company to any person; (ii) a transaction or series of related transactions in which any person (including an existing stockholder of the Company) acquires, directly or indirectly, more than 50% of the total voting power of the voting equity of the Company, including by way of merger, consolidation or otherwise; (iii) the consummation of a confirmed chapter 11 plan of the Company; (iv) entry of an order of conversion by a court of competent jurisdiction or (v) dismissal of the chapter 11 cases.

receive awards from the KERP Discretionary Pool, as well as the appropriate amounts of such awards. Participants in the Discretionary Pool are not allowed more than one award and no single award may exceed $18,750.

        **B.**        **Post-Petition Continuation of the Non-Executive KERP**

        25.        The Debtors seek relief, only with respect to the Non-Executive KERP, for authorization but not direction to make any remaining payments pursuant to the Non-Executive KERP, including paying awards from the remaining Discretionary Pool.

        26.        The Non-Executive KERP Participants play important roles in the Debtors' wind down efforts, each performing crucial tasks within the Debtors' various departments. The Non-Executive KERP Participants each possess unique knowledge of the Debtors' business operations that they have developed over the course of their employment, which cannot be easily replaced or replicated. Sullivan Decl. ¶ 13. Additionally, many of the Non-Executive KERP Participants have seen their workloads expand significantly as a result of these Chapter 11 Cases as, among other things, the Debtors have sought to address the ongoing concerns of various governmental agencies and regulators while servicing their underlying loan portfolios and planning for the wind down of their business. *Id.* As a financial services company, the Debtors' successful operations and completion of these Chapter 11 Cases depends on the efforts of the Non-Executive KERP Participants at this critical stage.

### C.    Non-Insider Status of the Non-Executive KERP Participants

27.    None of the Non-Executive KERP Participants are an insider as that term is defined in section 101(31) of the Bankruptcy Code.[7]  The titles of the Non-Executive KERP Participants are as follows:

- Corporate Controller,
- Manager, Legal Operations,
- Program Management Lead - Borrower Support,
- Senior Program Management Lead,
- Collections Manager,
- Program Management Lead,
- Associate Program Management Lead,[8]
- Financial Operations Supervisor

28.    The duties and responsibilities of these positions are limited to their specific departments and individual roles.  As further described in the Sullivan Declaration, the Non-Executive KERP Participants do not participate in the decisions of the Debtors' management team or the Board, do not attend management meetings, and do not have any meaningful control over company policy or substantial budgetary amounts.  None of the Non-Executive KERP Participants were appointed by the Board, report directly to the Board, or attend any Board meetings.  Most importantly, none of the Non-Executive KERP Participants had any input on any aspect or provision of the KERP.  Sullivan Decl. ¶ 9.

### D.    Market Analysis of the Non-Executive KERP

29.    In order to ensure that the KERP is market-based, competitive, and reasonable, the Company engaged WTW, an independent compensation consultant.  WTW was engaged to, among other things, provide relevant market data and advise on compensation design

---

[7]  The Bankruptcy Code defines "insider" as a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; . . . ([iv]) general partner of the debtor; or ([v]) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).

[8]  Four (4) Non-KERP Participants have the title "Associate Program Management Lead."

considerations.  Friske Decl. ¶ 2.  With respect to the Non-Executive KERP, WTW summarized common non-executive key employee retention programs across thirty (30) companies with revenues between $0 – $100 million or assets between $400 million – $1 billion that implemented non-executive key retention programs in the past five years.  Friske Decl. ¶ 8.  Based on these findings, WTW worked with management and the Company's advisors to formulate a strawmodel design for the KERP.  *Id.*

30.    The strawmodel design included recommendations on the scope of participation in the Non-Executive KERP, award amount, form of payment, payment timing, and treatment upon termination.  Friske Decl. ¶ 9.  WTW then compared this strawmodel to various other restructuring compensation programs and found that the Debtors' proposed aggregate cost for the Non-Executive KERP Participants was below the 25th percentile of the market when expressed as a percentage of the Debtors' assets.  *Id.*  WTW further concluded that (i) the number of the Debtors' Non-Executive KERP Participants was at the lower end of the range of common market practice, (ii) the average award per Non-Executive KERP Participant was consistent with median market practice, (iii) the Debtors' proposed form of cash payment was consistent with market standards, (iv) the proposed quarterly payments of equal installments was common practice, and (v) the retention requirements for each Non-Executive KERP Participant to receive their respective payment was in line with the market.  Friske Decl. ¶ 13.

31.    Additionally, with respect to the Discretionary Pool, WTW reviewed its proposed terms and concluded that the total combined cost of the Non-Executive KERP and Discretionary Pool would still be below the 25th percentile of retention programs adopted by companies with the ranges of assets and revenues as set forth above.  Friske Decl. ¶ 10.  Further, the Discretionary Pool is reasonable and appropriate given the circumstances; the Debtors are

cognizant of the uncertainty of these cases and do not know if certain individuals not currently included in the Non-Executive KERP may become necessary or vital to the Debtors' ultimate goals.

