**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                                                           :
In re                                                      :        **Chapter 11**
                                                           :
**KABBAGE, INC. d/b/a KSERVICING,** *et al.,*   :        **Case No. 22-10951 (CTG)**
                                                           :
Debtors.[1]                                                :        **(Jointly Administered)**
                                                           :
                                                           :        **Re: Docket No. __**
---------------------------------------------------------- x

**ORDER AUTHORIZING DEBTORS TO EMPLOY AND RETAIN**
**PHOENIX EXECUTIVE SERVICES, LLC TO PROVIDE A CHIEF**
**FINANCIAL OFFICER AND (II) DESIGNATING MARC SULLIVAN AS**
**DEBTORS' CHIEF FINANCIAL OFFICER, EFFECTIVE AS OF OCTOBER 24, 2022**

Upon the motion (the "**Motion**")[2] of Kabbage, Inc. d/b/a KServicing and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, for

entry of an order (i) authorizing the Debtors to employ and retain Phoenix to provide the Debtors

with a CFO and (ii) designating Marc Sullivan as CFO to the Debtors, in each case, effective as of

October 24, 2022, all as more fully set forth in the Motion; and the Court having jurisdiction over

this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

from the United States District Court for the District of Delaware, dated as of February 29, 2012;

and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A).  Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express.  The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

having been provided to the Notice Parties; and such notice having been adequate and appropriate

under the circumstances; and it appearing that no other or further notice need be provided; and this

Court having reviewed the Motion; and upon any hearing held to consider the relief requested in

the Motion; and upon consideration of the Sullivan Declaration, annexed to the Motion as

Exhibit C; and this Court having determined that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and it appearing that the relief requested in the

Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest;

and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors are

hereby authorized to employ and retain Phoenix to provide the Debtors with Marc Sullivan as

CFO, effective as of October 24, 2022, on the terms set forth in the Motion and the Engagement

Letter, except as modified herein.

3.      The terms of the Engagement Letter, including without limitation, the fee

provisions and the indemnification provisions, as modified by this Order, are reasonable terms and

conditions of employment and are hereby approved; subject to the following terms, which apply

notwithstanding anything in the Engagement Letter or the Motion to the contrary:

a.      Phoenix and its affiliates shall not act in any other capacity (for example, and without limitation, as a financial advisor, claims agent/claims administrator, or investor/acquirer) in connection with these Chapter 11 Cases;

b.      Phoenix shall file with the Court, and provide copies to the U.S. Trustee and any official committee(s) appointed in these Chapter 11 Cases, reports of compensation earned and expenses incurred on a monthly basis.  Such reports shall be filed on or after the 24th day of each month and contain summary charts, which describe the services provided, identify the compensation earned by Mr. Sullivan for services provided, and itemize the

expenses incurred.  Time records shall (i) be appended to the reports, (ii) contain a breakdown of hours worked and rates charged according to defined project categories, and (iii) be organized by project category.  Mr. Sullivan will be compensated by the fixed Monthly Fee, however, the time entries shall identify the time spent on each project category in one (1.0) hour increments and the corresponding charge (time multiplied by hourly rate) for each task as if Mr. Sullivan's hourly rate were to be applied.  Parties in interest shall have fourteen (14) days after the date each report is served to object to such report.  In the event an objection is raised and not consensually resolved, the portion of the report to which an objection is raised shall be subject to review by the Court.  Upon receipt of any objection, the Debtors shall deduct an amount equal to the objected to amount from the next payment(s) to Phoenix until such objection is resolved, either consensually or by Court order;

c.    In the event the Debtors seek to have Mr. Sullivan assume executive officer positions that are different than the position disclosed in the Motion, or to materially change the terms of the Engagement by (i) materially modifying the Mr. Sullivan's functions, (ii) adding new personnel, or (iii) materially altering or expanding the scope of the Engagement, a motion to modify the retention shall be filed;

d.    No principal, employees, or independent contractor of Phoenix and its affiliates shall serve as a director of any of the Debtors during the pendency of these Chapter 11 Cases;

e.    The Debtors are permitted to indemnify Mr. Sullivan on the best available terms provided to the Debtors' other officers and directors under the corporate bylaws and applicable state law, in addition to insurance coverage under the Debtors' director and officer insurance policies, to the extent applicable;

f.    There shall be no other indemnification of Phoenix or its affiliates;

g.    For the avoidance of doubt, Phoenix does not seek payment of a success fee, transaction fee, or other back-end fee for services in these Chapter 11 Cases; however, any such success fees, transaction fees, or other back-end fees agreed to by Phoenix and the Debtors shall be approved by the Court at the conclusion of these Chapter 11 Cases on a reasonableness standard and are not being pre-approved by entry of this Order.  No  success fee, transaction fee, or back-end fee shall be sought upon conversion of these Chapter 11 Cases, dismissal of these Chapter 11 Cases for cause, or appointment of a trustee;

h.    For a period of three years after the conclusion of the Engagement, neither Phoenix nor any of its affiliates shall make any investments in the Debtors;

