# Exhibit A

| | |
|---|---:|
| Reurned/Cancelled Loans | $3,617,304 |
| Reurned/Cancelled Loans in Remittance Report | ($426,258) |
| Additional Loans not Disbursed (per Danny) | $35,899 |
| **Adjusted Returned/Canceled Loans** | **$3,226,945** |
| | |
| Borrower Principal Repayments and Returns per Remittance File | $25,578,633 |
| Interest Collected | $1,030,328 |
| Reported Remittance Account Variance | $497,900 |
| **Total Borrower Remittance Payments (P&I)** | **$27,106,862** |
| | |
| Adjusted Returned/Cancelled Loans | $3,226,945 |
| Total Borrower Remittance Payments (P&I) | $27,106,862 |
| Fees Owed to SBA (Borrower Overpayments) | ($1,150,513) |
| **Disputed KServicing Remittance Holdbacks** | **$29,183,294** |
| | |
| **Disputed KServicing Fee Holdbacks** | **$8,317,023** |
| | |
| Disputed KServicing Remittance Holdbacks | $29,183,294 |
| Disputed KServicing Fee Holdbacks | $8,317,023 |
| **Disputed KServicing  Holdbacks** | **$37,500,317** |
| | |
| Negotiated Receivable | $58,000,000 |
| Disputed KServicing  Holdbacks | ($37,500,317) |
| **Settlement Payment** | **$20,499,683** |

# Exhibit B

<u>Sternberg. Jeremy M (BOS - X71476)</u>

| | |
|---|---|
| **From:** | Sternberg, Jeremy M (BOS - X71476) |
| **Sent:** | Tuesday, November 15, 2022 10:22 PM |
| **To:** | Arthur, Candace M.; Watkins, Philip S; Vervlied, Michele L; White, Alyssa A; Leibold, Carla; Monaghan, John (BOS - X75834) |
| **Cc:** | Slack, Richard; Tsekerides, Theodore; Sal Kafiti; Schrock, Ray; Bentley, Chase; Donna Evans |
| **Subject:** | RE: Settlement Payment |
| **Attachments:** | Kabbage Settlement Payment Reconciliation FINAL UPDATED 11 15 22.pdf |

Candace and team,

We write in response to your email from 9:26pm on Monday. Your email incorrectly asserts that Customers Bank ("CB") has not paid the "full Settlement Payment."

Some history and context is required in light of your disappointing and errant accusations of "bad faith and contempt of Court."

The Settlement and Release Agreement obliges CB to pay $58MM less the amount of the Disputed KServicing Holdbacks as of the Petition Date. Paragraph 3 of the Agreement provides that following the execution of the Agreement "through the Effective Date, the Parties shall work together in good faith to promptly reconcile the amounts of the Disputed KServicing Fee Holdback and the Disputed KServicing Holdback as of the Petition Date to determine the appropriate amount of the Settlement Payment." Paragraph 2 of the Agreement provides that the Effective Date is the date the Bankruptcy Court approves the Agreement. That date was November 9, 2022.

An important part of the history of the Agreement is that KServicing wanted a term *(see* 10/25/22 DRAFT Agreement at paragraph 3(B)) that would continue the reconciliation process from the Effective Date "through the Servicing Termination Date.. ." CB rejected that term, and in a phone call on October 26, 2022,1 explained the reasons that CB was uncomfortable with and would not agree to that term, and by email dated October 26, 2022 at 5:14 pm your team responded that you had "discussed with KS the final two outstanding points on the Settlement Agreement and are comfortable removing them, per your request." That same day your team circulated the final Agreement, CB signed it, and the next day KServicing signed it and then filed it with the court with the 9019 motion. Based on an email that Donna Evans of KServicing sent at 6:23pm on November 14, 2022 to the CB team stating that "my understanding is we'd continue to work together to ensure data points align on both sides. . .", it does not seem that certain members of the KServicing team appreciate that the reconciliation process had already ceased, per the terms of the final Settlement Agreement. CB intends to abide by the Settlement Agreement it signed and that the Court entered, not an earlier version that proposed an extended reconciliation process.

As part of its efforts to work "in good faith" with KServicing to reconcile the Disputed KServicing Holdback, CB promptly and repeatedly sought basic source information from KServicing. At every turn, these requests were either ignored, met with misdirection, or resulted in KServicing providing information different from the basic information that any servicer should have (trial balance and bank statements) and that any bank would want and expect. In fact, at no time prior to the Effective Date did KServicing provide CB with the figure that KServicing thought was the amount of the Disputed KServicing Remittance Holdbacks. When we repeatedly asked for the data and calculations used by Alix Partners to arrive at its estimate of that figure, KServicing

refused to provide it. It certainly began to raise a suspicion within the CB team that by refusing to provide basic information KServicing was trying to hide something.

By way of a few examples of CB's good faith requests for information and KServicing's stonewalling or inability to provide it:

1. On November 3, Andrew Sachs of CB made an email request to the KServicing team for: (a) records evidencing total amounts received into the remittance account; (b) records evidence total amounts CB paid KServicing for loans that were never funded or that were canceled and repaid by the borrower; and (c) records evidencing total amounts withdrawn from the remittance account and then returned to the borrowers or paid to the SBA. KServicing refused to provide these documents. That same day, CB made a written request for an updated trial balance. KServicing's response via email from Donna Evans was that KServicing would be unable to provide that information in a timely way.

2. As an alternative, I sought on multiple occasions from you (11/3/22 email at 6:56pm and 11/9/22 email at 8:36am) the information that Alix Partners reviewed and its calculations that were the basis for the estimated figure of $26.6MM in paragraph 1(E) of the Settlement Agreement for the Disputed KServicing Remittance Holdback. You did not provide that information.

3. On Friday night (11/4/22) by email at 7:52pm, KServicing promised to provide remittance reports and ACH information. On Monday evening (11/7/22), by email from Donna Evans at 4:54pm, KServicing announced that it was still working on providing the "Canceled loan file/status discrepancies," "Synovus file follow up," and "Trial balance update." Those materials were not provided in full by the Effective Date.

