## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| KABBAGE, INC., d/b/a KSERVICING, et al.,[1] | Case No. 22-10951 (CTG) (Jointly Administered) |
| Debtors. | Obj. Deadline:  December 21, 2022 at 4:00 PM EST |
|  | Hearing Date:  January 6, 2023 at 10:00 AM EST |

**MOTION OF CUSTOMERS BANK FOR ENTRY OF AN ORDER
(I) COMPELLING COMPLIANCE WITH COURT APPROVED SETTLEMENT
AGREEMENT AND ORDER; (II) REQUIRING ADDITIONAL ADEQUATE
PROTECTION IN FAVOR OF CUSTOMERS BANK;
AND (III) GRANTING RELATED RELIEF**

Customers Bank, an operating subsidiary of Customers Bancorp. Inc. ("Customers Bank")

and owner of a portfolio of "PPP" loans ("CB PPP Loans") serviced by the debtor, Kabbage, Inc.,

d/b/a KServicing ("Kabbage" or the "Debtor"), pursuant to two executory contracts, hereby moves

pursuant to sections 105, 361 and 363(e) of title 11 of the United States Code (the "Bankruptcy

Code"), and Rules 4001 and 9013 of the Federal Rules of Bankruptcy Procedure (the "Rules"),

and Rules 4001-1 and 9013-1 of the Local Rules for the United States Bankruptcy Court, District

of Delaware (the "Local Rules"), for entry of an order substantially in the form attached hereto as

**Exhibit A** (i) compelling the Debtor's immediate and prospective compliance with its unequivocal

obligations under the Court approved Settlement Agreement (defined below) to segregate, account

for, and remit to Customers Bank *all* funds collected by the Debtor from borrowers on Customers

Bank's behalf beginning as of the October 3, 2022 petition date that *are required to be held in*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

*trust for Customers Bank* ("Borrower Remittances"); (ii) directing the Debtor to provide Customers Bank with additional forms of adequate protection of its ownership interest in the Borrower Remittances, including online viewing access to the bank account receiving the Borrower Remittances, and requiring that the Debtor segregate and retain all Borrower Remittances pertaining to CB PPP Loans with such funds to be disbursed to Customers Bank or in accordance with Customers Bank's instruction; and (iii) granting Customers Bank such other related relief as is just and proper.

The Settlement Agreement agreed to by the Debtor and presented by the Debtor to this Court for approval mandates that *starting as of the October 3, 2022 Petition Date* the Debtor must deposit "**any and all** borrower collections . . . into a segregated account in the name of and for the benefit of" Customers Bank, and "transfer **all** such funds to Customers Bank" on a timely basis. *See Settlement Agreement*, at par. 4(E). There is no ambiguity—Borrower Remittances are received, held **in trust** for Customers Bank pending month end, and then paid to, and only to, Customers Bank. When it came time for the Debtor to comply with this obligation in November 2022 and turn over funds that are indisputably "borrower collections" owned by Customers Bank, however, the Debtor issued a short payment in the amount of *$376,326.59,* substantially less than the $1,301,569 in Borrower Remittances reported by the Debtor as having been received, and the approximately $1,551,245.91 in deposits detailed in the October 2022 bank statement. The Debtor's assertion that it has "remitted to CUBI postpetition amounts that were collected through October 31, 2022,"[2] is quite simply, and demonstrably, false. A simple review of the Debtor's own bank statement for the month of October 2022 reveals numerous withdrawals totaling approximately $1 million from the Trust Account that the Debtor was not permitted to make by

---

[2] *See Letter to Attorney Sternberg dated November 18, 2022,* filed as Docket No. 299 ("Debtor's Reply Letter").

#182006303_v1

the terms of the Settlement Agreement. The Debtor has since refused to pay Customers Bank the approximately $1 million difference between the actual borrower remittances deposited into the Trust Account and the amount actually paid by the Debtor to Customers Bank. *See Affidavit of Alyssa White,* discussed below.[3] The obligation of the Debtor to remit <u>all</u> borrower payments deposited into the Trust Account is clear and absolute, entitling Customers Bank to swift relief to enforce both the Settlement Agreement and the Order of the Court approving those terms.

Because the Debtor has yet again proven itself incapable of performing basic servicing obligations despite now having the liquidity and professional expertise to do so, in addition to seeking to recover Borrower Remittances for October 2022, Customers Bank requests that the Court restrict the Debtor's access to the Borrower Remittances for all purposes (but for payment to Customers Bank) for the duration of the parties' business relationship as a form of adequate protection of Customers Bank's rights to receive **all** Borrower Remittances, as discussed below. In further support of the requested relief, the Debtor states as follows:

<u>**JURISDICTION AND VENUE**</u>

1.        This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.        Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory predicate for the relief requested herein are sections 105 and 361 and 363(e) of the Bankruptcy Code, and Rules 4001 and 9013 and Local Rules 4001-1 and 9013-1.

