**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------- x
                                                         :
In re                                                    :     Chapter 11
                                                         :
KABBAGE, INC. d/b/a KSERVICING, et al.,                  :     Case No. 22-10951 (CTG)
                                                         :
        Debtors.¹                                        :     (Jointly Administered)
                                                         :
                                                         :     Obj. Deadline: December 21, 2022 at 4:00 p.m. (ET)
                                                         :     Hearing Date: January 6, 2023 at 10:00 a.m. (ET)
-------------------------------------------------------- x
```

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER ENFORCING THE**
**SETTLEMENT ORDER AND THE SETTLEMENT AGREEMENT**
**BETWEEN KSERVICING AND CUSTOMERS BANK**

Kabbage, Inc. d/b/a KServicing ("**KServicing**") and its debtor affiliates, as debtors

and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

hereby submit this motion (the "**Motion**") to enforce the Court's order entered on November 9,

2022 approving the *Settlement and Release Agreement*, dated October 27, 2022 (the "**Settlement**

**Agreement**") between KServicing and Customers Bank ("**CB**") [Docket No. 232] (the

"**Settlement Order**") and the Settlement Agreement. Contemporaneously herewith, the Debtors

submit the declarations of Donna R. Evans (the "**Evans Declaration**") and Tamica M. Williams

(the "**Williams Declaration**") and respectfully state as follows in support of the Motion:

**PRELIMINARY STATEMENT**

1.      CB has failed to pay KServicing the full amount owed under the Settlement

Agreement in its continued attempt to wrongfully deprive KServicing, and thus its estate and

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage
Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A
LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license;
Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address
is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

creditors, of amounts owed to it. The Debtors therefore seek to collect the outstanding balance of the Settlement Payment[2] in the amount of $3,281,103 (the "**Unpaid Amount**").

2.      The Settlement Agreement resolved, among other things, KServicing's claims against CB for improperly withholding for years over $65 million in fees owed to KServicing. As the Court is aware, at the heart of the Settlement Agreement was KServicing's immediate receipt of the approximately $23.2 million cash component of the aggregate Settlement Payment of $58 million. Nevertheless, CB has failed to pay KServicing the full amount due to it under the Settlement Agreement and by its actions has forced the Debtors to continue to expend estate resources and limited funds in furtherance of collecting the Unpaid Amount.

3.      The cash component of the Settlement Payment under the Settlement Agreement was based on a formula. That formula is set forth in Section 1(H) of the Settlement Agreement and in related definitions. Essentially, the formula was designed to implement the intention of the Parties that CB would pay in cash the difference between the total Settlement Amount of $58 million less the amounts that KServicing had already collected and withheld from CB. As discussed below, there are three amounts that need to be calculated to determine the Settlement Payment: (a) the amount received by KServicing on account of cancelled CB loans (where KServicing owes that amount to CB); (b) fees owed to CB and held by KServicing; and (c) remittances from borrowers owed to CB and held by KServicing. Settlement Agreement §§ 1(C), 1(E).

4.      The Settlement Agreement included approximate amounts that comprised the various components of the Settlement Payment, in each instance as contended by CB, and also

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* (the "**Settlement Motion**") [Docket No. 172].

included a reconciliation mechanism that provided for the Parties to work together to confirm the precise amount of the Settlement Payment. The Reconciliation Process was meant to be mutual, not unilateral, and should have been straightforward and non-contentious if both Parties were working in good faith. Unfortunately, CB attempted to further squeeze the Debtors out of millions of dollars they are indisputably owed.

5.      Importantly, and to state the obvious, the Settlement Payment formula yields a correct and accurate amount that CB is required to pay KServicing. As set forth in the Williams Declaration, including supporting data, KServicing has calculated the correct and accurate number for the Settlement Payment as $23,780,786.63. The back-up and underlying calculations are set forth in the Williams Declaration, and KServicing performed the calculations utilizing reliable data and processes and procedures that KServicing uses in the ordinary course to confirm and reconcile cancelled loans, fees owed, and borrower remittances. Instead of paying the correct and full Settlement Payment amount, CB unilaterally stopped working with KServicing to reconcile amounts due, wired $19,469,355 to KServicing on November 14th, and then unilaterally increased its payment to $20,499,683 on November 15th. Indeed, neither when it paid KServicing on November 15th, nor at any time prior thereto did CB provide KServicing with the underlying basis for its payments (other than to assert that it purportedly took the numbers from data KServicing provided during the course of the Reconciliation Process).

