**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>**KABBAGE, INC. d/b/a KSERVICING,** *et al.*,<br><br>Debtors.[1] | ) <br>) Chapter 11 <br>) <br>) Case No. 22-10951 (CTG) <br>) <br>) (Jointly Administered) <br>) <br>) Re: Docket No. 336 <br>) <br>) <br>) |

**DEBTORS' OBJECTION TO MOTION OF CUSTOMERS BANK FOR
ENTRY OF AN ORDER (I) COMPELLING COMPLIANCE WITH COURT
APPROVED SETTLEMENT AGREEMENT AND ORDER; (II) REQUIRING
ADDITIONAL ADEQUATE PROTECTION IN FAVOR OF CUSTOMERS BANK;
AND (III) GRANTING RELATED RELIEF**

Kabbage, Inc. d/b/a KServicing ("**KServicing**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby submit this objection (the "**Debtors' Objection**") to *Motion of Customers Bank for Entry of an Order (I) Compelling Compliance With Court Approved Settlement Agreement and Order; (II) Requiring Additional Adequate Protection In Favor of Customers Bank; and (III) Granting Related Relief* (the "**Motion to Compel**") [Docket No. 336].[2] Contemporaneously herewith, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] In support of its Motion to Compel, on December 7, 2022, CB also filed the *Declaration of Alyssa White in Support of Motion of Customers Bank for Entry of an Order (I) Compelling Compliance with Court Approved Settlement Agreement and Order; (II) Requiring Additional Adequate Protection in Favor of Customers Bank; and (III) Granting Related Relief* ("**White Declaration**") [Docket No. 337].

Debtors submit the declaration of Tamica M. Williams (the "**Williams Objection Declaration**") and respectfully state as follows in support of the Debtors' Objection:

### PRELIMINARY STATEMENT[3]

1. The Motion to Compel seeks excessive relief based on isolated circumstances. On its face, the Motion to Compel asserts that the Settlement Agreement approved by the Court requires all borrower remittances received by KServicing on account of loans in the Customers Bank ("**CB**") PPP portfolio that are placed in a separate account for the benefit of CB must be remitted to CB without regard to the Debtors' loan servicing obligations, the historical course of dealings between the Parties in connection with treatment of such amounts, the SBA's regulatory guidance concerning the PPP initiative, or other relevant orders of this Court. Specifically, CB contends that KServicing's payment of approximately $925,243 to the SBA for CB PPP Loans purchased by the SBA pursuant to its guaranty purchase obligations (the "**SBA Payment**") violated the Settlement Agreement. The Motion to Compel also contends that, notwithstanding the fact that the SBA Payment was indisputably owed to the SBA, such amounts should have been remitted to CB because the Debtors already accounted for it during the reconciliation commenced pursuant to the Settlement Agreement – essentially that the Debtors double-counted the $925,243.

2. The Motion to Compel should be overruled. First, the Debtors have already addressed the inadvertent double-counting of the SBA Payment for the month of October 2022 and remitted the full amount to CB on December 14th. Thus, the primary issue raised by CB is resolved and the related relief requested moot. Second, it is undisputed that the SBA Payment was due to the SBA and CB has not provided the Debtors with any indemnification protections or

---

[3] Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final judgment or order with respect to the Motion to Compel if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the Debtors.

releases in exchange for demanding the Debtors cease performing certain of their core PPP servicing functions. Third, the extensive adequate protection requested is neither justified nor warranted.

