# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KABBAGE, INC., d/b/a KSERVICING, et al.,[1]<br><br>Debtors.[2] | Chapter 11<br><br>Case No. 22-10951 (CTG)<br>(Jointly Administered)<br><br>Hearing Date: January 6, 2023<br>    at 10:00 AM EST |

### OPPOSITION OF CUSTOMERS BANK TO DEBTORS' MOTION FOR AN ENTRY OF AN ORDER ENFORCING THE SETTLEMENT ORDER AND THE SETTLEMENT AGREEMENT BETWEEN KSERVICING AND CUSTOMERS BANK

Customers Bank, an operating subsidiary of Customers Bancorp. Inc. ("Customers Bank"), hereby objects to the *Motion of Debtors for Entry of an Order Enforcing the Settlement Order and the Settlement Agreement Between KServicing and Customers Bank* filed by the debtor, Kabbage, Inc., d/b/a KServicing ("Kabbage" or the "Debtor") on December 7, 2022 [Dkt. No. 340] (the "Debtors' Motion"). The Debtors' Motion reflects a profound misunderstanding of the obligations of a loan servicer, and should be denied because it fails to provide any reliable basis for a reconciliation of the required sums during (or even after) the reconciliation period. Instead, the Debtors' Motion and Declarations filed in support reveal a continued inability to provide basic information in a way that ultimately ties to the fundamental obligations of a servicer, namely an identification of each loan that is being serviced and its current status (as adjusted for payments, forgiveness, guaranty or cancellation). This industry standard "trial balance" provides the basic data from which each component of this or any other reconciliation flows.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] While KServicing is the counterparty to the Settlement Agreement, the Motion has been filed by KServicing and each of the above captioned debtors, referred to herein as "Debtors" when appropriate.

As set forth in greater detail below, before and during the reconciliation period, the Debtor provided Customers Bank with numerous, different documents purporting to be trial balances. All were riddled with errors that Customers Bank pointed out to the Debtor, including errors such as listing loans on the trial balance that were not made by Customers Bank. The Debtor has fallen short in its financial reporting obligations to Customers Bank throughout the relationship between the parties. Those shortcomings come into sharp focus with respect to the two primary issues in the Debtors' Motion, namely its assertions that: (1) the amount of the Borrower Remittances[3] (as set forth in Section 1(E)(i) of the Settlement Agreement) should be reduced by approximately $1.5 million due to some late discovered file showing a payment of such amount made by the Debtor to Customers Bank in October, 2020; and (2) that the Cancelled Loan[4] amount (as set forth in Section 1(E)(ii) of the Settlement Agreement) should be reduced by approximately $1.9 million due to the Debtor's tardy and erroneous assertion that such amount actually represents funded loans.

As a threshold matter, the Debtor seems to view the reconciliation specifically called for by the Settlement Agreement (specifically Section 3) as some kind of give and take compromise effort in which the Debtor throws an ever-changing barrage of numbers and internally inconsistent reports at Customers Bank and Customers Bank provides its views. Not at all. The Debtor is the servicer. Only the Debtor received the Borrower Remittances, maintained a bank account for those remittances, held the monies for Cancelled Loans, and received the information on Cancelled

---

[3] These are defined as the amount "collected from borrowers that KServicing is required to remit to [Customers Bank] under the Original [Processing and Servicing Agreement] and [Sales and Servicing] Agreement. Settlement Agreement at § 1(E)(i).

[4] As the Debtors stated in their Motion, "[t]he cancelled loan remittance amount consists of funds that were disbursed by [Customers Bank] to KServicing for loans that borrowers applied and were approved for, but were either later cancelled and the funds were therefore not disbursed to those borrowers, or where the funds were disbursed to the borrower but then returned to KServicing." *Debtors' Motion*, at par. 32; *see also Settlement Agreement*, at § 1(E)(ii) (identifying cancelled loan amount as the funds "held by KServicing on account of cancelled loans.").

Loans. The Debtor, as servicer, is required to maintain an accurate trial balance for the portfolio. Customers Bank relied on and continues to rely on the Debtor to report accurately on the sums the Debtor collects from borrowers due to loan payments, cancellations or other reasons. All of this information is uniquely and exclusively in the hands of the Debtor until it shares that information with Customers Bank (or with others, such as the SBA). The Debtors' Motion and supporting papers incorrectly suggest that Customers Bank has access to independent sources of this information, and further fail to appreciate that the ultimate reconciliation of the figures required by the Settlement Agreement is to determine that all of the funds loaned by Customers Bank and all the monies paid by borrowers (or forgiven or guaranteed by the SBA) must match. Customers Bank's reconciliation indicates that, with the sum already paid by Customers Bank as the Settlement Payment, they do match.

