IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:<br><br>KABBAGE, INC., d/b/a KSERVICING, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-10951 (CTG)<br>(Jointly Administered)<br><br>**Re: Docket Nos. 336, 355**<br><br>Hearing Date: January 6, 2023 at 10:00 a.m. |

**CUSTOMERS BANK'S REPLY TO THE DEBTORS' OBJECTION TO MOTION OF CUSTOMERS BANK FOR ENTRY OF AN ORDER (I) COMPELLING COMPLIANCE WITH COURT APPROVED SETTLEMENT AGREEMENT AND ORDER; (II) REQUIRING ADDITIONAL ADEQUATE PROTECTION IN FAVOR OF CUSTOMERS BANK; AND (III) GRANTING RELATED RELIEF**

Customers Bank, an operating subsidiary of Customers Bancorp Inc. ("Customers Bank") hereby submits this Reply (the "Reply") to the *Debtors' Objection to Motion of Customers Bank for Entry of an Order (I) Compelling Compliance With Court Approved Settlement Agreement and Order; (II) Requiring Additional Adequate Protection in Favor of Customers Bank; and (III) Related Relief* [Dkt No. 355] (the "Objection"), in further support of the *Motion of Customers Bank for Entry of an Order (I) Compelling Compliance With Court Approved Settlement Agreement and Order; (II) Requiring Additional Adequate Protection in Favor of Customers Bank; and (III) Related Relief* [Dkt. No. 336] (the "Motion to Compel"). Although the debtor Kabbage, Inc. d/b/a KServicing ("KServicing" or the "Debtor") confesses in its Objection to a nearly $1 million error that it only rectified after Customers Bank filed its Motion to Compel, at base, the remainder of the Objection is merely an attempt to create noise to obfuscate the Debtor's malfeasance. By its

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

own admission, the Debtor misdirected funds held in trust for the benefit of Customers Bank to the Small Business Administration (the "SBA"). Although this violation should end the dispute as to whether the Debtor's conduct was appropriate, the Debtor attempts to suggest that its invasion of trust assets was somehow justified because it had another creditor, the SBA, that it believes it also owed money to, and further that its transgressions should be excused because, after its mishandling of trust assets was discovered, it replaced the misdirected trust funds with other funds from some undisclosed source. This should be given no credence. Notwithstanding the Debtor's failure to make any attempt to prospectively obtain Customers Bank's consent to the use of its trust funds to pay the SBA, in a further attempt to explain away its plain trust violation, the Debtor attempts to cast blame on Customers Bank, asserting that Customers Bank should have proactively sought out the Debtor to discuss a remedy after the trust funds had been improperly disbursed and therefore withheld from Customers Bank.[2]

In a last ditch attempt to put window dressing on its trust violation for the month of October, the Debtor suggests that such invasions are consistent with what it views as normal servicing operations. Customers Bank's request for its contractually agreed upon rights to transparency with respect to the trust funds is underscored by the fact that the Debtor has again invaded the funds held in trust in November (and not made full payment of all borrower remittances to Customers Bank). As such, it is difficult to understand the Debtor's argument that Customers Bank's requested access to information regarding the trust account is "not warranted." In the same vein, the requested adequate protection measures are necessary because the Debtor has proven itself to

---

[2] This suggestion ignores the fact that Customers Bank outlined its grievances in its November 28, 2022 letter to the Court, which also indicated that Customers Bank would file a motion with the Court for relief if necessary. *See* Dkt. No. 289. Approximately 9 days later, according to a motion schedule discussed by the Parties with the Court at the November 28 status conference, Customers Bank did just that. Accordingly, the Debtor's allegations that Customers Bank is before the Court as part of a contrived aggressive litigation tactic is simply unsupported by the facts.

be either unwilling or incapable of adhering to the trust provisions of the *Settlement and Release Agreement* (the "Settlement Agreement") approved in this Court's November 9, 2022 *Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* [Dkt No. 232] (the "Settlement Approval Order"), which entered nearly three weeks later than the *Final Order Authorizing Debtors to (I) Continue Servicing and Subservicing Activities and (II) Perform Related Obligations* (the "Servicing Order") [Dkt. No. 140] that the Debtor seeks to hide behind.

