## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **KABBAGE, INC. d/b/a KSERVICING, et al.,** | Case No. 22-10951 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Dkt. Nos. 176 & 396** |
| | **Objection Deadline: Jan. 12, 2023 at 12:00 p.m. (ET), as extended for Cross River Bank** |
| | **Hearing Date:  Jan. 19, 2023 at 10:00 a.m. (ET)** |

**CROSS RIVER BANK'S OBJECTION TO MOTION OF DEBTORS FOR ENTRY
OF ORDER (I) APPROVING THE DISCLOSURE STATEMENT OF THE
DEBTORS, (II) ESTABLISHING SOLICITATION, VOTING, AND RELATED
PROCEDURES, (III) SCHEDULING CONFIRMATION HEARING, (IV)
ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR
CONFIRMATION OF PLAN, (V) APPROVING SPECIAL ELECTRONIC
NOTICING PROCEDURES,  (VI) APPROVING DEBTORS' PROPOSED CURE
PROCEDURES FOR UNEXPIRED LEASES AND EXECUTORY CONTRACTS,
AND (VII) GRANTING RELATED RELIEF**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A) (collectively, the "Debtors").

Cross River Bank ("Cross River") hereby objects to the *Motion of Debtors for Entry of Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors' Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief* [ECF 176] (the "Motion").[2]

### INTRODUCTION

1.    The Debtors' Disclosure Statement is deficient, and the Plan it describes cannot be confirmed.[3]

2.    Cross River is likely the Debtors' largest unsecured creditor, by far.  The Small Business Administration ("SBA") has held up payment or forgiveness of hundreds of millions of dollars of Cross River Paycheck Protection Program ("PPP") loans that were originated and/or serviced by the Debtors.  This hold up, according to the SBA, is based on the Debtors' alleged actions and inactions in originating the loans.  The Debtors have done virtually nothing to address the SBA's asserted issues and claim they lack the resources to do so.  They also apparently have no money to pay Cross River and other unsecured creditors anything (let alone to fulfill Kabbage's obligations to make Cross River whole), and the Debtors' only chance of having the money is pursuing estate cause of action against the parties that created this mess, including shareholders who took out hundreds of millions of dollars less than two years before the Petition Date.  Thus, it is Cross River and the other unsecured creditors that have been left holding the bag.  The

---

[2]    References to the "Plan" are to the *Amended Joint Chapter 11 Plan of Liquidation* [ECF 395], and references to the "Disclosure Statement" are to the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation* [ECF 396].

[3]    Capitalized terms are as defined in the Plan and Disclosure Statement.

Disclosure Statement fails to provide adequate information to Cross River and other creditors, and the Plan underlying it is fatally flawed.

***Deficient Disclosures***

3.    ***Inadequate Disclosure Regarding Creditor Recoveries***.  The Disclosure Statement tells Cross River and other unsecured creditors nothing about what they will receive under the Plan, or when they might receive it.  Months into this case—and more than two years into their self-described "wind down"—all the Debtors can tell creditors is that their recoveries are "TBD," "unknown," and "cannot be estimated with any degree of certainty."  Disclosure Statement at 13 & n.11.  This is not adequate information—it is no information at all.  Section 1125 requires that a disclosure statement contain "adequate information" so creditors may make an informed decision on the Plan, but the Debtors' Disclosure Statement just leaves creditors guessing (or often scratching their heads).

4.    Nor does the Disclosure Statement adequately describe how Plan distributions will be funded, other than that they may be made from vaguely described "Causes of Action."  Disclosure Statement at 13 & n.11.   Creditors are left to guess as to what claims might be pursued, who will control those claims, and whether or not the Debtors will stay in business and continue servicing some loans (for an undisclosed period of time)

5.    The liquidation analysis in the Disclosure Statement is similarly deficient.  It is premised on nonsensical assumptions with no explanation, including that somehow the SBA will approve virtually all loans in a chapter 11, and virtually none of those same loans in a chapter 7.

6.    ***Inadequate Disclosures Regarding The AmEx Transaction And Causes Of Action***.  The Disclosure Statement makes insufficient disclosures about what are undoubtedly the Debtors' largest assets—claims against shareholders and management.  The Disclosure Statement

makes quick reference to the fact that when the "substantial majority of the Company's business" was transferred to American Express ("American Express" or "AmEx") in 2020 for $750 million, nearly all of the money went to the Debtors' shareholders and management. Disclosure Statement at 17. Barely anything went to the Debtors, which were left as a shell with substantial, unsatisfied liabilities, and whose main purpose was to "wind down."

7.     Nowhere does the Disclosure Statement mention that the AmEx Transaction and accompanying shareholder distribution was clearly a fraudulent transfer, but for which the Debtors would not be in a liquidating chapter 11 now, and their unsecured creditors would not be facing the real prospect of zero recoveries.[4] The Debtors would not have had to work hard to find this information to put in their Disclosure Statement—it is on the *first page* of a congressional report: "After Kabbage's acquisition by American Express in October 2020, PPP borrowers were left at the mercy of an ***underfunded and understaffed spin-off company that failed to properly service their loans and would later file for bankruptcy***." *How Fintechs Facilitated Fraud In The Paycheck Protection Program*, U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis Staff Report, Dec. 2022 ("Subcommittee Report"), at 1 (emphasis added).[5] In other words, the AmEx Transaction, which stripped the Debtors of their most valuable assets and transferred all of the value of those assets to AmEx and the shareholders, left the Debtors woefully undercapitalized and unable to continue their business—the hallmarks of a fraudulent transfer.

---

[4]   The Debtors provided Cross River with certain documents related to the AmEx Transaction that Cross River had previously requested four-and-a-half hours before the deadline to file this Objection. Cross River's review of such documents is ongoing. Cross River respectfully reserves the right to supplement this Objection following the completion of its review of those documents.

