**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-----------------------------------------------------------x
                               :

In re                          :    **Chapter 11**
                                :

**KABBAGE, INC. d/b/a KSERVICING,** *et al.,*  :    **Case No. 22-10951 (CTG)**
                                :
                                :    **(Jointly Administered)**
              **Debtors.**[1]        :
                                :
                                :    **Re: Docket Nos. 63, 396, 431, 433, 437**
                                :    **Hearing Date: January 19, 2023 at 10:00 a.m. (ET)**
                                :
-----------------------------------------------------------X

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO**
**MOTION OF DEBTORS FOR ENTRY OF ORDER (I) APPROVING**
**THE DISCLOSURE STATEMENT OF THE DEBTORS, (II) ESTABLISHING**
**SOLICITATION, VOTING, AND RELATED PROCEDURES, (III) SCHEDULING**
**CONFIRMATION HEARING, (IV) ESTABLISHING NOTICE AND OBJECTION**
**PROCEDURES FOR CONFIRMATION OF PLAN, (V) APPROVING SPECIAL**
**ELECTRONIC NOTICING PROCEDURES, (VI) APPROVING DEBTORS'**
**PROPOSED CURE PROCEDURES FOR UNEXPIRED LEASES AND**
**EXECUTORY CONTRACTS, AND (VII) GRANTING RELATED RELIEF**

Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this reply (the "**Reply**") to the Objections (as defined below) to the *Motion of Debtors for Entry of Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors' Proposed Cure Procedures for*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

*Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief* [D.I. 176] (the "**Motion**")[2] seeking, among other things, approval of the Disclosure Statement (as defined herein).

## Preliminary Statement

1.      The Debtors commenced these chapter 11 cases with the singular focus of processing the balance of their loan portfolio for the benefit of borrowers and completing their efforts to wind down their business pursuant to a chapter 11 plan and the Bankruptcy Code.  The Debtors have diligently spent the past 100 days in the most efficient manner practicable under evolving circumstances.  Despite finite and limited resources, the Debtors continue to service a complex loan portfolio during these chapter 11 cases amidst ever changing guidance from the Small Business Administration ("**SBA**"), they are engaged with stakeholders in an effort to confirm a consensual chapter 11 plan, and they are coordinating with relevant stakeholders in connection with developing a loan servicing transition plan that could be utilized should they cease servicing after the effective date of a confirmed chapter 11 plan.

2.      The Debtors may decide to seek a transition of all loan servicing portfolios—as to finally allow the Debtors to wind down their operations—and to utilize the time in chapter 11 to coordinate an orderly transition of loan servicing obligations and equip the Wind Down Estates to complete the wind down process and pursue potential Causes of Action.  The Debtors submit that the Plan is in the best interests of their estates and will enhance and maximize distributions for all creditors.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Plan (as defined herein) or the Disclosure Statement (as defined herein), as applicable.

3.     From the very outset of these Chapter 11 Cases, the Debtors have worked with their various stakeholders to build consensus and ensure an efficient transition through chapter 11, minimizing administrative costs, maximizing creditor recoveries where possible, and establishing a framework for the Debtors' wind down.  In furtherance of such goals, the Debtors filed the *Joint Chapter 11 Plan of Liquidation Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [D.I. 14] (the "**Initial Plan**") and the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [D.I. 63] (the "**Initial Disclosure Statement**") with its first day papers, to set forth a proposed wind down structure and expedite stakeholder negotiations in light of the Debtors' limited cash position.

4.     Since filing the Initial Plan and Initial Disclosure Statement, the Debtors worked earnestly with multiple parties in interest, including multiple government agencies, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), its Partner Banks, and counsel to various creditors.  On December 30, 2022, the Debtors filed the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [D.I. 395] (as may be amended, modified, or supplemented, the "**Plan**") and the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [D.I. 396] (as may be amended, modified, or supplemented, the "**Disclosure Statement**"), reflecting the change in the Debtors' circumstances (securing additional and necessary liquidity to pursue a "funded" transaction) and to address issues raised informally regarding the adequacy of information in the Initial Disclosure Statement, mechanics of the Initial Plan, and the Debtors' Solicitation and Voting Procedures.  A further amended Plan and Disclosure Statement are being filed contemporaneously herewith following additional discussions with stakeholders and case developments and in an effort to address the Objections

(defined below).  The Debtors seek to solicit votes on this Plan as they believe, as the sole fiduciary for all creditors in these cases, the Plan represents both the best path forward and is the necessary catalyst to end these Chapter 11 Cases.

5.      Pursuant to section 1125 of the Bankruptcy Code, the only question at hand is whether the Disclosure Statement enables a "hypothetical investor typical of the holders of claims or interests in the case" to cast an informed vote on the Plan.  11 U.S.C. § 1125(a)(1).  The Court is not required to consider specialized issues that a particular creditor may wish to raise with respect to a plan nor does it require that the disclosure statement satisfy the "adequate information" standard in relation to every single party in interest.  Further, the information required to be disclosed is only as "far as is reasonably practicable".  11 U.S.C. § 1125(a)(1).  The Debtors have worked diligently to try to address, to the extent practicable and appropriate, any objections with respect to the adequacy of the Disclosure Statement and/or the solicitation and tabulation procedures.  Accordingly, the Debtors will file contemporaneously herewith the further revised and amended version of the Plan and the Disclosure Statement, which incorporate responsive disclosures and/or provisions, as applicable. As detailed in the Objection Response Chart (as defined herein), the Debtors have addressed the Objections (as defined herein) that relate to the adequacy of disclosure by including certain additional language in the Disclosure Statement and/or the Plan—even where the Debtors believe that the requested disclosure extends beyond the scope of "adequate disclosure" per section 1125. As the Debtors have done, the Debtors will continue to work toward consensual resolution of all remaining disclosure-related Objections, where possible, in advance of the Disclosure Statement hearing.

6.      Tellingly, only three objections to the Disclosure Statement and the Debtors' requested relief in the Motion were filed, despite more than 493,000 parties in interest being served

with the initial notice of hearing to consider approval of the Disclosure Statement. *See Affidavit of Service* [D.I. 404]. The objections are filed by: (i) the U.S. Trustee [D.I. 431] (the "**UST Objection**"), (ii) the United States of America on behalf of itself and the U.S. Small Business Administration [D.I. 433] (the "**United States Objection**"), and (iii) Cross River Bank [D.I. 437] (the "**CRB Objection**" and together with the UST Objection and the United States Objection, the "**Objections**").

### Nature of the Objections

7. The issues raised in these Objections fall primarily into three (3) categories: (i) objections to the adequacy of the disclosures provided in the Debtors' Disclosure Statement (the "**Disclosure Objections**"); (ii) objections to the solicitation and voting procedures (the "**Solicitation Objections**"); and (iii) objections to the confirmation of the Plan on the basis that it is patently unconfirmable – a heavy burden that none of the objectors has sustained (the "**Confirmation Objections**"). Attached as **Exhibit A** is a chart identifying each of the Objections and the Debtors' responses (the "**Objection Response Chart**").

8. Although not all Objections have been resolved as of the date hereof, the Debtors will continue to work with the objecting parties to resolve, or at least narrow, the outstanding issues in advance of the hearing to consider the Motion and approve the Disclosure Statement and the Solicitation and Voting Procedures (the "**Hearing**"). The Plan and Disclosure Statement, as proposed to be modified and filed prior to the Hearing, resolve the majority of concerns raised by the Objections and informal comments received from additional parties in interest. The Debtors submit that, with the changes reflected in the Plan and the Disclosure Statement, as modified, the outstanding Objections have been addressed, are without merit as to any remaining issues, or are Plan objections that should be addressed at confirmation. For the reasons set forth herein, the Debtors respectfully submit that the Objections not otherwise resolved should be overruled, the

Disclosure Statement should be approved and the Debtors should be authorized to solicit votes on

the Plan as requested in the Motion.

