```
1              UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
2

3   IN RE:                    . Chapter 11
                              . Case No. 22-10951 (CTG)
4   KABBAGE, INC. d/b/a       .
    KSERVICING, et al.,       . (Jointly Administered)
5                             .
                              . Courtroom No. 7
6                             . 824 Market Street
              Debtors.        . Wilmington, Delaware 19801
7                             .
                              . Thursday, January 19, 2023
8   . . . . . . . . . . . . . . 10:00 a.m.

9                   TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10              UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtor:          Zachary Shapiro, Esquire
                             RICHARDS, LAYTON & FINGER, P.A.
13                           One Rodney Square
                             920 North King Street
14                           Wilmington, Delaware 19801

15                           Natasha Hwangpo, Esquire
                             Candace Arthur, Esquire
16                           WEIL GOTSHAL & MANGES LLP
                             767 Fifth Avenue
17                           New York, New York 10153

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:          Theresa Mistretta

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the U.S. Trustee:    Rosa Sierra-Fox, Esquire
                         OFFICE OF THE UNITED STATES TRUSTEE
                         844 King Street, Suite 2207
                         Lockbox 35
                         Wilmington, Delaware 19801

For Customers Bank:      William Sullivan, Esquire
                         SULLIVAN HAZELTINE ALLINSON LLC
                         919 North Market Street
                         Wilmington, Delaware 19801

For Federal Reserve
Bank:                    Lisa Schweitzer, Esquire
                         CLEARY GOTTLIEB STEEN & HAMILTON LLP
                         One Liberty Plaza
                         New York, New York 10006

1                                   INDEX

2   MOTIONS:                                                    PAGE

3
    Agenda
4   Item 4: Motion of Debtors for Entry of Order (I)          8
5           Approving the Disclosure Statement of the
            Debtors, (II) Establishing Solicitation,
6           Voting, and Related Procedures, (III)
            Scheduling Confirmation Hearing, (IV)
7           Establishing Notice and Objection Procedures
            For Confirmation of Plan, (V) Approving
8           Special Electronic Noticing Procedures, (VI)
            Approving Debtors' Proposed Cure Procedures
9           for Unexpired Leases and Executory Contracts,
            and (VII) Granting Related Relief
10          [Docket No. 176 – filed October 31, 2022]

11              Court's Ruling:                                37

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Proceedings commence at 10:00 a.m.)

2       (Call to order of the Court)

3           THE COURT:  Please be seated.  Good morning.

4           MS. HWANGPO:  Good morning, Your Honor.

5           THE COURT:  So, we are on the record in In Re

6  Kabbage which is Case No. 22-10951.

7           You can proceed.

8           MS. HWANGPO:  Your Honor, Natasha Hwangpo, Weil

9  Gotshal & Manges, counsel for the debtors.

10          We're here today with a short agenda in what we

11 hope to be a quick procession of events.  The only remaining

12 matter for this morning is the approval of the debtor's

13 disclosure statement and solicitation procedures.

14          We are glad to report that we have resolved two of

15 the three remaining objections.  With additional language in

16 the plan and disclosure statement we were able to resolve the

17 United States and Cross River Bank's objections.  The only

18 outstanding objection is that of the U.S. Trustee.

19          THE COURT:  Okay.

20          MS. HWANGPO:  Before we dive into the substance, as

21 an initial housekeeping matter the debtor's filed the motion

22 for leave to file a reply at Docket No. 450. I believe that

23 order has been uploaded.  Unless Your Honor has any

24 questions, we respectfully request that that be entered.

25          THE COURT:  Well, I have read the reply, so if

1   someone wants to object, I think that concern has been

2   mooted.  So, we will go ahead and enter that order.

3               MS. HWANGPO:  Great.  Thank you, Your Honor.

4               With respect to the United States we worked

5   productively with counsel prior to the filing of the limited

6   objection and reservation of rights and have continued to

7   work together since.

8               Among other things the debtors have reflected

9   additional disclosures regarding the debtor's work plan for

10  the transfer of its loan servicing obligations and the work

11  plan for post-effective date servicing to the extent that

12  that becomes necessary.

13              In particular, with respect to the transfer of the

14  pledged PPLF loans -- and as a quick refresher for the Court

15  those are the loans that are pledged to the Reserve Bank SPPL

16  collateral.  The debtors are working together with the

17  Reserve Bank to transfer the outstanding loans and with the

18  SBA to transfer the forgiven or the guarantee purchase loans.

19              We imagine that this transfer process is going to

20  be complex and require the tight coordination of all parties,

21  but we're hopeful and we haven't thus far run into any

22  issues.  To the extent that we do, of course, Your Honor, we

23  will be back here seeking the Court's guidance.

24              THE COURT:  That's what I'm here for.

25              MS. HWANGPO:  With respect to Cross River Bank the

 1  parties similarly have been able to work together to

 2  consensually resolve the objection. In particular the

 3  debtors, Reserve Bank and CRB have agreed to language

 4  regarding CRB's consent rights to certain material decisions

 5  over causes of actions relating to the American Express

 6  transactions or any causes of actions regarding former

 7  officers, directors and shareholders.

 8         Similarly, we have agreed to consultation rights

 9  regarding the wind-down agreement.  As we work together to

10  transfer the CRB loans we are optimistic that we are going to

11  be able to, likewise, resolve their issues at confirmation

12  before the hearing.

13         Similarly, with respect to the Reserve Bank we're

14  working through issues in advance of confirmation including

15  with respect to releases, but, again, we're hopeful in that

16  respect.

17         Your Honor, I have redlines of the changes that we

18  have made to the drafts of the plan and disclosure statement

19  from the versions we filed on Tuesday.  They were the same

20  versions that we sent to Chambers.

21         THE COURT:  Okay.  I have seen those, so we're good

22  there.

23         MS. HWANGPO:  Okay.  Fantastic.  So I think the

24  only thing outstanding, again, is the U.S. Trustees objection

25  and if you are okay to proceed in that manner I will turn the

1  podium over to partner, Ms. Arthur.

2          THE COURT:  Okay.

3          MR. SULLIVAN:  Your Honor, good morning. Bill

4  Sullivan of Sullivan Hazeltine Allinson on behalf of

5  Customers Bank.  My partner, Bill Hazeltine, is with me in

6  the Courtroom.  And my co-counsel, John Monahan, is on the

7  phone.

