IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KABBAGE, INC. d/b/a KSERVICING, *et al.*, | Case No. 22-10951 (CTG) |
| Debtors.¹ | (Jointly Administered) |

## PROOF OF PUBLICATION

Attached hereto as Exhibit A is the Proof of Publication for the Notice of Entry of Final NOL Order from the following:

| Publication | Publication Date | Exhibit |
|---|---|---|
| The New York Times | November 14, 2022 | A |

/s/ Randy Lowry
Randy Lowry
Omni Agent Solutions
5955 DeSoto Avenue, Suite 100
Woodland Hills, California 91367
(818) 906-8300
*Claims, Noticing, and Administrative Agent for the Debtor*

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a/ KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

# **EXHIBIT A**

# **EXHIBIT A**



**The New York Times**
620 8TH AVENUE · NEW YORK, NY 10018

# PROOF OF PUBLICATION

Nov-14, 20 22

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of *The New York Times*, a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of *The New York Times* on the following date or dates, to wit on

Nov 14, 2022, NYT & Natl, pg B5

Sworn to me this 14th day of November, 2022

*Ellen Herb*
_____
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF STOCK ISSUED BY KABBAGE, INC. D/B/A KSERVICING:**

Upon the motion (the "**Motion**") of Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"), on November 2, 2022, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), having jurisdiction over the chapter 11 cases of the Debtors, captioned as *In re Kabbage, Inc. d/b/a KServicing, et al.*, No. 22-10951 (CTG) (the "**Chapter 11 Cases**"), entered a final order establishing procedures (the "**Procedures**") with respect to transfers in the beneficial ownership (including directly and indirectly) of common stock of the Debtors ("**Common Stock**") and options to acquire beneficial ownership of Common Stock.

In certain circumstances, the procedures restrict transactions involving, and require notices of the holdings of and proposed transactions by, any person, group of persons, or entity that either (i) is a Substantial Stockholder of the Common Stock or (ii) as a result of such a transaction, would become a Substantial Stockholder of the Common Stock. For purposes of the procedures, a "**Substantial Stockholder**" is any person or entity (within the meaning of applicable regulations promulgated by the U.S. Department of the Treasury, including certain persons making a coordinated acquisition of stock) that beneficially owns (including options to acquire and direct or indirect ownership) at least 1,848,370[1] shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock as of the Petition Date). *Any prohibited acquisition or other transfer of Common Stock (including options to acquire beneficial ownership of Common Stock) will be null and void ab initio and may lead to contempt, compensatory damages, punitive damages, or sanctions being imposed by the Bankruptcy Court.*

The Procedures are available on the website of Omni Agent Solutions, Inc., the Debtors' Court-approved claims agent, located at https://omniagentsolutions.com/kservicing, and on the docket of the Chapter 11 Cases, Docket No. 193, which can be accessed via PACER at https://www.pacer.gov.

The requirements set forth in the Procedures are in addition to the requirements of applicable securities, corporate, and other laws and do not excuse noncompliance therewith.

A direct or indirect holder of, or prospective holder of, Common Stock that may be or become a Substantial Stockholder should consult the Procedures.

Dated: Wilmington, Delaware     **BY ORDER OF THE COURT**
November 4, 2022

[1] As of the Petition Date, there were 38,913,048 shares of common stock outstanding.



Sam Bankman-Fried, the founder of the FTX crypto exchange, and Gisele Bündchen, its environmental adviser, at a panel on 'effective altruism' in April.

ERIKA P. RODRIGUEZ FOR THE NEW YORK TIMES

## Fall of FTX Deals Blow to Charity Movement

FROM FIRST BUSINESS PAGE

Mr. MacAskill did not respond to a request for comment for this article.

Through a separate nonprofit called Building a Stronger Future, Mr. Bankman-Fried also gave to groups including the news organizations ProPublica, Vox and the Intercept.

In a note to staff members on Friday, ProPublica's president, Robin Sparkman, and editor in chief, Stephen Engelberg, wrote that the remaining two-thirds of a $5 million grant for reporting on pandemic preparedness and biothreats were on hold. "Building a Stronger Future is assessing its finances and, concurrently, talking to other funders about taking on some of its grant portfolio," they wrote.

In a statement on Sunday, a senior adviser to the foundation, Avi Zenilman, wrote: "While we don't have information on the immediate future of Building a Stronger Future, it is clear that its scope and structure will need to change. However, the organizations and institutions it funded remain vitally important. We are hopeful that this work will continue in some way."

"We are deeply sorry to everyone impacted by this shocking event, including our grantees and partners," Mr. Zenilman added.

