# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KABBAGE, INC. d/b/a KSERVICING, *et al.*, | ) | Case No. 22-10951 (CTG) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |

### OBJECTION OF LEAD PLAINTIFFS AND PUTATIVE CLASS MEMBERS TO CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF KABBAGE, INC. d/b/a KSERVICING AND ITS DEBTOR AFFILIATES

The lead plaintiffs and putative class members (collectively, the "**Plaintiffs**") in the currently stayed action filed as *Carr et al., v. Kabbage, Inc.*, Case No. 22-cv-02149 (N.D. Ga. Mar. 30, 2022) (the "**Putative Class Litigation**"), by and through their undersigned counsel, file this objection and reservation of rights (the "**Objection**") to confirmation of the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (as the same may be amended from time to time, the **"Plan"**)[2] filed by the above-captioned debtors and debtors-in-possession (the **"Debtors"**), as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937) (the "Company"); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Plan.

## JURISDICTION

1.     This Court has jurisdiction over the Plan and this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' Chapter 11 case, the Plan and this Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A)-(B) and (O).

3.     The statutory predicates for the relief requested herein include Sections 105, 365 and 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

## BACKGROUND

A.     **The Class Action**

4.     On March 30, 2022, the Plaintiffs, individually and on behalf of all others similarly situated, filed a class action complaint (the "**Class Action Complaint**") against Debtor Kabbage, Inc. d/b/a KServicing in the Georgia District Court, alleging that the Company, a servicer of thousands of Small Business Association ("**SBA**") Paycheck Protection Program ("**PPP**") emergency loans, failed to timely and competently process loan forgiveness applications on behalf of borrowers. The Class Action Complaint sought injunctive relief directing the Company to review and process loan forgiveness in accordance with SBA regulations, disgorgement of PPP loan origination fees on theories of unjust enrichment, and damages in accordance with state consumer protection statutes.

5.     On May 31, 2022, Debtor Kabbage, Inc. d/b/a KServicing moved to dismiss the Class Action Complaint.

6.     Immediately prior to Debtor Kabbage, Inc. d/b/a KServicing filing its chapter 11 case, the Motion to Dismiss was fully briefed and the parties were awaiting a decision from the Georgia District Court.

B.    **Bankruptcy Proceedings**

7.    On October 3, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are authorized to continue to operate their business as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

8.    Pursuant to Bankruptcy Rule 1015(b), the Chapter 11 Cases are being jointly administered under the above captioned case.

9.    Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Deborah Rieger-Paganis in Support of the Chapter 11 Petitions and First-Day Pleadings* [Doc. No. 13] (the "**First Day Declaration**").

10.    On or about November 7, 2022, this Court entered the *Order Under 11 U.S.C. §§ 105, 361, 362, and 363, and Bankruptcy Rule 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lender* [Doc. No. 225] (the "**Cash Collateral Order**"), which, among other things, reflected certain acknowledgments by the Debtors and provided certain Adequate Protections to the Federal Reserve Bank of San Francisco (the "**Reserve Bank**").

11.    On January 19, 2023, the Debtors filed their *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* [Docket No. 466] (the "**Plan**") and Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 467] (the "**Disclosure Statement**").

30305312v.5

12.     On January 19, 2023, the Court entered the *Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors' Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief* [Docket No. 470] (the "**Disclosure Statement Order**") that, among other things, approved the Disclosure Statement, authorized the Debtors to commence solicitation on the Plan, and scheduled a confirmation hearing for the Plan on March 13, 2023 (the "**Confirmation Hearing**").

13.     On January 27, 2023, the Debtors filed the *Debtors' First Omnibus Objection (Substantive) to Certain Misclassified Claims* [Doc. No. 491] (the "**Omnibus Claims Objection**"), which, among other things, sought to re-classify claims filed by certain of the Plaintiffs as General Unsecured Claims (the "**Proposed Reclassified Claims**").  No objections or responses to the Omnibus Claims Objection were filed and it is anticipated the Proposed Reclassified Claims will be classified as General Unsecured Claims.

14.     Upon information and belief, all claims filed by Plaintiffs, other than the Proposed Reclassified Claims, were filed as General Unsecured Claims.

## C.     Plan Treatment of Claims

15.     Section 4 of the Plan addresses the treatment of Claims and Interests, including the treatment of General Unsecured Claims.

