## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
                                                              :
In re                                                         :    Chapter 11
                                                              :
KABBAGE, INC. d/b/a KSERVICING, et al.,                       :    Case No. 22-10951 (CTG)
                                                              :
            Debtors.¹                                         :    (Jointly Administered)
                                                              :
                                                              :    Obj. Deadline: March 3, 2023 at 4:00 p.m. (ET)
                                                              :    Hearing Date: March 20, 2023 at 10:00 a.m. (ET)
                                                              :
------------------------------------------------------------- x
```

### MOTION OF DEBTORS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 FOR PRODUCTION OF DOCUMENTS FROM FINANCIAL TECHNOLOGY PARTNERS LP AND FTP SECURITIES LLC

The debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby move the Court (this "**Motion**") for entry of an order requiring Financial Technology Partners LP and FT Securities LLC (collectively, "**FT Partners**") to produce certain records and documents, and respectfully state as follows:

### Relief Requested

1.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rule 2004 the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

Delaware (the "**Local Rules**"), requiring FT Partners to produce documents related to the transaction that was the subject of the *Agreement and Plan of Merger* among American Express Travel Related Services Company, Inc. ("**AmEx**") and the Debtors, among others, dated August 16, 2020 (which agreement became effective on October 16, 2020) (the "**AmEx Transaction**") for which FT Partners performed certain services as financial advisors to the Debtors, as more fully set forth in the document requests attached hereto as **Exhibit B** (the "**Document Requests**"). Given that the Debtors have been seeking to work cooperatively with FT Partners for over a month to obtain these materials, but FT Partners has been dragging its heels, FT Partners should be directed to produce the requested documents within seven days from the date of entry of the Proposed Order.

2.      The Debtors reserve their rights to seek additional documents and/or witness examinations on any information that may be revealed as a result of the Document Requests.

### Preliminary Statement[2]

3.      FT Partners is hindering the administration of the Debtors' estate. By not providing to the Debtors certain relevant documents, which the Debtors have sought to obtain since December 15, 2022, the Debtors have been unable to obtain information that is necessary for complete examination of the AmEx Transaction and events that transpired leading up to that transaction.  As the Debtors' financial advisers in connection with the AmEx Transaction, FT Partners has unique and specific information relating to the particulars of the transaction, including the negotiations and communications among the various parties and the financial analysis of the AmEx Transaction.  As the Court is aware, the individuals from the Debtors who were responsible

---

[2] Unless otherwise noted, citations to "Ex. __" are to the exhibits appended to the accompanying Declaration of Theodore E. Tsekerides, dated February 24, 2023.

for the AmEx Transaction are no longer with the Debtors, thus making obtaining information from parties such as FT Partners even more critical to evaluating whether and against which parties the Debtors may have claims relating to the AmEx Transaction—which claims are likely the largest potential remaining asset of the Debtors' estates.

4.      From certain limited information available to the Debtors, it is clear that in 2020 the Debtors engaged FT Partners to provide professional financial advice to assist the Debtors with certain strategic alternatives, including what was dubbed "Project Green", which was to become the AmEx Transaction. *See* **Ex. 1**, June 23, 2020 Minutes. Since December 15, 2022, the Debtors have tried to work with FT Partners to obtain documents and information relevant to the Debtors' examination of the AmEx Transaction, recognizing that the transaction occurred several years ago and that FT Partners needed time to search its records. While FT Partners, though its counsel, appeared to be cooperative, it has become clear that FT Partners has been slow-rolling responding to the Debtors' requests and simply not taking the matter seriously.  Only recently has FT Partners even gotten around to producing any documents, but then the production involved a mere sixty (60) documents with no indication when more would be produced or how much remained. Following this minimal first production, the Debtors requested FT Partners to prioritize documents that were contained in what the Debtors understand was a data room created for the AmEx Transaction.  Not only did FT Partners provide no substantive response to that request, it has utterly failed to provide any update on when it would produce further documents.  Given the significance of these materials to the investigation, the Debtors must seek Court intervention to compel production of documents from FT Partners.

5.      Examinations under Bankruptcy Rule 2004—which courts uniformly recognize as "broad" and "unfettered"—allow parties in interest to obtain information concerning any matter

that may affect the administration of a debtors' estate.  Here, relief under Bankruptcy Rule 2004 is necessary to enable the Debtors to obtain documents from the financial advisor that represented the Debtors during the AmEx Transaction in order to consider whether and to what extent the estates have causes of action against third parties in connection with the AmEx Transaction.

### Jurisdiction

6.        The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

**A.        General Background**

7.         On October 3, 2022 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

8.        Pursuant to Bankruptcy Rule 1015(b), the Chapter 11 Cases are being jointly administered under the above captioned case.

