**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

\-------------------------------------------------------- x
:
In re                               :       **Chapter 11**
:
**KABBAGE, INC. d/b/a KSERVICING,** *et al.,*  :       **Case No. 22-10951 (CTG)**
:
            **Debtors.**[1]            :       **(Jointly Administered)**
:
:
:
\-------------------------------------------------------- x

**DECLARATION OF SALIM KAFITI IN SUPPORT OF**
**CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION**
**OF KABBAGE, INC. (d/b/a KSERVICING) AND ITS AFFILIATED DEBTORS**

I, Salim Kafiti, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that

the following is true and correct to the best of my knowledge, information, and belief:

        1.        I am the Deputy General Counsel and Assistant Secretary of Kabbage, Inc.

d/b/a KServicing ("**KServicing**")[2] and its debtor affiliates in the above-captioned Chapter 11

Cases (collectively, the "**Debtors**"), and have held this position since February 2022.  I have more

than 20 years of experience serving in legal counsel roles, including as a consultant and attorney

supporting the SVP Managing Counsel and Global Contract Team at ADP, Inc.; as Senior

Associate General Counsel at Electrolux, where I worked for more than 13 years and also held the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan (defined herein), the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 467) (the "**Disclosure Statement**"), or the concurrently filed *Debtors' (I) Memorandum of Law in Support of Confirmation of Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* (the "**Memorandum**"), as applicable.

roles of interim Vice President and General Counsel, Associate General Counsel, Assistant General Counsel and Assistant Secretary; and as an attorney at Jones Day.  I hold a Juris Doctor from Case Western Reserve University School of Law.  I have also studied business administration at Miami University in Ohio and the University of North Carolina at Charlotte.

2.    I submit this declaration (the "**Declaration**") in support of confirmation of the *Amended Joint Chapter 11 Plan of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors* (Docket No. 627) (as may be amended, modified, supplemented, or restated, the "**Amended Plan**"), including the documents comprising the Plan Supplement, dated February 21, 2023, (Docket No. 561) the *Notice of Filing of Second Supplement to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors,* (Docket No. 611) and the *Notice of Filing of Third Supplement to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors,* filed contemporaneously herewith (as may be further amended, modified, restated, or supplemented, the "**Plan Supplements**").  I have reviewed, and I am generally familiar with, the provisions of the Amended Plan, the documents comprising the Plan Supplements, the Disclosure Statement, and the requirements for confirmation of the Amended Plan under section 1129 of the Bankruptcy Code.  I was personally involved in the development of the Amended Plan and its related documents.

3.    In my capacity as Deputy General Counsel, I am knowledgeable and familiar with the Debtors' day-to-day operations and business affairs, books and records, and these Chapter 11 Cases.  Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and other information, including relevant historical business records of the Debtors and information

provided to me by employees and contractors hired by the Debtors and working under my supervision, my duties and responsibilities as Deputy General Counsel for the Debtors, my familiarity with the Debtors' business operations, as well as my discussions with the Debtors' board of directors (the "**Board**"), management team ("**Management**"), and advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## The Debtors' Objectives

4.      The Debtors commenced these Chapter 11 Cases with a clear strategy and to achieve certain objectives, including to:

- preserve the remaining assets of the Debtors' estates for the purpose of maximizing creditor recoveries;

- effectuate the transition of the servicing of the Debtors' remaining PPP Loan portfolios, or develop the Debtors' ability to service the balance of the PPP Loan portfolios;

- provide an equitable distribution to the Debtors' stakeholders;

- minimize the impact to the PPP borrowers from any disruption in loan servicing caused by the depletion of the Debtors' assets; and

- conduct a responsible wind down of the Debtors' remaining operations and complete an organized liquidation of the Debtors.

