**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------------ x
                                                             :
In re                                                        :   Chapter 11
                                                             :
KABBAGE, INC. d/b/a KSERVICING, et al.,                      :   Case No. 22-10951 (CTG)
                                                             :
              Debtors.¹                                      :   (Jointly Administered)
                                                             :
                                                             :
                                                             :
                                                             :
------------------------------------------------------------ x
```

**DECLARATION OF DEBORAH RIEGER-PAGANIS IN SUPPORT OF
CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION
OF KABBAGE, INC. (d/b/a KSERVICING) AND ITS AFFILIATED DEBTORS**

I, Deborah Rieger-Paganis, pursuant to 28 U.S.C. § 1746, hereby declare, under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief:

    1.  I am a managing director at AlixPartners, LLP ("**AlixPartners**") and have served as a restructuring advisor to Kabbage, Inc. d/b/a KServicing (the "**Company**") and its debtor affiliates in the above-captioned chapter 11 cases (collectively, the "**Debtors**") since April 2022. Prior to my involvement with the Company, I served in a variety of roles providing extensive experience dealing with bankruptcy matters and companies going through chapter 11, including as interim Chief Financial Officer for various chapter 11 debtors, and Vice President of Restructuring for the wind down estate of JCPenney. In addition, I have also served as senior Vice President of Financial Planning and Analysis at MasterCard, and Vice President of Finance at Ann Taylor corporate. For a further discussion of my credentials, see the *Declaration of Deborah*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

*Rieger-Paganis In Support of the Chapter 11 Petitions and First-Day Pleadings* dated October 3, 2022 (Docket No. 13).

2. I submit this declaration (the "**Declaration**") in support of confirmation of the *Amended Joint Chapter 11 Plan of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors* (Docket No. 627) (as may be amended, modified, supplemented, or restated, the "**Amended Plan**"),[2] including the documents comprising the Plan Supplement, dated February 21, 2023 (Docket No. 561), the *Notice of Filing of Second Supplement to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors,* (Docket No. 611), and the *Notice of Filing of Third Supplement to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors,* filed contemporaneously herewith (as may be further amended, modified, restated, or supplemented, the "**Plan Supplements**"). I have reviewed, and I am generally familiar with, the provisions of the Amended Plan, the documents comprising the Plan Supplements, the Disclosure Statement, and the requirements for confirmation of the Amended Plan under section 1129 of the Bankruptcy Code. I was personally involved in the development of the Amended Plan and its related documents. I, along with employees of AlixPartners who report to me, prepared the liquidation analysis (the "**Liquidation Analysis**") annexed as Exhibit C to the Disclosure Statement.

3. In my capacity as managing director of the AlixPartners team serving as the Debtors' restructuring advisors, I am generally knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and these Chapter 11 Cases.

---

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 467) (the "**Disclosure Statement**"), or the concurrently filed *Debtors' (I) Memorandum of Law in Support of Confirmation of Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* (the "**Memorandum**"), as applicable.

Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and other information, including relevant historical business records of the Company, information provided to me by the Debtors, or advisors to the Debtors, including members of my team, or my duties and responsibilities as restructuring advisor for the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

### Claims Analysis

4. After the General Bar Date passed, the Debtors, with the assistance of their legal and financial advisors, including my team, conducted a diligent review of all claims filed against the Debtors with a particular focus on priority, administrative expense, and secured claims. The Debtors' goal during the claims reconciliation process has been to identify certain misclassified priority, administrative expense, and/or secured claims that have no basis in the Debtors' books and records supporting each of the claims' asserted priority or secured status in an effort to reduce the total amount of such claims allowed against the Debtors. With an understanding that any unresolved priority, secured, or administrative expense claims will have to be reserved for in the Wind Down Budget, the Debtors, with the assistance of their advisors, have prioritized objecting to such misclassified claims. The claims reconciliation process to date has revealed that a substantial number of priority, administrative expense, and secured claims filed against the Debtors were filed on account of borrowers of either PPP Loans or Legacy Loans that the Debtors service. After review of such claims, the Debtors determined that there is no legal basis under the Bankruptcy Code to support a priority, administrative expense, and/or secured claim based on a claimants' borrower status.

5.      Upon review with counsel, the Debtors filed a substantive claims objection to certain misclassified claims, which was granted on February 17, 2023. (Docket No. 546.) The Debtors have since filed a notice of satisfaction to address the payment in full of several other claims. (Docket No. 560.) The claims reconciliation process is ongoing, and the Debtors continue to identify certain late-filed claims that have no basis in the Debtors' books and records to support their asserted status. The Debtors anticipate filing a second substantive claims objection on or about March 14, 2023 in furtherance of the claims reconciliation process.

