UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------ x
                                     :

In re                                :       **Chapter 11**
                                       :

**KABBAGE, INC. d/b/a KSERVICING**, *et al.*, :       **Case No. 22-10951 (CTG)**
                                     :

               Debtors.[1]      :       **(Jointly Administered)**
                                     :
                                     :
                                     :
------------------------------------------------------------ x

## DECLARATION OF LAQUISHA MILNER IN SUPPORT OF CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF KABBAGE, INC. (d/b/a KSERVICING) AND ITS AFFILIATED DEBTORS

I, Laquisha Milner, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Executive Officer of Kabbage, Inc. d/b/a KServicing ("**KServicing**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"). I am also a member of the Company's Board of Directors.

2. I joined the Company in January 2021. Prior to my role as Chief Executive Officer, I served as the Company's Chief Operations Officer. I have over twenty years of experience in financial technology (fintech) operations. Before joining the Company, I was the Vice President of Project Management at Vector Solutions, and I also served in the roles of Head of Program Management, Head of Business Process Engineering, and Head of Platform

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

Implementations for Kabbage, Inc. (prior to the AmEx Transaction and the SBA's launch of the PPP) at various times over the course of eight years.  I did not work for Kabbage, Inc. in any capacity from April 2020 until I rejoined the Company in January 2021.

3.      I submit this declaration (the "**Declaration**") in support of confirmation of the *Amended Joint Chapter 11 Plan of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors* [Docket No. 466] (as may be amended, modified, supplemented, or restated, the "**Amended Plan**").[2]  I have reviewed, and I am generally familiar with, the provisions of the Amended Plan.

4.      In my capacity as Chief Executive Officer, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and these chapter 11 cases.  I was personally involved in the development of the plan to transition the Debtors' PPP Loan servicing obligations to third-party loan servicers (the "**Transition**"), and I am overseeing the Debtors' transition efforts.  Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and other information, including relevant historical business records of the Debtors and information provided to me by employees working under my supervision, my duties and responsibilities as Chief Executive Officer for the Debtors, my familiarity with the Debtors' business operations and financial conditions, as well as my discussions with the Debtors' board of directors (the "**Board**"), management team ("**Management**"), and advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan, the *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 467) (the "**Disclosure Statement**"), or the concurrently filed *Debtors' (I) Memorandum of Law in Support of Confirmation of Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors and (II) Omnibus Reply to Objections Thereto* (the "**Memorandum**"), as applicable.

RLF1 28712439V.1

## The Debtors' Objectives

5.      The Amended Plan provided flexibility (via the toggle mechanism) for the Debtors to take different paths toward confirmation that were contingent on certain variables.  One of these contingencies was securing the necessary funds to continue the Debtors' operations:  to submit tens of thousands of 24-month loans for guaranty purchase or forgiveness ahead of SBA submission deadlines beginning in October 2022, all while continuing to process and service the remaining loan population, responding to a constant stream of SBA inquiries, and simultaneously determining whether the Debtors would continue to serve as the loan servicer for certain stakeholders after emergence from chapter 11 or if the Debtors would transfer such services to a third party. After securing the necessary funds, the Debtors maintained their servicing activities and managed inbound requests from governmental entities and the Partner Banks related to auditing already processed loans.  After careful consideration, taking into account among other things liquidity needs, resources, impact on borrowers, and being informed by their advisors that the Debtors were able to reject certain contracts through the bankruptcy process (such that obligations with respect to having to transfer servicing would be easier on the Debtors and harder on CRB, CB, and the PPP Loan borrowers), the Debtors determined which plan process should be pursued.  Upon the Debtors' determination to transition their servicing obligations to a third party designated by applicable stakeholders, Management turned in earnest to developing a transition plan that would provide for the transition of its servicing obligations while also taking into account the Debtors' limited resources.

