**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------ x
                                      :

In re                              :     **Chapter 11**
                                        :

**KABBAGE, INC. d/b/a KSERVICING,** *et al.*,   :     **Case No. 22-10951 (CTG)**
                                        :

             Debtors.[1]               :     **(Jointly Administered)**
                                        :
                                        :
                                        :
------------------------------------------------------------ x

## DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF KABBAGE, INC. (d/b/a KSERVICING) AND ITS AFFILIATED DEBTORS AND (II) OMNIBUS REPLY TO OBJECTIONS THERETO

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock
Candace M. Arthur
Natasha S. Hwangpo
Chase A. Bentley
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi
Amanda R. Steele
Zachary I. Shapiro
Matthew P. Milana
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: March 9, 2023
       Wilmington, Delaware

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

PLEADINGS AND EVIDENCE IN SUPPORT OF CONFIRMATION ....................4

FACTS ..............................................................................................4

    **A.** General Background...............................................................4

    **B.** Disclosure Statement and Solicitation of the Amended Plan..............5

    **C.** Voting Results ....................................................................8

ARGUMENT ......................................................................................9

  **I.** THE AMENDED PLAN SATISFIES SECTION 1129 OF THE
BANKRUPTCY CODE AND SHOULD BE APPROVED ......................................10

    **A.** The Amended Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code .........10

    **B.** The Amended Plan's Classification of Claims and Interests Complies
with Section 1122 of the Bankruptcy Code.......................................11

    **C.** The Amended Plan Complies with Section 1123(a) of the Bankruptcy
Code.................................................................................14

    **D.** The Amended Plan's Content is Permitted and Complies with Section
1123(b) of the Bankruptcy Code ...................................................15

      **1.** Plan Permissive Provisions .................................................15

      **2.** The Plan Releases, Injunction, and Exculpation Provisions Should
Be Approved ...................................................................17

        **a.** The Debtor Releases Are Appropriate and Should be Approved..........18

        **b.** The Third Party Releases Are Consensual, Appropriate and
Should Be Approved.........................................................26

        **c.** The Exculpation Provision is Appropriate and Should be
Approved......................................................................29

        **d.** The Injunction Provision is Appropriate and Should be Approved.......30

    **E.** Section 1123(c) of the Bankruptcy Code Does Not Apply to the Debtors .........32

    **F.** The Amended Plan Provides Cure Amounts in Satisfaction of Section
1123(d) of the Bankruptcy Code ...................................................32

    **G.** The Amended Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code .........33

      **1.** Postpetition Disclosure and Solicitation ....................................34

      **2.** Acceptance or Rejection of the Amended Plan .............................34

    **H.** The Amended Plan Has Been Proposed in Good Faith in Compliance
with Section 1129(a)(3) of the Bankruptcy Code ...............................35

**I.**   The Amended Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.............................................................................................. 37

**J.**   The Debtors Have Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code.............................................. 38

**K.**   Section 1129(a)(6) of the Bankruptcy Code Does Not Apply to the Amended Plan ............................................................................. 39

**L.**   The Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor, in Satisfaction of Section 1129(a)(7) of the Bankruptcy Code ..................................................................... 40

**M.**  The Amended Plan Satisfies Section 1129(a)(8) of the Bankruptcy Code as to Each Class of Claims or Interests under the Amended Plan, or Satisfaction of Section 1129(a)(8) is Excused Under Section 1129(b) of the Bankruptcy Code ..................................................................... 42

**N.**   The Amended Plan Satisfies Section 1129(a)(9) of the Bankruptcy Code by Providing for Payment in Full of All Allowed Priority Claims ..................... 43

**O.**   The Amended Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code ....... 45

**P.**   The Amended Plan Is Feasible and Satisfies Section 1129(a)(11) of the Bankruptcy Code ..................................................................... 45

    **1.**   The Debtors Have Sufficient Funds to Meet Their Obligations ................. 47

    **2.**   The Amended Plan Provides for the Orderly Wind Down of the Estates ................................................................................ 51

**Q.**   The Amended Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.............................................................................................. 52

**R.**   Sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) are Not Applicable to the Amended Plan.......................................................... 52

**S.**   The Amended Plan Satisfies the "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes............... 53

    **1.**   The Amended Plan Does Not Discriminate Unfairly ................................. 54

    **2.**   The Amended Plan Is Fair and Equitable .................................... 55

**T.**   The Amended Plan Satisfies Section 1129(c) of the Bankruptcy Code............. 57

**II.**   THE OBJECTIONS TO THE AMENDED PLAN SHOULD BE OVERRULED AND THE AMENDED PLAN CONFIRMED.................................57

**A.**   Objection by the Carr Plaintiffs Should be Overruled ......................... 57

    **a.**   Debtors Have Provided an Adequate Liquidation Analysis ................. 58

    **b.**   Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor............................................ 59

    **c.**   The Amended Plan is Fair and Equitable .............................. 70

     **B.**    Objection by the United States Trustee Should be Overruled............................ 74

           **a.**    Amended Plan Does Not Violate Section 1141(d)(3) of the Bankruptcy Code ...................................................................... 74

     **C.**    Objection by Paul Pietschner Should be Overruled ............................................. 77

     **D.**    Objection by Cross River Bank Should be Overruled ........................................ 82

           **a.**    Amended Plan is Feasible and Provides Adequate Means for Implementation .................................................................... 82

           **b.**    Debtors Have Identified a Wind Down Officer in Compliance with Sections 1123(a)(7) and 1129(a)(5)................................... 97

     **E.**    Objection by Customers Bank Should be Overruled .......................................... 99

           **a.**    Amended Plan is Feasible and Provides Adequate Means for Implementation .................................................................... 99

           **b.**    Debtors Have Proposed the Amended Plan in Good Faith, as Required by Section 1129(a)(3) of the Bankruptcy Code .................. 107

CONCLUSION.........................................................................................................................111

**Exhibits**

**Exhibit A**:  Objections Chart

RLF1 28712465v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 431 W. Ponce De Leon, LLC*,
    515 B.R. 660 (Bankr. N.D. Ga. 2014) ..................................................................108

*In re 710 Long Ridge Rd. Operating Co.*,
    Case No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ........22

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986)...................................................................................36

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Off. Comm. of Equity
    Sec. Holders of Adelphia Commc'ns Corp. v. Off. Comm. of Unsecured
    Creditors of Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
    544 F.3d 420 (2d Cir. 2008)....................................................................23, 40, 63

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000).............................................................40, 63

*In re Aleris Int'l, Inc.*,
    Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)....................18

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012)..............................................................................46, 83

*In re AOV Indus., Inc.*,
    792 F.2d 1140 (D.C. Cir. 1986) ...............................................................................11

*In re Applied Safety, Inc.*,
    200 B.R. 576 (Bankr. E.D. Pa. 1996) .....................................................................84

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) .............................................................................10, 54

*In re Arrowmill Dev. Corp.*,
    211 B.R. 497 (Bankr. D.N.J. 1997) .........................................................................75

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)..........................................................................................40, 60

*Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments (In re Sea
    Garden Motel & Apartments)*,
    195 B.R. 294 (D.N.J. 1996) ....................................................................................84

iv

*In re Boy Scouts of Am. and Del. BSA, LLC*,
642 B.R. 504 (Bankr. D. Del. 2022) ...........................................................12, 67, 99

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) ...................................................................72

*In re Brotby*,
303 B.R. 177 (B.A.P. 9th Cir. 2003) .....................................................................82

*In re Bush Indus., Inc.*,
315 B.R. 292 (Bankr. W.D.N.Y. 2004) ..................................................................36

*In re Charming Charlie Holdings Inc.*,
Case No. 19-11534 (MFW) (Bankr. D. Del. July 21, 2022) (Docket No. 1433) ...................31

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...................................................................36

*CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*,
406 F.3d 229 (4th Cir. 2005) ...............................................................................96

*Citizens Against Corp. Crime, LLC v. Lennar Corp. (In re Landsource Cmtys. Dev., LLC)*,
612 B.R. 484 (D. Del. 2020) ...............................................................................81

*In re Clarus Therapeutics Holdings, Inc.*,
Case No. 22-10845 (MFW) (Bankr. D. Del. Feb. 9, 2023) (Docket No. 320) .....................31

*In re Cloud Peak Energy Inc., ,*
No. 19-11047 (KG) (Bankr. D. Del. Dec. 5, 2019) (Docket No. 868) .................................28

*In re Coastal Broad. Sys., Inc.*,
570 F. App'x 188 (3d Cir. 2014) ....................................................................11, 54

*In re Coram Healthcare Corp., ,*
271 B.R. 228 (Bankr. D. Del 2001) ......................................................................36

*In re Cyber Litig. Inc.*,
Case No. 20-12702 (CTG) (Bankr. D. Del. Mar. 11, 2022) (Docket No. 723) .....................32

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex 2009) ...................................................................96

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ...................................................................84

v

*In re Digerati Techs., Inc.*,
   No. 13-33264, 2014 WL 2203895 (Bankr. S.D. Tex. May 27, 2014) ....................................99

*In re Dow Corning Corp.*,
   237 B.R. 380 (Bankr. E.D. Mich. 1999) ................................................................................67

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992), *aff'd sub nom. Lambert Brussels
   Assocs., L.P. v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham
   Lambert Grp., Inc.*), 140 B.R. 347 (S.D.N.Y. 1992) ....................................................33, 41, 55

*In re Eddington Thread Mfg. Co., Inc.*,
   181 B.R. 826 (Bankr. E.D. Pa. 1995) ....................................................................................84

*In re Emerge Energy Services LP*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ............................................................28, 47

*In re Energy Future Holdings Corp.*,
   593 B.R. 217 (Bankr. D. Del. 2018) ......................................................................................95

*In re EV Energy Partners, L.P.*,
   Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) (Docket No. 238) ........................30

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ..................................................................................20, 72

*In re Exide Holdings, Inc.*,
   No. 20-11157 (CSS) (Bankr. D. Del. Oct. 16, 2020) (Docket No. 998) .................................27

*In re EYP Grp. Holdings, Inc.*,
   Case No. 22-10367 (MFW) (Bankr. D. Del. Nov. 1, 2022) (Docket No. 568) .......................31

*In re Fairchild Aircraft Corp.*,
   128 B.R. 976 (Bankr. W.D. Tex. 1991) ..................................................................................81

*In re Finlay Enters., Inc.*,
   No. 09-14873 JMP, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) .......................47, 56

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014) ...................................................................................23

*In re Gibson Brands, Inc.*,
   No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2, 2018) (Docket No. 872-1 Ex. B) ...............27, 28

*In re Global Indus. Techs., Inc.,* ,
   645 F.3d 201 (3d Cir. 2011).....................................................................................................66

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ...................................................................10

*In re Gulf Coast Health Care, LLC*,
    Case No. 21-11336 (KBO) (Bankr. D. Del. June 27, 2022) (Docket No. 1424).....................31

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II* (*In re Briscoe Enterprises, Ltd., II*),
    994 F.2d 1160 (5th Cir.1993) .................................................................10

*In re Heritage Highgate, Inc.*,
    679 F.3d 132 (3d Cir. 2012).................................................................46, 47, 83

*In re Hexion Holdings LLC*,
    No. 19-10684 (KG) (Bankr. D. Del. June 25, 2019) (Docket No. 920) .................................27

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *aff'd sub nom. Spencer ad hoc Equity Comm. v. Idearc, Inc.* (*In re Idearc, Inc.*), 662 F.3d 315 (5th Cir. 2011)...............................11

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ...........................................................20, 24, 66

*In re Insys Therapeutics, Inc.*,
    No.19-11292 (JTD) (Bankr. D. Del. Jan. 16, 2020) (Docket No. 1115) ...............................28

*Jason v. Bumble Bee Foods, LLC* (*In re Old BBP, Inc.*),
    2020 WL 7074642 (Bankr. D. Del. Dec. 1, 2020)..................................................82

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987).................................................................12

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993).................................................................12

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1998)..................................................46, 54, 55

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*),
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .........................................................42, 64

*In re JRV Grp. USA L.P.*,
    No. 19-11095 (CSS) (Bankr. D. Del. June 19, 2020) (Docket No. 456)...............................77

*In re Key3Media Grp.*,
    336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2,
    2006) .................................................................................................................25

*In re KiOR, Inc.*,
    Case No. 14-12514 (CSS) (Bankr. D. Del. June 8, 2015) (June 8, 2015 Hr'g
    Tr.) (Docket No. 644) ......................................................................................13

*In re Korea Chosun Daily Times, Inc.*,
    337 B.R. 773 (Bankr. E.D.N.Y. 2005) .............................................................96

*In re Kreider*,
    No. 05-15018 (ELF), 2006 WL 3068834 (Bankr. E.D. Pa. Sept. 27, 2006) .........46

*In re LBI Media, Inc.*,
    Case No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 839) ........30

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd sub nom. Stonington Partners, Inc.*
    *v. Official Comm. of Unsecured Creditors* (*In re Lernout & Hauspie Speech*
    *Prods., N.V.*), 308 B.R. 672 (D. Del. 2004) ......................................................54

*Lisanti v. Lubektin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (D.N.J. 2005) .............................................................................38

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) ...............................................13, 58, 66, 67

*Marvel Ent. Grp., Inc. v. MAFCO Holdings, Inc.* (*In re Marvel Ent. Grp., Inc.*),
    273 B.R. 58 (D. Del. 2002) ..............................................................................19

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) .............................................................25

*In re Maxus Energy Corp.*,
    Case No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) (Docket No. 1460) ......30

*In re Mercado*,
    124 B.R. 799 (Bankr. C.D. Cal. 1991) .........................................................81, 82

*In re Model Reorg Acquisition, LLC*,
    Case No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) (Docket No. 222) ..........30

*In re Orlando Invs., L.P.,* ,
    103 B.R. 593 (Bankr. E.D. Pa. 1989) ...............................................................66

*In re Nellson Nutraceutical, Inc.*,
    369 B.R. 787 (Bankr. D. Del. 2007) .................................................................74

viii

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ...............................................................10

*In re PPI Enters. (U.S.), Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998), *aff'd sub nom. Solow v. PPI Enters.*
*(U.S.), Inc. (In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197 (3d Cir. 2003) .............................35

*In re Paragon Offshore PLC*,
No. 16-10386 (CSS) (Bankr. D. Del. June 7, 2017) (Docket No. 1614) ................................28

*In re PC Liquidation Corp.*,
No. 05-89022-288, 2006 Bankr. LEXIS 4638 (Bankr. E.D.N.Y. Nov. 13,
2006) ...............................................................................................................96

*In re Pipeline Foods, LLC*,
Case No. 21-11002 (KBO) (Bankr. D. Del. Mar. 1, 2022) (Docket No. 921).........................32

*Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*),
761 F.2d 1374 (9th Cir. 1985) .........................................................................46, 84

*In re Plant Insulation Co.*,
469 B.R. 843 (Bankr. N.D. Cal.), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd*
*on other grounds*, 734 F.3d 900 (9th Cir. 2013)....................................................67

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)...............................................................19, 33, 36, 108

*Quad/Graphics, Inc. v. One2One Commc'ns, LLC* (*In re One2One Commc'ns,
LLC*),
No. 12-27311 (JLL), 2016 WL 3398580 (D.N.J. June 14, 2016)...................................24

*In re Quigley Co.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................................61

*In re Rubicon U.S. REIT, Inc.*,
434 B.R. 168 (Bankr. D. Del. 2010) ...................................................................56

*In re Sagewood Manor Assocs. Ltd. P'ship*,
223 B.R. 756 (Bankr. D. Nev. 1998) ..................................................................84

*In re SPC Seller*,
No. 09-12647, 2010 Bankr. LEXIS 5321 (Bankr. D. Del. Dec. 8, 2010)..............................84

*In re Stein Mart, Inc.*,
629 B.R. 516 (Bankr. M.D. Fla. 2021) ................................................................76

*In re SunEdison, Inc.*,
575 B.R. 220 (Bankr. S.D.N.Y. 2017)...............................................................57, 72

*In re Suntech Am., Inc.*,
    Case No. 15-10054 (CSS) (Bankr. D. Del. Apr. 27, 2016) (Docket No. 587) .................77, 80

*In re Superior Air Charter, LLC*,
    Case No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) (Docket No. 212) .........................30

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................................38, 46, 83

*In re TECT Aerospace Grp. Holdings, Inc.*,
    Case No. 21-10670 (KBO) (Bankr. D. Del. Mar. 8, 2022) (Docket No. 812)........................32

*In re Toy & Sports Warehouse, Inc.,* ,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984)...................................................................................35

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *aff'd*, 587 B.R. 606 (D. Del. 2018), *aff'd*,
    972 F.3d 228 (3d Cir. 2020).................................................................................................22

*In re Tribune Co.*,
    472 B.R. 223 (Bankr. D. Del. 2012) .....................................................................................73

*In re Tribune Co.*,
    476 B.R. 843 (Bankr. D. Del. 2012), *aff'd as modified*, No. 12-CV-1072
    GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*,
    799 F.3d 272 (3d Cir. 2015)................................................................................................11

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co.* (*In re Spansion, Inc.*),
    426 B.R. 114 (Bankr. D. Del. 2010) ..............................................................................18, 19

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd sub nom. Teamsters Nat'l Freight Indus.*
    *Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581
    (6th Cir. 1986)......................................................................................................................46

*United States v. Energy Res. Co.*,
    495 U.S. 545 (1990).......................................................................................................46, 83

*United States v. Stelweck*,
    108 B.R. 488 (E.D. Pa. 1989) ..............................................................................................78

*In re VER Techs. Holdco LLC,* ,
    No. 18-10834 (KG) (Bankr. D. Del. July 26 2018) (Docket No. 647)...................................28

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013), 729 F.3d 332
    (3d Cir. 2013), 532 F. App'x 264 (3d Cir. 2013)............................................................ *passim*

x

*In re WR Grace & Co.*,
    532 Fed. Appx. 264 (3d Cir. 2013) ................................................................66

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
    386 B.R. 17 (D. Del. 2008) ........................................................................82

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ................................................20, 28, 65

*In re WorldCom, Inc.*,
    No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........54

*In re Worldwide Direct, Inc.*,
    334 B.R. 112 (Bankr. D. Del. 2005) ...............................................................95

*In re Yellowstone Mountain Club, LLC*,
    460 B.R. 254 (Bankr. D. Mont. 2011), *aff'd sub nom. Sumpter v. Yellowstone
    Mountain Club, LLC*, 584 F. App'x 676 (9th Cir. 2014) ......................................75

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bank D. Del. 1999) ..........................................................19, 20, 22

*In re Zosano Pharma Corp.*,
    Case No. 22-10506 (JKS) (Bankr. D. Del. Nov. 22, 2022) (Docket No. 294) .........31

**Constitutional Provisions, Statutes, & Rules**

U.S. Const. art. III ........................................................................................66, 110

11 U.S.C. § 363 ............................................................................................16, 74

11 U.S.C. § 365 ....................................................................................................32

11 U.S.C. § 503 ............................................................................................95, 96

11 U.S.C. § 507 ..............................................................................................*passim*

11 U.S.C. § 510 ............................................................................................12, 55

11 U.S.C. § 511 ....................................................................................................45

11 U.S.C. § 523 ............................................................................................76, 79

11 U.S.C. § 524 ....................................................................................................75

11 U.S.C. § 1107 ....................................................................................................4

11 U.S.C. § 1108 ....................................................................................................4

11 U.S.C. § 1109 ...................................................................................................110

11 U.S.C. § 1122 .................................................................................................*passim*

11 U.S.C. § 1123 .................................................................................................*passim*

11 U.S.C. § 1124 ...............................................................................................14, 15

11 U.S.C. § 1125 ...........................................................................................5, 33, 34

11 U.S.C. § 1126 ...........................................................................33, 34, 35, 42, 43

11 U.S.C. § 1129 .................................................................................................*passim*

11 U.S.C. § 1141 .................................................................................................*passim*

12 U.S.C. § 343 .....................................................................................................71

15 U.S.C. § 636 .....................................................................................................68

31 U.S.C. § 3717 ...................................................................................................52

31 U.S.C. § 3729, *et seq* ...............................................................................78, 79

Fed. R. Bankr. 1015 ...............................................................................................4

Fed. R. Bankr. 2002 ................................................................................7, 24, 69

Fed. R. Bankr. 2004 ...........................................................................................105

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ..........................................................................10, 33

S. Rep. No. 95-989 (1978) ..................................................................................10

Kabbage, Inc. d/b/a KServicing and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "**Debtors**"),[2] submit this Memorandum of Law and omnibus reply to the Confirmation Objections[3] (the "**Memorandum**") in support of the Debtors' request for confirmation of the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors*, filed contemporaneously herewith (as the same has been or may be amended, modified, supplemented, or restated, the "**Amended Plan**").

## PRELIMINARY STATEMENT

1.      The Debtors commenced these Chapter 11 Cases to implement the wind down of its loan servicing business—a business that had already been in wind down mode for nearly two years prior to the Commencement Date.  Faced with severely limited and rapidly-evaporating liquidity, no prospects for debtor-in-possession financing, and a small roster of employees already inundated with servicing and investigation requests, the Debtors' ability to chart their course and present the Amended Plan to the Court for confirmation within five (5) months of the Commencement Date is truly remarkable.  The Amended Plan provides for an orderly transfer of the Debtors' PPP Loan servicing obligations and final wind down of the Estates for the benefit of all stakeholders—an outcome that was anything but certain at the outset of these Chapter 11 Cases.

2.      The Debtors entered chapter 11 with a toggle-plan that contemplated the possibility of an "Unfunded Transaction" where, absent securing favorable outcomes from

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Plan (defined herein), the Disclosure Statement (each as defined herein), or First Day Declaration (defined herein), as applicable.

[3]     Objections to confirmation of the Amended Plan (collectively, the "**Confirmation Objections**") are listed on the Objections Chart attached hereto as **Exhibit A** or addressed herein.

1

preexisting disputes with Customers Bank ("**CB**") and discussions regarding the use of cash collateral with the Federal Reserve Bank of San Francisco (the "**Reserve Bank**"), the Debtors would be faced with no option but to reject their servicing contracts, potentially abandon the entire PPP Loan portfolio, and immediately liquidate any remaining assets. Through perseverance, and cooperation from certain of their key stakeholders, the Debtors have been able to service loans in the ordinary course and have made substantial progress in implementing an efficient and situation-appropriate plan to transition servicing obligations and the related loan files to each of the Reserve Bank, Cross River Bank ("**CRB**"), CB, and the Small Business Administration ("**SBA**"), as applicable.

3.     To be clear, the Debtors could have proposed a plan where the "Unfunded Transaction" was the only option. But rather than pursue a value destructive path that left PPP Loans unserviced, borrowers unsure of their future, and the Partner Banks and Reserve Bank scrambling to salvage what was left of their abandoned portfolios, the Debtors chose to do the right thing. Notwithstanding their severely limited financial and personnel resources, the Debtors have preserved the status quo to bridge their creditors to a value maximizing transition. CRB and CB are two of the primary beneficiaries of the Debtors' efforts—for the Partner Banks to now challenge the feasibility and good faith nature of the very plan that sets the stage for the orderly transition of their portfolios is disingenuous. They notably do not offer an alternative solution, other than blind insistence that the Debtors spend their limited resources in prioritizing and ensuring that each document, correspondence, and immaterial piece of data relating to their loans is transferred to them yesterday. Surely, the alternative of a chapter 7 liquidation or even an "Unfunded Transaction" (or similar transaction that provided for rejection of the service contracts) would not have benefited any of the Debtors' stakeholders, and especially the borrowers.

2

4.      Nevertheless, the Debtors small number of remaining employees have worked tirelessly to not only design a complicated transition process, but do so for *four* different parties—and all while servicing nearly 50,000 active loans, responding to government and Partner Bank inquiries on hundreds of thousands more, and operating within chapter 11.  Each of the servicing and the transition processes are independently complicated and costly (both in terms of third-party expenses and incurrence of time by the Debtors' employees and professionals) with each of the four counterparties requesting priority, a different set of requirements, a bespoke process, and the Company's full attention; yet the Debtors are doing all in tandem.  It is important to note that certain aspects of the transition are outside the Debtors' immediate control and requires the cooperation and active involvement from certain of the Debtors' vendors—namely American Express and Biz2Credit—which the Debtors are actively coordinating.  For the avoidance of doubt, as the Debtors' Amended Plan has contemplated from the beginning of these Chapter 11 Cases, the cost of transfer must be borne by the Reserve Bank, CRB, CB, and the SBA.

5.      Time is of the essence; confirmation and the subsequent implementation of the Amended Plan represent the final steps in the administration of these hard-fought Chapter 11 Cases.  With the Debtors' diminishing pool of resources, confirmation of the Amended Plan is the best way to stem chapter 11 related costs and to provide the Debtors with the necessary breathing room to focus efforts on transition and wind down.  A delay in confirmation will not benefit stakeholders and will only put at risk the Amended Plan that is specifically designed to make the most of less than favorable circumstances.  For the reasons set forth herein and in the supporting evidence and pleadings submitted in support of confirmation, the Amended Plan satisfies the requirements of section 1129 of the Bankruptcy Code, is in the best interests of creditors, and should be confirmed.

3

**PLEADINGS AND EVIDENCE IN SUPPORT OF CONFIRMATION**

6.      In further support of the Amended Plan, the Debtors submit the following

declarations:

a.   Declaration of Salim Kafiti, Deputy General Counsel of Kabbage, Inc. d/b/a
     KServicing, in Support of Confirmation of the Amended Plan (the "**Kafiti
     Declaration**");

b.   Declaration of Laquisha Milner, Chief Executive Officer of Kabbage, Inc. d/b/a
     KServicing, in Support of Confirmation of the Amended Plan (the "**Milner
     Declaration**");

c.   Declaration of Deborah Rieger-Paganis, a Managing Director at AlixPartners,
     LLP ("**AlixPartners**"), in Support of Confirmation of the Amended Plan (the
     "**Rieger-Paganis Declaration**");

d.   Declaration of Kim D. Steverson of Omni Agent Solutions, Inc. ("**Omni**")
     Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Amended
     Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and
     its Affiliated Debtors (the "**Voting Declaration**").

