IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>KABBAGE, INC. d/b/a KSERVICING et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10951 (CTG)<br><br>(Jointly Administered)<br><br>Hearing Date: March 20, 2023 at 10:00 a.m. |

**DEBTORS' REPLY IN FURTHER SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER ENFORCING THE SETTLEMENT ORDER AND THE SETTLEMENT AGREEMENT BETWEEN KSERVICING AND CUSTOMERS BANK**

Kabbage, Inc. d/b/a KServicing ("**KServicing**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby submit this Reply (the "**Reply**") in response to opposition [Docket No. 356] (the "**Opposition**") filed by Customers Bank ("**CB**") to the *Motion of Debtors for Entry of an Order Enforcing the Settlement Order and the Settlement Agreement Between KServicing and Customers Bank*, (Dec. 7, 2022) [Docket No. 340] (the "**Motion**").[2] Contemporaneously herewith, the Debtors submit the declarations of Donna R. Evans (the "**Evans Reply Declaration**") and Tamica M. Williams (the "**Williams Reply Declaration**") and respectfully state as follows in support of the Reply:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express. The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion. KServicing adopts and incorporates by reference the arguments in the Motion in their entirety, as if fully set forth herein.

**PRELIMINARY STATEMENT**

1.  Since the Motion was adjourned, CB and the Debtors have met and conferred on the Settlement Payment issues and have narrowed the dispute to one issue. The remaining issue is the appropriate calculation of "Disputed KServicing Remittances Holdbacks," and, in particular, the amount of funds collected from borrowers that KServicing would have otherwise been required to remit to CB. The remaining amount at issue is $1,555,656.

2.  The dispute can be summarized as follows: In the early stages of the reconciliation process concerning the amount of the Settlement Payment, the Company sent to CB two spreadsheets on November 4, 2022 that contained, among other things, a preliminary list of loans where KServicing had collected money from borrowers that still needed to be returned to CB ("**Borrower Remittances**"). Borrower Remittances were to be deducted from the $58 million Settlement Amount because KServicing was holding (and would return to CB as part of the Settlement) amounts paid by Borrowers that still needed to be paid to CB.

3.  It is clear from the declaration submitted by Alyssa White with CB's opposition papers that CB's calculation of the Settlement Payment took the amount of the Borrower Remittances straight from the November 4, 2022 spreadsheets. White Decl. ¶ 11(b) ("Customers Bank accepted those figures and the Reconciliation Summary at Exhibit 1 uses both of those figures in reaching the lines item 'Total Borrower Remittance Payments (P&I).'"); White Decl., Ex. 1.

4.  It is also now clear that the preliminary list of loans in the November 4, 2022 spreadsheets did not reflect the undisputed fact that KServicing had already paid CB with respect to five (5) loans on those spreadsheets. As noted above, the amount previously remitted to CB (and for which CB needs to increase its Settlement Payment) is $1,555,656.

5. This dispute is straightforward. The five (5) loans at issue are expressly contained in the November 4, 2022 spreadsheet that CB used to calculate Borrower Remittances. Yet, it is now clear that the money received from borrowers with respect to these five (5) loans was already paid to CB. If the Court were to adopt CB's Settlement Payment calculation, CB would receive the $1,555,656 twice: once when it was paid in the usual course of business back in October 2020 and once in connection with the Settlement Payment.

6. CB has no real answer to this issue. CB seems to suggest that the prior payment of the money owed to CB on these five (5) loans can somehow be ignored because it came from a Wells Fargo bank account and not a Synovus bank account and took place in October 2020, before what CB claims is the relevant time period. This assertion is at best perplexing. Regardless of the bank account from which the payments were made, there is no dispute that these payments were made to CB on account of these five (5) loans that were on the list that CB admittedly used to determine Borrower Remittances.

7. Second, it makes sense that any payments on these loans would have come from a Wells Fargo bank account given the time the money was paid to CB. The Wells Fargo account was the predecessor to the Synovus account and prior to the AmEx transaction it was the account through which payments were made to CB.