32.     In short, as further described in the Friske Declaration, the average award to each Non-Executive KERP Participant falls below median market comparables, and its overall cost is reasonable when compared to the aggregate costs of key employee retention programs approved in similarly sized chapter 11 cases.  Friske Decl. ¶ 19.  The proposed payments to the Non-Executive KERP Participants were developed in conjunction with management, AlixPartners, Weil, and WTW and, as set forth in the Friske Declaration, reflect WTW's review of retention-based compensation programs approved in other chapter 11 cases.  The Debtors respectfully submit that the awards contemplated by the Non-Executive KERP are reasonable, market-based, and justified under the circumstances of these Chapter 11 Cases.

## Relief Requested Should Be Granted

33.     The Debtors submit that the relief requested herein should be granted because (i) the implementation of the Non-Executive KERP reflects a reasonable exercise of the Debtors' business judgment and, therefore, is appropriate under section 363(b)(1) of the Bankruptcy Code, (ii) the Non-Executive KERP satisfies section 503(c) of the Bankruptcy Code because the KERP does not provide for payments to "insiders" as that term is used in section 101(31) of the Bankruptcy Code, and (iii) the Non-Executive KERP is justified by the facts and circumstances of these Chapter 11 Cases.

### A.     The Implementation of the Non-Executive KERP is an Exercise of the Debtors' Sound Business Judgment

34.     The Non-Executive KERP constitutes a sound exercise of the Debtors' business judgment and should be approved under section 363(b)(1) of the Bankruptcy Code.

Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that a debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp; (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted) "Compensation issues are normally governed by the business judgment standard, i.e., proof that there is a broad business purpose for an action." *In re Glob. Home Prods., LLC*, 369 B.R. 778, 783–84 (Bankr. D. Del. 2007) (citing *Nyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).

35.    The Debtors, in consultation with their advisors, took a measured approach when developing the Non-Executive KERP and selecting the modest number of Non-Executive KERP Participants.  Sullivan Decl. ¶ 7.  The Debtors believe the program is appropriately designed and narrowly tailored to retain the Non-Executive KERP Participants, boost employee morale in light of the uncertainty created by these Chapter 11 Cases, and mitigate the risk of employee attrition at this crucial juncture.  Employee retention is even more important in light of the fact that the Debtors are currently winding down their business.  At this stage in the wind down process, it would not be practical (if even possible) for the Debtors to attempt to recruit new personnel and would require expending significant time and resources.  Sullivan Decl. ¶ 11.  Particularly given that the Non-Executive KERP Participants duties have expanded and now require additional

responsibilities coupled with greater time commitment, the Debtors maintain that the Non-Executive KERP is appropriate, justified, and critical to the success of their wind down efforts.

36.     The Non-Executive KERP was also carefully designed through an approach that balanced the Debtors' goals with respect to performance and retention while adhering to market standards.  Sullivan Decl. ¶ 12.  Further, the Debtors maintain that the payment levels under the Non-Executive KERP (including the Discretionary Pool) are reasonable and were determined based on an independent analysis performed by WTW.  *Id.*  According to the Debtors and their advisors, the overall cost of the Non-Executive KERP is consistent with similar programs implemented by market peers, and is reasonable in light of the size of the Debtors' estates and the benefit to be gained from a successful wind down.  *Id.*

37.     For the foregoing reasons, the Debtors submit that implementation of the Non-Executive KERP reflects a sound exercise of their business judgment.

**B.      Sections 503(c)(1) and 503(c)(2) Do Not Apply to the Non-Executive KERP Because the Non-Executive KERP Does Not Provide for Payments to Insiders**

38.     Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code impose material limitations on retention and severance plans that are implemented for the benefit of "insiders." The Bankruptcy Code defines "insider" as a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; . . . ([iv]) general partner of the debtor; or ([v]) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B). While a person holding an officer's title is presumptively an "officer" and, thus, an "insider," that presumption may be rebutted with "evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." *In re Foothills Texas, Inc.*, 408 B.R. 573, 574–75 (Bankr. D. Del. 2009).