3

i.     Phoenix shall disclose any and all facts that may have a bearing on whether Phoenix, its affiliates, and/or Mr. Sullivan hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest.  If any new parties are provided to Phoenix in connection therewith or Phoenix discovers new material relevant facts or relationships, Phoenix will promptly file a supplemental declaration;

j.     During the course of these Chapter 11 Cases, Phoenix and Mr. Sullivan shall have whatever fiduciary duty is imposed upon them by applicable law; and

k.     To the extent that any services are to be performed by any affiliate of Phoenix, that affiliate shall promptly file appropriate disclosures regarding any connections they may have with parties in interest in these Chapter 11 Cases, as well as disclosures regarding their disinterestedness.  To the extent that Phoenix uses the services of independent contractors or subcontractors (collectively, the "**Contractors**") in these Chapter 11 Cases, Phoenix shall (i) pass through the cost of such Contractors to the Debtors at the same rate that Phoenix pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the same conflicts checks as required for Phoenix; and (iv) file with this Court such disclosures required by Bankruptcy Rule 2014(a) with respect to such Contractors.

4.     The Debtors are authorized to pay Phoenix in such amounts and at such times as is provided in the Engagement Letter without further order of this Court.

5.     Phoenix is entitled to reimbursement of actual and necessary expenses pursuant to the terms of the Engagement Letter and this Order; *provided, however*, that Phoenix shall not seek reimbursement of any fees incurred defending any of Phoenix's fee applications or compensation reports in these Chapter 11 Cases.

6.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

7.     This Order shall be immediately effective and enforceable upon its entry.

8.     To the extent there is inconsistency between the terms of the Engagement Letter, the Motion, the Sullivan Declaration, and this Order, the terms of this Order shall govern.

4

9.      This Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Order.

## **Exhibit B**

## **Engagement Letter**



**Phoenix Executive Services, LLC**

3340 Peachtree Road NE
Tower Place100, Ste 1800
Atlanta, GA 30326

**P:** 404.814.5285
**F:** 770.592.3642

**'Marc Sullivan**
**Managing Director**

November 11, 2022

Laquisha Milner, CEO
Kabbage, Inc., d/b/a KServicing
730 Peachtree Street, Suite 470
Atlanta, Georgia 30308

Re: Engagement of Chief Financial Officer in Chapter 11 Case No. 22-10951

Dear Ms. Milner:

On behalf of Phoenix Executive Services, LLC ("PES"), I am pleased to provide to you and the Board of Directors (the "Board") of Kabbage, Inc. d/b/a KServicing (the "Debtor" or the "Company") this proposal for PES to provide executive leadership to the Company through Marc Sullivan, who shall act as Chief Financial Officer ("CFO") of the Company. Generally, the engagement of PES shall be subject to the direction of the CEO of the Company. This letter sets forth the terms, conditions and limitations of this engagement and hereby amends and restates the engagement letter dated October 14, 2022 (the "Initial Agreement" and, as amended and restated, the "Agreement").

We understand the company is operating under the auspices of the United States Bankruptcy Court in the District of Delaware (Case Number 22-10951 (Jointly Administered)).

Scope of Services

In performing its duties hereunder, the CFO will have full access to the Company's books and records, the Company's facilities and members and staff of the Company's management in order to accomplish the tasks set forth herein. The CFO's duties shall include, but not be limited to, the following activities and will include reviewing, analyzing, and making recommendations to the Company's senior management and the Board in the following areas:

1.      Provide financial leadership to the Finance and Accounting functions staffed in Atlanta, GA.
2.      Oversee the preparation, monitoring and periodically modify the Company's monthly financial projections.
3.      Oversee the preparation of monthly financial statements along with a comparison of monthly and YTD actual financial results versus budget.

4.  Oversee the preparation of year-end financial statements for 2022 and the corresponding tax returns.

5.  Provide oversight with regard to daily cash management activities, including maximizing and forecasting collections and availability, and assisting the Company with prioritizing disbursements.