KServicing's inability to provide the basic information that would be expected in a good faith reconciliation is emblematic of its processing and servicing failures that led to the dispute between the parties. Though frustrated by KServicing's inability to provide basic information that would be required for a good faith reconciliation, CB worked hard and in good faith to meet its obligations under the Settlement Agreement from both a substance and timing perspective. Therefore, while KServicing's data was incomplete as of the Effective Date, CB reluctantly accepted it and used it to calculate the Settlement Payment.

In any event, each figure in the payment reconciliation provided by CB to KServicing on the payment day (11/14/22) is accurate based on KServicing's information, with one exception set forth below.

The Settlement Agreement provides that the Settlement Amount = $58MM less Disputed KServicing Holdbacks

Disputed KServicing Holdbacks are:

A.      **The amounts of the SBA loan origination fees due to CB under the Sale and Servicing Agreement (Settlement Agreement at paragraph 1(C)) and were estimated at $8.3 million.** According to an email from Donna Evans of KServicing to CB on 11/4/22 at 4:25pm the amount of the Fee Holdback is $8,317,023. CB accepted that amount.

B.      **The amounts collected from borrowers that KServicing was required to remit to CB (Settlement Agreement at paragraph l(E)(i)).** These total $26,608,962 according to a spreadsheet provided by KServicing to CB by email on 11/4/22 at 7pm. CB accepted that amount. That same spreadsheet describes a separate amount for interest in the amount of $1,030,328.48. CB mistakenly viewed that as separate and distinct from the aggregate borrower remittance figure, and will be wiring that amount ($1,030,328.48) to KServicing tomorrow morning. The only other element of the borrower remittance figure is $497,900, described in a spreadsheet called Synovus Account Analysis sent by KServicing to CB by email on 11/4/22 at

7:38pm. After correcting its error noted above, the remittance amount used by CB in calculating the Settlement Payment is the exact figure that KServicing reported in the Synovus Account Analysis as having been collected from CB ' s borrowers.

C.      **The amounts held by KServicing on account of cancelled loans (Settlement Agreement at paragraph l(E)(ii)).** By email dated 11/4/22 at 4:14pm, Donna Evans of KServicing wrote to the CB team that the "amount of cancelled/missing/incomplete loan holdback: $3,617,304." CB accepted that amount, but acting in the highest level of good faith reduced it by $426,258 (in KServicing's favor) based on payments that it found duplicated in KServicing's remittance report. It added back $35,899 based on loans that KServicing's CFO advised by email dated August 28, 2021 had been funded by CB but not disbursed. CB also agreed with KServicing's figure of $1,150,513 for fees owed to the SB A for borrower overpayments, a figure provided by KServicing to CB by email on 11/4/22 at 8:33pm.

We have attached an updated and corrected reconciliation summary that includes all of these figures.

Contrary to the accusation in your email, CB does not believe there is any "unilateral attempt to pay millions of dollars less than what is owed..." Rather, CB made appropriate efforts to pay what was owed and did so openly and transparently by providing the full calculation to KServicing.

The time for reconciliation has ended, and it is time for KServicing to focus on its servicing obligations in the Settlement Agreement. You should be aware that KServicing unilaterally canceled its vital servicing meetings today with CB. CB entered into this settlement so as to obtain important loan servicing from KServicing. If those commitments are not going to be met, CB will be seeking relief from the court.

**Jeremy Sternberg ( Holland & Knight**
Partner
Holland & Knight LLP
10 St. James Avenue, 11th Floor | Boston, Massachusetts 02116
Phone 617.854.1476 | Fax 617.523.6850
jeremy.sternberg@hklaw.com | www.hklaw.com

**From:** Arthur, Candace M. <Candace.Arthur@weil.com>
**Sent:** Monday, November 14, 2022 9:21 PM
**To:** Watkins, Philip S <pwatkins@customersbank.com>; Vervlied, Michele L <mvervlied@customersbank.com>; White, Alyssa A <awhite@customersbank.com>; Leibold, Carla <cleibold@customersbank.com>; Sternberg, Jeremy M (BOS - X71476) <Jeremy.Sternberg@hklaw.com>; Monaghan, John (BOS - X75834) <john.monaghan@hklaw.com>
**Cc:** Slack, Richard <richard.s!ack@weil.com>; Tsekerides, Theodore <theodore.tsekerides@weil.com>; Sal Kafiti <skafiti@kservicecorp.com>; Schrock, Ray <Ray.Schrock@weil.com>; Bentley, Chase <Chase.Bentley@weil.com>; Donna Evans <devans@kservicecorp.com>
**Subject:** RE: Settlement Payment

*[External email]*
We are in receipt of the below correspondence from Customers Bank reflecting the initiation of a wire payment in the amount of $19,469,355 (the "Deposit") in connection with its obligations under that certain Settlement Agreement between Customers Bank and Kabbage Inc. d/b/a KServicing (the "Debtor"), dated October 27, 2022, and approved by the United States Bankruptcy Court for the District of Delaware on November 9, 2022 (the "Settlement Agreement").

The Deposit is not the full Settlement Payment due to the Debtor. The Debtor's reject any attempt to pay less than the Court ordered settlement amount of $58 million and such action is, among other things, in bad faith and in contempt of the Court. The Debtor's view the pending payment as a deposit in connection with the full Settlement Amount due and

demand immediate remittance of the balance. It is my understanding that the parties were mutually engaged in further reconciliation and, in response to direct requests made by Customers Bank, the Debtor provided Customers Bank with data reconciling the Disputed KServicing Remittance Holdback before the issuance of any wire payment and such data clearly demonstrates that the Deposit is incorrect as to final amounts due.