4.        Customers Bank consents pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the

---

[3] *See also Letter to the Honorable Craig Goldblatt dated November 28, 2022,* Docket No. 289 ("<u>CB Letter</u>"), and November 28, 2022 Hearing Transcript, attached hereto as **Exhibit B**.

Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## THE UNDISPUTED FACTS

### A.    The Parties' Contracts and Business Relationship.

5.    The Debtor was founded in 2008 as an online financial technology company, but after the sale of most of its assets to American Express in 2020 is now basically an online loan servicer, with a business that consists of servicing a loan portfolio comprised of loans that it funded under the Paycheck Protection Program or "PPP" ("PPP Loans"), as well as loans funded by third-party lenders, that are awaiting forgiveness or guarantee by the Small Business Administration or "SBA," collectively with an aggregate outstanding principal balance of approximately $1.3 billion.[4] As the Debtor has indicated in several pleadings filed to date, it is in the process of winding down its PPP Loan servicing business on account of the sale of substantially all of its assets to affiliates of American Express in October 2020, it is not generating significant cash on a go-forward basis, and it filed the Chapter 11 Cases to implement that winding-down process pursuant to a chapter 11 plan and the Bankruptcy Code.

6.    Customers Bank is a Pennsylvania state-chartered bank and approved SBA Lender that agreed, through the *Processing and Servicing Agreement Pursuant to Division A, Title I of the CARES Act* entered into with the Debtor on April 27, 2020 (the "PSA"), to fund PPP Loans approved for issuance to third-party borrowers, selecting the Debtor as loan processor and servicer. In turn, the Debtor agreed to originate PPP Loans according to all pertinent SBA requirements and guidelines on Customers Bank's behalf by qualifying borrowers' loan applications, and thereafter,

---

[4] A more complete description of the Debtor's servicing business and the PPP Loan Program is set forth in the previously filed *Motion of Debtors for Interim and Final Orders Authorizing Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations* [Dkt. No. 11] ("Servicing Motion").

servicing those PPP Loans once funded by Customers Bank. Separately, through *Sale & Servicing Agreement* dated February 20, 2021 (the "S&S Agreement" and, collectively with the PSA and the S&S Agreement, as amended, the "Contracts"), Customers Bank acquired a portfolio of PPP Loans that the Debtor had originated and funded, which loans the Debtor also agreed to service on Customers Bank's behalf.

7.     As of the Petition Date, the Debtor was servicing a portfolio of approximately 7,000 outstanding PPP Loans owned by Customers Bank, constituting loans for which Customers Bank remains the lender of record pending a Guaranty Purchase or Loan Forgiveness (the Customers Bank PPP Loans, and defined in the Settlement Agreement, discussed below, as the "Remaining Loan Population"), with a principal balance of approximately $181 million. *See Declaration of Deborah Rieger-Paganis in Support of the Chapter 11 Petitions and First-Day Pleadings* [Dkt. No. 13]("First-Day Declaration*")* at par. 25.

**B.     The Original Disputes and Resulting Settlement.**

8.     The parties' business relationship led to numerous disputes, primarily on account of the Debtor's failure to properly originate loans according to the SBA rules and then properly service the Remaining Loan Population. These failures led to investigations of the Debtor by the SBA, the United States Department of Justice, and others, and resulted in the refusal of the SBA to approve a portfolio of PPP Loans for either forgiveness or guaranty purchase, thereby greatly increasing the risk of loss to Customers Bank.

9.     Indeed, the Debtor admitted that its operations were "overburdened" and that "processing the remaining PPP Loans has presented a number of challenges for the Company" since the Debtor is "embroiled in government investigations, litigations, and stakeholder disputes related to the PPP program." *See First-Day Declaration,* at pars. 14, 17, 42. As detailed in the

First-Day Declaration, other challenges have included investigations by the U.S. Department of Justice offices in the District of Massachusetts and the Eastern District of Texas regarding the Company's Borrower Diligence practices, as well as a class action lawsuit brought by certain PPP Loan borrowers in the United States District Court for the Northern District of Georgia, Atlanta Division alleging that the Company failed to timely and competently process loan forgiveness applications on behalf of borrowers. The Debtor also was in dispute with the SBA regarding, for instance, the processing of over $100 million of loans originated in amounts exceeding (and violation of) the SBA guidelines and which the SBA is refusing to process for guaranty. *Id.* at par. 47.

10.     As those concerns of Customers Bank escalated, prior to the Petition Date, Customers Bank withheld payment to the Debtor of origination and servicing fees that had accrued under the Contracts, asserting its right to setoff or recoup those fees, referred to in pleadings as the "CUBI Receivable" and defined in the Settlement Agreement as the "Disputed CB Holdback," against the claims held by Customers Bank against the Debtor. In response, the Debtor began withholding sums due to Customers Bank, including remittances of borrower payments (primarily, principal and interest) on PPP Loans owned by Customers Bank estimated to be "approximately $34 million" as of the Petition Date that were received by the Debtor on behalf of Customers Bank ("Petition Date Remittances"). *See First-Day Declaration*, at par. 30.