6.      CB knew its calculation was wrong at the time it made its payments. More specifically, CB paid KServicing based on a cancelled loan amount of $3,617,304 but, prior to using that figure, CB had expressly told KServicing that the right amount of the cancelled loans was approximately $1.6 million. Based on statements made by CB, KServicing informed CB that it would further reconcile the cancelled loan amount. In fact, prior to the time CB made its initial

payment, KServicing used the most reliable data, directly from the SBA's website, to confirm CB's $1.6 million cancelled loan amount and sent that updated figure to CB. Thus, at the time CB paid the $20.5 million, it knew that it owed at least $1.9 million more based on the cancelled loan issue alone. CB's knowledge of the correct amount KServicing retained on account of cancelled loans, CB's access to data confirming that amount before it sent payment, and CB's intentional decision to use a higher cancelled loan amount to pay KServicing less than it is owed clearly shows that CB breached its obligations under the Settlement Order and the Settlement Agreement.

7.    The amount of the borrower remittances held back by KServicing was also overstated by CB in its payment calculation. By looking at actual bank transfer data, KServicing determined that the amount of such withheld remittances is $24,022,977, where CB instead attributed $25,578,633 to such remittances, and thus failed to account for over $1.5 million in payments KServicing already made directly to CB (and thus no longer owes to CB). But CB already knew KServicing had passed on to CB the funds making up that over $1.5 million difference—KServicing's former CFO sent CB a spreadsheet detailing the basis for that payment at the time the wire transfer was made—on October 21, 2020, further demonstrating CB's willful decision to underpay KServicing and its lack of good faith.

8.    The extensive work performed by and detailed calculations of KServicing representatives demonstrate that not only has CB paid significantly less than the $23.2 million that the Parties contemplated, but the correct Settlement Payment amount owed to KServicing under the Settlement Agreement is $23,780,786.63. Allowing CB to pay anything less than the full and correct Settlement Payment amount would be tantamount to allowing CB to be paid a second time by KServicing for amounts that have already been remitted to CB.

9.      CB's apparent justification for failing to pay the correct Settlement Amount is without any merit whatsoever. According to CB, the Settlement Agreement required the Parties to work together in good faith to reconcile amounts through November 9th and it had the ability to stop the Reconciliation Process and remit a Settlement Payment that was not correct. Nothing in the Settlement Agreement, however, alters the obligation of CB to pay the correct or accurate Settlement Payment amount. Moreover, while the Settlement Agreement required the Parties to act in good faith to reconcile amounts through November 9th, nothing prevented the Parties from continuing to reconcile numbers to avoid disputes after that date. One would expect that even if not required, the Parties would continue to act in good faith to avoid disputes even after November 9th. Indeed, to the extent that CB had calculated an amount of the Settlement Payment during the reconciliation efforts, good faith would have required CB to share the basis for its calculation and discuss it with KServicing before unilaterally deciding to short pay the Debtors by over $3 million.

10.     The Unpaid Amount of the Settlement Payment due to KServicing is an asset of the Debtors' estates. Prior to executing the Settlement Agreement, KServicing had already expended a significant amount of its limited resources to resolve its dispute over the CB Receivable (as defined below) and reach what it believed was a fair and reasonable compromise. Now it is forced to expend further resources. It is time for this matter to be resolved once and for all: CB should pay the correct Settlement Payment amount it owes to KServicing under the Settlement Agreement and the Settlement Order.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28

U.S.C. § 157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is section 105(a) of the Bankruptcy Code.[3]

## RELEVANT BACKGROUND

### I.     KServicing and CB Entered into the Settlement Agreement, Which this Court Approved Following a Hearing

12.     The original underlying dispute between CB and KServicing involved the Parties' obligations related to their respective participation in the SBA's PPP initiative. KServicing contended that CB originated over $2.6 billion in loans through its arrangement with KServicing, generating tens of millions of dollars in fees payable to KServicing under the Parties' agreements, including approximately $65.5 million in fees due at loan origination that CB failed to pay after repeated demands for payment (the "**CB Receivable**").