3. The Motion to Compel is both unnecessary and tactical. It is designed to have an affirmative motion in front of the Court at the same time as the Debtors' Motion to Enforce[4] to require CB to pay the full amount of the Settlement Payment. Had CB simply raised the issue of the double-counting of the SBA Payment and attempted to work cooperatively with KServicing, that issue would have been completely resolved without the need for a motion. Just as CB failed to work with KServicing to determine the proper amount of the Settlement Payment as detailed in KServicing's Motion to Enforce, CB rushed to court instead of making any effort to confer with KServicing to avoid this dispute. CB's contention that KServicing has, since CB notified KServicing of the deficiency in KServicing's October Borrower Remittance Payment, "refused to pay Customers Bank the approximately $1 million difference between the actual borrower remittances deposited into the Trust Account and the amount actually paid by the Debtor to Customers Bank," is wrong. *See* Mot. to Compel, at pp. 3. KServicing corrected this error through its payment to CB on December 14th once CB provided KServicing with sufficient information to identify it and do so.

4. CB's Motion to Compel also argues that the Settlement Agreement prohibits KServicing from continuing to make payments due and owing to the SBA. This position is wholly contrary to the practice of the Parties and this Court's *Final Order Authorizing Debtors to (I)*

---

[4] The "**Motion to Enforce**" means the *Motion of Debtors for Entry of an Order Enforcing the Settlement Order and the Settlement Agreement Between KServicing and Customers Bank*, (Dec. 7, 2022) [Docket No. 340]; the "**Williams Declaration**" means the *Declaration of Tamica Williams in Support of Motion of Debtors for Entry of an Order Enforcing the Settlement Order and the Settlement Agreement Between KServicing and Customers Bank*, (Dec. 7, 2022) [Docket No. 341].

*Continue Servicing and Subservicing Activities and (II) Perform Related Obligations* [Docket No. 140] (the "**Loan Servicing Final Order**"). The amounts KServicing paid to the SBA were actually owed to the SBA. KServicing thus paid to the SBA funds that were undoubtedly due to the SBA, and not to CB, during the month of October on account of payments KServicing received from borrowers whose loans had been guaranty purchased by the SBA,[5] meaning the SBA owned the loans and the right to any payment thereon. Moreover, CB has not set forth any basis for how they were harmed by these payments given the SBA was owed these amounts (CB would have had to pay them anyway).

5.   In any event, if CB is now requesting that it, rather than KServicing, should make required payments to the SBA and borrowers from the monthly borrower remittances KServicing receives (notwithstanding regulatory guidance and a Court order which suggests otherwise), KServicing has no objection to CB doing so, *provided that* CB provides an indemnity to KServicing for any possible resulting liability from the SBA and borrowers. To be clear, KServicing does not contend that the money owed to the SBA or to borrowers is property of KServicing and it is prepared, with appropriate protections much like in an interpleader, to send the remittance in the future to CB as either directed by the Court or agreed to by the SBA (on its behalf and on behalf of PPP borrowers) and CB. Given the Loan Servicing Final Order and regulatory guidance, which expressly contemplate that payment will be made to the SBA and borrowers, as applicable, the Debtors should not be obligated to remit funds to CB but then be exposed to potential liability for doing so to the SBA or borrowers.

---

[5] In the event a PPP Loan was not eligible for forgiveness pursuant to the SBA guidelines, the SBA nevertheless guaranteed its purchase of 100% of the PPP Loan from the originating lender upon application of the lender. Such purchase of a loan by the SBA is defined as a "**Guaranty Purchase**."

6.      Finally, CB is not entitled to the laundry list of extensive additional "adequate protection" sought in its Motion to Compel. The Settlement Agreement itself sets forth the bargained for adequate protections agreed to by the Parties. It then specifically states that CB is not permitted to challenge such protections as inadequate. In other words, while CB can enforce any existing protections in the Settlement Agreement, it cannot contractually seek any additional protections. Moreover, even if such additional protections were not contractually barred, the facts here show that they are unnecessary and inappropriate in any event.