There are many concrete and demonstrable reasons to disbelieve the Debtor's reconciliation, presented to Customers Bank for the first time in the Debtors' Motion which was filed on December 7, 2020, nearly a month after the reconciliation period ended. One reason for doubt is the fallacy in the Debtors' Motion and supporting documents is that the Settlement Payment had to be $23.2 million or something close to it because that is what was estimated in the Settlement Agreement. Contrary to Debtor's suggestion, that Settlement Agreement requires the Settlement Payment to equal an amount resulting from an *actual* reconciliation. Based on the information that the Debtor provided (namely bank account statements, summaries, and spreadsheets regarding cancelled loans and summaries), upon which Customers Bank reasonably relied, the Settlement Payment is exactly the amount that Customers Bank has paid to the Debtor, namely $20,499,683.

The Court should be aware that the $23.2 million estimate in the Settlement Agreement was based on an analysis performed by the Debtor's financial advisor, AlixPartners LLP. For reasons that remain unknown to Customers Bank, but are so inexplicable as to raise serious questions regarding the Debtor's intentions of arriving at a fully informed and accurate reconciliation, as set forth in the accompanying *Declaration of Alyssa White in Support of Customers Bank's Opposition to Debtors' Motion For an Order Enforcing the Settlement Order and Settlement Agreement Between KServicing and Customers Bank* ("Second White Declaration"), the Debtor refused to share the AlixPartners LLP information despite two written requests from Customers Bank during the reconciliation process. For these reasons, and as more fully set forth below, the Debtors' Motion must be denied.

In support of this Opposition, Customers Bank relies upon and incorporates by reference the Second White Declaration.[5] In further support of the relief requested in this Motion, Customers Bank states as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief requested herein are sections 105 and 361 and 363(e) of the Bankruptcy Code, and Rules 4001 and 9013 and Local Rules 4001-1 and 9013-1.

4. Customers Bank consents pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the

---

[5] The *Second White Declaration* is being filed contemporaneously herewith.

Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## ARGUMENT

5. The Debtor's arguments fail for three reasons. First, it is undisputed that as of the end of the reconciliation period, the Debtor had not provided Customers Bank with any of the materials or information that it now claims justifies a different Settlement Payment. Second, the "new" information that it has provided is at best an exercise in misdirection. The facts asserted are both demonstrably incorrect and camouflage a deep rot in the internal financial accounting function at the Debtor. Third, and importantly the Settlement Payment actually made by Customers Bank reconciles with the overall trial balance, thus indicating that not only are each of the two disputed items correct as calculated by Customers Bank as part of the Settlement Payment it made to the Debtor, but also that the calculations make sense from a macro/total portfolio level as well.

### A.  The Debtor's Arguments Are Untimely and Unsupported and Unsupportable.

6. The Settlement Agreement, which was approved by the Court on November 9, 2022 [Dkt No. 232], provided in Sections 2 and 3 for a reconciliation period that ended on the Effective Date, which as defined in the Settlement Agreement was the date the Court approved the Settlement Agreement, which was November 9, 2022. Paragraph 12 of the Settlement Agreement also provides that it can only be amended in writing. The Debtor does not argue that there was any written amendment to extend the reconciliation period. Nor could it, as there was none. Instead, the Debtor seems to try to transform its own late actions into an oral contract amendment. There is no support for this.

7. Under Pennsylvania law (which governs according to paragraph 20 of the Settlement Agreement), an agreement that prohibits amendment other than by writing may be modified by parties' subsequent oral agreement or conduct only if parties' conduct *clearly* shows