## ARGUMENT

1.     Paragraph 4(E) of the Settlement Agreement, as approved by the Settlement Approval Order, is simple and clear:

> For the avoidance of doubt, pursuant to the Servicing Plan, beginning as of the Petition Date, KServicing has and shall continue to deposit any and all borrower collections received on or after the Petition Date into a segregated account in the name of and for the benefit of [Customers Bank] (separate and apart from any other funds or assets) and shall provide [Customers Bank] with the account information regarding the segregated account, shall hold such funds in trust for the benefit of [Customers Bank], and shall promptly, but in any event within ten (10) Business Days of the end of each month, or such other timing as mutually agreed upon in writing by the Parties, transfer all such funds to [Customers Bank].

*Settlement Agreement*, at par. 4(E).

2.     That Paragraph 4(E) obligation provides that the Debtor will hold the money "in trust for the benefit of" Customers Bank. By virtue of that provision, there is only one authorized use of those funds held in trust: deposit into a segregated account for Customers Bank's exclusive benefit and remittance to Customers Bank each month. *Settlement Agreement*, at par. 4(E).

3.     The Debtor's obligations under the Settlement Agreement are not limited to paying over borrower payments exclusively to Customers Bank. Paragraph 4(E) also obligates the Debtor to "provide [Customers Bank] with the account information regarding the segregated account." As set forth below, the Debtor has failed to provide requested information regarding the segregated

3

account, so the requested adequate protection measures seek little more than the transparency that the Debtor agreed to, but has proven itself unwilling to provide.

4. In the face of clear and unambiguous Court-approved obligations, the Debtor admits its unequivocal breach but attempts to rationalize and deflect blame for its improper action through a series of hollow and largely accusatory responses, each of which will be dealt with below. It concludes with an assertion that, despite the Debtor's evidenced inability to protect Customer Bank's interest in the funds that the Debtor holds in trust for it and to provide the transparency as to account activity, no additional adequate protection rights ought to be granted because they were not bargained for in the Settlement Agreement– inexplicably stating in almost the same breath that the Debtor seeks an extra-contractual, and unnecessary, indemnity.

### A. The Settlement Agreement Is Unambiguous and Must Be Enforced According to Its Plain Terms.

5. The Paragraph 4(E) obligation requires the Debtor to first deposit into a segregated account and second to deliver to Customers Bank "any and all" borrower collections. That language was intentional and did not carve out any exceptions, including borrower overpayments or payments made after the SBA had made a guaranty purchase.

6. The phrase "any and all" is clear and unambiguous; any and all borrower payments made are to be delivered to Customers Bank.[3] Under Pennsylvania law,[4] settlement agreements are enforced according to the plain meaning of the words used within the agreement. *Friia v. Friia*, 780 A.2d 664, 669 (Pa. Super. 2001) (enforcing settlement agreement by the plain meaning

---

[3] To the extent the Debtor is arguing at paragraph 10 of its Objection that the Settlement Agreement's defined term at Paragraph 1(A) of "Borrower Overpayments," creates an exclusion, that argument is nonsensical and counterfactual. That defined term was important to establishing the ground rules for the reconciliation called for by the Settlement Agreement. It has nothing to do with the Paragraph 4(E) of the Settlement Agreement obligations to remit "any and all" borrower payments to Customers Bank and must not be read to invalidate that provision.

[4] The Settlement Agreement is governed by Pennsylvania law. *See Settlement Agreement*, at par. 20.

of its words when agreement was unambiguous and "support[ed] a single conclusion concerning the parties' intent."); *see also In re Zohar III, Corp.*, No 18-10512, 2020 WL 3960820, at *4-5, 14 (D. Del. July 13, 2020) (upholding bankruptcy court's plain meaning interpretation of Settlement Agreement, despite parties' different interpretations, because the meaning was unmistakable). If the meaning of key terms is unambiguous, courts will not expand their definition. *PECO Energy Co. v. First Montgomery Props., Ltd.*, No. 2100 EDA 2015, 2016 WL 5400795, at *4 (Pa. Super. Aug. 30, 2016); *see also ABC Pediatrics HHC v. Health Partners Plans*, No. 1205 EDA 2014, 2015 WL 6168150, at *3 (Pa. Super. Feb. 27, 2015) ("'If courts were called on to re-evaluate settlement agreements the judicial policies favoring settlements would be deemed useless . . . .'") (quoting *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 517-18 (Pa. Super. 2009)).