[5]   The Subcommittee Report is available at: https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2022.12.01%20How%20Fintechs%20Facilitated%20Fraud%20in%20the%20Paycheck%20Protection%20Program_0.pdf

Inexplicably, causes of action relating to the AmEx Transaction, which are likely the estates' largest assets, receive short shrift in the Disclosure Statement.

8.     ***Inadequate Disclosures Regarding The Board, The Wind Down Officer, And Conflicts Of Interest***.  The Disclosure Statement also does not disclose that the parties who are running this chapter 11 now—including the Debtors' Board of Directors—are serving at the behest of the very parties who orchestrated the AmEx Transaction and received the fraudulent transfers. The shareholders who got all of the money in 2020 are the ones who picked the Board of Directors that is serving in 2022.  The Debtors tout that "an entirely new leadership team and board, including independent directors, is in place today,"[6] but they say nothing about their connections to (i.e., that they were put in place by) the very parties responsible for the Debtors' financial difficulties.

9.     It gets worse.  The Plan purports to cancel existing, out-of-the-money equity interests, but it doesn't really.  Rather, the Plan provides that the Debtors' equity (the "Single Share") will be held in trust by a Wind Down Officer "***for the benefit of*" *existing equity*—the same existing equity that (1) received fraudulent transfers, and (2) is totally out of the money now. Thus, all shareholder rights—including the right to call shareholder meetings, elect directors, and vindicate breaches of duty—will be held by the Wind Down Officer (selected by the existing Board of Directors) and will be subject to a "Wind Down Agreement" that nobody has seen.  The Wind Down Officer will be accountable to virtually no one except himself, while holding stock for the existing equity, who are a primary target of estate claims that the Wind Down Officer is supposed to bring for the benefit of creditors.  It will be the perfect circle of conflict and non-accountability.

---

[6]    Disclosure Statement at 3 n.3.

10.     ***Inadequate Disclosures Regarding Creditors' Rights As To Causes Of Action***. Nor does the Disclosure Statement adequately explain to creditors what if any say they will have in how—or even if—these causes of action are prosecuted.  To the extent there are "consultation" rights, they are indecipherable in the Plan and Disclosure Statement.  What is clear, however, is that critical decisions will be made by the existing Board of Directors (i.e., people who the fraudulent transfer recipients picked), or by people selected by the existing Board of Directors.

11.     The Plan proposes that the Debtors (i.e., the existing Board of Directors) will select the Wind Down Officer.  *See* Plan § 1.121, at 11.  The Plan and Disclosure Statement make vague references to certain "consent" and "approval" rights that the Reserve Bank (as secured creditor) will have, and to certain unclear "consultation" rights (whatever that means) that Cross River and a few other creditors might have.  Otherwise, creditors—whose money is actually at stake—have no say in (let alone control over) the selection of the Wind Down Officer or the prosecution of causes of action.  Subject only to the vague consent and consultation rights, the Wind Down Officer will control the estates' liquidation, including prosecution of causes of action against, among others, AmEx, the existing shareholders, and other present and former management and other insiders.  Neither creditors nor the Court will have any meaningful say in the decision to sue, or not to sue, anyone, and settlements will **not** be subject to Rule 9019 approval.

12.     ***Inadequate Disclosures Regarding Releases***.  The Disclosure Statement fails to adequately explain why releases are being provided to management, professionals, and others. These include both Debtor-releases and third-party releases by creditors (with deficient opt-out rights).   As described further below, the Debtors are subject to multiple governmental investigations and class actions, including for actions taken while the Debtors' existing management was in charge, and including serious issues identified in the Subcommittee Report.

Although the releases carve out intentional wrongdoing, nothing in the Disclosure Statement explains why even claims for negligence should be released (let alone whether such claims have been investigated, and what the findings were of any such investigation).

**Flaws That Make Debtors' Plan Patently Unconfirmable**

13.    The foregoing disclosure problems also relate to defects that render the Debtors' Plan patently unconfirmable.  The Plan gives the creditors no meaningful say in post-confirmation governance, including how valuable causes of action are prosecuted or settled.  The Debtors thus will have all of the benefit of debtors in possession, without any of the burdens.  The Plan thus violates Bankruptcy Code sections 1123(a)(6), 1123(a)(7), and 1129(a)(5) because it deprives creditors of any voting rights with respect to their interests in the reorganized Debtors, and gives the insolvent, conflicted Debtors control over the post-Effective Date management of the estates.

14.    The Plan also violates the absolute priority rule, because the Reorganized Debtors' equity will be held "for the benefit of" out-of-the-money shareholders in violation of Bankruptcy Code section 1129(b)(2)(B) and *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 199-200 (1988), rather than being distributed to creditors who are the only real economic parties in interest.

**Improper Solicitation Procedures**

15.    The Debtors' confirmation procedures are also flawed.  *First*, the Debtors' proposed procedures improperly limit the rights of creditors to opt out of the Plan's third-party releases.  *Second*, the procedures improperly disregard contingent claim amounts for voting purposes.  And *third*, the procedures provide insufficient time for executory contract counterparties to challenge the Debtors' assumption and rejection decisions and proposed cure amounts.

16.    Cross River is engaged with, and will continue to engage with, the Debtors and other constituents in an attempt to resolve the foregoing issues and move towards a consensual

confirmation.[7]  But the Disclosure Statement currently remains deficient, and the Plan underlying it remains unconfirmable.

## FACTUAL BACKGROUND

17.     Debtor Kabbage, Inc. d/b/a KServicing ("Kabbage") was at one time a fintech darling.  Founded in 2008, Kabbage used proprietary "machine-learning algorithms, data from public profiles, and other factors to quickly and efficiently evaluate the financial health of loan applications, significantly shortening loan approval and disbursement processes as compared to traditional banks."  Disclosure Statement at 17.