**Modifications to the Plan and the Disclosure Statement**

**I.      Summary of Modifications to the Plan.**

9.      The Debtors have made certain revisions to the Initial Plan, including among other

things, the following changes:

      **A.**      Revising the means for implementation following certain settlements and resolutions reached by the Debtors, particularly with respect to CUBI and the entry of the Cash Collateral Order (Section 5.3);

      **B.**      Revising treatment of the Debtors' creditors to correspond with the changes made in connection with the means for implementation (Section 4);

      **C.**      Revising information regarding the transfer of any PPPLF Collateral to the Reserve Bank (Section 5.3);

      **D.**      Narrowing the releases proposed under the Plan and the scope of the injunction with respect to carve-outs for the Reserve Bank and United States (Sections 10.3; 10.5, 10.6);

      **E.**      Including additional detail regarding the Debtors' proposed post-Effective Date corporate governance and the preservation of Causes of Action (Sections 5.4; 5.8); and

      **F.**      Addressing the treatment of Indemnification Obligations with respect to current officers, directors, or employees of the Debtors (Section 8.5).

**II.      Summary of Modifications to the Disclosure Statement.**

10.      The Debtors have made certain revisions to the Initial Disclosure Statement,

including among other things, the following changes:

      **A.**      Updating the Initial Disclosure Statement regarding the Debtors' settlement with respect to the CB Receivable dispute and the Cash Collateral Order and the impact on the Chapter 11 Cases (Article I.B, Article V.E);

      **B.**      Adding further language with respect to the scope and mechanics of the proposed releases in the Plan (Article I.C);

C.  Detailing the Debtors' ongoing obligations with respect to their PPP business, including the handling of borrower overpayments and compliance with regulatory obligations and ongoing investigations (Article II.C);

D.  Updating the circumstances leading to the commencement of the Chapter 11 Cases, including updates with respect to disputes with stakeholders and their current status (Article IV.B);

E.  Revising the details regarding an overview of the Chapter 11 Cases to incorporate additional developments, including with respect to the approval of certain settlements, entry of the Cash Collateral Order, approval of the Non-Executive KERP, and details regarding the Debtors' potential Causes of Action (Article V);

F.  Summarizing the Debtors' efforts to date in developing a transition plan overview in connection with transferring their loan service obligations related to the Reserve Bank's and Partner Bank's loan portfolios to a third party (Article I.B); and

G.  Detailing additional risk factors to be considered with respect to voting to accept or reject the Plan (Article VIII).

## Argument

## I.    The Disclosure Statement Meets the Applicable Standards for Approval Under Section 1125 and the Disclosure Objections Should be Denied

### A.    The Disclosure Statement Meets the Applicable Standards for Approval Under Section 1125

11.    Pursuant to section 1125 of the Bankruptcy Code, the proponent of a chapter 11 plan must provide holders of impaired claims and interests entitled to vote on a plan with "adequate information" regarding the plan.    *See* 11 U.S.C. § 1125(a)(1).    Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

*Id.*  The determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  *See Oneida*

7

*Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.").

12.    In its section 1125 inquiry, the Court need not consider specialized issues that a particular creditor may wish to raise with respect to a plan, nor is a debtor required to explain why its chapter 11 plan is superior to other, hypothetical plans.    *See* 11 U.S.C. § 1125(a)(1) ("[A]dequate information need not include such information about any other possible or proposed plan[.]").  Further, "adequate information," as used in section 1125 of the Bankruptcy Code, does not require that the Disclosure Statement include information about every aspect of the Debtors' business, the Plan, or claims asserted against the Debtors.  Rather "adequate information" is limited to "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]"  11 U.S.C. § 1125(a)(1); *see also Bank of N.Y., Mellon Tr. Co. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 317 (E.D. Pa. 2013) ("What constitutes 'adequate information' is determined on a case-by-case basis, with the ultimate determination within the discretion of the bankruptcy court.") (citing *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1156–57 (5th Cir. 1988)), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).

13.    Information that will have no bearing on a hypothetical investor's vote to accept or reject a plan of reorganization need not be included in the Disclosure Statement for the Disclosure Statement to comply with section 1125 of the Bankruptcy Code.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (noting that "certain categories of information which may be necessary in one case may be omitted in another"); *In re River Vill. Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (explaining that courts should consider the specific needs of parties in

interest). Further, courts have held that even where "the disclosure statement could have included more information . . . a disclosure statement need not be perfect and may be approved if the information is reasonable in the circumstances." *In re Price Funeral Home, Inc.*, Case No. 08-04816-8-ATS, 2008 WL 5225845, at *2 (Bankr. E.D.N.C. Dec. 12, 2008).

14. Courts have identified categories of information that generally should be included in a disclosure statement, while acknowledging that certain categories of information that are necessary in one case may be omitted in another. *See Phoenix Petroleum*, 278 B.R. at 393; *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988).

15. Here, the Disclosure Statement contains adequate information in each of those categories necessary for creditors to make an informed decision in these Chapter 11 Cases. Specifically, the Disclosure Statement contains information regarding the below:

- The Debtors' corporate history and structure, business operations, prepetition capital structure and liquidity are discussed in <u>Section III</u>;
- Events leading up to these Chapter 11 Cases are discussed in <u>Section IV</u>;
- The classification and treatment of claims and interests under the Plan, including who is entitled to vote and how to vote on the Plan, is discussed in <u>Section VI</u>;
- Certain important effects of confirmation of the Plan are discussed in <u>Section VI.H</u>;
- U.S. federal income tax consequences of confirming the Plan are discussed in <u>Sections VII.</u>;
- The statutory requirements for confirming the Plan are discussed in <u>Sections X.C</u>; and
- Certain risk factors that holders of claims should consider before voting to accept or reject the Plan and information regarding alternatives to confirmation of the Plan are discussed in <u>Sections VIII</u>.

16. The Disclosure Statement provides more than adequate information for creditors entitled to vote to make an informed decision about whether to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code. Further, as reflected in the Objection Response Chart and as described below, the Debtors have made numerous changes to the Disclosure Statement to include additional disclosures addressing the Objections, even where the Debtors believe that the requests extend beyond the scope of "adequate disclosure" required by section 1125. Accordingly,

the Disclosure Statement as currently proposed provides more than adequate information for creditors entitled to vote to make an informed decision about whether to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code.

**B.    CRB's Disclosure Statement Objection Should Be Denied**

17.    CRB argues that the Disclosure Statement fails to adequately disclose: (i) what creditors will receive under the Plan, (ii) valuable estate claims against insiders and others, including the AmEx Transaction and related claims, and (iii) that claims against those insiders will be controlled by such insiders.  The CRB Objection, however, misinterprets material provisions of the Plan, misconstrues or omits relevant facts, and fails to account for complexities involved in the Debtors' business operations.  For several reasons, as noted herein, the CRB Objection—to the extent not resolved by the modifications made to the Disclosure Statement, should be denied.

*Creditor Recoveries are Adequately Disclosed*

18.    *First*, the Disclosure Statement and Plan make clear that sources of distribution under the Plan will include, among other things, Net Cash Proceeds, the proceeds from the sale of any or all Legacy Loans, proceeds from the sale of any or all KS Direct PPP Loans, and any other non-Cash assets of the Debtors that may become Cash, including proceeds from the Estate Causes of Action.  *See* Plan § 5.2.  As CRB intimates, the most significant sources of distribution available for Holders of General Unsecured Claims are any proceeds of Estate Causes of Action; however, the value or magnitude of such proceeds, if any, are necessarily uncertain given they will be pursued by the Wind Down Officer on a post-Effective Date basis.  To include an estimate of potential recoveries on Estate Causes of Action at this time, particularly with respect to the oft-referenced AmEx Transaction which the Debtors have conducted initial investigatory steps in relation thereto (including informal discovery requests in connection with the AmEx Transaction but subject to ongoing investigation), could prove to be misleading.  Rather than engage in

conjecture, the Debtors have aptly noted that recoveries on Estate Causes of Action are "to be determined." *See In re Chinos Holdings, Inc.*, Case No. 20-32181 (KLP) (Bankr. E.D. Va. June 26, 2020) [D.I. 559] (approving disclosure statement which included a liquidation analysis [D.I. 542 at 152] that excluded recoveries or costs associated with litigation or potential avoidance actions because "the [d]ebtors believe that recoveries from such actions or litigation, if any, would be speculative in nature and are therefore not presented here"); *In re Fairway Grp. Holdings, Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Aug. 14, 2020) [D.I. 686] (approving disclosure statement where liquidation analysis [D.I. 571 at 6] did not include estimation of recoveries for causes of action); *In re SLT Holdco, Inc.*, Case No. 20-18368 (MBK) (Bankr. D.N.J. Sept. 16, 2020) [D.I. 461] (approving disclosure statement with recovery analysis [D.I. 376-1 at 17 n.3] providing "[t]he estimated recovery percentage for Class 6 General Unsecured Claims does not include any proceeds for recoveries on account of Retained Causes of Action.  At this time, the Debtors have not conducted a separate valuation of any of the Retained Causes of Action.").