8          Your Honor, I just wanted to stand-up because

9  Customers Bank did not have any objection to the adequacy of

10  the disclosure statement, but we did have an objection to the

11  characterization of the settlement agreement with Customers

12  Bank that was included in the amended disclosure statement

13  filed Tuesday evening.  We had an exchange of emails on

14  revising that and there was an agreement by email this

15  morning that the debtors would include revised language at

16  page 40 of the amended disclosure statement.

17          I haven't seen the redlines that are going to be

18  presented to the Court, but certainly to the extent that it

19  includes the revised language from this morning we're

20  satisfied.

21          MS. HWANGPO:  Your Honor, we can confirm that

22  language that we sent to Customers Bank is the same that we

23  sent to Chambers this morning.

24          THE COURT:  Okay. Well, why don't I give all a

25  chance to make sure that you have seen the language and that

1  everyone is satisfied that the issue is resolved.

2          MR. SULLIVAN:  Yes, Your Honor.  That is the

3  language that was agreed to this morning.

4          THE COURT:  Terrific.  Very well.

5          MS. ARTHUR:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MS. ARTHUR:  For the record Candace Arthur, Weil

8  Gotshal & Manges, on behalf of the debtors.

9          As my partner, Ms. Hwangpo noted, the only

10 objection before the Court today in connection with the

11 debtor's disclosure statement and solicitation procedures is

12 with the objection filed by the United States Trustee.

13         Your Honor, the objection is with respect to the

14 third-party releases and the solicitation procedures related

15 to such releases.  The U.S. Trustee contends that the

16 debtor's plan is patently unconfirmable because the third-

17 party releases should only be allowed if an opt-in feature is

18 used and, in the alternative, if an opt-out mechanism is used

19 within in every party regardless of treatment and other

20 affirmative actions such party may take should have the

21 ability to opt-out.

22         Your Honor, we are well-aware that the arguments

23 made by the U.S. Trustee has been made before this Court

24 before and we are also aware of the Court's rulings.  With

25 the Court's indulgence though I would like to go through the

1  three points as to the basis for which the debtor's position

2  is that the objection should be overruled.

3         THE COURT:  So, I'm absolutely prepared to allow

4  you and the U.S. Trustee to be fully heard, and I will, you

5  know, reserve judgment, but before you start let me just tell

6  you the target you're shooting at just in the interest of –

7         MS. ARTHUR:  Thank you, Your Honor.

8         THE COURT:  Look, my –- I come into this with the

9  view that I have had since, I think, the first time this

10  question has come before me that while I have a lot of

11  respect for the views of several of my colleagues that

12  require opt-in, I am comfortable with an opt-out procedure.

13  So, I think I am on your side on that issue.

14         On the question of tying the vote on the plan to

15  the granting of a third-party release, obviously, that is

16  done whenever its non-consensual.  My –- I will hear

17  everyone, but where I tentatively am, as you begin, is I

18  think that that mechanism, essentially, puts undo leverage or

19  pressure on the granting of the consent so that it takes it

20  out of the world of consensual, so that in a world in which

21  we're saying it is consensual I am disinclined to permit them

22  to be tied, but I will hear you out as to the reasons why I

23  am wrong about that.

24         MS. ARTHUR:  So, Your Honor, to focus on the

25  question you presented I think it's from the debtor's vantage

1   point important for us to note that from the time you file

2   your petition we see it as an opportunity for the parties to

3   negotiate.  That is what has occurred and what has continued

4   to occur.  And we view the plan as one in which the parties

5   are coming to negotiate.  We are presenting a best and final

6   offer here in connection with the approval.

7           To the extent a party is looking at the plan in its

8   totality and it has decided to affirmatively approve this

9   treatment we do believe that it can, in fact, be tied.  That

10  being said, Your Honor --

11          THE COURT:  So let me ask this question: imagine

12  instead of saying your choices are to vote yes and grant the

13  third-party release or just vote no if you said here is what

14  you need to do.  In order to vote yes you need to include a

15  check for $10 made out to the CEO of the debtor.  If you

16  don't want to do that you don't have to, you can vote no

17  instead, but your yes vote won't count unless its accompanied

18  by a check made out to the CEO of the debtor.  Is that okay?

19          MS. ARTHUR:  I think its okay for you to be able to

20  relinquish that if you don't like the terms, Your Honor. I

21  think that with any contractual negotiations if one doesn't

22  like the terms, they are completely able to say they do not

23  want to proceed with the --

24          THE COURT:  So if I had -- if your disclosure

25  statement said that instead of what it says I should still

1  confirm it -- not confirm it, I should still approve the

2  disclosure statement and let that go out?

3         MS. ARTHUR:  Well, thankfully, our disclosure

4  statement does not say that.

5         THE COURT:  No, I understand.  I'm trying to

6  understand the analytic principal under which its okay to tie

7  the creditor's right to vote on the treatment of their claim

8  under the plan to these other things.  It would surprise me

9  if it were generally viewed in the bankruptcy community that

10  it would be okay to tie it to you must cut a check to the

11  debtors, you know, principal and it seems to me that it's not

12  -- this is not analytically different from that which is why

13  it gives me pause.

14         MS. ARTHUR:  I think one thing to consider, Your

15  Honor, is when you tie the treatment to either the releases

16  or, to your example, the cutting of a check if the treatment

17  itself is, in fact, tied to leases, not in this particular

18  instance, but when you have someone putting in new money, for

19  example, or depending upon the consideration they give that

20  consideration is, in fact, the treatment.

21         I guess I would put back before the Court why

22  shouldn't that, in fact, be tied.  Why shouldn't that, in

23  fact, coincide.  And I do think that the reason why third-

24  party releases are seen more as an exception versus a general

25  rule is because you do have to look at the facts and

1  circumstances each time.

2      I think in this instance it is unique -- the facts

3  before the Court are unique enough that it wouldn't warrant a

4  decision and it would make the Court feel comfortable, and

5  other parties in interest feel comfortable that an approval

6  in this instance, which is tied to a limited third-party

7  release, is acceptable and okay.

8      I am not saying that third-party releases should

9  always be tied, but do I believe that it can be tied and it

10  can be tied appropriately I do think so, Your Honor.

11      THE COURT:  So, I think so under existing law if

12  you meet the Continental standard, right.  There you don't

13  have the ability to say no, I want out of this, because the

14  debtor has made a showing that meets - that shows it's an

15  extraordinary case.

16      It seems to me that we've got two different

17  categories; consensual and non-consensual.  At least the way

18  I think about it if its consensual I don't need you to meet

19  the Continental standard, but it really needs to be

20  consensual. That is where I'm struggling.