Benjamin Soskis, senior research associate in the Center on Nonprofits and Philanthropy at the Urban Institute, said that the issues raised by Mr. Bankman-Fried's reversal of fortune acted as a "distorted fun-house mirror of a lot of the problems with contemporary philanthropy," in which very young donors control increasingly enormous fortunes.

"They gain legitimation from their status as philanthropists, and there's a huge amount of incentive to allow them to call the shots and gain prominence as long as the money is flowing," Mr. Soskis said.

Mr. Bankman-Fried's fall from grace may have cost effective-altruist causes billions of dollars in future donations. For a relatively young movement that was already wrestling over its growth and focus, such a high-profile scandal implicating one of the group's most famous proponents represents a significant setback.

His connection to the movement in fact predates the vast fortune he won and lost in the cryptocurrency field. Over lunch a decade ago while he was still in college, Mr. Bankman-Fried told Mr. MacAskill, the philosopher, that he wanted to work on animal-welfare issues. Mr. MacAskill suggested the young man could do more good earning large sums of money and donating the bulk of it to good causes instead.

Mr. Bankman-Fried went into finance with the stated intention of making a fortune that he could then give away. In an interview with The New York Times last month about effective altruism, Mr. Bankman-Fried said he planned to give away a vast majority of his fortune in the next 10 to 20 years to effective altruist causes. He did not respond to a request for comment for this article.

Effective altruism focuses on how individuals can do as much good as possible with the money and time available to them. Historically, the community focused on low-cost medical interventions, such as insecticide-treated bed nets to prevent mosquitoes from giving people malaria.

More recently many members of the movement have focused on issues that could have a greater impact on the future, like pandemic prevention and nuclear nonproliferation as well as preventing artificial intelligence from running amok and sending people to distant planets to increase our chances of survival as a species.

In a few short years, effective altruism went from a somewhat obscure corner of charity favored by philosophy students and social workers to a leading approach to philanthropy for an increasingly powerful cohort of millennial and Gen-Z givers, including Silicon

### Nonprofits are scrambling to replace millions in grant commitments.

Valley programmers and hedge fund analysts.

The Facebook and Asana co-founder Dustin Moskovitz and his wife, Cari Tuna, have said they are devoting much of their fortune to effective-altruist causes.

"I don't know yet how we'll repair the damage Sam did and harden EA against other bad actors," Mr. Moskovitz wrote in a tweet on Saturday. "But I know that we're going to try, because the stakes remain painfully high."

As recently as last month, the umbrella FTX Foundation said it had given away $140 million, of which $90 million went through the FTX Future Fund dedicated to long-term causes. It is unclear how much of that money made it to the recipients and how much was earmarked for giving in installments over several years.

Asked whether he had set up any kind of endowment for his giving, Mr. Bankman-Fried said in the Times interview last month: "It's more of a pay-as-we-go thing, and the reason for that, frankly, is I'm not liquid enough for it to make sense to do an endowment right now."

A significant share of the grants went to groups focused on building the effective altruist movement rather than organizations working directly on its causes. Many of those groups had ties to Mr. Bankman-Fried's team of advisers. The largest single grant listed on the Future Fund website was $15 million to a group called Longview, which according to its website counts Mr. MacAskill and the chief executive of the FTX Foundation, Nick Beckstead, among its own advisers.

The second-largest grant, in the amount of $13.9 million, went to the Center for Effective Altruism. Mr. MacAskill was a founder of the center. Both Mr. Beckstead and Mr. MacAskill are on the group's board of trustees, with Mr. MacAskill serving as the chair of the United Kingdom board and Mr. Beckstead as the chair of the U.S. subsidiary.

The FTX Foundation itself had little to no oversight beyond Mr. Bankman-Fried's close coterie of collaborators. According to its website, the board of the FTX Foundation comprised Caroline Ellison, the head of Alameda Research, the hedge fund Mr. Bankman-Fried founded; Gary Wang, the chief technology officer of FTX; and Nishad Singh, director of engineering at FTX.

## FTX's Founder Was Called A Modern-Day J.P. Morgan. The Analogy Still Works.

By ROGER LOWENSTEIN

With inflation still roaring, it is a hard time to make a case for the value of central banks. But the boy wizards of cryptocurrency have done it.

The great benefit of crypto was said to be decentralization. This was accompanied by all manner of gasbagging about the liberating power of money unhinged from the central state.

One prominent evangelist of decentralized money, Sam Bankman-Fried, famously wore shorts and was said to be worth $25 billion at age 30. Mr. Bankman-Fried, the founder of the exchange known as FTX, was considered by many to be a safe bet that would tame the wilds of crypto, his industry's white knight.