16.     Pursuant to Section 4.3 of the Plan, the Debtors propose that Reserve Bank be allowed a claim for $536,450,940 plus significant additional unknown amounts (the "**Unknown Reserve Bank Claims**") for, among other things, interest, costs, and attorney fees, which would consist of: (i) a Secured Claim to the extent of the proceeds from the PPPLF Collateral and

Adequate Protection, and (ii) a priority claim, under Section 507(a)(2) of the Bankruptcy Code, to the extent the PPPLF Collateral and Adequate Protection are insufficient to pay in full the Reserve Bank Claims.  No basis is provided for the allowance of the Reserve Bank Priority Claim. Moreover, there is no process to challenge the Reserve Bank Claim and the Plan specifically provides that there will be "no estimation of the Reserve Bank Claim."  *See* Plan, § 7.5. Effectively, the Debtors are seeking approval to provide a blank check to the Reserve Bank.

17.    Pursuant to Section 4.3(c)(ii), Reserve Bank Priority Claims will receive the GUC Pool Class A Interest.

18.    Section 4.4 provides for the treatment of General Unsecured Claims and, in relevant part, states that each holder of an Allowed General Unsecured Claim will receive its *pro rata* share of the GUC Pool Class B Interests.

19.    Pursuant to Section 1.57 of the Plan, the "GUC Pool" is:

> the Cash pool established pursuant to this Plan, containing (a) on the Effective Date, the amount of the GUC Pool Amount, (b) after the Effective Date but prior to the conclusion of the Wind Down, all Cash in the Wind Down Estate minus a reasonable amount of Cash determined by the Wind Down Officer and subject to the Wind Down Budget needed to fund the administration of the Wind Down Estate, and (c) at the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Estate (other than amounts on account of Post-Effective Date Servicing Costs, if applicable), which Cash shall be held in the Wind Down Estate's general accounts and not segregated.

20.    The Plan provides for two classes of interests in the GUC Pool: (a) GUC Pool Class A Interests, which entitles the Reserve Bank to the proceeds of the GUC Pool until such time that the Reserve Bank Claims are paid in full (*see* Plan, § 1.59), and (b) GUC POOL Class B Interests, which provides the means for Distributions to General Unsecured Creditors after the GUC Pool Class A Interests are satisfied, in full, (*see* Plan, § 1.60).

21.    Effectively, *only after Reserve Bank's claims, known and unknown, are paid in full* will General Unsecured Creditors, including the Plaintiffs, receive *any* Distributions from the GUC Pool, which is the only means for Distributions to General Unsecured Creditors.

22.    Pursuant to section 5.2 of the Plan, the Debtors propose to fund Distributions, in part, from proceeds of Estate Causes of Action.  Assuming "Estate Causes of Action" are the "Causes of Action" defined in section 1.13 of the Plan, they include, among other things, actions, claims, causes of action under chapter 5 of the Bankruptcy Code, including the Avoidance Actions.

23.    Finally, whether to pursue the Avoidance Actions, which appear to be the primary means for funding the GUC Pool, is a decision made by the Wind Down Officer subject to the "consent and consultation" of the Reserve Bank, the U.S. Department of Justice, the Small Business Administration, and CRB.  *See* Plan, § 5.8.

## OBJECTIONS TO PLAN CONFIRMATION

24.    To confirm a plan of reorganization, a debtor must prove by a preponderance of the evidence that all elements of § 1129 of the Code are satisfied.  *In re BSA*, 642 B.R. 504, 553 (Bankr. D. Del. 2022).  Courts universally agree that the burden of proof lies with the proponent of the plan, which, here, are the Debtors. *See, e.g., In re Washington Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011) ("[T]he Plan Supporters bear the burden of proving that the Plan complies with all of the requirements of the Bankruptcy Code for confirmation.")

25.    "To satisfy the requirements of § 1129(a), all impaired classes must accept the Plan." *In re Armstrong World Indus.*, 348 B.R. 111, 120 (D. Del. 2006).  "Section 1129(b) allows the confirmation of a plan over the objection of an impaired class if the 'plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *Id.* (*quoting* 11 U.S.C. § 1129(b)(1)). When a plan is confirmed pursuant to Section 1129(b) it is referred to as a "cramdown."  "A cramdown may be

necessary under certain circumstances to foreclose the possibility that a small minority would prevent confirmation of the plan." *Id.* "In the context of a cramdown, the debtor's standard of proof that the requirements of § 1129 are satisfied is a preponderance of the evidence." *Id.* The Court may confirm non-consensual plans only if it determines that there has been compliance with the applicable requirements of both Section 1129 (a) and (b).