4

9.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Deborah Rieger-Paganis in Support of the Chapter 11 Petitions and First Day Pleadings* [Docket No. 13] (the "**First Day Declaration**").

B.      **The AmEx Transaction**

10.      On August 16, 2020, AmEx, Green Acquisition Merger Sub, Inc. (a wholly owned subsidiary of Amex, called "**Merger Sub**"), Kabbage, Inc., (now known as KServicing, Inc.), Alpha Kabbage, Inc. (the target company and now known as American Express Kabbage, Inc.), and Fortis Advisors, LLC (Stockholders Agent on behalf of the Converting Holders), entered into that certain *Agreement and Plan of Merger* ("**Merger Agreement**") pursuant to which Kabbage's lending and servicing platform were separated from the company's existing loan book. The AmEx Transaction was effectuated by restructuring Kabbage such that all of the "Transferred Assets" (as defined in the Merger Agreement)—largely its lending and servicing platform—were placed in Alpha Kabbage, merged with Merger Sub, and finally becoming Amex Kabbage, a wholly owned subsidiary of AmEx.  In turn, KServicing retained certain "Excluded Assets" (as defined in the Merger Agreement).  As of the petition date, the Company's business consisted solely of servicing (a) loans issued to small businesses under the Paycheck Protection Program (the "**PPP**" and the loans provided thereunder, the "**PPP Loans**") during the height of this country's public health and economic crisis caused by COVID-19, and (b) a relatively small portfolio of non-PPP small business loans (the "**Legacy Loans**" and, together with the PPP Loans, the "**Loan Portfolio**"). The loans in the Loan Portfolio are scheduled to mature by 2026, which was also the wind down end date contemplated by the Merger Agreement.

5

11.     Following the AmEx Transaction, the Debtors were left with approximately $17 million to continue operations and wind down the business.

**C.     FT Partners Role as Financial Advisor**

12.     FT Partners acted as financial advisor to the Debtors prior to and through the AmEx Transaction, following which FT Partners collected a transaction fee in connection with the AmEx Transaction in an amount in excess of $12 million.

13.     Prior to the AmEx Transaction, and at least between April and June of 2020, FT Partners participated in special meetings of the Debtors' board of directors and prepared, distributed and presented materials to the board and various members of management in connection with the board's evaluation of various strategic alternatives, including the AmEx Transaction. *See* **Ex. 1**, June 23, 2020 Minutes.

14.     As financial advisor to the Debtors in connection with the AmEx Transaction, FT Partners has materials both relevant and material to the investigation of potential causes of action available to the Debtors' estates, which are of critical importance to the Debtors' creditors and which will be an important asset of the Debtors' wind down.

**D.     The Debtors Requested Documents from FT Partners**

15.     On December 15, 2022, the Debtors sent a letter to FT Partners requesting the production of certain documents (*see* **Ex. 2**) necessary to examine the AmEx Transaction as part of the administration of Debtors' estates in these Chapter 11 Cases and requested production by January 9, 2023. FT Partners responded later that same day that they would come back with an official response.

16.     On December 27th, after receiving no further response, the Debtors contacted FT Partners to inform them that given the absence of any response, the Debtors intended to move the

Court for an order pursuant to Bankruptcy Rule 2004 seeking to compel production.  Later that evening, FT Partners general counsel emailed that FT Partners would respond over the next few days.  Soon thereafter, FT Partners' outside counsel, Morgan, Lewis & Bockius, indicated that FT Partners would cooperate with the request and would be in touch to discuss process. *See* **Ex. 3**, December 27, 2022 Email Chain.

17.     Having heard nothing further, on January 10, 2023 the Debtors wrote FT Partners' outside counsel to inquire about status and were advised, that same day, that a rolling production would be implemented so that the Debtors could obtain the sought after documents.  Counsel indicated that an update would be provided that Friday, January 13, 2023. *See* **Ex. 4**, January 10, 2023 Email Chain.  At the end of that same week, on January 13th, in response to a further inquiry by the Debtors, FT Partners' counsel indicated that they would start producing documents the following week.  Consistent with what would become a pattern of hollow promises, two weeks passed with no production. On January 28, 2023 the Debtors again reached out to FT Partners to check on the status and make it clear that in the absence of any production, a 2004 motion was to follow.  The next day FT Partners' counsel responded that they received documents and would get those reviewed and produced to the Debtors on a rolling basis. *See* **Ex. 5**, January 29, 2023 Email Chain.