5.      The Debtors have had limited liquidity during these Chapter 11 Cases and commenced these cases at a time when they were facing numerous investigations and related demands in connection with the PPP Loan program.  The Debtors recognized that achieving their objectives would not be easy and would require consensus of many of the Debtors' largest stakeholders, nearly all of whom commenced those investigations and related demands. Accordingly, the Debtors initiated and remained in close contact with the Reserve Bank, Department of Justice, SBA, and Partner Banks throughout these proceedings, and reached, or are in the process of discussing and negotiating, various resolutions over remaining issues that impact

RLF1 28709616v.1

the Debtors' ability to achieve their goals.  In particular, as discussed herein, the Debtors have worked closely with the Reserve Bank to reach an agreement on all material matters of these Chapter 11 Cases, including with respect to the use of cash collateral, transfer of servicing of the PPPLF Loans, Amended Plan (notably, the Reserve Bank's treatment, the release provisions, and third party consent and consultation rights), documents comprising the Plan Supplements, and the proposed Confirmation Order.

6.      The Debtors also recognized that it would require tremendous effort and cooperation to establish and implement a process to concurrently transition the Debtors' PPP Loan servicing obligations to four different entities.  As discussed further in the concurrently filed *Declaration of Laquisha Milner in Support of Confirmation of Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors*, the Debtors have made comprehensive and coordinated efforts to effectuate the PPP Loan transition despite the complexities and challenges in performing this herculean task in an accelerated time period while continuing day-to-day operations (including loan servicing), progressing these Chapter 11 Cases, and resolving the numerous investigations and related demands arising from the Debtors' involvement in the PPP Loan program.

7.      Members of the Debtors' Board and Management were put in place at various times after the American Express Transaction, but prior to the commencement of these cases.  These individuals have directed and overseen the chapter 11 process with the assistance of the Debtors' advisors and with an eye toward the goals described above.  At all times, the Board and Management have been and remain actively engaged with the Debtors' advisors to preserve and maximize the value of the Debtors' estates for the benefit of all creditors.  These efforts were

4

in furtherance of avoiding disruption to PPP borrowers where possible and effectuating an orderly and efficient wind down of the Debtors' remaining operations.

## **The Amended Plan**

### A. General Overview

8.      The Amended Plan, the only chapter 11 plan on file, represents the culmination of the Debtors' efforts in these Chapter 11 Cases to achieve their goals stated at the outset with the support of a number of key constituents.  The Amended Plan is the product of extensive good-faith, arm's-length negotiations between the Debtors and their major stakeholder constituencies, and sets the Debtors on an efficient course toward wind down by (i) permitting the transfer of servicing of the Pledged PPPLF Loans to the satisfaction of the Reserve Bank, (ii) effectuating the transfer of the Debtors' other PPP Loan servicing obligations to its Partner Banks and the SBA, or their respective designated alternate servicers, (iii) establishing a scheme of distributions to creditors according to priorities in the Bankruptcy Code, and (iv) permitting the Debtors, or the Wind Down Estates, as applicable, to pursue other settlements and monetization of remaining assets in furtherance of the Amended Plan. Throughout these cases, the Debtors, led by the Board and Management, have worked to protect the interests of all constituents, with the objective of achieving consensus wherever possible.  The Debtors developed the Amended Plan in good faith and in close consultation with their primary stakeholders following diligence and negotiations.

9.      The Amended Plan, including the ability to transfer servicing of the Pledged PPPLF Loans and the Debtors' other PPP Loan servicing obligations, achieves all of the objectives the Debtors sought to achieve at the outset of these cases.  Specifically, with the exception of the Carr Plaintiffs, confirmation of the Amended Plan has only drawn limited objections, and it is a

plan that maximizes value, minimizes disruption to customers and other constituents, including PPP borrowers where possible, and provides for the most effective transition possible of the Debtors' holdings and servicing obligations given the complex regulatory issues embedded in the PPP Loan program.   The Amended Plan framework was negotiated to provide for possible settlements and transactions that would pave the way for a swift confirmation process and resolution of these Chapter 11 Cases; not to penalize any party in interest.   The Amended Plan may also result in recoveries for the holders of General Unsecured Claims through their GUC Pool Class B Interests, which will be funded with any proceeds (including any proceeds generated by the Wind Down Estates' pursuit of Estate Causes of Action) remaining after distributions to senior Classes of Claims.   I believe that the Amended Plan is fair and reasonable and offers benefits, including the potential recoveries to General Unsecured Creditors, which would not be available in the absence of the proposed Amended Plan without significant and uncertain litigation.