6.      Although the bar date for administrative expense claims has yet to be set, the Debtors and their advisors believe that there should not be any significant administrative expense claims outstanding, other than the $15,000 reserve in paragraph 8, because the Debtors continue to pay postpetition expenses in the ordinary course.[3] The Debtors successfully objected to the allowance of an administrative expense claim by the Juneau Group, LLC, and I do not believe any other material, valid administrative expense claims have been incurred. I understand no administrative expense claims have been filed (other than the aforementioned Juneau Group, LLC claim). Based on their objections to confirmation, I am aware that the Partner Banks are contending that they may assert an administrative expense claim at some point in the future based on the Debtors' alleged breach of servicing transfer obligations. To date there are no such claims that have been or could be asserted. At this point, any such claims are purely hypothetical and speculative and therefore do not warrant consideration.

---

[3] As provided in the Proposed Confirmation Order, following service of notice of entry of the Proposed Confirmation Order, all other Administrative Expense Claimants will have thirty-five (35) days to file and serve their Administrative Expense Claims (the "**Administrative Expense Claims Bar Date**"). Following the Administrative Expense Claims Bar Date, the Debtors, or the Wind Down Estates, as applicable, and their advisors will continue to reconcile and make determinations as to allowance of requests for payment of Administrative Expense Claims.

RLF1 28709037v.1

7. Throughout these chapter 11 cases, the Debtors, with the assistance of their restructuring advisors, have also been tracking and estimating the amount of secured, administrative expense, and priority claims that will either need to be reserved for, or paid, on the Effective Date as provided under the Amended Plan (the "**Outstanding SAP Claims**"). Allowed secured, administrative expense, and priority claims will be paid on the Effective Date (or as otherwise set forth in the Amended Plan) and disputed claims will be reserved for. The Outstanding SAP claims amounts are estimated based on Proofs of Claim received by the General Bar Date, the Debtors' books and records, and discussions with members of the Debtors' management team and advisors.[4]

8. The Debtors estimate the following Outstanding SAP claims need to be reserved for or paid as of the Effective Date:

(i) **Administrative Expenses:** approximately $15,000.

(ii) **Class 1 - Priority Non-Tax Claims:** approximately $0.

(iii) **Class 2 - Other Secured Claims:** approximately $2.1 million; provided, that, there are funds set aside in restricted escrow cash accounts and in security deposits, which may be used to offset any valid claim amounts.

9. In addition to the Outstanding SAP claims, the Reserve Bank has approximately $427.4 million of claims representing the estimated principal amount,[5] including accrued and unpaid interest, and costs and expenses, which will be satisfied through the return of the Pledged PPPLF loans. Additionally, the estimated range of Allowed General Unsecured claims

---

[4] Pursuant to the *Notice of Deadlines to File Proofs of Claim*, the deadline to file claims against the Debtors, including secured claims, priority claims, unsecured non-priority claims, and claims arising under section 503(b)(9) was November 30, 2020, at 5:00 p.m. (Prevailing Eastern Time) (the "**General Bar Date**").

[5] Estimated as of the Conversion Date in a PPP Transfer scenario. *See Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 467).

is $31 million to $103 million, as reflected in the Disclosure Statement.[6] The estimated range does not include any potential claims that may be filed by the Department of Justice, Federal Trade Commission, or the SBA, because, as of the date hereof, the deadline for Governmental Units to file proofs of claim has not yet passed.

### The Plan is in The Best Interest of Creditors

10. The Liquidation Analysis demonstrates that all Classes of claims or interests will recover value equal to or in excess of what such claims or interests would receive in a hypothetical chapter 7 liquidation, which, for all prepetition creditors other than holders of Priority Non-Tax Claims, Other Secured Claims, and Reserve Bank Claims, is $0 in both scenarios. As further detailed in the Amended Plan and Liquidation Analysis, the Debtors have determined that holders of claims and interests in each Class would be entitled to the following projected recoveries under the Amended Plan—specifically, in a PPP Transfer scenario, and in a hypothetical chapter 7 liquidation, respectively:[7]

| Class | Claim or Interest | Estimated Recovery under PPP Transfer Scenario in Chapter 7 | Estimated Recovery under the Plan in a "Low Case" Scenario | Estimated Recovery under the Plan in a "High Case" Scenario |
|---|---|---|---|---|
|  | Administrative Expense Claims | 100% | 100% | 100% |
| 1 | Priority Non-Tax Claims | N/A | N/A | N/A |
| 2 | Other Secured Claims | 100% | 100% | 100% |
| 3 | Reserve Bank Claims | 90.6% | 91.5% | 99.0% |
| 4 | General Unsecured Claims | 0% | 0% | 0% |
| 5 | Intercompany Claims | N/A | N/A | N/A |

---

[6] A range is provided given that the ultimate Allowed amount of any Claim cannot be estimated with any degree of certainty.