6.      Management recognized that a transition plan would need to account for many operational and technical challenges including (i) having files and information related to each PPP Loan on multiple servicing platforms and in the control or custody of parties other than

RLF1 28712439V.1

the Debtors, (ii) the complexity in providing for a large scale data transfer on a truncated timeline, (iii) transferring data to four different parties – the Reserve Bank, CRB, CB, and the SBA – each with different technology capabilities and requirements, (iv) continuing to service loans, (v) coordinating with various stakeholders to ensure their servicing needs would be achieved at the conclusion of such transfer, and (vi) and accomplishing such transfer.  Management also understood that achieving this ambitious objective would involve certain factors outside of the Debtors' control, including the cooperation of the Debtors' stakeholders that were the ultimate beneficiaries of the servicing transition.  Despite the clear challenges and notwithstanding having a clear option for wind down that would be easier if transferring servicing obligations for the Partner Banks were not undertaken, the Debtors have pursued the Transition and remained consistent with Management's longstanding mission: to do what is right—even when it is difficult.

7.      The Debtors' small but dedicated team of employees (the "**Transition Team**"), met on a frequent basis throughout these chapter 11 cases to design a multi-phase, multi-stakeholder transition plan, inclusive of possible alternative solutions should certain challenges arise, that if implemented would provide for the herculean task of transitioning the Debtors' highly complex portfolio.  In parallel with the development of the transition plan, the Transition Team continued to perform the Debtors' extensive servicing obligations.  Specifically, members of the Transition Team are responsible for servicing all PPP Loans, responding to voluminous audit requests from the U.S. government that have amounted to hundreds of inbound queries a day and periodic inquiries about tens of thousands of loans at a time, and information demands from the same stakeholders also requiring the Transition, at unpredictable times with short deadlines.

8.      As is necessary for a transition of the type contemplated, the Debtors have remained in constant discussion and consultation with the Reserve Bank, SBA, CRB, and CB and

RLF1 28712439V.1

their respective alternate servicers (together, the "**Transition Parties**") throughout these proceedings and are in the process of negotiating various agreements and formulating collaborative work plans with respect to the Transition.  The Debtors have worked closely with the Transition Parties to establish a consensually designed process and reach an agreement as to substantive terms for the transfer of servicing of the PPPLF Loans, the CRB PPP Loans, and the CB PPP Loans, respectively.

9.      The Debtors have also undertaken efforts to address obtaining and transferring necessary data to the Transition Parties that is in the possession and control of third parties such as American Express.  Specifically, the Debtors (i) identified for the Transition Parties where material data resided to the extent it was on a third party platform, (ii) provided the Transition Parties with descriptions of the contractual arrangements with the Debtors and such third parties so that the Transition Parties may determine if they needed to enter into similar contractual arrangements, (iii) reached out to parties such as American Express to request their cooperation in the transfer of such data, (iv) facilitated meetings among American Express and the Transition Parties to begin direct engagement between the stakeholders, and (v) continued active dialogue with American Express to obtain the data and information the Debtors demanded in writing be provided in furtherance of the Transition.

10.      The efforts of the Transition Team culminated in the Transition Plan (as defined herein), which describes the process of transitioning the Debtors' PPP Loan servicing obligations to the Transition Parties.  Although the Transition has not yet been fully implemented and the active participation of the Transition Parties and other third parties remain necessary to achieve completion, the Debtors are making strides on a daily basis that bring them closer to completing this extraordinarily challenging objective.  The Debtors have worked tirelessly to

effectuate the Transition, and will continue to do so through the remainder of these chapter 11 cases.

11.    I believe that the Transition has advanced at the swiftest pace practicable for the Debtors given the facts and circumstances, and is at a stage in the process that demonstrates the Debtors' ability to complete the Transition's remaining necessary steps in order for the Amended Plan to go effective.