## FACTS

**A.      General Background**

7.       On October 3, 2022, (the "**Petition Date**") the Debtors each commenced

with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11

Cases**").  The Debtors are authorized to continue to operate their business as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory

committee of creditors has been appointed in these Chapter 11 Cases.

8.      Pursuant to Bankruptcy Rule 1015(b), the Chapter 11 Cases are being

jointly administered under the above captioned case.

9.      Additional information regarding the Debtors' businesses, capital structure,

and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the

4

*Declaration of Deborah Rieger-Paganis in Support of the Chapter 11 Petitions and First Day Pleadings* (Docket No. 13) (the "**First Day Declaration**").

10.     On the Petition Date, the Debtors filed their initial plan (the "**Initial Plan**"), which furthered the Debtors' goal of completing these Chapter 11 Cases as swiftly and efficiently as possible.  The Initial Plan was filed with a toggle feature that provided for a funded and unfunded scenario for the Chapter 11 Cases.  Due to the Debtors' successes in (i) negotiating a settlement agreement with one of their Partner Banks, CB, and (ii) negotiating the consensual use of the Reserve Bank cash collateral, the Debtors were able to pivot and proceed with the funded scenario.

### B.     Disclosure Statement and Solicitation of the Amended Plan

11.     On January 19, 2023, the Debtors filed the solicitation versions of the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 466) (the "**Solicitation Plan**") and *Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 467) (the "**Disclosure Statement**").

12.     Also, on January 19, 2023, the Court entered the *Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors' Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief* (the "**Disclosure Statement Order**") (Docket No. 470) that, among other things: (i) approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code; (ii) scheduled the hearing to consider confirmation of the Amended Plan for March 13, 2023 at 10:00 a.m. (prevailing Eastern Time)

5

(the "**Confirmation Hearing**"); (iii) established February 21, 2023 at 5:00 p.m. (prevailing Eastern Time) as the deadline to vote to accept or reject the Solicitation Plan;[4] (iv) approved the proposed procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Solicitation Plan, (b) voting to accept or reject the Solicitation Plan, and (c) filing objections to the Solicitation Plan; and (v) approved the form of ballots with voting instructions.

13.    On January 24, 2023, in accordance with the Disclosure Statement Order, the Debtors commenced solicitation of the Solicitation Plan by causing Omni, the Debtors' solicitation agent, to distribute copies of the Solicitation Plan, the Disclosure Statement Order, the Disclosure Statement, the *Notice of (I) Approval of the Disclosure Statement Of the Debtors (II) Establishment of Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approval of Special Electronic Noticing Procedures (VI) Approval of Debtors' Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief* (the "**Confirmation Hearing Notice**"), and the applicable ballot (collectively, the "**Solicitation Package**") to each creditor entitled to vote on the Solicitation Plan—holders of Claims in Class 3 (Reserve Bank Claims) and Class 4 (General Unsecured Claims). *Voting Decl.* ¶ 7. Pursuant to the Disclosure Statement Order, holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 5 (Intercompany Claims), Class 6 (Intercompany Interests), Class 7 (Subordinated Security Claims), and Class 8 (KServicing Equity Interests) were not provided with a Solicitation Package, as such holders were not entitled to vote on the Solicitation Plan, but

---

[4]    On February 10, 2023, the Voting Deadline was extended to February 28, 2023 at 5:00 p.m. (Prevailing Eastern Time).  Docket No. 523.

were provided with the Confirmation Hearing Notice. *Affidavits of Service* (Docket Nos. 518, 519, 520, 521, and 522).

14.     On January 27, 2023, the Debtors published the Confirmation Hearing Notice in *USA Today*. *Proof of Publication* (Docket No. 508). The Solicitation Plan and the Disclosure Statement were also made available at no cost on Omni's website for the Chapter 11 Cases at www.omniagentsolutions.com/KServicing.

15.     On February 21, 2023, the Debtors timely filed the *Notice of Filing of Supplement to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (the "**First Plan Supplement**") (Docket No. 561). The First Plan Supplement included (i) an assumption schedule for executory contracts and unexpired leases (the "**Assumption Schedule**"), (ii) a schedule of non-exclusive retained Causes of Action, (iii) a Wind Down Budget, (iv) a description of the selection process for the Wind Down Officer, and (v) a Wind Down Agreement. *See First Plan Supplement*, Exs. A–E. The First Plan Supplement was served on all parties entitled to receive service pursuant to Bankruptcy Rule 2002 and in accordance with the Disclosure Statement Order. *Affidavit of Service* (Docket No. 563); *Affidavit of Supplemental Service* (Docket No. 575). On March 6, 2023, the Debtors filed the *Notice of Filing of Second Supplement to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors* (Docket No. 611) (the "**Second Plan Supplement**"), which included (i) a revised assumption schedule containing certain additional contracts that the Debtors determined would be beneficial to assume (the "**Amended Assumption Schedule**"); and (ii) pursuant to section 8.6 of the Amended Plan, a rejection schedule ("**Rejection Schedule**") reflecting certain intellectual property contracts, licenses, royalties, or other similar agreements that the Debtors decided to reject. Further, on March 6, 2023, the Debtors filed the

7

*Notice of Rejection of Certain Agreements Pursuant to the Plan* (Docket No. 613), notifying

counterparties of the contracts listed in the Rejection Schedule that, pursuant to Section 8.1 of the

Amended Plan and the Confirmation Order, their contracts will be rejected on the Effective Date.

16.    Concurrently with this Memorandum, the Debtors are filing the

confirmation version of the plan (the "**Amended Plan**")—which changes are non-substantive or

have been agreed to by the appropriate counterparty—and the *Notice of Filing of Third Supplement*

*to the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its*

*Affiliated Debtors* (the "**Third Plan Supplement**," and together with the First Plan Supplement

and the Second Plan Supplement, the "**Plan Supplements**"), which provides notice of the

identification of the Wind Down Officer, the proposed compensation of the Wind Down Officer,

and any affiliations.

### C.    Voting Results

17.    The voting deadline was set for 5:00 p.m., prevailing Eastern Time, on

February 28, 2023, and the Debtors extended the voting deadline solely for the Reserve Bank by

agreement to March 2, 2023.  After the voting deadlines passed, and following a complete review

by Omni of all ballots received, Omni finalized the tabulation of timely and properly filed ballots.

*See Voting Decl.* ¶ 10.  As set forth in the Voting Declaration, and as summarized in the following

chart, holders of Claims in Class 3 voted to accept the Amended Plan, and holders of Claims in

Class 4 voted to reject the Amended Plain:

| Classes | Debtors | Accept | | Reject | | Outcome |
|---|---|---|---|---|---|---|
| | | PERCENT (Vote %) | AMOUNT (Amount %) | PERCENT (Vote %) | AMOUNT (Amount %) | |
| Class 3 (Reserve Bank Claims) | All Debtors | 100% | 100% | 0% | 0% | **Accept** |
| Class 4 (General Unsecured Claims) | Kabbage, Inc d/b/a KServicing[5] | 39.13% | 33.70% | 52.17% | 66.30% | **Reject** |

18. The Amended Plan represents the Debtors' extensive and successful efforts at creating a mechanism that will allow them to wind down their business while also maximizing value for all of their economic stakeholders. The Amended Plan is also the result of a collaborative process between the Debtors and all of their major key stakeholders, and was accepted by the Reserve Bank—the Debtors primary secured and priority stakeholder. The Debtors submit that the Amended Plan is in the best interests of the Debtors and all of their stakeholders, and that the Court should confirm the Plan.

## **ARGUMENT**

19. This Memorandum is divided into two (2) parts. Part I addresses the applicable requirements for confirmation of the Amended Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each such requirement and achievement of the objectives of chapter 11. Part II responds to certain Confirmation Objections.

---

[5] Pursuant to the Amended Plan, the Disclosure Statement Order, and section 1129(a)(8) of the Bankruptcy Code, Class 4 (General Unsecured Claims) with respect to the cases of Kabbage Canada Holdings, LLC, Kabbage Asset Securitization LLC, Kabbage Asset Funding 2017-A LLC, Kabbage Asset Funding 2019-A LLC, and Kabbage Diameter, LLC was deemed eliminated from the Amended Plan for purposes of voting to accept or reject the Amended Plan and for purposes of determining acceptance or rejection of the Amended Plan.

9

I.     **THE AMENDED PLAN SATISFIES SECTION 1129 OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED.**

20.     To achieve confirmation of the Amended Plan, the Debtors must demonstrate that the Amended Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence.  As the United States Court of Appeals for the Fifth Circuit stated in *Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd., II* (*In re Briscoe Enterprises, Ltd., II*):  "The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."  994 F.2d 1160, 1165 (5th Cir. 1993); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012), *aff'd*, 729 F.3d 311 (3d Cir. 2013), 729 F.3d 332 (3d Cir. 2013), 532 F. App'x 264 (3d Cir. 2013); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006)).  The Debtors will demonstrate, by a preponderance of the evidence, that all subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Amended Plan.

A.     **The Amended Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.**

21.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan, respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative history reflects that 'the applicable provisions of chapter 11 [includes sections] such as section 1122 and 1123, governing classification and contents of plan." (alteration in original) (quoting H.R. Rep. 95-595,

10

at 412)).  As discussed below, the Amended Plan fully complies with the requirements of the Bankruptcy Code.

B.    **The Amended Plan's Classification of Claims and Interests Complies with Section 1122 of the Bankruptcy Code.**

22.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  Under this section, a plan may provide for multiple classes of claims or interests as long as each claim or interest within a class is substantially similar to the other claims or interests in that class.  A plan proponent has significant flexibility in classifying claims and interests into multiple classes, provided there is a reasonable basis to do so and that all claims or interests within a given class are "substantially similar[.]"  *See In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014); *see also In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class."), *aff'd sub nom. Spencer ad hoc Equity Comm. v. Idearc, Inc.* (*In re Idearc, Inc.*), 662 F.3d 315 (5th Cir. 2011).  To determine whether claims are "substantially similar," courts have held that the proper focus is on "the legal character of the claim as it relates to the **assets of the debtor**."  *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150–51 (D.C. Cir. 1986) (citation omitted); *see also In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012) (concluding that the phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them"), *aff'd as modified*, No. 12-CV-1072 GMS, 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015) (citation omitted).

23.    Though claims classified together must be sufficiently similar, the Bankruptcy Code does not forbid "the presence of similar claims in different classes.  Although

11

the legislative history behind section 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–61 (3d Cir. 1987).  The Third Circuit has held that separate classification of similar claims is impermissible where the sole purpose of the classification scheme is to gerrymander votes and create an artificial impaired consenting class. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993).  On the other hand, similar claims may be placed in multiple classes "if there is a rational basis to do so." *In re Boy Scouts of Am. and Del. BSA, LLC*, 642 B.R. 504, 633 (Bankr. D. Del. 2022) (citing *John Hancock*, 987 F.2d at 158–59).

24.    In total, there are eight (8) Classes of Claims against and Interests in the Debtors, as follows:

    i.    <u>Class 1</u> includes Priority Non-Tax Claims.

    ii.    <u>Class 2</u> includes Other Secured Claims, which are Secured Claims, other than Reserve Bank Claims.

    iii.    <u>Class 3</u> includes Reserve Bank Claims, which are comprised of both Reserve Bank Priority Claims and Reserve Bank Secured Claims.

    iv.    <u>Class 4</u> includes General Unsecured Claims, which are Claims against the Debtors (other than Intercompany Claims and Subordinated Securities Claims) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Court.

    v.    <u>Class 5</u> includes Intercompany Claims, which are prepetition Claims against a Debtor held by another Debtor or non-Debtor Affiliate.

    vi.    <u>Class 6</u> includes Intercompany Interests, which are Interests in a Debtor other than KServicing Equity Interests.

    vii.    <u>Class 7</u> includes Subordinated Securities Claims, which are Claims subject to subordination under section 510(b) of the Bankruptcy Code.

12

viii.    <u>Class 8</u> includes KServicing Equity Interests, which are Interests in Kabbage, Inc. d/b/a/ KServicing.

25.    The classification scheme of the Amended Plan is rational and complies with the Bankruptcy Code.  Generally, the Amended Plan incorporates a "waterfall" classification and distribution scheme that strictly follows the statutory priorities prescribed by the Bankruptcy Code.  All Claims and Interests within each Class have the same or similar rights against the Debtors, except the Reserve Bank Claims (Class 3), which treatment has been extensively negotiated with the Reserve Bank—the only claimant in Class 3.  The Amended Plan provides for the separate classification of Claims against, and Interests in, each Debtor based upon the differences in legal nature and/or priority of such Claims and Interests.

26.    Further, the classification of claims in the Amended Plan poses no risk whatsoever of gerrymandering votes and manufacturing artificial support for the plan, the primary concern of courts that have heard challenges to classification schemes in chapter 11 plans.  *See*, *e.g.*, *In re KiOR, Inc.*, No. 14-12514 (CSS) (Bankr. D. Del. June 8, 2015) (June 8, 2015 Hr'g Tr. at 182:1–18) (Docket No. 644) ("you can't [classify similar claims in different classes] for some sort of illegitimate purpose, and of course, that's gerrymandering."); *In re Mallinckrodt PLC*, 639 B.R. 837, 857 (Bankr. D. Del. 2022) (holding that debtors cannot classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan).  Here, only Classes 3 (Reserve Bank Claims) and 4 (General Unsecured Claims) are entitled to vote on the Amended Plan—the other Classes are either presumed to accept (Classes 1 and 2), deemed to reject (Classes 5, 7, and 8), or presumed to accept or deemed to reject, depending on whether Intercompany Interests are reinstated (Class 6), the Amended Plan.  There is no dispute that the priority and characteristics of the Claims, as against the Debtors, in Classes 3 and 4 are distinct and separate from Claims in the other Classes.  No alternative and plausible classification scheme could

13

possibly manipulate even a single vote with respect to the Amended Plan, and no party has objected to the Amended Plan's classification scheme.

27.    Accordingly, the classification scheme of the Amended Plan complies with section 1122 of the Bankruptcy Code and should be approved.

**C.    The Amended Plan Complies with Section 1123(a) of the Bankruptcy Code.**

28.    Section 1123(a) of the Bankruptcy Code sets forth five applicable requirements that the proponent of a chapter 11 plan must satisfy. *See* 11 U.S.C. § 1123(a). The Amended Plan fully complies with each such requirement:

i.    The Amended Plan designates Classes of Claims and Classes of Interests as required by section 1123(a)(1). *Amended Plan* § 3.

ii.    The Amended Plan specifies each Class of Claims or Interests that is Unimpaired under the Amended Plan, as required by section 1123(a)(2). *Amended Plan* §§ 3, 4. Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 6 (Intercompany Interests) (only in the event that Intercompany Claims are reinstated) are unimpaired under the Amended Plan within the meaning of section 1124 of the Bankruptcy Code.

iii.    The Amended Plan specifies each Class of Claims or Interests that is Impaired under the Amended Plan, as required by section 1123(a)(3). *Amended Plan* §§ 3, 4. Class 3 (Reserve Bank Claims), Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), Class 6 (Intercompany Interests) (only in the event Intercompany Interests are not reinstated), Class 7 (Subordinated Securities Claims), and Class 8 (KServicing Equity Interests) are impaired under the Amended Plan within the meaning of section 1124 of the Bankruptcy Code.

iv.    The Amended Plan and the various documents set forth in the Plan Supplement provides adequate means for its implementation as required by section 1123(a)(5) through, among other things:  (a) identification of sources of consideration to be distributed under the Amended Plan, *Amended Plan* § 5.2; (b) provisions governing the Debtors' continued servicing of the PPP Loans until on or about the Effective Date, *Amended Plan* § 5.3(a); (c) provisions governing the Debtors' efforts to assist in the transfer of PPP Loan servicing obligations to third-party loan servicers, *Amended Plan* § 5.2(c)-(d), or otherwise continue servicing the PPP Loans on and after the Effective Date, *Amended Plan* § 5.2(e); (d) the funding of the GUC Pool and the Wind Down Estate, the transfer of assets to the Wind Down Estate, and the potential sale of Legacy Loans, *Amended Plan* § 5.3;

14

(e) provisions governing the appointment, authority, and duties of the Wind Down Officer, *Amended Plan* § 5.4, Wind Down Agreement; and (f) cancellation of Liens, *Amended Plan* § 5.4, other than Liens on the Pledged PPPLF Loans granted to or held in favor of the Reserve Bank, *Amended Plan* § 4.3(c)(iii). As explained below, the Confirmation Objection by CRB on the basis that the Plan fails to provide a means for implementation should be overruled. CRB's Confirmation Objection misunderstands section 1123(a)(5), conflates it with section 1129(a)(11), and altogether heavily discounts and disregards the various actions taken by the Debtors to date that demonstrate their commitment to exercise commercially reasonable efforts—which is the extent of the Debtors' obligations in the Amended Plan—to transfer servicing obligations with respect to CRB's PPP Loans.

v. Section 1123(a)(6) does not apply because the Amended Plan provides for the dissolution of the Debtors.

vi. The Amended Plan satisfies section 1123(a)(7) by specifying that Jeremiah Foster shall be appointed as Wind Down Officer, whose appointment and designation is consistent with the interests of creditors and equity security holders and with public policy. *Third Plan Supplement*, Ex. D. In addition, the Amended Plan gives certain creditors various consent and consultation rights with respect to the selection and decision making of the Wind Down Officer. *Amended Plan* §§ 1.125, 5.4. To the extent not resolved by the Confirmation Hearing, CRB's Confirmation Objection to the selection of the Wind Down Officer should be overruled. The Debtors conducted a robust process to select the Wind Down Officer, who is competent, experienced, and independent, and who will consult with certain creditors, including CRB, in exercising his duties.

vii. Section 1123(a)(8) does not apply to the Amended Plan because the Debtors are not individuals.

**D. The Amended Plan's Content is Permitted and Complies with Section 1123(b) of the Bankruptcy Code.**

**1. Plan Permissive Provisions**

29. Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Amended Plan is consistent with section 1123(b):

i. As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, the Amended Plan describes the treatment for Unimpaired Classes and Impaired Classes.

15

*Amended Plan* § 4.  Both Unimpaired and Impaired Classes are receiving appropriate treatment under the Amended Plan.

ii.   With respect to the Debtors' executory contracts or unexpired leases, the Amended Plan provides for rejection by the Debtors or the Wind Down Estates, as applicable, unless otherwise assumed—except that certain insurance policies and intellectual property agreements are assumed unless otherwise rejected—and all as contemplated by section 1123(b)(2) of the Bankruptcy Code.  In accordance with the Disclosure Statement Order, the Debtors filed and served, as Exhibit A to the First Plan Supplement, and as Exhibits A and F to the Second Plan Supplement, the Assumption Schedule, the Amended Assumption Schedule, and the Rejection Schedule, respectively.  *Amended Plan* § 8.

iii.  As permitted by section 1123(b)(3)(A) of the Bankruptcy Code and explained in greater detail below, the Amended Plan provides for a release of Claims and Causes of Action owned by the Debtors' estates.  *Amended Plan* § 10.5.

iv.   As permitted by section 1123(b)(3)(B) of the Bankruptcy Code, Section 5.8 of the Amended Plan preserves the Wind Down Estates' right to purse Causes of Action, including any actions specifically enumerated in the Non-Exclusive Schedule of Causes of Action included in the Exhibit B of the First Plan Supplement, other than any Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Amended Plan.

v.    The Debtors intend to seek separate approval to proceed with the transfer of the Pledged PPPLF Loans and the sale of the Legacy Loans in accordance with section 363 of the Bankruptcy Code, therefore, section 1123(b)(4) of the Bankruptcy Code is not applicable.

vi.   As permitted by section 1123(b)(5) of the Bankruptcy Code, the Amended Plan modifies the rights of holders of Claims and Interests in the Impaired Classes and leaves unaffected the rights of holders of Claims and Interests in the Unimpaired Classes.  *Amended Plan* § 4.

vii.  As permitted by section 1123(b)(6) of the Bankruptcy Code, which states that a plan "may include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]," the Amended Plan contains certain provisions for, among other things: (a) distributions to holders of Claims and Interests, *Amended Plan* § 6; (b) the resolution of Disputed Claims, *Amended Plan* § 6; (c) the allowance of certain Claims, *Amended Plan* § 4.3(b); (d) release, injunction, and exculpation provisions, as described in greater detail herein, *Amended Plan* § 10; and (e) provides that the Court will retain jurisdiction over all matters arising in and related to these Chapter 11 Cases, in each case consistent with the applicable

provisions of the Bankruptcy Code and the law of the United States Court of Appeals for the Third Circuit, *Amended Plan* § 11.1.

**2.      The Plan Releases, Injunction, and Exculpation Provisions Should Be Approved.**

30.      The Amended Plan provides for two (2) categories of releases:

i.      releases of certain claims relating to the Debtors or these Chapter 11 Cases held by the Debtors and each of their respective Affiliates, on behalf of them and their Estates, including any successor to the Debtors such as the Wind Down Estate, against the Released Parties and their Related Parties,[6] excluding any Claim or Cause of Action against any Debtor or Affiliate arising out of the American Express Transaction or the distribution of any consideration or value received on account of the American Express Transaction (the "**Debtor Releases**"), *see Amended Plan* § 10.5; and

ii.      releases of certain claims relating to the Debtors or these Chapter 11 Cases against the Released Parties by the Releasing Parties and their Related Parties,[7] excluding any right to enforce the Amended Plan or as otherwise

---

[6]      As defined in Section 1.102 of the Amended Plan, "**Released Parties**" means, "collectively, each of the following in their capacity as such: (a) the Debtors and the Debtors' Released Related Parties; (b) the Wind Down Estates and the Wind Down Estates' Released Related Parties; and (c) the Reserve Bank and its Released Related Parties."

As defined in Section 1.101 of the Amended Plan, "**Released Related Parties**" means, "with respect to any specific Released Party, each of such Released Party's: (a) successors and assigns, subsidiaries, affiliates, managed accounts or funds, (b) postpetition officers, postpetition directors, postpetition employees, postpetition agents, postpetition trustees, postpetition advisory board members, postpetition employment vendors and postpetition consultants, and Professionals and (c) heirs, executors, estates, servants and nominees; *provided*, that (x) the Former Officers and Directors of the Debtors, (y) current and former shareholders, and (z) American Express and its Affiliates shall not be 'Released Related Parties['];  *provided, further*, that a Professional of the Debtors shall only be a 'Released Related Party' to the extent such Professional was retained pursuant to an order of the Bankruptcy Court, including the Ordinary Course Professionals Order."

[7]      As defined in Section 1.104 of the Amended Plan, "**Releasing Parties**" means, "collectively, each of the following in their capacity as such: (a) the Reserve Bank; (b) all holders of Claims in Class 4 who vote to accept the Plan and do not affirmatively opt-out of the releases in accordance with the ballot to solicit acceptances of the Plan; (c) all holders of Claims that are unimpaired and deemed to accept or impaired and deemed to reject the Plan and who do not object to the releases in Section 10.6 of the Plan; (d) all holders of Interests in Class 6; (e) all holders of Claims that are eligible to vote to accept or reject the Plan that either vote to reject the Plan or abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt-out of the releases in accordance with the ballot to solicit acceptances or rejections of the Plan; (f) all holders of Claims not otherwise included in the foregoing clauses (a) – (e) who have notice and an opportunity to object to the releases and who do not object to the releases in Section 10.6 of the Plan; and (g) with respect to each of the foregoing Entities and Persons in clauses (a) – (f), all of their respective Releasing Related Parties solely with respect to claims that such Entities or Persons could have properly asserted on behalf of such Entities or Persons in clauses (a) – (f)."

As defined in Section 1.103 of the Amended Plan, "**Releasing Related Parties**" means, "with respect to any specific Person, each of such Person's: (a) predecessors, successors, assigns, subsidiaries, affiliates, managed

provided in the Plan or in the Confirmation Order (the "**Third Party Releases**").

        a.        **The Debtor Releases Are Appropriate and Should be Approved.**

31.    The Debtor Releases are narrowly tailored to serve their critical purposes without diminishing the estates and comply with the Bankruptcy Code and applicable law. The lack of objections to the Debtor Releases is compelling evidence that the Debtor Releases should be approved. All creditors received notice of the Debtor Releases and their right to object to such releases. This is a significant endorsement of the Debtor Releases that the Court should not overlook. In particular, it reinforces and affirms the Debtors' determination that the Debtor Releases are in the best interests of the Debtors' estates. Accordingly, for these reasons and for the reasons set forth below, the Debtor Releases should be approved.

                i.        *Applicable Legal Standard.*

32.    Pursuant to section 1123(b)(3)(A), a debtor may release claims under a chapter 11 plan "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010), *appeal dismissed*, Civil Nos. 10-369 (RBK), 10-385 (RBK), 2011 WL 3420441 (D. Del. Aug. 4, 2011); *see also In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (finding that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan").

---

accounts or funds, (b) officers, directors, principals, shareholders, employees, agents, trustees, advisory board members, consultants, representatives, management companies, fund advisors and Professionals and (c) heirs, executors, estates, servants and nominees."

33.     As an exercise of its business judgment, a debtor's decision to release claims against third parties under a plan is afforded deference.  *See, e.g.*, *Spansion*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors . . . ."); *Marvel Ent. Grp., Inc. v. MAFCO Holdings, Inc.* (*In re Marvel Ent. Grp., Inc.*), 273 B.R. 58, 78 (D. Del. 2002) ("[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.  Thus, under the business judgment rule, a board's decisions will not be disturbed if they can be attributed to any rational purpose and a court will not substitute its own notions of what is or is not sound business judgment.") (internal quotation marks and citations omitted). Additionally, under Third Circuit precedent, a release by a debtor is appropriate if, in the debtor's judgment, any claims of the estate being released are of only marginal viability.  *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (approving release by debtor of potential avoidance claims in connection with a prepetition leveraged recapitalization because the claims were "of only marginal viability" and not worth pursuing).