8. Because CB cannot dispute that the loan-by-loan list it admittedly used to determine Borrower Remittances inaccurately reflected five (5) loans for which payments received from borrowers had already been made to CB, CB contends that it conducted some type of "trial balance" analysis that it says confirmed its Settlement Payment amount. This "trial balance" analysis, discussed in the Declaration of Alyssa White, is not a loan-by-loan analysis and does not (and cannot) refute the fact that five (5) of the loans on the spreadsheet used by CB to calculate

Borrower Remittances should not have been on that list because money collected on those loans had already been paid to CB. In any event, even if the analysis were somehow relevant here, the trial balance analysis provides no backup or support whatsoever and appears to be based on information received from AmEx that the parties have repeatedly recognized is flawed and needs to be reconciled to the Company's books and records. Evans Reply Decl. ¶¶ 3-4, 6-7. Lastly, the Debtors have repeatedly asked for the underlying backup to the trial balance analysis and have only been provided with a single page document that simply purports to set out the calculation. As such, the Debtors have been unable to duplicate the analysis or even analyze or otherwise review any of the backup used. Under these circumstances any evidence with respect to this trial balance analysis should be precluded.

9. Another argument made by CB with respect to the Settlement Payment is that the reconciliation process was supposed to end on November 9 and therefore it could pay any amount without regard to whether that number is correct. But as set forth in the opening brief in support of the Motion, the Settlement Payment is defined as the correct amount of the payment, not some inaccurate amount when the reconciliation period purportedly ended. From the outset of the Reconciliation Process, KServicing's goal has been to reach the correct Settlement Payment amount. Even after the Motion was filed, the Company has worked to arrive at the correct number and has now narrowed the issue to be decided by the Court to calculation of Borrower Remittances. It is unfortunate that CB refused to work with the Company before the Motion was filed, but it is time for CB to pay the correct Settlement Payment.

## ARGUMENT

### I.   KServicing Already Paid CB Over $1.55 million in Borrower Remittances

10.   As noted above, the sole issue remaining in the Motion relates to the amount of Borrower Remittances and its impact on the Settlement Payment. The calculation of the Settlement Payment by each of CB and KServicing is set out in the chart attached as Exhibit D to the Williams Reply Declaration and copied below, with blue highlight indicating the only calculations that differ as between the two analyses:

|  | CUBI | KSERVICING |
|---|---|---|
| Returned/Cancelled Loans | $3,617,304 | $3,617,304 |
| Returned/Cancelled Loans in Remittance Report | ($426,258) | ($426,258) |
| Additional Loans not Disbursed (per Danny) | $35,899 | $35,899 |
| **Adjusted Returned/Canceled Loans** | **$3,226,945** | **$3,226,945** |
| Borrower Principal Repayments and Returns per Remittance File | $25,578,633 | $24,022,977 |
| Interest Collected | $1,030,328 | $1,030,328 |
| Reported Remittance Account Variance | $497,900 | $497,900 |
| **Total Borrower Remittance Payments (P&I)** | **$27,106,862** | **$25,551,205** |
| Adjusted Returned/Cancelled Loans | $3,226,945 | $3,226,945 |
| Total Borrower Remittance Payments (P&I) | $27,106,862 | $25,551,205 |
| Fees Owed to SBA (Borrower Overpayments) | ($1,150,513) | ($1,150,513) |
| **Disputed KServicing Remittance Holdbacks** | **$29,183,294** | **$27,627,637** |
| **Disputed KServicing Fee Holdbacks** | **$8,317,023** | **$8,317,023** |
| Disputed KServicing Remittance Holdbacks | $29,183,294 | $27,627,637 |
| Disputed KServicing Fee Holdbacks | $8,317,023 | $8,317,023 |
| **Disputed KServicing Holdbacks** | **$37,500,317** | **$35,944,660** |
| **Negotiated Receivable** | **$58,000,000** | **$58,000,000** |
| Disputed KServicing Holdbacks | ($37,500,317) | ($35,944,660) |
| **Settlement Payment** | **$20,499,683** | **$22,055,340** |
| Rec'd from CUBI 11/14 | | $19,469,355 |
| Rec'd from CUBI 11/16 | | $1,030,328 |
| | | $20,499,683 |
| **Still owed by CUBI** | | **$1,555,656** |