39.     Here, none of the Non-Executive KERP Participants are "insiders" within the meaning of the Bankruptcy Code.  None of the Non-Executive KERP Participants participate in the Debtors' strategic management or direction, and many of their duties are limited to tasks within particular divisions or departments.  Sullivan Decl. ¶ 9.  The Non-Executive KERP Participants generally do not attend senior management meetings and do not participate in meetings of the Board.  Additionally, none of the Non-Executive KERP Participants has discretionary control over any substantial budgetary amounts or the ability to dictate company policy.  Moreover, none of the KERP Participants were appointed by the Board, are a member of the Board, or had any say or input on any aspect of the KERP.  *Id.*

40.     As a consequence, the Non-Executive KERP Participants are not "insiders" as defined in the Bankruptcy Code, and, accordingly, the Debtors maintain that sections 503(c)(1) and 503(c)(2) do not apply to the Non-Executive KERP.[9]

**C.     The Non-Executive KERP is Justified by the Facts and Circumstances of these Chapter 11 Cases**

41.     Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  Courts consider several factors in determining whether a particular program is justified under the facts and circumstances of a particular case, including: (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of a debtor's assets and liabilities; (iii) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) whether

---

[9]  Section 503(c)(2) is inapplicable because it applies only to severance payments.  The Debtors' proposed Non-Executive KERP is not a severance plan because, among other things, the compensation to be awarded thereunder is not triggered by, or otherwise dependent upon, the termination of the Non-Executive KERP Participants' employment.

the plan is consistent with industry standards; (v) whether the debtor performed due diligence in investigating the need for the plan; and (vi) whether the debtor received independent advice in performing due diligence with respect to creating and authorizing the plan.  *See Glob. Home Prods.,* 369 B.R. at 786; *Dana Corp.*, 358 B.R. 576–77 (Bankr. S.D.N.Y. 2006).  No single factor is dispositive, and the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it.  *See Dana Corp.*, 358 B.R. at 576.

42.      First, as set forth above and in the Sullivan Declaration, the Debtors and their advisors designed the Non-Executive KERP to retain and reward the Non-Executive KERP Participants for their significant efforts given the increased demands placed upon them in connection with the chapter 11 process, and to avoid the loss of key personnel.  Sullivan Decl. ¶ 11.  To receive and retain any award under the Non-Executive KERP, the Non-Executive KERP Participants must remain in the Debtors' employ through the applicable quarter, which will ensure that the Debtors have the appropriate staff on hand to continue their operations, maximize value for their estates, and eventually wind down their loan servicing business.  Failure to retain the Non-Executive KERP Participants would surely cause the Debtors' financial and operational performance during the Chapter 11 Cases to suffer.  Further, it would cause the Debtors to incur significant time and expense to hire and train replacement employees.  Sullivan Decl. ¶ 12.

43.      Second, the cost of the Non-Executive KERP is reasonable in light of the Debtors' assets and liabilities.  As stated previously and more thoroughly in the Friske Declaration, WTW engaged in an extensive analysis to assist the Debtors with the design of the Non-Executive KERP and concluded that the costs associated with the Non-Executive KERP are within the range of other chapter 11 cases with debtors of a similar size.  Friske Decl. ¶ 6.  WTW engaged in an extensive analysis to assist the Debtors with the design of the Non-Executive KERP and concluded

18

that the associated costs were within the range of these programs.  Additionally, WTW determined that the terms of the Non-Executive KERP are reasonable and consistent with the terms approved in those other programs, with respect to, eligibility, form of payment, total cost, and payout frequency and timing.  Friske Decl. ¶ 9.  The implementation of the Non-Executive KERP addresses the reality that the competition for talent continues and the hardships of a company in wind down to retain and attract employees.

44.     Third, the scope of the Non-Executive KERP is fair and reasonable.  The Debtors, with the assistance of their advisors, undertook a careful selection process to determine the specific employees who should be eligible for the Non-Executive KERP.  Sullivan Decl. ¶ 7. The Non-Executive KERP Participants, who work across a wide variety of disciplines, were chosen because they are essential to the Debtors' operations and to the successful wind down of their business.  *Id*.  The inclusion of the Discretionary Pool provides the Debtors the ability to disburse awards to certain non-senior-management employees who are important to the Debtors' restructuring efforts, but who initially were not identified as Non-Executive KERP Participants, thereby eliminating any concerns that the Debtors have erred in their initial selection of the Non-Executive KERP Participants.  Friske Decl. ¶ 4.

45.     Accordingly, the Debtors respectfully submit that the Non-Executive KERP satisfies section 503(c)(3) of the Bankruptcy Code and should be approved.

### Bankruptcy Rules 6004(a) and (h)

46.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a), and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As set forth herein, ample cause exists to justify finding that the notice requirements

under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Notice

47.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Federal Reserve Bank; (d) Customers Bank; (e) Cross River Bank; (f) the United States Department of Justice; (g) the Federal Trade Commission; (h) the Small Business Administration; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the United States Attorney's Office for the District of Delaware; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  The Debtors believe that no further notice is required.

## No Prior Request

48.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:    November 15, 2022
          Wilmington, Delaware

/s/ Matthew P. Milana

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi, Esq. (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
        steele@rlf.com
        shapiro@rlf.com
        milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
E-mail:    ray.schrock@weil.com
           candace.arthur@weil.com
           natasha.hwangpo@weil.com
           chase.bentley@weil.com

*Attorneys for Debtors and Debtors in Possession*