6.  Provide ongoing reporting to the management team and Board.

7.  Assist the Company, its bankruptcy counsel, and its financial advisors in its communications and negotiations with any creditors.

8.  Monitor and manage vendor and partner relationships.

9.  With the assistance of the Company's financial advisor, oversee, monitor, and modify the Company's cash flow forecasts and any required or requested bankruptcy-related budgets, on a periodic basis in order to determine and/or validate the sources and uses of cash, borrowing availability (if applicable), and the timing and magnitude of financing necessary to support the Company.

    a.  Develop and maintain a "Scorecard" to monitor the actual versus forecasted results.

10. Work with the Company's restructuring counsel and financial advisor to assist in the preparation of the Monthly Operating Reports (MORs).

11. Assist the Company's management to coordinate the work of outside advisors.

12. If requested, provide testimony in any Chapter 11 proceeding as needed.

13. Other duties as mutually agreed.

Fee Structure

As a courtesy, PES is prepared to provide the services of the CFO for the fixed fee of $72,500 per month (the "Monthly Fee").  Travel time, normally billed at 50%, will be waived.

Invoices

The Monthly Fee shall be invoiced monthly and payable via ACH or wire transfer.

Notwithstanding anything herein to the contrary, failure of the Company to promptly pay the Monthly Fee or to pay for reimbursement of expenses shall constitute justification for PES to terminate this Agreement upon five days' written notice.

ACH & Wire transfer instructions are as follows:
Truist Bank
150 S. Warner Road, King of Prussia, PA  19406
Telephone: 800-222-3321
Phoenix Executive Services, LLC
Account #13 900 1730 7432
ABA #031309123

Expenses

The Company shall pay all reasonable, incidental, and related expenses incurred in connection with services related to the engagement (e.g., actual out-of-pocket expenses such as travel and meals incurred in connection with the engagement).

Project Deposit

The Company has paid PES a retainer in the amount of Seventy Two Thousand Five Hundred Dollars ($72,500) via ACH or wire transfer upon the signing of the Initial Agreement (the "Deposit"). This Deposit shall be applied or credited to amounts due from the Company.

The Company and PES agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement. PES acknowledges that during the pendency of any Bankruptcy Court-approved retention, the indemnification provisions and any liability cap provisions set forth in this letter may be subject to modification as stated within the Bankruptcy Court's retention order. PES further acknowledges that the engagement contemplated herein is subject to Bankruptcy Court approval in all respects, and absent such approval, PES may be required to turn over the Deposit to the Company.

PES has begun this Project. By signing below, the Company also acknowledges that PES's Standard Terms, Conditions and Disclosure Agreement (which is attached hereto) is hereby incorporated by reference and made part of this Agreement.

This letter contains the entire Agreement among the parties relating to the subject herein. Any modification or other changes to the terms contained herein or therein must be in writing and signed by the parties hereto to be enforceable.

If the foregoing is in accordance with our understanding, please sign the attached copy and forward it to our office.

We appreciate the confidence you have expressed in our firm and look forward to working with you and assisting you during this critical period.

Very truly yours,

PHOENIX EXECUTIVE SERVICES, LLC

By: _____

**Marc Sullivan**
**Managing Director**

Agreed and Accepted on behalf of
Kabbage, Inc., d/b/a KServicing

3

By: _____

Name: Laquisha Milner

Title: CEO

Date: 11/16/22

4

## CONSENT, RELEASE, AND INDEMNIFICATION

Whereas, Kabbage, Inc., d/b/a KServicing (the "Company") has agreed to utilize the services of Phoenix Executive Services, LLC ("PES") pursuant to the terms of that engagement letter dated **October 14, 2022**, as amended and restated on **November 11, 2022** (the "Agreement") whereby PES will provide services as set forth therein, and PES has agreed to accept such engagement in consideration of, among other things, the covenants and commitments of the Company set forth below.

The Company acknowledges that the services provided by PES are not an exact science and that the amelioration of the Company's business and financial condition are subject to many factors beyond the control of PES and that without the following commitments and agreements by the Company, PES would not enter into this agreement.