The unilateral attempt to pay millions of dollars less than what is owed is not accepted nor acceptable. For the avoidance of doubt, any acceptance of the Deposit by the Debtor is not in full and final satisfaction of amounts due to the Debtor from Customers Bank under the Settlement Agreement. The acceptance of the partial payment shall in no way abridge the Debtor's rights with respect to receiving the balance of the Settlement Payment due under the Settlement Agreement and all rights, remedies, claims and defenses are fully reserved.

I have copied my litigation partners, Richard Slack and Theodore Tsekerides to this correspondence. We trust you will govern yourselves accordingly and look forward to promptly hearing from you. Absent corrective action on your part the Debtor will seek immediate Court intervention.



Candace M. Arthur
Partner

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
candace.arthur@weil.com
+1 212 310 8324 Direct
+1 212 310 8007 Fax

# Exhibit C

EXECUTION VERSION

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement") is entered into this 27th day of October, 2022, by and among the following parties (collectively, the "Parties"):

(i)    Kabbage, Inc., d/b/a KServicing[1] ("KServicing"), a Delaware corporation; and

(ii)   Customers Bank ("CB"), a state-chartered bank under the laws of Pennsylvania.

WHEREAS, KServicing is a loan processor and servicer headquartered in Atlanta, Georgia;

WHEREAS, CB is a bank whose business includes lending money to small businesses;

WHEREAS, in response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act");

WHEREAS, the CARES Act provided for the Payment Protection Program ("PPP"), under which the United States Small Business Administration ("SBA") would forgive and/or guaranty loans issued to small businesses that met criteria set forth by the SBA in an effort to expeditiously provide support to small businesses and their employees;

WHEREAS, the SBA approved KServicing to make PPP loans and to process applications for PPP loans;

WHEREAS, KServicing desired to partner with a lender to fund PPP loans and CB desired to partner with a loan processor and servicer to assist CB with processing PPP applications and to service loans on CB's behalf;

WHEREAS, the Parties initially entered into that certain SAAS Services Agreement (as amended, the "SaaS Agreement"), dated April 24, 2020, and that certain Processing and Servicing Agreement Pursuant to Division A, Title I of the CARES Act (as amended, the "Original PSA"), dated April 27, 2020, under which KServicing would process loan applications from small businesses for approval by the SBA, CB would fund said loans, and KServicing would service said loans on CB's behalf;

WHEREAS, the Parties entered into an additional contract, that certain Sale and Servicing Agreement (as amended, the "S&S Agreement", and, collectively with the Original PSA and SaaS Agreement, the "Contracts" and the loans thereunder the "CB PPP Loans"), dated February 2, 2021, under which KServicing would sell PPP loans to CB that KServicing had issued and KServicing would service those loans for CB;

---

[1] Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express.

WHEREAS, various disputes (collectively, the "<u>Disputes</u>") arose between the Parties in relation to the Contracts, including:

(A)  CB contends that KServicing is improperly withholding from CB the Disputed KServicing Holdbacks; KServicing contends it is properly withholding from CB the Disputed KServicing Holdbacks;

(B)  CB contends that, as a result of failures by KServicing in processing loan applications, the Missing in E-Tran Population may not (in whole or in part) be subject to guaranty or forgiveness by the SBA in an amount for which CB contends that KServicing is liable to CB;

(C)  CB contends that, as to the Missing in E-Tran Population, CB has additional exposure because the borrowers of those loans, who were informed that they would not face any liability if they complied with the SBA's requirements, will have tax liabilities if CB forgives their loans and CB contends that KServicing is in turn liable to CB for any such amounts;

(D)  CB contends that, as a result of KServicing's aforementioned failures in processing loan applications in relation to the Missing in E-Tran Population, CB did not receive its share of origination fees that would otherwise have been due to CB under the Contracts, an amount for which CB contends that KServicing is liable to CB;

(E)  KServicing contends that any and all liability on account of the Missing in E-Tran Population is the SBA's and is not on account of any failures by KServicing;

(F)  CB contends that KServicing's failure to adequately perform its servicing obligations made it necessary for CB to hire outside consultants to perform some of the loan servicing functions that KServicing contracted to perform, at a cost for which CB contends KServicing is liable to CB;

(G)  KServicing contends that no failure to adequately perform its servicing obligations has occurred or resulted in the need for CB to hire any outside consultant to perform KServicing's services;

(H)  CB contends that it faces additional exposure in an unknown amount, for which CB contends KServicing is liable to CB, because of KServicing's failure to prevent loan applications from including amounts earned by any employee of a borrower above $100,000 annually, which was not permitted by SBA guidance (the "<u>$100k Issue</u>"), with the result that CB is currently the lender of record on certain loans that were issued with principal amounts in excess of the amount that would have been approved by the SBA if SBA guidance had been fully complied with (the "<u>$100k Population</u>"), which the United States Department of Justice ("<u>DOJ</u>") is currently investigating (the "<u>$100k Investigation</u>"), and for which the SBA has indicated it is not currently willing to forgive or guaranty the "excess" part of any loan within the $100k

2

Population, for the amount of which loans and any potential DOJ or SBA penalties or assessments CB contends KServicing is liable to CB;

(I) CB contends that it faces additional exposure in an unknown amount, for which CB contends KServicing is liable to CB, because of KServicing's failure to ensure that loan applications properly took account of SBA guidance relating to the use of certain information on Federal Tax Form 940 (the "Form 940 Issue"), with the result that CB is currently the lender of record on certain loans that were issued with principal amounts in excess of the amount that would have been approved by the SBA if SBA guidance had been fully complied with (the "Form 940 Population"), which the DOJ is currently investigating (the "Form 940 Investigation" and together with the $100k Investigation and any pending False Claims Act case or related investigation involving Kabbage being pursued by the U.S. Attorney's Office in the District of Massachusetts, collectively the "DOJ Investigations"), and for which the SBA has indicated it is not currently willing to forgive or guaranty the "excess" part of any loan within the Form 940 Population, for the amount of which loans and any potential DOJ or SBA penalties or assessments CUBI contends KServicing is liable to CB; and

(J) KServicing contends that it is not liable to CB for the $100k Issue, the Form 940 Issue, or any of the DOJ Investigations, and that it properly relied on borrower representations made in loan applications and at all times complied with the PPP lending requirements in approving borrower loan applications pursuant to the guidance published by the SBA.