11.     While efforts to resolve these and other disputes initially failed, settlement discussions were renewed after the Petition Date in an effort to address the Debtor's liquidity issues and avoid the sudden interruption in the Debtor's servicing operations to the detriment of lenders and borrowers alike. This time, the negotiations were successful in that the Debtor and Customers Bank reached agreement on the terms for payment towards the balance of the "CUBI Receivable"

following reconciliation of amounts owed to Customers Bank for, among other categories, the Petition Date Remittances and other amounts owed to Customers Bank or due to be paid under the Contracts. When those negotiations concluded, the Debtor and Customers Bank entered into a Settlement and Release Agreement on October 27, 2022 (the "Settlement Agreement").[5] Generally, the Settlement Agreement was intended to resolve the (i) claim of the Debtor asserted against Customers Bank to recover the "CUBI Receivable" and its defenses to payment of the Petition Date Remittances; and (ii) claims of Customers Bank against the Debtor to recover the Petition Date Remittances as well as those liabilities that Customers Bank asserted were owing on account of failures in processing loan applications and servicing PPP Loans prior to the Petition Date, as more fully described and defined in the Settlement Agreement as the "Disputes". As will be discussed more fully below, Customers Bank agreed to pay $58 million towards the CUBI Receivable, less various offsets agreed to by the Debtor and defined in the Settlement Agreement, including the Prepetition Remittances. The Settlement Agreement was conditioned on approval of the Bankruptcy Court and explicitly required a reconciliation of the amounts that the Debtor had been holding back from Customers Bank.

12.     Following the Settlement Agreement's execution, the Debtor filed the *Motion for Entry of an Order (I) Authorizing and Approving Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* on October 27, 2022 [Dkt. No. 172] (the "Settlement Motion"),[6] urging the Court to approve the Settlement Agreement pursuant to Federal

---

[5] The Settlement Agreement is attached as Exhibit A to the Settlement Order, discussed below, as Docket No. 232-1.

[6] The Debtor also filed the *Debtors' Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Dkt. No. 213] and the *Declaration of Laquisha Milner in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Dkt. No. 211] in support of the Settlement Motion.

Rule 9019 as a comprehensive resolution of the Disputes that represented a key step forward in the chapter 11 cases and a reasonable exercise of the Debtor's business judgment. Following a hearing held on November 7, 2022, and in overruling a limited objection to the Settlement Motion filed by another PPP Loan lender, Cross River Bank ("Cross River"), the Court granted the Settlement Motion and approved the terms of the Settlement Agreement through the *Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Dkt. No. 232] (the "Settlement Order"). Pursuant to the Settlement Order, the Court authorized the Debtor to enter into the Settlement Agreement and "perform, execute, and deliver all documents, and take all actions, necessary to immediately continue and fully implement the Settlement Agreement in accordance with the terms, conditions, and agreements set forth in the Settlement Agreement . . . ." *Settlement Order*, at par. 3. The Effective Date of the Settlement Agreement was November 9, 2022, the date the Settlement Order entered.

13.    The Settlement Agreement obligates Customers Bank to make payment to the Debtor in the amount of $58 million "less the amount of the Disputed KServicing Holdbacks as of the Petition Date" within 3 business days from the Effective Date. In turn, "Disputed KServicing Holdbacks" is defined as: "collectively, the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback." "Disputed KServicing Fee Holdback" means "the amount that constitutes SBA loan origination fees due to [Customers Bank] under the S&S Agreement," estimated at approximately $8.3 million. The "Disputed KServicing Remittance Holdback" is "the amount that constitutes funds (i) collected from borrowers that KServicing is required to remit to [Customers Bank] under the Original PSA and S&S Agreement, and (ii) held by KServicing on account of cancelled loans" otherwise due to Customers Bank, or the Petition Date Remittances.

Excluded from this amount, though, were "Borrower Overpayments" or amounts collected from a borrower on account of a Customers Bank PPP Loan payable by KServicing to the SBA, or in appropriate circumstances, due to a borrower. *See Settlement Agreement*, at par. 2.

14.    The parties were obligated in Paragraph 3 of the Settlement Agreement, prior to the Effective Date, to "work together in good faith to promptly reconcile the amounts of the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback as of the Petition Date to determine the appropriate amount of the Settlement Payment."

15.    In the meantime, the Debtor agreed to continue as loan servicer for the Remaining Loan Population, on terms described in Paragraph 4 of the Settlement Agreement, and continued to receive Borrower Remittances on Customers Bank's behalf. The Settlement Agreement required those funds, though, to be held by the Debtor in a segregated account in trust for Customers Bank, with Paragraph 4(E) providing that:

> beginning as of the Petition Date, KServicing has and shall continue to deposit any and all borrower collections received on or after the Petition Date into a segregated account in the name of and for the benefit of [Customers Bank] (separate and apart from any other funds or assets) and shall provide [Customers Bank] with the account information regarding the segregated account, shall hold such funds in trust for the benefit of [Customers Bank], and shall promptly, but in any event within ten (10) Business Days of the end of each month, or such other timing as mutually agreed upon in writing by the Parties, transfer all such funds to [Customers Bank].