13.     In response to CB's refusal to pay KServicing the CB Receivable, and to maintain a dwindling amount of liquidity, KServicing retained funds that would otherwise be due to CB—just over $34 million up to the Petition Date.

14.     After extensive, good faith, arm's-length negotiations, on October 27, 2022, the Company and CB memorialized the terms of an agreed-upon settlement in the Settlement Agreement.[4] The Settlement Agreement reflects a bargained-for comprehensive resolution of the various Disputes between the Parties and was explicitly intended to result in the Company (i) recovering $58 million of the CB Receivable, with an approximately $23.2 million cash infusion to the Debtors due shortly after this Court entered of the Settlement Order, (ii) receiving a release of potentially significant contingent and unliquidated claims asserted by CB against the Debtors

---

[3] Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the Debtors.

[4] Also on October 27, 2022, the Debtors filed the Settlement Motion.

and their estates, (iii) reaching an agreement with CB with respect to servicing obligations under applicable contracts, and (iv) ending the costs and expended resources attendant in protracted negotiations and litigation.

15.     The Settlement Agreement was approved by this Court in the Settlement Order on November 9, 2022 [Docket No. 232]. The Court authorized KServicing "to enter into, perform, execute, and deliver all documents, and take all actions, necessary to immediately continue and fully implement the Settlement Agreement in accordance with the terms, conditions, and agreements set forth in the Settlement Agreement…" *Id.* at ¶ 2. Finally the Settlement Order provided that "[t]his Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order." *Id.* at ¶ 7.

## II.     The Relevant Provisions of the Settlement Agreement

16.     The Settlement Agreement sets forth a Settlement Amount due to KServicing of $58,000,000. Settlement Agreement, § 1(G).

17.     The Settlement Agreement defines the "Settlement Payment" to be made by CB as "the Settlement Amount [of $58 million] less the amount of the Disputed KServicing Holdbacks as of the Petition Date." Settlement Agreement §1(H).

18.     The "Disputed KServicing Holdbacks" in turn is defined to comprise two separate types of holdbacks: (1) the Disputed KServicing Fee Holdback and (2) the Disputed KServicing Remittance Holdback. Settlement Agreement § 1(D). The "Disputed KServicing Remittance Holdback" in turn itself has two components: (i) funds "collected from borrowers that KServicing is required to remit to CB[,]" and (ii) funds "held by KServicing on account of cancelled loans." Settlement Agreement § 1(E). These Disputed KServicing Holdbacks consist of amounts that CB contended KServicing had received but owed to CB under the terms of the Parties' prior agreements. The calculation of the Settlement Amount can be graphically set forth as follows:

| The Settlement Amount of $58,000,000 |
| :--- |
| *LESS* |
| Disputed KServicing Fee Holdback |
| Disputed KServicing Remittance Holdback (Total of A and B below) |
| A. Funds on Account of Cancelled Loans |
| B.  Funds Collected from Borrowers |
| *EQUALS* |
| **Settlement Payment** |

19.    The Settlement Agreement contains a "Reconciliation" provision that requires the Parties to act in good faith (the "**Reconciliation Process**") to jointly attempt to confirm the correct amount of the Settlement Payment. Settlement Agreement, § 3(A). Importantly, nothing in this reconciliation provision alters the obligation of CB to pay the correct and accurate amount of the Settlement Amount. In addition, while the reconciliation provision requires the Parties to act in good faith to reconcile the amounts through November 9, 2022, nothing prevents the Parties from acting in good faith to continue reconciling the amounts past November 9, 2022.

III.    **The Reconciliation Process and KServicing's Calculation of the Settlement Payment**

A.    **Despite KServicing Engaging in the Reconciliation Process in Good Faith, CB Prematurely and Unilaterally Ended it and Paid an Amount it Knew Was Incorrect**

20.    In connection with the Reconciliation Process, starting on Monday, October 31, 2022, CB and KServicing typically met three times a day for hours at a time. Evans Decl., ¶ 13. Donna Evans acted as the lead person at KServicing responsible for interfacing with CB in connection with the Reconciliation Process and worked closely with her colleague Tamica

Williams, Controller at KServicing, as well as others, to obtain the information necessary to calculate the Settlement Payment. *Id.* at ¶ 12.