## RELEVANT BACKGROUND

I. **The Parties' Relationship Prior to Settlement Agreement and Entering into the Settlement Agreement**

7.      Relevant to the dispute raised in CB's Motion to Compel, the original underlying disputes between CB and KServicing involved the Parties' obligations related to their respective participation in the SBA's PPP initiative. CB owed KServicing approximately $65.5 million in fees under KServicing's agreements to service PPP loans issued by CB, which fees were due at loan origination, and which CB failed to pay for years (the "**CB Receivable**"). In response to CB's refusal to pay KServicing the CB Receivable, KServicing retained funds as part of its servicing that would otherwise be due to CB under the Parties' Agreements—just over $34 million up to the Petition Date. The Parties resolved this dispute, among others, when they entered into the Settlement Agreement on October 27, 2022.

8.      The Settlement Agreement not only required CB make the cash Settlement Payment to KServicing, but also contained other terms the Parties' agreed would govern their business relationship going forward, including the Parties' agreements with respect to loan servicing obligations under applicable contracts, and KServicing's agreement—in light of receiving the Settlement Payment—to remit to CB borrower payments due to CB instead of holding back

amounts as KServicing had done prior to the settlement as a result of CB's failure to pay KServicing its fees.

9. In essence, the Settlement Agreement was intended as a true-up and reset mechanism: as a result, CB was to finally and immediately pay KServicing approximately 90% of what it owed, and KServicing would begin remitting to CB, on a monthly basis, amounts KServicing collected from borrowers each month post-petition that were due to CB ("**Monthly Borrower Remittance Payments**").

II. **The Settlement Agreement Contains Provisions That Undermine the Motion**

10. The Settlement Payment calculation in the Settlement Agreement required the deduction of the "Disputed KServicing Holdbacks" from the $58 million "Settlement Amount" to yield the Settlement Payment. Settlement Agreement §§ 1(G), 1(H). These Disputed KServicing Holdbacks are defined in the Settlement Agreement to comprise two separate types of holdbacks, one of which, "Disputed KServicing Remittance Holdback," included funds "collected from borrowers that KServicing is required to remit to CB." Settlement Agreement § 1(E). But that amount, to be deducted from the Settlement Amount to reach the Settlement Payment, *excludes* "Borrower Overpayments" or, as CB describes it, "amounts collected from a borrower on account of a Customers Bank PPP Loan payable by KServicing to the SBA, or in appropriate circumstances, due to a borrower." Settlement Agreement §§ 1(A), 1(E); Mot. to Compel, ¶ 13; Williams Objection Decl., ¶¶ 6, 7. These funds were left behind by CB with KServicing in the Settlement Payment calculation in order for KServicing to make payments to the SBA and to borrowers, where applicable. The Settlement Agreement thus contemplates that KServicing make precisely the payments to the SBA that CB challenges.

11. A key component of the Parties' agreement to settle their disputes involved KServicing's agreement to "continue as loan servicer for the Remaining Loan Population" as

detailed in Section 4 of the Settlement Agreement (the "**Servicing Plan**") and Exhibit A thereto (the "**Servicing Plan Reports**") for a specified period of time. Settlement Agreement § 4, Ex. A. Indeed, as part of the agreed-upon Servicing Plan and in order to avoid disputes and maintain a productive business relationship going forward, the Parties agreed "to hold weekly meetings, as needed or reasonably requested by either Party…to review matters relating to the Remaining Loan Population," those CB PPP loans that remain outstanding and are serviced by KServicing. *Id.*, at § 4(D). CB agreed to "accept[] the Servicing Plan," and agreed that "CB shall not challenge the Servicing Plan or the sufficiency of the Servicing Information provided by KServicing in support thereof." *Id.*, at § 4(F). CB's Motion to Compel violates these provisions. While CB can seek to enforce the agreement, it cannot seek more protections than the Parties bargained for under the Settlement Agreement.