an intent to waive the requirement. *See In re Marcus Lee Assocs., L.P.*, 422 B.R. 21, 39-40 (Bankr. E.D. Pa. 2009); *In re Ginko Assocs., L.P.*, 372 B.R. 229, 239 (Bankr. E.D. Pa. 2007); *Schluth v. Krishavtar, Inc.*, Nos. 745 EDA 2021, 746 EDA 2021, 2022 WL 703685, at *3 (Pa. Super. Ct. Mar. 9, 2022). Oral modification is prohibited unless the new agreement is (1) based on valid consideration and (2) proved by clear, precise, and convincing evidence. *2101 Allegheny Assocs. By Rappaport v. Cox Home Video, Inc.*, No. 91-2743, 1991 WL 225008, at *5-6 (E.D. Pa. Oct. 29, 1991) (citing *Bonczek v. Pascoe Equip. Co.*, 450 A.2d 75, 77 (Pa. Super. Ct. 1982)) (finding subsequent oral modification failed where party offered no evidence that modification was supported by additional consideration beyond the preexisting duty present in the original contract); *Douglas v. Benson*, 439 A.2d 779, 783 (Pa. Super. 1982) (holding verbal agreement invalid where "there was no evidence by anyone that the parties had consciously intended to waive the requirement that amendments must be in writing."); *Koken v. Commonwealth Prof'l Grp.*, No. 5968, 2006 WL 334787, at *4 (Pa. Ct. C.P. Feb. 9, 2006) (finding continued negotiations themselves do not demonstrate waiver of no-oral modification clause). While Debtor tepidly alludes to some post-reconciliation communications by both parties, the Debtor neither explicitly claims that there was any amendment to the Settlement Agreement, nor could it, given the failure to proffer any evidence, let alone clear and convincing evidence, of conscious waiver and clear consideration.

8.      Nor is there any dispute that the issues that are at the core of the Debtors' motion are not timely in that the Debtor raised them after November 9, 2022.  The two main issues are: (1) the Debtors' contention that the amount of the Cancelled Loans is approximately $1.6 million as opposed to the $3.6 million figure that it provided to Customers Bank during the reconciliation period; and (2) the Debtors' contention that the Borrower Remittances figure in its Synovus Bank

#182840239_v4

statement provided to Customers Bank during the reconciliation period should be reduced by $1,556,656 on the theory that the Debtor had previously paid that amount to Customers Bank (in October 2020).

9.  Both contentions are substantively and demonstrably wrong, and they are untimely. It is undisputed that the Debtor only advised Customers Bank for the first time on November 14, 2022 of its contention on the Cancelled Loan Issue. *See Debtors' Motion* [Dkt No. 340] at p. 11, par. 25; *Declaration of Donna Evans in Support*, at par. 21 & Ex. 6 (November 14, 2022 email from Ms. Evans to numerous Customers Bank employees stating: "We have a follow up analysis about the cancelled loan file that KS had forward to the CB team on 11.4.22. We conducted another analysis of the data last week, and confirmed the cancelled loan population was different."). Therefore, the only information that the Debtor communicated to Customers Bank during the reconciliation period regarding the Cancelled Loan amount was the exact figure that Customers Bank used. *Second White Declaration*, at par. 11(c) & Ex. 4 (November 4, 2022 email from Donna Evans of the Debtor to Alyssa White and others at Customers Bank stating: "Attached are two files that include the detail for cancelled/missing/incomplete loans that KServicing has included as part of the holdback amount. Total amount of cancelled/missing/incomplete loan holdback: $ 3,617,304").

10. The Debtor's communication of information regarding its different view of its own Borrower Remittance file is equally untimely but somewhat more bizarre. During the reconciliation period, the Debtor sent Customers Bank its Synovus bank statements and a summary of them,[6] on which Customers Bank properly relied. Oddly, according to the *Declaration of*

---

[6] *Second White Declaration*, at par. 11(b), Exs. 3 & 3(a) (11/4/22 email from Donna Evans of the Debtor to Alyssa White and others at Customers Bank stating: "Synovus accounts analysis: KServicing has performed an analysis of the activity in the Synovus account from **inception** to October 3, 2022, reconciling the activity in the account to our remittances files. See attached files for reference.") (emphasis added). The attachments include an excel spreadsheet

*Tamica Williams* at paragraph 22, the Debtor's Corporate Controller, she learned from the Debtor's former CFO, "Mr. Eidson on November 10, 2022 that there was a file of which we were not previously aware that reflected amounts KServicing had passed on to CB on account of additional borrower payments." How this would not be known to the Debtor earlier is a legitimate question, but it is clear that this belated revelation took place after the reconciliation period, and in fact was not communicated to Customers Bank until the filing on December 7, 2022 of the Debtors' Motion.