7. The Debtor's attempt to mask its failures by hiding behind the Servicing Order is unavailing. *See Objection*, at par. 4. The Servicing Order pre-dates the Settlement Agreement and the Settlement Approval Order. More importantly, as to the Debtor's loan servicing undertakings, it merely provides in each instance that the "Debtors are authorized, but not directed" to engage in certain actions relating to the "Partner Bank Portfolio." *Servicing Order*, at par. 4.

8. The directive that controls here is in the Court's subsequently issued Settlement Approval Order, which obligates both Parties to adhere to the Settlement Agreement. The direction is clear– deliver all collected Borrower-paid funds relating to the Customers Bank portfolio to Customers Bank. This Court maintains the authority to enforce this November 9, 2022 Order as it does all other orders it issues. *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) ("[A] court possesses the inherent authority to enforce its own orders.") (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379-80 (1994)); *In re Essar Steel Minn., LLC*, 47 F.4th 193, 197 (3d Cir. 2022) (citing *Travelers Indem. Co v. Bailey*, 557 U.S. 137, 151

(2009)) (bankruptcy courts can interpret and enforce its own orders).  Insofar as a new order is more specific than a prior general order, courts enforce the more recent, specific order.  *See, e.g., In re Cervantes*, 617 B.R. 687, 693 n.8 (Bankr. E.D. Cal. 2020) (finding specific orders on payment of fees override previous orders in miscellaneous matters that stated a party would not need to apply for fees).

9. The Settlement Agreement provided a hard Petition Date cutover.  The Borrower Overpayments received by the Debtor prepetition were to be excluded from the Reconciliation calculation.  *Settlement Agreement*, at pars. 1(A), 1(E), 3(E).  Given the Debtor's demonstrated servicing inadequacies, however, "beginning as of the Petition Date, KServicing has and shall continue to deposit any and all borrower collecting received on or after the Petition Date into a segregated account . . . and shall promptly . . . transfer all such funds to [Customers Bank]." *Settlement Agreement*, at par. 4(E).

**B.     The Debtor Cannot Cast Blame on Customers Bank for the Debtor's Misconduct with Respect to the Trust Funds.**

10. The Debtor dedicates portions of no fewer than six paragraphs of its Objection to taking Customers Bank to task for what the Debtor views as inadequate communication regarding the nearly $1 million shortfall in the October remittance after Customers Bank discovered the Debtor's misdirection.  *Objection*, at pars. 13-18.

11. As an initial matter, the Debtor makes no attempt to explain why, as a loan servicer holding funds in trust, it failed to contact the beneficiary of that trust before misapplying almost $1 million of a $1.3 million or so balance held in segregated account.

12. Putting that aside, the sequencing of events discernible from the docket in this case belies any contention that the Debtor, once its trust invasion was discovered by Customers Bank and specifically raised with the Debtor, had a sincere interest in discussion or resolution.

6

#183113170_v1

13. On November 28, 2022, in response to a letter that the Debtor filed with the Court a day earlier, Customers Bank filed a letter with the Court (the "November 28 Letter") [Dkt. No. 289]. That letter included as an exhibit a letter from Customers Bank to KServicing dated November 17, 2022 stating the following:

> The [Settlement] Agreement obligates KServicing from the Petition Date (October 3, 2022) onward to hold all borrower collections in trust for [Customers Bank], and to transfer such funds to [Customers Bank] "promptly, but in any even within ten (10) business days of the end of each month . . . ." Ten business days from the end of October was November 14, 2022. That day has passed without CB fulfilling its prompt payment obligation. This is especially concerning because it appears that there is over $1.5 million that was deposited into that account in October. Those funds are the property of CB and KServicing is wrongfully holding that property.

*See* Dkt. No. 289-1, at Ex. E, pp. 29-30.