18.     Kabbage subsequently "added several lines of business, providing, among other things, access to flexible lines of credit, business checking accounts, online bill payment, cash flow visualization tools, and e-gift certificates through its website and app."  *Id.*

19.     Following the start of the COVID epidemic, the SBA  commenced the PPP. Kabbage further expanded its business by becoming an authorized PPP lender pursuant to an agreement with the SBA.  Declaration of Deborah Rieger-Paganis ¶ 11 [ECF 13] ("First Day Declaration").  From April 2020 to September 2021, the Debtors originated over $7 billion in PPP loans.  *Id.* ¶¶ 12, 14.  But while the PPP program was high-volume at the time, it was short-lived by design, expiring when the country began to recover from the initial disruptions caused by COVID.  Moreover, as discussed further below, the Debtors' participation in the PPP program has led to numerous governmental investigations, consumer lawsuits, and allegations of wrongdoing by the Debtors both before and after the Amex Transaction.

---

[7]    Other issues raised by Cross River to the Debtors appear to have been resolved by language proposed but not yet filed by the Debtors.  Accordingly, Cross River reserves its rights to amend this objection in the event the Debtors do not amend their Disclosure Statement as has been agreed.

20.     As the first wave of PPP loans were running out, the Debtors' management and controlling shareholders hatched a plan to sell most of the Debtors' assets and to keep the proceeds for themselves.  In October 2020, the Debtors transferred the substantial majority of their assets to affiliates of American Express.  Disclosure Statement at 3.  American Express, for its part, obtained, among other things, the Debtors' valuable lending and servicing platform, and the Kabbage IP, including the "Kabbage" name.  *Id.* at 38.  American Express now runs "Kabbage Funding From American Express."

21.     The Debtors' management and shareholders pocketed virtually all of the $750 million that American Express purportedly paid for the Debtors' assets.[8]  American Express and the shareholders left behind "a small portfolio of Legacy Loans and the Company's PPP business." *Id.* at 17.  They also left behind a lot of unsatisfied creditor claims.  The American Express transaction left Kabbage as a mere shell, which the Debtors admit has been in "wind down" since the AmEx Transaction closed.  *Id.* at 26.  Indeed, the Debtors filed for bankruptcy less than two years after the transaction under the weight of the numerous investigations and claims for wrongdoing leveled against them.

22.     There were reasons why American Express and the Debtors' management and shareholders left the PPP business behind.  Following the Amex Transaction, the Debtors have been embroiled in numerous disputes concerning their participation in the PPP, including investigations by the Department of Justice in the Districts of Massachusetts and Texas ("DOJ"). First Day Decl. ¶ 16.  The DOJ's investigations have focused on whether the Debtors violated the False Claims Act and the Financial Institutions Reform, Recovery, and Enforcement Act with

---

[8]     According to the Disclosure Statement, $38 million of the purchase price remains, and is held in escrow "for the benefit of the selling shareholders," but also may remain "subject to certain unresolved claims by AmEx under the documents related to the AmEx Transaction."  *Id.* at 38.

respect to the PPP loans.  *Id.* ¶ 44.  Specifically, the DOJ has alleged that the Debtors improperly included ineligible individuals in payroll calculated, and failed to exclude certain ineligible expenses.  *Id.* ¶ 47.  The DOJ has also alleged that the Debtors originated loans in amounts involving duplicate counting of state and local taxes.  *Id.* ¶ 48.

23.    The Debtors also have been subject to investigation by the United States House of Representatives Select Subcommittee on the Coronavirus Crisis, and the Federal Trade Commission ("Congressional Subcommittee").  *Id.* ¶ 16.  The investigation is focused on issues of potential waste, fraud, and abuse in connection with PPP loans.  *Id.* ¶ 50.

24.    The Congressional Subcommittee discussed the Amex Transaction on the first page of its report, stating that "[a]fter Kabbage's acquisition by American Express in October 2020, PPP borrowers were left at the mercy of an underfunded and understaffed spin-off company that failed to properly service their loans and would later file for bankruptcy."  Subcommittee Report at 1.  As the Subcommittee Report noted, "[w]hile American Express obtained Kabbage's PPP profits, KServicing [the shell entity left behind] was left with its responsibilities to service borrowers' loans and the portfolio's liabilities, including multiple Department of Justice investigations . . . ."  *Id.* at 73.  Incredibly, notwithstanding that Kabbage was left "with a skeleton staff," and only "***one . . . employee . . . dedicated full time and exclusively to AML, BSL or fraud compliance***," Kabbage still "continued to fund loans" after the Amex Transaction.  *Id.* at 72 (emphasis added).  The Subcommittee Report concluded:  "While Kabbage's sale left the company with fewer staff to prevent fraudulent loans and protect taxpayer dollars, and borrowers with limited assistance with forgiveness servicing, ***American Express, Kabbage, and its executives were left free from liability and responsibility***."  *Id.* (emphasis added).

25.     In addition to the DOJ and the Congressional Subcommittee, the Debtors are being investigated by the Federal Trade Commission ("FTC"), with respect to allegations of deceptive and/or unfair acts concerning the Debtors' advertising, marketing, underwriting, originating, and servicing of PPP loans.  First Day Declaration ¶ 51.

26.     Further, the SBA has held up PPP loans for forgiveness or guarantee on multiple grounds, including that the Debtors may not have followed proper procedures at the time of origination, and that the Debtors should be liable for loan amounts paid to borrowers exceeding what the borrowers were entitled to receive.  *Id.* ¶ 16.