19.    Here, the Debtors *do* quantify the projected monies available for distribution to creditors—those projections merely attribute zero value to the Estate Causes of Action because of their inherently unpredictable nature at this stage.  CRB fails to acknowledge that Distributions are funded from a number of sources, not just Estate Causes of Action.  The other components are quantified, or otherwise given a projected value, because the Debtors have the means to reasonably derive the applicable value.  The fact that the other components of Distributions are, as estimated, insufficient to satisfy claims senior to those held by CRB, does not mean that the Debtors have provided "no information" as CRB suggests.

20.    With respect to CRB's objections to the Debtors' Liquidation Analysis, the Debtors will demonstrate in connection with Plan confirmation that the Liquidation Analysis proves that

the Plan meets the best interests test.  Setting aside CRB's conflating of Disclosure Statement and

Plan confirmation issues, it is disconcerting that the nation's self-proclaimed second largest PPP

lender by loan count[3] thinks that the Debtors are being "nonsensical" in assuming that the balance

of the CRB PPP Loans could lose their Guaranty Purchase or Loan Forgiveness eligibility in a

chapter 7 scenario where the servicing of the loans ceases entirely.[4]  SBA PPP regulations are

abundantly clear: lenders and borrowers need to take active steps—including submission of

Guaranty Purchase and Loan Forgiveness applications and attestation of multiple certifications

regarding the underlying loan application, use of proceeds, and attempts to collect by lenders,

among others—before the SBA will honor its Guaranty Purchase or Loan Forgiveness

obligations.[5]  It takes no stretch of the imagination to consider a scenario where the SBA will

refuse to take action with respect to matured loans or in connection with delinquent borrowers

where no application has been submitted by the lender.

21.     Supporting the Debtors' assumption in the Liquidation Analysis is the fact that the

SBA's Guaranty's Purchase and Loan Forgiveness obligations are time limited.  If appropriate

borrower or lender action is not taken within the prescribed time period, then it is reasonable to

assume that CRB will never be made-whole on its PPP portfolio.  Therefore, the Debtors

reasonably assumed in the Liquidation Analysis that, upon the hypothetical conversion to a chapter

---

[3] Cross River, *PPP Impact Report 2021, How Cross River Saved More Than One Million Jobs*, at 2 (2021), https://www.crossriver.com/sites/default/files/2021-12/CrossRiver_PPPImpactReport_2021.pdf.

[4] "The Liquidation Analysis assumes that, in a chapter 7, operations of the Debtors will cease and the Trustee will sell or transfer substantially all of the Debtors' remaining assets through a liquidation process beginning on or about March 31, 2023 (the "**Conversion Date**") and will subsequently complete the administrative closure of the cases." Liquidation Analysis at 1.

[5] *See* SBA Procedural Notice Control No. 5000-812316, at 6 (2021) (*e.g.*, "An Authorized Lender Official must certify the following for each guaranty purchase request:… [t]he Lender has made, closed, and serviced the loan in accordance with the PPP Loan Program Requirements."); SBA Procedural Notice Control No. 5000-20038, at 1 (2020) (*e.g.*, "To receive PPP loan forgiveness, a borrower must complete and submit the Loan Forgiveness Application (SBA Form 3508, 3508EZ, or Lender equivalent) to its Lender (or the Lender servicing its loan)").

7, all servicing would cease and that the chapter 7 trustee would make no effort to continue servicing the CRB portfolio—certainly a reasonable, if not realistic assumption, given that servicing of the CRB portfolio is a prepetition obligation, not an asset, of the Debtors.

22.    In contrast, both of the two chapter 11 scenarios—PPP Transfer and Post-Effective Date PPP Servicing—will result in the CRB PPP Loans receiving ordinary course service, whether by the Debtors or by a third-party loan servicer.  Because servicing will continue, the Debtors have assumed in the Liquidation Analysis that the potential claim by CRB would be in large part based on the "excess loan amounts" and, unlike a chapter 7, there would be no reason to think that the balance of the CRB PPP Loans might be ineligible for Guaranty Purchase or Loan Forgiveness on account of a lapse in servicing.  Thus, for purposes of the Liquidation Analysis, in a chapter 11 the aggregate General Unsecured Claims are assumed to be approximately $31 million, whereas in a chapter 7 they are assumed to be approximately $578 million.  Notwithstanding the adequacy of disclosure in the Liquidation Analysis notes, for the sake of clarity, the Debtors have added brief explanatory language to the Liquidation Analysis to provide further detail on this matter in response to CRB's objection.

### *AmEx Transaction and Related Causes of Action are Adequately Disclosed*

23.    Recognizing the importance of proceeds from the Estate Causes of Action, the Debtors have disclosed their ongoing efforts to investigate the AmEx Transaction, including an overview of the ongoing discovery process.  The Disclosure Statement makes clear that the AmEx Transaction is important and related Claims and Causes of Action are thereby being investigated and are under review by the Debtors' board of directors.  CRB is taking the position that the Debtors' disclosures pertaining to the AmEx Transaction are inadequate because the Disclosure Statement should "mention that the AmEx Transaction and accompanying shareholder distribution

was clearly a fraudulent transfer." In support of its contention, CRB points to, in principal part, a congressional report. CRB Obj. ¶ 7. To be clear, the Debtors' investigation remains ongoing and although others may have already reached a conclusion as to what Claims or Causes of Action may exist with respect to the AmEx Transaction, it is premature for the Debtors to reflect any conclusions in the Disclosure Statement, where none have yet been reached. Nor do the Debtors believe that such conclusions are necessary to inform a hypothetical investor to vote to accept or reject the Plan. The Debtors have disclosed the high-level structure of the AmEx Transaction, that the investigation is in process, and the status of document collection/discovery. Further, as noted in the CRB Objection, the Debtors have provided CRB with certain documents related to the AmEx Transaction that CRB has requested, in addition to having discussions with CRB regarding the same. CRB Obj. ¶ 7 n.4. It is axiomatic that requests for disclosure of unnecessary, unavailable, or privileged information not required by section 1125 of the Bankruptcy Code should not delay solicitation.

### *Post-Effective Date Corporate Governance is a Confirmation Issue and No Inadequacy of Disclosure Exist as to the Wind Down Officer*

24.    Post-Effective Date corporate governance is clearly a confirmation issue. However, given CRB's implication that the Debtors may be acting untoward, the Debtors respond to clear the record.