21      Let me -- can I ask -- I've got -- just while we're

22  on the topic I think that I agree with you and not the U.S.

23  Trustee with respect to non-voting classes.  I think as to

24  those who are unimpaired or, otherwise, not entitled to vote

25  under the code their welcome to object to the plan if they

1   take issue with the releases, but I don't think you have to

2   go out of your way to send them a piece of paper to solicit

3   their rejection of their opt-out.  They can object and say

4   that the third-party releases renders the plan unconfirmable

5   and if their right about that we'll deal with that at

6   confirmation, but I don't have a problem with your procedure

7   -- your proposed procedure in which you don't send,

8   essentially, a ballot to someone who doesn't vote.

9        As to the scope of the releases -- so my usual view

10  is that the scope of the releases is a confirmation issue and

11  doesn't get addressed at the disclosure statement.  The U.S.

12  Trustees point did give me some pause.  Take -- particularly

13  in a world in which we're going to require a non-voting party

14  to actually file a plan confirmation.

15       So, the example that the U.S. Trustee gives of the

16  taxing authority here, I guess, the language of the releases,

17  you know, any liability that relates to the debtor.  So the

18  argument they make is, well, imagine you have an employee of

19  the debtor who received income from the debtor, and if that

20  employee is a released party then the taxing authority runs

21  the risk that the ordinary income tax that the employee would

22  owe on the income they obtained from the debtor would

23  literally fall within the language of the release and,

24  therefore, unless the taxing authority, which after all is

25  presumably a priority claimant and, therefore, not a voting

1  class is deemed to have released its right to recover taxes.

2          I guess while I normally wouldn't address issues of

3  the scope of the release until confirmation it seems like I

4  would be more comfortable not requiring you to send a ballot,

5  a form to those parties if, at least, that category of issue

6  would be cleaned up.  Now I take it you don't intend to

7  relieve the employee of the debtor its obligation to pay

8  income taxes, right?

9          MS. ARTHUR:  Correct, Your Honor.

10          THE COURT:  And you can explain to my why I'm

11  wrong, but I think the U.S. Trustee makes a fair argument

12  that the language of the release, at least as written when it

13  was filed, if that's been cleaned up since --

14          MS. ARTHUR:  One moment.

15          THE COURT:  Certainly.

16          MS. ARTHUR:  So, I think two points, Your Honor.

17          THE COURT:  Certainly.

18          MS. ARTHUR:  One, I do think it's telling that in

19  terms of timing that an entity such as the taxing authority

20  has the ability to object to the scope of the release at the

21  same time that if I did provide the ballot would have that

22  issue.

23          In terms of the scope and the language itself I do

24  think its important to also note that they're only being

25  released in the capacity as -- in the actual specific

1  capacity.  So, when one says the hypothetical the U.S.

2  Trustee posited it would not be an issue.

3       THE COURT:  Well that's -- look, its often the case

4  that in the -- I generally believe that for many of the

5  problems about the breadth of the release that the language,

6  like in the capacity as such, usually solves the problem. I

7  am not sure it does here, right, because it's about liability

8  related to the debtor and its income they obtained in their

9  capacity as employee.

10       So, I am not sure limiting the release in the

11  capacity as such -- I mean I am happy to hear from you as to

12  why, but it's not obvious to me that that language solves

13  this problem.

14       MS. ARTHUR:  Your Honor, I do think that it would

15  solve it that an employee who obtains, you know, such benefit

16  that the taxing authority or whoever else is a capable party

17  in order to raise any of these similar objections at the

18  right time at confirmation would, in fact, be able to push

19  back and would, in fact, not have that release being too

20  broad.

21       I would also note for Your Honor the practical how

22  it works practically.  If the taxing authority is raising its

23  hand and coming to the debtors and saying this is the issue

24  that we have in the release we would treat it in the same way

25  that we treat other such objections at that time as well.

1  So, I don't think that they're prejudiced by the actual scope

2  that we currently have contemplated under the document.

3           THE COURT:  Okay.  So, can I ask you another

4  question?  So I read just what's in your brief, and I haven't

5  read more, about the decision that Judge Walrath made.  Just

6  snippets from a transcript, but are you in a position to

7  explain to me what was going on there?

8           MS. ARTHUR:  Yes, Your Honor.  In RCS Capital

9  Corporation similarly the question came up as to whether or

10  not voting on the plan itself would be sufficient.  It was a

11  contested -- it was contested in that case and the Judge

12  found that the affirmative action of voting for approval of a

13  plan was sufficient in order for it to be considered a

14  consensual release.

15           Importantly, I do think that it was contested and

16  very similar arguments were raised that the U.S. Trustee is

17  now being raised today.  In that instance Judge Walrath did

18  find that it was appropriate to tie the releases to the

19  treatment.  She didn't find that problematic.  This is the

20  same Judge as in WAMU and other ones that people have put

21  forward for a different contention.

22           In that instance in RCS Capital Corporation, which

23  is very similar to our situation here, the Judge highlighted

24  a couple of facts.  She wanted to know was the ballot

25  sufficiently clear. In our case we believe its crystal clear

1  as to what the options are that are available. She said when

2  its clear when the parties are able to -- there is no

3  confusion and there's no specter of, you know, impropriety in

4  that that it would be appropriate for a vote in favor of the

5  plan to be viewed as a consensual release.

6        THE COURT:  Okay.  I take it if you guys found that

7  transcript that wasn't associated with the published opinion,

8  I take it there isn't more in terms of general practice in

9  this Court beyond that that is out there that you haven't

10  shared.

11        MS. ARTHUR:  No, Your Honor.  In terms of it being

12  a contested issue we have not found that.

13        THE COURT:  Okay.

14        MS. ARTHUR:  We do think that when you look

15  Indianapolis Downs and some of the other cases that when it

16  comes to being able to tie an approval to the treatment that

17  the Courts have found that that has been accepted.  That

18  being said as you have noted the issue has not been contested

19  to the point that it could really pressure test whether or

20  not the Courts would be aligned or view differently.

21        I think what is important is that in each instance

22  it seems the facts of the case, even when looking at what

23  occurred in WAMU and looking at what occurred in TPC and

24  whether it be a death trap.  In WAMU it would be a situation

25  where the opt-out really wasn't an opt-out.