That characterization gained steam this summer after Mr. Bankman-Fried tried to bail out a couple of smaller failed crypto firms, Voyager Digital and BlockFi Inc., drawing laudatory press that compared him to J.P. Morgan Sr.

The Morgan analogy was repeated this week even after FTX customers withdrew $6 billion in funds in the equivalent of a bank run, forcing FTX to freeze operations and stranding billions in remaining customers' potentially lost assets.

For all of the obvious ways in which Mr. Bankman-Fried is no Pierpont Morgan, a model of discretion whose namesake firm continues to be solvent to this day, on one point they have something in common: Their careers demonstrate a need for central banks.

Morgan earned his reputation as a private rescuer in 1907, when a bank run struck the trusts (banklike associations) in New York City and then spread to traditional banks. Morgan assembled the city's leading financiers to lend emergency funds and ease the panic.

His heroism slowed the bleeding — but some banks failed, many suspended withdrawals and scores resorted to dispensing homemade certificates in lieu of money. As each bank hoarded reserves to save itself, the stock market plunged 40 percent and the country suffered a severe recession.

Morgan's inadequacy made plain that the United States, already an industrial powerhouse, could not depend on the benevolence of a single financier. Precisely for this reason, Nelson Aldrich, a powerful senator with close ties to Morgan, led a mission to Europe in 1908 to study the workings of the central banks in England, France and Germany.

### DealBook/

DealBook helps you make sense of the day's most important business and policy headlines. Sign up for the newsletter at **nytimes.com/dealbook**

Two years later, a group of bankers, including a senior partner of Morgan's, the president of its rival National City Bank, and the central banking crusader Paul Warburg, gathered at Morgan's exclusive club on Jekyll Island, off the coast of Georgia. Meeting in secret, they plotted the outline of what Americans had resisted since Andrew Jackson's day — a central bank. The Federal Reserve was born three years later, in 1913.

This week, The Wall Street Journal's James Mackintosh opined, "The fundamental flaw of centralized finance is that it needs central banks to end chaotic bank runs . . . " This is like saying that the flaw with owning a home is that one may need the fire department.

### Two different careers make the case for central banks.

Any monetary instrument is a form of credit, and credit will always involve risk. Mr. Bankman-Fried discovered that. His putative savior, a crypto exchange known as Binance, backed out 24 hours after it had tentatively agreed to a rescue. On Friday, FTX filed for bankruptcy. Yet had the rescue deal gone through, Binance would have been on the hook for, reportedly, up to $8 billion in claims against FTX. Who would have come to the rescue of Binance?

The point of a central reserve, which is what Paul Warburg and Nelson Aldrich had in mind in 1913, is that the pooled resources of the nation are immeasurably greater than those of any single mogul. They offer, in times of need, an ocean of liquidity to iron out the inevitable fluctuations in individual, regional, and industry-specific credit. Would anyone in their right mind wish to entrust the nation to crypto — and trade the imperfect Fed for the likes of FTX and Binance?

*Roger Lowenstein is the author of "America's Bank: The Epic Struggle to Create the Federal Reserve."*

What do you think? Let us know: dealbook@nytimes.com

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

In re: SIZMEK INC., et al.,[1] Debtors.

Chapter 7
Case No. 19-10971-DSJ

NOTICE OF JANUARY 31, 2023 DEADLINE TO FILE REQUESTS FOR PAYMENT OF CHAPTER 11 ADMINISTRATIVE EXPENSES TO ALL PERSONS AND ENTITIES THAT ASSERT CHAPTER 11 ADMINISTRATIVE CLAIMS AGAINST ANY OF THE DEBTOR ENTITIES LISTED BELOW:

1. The United States Bankruptcy Court for the Southern District of New York ("Court") has entered an Order establishing January 31, 2023 at 5:00 p.m., prevailing Eastern time (the "Administrative Bar Date"), as the last date for each person or entity (including individuals, partnerships, corporations, estates, joint ventures, trusts, and governmental units) to file requests for payment of chapter 11 administrative expenses ("Requests") against any of the following Debtors (the "Debtors"):

| Debtor | Case Number | Debtor | Case Number |
|---|---|---|---|
| Sizmek Inc. | 19-10971 | WirelessDeveloper, Inc. | 19-10976 |
| Point Roll, Inc. | 19-10972 | X Plus One Solutions, Inc. | 19-10977 |
| Sizmek DSP, Inc. | 19-10973 | X Plus Two Solutions, LLC | 19-10978 |
| Sizmek Technologies, Inc. | 19-10974 | Solomon Acquisition Corp. | 19-13866 |
| Wireless Artist LLC | 19-10975 | | |