**I.      The Plan Cannot be Confirmed Because the Debtors Have Not Shown That It Complies with the Best Interests of Creditors Test Under 11 U.S.C. § 1129(a)(7)**

26.      The Plan must satisfy all the requirements of section 1129(a) of the Bankruptcy Code to be confirmable, including section 1129(a)(7). Section 1129(a)(7), known as the "best interest of creditors" test, requires that each holder of a claim in an impaired class has either accepted the plan or will receive at least as much as it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7). For the reasons set forth below, the Debtors have failed to demonstrate the Plan is in the best interest of the Plaintiffs and is thus not confirmable in its current form.

27.      In relevant part, section 1129(a)(7) provides:

(7) With respect to each impaired class of claims or interests –

(A) each holder of a claim or interest of such class –

(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date;

28.      The Plan does not satisfy the requirements set forth in section 1129(a)(7)(A)(i) because the Plaintiffs are holders of claims in an impaired class (i.e., Class 4 under the Plan) and have not accepted Plan.

29.      The Plan also fails to satisfy the requirements set forth in section 1129(a)(7)(A)(ii) because the Debtors have not met their burden of proving that that the Plaintiffs will receive as

much value under the Plan as they would receive under a Chapter 7 liquidation. *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("The proponent of the plan bears the burden of showing that the best interest of creditors has been satisfied.")

30.     Notably here, the requirements of section 1129(a)(7) apply to individual dissenters rather than classes of creditors. *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle II*, 526 U.S. 434, 441 n.13, 119 S. Ct. 1411, 143 L. Ed. 2d 607 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."). As such, the Debtors must demonstrate that the Plan passes the "best interest test" for the Plaintiffs, specifically—not just for unsecured creditors as a class.

31.     "In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7." *In re Mallinckrodt PLC*, 639 B.R. 837, 888 (quoting *In re Adelphia Communs. Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007). "In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation." *Id.* In that way, "[i]t is an individual guaranty to each creditor or interest holder that it will receive as much in reorganization as it would in liquidation." 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7]; *see also In re Ditech Holding Corp.*, 606 B.R. 544, 607 (Bankr. S.D.N.Y. 2019) ((quoting *In re McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990) ("To be sure, the command of section 1129(a)(7)(A)(ii) is perhaps the strongest protection creditors have in chapter 11.")).

**Debtors Failed to Provide Adequate Liquidation Analysis**

32.     First, as an initial matter, the Debtors are required to include a liquidation analysis in the Plan. *See* 11 U.S.C. 1190(1)(B) ("A plan filed under this subchapter [11 USCS §§ 1181 et

seq.]—(1) shall include—(B) a liquidation analysis;…").  As of the date hereof, the Debtors have not filed a liquidation analysis that sufficiently addresses whether the Plan, rather than liquidation under chapter 7, is in the Plaintiffs' best interests.  Instead, the Disclosure Statement contains a generalized, conclusory statement about a hypothetical, future liquidation analysis: "[T]he Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code" based on "(i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests, and (ii) the Liquidation Analysis (which will be filed no later than the date the Plan Supplement is filed and served on holders of Claims in the Voting Classes as promptly practicable upon filing)." Disclosure Statement, § VIII(C)(1)(B). This general statement is further qualified by the disclaimer that "any liquidation analysis is *speculative*, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors." Disclosure Statement, § VIII(C)(1)(B) (emphasis added).

33.    The Debtors' failure to file a liquidation analysis in a timely manner prior to the Plan's objection deadline and confirmation hearing renders the Plan unconfirmable on its face.

**The Debtors Have Not Shown Sufficient Value of Third-Party Releases**

34.    Second, the Plan also provides for certain broad third-party releases (the "**Third-Party Releases**") that would not occur under chapter 7.