18.     By February 2, 2023 still no production was received and the Debtors were forced to reach out yet again for an update.  The Debtors were told that the production would be made later that day.  But that production was never made either, requiring yet another follow up email from Debtors' counsel. *See* **Ex. 6**, February 3, 2023 Email Chain.  Finally, late in the afternoon on February 3rd, FT Partners produced a grand total of sixty (60) documents, comprised mainly of board presentations. Notwithstanding the amount of time FT Partners had with the Debtors'

7

requests, this meager production failed to include important materials relating to FT Partners' work in connection with the AmEx Transaction, including communications with the Debtors, FT Partners' work papers or analysis of the proposed transaction, or any documents reviewed or utilized by FT Partners in analyzing the AmEx Transaction. Following review of FT Partners' sole production, and still awaiting further "rolling" production of materials as promised, on February 7th the Debtors asked FT Partners to prioritize production of documents that were in a data room that the Debtors understood was created for the AmEx Transaction.  FT Partners' counsel responded that they would "connect with the client and get back to you ASAP".  *See* **Ex. 7**, February 7, 2023 Email Chain.

19.    Receiving no response, on February 13th the Debtors made a further attempt to obtain the requested documents without the need for Court intervention.  Counsel again responded that they would check on the status and get back to the Debtors the next day.  That day came and went with no response.  On February 16th the Debtors' counsel informed FT Partners' counsel that the next step would be this Motion.  *See* **Ex. 8**, February 16, 2023 Email Chain.  To date, the Debtors have not received any further production from FT Partners.

## Basis for Relief

20.    Rule 2004 is the basic discovery device in bankruptcy cases." Lawrence P. King, et al., 9 *Collier on Bankruptcy*, ¶ 2004.01[1], at 2004-3 (15th ed. 2003). The purpose of a Bankruptcy Rule 2004 examination is to assist a party in interest, including a debtor, in determining the nature and extent of the bankruptcy estate, revealing assets and examining transactions. *See In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996).  Its objective is "'to show the condition of the estate and to enable the court to discover its extent and whereabouts and to come into possession of it that the rights of creditors may be preserved.'" *In*

*re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (*citing Cameron v. United States*, 231 U.S. 710, 717 (1914)).

21.    Bankruptcy Rule 2004 is frequently employed by debtors who seek to compel discovery of information maintained by creditors or third parties where such information is critical to the effective administration of the estate and its assets. *See, e.g., In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 354 n.6 (3d Cir. 2007) (discussing debtors' use of Bankruptcy Rule 2004 to conduct discovery concerning possibility of bringing claims against debtors' former parent company); *In re Analytical Sys., Inc.*, 71 B.R. 408, 413 (Bankr. N.D. Ga. 1987) (granting debtor's motion to compel discovery of information maintained by creditor and examination of creditor's officers, directors or managing agents pursuant to Rule 2004).

22.    In accordance with this purpose, courts have consistently emphasized that the scope of Bankruptcy Rule 2004 is extremely broad—broader than discovery permitted under the Federal Rules of Civil Procedure—and that it may properly be in the nature of a "fishing expedition." *See, e.g., In re Szadkowski*, 198 B.R. 140, 141 (Bankr. D. M.D. 1996) ("Discovery under Rule 2004 serves a far different purpose than discovery propounded under the Federal Rules of Civil Procedure.  A Rule 2004 examination allows a broad 'fishing expedition' into an entity's affairs for the purpose of obtaining information relevant to the administration of the bankruptcy estate.") (citing *In re M4 Enters., Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995)); *In re Wash. Mut., Inc.*, 408 B.R. 45, 49-50 (Bankr. D. Del. 2009) (noting that a "Rule 2004 examination is commonly recognized as more in the nature of a fishing expedition") (internal citations and quotations omitted); *In re Ecam Publ'ns, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991) ("Discovery under Rule 2004 is broader than that available under the Federal Rules of Civil Procedure. In fact, the scope of a Rule 2004 examination is so broad that it can be in the nature of a 'fishing expedition'")

9

(*citing In re Drexel Burnham Lambert Group*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991)); *see also* 9 Lawrence P. King, et al., 9 *Collier on Bankruptcy*, ¶ 2004.02[1], at 2004-06 (15th ed. 2003) ("The scope of Rule 2004(b) is very broad"). Additionally, "[b]ecause the purpose of Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation." *In re Ionosphere Clubs*, 156 B.R. at 432.

23.     A party seeking authority to use Bankruptcy Rule 2004 must establish "good cause" for the relief requested. *See, e.g., In re Eagle-Picher Indus., Inc.*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) ("[t]he one seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks."). "Generally, good cause is shown if the [Rule 2004] examination is necessary to establish the claim of the party seeking the examination[.]" *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) (Silverstein, J.). This includes information that would enable the movant "to determine the scope of viable claims that may exist on behalf of the [the debtor] against potential third parties that may be culpable for causing such harm to the Debtors." *Id.* (citations omitted); *see also In re Lev*, No. 05-35847, 2008 WL 207523, at *4 (Bankr. D.N.J. Jan. 23, 2008) (good cause where movant uncovered scheme and was investigating further); *In re Daisytek, Inc.*, 323 B.R. 180, 185 (N.D. Tex. 2005) (Rule 2004 discovery is appropriate where the movant has "not completed his investigation and does not yet know the full scope of any prepetition claims").