10.     Confirmation of the Amended Plan represents the best available path to conclude these Chapter 11 Cases, maximize creditor recoveries, and effectuate the transition of the Debtors' assets and obligations.   The alternative is almost certainly a liquidation filled with litigation of substantially all of the issues that the Amended Plan, and settlements in furtherance of the Amended Plan, will resolve.   Given the fact that the Debtors are already winding down their business, it is highly unlikely any additional capital could be obtained in a reasonable timeframe. If the Amended Plan is not confirmed, the Debtors simply do not have the financial or human resources to pivot to an alternative transaction or substantially delay confirmation of the Amended Plan; I believe the alternative is a chapter 7 liquidation.

11.     I believe that the Reserve Bank's acceptance of the Amended Plan reflects the Amended Plan's fairness and the good faith efforts of the parties to achieve the objectives of

6

chapter 11.  The Amended Plan was proposed with legitimate and honest purposes and for no other purpose as reflected by the record herein, the Disclosure Statement, at the hearings leading up to confirmation of the Amended Plan, and in the Memorandum.  For the avoidance of doubt, the principal purpose of the Amended Plan was not the avoidance of taxes or Section 5 of the Securities Act.  In sum, I believe that the Debtors have acted in good faith and with the best intentions for creditors in proposing the Amended Plan.

### B.  Classification Scheme

12.     In designing the Amended Plan, the Debtors separately classified claims against, and interests in, the Debtors based upon the difference in legal nature and/or priority of such claims and interests.  In such classification, there has never been an intention or even a discussion of classifying or treating claims under the Amended Plan for any other purpose, including any improper purpose or to unfairly discriminate between holders of claims and interests. I understand that for each separate class, the Amended Plan provides for whether the claims or interests are impaired or unimpaired and that the treatment for each claim or interest within a particular class, unless a holder agrees to less favorable treatment, is the same as each other claim or interest in that class.

13.     The Amended Plan has six impaired classes, each of which was classified separately based on the priority and legal nature of the claims or interests as against the Debtors. Specifically, the Reserve Bank Claims (Class 3) are classified separately from General Unsecured Claims (Class 4) due to the fact that the Reserve Bank's claims are either secured or, to the extent not secured, priority claims under the Bankruptcy Code.  No similarly situated classes are treated differently; no Class of equal priority is receiving more favorable treatment; no Class that is junior to the rejecting Classes will receive or retain any property on account of the claims or interests in

such junior Class; and no Class senior to Class 4 is receiving more than a 100 percent recovery under the Amended Plan.

### C. Means of Implementation

14.    The Amended Plan and the various documents and agreements set forth in the Plan Supplements provide adequate means for the Amended Plan's implementation, including (a) identification of sources of consideration to be distributed under the Plan; (b) provisions governing distributions under the Amended Plan; (c) provisions governing the Debtors' ongoing servicing of loans before and, if necessary, after the Effective Date, the ability to transfer servicing obligations of the Pledged PPPLF Loans and other PPP Loan servicing obligations, the creation, governance, and funding of the GUC Pool and the Wind Down Estates, the transfer of assets to the Wind Down Estates, and the potential sale of Legacy Loans; (d) provisions governing the appointment, authority, and duties of the Wind Down Officer; (e) provisions regarding the wind down and dissolution of the Debtors in accordance with the Amended Plan; (f) the vesting of all of the property of the Debtors' Estates and any Estate Causes of Action in accordance with Section 10.1 of the Amended Plan; and (g) authorization for all actions contemplated by the Amended Plan.

### D. Plan Releases

15.    The Amended Plan provides for two (2) categories of releases:

    i.    releases of certain claims relating to the Debtors or these Chapter 11 Cases held by the Debtors and each of their respective Affiliates, on behalf of themselves and their Estates, including any successor to the Debtors such as the Wind Down Estate, against the Released Parties and their Related Parties, excluding any claim or Cause of Action against any Debtor or Affiliate arising out of the American Express Transaction or the distribution of any consideration or value received on account of the American Express Transaction (the "**Debtor Releases**"), *see* Amended Plan § 10.5; and

    ii.    releases of certain claims relating to the Debtors or these Chapter 11 Cases against the Released Parties by the Releasing Parties and their Related

Parties, excluding any right to enforce the Amended Plan or as otherwise provided in the Plan or in the Confirmation Order (the "**Third Party Releases**").