[7] Of note, the Liquidation Analysis also reflects a scenario comparing the Amended Plan with Post-Effective Date Servicing against a hypothetical chapter 7 liquidation.

| 6 | Intercompany Interests | N/A | N/A | N/A |
|---|---|---|---|---|
| 7 | Subordinated Securities Claims | N/A | N/A | N/A |
| 8 | KServicing Equity Interests | N/A | N/A | N/A |
| | Total Creditor Recovery | 38.9% | 73.8% | 92.2% |
| | Total Equity Recovery | N/A | N/A | N/A |

11. The Liquidation Analysis is reasonable and incorporates sound assumptions and estimates regarding the Debtors' assets and claims and the costs associated with a liquidation. Together with other members of the AlixPartners team, I developed the assumptions and estimates based upon input from the Debtors' other advisors and based on the team's knowledge and familiarity of the Debtors' assets and liabilities as well as the projected liquidity and risks to the Debtors. Here, the Debtors have assumed in the Liquidation Analysis, among other things, that:

(i) Neither the trustee in a chapter 7 wind down, or the Wind Down Officer in a chapter 11 wind down, will service the PPP Loans after the Conversion Date or the Effective Date of the Plan, as applicable.

(ii) In a chapter 7, the Liquidation Analysis assumes the trustee would seek to transfer the Debtors' loan servicing obligations to a third party alternate servicer. The Liquidation Analysis accounts for transfer costs associated with transferring the Debtors' PPP Loan servicing obligations to an alternate loan servicer. In order to do so, a significant data engineering process would be undertaken by the trustee and its professionals and any operating employees. Such a process would include preparation of all data and systems for the alternate servicer to be able to take over servicing the loan portfolio. The Liquidation Analysis assumes the transfer process would require considerable labor and cost.

(iii) Due to the inherently uncertain nature of litigation, and solely for purposes of this analysis, the Liquidation Analysis assumes $0 on account of the Debtors' Causes of Action including any potential fraudulent transfers or avoidance actions, including but not limited to any Causes of Action relating to the American Express Transaction in either a chapter 7 or chapter 11. That figure is not meant to express a view by the Debtors regarding the potential recovery under any such Causes of Action. Moreover, given that the recovery on Causes of Action would be the same in a chapter 7 and a chapter 11, this assumption has no impact on the analysis.

7

  (iv)  The Liquidation Analysis assumes a sale price of 10% of the principal balance for the remaining Legacy Loan portfolio, and the Debtors have conservatively assumed recoveries would be the same in either a chapter 7 or chapter 11.

  (v)  The cessation of business in a chapter 7 liquidation is likely to trigger certain claims that otherwise would not exist under the Plan proposed by the Debtors, such as unpaid administrative expenses, and certain executory contract and unexpired lease rejection claims. Such claims could be significant and some may be administrative expenses while others may be entitled to priority in payment over General Unsecured Claims. These chapter-7-specific claims are excluded from the Liquidation Analysis, but would clearly increase the amount of claims under a chapter 7 liquidation.

  (vi)  Also excluded from the Liquidation Analysis are estimates for the tax consequences, both federal and state, that may be triggered upon the chapter 7 liquidation and/or sale of assets in the manner described. Such tax consequences may be material.

12. The Liquidation Analysis demonstrates that in addition to costs associated with administering a chapter 7 liquidation, there would be more General Unsecured Claims in a chapter 7 than in a chapter 11 and, as such, in the event that there are sufficient liquidation proceeds to satisfy senior claims and the General Unsecured Claims receive a recovery, the Carr Plaintiffs' pro rata recovery would be less in a chapter 7 than in a chapter 11.

13. As demonstrated in the Liquidation Analysis, under the Amended Plan, recoveries for holders of claims in Class 4 are projected to be $0, given the amount of claims senior in priority and the limited distributable funds, among other assumptions and estimations, including that there will be no recovery on account of retained Causes of Action. Although the projected recoveries are $0, treatment under the Amended Plan is relatively more favorable for creditors as the Amended Plan does not carry additional chapter 7-specific costs which would potentially diminish potential recoveries for general unsecured creditors. Put simply, the Reserve Bank's consent in this regard provides the Wind Down Officer the ability to pursue Causes of Action that may otherwise not be pursued in a chapter 7 due to the various fees associated therewith, for the

benefit of all creditors. This aspect of the Amended Plan is especially beneficial for the Carr Plaintiffs, as it creates the opportunity and potential for holders of Class 4 General Unsecured Claims to receive more on account of their Claims than the currently projected $0, and in fact do better than in a hypothetical chapter 7 liquidation.