## THE INITIAL TRANSITION PROCESS

12.    The Transition involves significant operational, technological and legal obstacles, and from the early stages of these proceedings the Debtors focused on developing a practical transition plan that could both overcome these obstacles and be acceptable to the Transition Parties.  By December 2022, the Debtors developed a workplan (the "**December Workplan**"), designed to bring uniformity and clarity to the transition by assisting the Transition Parties with aligning on the definition of loan files, identifying the location of various components of those files, and determining the data necessary for the Transition Parties to undertake their respective go-forward servicing obligations.  Specifically, the December Workplan identified the categories of information to be provided, who at the Debtors will coordinate the effort in providing the information, how that person will approach the task, the level of involvement, and the "Work Effort to Provide Information" which includes an express qualifier that states "Best efforts/best case; based on assumption and subject to contingencies."  The December Workplan also included estimates for the amount of effort required to accomplish certain tasks related to the retrieval and distribution of data and information using an approximate number of days of labor as a metric. The periods listed in the December Workplan were illustrative, applicable to each Transition Party on a sequential and not concurrent basis, and not intended to be delivery timelines, let along

6

binding commitments.   Further, the "Work Effort to Provide Information" notably includes an express qualifier that states "Best efforts/best case; based on assumption and subject to contingencies" and were subject to, among other things, the cooperation and participation of CRB and finalization of the scope of "Servicing Files".  The Debtors shared the December Workplan with CRB, through counsel, on December 22, 2022.  The Transition Team met with and walked CRB and its counsel through the December Workplan on December 29, 2022, and discussed the Transition steps therein.

13.    The technical practicalities of the Transition are complex, but at a high level, the data involved in the Debtors' loan servicing flows from several different locations within and outside of the Debtor's control—including at American Express and Biz2Credit—and involves various data types that may not be compatible with all data platforms and processing programs used by other loan servicers.  The Debtors' technology stack works seamlessly within one footprint, but to have four different parties step into one partitioned footprint, requires significant data management expertise on all sides.  The data management expertise and ability to receive the outputs in particular is why the Debtors stressed to the Transition Parties for months that they needed to identify an alternative servicer to coordinate the process.  Absent knowing the entity who would ultimately receive the loan servicing data, the Debtors were unable to confirm the transferee entity's technological capabilities for receiving the information and unable to ensure the Transition would not have to occur more than once.  Without the critical step of knowing end users, the Debtors could prepare for and execute the front-end of a transfer but still be unsuccessful because the party on the receiving end lacked the ability to receive the data in an efficient manner, or at all.  This could easily create a situation where the Debtors would have to redo the front-end transfer, wasting precious time and effort.  The Transition Team is now seeing that exact situation

play out with CB's notification to the Debtors on March 8, 2023 of CB's technology deficiencies, as described in more detail below.

14.    The Debtors requested the Transition Parties select and inform the Debtors of their third-party loan servicers numerous times over the course of these proceedings.  It is my understanding from the Debtors' advisors and members of the Transition team who work at my direction, that such requests to each of the Transition Parties were not promptly answered.  I also understand that the Debtors made several attempts to impress upon the Transition Parties their limited ability to advance the Transition without knowing the Transition Parties' third-party servicers and/or the specific materials each party would require for actual servicing purposes.  I believe based on the reactions of certain of the Transition Parties, as reported to me, that at times there was a failure to appreciate the technical practicalities of the Transition to properly integrate the data to ensure all loan information will be accurately reflected when accessed for future servicing.  Implementing the Transition is far from simply pushing a button.

## THE TRANSITION PLAN

15.    Despite not having the level of collaboration necessary for a transition of this magnitude, the Debtors developed a transition plan that was as comprehensive as possible without knowing the specifics of the Transition Parties' third-party loan servicers and their respective data capabilities.  An updated version of the December Workplan, including six separate workplan documents reflecting a two-phased approach for the Transition (collectively, the "**Transition Plan**"), was shared with the Reserve Bank on February 9, 2023, CRB and CB on February 10, 2023, and the SBA on February 16, 2023.  After delivery, the Debtors held calls with each of the parties and, where applicable, their alternate servicers, to discuss the details of the Transition Plan.  Since then, the Debtors have communicated extensively with the Transition

Parties, both through advisors and directly, to refine and solidify the contemplated process for the Transition.