34.     Although the Debtors believe the appropriate standard to consider a debtor release is business judgment, in evaluating a debtor's release of claims, some courts in this district have also considered the following non-exclusive and disjunctive list of factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) (the "***Zenith* Factors**"), which were first articulated as the standard for a third party release:  (i) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (iv) an agreement by a substantial

19

majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (v) [a] provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. *Id.* at 110; *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 303–04 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements."); *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (stating that the *Zenith* Factors "simply provide guidance in the [c]ourt's determination of fairness"); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* Factors are not exclusive or conjunctive requirements). As a list of non-conjunctive factors, these factors provide a way of "weighing the equities of the particular case after a fact-specific review." *Indianapolis Downs*, 486 B.R. at 303.

35.     Here, because approval of the Debtor Releases was both a valid exercise of the Debtors' business judgment and appropriate under the *Zenith* Factors, the Debtor Releases should be approved.

> ii.     *Approval of the Debtor Releases Is a Valid Exercise of the Debtors' Business Judgment.*

36.     The Debtors' board of directors (the "**Board**") approved the Debtor Releases in conjunction with the various transactions contemplated in furtherance of the Amended Plan, and in close coordination with the Debtors' Professionals.

37.     The Debtor Releases: (a) are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code; (b) are in exchange for the good and valuable consideration provided by the Released Parties; (c) are in the best interests of the Debtors and all holders of Claims and Interests; and (d) were given and made after due notice and opportunity for a hearing, and were not objected to.

38.     In approving the Debtor Releases, the Board considered the narrow scope of the releases. *Kafiti Decl.* ¶¶ 18–19.  Notably, the Debtor Releases do not include the release of any Claim or Cause of Action against any Debtor or Affiliate arising out of the American Express Transaction, *Amended Plan* § 10.5; *Kafiti Decl.* ¶ 18.  The Debtors understand that any such claims related to the American Express Transaction may constitute a significant portion of potential recoveries to creditors.  *Kafiti Decl.* ¶ 18.  Also excepted from the Debtor Releases are any Causes of Action arising from an act or omission of a Released Party that is judicially determined in a Final Order to have constituted actual fraud, gross negligence, criminal misconduct or willful misconduct. *Amended Plan* § 10.5.

39.     Included in the Released Parties are the Debtors' Professionals, the Board, and management team ("**Management**"), whose contributions and efforts were, and continue to be, critical in prosecuting these Chapter 11 Cases and performing the duties required to confirm the Amended Plan and reach the Effective Date.  Also included as a Released Party is the Reserve Bank which, among other things, has agreed to accept treatment under the Amended Plan that is less than what the Bankruptcy Code requires.  Had the Debtor Releases not been provided, it was uncertain whether and to what extent the Reserve Bank would agree to other terms of the Amended Plan, which benefit all stakeholders, or whether it would vote in favor of the Amended Plan. *Kafiti Decl.* ¶ 21.  Acceptance of the Debtor Releases allowed the Debtors to move forward with the Amended Plan and avoid uncertain and value-destructive litigation with creditors, including the Reserve Bank, which would have unnecessarily delayed, if not thwarted entirely, the Debtors' ability to successfully consummate the Amended Plan and transfer the servicing obligations of the Pledged PPPLF Loans and other PPP Loans, resulting in disruption and delay for PPP borrowers and significantly increased economic exposure for the Reserve Bank and the Partner Banks. *Id.*

21

40.     Considered against this backdrop, it was well-within the business judgment of the Debtors to determine that the Debtor Releases are appropriate.

*iii.*     *The Debtor Releases are Appropriate under the Zenith Factors.*

41.     Application of the *Zenith* Factors here also demonstrates that the balance of equities weighs in favor of approving the Debtor Releases.  First, an identity of interests is shared between the Debtors and the Released Parties because each shares a common goal of having the Amended Plan confirmed and consummating the transactions in furtherance of the same.  *See, e.g.*, *Zenith*, 241 B.R. at 110 (finding an identity of interest with debtor where certain released parties who "were instrumental in formulating the Plan" shared an identity of interest with debtor "in seeing that the Plan succeed and the company reorganize"); *In re 710 Long Ridge Rd. Operating Co.*, No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder"); *In re Tribune*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (noting an identity of interest between debtors and settling parties where such parties "share[d] the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement"), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd in part sub nom. Law Debenture Tr. Co. of N.Y. v. Tribune Media Co.* (*In re Tribune Media Co.*), 587 B.R. 606 (D. Del. 2018), *aff'd sub nom. In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020).  Given the identities of interest between the Debtors and the Released Parties, approval of the Debtor Releases is necessary and appropriate.

42.     Additionally, an identity of interest may be established where the non-debtor is entitled to indemnification from the debtor.  Under applicable corporate documents, the Debtors may owe indemnification obligations to their current and former officers, directors,

22

agents, or employees to the fullest extent permitted by law in connection with defending against claims and causes of action arising out of the good-faith performance of their duties as directors and officers.  Further, Section 8.5 of the Amended Plan provides that any obligations of the Debtors pursuant to a contract, their corporate governance documents, or any other document to indemnify their officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for, or on behalf of, the Debtors, prior to the Effective, Date shall not be discharged, Impaired, or otherwise affected under the Amended Plan.  The release of claims against an officer or director is appropriate where such claims would be subject to indemnification by the Debtors.  *See In re Genco Shipping & Trading Ltd*., 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (quoting *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Off. Comm. of Equity Sec. Holders of Adelphia Commc'ns Corp. v. Off. Comm. of Unsecured Creditors of Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), 544 F.3d 420 (2d Cir. 2008) ("Some people and entities (*e.g.,* by employment contracts, corporate bylaws, or retention or loan agreements) must be indemnified by the estate with respect to their services. To the extent that the third party releases are congruent with the indemnification obligations, and the Debtors would be liable for any liability imposed on such persons, the third-party releases are acceptable.")).    Therefore, as to the Debtors' current directors, officers, and agents, the indemnification obligations provide a separate basis for finding an identity of interest.  For the avoidance of doubt, the Released Parties excludes the Debtors' Former Officers and Directors, who may have been involved with the American Express Transaction.

43.    Second, the Released Parties have provided significant value to the Debtors' Estates throughout these Chapter 11 Cases.  Courts have emphasized that an analysis of substantial

23

contribution must be approached on a case-by case basis.  *See Quad/Graphics, Inc. v. One2One Commc'ns, LLC* (*In re One2One Commc'ns, LLC*), No. 12-27311 (JLL), 2016 WL 3398580, at *8 (D.N.J. June 14, 2016) (surveying cases and noting that courts frequently reach different conclusions about whether similar types of contributions are substantial in the context of different cases); *see also Indianapolis Downs*, 486 B.R. at 303–04 (describing the release analysis in the Third Circuit as "fact-specific").

44.     Here, the small and narrow universe of Released Parties were instrumental in providing financial support to the Debtors and getting to the Confirmation Hearing, including by negotiating the Plan and maximizing value for creditors during the Chapter 11 Cases.  *Kafiti Decl.* ¶¶ 24–25.  The Debtors, the Board, and Management aided in negotiations related to the Amended Plan, Disclosure Statement, settlement with CB, resolution of other disputes, and other key tasks relevant to a transition into, and orderly wind down from, chapter 11, while also maintaining regular operational duties and stabilizing the Debtors' operations.  *Id.*  The Reserve Bank has worked to consensually make cash available during the Chapter 11 Cases, through the access to up to $8.5 million over a six month period pursuant to the *Order Under 11 U.S.C. §§ 105, 361, 362, and 363, and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lender* (Docket No. 225) (the "**Cash Collateral Order**"), which made it possible for the Debtors to pivot from the unfunded and expedited wind down toggle that was contemplated at the start of these Chapter 11 Cases, which would have been value destructive for all parties involved.  Moreover, the Reserve Bank waived its right to have the Reserve Bank Priority Claim paid in full on the Effective Date or, potentially at all, which was a significant concession.  *Kafiti Decl.* ¶ 24.  Due largely to the efforts and concessions of the Released Parties, the Debtors are better suited to transfer their PPP Loan

24

servicing obligations and wind down in an orderly fashion, to the benefit of all stakeholders.  *Id.*
Such an outcome in these Chapter 11 Cases avoids potentially costly and protracted litigation, let
alone the prospect of a chapter 7 liquidation due to otherwise lacking funds to continue pursuit of
chapter 11 options, and provides for the establishment of the Wind Down Estates and GUC Pool
for the benefit of multiple constituencies.  *Id.*  The Debtors' Professionals guided the Debtors
through these challenging times and were crucial in negotiating the terms of the Amended Plan
and settlements in furtherance of the Amended Plan.  *Id.* ¶ 25.  Finally, the Wind Down Estates
and Released Related Parties will ensure an orderly wind down of the Debtors after the Amended
Plan is confirmed and other conditions have been met.  *Id.*

45.     Third, the Debtor Releases are essential to the success of the Amended Plan.
*Id.* ¶ 24.  The Debtor Releases served as a crucial inducement for the Released Parties to participate
in consensual resolution of these Chapter 11 Cases and facilitate the Amended Plan and wind down
process of the Debtors.  *Id.*  Working consensually with Reserve Bank allowed the Debtors to
move forward with the Amended Plan and avoid lengthy, complex, and value-destructive
litigation.  *Id.*

46.     Fourth, not a single party has objected to the Debtor Releases.  When a
debtor's creditors (who are most affected by a debtor's release of claims or causes of action)
approve of a release provision, that can provide strong evidence that supports finding the release
to be appropriate.  *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 938 (Bankr. W.D. Mo.
1994) (stating that creditor approval of a release is "the single most important factor" to determine
whether a release is appropriate); *see also In re Key3Media Grp., Inc.*, 336 B.R. 87, 97–98 (Bankr.
D. Del. 2005) (granting a settlement of estate causes of action over a creditor's objection because,

25

among other things, a majority of creditors approved of the settlement), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006).

47.    Therefore, application of the *Zenith* Factors demonstrates that the balance of equities weighs in favor of approving the Debtor Releases.

> **b.    The Third Party Releases Are Consensual, Appropriate and Should Be Approved.**

48.    The Amended Plan contains certain Third Party Releases: releases by the Releasing Parties of the Released Parties for liability relating to the Debtors or these Chapter 11 Cases.  The Third Party Releases are essential components of the Amended Plan and should be approved.

49.    Section 10.6 of the Amended Plan contains releases by the following Releasing Parties against the Released Parties for liability relating to the Debtors and these Chapter 11 Cases:

   i.   Reserve Bank;

   ii.  all holders of Claims in Class 4 who vote to accept the Plan and do not affirmatively opt-out of the releases in accordance with the ballot to solicit acceptances of the Plan;

   iii. all holders of Claims that are Unimpaired and deemed to accept or Impaired and deemed to reject the Plan and who do not object to the releases in Section 10.6 of the Amended Plan;

   iv.  all holders of Interests in Class 6 (which consist only of Debtor entities);

   v.   all holders of Claims that are eligible to vote to accept or reject the Plan that either vote to reject the Plan or abstain from voting on the Plan for all Classes in which they are eligible to vote and who do not affirmatively opt-out of the releases in accordance with the ballot to solicit acceptances or rejections of the Plan;

   vi.  all holders of Claims not otherwise included in the foregoing clauses who have notice and an opportunity to object to the releases and who do not object to the releases in Section 10.6 of the Plan; and

26

vii.    with respect to each of the foregoing Entities and Persons, all of their respective Releasing Related Parties solely with respect to claims that such Entities or Persons could have properly asserted on behalf of such Entities or Persons.

50.    The Third Party Releases do ***not*** apply to creditors that have opted out of the Third Party Releases on the ballot or who have objected to the Third Party Releases. Accordingly, the Third Party Releases are limited in scope and only affect the stakeholders that have consented to such treatment by failing to opt out or object to such releases.

51.    Moreover, as to the Releasing Related Parties, the Amended Plan limits the release solely to those claims that the Releasing Parties—which each received actual notice and opportunity to either opt-out of or object to the Third Party Releases, *see Memorandum* ¶ 53— could have asserted on behalf of themselves. *See Amended Plan* § 1.104. Such related party releases of claims that are related to the principal, which has consented to the releases, are appropriately treated as consensual. *In re Gibson Brands, Inc.*, No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2, 2018) (Docket No. 872-1 Ex. B at 65:6–13) (noting that, although a related party's ***independent*** claims cannot be released on a consensual basis, such releases can be consensual as to claims related to the consenting, releasing principal).

52.    In this district, a release is generally consensual where, as here, the parties have consented to the release because they either voted to accept the plan (or were deemed to accept the Amended Plan as a result of their Unimpaired treatment) or were given notice of the opportunity to opt out of or object to the releases but did not do so. *See, e.g.*, *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. Oct. 16, 2020) (Docket No. 998 at 5) (confirming plan and finding that "[p]arties subject to the Third Party Release were duly informed of the Third Party Release and given the opportunity to opt out or object."); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. June 25, 2019) (Docket No. 920) (confirming a plan with third-party

27

releases that included as releasing parties all holders deemed to reject that did not file a timely

objection to confirmation of the plan with respect to the releases); *In re VER Techs. Holdco LLC*,

No. 18-10834 (KG) (Bankr. D. Del. July 26 2018) (Docket No. 647) (confirming a plan with third

party releases that required parties in interest to file formal objections to the plan to be excluded

as releasing parties and describing the releases as consensual); *In re Gibson Brands, Inc.*, No. 18-

11025 (CSS) (Bankr. D. Del. Oct. 2, 2018) (Docket No. 872-1 Ex. B at 62:25–63:2) (holding that

"[u]nimpaired creditors who didn't get a ballot but did get a notice are deemed to consent to the

releases unless they object"); *In re Paragon Offshore PLC*, No. 16-10386 (CSS) (Bankr. D. Del.

June 7, 2017) (Docket No. 1614, at 26–27) (confirming plan and finding releases therein to be

"consensual" because the releases were provided only by creditors who voted to accept the plan,

creditors who did not timely object to the plan, and creditors that either abstained or voted to reject

and did not opt out of the releases); *In re Insys Therapeutics, Inc.*, No.19-11292 (JTD) (Bankr. D.

Del. Jan. 16, 2020) (Docket No. 1115) (confirming plan and binding creditors who were deemed

to reject and did not opt out of third-party releases).[8]

53.    Here, in soliciting votes on the Amended Plan, the Debtors provided the

Releasing Parties affected by the releases with ample opportunity to opt-out of the releases:

- The Court-approved ballots sent to all holders of claims entitled to vote in Class 3 (Reserve Bank Claims) and Class 4 (General Unsecured Claims) stated in bold letters that certain releases were contained in the Amended Plan and Disclosure Statement, restated the text of the releases in their entirety, and provided instructions for how to opt out of such releases. The Ballots also indicated that Releasing Parties entitled to vote on the Plan who abstained from voting are deemed to have consented to the Third Party Release unless they affirmatively opted-out as explicitly stated on the Ballots.

---

[8]    *But see Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. Dec. 5, 2019) (Docket No. 868) (declining to approve opt out release for deemed to reject shareholders); *In re Emerge Energy Services LP,* No. 19-11563 (KBO), 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019); *Wash. Mut.*, 442 B.R. at 355.

- With respect to holders of Claims not entitled to vote on the Amended Plan (which did not receive a ballot), such holders received a Confirmation Hearing Notice that was approved by the Court. The Confirmation Hearing Notice clearly identified the releases and also stated that non-voting claimants would be deemed to have granted the Third Party Releases unless they timely objected to such releases by the deadline to object to confirmation of the Amended Plan.

*Voting Decl.* ¶ 7; *Affidavits of Service* (Docket Nos. 518, 519, 520, 521, and 522).

54.      Therefore, all affected parties received sufficient notice of the Third Party Releases and had ample time to raise any objections or opt-out. The Third Party Releases apply only to holders of Claims and Interests who, with full and proper notice, *consented* to such releases by electing not to opt out of the releases, for those holders of Claims that were entitled to vote on the Amended Plan, or by not objecting to the releases, for the non-voting holders of Claims.

55.      Accordingly, the Debtors submit that the Third Party Releases are consensual releases and otherwise appropriate under the circumstances and should be approved.

       **c.      The Exculpation Provision is Appropriate and Should be Approved.**

56.      Section 10.7 of the Amended Plan also contains a customary exculpation for certain Exculpated Parties[9] for claims arising out of or related to, among other things, the Debtors or these Chapter 11 Cases (the "**Exculpation Provision**"). In addition, the Exculpation Provision carves out acts or omissions that are determined by a Final Order to have constituted fraud or willful misconduct and applies only to fiduciaries of the Debtors' Estates.

57.      Each of the Exculpated Parties has participated in the Debtors' Chapter 11 Cases in good faith. Without the support of the Exculpated Parties, the Debtors would not have

---

[9]      As defined in Section 1.49 of the Amended Plan, "**Exculpated Parties**" means "collectively, each of the following in their capacity as such: (a) the Debtors and the Estates, (b) the Debtors' officers, directors, managers, and professionals, and (c) with respect to each of the foregoing, such Entities' successors and assigns; *provided* that the Former Officers and Directors shall not be 'Exculpated Parties.'"

29

been able to commence these Chapter 11 Cases, execute their chapter 11 strategy, and propose a confirmable plan.  The Exculpation Provision is necessary to protect fiduciaries of the Debtors' Estates that have made substantial contributions to the Chapter 11 Cases from collateral attacks related to good faith acts or omissions related to the Debtors' Chapter 11 Cases.

58.    Further, the scope of the Exculpation Provision is appropriately tailored to cover only acts or omissions occurring between the Commencement Date and the Effective Date and will not affect any liability that arises from fraud, gross negligence, or willful misconduct, as determined by Final Order.  Courts in this and other districts have approved similar exculpation provisions in chapter 11 plans of similarly-situated debtors.  *In re Superior Air Charter, LLC*, No. 20-11007 (CSS) (Bankr. D. Del. Sept. 4, 2020) (Docket No. 212); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 839); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) (Docket No. 238); *In re Model Reorg Acquisition, LLC*, No. 17-11794 (CSS) (Bankr. D. Del. Oct. 6, 2017) (Docket No. 222); *In re Maxus Energy Corp.*, No. 16-11501 (CSS) (Bankr. D. Del. May 22, 2017) (Docket No. 1460).

59.    Notably, none of the Debtors' creditors have objected to the scope of the Exculpation Provision.[10]  The Exculpation Provision is consistent with applicable law and should be approved.

> **d.    The Injunction Provision is Appropriate and Should be Approved.**

60.    Section 10.3 of the Amended Plan provides for a customary injunction (the "**Injunction Provision**") and merely seeks to assure that parties do not interfere with the consummation and implementation of the Amended Plan and all the transactions contemplated

---

[10]    With the exception of the U.S. Department of Justice in informal comments were subsequently resolved.

thereby.  The Injunction Provision implements the Debtor Releases, Third Party Releases, and the Exculpation Provision embodied in the Amended Plan by, among other things, permanently enjoining all persons and entities from commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions.  There is nothing unusual or inappropriate about the Injunction Provision.  Without the Injunction Provision, the carefully crafted and intensely negotiated structure and purpose of the Amended Plan and transactions in furtherance thereof could be contravened.

61.     The Injunction Provision is also necessary to the distribution scheme in the Amended Plan.  As discussed more below in response to the limited Confirmation Objection by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), this is not a case where the Debtors will become shell corporations after transferring all assets to a liquidating trust; here, the Debtors will continue to hold estate assets, for the benefit of creditors, after the Effective Date.  Accordingly, in order for assets to be distributed pursuant to the Amended Plan, the assets of the Debtors' estates must be protected against any attempt by a creditor to obtain more than its entitlement under the Amended Plan.  Such prohibited actions would, obviously, disrupt the proposed distribution structure incorporated in the Amended Plan.

62.     Indeed, this Court has routinely approved injunctions in chapter 11 liquidating plans.  *See In re Clarus Therapeutics Holdings, Inc.*, Case No. 22-10845 (MFW) (Bankr. D. Del. Feb. 9, 2023) (Docket No. 320); *In re Zosano Pharma Corp.*, Case No. 22-10506 (JKS) (Bankr. D. Del. Nov. 22, 2022) (Docket No. 294); *In re EYP Grp. Holdings, Inc.*, Case No. 22-10367 (MFW) (Bankr. D. Del. Nov. 1, 2022) (Docket No. 568); *In re Charming Charlie Holdings Inc.*, Case No. 19-11534 (MFW) (Bankr. D. Del. July 21, 2022) (Docket No. 1433); *In re Gulf Coast Health Care, LLC*, Case No. 21-11336 (KBO) (Bankr. D. Del. June 27, 2022)

31

(Docket No. 1424); *In re Cyber Litig. Inc.*, Case No. 20-12702 (CTG) (Bankr. D. Del. Mar. 11, 2022) (Docket No. 723); *In re TECT Aerospace Grp. Holdings, Inc.*, Case No. 21-10670 (KBO) (Bankr. D. Del. Mar. 8, 2022) (Docket No. 812); *In re Pipeline Foods, LLC*, Case No. 21-11002 (KBO) (Bankr. D. Del. Mar. 1, 2022) (Docket No. 921).

63.     Consistent with the weight of authority on this issue, the Injunction Provision should be approved, as it is critical to accomplishing the Amended Plan's overall objectives and is consistent with section 1123(b)(6) of the Bankruptcy Code.

**E.     Section 1123(c) of the Bankruptcy Code Does Not Apply to the Debtors.**

64.     The Debtors are not individuals in these chapter 11 cases.  Accordingly, section 1123(c) of the Bankruptcy Code is not applicable to the Amended Plan.

**F.     The Amended Plan Provides Cure Amounts in Satisfaction of Section 1123(d) of the Bankruptcy Code.**

65.     As required by section 1123(d) of the Bankruptcy Code, Section 8 of the Amended Plan provides for the cure of any default for each executory contract and unexpired lease to be assumed pursuant to the Amended Plan in accordance with section 365(b)(1) of the Bankruptcy Code, and for the amount necessary to cure any such default in accordance with the underlying executory contract and unexpired lease and applicable nonbankruptcy law.  In accordance with Section 8.2 of the Amended Plan and the Disclosure Statement Order, the Debtors filed the *Notice of Potential Assumption and Cure Amounts in Connection with Contracts and Leases* (Docket No. 566) and the *Supplemental Notice of Potential Assumption and Cure Amounts in Connection with Contracts and Leases* (Docket No. 612) (together, the "**Cure Notice**").  All executory contracts and unexpired leases that could potentially be assumed as of the Effective Date were listed on the Cure Notice with the applicable proposed cure costs or were otherwise addressed pursuant to the Plan.  Notice of the specified cure costs was provided to the applicable counterparty

32

to each of the executory contracts and unexpired leases to be assumed based on the Debtors' books and records. *Affidavits of Service* (Docket Nos. 573, 617, and 619). Parties wishing to object to the assumption of an executory contract and unexpired lease had ten (10) days from filing and service of the Cure Notice to object. Should such objection relate solely to the Cure Amount, the Debtors may assume the applicable contract or lease, provided that the Debtors or the Wind Down Estates, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party, unless a smaller amount is fixed by the Bankruptcy Court or otherwise agreed by the contract parties. If any objection could not be resolved by the parties, the Debtors adjourned their request to assume the executory contract or unexpired lease pending resolution.

66.     Based upon the foregoing, the Amended Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code. Therefore, the Amended Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### G.     The Amended Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.

67.     Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history of section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also PWS Holding Corp.*, 228 F.3d at 248; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992). As demonstrated below, the Debtors, as plan proponents, have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 regarding

33

disclosure and plan solicitation, respectively, as well as the Disclosure Statement Order regarding

disclosure and solicitation of the Amended Plan.

### 1.    Postpetition Disclosure and Solicitation

68.    Under section 1125 of the Bankruptcy Code, prior to the solicitation of votes

on a chapter 11 plan, a debtor must disclose information that is adequate to permit an informed

judgment by creditors and shareholders entitled to vote on the plan.  Pursuant to the Disclosure

Statement Order, the Court approved the Disclosure Statement pursuant to section 1125(b) of the

Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable

hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment

regarding whether to accept or reject the Amended Plan.  As set forth in the Voting Declaration,

each holder of a Claim in Class 3 (Reserve Bank Claims) and Class 4 (General Unsecured Claims)

was sent the Solicitation Package required by the Disclosure Statement Order.  *Voting Decl.* ¶ 7.

The Solicitation Package was transmitted in connection with the solicitation of votes to accept or

reject the Amended Plan in compliance with section 1125 of the Bankruptcy Code and the

Disclosure Statement Order.  The Debtors did not solicit acceptances of the Amended Plan from

any creditor prior to the approval and transmission of the Disclosure Statement.

### 2.    Acceptance or Rejection of the Amended Plan

69.    Section 1126 of the Bankruptcy Code specifies the requirements for

acceptance of the Amended Plan.  Under section 1126, only holders of Allowed Claims in Impaired

Classes of Claims and Interests that will receive or retain property under the Amended Plan on

account of such Claims or Interests may vote to accept or reject the Amended Plan.  In accordance

with Sections 3 and 4 of the Amended Plan and section 1126 of the Bankruptcy Code, the Debtors

solicited acceptances of the Amended Plan from the holders of Claims in Class 3 (Reserve Bank

Claims) and Class 4 (General Unsecured Claims), which are entitled to vote to accept or reject the

34

Amended Plan.  In accordance with Sections 3 and 4 of the Amended Plan, the Disclosure Statement Order, and sections 1126(f) and (g) of the Bankruptcy Code, the Debtors did not solicit acceptances from the holders of Claims or Interests in: (i) Class 1 (Priority Non-Tax Claims) or Class 2 (Other Secured Claims), as the holders of such Claims are not Impaired under the Amended Plan and thus are presumed to accept the Amended Plan; (ii) Class 5 (Intercompany Claims), Class 7 (Subordinated Securities Claims), and Class 8 (KServicing Equity Interests), as the holders of such Claims and Interests will not receive any distribution or property on account of their Claims and Interests, and thus are deemed to reject the Amended Plan; or (iii) Class 6 (Intercompany Interests),  as the Holders of such Interests either (a) are Unimpaired under the Plan and thus are conclusively presumed to have accepted the Plan, or (b) will receive no distribution or property on account of their Claims and Interests and thus are deemed not to have accepted the Amended Plan.