11. As the chart above reflects, the only difference to be decided by the Court is the correct amount of Borrower Remittances. CB's calculation lists the Borrower Principal Payment of $25,578,633 and the interest of $1,030,328—which add up to $26,608,962. The Declaration of Alyssa White confirms that CB obtained the Borrower Remittance amounts in its Settlement Payment calculation from KServicing's spreadsheet. Ms. White states:

> During the reconciliation process, Donna Evans of KServicing sent me (and others) an email on November 4, 2022 at 7:38 p.m. stating: "Synovus accounts analysis: KServicing has performed an analysis of the activity in the Synovus account from inception to October 3, 2022, reconciling the activity in that account to our remittances files. See attached files for reference." This email and the attached Synovus bank statements are attached hereto as Exhibit 3. The first entry in these Synovus bank statements is in November 2020. Included with that email was an excel spreadsheet called "Synovus account analysis," which is attached hereto as Exhibit 3(a). That analysis shows net borrower payments of $27,106,862, and breaks it down into borrower repayments per remittances file ($26,608,962) and remaining variance to be resolved ($497,900). Customers Bank accepted those figures and the Reconciliation Summary at Exhibit 1 uses both of those figures in reaching the line item "Total Borrower Remittance Payments (P&I)." White Decl. ¶ 11(b).

Thus, Ms. White admits that the Borrower Remittance total came directly from the files sent to CB on November 4, 2022.

12. The CB Remittance File[3] sent to CB on November 4, 2022 expressly <u>includes</u> five (5) loans for which prior payment to CB was not accounted. Excerpts from the CB Remittance File, attached as Exhibit B to the Williams Reply Declaration, incorrectly reflected that KServicing owed CB a total $1,614,611.83 on account of these five loans (although $1,555,656 of that amount for these same loans was already paid to CB in October 2020, as shown below).

---

[3] As defined in the Williams Reply Declaration, filed contemporaneously herewith. *See* Williams Reply Decl. ¶ 12.

13. CB's Opposition does not dispute that payment with respect to these five loans was received. Indeed, the evidence is clear that $1,555,656 of that amount for these same loans was already paid to CUBI in October 2020. At the time KServicing's former CFO made that payment to CB, he attached a spreadsheet entitled "CUBI payment details 10212020.xlsx" (the "**CB Payment Oct. 2020 Spreadsheet**") showing the amounts paid on account of each loan, by loan number and amount. As set forth in the Williams Reply Declaration, that spreadsheet (described there as the "payment file") expressly listed the same five (5) loans at issue in the Motion. The payment to CB described in that email on account of those loans is also reflected in a Wells Fargo wire transfer record showing that the precise amount from the CB Payment Oct. 2020 Spreadsheet was paid to CB. Williams Reply Decl. ¶¶ 15-17.

14. Thus, in summary:

- The Borrower Remittance amounts used by CB in its Settlement Calculation admittedly came directly from the November 4 spreadsheets sent to CB;

- The list of loans in that spreadsheet inaccurately included five (5) loans as having amounts that had been paid by borrowers to KServicing that needed to be, in turn, paid to CB;

- The borrower payments for these five (5) loans were already paid to CB in October 2020. The amount of these payments was $1,555,656.

15. That should end the dispute and CB's arguments with respect to this issue are specious at best. First, CB argues that it is entitled to be paid twice on the same loans because the payment was made from an account other than the current Synovus account used by KServicing and because the payment was made before KServicing began holding back funds as a result of CB's non-payment of fees. *See* Opp'n ¶¶ 15–16; White Decl. ¶ 21. This argument makes no sense. It does not matter from which bank account a payment is made, nor when a payment was made. Rather, the point of the borrower remittance deduction from the Settlement Payment was that if

there was money being held by the Company that is owed to CB, then that amount was to be deducted from the $58 million Settlement Amount to yield the Settlement Payment. Here, borrower payments on five loans were incorrectly listed on the spreadsheet that CB used to calculate Borrower Remittances, but it is clear that $1,555,656 was already paid to CB—it does not matter from which bank accounts those payments were made or when they were made.