In consideration of PES's agreement to perform the services under the Agreement diligently and in good faith and, other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Company in addition to any other indemnification obligations contained within this Agreement hereby (a) releases and waives any and all claims which it may now or in the future have against PES, its principals, employees, independent contractors, officers, directors, agents, affiliates, counsel or other representatives (the "Indemnified Parties") arising under or in any way related to the Agreement (hereinafter a "Claim") and (b) agrees to indemnify, hold harmless and defend the Indemnified Parties from and against any and all liabilities including, *inter alia*, such costs, expenses, damages, Claims, demands, suits or actions or causes of action brought by any person or entity, including but not limited to any current or former director, officer, employee, shareholder, customer, creditor, representative or vendor of the Company or any of its affiliates and shall reimburse the Indemnified Parties for all costs, expenses and damages (including attorney's fees) incurred by the Indemnified Party to investigate, defend, prepare for, or contest any such Claim, liability, demand or action; provided, in each case, that the Company will not waive nor be responsible for any Claim or related expenses of the Indemnified Parties that are determined by a final judgment of a court of competent jurisdiction to have resulted from the Indemnified Parties' gross negligence, bad faith, self-dealing, or willful misconduct in connection with any of the services contemplated herein. PES may hire any counsel of its choice to defend it with respect to any Claim. Moreover, if so requested by PES, the Company shall assume the defense against any Claim, including, the employment of counsel satisfactory to PES. The Company shall pay all expenses of counsel, whether hired by PES or the Company, to defend against any Claim. All costs and expenses (including attorney's fees) shall be paid in advance to the Indemnified Party immediately upon request. The foregoing release and indemnity shall not apply if it is judicially determined that such claims, damages, liabilities and expenses resulted from the willful misconduct or gross negligence of the Indemnified Party.

If for any reason the foregoing indemnity is unavailable to the Indemnified Parties or insufficient to hold them harmless, the Company shall contribute to the amount paid or payable by the Indemnified parties, as a result of the Claim in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and the Indemnified Parties on the other, but also the relative fault of the Company and the Indemnified Parties, as

well as any relevant equitable considerations.  In no event shall the aggregate contribution of the Indemnified Parties to all Claims exceed the amount of fees actually received from the Company by the Indemnified Parties pursuant to the Agreement.  The parties further agree that the relative benefits to the Company on the one hand and the Indemnified Parties on the other with respect to any Transaction contemplated by the Agreement shall be deemed in the same proportion as (a) the total value the Transaction bears to (b) the fees paid to PES with respect to the Transaction.

The Company shall not settle or compromise, or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought from the Company by PES or any other of the Indemnified Parties (whether PES is an actual or potential party to the Claim, action, suit or proceeding) unless such settlement, compromise or consent includes an unconditional release of PES and all other Indemnified Parties from all liability arising out of any Claim, including, inter alia, any action, suit or proceeding.

This Consent, Release and Indemnification, and the Company's obligations hereunder, shall survive the termination of the Agreement until all of the Company's obligations have been satisfied or discharged in full.  The Company's obligations hereunder shall be in addition to any rights that any Indemnified Party may have at common law or otherwise.  Any trustee, individual or entity who succeeds to the assets, properties, liabilities, shares or business of the Company shall be deemed to have assumed the legal commitment to satisfy, perform and discharge all of the Company's obligations hereunder.

Until such time as the Company confirms that its existing insurance policy adequately covers the Chief Financial Officer as an officer under the Company's existing director and officer liability insurance policy in order to insure that the Chief Financial Officer will be able to perform and execute those actions customarily required as an officer of the Company, the CFO will remain an advisor.  In the event PES or the Chief Financial Officer shall have the right to assert a claim for indemnification for which they are also direct insured parties under the Company's director and officer liability insurance policy, neither PES nor the Chief Financial Officer will make a demand for payment from the Company if and to the extent they are able to obtain payment in cash in full from the insurance provider promptly upon making a request for payment; provided that the foregoing is intended solely as an agreement as to the sequence by which PES and the Chief Financial Officer make demand for payment for their indemnification claims and shall not limit or affect any of the Company's indemnity obligations to the Chief Financial Officer or require the Chief Financial Officer to collect payment by legal or equitable process from the insurance provider or be construed to affect the Chief Financial Officer's rights or the Company's obligations in any manner which may adversely affect either the Company's or the Chief Financial Officer's rights under the insurance policy, nor shall it affect the Chief Financial Officer's right to assert an administrative expense claim for the indemnity obligations. To the extent available at a commercially reasonable cost, and to the extent the Company remains in corporate existence, the Company shall also maintain any such insurance coverage for the Chief Financial Officer for a period of not less than two years following the date of the termination of the Chief Financial Officer's services hereunder, through the purchase of a "tail" policy or otherwise.  The provisions in this section are in the nature of contractual obligations

and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the Chief Financial Officer's rights hereunder.  Neither termination of this Agreement nor the engagement shall affect the obligations in this paragraph, all of which shall survive termination.

- To avoid doubt, Marc Sullivan shall be added to the Company's D&O policy by way of endorsement.