WHEREAS, KServicing continues to service a portfolio of outstanding CB PPP Loans, constituting all loans for which CB is the lender of record that CB made or acquired pursuant to the Contracts (such loans as of the Effective Date, the "Remaining Loan Population");

WHEREAS, on May 25, 2022, KServicing filed a lawsuit against CB in the Northern District of Georgia, styled *Kabbage, Inc. d/b/a KServicing v. Customers Bank*, No. 1:22-cv-02101-JPB (the "Lawsuit");

WHEREAS, the Parties participated in a mediation of the Disputes on August 23, 2022 and a resolution was not reached;

WHEREAS, the Parties entered into a tolling agreement, pursuant to which KServicing filed a notice of dismissal without prejudice of the Lawsuit on September 19, 2022;

WHEREAS, on October 3, 2022, KServicing filed a voluntary petition pursuant to Chapter 11 of Title 11 of the United Stated Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement its wind down strategy (any such case, the "Chapter 11 Case");

3

WHEREAS, prior to entry into this Agreement, KServicing has provided CB with information (the "Servicing Information") to support its forecasted performance under the Servicing Plan (as defined below); and

WHEREAS, the Parties desire to settle the Disputes and, to the extent possible, to minimize risk to the Parties, to minimize potential harm to borrowers of CB PPP Loans from the Disputes, and to maximize the value of KServicing's estate;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, it is agreed by and among the Parties as follows:

1.    Definitions.

(A)    "Borrower Overpayments" means amounts collected from a borrower on account of a CB PPP Loan (i) already purchased by the SBA, thus resulting in such collected amounts being payable by KServicing to the SBA, (ii) where such amounts are in excess of the required minimum loan payments, including payments on forgiven loans, thus resulting in such collected amounts being payable by KServicing to the applicable borrower, or (iii) that is ultimately forgiven by the SBA, thus resulting in such collected amounts being payable by KServicing to the applicable borrower, or (iv) any other overpayments received by KServicing from any source that must be returned or otherwise paid to a borrower or the SBA.

(B)    "Disputed CB Holdback" means the approximately $65.5 million that constitutes loan origination and servicing fees due to KServicing under the Original PSA and SaaS Agreement as of the Petition Date.

(C)    "Disputed KServicing Fee Holdback" means the amount that constitutes SBA loan origination fees due to CB under the S&S Agreement. As of the Petition Date, CB contends that the Disputed KServicing Fee Holdback is approximately $8.3 million.

(D)    "Disputed KServicing Holdbacks" means, collectively, the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback.

(E)    "Disputed KServicing Remittance Holdback" means the amount that constitutes funds (i) collected from borrowers that KServicing is required to remit to CB under the Original PSA and S&S Agreement, and (ii) held by KServicing on account of cancelled loans. For the avoidance of doubt, Disputed KServicing Remittance Holdback does not include any Borrower Overpayments. As of the Petition Date, CB contends that the Disputed KServicing Remittance Holdback is approximately $26.5 million.

(F)    "Missing in E-Tran Population" means the loans intended to qualify for the PPP program that CB issued and/or purchased from KServicing that currently do not have SBA-recognized "E-Tran" numbers.

4

(G)   "Settlement Amount" means $58,000,000.

(H)   "Settlement Payment" means an amount equal to the Settlement Amount *less* the amount of the Disputed KServicing Holdbacks as of the Petition Date.

2.      Effective Date. This Agreement shall be effective on the date on which the Bankruptcy Court approves this Agreement pursuant to Paragraph 5 (the "Effective Date").

3.      Reconciliation.

(A)   Following the execution of this Agreement through the Effective Date, the Parties shall work together in good faith to promptly reconcile the amounts of the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback as of the Petition Date to determine the appropriate amount of the Settlement Payment.

4.      Servicing Plan.

(A)   KServicing agrees that it shall take commercially reasonable efforts to maintain the current levels of PPP loan servicing with respect to the Remaining Loan Population (the "Servicing Plan") from the Effective Date through the earlier of (i) March 31, 2023 and (ii) the date of transfer of KServicing's servicing obligations to an alternative servicer acceptable in all respects to CB (the "Servicing Termination Date"); *provided*, that the Servicing Plan shall not govern servicing of the Remaining Loan Population after the Servicing Termination Date and any such continued servicing by KServicing of the Remaining Loan Population shall be subject to separate agreement.

(B)   The Parties agree that KServicing shall not be responsible for any incremental costs above its ordinary course operating expenses, including payroll, required to comply with its obligations under the Servicing Plan, associated with any transfer of KServicing's servicing obligations for the Remaining Loan Population to an alternative servicer; *provided*, that KServicing will provide CB with three (3) business days' notice of its intent to incur any third-party costs for which reimbursement by CB will be requested, during which period CB may, at its sole discretion, direct KServicing to engage an alternative provider identified by CB at CB's expense. For the avoidance of doubt, the Servicing Plan does not contemplate the provision of additional services or reporting by KServicing for the purpose of transferring servicing obligations.

(C)   As part of the Servicing Plan, KServicing shall provide to CB the reports described on Exhibit A hereto (the "Servicing Plan Reports"). KServicing agrees to provide the Servicing Plan Reports from the data systems described on Exhibit A (collectively the "Data Delivery Requirements").

5

(D)    The Parties agree to hold weekly meetings, as needed or reasonably requested by either Party, from the date of this Agreement through the Servicing Termination Date to review matters relating to the Remaining Loan Population.

(E)    For the avoidance of doubt, pursuant to the Servicing Plan, beginning as of the Petition Date, KServicing has and shall continue to deposit any and all borrower collections received on or after the Petition Date into a segregated account in the name of and for the benefit of CB (separate and apart from any other funds or assets) and shall provide CB with the account information regarding the segregated account, shall hold such funds in trust for the benefit of CB, and shall promptly, but in any event within ten (10) Business Days of the end of each month, or such other timing as mutually agreed upon in writing by the Parties, transfer all such funds to CB.