*Settlement Agreement,* at par. 4(E).

### C.    The Current Disputes Involving the Settlement Agreement.

16.    Using information provided by the Debtor, which as the servicer was the only available source, Customers Bank did work diligently to reconcile all data and determine the appropriate amount of the Settlement Payment in accordance with the Settlement Agreement and made a payment to the Debtor of $20,499,683 based on that reconciliation.

#182006303_v1

17.    As discussed at a status hearing held on November 28, 2022, and as outlined in correspondence to the Court docketed as numbers 287 and 289, and separate, earlier communication between the parties (through counsel) filed as docket number 299, the Debtor has disputed Customers Bank's calculation of the Settlement Payment, claiming to be owed instead, $23,780,786.63. That dispute is not the subject of this Motion, however.

18.    Rather, as October 2022 came to an end, Customers Bank's employees began communicating with their contacts at the Debtor regarding the required Monthly Borrowing Remittance Report due to Customers Bank, *see Settlement Agreement at Ex. A*, and the anticipated funding of the Borrower Remittances collected on Customers Bank's behalf from October 3, 2022 through October 31, 2022 ("October Remittances"). Even though the Debtor's remittance report showed Borrower Remittances of $1,276,569 for the month of October 2022, and the bank statement for the Synovus Bank account set up to hold Borrower Remittances in trust ("Trust Account") reflects deposits of approximately $1,551,245.91, the payment actually received by Customers Bank from the Debtor was only *$376,326.59* ("October Payment").

19.    Customers Bank brings this Motion to compel compliance with the Debtor's clear, express obligation in the Settlement Agreement to remit payment to Customers Bank of *all Remittances* to Customers Bank and properly account for and deliver Borrower Remittances going-forward. Since it has become clear that the Debtor is continuing its pre-petition practice of using Borrower Remittances held in the Trust Account for purposes other than as expressly authorized, negotiated, and approved by this Court, in clear violation of the Settlement Agreement, Customers Bank also requests that this Court provide Customers Bank various forms of adequate

protection of its interest in funds in the possession of the Debtor, pending transition of the servicing

obligations to a third-party at a later point in this case.[7]

## **RELIEF REQUESTED**

20.      By this Motion, Customers Bank seeks entry of an order (i) compelling the Debtor's

immediate and prospective compliance with its unequivocal obligations under the Court approved

Settlement Agreement to segregate, account for, and remit to Customers Bank *all* Borrower

Remittances, and funding the balance of the October Remittances presently due; (ii) directing the

Debtor to provide Customers Bank with additional forms of adequate protection of its interest in

the Borrower Remittances, such as timely and fulsome servicing reporting, online access to the

bank account receiving the Borrower Remittances, and requiring that the Debtor segregate and

hold all Borrower Remittances with Debtor's ability to make withdrawals or disbursements of such

funds being limited solely to monthly delivery to Customers Bank or for such uses directed or

---

[7] Adequate protection is appropriate based solely on the Debtor's breach of its trust obligations in the Settlement Agreement. However, the need for it is even more acute given that this is not the first time that the Debtor has breached its trust obligations to Customers Bank. Paragraph 31 of the *First-Day Declaration* [Dkt No. 13] refers to an agreement between the parties called the Sale and Servicing Agreement. It has trust obligations at section 10. KServicing admits that it breached them (at least with the monies it collected under that agreement) by stating at paragraph 52 of that same declaration that it withheld those monies "to offset the CUBI Receivable . . . ." While those breaches have been resolved by the Settlement Agreement, it is apparent that the Debtor is continuing to disregard its trust obligations in the Settlement Agreement and simply cannot be relied upon to adhere to them absent adequate protection.

approved by Customers Bank in writing; and (iii) granting Customers Bank such other related relief as is just and proper.

## ARGUMENT IN SUPPORT

**A.     Enforcement of the Settlement Agreement and Order Requires the Payment of ALL of the Borrower Remittances From and After the Petition Date.**

21.     The relief that Customers Bank seeks is, quite simply, enforcement of the terms of a Court approved Settlement Agreement and the related order, well within the Court's powers, and the result compelled by the unambiguous terms of that contract.

22.     It is axiomatic that "a court possesses the inherent authority to enforce its own orders." *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994)); *In re Essar Steel Minn., LLC*, 47 F.4th 193, 197 (3d Cir. 2022) (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)) (a bankruptcy court "plainly ha[s] jurisdiction to interpret and enforce its own prior orders."); *In re SemCrude L.P.*, No. 08-115352011, WL 4711891, at *8, (Bankr. D. Del. Oct. 7, 2011) (noting court has authority to enforce existing Confirmation Order, Settlement Agreement, and confirmed Chapter 11 Plan).