21.     During the Reconciliation Process, KServicing worked diligently to gather and send to CB voluminous data sets and lengthy deliverables from a variety of sources, primarily at CB's request, including data sets CB requested from multiple sources, reports generated by AmEx, banking records dating back from loan origination, and extensive loan reports. Williams Decl., ¶¶ 8–9. KServicing cross-referenced data sources and sought information from the SBA and from former KServicing employees who had been involved in accounting for borrower remittances, SBA fees, and the number and amount of cancelled loans. *See* generally Williams Decl. By contrast, CB treated the Reconciliation Process as a one-sided endeavor; it consistently demanded that KServicing provide information, but *not once* during the Reconciliation Process did CB provide KServicing with any copies of its own data or any documentation of the amounts it believed the KServicing Disputed Holdbacks to be. *See* Evans Decl., ¶ 23.

22.     Importantly, CB did inform KServicing by phone on November 7th that CB believed KServicing's preliminary calculation of amounts attributable to cancelled loans of $3,617,304, which KServicing had transmitted to CB on November 4th, was a mistake and too high. Evans Decl., ¶ 15. Specifically, CB stated that it had calculated the cancelled loans amount to be approximately $1.6 million, explaining in substance that the discrepancy resulted from the fact that some of the loans that were listed in KServicing's November 4th spreadsheet were actually in forgiveness or had otherwise been disbursed (and not returned), and therefore they were not cancelled. *Id.* Accordingly, the correct amount to deduct from the Settlement Amount on account of cancelled loans should be approximately $1.6 million, not $3.6 million. *Id.* Ms. Evans followed up with CB by email that day (November 7th) to notify CB that KServicing would

"review the discrepancy in the cancelled loan amounts to confirm CB's figure and provide an updated number," and CB responded the next day that they were "looking forward to that information." *Id.* at ¶ 16.

23.    In addition to knowingly paying less than the correct Settlement Payment amount, CB conducted itself as if the Parties were continuing to reconcile the Disputed KServicing Holdbacks beyond November 9th. On Wednesday November 9th (the Effective Date under the Settlement Agreement), KServicing representatives including Ms. Evans and Deputy General Counsel, Salim Kafiti, spoke by phone with CB's General Counsel, Andrew Sachs. Evans Decl., ¶ 18. On this telephone call, Mr. Sachs stated that because this Court had just issued its Order approving the Settlement Agreement, and CB accordingly had three business days to make payment by the terms of the Settlement Agreement, the Parties would have the weekend to continue the Reconciliation Process together to jointly attempt to agree on the Settlement Payment amount. *Id.* KServicing did not object to Mr. Sachs' statement because it was similarly of the position that the Settlement Agreement did not prevent the Parties from continuing to work in good faith to jointly confirm the correct Settlement Payment after November 9, 2022 in an effort to avoid disputes. *Id.*

24.    That evening, KServicing and CB continued to communicate by email concerning information that had been exchanged; a CB representative emailed stating "that CB would 'provide feedback' on one of KServicing's data files 'by the end of the day tomorrow,' November 10th." Evans Decl., ¶ 19. Thus, both orally and in emails, CB recognized that the Parties could, and would, continue reconciling the amount of the Settlement Payment owed by CB after November 9th to confirm the correct Settlement Payment amount. *Id.* CB sent one more email to KServicing on November 10th asking for certain additional information, which KServicing provided that same

day, but thereafter KServicing did not hear from CB except for when CB reached out to communicate about logistics of making a wire transfer to KServicing. *Id.* at ¶¶ 19–21.

25.    In an effort to further the Reconciliation Process and avoid unnecessary disputes, on November 14th, Ms. Evans emailed CB confirming, based on the most reliable source data—the SBA's data from its web site—that CB's earlier cancelled loan amount of approximately $1.6 million was accurate. Ms. Evans informed CB that the funds due to CB on account of cancelled loans was therefore significantly less than KServicing had initially estimated. *Id.* at ¶ 21. In that same email, Ms. Evans offered to have a call with CB to discuss the updated amount for the cancelled loan population. Evans Decl., ¶ 21.