### III. Both Parties Understood That Amounts KServicing Was to Remit to SBA Were Not Payable to CB

12. Neither Party contemplated that CB would collect and distribute Borrower Overpayments. In the Settlement Agreement and consistent with the Court's Loan Servicing Final Order, the Parties understood *KServicing*, and not CB, would, on account of "**Borrower Overpayments**" (i) pay to the SBA, and not to CB, those amounts due to the SBA on account of payments made by borrowers on loans issued by CB where those loans had since been guaranty purchased by the SBA ("thus resulting in such collected amounts being payable by KServicing to the SBA," not CB), (ii) refund by paying directly to borrowers payments a borrower made on a loan that is forgiven by the SBA, "thus resulting in such collected amounts being payable by KServicing to the applicable borrower," not CB, and (iii) remit to either the SBA or borrower, depending on the circumstances, and not to CB, "any other overpayments received by KServicing from any source" that were due to the SBA or a borrower. *See* Settlement Agreement, § 1(A). This

provision of the Settlement Agreement is consistent with the relief granted in the Loan Servicing Final Order, paragraph 5. Accordingly, such amounts were and are to be deducted from any payments owed to CB.

### IV. CB Failed to Confer with KServicing in Good Faith Concerning KServicing's Borrower Remittance Payments Post-Settlement

13. As contemplated in the Settlement Agreement, KServicing prepared during the month of October to pay CB funds KServicing had received from borrowers that month (but after the Petition Date) that were due and payable to CB. Then, on November 18, 2022, KServicing sent to CB via SFTP the October (post-petition) Borrower Remittance Report and wired $376,326.59 to CB. *See* Williams Objection Decl., ¶ 13. KServicing's payment on November 18th was comprised of amounts KServicing had collected from borrowers on account of CB PPP loans during that time and owed to CB under the terms of the Parties' prior agreements, but did not include funds collected from borrowers due instead to the SBA, including with respect to Borrower Overpayments, which KServicing paid to the SBA on a loan-by-loan basis during the month of October. *Id.*

14. KServicing, however, made an error in calculating this payment, which it has since corrected. Notably, given the long-standing dispute between the Parties giving rise to the Settlement Agreement, this was the first time KServicing had paid borrower remittance amounts to CB since the Parties entered into the Settlement Agreement. *See* Williams Objection Decl., ¶ 11. When KServicing made this October Remittance Payment to CB, it did so in a good faith effort to remit to CB all amounts collected from borrowers and due to CB on a monthly basis. KServicing, however, mistakenly omitted from its October Remittance Payment the SBA Payment because those funds had already been accounted for in the Parties' Settlement Payment calculations. In other words, the funds were left behind by CB as part of the Settlement Agreement

for KServicing to pay the SBA and therefore should not have been deducted again from the post-Settlement Borrower Remittance Payment for October. *See* Williams Objection Decl., ¶ 19.[6]

15. Between November 18th and November 28th, CB said nothing to KServicing regarding KServicing's October Remittance Payment. But on November 28, 2022, *only after* KServicing submitted its November 25th letter to the Court describing the Parties' dispute as to CB's failure to pay the correct Settlement Payment amount, CB decided to notify KServicing of its belief that KServicing's October Remittance Payment was insufficient. Even these communications did not explain or identify the double-counting issue.

16. On November 28th, CB's Alyssa White sent KServicing representatives, including Ms. Williams, an email confirming CB's receipt of KServicing's October Remittance Report and wire for $376,326.59, and stating that "it appears SBA payments were netted out," and that given KServicing's October Synovus bank statement showed $1,551,275.91 in deposits, the remainder was "not accounted for." *See* White Decl., Ex. B. The email contains no specifics or any detail and appears designed as part of CB's litigation tactics. Indeed, only a few hours after sending the email, CB filed a letter with the Court, which focused primarily on the Parties' dispute regarding the Settlement Payment amount, but stated that KServicing's November 18th October Remittance Payment of $376,326.59 to CB was short by over $1 million. *See* Docket No. 289.