11.   The Debtor entered a contract - the Settlement Agreement - that bound it to a reconciliation process that was time limited. This was an important point of negotiation and one the Debtor clearly understood. See *Letter to Court* [Dkt No. 289] dated November 28, 2022, at Ex. 2 (detailing that Customers Bank rejected an open-ended reconciliation process and insisted on one that was time limited, to which the parties reached agreement). Having received a series of inconsistent, inaccurate and ever-changing analyses over a months-long period, and entering a Settlement Agreement that provided for Customers Bank to deliver, as it turns out, over $20 million to the Debtor, it was important to Customers Bank that the reconciliation process not provide an open route to undercutting the central provisions of that agreement.

12.   The Debtor should have been highly motivated to provide thorough and accurate documents regarding borrower remittances and cancelled loans. In fact, the Debtor's extremely sophisticated financial advisor had performed the calculations that resulted in the estimates that are in the Settlement Agreement for those figures. Knowing that on two occasions during the reconciliation period counsel for Customers Bank asked counsel for the Debtor in writing for the

---

of a "Synovus account analysis," (*see id.* at Ex. 3(a)), that provides a "Total" of $27,106,862 (*see id.* at Ex. 3(a), tab ("Summary analysis")). The other attachments are the Synovus bank statements which begin in November 2020 ("inception") and the very first activity in the account is on November 17, 2020. This is significant to the substantive analysis discussed below. *Id*. at Ex. 3.

8

AlixPartners LLP calculations, once on November 3 and again on November 9. *Second White Declaration*, at par. 13, Exs. 7 & 7(a). The Debtor did not provide this information.

13. Moreover, at no point during the reconciliation process did the Debtor provide to Customers Bank a calculation of what it thought the amount of the Settlement Payment to be. *Second White Declaration*, at par. 14. Instead, the Debtor provided information to Customers Bank, information that as servicer it, and only it, had and Customers Bank used that very information to determine the Settlement Payment. Apparently unaware of how the numbers would add and subtract, the Debtor expressed shock and accused Customers Bank of wrongdoing upon receiving the mathematically determined Settlement Payment applying the very data that the Debtor provided during the reconciliation process. Instead of respecting the timing and substance of the reconciliation process required by the Settlement Agreement, the Debtors' motion is a new strategy to obtain, wrongfully, more money than it is entitled to under the Settlement Agreement from Customers Bank. The Court should reject this effort.

## II. The Debtor's Substantive Arguments on the Borrower Remittance and the Cancelled Loan Amounts Are Demonstrably Wrong.

### A. The Borrower Remittance Amount Must Not Be Reduced by $1,555,656.

14. The Debtor goes to some lengths to concoct an argument that the Court should disregard the bank statements and reconciliation of those bank statements that the Debtor provided to Customers Bank during the reconciliation period (on November 4, 2022) that showed a total of borrower remittance payments of $27,106,862.[7] The concocted argument is that after the

---

[7] Courts have repeatedly recognized in a variety of legal contexts that a company's own reported financial documents are assumed to be correct. *See, e.g.*, *Finger v. Pearson PLC*, No. 17 Civ. 1422 (RJS), 2019 WL 10632904, at *11 (S.D.N.Y. Sept. 16, 2019) (stating "when a company chooses to speak on a topic, it assumes 'a duty to be both accurate and complete.'") (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)); *Anderson v. Dickson*, No. 5:16-71-KKC, 2018 WL 4059373, at *1 (E.D. Ky. Aug. 24, 2018) (noting court presumes records of a plaintiff's finances are accurate where plaintiff "failed to correct the financial information in the record"); *U.S. v. DeLeon*, 704

reconciliation period had finished, the Debtor had some contact with its former CFO who advised them of a secret file of which it was "not previously aware," and that this file "reflected amounts KServicing had passed on to CB [Customers Bank] on account of additional borrower payments." *Declaration of Tamica Williams*, at par. 22. Ms. Williams goes on to swear that according to this newly discovered file and other records she "determined that KServicing, at the direction of its former CFO, had separately already paid to CB on October 21, 2020 $1,555,656 of borrower payments on account of five individual loans listed in the Synovus Repayment File, but the payments to CB had not been accounted for in the Synovus Repayment File." *Id*. Based on these averments, the Debtor argues that it should reduce by $1,555,656 the amount showing in its Synovus bank reconciliation file.