14. Apparently spurred by that communication, the day after the Debtor's receipt of that November 17, 2022 letter, the Debtor sent a payment of $376,326,59—nearly $1.2 million less than the demanded $1.5 million amount. *See Declaration of Alyssa White in Support of Reply of Customers Bank to Debtors' Objection to Motion of Customers Bank for Entry of an Order (I) Compelling Compliance With Court Approved Settlement Agreement and Order; (II) Requiring Additional Adequate Protection in Favor of Customers Bank; and (III) Related Relief* (the "White Declaration"), filed contemporaneously herewith, at par. 7. The same day that the payment was made, the Debtor doubled down on its assertion of the correctness of its unsupportable position, stating that, "we can confirm that as the date hereof the [Debtor] has remitted to [Customers Bank] postpetition amounts that were collected through October 31, 2022 . . . ." *See Notice of Filing November 18, 2022 Letter from the Debtors to Customers Bank* [Dkt. No. 299-1], at Ex. 1, p. 3.

15. As later set forth in an email from Customers Bank to the Debtor, on November 28, 2022 (before the Court held a status hearing in this matter later that same day), Customers Bank

7

specifically told the Debtor of a $925,243 short payment for the month of October. *See Declaration of Alyssa White in Support of the Motion of Customers Bank for Entry of an Order (I) Compelling Compliance With Court Approved Settlement Agreement and Order; (II) Requiring Additional Adequate Protection In Favor of Customers Bank; and (III) Granting Related Relief* [Dkt. No. 337], at Ex. 4 ("The remittance report shows $1,302,569 as the amount owed. It appears SBA payments [identified in the email as $925,243] were netted out; however those funds were never paid to Customers Bank and therefore should not reduce our payment.").

16. The Debtor responded to that email later that same day at a status conference before the Court, and simply reiterated its mistaken insistence that KServicing had made payment in the correct amount for the month of October. Debtor's counsel informed the Court of the Debtor's view that Customers Bank did not have "any basis for saying they think they're owed more, other than in the past times, past months, the payment has been a million and a half; and that the letter doesn't provide any information why the three seventy-six is not the right number." *See Motion to Compel* [Dkt No. 336-3], at Ex. B, p. 9, lines 14-18. Only bringing the instant motion caused the Debtor to examine its conduct and confess error.

17. The body of the November 28 Letter to the Court also reported on the controversy, and indicated that Customers Bank intended to bring a "prompt motion" seeking "full payment of the October remittances." *See* November 28 Letter, at p. 5. The Motion to Compel was not filed until December 7, 2022– according to the schedule discussed by the Parties with the Court at the November 28 status conference. As the Debtor reports, apparently again shocked into compliance, it remitted almost $1 million to account for the October short payment on December 14, 2022, seven days after the filing of the Motion to Compel. *See White Declaration*, at pars. 7-8. As set

forth below, the Debtor has again breached its obligations by making another short payment for November.

### C. There Is No Parade of Horribles for the Debtor, But There Is for Customers Bank.

18. The Debtor argues that "[n]either Party contemplated that [Customers Bank] would collect and distribute Borrower Overpayments." *Objection*, at par. 12. This assertion defies logic and the clear contemplation of the "any and all" language of Paragraph 4(E). Given the Debtor's poor prepetition servicing track record, the Settlement Agreement provides for a shift in the risks associated with distribution of funds paid by Customers Bank's borrowers so that the Debtor's servicing obligations are limited to collecting the funds and paying them to Customers Bank for allocation. This distribution of responsibility was intentional and agreed to by both parties in the Settlement Agreement approved by the Court in the Settlement Approval Order.

19. The Debtor, perhaps unwittingly, itself confirms that the Settlement Agreement's reallocation of the fund disbursement obligation tracks the legal risk of nonpayment to the SBA of Borrower Overpayments. That legal risk lies with Customers Bank, not with the Debtor. As the Debtor states in its Objection:

> The SBA Form of Assignment, which [Customers Bank] would have been required to sign on account of each guaranty purchase of a loan by the SBA, constitutes an assignment by [Customers Bank] to the SBA of all right, title and interest to and under the PPP Loan and provides that if an "Assignor receives any payment or any value of any kind with respect to the Loan or obligations secured or evidenced thereby, Assignor shall hold the same in trust for Assignee [the SBA] . . . ."