27.     The Debtors also have had numerous disputes with lenders and borrowers.  *Id.* ¶¶ 52-54.  Customers Bank, one of the lenders that the Debtors service loans on behalf of, has alleged that the Debtors failed to adhere to PPP guidelines.  *Id*. ¶ 16.  Cross River also has asserted claims, including indemnification rights to the extent the Debtors failed to adhere to PPP guidelines.  *Id.* ¶¶ 16, 55.  Cross River asserted contractual putback  (repurchase) and indemnity rights against Kabbage before the bankruptcy, but Kabbage failed to repurchase the loans.  Moreover, PPP borrowers filed a class action suit against the Debtors, alleging that they did not properly process loan forgiveness applications.  *Id.* ¶ 56.

28.     On October 3, 2022, the Debtors and certain of its affiliates filed chapter 11 petitions.  ECF 1.  One day later, the Debtors filed the Plan.  ECF 14.  The Debtors filed the Disclosure Statement the next day.  ECF 63.  They have since amended both.  ECF 395, 396.

29.     The Debtors' Plan offers creditors no certainty as to the timing or amount of distributions.

30.     It appears that general unsecured claims will receive nothing or near nothing unless causes of action are successfully pursued.  *See* Disclosure Statement at 13, n. 11 ("At this time, it

is anticipated that the primary source of recovery for Allowed General Unsecured Claims … will be any proceeds that may be recovered on account of any Causes of Action.").  The Disclosure Statement, however, says nothing about what claims might be pursued, the merits of those claims, or potential recoveries that creditors might receive.  Unsecured creditor recoveries are—literally— "TBD."

31.    Notwithstanding the fact that unsecured creditors may receive nothing, the Debtors' out-of-the-money existing equity holders will receive one (and the only) share of the post-confirmation Debtors' common stock, to be held in trust "for the benefit of" the out-of-the-money equity holders by the Wind Down Officer.  *Id.* at 14-15; Plan § 4.8.  The Wind Down Officer, for its part, will be selected by the Debtors.  Plan § 1.121.  In other words, the Debtors, despite being woefully insolvent, will allow their existing equity holders to retain their equity interests, to be held by a Wind Down Officer that is handpicked by the Debtors (i.e., the shareholders).  Other than some vague consent rights for Reserve Bank (as secured creditor), creditors, who are the real parties in interest, will have no say in the Debtors' post-confirmation management, including in the pursuit of claims against insiders.[9]

32.    The Plan also envisions the transfer of servicing to third party servicers on an unspecified date or continuation of servicing with the Debtors if the Debtors decide to offer it (with

---

[9]    The Plan and Disclosure Statement reference certain unclear "consultation" rights for CRB and certain other creditors in the appointment of the Wind Down Officer and certain decisions by the Wind Down Officer.  *See* Plan § 1.121; Disclosure Statement at 54.  Beyond not providing any disclosure about what that actually means, such consultation rights are not nearly sufficient.  Moreover, the Disclosure Statement and Plan are inconsistent.  The Plan states that the Debtors will select the Wind Down Officer (subject to the aforementioned vague consultation or consent rights).  Plan § 1.121.  The Disclosure Statement, however, states that "additional information regarding the go forward corporate governance process in connection with the identity of the Wind Down Officer is set forth in the Plan Supplement."  Disclosure Statement at 50, n. 44.

no information as to when the Debtors would make such a decision).  Disclosure Statement at 5.

But the Disclosure Statement does not explain how the Debtors will accomplish the servicing

transfer given their apparent difficulties in obtaining cooperation from American Express, which

took the Debtors' systems and data, and which has apparently refused in the past to provide

documents necessary for the Debtors to properly service the loans.  *See* First Day Declaration ¶ 16

(citing "AmEx's refusal to honor its obligations under a Transition Services Agreement [ ] between

the Company and AmEx entered into in connection with the AmEx Transaction, which has

affected the Company's ability to perform a number operational functions"); *see also*

Subcommittee Report at 72 (describing that Kabbage retained "only contractual use" of the data

and systems, and had to "request access" from American Express just to "perform forgiveness

services for borrowers").

## ARGUMENT

## I.    THE DISCLOSURE STATEMENT FAILS TO PROVIDE ADEQUATE INFORMATION

33.    Section 1125(b) requires that a disclosure statement contain adequate information

to enable creditors "to make an informed judgment about the plan."  *See Century Glove, Inc. v.*

*First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee

a minimum amount of information to the creditor asked for its vote.").  It is critical that a disclosure

statement contain sufficient information because creditors and the Bankruptcy Court rely upon the

disclosure statement as the basis upon which to evaluate the proposed plan.  *See Oneida Motor*

*Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("Given this reliance, we

cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code

standard of 'adequate information.'"); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber*

*Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("[D]isclosure requirements are crucial to the effective

functioning of the federal bankruptcy system [because] creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan . . . .").  The Third Circuit has called the filing of a disclosure statement with adequate information a "pivotal concept in reorganization under the Code."  *Onieda Motor Freight*, 848 F.2d at 417.

> ### A.    The Disclosure Statement Fails To Disclose, Or Even Estimate, What Creditors Will Receive Under The Plan (If Anything)

34.    The Disclosure Statement says nothing meaningful about what creditors will receive under the Plan.

35.    According to a chart on page 13 of the Disclosure Statement, general unsecured creditors will receive *pro rata* shares of "GUC Pool Class B Interests."  Nothing in the Disclosure Statement, however, provides any hint whatsoever as to what these interests might be worth, or when creditors might expect to recover that value.  Instead, the value and timing depend entirely on causes of action that the Debtors disclose virtually nothing about, and which the Debtors propose to administer in a deeply conflicted structure controlled by shareholders who are out of the money and the very targets of the litigation.  This plainly is not "adequate information"; it is no information.  And this is not a confirmable Plan, it is a fatally flawed Plan.[10]

---

[10]   The Debtors also fail to disclose the impact that certain governmental claims may have on the Plan.  The Debtors recently entered into a stipulation with the United States to extend the government's deadline to bring a nondischargeability complaint, premised on, among other things, potential violations of the False Claims Act ("FCA").  ECF 426.  And the Plan provides that the Plan and Confirmation Order shall not "grant the Debtors a discharge pursuant to 1141(d) of the Bankruptcy Code as to the United States."  Plan § 10.3(f).  The Disclosure Statement contains no discussion concerning what consequences exempting such FCA proceedings and resulting liabilities or other remedies may have on the Debtors' ability to successfully consummate the Plan, the ability to implement the transactions and other actions contemplated by the Plan, or creditor recoveries under the Plan.