25.    CRB argues that the Debtors' current board of directors, who are serving at the behest of those orchestrating the AmEx Transaction, will be selecting the Wind Down Officer. CRB Obj. ¶ 8–9. Importantly, each director is well aware of their fiduciary duties to the Debtors and their stakeholders. And the Debtors, as the sole fiduciary for all creditors in these cases, seek to select a Wind Down Officer with the consent of the Reserve Bank and consultation with certain creditors—including CRB. The Plan explicitly states that the identity of the Wind Down Officer

will be included in the Plan Supplement.  Plan § 1.83.  As part of any confirmation of the Plan, the

Plan Supplement will be subject to objection by parties in interest, and CRB will be free to raise

any objection with respect to the identity of the Wind Down Officer at that stage.  Once the Wind

Down Officer is appointed, it will owe fiduciary duties to its stakeholders and will owe no fiduciary

duties to any former holder of KServicing Stock until all Allowed Claims are paid in full.  *See* Plan

§ 5.4(d)(xiii) ("until all Allowed Claims have been satisfied in full in accordance with the

Bankruptcy Code and the Plan, the Wind Down Officer shall owe no fiduciary duties to KServicing

Existing Equity Interests on account of the Single Share maintained by the Wind Down Officer.").

Further, for the avoidance of doubt, the Wind Down Officer shall be the sole officer, director or

manager, as applicable, of each of the Debtors.  *See* Plan § 5.4(e).

26.    CRB's statement that "creditors—whose money is actually at stake—have no say

in (let alone control over) the selection of the Wind Down Officer or the prosecution of causes of

action[,]" CRB Obj. ¶ 11, is baseless and underestimates the Reserve Bank's claims while over-

inflating CRB's contingent claims.  CRB's contention that the Reserve Bank's recovery range

should be higher than set forth in the liquidation analysis on account of the SBA's indication that

it will pay certain "excess amounts" of PPPLF Loans, and the Reserve Bank should therefore have

no need to look to the causes of action as a means of recovery, overlooks the scope of the Reserve

Bank Claim.  CRB Obj. ¶ 37.  Importantly, although the SBA has indicated certain things to date,

they are just that, indications.  There is no guarantee that the SBA will continue to abide by their

previous statements.  Moreover, the Reserve Bank Claims beyond just principal and interest on

the PPPLF Advances include, among other things, mitigation costs and the costs associated with

transferring servicing of the Pledged PPPLF Loans.  Put differently, there is no viable scenario in

which the Reserve Bank is paid off in full from the PPPLF Collateral, and as such, the Reserve

Bank will need to look to the Estate Causes of Action for recovery.  Further, as we stand here today, CRB's claim remains contingent—like many of the Debtors' general unsecured claims which are contingent, unliquidated, or disputed—and their claim remains subject to allowance. Beyond the issue of whether CRB's claims are valid, CRB's claims are reduced dollar-for-dollar by any SBA payment, and there is a plausible chance that CRB's claim is reduced dramatically by SBA payments, perhaps even to a level where they are not the Debtors' largest unsecured creditor, by far.  Although CRB asserts that it has more at stake because they don't enjoy the same benefit of the Reserve Bank and the treatment of their "excess amounts," there is no requirement that the Debtors assume the best-case scenario for the Reserve Bank and the worst-case scenario for CRB.

27.    In short, each of CRB's Objections with respect to adequate information is sufficiently addressed in the Disclosure Statement and Plan it seeks to solicit and should be overruled.

**C.    The United States of America's Disclosure Statement Objection Should be Denied**

28.    The United States objects to the Disclosure Statement on the basis that it lacks adequate information regarding what will happen in a scenario where the Debtors transfer their loan servicing obligations, and more specifically, how loan documentation will be transferred such that the United States will continue to have access.  *See* United States Obj. ¶ 12–13.  Importantly, as the United States reflects in paragraph 15 of the United States Objection, the parties have had fruitful and productive conversations to consensually resolve concerns and discussions are ongoing to resolve the few remaining issues.

29.    The Disclosure Statement, as revised, includes additional information regarding the Debtors' efforts and approach to transferring their loan servicing obligations—including disclosures around the challenges involved, the necessary components of the potential transfer that

involve several workstreams and various third parties, the work done to date, and importantly, what remains. Similarly, the Disclosure Statement now reflects additional information as to the analysis underway to estimate Post-Effective Date Servicing Costs and what operational requirements would be necessary (*e.g.* employee footprint). For the avoidance of doubt, these disclosures are with respect to the Debtors proposed process and as the Debtors, in concert with the applicable stakeholders, take on the herculean task of transferring the loan obligations, they may have to pivot towards the Post-Effective Date PPP Servicing scenario as facts and circumstances evolve. In the Post-Effective Date PPP Servicing scenario, the operational footprint may change depending on what the ultimate remaining portfolio looks like. Additionally, although the Debtors believe that the United States' concern with respect to having continued access to documents following the Debtors' transfer of loans is, at best, an issue to be discussed at confirmation, the responsibility and costs associated with such post-transfer request is neither the obligation nor responsibility of the Debtors. Any SBA requests for information post transfer should be made to the servicer or lender of record. Further, in regards to non-transferred Pledged PPPLF Loan documentation, any retention related obligations will fall to the SBA. Accordingly, while the means of the Plan's implementation may eventually change, as of today, the information reflected in the Disclosure Statement (including the related risk factors) is as far as is reasonably practicable based on the Debtors' best estimate of what is to come. Thus, the Debtors believe these disclosures are adequate to inform a hypothetical voter of proceeding with its vote on the Plan.

## II.    The Solicitation and Voting Procedures are Reasonable and Appropriate and Solicitation and Voting Procedures Objections Should Be Denied.

### A.    The Opt-Out Mechanism for Voting Creditors in the Ballots is Permissible

30.    CRB and the U.S. Trustee[6] each object to the Plan and form of ballots (collectively, the "**Ballots**") on the basis that they improperly limit the rights of voting creditors to opt-out of the Plan's third party releases set forth in section 10.6 (the **"Third Party Releases"**).  Specifically, CRB and the U.S. Trustee argue that creditors who vote to accept the Plan must be given the opportunity to opt-out of the Third Party Releases.

31.    The Plan, the Disclosure Statement, the Confirmation Hearing Notice, and form of Ballots provide ample opportunity for voting creditors to evaluate the terms of the Plan, including the releases, and instructions to opt-out of the Third Party Releases.  Specifically, the Ballots provide a creditor with clear and specific choices: (1) vote to accept the Plan and consent to the Third Party Releases; (2) vote to reject the Plan and consent to the Third Party Releases; (3) vote to reject the Plan and opt out of the Third Party Releases; and (4) abstain from voting on the Plan

---

[6] In its objection, the U.S. Trustee also argues that an "opt-in" mechanism is required for a creditor to affirmatively consent to the Third Party Releases (as defined herein) relying on *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) and *Emerge Energy Servs. LP*, Case No. 19-11563, 2019 WL 7634308 at *52 (Bankr. D. Del, Dec. 5, 2019).  *See* UST Obj. at ¶ 15-17.  Initially, this position is inherently inconsistent with the U.S. Trustee's position that voting creditors must be given an opportunity to opt-out of the releases. *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (finding that voting in favor of a plan of reorganization that provides for a third-party release indicates consent to the release, even without an explicit election opting to accept the third-party release provision).  Regardless, to the extent the U.S. Trustee is pressing this aspect of its objection, an opt-in mechanism is not required and Courts in this district have routinely approved opt-out mechanisms for third party releases.  *See* Hr'g Tr. at 77:4-13, *In re AH Liquidation, Inc.*, Case No. 21-10883 (CTG) (Bankr. D. Del. Oct. 27, 2021) [D.I. 394] (the practice of adding an opt-out mechanism on the ballot is "perfectly appropriate" to indicate that a party objects and does not agree to grant a third-party release); Hr'g Tr. 48:9-11, *In re Z Gallerie, LLC*, Case No. 19-10488 (LSS) (Bankr. D. Del. June 13, 2019) [D.I. 384] ("With respect to third-party releases I'm prepared to find that they are consensual because of the opt-out box in the ballots."); Hr'g Tr. 214:6–12  *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 16, 2018) [D.I. 252] ("And with regard to the third-party releases, I mean, look, I think they're consensual.  I don't think they're nonconsensual.  It's very clear in the notice, you know, shareholders and creditors have to read legal notices; that's just the way it is. And if you don't know that, then you're proceeding at your own risk . . . ."); Hr'g Tr. 62:10–14  *In re Gibson Brands*, Case No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2, 2018) [D.I. 873] ("I have ruled numerous times that 'check the box' isn't required for a creditor to be deemed – to have been deemed to consent to something, that it's sufficient to say, here's your notice, this is what's going to happen and if you don't object, you'll have been deemed to consent").

and opt out of the Third Party Releases. *See* Motion, Exhibit 2-A, at 4. Under the terms of the Plan and as is clearly set forth in the Ballot, if a voting creditor determines that it does not want to grant the Third Party Releases, the creditor has the option to vote to reject the Plan or abstain from voting and, in either case, opt-out of the Third Party Releases. CRB and the U.S. Trustee do not (and cannot) argue that creditors are not given clear instructions on how to opt-out of the Third Party Releases.