1    I think when there's facts such as that the Courts

2  have rightly ruled including Your Honor.  But that being said

3  I think in this case, and given the population that we're

4  talking about, given the class structures, and who is

5  impaired and unimpaired, given who is giving a release and

6  who's not, and really given the limited universe of the non-

7  debtor parties who are involved in the third-party release we

8  do believe that the facts and circumstances in this case do

9  support the debtor's position that third-party releases

10  should be granted to the extent that a party who's, eyes wide

11  open, votes in favor of the plan they vote to approve it.  If

12  they don't, we will take that risk as well, Your Honor.

13    THE COURT:  When you say it's a limited universe, I

14  mean, isn't the universe of -- what is the universe -- how

15  many creditors do you think you have?

16    MS. ARTHUR:  Well, Your Honor, if I look at Class

17  IV, in terms of my voting creditors, I have about 265.  Then

18  from there, and I look at the breakdown, I take out the SBA,

19  the DOJ, Cross River, Partner Banks, and then I look at the

20  owners of small businesses they are about 170 of that 265.

21  Those are the general unsecured population that would be

22  providing a release.

23    Then I thought to myself, Your Honor, well then let

24  me look at the actual non-debtors who are being released.

25  There is the debtors and the debtor related parties.  The

1  debtor related parties are approximately 30 people or 30

2  individuals.  Then there's the wind-down estate which hasn't

3  been formed yet, and the wind-down estates related parties.

4  Then there is the reserve bank.  I think it's important

5  knowing the reserve bank and the reserve bank's related

6  parties.  It's important to know as well.

7       The looking at that I think what's important is

8  when I considered what Your Honor was facing in TPC in that

9  situation you had pending litigation against the very parties

10 that were going to be subject to the release.  We are not

11 aware of any such situation.  In fact, in our pending

12 lawsuits parties have not named any individuals in the

13 capacities as debtors.  It's just been Kabbage as an entity.

14 I think that is important to note.

15      So, I do think, in fact, Your Honor, the releases

16 here have been limited.  I think in negotiating with the

17 reserve bank as well they have done a really good to ensure

18 that we have limited it even further to post-petition

19 parties, post-petition entities, individuals.  We have carved

20 out, you know, American Express transaction and things

21 related thereto in connection with it.

22      So, of course, I'm comfortable, Your Honor, with

23 the terms of it, but I do think that in this case, you know,

24 the Court could also get comfortable with the facts before it

25 and the record before it.

1           THE COURT:  Okay.  I appreciate that.

2           Anything else that I should know before I hear from

3 the U.S. Trustee?

4           MS. ARTHUR:  Your Honor, I think that the only

5 other point is the clarity of the ballots. I think that it is

6 very clear and I do think that given the population of the

7 general unsecured creditors that I noted, given that the

8 Class III is only the reserve bank, and thinking of whose

9 implicated, how to implicate it and could they actually make

10 an informed decision on this such that if it wasn't a plan

11 context, but instead just a stipulation between two parties

12 would they be able to make an informed decision I do think

13 the answer is yes, Your Honor.

14           So with that I will cede the podium to the U.S.

15 Trustee at this time.

16           THE COURT:  Okay.  Ms. Sierra-Fox.

17           MS. SIERRA-FOX:  Good morning, Your Honor.  Rosa

18 Sierra-Fox on behalf of the U.S. Trustee.

19           So, Your Honor, to begin on the opt-in point I

20 think we raised that point to preserve our rights and make

21 the record the clear that that is our --

22           THE COURT:  I understand your position.

23           MS. SIERRA-FOX:  -- position, but we are

24 comfortable for purpose of today's hearing and given Your

25 Honor's prior rulings and indications on the issue to step

1 into the realm of opt-out world. So, I think the question

2 really is for us, accepting that an opt-out mechanism can be

3 a manifestation of consent for purposes of this case before

4 Your Honor, let's make the opt-out truly -- I think what Your

5 Honor said when you were speaking to counsel for the debtor

6 really needs to be consensual.

7        So, I think that is the first point that we are

8 picking up on from Your Honor's prior rulings and I think

9 there's nothing unique about this case.  Given your prior

10 reasoning in TPC and other cases as to why not to give the

11 accepting creditors the ability to opt-out of the third-party

12 release, Your Honor.  And the logic being that treatment

13 under the plan is separate and distinct from, as Your Honor

14 has said before, accepting every single provision of the

15 plan.

16        With respect to the – so I think the debtors

17 presented the RCS transcript in response to the question that

18 you posed in question that you posed in TPC and, Your Honor,

19 I would say that that transcript does not answer the question

20 at all.  And as Your Honor, I think, was suggesting in your

21 questioning to debtor's counsel we don't know the facts of

22 the case, we don't have the benefit of a published or written

23 decision to really know what factors when into Judge

24 Walrath's reasoning for ruling that way in that case.

25        So, I don't really think that is persuasive at all.

1 To the extent that it stands for anything I think, Your

2 Honor, it is clear that there is diversity of opinion on this

3 Court on this issue.  I think prior to Your Honor coming on

4 this bench and maybe even one of your colleagues coming on

5 this bench, Judge Stickles, who also seems to be of the same

6 mind as you on this issue, the accepting -- I think Judges

7 and even parties were taking for granted that accepting the

8 plan was actually a true manifestation of consent and consent

9 to a third-party release at that.

10        Your Honor, I think that it doesn't necessarily

11 mean there is any sort of well-reasoned analytical decision

12 for --

13        THE COURT:  So let me back-up.  Look, I have no

14 problem with the proposition that one can -- let me ask this,

15 is it your view that this sort of tying is, otherwise, common

16 in this jurisdiction?  I am just trying to understand what

17 you just said.

18        MS. SIERRA-FOX:  Yeah.  In terms of ballots that go

19 out and say accept and do not provide the option to opt-out

20 of a third-party release I think it is clear.

21        THE COURT:  You think it is?

22        MS. SIERRA-FOX:  Yeah.

23        THE COURT:  All right.

24        MS. SIERRA-FOX:  I think it is common because what

25 I believe the reason it's become common is because the -- I

1  guess the case law and the reasoning has focused more on well

2  if you are rejecting the plan why do you also have to opt-

3  out, right, or --

4        THE COURT:  No, I understand.  Is it common -- let

5  me say it this way, I believed when I saw this issue in TPC

6  that what was being asked of me there, which was a plan that

7  would deny accepting creditors the opportunity to opt-out of

8  the plan was unusual.  Are you saying I was wrong about that

9  and that it is actually common?  Don't be shy about telling

10 me that I'm wrong.  If I am I want to know.