2. The deadline and procedures set forth herein apply to all Requests of whatever character against the Debtors, arising (a) against Solomon Acquisition Corp. on and after December 5, 2019 (the "Solomon Acquisition Filing Date"), the date that Solomon Acquisition Corp. filed a voluntary petition for relief under chapter 11 of title 11, United States Code ("Bankruptcy Code"), and (b) against the remaining Debtors on and after March 29, 2019 (the "Filing Date"), the date the remaining Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and on or before November 24, 2020 (the "Conversion Date"), the date upon which the Debtors' chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code, and is not one of the types of Requests described in Section 6 below that are specifically excluded from the Administrative Bar Date filing requirement. The Administrative Bar Date does apply to a holder of an administrative expense for compensation for professional services rendered and reimbursement of expenses incurred on behalf of the Debtor's estate of the type allowable under Bankruptcy Code §§ 330 and 331.

3. WHO MUST FILE A REQUEST FOR PAYMENT: You MUST file a Request to share in distributions from the Debtors' bankruptcy estates if your expenses were incurred under sections 503(b) and/or 507(a)(2) of the Bankruptcy Code during the Debtors' chapter 11 cases on or after the Solomon Acquisition Filing Date or the Filing Date, as the case may be, and before the Conversion Date, and it is not one of the types of Requests described in Section 6 below. Requests based upon acts or omissions of the Debtors that occurred after the Solomon Acquisition Filing Date or the Filing Date, as the case may be, and before the Conversion Date must be filed on or before the Administrative Bar Date, even if such Requests are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain on or after the Solomon Acquisition Filing Date or the Filing Date, as the case may be, and on or before the Conversion Date.

4. WHAT TO FILE: A Request for Payment form may be found at the website of claims agent Stretto at https://case.stretto.com/sizmek/fileaclaim. All Requests must (i) be signed, and include your complete name, address, telephone and facsimile numbers, and email address, (ii) include supporting documentation (if voluminous, attach summary) or an explanation as to why documentation is not available, (iii) be in the English language, and (iv) be denominated in United States currency. If you are a professional retained by Court Order, you must also file a fee application consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Court's Local Rules.

Your Request for Payment form must not contain complete social security numbers or taxpayer identification numbers (only the last four digits), a complete birth date (only the year), the names of a minor (only the minor's initials) or a financial account number (only the last four digits of such financial account).

Any holder of an Administrative Claim against more than one Debtor must file a separate Request for Payment with respect to each such Debtor and all holders of claims must identify on their Request for Payment the specific Debtor against which their claim is asserted and the case number of that Debtor's bankruptcy case. A list of the names of the Debtors and their case numbers is set forth above.

5. WHEN AND WHERE TO FILE: Except as provided for herein, all Requests must be filed so as to be received on or before January 31, 2023 at 5:00 p.m., prevailing Eastern time, in the following manner and at the following address:

(a) electronically with the claims agent Stretto at the following website: https://case.stretto.com/sizmek/fileaclaim; or

(b) by delivery of the original Request by mail, by hand delivery, or by overnight courier to:

Sizmek Claims Processing c/o Stretto
8269 E 23rd Ave, Suite 275 • Denver, CO 80238

Requests shall be deemed filed only when actually received by the Claims Agent on or before the Administrative Bar Date. Requests may not be delivered by facsimile or telecopy. IF YOU ARE SUBMITTING YOUR REQUEST BY MAIL, YOU MUST ALLOW SUFFICIENT TIME FOR DELIVERY.

6. WHO NEED NOT FILE A REQUEST: You do not need to file a Request on or before the Administrative Bar Date if you are:

(a) a person or entity that has already filed a Request either with Stretto, the Debtors' claims agent, or with the Clerk of the United States Bankruptcy Court (if such Request is filed incorrectly, however, you may change information relating to your Request by filing another Request and designating it as an amended Request);

(b) a person or entity whose Request has already been allowed by order of the Court;

(c) a person or entity whose Request has been paid in full; or

(d) a person or entity for which specific deadlines have previously been fixed by the Court.

This notice was sent to many persons and entities that have had some relationship with or have done business with the Debtors but may not have an unpaid administrative expense or who are otherwise not required to file a Request. The fact that you have received this Notice does not mean that you have an administrative expense, or that the Debtors, the chapter 7 trustee, or the Court believe that you have an administrative expense.