35.    The relevant Third-Party Releases are set forth in Section 10.6 of the Plan:

> **10.6. Releases By Holders of Claims and Interests.** As of the Effective Date, except (a) for the right to enforce the Plan or (b) as otherwise expressly provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or

-9-

30305312v.5

integrated after the date upon which the Bankruptcy Court enters the Confirmation Order, on or after the Effective Date, each Released Party shall be deemed expressly, conclusively, absolutely, unconditionally, irrevocably and forever, released, and waived by each of the Releasing Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or that may be asserted on behalf of any of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Plan (including the Plan Supplement), the Disclosure Statement, the restructuring of Claims or Interests in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation of any of the foregoing or any contract, instrument, release, or other agreement or document created or entered into in connection with any of the foregoing, … [.]

36.    These Third-Party Releases are not accounted for in any liquidation analysis as a part of the Plan, which it is a required part of a liquidation analysis.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation.").

37.    Five factors are often cited by the Third Circuit to guide the Court in determining whether proposed third-party releases are appropriate under a plan:

(1) an identity of interest between the debtor and released party such that a suit against the released party will deplete the estate's resources;
(2) a substantial contribution to the plan by the released party;
(3) the necessity of the release to the reorganization, to the extent that, without the release, there is little likelihood of success;
(4) the overwhelming acceptance of the plan and release by creditors and interest holders; and
(5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*In re Washington Mutual, Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R.

-10-

930, 937 (Bankr. W.D. Mo. 1994)). These five factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Washington Mutual, Inc.*, 442 B.R. at 346 (citing *Master Mortgage*, 168 B.R. at 935).

38.     Here, the Plan includes the proposed releases of third-party claims without accounting for whether, and/or to what extent, the benefit derived from providing such releases and to what extent the claims being released would be available for recovery in a chapter 7 liquidation.

**The Plan Fails to Address the Putative Class Claims**

39.     Third, the Plan fails to account for the fact that Debtors failed to timely and competently process loan forgiveness applications on behalf of borrowers, such as the Plaintiffs. The Plan simply ignores this glaring issue.  Instead of correcting the Debtors continued failure to implement forgiveness of the PPP loans to the Plaintiffs (the "**Plaintiffs' PPP Loans**"), the Plan proposes to use these loans as collateral for Reserve Bank Claims.

40.     The Plaintiffs' PPP Loans should be forgiven.  To the extent that the Plaintiffs' PPP Loans are transferred to Reserve Bank, they should be done without any release or waiver of claims by Plaintiffs – specifically that the Plaintiffs' PPP loans are forgiven and Plaintiffs are no longer obligated to pay such loans.  However, the Plan not only proposes to transfer the Plaintiffs' PPP Loans to Reserve Bank, but also proposes to release claims against Reserve Bank (*see* Plan, §§ 1.102, 10.5, and 10.6).  There is no basis for providing this release and no showing that it is in the best interests of creditors.  In fact, as regards the Plaintiffs, the release is likely to increase the burden associated with correcting the Debtors' failure to have the Plaintiffs' PPP Loans forgiven.

41.     To the extent that the Plaintiffs' PPP Loans are not transferred to Reserve Bank, but are transferred to the Wind Down Estates, the transfer should occur without any release or

waiver of claims by Plaintiffs. Similar to the release of claims involving Reserve Bank, the Plan proposes to release claims against property transferred to the Wind Down Estates (*see* Plan § 10.1(a)). There is no basis for providing this release as it relates to Plaintiffs' PPP Loans and no showing that it is in the best interests of creditors. As with the release of claims against Reserve Bank, the release of claims related to the forgiveness of the Plaintiffs' PPP Loans is likely to increase the burden associated with correcting the Debtors' failure to have the Plaintiffs' PPP Loans forgiven and is not in the best interest of the Plaintiffs.

42. Significantly, the Debtors have failed to show how creditors are better under the Plan with the transfer of the Plaintiffs' PPP Loans and corresponding waivers to Reserve Bank and the Wind Down Estate; rather, than a liquidation under chapter 7. Accordingly, for this reason as well as Debtor's failure to provide a liquidation analysis and the Plan's unjustified third-party releases, the Plan fails under section 1129(a)(7)(A)(ii).

43. As the Debtors have not shown the Plan complied with either requirement under section 1129(a)(7), confirmation of the Plan should be denied.

## II.    The Plan Cannot be Confirmed Because the Debtors Have Not Shown That it is Fair and Equitable in Compliance with 11 U.S.C. § 1129(b)

44. As stated above, the Court may confirm non-consensual plans only if it determines that there has been compliance with the applicable requirements of section 1129(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1129. With respect to unsecured creditors, § 1129(b)(2)(B) provides that a plan is fair and equitable with respect to a class if "(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the

debtor is an individual, the debtor may retain property included in the estate under section 1115 .