24.     In determining whether good cause is shown, the Court balances the "the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *Id.* (quoting *In re Drexel Burnham Lambert Grp., Inc.,* 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991)).

10

25.    Good cause exists to obtain the requested discovery.  As described above, FT Partners acted as financial advisor to the Debtors in connection with the AmEx Transaction. Determining whether and to what extent the Debtors' have causes of action against third parties in connection with the AmEx Transaction is a critical aspect of the wind-down of the Debtors' estates and a potentially valuable asset for the benefit of the Debtors' creditors.

26.    Documents that FT Partners possess as relates to the AmEx Transaction are thus clearly relevant to assessing whether and to what extent any such causes of action exist. Accordingly, the Debtors' Document Requests fall squarely within the scope of Bankruptcy Rule 2004 because they relate to issues affecting the assets of the Debtors' estates.

27.    Additionally, the Debtors will suffer hardship and injustice unless they are allowed to discover the requested information.  The Debtors have limited sources of information relating to the AmEx Transaction, including because the Debtors' personnel that worked on the AmEx Transaction are no longer employed by the Debtors.  Thus, the Debtors' former financial advisors are a logical and uncontroversial source for that information.  If FT Partners does not produce the requested information, then the Debtors will not be able to fully investigate their potential claims relating to a transaction.  Those potential claims will ultimately inure to the benefit of the Debtors' creditors and the Debtors and the Debtors' creditors will be harmed if the Debtors cannot fully investigate them. *See In re Metiom, Inc.*, 318 B.R. 263, 272 n. 6 (S.D.N.Y. 2004) (citations omitted).  The Rule 2004 discovery process is an appropriate efficient, "powerful and streamlined" process for determining whether viable claims exist.  *In re Consol. Meridian Funds*, No. 10-17952, 2013 WL 1501636, at *9 (Bankr. W.D. Wash. Apr. 5, 2013); *see In re Metiom, Inc*., 318 B.R. at 270-71 (noting that a debtor's limited resources support the grant of Rule 2004 application, and that failure to grant such an application can impose an "undue hardship").  The Debtors should be

11

permitted to use this tool to ensure that relevant information relating to potential claims has been obtained.

28.     Rule 2004 discovery is permissible where a balancing of "the competing interests of the parties," favors "the relevance of and necessity of the information sought by examination." *In re Millennium Lab Holdings II*, 562 B.R. at 626 (citations omitted).   Here, "[t]he value of this information" to the Debtors is far greater than any burden that may be imposed.  *Lev*, 2008 WL 207523 at *4.  The requested information is, as described, critical to the Debtors' investigation and to the administration of the bankruptcy estate.   FT Partners will suffer little if any hardship in producing the requested documents, including because the documents should be readily available and presumably it had a file related to this transaction for which it received over $12 million in fees. Moreover, responding to discovery in and of itself is not an undue burden, especially where, as here, the requests are targeted and related to a specific transaction that spanned a fairly short period of time.

29.     Finally, given that the Debtors have been more than patient in seeking a voluntary production from FT Partners but FT Partners has shown that it has not taken these requests seriously, FT Partners should be compelled to provide the requested discovery no later than seven days after the date of entry of an order approving the discovery requested herein.

## Local Rule 2004-1 Certification

30.     Pursuant to Local Rule 2004-1, the Debtors' undersigned counsel certifies that the Debtors' counsel has conferred with FT Partners' counsel regarding the requested production of documents and the timing of such production.  As of the filing of this Motion, the parties are unable to come to an agreement regarding the timing and scope of the proposed document production.

RLF1 28641161v.1

## Notice

31.     Notice of this Motion will be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Federal Reserve Bank; (d) Customers Bank; (e) Cross River Bank; (f) the United States Department of Justice; (g) the Federal Trade Commission; (h) the Small Business Administration; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the United States Attorney's Office for the District of Delaware; (l) FT Partners; (m) Morgan, Lewis & Bockius LLP, counsel to FT Partners; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").  The Debtors believe that no further notice is required.

## No Prior Request

32.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.


*[Remainder of page intentionally left blank]*

13

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: February 24, 2023
       Wilmington, Delaware

<div style="margin-left:40%">

*/s/ Matthew P. Milana*

RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi, Esq. (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
       steele@rlf.com
       shapiro@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
E-mail:     ray.schrock@weil.com
          candace.arthur@weil.com
          natasha.hwangpo@weil.com
          theodore.tsekerides@weil.com

*Attorneys for Debtors and Debtors in Possession*

</div>