16. I believe that the Amended Plan, including the releases therein, is in the best interests of the Debtors' estates and creditors and provides a much-needed resolution to these Chapter 11 Cases.

**E.  Debtor Releases**

17. No party has objected to the Debtor Releases.  The Debtor Releases, which were approved by the Board in conjunction with the Amended Plan and in the Debtors' sound business judgment: (a) are essential to the formulation and implementation of the Plan; (b) are in exchange for good and valuable consideration provided by the Released Parties; (c) are in the best interests of the Debtors and all holders of claims and interests; and (d) were given and made after due notice and opportunity for a hearing.

18. The Debtor Releases are narrowly tailored to serve their critical purposes without diminishing the estate.  The Debtor Releases do not include the release of any claim or cause of action against any Debtor or Affiliate arising out of the American Express Transaction, or the distribution of any consideration or value received on account of the American Express Transaction, which are the primary claims the Board believes could potentially lead to recoveries. The Debtor Releases also do not release any individual from any claim related to an act or omission that is determined by a court of competent jurisdiction to have constituted actual fraud, gross negligence, criminal misconduct, or willful misconduct.  Additionally, the Debtor Releases were essential in formulating the Amended Plan.  Included in the Released Parties are the Debtors' Professionals, the Board, and Management, whose contributions and efforts were, and continue to be, critical in prosecuting these Chapter 11 Cases and performing the duties required to confirm the Amended Plan and reach the Effective Date.  Also included as a Released Party is the Reserve

9

Bank which, among other things, has agreed to accept treatment under the Amended Plan that is less than what the Bankruptcy Code requires.  Put simply, the Debtor Releases are a critical aspect of the Amended Plan.

19.    The scope of the release of the Released Parties in section 10.5 of the Amended Plan has been significantly narrowed from what the Debtors originally proposed in the iteration of the chapter 11 plan filed early in these cases with the aim of ensuring that none of the Released Parties were involved with the American Express Transaction.  To the best of my knowledge, information and belief, and after reasonable inquiry, including discussions with the Debtors' advisors and certain of the Debtors' Released Related Parties, the Debtors' Released Related Parties, each in their respective capacities as such, had no role in the negotiation, recommendation, approval, or execution of the American Express Transaction.

20.    The Board determined that, in its business judgment, the Debtor Releases were appropriate and recommended that they be incorporated into the Amended Plan, which provides significant value to all stakeholders.

21.    The Debtor Releases are essential to the success of the Amended Plan, and served as a crucial inducement for the Released Parties to participate in these cases and facilitate the Amended Plan and wind down process of the Debtors.  It is also my understanding that the Debtor Releases served as a core negotiation point with the Reserve Bank in discussions surrounding the Amended Plan.  Had the Debtor Releases not been provided, it was uncertain whether and to what extent the Reserve Bank would agree to other terms of the Amended Plan— which benefit all stakeholders—and vote in favor of the Amended Plan.  Acceptance of the Debtor Releases allowed the Debtors to move forward with the Amended Plan and avoid uncertain and value-destructive litigation with creditors, including the Reserve Bank, which would have

unnecessarily delayed, if not thwarted entirely, the Debtors' ability to successfully consummate the Amended Plan and transfer the servicing obligations of the Pledged PPPLF Loans and other PPP Loans, resulting in disruption and delay for PPP borrowers and significantly increased economic exposure for the Reserve Bank and the Partner Banks.  Further, the Debtors' directors, officers, employees, and advisors, among others, guided the Debtors through these challenging times and were essential in negotiating the terms of the Amended Plan.

### F.  Third Party Releases

22.     The Third Party Releases are set forth in Section 10.6 of the Amended Plan and do not release any individual from any claim related to an act or omission that is determined by a court of competent jurisdiction to have constituted a criminal act, intentional fraud, gross negligence, or willful misconduct.  I understand that, in soliciting votes on the Amended Plan, the Debtors provided the Releasing Parties affected by the releases with ample opportunity to opt-out of the releases:

- The Court-approved ballots sent to all holders of claims entitled to vote in Class 3 (Reserve Bank Claims) and Class 4 (General Unsecured Claims) stated in bold letters that certain releases were contained in the Amended Plan and Disclosure Statement, restated the text of the releases in their entirety, and provided instructions for how to opt out of such releases.  The Ballots also indicated that Releasing Parties entitled to vote on the Plan who abstained from voting are deemed to have consented to the Third Party Release unless they affirmatively opted out as explicitly stated on the Ballots.