14. I understand that the Carr Plaintiffs have questioned the Liquidation Analysis, asserting that it does not specifically account for the Third Party Releases, and whether or to what extent the claims being released in a chapter 11 would be available for recovery in a chapter 7 liquidation. The Liquidation Analysis does consider and take into account claims against the Debtors and their estates—these claims are not released under the Amended Plan's Third Party Releases and are being treated under the Amended Plan. The Liquidation Analysis does not consider direct creditor claims against non-Debtor third parties which may be released under the Amended Plan's Third Party Releases. I am not aware of any such claims that may be released under the Amended Plan that would be available for recovery against non-Debtor third parties in a chapter 7; nor do the Carr Plaintiffs identify any such claims. Additionally, the Third Party Releases are consensual, and the Carr Plaintiffs are not releasing claims against non-Debtor third parties because each of the Carr Plaintiffs are identified as having opted out of the Third Party Releases.

15. The Debtors satisfy the "best interests" test because the Liquidation Analysis shows that holders of claims in Class 4 (General Unsecured Claims), would receive no recovery in a hypothetical liquidation under chapter 7 and have the potential to receive some recovery under the Amended Plan.

**The Plan is Feasible**

16. Throughout these Chapter 11 Cases, AlixPartners, under my guidance, has carefully reviewed claims and liabilities of the Debtors and the Debtors' books and records, consulted with the Debtors' counsel and other advisors, and received input from the Debtors' management and employees who have extensive knowledge of the Debtors' assets and liabilities. AlixPartners has estimated the Debtors' anticipated sources and uses of funds following confirmation and occurrence of the Effective Date of the Plan. Based on the foregoing, I expect that the Debtors will have sufficient funds to meet their post-Effective Date obligations to pay for the ongoing costs of administering and consummating the Amended Plan and ultimately closing these Chapter 11 Cases, and that the Amended Plan is not a visionary scheme.

17. The Amended Plan embodies a rational approach for: (1) the orderly wind down of the Debtors' estates; and (2) the payment and delivery of distributions to holders of Allowed Claims following the Effective Date according to a priority "waterfall". In addition, holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Other Secured Claims are being paid in full, such that they will be unimpaired under the Amended Plan. Reserve Bank Claims are either (i) secured by the PPPLF Collateral or the adequate protection liens provided under the Cash Collateral Order, or (ii) to the extent under-secured, such deficiency claims have priority under the Bankruptcy Code.

18. The Amended Plan establishes the GUC Pool to satisfy the priority portion of the Allowed Reserve Bank Claims, and thereafter for the benefit of Allowed General Unsecured Claims. According to differences in priority, the Allowed Reserve Bank Claims shall receive GUC Pool Class A Interests, and the Allowed General Unsecured Claims shall receive GUC Pool Class B Interests. On the Effective Date, the Debtors will transfer to the GUC Pool any remaining Net

Cash Proceeds, which will then be supplemented prior to the conclusion of the Wind Down with all remaining Cash in the Wind Down Estates, minus amounts needed to fund the administration of the Wind Down Estates. Then, at the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Estates (other than amounts on account of Post-Effective Date Servicing Costs, if applicable) shall also be contributed to the GUC Pool. As described in further detail herein, I expect that the Debtors will be able to meet their obligations under the Amended Plan to satisfy their estimated administrative costs and fund the Wind Down Estates.

A. **Estimated Sources of Funds**

19. As set forth below, the Debtors expect to have sufficient funds to administer and consummate the Amended Plan, including funding all payments required under the Amended Plan, and proceed with an orderly wind down of these Chapter 11 Cases.

i. **Estimated Remaining Cash Sources**

20. As of March 31, 2023—the Debtors' illustrative Effective Date— the value of the Debtors' remaining cash sources is estimated to be approximately $17.9 million, including $15.3 million in cash on hand.[8]

| ESTIMATED SOURCES | AMOUNT |
|---|---|
| **Cash Balance Estimate as of March 31, 2023** | $15.3 million |
| **Restricted Cash** | $2.1 million |
| **Residual Legacy Loan Agency Collections** | $0.5 million |
| **TOTAL SOURCES:** | **$17.9 million** |

---

[8] The estimated sources are conservative and do not include proceeds from a potential sale of residual Legacy Loan assets or remaining amounts due to the Debtors pursuant to the *Order (I) Authorizing and Approving the Settlement Agreement Between KServicing and Customers Bank and (II) Granting Related Relief* (Docket No. 232).