16.     The Transition Plan contemplated the transition of servicing of PPP Loans to four entities: (i) a new loan servicer for the Reserve Bank (the "**Reserve Bank Servicer**"); (ii) the SBA; (iii) CB; and (iv) a new loan servicer for CRB (the "**CRB Servicer**").  The Transition Plan accounted for the fact that the Debtors have limited financial and personnel resources available during its wind down, the timing of events in the chapter 11 cases, the complexity of concurrent loan transfers, and the Debtors' reliance on the efforts and cooperation of third parties, such as American Express and Biz2Credit.  The Transition Plan also included a compendium of third-party relationships, contracts and software that KServicing uses to perform its loan servicing functions.  This catalog of contracts and resources was compiled to facilitate discussion with transferee servicers about how to best replicate loan servicing functions.  The Debtors, through counsel, also offered a list of executory contracts to the Transition Parties for assumption and assignment subject to necessary approvals, but all Transition Parties declined or otherwise did not respond.  Importantly, the Transition Plan is a live document and will have to adapt and evolve as the situation requires.

17.     <u>CRB Transition</u>.  The Debtors and CRB received joint approval from in-house counsel to establish a secure data connection for purposes of safely transmitting loan and borrower files on February 6, 2023.  However, CRB did not inform the Debtors of its selected third-party servicer until February 15, 2023, and for the reasons stated above, the Debtors must know the technological capabilities of the CRB Servicer to ensure successful data transmission. On February 20, 2023, the Debtors established a connection with CRB using Amazon Web Services S3 cloud storage service ("**AWS S3**").  On February 23, the Debtors and CRB Servicer

met to finalize data connection requirements, after multiple interim meetings to discuss the same. Beginning the same day, the Debtors initiated the transfer of data and loan documentation to the CRB data repository through AWS S3. On February 24, 2023, the Debtors held a virtual meeting with the CRB Servicer to walk through and explain the Transition Plan. On February 28, 2023, the Debtors sent a status update on the Transition (a "**Transition Status Update**") to CRB. A Transition Status Update is a document outlining the current status of the Transition and describes, among other things, ongoing Transition activities between the Debtor and respective Transition Party, third-party discussions, and action items. The Debtors intend to send Transition Status Updates to each of the Reserve Bank, CRB, CB, and the SBA on a weekly basis for the duration of the Transition. The Debtors anticipate sending this week's Transition Status Report to CRB on March 9, 2023. Now that CRB has identified the CRB Servicer, the Transition Plan is well underway. 1,274,975 loan servicing documents, for 121,797 loan origination packages, comprising 1.3 terabytes of data have been made available to the CRB Servicer. Provided that CRB and the CRB Servicer continue to cooperate with the Debtors, I believe the Transition can be effectuated expeditiously with respect to the CRB PPP Loans.

18.    <u>CB Transition</u>. CB informed the Debtors that it would act as its own servicer. On February 13, 2023, the Debtors began preparing the file set for the transfer of data and loan documentation to the CB data repository, which is a Secure File Transfer Protocol ("**SFTP**") add-on to AWS S3 that is less efficient than the pure AWS S3 platform. The Debtors have since worked with CB to effectuate the Transition, and although CB's current capability to securely receive data is less than optimal, the Debtors are working cooperatively to complete the Transition with respect to the CB PPP Loans. As an example of the Debtors' cooperative efforts, CB lacks the ability to use the preferred cloud storage available by AWS S3, and to accommodate

the limitation the Debtors provided CB's loan files on a secure SFTP platform and had to manually categorize the data to allow for manageable uploading. The Transition Team prepared and uploaded 1,053,396 loan servicing documents, for 99,336 loan origination packages, comprising 1.1 terabytes of data for the SFTP transfer. On March 1, 2023, the Debtors sent a Transition Status Report to CB and they intend to send this week's version on March 9, 2023.