70.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by Impaired classes of claims entitled to vote to accept or reject a chapter 11 plan.  As evidenced by the Voting Declaration, the Amended Plan has been accepted by holders of Claims in Class 3 (Reserve Bank Claims) against each Debtor.  *Voting Decl.* ¶ 10.

**H.    The Amended Plan Has Been Proposed in Good Faith in Compliance with Section 1129(a)(3) of the Bankruptcy Code.**

71.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Third Circuit has defined the good faith standard as requiring a showing that "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."  *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998), *aff'd sub nom. Solow v. PPI Enters. (U.S.), Inc.* (*In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197 (3d Cir. 2003) (quoting *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984)); *see also*

35

*PWS Holding Corp.*, 228 F.3d at 242 ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (alteration in original) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)). "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). The court is given "considerable [judicial] discretion in finding good faith." *W.R. Grace*, 475 B.R. at 87 (internal quotation marks omitted) (quoting *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del 2001)).

72.     As discussed above, from the outset of these Chapter 11 Cases, the Debtors have undertaken substantial efforts to design a chapter 11 plan that maximizes value for the benefit of all stakeholders and have proceeded in a constructive and cooperative manner to achieve consensus whenever possible and avoid expending scarce resources on disputes and litigation.  No one—not even CB, who objects to the Amended Plan on the basis of "good faith"—can question the open and collaborative process undertaken by the Debtors to garner support for a consensual resolution of these Chapter 11 Cases, precisely in the manner prescribed by the Bankruptcy Code. Starting prior to the filing of these Chapter 11 Cases and continuing beyond the Confirmation Hearing, the Debtors have and will continue to seek to achieve settlements with all key stakeholders, including the United States Department of Justice (the "**Department of Justice**"), the SBA, and the Partner Banks.  Indeed, the overwhelming amount of time that the Debtors have spent engaging with CB on settlement of CB's failure to pay servicing fees, servicing of its PPP

36

Loan Portfolio, and coordinating transition of its loan servicing, demonstrates the Debtors' good faith throughout these Chapter 11 Cases, including in connection with proposing the Amended Plan.

73.     The Debtors initiated these Chapter 11 Cases with the goal of effectuating an orderly wind down with minimal disruption or damage to the PPP Loan borrowers.  But at that time, the Debtors' financial capacity to remain operating was in serious doubt.  Accordingly, the Debtors initially filed a toggle plan that provided a path forward regardless of whether the necessary liquidity could be secured.  When liquidity was secured, primarily from the Debtors' settlement with CB and availability of cash collateral, as stipulated by the Reserve Bank, the Debtors quickly pivoted in approach.  Now, the Debtors' goal is to transition the PPP Loans to alternate servicers by working closely with CB, CRB, the Reserve Bank, and the SBA and their respective alternate servicers.  The result will be that servicing of the PPP Loans continues, just off of the Debtors' platform.  To implement this approach, the Debtors have worked tirelessly with each stakeholder and their alternative servicers simultaneously for months.  Moreover, the Debtors' transition efforts are in addition to those required to maintain regular servicing for the benefit of the PPP Loan counterparties and borrowers.

74.     The Debtors will take the same approach with the Legacy Loans.  The Debtors have begun a transparent process for a value-maximizing sale transaction regarding the Legacy Loans.

75.     For the reasons stated herein, the Debtors submit that the Amended Plan unequivocally furthers the objectives and purposes of the Bankruptcy Code.

**I.     The Amended Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.**

76.     Section 1129(a)(4) of the Bankruptcy Code requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection

37

with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees which are made from estate assets be subject to review and approval as to their reasonableness by the court. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *accord Lisanti v. Lubektin* (*In re Lisanti Foods, Inc.*), 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd sub nom. In re Lisanti Foods, Inc.*, 241 F. App'x 1 (3d Cir. 2007).

77.     All payments for services provided to the Debtors during these Chapter 11 Cases must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.2 of the Amended Plan provides that all Fee Claims must be approved by the Court pursuant to final fee applications as reasonable.  Additionally, the Court will retain jurisdiction on and after the Effective Date to "hear and determine all proceedings, if any, to approve Fee Claims."  *Amended Plan* § 11.1(h).  Therefore, the Amended Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code with respect to the Debtors' Professionals.

**J.     The Debtors Have Complied With the Requirements of Section 1129(a)(5) of the Bankruptcy Code.**

78.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a successor to a debtor under the plan and that such appointment be consistent with the

38

interests of creditors and equity security holders and with public policy.  In addition, to the extent there are any insiders that will be retained or employed by the debtors, section 1129(a)(5)(B) of the Bankruptcy Code requires that the plan proponent disclose the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5)(B).

79.     Contemporaneously herewith, the Debtors have filed the Third Plan Supplement identifying the Wind Down Officer, who will serve as the sole officer, director, or manager, as applicable, of the Debtors.  *See Amended Plan* § 5.4(e).  As set forth in Exhibit D, the Wind Down Officer shall be Jeremiah Foster of Resolute Commercial Services.  Mr. Foster shall receive a monthly fee of $30,000/month for the duration of his service as the Wind Down Officer plus an administrative fee of 3% of total hourly billings per period.  To the extent Resolute is hired as the Wind Down Officer's financial advisors, rates range from $375 – $575 per hour.

80.     The Wind Down Officer is not an insider of, or in any way affiliated with, the Debtors.  In accordance with the Amended Plan, the Wind Down Officer was selected by the Debtors with the consent of the Reserve Bank and in consultation with the Department of Justice, the SBA, and CRB.  Thus, the appointment of the Wind Officer is consistent with the interests of creditors and equity security holders and with public policy.

81.     Accordingly, the Amended Plan complies with the requirements of section 1129(a)(5) of the Bankruptcy Code with respect to the disclosure of the identity and nature of any compensation of any insiders retained or employed by the Debtors.

**K.     Section 1129(a)(6) of the Bankruptcy Code Does Not Apply to the Amended Plan.**

82.     Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission that has jurisdiction over the debtor approve any rate change in the Amended Plan.

39

The Amended Plan does not provide for any rate changes by the Debtors, and, therefore, section 1129(a)(6) is inapplicable.

**L.      The Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor, in Satisfaction of Section 1129(a)(7) of the Bankruptcy Code.**

83.      Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity interest holders in the Debtors—commonly referred to as the "best interests" test.  The best interests test focuses on potential individual dissenting creditors rather than classes of claims.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).  It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

84.      Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."  *Adelphia*, 368 B.R. at 252.  The Court must evaluate the evidence presented, cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000); *W.R. Grace*, 475 B.R. at 142 ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record.  It is not necessary to itemize or specifically determine precise values during this estimation procedure.  Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7

40

liquidation").  As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of Impaired claims or equity interests.  *See Drexel Burnham Lambert Grp.*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests.").

85.     The best interests test does not apply to the holders of Claims in Class 1 (Priority Non-Tax Claims) or Class 2 (Other Secured Claims), because each holder in such Classes is Unimpaired under the Amended Plan, presumed to accept the Amended Plan, and will either receive payment in full, in Cash, be reinstated and paid in the ordinary course, or otherwise its legal, equitable, or contractual rights will not be altered.  Accordingly, the holders of such Claims or Interests are receiving or retaining under the Amended Plan the maximum recovery to which they are entitled and, as a result, could not receive greater recovery in a chapter 7.

86.     As set forth in the Liquidation Analysis and the Rieger-Paganis Declaration, the best interests test is satisfied as to <u>every holder</u> of a Claim in Classes 3, 4, 5 and 7, and an Interest in Classes 6 and 8.  *Rieger-Paganis Decl.* ¶ 10.  Specifically, the Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation.  *See* Disclosure Statement Ex. C (Liquidation Analysis).

87.     The Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals, (ii) a $0 value on all of the Debtors' causes of action due to the inherently uncertain nature of litigation, solely for purposes of the Liquidation Analysis, (iii) a conservative estimate of the sale price for the Debtors' remaining Legacy Loan portfolio, and (iv)

41

that the cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under the Amended Plan proposed by the Debtors. *Rieger-Paganis Decl.* ¶¶ 11.

88.     The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' Professionals with the Debtors' business and their relevant experience in chapter 11 proceedings. *Id.* ¶ 11. Accordingly, the Debtors' Liquidation Analysis should be afforded deference. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 261–62 (Bankr. S.D.N.Y. 2009) (discrediting creditors' objection to liquidation analysis because it consisted of a "largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize"). As discussed further below in response to certain Confirmation Objections, the Amended Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**M.     The Amended Plan Satisfies Section 1129(a)(8) of the Bankruptcy Code as to Each Class of Claims or Interests under the Amended Plan, or Satisfaction of Section 1129(a)(8) is Excused Under Section 1129(b) of the Bankruptcy Code.**

89.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of Impaired claims or interests accepts the plan, as follows: "With respect to each class of claims or interests – (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). As set forth above, holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), and Class 6 (Intercompany Interests) (only in the event that Intercompany Claims are reinstated) are not Impaired under the Amended Plan and are, therefore, conclusively presumed to have accepted the Amended Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, as evidenced by the Voting Declaration, the Amended Plan has been accepted by 100% of voting creditors in Class 3 (Reserve Bank Claims) entitled to vote

42

and who voted on the Amended Plan. *Voting Decl.* ¶ 10. Thus, as to such Class, the requirements

of section 1129(a)(8) of the Bankruptcy Code have been satisfied.

90.    Holders of Claims in Class 4 (General Unsecured Claims) against

KServicing voted to reject[11] the Amended Plan, and holders of Claims or Interests in Class 5

(Intercompany Claims), Class 6 (Intercompany Interests) (only in the event Intercompany Interests

are not reinstated), Class 7 (Subordinated Securities Claims), and Class 8 (KServicing Equity

Interests) are deemed to have rejected the Amended Plan pursuant to section 1126(g) of the

Bankruptcy Code. As to these Classes, the Amended Plan may be confirmed under the "cram

down" provisions of section 1129(b) of the Bankruptcy Code, as explained below.

### N.    The Amended Plan Satisfies Section 1129(a)(9) of the Bankruptcy Code by Providing for Payment in Full of All Allowed Priority Claims.

91.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding

allowed claims entitled to priority under section 507(a) of the Bankruptcy Code receive specified

Cash payments under the plan. Unless the holder of a particular claim agrees to different treatment

with respect to such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the

plan must provide. 11 U.S.C. § 1129(a)(9).

92.    The Amended Plan complies with section 1129(a)(9) of the Bankruptcy

Code. The Amended Plan provides that, unless a holder and the Debtors or the Wind Down Officer

agree to different treatment, the Debtors (or the Wind Down Officer, as the case may be) shall pay

to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such

---

[11]    There were no Class 4 Claims (General Unsecured Claims) against Debtors Kabbage Canada Holdings, LLC, Kabbage Asset Securitization LLC, Kabbage Asset Funding 2017-A LLC, Kabbage Asset Funding 2019-A LLC, and Kabbage Diameter, LLC, because all Claims in such Classes were disallowed for voting purposes either by stipulations or objections to such Claims. Accordingly, such Classes were eliminated from the Amended Plan for purposes of section 1129(a)(8) of the Bankruptcy Code. *See Amended Plan* § 3.5; Disclosure Statement Order, Ex. 2-B.

43

Claim on (a) the later of (i) the Effective Date and (ii) the first Business Day after the date that is

thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed

Administrative Expense Claim, or as soon thereafter as is reasonably practicable, or (b) on such

other date or terms as may be mutually agreed upon between the holder of such an Allowed

Administrative Expense Claim and the Debtors or the Wind Down Officer, as applicable; except,

Administrative Expense Claims incurred in the ordinary course of business shall be paid in the

ordinary course consistent with past practice and in accordance with the terms and subject to the

conditions of any orders or agreements governing, instruments evidencing, or other documents

establishing, such liabilities. *Amended Plan* § 2.1.

93.     Moreover, the Amended Plan provides that, unless a holder agrees to less

favorable treatment, holders of Allowed Priority Non-Tax Claims under section 507(a) of the

Bankruptcy Code (excluding Priority Tax Claims under section 507(a)(8), as described herein)

shall be paid in full in Cash or otherwise receive treatment consistent with the provisions of section

1129(a)(9) of the Bankruptcy Code. *Amended Plan* § 4.1.  The Amended Plan, therefore, satisfies

the requirements of section 1129(a)(9)(A) and (B).

94.     The Amended Plan also satisfies the requirements of section 1129(a)(9)(C)

of the Bankruptcy Code with respect to the treatment of Priority Tax Claims under section

507(a)(8) of the Bankruptcy Code.  Pursuant to Section 2.3 of the Amended Plan, unless holders

agree to less favorable treatment, holders of Allowed Priority Tax Claims (a) will be paid Cash in

an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of

(i) the Effective Date, to the extent such Claim is Allowed on the Effective Date, (ii) the first

business day after the date that is forty-five (45) calendar days after the date such Claim becomes

Allowed, and (iii) the date such Claim is due and payable in the ordinary course as such obligation

44

becomes due; or (b) will receive equal annual Cash payments in an aggregate amount equal to the amount of such Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date. *Amended Plan* § 2.3.

95. Moreover, the holders of the Allowed Reserve Bank Claims—which are entitled to priority (to the extent not secured) under section 507(a)(2) of the Bankruptcy Code but will not be paid Cash on the Effective Date equal to the amount of such claim—have agreed to such treatment, which was specifically negotiated with the Reserve Bank, and the Reserve Bank has voted to accept the Amended Plan.

96. Accordingly, the Amended Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**O.    The Amended Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code.**

97. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Amended Plan by at least one class of Impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). Here, Class 3 (Reserve Bank Claims) is Impaired and has voted to accept the Amended Plan as to each of the Debtors. *Voting Decl.* ¶ 10.

98. Accordingly, the Amended Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**P.    The Amended Plan Is Feasible and Satisfies Section 1129(a)(11) of the Bankruptcy Code.**

99. Section 1129(a)(11) of the Bankruptcy Code requires the Court find that the Amended Plan is feasible as a condition precedent to confirmation. Specifically, it requires that confirmation is not likely to be followed by liquidation or the need for further financial

45

reorganization of the debtor, unless such liquidation or reorganization is proposed in the plan.  11 U.S.C. § 1129(a)(11); *see In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012).  The feasibility test set forth in section 1129(a)(11) requires that the Court determine whether the Amended Plan may be implemented and has a reasonable likelihood of success. *See U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

100.    Section 1129(a)(11) "does not require a plan's success to be guaranteed." *Am. Cap. Equip.*, 688 F.3d at 156.  Rather, "[t]he key element of feasibility is whether there is a ***reasonable probability*** the provisions of the plan can be performed." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 142 (3d Cir. 2012) (emphasis added) (quoting *TCI 2 Holdings,* 428 B.R. at 148); *W.R. Grace*, 475 B.R. at 115 ("[T]he bankruptcy court need not require a guarantee of success, but rather only must find that the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success." (internal quotations omitted)).  The purpose of the feasibility test under section 1129(a)(11) is to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985); *In re Kreider*, No. 05-15018 (ELF), 2006 WL 3068834, at *5 (Bankr. E.D. Pa. Sept. 27, 2006).  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd sub nom. Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581 (6th Cir. 1986).

101.    Feasibility is a "low threshold." *Emerge Energy Servs.* 2019 WL 7634308, at *15; *Tribune*, 464 B.R. at 185 ("[I]t is clear that there is a relatively low threshold of proof

46

necessary to satisfy the feasibility requirement.") (quoting *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir.1993)).  Bankruptcy courts have found that feasibility is established where a debtor has "sufficient resources" to meet its obligations under a liquidating plan, including its "obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases." *In re Finlay Enters., Inc.*, No. 09-14873 JMP, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010).  Other courts have said that, to demonstrate that a liquidating plan is feasible, a plan proponent need only show that "the successful performance of [the plan's] terms is not dependent or contingent upon any future, uncertain event." *In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. Aug. 31, 2007) (holding that the creation of a creditor trust with *res* consisting of estate cash and the proceeds of any future successful litigation in addition to a fixed trust governance mechanism qualified as feasible).  For the reasons set forth below, the Amended Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

### 1.    The Debtors Have Sufficient Funds to Meet Their Obligations.

102.    As explained in the Rieger-Paganis Declaration, the Debtors have demonstrated that there is a reasonable probability that they will have sufficient funds to meet their post-Effective Date obligations to pay for the ongoing costs of administering and consummating the Amended Plan and ultimately closing these Chapter 11 Cases.  *See Rieger-Paganis Decl.* ¶¶ 16–18.

103.    Notwithstanding the anticipation of minimal ongoing obligations after the Effective Date, the Debtors, in consultation with their professionals, have spent significant time analyzing the breadth and amount of such obligations.  *Id.* ¶ 4.  In furtherance of this effort, the Debtors prepared a comprehensive Wind Down Budget, which was filed on February 21, 2023 with the First Plan Supplement.  Specifically, in light of the transfer scenario now contemplated in the Amended Plan, the Debtors and their professionals estimated, among other things: (a) operating

47

expenses, such as payroll and benefits, service provider fees, IT services, and other fees; (b) non-operating expenses, such as professional fees, taxes, insurance, U.S. Trustee fees, contract cures, Wind Down Officer related costs, and litigation advisor related costs; and (c) amounts for wind down and litigation reserves (the "**Transfer Budget**").    Based on the Debtors' analysis, the Debtors expect the Transfer Budget will be sufficient to satisfy the Debtors' limited post-Effective-Date obligations, including, but not limited to, the costs associated with the Wind Down Officer's administration and implementation of the Amended Plan.  *Id.* ¶¶ 18–22.

104.    AlixPartners has estimated the Debtors' anticipated sources and uses of funds following confirmation and occurrence of the Effective Date of the Plan.  *Id.*  The Debtors retained AlixPartners to assist with their financial and operational restructuring in April 2022, prior to initiating these cases.  *Id.* ¶ 1.  They have carefully reviewed filed Claims and assets, consulted with the Debtors' counsel and other advisors, and received input from the Debtors' Management and employees who have extensive knowledge of the Debtors' assets and liabilities.  *Id.* ¶ 4.  With an understanding that any unresolved priority or administrative expense claims would have to be paid or reserved for at the Effective Date, the Debtors and their advisors prioritized objecting to any such misclassified claims throughout these Chapter 11 Cases.  *Id.*  The claims reconciliation process to date revealed that a substantial number of priority, administrative expense, and secured claims filed against the Debtors were filed on account of borrowers of either PPP Loans or Legacy Loans that the Debtors service, which the Debtors determined did not have legal basis to assert priority or secured claims.    *Id.*  The Debtors filed a substantive claim objection to certain misclassified claims, which was granted on February 17, 2023.  *See Order Granting Debtors' First Omnibus Objection (Substantive) to Certain Misclassified Claims* (Docket No. 546).  The Debtors have since filed a notice of satisfaction to address the payment in full of several other claims.  *See*

48

*Debtors' First Notice of Claims Satisfied in Full* (Docket No. 560).  The claims reconciliation process is ongoing, and the Debtors continue to identify misclassified claims.  *Rieger-Paganis Decl.* ¶ 4–5.  The Debtors plan to object to these additional claims by filing a second substantive claim objection to certain misclassified claims.  *Id.*

105.    Based on their experience and deep understanding of the Debtors' business, the AlixPartners team was able to prepare estimates of the Debtors' anticipated sources and uses of funds that are reasonable and well-founded.

106.    As detailed in the Rieger-Paganis Declaration, the Debtors expect to have sufficient funds to administer and consummate the Amended Plan, including funding all payments required under the Amended Plan, and proceed with an orderly wind down of these chapter 11 cases.  *Id.* ¶ 18.  As of March 31, 2023—the Debtors' illustrative Effective Date—the value of the Debtors' remaining cash sources is estimated to be approximately $17.9 million, including $15.3 million in cash on hand.  *Id.* ¶ 20.  The estimated sources do not include proceeds from a potential sale of residual legacy loan assets.  These assets include:

| ESTIMATED SOURCES | AMOUNT |
|---|---|
| **Cash Balance Estimate as of March 31, 2023** | $15.3 million |
| **Restricted Cash** | $2.1 million |
| **Residual Legacy Loan Agency Collections** | $0.5 million |
| **TOTAL SOURCES:** | **$17.9 million** |

107.    The Debtors project wind down expenses of approximately $13.2 million, including remaining operating expenses, professional fees, other non-operating expenses (including taxes, insurance, U.S. Trustee fees, contract cures, Wind Down Officer related costs,

49

and litigation advisor and related costs), wind down contingency reserves, and litigation reserves. *Id.* ¶ 22.

| ESTIMATED USES OF FUNDS | AMOUNT |
|---|---|
| Operating Expenses | $2.8 million |
| Professional Fees | $2.6 million |
| Other Non-Operating Expenses | $4.3 million |
| Wind Down Reserves | $2.0 million |
| Litigation Reserves | $1.5 million |
| TOTAL USES: | $13.2 million |

108.    The Debtors estimate that the total amount of outstanding claims that need to be reserved for or paid on the Effective Date will be approximately $2.1 million, consisting of the following, *Id.* ¶ 23:

| ESTIMATED OUTSTANDING SAP CLAIMS | AMOUNT |
|---|---|
| Other Secured Claims | $2.1 million |
| Administrative Expense Claims | $15,000 |
| TOTAL CLAIMS: | $2.1 million |

109.    This leaves the Debtors' estates with approximately $2.6 million, which is more than sufficient to satisfy the Debtors' obligations under the Amended Plan and any other contingencies that may arise. *Id.* ¶ 24. As with any projections, there is a possibility that there may be some variance in the Wind Down Budget and expenses. *Id.* To account for the potential variance, the budget includes certain contingency reserve amounts. *Id.* The Debtors believe that the budget surplus could be as high as $6.1 million if the Debtors do not use the budgeted $3.5

50

million of Wind Down and Litigation Reserves, which will be sufficient to cover any additional unforeseen costs of winding down the Debtors' business.  *Id.*

> 2.      **The Amended Plan Provides for the Orderly Wind Down of the Estates.**

110.     The Amended Plan embodies a rational procedure for the orderly wind down of the Debtors' estates and the delivery of distributions to holders of Allowed Claims following the consummation of any sale transactions and settlements, which will be brought before the Court for approval, and the pursuit of the Estate Causes of Actions.  *Id.* ¶ 18.  The Amended Plan also provides for the establishment of the GUC Pool for the benefit of holders of Reserve Bank Claims and Allowed General Unsecured Claims in a waterfall distribution scheme, to which the Debtors will transfer all remaining Net Cash Proceeds on the Effective Date, and any residual amounts remaining prior to the conclusion of the Wind Down.  *Id.* On the Effective Date, the Debtors will transfer to the GUC Pool any remaining Net Cash Proceeds, which will then be supplemented prior to the conclusion of the Wind Down with all remaining Cash in the Wind Down Estates, minus amounts needed to fund the administration of the Wind Down Estates.  *Id.* Then, at the conclusion of the Wind Down, any residual amounts remaining in the Wind Down Estates (other than amounts on account of Post-Effective Date Servicing Costs, if applicable) shall also be contributed to the GUC Pool.  *Id.*

111.     The Amended Plan establishes and appoints a post-Effective Date fiduciary to carry out the Amended Plan and complete the Wind Down of the Debtors' estates.  *Id.* ¶ 25. The Amended Plan provides that the Wind Down Officer will among other things, complete the claims reconciliation process and monetize any remaining non-cash assets of the Debtors— including the prosecution of any Causes of Action.  *Id.*   The Amended Plan and the various administration agreements contained in the Plan Supplement outline the rights, duties, and powers of the Wind Down Officer, which were negotiated at arms' length by various stakeholders.  *See*

51

*First Plan Supplement* Ex. E: Wind Down Agreement.   Lastly, the Debtors have estimated recoveries for holders of Claims and have not promised a specific amount of payment; thus, all that is required of the Debtors to satisfy their obligations under the Amended Plan is to distribute Cash on hand in accordance with the provisions therein.   *Rieger-Paganis Decl.* ¶ 6–7.

112.    As discussed below, CRB and CB's Confirmation Objections on the basis of section 1129(a)(11) should be overruled.   Neither objector establishes a plausible basis for asserting an administrative claim, and even if they did, the threat of such administrative claims should not preclude confirmation.

113.    Accordingly, the Amended Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

**Q.    The Amended Plan Complies with Section 1129(a)(12) of the Bankruptcy Code.**

114.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan[.]"   11 U.S.C. § 1129(a)(12).   Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.   11 U.S.C. § 507(a)(2).   In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.1 of the Amended Plan provides for the payment of such fees, together with interest (if any) pursuant to section 3717 of title 31 of the United States Code on the Effective Date and thereafter as may be required.

**R.    Sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) are Not Applicable to the Amended Plan.**

115.    Section 1129(a)(13) of the Bankruptcy Code relates to existing retiree benefits.   The Debtors have no existing retiree benefits, and no party has objected on the basis of section 1129(a)(13).

52

116.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not subject to any domestic support obligations and, accordingly, section 1129(a)(14) is inapplicable.

117.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  None of the Debtors are "individuals," and, accordingly, section 1129(a)(15) is inapplicable.

118.    Section 1129(a)(16) of the Bankruptcy Code provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust must be made in accordance with any applicable provisions of nonbankruptcy law.  Each Debtor is a moneyed, business, or commercial corporation; accordingly, section 1129(a)(16) is inapplicable.