16. Second, CB argues that the records reflecting KServicing's $1,555,656 payment to CB from KServicing's former Wells Fargo account was a "secret file." But as reflected in Exhibit 3 to the Williams Declaration, Kabbage's then-CFO, Mr. Eidson sent this "secret file" to CB contemporaneously with payment in October 2020, which showed the payments on the five (5) loans at issue. That same day, Kabbage wired these funds to CB from its former Wells Fargo account, which included the $1,555,656 on account of five loans at issue here. Williams Decl., Ex. 4. CB does not deny it received this payment.

17. In addition, CB is well aware of KServicing's use of the Wells Fargo account. *See* Opp'n ¶¶ 14, 17. As CB knows, prior to the AmEx Transaction, KServicing (then known as Kabbage) maintained its bank accounts with Wells Fargo—including accounts in which remittances from CB borrowers were kept—and at that time did not have any accounts with Synovus bank. *See* Williams Reply Decl. ¶¶ 19–20. As a result, CB's alleged befuddlement and supposed "shock," as to why KServicing would refer to payments made from its former Wells Fargo account is pure artifice, an attempt to create confusion where none exists. Simply put, CB cannot deduct from the Settlement payment funds KServicing *already* paid to CB; such a requirement would result in CB being paid the same funds twice, and would unjustly enrich CB by crediting CB with funds it already has.

## II.   CB's Trial Balance Analysis Does Not Refute the Loan-By-Loan Remittance Calculation and Should Be Disregarded in any Event

18. Although CB and Ms. White make much of the "trial balance" analysis they claim supports their calculation, *see* Opp'n ¶¶ 26–27, CB provides no back-up for this analysis and it is unclear what was used and from where the calculation is derived.

19. It appears that the trial balances to which CB is referring may have come directly from AmEx (and not from KServicing). CB knows these AmEx "trial balances" are not accurate and require further analysis and reconciliation. Indeed, as Ms. Evans explains, since the AmEx Transaction, these trial balance reports are maintained by AmEx and KServicing has no control over these reports. These trial balance reports do not include a large number of transactions or reflect all proper transaction codes needed to render loan-level up-to-date data. Evans Reply Decl. ¶ 6. Both prior to and during this dispute, CB and KServicing have explicitly discussed, on multiple occasions, whether, given the gaps in these AmEx-generated trial balance exports, the Parties could implement some fix to make the AmEx trial balance data more reliable, including an automated update that would layer necessary KServicing data on top of the reports to yield more accurate information on the total outstanding loan population. *See id.* ¶¶ 6–7. However, as KServicing communicated to CB, such an automated update, or "bridge file," was near impossible to create and thus has not been implemented. *Id.*

20. In obvious recognition of the need to reconcile the AmEx trial balances, the Parties agreed in the Settlement Agreement that the Company would have to provide a supplemental report to the AmEx trial balance data. Exhibit A to the Settlement Agreement lists "Daily Trial Balance Reports" and states that these "Daily Trial Balance Reports will continue to be generated automatically each business day from the CoreCredit system of record maintained by American Express in the format such reports are current[ly] prepared. *A supplemental report will be provided*

each business day for the entire originated portfolio that provides the bank total balance reflecting all payment types (*i.e.*, remittance, guaranty, forgiveness, return, fraud recovery, etc.). *KServicing will perform reconciliation and implement appropriate controls to ensure data sets are harmonized*." Settlement Agreement, Ex. A, ¶ 2 (emphasis added). Thus, CB knew, and the Settlement Agreement reflected, that the AmEx-generated trial balance reports are not complete, and require reconciliation. Evans Reply Decl. ¶¶ 4, 8. Yet, it now appears that CB is using this "trial balance" as a (poor) substitute for a loan-by-loan analysis. Thus, CB's assertions that the trial balances are the "gold standard" for reconciling financial data are belied by the undisputed facts as confirmed by the Settlement Agreement itself.