Intending to be legally bound hereby, the undersigned, having been duly authorized by the Board of **Kabbage, Inc., d/b/a KServicing** have set their hands and seal this ___16th___ day of November, 2022.

**Kabbage, Inc., d/b/a KServicing**:

By: _____

Name: _Laquisha Milner_____

Title: _CEO_____

Date: _11/16/22_____

(SEAL)

Witness:

By: _Salim A. Kafiti_____

Name: _Salim A. Kafiti_____

Title: _Deputy General Counsel & Assistant Secretary_

Date: _November 16, 2022_____

## STANDARD TERMS, CONDITIONS AND DISCLOSURES

Phoenix Executive Services, LLC ("PES") shall provide services to Kabbage, Inc., d/b/a KServicing (the "Company"), subject to the scope, terms and conditions of the engagement letter dated October 14, 2022, as amended and restated on November 11, 2022 (the "Agreement") by and between PES and the Company. These standard terms and conditions are made part of and deemed incorporated into the Agreement:

1. Non-Solicitation. The Company agrees not to, directly or indirectly, solicit, recruit, utilize or hire any employees or agents of PES for a period of two (2) years subsequent to the completion and/or termination of this Agreement.

2. Legal Proceedings. If after the termination of the engagement PES is requested and agrees or is required to participate in any manner in legal or administrative proceedings regarding the Company, compensation shall be paid to PES in advance for its time at the then current hourly rates. For individuals no longer employed by PES at the time of such participation, payment shall be made to such individuals directly or to their employers, as applicable.

3. Indemnification. The Company shall indemnify PES, its principals, employees and agents, at a minimum, to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to PES or its employees and/or agents. Attached to and made part of the Agreement is a Consent, Release, and Indemnification. The Company agrees to execute such Consent, Release, and Indemnification contemporaneous with executing the Agreement, and warrants that the indemnification provided in the Consent, Release, and Indemnification is equal to or better than the most favorable indemnification the Company extends to its officers or directors. The provisions in this section are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect any rights hereunder. Neither termination of this Agreement nor the engagement shall affect the obligations in this paragraph, all of which shall survive termination.

4. Level of Analysis. Any work for the Company will be performed on a "level-of-effort" basis, that is, the depth of our analyses and extent of our authentication of the information on which our advice to the Company and the Board will be predicated, may be limited in some respects due to the extent and sufficiency of available information, time constraints dictated by the circumstances of our engagement, and other factors. Moreover, we do not contemplate examining any such information in accordance with generally accepted auditing or attestation standards. Rather, it is understood that, in general, we are to rely upon information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of its accuracy and validity. The Company acknowledges that PES is neither serving as an accountant or lawyer for the Company. This engagement shall not constitute an audit, review or compilation, or any

other type of financial statement reporting or consulting engagement that is subject to the rules of the AICPA, the SSCS, or other such state and national professional bodies. Company agrees that PES shall incur no liability to the Company or any individual or other entity that may arise if any information furnished directly or indirectly by Company or from generally recognized public sources proves to be unreliable, inaccurate or incomplete.

5. <u>Information</u>. The Company will provide PES with access to management and other representatives of the Company, as reasonably requested by PES. The Company will furnish PES with such information as PES may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's best knowledge, accurate and complete at the time furnished (the "Information"). The Company further represents and warrants that any financial projections delivered to PES have been or will be reasonably prepared in good faith and will be based upon assumptions which the Company believes, in light of the circumstances in which they are made, are reasonable. The Company will promptly notify PES in writing of any material inaccuracy or misstatements in, or material omission from, any Information previously delivered to, or discussed with, PES, or any materials provided to any interested party. The Company will also promptly notify PES of the occurrence of any event or any other change known by the Company which results in the Information ceasing to be complete and correct. PES shall rely, without independent verification, on the accuracy and completeness of all Information that is publicly available and of all Information furnished by or on behalf of the Company or any other party or otherwise reviewed by PES. The Company understands and agrees that PES will not be responsible for the accuracy or completeness of such Information, and shall not be liable for any inaccuracies or omissions therein. The Company acknowledges that PES has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar matters. Any advice (whether written or oral) rendered by PES pursuant to this Agreement is intended solely for the use of the Board of Directors of the Company, and such advice may not be relied upon by any other person or entity or used for any other purpose. Except as may be required by subpoena, court order or legal process or as may be filed with any bankruptcy pleadings or papers, (i) any advice rendered by, or other materials prepared by, or any communication from, PES may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of PES, which shall not be unreasonably withheld and (ii) neither PES nor the terms of this Agreement may otherwise be referred to without prior written consent.