(F)    CB agrees to and accepts the Servicing Plan, including that the Servicing Plan as set forth in this Agreement includes sufficient provisions for the retention of personnel to meet the Servicing Plan and Data Delivery Requirements. CB shall not challenge the Servicing Plan or the sufficiency of the Servicing Information provided by KServicing in support thereof.

    5.    <u>Motion to Approve Agreement</u>. Within no more than seven (7) business days following the execution of this Agreement, KServicing shall file motions with the Bankruptcy Court, each in form and substance reasonably acceptable to CB, seeking (i) entry of a final order approving and authorizing the settlement of the Disputes as memorialized by this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>9019 Motion</u> and the related order, the "<u>9019 Order</u>") and (ii) entry of a final order shortening the notice period for the hearing on the 9019 Motion and the related response deadline (the "<u>Motion to Shorten Order</u>"). KServicing shall use commercially reasonable efforts to promptly obtain the 9019 Order and the Motion to Shorten Order, and CB will provide to KServicing such commercially reasonable assistance in that effort as KServicing may reasonably request.

    6.    <u>Communications to Borrowers</u>. Following the Effective Date, CB shall have control over the timing and content of all communications to borrowers of CB PPP Loans regarding cancelation of the loans, tax liability regarding such cancelation, or any other aspect of resolving all or any portion of a CB PPP Loan which the SBA has at the time of the communication refused to recognize as a valid SBA PPP loan, and will use commercially reasonable efforts to provide advance notice to KServicing of such communications, and KServicing will use commercially reasonable efforts to facilitate such communications; *provided*, that nothing in this Agreement shall affect KServicing's ability to communicate with borrowers (i) as necessary to comply with its obligations in the Chapter 11 Case, and (ii) in the ordinary course of servicing the Remaining Loan Population. In no circumstances shall either Party's borrower communications (a) seek to disparage, blame, or allocate liability to the other for any action or inaction in connection with KServicing's provision of loan processing services, or (b) result in any liability to KServicing, including as a result of any mistakes in the content or delivery of such communications. As requested by CB, KServicing shall place automated holds and/or other systematic restrictions on collection notices to all CB PPP Loan borrowers, except for CB PPP

6

Loan borrowers who are already on an agreed list of "in collections" CB PPP Loan borrowers as determined by the Parties in writing; *provided further*, that if the conditions set forth in this <u>Paragraph 6</u> cause a guaranty submission to be untimely, it shall be without prejudice to KServicing.

7.    <u>Agreement Contingent on Bankruptcy Court Approval</u>. This Agreement is subject to approval by the Bankruptcy Court.  Should the Bankruptcy Court deny entry of the 9019 Order, in whole or in part, this Agreement shall be void and of no legal effect, except that the Confidentiality provision set forth in <u>Paragraph 27</u> of this Agreement shall continue in effect.

8.    <u>Settlement Payment</u>.  Within three (3) business days following the Effective Date, CB shall pay to KServicing in immediately available funds an amount equal to the Settlement Payment.

9.    <u>Mutual Release.</u>

a.  Definitions.

For the purposes of this Agreement:

i.  "<u>KServicing Parties</u>" means KServicing and its direct and indirect current and former affiliates, parents, partners, members, managers, subsidiaries, successors, assigns, and shareholders, and their respective current and former shareholders, owners, investors, members, directors, officers, partners, predecessors in interest, successors, assigns, investors, executors, administrators, managers, principals, agents, representatives, attorneys, advisors, divisions, employees, independent contractors, and all related entities of any kind or nature, and all persons acting by, through, under or in concert with them, but expressly excludes American Express.

ii.  "<u>CB Parties</u>" means CB, its direct and indirect, current and former affiliates, parents, partners, members, managers, subsidiaries, successors, assigns, and shareholders, and their respective current and former shareholders, owners, investors, members, directors, officers, partners, predecessors in interest, successors, assigns, investors, executors, administrators, managers, principals, agents, representatives, attorneys, advisors, divisions, employees, independent contractors, and all related entities of any kind or nature, and all persons acting by, through, under or in concert with them.

b.  KServicing Parties' Release

i.  KServicing hereby releases the CB Parties from, and covenants not to sue the CB Parties for, any and all actual or potential actions, causes of

7

action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or in equity, whether contractual, extra-contractual, in tort or otherwise, arising out of the Disputes, the Contracts or the PPP prior to the Effective Date, provided, however, that nothing herein shall constitute a release of the CB Parties' obligations under this Agreement.

    c.   CB Parties' Release

        i.   The CB Parties hereby release the KServicing Parties from, and covenant not to sue the KServicing Parties for, any and all actual or potential actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, attorneys' fees, expenses, damages, judgments and demands whatsoever in law or in equity, whether contractual, extra-contractual, in tort or otherwise, arising out of the Disputes, the Contracts or the PPP prior to the Effective Date, provided, however, that nothing herein shall constitute a release of the KServicing Parties' obligations under this Agreement.

10.     <u>PSA Submission to the SBA</u>.  On account of the SBA's direction to the Parties to submit a new processing and servicing agreement for reconsideration, the Parties hereby agree that the Original PSA shall be submitted to the SBA and any restated agreement resulting from such submission (the "<u>Restated PSA</u>") is not intended to, and shall not otherwise change, renew, or otherwise impact the respective Parties' rights, obligations, claims, defenses and legal positions. For the avoidance of doubt, any representations or warranties made in connection with the Restated PSA will continue to be made as of the date of the Original PSA or its constituent amendments was executed, and submission to the SBA of any other version of a processing and servicing agreement dated subsequent to the Original PSA, or any Restated PSA resulting therefrom, shall not constitute a bring-down of such representations or warranties. Notwithstanding the date on which the Parties execute or otherwise submit the Restated PSA, the Parties agree and acknowledge that for all purposes the Original PSA was entered into before the Petition Date and the Restated PSA shall not in any way abridge the Debtors' rights under the Bankruptcy Code with respect to the rejection, assumption or assumption and assignment of the Original PSA and the Restated PSA.   For the duration of this Agreement, CB agrees to take commercially reasonable efforts to assist and support KServicing in maintaining its status as an approved loan service provider with the SBA.