23.     Section 105(a) of the Bankruptcy Code expressly provides a bankruptcy court with broad authority to exercise its equitable powers to ensure compliance with its own orders. *See* 11 U.S.C. § 105(a); *In re Nosek*, 544 F.3d 34 (1st Cir, 2008); *NWL Holdings, Inc. v. Eden Ctr., Inc. (In re Ames Dep't Stores)*, 317 B.R. 260, 274 (Bankr. S.D.N.Y. 2004) (section 105(a) plainly may be used "to enforce and implement" earlier orders). Indeed, it is a court's "burden and province" to interpret and enforce its own orders, particularly when the court has retained jurisdiction to "hear and determine all matters" relating to the implementation, interpretation, or enforcement of that order to the presiding bankruptcy court, as the Settlement Order so provides. *See In re*

12

*Caribbean Petroleum Corp*, 512 B.R. 774, 777 (Bankr. D. Del. 2014) (noting it a court's "responsibility to litigants and another court to decide a dispute over language [the court] approved.").

24.     Similarly, a bankruptcy court, as a court of equity, possesses the power to summarily enforce settlements. *See In re Springpark Assocs.*, 623 F.2d 1377, 1380-81 (9th Cir.), cert. denied, 449 U.S. 956 (1980) (bankruptcy court has inherent power to enforce settlement providing for termination of automatic stay to permit foreclosure); *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008) (using Section 105(a) to enforce and implement an earlier Settlement Agreement that provided for the court to retain jurisdiction for all disputes arising out of the aforementioned Settlement Agreement).

25.     In interpreting and enforcing the terms of a settlement agreement, general contract rules of interpretation should apply. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 282 n.50 (3d Cir. 2014); *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 192-93 (3d Cir. 2000) (holding "basic contract principles do indeed apply to settlement agreements"); *Amgen Inc. v Amneal Pharms. LLC*, No. 16-853, 2019 WL 4538135, at *6 (D. Del. Sept. 19, 2019); *In re Essar Steel Minn. LLC*, 590 B.R. 109, 115 (Bankr. D. Del. 2018) (interpreting Settlement Agreement approved by court according to contract interpretation principles under corresponding state law). If the parties' meaning is clear and unambiguous from the language of the Settlement Agreement, courts must interpret the Agreement according to the plain meaning of the words used. *See Blunt*, 767 F.3d at 282, n.50; *In re Zohar II, Corp.*, No. 18-105122020, WL 3960820, at *4 (D. Del. July 13, 2020) (upholding bankruptcy court's interpretation of Settlement Agreement, despite parties' disagreement as to meaning, as the Agreement's wording was unmistakable); *In re Dominao*, 442

#182006303_v1

B.R. 97, 104 (Bankr. M.D. Pa. 2010) (finding explicit language of Settlement Agreement did not preclude a party from bringing certain motions not specifically prohibited in the Agreement).

26.    Here, the Settlement Agreement is explicit and supports the relief requested by Customers Bank. First, through the Settlement Agreement, all Borrower Remittances received after the Petition Date must be held by the Debtor *in trust* for the benefit of Customers Bank. *Settlement Agreement*, at par. 4(E). The Borrower Remittances, therefore, are not property of the estate available for sources other than as agreed to by Customers Bank, or ordered otherwise. *See* 11 U.S.C. § 541(d) (emphasis added); *Begier v. I.R.S.*, 496 U.S. 53, 59-60 (1990) (trust-fund tax payments from its general accounts were transfers of property held in trust, not property of the estate); *see also In re Magna Entm't Corp.*, 438 B.R. 380, 387 (Bankr. D. Del. 2010) ("Funds that a debtor holds in trust are not property of the debtor's bankruptcy estate whether the trust is statutory or constructive."); *In re Edison Bros., Inc.*, 243 B.R. 231, 231 (Bankr. D. Del. 2000) ("[C]ourts have concluded that property which debtor holds in trust (express or constructive) for another does not become property of the estate when the debtor files for bankruptcy."); *In re Reagor-Dykes Motors, LP*, No. 18-50214, 2022 WL 2046144, at *9 ("Funds held in trust for another are not property of the bankruptcy estate.") (citing *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990)).

27.    Through the Settlement Agreement, Customers Bank has <u>not</u> authorized the Debtor to expend the Borrower Remittances on <u>any</u> expense, whether relating to the servicing of PPP Loans or otherwise, and instead, the Debtor is obligated to "promptly, but in any event within ten (10) Business Days of the end of each month, or such other timing as mutually agreed upon in writing by the Parties, transfer all such funds to [Customers Bank]." *Settlement Agreement*, at par. 4(E).

28.    Based on the remittance reporting provided by the Debtor to Customers Bank, however, it appears as though the Debtor used **approximately $925,243.00** of the October Remittances to make payment to the SBA, thereby reducing the actual payment to Customers Bank dollar for dollar. An excerpt of that Report regarding the October Payment sets forth the following:

| Row Labels | Count of SbaLoanID | Sum of TransactionAmount | Sum of Transaction_amount_ applied_to_plan | Sum of Amount_applied_to_ principal_within_plan | Sum of Amount_applied_to_i nterest |
|---|---|---|---|---|---|
| ⊟ Customer Payments Remitted to SBA - Oct | 41 | $ (925,243) | $ 925,243 | $ 885,631 | $ 39,612 |
| ⊞ Apr | 1 | $ (100) | $ 100 | $ - | $ 100 |
| ⊞ Jun | 2 | $ (4,955) | $ 4,955 | $ 4,876 | $ 79 |
| ⊞ Jul | 3 | $ (2,750) | $ 2,750 | $ 1,800 | $ 950 |
| ⊞ Aug | 6 | $ (205,139) | $ 205,139 | $ 199,417 | $ 5,723 |
| ⊞ Sep | 23 | $ (600,767) | $ 600,767 | $ 574,997 | $ 25,770 |
| ⊞ Oct | 5 | $ (107,271) | $ 107,271 | $ 100,377 | $ 6,894 |
| ⊟ Owed 19 | 770 | $ (1,301,569) | $ (1,301,569) | $ (1,220,831) | $ (80,738) |
| ⊞ Sep | 1 | $ (25,000) | $ (25,000) | $ (25,000) | $ - |
| ⊞ Oct | 769 | $ (1,276,569) | $ (1,276,569) | $ (1,195,831) | $ (80,738) |
| **Grand Total** | 811 | $ (2,226,812) | $ (376,326.59) | $ (335,200) | $ (41,126) |

*See Affidavit of Alyssa White,* contemporaneously filed ("<u>White Affidavit</u>"), at Ex. A.

29.    This calculation was disputed by Customers Bank. *See White Affidavit*, at Ex. B. In responding to that challenge to the amount of the October Payment by Customers Bank, at the November 28, 2022 Status Conference, counsel to the Debtor explained:

> Now I know the Court doesn't know what that means. But briefly, what that means is that the deviation from the payment from prior months is because, in October, the SBA agreed to guarantee a whole chunk of loans. And when that happened, payments that were made by borrowers were owed to the SBA. That's at least the SBA's position, since they were guaranteeing those loans.

*See November 28, 2022 Hearing Transcript,* **Exhibit B** hereto*,* p. 10.

30.    That statement, though, is an undeniable admission of breach as there is nothing in the Settlement Agreement that provides any discretion for the Debtor to deviate from its obligation to pay all funds to Customers Bank. There is an obvious and straightforward reason for that, namely that the referenced obligations to the SBA were already contemplated by and addressed in the reconciliation process relating to the Settlement Payment.

15

31.     As Debtor was aware at least by the time the Status Hearing commenced, the Debtor had already accounted for payments due to the SBA, calculated by the Debtor's Senior Operations Officer to be in the amount of $1,150,513, and that amount was used by Customers Bank in calculating the "Settlement Payment". *See White Affidavit,* at Ex. C. Pursuant to the Settlement Agreement, the amount of Borrower Overpayments, whether due to borrowers or the SBA as of the Petition Date, are expressly carved out from the amount of the "KServicing Remittance Holdback." That amount is, as defined, essentially all Prepetition Remittances due to Customers Bank net of the Borrower Overpayments. The net result was that the Settlement Payment was <u>not</u> reduced by Borrower Overpayments otherwise comprising Prepetition Remittances received by borrowers that are due to the SBA, because the Debtor has or will fund those payments from the substantial amount of *Prepetition Remittances* it withheld from Customers Bank prior to the Petition Date.[8] Those payments due to the SBA though, already accounted for and reducing the offset available to Customers Bank in calculating the Settlement Payment, do not under any reading of the Settlement Agreement also serve to enable the Debtor to withhold transfer to Customers Bank of all of the post-petition October Remittances on the CB PPP Loans held in trust.[9]

32.     To the contrary, no matter how many withdrawals were made from the Trust Account prior to the Effective Date, Customers Bank is still entitled to all of the *deposits* into that account for Borrower Remittances. The Settlement Agreement does not provide for any exceptions

---

[8] Even if relevant to the instant matter, however, and Customers Bank asserts that it is not, the payments alleged to have become due to the SBA *in October* for Guaranty Purchases appear to only total (as reported by the Debtor, summarized above) $107,271.00 of the $925,243.00 withheld.

[9] Customers Bank reserves all rights to challenge the amount of payments calculated as due to the SBA whether before or after the Settlement Agreement's Effective Date, in connection with any dispute by the Debtor of the calculation of the Settlement Payment raised in separate motion.

on the Debtor's segregation of the trust, and prompt and full payment to Customers Bank *of Customers Bank's own property* and the Court should not countenance the Debtor's efforts to unilaterally amend the Settlement Agreement or to engage in improper breach of trust in derogation of its clear obligations.

33.    The amount that should have been remitted to Customers Bank under the Settlement Agreement, constituting the entirety of the October Remittances held in trust, is at least **$1,551,245.91** based on records provided by the Debtor to date. That is the amount that reflects all borrower payments received in the Trust Account on Customers Bank PPP Loans from the Petition Date through October 31, 2022, as reflected on the Synovus bank statement provided by the Debtor to Customers Bank. *See White Affidavit*, at Ex. A.[10] That is at least the amount that the Settlement Agreement requires to be paid to Customers Bank, for the month of October and the same methodology must apply going-forward. Through this Motion, therefore, Customers Bank requests entry of an Order compelling the Debtor to remit payment of **an additional $1,174,919.32** to Customers Bank, as well as all overdue servicing and remittance reports required under the Contracts and the Settlement Agreement.