26.    Despite KServicing having followed up by email with CB on November 14th confirming the correct amount of the cancelled loans, CB simply ignored that confirmation when making its payment. Instead, within an hour CB's counsel forwarded to counsel for KServicing a wire transfer notice of $19,469,355 and admitted that it used KServicing's older $3.6 million figure, which CB knew was wrong and knew that KServicing had since reconciled with data directly from the SBA to the approximately $1.6 million amount CB had previously provided. Evans Decl., ¶ 22. Thereafter, CB and its counsel failed to respond to repeated outreach from KServicing for over 24 hours. *See* Evans Decl., ¶ 22, Ex. 7. These facts confirm that CB was not interested in reaching an accurate Settlement Payment amount, and was not interested in acting in good faith as required by the Settlement Agreement.

27.    The next day, on November 15th, CB initiated a wire transfer of an additional $1,030,328 to KServicing, yielding a total payment of $20,499,683, with CB's counsel noting by email that CB had been mistaken in its accounting of the Settlement Payment. Evans Decl., ¶ 23. The fact that CB itself separately increased the amount of payment underscores that CB believed

the Reconciliation Process had not concluded and was intended to yield the correct number, but CB chose to continue that reconciliation unilaterally, instead of jointly with KServicing. CB's calculation also exposes the fact that CB simply cherry-picked figures out of preliminary data provided by KServicing—which KServicing provided in the spirit of working jointly and in good faith to reach an accurate number—and ignored data that CB knows is correct but which results in CB owing more to KServicing. Indeed, CB's counsel stated that CB knew the data it used to calculate this amount "was incomplete," but that CB "used it to calculate the Settlement Payment" anyway. *See* Evans Decl., Ex. 7. In that same email, counsel for CB transmitted a half-page PDF document listing certain line items it used to calculate its payment. *See id.* Importantly, CB's PDF does not provide detailed information about the calculation or how each line item was derived. Indeed, prior to making its inaccurate and insufficient payment, CB had never shared these calculations with KServicing in any format for review or discussion and therefore never gave the Parties an opportunity to discuss them to avoid a dispute. Regardless, the calculation provided by CB is wrong.

> **B.    KServicing Calculated the Accurate Amount of the Settlement Payment**

28.    The amount of the Settlement Payment did not depend on the Reconciliation Process, but rather on deriving the *correct number*. At all times during the Reconciliation Process, KServicing proceeded in good faith. As set forth in the Williams Declaration, Ms. Williams "worked with the KServicing team to reconcile various data sources related to the cancelled loans and borrower remittance holdback amounts, including trial balance files, remittance reports, source material data maintained by the SBA, wire transfer records, and bank account statements, to determine the proper amount of the Settlement Payment" during the Reconciliation Process, with certain confirmatory work continuing just after that period. *Id.*

29.     As described in the Williams Declaration, KServicing has determined that the correct amount owed by CB to KServicing under the Settlement Agreement is **$23,780,786.63**, and a spreadsheet setting forth that calculation is attached as Exhibit 1 thereto. Williams Decl., ¶ 14, Ex. 1. A summary of KServicing's calculation of the KServicing Disputed Holdback Amounts and resulting Settlement Payment is shown in the below chart:

| | |
|---|---|
| **Total Settlement Amount** | $58,000,000 |
| *LESS* | |
| Disputed KServicing Fee Holdback | ($8,317,023.23) |
| Disputed KServicing Remittance Holdback (Total of A and B below) | ($25,902,190.14) |
| A. Funds on Account of Cancelled Loans | ($1,677,192.00) |
| B.  Funds Collected from Borrowers | ($24,224,998.14) |
| *EQUALS* | |
| **Settlement Payment** | $23,780,786.63 |

30.     The categories within the Disputed KServicing Holdbacks, to be deducted from the $58 million Settlement Amount, correspond with three different buckets of funds KServicing received, from borrowers and the SBA, to be remitted to CB under the terms of the Parties' Agreements, but that KServicing instead held to offset CB's failure to pay the $65.5 million in fees CB owed to KServicing.

31.     ***Bucket one***, the "Disputed KServicing Fee Holdbacks," corresponds with fees KServicing received from the SBA on account of loans issued by CB. Settlement Agreement §

1(C). There is no material dispute as to the "Disputed KServicing Fee Holdback" amount; both CB and KServicing have calculated that number as $8,317,023. Williams Decl., ¶ 15.