17. Like the email, CB's letter to the Court did not specify the exact amount of or reason for the shortfall, despite KServicing having made the payment and submitted the applicable Servicing Plan Reports **ten days** prior. *See* Docket No. 289; Williams Objection Decl., ¶ 15. CB also stated in its letter that "KServicing has failed to provide any reason for this shortfall," but

---

[6] For the avoidance of doubt, the issues raised in this motion do not impact the Settlement Payment calculation in KServicing's Motion to Enforce and the Williams Declaration accompanying that motion, nor does CB's Motion to Compel allege that they do. *See* Docket Nos. 340, 341. The error described herein occurred due to a mistaken double-count of amounts due to the SBA post-settlement that were already accounted for in that calculation.

omitted the fact that CB had only alerted KServicing to the issue that very same day, allowing no chance for KServicing to discuss the issue with CB, let alone review its records to determine the presence and extent of any shortfall. *Id.* Following CB's general description of complaints in the letter, CB stated it would be seeking relief from KServicing in court "by way of prompt motion," including payment of the remaining October remittances, an accounting, and adequate protection. *See* Docket. No. 289, at 5. It is therefore obvious that CB was looking to rush to Court, likely to deflect from its failure to make the full Settlement Payment.

18. After making no attempt to meet and confer on the issue, on December 7, 2022 CB filed its Motion to Compel. In sum, rather than attempting to resolve the matters at issue in CB's Motion to Compel consensually, CB chose to raise them in a litigation posture.

### V. KServicing Omits the SBA Payment from its October Remittance Payment, but Promptly Corrects the Issue

19. KServicing has always sought to calculate and remit the correct amount of the Monthly Borrower Remittance Payments and continues to be open to reconcile any discrepancies cooperatively with CB. Although CB never attempted to meet and confer with respect to the underlying issues in its Motion to Compel, as soon as KServicing was alerted to CB's issue, it worked to determine whether KServicing had correctly calculated that payment. Within a week, KServicing determined that it had not remitted the correct amount and sought to promptly rectify the situation.

20. KServicing had paid the SBA a total of $925,242.87 (the SBA Payment) throughout the month of October (post-petition), made up of borrower payments made on loans that had been guaranty purchased by the SBA, meaning those loans were owned by, and borrower payments thus due to, the SBA instead of CB. Williams Objection Decl., ¶ 18. KServicing had deducted this amount from its October Borrower Remittance Payment (yielding the $376,326.59 paid on

November 18th), but determined that KServicing had already accounted for these funds when it calculated the $1,071,094 Borrower Overpayments amount included Settlement Payment amount. *Id.*[7] In essence, the $1,071,094 Borrower Overpayment amount acted as a credit to CB, leaving behind with KServicing those funds in order to make payments that were due to the SBA as of the Petition Date, but that KServicing had not yet paid to the SBA. As a result, the full amount of the SBA Payment was already properly encompassed within the calculation of the Settlement Payment—meaning the total October Borrower Remittance Payment to CB for post-petition October should have been $1,302,569.46. *Id.*

21. To be clear, the treatment of the SBA Payment was not a matter of failing to accurately calculate the amounts owed to the SBA—KServicing properly accounted for borrower remittances and paid the proper amount due to the SBA based on borrower payments on guaranty-purchased loans during the month of October—but rather, the issue related to the timing of accounting for payments due to the SBA. KServicing simply erred when it attributed those payments during October, when they were actually made, rather than as payments that were due (but not yet paid) as of the Petition Date and already properly credited to KServicing as Borrower Overpayments in the Settlement Payment calculation.

22. To rectify this error, on December 14th, KServicing paid CB $1,026,516.58, which included the $925,242.87 KServicing mistakenly omitted from its October Borrower Remittance Payment. Williams Objection Decl., ¶ 20. As a result of the December 14th payment, the October and November Borrower Remittance Payments are now complete and accurate.

---

[7] *See* Williams Declaration [Docket No. 341], at 8 (table); *id*. at Exhibit 1.