15. This is a shocking assertion. As noted earlier, the Synovus bank account records and summaries provided to Customers Bank by the Debtor during the reconciliation period showed that the Synovus account's entries began in mid-**November** 2020. *Second White Declaration*, at par. 11(b) & Ex. 3 and par. 21. The reconciliation was to determine the amount of borrower payments (remittances) that had been paid to the Debtor and which the Debtor had "held back" (as part of a self-help strategy) from Customers Bank. Of course this item is referred to in the Settlement Agreement at paragraph 1(E) as the "Disputed KServicing Remittance Holdback." The point is these were monies that the Debtor had held back from their rightful owner, Customers Bank, and those holdbacks began after October 2020 and after the Synovus account that was to be reconciled began to have activity in it. Any payment to Customers Bank of borrower remittances before that time frame has no bearing on the reconciliation of the Synovus account.

---

F.3d 189, 195 (1st Cir. 2013) (finding calculation for tax evasion statute purposes is reasonable by using company's own data as an estimate based on available facts).

16.  Moreover, it appears that the payment of $1,555,656 referred to by the Debtor was made from a Wells Fargo bank account, not a Synovus account. *Second White Declaration*, at par. 22. In any event, the immutable problem with Debtor's position is that the payment had nothing to do with the Synovus account reconciliation and could have no impact on its numbers. As noted, one of the principal aims of the reconciliation required by the Settlement Agreement was to determine how much money in borrower remittances went into the Synovus account from November 2020 through October 3, 2022 (Petition Date). All such Borrower Remittances (or SBA guaranty or forgiveness payments)[8] were the property of Customers Bank and were to be offset from any monies owed to the Debtor.

17.  In short, the Debtor's position is an irrelevant invention. It also reflects a troubling misunderstanding on behalf of the Debtor of what it meant to reconcile the borrower remittances paid in to the Synovus account apparently dedicated to borrower payments on Customers Bank loans. This artifice by the Debtor must be rejected.

B.  **The Debtor's Assertion That the Cancelled Loan Amount Is $1.6 Million Is Also <u>Demonstrably Incorrect</u>.**

18.  The Debtor argues that days after the reconciliation ended it performed an analysis of the Cancelled Loan amount, in part based on suggestions from Customers Bank that the figure the Debtor had proffered during the reconciliation process may not be correct, and in the process of doing so "found" that the correct number was not approximately $3.6 million, but rather was approximately $1.6 million.

19.  To understand the fallacy in the Debtor's assertion it is important to begin with historical facts, including that on November 4, 2022, during the reconciliation process, the Debtor

---

[8] Other than mistaken excess payments, which would be borrower or SBA property.

told Customers Bank in writing that the Cancelled Loan amount was $3,617,304. *Second White Declaration*, at par. 11(c) & Ex. 4 (November 4, 2022 email from Donna Evans of the Debtor to Alyssa White and others at Customers Bank stating: "Attached are two files that include the detail for cancelled/missing/incomplete loans that KServicing has included as part of the holdback amount. Total amount of cancelled/missing/incomplete loan holdback: $ 3,617,304"). The Debtor made this assertion unreservedly and not preliminarily or initially, as its motion papers suggest. Customers Bank indeed questioned the accuracy of this figure because of concerns that loans that appeared on the list had been submitted by the Debtor to the SBA for forgiveness of guaranty purchase. For example, Customers Bank was aware that there were loans on the SBA's ETran list of active loans and the Debtor's list of active loans that actually were not active, funded loans.[9]

20. The Debtor argues that after the reconciliation period had ended it determined that nearly $2 million of loans that it originally said were cancelled were actually not cancelled. The reasoning behind this argument is that after the reconciliation period, the Debtor consulted the SBA's ETran website and determined that the loans were active and thus not cancelled. More specifically, in her Declaration, Donna Evans, the Debtor's Vice President of Operations, swears at paragraph 21 that "after additional review *based on the SBA data*, KServicing was able to confirm that 115 of the 204 loans listed in the preliminary cancelled loan spreadsheet sent to CB on November 4th were cancelled . . . ." (emphasis added).