*Objection*, at par. 27 (citing SBA Form of Assignment, Effective October 5, 2022, *available at*: https://www.sba.gov/sites/default/files/2020.02/Assignment%20Revised%2002-22-20.pdf).

20. The Debtor goes on to point out that SBA guidance further provides that, "[i]f the Lender receives any post-guaranty purchaser payments from the borrower, the Lender must send the full payments to the SBA via Pay.Gov." *Objection*, at par. 27 (citing SBA Procedural Notice

No. 5000-835955, dated October 5, 2022, *available at*: https://cdn.ymaws.com/www.naggl.org/resource/resmgr/policynotices_2022/SBA_Procedural_Notice_5000-8.pdf).

21. As the Debtor points out, the "Assignor" (here, Customers Bank), and not the servicer (here, KServicing), has the contractual obligation to hold Borrower Overpayments in trust for the benefit of the SBA. As the Debtor also points out, the "Lender," (here, Customers Bank), and not the servicer (here, KServicing), has the obligation to send "any post-guaranty purchaser payments from the borrower" to the SBA, if and when KServicing adheres to its obligations to remit "any and all" borrower payments to Customers Bank pursuant to the Settlement Agreement. Of course, the Debtor is liable for all monies it converts, misapplies, or otherwise transfers in breach of its obligations under the Settlement Agreement.

22. Given the Debtor's many failings in its servicing obligations, it is clear why Customers Bank determined that the Settlement Agreement should precisely track the trust fund language of the SBA guidance to impose a parallel obligation on the Debtor as recipient of those Borrower Overpayments. Likewise, it is plain to see why Customers Bank would want to ensure post-petition this allocation of obligations and retain control over ensuring that Borrower Overpayments to the SBA were actually and properly delivered, rather than to leave this critical task to a loan servicer that has been unreliable at best.

23. Customers Bank has entered, and this Court has approved, a Settlement Agreement that enables it to fulfill its obligations to its borrowers and to the SBA. To that end, Customers Bank has already been in touch with the SBA and will, of course make the proper payments as required, if, and only if, and when, and only when the Debtor adheres to its obligations to remit "any and all" borrower payments to Customers Bank pursuant to the Settlement Agreement.

#183113170_v1

> **D.  Despite Its Representations to the Contrary, the Debtor Does Not Appear to Have Amended Its Ways.**

24. Throughout its Objection, and despite the clear and unequivocal trust and delivery language of the Settlement Agreement, the Debtor refers to its invasion of the Borrower Remittances held in the segregated trust account as "isolated," "inadvertent," or simply an "error." *Objection*, at pars. 1-3.

25. Allowing the benefit of the doubt, the Debtor's error for the October shortfall may indeed have been inadvertent. This becomes less plausible, however, when considering that in mid-December, after the filing of the Motion to Compel, the Debtor delivered the November payment which, despite over $500,000 in borrower remittances deposited into the segregated account during the month of November totaled only $101,273.71 after backing out the correction payment of $925,242.87 that was short from the month before. *White Declaration* at par. 8, Exs. A & B. The November bank statement reveals over $500,000 in borrower payments/deposits, and hundreds of thousands of dollars in unauthorized transfers out from the account. *Id*. at Ex. B. In short, October's misconduct was repeated in November.

26. Additionally, it appears that KServicing made transfers from the segregated account to the SBA for obligations that pre-date October 3, 2022. Those payment obligations were resolved as part of the Settlement Agreement's reconciliation process and should not have been paid with borrower remittances received into the segregated account after October 3, 2022. *See id.* at par. 8.