36.     The liquidation analysis in the Disclosure Statement is no better.  As with the rest of the Disclosure Statement, the liquidation analysis simply assumes zero recovery on causes of action in both a "high recovery" and "low recovery" scenario.  Disclosure Statement, Ex. C at 7.

37.     Moreover, the Pledged PPPLF Loans (i.e., the loans securing the Reserve Bank's claims) in the liquidation analysis do not include "excess amounts" associated with certain issues that are purportedly unresolved with the SBA.  *Id.*  But, the Disclosure Statement also states that the SBA, without any justification or rationale, is distinguishing certain PPP Loans pledged by the Reserve Bank from the exact same PPP Loans held by Cross River (and not pledged), by honoring excess amounts for the Reserve Bank (but for nobody else).  Disclosure Statement at 39.  Thus, there appears to be no basis to subtract those excess amounts from the collateral available to satisfy the Reserve Bank's claims.  This is important, because the Reserve Bank is the only party that has been granted "consent" rights in connection with the Wind Down, including the prosecution of causes of action.  But the Reserve Bank is projected to recover between 90.5% and 99% on its claims without ascribing any value to those causes of action.  In actuality, the Reserve Bank's recovery range should be even higher and it should have no need to look to the causes of action or, at the very least, would likely be willing to settle any causes of action for a much lower amount than unsecured creditors would.  The Reserve Bank's "consent" rights thus fail to protect general unsecured creditors who can look only to those causes of action for recovery.

38.     The Debtors' liquidation analysis also makes nonsensical assumptions about the SBA's treatment of loans in a chapter 11 vs. a chapter 7.  The Debtors assume that in a chapter 7, Cross River's claims include certain costs and the full outstanding principal of all Cross River loans as of the Conversion Date.  Disclosure Statement, Ex. C at 9.  In other words, the Debtors assume that in a chapter 7 the SBA will not honor any of its guarantees of the PPP loans.  But the

Debtors assume that in a chapter 11 Cross River's claims only include costs and the "excess amounts" associated with certain issues unresolved with the SBA (and not the full outstanding principal). *Id.* The Debtors fail to explain why Cross River's claims would be so drastically different in a chapter 7 as opposed to a chapter 11. The Debtors thus offer no basis for their assumption that General Unsecured Claims will total nearly $578 million in a chapter 7 and less than $32 million in a chapter 11. Disclosure Statement, Ex. C at 5.

39.     The liquidation analysis is a critical part of the Disclosure Statement, and it too is subject to the "adequate information" requirements of section 1125. The Debtors' liquidation analysis fails this requirement and does not allow a creditor to make heads or tails of it.

**B.      The Disclosure Statement Fails To Adequately Disclose Valuable Estate Claims Against Insiders And Others**

40.     As described above, in October 2020 Kabbage transferred substantially all of its assets, other than the liability-plagued PPP business, to American Express in exchange for having its management and shareholders pocket virtually all of the $750 million for those assets.[11] Claims, including those relating to these transactions, are likely the estates' largest assets and, as the Debtors acknowledge (Disclosure Statement at 13, n. 11) the only hope of unsecured creditors receiving anything in this case. But, the Disclosure Statement gives no meaningful information about the Debtors' claims or the their purported investigation of them. Indeed, the Debtors claim that they are seeking information from certain entities (Disclosure Statement at 38-39), but say

---

[11]   The Disclosure Statement provides that "$38 million of the purchase price is currently in escrow … for the benefit of the selling shareholders, and to the Debtors' knowledge, remains subject to certain unresolved claims by AmEx under the documents related to the AmEx Transaction." Disclosure Statement at 38 (emphasis added). But the Disclosure Statement does not explain what the "unresolved claims by AmEx" are, and whether the shareholders' remaining payment from AmEx is dependent in any way upon what the Debtors may (or may not) do in these chapter 11 cases, including potentially pursuing claims against American Express.

nothing about whether they sought information from the very shareholders who received hundreds of millions of dollars for the transfer of the Debtors' business, leaving the Debtors with virtually nothing. Either the Disclosure Statement is insufficient or the Debtors have inexplicably failed to do anything to investigate the transferee shareholders.

41.     The Disclosure Statement is inadequate because it fails to disclose information about estate claims, including the AmEx Transaction and related claims. "The Code requires that a debtor list *potential* causes of action" and that "the importance of full and honest disclosure cannot be overstated." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322-23 (3d Cir. 2003) (internal quotations omitted); *see also In re Sierra-Cal*, 210 B.R. 168, 176 (Bankr. E.D. Cal. 1997) (disclosure statement was inadequate where it "fail[ed] to reveal that an entity being paid under the plan had received transfers that would, as a matter of law, require disallowance of all its claims pending disgorgement" and "[t]his inaccuracy negatively affected the ability of a hypothetical reasonable investor holding an unsecured claim to make an informed judgment about the plan").