32.    Instead, CRB and the U.S. Trustee argue that creditors who vote to accept the Plan *must* be given the opportunity to opt-out of the Third Party Releases. At least one court in this district has rejected this argument and approved, over objection, ballots that condition voting in favor of the plan on giving a third party release and noted that "affirmatively voting on the plan is enough action to be an acceptance of the third-party releases." Hr'g Tr. 59:21-60:2, *In re RCS Cap. Corp.*, Case No. 16-10223 (MFW) (Bankr. D. Del. Mar. 21, 2016) (the "***RCS* Hr'g Tr.**"), attached hereto as **Exhibit B**. Further, the court in *RCS* noted that the ballots were clear that "[i]f a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote." *Id.* The same is true here.

33.    Further, consistent with basic principles of contract law it is not uncommon for a party to a contract to voluntarily relinquish certain of their rights. *See Dooley v. Weil (In re Garfinkle)*, 672 F.2d 1340, 1347 (11th Cir. 1982) ("A party may waive any right which it is legally entitled to."). *See also Old Republic Ins. Co. v. Rexene Corp.*, Case No. 90-10970, 1990 WL 176791, at *3 (Del. Ch. Nov. 5, 1990) ("Waiver may be found where a party intentionally and voluntarily relinquishes a known right."); *In re U.S. v. Erwin*, 765 F.3d 219, 229 (3d Cir. 2014) ("A waiver is defined as the intentional relinquishment or abandonment of a known right.") (internal quotations omitted); *Evcco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 193 (3d

Cir. 1987) ("It is well settled that a party may waive statutory provisions (as well as other rights) intended for that party's benefit . . ."); *see also In re TPC Group*, Case No. 22-10493 (Bankr. Del. Sept. 27, 2022) [D.I. 855] (approving plan that contains release for claims "whether liquidated or unliquidated, fixed or contingent, matured or unmatured, *known or unknown*, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise . . .") (emphasis added); *In re Mallinckrodt, PLC*, Case No. 20-12522 (Bankr. D. Del. Mar. 2, 2022) [D.I. 6660] (approving plan that contains releases for claims "whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law . . ."). If a creditor, after reviewing the Ballot, Plan and the Third Party Releases, wants to vote to accept the Plan then it is clear by doing so that it is granting the Third Party Releases. Indeed, even those courts that have held that an "opt-in" mechanism is required for third party releases, agree that "an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release." *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017). It bears underscoring that, rather than providing creditors with the opportunity to cherry-pick provisions of a plan that they want to adhere to, the Debtors' solicitation procedures provide creditors with the ability to vote to reject the plan in its entirety.

34.    The Debtors acknowledge that this Court in *In re TPC Group Inc.* held that "in order to approve [the] ballot . . . [it] would need to give every creditor [in the respective class] the option to opt out of the third party releases without affecting their ability to vote in favor or against the plan." *See In re TPC* Group, Case No. 22-10493 (CTG), Hr'g Tr. 71:22–72:3 (the "***TPC* Hr'g**

Tr."). However, the circumstances of these Chapter 11 Cases are distinguishable from *TPC* for several reasons. *See TPC* Hr'g Tr. 72:4–8 (noting that the ruling in *TPC* was "limited to the circumstances of this case" and the Court expressed that it was "open-minded in a different case to considering [the same issue] again.").

35.    *First*, as the U.S. Trustee noted, the *TPC* plan included a "death trap" provision, whereby claimants who voted in favor of the plan could, because of factors outside of their control (i.e., the class ultimately voted against the plan), receive no recovery while also granting a release. The Court believed this made the ballot inherently confusing and unfair no matter how clear the debtors made the instructions on the ballot. *See TPC* Hr'g Tr. 29:9-16 ("Just to be clear, I've got concerns in the context of this case and the structure of this plan . . . because of the death trap feature of the plan that tying the release or not to a vote, where you don't know what the treatment is you're going to get when you might vote, itself, be a problem, particularly in a situation where creditors are real people."). Here, by contrast, the Debtors' Plan does not include a "death trap" for either of its voting classes and the treatment afforded to both accepting and rejecting claimants is clear and consistent regardless of the manner in which the class votes. In other words, regardless of whether the applicable voting class ultimately votes for or against the Debtors' Plan, the consideration give to a creditor in a voting class that votes to accept the Plan will not change.

36.    *Second*, as noted above, the composition of the voting creditors in these Chapter 11 Cases is different than that in *TPC*.    The voting creditors in *TPC* included involuntary tort claimants who were not the "sort of sophisticated financial players who are regular players in bankruptcy" and "not people who chose to do business with the debtor," *TPC* Hr'g Tr. 21:17–23, 56:6–9.    Conversely, the only creditor in Class 3 is the Reserve Bank—a sophisticated governmental institution who is a Releasing Party represented by experienced bankruptcy counsel

who are heavily participating in the Chapter 11 Cases and are familiar with how bankruptcy cases operate and are already a Releasing Party regardless of whether they opt out of the Third Party Releases (on their ballot or otherwise).  In addition, although creditors in Class 4 are wide ranging, they include sophisticated governmental institutions (including the United States and the Small Business Administration) represented by bankruptcy counsel, the Partner Banks, each of which are represented by bankruptcy counsel, former officers and directors who are also represented by bankruptcy counsel, trade claimants and a subset of borrowers who filed claims prior to the Bar Date.  And unlike the *TPC* creditors, the borrowers here—if borrowers indeed have claims, which is left to be determined—affirmatively chose to do business with the Debtors; these are not the involuntary creditors that gave rise to the Court's holding in *TPC*.

37.      *Third,* part of the Court's ruling in *TPC* was based on the fact that the Court was not aware of any rulings by any of the other bankruptcy judges in the District of Delaware on whether it was permissible "to condition the right to vote in favor of a plan on granting a release." *TPC* Hr'g Tr. 71:10-12.  As noted above, Judge Walrath in *RCS* expressly ruled that such a structure was permissible after having a colloquy with debtors' counsel.  *See RCS* Hr'g Tr. 59:21– 60:2 ("…there's enough affirmative action required to allow the mechanism the debtor is suggesting because it's clear in the ballot that, if they vote yes on the plan, they are granting a release.  If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote. So I think affirmatively voting on the plan is enough action to be an acceptance of third-party releases.").

38.      *Finally*, as noted above, the Debtors have made the Ballots as clear and concise as possible to provide that acceptance of the Plan also requires consent to the Third Party Releases.

There can be no argument that a voting creditor is unaware of its options when filling out a ballot and/or the consequences of voting in favor of the Debtors' Plan.

**B.      Non-Voting Creditors Have the Ability to Object to the Third Party Releases**

39.      The U.S. Trustee also contends that non-voting creditors must be given the ability to opt-out of the Third Party Releases.   There is no requirement that all creditors must be provided with the ability to opt-out of third party releases for such releases to be consensual.  In fact, courts in this district have found releases to be ***consensual*** where creditors are unimpaired and deemed to accept a plan, ***without*** the creditors' affirmative consent where, as is the case here, such deemed-accepting creditors were unimpaired pursuant to the plan as consideration for their release.  *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 297 (Bankr. D. Del. 2013); *U.S. Bank Nat'l Ass'n. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010).