11        MS. SIERRA-FOX:  Your Honor, I think -- I do think

12 it is common.  And I hope that doesn't detract from the point

13 that --

14        THE COURT:  No.  Has your office raised this issue

15 in front of --

16        MS. SIERRA-FOX:  So, my office did raise it in

17 front of Judge Walrath in RCS.

18        THE COURT:  Okay.

19 MS. SIERRA-FOX:  Based off my reading of the ten lines of the

20 transcript, yes.

21        THE COURT:  But in the time since -- let me lay

22 out where I am philosophically.

23        MS. SIERRA-FOX:  Yeah.

24        THE COURT:  I do -- I have this concern with this

25 issue, but I also want to be respectful of existing practices

1  in this Court, both sort of formal and informal.  And so it

2  isn't my intention to create a rule in which what I'm doing

3  is profoundly different from how my colleagues are doing it.

4  And I'm not saying I would never do something different, but

5  I wouldn't do it lightly because I do think that part of what

6  we're here to do is to provide clarity, uniformity, and

7  consistency.  And so hearing that this procedure is common, I

8  guess, surprises me.

9           Okay.  Well, why don't I let you continue?

10          MS. SIERRA-FOX:  Your Honor, I mean, just to back

11  up on that point, I think --

12          THE COURT:  And I appreciate your candor --

13          MS. SIERRA-FOX:  Yeah, yeah, yeah.

14          THE COURT:  -- so --

15          MS. SIERRA-FOX:  I think they -- to the extent

16  it's common, I think -- I agree that other than the RCS that

17  I'm aware of, I'm not sure how many times a judge has

18  confronted this issue squarely.

19          THE COURT:  Okay.

20          MS. SIERRA-FOX:  But, other than that, I think the

21  reason, to the extent it's become common and, analytically,

22  why it has is because no one has really looked at in the way

23  that we're looking today and that Your Honor did in TPC as at

24  the issue of they're taking for granted that accepting the

25  plan means you accept, you know, every other part of the

1   plan, right?  And that acceptance there being -- that active

2   saying, yes, I vote to accept my treatment under the plan, I

3   think the common view is like, well, that's enough to show my

4   manifestation to consent to this third party release.

5           Your Honor, but I -- our role and part of our --

6   what we're trying to do as the U.S. Trustee program is really

7   make these procedures clear, better, and really not raise

8   issues where we think that unsuspecting creditors or

9   creditors that are not as sophisticated, or whatever it might

10  be, have fair procedures so they can truly show that they're

11  really consenting to the third party release.

12          THE COURT:  Okay.

13          MS. SIERRA-FOX:  So I guess that's the first

14  point, Your Honor.  And with respect to, I guess, the

15  uniqueness of this case, I think toward the end debtors'

16  counsel in response to your question was discussing why this

17  is different from TPC and why this might even be unique with

18  respect to, you know, differentiating it from other cases.

19          Your Honor, the point about whether there's 30

20  people in the related parties and, you know, 265 creditors, I

21  mean, I see that as a factual question.  I mean, there's not

22  -- we can understand that debtors' counsel probably has

23  looked into this, but I guess that is -- I think we're here

24  on a legal issue and like if we're going to start delving

25  into making a decision based off there's only 30 related

1  parties and -- I think that makes this more complicated and

2  perhaps that's a better discussion at confirmation when

3  there's declarations and actual evidence on that point.

4         THE COURT:  Okay.

5         MS. SIERRA-FOX:  Your Honor, so we talked about

6  RCS.  Your Honor, I think the other point about TPC and why I

7  think your reasoning in TPC is equally applicable here,

8  again, one of the things that was egregious about that case

9  was the death trap component, understanding that is not at

10 issue here.  Nonetheless, I think the first question that you

11 posed in that case about whether conditioning the voting --

12 accepting the plan on giving the releases is proper I think

13 is -- would be at issue in any case that proposes this sort

14 of structure.

15        Your Honor, and, importantly, in here the Class 4

16 general unsecured creditors, per the disclosure statement,

17 they're getting their pro rata share of the Class B

18 interests, which are -- no one knows what that is right now

19 and their projected recovery is to be determined.  So, I

20 mean, they might be accepting to vote this plan, maybe on the

21 hope that one day in the future they'll get something, while

22 at the same time being forced to provide a third party

23 release on what ultimately may end up being nothing in the

24 future.

25        Your Honor, then with respect to the point about,

1  I guess, the unimpaired creditors.  So one thing that I think

2  it's important to note, if Your Honor had it, is that the

3  debtors did accept that of the third party release through

4  their most recent revisions, they did except out the interest

5  holders.  So Class 8, which would be -- is deemed to reject,

6  is no longer giving -- per their structure, giving this third

7  party release.  So it's really unimpaired creditors deemed to

8  accept.

9         And, Your Honor, I guess -- I argued the same

10  issue in TPC and Your Honor said it -- and the issue being we

11  think they should be able to opt out as well because the

12  release that they're giving, the release that they're giving

13  is not only about the claim that they're going to get paid in

14  full on --

15         THE COURT:  Right.  And they can by filing an

16  objection to confirmation and the question is are they

17  entitled to sort of more than that as a way to enforce their

18  legal rights.

19         MS. SIERRA-FOX:  Yes.  And, Your Honor, I think

20  what's concerning to the U.S. Trustee is the hesitance from

21  not only this debtors' counsel, but that we encounter in

22  other cases.  Even if it's not sending the opt-out form to

23  the unimpaired class, why can't that issue be clarified now?

24  Or why can't the debtors do a better job of just making that

25  point clear because if you read --

1            THE COURT:  Making what point clear?

2            MS. SIERRA-FOX:  The point clear that their intent

3  is not to have the taxing authority release the claims

4  against the related employee.

5            THE COURT:  So where I am at the moment is that --

6  I think I may have talked myself back into the view that

7  that's an issue that's more appropriately addressed at

8  confirmation.  Look, I have sympathy for the view that that

9  release is too broad.  If I recall, we had exactly this issue

10 in TPC and in that case your office at confirmation said we

11 have no objection.

12            MS. SIERRA-FOX:  Right.

13            THE COURT:  So, without an objection, I'm not --

14            MS. SIERRA-FOX:  Right.

15            THE COURT:  -- line editing it myself.  And, you

16 know, if we have an objection on the scope of the release, I

17 think that can be appropriately addressed.  I think I've

18 talked myself out of my coming-in position and that I do

19 think that the scope of the release can be appropriately

20 addressed at confirmation.  And I do think, as a general

21 matter, the procedure of allowing one to opt in or opt out as

22 part of voting is just a convenience mechanism and not an

23 entitlement that the Code creates.