7. CONSEQUENCES OF FAILURE TO FILE A REQUEST BY THE ADMINISTRATIVE BAR DATE: IF YOU ARE REQUIRED TO FILE A REQUEST, BUT DO NOT DO SO IN THE MANNER AND TIME PRESCRIBED, YOU WILL BE FOREVER BARRED FROM ASSERTING A REQUEST, YOUR REQUEST WILL BE FOREVER BARRED, YOU WILL NOT BE ENTITLED TO ANY DISTRIBUTION ON THAT REQUEST, AND YOU WILL RECEIVE NO FURTHER NOTICES REGARDING YOUR REQUEST.

8. RESERVATION OF RIGHTS: The Trustee reserves the right to dispute or to assert offsets or defenses against any Administrative Claim as to nature, amount, liability, priority, classification, or otherwise. Nothing contained in this Notice shall preclude the Trustee from objecting to any claim on any grounds.

9. FURTHER INFORMATION: If you have a question about this notice, you may contact the counsel for the Trustee as set forth below. Any other questions, such as whether you should file a Request or take any other action with respect to your Request should be directed to your attorney.

Dated: New York, New York
November 2, 2022

BY ORDER OF THE COURT
WINDELS MARX LANE & MITTENDORF, LLP
Leslie S. Barr, Esq. (lbarr@indelsmarx.com)
156 West 56th Street • New York, New York 10019
Tel: (212) 237-1000 • Attorneys for Alan Nisselson, Chapter 7 Trustee

[1] Debtors in the above-captioned cases, along with the last four digits of each Debtor's federal tax identification number, include: Sizmek Inc. (4624); Sizmek DSP, Inc. (2319); Point Roll, Inc. (3173); Sizmek Technologies, Inc. (0402); Wireless Artist LLC (0302); Wireless Developer, Inc. (9686); X Plus One Solutions, Inc. (8106); X Plus Two Solutions, LLC (4914); and Solomon Acquisition Corp. (4229).

ATTENTION DIRECT AND INDIRECT HOLDERS OF, AND PROSPECTIVE HOLDERS OF STOCK ISSUED BY KABBAGE, INC. D/B/A KSERVICING:

Upon the motion (the "Motion") of Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"), on November 2, 2022, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), having jurisdiction over the chapter 11 cases of the Debtors, captioned as In re Kabbage, Inc. d/b/a KServicing, et al., No. 22-10951 (CTG) (the "Chapter 11 Cases"), entered a final order establishing procedures (the "Procedures") with respect to transfers in the beneficial ownership (including directly and indirectly) of common stock of the Debtors ("Common Stock") and options to acquire beneficial ownership of Common Stock.

In certain circumstances, the procedures restrict transactions involving, and require notices of the holdings of and proposed transactions by, any person, group of persons, or entity that either (i) is a Substantial Stockholder of the Common Stock or (ii) as a result of such a transaction, would become a Substantial Stockholder of the Common Stock. For purposes of the procedures, a "Substantial Stockholder" is any person or entity (within the meaning of applicable regulations promulgated by the U.S. Department of the Treasury, including certain persons making a coordinated acquisition of stock) that beneficially owns (including options to acquire and direct or indirect ownership) at least 1,848,370 shares of Common Stock (representing approximately 4.75% of all issued and outstanding shares of Common Stock as of the Petition Date). Any prohibited acquisition or other transfer of Common Stock (including options to acquire beneficial ownership of Common Stock) will be null and void ab initio and may lead to contempt, compensatory damages, punitive damages, or sanctions being imposed by the Bankruptcy Court.

The Procedures are available on the website of Omni Agent Solutions, Inc., the Debtors' Court-approved claims agent, located at https://omniagentsolutions.com/kservicing, and on the docket of the Chapter 11 Cases, Docket No. 193, which can be accessed via PACER at https://www.pacer.gov.

The requirements set forth in the Procedures are in addition to the requirements of applicable securities, corporate, and other laws and do not excuse noncompliance therewith.

A direct or indirect holder of, or prospective holder of, Common Stock that may be or become a Substantial Stockholder should consult the Procedures.

Dated: Wilmington, Delaware
November 4, 2022

BY ORDER OF THE COURT

[1] As of the Petition Date, there were 38,913,048 shares of common stock outstanding.

Make sense of the news, every day, with David Leonhardt and Times journalists.

**The Morning**

A Newsletter

Sign up to get it in your inbox seven days a week.
nytimes.com/themorning

The New York Times

The New York Times

Prepare today's college students to become tomorrow's global citizens.

Get campuswide access to The New York Times.

Learn more at nytimes.com/campuswide