. . ." *Id.*  This provision is often referred to as the "absolute priority rule."

45.     A plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.  *In re Hercules Offshore, Inc.*, 565 B.R. 732, 766 (Bankr. D. Del. 2016).

46.     The reasons for denying confirmation under section 1129(a)(7) of the Bankruptcy Code are similarly applicable to consideration of confirmation under section 1129(b) of the Bankruptcy Code.  Simply stated, the Plan cannot be considered equitable without a sufficient liquidation analysis and with unjustified releases that burden General Unsecured Creditors, such as the Plaintiffs.

47.     In addition, the Plan provides for two classes of interests in the GUC Pool and prioritizes Reserve Bank's GUC Pool Class A Interests over General Unsecured Creditor's GUC POOL Class B Interests.  As it's currently structured, the Plaintiffs and the other General Unsecured Creditors will only receive distributions from the GUC Pool after Reserve Bank's claims, *known and unknown*, are paid in full.  While the Debtors are clearly eager to have Reserve Bank's support for the Plan, there is no basis to allow Reserve Bank Claims in unknown amounts and presume that such claims have secured and/or priority status.  Creditors are left unable to verify whether the arrangements reached between the Debtors and Reserve Bank are fair and equitable or unjustly prejudice General Unsecured Creditors.

48.     Specifically, to the extent that any portion of Reserve Bank Claims, including the Unknown Reserve Bank Claims, are not entitled to priority status and are simply General

-13-

Unsecured Claims, Reserve Bank should not receive Distributions for such claims in advance of other holders of General Unsecured Claims.

49.     Similarly, there is no basis for Reserve Bank to receive Distributions from recoveries related to Avoidance Actions.  Reserve Bank's pre-petition liens would not have attached to these Causes of Action.  It would be inequitable to allow Reserve Bank to recover from Avoidance Actions based on a secured claim prior to General Unsecured Creditors.

50.     Moreover, the Plaintiffs and other General Unsecured Creditors have no voice in the decisions regarding pursuit of Avoidance Actions, which appear to be the primary means for funding the GUC Pool.  Instead, the Plan dictates that decision will be made by the Wind Down Officer subject to the "consent and consultation" of the Reserve Bank, the U.S. Department of Justice, the Small Business Administration, and CRB.  *See* Plan, § 5.8.  The rights of General Unsecured Creditors are not represented at all on this matter despite the consequential effect it will have on the funding of any Distributions to General Unsecured Creditors under the Plan.

51.     Fairness and equity require that unknown and potentially unsecured claims of Reserve Bank not receive priority, in the form of a "GUC Pool Class A Interest" or recoveries from Avoidance Actions over the claims of other General Unsecured Creditors, such as the Plaintiffs.  Moreover, the Plan should provide for the representation of the General Unsecured Creditors in a manner that represents their interests in funding and distributions of the GUC Pool.

52.     For the reasons set forth below, the Plan fails to satisfy the absolute priority rule and general requirements of section 1129(b) and, accordingly, should not be confirmed.

## <u>RESERVATION OF RIGHTS</u>

53.     The Plaintiffs do not waive any, and expressly reserve all, rights and defenses under applicable law or otherwise.  The Plaintiffs further reserve all rights to assert any and all such

30305312v.5

rights and defenses in any appropriate manner or forum whatsoever, including the right to raise and respond to the issues relating to the Plan in the Putative Class Litigation and any procedurally appropriate contested matter and/or adversary proceeding.

54.    The Plaintiffs reserve their right to right to amend, modify, supplement, amend, and/or withdraw this Objection and to introduce evidence at any hearing related to the Plan. The Plaintiffs also expressly reserve the right to adopt any other confirmation objections filed by any other party.

### CONCLUSION

For the reasons set forth above, the Plan does not satisfy the requirements of 11 U.S.C. § 1129 and should not be confirmed.

WHITE AND WILLIAMS LLP

ROCHELLE L. GUMAPAC (#4866)
600 N. King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 467-4531
Facsimile: (302)467-4559
gumapacr@whiteandwilliams.com
Attorney for Lead Plaintiffs and Putative Class Members

Dated February, 21, 2023