- With respect to holders of claims or interests not entitled to vote on the Amended Plan (which did not receive a ballot), such holders received a Confirmation Hearing Notice that was approved by the Court.  The Confirmation Hearing Notice clearly identified the releases and also stated that non-voting claimants would be deemed to have granted the Third Party Releases unless they timely objected to such releases by the Amended Plan objection deadline.

23.     The Third Party Releases apply only to holders of claims and interests who, with full and proper notice, consented to such releases by electing not to opt out of, or object to,

the releases.  I also believe that the Third Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released as they, among other things, describe the nature and type of claims being released.

24.    Further, I believe that the Third Party Releases are an integral part of the Amended Plan because they facilitated participation in both the Amended Plan and the chapter 11 process by the Released Parties and were critical in gaining their support for the Amended Plan, particularly the Reserve Bank.  Such participation and support resulted in, among other matters, consensual use of cash collateral to fund these Chapter 11 Cases, and the Reserve Bank's agreement to treatment under the Amended Plan that I understand is less favorable than what it may have been entitled to under the Bankruptcy Code.  Accordingly, the Third Party Releases were a fundamental negotiation point and appropriately offer certain protections to parties that constructively participated in the Chapter 11 Cases.

25.    Finally, the Third Party Releases are given for consideration.  The Released Parties have played an extensive and integral role in the Debtors' Chapter 11 Cases, including, among other things: (a) agreeing to the consensual use of cash collateral (as to the Reserve Bank); (b) maximizing value for the Debtors' Estates by allowing for the transfer of servicing obligations affecting Pledged PPPLF Loans and the other PPP Loans, sale of certain assets, and wind down of the Debtors; (c) negotiating the Amended Plan and settlements in furtherance of the Amended Plan; (d) preserving value for unsecured creditors through the expeditious resolution of these Chapter 11 Cases; and (e) with respect to the Debtors' board of directors, officers, and employees, devoting significant time to navigating the Debtors through these Chapter 11 Cases in addition to their regular duties and taking great efforts to prosecute the Chapter 11 Cases and achieve confirmation of the Amended Plan.  These substantial contributions led to the development of the

Amended Plan, which will facilitate the Debtors' goals of effectuating an orderly wind down.  All parties in interest benefit from the transactions contemplated by the Amended Plan and the significant contributions of the Released Parties in furtherance thereof.

26.    Based on my knowledge of the Debtors' negotiations with the Released Parties throughout these Chapter 11 Cases, I do not believe that the Debtors would have been able to secure all of the valuable consideration provided by the Amended Plan or consummate value-maximizing transactions for the benefit of all stakeholders without the Third Party Releases.

**G. Exculpation Provision**

27.    Based on my participation in the negotiations regarding the Amended Plan, I believe the exculpation provision in Section 10.7 of the Amended Plan (the "**Exculpation Provision**") is appropriate, as it provides protection to the Exculpated Parties that have participated in the Debtors' Chapter 11 Cases in good faith.  The Exculpation Provision is narrowly tailored to address matters relating to these Chapter 11 Cases and only those arising between the Commencement Date and the Effective Date, with an exception for any claims based on any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct as determined by a Final Order.

28.    Moreover, the Debtors limited the Exculpation Provision such that it does not apply to Former Officers and Directors.  I believe the protections afforded to the Exculpated Parties by the Exculpation Provision are reasonable and appropriate, given that the Exculpated Parties provided substantial contributions to the Debtors' estates during the restructuring, and because I believe the Chapter 11 Cases could not have progressed as rapidly and productively without their contributions.

29.     I believe that failure to approve the Exculpation Provision would undermine the purpose of the Amended Plan and the settlements embodied therein by allowing parties to pursue claims post-bankruptcy that are otherwise fully and finally resolved by the Amended Plan.