B.  **Estimated Uses of Funds**

i.  **Uses of Funds**

21. The Debtors project wind down expenses of approximately $13.2 million, including remaining pre-Effective Date operating expenses and restructuring professionals' fees, other non-operating expenses (including taxes, insurance, U.S. Trustee fees, contract cures, Wind Down Officer related costs, and litigation advisor and related costs), wind down contingency reserves, litigation reserves, and claims reserves. By implementing, among other things, an appropriate cash reserve system, the Debtors have thus ensured that they will maintain adequate cash levels to effectuate the wind down.

22. The Debtors project wind down expenses of approximately $13.2 million, including remaining operating expenses, professional fees, other non-operating expenses (including taxes, insurance, U.S. Trustee fees, contract cures, Wind Down Officer related costs, and litigation advisor and related costs), wind down contingency reserves, and litigation reserves.

| ESTIMATED USES OF FUNDS | AMOUNT |
|---|---|
| **Operating Expenses** | $2.8 million |
| **Professional Fees** [9] | $2.6 million |
| **Other Non-Operating Expenses** | $4.3 million |
| **Wind Down Reserves** [10] | $2.0 million |
| **Litigation Reserves** [11] | $1.5 million |
| **TOTAL USES:** | **$13.2 million** |

---

[9] Includes fees for post-effective date restructuring and ordinary course professionals.

[10] Wind Down Reserves includes contingent amounts to cover unforeseen costs associated with the wind down of the business, including but not limited to payroll, tax liabilities and legal expenses.

[11] Litigation Reserves includes contingent amounts to cover unforeseen costs of pursuing Causes of Action.

12

ii.     **Estimated Outstanding SAP Claims**

23.     The Debtors estimate that the total amount of Outstanding SAP Claims that need to be reserved for or paid on the Effective Date will be approximately $2.1 million, consisting of the following:

| ESTIMATED OUTSTANDING SAP CLAIMS | AMOUNT |
|---|---|
| **Other Secured Claims** | $2.1 million |
| **Administrative Expense Claims** | $15,000 |
| **TOTAL CLAIMS:** | **$2.1 million** |

24.     This leaves the Debtors' estates with approximately $2.6 million, which I believe is more than sufficient to satisfy any other contingencies that may arise. As with any projections, there is a possibility that there may be some variance in the Wind Down Budget and expenses. To account for the potential variance, the Wind Down Budget includes certain contingency reserve amounts. I believe that the budget surplus could be as high as $6.1 million if the Company does not use the budgeted $3.5 million of Wind Down and Litigation Reserves. I believe the estimated Remaining Cash Sources will be sufficient to cover any additional unforeseen costs of winding down the business. The Wind Down Budget was discussed with, and revised, based on discussions with the Reserve Bank's advisors.

25.     The Amended Plan establishes and appoints a post-Effective Date fiduciary to carry out the Amended Plan and complete the Wind Down of the Debtors' estates. The Amended Plan provides that the Wind Down Officer will complete the claims reconciliation process and monetize any remaining non-cash assets of the Debtors (including any Causes of Action). The Amended Plan and the various agreements contained in the Plan Supplements,

among other things, outline the rights, duties, and powers of the Wind Down Officer and reflect the reserved amounts in the Wind Down Budget for Wind Down Officer related fees.

### C. Conditions Precedent to the Effective Date

26. In the illustrative scenario where the Debtors' Effective Date occurs on March 31, 2023, the Debtors have $15.3 million in cash, exclusive of restricted cash. Due to the limited funds available to the Debtors, it is necessary for the Debtors to be deliberate in causing any potential delays to the Effective Date. As such, the Debtors continue to remain focused on an efficient transfer of the loan servicing obligations, and for the avoidance of any doubt, all parties understand that any transfer costs are to be paid by the applicable counterparties. As discussed in the *Declaration of Laquisha Milner in Support of Confirmation of the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors*, the Debtors are expected to meet all conditions precedent under Section 9.1 of the Amended Plan—including the transfer of servicing the PPPLF Collateral to an alternate third party servicer to the satisfaction of the Reserve Bank.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 9, 2023
New York, New York

                                                /s/ *Deborah Rieger-Paganis*
                                                Name: Deborah Rieger-Paganis
                                                Title: Managing Director, AlixPartners, LLP