19.     Late afternoon on March 8, 2023, the Transition Team was informed by CB that CB had difficulties with using the SFTP platform and successfully downloading the data already uploaded by the Transition Team a week prior, and CB now requests that their loan files to be provided by hard drive. The Transition Team is now compelled to further navigate ways to accommodate the same party, multiple times with respect to the same issue, due to CB's technological limitations. Nevertheless, provided CB continues to cooperate and takes a rational approach to solving for issues that have and may continue to arise, the Debtors believe that CB's less sophisticated data infrastructure will not be a complete barrier to timely completing the Transition.

20.     Reserve Bank Transition. The Reserve Bank has been cooperative with the Debtors and it is my understanding that the Reserve Bank has not objected to confirmation or raised issues with respect to the Transition Plan as it relates to them. Unfortunately, the Reserve Bank did not notify the Debtors of the selection of its third-party loan servicer, until February 7, 2023 and the Reserve Bank's delay in selecting a third-party loan servicer similarly slowed the overall progression of the Transition, but the Debtors are working expeditiously. 125,730 loan servicing documents, for 15,498 loan origination packages, comprising 75 gigabytes of data have been made available for download to the Reserve Bank Servicer. On March 1 and March 8, 2023, the Debtors sent Transition Status Reports to the Reserve Bank.

11

21.     <u>SBA Transition</u>.  The SBA has not yet identified a third party to service its designated loan population but is still working with the Debtors on its data transmission process in connection with the Transition.  The SBA and the Debtors are working cooperatively to provide for a Transition to the SBA directly such that once the SBA engages an alternate servicer, the SBA's loan files, data and information will be available and retrievable for the servicer.  SBA provided the standard of technological capability it will require for its selected servicer, and the Transition Team has made 687,865 loan servicing documents, for 97,094 loan origination packages, comprising 829 gigabytes of data available for download accordingly.  The Debtors believe that efforts with the SBA will culminate in a successful transition.  The Debtors anticipate sending a Transition Status Report to the SBA on March 9, 2023.

## THE TRANSITION PROCESS ACCELERATION

22.     The Transition Plan is composed of two distinct phases.

23.     The first phase ("**Phase 1**") involves transition of all origination documentation for each borrower on the Debtors' entire portfolio, comprised of over 300,000 PPP Loans. Originally, and as contemplated by the Transition Plan, the Debtors were only going to transition documentation for only active loans (PPP Loans that require continued servicing, including both loan documents and accompanying transaction data) as part of Phase 1 and then follow with the remainder of the portfolios in Phase 2.  However, as the Transition Team began building the Phase 1 data set, they realized that it would be more efficient for the Debtors to pull and upload origination documentation for all PPP Loans (whether active or not) as part of Phase 1.  Transition of day-to-day operations and documentation, as needed, is also included as part of Phase 1.

24.     The second phase ("**Phase 2**") involves the Transition of loan documents and accompanying transaction data, including materials related to guaranty purchase and forgiveness applications and inquiries.  Phase 2 contemplates the transfer of documents and data related to the entire loan portfolio, however, the Debtors are working with the Transition Parties to prioritize currently active loans.  Further, the Debtors have identified certain categories of priority information in the Data Document Inventory Overview that can be made available to the Transition Parties quickly, in the coming weeks, while the Transition Team continues to facilitate transfer of other materials with third parties.  Similar to the shift in Phase 1 described above, Phase 2 originally contemplated the transition of loan populations that have been processed (*i.e.*, non-active loans) and submitted to the SBA for forgiveness and/or guaranty purchase, including both loan documentation and accompanying transaction data, but the Transition Team revised its initial plan in an effort to most efficiently complete all of the Transitions, as contemplated.  As noted above, this Transition process is always evolving.

25.     Since learning the identities of the Transition Parties' selected third-party loan servicers (the "**Transferee Entities**"), the Transition Team has met and communicated with the Transferee Entities regularly and on an ongoing basis.  The Debtors completed the upload of the loan servicing documents for the Phase 1 transition for CRB on March 1, 2023, for CB on March 3, 2023, and for the SBA and Reserve Bank on March 6, 2023 (the "**Phase 1 Upload**").  Upon the applicable completion date of the Phase 1 Upload, the Transferee Entities could access and download all the loan servicing documents for the Phase 1 transition in the amounts described above.  Effectuating the Phase 1 Upload in the short amount of time between being informed of the Transferee Entities and their respective data transferring capabilities required significant effort from the Transition Team.