S.    **The Amended Plan Satisfies the "Cram Down" Requirements under Section 1129(b) of the Bankruptcy Code for Non-Accepting Classes.**

119.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all Impaired classes of claims.  Under section 1129(b) of the Bankruptcy Code, the court may "cram down" a plan over the dissenting vote of an Impaired class or classes of claims or interests as long as (i) the plan satisfies the requirements of section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8), and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

120.    Class 3 (Reserve Bank Claims) voted to accept the Amended Plan. Therefore, "cram down" is relevant to Class 4 (General Unsecured Claims), which was entitled to vote, and those Classes of Claims and Interests that are deemed to have rejected the Amended Plan (*i.e.*, Class 5 (Intercompany Claims), Class 6 (Intercompany Interests) (only in the event

53

Intercompany Interests are not reinstated), Class 7 (Subordinated Securities Claims), and Class 8 (KServicing Equity Interests)).  The Amended Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

      1.      **The Amended Plan Does Not Discriminate Unfairly.**

      121.     Section 1129(b)(1) does not prohibit discrimination between classes. Rather, it prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.  *See Armstrong World Indus.*, 348 B.R. at 121 (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination" (quoting *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd sub nom. Stonington Partners, Inc. v. Official Comm. of Unsecured Creditors* (*In re Lernout & Hauspie Speech Prods., N.V.*), 308 B.R. 672 (D. Del. 2004)); *accord In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1998); *Coastal Broad. Sys.*, 570 F. App'x at 193 ("[G]rouping of similar claims in different classes is permitted so long as the classification is reasonable.") (internal quotation marks omitted).  As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g.*, *Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and treatment was rational where members of each class "possess[ed] different legal

rights"), *aff'd sub nom. Lambert Brussels Assocs., L.P. v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 140 B.R. 347 (S.D.N.Y. 1992).

122.    The Amended Plan does not discriminate unfairly with respect to Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), Class 6 (Intercompany Interests) (only in the event Intercompany Interests are not reinstated), Class 7 (Subordinated Securities Claims), or Class 8 (KServicing Equity Interests).  Holders of Claims and Interests in each such Class are properly classified separately because they hold different legal rights as set forth in the following table:

| Class | Rationale For Separate Classification |
|---|---|
| Class 4 (General Unsecured Claims) | ▪ Composed of Claims against the Debtors (other than Intercompany Claims and Subordinated Securities Claims) that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Court |
| Class 5 (Intercompany Claims) | ▪ Composed of Claims against a Debtor held by another Debtor or non-Debtor Affiliate. |
| Class 6 (Intercompany Interests) | ▪ Composed of holders of Interests in the Debtors, other than KServicing Equity Interests. |
| Class 7 (Subordinated Securities Claims) | ▪ Composed of holders of Claims subject to subordination under Section 510(b) of the Bankruptcy Code. |
| Class 8 (KServicing Equity Interests) | ▪ Composed of holders of Interests in Kabbage, Inc. (d/b/a/ KServicing). |

123.    As demonstrated herein, the Debtors have sound bases for classifying Claims or Interests in Classes 4, 5, 6, 7, and 8 differently.  Accordingly, the Amended Plan does not "discriminate unfairly" with respect to such Impaired Classes of Claims or Interests.

### 2.    The Amended Plan Is Fair and Equitable.

124.    To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either: (i) that each holder of the nonaccepting class will receive or retain on account of such claim property of a value equal to the

55

allowed amount of such claim; or (ii) that a holder of any claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(B).

125.    To be "fair and equitable" as to holders of interests in a debtor, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either: (i) that each holder of an equity interest in a nonaccepting class will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) that a holder of any interest that is junior to the nonaccepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(C).

126.    The "fair and equitable" rule is satisfied as to the holders of Claims in Classes 4, 5 and 7, and Interests in Classes 6 and 8, as no Claims or Interests junior to each such Class, as applicable, will receive or retain any property under the Amended Plan on account of such junior Claims or Interests. *See, e.g.*, *In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 179 (Bankr. D. Del. 2010) (finding a plan was fair and equitable in its treatment of equity interests under section 1129(b)(2)(C) of the Bankruptcy Code because there was no class junior to the equity class); *Finlay Enters.*, 2010 WL 6580628, at *7 (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan).

127.    The Amended Plan also satisfies the "unwritten corollary to the absolute priority rule . . . that a senior class cannot receive more than full compensation for its claims." *In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017). No Class of Claims that is senior to Class 4 will receive more than a full recovery under the Amended Plan. Section 4.3(c)(iii) of

56

the Amended Plan states that the Reserve Bank shall not receive Cash in excess of the Reserve Bank Claims.

128.    Accordingly, the Amended Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code as to Class 5 (Intercompany Claims), Class 6 (Intercompany Interests) (only in the event Intercompany Interests are not reinstated), Class 7 (Subordinated Securities Claims), and Class 8 (KServicing Equity Interests), and may be confirmed despite the rejection by such Classes.

**T.    The Amended Plan Satisfies Section 1129(c) of the Bankruptcy Code.**

129.    Section 1129(c) of the Bankruptcy Code only applies if more than one plan has been filed.  The Amended Plan is the only operative plan currently on file in these cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.  The Amended Plan Satisfies Section 1129(d) of the Bankruptcy Code.

130.    The principal purpose of the Amended Plan is not the avoidance of taxes or the avoidance of Section 5 of the Securities Act, and no party has objected on any such grounds. Accordingly, the Amended Plan satisfies section 1129(d) of the Bankruptcy Code.

**II.    THE OBJECTIONS TO THE Amended PLAN SHOULD BE OVERRULED AND THE Amended PLAN CONFIRMED.**

**A.    Objection by the Carr Plaintiffs Should be Overruled.**

131.    As a preliminary matter, the plaintiffs in the putative class action filed as *Carr et al., v. Kabbage, Inc.*, Case No. 22-cv-01249 (N.D. Ga. Mar. 30, 2022) (the "**Carr Action**") and (the "**Carr Plaintiffs**") do not have standing to challenge the treatment or recoveries of general unsecured creditors on behalf of the putative class members in these Chapter 11 Cases.  There has been no class certified in the Carr Action and no motion has been granted in this Court to allow the named plaintiffs in the Carr Action to act as a class in these cases.  The Carr Plaintiffs thus

RLF1 28712465v.1

lack standing to challenge the Amended Plan, on any basis, on behalf of the putative class members. *See Mallinckrodt*, 639 B.R. at 860–61 (finding that a plan objector did not have standing to object on behalf of all putative class members due to failure to seek class certification). Instead, the Carr Plaintiffs' Confirmation Objection should be properly treated as being filed on behalf of only the named plaintiffs in the Carr Action.

> a.    **Debtors Have Provided an Adequate Liquidation Analysis.**

132.    The Carr plaintiffs object to confirmation of the Amended Plan on the basis that the Debtors failed to file a liquidation analysis in a timely manner prior to the Plan Objection Deadline. That simply is not true. The Debtors filed their initial liquidation analysis on December 30, 2022 as Exhibit C to the Amended Disclosure Statement (Docket No. 396), and on January 17, 2023 filed a revised liquidation analysis with the Amended Disclosure Statement (Docket No. 454) (together, the "**Liquidation Analysis**"). The Carr Plaintiffs received due and proper notice of both filings.[12] Notwithstanding that the Liquidation Analysis was filed in advance of the deadline to object to approval of the Disclosure Statement (including the Liquidation Analysis), the Carr

---

[12]    *See Affidavit/Declaration of Service for Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 395], Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 396], Notice of Blacklines of (I) Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors and (II) Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 397], and Notice of Filing Revised Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief [Docket No. 398]* (Docket No. 404); *Affidavit/Declaration of Service for Notice of Filing of Further Revised Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief [Docket No. 452], Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 453], Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 454], and Notice of Blacklines of (I) Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors and (II) Amended Disclosure Statement for the Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and its Affiliated Debtors [Docket No. 455]* (Docket No. 461).

58

Plaintiffs did not file an objection or submit any informal comments to the Debtors, including as to the adequacy of the information in the Disclosure Statement or the underlying assumptions and methods used to prepare the Liquidation Analysis, as they now seem to do in their Confirmation Objection.

133.    On January 19, 2023, the Court approved the Amended Disclosure Statement, including the adequacy of the information provided in the Debtors' Liquidation Analysis. *See Order (I) Approving the Disclosure Statement of the Debtors, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling the Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, (V) Approving Special Electronic Noticing Procedures, (VI) Approving Debtors Proposed Cure Procedures for Unexpired Leases and Executory Contracts, and (VII) Granting Related Relief* at 2, Jan. 19, 2023 (Docket No. 470).  As such, the Carr Plaintiffs' Confirmation Objection is both inaccurate and untimely, and should be overruled.

### b.    Amended Plan is in Best Interests of All Creditors of, and Equity Interest Holders in, Each Debtor.

134.    Although unclear from their Confirmation Objection, to the extent the Carr Plaintiffs call into question the validity of the information included in and used to prepare the Debtors' Liquidation Analysis, the Debtors contend that such challenge is untimely (because it goes to the adequacy of the Disclosure Statement, which has already been approved) and baseless and, therefore, should be overruled.  Section 1129(a)(7)(A) requires that each holder of a claim in an impaired class has either accepted the plan or will receive not less than what it would receive in a chapter 7 liquidation.[13]    The Debtors have complied with the requirements of section

---

[13]    The Carr Plaintiffs seem to confuse the requirements of 1129(a)(7).  In their Confirmation Objection, the Carr Plaintiffs initially and correctly identify the relevant standard for compliance with the "best interests" test provided under section 1129(a)(7).  *Carr Plaintiffs Confirmation Objection* ¶ 26.  However, in another section

1129(a)(7) because the Liquidation Analysis shows that the Carr Plaintiffs, as holders of Claims in Class 4 (General Unsecured Claims), are projected to receive no recovery in a hypothetical liquidation under chapter 7 and have the potential to receive some recovery under the Amended Plan. As stated in the Rieger-Paganis Declaration and supported by the underlying facts and assumptions discussed therein, holders of Claims in Class 4 (General Unsecured Claims) would receive or retain property under the Amended Plan having a present value, as of the Effective Date, *not less than* the amount holders of Claims in Class 4 (including the Carr Plaintiffs) would receive or retain on account of such claims if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. *Rieger-Paganis Decl.* ¶ 13. As such, the Debtors have satisfied the "best interests" test.

135. The Carr Plaintiffs' Confirmation Objection convolutes the requirements of section 1129(a)(7) by noting that the "best interests" test applies "to individual dissenters rather than classes of creditors," citing to *Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 441 n.13 (1999). The Carr Plaintiffs incorrectly suggest that *Bank of America* would require the Debtors to itemize each holder's claims and individually demonstrate that such claims would recover at least as much in a hypothetical chapter 7 as under the Amended Plan in order to satisfy the "best interests" test. *See Carr Plaintiffs Confirmation Objection* ¶ 30. That is not the standard set forth in section 1129(a)(7). The quotation cited from *Bank of America* stands for the proposition that Debtors must account for the interests of *individual creditors within an impaired class*, even if the impaired class votes to accept

---

of their Confirmation Objection, the Carr Plaintiffs state that the Debtors have "failed to show how creditors are better under the Plan" in the context of a section 1129(a)(7) analysis. *Carr Plaintiffs Confirmation Objection* ¶ 42. For the avoidance of doubt, the Debtors clarify that section 1129(a)(7) does not require a showing that the Carr Plaintiffs are "better" under the Amended Plan, but instead is limited to a showing by the Debtors that the Carr Plaintiffs would recover on account of their Claims under the Amended Plan in an amount not less than as compared to a hypothetical chapter 7 liquidation. 11 U.S.C. § 1129(a)(7).

the proposed plan, in order to satisfy the "best interests" test—but the "best interests" test does not require the Debtors to demonstrate relative projected recoveries for claimholders on an individual basis. *See Bank of Am. Nat'l Tr.*, 526 U.S. at 441 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, ***even if the class as a whole votes to accept the plan***.") (emphasis added); *In re Quigley Co.*, 437 B.R. 102, 144 (Bankr. S.D.N.Y. 2010) ("§ 1129(a)(7) is designed to protect individual dissenting members of an impaired, accepting class, establishing the minimum that they must receive or retain under the plan.") (citing *Kane*, 843 F.2d at 649). Here, there is no need to protect the individual dissenting members of an impaired accepting class; Class 4 has voted to reject the Amended Plan, and the concerns articulated in *Bank of America* are not present here. *Voting Decl.* ¶ 10. Nevertheless, the Debtors have successfully satisfied the "best interests" test by demonstrating that all holders of Claims in Class 4, including the Carr Plaintiffs, would recover at least as much under the Amended Plan as in chapter 7. *See Amended Disclosure Statement* Ex. C (Liquidation Analysis); *Rieger-Paganis Decl.* ¶ 13.

136.    The Liquidation Analysis distributes estimated total value available for distribution to holders of Claims against, and Interests in, the Debtors in accordance with the Bankruptcy Code's priority scheme, to determine recoveries to claimants under a hypothetical chapter 7 liquidation. In addition to costs associated with administering a chapter 7 liquidation, the Liquidation Analysis also demonstrates that there would be more General Unsecured Claims in a hypothetical chapter 7 liquidation as compared to the Debtors' Chapter 11 Cases. *See Amended Disclosure Statement* Ex. C (Liquidation Analysis). Therefore, the Carr Plaintiffs' *pro rata* recovery on their Claims against the Debtors would be further diminished in a hypothetical chapter 7 liquidation, even in the event there are sufficient liquidation proceeds to satisfy senior

61

Claims and the General Unsecured Claims are able to recover on account of their Claims. *Rieger-Paganis Decl.* ¶ 13.

137.    Ultimately, recoveries for holders of Claims in Class 4 in a hypothetical chapter 7 liquidation are projected to be $0.  Under the Amended Plan, the Carr Plaintiffs, as holders of Claims in Class 4, recover only after Classes with senior priority are paid in full.  As demonstrated in the Liquidation Analysis, recoveries for holders of Claims in Class 4 are projected to be $0, given the amount of Claims senior in priority and the limited distributable funds, among other assumptions and estimations, including that there will be no recovery on account of retained Causes of Action, which cannot be estimated with any degree of certainty.  *See Amended Disclosure Statement* Ex. C (Liquidation Analysis); *Rieger-Paganis Decl.* ¶ 10.  Although the projected recoveries are $0, treatment under the Amended Plan is relatively more favorable for creditors such as the Carr Plaintiffs, as the Amended Plan does not carry additional chapter 7-specific costs, which would potentially diminish General Unsecured Creditors' recoveries.  *See Amended Disclosure Statement* Ex. C (Liquidation Analysis) § 2 (noting that the analysis excludes "unpaid chapter 11 administrative expenses, and certain executory contract and unexpired lease rejection Claims," which "could be significant and…may be administrative expenses while others may be entitled to priority in payment over General Unsecured Claims.").  And given that the Reserve Bank, as the senior secured and priority creditor, is supporting the Amended Plan, there is a consensual path to using cash (which would otherwise be Reserve Bank's cash collateral in a hypothetical chapter 7) to administer the Wind Down Estates in an orderly fashion and pursue the Causes of Action, distributions of which will fund the GUC Pool.  Put simply, Reserve Bank's consent in this regard provides the Wind Down Officer the ability to pursue Causes of Action, that may otherwise not be pursued in a chapter 7 due to the various fees associated therewith, for benefit

62

of all creditors.  This aspect of the Amended Plan is especially beneficial for the Carr Plaintiffs, as it creates the opportunity and potential for holders of Class 4 General Unsecured Claims to receive more on account of their Claims than the currently projected $0, and in fact, do better than in a hypothetical chapter 7 liquidation.

138.    The Carr Plaintiffs' misguided suggestion that the Liquidation Analysis is conclusory in nature just because it contains qualifiers would inherently disqualify all liquidation analyses, such that all are based on forward-looking assumptions.  Indeed, it is customary for a debtor's liquidation analysis to account for a degree of estimation and prediction, and such estimations and predictions do not render the liquidation analysis inadequate.  *See W.R. Grace*, 475 B.R. at 142 ("[I]t is important to note that the valuation of claims in a hypothetical Chapter 7 liquidation is 'not an exact science' because the process entails a considerable degree of speculation.") (citing *Affiliated Foods*, 249 B.R. at 788).  Here, the Liquidation Analysis is sound, reasonable, and incorporates widely accepted and reasonable assumptions and estimates regarding the Debtors' assets and claims, including, among other things, additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees, the delay and erosion of value of the Debtors' assets due to the need of the newly appointed chapter 7 trustee, and the reduced recoveries caused by an accelerated sale or disposition of the Debtors' assets by the chapter 7 trustee.  *See Carr Plaintiffs Confirmation Objection* ¶ 32; *Amended Disclosure Statement* Ex. C (Liquidation Analysis); *Rieger-Paganis Decl.* ¶ 11; *see also Adelphia*, 368 B.R. at 252–58 (considering, among other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would adopt settlements embodied in plan).

63

139.    The Liquidation Analysis, including the estimates regarding the Debtors'

assets and liabilities that are incorporated therein, were based upon the knowledge and familiarity

of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11

proceedings.  As such, the Debtors' Liquidation Analysis should be afforded deference.  *See*

*Charter Commc'ns*, 419 B.R. at 261–63 (finding that Debtors' liquidation analysis "appear[ed] to

have relied on reasonable assumptions.").

140.    The Debtors' Liquidation Analysis shows that holders of Claims in Class 4

(including the Carr Plaintiffs) would receive or retain property under the Amended Plan having a

present value *not less than* the amount holders of Claims in Class 4 would receive or retain on

account of such Claims if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Accordingly, the Debtors have complied with the requirements of section 1129(a)(7).

>    i.    *Debtors Have Properly Accounted for Carr Plaintiffs'*
>        *Released Claims.*

141.    In their Confirmation Objection, the Carr Plaintiffs argue that the "Third-

Party Releases [provided under the Amended Plan] are not accounted for in any liquidation

analysis," without going on to explain how they propose the releases be "accounted for" or

identifying which claims subject to those releases are the basis for their objection.  *Carr Plaintiffs*

*Confirmation Objection* ¶ 36.  The Carr Plaintiffs could either be taking issue with the purported

lack of value assigned to their claims against the Debtors, or to some hypothetical claims they may

have against non-Debtor Released Parties.

142.    As an initial matter, unlike in *Washington Mutual*—the case cited by the

Carr Plaintiffs in support of their Confirmation Objection—the Carr Plaintiffs, as objectors to

confirmation, have only asserted Claims (i.e., their class action suit) against the *Debtors*

64

*themselves*[14] as opposed to a non-Debtor third-party contemplated to be released under the Amended Plan.[15]  To date, the Debtors are unaware of, nor have the Carr Plaintiffs asserted, any claims against non-Debtor Released Parties nor are any such claims identified or quantified in the Carr Plaintiffs' Confirmation Objection.

143.    The requirement in *Washington Mutual* is that a holder's "released *claims* must be considered" as part of a debtor's liquidation analysis, and not the *value of the releases* themselves.  *See Wash. Mut.*, 442 B.R. at 359–60 (emphasis added).  The Amended Plan does not provide for a release of any Claims against the Debtors that are being treated under the Amended Plan.  Therefore, the Liquidation Analysis does not ascribe any value to such releases nor does it discount the value of the Claims on account of such releases—because such releases do not exist. Unlike in *Washington Mutual*, any value assigned to the Carr Plaintiffs' Claims against the Debtors under the Amended Plan is the exact same in both the chapter 11 and the hypothetical chapter 7 scenarios, notwithstanding the releases provided in the Amended Plan.  *Rieger-Paganis Decl.* ¶ 14. *Compare Wash. Mut.*, 442 B.R. at 359 (disagreeing with the debtors' assumption that a chapter 7 trustee would accept the releases provided under the chapter 11 global settlement, and thus all of the claims released by the global settlement were disregarded by the debtors in preparing the liquidation analysis).

---

[14]    Notably, the Debtors are the only named defendants in the Carr Plaintiffs' class action suit.  *See* Compl., *Carr et al., v. Kabbage, Inc.*, Case No. 22-cv-02149 (N.D. Ga. Mar. 30, 2022).

[15]    The plan objectors in *Washington Mutual* possessed substantial and previously asserted claims against certain **non-Debtor third parties**, such as directors, etc., that were being released under the chapter 11 plan.  The objectors, among other things, challenged the debtors' liquidation analysis for failing to account for the objectors' previously asserted and quantified claims and arguing that such claims should be ignored for purposes of the "best interests" test.  The court disagreed with the debtors, and noted that in such circumstances (including the presence of a global settlement), the debtors' liquidation analysis was required to account for the value of the objectors' released **claims**, as such **claims** had the potential to yield value in a hypothetical chapter 7 if the chapter 7 trustee chose to not accept the global settlement that included such releases.  *See In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011).  These circumstances are not present in nor comparable to the Debtors' Chapter 11 Cases—here, there no known, substantial, nor previously asserted claims against non-Debtor third parties.  Further, if such claims do exist, the Carr Plaintiffs have objected to the Third Party Releases.

144.    To the extent that the Carr Plaintiffs are, instead, referring to some hypothetical claims they may have against non-Debtor Released Parties, the Carr Plaintiffs are not releasing such claims under the Amended Plan.  This is because the Carr Plaintiffs are each identified in the Voting Certification as having opted out of the Third Party Releases.  As a result, the Carr Plaintiffs simply lack standing to argue that the Liquidation Analysis failed to take into account the release of their claims against the non-Debtor Released Parties *because the Carr Plaintiffs are not releasing such claims.  See In re WR Grace & Co.*, 532 Fed. Appx. 264, 266 (3d Cir. 2013) ("A party objecting to the confirmation of a plan for reorganization under Chapter 11 must therefore meet the requirements for standing that litigants in all federal cases face under Article III of the Constitution . . . Those requirements include that the party has suffered an injury in fact.") (citing *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) (internal quotation marks omitted)); *see also In re Mallinckrodt PLC*, 639 B.R. at 877 ("the Pension Trust lacked standing to object to the Third Party Releases because it has opted out and is therefore not bound by them."); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) ("In the context of a confirmation hearing, creditors have standing only to challenge those parts of a reorganization plan that affect their direct interests.") (citing *In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989)).  That said, even if they had standing to make such an argument, the Carr Plaintiffs have neither identified nor offered any legal basis or value for such claims.  On that basis alone, to the extent the Carr Plaintiffs challenge the Liquidation Analysis for excluding such claims, the Carr Plaintiffs' Confirmation Objection should be overruled.  *See Mallinckrodt PLC*, 639 B.R. at 890–891 (denying objection of creditor that challenged liquidation analysis for failure to account for hypothetical claims that the creditor might have against debtors' directors, which were released by a chapter 11 plan, where the creditor

66

offered no evidence of the existence or value of such claims); *In re Dow Corning Corp.*, 237 B.R. 380, 411–12 (Bankr. E.D. Mich. 1999) (noting that courts look only at the dividend the creditor would receive from the hypothetical chapter 7 trustee, *and only that amount*, for comparison with the dividend available under a debtor's chapter 11 plan to the extent that such claims are of "an uncertain value.").  That failure aside, the Debtors are not aware of any Claims held by the Carr Plaintiffs against the non-Debtor Released Parties that would be subject to the Third Party Releases.  *Rieger-Paganis Decl.* ¶ 14.

145.    Even if the Carr Plaintiffs had identified and quantified claims against non-Debtor Released Parties, several courts, including courts in this district, have previously held that the value of potential recoveries from claims held against non-Debtor third-parties are not required to be included in a debtor's liquidation analysis, as the plain language of section 1129(a)(7) is limited to potential **recoveries from the debtor** in the context of the "best interests" test.  *See* 11 U.S.C. § 1129(a)(7)(A)(ii); *see also Boy Scouts of Am.*, 642 B.R. at 665; *In re Plant Insulation Co.*, 469 B.R. 843, 886 (Bankr. N.D. Cal.), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013), and *aff'd*, 544 F. App'x 669 (9th Cir. 2013) (holding that the claims of creditors against non-debtor third parties could not be considered in a liquidation analysis even when those claims would otherwise remain in a chapter 7 case).  To the extent the Carr Plaintiffs believed they possessed valuable Claims against non-Debtor Released Parties, the Carr Plaintiffs had notice of and the opportunity to opt-out or object, as applicable, to the Third Party Releases in order to preserve such Claims.  And, in fact, the Voting Certification reflects that they all did.  *Voting Decl.* Ex. D (Opt-Out Report).

146.    Because the Debtors have (i) filed the Disclosure Statement, including an appropriate Liquidation Analysis, that was approved as containing adequate information, (ii)

properly accounted for the Carr Plaintiffs' Claims thereunder and in the Amended Plan, and (iii) soundly demonstrated that the Carr Plaintiffs would recover at least as much on account of their Claims in a hypothetical chapter 7 liquidation as under the Amended Plan, the Debtors have satisfied the requirements of section 1129(a)(7) and the Carr Plaintiffs' Confirmation Objection on these grounds should be overruled.

ii.    *The Carr Plaintiffs' PPP Loans are Valid Collateral of Reserve Bank.*

147.    Although not an appropriate consideration for purposes of the "best interests" test, the Carr Plaintiffs proclaim that the PPP Loans that underpin their prepetition suit should be forgiven, and by consequence, should not be pledged as collateral for Reserve Bank Claims. *Carr Plaintiffs Confirmation Objection* ¶ 39–40. First, the question of whether the Carr Plaintiffs' PPP Loans should be forgiven is a determination that cannot be made by this Court and certainly cannot be made or otherwise granted by the Debtors—approval of a loan forgiveness request is the purview of the SBA alone, pursuant to Section 7(a) of the Small Business Act, 15 U.S.C. § 636(a), and the Coronavirus Aid, Relief, and Economic Security Act (the "**CARES Act**"). Any assertions or arguments as to the underlying merits of such claims are not properly before this Court and, regardless, are not relevant considerations to be taken into account in a section 1129(a)(7) analysis.

148.    Moreover, the Carr Plaintiffs have no legal right or basis to challenge the Debtors' use of the Pledged PPPLF Loans[16] as collateral pursuant to the Paycheck Protection Program Liquidity Facility Letter of Agreement, dated May 12, 2020 (as amended January 14, 2021), by and among KServicing and the Reserve Bank, and the Federal Reserve's Operating

---

[16]    Importantly, only a subset of the Debtors' PPP Loans are Pledged PPPLF Loans and may otherwise constitute a CRB Loan or a CB Loan.