21. In her declaration, Ms. White contends that CB was "able to reconcile" its Settlement Payment calculation with the "trial balances" (which CB knows have limitations) within "about" $1,380. White Decl. ¶ 23. Ms. White's declaration, however, attaches no data or documentation in support of this assertion, nor has CB ever provided a loan-level justification for its Settlement Payment calculation generally, nor its purported comparison of the same to the "trial balance." It appears that CB now seeks to avoid a "loan-by-loan" analysis in favor of some general check because it knows the loan-by-loan analysis reflects that actual payment on the five loans at issue was made to CB over 2 years ago.

22. On multiple occasions, the Debtors have asked CB to provide data, documentation, backup or other information that supports CB's calculation of its Settlement Payment amount or could aid in KServicing's understanding of what CB describes as the reconciling of that amount with the "trial balance." In response, CB has repeatedly refused to provide specific backup or information, other than a one-page demonstrative (with no source data), to authenticate how CB arrived at its purported "reconciliation" of the "trial balance" with its Settlement Payment amount.

As a result, CB should be precluded at the hearing on the Motion from introducing the trial balance analysis and any documents, data, or proffering any testimony based upon information or data that has not been provided to KServicing concerning its purported reconciliation of its Settlement Payment amount with the "trial balances" as referred to in the White Declaration.

### III. The Correct Settlement Payment Number Was Not Subject To Any "Reconciliation" Deadline

23. CB spends nearly five pages of its Opposition arguing that the clock ran out on needing to calculate the correct Settlement Payment amount (Opp'n ¶¶ 6–13). But, there is nothing in the Settlement Agreement that allows CB to pay less than the actual amount owed. As set forth in the Motion, the Settlement defines the Settlement Payment as "an amount equal to the Settlement Amount [of $58,000,000] less the amount of the Disputed KServicing Holdbacks as of the Petition Date." Settlement Agreement, §§ 1(G), 1(H). This requires the payment of the right amount, and nothing limits that payment based on the reconciliation process engaged in by the parties.

24. The Reconciliation provision provides that "through the Effective Date, the Parties shall work together in good faith to promptly reconcile the amounts of the Disputed KServicing Fee Holdback and the Disputed KServicing Remittance Holdback as of the Petition Date to determine the appropriate amount of the Settlement Payment." Settlement Agreement, § 3(A). This provision simply provides a mandatory period for the Parties to act in good faith to agree on the right number and avoid disputes—not that they must cease all reconciliation as of that period. More significantly, the Reconciliation provision does not state that if the Parties have not reconciled the amount of the Settlement Payment by the Effective Date, CB could simply pay whatever it wished. Yet, that is precisely what CB did.

25. While CB states that KServicing's Motion "tepidly alludes to some post-reconciliation communications by both parties," as supposed support for its deadline argument, CB fails to mention (and does not deny) that these communications included CB General Counsel's representation to KServicing on November 9th (the Effective Date) that the parties would continue their joint reconciliation efforts over the following weekend, given CB had until November 14th to remit the Settlement Payment to KServicing. *See* Opp'n ¶ 7; Evans Decl. ¶ 18. Moreover, the fact that even after the Effective Date CB paid KServicing an additional approximately $1 million on November 15th as part of the Settlement Payment, demonstrates that the clock did not "stop" as CB contends. *See* Evans Decl., Ex. 7.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order attached as Exhibit A to the Motion, modified to account for the remaining $1,555,656 sought herein, granting the relief requested in the Debtor's Motion and such other and further relief as may be just and proper.

[*Remainder of page intentionally left blank*]

Dated: March 13, 2023
      Wilmington, Delaware

                    */s/ Matthew P. Milana*
                    RICHARDS, LAYTON & FINGER, P.A.
Daniel J. DeFranceschi (No. 2732)
Amanda R. Steele (No. 5530)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
E-mail: defranceschi@rlf.com
           steele@rlf.com
           shapiro@rlf.com
           milana@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
Natasha S. Hwangpo (admitted *pro hac vice*)
Theodore E. Tsekerides (admitted *pro hac vice*)
Richard W. Slack (admitted *pro hac vice*)
Chase A. Bentley (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
E-mail:       ray.schrock@weil.com
               candace.arthur@weil.com
               natasha.hwangpo@weil.com
               theodore.tsekerides@weil.com
               richard.slack@weil.com
               chase.bentley@weil.com

*Attorneys for Debtors and Debtors in Possession*