6. <u>Reports</u>. PES will submit oral and/or written reports at the Company's or Board's request, summarizing our evaluations and analyses based on our work pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work and are significant as deemed by PES in relation to the objective of our engagement. However, because of the time and scope limitations implicit in our engagement and the related limitations on the depth of our analyses and the extent of our verification of information, we may not discover all such matters or perceive their

significance. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the information used in our analyses and on which our findings and advice to the Company may be based. In addition, we have no obligation to and will not update our reports or extend our activities beyond the scope set forth herein unless you request and we agree to do so.

7. <u>Future Performance.</u> The services to the Company to the extent the Agreement so provides, may include the preparation of recommendations, projections, and other forward looking statements. The Company acknowledges that numerous factors may affect the Company's actual financial and operational results, and that these results may materially and adversely differ from the recommendations and projections, if any, prepared, in whole or in part, by PES. PES does not provide assurance regarding the outcome of its engagement and its fees are not contingent on the results of the engagement.

8. <u>Use of Name</u>. The Company agrees that PES and/or its affiliates shall have the right to use the Company's name and logo in a description of the services provided by PES under the Agreement.

9. <u>Regulatory Compliance</u>. The Office of Foreign Assets Control (OFAC) administers and enforces economic and trade sanctions based upon US foreign policy and national security goals. To the extent it is determined that any services provide under this Agreement are prohibited under OFAC regulations, PES is permitted to terminate this Agreement immediately with simultaneous notice to the Company. Additionally, Company agrees to provide requested information, in a timely manner, to enable PES's compliance with FINRA Rule 2090 Know Your Customer. This includes knowing and retaining the essential facts about a customer, who has the authority to act for the customer and the scope of that authority.

10. <u>Reimbursements</u>. The Company shall pay all reasonable expenses incurred in connection with services related to the engagement (e.g. actual out-of-pocket expenses such as travel and meals) and the weekly or monthly fee for compensation of administrative and support time and expenses (e.g. computer, email, administrative staff time, etc.), upon receipt of PES' invoice. PES shall, in addition, be reimbursed by the Company for the reasonable fees and expenses of PES' legal counsel incurred in connection with the negotiation and performance of this Agreement and the matters completed hereby.

11. <u>Termination.</u> The Company and/or PES may terminate this Agreement with or without cause immediately upon written notice. In the event of such termination, the Company shall pay to PES all amounts accrued or due under this Agreement through the date of termination that have not been previously paid.

12. <u>Periodic Rate Adjustment/Interest</u>. PES reserves the right to adjust the standard hourly rates set forth within the Agreement in the normal course subject to thirty (30) days written notice to the Company.

13. <u>Communications</u>.  PES and its affiliates have extensive experience providing companies with financial advisory, restructuring and consulting services.  Over the years, PES and its affiliates have represented many different clients with various business interests in numerous industries and have developed working relationships with intermediaries, such as lawyers, investment bankers, lenders and accountants, who often provide referrals to them.  PES may be able to call upon these successful working relationships to better assist the Company in its restructuring efforts.  In undertaking the engagement on behalf of the Company, PES's objective is to provide services for the Company and its Board to the best of its ability.  Part of PES's role during this engagement will be to maintain the credibility of the Company with your various creditor constituencies through ongoing communications.  As such, in coordination with management and the Company's restructuring advisors, we will periodically communicate directly with your creditors, including the Company's senior lender(s) as necessary and share information with them concerning the purposes of the Company efforts.  The Company acknowledges that a good relationship with its general creditors and senior lenders alike is critical in promoting a successful chapter 11 and agrees that PES shall be entitled to respond to lender and creditors requests for information.

14. <u>Disclosures</u>.  PES and its affiliates and subsidiaries comprise a consulting firm (the "Firm") that provides crises management, restructuring, advisory, investment banking and consulting services as well as temporary employees to staff advisory, crisis management, and restructuring, advisory and consulting engagements.  The Firm's clients are often referred to or are likely to be referred to PES by intermediaries such as lawyers, investment bankers, lenders and accountants ("Referral Sources").  Because the Firm has represented, and will in the future represent, many different clients with various business interests in numerous industries, it is possible that the Firm may have rendered or will render services to or have business associations with other entities or people which had or have or may have relationships with the Company, including creditors of the Company.  In undertaking the engagement on behalf of the Company the objective is to provide services for the Company to the best of its ability, but without precluding the Firm from representing other entities or individuals, including entities and individuals whose interests may be in competition or conflict with the Company's, provided the Firm makes appropriate arrangements to ensure that the confidentiality of information is maintained, or from accepting referrals from or making referrals to Referral Sources.  Each entity under the definition of Company acknowledges and agrees that the services being provided on behalf of each of them and each of them hereby waives any and all conflicts of interest that may arise on account of the services being provided on behalf of any other such entity.  Each such entity represents that it has taken all corporate action necessary and is authorized to waive such potential conflicts of interest.  Since PES wants the Company to be comfortable with the retention of PES in light of Firm client and Referral Sources relationships, PES makes the following disclosures, based on the information provided by the Company, of parties with an interest in the engagement:

There are no known required disclosures at this time.

15. <u>Bankruptcy</u>.  Given that the Company has sought protection under the U.S. Bankruptcy Code, the Company agrees that it will promptly apply and use reasonable efforts to obtain Bankruptcy Court approval (and to the extent necessary nunc pro tunc to the date of the Initial Agreement) of all of the terms and conditions of this Agreement including, *inter alia*, the Deposit.

16. <u>Independent Contractor Status</u>.  PES is an independent contractor under this Agreement, and except as otherwise provided for hereunder, neither PES nor any of its employees, agents or independent contractors (collectively "PES Personnel") will be entitled to receive from the Company any wages or other employee benefits.

    As an independent contractor of the Company, PES will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all PES Personnel, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business.  Of course, as an independent contractor of the Company, PES Personnel will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.  PES will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business.  To the extent PES retains an independent contractor to assist PES in the performance of the Agreement; such independent contractor shall be paid directly by PES.  While rendering services to the Company, the PES Personnel may continue to work with other personnel at PES in connection with unrelated matters, which will not unduly interfere with services pursuant to this engagement.

17. <u>Confidentiality</u>.  Except as otherwise provided in the Agreement, during the term of the engagement and for a period of twelve (12) months thereafter, PES shall keep secret and retain in strictest confidence, any and all confidential information relating to the Company or which PES shall obtain knowledge of by reason of the engagement, including, without limitation, trade secrets, customer lists, financial plans or projections, pricing policies, marketing plans or strategies, business acquisition or divestiture plans, new personnel acquisition plan or strategies, technical processes and other research projects.  Except as otherwise provided in the Agreement, PES shall not, except in connection with the performance of its duties hereunder, disclose any such information to anyone outside the Company, other than to PES's affiliates or legal counsel, as required by applicable law (provided prior written notice thereof is given by PES to the Company) or with the Company's prior written consent, which shall not be unreasonably withheld or delayed nor shall PES purchase or sell any securities of the Company at any time.  The obligations of PES in this paragraph shall not apply to information which is (i) known generally to the public; (ii) known to PES prior to the date of this Agreement; (iii) lawfully disclosed to PES by a third party; (iv) generally known in the industry in which the Company is engaged; or (v) required by law to be disclosed by PES, in which event PES shall provide the Company with prompt notice thereof.  Provided such is consistent

with the foregoing, PES may include the services provided under this Agreement in PES's publications and promotional materials.

18. <u>Limitation of Duties</u>.  PES does not assume any responsibility for the Company's decision to pursue, or not pursue any business strategy, or to affect or not to affect any transaction.  Any duties arising by reason of this Agreement or as a result of the services to be rendered by PES hereunder will be owed solely to the Company.

19. <u>Electronic Communications</u>.  PES and our clients rely upon electronic communication such as e mail and cellular telephones and faxes, tools and media ("Electronic Communications") in day to day business communications.  Because of their nature, Electronic Communications are not as secure as more traditional lines of communications, such as hard-wired telephones and faxes, U.S. Mail, or couriers.  In the course of our representation of the Company, Electronic Communications unless specifically requested otherwise by the Company in writing to PES are hereby authorized for all purposes.  The Company understands that some risk exists that any and all Electronic Communications could be intercepted by an unauthorized third party, and the Company accepts that risk.