11.     <u>No Assignment.</u> The Parties represent and warrant that there has been no, and agree that there will be no, assignment or other transfer of any interest, claim, or right with respect to any of the Disputes or claims under the Contracts arising prior to the Effective Date, which are being fully released and fully discharged pursuant to this Agreement; *provided*, that, for the avoidance of doubt, nothing herein shall prohibit KServicing from seeking leave of the Bankruptcy Court to transfer (i) the Contracts and KServicing's rights and obligations thereunder nor prohibit CB from objecting to any such transfer, or (ii) this Agreement pursuant to a chapter 11 plan. Each

8

Party agrees to protect, indemnify, reimburse and hold harmless the others from any claim or action that has arisen or may arise based upon any assignment or transfer made in contravention of these representations and warranties.

12.    Entire Agreement. The Parties agree and acknowledge that this Agreement constitutes the entire agreement among the Parties regarding the resolution of the Disputes and settlement and release of the matters specified herein, and that this Agreement shall not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a duly executed writing by all of the Parties. The Parties further acknowledge that they have made an investigation of the facts pertaining to this Agreement as deemed necessary, and, further, acknowledge that they have not relied upon any statement or representation of others, other than as expressly set forth herein.

13.    No Admission of Liability. The Parties agree that this Agreement has been negotiated between the Parties as a compromise of disputed claims, in order to avoid further expense and uncertainty, and that the Parties do not admit any liability by entering into this Agreement. The existence of this Agreement shall have no meaning or implication outside of this Agreement, and it may not and shall not be used, construed as, or offered as an admission of liability or wrongdoing by any of the Parties.

14.    Reservation of Rights. Nothing in this Agreement, nor any payment made pursuant to this Agreement, is intended to be or shall be (i) deemed to waive or release any Party's rights, remedies, claims, defenses and legal positions, except as specifically set forth herein or (ii) construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

15.    Enforcement. The terms and conditions of this Agreement shall be enforceable by any of the Parties and their respective successors, representatives, and assigns. This Agreement is and may be pleaded as a full and complete defense to, and is and may be used as a basis for, an injunction against the prosecution of any claim or action that seeks recovery or relief contrary to the terms of this Agreement.

16.    No Release. Nothing contained in this Agreement shall release any of the Parties from the Parties' covenants, obligations and agreements set forth in this Agreement.

17.    Construction. This Agreement shall not be construed in favor of any particular Party to this Agreement but shall be construed as if it were drafted by all Parties to this Agreement. Underlined headings are included for the convenience of the Parties only and shall not be interpreted to have any effect on the meaning of the paragraphs that they accompany.

18.    Severability. Any term, paragraph, or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term

9

or provision in any other situation or in any other jurisdiction.  If any provision hereof would, under applicable law, be invalid or unenforceable in any respect, then the Parties intend that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.  Notwithstanding the foregoing, the Parties acknowledge and agree that the conditioning of relief upon the Bankruptcy Court's approval of this Agreement set forth in Paragraph 5 above and the mutual releases set forth in Paragraph 12 above are necessary to this Agreement, without which the Parties would not have entered into this Agreement.

19.     Finality of Release.  The Parties intend this instrument to be effective as a full and final accord and satisfaction of the matters expressly released herein.  The Parties to this Agreement understand and acknowledge that they may later discover facts different from, or in addition to, those they now know or believe to be true, or may identify claims different from or in addition to those they now know of with respect to the matters expressly released herein.  Notwithstanding any such different or additional facts and claims, the Parties expressly accept and agree that this Agreement shall be and remain effective and binding.  It is the intention of the Parties that, notwithstanding the possibility that they or their counsel may discover or gain a more complete understanding of the facts, events or law which, if presently known or fully understood, would have affected the foregoing release, this Agreement shall be deemed to have fully, finally and forever settled any and all claims encompassed by the release set forth herein, notwithstanding the discovery or existence of any additional or different facts, events or law.  The Parties further represent that they have carefully read and understood all the provisions of this Agreement, have made their own investigation of the facts and are relying solely upon their own knowledge and the advice of legal counsel, and are not relying upon any statements, understandings, representations, expectations, or agreements other than those expressly set forth in this Agreement.  Accordingly, the Parties expressly and knowingly waive (1) any claim that this Agreement was induced by any misrepresentation, omission, or nondisclosure and (2) any right to rescind or avoid this Agreement based upon presently existing facts, known or unknown.

20.     Governing Law.  This Agreement, in all respects, shall be interpreted, enforced and governed by and under the laws of the State of Pennsylvania.

21.     Jurisdiction/Dispute Resolution.  Any dispute based hereon, or arising out of, under, or in connection with this Agreement will be resolved by the Bankruptcy Court, except as otherwise set forth herein.

22.     Parties to Bear Own Costs.  The Parties shall bear their own costs and expenses incurred in connection with the preparation, execution and performance of this Agreement and the investigation of the matters related hereto, including without limitation expenses of legal counsel, agents and other representatives.

WEIL:\98808270\30\55894.0003

23.    <u>Advice of Counsel</u>. The Parties hereby acknowledge that they have been represented and advised by counsel in connection with the execution of this Agreement.

24.    <u>Counterparts</u>. The Parties agree that this Agreement may be executed in one or more counterparts, and in both original form and one or more photocopies, each of which shall be deemed to be an original, but all of which shall be deemed to be and constitute one and the same instrument.

25.    <u>Execution</u>. Each person signing this Agreement warrants and represents that he or she has read this Agreement and has the necessary authority to execute this Agreement individually and on behalf of his or her respective principals, if any.