B.     **Adequate Protection of Customers Bank's Ownership Interest in the Borrower Remittances Is Necessary.**

34.    As should not be disputed based on the language of the Settlement Agreement, the Debtor is in custody and control of cash remittances that are property of Customers Bank, not the Debtor, held in express trust.[11] As a result, Customers Bank holds a statutory right through Section

---

[10] To the extent that the Debtor is collecting payments on the Customers Bank portfolio in other accounts it must also account for those and pay those amounts over to Customers Bank.

[11] The words "trust" and "trustee" carry a "'precise and well-settled legal meaning [that] must be interpreted' accordingly." *Pa. Envtl. Def. Found. v. Commonwealth (PEDF)*, 161 A.3d 911, 932 (Pa. 2017) (quoting *Appeal of Ryder*, 74 A.2d 123, 124 (1950)).

363(e) to "at any time" seek an order of the Court prohibiting the use of property in which it has

an interest "to the extent necessary to provide adequate projection of such interest." In turn, section

361 of the Bankruptcy Code provides that when adequate protection is required under section 362,

363[12], or 364, such adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; . . . (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

*See* 11 U.S.C. § 361.

35.      The means by which that adequate protection may be afforded are flexible. Section

361 of the Bankruptcy Code provides various examples of forms of adequate protection, such as

granting replacement liens and administrative claims, leaving courts to decide what constitutes

sufficient adequate protection on a case-by-case basis. *See In re Swedeland Dev. Grp., Inc.*, 16

F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made

on a case by case basis."); *In re Columbia Gas Sys.*, Inc., Nos. 91-803, 91-804, 1992 WL 79323,

at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286

(5th Cir. 1986); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of

adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"). The nuances

---

[12] Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."

of this case mandate that Customers Bank receive adequate protection in various forms, in particular, measures aimed at providing it transparency as to, and control over, the Trust Account to protect its interest in Borrower Remittances.

36.    As is revealed from the face of the Synovus Bank Statement of Account for the month of October 2022 ("October Bank Statement"), the Debtor is not only receiving Borrower Remittances in the Trust Account, but is also actively authorizing various withdrawals for purposes not authorized by the Settlement Agreement. The very first transaction initiated by the Debtor on the Petition Date was to transfer $3 million of funds held in the Trust Account named "PPP Payments CUBI" *to an account maintained for another lender, Cross River Bank. See White Affidavit*, at Ex. A. As indicated in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (B) Implement Changes to Cash Management in the Ordinary Course of Business; and (II) Granting Related Relief* [Dkt. No. 12], the Synovus account ending in 5268 is one maintained by the Debtor to collect borrower payments on loans serviced by the Debtor for Cross River Bank (and not Customers Bank):

| **Synovus CRB Servicing Account**<br><br>Synovus<br>*(account ending 5268)* | The Synovus CRB Servicing Account collects payments made by borrowers on loans (a) originated by and/or sold to Cross River Bank ("**CRB**"), and (b) serviced by the Debtors on behalf of CRB. These collections are made on each banking day and then subsequently transferred to the Main Operating Account on an as needed basis depending on the Main Operating Account balance to be remitted to CRB on a monthly basis. |
|---|---|
| | The Synovus CRB Servicing Account is also issued to (a) issue direct refunds to borrowers in the event of borrower overpayment on a daily basis, and (b) transfer funds collected on account of borrower payments to the SBA where the SBA has granted guaranty purchase of such loan. |
| | As of the Petition Date, the Synovus CRB Servicing Account had a balance of approximately $11,038,446.44. |

#182006303_v1

37.     Then, throughout the month of October 2022, Debtor debits served to reduce the balance in the Trust Account by an additional approximately $1,072,898.91. Those debits (other than the Cross River Bank transfer) to the extent relating to Borrower Overpayments (as described in the Servicing Motion) received by the Debtor on the Remaining Loan Population prior to execution of the Settlement Agreement, *may* have been a proper use of the *Prepetition Remittances*, but there is *no* authority for those payments to continue to be funded from and after the Petition Date from the Trust Account without the prior authorization of Customers Bank.[13] The Settlement Agreement is governed by Pennsylvania law. *See Settlement Agreement*, at par. 20. Under Pennsylvania law, a trustee has an obligation to administer a trust as any "prudent person would, by considering the purposes, provisions and distributional requirements and other circumstances of the trust . . . ." 20 Pa. Cons. Stat. Ann. § 7774 (West 2006). Along those lines, it is well established that a trustee may use the assets of the trust only for purposes authorized by the trust . . . other uses are beyond the scope of the discretion conferred . . . ." *Robin Twp. v. Commonwealth*, 83 A.3d 901, 690-91 (Pa. 2013) (*citing Metzger v. Lehigh Valley Trust & Safe Deposit Co.*, 69 A. 1037, 1038 (1908)); *see also PEDF*, 161 A.3d at 933 ("The duty of loyalty imposes an obligation to manage the corpus of the trust so as to accomplish the trust's purposes for the benefit of the trust's beneficiaries."); *In re Hartje's Estate*, 28 A.2d 908, 910 (Pa. 1942) ("[T]he trustee can properly exercise such powers and only such powers as (a) are conferred upon him in specific words by the words by the terms of the trust, or (b) are necessary or appropriate to carry out purposes of the trust and are not forbidden by the terms of the trust.") (*quoting* Restatement (First) of Trusts § 186 (Am. L. Inst. 1935)). The Debtor, serving as "trustee" of the Trust Account, is in breach of its obligations as fiduciary to Customers Bank.