32.    **Bucket two** is the funds "held by KServicing on account of cancelled loans" and is the first component of the "Disputed KServicing Remittance Holdback" category. Williams Decl., ¶ 16; Settlement Agreement § 1(E). The cancelled loan remittance amount consists of funds that were disbursed by CB to KServicing for loans that borrowers applied and were approved for, but were either later cancelled and the funds were therefore not disbursed to those borrowers, or where the funds were disbursed to the borrower but then returned to KServicing. Williams Decl., ¶¶ 14, 16. For purposes of the Settlement Payment, "the larger the amount of funds held on account of cancelled loans, the less CB would owe KServicing; conversely, the smaller the amount of funds held on account of cancelled loans, the more CB would owe KServicing under the Settlement Agreement." Williams Decl., ¶ 16.

33.    As described above, Ms. Williams and her colleagues worked to reconcile the cancelled loan amount. Williams Decl., ¶ 18. Specifically, KServicing utilized the most reliable source of information—recent data posted by the SBA on a loan-by-loan basis showing the status of each loan. *Id.* This work involved Ms. Williams and her colleagues looking up each loan KServicing had previously counted as cancelled and "cross referencing the list of loans in the spreadsheet that led to the November 4th approximate $3.6 million figure, using the SBA Loan ID number, with the SBA's source data obtained from the SBA website." *Id.* After doing this detailed analysis, KServicing determined that a number of the loans on the spreadsheet provided by its former CFO to CB had *not* been cancelled, and that the funds due to CB on account of cancelled loans was therefore significantly less than KServicing had initially estimated. *Id.* Through that analysis, Ms. Williams and her colleagues determined that the accurate amount KServicing held

on account of cancelled loans was **$1,677,192.00** – a number entirely consistent with what CB indicated to KServicing on November 7th was the accurate amount of the cancelled loans, and which results in an increase in the Settlement Payment in an amount of **$1,940,112**. *Id.*

34.     ***Bucket three*** is the second of the two components in the "Disputed KServicing Remittance Holdback" category and consists of a certain of funds collected from borrowers. Williams Decl., ¶ 13. Ms. Williams and her team determined, based on a review and cross reference of a number of data sources including actual bank statements, customer payment receipts, and KServicing's finalized cancelled loan list that the amount held on account of Borrower Remittances is **$24,224,998.14.** *Id.* at ¶ 19.

35.     Here, KServicing knew that the Company's former CFO Mr. Eidson had been involved in creating a spreadsheet reflecting preliminary borrower repayment account analysis, which KServicing sent to CB on November 4, 2022, and CB stated they used this file to calculate the corresponding figure included in their settlement payment. *Id.* at ¶ 21. As a result, Ms. Williams and her colleagues worked to determine whether the data in that spreadsheet was up to date. As part of that work, KServicing spoke with Mr. Eidson, and learned that there was a data file that reflected payments already made to CB that were not reflected in the Repayment File sent to CB on November 4, 2022. *Id.* KServicing had previously remitted additional borrower payments to CB, and those payments were therefore no longer due to CB. *Id.* at ¶ 22.

36.     Ms. Williams reviewed the file referenced by Mr. Eidson and all of the bank statements and wire transfer records, and confirmed that KServicing had already paid $1,556,656 to CB in borrower payments not reflected in the data CB used to calculate its payment. *Id.*, Exs. 2, 3, 4. As a result, KServicing removed those amounts from the Borrower Remittance amount to arrive at the correct Settlement Payment; in fact, the exact amount of the difference between CB's

November 15th $25,578,633 figure on account of borrower payments and KServicing's calculation of that amount is the $1,556,656 KServicing already remitted to CB. *Id.* ¶ 24. Significantly, in reviewing Mr. Eidson's email, KServicing confirmed that Mr. Eidson sent this file to CB in October 2020 (at the same time KServicing paid CB these amounts). *Id.* at ¶ 22. Thus, CB had, but nonetheless ignored, information that amounts it included in its payment calculation had already been paid by KServicing. CB instead chose to use what it knew was outdated information, resulting in CB short-paying KServicing by over $1.5 million. Williams Decl., ¶¶ 22–23.