**ARGUMENT**

I. **KServicing Has Paid CB The Full Borrower Remittance Payments Due to CB for October and November 2022**

23.  As set forth above, as soon as CB provided KServicing with information regarding the possibility that KServicing's October Borrower Remittance Payment was short because of the double-counting issue, KServicing undertook to determine if it had made an error. As described in the Williams Objection Declaration and above, KServicing diligently worked out that the SBA Payment made in October (and therefore deducted from its initial October Borrower Remittance Payment to CB) was already encompassed within the credit properly taken as part of the Settlement Payment calculation. Williams Objection Decl., ¶ 19. KServicing corrected this error by paying CB $925,242.87 on December 14th, along with its payment for the month of November.

II. **KServicing's Payments to the SBA Were Proper**

24.    While KServicing determined that the SBA Payment should have been paid to CB (as described above), the reason that such payment was necessary was not that the funds were improperly paid to the SBA. The payments to the SBA were entirely proper. As described above and in the Williams Objection Declaration, KServicing paid to the SBA funds that are concededly owed to the SBA. Indeed, the payments to the SBA during the month of October were on account of payments KServicing received from borrowers whose loans had been guaranty purchased by the SBA—therefore, CB is no longer the holder of the loan note and is not entitled to payments on the loan collected by KServicing from borrowers.

25.    Furthermore, the Settlement Agreement itself states that with respect to Borrower Overpayments on account of loans guaranty purchased by the SBA included in the Settlement Payment Calculation, the SBA's purchase results in those amounts "being payable by KServicing to the SBA." Settlement Agreement § 1(A). The Settlement Payment calculation as set forth in the

Settlement Agreement explicitly carved out these Borrower Overpayments from the amounts to be deducted from the Settlement Amount to reach the Settlement Payment, meaning the Parties intended this money be left behind with KServicing such that KServicing would remit the funds to the SBA itself. Thus, the Parties explicitly contemplated KServicing making these payments. The Motion to Compel does not raise any dispute as to whether such payments are due to the SBA, and a practice requiring that KServicing first pay those funds to CB so that CB could then remit them to the SBA would not only be contrary to the terms of the Settlement Agreement, but also to the Debtors' historical practices and the Loan Servicing Final Order (which CB did not object to). *See* Loan Servicing Final Order [Docket No. 140], at ¶ 5.

26.    On the Petition Date, the Debtors filed their Loan Servicing Motion,[8] seeking authority from the Court to continue various loan servicing activities, which the Court granted in its Loan Servicing Final Order. In the Loan Servicing Motion, the Debtors described that borrowers make payments to the company that may be "(a) in excess of the required minimum loan payments… ('**Regular Overpayments**'), (b) on account of PPP Loans that are ultimately forgiven by the SBA ('**Forgiveness Overpayments**'), and (c) on account of PPP Loans that the SBA has already granted Guaranty Purchase ('**Guaranty Overpayments**')," "**Borrower Overpayments**." Loan Servicing Mot., ¶ 41. Regarding these Borrower Overpayments, KServicing described that it, "in the ordinary course of business," (a) remits both "Regular Overpayments and Forgiveness Overpayments to borrowers" (b) "may adjust regular remittances to" Partner Banks, including CB, on account of borrower refunds and payments to the SBA, and "(c) remits Guaranty Overpayments to the SBA" (the "**Overpayment Procedures**"). *Id.* at ¶ 43

---

[8] *Motion of Debtors For Interim and Final Orders Authorizing the Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations*, October 3, 2022 ("**Loan Servicing Motion**") [Docket No. 11].

The Loan Servicing Final Order authorized the Debtors to continue engaging in these activities. [Docket No. 140], at ¶ 5. Thus, the practices authorized by the Court and not objected to by CB permit and authorize KServicing to pay the SBA and borrowers as a matter of standard servicing practices.