21. As noted, the SBA's ETran site is not a reliable indicator of whether a loan was actually funded, and any effort to establish that site as the standard is misguided and wrong. The

---

[9] One example involves a borrower identified herein for privacy reasons as MV. *Second White Declaration*, at par. 17 & Ex. 9. As the emails make clear, the borrower never received its funds but it was listed by on the SBA's ETran site as a funded loan. *Id.* This example is highly relevant to the Debtor's creative but obviously inaccurate effort to arrogate to itself nearly $2 million on the Cancelled Loan issue.

12

#182840239_v4

information for the Customers Bank loans on the SBA's ETran system is not independently generated, because it is supplied to the SBA by the Debtor. *Second White Declaration*, at par. 17. As set forth in the MV example above, the data is highly unreliable as it is based on the Debtor's reporting, including the need for corrective reporting if the Debtor originally reported a loan as funded and thereafter the loan was returned. Returns occurred frequently.

22. There are two pieces of evidence that the Debtor does not discuss that are relevant. One undermines the Debtor's argument. The other would eviscerate it, but the Debtor did not share it.

23. The first piece of evidence, which completely undermines the Debtor's assertion is the Debtor's own excel spreadsheet provided to Customers Bank on November 14, 2022 (after the reconciliation period had ended) entitled "CUBI Returned or Incomplete Loans_11.4.22Updated." *Second White Declaration*, at par. 18 & Ex. 8. This spreadsheet shows that for every one of the 100 or so loans that the Debtor's belated "research" has transformed from a cancelled loan to a funded loan there is an entry in column R (called Return_Reason_Code) showing that the loans were returned, meaning the Debtor, not the borrower, had possession of funds that Customers Bank had provided to the Debtor to make the loan. *Id.*[10] Each of the "Return Reasons" has a so-called RCode. These codes all correspond to a reason for an ACH[11] return. *Id.* The ACH codes on the spreadsheet include R02 (Account Closed), R03 (No Account/Unable to Locate Account), and R23 (Credit Entry Refused by Receiver). *Id.* at Ex. 10 (Glossary of ACH Return Codes).

---

[10] A funded loan is a loan in which funds were actually lent to a borrower and loan documents were executed and delivered. A cancelled loan is one that was underwritten, Customers Bank forwarded money to the Debtor to make a loan, but no loan was ever made to a borrower and the money advanced by Customers Bank to the Debtor was never refunded to Customers Bank. A returned loan is one in which efforts were made to fund the borrower, but those efforts were unsuccessful or returned. *Second White Declaration*, at par. 18

[11] ACH or Automated Clearing House network is an electronic fund transfer made between banks across what is called the Automated Clearing House network.

Therefore, the Debtor's own records reveal that these loans were returned and/or not funded, yet the Debtor is arguing that they are funded loans merely because of its failures to update the SBA's ETran site.[12] Any servicer that wanted to prove that a cancelled or returned loan was actually made would have proffered the only record that would be dispositive, namely the Debtor's ACH records showing that the loan was funded after the return/cancellation. Curiously, not only does the Debtor not provide such records, it also does not even refer to them or their existence, instead relying on misdirection by referring to the SBA ETran site that is only as good as the faulty information that the Debtor provides.[13]

24.     Any servicer who wanted to prove that an initially cancelled or returned loan was subsequently made knows how to do so. It is simple. One supplies the ACH confirmation. *See Second White Declaration*, at par. 18. The Debtor did not do so and instead relies on fictional constructs that contradict its own records. The Court should see this effort for the cynical misdirection that it is and reject it.

25.     During the reconciliation process, by email dated November 4, 2022, Donna Evans, the Debtor's Vice President of Operations, informed Customers Bank that the amount of the Cancelled Loan holdback was $3,617,304 and that the "Cancelled Loan file includes list of 204 loans that KServicing owes Cubi remittance for." *Second White Declaration*, at par. 11(c) & Ex. 4. Now, the Debtor is claiming that 115 of those loans were not cancelled and that the principal amount of those loans is $1,940,112, thereby reducing the Cancelled Loan Amount from

---

[12] Further evidence from the Debtor's own spreadsheet that these loans were not funded is found in Column Z "Status" in which many of the loans have the Status "Not Reissuing." *Id.* at Ex. 8.

[13] One clear example of the SBA's ETran data base being infected with the "garbage in garbage out" phenomenon involves a would be borrower here as MV for privacy reasons. As the Second Alyssa White Declaration at paragraphs 17 through 20 reveals, when pressed on the status of loan listed by the Debtor as funded, after the Debtor undertook a six week investigation it conceded that the loan had not been funded, it had been cancelled, but nonetheless it was submitted to the SBA for a guaranty purchase.