27. "The trustee's basic fiduciary duty is to administer the trust." *See Pa. Env't Def. Found. v. Commonwealth*, 255 A.3d 289, 311 (Pa. 2021) (citing Restatement (Second) of Trusts § 169 (Am. L. Inst. 1959); *see also* 20 Pa. Stat. and Cons. Stat. Ann. § 7771 (West 2006) ("[T]he trustee shall administer the trust in good faith, in accordance with its provisions and purposes and

the interests of the beneficiaries and in accordance with applicable law."). Transparency is the "cornerstone of the [trustee's] fiduciary duty." *In re Estate of McAleer*, 248 A.3d 416, 435 (Pa. 2021). Further, an accounting of trust management is the most "fundamental duty" imposed on a trustee. *In re Pittsburgh Rys. Co.*, 117 F.2d 1007, 1008 (3d Cir. 1941); *In re Union Real Estate Invest Co. First Mortgage 6% Gold Bonds Due July 1, 1941*, 1 A.2d 662, 666 (Pa. 1938) (finding a trustee "must justify every expenditure as a proper one according to the terms of the instrument under which it is acting . . . .").

### E. Adequate Protection Is Necessary And Appropriate.

28. The Debtor's final argument is that the adequate protection measures sought by Customers Bank are not warranted. The Debtor offers no suggestion of adequate protection it might be willing to provide, but instead urges outright denial of Customers Bank's request.

29. Under § 361 of the Bankruptcy Code, a creditor may receive adequate protection.[5] A secured creditor's interest that either is declining in value, or is threatened to decline in value, must receive adequate protection. *See In re Gunnison Venter Apartments, LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); *see also In re Rocco*, 319 B.R. 411, 419 (Bankr. W.D. Pa. 2005) (stating debtors bear the burden of proof and to establish a creditor's interest is adequately protected). Adequate protection is a bespoke analysis that requires courts to consider the specific facts before it. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of

---

[5] According to statute, adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; . . . (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

*See* 11 U.S.C. § 361.

whether there is adequate protection is made on a case by case basis."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).

30.     The Debtor has admitted that it erroneously delivered funds that the Settlement Agreement requires that it hold in trust for the benefit of Customers Bank to the SBA. In response to Customers Bank seeking relief from this Court regarding that error, the Debtor attempts to shift the blame to Customers Bank, alleging that Customers Bank provided inadequate detail (regarding the Debtor's own error) and late quantification of the amount at issue.

31.     Customers Bank's requested adequate protection is for transparency and the right to approve use of funds that it owns, but that the Debtor as trustee holds for Customer Bank's benefit. As trustee, the Debtor has a fiduciary duty to remain transparent. *See McAleer*, 248 A.3d at 435. Customers Bank's request for transparency is the ability to view the inflows and outflows of its funds held in a segregated account that contains nothing more than the funds of Customers Bank. Its request for approval rights is a request that its funds, held in trust by the Debtor, not be used for any purpose not authorized in the Settlement Agreement without its approval. It is difficult to conceive of a reason that the Debtor would contest either of those requests.

32.     Even if the funds held in the Settlement Agreement-required segregated account were nothing more than cash collateral in which Customers Bank held an interest, the Debtor could not use those funds without Customers Bank's consent or an order of this Court following a finding of adequate protection. It has neither.[6]

---

[6] As set forth herein, the funds at issue are neither cash collateral nor property of the estate. A consideration of the Code-provided protections for cash collateral, however, is illustrative. Section 363(c) provides in relevant part that, absent either consent of the lien holder or court order after notice and a hearing, the debtor may not use cash collateral and must segregate and account for cash collateral. 11 U.S.C. §§ 363(c)(2), (c)(4). *See also In re Rebel Rents, Inc.*, 307 B.R. 171, 182 (Bankr. C.D. Cal. 2004) ("Absent consent or court authorization, a debtor in possession has an affirmative duty to segregate and account for any cash collateral in its possession, custody or control . . . Segregation of cash collateral . . . is mandatory under the statute."). Indeed, the restrictions imposed upon the use of cash collateral

13

33. The funds held in the segregated account, however, are not merely cash collateral. They are funds owned by Customers Bank held in trust by the Debtor. There is no basis for serious contest regarding the fund owner's rights to view account information and have approval rights regarding transactions involving its funds held in trust by the Debtor, and the Objection fails to credibly assert otherwise.

34. The Debtor's lead argument is merely another contortion of the Settlement Agreement. The Debtor argues that the portion of Paragraph 4(F) in which Customer Bank agreed not to "challenge the Servicing Plan" limits its remedies for breach of the Settlement Agreement. *See Objection*, at par. 32.