42.     Here, the Disclosure Statement dedicates no more than a page to causes of action, and provides nothing more than a surface level discussion of the AmEx Transaction and a bare bones statement about the Debtors' investigation (which can be summed up as essentially saying: "we have sought informal discovery and have received some documents from some parties"). *See* Disclosure Statement at 38-39. It says nothing meaningful about (a) what claims or causes of action the Debtors are investigating in connection with the AmEx Transaction, (b) who those causes of action would be against, or (c) any other causes of action the Debtors may have. Indeed, the Disclosure Statement dedicates the same amount of space (and the Debtors appear to have

dedicated more effort) to a $3 million dispute with Customers Bank (Disclosure Statement at 35-36) than to pursuing the more than $700 million in value taken by AmEx and the shareholders.

43.     The Debtors have apparently had new directors in place for months (if not years) after the AmEx Transaction,[12] and they retained Weil Gotshal in April 2022.[13]  And yet, after months and months, the Debtors cannot tell creditors anything meaningful about the AmEx Transaction and the causes of action related thereto.

### C.     The Disclosure Statement Fails To Adequately Disclose That Claims Against Insiders Will Be Controlled By Those Very Insiders And Their Designees, Rather Than By Creditors

44.     As described (*supra* ¶¶ 8-9, 31), the Plan provides that the Debtors themselves will select the Wind Down Officer, who will have control over pursuing—or *not* pursuing—causes of action, including against the insider shareholders and management.  The Debtors, in turn, are currently controlled by a board chosen by the very same insiders who should be the targets of causes of action related to the AmEx Transaction, and potentially other causes of action related to the shareholders' controlling roles viz a viz the Debtors.

45.     As described, the causes of action relating to the AmEx Transaction, and who controls those causes of action, are critical to creditors.  There appear to be no other assets that could be used to satisfy creditor claims beyond those causes of action.  Moreover, creditors can take no comfort from the Debtors' statements that there is "an entirely new leadership team and board" in place, because the Disclosure Statement fails to explain what connections there are between that new leadership and the existing equity that should be the targets of the litigation.

---

[12]    *See* Disclosure Statement at 5.

[13]    *See* ECF 15 ¶ 8 (Weil Retention Application).

46.     The selection of who will control the post-confirmation Debtors is also of utmost importance to creditors.   Bankruptcy Code section 1129(a)(5) requires that plan proponents disclose the identity and affiliations of individuals proposed to serve as directors, officers, or voting trustees of the debtors, and that the "appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy."   Section 1123(a)(7) similarly requires that the Plan contain "only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."   Nonetheless, the Disclosure Statement says nothing about who the Wind Down Officer will be, let alone why his or her selection (whoever they are) would be in the best interests of creditors.

47.     Nor does the Disclosure Statement adequately disclose the significance of the Debtors' handpicking of their own Wind Down Officer.   The Debtors are deeply insolvent, liquidating chapter 11 debtors, and yet creditors will have no meaningful say in management going forward.   At a minimum, the Disclosure Statement should clearly warn creditors that they will have no real say in the prosecution—or non-prosecution of insider claims—and that instead decisions about such claims will be made by persons whom the insiders themselves have selected, and without any supervision whatsoever by this Court.[14]

48.     The Plan provides for broad releases by the Debtors and third-parties of the Debtors' insiders, Plan §§ 10.5, 10.6, but the Disclosure Statement contains no discussion about

---

[14]   The Disclosure Statement also does not address what (if any) funding will be available to  the Wind Down Officer for investigation and pursuit of causes of action.  Indeed, the liquidation analysis provides for "Wind Down Costs" and "Reserves/Contingencies" in the chapter 11 scenario, and the notes make no mention of investigation and funding causes of action. Disclosure Statement, Ex C.

why the Debtors believe such releases are appropriate.  This is insufficient.  *See, e.g.*, *In re Lower Bucks Hosp.*, 471 B.R. 419, 462 (Bankr. E.D. Pa. 2012), *aff'd*, 488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) (disclosure statement was inadequate where third party releases were not sufficiently separated from debtor releases and there was lack of information about merits of claims being released).  That is particularly so, given that, as described above (*supra* ¶ 24), the Congressional Subcommittee found that the Debtors continued to fund loans after the AmEx transaction notwithstanding the lack of resources to properly implement the PPP.  It is unclear what officers and directors were in place at the Debtors during that time, and there is no basis described in the Disclosure Statement to justify releases, either by the estates or by non-opting out creditors.

## II.  THE PLAN UNDERLYING THE DISCLOSURE STATEMENT IS UNCONFIRMABLE

49.  The Third Circuit has held that "if it appears that there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153 (3d Cir. 2012); *see also In re Moshe*, 567 B.R. 438, 447 (Bankr. E.D.N.Y. 2017) (declining to approve disclosure statement where objecting creditor's intention to vote against the plan would make it unconfirmable); *In re Arnold*, 471 B.R. 578, 614 (Bankr. C.D. Cal. 2012) (declining to approve disclosure statement where plan violated the absolute priority rule).

### A.  The Plan Cannot Be Confirmed Because It Is Inconsistent With The Interests Of Creditors And Public Policy

50.  As described (*supra* ¶¶ 13, 46), section 1123(a)(7) mandates that the selection of any officer, director, or trustee under the plan be "consistent with the interests of creditors," and

section 1129(a)(5) requires that the appointment of such persons be "consistent with the interests of creditors and equity security holders and with public policy."

51.     The Plan is inconsistent with these provisions because it provides for the Debtors to hand-pick the Wind Down Officer in a deeply insolvent, liquidating chapter 11, and creditors will have no real say in management going forward.  Under the undisputed facts of this case, this proposal is egregious.  The principal remaining assets in this case are causes of action, including those in connection with the October 2020 AmEx Transaction against insiders of the Debtors.  Yet, the Wind Down Officer, who will have the authority to prosecute or settle such claims, will be picked by the board that was put in place by the potential targets of that litigation.  The Wind Down Officer has no accountability to general unsecured creditors, for whose benefit the litigation must be pursued.