40.      Nevertheless, the Plan expressly provides non-voting creditors with the ability to opt-out of the Third Party Releases by filing an objection.[7]  Specifically, the Plan provides that non-voting creditors—including holders of Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Intercompany Claims, and Subordinated Securities Claims—will not be bound by the Third Party Releases if the creditor objects to such releases.  *See* Plan § 1.104 ("Releasing Parties means . . . all holders of Claims that are unimpaired and deemed to accept or impaired and deemed to reject the Plan and who do not object to the releases in Section 10.6 of the Plan").[8]  The Confirmation Hearing Notice also conspicuously

---

[7] The U.S. Trustee also seems to suggest that you must retain counsel in order to file anything with the Court.  This is plainly not true as is evidenced by numerous filings in these Chapter 11 Cases by *pro se* claimants, and such practices are well established among bankruptcy courts.

[8] The most recent version of the Plan removes holders of Interests in Class 8 from the definition of "Releasing Parties".  Accordingly, such holders are no longer providing the Third Party Releases.  In addition, while, pursuant to the most recent version of the Plan, the holders of Interests in Class 6 are unable to opt-out of the Third Party Releases, such holders are either the Debtors (and thus are proponents of the Plan) or Affiliates of the Debtors (and thus are

includes the Third Party Releases and specifically provides notice to non-voting creditors that they will be deemed to consent to the releases unless they file an objection to the Plan.  Courts in this district have approved this construct and have held there is no requirement to send an opt-out form to non-voting creditors and interest holders.  *See TPC* Hr'g Tr. 69:16-70:6 ("I'm also comfortable with the debtors' proposal that no opt-out form be sent to, essentially, unclassified creditors or anyone who is, essentially, not a voting creditor . . . Obviously, those parties could file a confirmation objection, but I don't think we have to give a form to those creditors."); *In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 586 (Bankr. D. Del. 2022) ("Creditors in non-voting classes could opt-out of these releases by objecting to the Plan.").[9]

41.    Further, the U.S. Trustee argues that creditors that fail to return a ballot should not be bound by the Third Party Releases.  Courts in this district have approved third-party releases as consensual where holders of claims or interests failed to return a ballot.  *See, e.g.*, Confirmation Hr'g Tr. 110:13-14, *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) [D.I. 1121] (approving the form of ballot and noting that "[t]here was clear notice of the opt-out requirement in both, mailed and published notice . . . ."); Confirmation Hr'g Tr. 62:10-14, *In re Gibson Brands*, Case No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2018) [D.I. 873] ("I have ruled numerous times that 'check the box' isn't required for a creditor to be deemed – to have been deemed to consent to something, that it's sufficient to say, here's your notice, this is what's going

---

controlled by the Debtors) and, therefore, it serves no purpose to provide such holders with the opportunity to opt-out of the Third Party Releases.

[9] It is unclear from the UST Objection whether the U.S. Trustee is arguing that all creditors and Interest holders should receive an opt-out form rather than being required to object to opt-out of the Third Party Releases.  To the extent the U.S. Trustee is making that argument, the Debtors believe that objection may be moot because, due to the recent changes to the Plan, the only potential Releasing Parties that are not receiving a Ballot are the holders of Subordinated Securities Claims (which the Debtors do not believe exist) and creditors that are unimpaired or otherwise being paid in full.

to happen and if you don't object, you'll have been deemed to consent"); Confirmation Hr'g Tr. 87:11-18, *In re Corinthian Colleges Inc.*, Case No. 15-10952 (KJC) (Bankr. D. Del. Aug. 26, 2015) [D.I. 921] ("I will deem consent to have occurred with respect to the third-party releases with respect to those creditors who are entitled to vote but who have not submitted opt-out ballots, that it seems to me that the burden of having to submit is so light . . .); *see also Indianapolis Downs,* 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.").  Here, the Confirmation Hearing Notice and the Ballots provide clear instructions to a voting creditor on how to opt-out of the Third Party Releases and return the Ballot and voting creditors should be required to follow such instructions.

42.     Finally, the U.S. Trustee questions which parties fall into the category of Releasing Parties that includes "all holders of Claims not otherwise included in the foregoing clauses (a) – (e) who have notice and an opportunity to object to the releases and who do not object to the releases in Section 10.6 of the Plan."  *See* Plan § 1.104.  The intent of this language is to capture the holders of unclassified claims, which include, among others, administrative expense claimants and priority tax claimants.  Similar to creditors in non-voting classes, these parties are also given the opportunity to opt-out of the Third Party Releases by filing an objection and the Confirmation Hearing Notice specifically includes instructions on how an "unclassified" claim can object to the Third Party Releases in the Plan.  Moreover, such creditors will be paid in full so that alone constitutes sufficient consent to the Third Party Releases.  *See, e.g.*, *Indianapolis Downs,* 486 B.R. at 297; *Spansion*, 426 B.R. at 144.

**C.     CRB's Other Objections to the Solicitation and Voting Procedures Should be Overruled or are Resolved**

43.     In addition to its objection to the opt-out mechanism in the Ballots, CRB also objects to the Solicitation and Voting Procedures on the basis that the procedures (i) improperly disregard contingent claim amounts for voting purposes, and (ii) provide insufficient time for creditors to object to the Assumption Schedule.

44.     Courts have routinely approved voting and tabulation procedures that provide that holders of contingent claims may vote in the amount of $1.00.  *See, e.g.*, Order ¶ 22(d), *In re AH Liquidation, Inc.*, Case No. 21-10883 (CTG) (Bankr. D. Del. Sept. 23, 2021) [D.I. 331] (approving disclosure statement that provides that "after a reasonable review by the Claims and Balloting Agent, as contingent, unliquidated or disputed, either in whole or in part, or if no Claim amount is specified on such proof of Claim, such Claim shall be temporarily allowed solely for voting purposes in the amount of $1.00 . . ."); *see also* Order ¶ 26(c), *In re Chinos Holdings, Inc.*, Case No. 20-32181 (KLP) (Bankr. E.D. Va. June 26, 2020) [D.I. 559] (approving disclosure statement that provides that "[i]f a claim for which a proof of claim has been timely filed or is otherwise included in the Debtors' Schedules is wholly contingent, unliquidated, or disputed . . . such claim is accorded one vote and valued at $1.00 for voting purposes only"); Hr'g. Tr. 17:19-25, *In re Panda Temple Power, LLC*, Case No. 17-10839 (LSS) (Bankr. D. Del. June 27, 2017) [D.I. 238] ("I have no problem with unliquidated and contingent claims being temporarily allowed for a dollar, I suppose, with the caveat that someone can come in here and challenge that through a 3018 motion or otherwise, but not a disputed claim.").  Here, consistent with Judge Silverstein's statements in *Panda Temple*, the Debtors' Solicitation and Voting Procedures provide creditors with contingent claims with the ability to file a motion pursuant to Bankruptcy Rule 3018 to have

its claim temporarily allowed for purposes of accepting or rejecting a proposed plan.  *See* Solicitation and Voting Procedures ¶¶ 31–34.  Accordingly, this objection should be overruled.