24            So I don't -- I'm not inclined to impose on the

25 debtor the obligation to provide this when they're not

1  otherwise sending a piece of paper giving someone the chance

2  to check a box.

3            MS. SIERRA-FOX:  Yeah.

4            THE COURT:  So that's, I think, where I am there.

5            MS. SIERRA-FOX:  Yes, Your Honor.  It's a

6  convenience mechanism that, as Your Honor pointed out

7  earlier, allows them at confirmation to step into the

8  territory of saying this is a consensual -- or this was a

9  consensual release, therefore, you know, we don't need to

10  prove the Continental factors, if that's at issue.

11            Your Honor, I guess the other point I would raise

12  with respect to this unimpaired creditors point is -- and we

13  raised this in our papers -- is to put out there for Your

14  Honor's consideration whether the same logic that applies to

15  -- that appeared to have applied based on Your Honor's

16  reasoning in TPC about giving the accepting creditors the

17  ability to opt out of providing a third party release because

18  that's you're analytically separating treatment under the

19  plan versus whether I love every part of the plan.  Whether

20  that also extends to -- or it could also extend to the

21  unimpaired creditors, that being -- the logic there I think

22  is they're unimpaired because they're getting paid in full

23  and instead of them deciding whether they accept the plan or

24  whether the code says they accept the plan and what -- so

25  whether -- if the debtors are putting opt-out on the table at

1  this stage, whether they should do that for their other

2  classes.

3       THE COURT:  Yeah, I -- my view that -- my

4  overarching view, as I tried to explain, I'm sure quite

5  inartfully, just -- I've never written on this topic, just to

6  muse from the bench -- but my overarching view is that a

7  third party -- that under existing law in the Third Circuit a

8  third party release is a plan provision, like any other plan

9  provision, and in some circumstances it's a lawful provision

10  and in other circumstances it's an unlawful provision, and

11  that it depends on the facts and circumstances in evidence

12  and that, if one is included, there's no reason,

13  analytically, to treat it differently from any other

14  contestable plan provision, which may or may not be

15  permissible.

16       And the way we normally do that is that we don't

17  ask everyone separately do you like it.  If they've got a

18  problem with it, you know, this is a legal process.  They get

19  served with a plan and disclosure statement and it tells them

20  what their objection deadline is and, if they have a problem

21  with a provision, they think it's inconsistent with the Code,

22  they come in and they file an objection, and then the debtor

23  either proves that it's lawful or, you know, as is commonly

24  the case in third party releases, carves out the objecting

25  party.  And I think that mechanism comports with the law.

1          And so I have no problem, I think it's a good

2   thing to give voting creditors the opportunity as part of the

3   ballot to make this decision and save them the trouble of

4   filing a confirmation objection, but I view that as something

5   that's just a convenience, not a strict legal necessity, and

6   I'm not inclined to extend it to those who aren't otherwise

7   getting a piece of paper asking them how they vote.

8          So I respect your argument and I'm not saying it

9   wouldn't be a nice thing to do, but it's the debtors' motion

10  and they filed it the way they did and I don't see a legal

11  reason why they should be required to do it differently.

12          MS. SIERRA-FOX:  Understood, Your Honor.  Well,

13  unless you have any other questions for me on the other

14  points, then, Your Honor --

15          THE COURT:  I don't.

16          MS. SIERRA-FOX:  -- we have no further comments.

17          THE COURT:  I want to bother Ms. Arthur further,

18  though.

19          So, all right, here's where I'm still stuck.

20  Imagine I approve your solicitation procedures and there's a

21  creditor who votes yes on the plan.  And then that creditor

22  comes in at confirmation and they file an objection and they

23  say, Judge, this plan is un-confirmable because it includes a

24  third party release.  And this is not an exceptional case

25  that meets the Continental standards and the debtor hasn't

1  and can't prove that it is.  So, therefore, you shouldn't

2  confirm the plan.

3          So what do I do in that case?  Imagine I think

4  that they're right about the satisfaction of Continental.

5      (Pause)

6          MS. ARTHUR:  Okay, Your Honor.

7          THE COURT:  And, just to be clear, I'm not one who

8  stands on ceremony.  So, to the extent you want to consult

9  with your colleagues and you want to have more than one

10  person, like we're good here.

11          MS. ARTHUR:  Thank you, Your Honor.  We're trying

12  to get to the right answer, of course, Your Honor.

13          You know, Your Honor, I think what's important in

14  this instance is the fact that we do have the multiple

15  options available for a creditor in that situation, in that

16  scenario.  So, to the extent that they look at the plan in

17  its entirety and then they come up and say we have an

18  objection, Your Honor, now to the plan, then that objection

19  will be heard, the scope of it will be heard.  Even between

20  now and voting, we do suspect that there may even be some

21  more changes in terms like the release.  So that's --

22          THE COURT:  So isn't that --

23          MS. ARTHUR:  -- one thing.

24          THE COURT:  -- then misleading to tell them that

25  by -- I see you want to stand up and you're welcome to --

1          (Laughter)

2                MS. ARTHUR:  He's itching to do it.  Go ahead.

3                THE COURT:  -- because that answer feels like a

4  better answer than the alternative, but it seems different

5  from what you're telling that creditor in the ballot you're

6  sending them.

7                MR. SHAPIRO:  So -- sorry, for the record, Zach

8  Shapiro -- this is my -- we talked about this, so I'm going

9  to take credit for this bad idea.

10          (Laughter)

11                MR. SHAPIRO:  So I think there's three choices if

12  somebody does that, right?  Option one, we could decide to

13  let them out of the release, in which case then it's done,

14  right?  We have that ability to resolve any confirmation

15  objection and that's what we could do.  We could decide to do

16  that, right?

17                THE COURT:  Mm-hmm.

18                MR. SHAPIRO:  Option two, I could say you gave up

19  that right when you voted yes, and I could try to enforce

20  that.  Then you could decide at that time whether that's

21  something that you feel comfortable enforcing.