### H.   Injunction Provision

30.     I believe that the injunction provision in section 10.3 (the "**Injunction Provision**") is critical to the Amended Plan because it provides certainty to the Debtors, the Wind Down Officer, and other parties in interest that the Amended Plan will be enforceable in accordance with its terms.  Moreover, the Injunction Provision is essential to protect the assets of the Debtors' estates from potential litigation from prepetition creditors on and after the Effective Date, particularly given the corporate structure of the Wind Down Estates—where the Debtors will wind down "in place" as opposed to moving all estate assets into a post-confirmation trust. Absent the Injunction, any such litigation by a prepetition creditor would hinder the Wind Down Officer's ability to effectively fulfill the responsibilities contemplated by the Amended Plan, and would deplete the Wind Down Estates of scarce resources, frustrating the Amended Plan's purpose and upending the distribution scheme.  The Injunction Provision is therefore necessary to implement the releases and other provisions of the Amended Plan and is tailored to achieve that purpose.

### I.   Other Considerations

31.     Section 8 of the Amended Plan provides for the cure of any default for each executory contract and unexpired lease to be assumed pursuant to the Amended Plan and for the amount necessary to cure any such default in accordance with the underlying executory contract and unexpired lease and applicable nonbankruptcy law.  In accordance with Section 8.2 of the Amended Plan and the Disclosure Statement Order, the Debtors filed the *Notice of Potential*

14

*Assumption and Cure Amounts in Connection with Contracts and Leases* (Docket No. 566) (the

"**Assumption Notice**").  All executory contracts and unexpired leases that the Debtors determined

could potentially be assumed as of the Effective Date were listed thereto with the applicable

proposed cure costs.  Parties wishing to object to the assumption of an executory contract and

unexpired lease had until March 6, 2023 at 4:00 p.m.[3] (Prevailing Eastern Time) to object.

Following the objection deadline, the Debtors filed the "*Notice of Filing of Second Supplement to

the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its

Affiliated Debtors*" (Docket No. 611), which included (i) a revised assumption schedule containing

certain additional contracts that the Debtors determined would be beneficial to assume; and (ii)

pursuant to section 8.6 of the Amended Plan, a rejection schedule ("**Rejection Schedule**")

reflecting certain intellectual property contracts, licenses, royalties, or other similar agreements

that the Debtors decided to reject.  Further, on March 6, 2023, the Debtors filed the "*Notice of

Rejection of Certain Agreements Pursuant to the Plan*" (Docket No. 613) notifying the

counterparties of the contracts listed in the Rejection Schedule that, pursuant to 8.1 of the Amended

Plan and the Confirmation Order, their contracts will be rejected on the Effective Date.[4]   If any

related objection could not be resolved by the parties, the Debtors adjourned their request to

assume the executory contract or unexpired lease pending resolution.

32.     As part of the Debtors' Plan Supplement filings, the Debtors have contemporaneously

disclosed the identity of the Wind Down Officer and related compensation information.   In

accordance with Section 5.4(e) of the Amended Plan, on the Effective Date, (a) the Wind Down

---

[3] The Debtors granted a 24 hour extension to file a response to the Assumption Notice to certain counterparties of contracts listed on the Assumption Notice.

[4] Of note, the Debtors reserved the right to assume or assume and assign any contracts or leases with the consent of the non-Debtor counterparty to such contract or lease.

RLF1 28709616v.1

Officer shall be the sole representative of, and shall act for, the Wind Down Estates, and (b) the Debtors' then existing Board and Management shall be relieved of any and all duties and shall be deemed to have resigned.

33.     In accordance with section 2.2 of the Amended Plan, all Fee Claims must be reviewed by the Court and approved.  The Amended Plan provides for the payment in full of priority claims and administrative expense claims, unless the holder of such claims agrees to less favorable treatment, subject to the timing parameters as more fully described in the Amended Plan.  The Amended Plan does not provide for any rate changes and provides for the payment of all statutory fees.

34.     Prior to and at the time these Chapter 11 Cases were commenced, the Debtors did not have any existing retiree benefits, nor do the Debtors have any domestic support obligations.  Moreover, no Debtor is an "individual" as I understand that term to be used in the Bankruptcy Code.  Finally, each Debtor is a moneyed, business, or commercial corporation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 9, 2023
Charlotte, North Carolina

/s/ *Salim Kafiti*
Name: Salim Kafiti
Title: Deputy General Counsel
Kabbage, Inc. d/b/a KServicing

RLF1 28709616v.1