RLF1 28712439V.1

26.    Preparation of the Phase 1 Upload involved intense coding and testing efforts to ensure the loan servicing documents could be transferred securely, not comingled, and accessed and downloaded with minimal to no errors or issues.  The Transferee Entities do not all use the same data transferring protocols and configurations.  Although the Debtors preference was to use the more efficient and cloud-based AWS S3 environment for the Transition, at the request of certain Transition Parties, the Debtors also facilitated the use of slower SFTP connections—creating an additional layer of complexity.  The Transition Team accomplished the Phase 1 Upload, a task that would have ideally occurred in a longer timeframe, in only a few weeks from the time the Debtors learned the identities of the Transferee Entities.

27.    The Phase 1 Upload transmitted over 3,000,000 unique loan documents for over 300,000 loans, equating to approximately 3.3 terabytes of data.  Transmitting this enormous volume of data from its existing environments to four unique environments where the Transferee Entities could access only their own respective data is a testament to the Debtors' ability to fully effectuate the Transition.  The Debtors' effectuation of the Phase 1 Upload in an objectively short timeframe, at Management's uncompromising standard for traceability, security, and completeness, is nothing short of a momentous success.

28.    In parallel with the preparation of the Phase 1 Upload, the Transition Team also provided transition updates to the respective Transition Parties informing them of outstanding deliverables (including those that required action from them), estimated timelines for deliverables, and associated costs.  On March 6, 2023, the Debtors delivered to each Transition Party a refined summary of the location of each category of data subject to the Transition Plan, noting whether the Debtors can unilaterally deliver the data or whether involvement of a third-party in control of such data is necessary.  In the same correspondence, the Debtors offered to arrange a call with

American Express as soon as possible. So far, the Debtors have facilitated separate calls with American Express for CRB, CB, and SBA on March 10, 2023 and are finalizing schedules for a call with the Reserve Bank on March 10, 2023.

29.     Since the completion of the front-end uploads of Phase 1 data, the Transition Team has started working on Phase 2. The Debtors circulated a statement of work (a "**SOW**") to the Reserve Bank Servicer on March 8, 2023, and anticipate sending SOWs to the other Transition Parties on or about March 9, 2023. The SOWs outline the steps of the Transition Plan to ensure the Debtors and each Transitions Party is aligned as to what needs to occur to achieve completion of the Transition and an agreement is reached with respect to the balance of outstanding actions to be performed before the Debtors' plan goes effective. The SOWs also reflect anticipated transfer costs to be borne by the applicable parties and include requests for the Transition Parties to confirm receipt of various data categories, and the ongoing cooperation and confirmations are crucial to the implementation of the Transition. The Debtors have also coordinated initial calls among the Transition Parties and third parties such as American Express, and are optimistic that consensual agreements can be reached to ensure that information in the custody and control of those parties will be made available to the Transition Parties.

30.     The Debtors have scheduled a call with Biz2Credit on March 9, 2023 to request a revised data delivery timeline in response to CB's request that data for active CB PPP Loans be prioritized over already-processed loans.

31.     Consistent with the Transition Plan, the Transition Team will continue to meet and communicate with the Transferee Entities to maximize the efficiency of data delivery under the Transition Plan. Nevertheless, the success of the Transition Plan also requires the

15

Transition Parties, the Transferee Entities, and third parties such as American Express and Biz2Credit to do their part and collectively cooperate.

32.     Completing the Transition is an achievable objective, and is the best available outcome for the Debtors and all of their stakeholders.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 9, 2023

Atlanta, Georgia

/s/  *Laquisha Milner*
Name: Laquisha Milner
Title: Chief Executive Officer