68

Circular No. 10, effective July 16, 2013 (the "**Program Agreements**").  That pledge of collateral was recognized as valid by the Court on November 7, 2022, in the *Order Under 11 U.S.C. §§ 105, 361, 362, and 363, and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Secured Lender* (Docket No. 225) (the "**Cash Collateral Order**").  *See Cash Collateral Order* at 4 (validating the Debtors' acknowledgement that "KServicing services a series of Paycheck Protection Program loans…which are pledged as Collateral…for the Obligations…under the Program Agreements (including any proceeds and offspring of such Collateral) and are guaranteed by the U.S. Small Business Administration.").  The Debtors' stipulations as to the pledged collateral were approved by this Court and became binding on all parties in interest after notice and the lapse of a challenge period, of which the Carr Plaintiffs were properly notified.[17]  Notably, the Carr Plaintiffs did not challenge or otherwise object to such stipulations, and should therefore not be permitted to collaterally attack a valid and proper finding of this Court on the eve of confirmation.  Additionally, even absent entry of the Cash Collateral Order, PPP Loan borrowers (the Carr Plaintiffs included) have no interest in the Pledged PPPLF Loans.  The Pledged PPPLF Loans are *obligations* of applicable borrowers—borrowers hold no lien or other security interest in the collateral.

149.    The Carr Plaintiffs further argue that, in the event the Pledged PPPLF Loans are transferred to Reserve Bank, the Wind Down Estate, or a new servicer, as contemplated by the Amended Plan, such transfer should be effectuated without the associated releases provided in sections 10.1(a), 10.5, 10.6 of the Amended Plan.  *Carr Plaintiffs Confirmation Objection* ¶ 40. The Carr Plaintiffs argue that providing such releases to Reserve Bank and the Wind Down Estate

---

[17]    *See Affidavit/Declaration of Service of Motion of Debtors for Entry of Order (I) Authorizing Debtors Limited Use of Cash Collateral, (II) Granting Adequate Protection to Secured Lender, (III) Modifying Automatic Stay, and (IV) Granting Related Relief [Docket No. 143]* (Docket No. 166).

69

would unfairly burden the Carr Plaintiffs and prejudice their ability to achieve forgiveness of their PPP Loans. Initially, it is hard to fathom how the Debtor Releases (*i.e.*, a release of claims held by the Estates) would affect the Carr Plaintiffs' right to seek forgiveness of their PPP Loans. Further, as noted above, none of the Carr Plaintiffs are subject to the Third Party Releases. Regardless, even if the Lead Plaintiffs all consented to, or were otherwise subject to, the cited releases, such releases would not prejudice the Carr Plaintiffs' rights to seek forgiveness of their PPP Loans per SBA PPP Guidelines. The only difference in that process implemented by the terms of the Amended Plan is that the party servicing the Carr Plaintiffs' PPP Loans will no longer be the Debtors. Notwithstanding the foregoing, the Carr Plaintiffs' arguments concerning the pledge of collateral to the Reserve Bank are not appropriate nor required as part of the "best interests" test under section 1129(a)(7).

### c.    The Amended Plan is Fair and Equitable.

150.    The Carr Plaintiffs also argue that the Amended Plan is not fair and equitable in its treatment of holders of General Unsecured Claims, relying largely on the fact that the Reserve Bank's interests in the GUC Pool Class A are prioritized over the interest in GUC Pool Class B granted to holders of General Unsecured Claims.

> i.    *Amended Plan Does Not Unfairly Discriminate as Between the Reserve Bank Claims and the General Unsecured Claims.*

151.    The Reserve Bank Claims and General Unsecured Claims are not similarly situated. First, the Reserve Bank Claims are either (i) secured by the PPPLF Collateral or the adequate protection liens provided under the Cash Collateral Order, or (ii) to the extent under-secured, such deficiency claims have priority under section 507(a)(2) of the Bankruptcy Code (granting priority to, among other things, "unsecured claims of any Federal reserve bank related to loans made through programs or facilities authorized under section 13(3) of the Federal Reserve

70

Act (12 U.S.C. 343).").  The Debtors stipulated as much, which is reflected in the Cash Collateral Order and was then set forth in an order of this Court.  *Cash Collateral Order* at 5.  As discussed below, the Carr Plaintiffs did not object to the Cash Collateral Order and it is binding on them.  Contrary to the Carr Plaintiffs' contention, even to the extent the Reserve Bank's adequate protection liens do not extend to potential proceeds of avoidance actions—which they do—the Reserve Bank Priority Claims have express statutory priority over the General Unsecured Claims as to all property of the estate, which would include proceeds of avoidance actions.

152.    Further, the Cash Collateral Order sets forth what amounts constitute Reserve Bank Claims, including (a) an aggregate principal amount of approximately $536,450,940 in respect of outstanding advances under the relevant Program Agreements (as defined therein), plus (b) accrued and unpaid interest and costs and expenses including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements, and other obligations owing under the Program Agreements.  *Cash Collateral Order* ¶ D(ii).

153.    Importantly, the Debtors provided notice of the stipulations, which would become binding on all parties in interest after the lapse of the challenge period.  The deadline for a party in interest to bring a challenge was no later than 75 days after entry of the Cash Collateral Order.  Given that no party objected during the challenge period, the Stipulations became "binding on all parties whatsoever, including, without limitation, any Creditors' Committee and any trustee or trustees appointed in the Chapter 11 Case or in any Successor Case." *Id.* at 29–30.  Accordingly, the Debtors and their creditors, including the Carr Plaintiffs, are bound by the stipulations as to the amount and priority of the Allowed Reserve Bank Claims.  Any assertion by the Carr Plaintiffs that the Reserve Bank Claims should be disallowed or reclassified is untimely and inappropriate.

71

154.    Still, the terms of the stipulation and Cash Collateral Order do not mean that the Reserve Bank can recover more than it is entitled to.  "An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims." *SunEdison*, 575 B.R. at 227; *see also Exide Techs.*, 303 B.R. at 61.  Here, the Amended Plan's treatment of the Reserve Bank Claims explicitly provides:

> For the avoidance of doubt, (x) the Reserve Bank shall not receive Cash in excess of the Reserve Bank Claims and any amounts in excess of the Reserve Bank Claims paid in Cash to the Reserve Bank on account of the Allowed Reserve Bank Claims shall revert to the Wind Down Estate . . . ."

*Amended Plan* § 4.3(c)(iii).  Additionally, the Debtors and the Wind Down Officer—who is independent and will owe fiduciary obligations to all creditors—retain the ability to object to claims under Section 7.1 of the Amended Plan.  Thus, contrary to the Carr Plaintiffs' assertions, the Amended Plan does not write a "blank check" to the Reserve Bank, and the Debtors and Wind Down Officer will ensure the Reserve Bank recovers only what it is entitled to on its claims.

155.    Because the Allowed Reserve Bank Claims have priority over the General Unsecured Claims, the Amended Plan does not unfairly discriminate as between the Reserve Bank Claims and General Unsecured Claims.  In fact, the unfair discrimination test does not apply as between classes of different priority—that protection comes from the absolute priority rule.  *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) (explaining that "the unfair discrimination test assures fair treatment among classes of the same priority level while the fair and equitable requirement ensures fair treatment among classes of different priority levels."); *In re Tribune Co.*, 472 B.R. 223, 239 (Bankr. D. Del. 2012) ("[T]he Bankruptcy Code's prohibition against 'unfair discrimination' ensures that a dissenting class will receive relative value equal to the value given to all other ***similarly situated classes***.") (emphasis

72

added).  As discussed, the Reserve Bank Claims are senior in priority than any claims held by the

Carr Plaintiffs and there is no basis to find any discrimination, let alone unfair discrimination

> ii.     *The Carr Plaintiffs Are Not Entitled to Consent or Consultation Rights.*

156.    The Carr Plaintiffs further assert that the Amended Plan is not fair and

equitable as to their claims because they have not been given consent and consultation rights as to

administration of the Wind Down Estates and pursuit of recoveries that may inure to the benefit

of holders of General Unsecured Claims.  The Carr Plaintiffs have identified no basis under which

they are entitled to consent or consultation rights.  The Amended Plan provides consent rights for

the Debtors' largest and primary secured creditor, the Reserve Bank, and provides consultation

rights to certain holders of likely the largest General Unsecured Claims—namely, CRB, the

Department of Justice, and the SBA.  *See, e.g.*, *Amended Plan* § 5.8.

157.    As debtors in possession with exclusivity rights, the Debtors can employ

their sound business judgment to make ordinary course decisions and propose any chapter 11 plan,

so long as they otherwise comply with the Bankruptcy Code.  Even if the grant of consent and

consultation rights to creditors required court approval, courts generally will not entertain

objections to a debtor's chosen transactions in the ordinary course, "provided that the conduct

involves a business judgment made in good faith upon a reasonable basis and within the scope of

authority under the Bankruptcy Code.  "Put another way, the Court will not disturb a transaction

within the ordinary course of business 'if the [debtor in possession] can articulate reasons for [its]

conduct (as distinct from a decision made arbitrarily or capriciously).'"  *See, e.g.*, *In re Nellson

Nutraceutical, Inc.*, 369 B.R. 787, 796–97 (Bankr. D. Del. 2007) (in the context of approval under

section 363 of the Bankruptcy Code).

158.     The Debtors reasonably chose which creditors to give consent and consultation rights to with an eye toward moving these cases to a resolution and providing a seat at the table for those with the most at stake.  To require the Debtors to provide consent and consultation rights to all creditors would be an unwieldy and unreasonable demand on the Debtors and the Wind Down Estates – and obviously would be entirely unworkable as a practical matter and unduly expensive and wasteful to have every creditor have consent and consultation rights.  And, in any event, section 1129(b)(2)(B) of the Bankruptcy Code clearly describes what constitutes "fair and equitable" treatment of General Unsecured Claims, and providing consent and consultation rights is not part of the calculus.

159.     Finally, the Carr Plaintiffs contend that their arguments for denying confirmation under section 1129(a)(7) of the Bankruptcy Code apply equally in the context of section 1129(b).  As noted, those arguments have no merit, and as with the arguments regarding consent and consultation rights, such issues are not implicated by the fair and equitable test prescribed by section 1129(b)(2)(B) of the Bankruptcy Code.

160.     For the reasons stated herein, the Carr Plaintiffs' Confirmation Objections under section 1129(b) of the Bankruptcy Code should be overruled in their entirety.

**B.     Objection by the United States Trustee Should be Overruled.**

        **a.     Amended Plan Does Not Violate Section 1141(d)(3) of the Bankruptcy Code.**

161.     The U.S. Trustee objects on a limited basis to the Amended Plan's injunction and release provisions, arguing that they amount to an improper discharge of a liquidating debtor under section 1141(d)(3) of the Bankruptcy Code.  Namely, the U.S. Trustee asserts that the Amended Plan improperly achieves a discharge in two steps: (i) the Debtors are receiving a release by creditors and claimants pursuant to the Third Party Releases; and (ii) the

74

Injunction Provision prevents holders of claims from taking actions against the Debtors in the same way that section 524(a) of the Bankruptcy Code would.

162.     The Debtors do not disagree that they are ineligible for a discharge under section 1141(d)(3) of the Bankruptcy Code—the Amended Plan explicitly states that it does not grant a "discharge" pursuant to section 1141(d) of the Bankruptcy Code. *Amended Plan* § 10.3(f). But section 1141(d) does not prohibit either the Third Party Releases or the Injunction Provision.

163.     "A discharge in bankruptcy is an ***involuntary release*** by operation of law of creditor claims against an entity (both asserted and unasserted) which is enforced by the court." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (emphasis added); *see also In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 268 n.4 (Bankr. D. Mont. 2011), *aff'd sub nom. Sumpter v. Yellowstone Mountain Club, LLC*, 584 F. App'x 676 (9th Cir. 2014). In contrast, here, the Third Party Releases are entirely consensual (*see Memorandum* § I.D.1.b). Courts are clear that a consensual release is not a discharge. *See, e.g.*, *Arrowmill Dev.*, 211 B.R. at 506 ("When a release of liability of a nondebtor is a consensual provision, however, agreed to by the effected creditor, it is no different from any other settlement or contract and does not implicate 11 U.S.C. § 524(e). A voluntary, consensual release is not a discharge in bankruptcy."); *see also* Hr'g Tr. at 28:16–24, *In Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Dec. 17, 2020) (Docket No. 850) (finding that parties have the right to consent to a third party release as part of a liquidating plan, and rejecting an argument that allowing such would constitute an impermissible discharge to a corporate debtor). Additionally, "nothing in § 1141(d)(3) or § 523(a) prevents Debtors or the non-debtor individuals from negotiating voluntary consensual releases with creditors." *In re Stein Mart, Inc.*, 629 B.R. 516, 527 (Bankr. M.D. Fla. 2021). Therefore, given

75

that there is no discharge under the Amended Plan, section 1141(d)(3) of the Bankruptcy Code is not violated.

164.    The importance of the Injunction Provision is particularly highlighted by the structure of the Amended Plan.  This is not a case where the Debtors will become shell corporations after transferring all assets to a liquidating trust; here, the Debtors will continue to hold estate assets, for the benefit of creditors, after the Effective Date.  Accordingly, the Injunction Provision is a critical component of the Amended Plan to ensure that parties do not interfere with the consummation and implementation of the Amended Plan.  The Injunction Provision implements the Debtor Releases, the Third Party Releases, and the Exculpation Provision embodied in the Amended Plan, in part, by permanently enjoining all persons and entities from, among other things, commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions.  Without the Injunction Provision, the carefully crafted and intensely negotiated structure and purposes of the Amended Plan could be contravened.  Defending against lawsuits not enjoined by the Amended Plan would be costly and would deplete the Wind Down Estates of scarce resources, ultimately reducing the recoveries of all creditors to benefit the creditor pursuing litigation.  Such prohibited actions would, clearly, disrupt the proposed distribution structure incorporated in the Amended Plan.

165.    A court in this district has previously overruled a similar objection by the U.S. Trustee under similar circumstances.  *See* Hr'g Tr. at 21:10–22:3, *In re Suntech Am., Inc.*, No. 15-10054 (CSS) (Bankr. D. Del. April 27, 2016) (Docket No. 587).  In *Suntech*, the debtors explained the critical nature of the plan's injunction: the estate assets would remain with the debtors after the effective date, such that any depletion of those assets by parties pursuing litigation would ultimately harm creditors.  *Id.* at 17:11–20:13.  The court agreed and approved the injunction

76

provision, stating: "These aren't going to be shell corporations. As a result, to allow claims to be asserted . . . post-confirmation . . . would be to waste estate assets and dissipate those assets from otherwise being available for creditors." *Id.* at 21:23–22:3.

166.    Further, a court in this district recently overruled an objection asserting that certain third-party releases and an injunction provision set forth in a chapter 11 plan of liquidation worked in concert to provide a de facto discharge for the debtors, such that no entity could continue to enforce a claim against the debtors. *See* Hr'g Tr. at 23:9–24:15, *In re JRV Grp. USA L.P.,* No. 19-11095 (CSS) (Bankr. D. Del. June 19, 2020) (Docket No. 456).  Specifically, the court held:

> [although there] is no discharge here under [section 1141] . . . there are independent provisions that, when taken in concert, arguably provided for a *de facto* discharge . . . [b]ut the important point is that [the express releases, third-party releases, and injunctions] stand . . . on their own as appropriate and authorized by the Code.  So if you have three independent factors, all of which are appropriate, all of which are supported by the evidence, and all of which are authorized by the Code, and the *de facto* effect is that they give a de facto discharge, I really don't think that undoes what you were otherwise allowed to do . . . my belief in ruling is that the fact that the elements that result in the *de facto* discharge are all appropriate, supported by the evidence, supported by the law, supported by the Code, and the fact that, when you combine and you end up with a *de facto* discharge – which you obviously can't have a *per se* discharge in the plan – I think is of no moment.

*Id.*

167.    Accordingly, the Third Party Releases and Injunction Provision should be approved, as they do not violate section 1141(d)(3) of the Bankruptcy Code and are critical to accomplishing the Amended Plan's overall objectives and the U.S. Trustee's limited objection should be overruled.

### C.    Objection by Paul Pietschner Should be Overruled.

168.    Creditor Paul Pietschner ("**Pietschner**") is the plaintiff and "relator" in a pre-petition *qui tam* lawsuit (the "**FCA Action**") against KServicing and certain non-Debtors under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, pending under seal in the United States District Court for the Eastern District of Texas, Sherman Division (the "**Texas Court**"), Case No.

77

4:21-cv-110.  Pietschner objects to the Amended Plan's injunction and release provisions on the basis that they would discharge and release his claims, which he asserts are nondischargeable.[18] (Docket No. 591).  The Court should overrule the objection.

169.    As an initial matter, the objection is premised on Pietschner's conclusory assertion that his claims are nondischargeable.  Although he has filed Proofs of Claim subjecting his unsecured claims to this Court's jurisdiction,[19] he has yet to file a complaint to determine the nondischargeability of his debt—and in fact has stipulated to extend the deadline to do so until after the Effective Date.  When the time comes, Pietschner will bear the heavy burden of proving nondischargeablility by clear and convincing evidence.  *See United States v. Stelweck*, 108 B.R. 488, 494 (E.D. Pa. 1989) ("the vast majority of bankruptcy courts … require the party seeking to have the judgment enforced prove the merits of their case under the bankruptcy court's more demanding 'clear and convincing' standard before granting an exception from discharge").  He will not be able to meet that burden.  *See id.* at 493–94 (affirming bankruptcy court's conclusion that plaintiff's False Claims Act claim was dischargeable).

170.    In any event, the Debtors have agreed to include language in the proposed Confirmation Order that provides Pietschner with the ability to prosecute the FCA Action in the Texas Court if his claims turn out to be nondischargeable, while also protecting other creditors from the harm that would occur if Pietschner could pursue the Wind Down Estates outside of the confines of the Amended Plan before there has been a determination that the holders of Allowed General Unsecured Creditors will receive a Distribution.  The relevant language of the proposed Confirmation Order provides as follows:

---

[18]    Pietschner's objection to the release provisions has been mooted because Pietschner is not providing a release under the Plan. *Voting Decl.* Ex. D.

[19]    *See* Proof of Claim Nos. 955-10, 952-8, 953-6, 954-7, 956-7 and 951-174.

For the avoidance of doubt, section 10.3 of the Plan shall apply to that certain proceeding commenced by Paul Pietschner ("**Pietschner**") under the False Claims Act, 31 U.S.C. Sec. 3729, *et seq*., currently pending under seal in the United States District Court for the Eastern District of Texas, Sherman Division (the "**Texas Court**"), Case No. 4:21-cv-110 (the "**FCA Action**"); provided, however, that if this Court determines that the Claims asserted in the FCA Action are non-dischargeable under section 523(c) of the Bankruptcy Code, the following procedure shall apply:

    a. Upon the Wind Down Officer determining that there will be a Distribution to the holders of Allowed General Unsecured Claims, by no later than five (5) business days thereafter, the Wind Down Officer shall notify counsel to Pietschner in writing of such determination.

    b. Pietschner shall then have five (5) business days after receipt of such notice to file a notice on the docket in these Chapter 11 Cases that Pietschner intends to prosecute the FCA Action in the Texas Court (a "**Prosecution Notice**").

    c. The Wind Down Officer or any other party in interest shall have ten (10) business days to file an objection to any Prosecution Notice (a "**Prosecution Objection**"). If no such objection is filed, section 10.3 of the Plan shall be modified to allow the FCA Action to proceed in the Texas Court for the purposes of liquidating the Claims asserted in Proof of Claim nos. 955-10, 952-8, 953-6, 954-7, 956-7 and 951-174 (the "**Pietschner Claims**").

    d. If a Prosecution Objection is filed and the parties are unable to resolve such objection, Pietschner shall request a hearing at the next regularly scheduled omnibus hearing on the Prosecution Notice and any Prosecution Objection. For the avoidance of doubt, in the event that the Pietschner Claims are liquidated in the FCA Action and there is a judgment against KServicing, the judgment shall be an Allowed General Unsecured Claim in the amount of such judgment.

*See proposed Confirmation Order* ¶ 32.

171.    This language will enjoin Pietschner from pursuing his claims outside of the Plan until first obtaining a determination from this Court that his claims are nondischargeable, and until after there is a reasonable prospect of recovery for the Class of Claims to which he belongs. This latter protection is warranted for two reasons.

172.    First, any recovery to the holders of Allowed General Unsecured Claims is uncertain and depends on the Wind Down Estates successfully prosecuting residual estate causes of action. *See Amended Disclosure Statement* at 9–16 (summarizing projected recoveries for each

79

Class).  Depending on how events unfold, it is possible that the holders of Allowed General Unsecured Claims may never receive any recovery on account of their Claims.  Requiring the Wind Down Estates to spend scarce resources litigating one out-of-the-money contingent unsecured claim before it becomes known whether senior classes will be paid in full would be harmful to the estates.

173.    Second, the structure of the Wind Down Estates creates a situation that, if left unaddressed, could provide holders of nondischargeable claims a windfall at the expense of other creditors.  Unlike a liquidation plan that sets up a post-confirmation trust and leaves the debtor behind, the Wind Down Estates are a continuation of the Debtors.  In other words, the estate assets that will be used to implement the Plan will remain with the Debtors, which will become the Wind Down Estates.  *Amended Plan* § 1.124 (providing that the Wind Down Estates consist of the Debtors).[20]  This creates an anomaly with respect to nondischargeable claims because typically, a holder of a nondischargeable claim can immediately seek to pursue and collect his claim against the emerged debtor (as opposed to against the post-confirmation trust holding estate assets).  *See In re Fairchild Aircraft Corp.*, 128 B.R. 976, 981–82 (Bankr. W.D. Tex. 1991) ("[T]he lack of a discharge means that the creditor is not barred from proceeding against the corporation itself and whatever assets might subsequently come into its possession" after the confirmation of the debtor's plan.).  But allowing a nondischarged claim to freely proceed against the Debtors here would be tantamount to allowing it to proceed freely against the Wind Down Estates.  If that happened, it would frustrate the fundamental purpose of the Plan, because Pietschner could attempt

---

[20]    As noted above, this Court has noted that a similar plan structure warrants enjoining claims against a post-confirmation debtor under a liquidating plan.  *See In re Suntech Am., Inc.*, Case No. 15-10054 (CSS) (Bankr. D. Del. Apr. 27, 2016), Hr'g Tr. 22:23-25, 23:1-3 ("These aren't going to be shell corporations.  As a result, to allow claims to be asserted . . . post-confirmation . . . would be to waste estate assets and dissipate those assets from otherwise being available for creditors.  So I'll approve the language as presented and overrule the objection.").

to recover beyond his *pro rata* share of Plan assets from other creditors' sources of recovery. The Plan injunction language protecting from this harm (as modified) thus both is necessary and appropriate.

174.   The Court has the authority to temporarily enjoin the pursuit of Pietschner's claims in the manner proposed. Pietschner premises the nondischargeabilty of his claims on section 1141(d)(6)(A) of the Bankruptcy Code, but as the District Court has noted, nothing in that section prohibits a court from temporarily enjoining the claim. *See Citizens Against Corp. Crime, LLC v. Lennar Corp.* (*In re Landsource Cmtys. Dev., LLC*), 612 B.R. 484, 499 (D. Del. 2020) ("Section 1141(d)(6)(A) places no limits on the Bankruptcy Court's authority to … enter … injunctions with respect to fraud claims held by government agencies – whether for debtors or other interested parties as part of a reorganization plan.").[21] The modified injunction language is needed to prevent irreparable harm to the estates, because allowing an unsecured creditor to pursue the Wind Down Estates outside the confines of the Plan would upend the Plan's distribution scheme. *See In re Mercado*, 124 B.R. 799, 803 (Bankr. C.D. Cal. 1991) (creditors holding nondischargeable debts could seek immediate payment of those debts, which would "undercut a debtor's attempt to reorganize" and could interfere or "effectively preclude" the debtor from consummating its plan). In addition, requiring the estates to incur defense costs before it is even known whether the holders of Allowed General Unsecured Claims will receive a Distribution would harm senior creditor classes. By contrast, any harm to Pietschner would be minimal. The only harm he would suffer is delay—and only if it turns out that the Wind Down Estates could make a Distribution to general unsecured creditors—and delay alone does not outweigh threats to

---

[21]   Indeed, both the proposed Confirmation Order and the Plan are clear that no Claims are being discharged. *Proposed Confirmation Order* ¶ 33 ("Nothing in the Plan or the Confirmation Order shall . . . grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code."); *Amended Plan* § 10.3(f) (same).

81

the Plan's implementation.  *See, e.g.*, *W.R. Grace & Co. v. Chakarian* (*In re W.R. Grace & Co.*), 386 B.R. 17, 36 (D. Del. 2008) (finding delay of compensation for asbestos claimants and delay that may Carr to potential loss of witness testimony did not outweigh potential harm to reorganization efforts).[22]

175.    For these reasons, the Court should overrule Pietschner's Confirmation Objection and approve the Plan injunction as modified.

### D.    Objection by Cross River Bank Should be Overruled.

#### a.    The Amended Plan is Feasible and Provides Adequate Means for Implementation.

176.    In their Confirmation Objection, CRB argues that the Amended Plan (a) violates the "feasibility" requirement for plan confirmation provided by section 1129(a)(11) of the Bankruptcy Code and, (b) does not provide for "adequate means for the plan's implementation," in violation of section 1123(a)(5) of the Bankruptcy Code.  CRB's support for these arguments is their purported concerns over the Debtors' ability to transfer their loan servicing obligations and the various Servicing Files with respect to CRB's PPP Loans prior to the Plan Effective Date. CRB's objection should be overruled for several reasons.  Of course, the Debtors do not dispute that they must comply with the requirements set forth in sections 1123(a)(5) and 1129(a)(11) and,

---

[22]    Some courts in other jurisdictions have gone one step further and found authority to temporarily enjoin the collection of nondischargeable debts against an *emerged debtor* (as opposed to against the wind down estate, as is the case here).  *See, e.g.*, *In re Brotby*, 303 B.R. 177, 187–191 (B.A.P. 9th Cir. 2003) (surveying cases); *In re Mercado*, 124 B.R. at 801–03 (same).  Although a split of authority exists on this factually different issue, even there the better view holds that bankruptcy courts are so authorized when the relief is important to the plan's successful implementation.  *See id.*  Those courts taking a contrary view base their reasoning on the erroneous premise that a confirmed plan *cannot* bind a nondischargeable claim.  *Mercado*, 124 B.R. at 801–02 (discussing and rejecting this approach).  Were that the case, then in a typical chapter 11 liquidation case—where no claims are discharged by virtue of section 1141(d)(3) of the Bankruptcy Code—a plan would not be able to bind *any* claim.  Not only would that result be absurd, it also would be inconsistent with the law in this district.  *See, e.g.*, *Jason v. Bumble Bee Foods, LLC* (*In re Old BBP, Inc.*), 2020 WL 7074642, at *5 (Bankr. D. Del. Dec. 1, 2020) (holding that even though claims were nondischargeable, the claimant still was bound to liquidate those claims through the claims administration process:  "As for the liquidation of those claims, Defendant is correct that this is properly done in the claim administration process.").

in fact, have discussed their compliance with and satisfaction of such requirements herein. *See Memorandum* § I.C.11.iv. and I.M.