20. <u>Governing Law and Arbitration.</u>  This Agreement will be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania applicable to agreements made and to be performed entirely in such State, without giving effect to the choice of law provisions thereof.  Unless the Bankruptcy Court specifically refuses to enforce these arbitration provisions (an outcome which the Company will not seek), each of the parties hereto agrees to submit any claim or dispute arising out of or related to this Agreement to private and confidential arbitration by a single arbitrator selected in accordance with the rules of the American Arbitration Association.  Any such arbitration proceedings shall be governed by the Commercial Rules of Arbitration of the American Arbitration Association and shall take place in Philadelphia, PA.  The arbitrator shall have the power to order discovery and the authority to award any remedy or relief that a court of the Commonwealth of Pennsylvania could order or grant, including, without limitation, specific performance.  The decision of the arbitrator shall be final and binding on each of the parties and judgment thereon may be entered in any court having jurisdiction.  This arbitration procedure is intended to be the exclusive method of PES resolving any claim arising out of or related to this Agreement, including any claim as to the validity of this Agreement.  The Company and PES agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement; except for the Bankruptcy Court's exercising jurisdiction over any dispute, each party agrees to the personal and subject matter jurisdiction of the arbitrator for the resolution of any such claim, including any issue relating to this arbitration position.  In the event of any arbitration or other litigation arising out of or in connection with this Agreement, should PES be the prevailing party PES shall be entitled to an award of actual attorneys' fees and related collection costs incurred in connection with the arbitration including out of pocket expenses and fees for PES professionals' time requirements charged at the then prevailing hourly bill rates(s).  The provisions of this

Agreement regarding indemnity and arbitration will survive any termination of this Agreement.

21. <u>Binding Agreement</u>.  This Agreement shall be binding upon PES and the Company, their respective heirs, successors, and assignees, and any heir, successor or assignee of a substantial portion of PES's or the Company's respective businesses and or assets, including any chapter 11 trustee.

22. <u>Assignment</u>.  Neither PES nor Company may assign this Agreement, by operation of law or otherwise, without the prior written consent of the other party; provided, that the Company may assign this Agreement to its successor as part of a chapter 11 plan.  Any assignment in violation of this provision shall be deemed to be null and void.

23. <u>Force Majeure</u>.  Neither party shall be liable for any default or delay in the performance of its obligations (except for payment obligations) under this Agreement if such default or delay is caused by an act of God or other circumstance outside the reasonable control of the party, including, but not limited to, fire, flood, earthquake, natural disasters or other acts of God, terrorist acts, riots, civil disorders, freight embargoes, government action, or the like.

24. <u>Headings and Interpretation</u>.  The section headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement.  All parties hereto have participated substantially in the negotiation and drafting of this Agreement and each party hereby disclaims any defense or assertion that any ambiguity herein should be construed against the drafter of the Agreement.

25. <u>Continuing Validity of Agreement</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

26. <u>Counterparts</u>.  This agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument.  Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

27. <u>Requisite Company Authority</u>.  The Company has all requisite power and authority to enter into this Agreement. This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.  PES has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder.  This Agreement has been duly and validly authorized by all necessary action on the part of PES and has been duly executed and delivered by PES and constitutes a legal, valid and binding agreement of PES, enforceable in accordance with its terms.  This Agreement has been reviewed by the signatories hereto and their counsel.

14

28. <u>Agreement Binding on all Company Affiliates</u>.  To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

29. <u>Survival of Certain Provisions</u>.  The provisions of paragraphs 1-3, 8, 16-20, 23-25, 29, 30 as well as the Consent, Release and Indemnification and those provisions which expressly state that they continue for a period of time following such termination or expiration shall survive any expiration or termination of this Agreement.

30. <u>Entire Agreement, Waiver, Modifications and Notices</u>.  The Agreement, which includes the Standard Terms, Conditions and Disclosures and the Consent, Release and Indemnification, as well as any exhibits thereto, constitutes the final and complete expression of the parties with respect to its subject matter and supersedes and replaces any other written or oral agreement or understanding between the parties.  This Agreement may be amended, modified, supplemented or waived only by a written instrument signed by both parties.  No waiver of a breach hereof shall be deemed to constitute a waiver of a future breach, whether of a similar or a dissimilar nature.  All notices, demands or other communications which are required or are permitted to be given in this Agreement shall be in writing and shall be deemed to have been sufficiently given (i) upon personal delivery, (ii) the third business day following due deposit in the United States mail, postage prepaid, and sent certified mail, return receipt requested, correctly addressed or (iii) when receipt is acknowledged if sent via facsimile transmission.  Notices to you shall be sent to the address set forth on page one of the Agreement.  Notices to PES shall be sent to the address below:

      Phoenix Executive Services, LLC
      Attention: L. Dianne Lomonaco
      110 Commons Court
      Chadds Ford, PA 19317-9716
      Tel: 610-358-4700
      Fax: 610-358-9377

Either party may give written notice of a change of address by certified mail, return receipt requested, and after notice of such change has been received, any notice shall be given to such party in the manner above described at such new address.