26.    <u>Good Faith.</u> The Parties enter into this Agreement in good faith for the purpose of resolving all matters relating to the Disputes or otherwise addressed in this Agreement.

27.    <u>Confidentiality.</u> This Agreement and its terms and conditions, to the extent reasonably feasible, shall be treated hereafter by all Parties as confidential, except as agreed to by the Parties in writing or in the following circumstances: (i) to the extent required by law, including, as necessary, to effectuate this Agreement in the Chapter 11 Case; (ii) to employees, investors, agents, attorneys, advisors, accountants, and consultants whose duties require that they be privy to the terms of this Agreement; (iii) by either Party to any regulator or governmental entity who in that Party's good-faith judgment needs access to the terms of this Agreement; *provided*, that the other Party is promptly notified, but in no event notified less than one (1) business day prior such disclosure; and (iv) as may be requested or otherwise required by any potential acquirer, purchaser, or target in the course of due diligence or negotiations concerning the terms of any acquisition, merger, or sale of any Party, provided first that the potential acquirer, purchaser, target, or similar party to such transaction shall execute a non-disclosure agreement safeguarding the confidentiality of this Agreement to substantially the same extent as provided for in this paragraph. Prior to any disclosures to any court or pursuant to any subpoena or discovery demand under, the Party from whom disclosure is sought shall promptly notify the other Party of any request or motion seeking disclosure.

[Signature Pages Follow]

11

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date set forth above.

KABBAGE, INC. D/B/A KSERVICING

Date: October 27, 2022                    By:_____

Its: Chief Executive Officer
     (Authorized to sign on its behalf)

CUSTOMERS BANK

Date: **10/26/22**

By: _____

Its: ___PRESIDENT_____

(Authorized to sign on its behalf)

## Exhibit A

Servicing Plan Reports

1.  <u>Monthly Borrower Remittance Reports</u>.  KServicing will continue to manually produce these reports within 5 business days of the close of each month in the format such reports are currently prepared.

2.  <u>Daily Loan Trial Balance Reports</u>.  KServicing shall, on each business day, deliver a loan trial balance report reflecting all payments received on the trailing business day (the "<u>Daily Trial Balance Report</u>") for the entire CB originated loan population. Daily Trial Balance Reports will continue to be generated automatically each business day from the CoreCredit system of record maintained by American Express in the format such reports are current prepared.  A supplemental report will be provided each business day for the entire originated portfolio that provides the bank total balance reflecting all payments types (*i.e.*, remittance, guaranty, forgiveness, return, fraud recovery, etc.). KServicing will perform reconciliation and implement appropriate controls to ensure data sets are harmonized

3.  <u>Weekly Guaranty Exception Reporting</u>.  KServicing will continue to provide weekly updates to the master report maintained by and perform to the currently-established workflow regarding any loans subject to a guarantee exception.  KServicing will continue providing updates and mitigation workflow activities through the Servicing Termination Date or until such earlier time as both parties mutually agree that no further reports are necessary or productive.  Updates will be provided by end of business every Friday.

4.  <u>Weekly/Work Daily Portfolio Report</u>.  KServicing will continue to provide a loan attribute report of all outstanding loans, in the format such reports are current prepared, including but not limited to information relating to the current forgiveness and/or guaranty purchase status, outstanding balance amounts, guaranty purchase deadline and inclusion in the $100k Population and the Form 940 Population.  This report will be reconciled to the daily loan trial to include all loans that have an outstanding balance in that report.  The report will be provided every Tuesday, by end of business.

5.  <u>940 and $100k Report</u>.  KServicing will provide prompt updates to CB with its knowledge of the SBA's and DOJ's respective positions on the processing of loans in the $100k Population and the Form 940 Population.  All updates will occur between internal and/or external legal counsel.  The parties agree to cooperate to facilitate SBA ultimately honoring its guaranty purchase obligations for any excess amounts relating to potentially affected loans.

6.      <u>Reconciliation of Servicing Plan Reports</u>.  Data contained in the reports described in <u>Paragraphs 1, 2 and 4</u> of this <u>Exhibit A</u> are to be delivered to CB via SFTP with consistent file naming convention, format and prior validation.  KServicing will make commercially reasonable efforts to reconcile the daily/weekly reports to its monthly reports and will make commercially reasonable efforts to reconcile all reports, or otherwise provide CB with consistent definitions, filters, or status description prior to sending reports to CB.

# Exhibit D

**Ruprecht, Sarah (BOS - X75838)**

| | |
|---|---|
| **From:** | Sternberg, Jeremy M (BOS - X71476) |
| **Sent:** | Thursday, November 3, 2022 6:56 PM |
| **To:** | Arthur, Candace M. |
| **Cc:** | Monaghan, John (BOS - X75834); Bentley, Chase; Hwangpo, Natasha |
| **Subject:** | RE: CUBI/KS Reconciliation Efforts |

Candace,

Thanks for your email.  The only holdbacks that need to be reconciled at this point seem to be the ones involving the borrower remittances and the SBA fees withheld by Kabbage (the receivable has been settled at $58 million, so there is no need to reconcile CUBI's holdback).  CUBI does not have any borrower remittance figures independent of what it has received from Kabbage.  That is why CUBI wants the actual balances from the segregated account that Kabbage has maintained for CUBI remittances.  What did Alix Partners look at to come up with the $26.5 million figure in the settlement agreement?  At a minimum, please provide us as soon as possible the Alix Partners materials that calculated that figure and whatever back up they used.

Any focus on "variances" is misplaced, because the only information that CUBI has regarding borrower remittances is the information that it gets from Kabbage.  Under these circumstances, CUBI's request to its servicer to report on remittance funds received in a segregated account is more than reasonable; it is vital.  CUBI does not have independent visibility into those remittances or the account to which they are deposited.

Apparently Kabbage told CUBI today that it will not be able to provide final numbers until Monday.  That is too late given the hearing on Monday.  We are with you on the imperative to solve this by Monday, but need CUBI needs source data from Kabbage to do so.  Please let me know how we can quickly unlock this source data.