---

[13] As detailed above, there is also no authority for the Debtor to net those debits out from the *October Remittances*.

38.     Just as importantly, Customers Bank cannot reconcile the entries on the October Bank Statement to the remittance reports provided by the Debtor, raising great concern about the reliability of the servicing reports and data provided by the Debtor and ability of the Debtor to properly account for activity in the Trust Account for the duration of this case. In attempting to determine how the Debtor calculated the October Payment and also accounted for activity on the Remaining Loan Population, it is apparent that the Debtor's staff is not prepared to handle the Trust Account in the manner required of the Settlement Agreement.

39.     These servicing, accounting, and payment failures impose great risk of loss of value of the Trust Account, rendering Customers Bank entitled to various forms of adequate protection by virtue of Section 361. In order to protect Customers Bank's interest in the Trust Account, based on the circumstances of this case, Customers Bank requests that the Court order that:

i)      the Debtor cause Synovus Bank to add Customers Bank as an authorized user of, and owner of, the Trust Account;

ii)     the Debtor cause Synovus Bank to provide Customers Bank with unrestricted online access to the Trust Account; and

iii)    the Debtor be prohibited from authorizing disbursements, withdrawals (debits) or transfers from the Trust Account other than to Customers Bank without the express, written instruction of Customers Bank's authorized representatives.

40.     While already provided for in the Settlement Agreement, the Debtor should also be compelled to timely and accurately prepare and distribute to Customers Bank the Servicing Plan Reports described in Exhibit A to the Settlement Agreement.

41.     Without further restrictions on the Debtor's ability to control the funds held in the Trust Account as requested, the disputes regarding the proper calculation of the month-end transfer to Customers Bank from the Trust Account for subsequent months will likely continue, to the detriment of Customers Bank and at further time and expense to the Court and the estate.

#182006303_v1

42.    Through entry of the Proposed Order, Customers Bank is confident that these disputes can be narrowed significantly or resolved, for the interest of all involved.

## CONCLUSION

43.    Based on the foregoing support, Customers Bank submits that the relief requested herein is necessary and appropriate, and requests that the Court enter the Proposed Order.

## NOTICE

Notice of this Motion will be provided to (a) counsel to the Debtor (i) Weil, Gotshal & Manges LLP, Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com), Candace M. Arthur (candace.arthur@weil.com), Natasha S. Hwangpo (natasha.hwangpo@weil.com), Chase A. Bentley (chase.bentley@weil.com), Richard Slack (richard.slack@weil.com); and (ii) Richards, Layton & Finger, P.A., Attn: Daniel DeFranceschi (defranceschi@rlf.com), Amanda R. Steele (steele@rlf.com), Zachary I. Shapiro (shapiro@rlf.com), and Matthew P. Milana (milana@rlf.com); (b) the office of the United States Trustee for the District of Delaware; (c) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (d) the Federal Reserve Bank; (e) Cross River Bank; (f) Synovus Bank; (g) the United States Department of Justice, Office of the U.S. Trustee for the District of Delaware; (h) the Federal Trade Commission; (i) the Small Business Administration; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Attorney's Office for the District of Delaware; and (m) any party that is entitled to notice pursuant to Bankruptcy Rule 2002. Customers Bank respectfully submits that no further notice is required.

## NO PRIOR REQUEST

This is Customers Bank's first request for relief regarding this matter.

**WHEREFORE,** Customers Bank requests entry of an order substantially in the form attached hereto as **Exhibit A** granting this Motion, and directing such other and further relief as is just and proper.

Dated:   December 7, 2022
           Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William A. Hazeltine*
William A. Hazeltine (Del. Bar No. 3294)
919 North Market Street, Suite 420
Wilmington, Delaware 19801
Telephone: 302-428-8191
Facsimile: 302-428-8195
whazeltine@sha-llc.com

-and-

**HOLLAND & KNIGHT LLP**
John J. Monaghan (admitted *pro hac vice*)
Jeremy M. Sternberg (admitted *pro hac vice*)
Lynne B. Xerras (*pro hac vice forthcoming*)
10 St. James Avenue
Boston, MA 02116
Telephone: 617-523-2700
Facsimile: 617-523-685
john.monaghan@hklaw.com
jeremy.sternberg@hkaw.com
lynne.xerras@hklaw.com

*Counsel to Customers Bank*

#182006303_v1