37.     Along with the other elements of KServicing's calculation of the Borrower Remittance amounts, "KServicing's calculation of $24,224,998 in Borrower Remittance due to CB is $1,340,991 less than CB's calculation of $25,565,989 for that category, with the majority of the net difference due to payments the Company already remitted to CB and are therefore no longer owed by KServicing." Williams Decl., ¶ 26; Ex. 1.

38.     In total, the Settlement Payment KServicing calculated through the labor-intensive and detailed work completed by Ms. Williams and her team is $23,780,786.63, which is $3,281,103 more than what CB paid to KServicing on November 15th.

## **RELIEF REQUESTED**

39.     By this Motion, the Debtors request the entry of an order, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, pursuant to section 105(a) of the Bankruptcy Code, (i) enforcing the Settlement Order and Settlement Agreement against CB and ordering CB to pay the Unpaid Amount to the Debtors not later than five (5) business days following entry of the Proposed Order, and (ii) preserving the Debtors' rights to seek sanctions, including attorneys' fees, for CB's intentional failure to comply with the Settlement Order and Settlement Agreement.

## BASIS FOR RELIEF REQUESTED

**I.**    **The Court Should Compel Payment of the Balance of the Correct Settlement Payment Amount by Enforcing the Settlement Order and Finding that CB Breached the Settlement Agreement**

40.    It is well settled that bankruptcy courts have jurisdiction to interpret and enforce their own orders,[5] and that Bankruptcy Code Section 105(a) allows bankruptcy courts to issue any order necessary to carry out the provisions of the Bankruptcy Code, including to enforce their previously entered orders.[6]

41.    It is also well settled that a court may enforce a settlement agreement entered into by parties in a proceeding pending before it.[7] Indeed, the obligation of parties to perform under a valid settlement agreement is a bedrock principle of law.[8] In this regard, both the Settlement Order and the Settlement Agreement explicitly provide that the Court will retain jurisdiction with respect to all matters arising with respect to the Settlement Order and the Settlement Agreement, including the enforcement thereof.[9]

---

[5] *In re Allegheny Health, Education and Research Foundation*, 383 F.3d 169, 175-76 (3d Cir. 2004) (holding that a bankruptcy court had jurisdiction to interpret and give effect to its previous sale order); *In re Worldcorp., Inc*., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (enforcing order and settlement agreement); *see In re Texaco, Inc*., 182 B.R. 937, 944 (Bankr. S.D.N.Y. 1995) (recognizing that "it is essential for a bankruptcy court to have jurisdiction to adjudicate controversies respecting, and to enforce, its own orders").

[6] *In re Marcus Hook Development Park, Inc*., 943 F.2d 261, 266 (3d Cir. 1991) (noting that Bankruptcy Code Section 105 "gives the bankruptcy court the power and the jurisdiction to enforce its valid orders.") (quoting *In re Radco Merchandising Services, Inc*., 111 B.R. 684, 688-89 (N.D. Ill. 1990)).

[7] *See Hobbs & Co. v. Am. Investors Mgmt., Inc*., 576 F.2d 29, 33 n.7 (3d Cir. 1978); *see Fox v. Consolidated Rail Corp*., 739 F.2d 929, 932 (3d Cir. 1984) ("It is well settled that a federal court has the inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein."); *Rosso v. Foodsales, Inc*., 500 F. Supp. 274, 276 (E.D. Pa. 1980) (noting that it was "well settled that a district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it.").

[8] *Good v. Pennsylvania Railroad Co*., 384 F.2d 989, 990 (3d Cir. 1967) ("The obligation to remain bound by a valid agreement of settlement duly entered into by counsel with the authority of his client is one which pervades the law.").

[9] Settlement Order at 3, ¶ 7; Settlement Agreement at 10, § 21.

42.     Where, as here, a party refuses to perform under a valid settlement agreement, the appropriate remedy is for the Court to enforce the agreement by its terms.[10] Importantly, the Court may compel the payment of amounts owed under a previously approved settlement agreement by way of a contested matter, rather than an adversary proceeding.[11] Indeed, this Court stated during the November 29, 2022 Status Conference regarding this matter that if the Parties agreed to resolve this matter through motion practice rather than through an adversary proceeding, they may do so, and both Parties agreed to those procedures. *See* Tr. of Status Conference, dated November 29, 2022, at 7:25-8:21. Thus, the relief requested by this Motion is procedurally proper.