27. In addition, the SBA's guidance concerning its PPP initiative makes it clear that any borrower payments collected on account of loans the SBA has guaranty purchased must be remitted to the SBA as owner of the loan. The SBA Form of Assignment,[9] which CB would have been required to sign on account of each guaranty purchase of a loan by the SBA, constitutes an assignment by CB to the SBA of all right, title and interest to and under the PPP Loan and provides that if an "Assignor receives any payment or any value of any kind with respect to the Loan or obligations secured or evidenced thereby, Assignor shall hold the same in trust for Assignee [the SBA] and shall immediately deliver the guaranteed share to Assignee [the SBA]." *Id.* SBA Procedural Notice No. 5000-835955, dated October 5, 2022 reiterates the obligation to turn over any post-guaranty purchase loan payments to the SBA: "If the Lender receives any post-guaranty purchase payments from the borrower, the Lender must send the full payments to SBA via Pay.Gov."[10] Put simply, after a PPP loan is guaranty purchased by the SBA, the SBA owns that loan (not CB) and is therefore entitled to any payments made on that loan.

28. Here, KServicing's role as servicer for CB PPP loans involves KServicing's receipt of payments from borrowers (where CB would have received these payments had it not contracted with KServicing to do so), including where the SBA had guaranty purchased the loan. In

---

[9] SBA Form of Assignment, Effective October 5, 2022, available at https://www.sba.gov/sites/default/files/2020-02/Assignment%20Revised%2002-22-20.pdf (last accessed Dec. 17, 2022).

[10] SBA Procedural Notice No. 5000-835955, dated October 5, 2022, available at https://cdn.ymaws.com/www.naggl.org/resource/resmgr/policynotices_2022/SBA_Procedural_Notice_5000-8.pdf (last accessed Dec. 17, 2022).

accordance with KServicing's role, the Parties' contemplated in the Settlement Agreement, and the Court authorized in the Loan Servicing Final Order, that KServicing would remit payments on guaranty purchased loans directly to the SBA. The SBA's guidance further supports that these funds must be paid to the SBA. As a result, CB's contention that the Settlement Agreement dictates that "Borrower Remittances are received, held in trust for Customers Bank pending month end, and then paid to, and only to, Customers Bank" is wrong. *See* Mot. to Compel, at 2. The Settlement Agreement simply provides that money actually due to CB after proper payments to the SBA and borrowers be held in trust and paid to CB, and the Settlement Agreement should be interpreted consistent with the Court's Loan Servicing Final Order.

29.  Nevertheless, if it is CB's contention that CB as lender, rather than KServicing as servicer, should remit both (i) to the SBA any and all borrower payments made on SBA guaranty-purchased loans going forward, and (ii) to the borrower any refunds for borrower overpayments and payments made on account of loans that are forgiven, KServicing is amenable to changing common practice, provided however, that CB provides KServicing with an indemnity in case the SBA takes the position, consistent with past practice, that KServicing must make the payments to the SBA. Specifically, CB should be required to (i) obtain confirmation from the SBA in writing that SBA will not hold KServicing responsible for any underpayments made by CB to the SBA, and (ii) provide KServicing with an indemnity. Given regulatory guidance and past practice on all of KServicing's PPP loan portfolios, KServicing is not willing to pay to CB amounts due and owing to the SBA and borrowers without these protections, and potentially expose itself to liability from the SBA and borrowers.

### III. CB Is Not Entitled To Additional Adequate Protection Measures

30.  CB's requested adequate protection measures, including requiring that KServicing (i) "cause Synovus Bank to add Customers Bank as an authorized user of, and owner of, the Trust

Account," (ii) "cause Synovus Bank to provide Customers Bank with unrestricted online access to the Trust Account," and (iii) prohibit KServicing "from authorizing disbursements, withdrawals (debits) or transfers from the Trust Account other than to Customers Bank without the express, written instruction of Customers Bank's authorized representatives," are neither appropriate under the Settlement Agreement nor otherwise warranted. *See* Motion to Compel, ¶ 39.