$3,617,304 to $1,677,192. *Declaration of Tamica Williams*, at par. 18. All of those 115 loans bear a return code on the Debtor's spreadsheet. *Second White Declaration*, at pars. 18-20. All of them also bear an explanation that is inconsistent with funding. For none of them has the Debtor provided an ACH confirmation after the date of return. *Id*. Debtors' motion must be denied for these reasons.

C.     Customers Bank's Calculated Settlement Payment Ties to the Trial Balance

26.     In determining the Settlement Payment, Customers Bank considered not just the calculation of borrower remittances and cancelled loans in isolation, but also in terms of the entire trial balance of its portfolio of loans that the Debtor is servicing. *Second White Declaration*, at par. 23. Using the figures as provided by the Debtor during the reconciliation period for the borrower remittances and the cancelled loans resulted in Customers Bank being able to reconcile the trial balance on its nearly $175 million current portfolio that is being serviced by the Debtor to within about one thousand three hundred and eighty-two dollars ($1,382.00). *Id*. This is further evidence that the Settlement Payment as made by Customers Bank is proper.

27.     For context, Customers Bank analyzed the PPP portfolio that Kabbage is servicing as of September 30, 2022 and determined that it had outstanding loans of over $202 million. *Id*. at par. 24. It then engaged in an analysis to compare (based on figures for Borrower Remittances and cancelled loans provided by the Debtor during the reconciliation period) the outstanding loan amounts (approximately $202 million) with the Borrower Remittances and Cancelled Loan amounts and borrower/SBA return amounts reported by the Debtor during the reconciliation period (approximately $27 million) with the amount outstanding on the trial balance (approximately $174 million). *Id*. In short, the amount of outstanding loans plus the borrower remittances should equal the trial balance. Doing this analysis as of September 30, 2022 using the figures reported by the

15

Debtor to Customers Bank during the reconciliation period the numbers match within just over one thousand dollars. *Id.* Adopting the Debtor's positions would not only be at odds with the facts, as set forth above, but would also put Customers Bank in a deficit position on its PPP portfolio.

## NOTICE

Notice of this Motion will be provided to (a) counsel to the Debtor (i) Weil, Gotshal & Manges LLP, Attn: Ray C. Schrock, P.C. (ray.schrock@weil.com), Candace M. Arthur (candace.arthur@weil.com), Natasha S. Hwangpo (natasha.hwangpo@weil.com), Chase A. Bentley (chase.bentley@weil.com), Richard Slack (richard.slack@weil.com); and (ii) Richards, Layton & Finger, P.A., Attn: Daniel DeFranceschi (defranceschi@rlf.com), Amanda R. Steele (steele@rlf.com), Zachary I. Shapiro (shapiro@rlf.com), and Matthew P. Milana (milana@rlf.com); (b) the office of the United States Trustee for the District of Delaware; (c) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (d) the Federal Reserve Bank; (e) Cross River Bank; (f) Synovus Bank; (g) the United States Department of Justice, Office of the U.S. Trustee for the District of Delaware; (h) the Federal Trade Commission; (i) the Small Business Administration; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the United States Attorney's Office for the District of Delaware; and (m) any party that is entitled to notice pursuant to Bankruptcy Rule 2002. Customers Bank respectfully submits that no further notice is required.

## CONCLUSION

Based on the foregoing reasons, and as set forth herein, Customers Bank respectfully request that this Court deny the Debtors' Motion, with prejudice.

Respectfully submitted,

Dated: December 21, 2022
Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William A. Hazeltine*
William A. Hazeltine (Del. Bar No. 3294)
919 North Market Street, Suite 420
Wilmington, Delaware 19801
Telephone: 302-428-8191
Facsimile: 302-428-8195
whazeltine@sha-llc.com

-and-

**HOLLAND & KNIGHT LLP**
John J. Monaghan (admitted *pro hac vice*)
Jeremy M. Sternberg (admitted *pro hac vice*)
Lynne B. Xerras (*pro hac vice forthcoming*)
10 St. James Avenue
Boston, MA 02116
Telephone: 617-523-2700
Facsimile: 617-523-685
john.monaghan@hklaw.com
jeremy.sternberg@hkaw.com
lynne.xerras@hklaw.com

*Counsel to Customers Bank*