35. There is nothing in Customers Bank's requested adequate protection that is contrary to, or exceeds the bound of the Servicing Plan. Section 4(C) of the Settlement Agreement provides that, "[a]s part of the Servicing Plan, KServicing shall provide to [Customers Bank] the reports described on Exhibit A [t]hereto." "Part" is not all. The main body of the Settlement Agreement in paragraph 4(E) requires that the Debtor "provide [Customers Bank] with the account information regarding the segregated account." Given the Debtor's evidenced inability or

---

are considered to be so axiomatic to chapter 11 that substantially harmful unauthorized use of cash collateral is one of the enumerated grounds for dismissal or conversion under section 1112(b). *See* 11 U.S.C. § 1112(b)(4)(D). By contrast, even in the hypothetical that the funds at issue were cash collateral, the Debtor's use of the funds would be impermissible, because it has neither obtained Customers Bank's consent to the use of its funds by the Debtor, nor entry of an Order of this Court approving such use. Rather, this Court's Settlement Approval Order explicitly *requires the Debtor to turn over such funds to Customers Bank. See Settlement Approval Order*, Settlement Agreement, at par. 4(E). At minimum, even if the funds were cash collateral in which the estate had an interest, the Bankruptcy Code would require they be segregated and unused. *See* 11 U.S.C. § 363(c)(4). The impropriety of the Debtor's use of the funds is even more egregious here, as the funds are not even property of the estate, because they are explicitly held in trust for the benefit of Customers Bank. *See* 11 U.S.C. § 541(d); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994) (explaining that it is a "well-settled principle that debtors do 'not own an equitable interest in property . . . [they] hold[ ] in trust for another,' and that therefore funds held in trust are not 'property of the estate.'" (quoting *Begier v. I.R.S.*, 496 U.S. 53, 59 (1990))); *In re Magna Ent. Corp.*, 438 B.R. 380, 386 (Bankr. D. Del. 2010) (same). Accordingly, it is clear that Customers Bank has no authority to use the funds and must be restrained from doing so in accordance with the Settlement Agreement and Settlement Approval Order.

unwillingness to abide by the provisions of the Settlement Agreement, the direct access to account information and approval rights sought are warranted.

## CONCLUSION

Based on the foregoing reasons, and as set forth herein, Customers Bank respectfully request that this Court allow its Motion to Compel and enter an Order substantially in the form of the Proposed Order appended thereto as Exhibit A.

Date: January 5, 2023　　　　　　　　　　SULLIVAN • HAZELTINE • ALLINSON LLC
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　　　　　　　*/s/ William A. Hazeltine*
　　　　　　　　　　　　　　　　　　　　William A. Hazeltine (No. 3294)
　　　　　　　　　　　　　　　　　　　　919 North Market Street, Suite 420
　　　　　　　　　　　　　　　　　　　　Wilmington, DE 19801
　　　　　　　　　　　　　　　　　　　　Tel. (302) 428-8191
　　　　　　　　　　　　　　　　　　　　Fax (302) 428-8195
　　　　　　　　　　　　　　　　　　　　Email: whazeltine@sha-llc.com

　　　　　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　　　　　**HOLLAND & KNIGHT LLP**
　　　　　　　　　　　　　　　　　　　　John J. Monaghan (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Jeremy M. Sternberg (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　Lynne B. Xerras (*pro hac vice forthcoming*)
　　　　　　　　　　　　　　　　　　　　10 St. James Avenue
　　　　　　　　　　　　　　　　　　　　Boston, MA 02116
　　　　　　　　　　　　　　　　　　　　Telephone: 617-523-2700
　　　　　　　　　　　　　　　　　　　　Facsimile: 617-523-685
　　　　　　　　　　　　　　　　　　　　john.monaghan@hklaw.com
　　　　　　　　　　　　　　　　　　　　jeremy.sternberg@hkaw.com
　　　　　　　　　　　　　　　　　　　　lynne.xerras@hklaw.com

　　　　　　　　　　　　　　　　　　　　*Counsel to Customers Bank*