52.     Moreover, the Debtors are under investigation by multiple governmental agencies for alleged wrongdoing that occurred while the Debtors' current and former management were in control.  Any investigation and pursuit of potential claims by the estate to remedy any such wrongdoing should not be connected to the very people who are the potential targets.

### B.     The Plan Cannot Be Confirmed Because The Single Share To Be Distributed To Current Equity Violates The Absolute Priority Rule

53.     As described (*supra* ¶¶ 9-11, 31), the Plan contemplates the issuance of a Single Share of equity to be held in trust by the Wind Down Officer for the benefit of existing, out-of-the-money, shareholders.  *See* Plan § 4.8.  This violates the absolute priority rule, thus rendering the Plan unconfirmable.

54.     Bankruptcy Code section 1129(b) requires that in order for a plan to be fair and equitable with respect to an impaired and dissenting class of unsecured claims, the Plan must: (1) pay the class's claims in full, or (2) not allow holders of any junior claims or interests to receive

or retain "any property" on account of such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(ii); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005) ("The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired …."); *see Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 199-200 (1988) (reversing order confirming plan because the plan provided that equity holders would retain their equity interests over impaired dissenting claimholders and thus violated the absolute priority rule).

55.     The Plan provides that one share of new common stock (the "Single Share") will be held in trust by the Wind Down Officer "for the benefit of the former [equity holders] consistent with their former relative priority and economic entitlements." Plan § 4.8(b). This violates the absolute priority rule. *First*, the Single Share indisputably is property. Further, it is property with significant value, given the virtually unfettered control that the Wind Down Officer will have over, among other things, the abandonment, prosecution and settlement of the Debtors' and the Estates' Causes of Action, including Avoidance Actions.[15] *Second*, it is highly unlikely that the unsecured creditor class will approve the Plan, because Cross River is the largest general unsecured creditor in the case, and is unlikely to vote in favor of the current formulation of the Plan. *See* 11 U.S.C. § 1126(c). *Third*, the class of general unsecured claims is impaired, and currently there is no

---

[15]   Moreover, if the Plan deems the Wind Down Officer to hold the Single Share "for the benefit of" the former holders of KServicing Equity Interests, it has troubling implications for the Wind Down Officer's ability to faithful fulfill their duties in that capacity. Section 5.4(c) of the Plan refers to the Wind Down Officer's fiduciary duties in such capacity. But "fiduciary duties" owed to whom? Certainly, the Wind Down Officers should owe duties to the Debtors' creditors, who should be the primary beneficiaries of the Plan. However, Section 4.8(b) suggests that the also will owe duties to KServicing's former equity holders. How is the Wind Down Officer to reconcile these conflicting roles in a manner consistent with the absolute priority rule and other applicable provisions of the Bankruptcy Code? The Disclosure Statement and Plan contain no answers to these questions.

indication that it will receive anything under the Plan. Disclosure Statement at 13. Thus, the Debtors cannot show that the Plan is "fair and equitable" under section 1129(b) because, on its face, the Plan provides that equity holders will retain their equity interests while dissenting unsecured creditors will not be paid in full. *Ahlers*, 485 U.S. at 202 ("There is little doubt that a reorganization plan in which respondents retain an equity interest in the farm is contrary to the absolute priority rule").

56. The Debtors claim that the equity holders "shall neither receive nor retain any property of the Estate or direct interest in property of the Estate on account of such KServicing stock" except "in the event that all Allowed Claims have been satisfied in full … each former holder of a KServicing Existing Equity Interests may receive its share of any remaining assets of KServicing." Plan § 4.8(b). But this is belied by other provisions in the Plan. In particular, the Wind Down Officer will hold the Single Share of stock in trust ***for the benefit of existing equity***. *Id.* Thus, the Wind Down Officer will be exercising all rights of a shareholder on behalf of the out-of-the-money equity holders, including, for example, electing directors, exercising shareholder voting and consent rights, and having standing to vindicate breaches of duty by the New Board. This constitutes a property interest under the absolute priority rule. *In re Mangia Pizza Invs.*, 480 B.R. 669, 700 (Bankr. W.D. Tex. 2012) ("[C]ontrol may be considered a property interest when applying the absolute priority rule.").

57. In any event, even if the Single Share did not effectively grant control to the existing equity holders (through the Wind Down Officer as their trustee), the Plan would still violate the absolute priority rule because "a debtor who retains his equity interest in the enterprise retains 'property.' Whether the value is '***present or prospective***, for dividends or only for purpose of

control' a retained equity interest is a property interest to 'which the creditors [are] entitled …

before the stockholders [can] retain it *for any purpose whatsoever*." *Id.* (emphases added).

### C.    The Plan Cannot Be Confirmed Because It Violates Section 1123(a)(6)

58.    Although the Single Share will have a vote, as noted, that vote will be vested in the

Wind Down Officer as trustee, not for creditors, but rather for the out-of-the-money existing equity

holders.  The creditors—who are entitled to the residual value of the insolvent estate—will be

completely disenfranchised from any power to vote the share that should rightfully be theirs, or to

exercise their other rights as shareholders (including to vindicate breaches of duty).  The creditors

will receive "GUC Pool Class B Interests," which essentially are "nonvoting equity securities"

because they purport to entitle the creditors to some share of the residual value but without any

right to vote.

59.    Section 1123(a)(6) protects against this result.  Indeed, the section ensures that

"'participation in, and control of, the selection of management of a reorganized debtor must be

considered as part of a fair and equitable plan and provided for accordingly,'" and that "'securities

must be distributed so that the allocation of voting power—i.e., the control of the company—

properly recognizes the respective position of the claimants and stockholders according to their

rank and the rights they surrender.'"  *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512, 517–20 (D.

Conn. 2008) (quoting 7 *Collier on Bankruptcy* P.1123.01).