45.     With respect to ten (10) days being insufficient for counterparties to object to the Assumption Schedule, such timing is commonplace and courts in this district have confirmed plans providing for a ten (10) day objection period (or less) to an assumption schedule or plan supplement materials.  *See, e.g., In re Ruby Pipeline, L.L.C.*, Case No. 22-10278 (CTG) (Bankr. D. Del. Dec. 19, 2022) [D.I. 561] (confirming plan providing for objection period of seven (7) days from the service of the assumption notice); *see also In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. Oct. 16, 2020) [D.I. 998] (confirming plan providing for objection period of ten (10) days from the service of the assumption period); *In re Fred's Inc.,* Case No. 19-11984 (CSS) (Bankr. D. Del. June 4, 2020) [D.I. 1162] (confirming plan providing for objection period of seven (7) days from service of assumption schedule); *In re Southland Royalty Co.*, Case No. 20-10158 (KBO) (Bankr. D. Del. May 21, 2021) [D.I. 1735] (confirming plan requiring Debtors to provide an objection period of at least 7 days from service of cure notice).  Moreover, if the Debtors filed a motion to assume any contract pursuant to Bankruptcy Code section 365, the non-Debtor counterparty could have as little as seven days to object to such motion.  *See* Rule 9006-1(c)(i) and (ii) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("all motion papers shall be filed and served in accordance with Local Rule 2002-1(b) at least fourteen (14) days prior to the hearing date"; [w]here a motion is filed and served in accordance with Local Rule 9006-1(c)(i) [less than twenty-one days prior to the hearing date], the deadline for objection(s) shall be no later than seven (7) days before the hearing date.").  In other words, the assumption procedures in the Plan provide

counterparties such as CRB with more time to object than they would otherwise be entitled to under the Local Rules.  Accordingly, this objection should be overruled.

46.     To the extent any objections to the Solicitation and Voting Procedures remain outstanding, they should be overruled for the reasons set forth in Objection Response Chart and herein.

### III.   The Objecting Parties Have Not Demonstrated the Plan is Patently Unconfirmable and Therefore the Confirmation Objections Should be Denied

47.     Disputes on confirmation-related issues do not—and should not—bar approval of a disclosure statement.  Indeed, requiring adjudication on confirmation issues at this time would effectively convert the Hearing from a hearing on the disclosure statement into a confirmation hearing, without the benefit of the evidentiary record necessary to determine confirmation issues. *See, e.g.*, *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting . . . ."); *see also In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (noting that questions existed regarding good faith, improper voter manipulation, and voter designation but finding that such questions were, nevertheless, "confirmation issues that require an evidentiary hearing," and approving the debtor's disclosure statement).

48.     Accordingly, courts have consistently held that challenges to a plan itself, are not proper disclosure statement objections, but rather plan objections that should be addressed at confirmation.  *See, e.g.*, Hr'g Tr. 60:9–62:23, *In re GUE Liquidation Cos.*, Case No. 19-11240 (LSS) (Bankr. D. Del. Oct. 23, 2019) [D.I. 821] (stating, at a disclosure statement hearing, that issues related to releases would be determined at confirmation, not disclosure statement hearing);

Hr'g Tr. 90:20–91:4, *In re Emerge Energy Servs., LP*, Case No. 19-11563 (KBO) (Bankr. D. Del.

Sept. 9, 2019) [D.I. 348] (same); *id.* at 91:12–15 (same regarding exculpation); Hr'g Tr. at 32:24–

50:16, *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. July 20, 2018) [D.I.

660] (explaining that objections to valuations of recoveries contained in the disclosure statement

and treatment or classification of claims were issues for the confirmation hearing).[10]

49.      A very limited exception exists in cases "where it is obvious at the disclosure

statement stage that a later confirmation hearing would be futile because the plan described by the

disclosure statement is patently unconfirmable."  *In re Am. Capital Equip., LLC*, 688 F.3d 145,

154 (3d Cir. 2012).  However, a plan is patently unconfirmable only "where (1) confirmation

defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon

which all material facts are not in dispute or have been fully developed at the disclosure statement

hearing."  *Id.* at 155 (internal quotation marks and citation omitted); *see also In re Monroe Well

Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) ("[T]he objections considered must be limited

to defects which could not be overcome by creditor voting results and must also concern matters

upon which all material facts are not in dispute or have been fully developed at the disclosure

statement hearing.").  Disapproving a disclosure statement on the basis of patent unconfirmability

requires a showing that the plan "is so fatally flawed that confirmation is impossible."  *In re

Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990).

---

[10] *See also* Hr'g Tr. at 27:22–24, *In re Tops Holding II Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Sept. 27, 2018) [D.I. 760] (noting that it was appropriate to reserve issues regarding third-party releases to confirmation to determine whether there really is an issue); *In re Ellipso, Inc.*, Case No. 09-00148, 2012 WL 368281, at *2 (Bankr. D.D.C. Feb. 3, 2012) (overruling certain disclosure statement objections that were "more appropriately dealt with at a confirmation hearing," including "an objection to the disclosure statement's admission that if [certain] claims [were] allowed, there [would] be nothing left to pay the other creditors . . . [and] allegations that the plan [was] being proposed in bad faith"); *In re Colin*, 44 B.R. 806, 809 (Bankr. S.D.N.Y. 1984) (refusing to apply the best interests of creditors test under section 1129(a)(7) where confirmation of the proposed plan was not yet at issue in the case).

### A.    The U.S. Trustee Fails to Demonstrate that the Amended Plan is Patently Unconfirmable

50.    In the UST Objection, the U.S. Trustee intimates that the Plan's proposed "opt-out" structure is deficient and may render the Plan "patently unconfirmable."  UST Obj. ¶ 18.  However, as stated above, it is the objecting party's burden to prove as a matter of law that the Plan is patently unconfirmable and the U.S. Trustee has not carried its heavy burden.  For the reasons set forth in Argument section III.A of this Reply, the Plan's opt-out process is appropriate and a mechanic often used by the Debtors and approved by courts in this district.[11]  Therefore, the opt-out process does not render the Plan "patently unconfirmable" and is an issue more appropriately heard in connection with confirmation of the Plan.  Courts in this District have consistently held that arguments regarding the propriety of releases are properly raised at plan confirmation, not disclosure statement approval.  *See, e.g.*, Hr'g Tr. 199:9–13, *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 3, 2018) [D.I. 1642] (approving a disclosure statement but declining to rule on releases at the hearing, as such issues are "classically [for] a confirmation hearing"); Hr'g Tr. 67:12, 14–15,  *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) [D.I. 1050] (noting that potential issues with releases should be dealt with at confirmation).[12]

---

[11]  *See, e.g.,* Hr'g Tr. 110:23–25, 111:1–3, *Insys Therapeutics*, Case No. 19-11292 (KG) [D.I. 1121] (overruling objection and confirming a plan with third-party releases that included as releasing parties all holders deemed to reject the that did not opt out of granting the releases); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [D.I. 238] (confirming a plan where holders in deemed rejecting classes had to affirmatively opt out of third-party releases).

[12]  *See also* Hr'g Tr. 57:3–8 *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Sept. 21, 2015) [D.I. 6132] ("To say that releases [are] an issue for confirmation doesn't make the [proposed plan] patently unconfirmable.  It can either be addressed in one of two ways and we'll figure that out when we get to confirmation. And I think that really goes to the heart of all of the confirmation, certainly patently unconfirmable confirmation objections."); *In re Innkeepers USA Tr.*, 448 B.R. 131, 148 (Bankr. S.D.N.Y. 2011) (finding that objections asserting that "release provisions [were] overly broad and should not be approved absent the consent of each releasing party" were "best categorized as confirmation objections.").

**B.    CRB Fails to Demonstrate that the Amended Plan is Patently Unconfirmable.**

51.    CRB objects to the Disclosure Statement on the grounds that the Plan is patently unconfirmable because (i) it is inconsistent with the interests of creditors and public policy, (ii) it violates the absolute priority rule, and (iii) it violates the Bankruptcy Code by issuing a nonvoting security to existing equity holders.  CRB Obj. ¶¶ 51, 53, 58.  Each of these arguments fails and CRB has failed on each count to carry its burden in proving the Plan is patently unconfirmable.