22                THE COURT:  Right.

23                MR. SHAPIRO:  And then option three, which I don't

24  think we're going to do --

25                THE COURT:  And assume that I -- so here's -- this

1  is why I -- you've put your sort of finger on what's

2  troubling me about this mechanism, which is it feels to me

3  like I shouldn't send this out saying, by voting yes, you are

4  irrevocably granting the third party release, unless I'm

5  actually prepared to confirm a plan that doesn't meet

6  Continental in the face of an objection by that creditor.

7  And I don't think I am, which is why I'm not comfortable

8  sending this out in this form.

9          MR. SHAPIRO:  But I -- see, I don't think -- I

10  don't think that's something you need to decide today, right?

11  We don't have any evidence in front of you that would give

12  you -- that would lead you to believe one way or the other --

13          THE COURT:  No, I understand.

14          MR. SHAPIRO:  -- whether we're going to approve --

15          THE COURT:  This exercise necessarily involves,

16  you know, sort of -- we're telling the creditors something,

17  right?  And we don't know what the future will hold.  It may

18  well be everyone votes -- look, it could well be the case

19  that everyone votes no and the plan fails.  There are lots of

20  different things that could happen, but before I say these

21  procedures are appropriate, I've got to at least do a little

22  bit of thinking about how this plays out.

23          MS. ARTHUR:  We did a tag team, Your Honor, so I'm

24  tagging myself back in.

25          THE COURT:  That's totally fine.

1          MS. ARTHUR:  For the record, Candace Arthur.

2          Your Honor, I think it's important to note that

3   what we are saying to the creditor, in your instance of

4   you're irrevocably saying that you're consenting to this

5   release, is make sure you understand this plan, know what

6   you're giving up.  And, if you know what you're giving up and

7   you check this box, then that is the situation.

8          If an objection then is made to Your Honor and

9   Your Honor is going to change the release in some way, isn't

10  that better?  Like --

11         THE COURT:  See --

12         MS. ARTHUR:  -- if anything happens, you provide

13  this like an upside now versus making the release worse than

14  what they have consciously said that they are agreeing to.

15  If the plan was, you know, two pages instead of like 60,

16  would we still have the same type of consent issue?  You've

17  read it, you've understood it, do not check this box if you

18  do not feel comfortable with the claims that you are being

19  released.  That's the baseline, right?

20         And I think, Your Honor, the reason why this

21  hasn't come up in other instances and other cases is because

22  the baseline is we are agreeing that this person read the

23  document and understands what they're giving up.

24         THE COURT:  Yeah.  I'll tell you, the reason that

25  this issue -- I mean, perhaps why -- I mean, I think in TPC

1  when it came up it was in response to an objection by a

2  party, but perhaps they just -- no, the committee actually

3  raised that objection and, you know, here there isn't a

4  committee, which has to bear in the analysis a bit, but

5  before -- I had a case before in which I think I had approved

6  without knowing it a procedure like this.  And then the

7  creditor came in and raised an objection and the debtor,

8  unsurprisingly, did exactly what Mr. Shapiro suggested one

9  might do, which is came back and said, no, just kidding,

10  we'll carve you out of the release.

11         And that did lead me to raise the question, should

12  I be approving solicitation procedures that essentially could

13  be read to suggest that you're irrevocably granting the

14  release when you vote on the plan, and I remain concerned by

15  it.

16         MS. ARTHUR:  Your Honor, I think parties,

17  including the debtors, do deserve some type of certainty as

18  well and we do provide the terms of the plan.  And, to your

19  point, perhaps a creditor comes in later, which is what

20  happened with you, and then they raise the issues to the

21  release.

22         I think, Your Honor, it's important to not prevent

23  people from forfeiting what they would like to forfeit at

24  whatever time that that question is posed before them.  I

25  also think, Your Honor, otherwise, you run into the situation

1  where you say, yes, do you approve this plan, but really tell

2  me again, do you really, really, really approve this plan.

3  And I don't think that people need to have multiple chances

4  and multiple options beyond what the Court and the Bankruptcy

5  Court are already providing to do so.

6         I think that, you know, we're giving parties a lot

7  of different options and a lot of different time and

8  sufficient time, sufficient information, to make that

9  informed decision and, to the extent that they don't and, as

10  Mr. Shapiro said, they come forward, then, Your Honor, they

11  are getting that second bite.  And I think that that is

12  enough precautions, enough procedural safeguards, if you

13  will, to provide comfort.

14         THE COURT:  Okay.  So, look, here's where I am.

15  And I really appreciate this argument and, frankly, the

16  candor from all parties all around, it's very helpful to me,

17  and I think this is tricky.

18         I think, for the sake of bringing some clarity to

19  the universe, it probably makes sense for me to actually

20  sketch out and write some thoughts on this, but that,

21  obviously, this case can't wait for that to happen.  So let

22  me tell you where I am and I reserve the right to flesh it

23  out a bit further in writing.  It would surprise me if anyone

24  planned on bringing an immediate appeal from an order

25  approving the disclosure statement, so I don't think there's,

1   you know, immediate urgency to getting that written, but I'm

2   not prepared to approve solicitation procedures that are in

3   this form, I think I'll only approve it as revised.

4          Obviously, if that's an issue you want to take up,

5   I'll allow you to do that, but if you don't, I'd be more than

6   happy -- I have no issues with the disclosures, you've solved

7   everyone's problem.  I think that -- I've read the disclosure

8   statement, I think it fairly apprises creditors of the

9   information that a reasonable creditor would need to have in

10  order to make an informed decision on how to vote.  I've got

11  no problem at all approving the disclosure statement and I'd

12  be happy with just a revision to the solicitation procedures

13  that would allow a creditor who votes yes to opt out, to then

14  enter an order permitting it, and I'm happy to explain in

15  writing my reasons why I'm not comfortable approving it in

16  its current form.

17         So, unless that causes anyone undue havoc, I'm

18  happy to -- I'll give you the chance to revise it, unless you

19  want to take this issue up, which I can't imagine -- well,

20  that's your right, so it's up to you.

21         MS. ARTHUR:  Thank you, Your Honor, and I

22  appreciate the ruling that you've made.  Just for

23  clarification, in terms of updating our procedures and the

24  ballots that are associated with respect thereto, it would be

25  the Class 4 general unsecured ballot and not Class 3;

1   correct?

2           THE COURT:  So Class -- so walk me through this

3   again.

4           MS. ARTHUR:  So Class 3 is the Reserve Bank and

5   the Reserve Bank is a releasing party, as well as -- so just

6   in terms of having to -- I think, actually, that would be

7   confusion now to have this opt-out feature that we were

8   discussing as well.  So I just want --

9           THE COURT:  So Class 3 is just the Reserve Bank?

10          MS. ARTHUR:  It's just the Reserve Bank, Your

11   Honor.

12          THE COURT:  Does the Reserve Bank seek the right

13   to opt out of the release?