177.    CRB appears to misconstrue the feasibility standard by asserting that the Debtors have "failed to prove their ability to consummate the Plan." *CRB Confirmation Objection* ¶ 8.  As noted herein, the feasibility test set forth in section 1129(a)(11) does not require the Debtors to "prove" that the Amended Plan will succeed.  The Debtors need only demonstrate that the Amended Plan has "a reasonable likelihood of success" or a "reasonable probability" that the provisions of the Amended Plan may be performed. *See Energy Res.*, 495 U.S. at 549; *Kane*, 843 F.2d at 649; *In re Am. Cap. Equip., LLC*, 688 F.3d at 156 (noting that section 1129(a)(11) "does not require a plan's success to be guaranteed"); and *In re Heritage Highgate, Inc.*, 679 F.3d at 142 (quoting *In re TCI 2 Holdings*, LLC, 428 B.R. at 148).  As noted by the United States Court of Appeals for the Ninth Circuit: "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pizza of Haw., Inc.*, 761 F.2d at 1382 (citations omitted).

178.    In fact, feasibility is a relatively low threshold. *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009) (noting that "[t]here is a relatively low threshold of proof necessary to satisfy the feasibility requirement") (quoting *In re Eddington Thread Mfg. Co., Inc.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995)), *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds sub nom. DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79 (2d Cir. 2011); *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998) ("only 'a relatively low threshold of proof [is] necessary to satisfy

83

the feasibility requirement'") (quoting *Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apartments* (*In re Sea Garden Motel & Apartments*), 195 B.R. 294, 305 (D.N.J. 1996)); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (the feasibility requirement is generally not viewed as rigorous). Some courts in the context of a liquidating plan, have interpreted 1129(a)(11) of the Bankruptcy Code to mean that a plan that provides for liquidation automatically satisfies section 1129(a)(11). *See, e.g. In re ie Corp.*, No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867, at *17 (Bankr. D. Del. Oct. 27, 2010) (finding that the debtor's liquidating plan satisfied section 1129(a)(11) of the Bankruptcy Code and was feasible because the plan provided for the liquidation and distribution of the debtors' assets); *In re SPC Seller*, No. 09-12647, 2010 Bankr. LEXIS 5321, at *22 (Bankr. D. Del. Dec. 8, 2010) (finding that "[b]ecause the [p]lan is a plan of liquidation, pursuant to 1129(a)(11), the [p]lan is feasible.").

179.    Here, the Amended Plan is clearly a liquidating chapter 11 plan and should therefore automatically satisfy section 1129(a)(11), but further, the evidence shows that the Debtors will be able to satisfy the conditions precedent to the Effective Date and have sufficient funds to meet their post-Confirmation Date obligations to pay for the ongoing costs of administering and consummating the Amended Plan and ultimately close the Chapter 11 Cases.

180.    As the evidence shows, the Debtors anticipate (i) having adequate funding to emerge from chapter 11, (ii) satisfying conditions precedent to emerge from chapter 11, and (iii) effectuating the transfer of their loan servicing obligations. As noted in the Rieger-Paganis Declaration and certain documents in the Plan Supplement, the Debtors expect to have sufficient funds to administer and consummate the Amended Plan, including funding all payments required under the Amended Plan. *First Plan Supplement* Ex. C. (Wind Down Budget); *Rieger-Paganis Decl.* ¶ 19. As of March 31, 2023, which was the projected Effective Date, the value of the

84

Debtors' assets is estimated to be approximately $17.9 million, including $15.3 million in cash on hand. *Rieger-Paganis Decl*. ¶ 20. The Debtors project wind down expenses of approximately $13.2 million, including remaining pre-Effective Date operating expenses and restructuring professionals' fees, other non-operating expenses (including taxes, insurance, U.S. Trustee fees, contract cures, Wind Down Officer related costs, and litigation advisor and related costs), wind down contingency reserves, litigation reserves, and claims reserves. *Id*. at ¶ 21. By implementing, among other things, an appropriate cash reserve system, the Debtors have thus ensured that they will maintain adequate cash levels to effectuate the wind down.

181.    Further, as discussed in the Rieger-Paganis Declaration, the Debtors are expected to meet all of the conditions precedent under Section 9.1 of the Amended Plan—including the transfer of servicing the PPPLF Loans to an alternate third party servicer to the satisfaction of the Reserve Bank. *Id.* ¶ 26. The Reserve Bank is actively involved in the Debtors' efforts to transition the Pledged PPPLF Loans to their designated servicer, *Milner Decl.* ¶ 20, and the Reserve Bank also voted to approve the Amended Plan. As the Amended Plan demonstrates given the nature of the Debtors' assets and that it is a liquidating plan, the conditions precedent to the effectiveness of the Amended Plan are relatively minimal. The most substantive conditions precedent included in the Amended Plan are the (i) transfer of servicing of the PPPLF Collateral to an alternate third party servicer, (ii) creation and funding of the GUC Pool, and (iii) funding of the Wind Down Estates. Of note, the Wind Down Budget successfully accounts for the projected funding of the Wind Down Estates, and the creation of the GUC Pool is to be effectuated through a fairly standard, mechanical process. Therefore, the condition precedent that presents the relatively "highest hurdle" for the Debtors is the condition with respect to the transfer of servicing

85

obligations.  The Debtors have also demonstrated their substantial efforts to effectuate transfer of their servicing obligations to other stakeholders and not just the Reserve Bank.

> i.     *Obligations Under the Stipulation Between the Debtors and Cross River Bank.*

182.    As an initial matter, it is important to recognize that the *Order Approving Stipulation Between the Debtors and Cross River Bank* (Docket No. 444) (the "**Servicing File Order**") does not impose a timeline on the Debtors for transferring Servicing Files (as defined therein).  The CRB Confirmation Objection asserts the Debtors "blew through timeframes set out in a workplan incorporated in the Servicing File Order," *CRB Confirmation Objection* ¶ 4, and even goes so far as to suggest that delivery of the Servicing Files was due prior to the Confirmation Hearing.  *See id*. ¶ 11.  However, the referenced workplan that was provided to CRB on December 22, 2022 (the "**December Workplan**"), did not establish any timeframes for transferring the Servicing Files.  *Milner Decl.* ¶ 12, Ex. A.  Rather, the December Workplan laid out illustrative estimates of the amount of time it would take Company personnel to complete a given task, with such time estimates being subject to among other things, the cooperation and participation of CRB and finalization of the scope of "Servicing Files."  *Id*.  To be clear, the December Workplan was not binding commitment to effectuate the transfer of all Servicing Files to CRB by a date certain.  That much was conveyed to CRB and its counsel on multiple occasions, including at a virtual meeting between the parties on December 29, 2022 at which the Debtors' transition team walked CRB through the December Workplan and the Debtors developing transition strategy.  *Id*.  Further demonstrating that CRB was aware that the December Workplan did not provide a committed timdframe for delivery, on its face, the December Workplan includes columns for the Reserve Bank and CB, making it clear that similar and contemporaneous processes would need to be run for counterparties other than just CB.  Any timelines associated with the December Workplan

could not be read in a vaccum and would have to be readjusted and modified to take into account the multiple, concurrent processes.   Despite facts to the contrary, even if CRB actually interpreted the December Workplan to be a commitment by the Debtors to deliver the Servicing Files on a date certain, it should have included in the Servicing File Order language that expressly incorporated those timelines.   That language is notably absent.   See *Stipulation Between the Debtors and Cross River Bank* ¶ 5 (Docket No. 441-1) (the "**CRB Stipulation**").

183.    For the avoidance of doubt, the December Workplan identified the categories of information to be provided, who at the Debtors will coordinate the effort in providing the information, how that person will approach the task, the level of involvement, and—most importantly with respect to CRB's "promised timeline" allegations—the "Work Effort to Provide Information" which notably includes an express qualifier that states "Best efforts/best case; based on assumption and subject to contingencies."   *Milner Decl.* ¶ 12, Ex. A.   The "Work Effort to Provide Information" column is seemingly the foundation of CRB's argument, notwithstanding that it does not include dates of any kind, and cannot be reasonably construed as a promise to accomplish the listed tasks in any amount of days starting from any particular date.[23]   The Court should disregard CRB's attempt to twist the Debtors good faith effort to coordinate with CRB (as one of multiple counterparties), by providing a workplan document outlining the extensive and time-consuming tasks required to transfer the Servicing Files, into a promise to transfer the Servicing Files within any particular timeframes.   CRB's allegation that the Debtors have failed to uphold promised timeframes corresponding to the December Workplan—none of which existed—

---

[23]    For example, using CRB's logic, within minutes of delivery of this December Workplan to the Reserve Bank, the Debtors would have been obligated to grant access to the Etran and SBA PPP Platforms, and to transfer to the Reserve Bank all forgiveness documentation and records of guaranty purchase submissions, among other things.   *Milner Decl.* Ex. A.

is based solely on CRB's attempt to shoehorn its way into transfer rights on par with the Debtors' only material secured creditor—the Reserve Bank. *See CRB Confirmation Objection* ¶ 10. The Debtors do not have an imposed timeline to transfer the Servicing Files; notwithstanding, they are making good faith efforts to do so as part of their obligation to "use commercially reasonable efforts to assist . . . CRB with transfer of all the Debtors' servicing obligations with respect to the CRB PPP Loans" by the Effective Date. *Amended Plan* § 5.3(c)(iii).

   ii. *Debtors Have Made Substantial Progress in Furtherance of Transferring Servicing Obligations for CRB PPP Loans.*

  184. Notwithstanding all of the machinations and falsities by CRB (and by CB, as discussed below), the Debtors have clearly demonstrated that there exists at least a "reasonable probability" that they will be able to satisfy their obligation to take "commercially reasonable efforts" to transition servicing obligations on the CRB PPP Loans by the Effective Date and to transfer the documents listed in the December Workplan as within the Company's control (collectively, the "**CRB Transition**"). Transferring the data and servicing obligations associated with 333,725 total PPP Loans—121,797 of which are CRB PPP Loans—is no easy feat, let alone with the limited financial and personnel resources of the Debtors. Yet, the Debtors' transition team has tackled this assignment head-on and has remained in constant contact, directly and through advisors, with CRB and its other partners throughout the process.

  185. The CRB Confirmation Objection erroneously implies that the CRB Transition could have been a simple file exchange directly between the Debtors and CRB. The CRB Confirmation Objection asserts that CRB has been trying to get copies of the Servicing Files; however, the practical exercise of providing copies of the raw data of the Servicing Files to CRB would have been an expensive, time-consuming, and ultimately fruitless. CRB ignores the complexities involved in securely transferring the Servicing Files onto a third-party server in a

manner that properly integrates the data to ensure all loan information will be accurately reflected when accessed for future servicing. *Milner Decl.* ¶ 14.  In reality, it was not until CRB selected a third-party loan servicer (the "**CRB Servicer**")—which did not occur until mid-February—that it was in a positon to properly receive the Servicing Files, further debunking the illusory timelines it alleges the Debtors failed to uphold.

186.    Nonetheless, before the Servicing File Order was even entered, the Debtors provided the December Workplan to CRB in an attempt to provide clarity and insight into the steps required to complete the CRB Transition.  Further, on February 10, 2023—again before CRB's third-party loan servicer was made known to the Debtors—the Debtors provided CRB with the CRB Transition Plan, which outlines the CRB Transition steps that the Debtors have closely followed and continue to undertake *Milner Decl.* Ex. B.

187.    CRB did not inform the Debtors of the identity of the CRB Servicer until February 15, 2023, *Milner Decl.* ¶ 17, notwithstanding that the Debtors made clear in its Plan filed on the first day of these Chapter 11 Cases that servicing obligations would need to be transferred to an alternative third-party servicer and the Debtors continued to ask CRB for its named servicer consistently since that date.  The Debtors have worked expeditiously with the CRB Servicer, and before its nomination, CRB, to transfer the Servicing Files since February 15, 2023, and have made significant progress in transferring the Servicing Files, including the following key milestones:

    i.    <u>December 22, 2022</u>: The Debtors delivered the December Workplan to CRB.

    ii.    <u>December 29, 2022</u>: The Debtors held a virtual meeting with CRB to walk through and explain the December Workplan.

    iii.    <u>February 6, 2023:</u> The Debtors and CRB received joint approval from in-house counsel to establish a secure data connection for purposes of safely transmitting loan and borrower files.

    iv.    <u>February 10, 2023</u>: The Debtors delivered to CRB an updated version of the December Workplan, including six (6) separate workplan documents that

laid out a two-phased approach for the CRB Transition (the "**CRB Transition Plan**").

v.   February 20, 2023: The Debtors established an Amazon Web Services S3 cloud storage service connection with CRB.

vi.   February 23, 2023: The Debtors and CRB Servicer met to finalize data connection requirements, after multiple interim meetings to discuss the same.  Beginning the same day, the Debtors initiated the transfer of data and loan documentation to the CRB data repository.[24]

vii.   February 24, 2023: The Debtors held a virtual meeting with the CRB Servicer to walk through and explain the CRB Transition Plan.

viii.   February 28, 2023: The Debtors sent a Transition status update to CRB.

ix.   March 1, 2023: The Debtors complete transfer of "Phase 1" data and loan documentation, including 121,797 loan origination packages, comprised of a total of 1,274,975 documents and 1.3 terabytes of data.

x.   First week of March, 2023: The Debtors begin "Phase 2" (data transfer).

xi.   March 6, 2023:  The Debtors deliver to CRB a refined summary of the location of each category of data subject to the CRB Transition, noting whether the Debtors can unilaterally deliver the data or whether involvement of a third-party in control of such data is necessary.  In the same correspondence, the Debtors offered to arrange a call with AmEx as soon as possible.  *Milner Decl.* Ex. C.

xii.   March 9, 2023: The Debtors deliver to CRB a "Statement of Work" that outlines the key CRB Transition steps, scope of deliverables, and governance, among other topics, in an attempt to align the CRB Servicer and the Debtors on the process going forward.

xiii.   March 10, 2023: Call scheduled to occur between the Debtors, CRB, and AmEx to discuss logistics of data requests and file transfer.

*Milner Decl.* ¶¶ 12–29.

188.   Importantly, the CRB Transition Plan also recognizes the Debtors' servicing operations have certain dependencies on data controlled by third-parties, including

---

[24]   The CRB data repository is an Amazon Web Services S3 cloud storage service ("**S3 Platform**") implemented by the Debtors pursuant to which the Debtors upload files and, in connection with the upload must test data coding to ensure accurate pulling of data from the source environment (*i.e.*, to be sure CRB is receiving data related to CRB PPP Loans, not, for example, CB PPP Loans), as well as, conduct analysis of appropriate authentication factors to establish sufficient security protocol.  After the upload and related processes are complete, the Debtors then notify the counterparty that the files are ready to view and download from the S3 platform.

90

American Express ("**AmEx**") and contemplates options to mitigate potential issues arising therefrom.  The Debtors reached out to CRB to discuss AmEx-related potential issues and a consensual path forward with Amex regarding these dependences, and specifically requested CRB identify any contracts it wanted the Debtors to assume and assign including contracts with AmEx.  As described in the CRB Confirmation Objection, CRB responded that it does not need any such contracts, and would rather defer to the oversimplified position that all issues would be moot if the Debtors would simply "turn over" the Servicing Files.  Contrary to CRB's assertions, the Debtors have not rejected CRB's attempts to work jointly toward retrieving documents from AmEx—the Debtors merely rejected CRB's litigious, resource-expending, and more costly strategy.  Instead, the Debtors have been engaged with AmEx from the outset of these Chapter 11 Cases and recognize that the most efficient way to retrieve the necessary loan data from AmEx—at least in the first instance—is to engage in consensual discussions regarding data capabilities and legal obligations of the parties.  Launching headlong into litigation for the sole purpose of incentivizing a transfer of PPP Loan servicing data would do nothing more than *delay* the timeline on which CRB and others receive their requested files, all the while whittling away at the Debtors finite economic resources.  To be sure, the Debtors are prepared to commence proceedings seeking to compel the cooperation of AmEx in necessary, but to date have remained optimistic that, based on engagement with AmEx, a consensual resolution of the data transfer from AmEx is possible.

189.    The Debtors are only required by the Amended Plan to use commercially reasonable efforts to assist with the CRB Transition, and the Debtors have upheld that standard and will continue to do so post-confirmation.  Commercially reasonable efforts only requires to Debtors to use its limited time and resources in a reasonable fashion. It cannot be read to require the Debtors to prioritize CRB PPP Loan portfolio on the timeline, speed, and breadth as unilaterally

91

set by CRB.  The facts at hand must be considered; the Debtors are already in wind down, with limited resources, and for the benefit of its stakeholders, is running at minimum, four contemporaneous transfer processes.

190.    In light of the above, CRB's concerns regarding the Debtors' "ability" to transfer the Servicing Files, and the Debtors' transparency throughout the transfer process, are entirely inconsistent with the record before this Court.  The Debtors have far surpassed the required demonstration of a "reasonable probability" that they will use "commercially reasonable efforts" to transition the servicing of CRB PPP Loans, and, notwithstanding the fight that CRB puts up at every turn, will continue to work with CRB and the CRB Servicer to timely complete the CRB Transition in accordance with the Amended Plan.

191.    Accordingly, the Debtors have demonstrated that the Amended Plan satisfies sections 1123(a)(5) and 1129(a)(11) of the Bankruptcy Code.  Given the foregoing, as well as the additional evidence on the record regarding the Debtors' continuous efforts to effectuate transfer of their loan servicing obligations and CRB's Servicing Files, especially in light of the Debtors' additional efforts to effectuate a successful wind down, the Debtors' have demonstrated that the Amended Plan may, with reasonable probability, be performed, in satisfaction of section 1129(a)(11).  As such, CRB's Confirmation Objection should be overruled.

192.    In addition, section 1123(a)(5) provides a nonexclusive and nonexhaustive list of factors that speak to whether a plan provides for adequate means for implementation.  *See* 11 U.S.C. § 1123(a)(5)(A)-(J).  The Debtors argue, and have demonstrated, that they have satisfied section 1123(a)(5) by providing for adequate means of the Amended Plan's implementation through, among other things:  (a) identification of sources of consideration to be distributed under the Amended Plan, *see Amended Plan* § 5.2; (b) provisions governing the Debtors' continued

92

servicing of the PPP Loans until the Effective Date, *see Amended Plan* § 5.3(a); (c) provisions governing the Debtors' efforts to assist in the transfer of PPP Loan servicing obligations to third-party loan servicers, *see Amended Plan* § 5.2(c)-(d), or otherwise continue servicing the PPP Loans on and after the Effective Date, *see Amended Plan* § 5.2(e); (d) the funding of the GUC Pool and the Wind Down Estate, the transfer of assets to the Wind Down Estate, and the potential sale of Legacy Loans, *see Amended Plan* § 5.3; and (e) provisions governing the appointment, authority, and duties of the Wind Down Officer, *see Amended Plan* § 5.4.  Despite this, CRB's Confirmation Objection heavily discounts and disregards the various mechanisms which provide for adequate implementation of the Amended Plan.  Instead, CRB bases their Confirmation Objection on an assumption that the Debtors' demonstrated commitments to implementing the Amended Plan are infeasible.  The Debtors have proactively demonstrated their ability to consummate the Amended Plan and commitment to exercise commercially reasonable efforts in good faith to transfer their loan servicing obligations with respect to CRB's PPP Loans and all relevant documentation associated therewith.

193.    Accordingly, the Debtors have demonstrated that the Amended Plan satisfies sections 1123(a)(5) and 1129(a)(11) of the Bankruptcy Code, and CRB's Confirmation Objection should be overruled.

> iii.    *CRB's Suggestion of an Administrative Claim is Baseless and, in any Event, Does Not Preclude Confirmation.*

194.    CRB further argues that the Debtors' ability to consummate the Amended Plan is threatened by a potential Administrative Expense Claim allegedly owing to CRB, which CRB asserts would arise if the Debtors fail to transfer the Servicing Files to CRB pursuant to the Servicing File Order.

93

195.    The Servicing File Order approved a stipulation between the Debtors and CRB, which provided, among other things:

> The Debtors will produce to Cross River the Servicing Files (as defined in the Agreements) as supplemented or otherwise modified by written agreement between the parties or as set forth in the documents specified in the correspondence between counsel to the parties, dated January 11, 2023. This is without prejudice to Cross River's rights to seek additional documents, including in connection with the transfer of servicing of Cross River's PPP Loans, and nothing herein shall be construed to modify or amend the Agreements.

*CRB Stipulation* ¶ 5.

196.    Although the CRB Stipulation committed the Debtors to produce the Servicing Files, the Debtors specifically did not commit to do so within any specified period of time.  So long as the Debtors produce the Servicing Files—which, as discussed above, they have already begun providing—there is no breach under the Servicing File Order or the CRB Stipulation.  In fact, missing from the CRB Stipulation is any obligation by the Debtors to produce the Servicing Files on CRB's unreasonable timelines, which would take the Debtors' focus away from other concurrent transition processes.   Nor have the Debtors "promised" any specific timelines, as CRB suggests.  Certainly, no breach has occurred to date that would give rise to any Administrative Expense Claim, and the assertion that an Administrative Expense Claim may arise in the near future is unsupported and hypothetical and would only arise if the Debtor did not ultimately produce the Servicing Files.  Notwithstanding this, the Debtors have made a sizeable production of Servicing Files to CRB, to date, from the data directly available to Debtors, with ongoing efforts to procure and facilitate documents and data in the possession of third parties on an accelerated timeline.

197.    Moreover, CRB does not even attempt to quantify its claim.  Under CRB's reasoning, any creditor in any case could hypothesize a contingent, unliquidated, and speculative "substantial" Administrative Expense Claim in an objection to confirmation to halt the process.

94

But given the weight and priority given to Administrative Expense Claims, courts do not accept speculative contentions.  Unlike creditors who assert a typical proof of claim, creditors seeking Administrative Expense Claims under section 503 of the Bankruptcy Code have the burden of proving such claims.  *E.g.*, *In re Energy Future Holdings Corp.*, 593 B.R. 217, 256 (Bankr. D. Del. 2018) ("The burden of proof is on the movant to prove that it is entitled to an allocation of an administrative expense award, and it must do so by a preponderance of evidence.") (citing *In re Worldwide Direct, Inc.*, 334 B.R. 112, 120 (Bankr. D. Del. 2005)).

198.    Even assuming, *arguendo*, CRB was likely to be owed an Administrative Expense Claim due to the Debtors' purported failure to transfer the Servicing Files, that fact should not preclude confirmation of the Amended Plan.  CRB points to section 1129(a)(9)(A) of the Bankruptcy Code, which by its plain language contradicts CRB's position (that Administrative Expense Claims are a confirmation issue), stating that, "with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, ***on the effective date of the plan***, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A) (emphasis added); *see also CIT Commc'ns Fin. Corp. v. Midway Airlines Corp.* (*In re Midway Airlines Corp.*), 406 F.3d 229, 242 (4th Cir. 2005) (noting that "an administrative expense under § 503(b) must be paid in cash on the effective date of the plan in a chapter 11 proceeding"); *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 784 (Bankr. E.D.N.Y. 2005) (noting that "the outside date by which administrative expenses must be paid in a [c]hapter 11 case" is "the effective date of the plan" pursuant to section 1129(a)(9) of the Plan and that "[t]he question of whether administrative expenses should be paid sooner than the effective date of the plan is committed to the sound discretion of the bankruptcy court").  Under the language

95

of section 1129(a)(9)(A) of the Bankruptcy Code, the relevant timing is the Effective Date, not confirmation.

199.    Numerous courts have found that section 1129(a)(9)(A) of the Bankruptcy Code is satisfied if the express terms of the plan comply with section 1129(a)(9)(A) of the Bankruptcy Code. *See, e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 431 (Bankr. S.D. Tex 2009) (finding that the "[t]he treatment of administrative expense claims under the Amended Plan satisfie[d] the requirements of § 1129(a)(9) of the Bankruptcy Code" because "the Amended Plan provide[d] that each holder of an administrative claim that becomes allowed shall receive the allowed amount of such claim, in accordance with the requirements of § 1129(a)(9)"); *In re PC Liquidation Corp.*, No. 05-89022-288, 2006 Bankr. LEXIS 4638, at *24–25 (Bankr. E.D.N.Y. Nov. 13, 2006) (finding in the confirmation order that, because debtor's plan provided for payment of allowed administrative expense claims in full, in cash, on the Effective Date, "the [p]lan satisfie[d] the requirements of section 1129(a)(9) of the Bankruptcy Code"). Because the Amended Plan's express terms provide for payment of Administrative Expense Claims in accordance with section 1129(a)(9)(A), nothing further is required, and this confirmation requirement is satisfied.

200.    It is inappropriate to deal in hypotheticals and argue about an unripe issue related to a potential, contingent Administrative Expense Claim.[25]  To give any credence to CRB's arguments would allow virtually any creditor with a speculative and entirely unquantified Administrative Expense Claim to hold up confirmation of any plan.  Particularly here, where the Debtors have gone beyond using commercially reasonable efforts to assist stakeholders in the loan

---

[25]    Pursuant to the Debtors' Proposed Confirmation Order, the Administrative Expense Claims Bar Date would be set as thirty-five (35) days from the date of service of the Notice of Effective Date.  *Proposed Confirmation Order* ¶ 17.

96

servicing and transfer process, it would be unreasonable to stall confirmation of the Amended Plan

on the basis of a hypothetical Administrative Expense Claim.