Regards,
Jeremy


**Jeremy Sternberg** | **Holland & Knight**
Partner
Holland & Knight LLP
10 St. James Avenue, 11th Floor | Boston, Massachusetts 02116
Phone 617.854.1476 | Fax 617.523.6850
jeremy.sternberg@hklaw.com | www.hklaw.com

**Ruprecht, Sarah (BOS - X75838)**

| | |
|---|---|
| **From:** | Arthur, Candace M. <Candace.Arthur@weil.com> |
| **Sent:** | Wednesday, November 9, 2022 10:55 AM |
| **To:** | Sternberg, Jeremy M (BOS - X71476) |
| **Subject:** | Re: |

*[External email]*

My understanding is that the AlixP materials are not what you are looking for. When they started their engagement they received company info of what was collected up to that date. Going forward they then took bank cash activity and applied it - it isn't loan level detail which I understand is what you are looking for. I also understand the difference with the company data and the AmEX data your client is relying on is very small at this point.

I am waiting for an update as to how the 11:30 call goes and our deliverables at that time.

**Candace M. Arthur**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
candace.arthur@weil.com
+1 212 310 8324 Direct
+1 212 310 8007 Fax

> On Nov 9, 2022, at 8:36 AM, Sternberg, Jeremy M (BOS - X71476) <Jeremy.Sternberg@hklaw.com> wrote:
>
> OK.  In the meantime, can you have your team send us whatever Alix Partners used to get to the $26.5MM borrower remittance figure that is in the settlement agreement?
>
> ---
>
> **From:** Arthur, Candace M. <Candace.Arthur@weil.com>
> **Sent:** Tuesday, November 8, 2022 9:29 PM
> **To:** Sternberg, Jeremy M (BOS - X71476) <Jeremy.Sternberg@hklaw.com>
> **Subject:** RE:
>
> *[External email]*
> Let's speak after the 11:30am call to see if there are any other open points as I understand it may be closed off.
>
>
> <image001.jpg>
>
> **Candace M. Arthur**
> Partner
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> candace.arthur@weil.com
> +1 212 310 8324 Direct
> +1 212 310 8007 Fax

**From:** Sternberg, Jeremy M (BOS - X71476) <Jeremy.Sternberg@hklaw.com>
**Sent:** Tuesday, November 8, 2022 5:03 PM
**To:** Arthur, Candace M. <Candace.Arthur@weil.com>
**Subject:**


**Jeremy Sternberg | Holland & Knight**
Partner
Holland & Knight LLP
10 St. James Avenue, 11th Floor | Boston, Massachusetts 02116
Phone 617.854.1476 | Fax 617.523.6850
jeremy.sternberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# Exhibit E

# Holland & Knight

10 St. James Avenue | Boston, MA 02116 | T 617.523.2700 | F 617.523.6850
Holland & Knight LLP | www.hklaw.com

Jeremy M. Sternberg
+1 617-854-1476
Jeremy.Sternberg@hklaw.com

Via Email (Candace.Arthur@weil.com)

November 17, 2022

Candace M. Arthur
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

        Re:    Notice of Breach of Settlement and Release Agreement

Dear Ms. Arthur:

I write on behalf of our client, Customers Bank ("CB"), to notify you of multiple breaches of the Settlement and Release Agreement (the "Agreement") by your client Kabbage, Inc., d/b/a KServicing ("KServicing").

One of the key terms of the Agreement was the continuity of servicing of the CB loan portfolio by KServicing during this critical period. Your client's CEO testified at the November 7, 2022 hearing as to the importance of being able to continue to service for the good of all parties, and particularly stressed KServicing's obligations to the borrowers. The servicing obligations that KServicing has to CB are in paragraph 4 of the Agreement entitled Servicing Plan. The Agreement obligates KServicing from the Petition Date (October 3, 2022) onward to hold all borrower collections in trust for CB, in a segregated account in the name of and for benefit of CB, and to transfer such funds to CB "promptly, but in any event within ten (10) Business Days of the end of each month. . ." Ten business days from the end of October was November 14, 2022. That day has passed without CB fulfilling its prompt payment obligation. This is especially concerning because it appears that there is over $1.5 million that was deposited into that account in October. Those funds are the property of CB and KServicing is wrongfully holding that property.

Those servicing obligations also include that "KServicing shall provide to CB the reports described on Exhibit A hereto." As of November 14, 2022, KServicing has failed to provide the following reports described in Exhibit A: (1) Monthly Borrower Remittance Reports that are due "within 5 business days of the close of each month"; (2) the supplemental trial balance report that is due each day; (3) the "Weekly/Work Daily Portfolio Report" that is due "every Tuesday, by end of business."

Atlanta | Austin | Boston | Century City | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth
Houston | Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia
Portland | Richmond | San Francisco | Stamford | Tallahassee | Tampa | Tysons
Washington, D.C. | West Palm Beach

Algiers | Bogotá | London | Mexico City | Monterrey

Candace M. Arthur
November 17, 2022
Page 2

The Agreement also provides that the parties will "hold weekly meetings, as needed or reasonably requested by either Party. . ." KServicing has unilaterally canceled every meeting with CB scheduled for this week (Tuesday, Wednesday, and Thursday). Further to the Agreement, CB reasonably wants, needs, and requests these meetings to "review matters relating to the Remaining Loan Population" that totals approximately $180 million in principal.

CB demands that KServicing rectify these breaches by end of day on November 18, 2022. Absent a complete cure by then, CB will invoke Paragraph 15 of the Agreement's provision that the Agreement's terms "shall be enforceable by any of the Parties and their respective successors, representatives, and assigns, " and paragraph 21's establishment of the Bankruptcy Court as the forum for adjudication, and seek prompt relief from the court.

Very truly yours,

HOLLAND & KNIGHT LLP

/s/Jeremy M. Sternberg

Jeremy M. Sternberg