43.     CB's refusal to remit the balance of the Settlement Payment is also a breach of the terms of the Settlement Agreement. The Settlement Agreement provides that it shall be "enforced and governed by and under the laws of the State of Pennsylvania." Settlement Agreement, § 20. Under Pennsylvania law, a claim for breach of a contract requires three elements: (1) the existence of a contract, including its material terms; (2) breach of a duty imposed by the contract; and (3) resultant damages. *Gladstone Tech., Partners, LLC v. Dahl*, 222 F. Supp. 3d 432, 440 (E.D. Pa. 2016). All three elements are satisfied. The Settlement Agreement is a valid contract that includes material terms, CB has an unambiguous duty to pay KServicing the Settlement Payment and it breached its duty by failing to do so, and KServicing has been damaged in the amount of $3,281,103.

---

[10] *Pugh v. Super Fresh Food Markets, Inc.*, 640 F. Supp. 1306, 1307-08 (E.D. Pa. 1986) (enforcing settlement agreement according to terms).

[11] *In re Worldcorp*, 252 B.R. at 895 ("While it is true as a general proposition that a claim to recover money or property or to obtain an injunction or other equitable relief must be brought as an adversary proceeding, that general rule is not applicable to this case. In this case, the Debtors are merely seeking to enforce an order already in place. The case was originally brought by the Debtors as an adversary proceeding. The adversary proceeding was resolved by a Settlement Agreement pursuant to which we issued the order the Debtors now seek to enforce. Thus, we conclude that an adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained.").

## **NO PRIOR REQUEST**

44.     No prior request for the relief requested herein has been made to this or any other court.

## **NOTICE**

45.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis; (c) the Reserve Bank; (d) Customers Bank; (e) Cross River Bank; (f) the United States Department of Justice; (g) the Federal Trade Commission; (h) the Small Business Administration; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the United States Attorney's Office for the District of Delaware; and (l) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). In light of the nature of the relief requested, Debtors submit that no further notice is required or needed under the circumstances.

*[Remainder of page intentionally left blank]*

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: December 7, 2022
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　/s/ Matthew P. Milana
　　　　　　　　　　　　　　RICHARDS, LAYTON & FINGER, P.A.
　　　　　　　　　　　　　　Daniel J. DeFranceschi, Esq. (No. 2732)
　　　　　　　　　　　　　　Amanda R. Steele, Esq. (No. 5530)
　　　　　　　　　　　　　　Zachary I. Shapiro, Esq. (No. 5103)
　　　　　　　　　　　　　　Matthew P. Milana, Esq. (No. 6681)
　　　　　　　　　　　　　　One Rodney Square
　　　　　　　　　　　　　　920 North King Street
　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　Telephone: (302) 651-7700
　　　　　　　　　　　　　　E-mail: defranceschi@rlf.com
　　　　　　　　　　　　　　　　　　steele@rlf.com
　　　　　　　　　　　　　　　　　　shapiro@rlf.com
　　　　　　　　　　　　　　　　　　milana@rlf.com

　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　Ray C. Schrock, P.C. (admitted *pro hac vice*)
　　　　　　　　　　　　　　Candace M. Arthur, Esq. (admitted *pro hac vice*)
　　　　　　　　　　　　　　Theodore E. Tsekerides (admitted *pro hac vice*)
　　　　　　　　　　　　　　Richard W. Slack (admitted *pro hac vice*)
　　　　　　　　　　　　　　Natasha S. Hwangpo, Esq. (admitted *pro hac vice*)
　　　　　　　　　　　　　　Chase A. Bentley, Esq. (admitted *pro hac vice*)
　　　　　　　　　　　　　　767 Fifth Avenue
　　　　　　　　　　　　　　New York, New York 10153
　　　　　　　　　　　　　　Telephone:　　(212) 310-8000
　　　　　　　　　　　　　　E-mail:　　　ray.schrock@weil.com
　　　　　　　　　　　　　　　　　　　　candace.arthur@weil.com
　　　　　　　　　　　　　　　　　　　　natasha.hwangpo@weil.com
　　　　　　　　　　　　　　　　　　　　chase.bentley@weil.com

　　　　　　　　　　　　　　*Attorneys for Debtors and Debtors in Possession*