31. Not only is it unclear exactly what CB is seeking, but providing CB with access and control over a KServicing bank account could lead to a situation where KServicing is liable for what occurs in the account, but has no control over the account's maintenance. If KServicing is required to seek express written approval from CB for every debit or transfer in the account, KServicing may be in danger (should CB not agree to the measures discussed in Section II above) of being held liable by the SBA and borrowers for delays or inaccuracies in payments due to those third parties.

32. Furthermore, the Settlement Agreement precludes the relief sought here. At the time the Parties settled their ongoing disputes on October 27, 2022, CB contended that KServicing had committed various errors, omissions, and failures in its servicing of the CB loans under the Parties' prior agreements. Settlement Agreement, pp. 2-3 (A)–(I). As a result, and to guide the Parties' going-forward relationship, the Settlement Agreement contains an agreed-upon "Servicing Plan." CB agreed to "accept[] the Servicing Plan," and agreed that "CB shall not challenge the Servicing Plan or the sufficiency of the Servicing Information provided by KServicing in support thereof." *Id.*, at § 4(F). Thus, CB agreed in the Settlement Agreement not to challenge the provision for specific documents and data KServicing is to deliver to CB on an ongoing basis contained in the Servicing Plan. The Servicing Plan does not, however, provide for CB to have full access to and control of KServicing's CB trust account; CB should have bargained for that right in the

Settlement Agreement if CB believed it necessary, but did not. While CB can certainly enforce the terms of the Servicing Plan set forth in the Settlement Agreement, it is expressly precluded from seeking any additional protections.

33. Even if the relief sought was not precluded, it is not otherwise warranted here. Adequate protection measures are "designed to protect secured creditors against diminution in value of their collateral[.]" *Del. Trust Co. v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.)*, 546 B.R. 566, 581 (Bankr. D. Del. 2016). The term "adequate protection" is not defined in the Bankruptcy Code, but Section 361 provides three examples of what constitutes adequate protection: (1) "the making of periodic cash payments to the creditor;" (2) "sufficient equity in the property for the creditor to cover fully on foreclosure the entire balance due on the debt;" and (3) "the debtor provid[ing] the creditor with such relief as will result in the 'indubitable equivalent' of the creditor's interest in the property." *In re Adams*, 27 B.R. 582, 584 (Bankr. D. Del. 1983). The third example is often referred to as a "catch-all," "a flexible concept which requires a Court to make decisions [on whether adequate protection is warranted] on a case-by-case basis, after full consideration of the peculiar characteristics common to each proceeding." *In re Monroe Park*, 17 B.R. 934, 940 (Bankr. D. Del. 1982). Courts should consider "the nature of the creditor's interest in the property, the potential harm to the creditor as a result of the property's decline in value and the method of protection." *Matter of Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).

34. In consideration of the aforementioned factors, in light of the circumstances of this dispute, it is apparent that CB's requested adequate protection measures are not proper. Because the relief CB seeks is inappropriate, and because CB agreed not to challenge the Servicing Plan (which it negotiated less than two months ago) CB's request that the Court order adequate protection should be denied.

**CONCLUSION**

**WHEREFORE**, for the reasons set forth above, the Debtors respectfully request that the Court deny the Motion to Compel.

Dated: December 21, 2022
       Wilmington, Delaware

/s/ *Matthew P. Milana*
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi, Esq. (No. 2732)
Amanda R. Steele, Esq. (No. 5530)
Zachary I. Shapiro, Esq. (No. 5103)
Matthew P. Milana, Esq. (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
       steele@rlf.com
       shapiro@rlf.com
       milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Candace M. Arthur, Esq. (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Richard W. Slack (admitted *pro hac vice*)
Natasha S. Hwangpo, Esq. (admitted *pro hac vice*)
Chase A. Bentley, Esq. (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
E-mail:   ray.schrock@weil.com
       candace.arthur@weil.com
       natasha.hwangpo@weil.com
       chase.bentley@weil.com

*Attorneys for Debtors and Debtors in Possession*