60.    Similarly, in *In re Acequia, Inc.*, the Ninth Circuit recognized that section

1123(a)(6) must be read together with section 1123(a)(7), which requires a plan to contain only

provisions that are consistent with the interests of creditors and public policy with respect to the

manner of selection of officers, directors, or trustees.  787 F.3d 1352, 1361-62 (9th Cir. 1986)

Taken together, these provisions mean that creditors whose rights "are modified or altered so that

they assume some risk of the success of the reorganized corporation, *are entitled to an allocation*

*of voting power and a voice in the selection of management that will protect their interests.*"  7

Collier on Bankruptcy ¶ 1123.01[6][a] (2020) (emphasis added).[16]  The Plan violates this principle

by vesting post-confirmation power in the Debtors and their out-of-the-money equity holders.

## III.    OBJECTIONS TO SOLICITATION PROCEDURES

61.     The Debtors' solicitation procedures are also flawed.

62.     *First*, the Debtors' proposed procedures improperly limit the rights of creditors to

opt out of the Plan's third party releases.  The Plan and proposed form of ballot provide that "all

holders of Claims or Interests who vote to accept the Plan" are "Releasing Parties."  Plan § 1.100,

at 9.  In other words, if a creditor votes to accept the Plan, the creditor cannot opt out of the third-

party releases.  There is no justification for that here.  Consistent with this Court's September 22,

2022 ruling in *TPC Group* (Case No. 22-10493), all creditors should have the right to opt out of

releases without affecting their ability to accept or reject the plan.  Ex. A at 69:2-15, 71:5-72:3.

63.     *Second*, the procedures improperly disregard contingent claim amounts for voting

purposes.  The Debtors' motion to approve the Disclosure Statement states that contingent claims

are deemed to be allowed in the amount of $1 for voting purposes.  ECF 176 ¶ 32(d), at 15-16.

That is improper.  Bankruptcy Code section 1126(a) provides: "The holder of a ***claim*** or interest

allowed under section 502 of this title may accept or reject a plan." (emphasis added).  A "claim"

of course includes a contingent claim.  *See*  11 U.S.C. § 101(5) (defining "claim" to include a

"right to payment, whether or not such right is . . . contingent").  There is no exception for

---

[16]    The Debtors' counsel has acknowledged that "various lower courts have continued to follow
the principles set forth in" *Acequia*, the issue "has not been seriously contested since," and that
the reason it has not been seriously contested is because "perhaps it is a reflection that this is
now settled case law."  Weil Restructuring, The Bankruptcy Voting Rights Act – Does the
Bankruptcy Code Require Universal Suffrage (Mar. 28, 2013) *available at*
*https://restructuring.weil.com/chapter-11-plans/the-bankruptcy-voting-rights-act-does-the-*
*bankruptcy-code-require-universal-suffrage/.*

contingent claims in section 1126(a).  Indeed, section 1126(c) counts claims based on the allowed

amount of the claim, and similarly has no exception for contingency.

64.    Moreover, a claim is allowed unless an actual objection to it is filed.  *See* 11 U.S.C.

§ 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed

allowed, unless a party in interest . . . objects.").  And the fact that a claim is contingent is *not* a

basis upon which to object to a claim.  *See* 11 U.S.C. § 502(b) (providing that a claim that is

"unenforceable . . . under any agreement or applicable law for a reason ***other than because such***

***claim is contingent or unmatured***" is not to be allowed) (emphasis added).

65.    The drafters of the Bankruptcy Code certainly knew what contingent claims are

(*see* 11 U.S.C. § 101(5)), and they also knew how to limit the ability of a contingent-claim holder

to take certain actions.  *See* 11 U.S.C. § 303(b) (requiring non-contingent claims to support filing

of involuntary petition); § 502(e) (disallowing reimbursement or contribution claims to the extent

they are contingent at the time of allowance).  But the drafters of the Code did not restrict the rights

of contingent claim holders to vote based on the fact that their claims where contingent in whole

or in part.  The Debtors' imposition such a restriction is improper and inconsistent with the plain

language of the Bankruptcy Code.[17]

66.    *Third*, the Plan states that the Debtors will file with the plan supplement a notice of

assumption of executory contracts or unexpired leases, and that any objection to the proposed

assumption, assignment, or related cure must be received by the Debtors within 10 days of service

of the assumption notice.  Plan § 8.2, at 33.  This time period is insufficient.  As the Debtors

acknowledge, the servicing agreements are the Debtors most significant current relationships, and

---

[17]    At an absolute minimum, in the event that claims objections are filed, any creditor should have
the ability to bring a motion under Rule 3018 for temporary allowance of the claim for voting
purposes.

there may be significant cure amounts and other issues to be determined upon the assumption or rejection of the contracts. Cross River requests an objection deadline of 14 days, and that any notice of assumption or rejection be served on counsel through the ECF system or other electronic means so as to provide Cross River sufficient time to respond.

## IV.    RESERVATION OF RIGHTS

67.    Cross River reserves the right to raise any and all other objections to the Disclosure Statement at the hearing. This objection is not limited to all of the issues that may be raised in opposing confirmation of the Plan, and Cross River reserves the right to make additional arguments opposing confirmation of any plan in this case.

## CONCLUSION

68.    For the reasons stated above, Cross River requests that the Court deny the Motion.

Dated: January 12, 2023                         Respectfully submitted,
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

*/s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (No. 3553)
1313 N. Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: (302) 442-7010
gwerkheiser@beneschlaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani
Isaac Nesser
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
susheelkirpalani@quinnemanuel.com
isaacnesser@quinnemanuel.com

Erika Morabito
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
erikamorabito@quinnemanuel.com

Matthew R. Scheck
300 West 6th Street, Suite 2010
Austin, TX 78701
Telephone: (737) 667-6100
matthewscheck@quinnemanuel.com

*Counsel to Cross River Bank*