***The Plan Is Not Inconsistent with the Interest of Creditors and Public Policy***

52.    CRB's argument that the Plan is inconsistent with the interests of creditors and public policy rests on the Plan's supposed violation of  section 1123(a)(7) of the Bankruptcy Code, which provides that a plan "must contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer[.]" 11 U.S.C. § 1123(a)(7).  In particular, CRB argues that the Plan wrongfully provides for the Debtors to hand pick the Wind Down Officer who will have authority to prosecute or settle claims relating to the AmEx Transaction without CRB having any consent rights over such prosecution. CRB Obj. ¶ 51.  As stated in Argument section I.B of this Reply, the Debtors' current board of directors—each a fiduciary of the Company and its stakeholders—are well aware of their fiduciary duties and, as the sole fiduciary of all creditors, will select a Wind Down Officer with the consent of the Reserve Bank and consultation of certain creditors—including CRB.  The identity of the Wind Down Officer will be publicly filed and if stakeholders have objections, they may be raised as part of the confirmation process.  The Wind Down Officer once appointed, will owe fiduciary duties to all holders of Allowed Claims and will not owe any fiduciary duties to KServicing Existing Equity Interests on account of the Single Share until all Allowed Claims are satisfied in full.  Plan, §§ 5.4(c), 5.4(e).  Further, as set forth the Plan and Disclosure Statement,

CRB, together with the Reserve Bank, has consultation rights with respect to material decisions made by the Wind Down Officer, including with respect to Causes of Action.  Plan § 5.4(b).

### The Single Share Vote Does Not Violate the Absolute Priority Rule

53.     The Single Share mechanism is one that is driven by tax-efficient transaction structuring, and as stated in the Plan, is meant to maintain the priority waterfall in the event holders of KServicing Equity Interests are in fact entitled to distribution after holders of Claims senior to them are paid in full—a concept entirely consistent with the absolute priority rule.  For the avoidance of doubt, former holders of KServicing Existing Equity Interests will not retain any voting rights in the Wind Down Estate and the Wind Down Officer will owe fiduciary duties to all holders of Allowed Claims and will not owe any fiduciary duties to KServicing Existing Equity Interests on account of the Single Share until all Allowed Claims are satisfied in full.

54.     Furthermore, the single share construct is a standard one used across various chapter 11 plan.  *See Exide Holdings*, Case No. 20-11157 [D.I. 998-2] (confirming chapter 11 plan where a single share was issued the Plan Administrator to hold in trust as custodian for the former holders of stock consistent with their former relative priority and economic entitlements where holders of general unsecured claims received no distribution under the plan and were deemed to reject); *In re Ditech Holding Corporation*, Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Sept. 26, 2019) [D.I. 1404-1] ("[O]n the Effective Date, all Parent Equity Interests shall be cancelled and one share of Ditech common stock (the 'Single Share') shall be issued to the Plan Administrator to hold in trust as custodian for the benefit of the former holders of Ditech common stock and preferred stock consistent with their former relative priority and economic entitlements."); *In re THQ Inc.*, Case No. 12-13398 (MFW) (Bankr. D. Del. April 18, 2013) [D.I. 604] ("On the Effective Date, the Equity Interests in THQI shall be cancelled and a single share of stock in THQI

shall be issued to the Stock Trust, which will hold such share for the benefit of the former holders of THQI stock.").

### *The Plan Does Not Violate Section 1123(a)(6)*

55.     Lastly, CRB argues that the Plan violates section 1123(a)(6) of the Bankruptcy Code, which provides that "notwithstanding any otherwise applicable non-bankruptcy law, a plan shall . . . provide for the inclusion in the charter of the debtor, if the debtor is a corporation … a provision prohibiting the issuance of nonvoting equity securities" to prevent from disenfranchising creditors who stand to recover.  11 U.S.C § 1123(a)(6).  CRB states the Single Share will have a vote which vests in the Wind Down Officer as trustee for out-of-the-money existing equity holders whereas CRB, in its capacity as a general unsecured creditor, will receive GUC Pool Class B interests, which are essentially "nonvoting equity securities[.]"  CRB Obj. ¶ 58.  CRB's argument incorrectly interprets the Plan and section 1123(a)(6).

56.     Relying on the case CRB itself cites, it is clear that section 1123(a)(6) only prohibits the issuance of new nonvoting equity securities.  *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1361 (9th Cir. 1986) ("Debtor has correctly noted § 1123(a)(6) only prohibits the issuance of *new* nonvoting securities.") (emphasis in original).[13]  Here, the Debtors are not issuing any new securities – whether voting or nonvoting.  Instead, the Plan provides for GUC Pool Class B Interests as the recovery means for general unsecured creditors, including CRB.  The GUC Pool Class B Interests are not nonvoting securities nor are they securities in any capacity—they are not

---

[13] Further, CRB's reliance on *Acequia* is misplaced.  In *Acequia*, the proposed chapter 11 plan of a family owned land company sought to divest a 50% equityholder of his right to vote to remove or vote for the company's directors. 787 F.2d at 1361.  The equityholder objected on the basis that this violated section 1123(a)(6) of the Bankruptcy Code because the plan proposed to issue nonvoting securities.  *Id.*  The court, however, overruled and held that such provisions were "consistent with the interests of equity security holders and with public policy."  *Id.* at 1362.  In particular, the court held that given the equityholder's prior misconduct and bitter relationship with the other 50% equityholder, removing voting authority was "proper" and in fact "preserve[d] the prospects of reorganization and protect[ing] the interests of creditors, shareholders and interested parties."  *Id.* at 1362.

tradable and merely serve as the mechanic for distributions to (and recourse against the GUC Pool by) general unsecured claimants. Further, CRB's argument that the policy implications for the codification of section 1123(a)(6) should serve as a basis for rendering the plan patently unconfirmable are not present here. CRB Obj. ¶ 59. Contrary to what CRB argues, "out-of-the-money equity holders" are not receiving post-confirmation power. CRB Obj. ¶ 60. Instead, the Single Share that CRB references is merely a tax-effective mechanism meant to preserve the priority waterfall only in the event that holders of KServicing Equity Interests are in fact titled to distribution after holders of Claims senior to them are paid in full. *See supra* ¶ 59.

57.     Here, in addition to the reasons set forth above, section 1123(a)(6) of the Bankruptcy Code is inapplicable because the Plan provides for the dissolution of the Debtors and accordingly, the Plan does not contemplate the issuance of any equity securities full stop. At the risk of over-repetition, the Single Share does not have any voting power, and the GUC Pool Class B Interests serve as CRB's recovery and recourse against proceeds from the GUC Pool rather than a "nonvoting equity security" as prohibited by section 1123(a)(6).[14]

58.     Accordingly, the Confirmation Objections failed to meet their burden of demonstrating that the plan is patently unconfirmable and all such Confirmation Objections should be overruled to the extent not resolved.

## Conclusion

59.     As set forth above, and in the Objection Response Chart, the Objections should be overruled either on the basis that they have been adequately addressed in the Disclosure Statement,

---

[14] Further, as CRB quotes, additional sources speaking to the scope and intent of section 1123(a)(6) specify that it is meant to address governance of reorganized debtor entities. 7 Collier on Bankruptcy ¶ 1123.01[6][a] (2020). Here, the Debtors are not reorganizing and not issuing any class of non-voting stock. With respect to CRB's interests, the Debtors have included language in the Plan which provides them with consultation rights regarding the Wind Down Officer's selection, who will owe fiduciary duties to its stakeholders. *See supra* ¶ 27.

pertain to confirmation issues and should be addresses at the confirmation hearing, or fail to meet the standard of demonstrating the Plan is patently unconfirmable.

60.     Accordingly, the Debtors respectfully request that the Court deny all Objections, defer all Confirmation Objections until the Confirmation Hearing, and enter the revised Disclosure Statement order (to be filed contemporaneously herewith) approving, among other things, the Disclosure Statement, Solicitation and Voting Procedures, and the proposed form of Ballots.

61.     The Debtors submit that such approval and the commencement of solicitation of the Plan is in the best interests of the Debtors, their Estates, and all parties in interest.

*[Remainder of page intentionally left blank]*

Dated: January 17, 2023
      Wilmington, Delaware

/s/ Matthew P. Milana
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
          steele@rlf.com
          shapiro@rlf.com
          milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
E-mail:       ray.schrock@weil.com
              candace.arthur@weil.com
              natasha.hwangpo@weil.com
              chase.bentley@weil.com

*Attorneys for Debtors and Debtors in Possession*