14          MS. SCHWEITZER:  I don't have -- to the extent

15   that Your Honor -- sorry, Lisa Schweitzer from Cleary

16   Gottlieb for the Reserve Bank of San Francisco.  I don't have

17   the authority to say on their behalf that they're waiving a

18   right that Your Honor --

19          THE COURT:  All right, but --

20          MS. SCHWEITZER:  -- is saying is available to all

21   creditors --

22          THE COURT:  -- but you're also a released party

23   under the plan?

24          MS. SCHWEITZER:  Yes, we are.

25          THE COURT:  Okay.  So I'm not going to give them

1 the same right.  If you want to file an objection to the

2 third party release, they can treat you like the unimpaired

3 creditors in that respect.

4           MS. SCHWEITZER:  Okay.

5           THE COURT:  If the Federal Reserve wants to file

6 an objection, it knows how to do it, and I don't think that

7 it's critical that the -- and you could, of course, vote no.

8           MS. SCHWEITZER:  Right.

9           THE COURT:  So I think I'm fine with that in that

10 context.

11           MS. SCHWEITZER:  Thank you, Your Honor.  That was

12 the only clarifying question that the debtors personally had.

13           THE COURT:  Okay.  Does that give everyone enough

14 guidance to move the case forward in a way that addresses the

15 estate's immediate needs?

16           MS. ARTHUR:  I believe so, Your Honor, it does.

17           THE COURT:  Okay.  While we're here -- I think

18 that takes us through the agenda, but while we're here, is

19 there any other matter on which the Court can be helpful to

20 the parties?

21           MS. ARTHUR:  Oh, a scary question, Your Honor.

22      (Laughter)

23           MS. ARTHUR:  No, Your Honor, I think that's it for

24 this morning.  Thank you.

25           THE COURT:  Okay.  So thank you all for this, this

1  has been very helpful and, with that, we're adjourned.  Thank

2  you.

3          COUNSEL:  Thank you, Your Honor.

4          MS. SCHWEITZER:  Your Honor?

5          THE COURT:  Yes?

6          MS. SCHWEITZER:  May we just be heard with respect

7  to a couple comments that they made?

8          THE COURT:  You may be heard, yes.  I take it

9  back, we're not adjourned.

10       (Laughter)

11          MS. SCHWEITZER:  Lisa Schweitzer from Cleary

12 Gottlieb for the Reserve Bank again.  I don't want to take

13 your time, that was the only contested matter on for today, I

14 just thought, given where we're at, we just wanted to -- Ms.

15 Arthur had previewed -- I'm trying to remember which one

16 previewed -- the debtors' counsel had previewed is just there

17 are some issues remaining as we head into the plan process,

18 and so we just wanted to let Your Honor know the scope and I

19 wanted to address one comment that was made in light of the

20 last discussion.

21          THE COURT:  Okay.

22          MS. SCHWEITZER:  As Your Honor knows that we

23 represent the Federal Reserve Bank of San Francisco, which

24 has extended this PPPLF facility to the debtors, and that

25 there was a substantial balance outstanding, defaults prior


1  to the bankruptcy, we've been working with the debtors.  And,

2  as Your Honor sees, there's a lot of provisions in the plan

3  that show the effort of that work.

4          For the Reserve Bank, obviously, the emphasis has

5  been the continued servicing of the loans and orderly

6  transfer of servicing, to the extent needed under the plan,

7  and the preservation of litigation against necessary parties

8  to the extent creditor recoveries can't be paid in full.

9          We're continuing to work with the debtors on these

10  issues.  As Your Honor sees, there's a bunch of plan

11  supplements that are needing to be done that -- just so

12  you're aware that there's wind-down agreements, wind-down

13  budgets, different -- I don't want to call them secondary

14  because they almost are the heart of the plan that we've been

15  working very constructively together, but there's still some

16  wood to chop before we get to our voting deadline and

17  including, as the debtors' counsel had indicated, on some of

18  the margins of the releases.

19          So we hope to come back before you in a month with

20  all of this resolved, and we feel it's been very

21  constructive, but just so you understand the bigger lay of

22  the land.

23          The only other point I wanted to make -- and,

24  again, this isn't the hearing on the releases, but Ms. Arthur

25  had mentioned that the Reserve Bank and related parties are

1  giving releases.  The Reserve Bank isn't a corporation the

2  way other people have like subsidiaries and all that, so I'm

3  not -- I don't believe actually that there are related

4  parties legally capable of -- they can deliver releases on

5  behalf of, but we're not before you today on this, it's not

6  meant to be a prolonged discussion, but just because it was

7  set out there, I just want the record to be clear of where

8  we're at and we'll obviously be working with them on all of

9  these issues.  It's not something necessarily that we were

10 fighting over yesterday, but I just want to make sure that,

11 since it was said, that there's no confusion or

12 misapprehension on that point.

13         So, again, I didn't mean to steal you away from

14 ending the hearing, but I just wanted to make clear given

15 that we haven't been before you in these different hearings

16 that you understand where we're all working towards.

17         THE COURT:  Okay.  Thank you very much for that.

18         Ms. Arthur, is there anything by way of response?

19         MS. ARTHUR:  We're fine.

20         THE COURT:  Okay.  Let me ask this again, is there

21 any other party in interest that would like the opportunity

22 to be heard while we're here?

23     (No verbal response)

24         THE COURT:  Okay.  If not, again, thanks to

25 everyone.  I think this has been helpful and I understand

1  more about what's going on every time that you all come in

2  and explain it to me.  So very much appreciated and, with

3  that, we are adjourned.

4          Thank you.

5          COUNSEL:  Thank you, Your Honor.

6      (Proceedings concluded at 10:54 a.m.)

7

8

9

10                      CERTIFICATION

11      We certify that the foregoing is a correct

12  transcript from the electronic sound recording of the

13  proceedings in the above-entitled matter to the best of our

14  knowledge and ability.

15

16  /s/ Tracey J. Williams              January 19, 2023

17  Tracey J. Williams, CET-914

18  Certified Court Transcriptionist

19  For Reliable

20

21  /s/ Mary Zajaczkowski              January 19, 2023

22  Mary Zajaczkowski, CET-531

23  Certified Court Transcriptionist

24  For Reliable

25