201.    CRB further asserts that, because a large Administrative Expense Claim

would preclude the Debtors from consummating any plan, the Amended Plan is not feasible and it

is "critical that the Debtors demonstrate their full compliance with the Servicing File Order prior

to the confirmation hearing." *CRB Confirmation Objection* ¶ 9.  As stated above: (a) CRB again

misunderstands the feasibility standard; (b) there is no requirement that the Debtors satisfy the

Servicing File Order prior to the confirmation hearing; (c) there is no Administrative Expense

Claim filed; and (d) to the extent an Administrative Expense Claim by CRB is filed and CRB

carries its evidentiary burden, the Debtors will, in accordance with the Amended Plan, object to,

settle, or otherwise reserve for the claim in advance of the Effective Date.  As the Debtors have

informed counsel for CRB on numerous occasions, and as CRB well knows, the Debtors are

resource-limited with a complex concurrent transition of, at minimum, four different portfolios.

The Debtors' proposed transition plan is workable and, most importantly, requires the buy-in and

participation of the counterparties and alternate servicers.  Rather than threatening the process—

which is meant to benefit all stakeholders, including CRB—with hypothetical Administrative

Expense Claims, CRB should focus on cooperating with the Debtors and others to effectuate the

transition process in an orderly fashion.

### b.    Debtors Have Identified a Wind Down Officer in Compliance with Sections 1123(a)(7) and 1129(a)(5).

202.    CRB also argues that the Debtors have failed to comply with sections

1123(a)(7) and 1129(a)(5) of the Bankruptcy Code because they have not yet selected a Wind

Down Officer nor provided justifications as to why their selection complies with the Bankruptcy

Code.  Contemporaneously herewith, the Debtors have filed an amended Plan Supplement that

97

includes the identity of the Wind Down Officer, who will serve as the sole officer, director, or manager, as applicable, of the Debtors. *See Amended Plan* § 5.4(e); *Third Plan Supplement* Ex. D. Section 1123(a)(7) of the Bankruptcy Code mandates that the selection of any officer, director, or trustee under a plan be "consistent with the interests of creditors." CRB's objection seems to suggest that their consultation rights with respect to the selection of the Wind Down Officer have been disregarded by the Debtors. Nothing can be further from the truth. The Debtors' and Reserve Bank advisors have engaged in continuous discussions with CRB's counsel with respect to the selection of the Wind Down Officer, including the slate of proposed candidates—all of whom are experienced and qualified professionals, and the interview process; all the while keeping CRB's counsel updated as to progress. When asked, CRB's counsel noted that they had no objections to or issues with the interview list and it was not until the eve of filing its Confirmation Objection that CRB suggested it would be challenging the Amended Plan on this basis to "reserve their rights." CRB's insinuations that it has not been properly consulted in the Wind Down Officer selection process are false and without merit.

203.    The Debtors' selection of the Wind Down Officer complies with the factors that Courts generally consider in connection with determining whether sections 1129(a)(5) and 1123(a)(7) have been satisfied. Notably, courts have previously considered whether a debtor is being effectively extinguished by the selection, and whether the director or officer selected is incompetent, inexperienced, or disinterested, among other things. *See, e.g.*, *In re Digerati Techs., Inc.*, No. 13-33264, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014) (cited in *Boy Scouts*, 642 B.R. at 639-40). Such factors weigh in favor of the Wind Down Officer selected by the Debtors—as set forth in Exhibit D of the *Third Plan Supplement*, the Wind Down Officer shall be Jeremiah Foster of Resolute Commercial Services. Mr. Foster shall receive a monthly fee of

$30,000/month for the duration of his service as the Wind Down Officer plus an administrative fee of 3% of total hourly billings per period. To the extent Resolute is hired as the Wind Down Officer's financial advisors, rates range from $375 – $575 per hour. Mr. Foster is qualified to serve as the Debtors' Wind Down Officer due his robust experience in providing financial advisor and trustee services in other chapter 11 cases. *Third Plan Supplement* Ex. D. Further, after a review of the Debtors and the parties in interest in these Chapter 11 Cases, Mr. Foster is also independent and "disinterested" in that he holds no connections to or adverse interests in the Debtors or any parties in interest in these Chapter 11 Cases, except as disclosed in the Plan Supplement, that would prejudice his ability to exercise his fiduciary and operational duties as the Debtors' Wind Down Officer. *See id.* Further details regarding the Wind Down Officer's compensation and qualifications are set forth in the Plan Supplement and the curriculum vitae appended thereto. Given the above, Debtors have satisfied section 1123(a)(7) in that the selected Wind Down Officer is competent, experienced, and independent—each "consistent with the interests of creditors." Further, the Amended Plan complies with the requirements of section 1129(a)(5) with respect to the disclosure of the identity and nature of any compensation of any insiders retained or employed by the Debtors. Accordingly, CRB's Confirmation Objection should be overruled.

     **E.**    **Objection by Customers Bank Should be Overruled.**

          **a.**    **Amended Plan is Feasible and Provides Adequate Means for Implementation.**

     204.   CB restates CRB's substantive arguments regarding feasibility of the Debtors' Amended Plan and applies their arguments to CB's PPP Loans and related loan servicing files. CB argues that (i) the CB Agreements, including the Court-approved settlement between the Debtors and CB (*see* Docket Nos. 172 & 232), obligates the Debtors to perform servicing until transfer of servicing is effectuated, which the Debtors have not appropriately demonstrated their

ability to do, and (ii) Debtors have failed to provide relevant loan servicing files to CB.  CB joins

CRB's argument in noting that, as a result of these non-occurrences, substantial administrative

claim(s) will likely be filed by CB, and thus would substantially deplete the Debtors' estate and

thwart their ability to implement the Amended Plan.

205.    As noted, CB's Confirmation Objection joins the CRB Confirmation

Objection and reiterates similar unsubstantiated concerns regarding the Debtors' ability to transfer

servicing.  As discussed above, the Debtors have demonstrated the reasonable probability the

provisions of the Amended Plan may be performed, in compliance with section 1129(a)(11).

Further, unlike CRB, the Debtors never agreed to transfer the loan servicing files of CB's PPP

Loans to CB or a third-party loan servicer.  Regardless, the Debtors have demonstrated the ability

to transfer servicing in accordance with the Amended Plan, and CB's concerns and allegations are

inconsistent with the Debtors conduct throughout the Chapter 11 Cases.

> i.      *The Debtors Have No Independent Contractual Obligation
> to Transfer Servicing for CB PPP Loans.*

206.    Contrary to CB's assertion in the CB Confirmation Objection, the Debtors

did not agree in the *Settlement and Release Agreement*, dated October 27, 2022, between

KServicing and CB (the "**CB Settlement Agreement**") (Docket No. 232-1) to transition servicing

on the CB PPP Loans or to otherwise transfer to CB all of its Servicing Files.  The Debtors also

note that any contractual obligation to undertake such transfer activities that may have existed

under the prepetition CB Agreements was released by CB pursuant to the CB Settlement

Agreement.  Try as they may to read into the CB Settlement Agreement any transfer obligations

of the Debtors beyond what is embodied in the Amended Plan, CB simply has no independent

contractual rights to enforce on this subject.  In its argument, CB cannot muster any more than a

hollow proclamation that the Debtors made "an express post-petition undertaking that ***references***

100

the transition of Customers Bank's PPP loan portfolio…" *CB Confirmation Objection* ¶ 5 (emphasis added).  A "reference" to transition by no means creates an express obligation, particularly in the face of the provision in the CB Settlement Agreement, which CB conveniently fails to mention, that most directly addresses this point:

> The Parties agree that KServicing shall not be responsible for any incremental costs above its ordinary course operating expenses, including payroll, required to comply with its obligations under the Servicing Plan, associated with any transfer of KServicing's servicing obligations for the Remaining Loan Population to an alternative servicer; provided, that KServicing will provide CB with three (3) business days' notice of its intent to incur any third-party costs for which reimbursement by CB will be requested, during which period CB may, at its sole discretion, direct KServicing to engage an alternative provider identified by CB at CB's expense. ***For the avoidance of doubt, the Servicing Plan does not contemplate the provision of additional services or reporting by KServicing for the purpose of transferring servicing obligations***.

*CB Settlement Agreement* § 4(B) (emphasis added).

207.    Despite not being a party to the Servicing File Order (that governs CRB), CB includes the defined term "Servicing Files" in the CB Confirmation Objection.  The CB Confirmation Objection provides, "Kabbage must, among other things, transfer to the Banks all of their respective 'Servicing Files,' as defined in the agreements relating to servicing of the PPP Loans." *CB Confirmation Objection* ¶ 2.  CB's ambiguous reference to a definition in the "agreements" is a thinly veiled attempt to conflate its rights with those of CRB.  CB is not entitled, by agreement or order, to be transferred servicing of CB's PPP Loans, and it is obvious CB phrased its objection in this way to obscure that indisputable fact.  Rather, on the matter of servicing transition, CB is only in a place to challenge the Debtors' satisfaction of the Bankruptcy Code's feasibility requirements with respect to the Debtors' obligation in the Amended Plan to take "commercially reasonable efforts" to implement such transition prior to the Effective Date—a standard which is discussed at length herein.

101

ii.     *Debtors Have Made Substantial Progress in Furtherance of Transferring Servicing Obligations for CRB PPP Loans.*

208.    The Debtors have clearly demonstrated that there exists at least a "reasonable probability" that they will be able to satisfy their obligation to take "commercially reasonable efforts" to transition servicing obligations on the CRB PPP Loans by the Effective Date (collectively, the "**CB Transition**").  Similar to the circumstances with CRB, the Debtors have made progress and have been transparent with CB regarding the CB Transition; with the caveat that the Debtors have been embroiled in contentious litigation with CB since before these Chapter 11 Cases and for the duration of these Chapter 11 Cases and, as such, have spent the majority of their countless hours engaging with CB on the subject of servicing and calculation of payments related to the CB Settlement Agreement.  A better use of that time, especially given the Debtors' limited resources, would have been for the parties to focus and progress the CB Transition.  It should be noted, though, that as part of the CB Settlement Agreement dispute, the Debtors have sent to CB a significant amount of loan and servicing data, which is all relevant to the CB Transition, and for which the Debtors should receive credit.

209.    In the CB Confirmation Objection, CB grossly oversimplifies the process required to transition the vast amount of data contained in the CB Transition.  What may seem like "basic transition information" to them, *CB Confirmation Objection* ¶ 6, in fact is a significant undertaking from a data processing perspective.   For example, the "borrower ACH payment information" identified in the CB Confirmation Objection is also covered in the CB Transition Plan, which indicates that the work effort is equal to 7-14 days.  That data must also be concurrently pulled for the Reserve Bank, CRB, and SBA, and must be sorted, validated, and uploaded to separate data repositories.  So while CB may flippantly refer to such a process as "basic", the Debtors view it as a use of precious limited resources that could otherwise be allocated to servicing

102

loans or transitioning data for other partners.  CB also alleges that they sent multiple requests that went unanswered by the Debtors.  The Debtors simply point out that refusal to provide CB's requested information on the demanded, near-immediate timeline is not a lack of response.  As discussed herein, the Debtors are managing four parallel workstreams with a limited team that must also carry out servicing obligations—they cannot meet every unrealistic demand drummed-up by CB and nor should they, considering the standard by which the Debtors' are obligated to transfer CB's portfolio falls below the standard of the Reserve Bank and CRB.

210.    The Debtors have worked expeditiously with CB, particularly since the issues related to the CB Settlement Agreement dispute have narrowed.  In particular, the Debtors have made significant progress in transferring servicing, including the following key milestones:

xiv.    CB confirmed to the Debtors that, due to CB's technology limitations, CB is not able to use the S3 Platform for transfer of data and documents under the CB Transition Plan.

xv.    January 26, 2023: Counsel to each of CB and the Debtors discuss CB Transition.

xvi.    February 10, 2023: The Debtors delivered to CB an updated version of the December Workplan, including six (6) separate workplan documents that laid out a two-phased approach for the CB Transition (the "**CB Transition Plan**").  On the same day, the Debtors held a virtual meeting with CB to walk through and explain the CB Transition Plan.

xvii.    February 13, 2023: The Debtors initiated the transfer of data and loan documentation to the CB data repository.[26]

xviii.    March 1, 2023: The Debtors sent a Transition Status Update to CB.

---

[26] The CB data repository is a Secure File Transfer Protocol, which is an add-on to the S3 Platform.  Unlike the S3 Platform, SFTP requires more manual interaction with the data site by both the Debtors and CB.  Not only is the data upload process more tedious, but CB has requested that the Debtors divide the Phase 1 data into dozens of separately-viewable buckets, which again requires more manual input from the Debtors.  SFTP is also materially slower on the CB side—for example, CRB and CB both had their Phase 1 data uploaded by March 3, 2023, but yet as of mid-day on March 8, 2023, CRB had already downloaded approximately 30% of its files, whereas CB had not eclipsed 1%.  As recently as the evening of March 8, 2023, CB informed the Debtors that due to the slow download speed of SFTP, CB wants the Debtors to downgrade to use of an external hard drive—an extremely rudimentary process that will demand a significant amount of time and resources by the Debtors.

103

xix. <u>March 3, 2023</u>: The Debtors complete transfer of "Phase 1" data and loan documentation, including 99,336 loan origination packages, comprised of a total of 1,053,396 documents and 1.17 terabytes of data.

xx. <u>The first week of March, 2023</u>: The Debtors begin analysis and planning for "Phase 2" data transfer.

xxi. <u>March 6, 2023</u>: The Debtors deliver to CB a refined summary of the location of each category of data subject to the CB Transition, noting whether the Debtors can unilaterally deliver the data or whether involvement of a third-party in control of such data is necessary. In the same correspondence, the Debtors offered to arrange a call with AmEx as soon as possible. *Milner Decl.* Ex. C.

xxii. <u>March 9, 2023</u>: The Debtors deliver to CRB a "Statement of Work" that outlines the key CRB Transition steps, scope of deliverables, and governance, among other topics, in an attempt to align the CRB Servicer and the Debtors on the process going forward.

xxiii. <u>March 9, 2023</u>: Called scheduled to occur between the Debtors and Biz2Credit to request revised data delivery timeline in response to CB's request that data for active CB PPP Loans be prioritized over already-processed loans.

xxiv. <u>March 10, 2023</u>: Call scheduled to occur between the Debtors, CB, and AmEx to discuss logistics of data requests and file transfer.

*Milner Decl.* ¶¶ 12–29.

211. In light of the above and the Debtors' transparency throughout the transfer process, CB's concerns regarding the Debtors' ability to transfer servicing of the CB PPP Loans, are inconsistent with the record before this Court. The Debtors have demonstrated their ability to transfer servicing of the CB PPP Loans to CB, and will continue to use commercially reasonable efforts in connection with the CB Transition.

212. At bottom, the Debtors are not required to transfer servicing of CB's PPP loans to CB, and to the extent they do so before March 31, 2023, the Debtors are only required to use commercially reasonable efforts. The Debtors have upheld that standard throughout the Chapter 11 Cases and will continue to do so post-confirmation. Accordingly, and as previously discussed, the Debtors have demonstrated that the Amended Plan satisfies the feasibility requirement pursuant to section 1129(a)(11) of the Bankruptcy Code.

104

213.    Separately, while not technically an objection to confirmation of the Amended Plan, the Debtors note that CB filed the *Motion for an Order Pursuant to Bankruptcy Rule 2004 Directing Production of Documents and Materials and Appearance for Oral Examination* on March 6, 2023 (Docket No. 608) (the "**CB 2004 Motion**"), which is nothing more than an end run around confirmation standards and an inappropriate attempt to supplement their feasibility and good faith arguments addressed above, not to mention an improper use of Bankruptcy Rule 2004.  With the CB 2004 Motion, CB attempts to leap-frog the Reserve Bank, CRB, and the SBA in terms of the content and timeline of the CB Transition and to side-step the requirement in the Amended Plan that CB pay for all costs and expenses of the Debtors related thereto.  Moreover, it is CB's effort to slip in contractual rights they simply do not have.  The Debtors will respond to the CB 2004 Motion in due course, but CB's bad faith attempt to distract the Debtors as they prepare to defend the Amended Plan at the Confirmation Hearing cannot be ignored.

iii.    *CB's Asserted Administrative Expense Claim Does Not Preclude Confirmation.*

214.    Like CRB, CB also questions the Amended Plan's feasibility based on the possibility that CB would file an Administrative Expense Claim based on the Debtors' supposed non-compliance with PPP Loan transition obligations.  According to CB, these obligations arise under the CB Settlement Agreement, which was approved by Court order on November 9, 2022 (Docket No. 232), and was later reaffirmed and altered by the CB Maintenance Order on January 10, 2023 (Docket No. 428).  Specifically, CB points to paragraph 4(A) of the CB Settlement Agreement, which states:

"KServicing agrees that it shall take commercially reasonable efforts to maintain the current levels of PPP loan servicing with respect to the Remaining Loan Population (the "Servicing Plan") from the Effective Date through the earlier of (i) March 31, 2023 and (ii) the date of transfer of KServicing's servicing obligations

105

to an alternative servicer acceptable in all respects to CB (the "Servicing Termination Date"); *provided*, that the Servicing Plan shall not govern servicing of the Remaining Loan Population after the Servicing Termination Date and any such continued servicing by KServicing of the Remaining Loan Population shall be subject to separate agreement."

Section 4(B) continues: "For the avoidance of doubt, the Servicing Plan does not contemplate the provision of additional services or reporting by KServicing for the purpose of transferring servicing obligations."

215.    Accordingly, the Debtors never agreed to effectuate a transfer of their servicing obligations to CB in the Settlement Agreement, or anywhere else for that matter, outside of the "commercially reasonable efforts" required by Section 5.3 of the Amended Plan. The Debtors only agreed to continue servicing the CB PPP Loans, and then, only until the earlier of March 31, 2023 and the transfer of the Debtors' servicing obligations. CB, therefore, attempts to block confirmation of the Amended Plan with an even more speculative future Administrative Expense Claim than CRB.

216.    As discussed above, the Debtors have serviced the CB PPP Loans in compliance with the Settlement Agreement and have used and continue to use commercially reasonable efforts to transfer the servicing obligations for the CB PPP Loans, as required by the Amended Plan. The Debtors are not required to meet CB's unreasonable timeline, particularly where they are attempting to concurrently transfer servicing obligations to four different parties. Moreover, the fact that the Debtors *might* fail to transfer the CB PPP Loans is not a basis for an Administrative Expense Claim against the estates, and certainly not a basis to halt the confirmation process. In fact, halting the confirmation process will inevitably create a perverse result—it would require the Debtors to expend even more of their limited resources and put at risk the Debtors' ability to efficiently transfer their loan servicing obligations.

106

217.     Additionally, even assuming, *arguendo*, that CB has a valid Administrative Expense Claim, and for the same reasons discussed in response to the CRB Confirmation Objection, a potential Administrative Expense Claim should not preclude confirmation of the Amended Plan.

### b.     Debtors Have Proposed the Amended Plan in Good Faith, as Required by Section 1129(a)(3) of the Bankruptcy Code.

218.     In their joinder, CB also argues that the Amended Plan was not proposed in good faith and therefore does not comply with section 1129(a)(3) of the Bankruptcy Code.  *CB Confirmation Objection* ¶¶ 10–13.  CB, however, offers no reasonable basis or evidence to attack the good faith nature of the Amended Plan.  Rather, CB alleges that the Amended Plan lacks good faith because it does not, at this stage, seem to serve a "legitimate and honest purpose to reorganize the debtor" and is "inconsistent with the objectives and purposes of the Bankruptcy Code."  *CB Confirmation Objection* ¶¶ 11, 13.  CB argues that bad faith grounds are present because (i) the Amended Plan's provisions regarding the Debtors' servicing transition obligations effectively allow the Debtors to shirk all transition obligations post-Effective Date, to the detriment of CB and the underlying PPP borrowers, and (ii) unsecured creditors "are left to look to the proceeds of expensive and likely contested litigation" (i.e., the Avoidance Actions and other causes of action whose distributions will fund the GUC Pool) for any returns on account of their Claims.  *CB Confirmation Objection* ¶ 13.  CB is factually incorrect regarding the basis for the Debtors' alleged servicing transition obligations and furthermore lacks standing to lobby on behalf of General Unsecured Creditors, having waived any such claims it might have once held.  For those, among other reasons, CB's Confirmation Objection should be overruled.

219.     Notably, CB is the *only* party alleging bad faith by the Debtors in proposing the Amended Plan.  In doing so, CB misunderstands the good faith requirement set forth in section

1129(a)(3) and how it is applicable in the current context.  As the Debtors contemplate a wind down effectuated by the Amended Plan, CB's assertion that the good faith standard requires a showing of an "honest purpose to reorganize the debtor" is misstated and inapplicable.  As noted herein, the Third Circuit has stated that "the 'touchstone' of the good faith inquiry is 'the plan itself and whether it will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *W.R. Grace*, 475 B.R. at 87 (quoting *PWS Holding*, 228 F.3d at 242) (other citation omitted).  As courts have further said, the "determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." *Id*.  Clearly, the Bankruptcy Code contemplates more than just reorganization under chapter 11.  *See, e.g.*, *In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 673 (Bankr. N.D. Ga. 2014) (analyzing the good faith of a liquidation plan and noting that "liquidations are specifically authorized by § 1123 [of the Bankruptcy Code].").  Here, under the circumstances, the Amended Plan seeks to achieve an orderly wind down and provide potential recoveries to creditors who, in a chapter 7 liquidation, would receive nothing.  Such purposes are precisely the objectives of the Bankruptcy Code.

220.    Further, the Amended Plan undoubtedly satisfies the good faith standard articulated by the Third Circuit.  As the evidence provides, the Debtors have undertaken substantial efforts to propose a chapter 11 plan that maximizes value for the benefit of all stakeholders, while also minimizing borrower disruption as the Debtors work to transition loan servicing obligations to alternate servicers in an orderly fashion.  The Debtors obtain no economic gain from continuing such PPP Loan servicing or committing to transition services—rather these efforts were made to ensure, where possible, an orderly wind down of a business that directly impacts stakeholders and borrowers alike.  Further, from the onset of these Chapter 11 Cases, the Debtors and all other

108

parties in interest, and each of their respective advisors, have worked diligently and with the honest purpose to engage constructively and cooperatively to achieve consensus whenever possible, while avoiding expending scarce resources to maximize value for the benefit of all creditors. Such engagement has been undertaken by the Debtors in good faith and with the purpose of achieving the Debtors' cited goals in commencing these Chapter 11 Cases, including effectuating an orderly wind down and liquidation of the Estate. *See Memorandum* § I.F. Given the facts, the Debtors believe that there is a reasonable likelihood that the Amended Plan will achieve a result consistent with the standards prescribed in the Bankruptcy Code and therefore satisfies the "good faith" standard.

221.    CB's argument that the Amended Plan's provisions are proposed in bad faith and allow the Debtors to shirk all transition obligations post-Effective Date, to the detriment of CB and the underlying PPP borrowers, does not hold water. As discussed in detail above, the Debtors are not obligated, under the CB Settlement Agreement or otherwise, to service CB's loans after March 31, 2023 and furthermore are not obligated to complete a servicing transition of the CB PPP Loans (although CB's Confirmation Objection seeks to impose additional obligations of the Debtors in such respect) by any certain time. Notwithstanding the lack of any such obligations, the Debtors have demonstrated their good faith, and certainly commercially reasonable efforts, to implement a servicing transition for CB and three other parties. Accordingly, CB's Confirmation Objection based on the Debtors' alleged bad faith in connection with their servicing and transfer obligations should be overruled.

222.    Notwithstanding the above, CB does not possess grounds to object to the treatment nor recoveries of the General Unsecured Creditors under the Amended Plan. CB is not itself an unsecured creditor, given that CB has released all prepetition Claims against the Debtors

109

by consenting to the releases provided under the CB Settlement Agreement.[27]  *CB Settlement Agreement* ¶ 9(c).  Thus, CB has no standing to object to the Amended Plan on this basis.  *See W.R. Grace*, 475 B.R. at 176-78 (noting that the Third Circuit clarified the question of standing in bankruptcy cases, "providing that a party challenging a reorganization plan in bankruptcy court must meet both the constitutional requirements for standing under Article III of the U.S. Constitution, as well as the statutory standing requirements put forth by the Bankruptcy Code in 11 U.S.C. § 1109(b)") (citing *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) ("A party seeking constitutional standing must demonstrate an 'injury in fact'…")).  Here, CB does not satisfy the baseline threshold for establishing standing, as they have not suffered, nor are in imminent danger of suffering, an "injury in fact" on account of the Amended Plan's treatment of General Unsecured Creditors.  Consequently, CB's arguments with respect to the treatment and projected recoveries of the General Unsecured Creditors are improper on their face.  Even if that were not the case, as discussed at length herein, the Liquidation Analysis demonstrates that General Unsecured Creditors under the Amended Plan would recover at least as much as they would in a hypothetical chapter 7 liquidation, and in fact, the Liquidation Analysis presents a more favorable outcome for such creditors than likely to occur in a chapter 7 liquidation, as it excludes various chapter 7-specific costs and additional general unsecured claims that would further reduce their *pro rata* recoveries.

223.    Accordingly, CB's Confirmation Objection that the Amended Plan was not proposed in good faith is unfounded and must be overruled.

---

[27]    In fact, CB has not filed a Proof of Claim in these Chapter 11 Cases and, thus, is not a holder of a Claim in Class 4 (General Unsecured Claims) or otherwise.

110

## <u>CONCLUSION</u>

224.    The Amended Plan complies with all of the requirements of section 1129 of

the Bankruptcy Code and should be confirmed.

Dated: March 9, 2023
      Wilmington, Delaware

/s/ Matthew P. Milana
_____
RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi, Esq. (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
      steele@rlf.com
      shapiro@rlf.com
      milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
E-mail:    ray.schrock@weil.com
      candace.arthur@weil.com
      natasha.hwangpo@weil.com
      chase.bentley@weil.com

*Attorneys for Debtors and Debtors in Possession*
