| | |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
| | DISTRICT OF DELAWARE |
| 2 | |
| 3 | IN RE:                        .  Chapter 11 |
| | .  Case No. 22-10951 (CTG) |
| 4 | KABBAGE, INC., d/b/a          .  (Jointly Administered) |
| | KSERVICING, *et al.*,         . |
| 5 | .  Courtroom No. 7 |
| | .  824 Market Street |
| 6 | Debtors.   .  Wilmington, Delaware 19801 |
| | . |
| 7 | .  Monday, March 13, 2023 |
| | . . . . . . . . . . . . . . .  1:00 p.m. |
| 8 | |

```
 9                    TRANSCRIPT OF ZOOM HEARING
              BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Zachary I. Shapiro, Esquire
                               RICHARDS, LAYTON & FINGER, PA
13                             One Rodney Square
                               920 North King Street
14                             Wilmington, Delaware 19801

15                             -and-

16                             Candace M. Arthur, Esquire
                               Natasha S. Hwangpo, Esquire
17                             Chase A. Bentley, Esquire
                               Theodore E. Tsekerides, Esquire
18                             WEIL, GOTSHAL & MANGES, LLP
                               767 Fifth Avenue
19                             New York, New York 10153

20   (APPEARANCES CONTINUED)
     Audio Operator:           Sean Moran, ECRO
21
     Transcription Company:    Reliable
22                             The Nemours Building
                               1007 N. Orange Street, Suite 110
23                             Wilmington, Delaware 19801
                               Telephone: (302)654-8080
24                             Email:  gmatthews@reliable-co.com

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the US Trustee:        Rosa Sierra-Fox, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
3                              J. Caleb Boggs Federal Building
                               844 King Street
4                              Suite 2207, Lockbox 35
                               Wilmington, Delaware 19801
5

6   For Cross River Bank:      Gregory W. Werkheiser, Esquire
                               BENESCH, FRIEDLANDER, COPLAN
7                                & ARONOFF, LLP
                               1313 North Market Street
8                              Suite 1201
                               Wilmington, Delaware 19801
9
                               -and-
10
                               Matthew R. Scheck, Esquire
11                             QUINN EMANUEL URQUHART
                                 & SULLIVAN, LLP
12                             300 West 6th Street
                               Suite 2010
13                             Austin, Texas 78701

14
    For the Federal Reserve
15  Bank of San Francisco:     Lisa M. Schweitzer, Esquire
                               CLEARY GOTTLIEB STEEN
16                               & HAMILTON, LLP
                               One Liberty Plaza
17                             New York, New York 10006

18
    For the United States
19  of America:                Alastair Gesmundo, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
20                             1100 L Street, NW
                               Washington, DC 20005
21

22  For Customers Bank:        John J. Monaghan, Esquire
                               HOLLAND & KNIGHT, LLP
23                             10 St. James Avenue
                               Boston, Massachusetts 02116
24

25

APPEARANCES (CONTINUED):

For American
Express:                    James L. Bromley, Esquire
                            SULLIVAN & CROMWELL, LLP
                            125 Broad Street
                            New York, New York 10004

1                                     INDEX

2    MOTIONS:                                               PAGE

3    Agenda
     Item 1:   Amended Joint Chapter 11 Plan of Liquidation    6
4              of Kabbage, Inc. (d/b/a KServicing) and its
               Affiliated Debtors
5              [Docket No. 627 - filed March 9, 2023]

6              Court's Ruling:                              60

7


8


9    WITNESSES CALLED
     BY THE DEBTORS:                                       PAGE
10

11         SALIM KAFITI

12         Direct examination by                           --

13         Cross-examination by Ms. Sierra-Fox             16

14


15


16   DECLARATIONS:                                         PAGE

17   1) Declaration of Salim Kafiti                        14

18   2) Declaration of Deborah Rieger-Paganis              14

19   3) Declaration of Kim D. Steverson                    14

20   4) Declaration of Laquisha Milner                     14

21

22   Declaration of Transcriptionists                      62

23


24


25

1      (Proceedings commence at 1:00 p.m.)

2           THE COURT:  Be seated.

3           MS. ARTHUR:  I was going to say good morning, but

4   good afternoon, Your Honor.

5      (Laughter)

6           THE COURT:  Good afternoon.

7           MS. ARTHUR:  For the record, Candace Arthur of

8   Weil, Gotshal & Manges on behalf of Kabbage, Inc., doing

9   business as KServicing.  They are the debtors in this case.

10          Your Honor, thank you for your time and,

11  particularly, thank you for the accommodations that you

12  provided to the debtors this morning.  The time was very well

13  spent.  It is definitely a testament to the bankruptcy

14  process, and I think you're going to be pleased at least with

15  the outcome and what we have done during the period.

16          The debtors are here today seeking confirmation of

17  their liquidating plan.  Your Honor, I'm not going to bury

18  the lead here.  The only live issue that's going to be before

19  the Court is with respect to the limited objection of the

20  United States Trustee.  I will make some brief statements for

21  the record and to also provide some of the general idea, in

22  terms of the resolutions that have been reached.  We'll also

23  go through it with the confirmation order as to the specific

24  language changes.

25          But again, for the most part, all objections have

1  been fully resolved.  And again, it -- the only one that

2  remains for the Court to address would be the United States

3  Trustee's objection.

4         So, Your Honor, we are here today seeking

5  confirmation of the debtors' liquidating plan.  We came

6  before the Court on October 3rd, and we didn't have a precise

7  view as to how these cases would end.

8         Without a liquidity solution in the form of the

9  Reserve Bank providing us with their consent to use cash

10  collateral and for the debtors' ability to obtain the balance

11  of an outstanding receivable from the partner bank Customers

12  Bank, we would not have been able to proceed with a -- what

13  we coined the "funded Chapter 11 cases."  The debtors would

14  have had to cease operating right away, they would have had

15  to cease assisting borrowers right away, and they would have

16  had to turn off the proverbial lights.

17         The debtors were able to secure the necessary

18  liquidity in mid to late November.  And as a result, as I

19  mentioned, the pursued the funded Chapter 11 case.  And once

20  the exit -- once the exit path materialized for the debtors,

21  they were able to turn their attention and focus to designing

22  a plan for transitioning their servicing obligations to the

23  relevant stakeholders.

24         I think it's important for the record to note that

25  this was not a prepackaged case, it wasn't prearranged.  And

1  in five months' time, the debtors were able to secure

2  liquidity, continue operating in the ordinary course.

3        They developed a transition plan, which they had

4  begun to implement before confirmation -- this confirmation

5  hearing.  And they were also able to manage through many of

6  the investigations and audits that were not stayed as a

7  result of their commencing the cases.

8        I would like to, before turning over to the

9  objection I had mentioned, provide you with the developments

10  that occurred.

11        So we reached a resolution with the Carr

12  Plaintiffs, Your Honor.  And one change was specific to the

13  plan and another one was to the wind-down agreement.  I do

14  have redlines of those if you would like to see those now, or

15  we can handle it at the balance of the hearing.

16        THE COURT:  I'm happy to --

17        MS. ARTHUR:  Just --

18        THE COURT:  -- happy to look at that.

19        MS. ARTHUR:  Okay.

20        THE COURT:  Do you have them?  Yes.  If that makes

21  sense.

22     (Participants confer)

23        THE COURT:  Okay.  Thank you.  Okay.

24        MS. ARTHUR:  Okay.  We also resolved the limited

25  objection and reservation of rights of Cross River Bank.

1  They have -- or they will -- I'm not quite sure, actually,

2  depending upon how the -- what the docket reflects at the

3  moment -- withdraw their objection.  And the language

4  reflecting the resolution is also going to be included in the

5  confirmation order, as well as certain conforming changes to

6  the Chapter 11 plan.

7         To the extent that that has not actually been

8  presented before the Court, so that Your Honor knows, in

9  general form, what the parties have agreed to is that we're

10  going to provide Cross River Bank with all of the data and

11  documents that are relevant for the transferring of their

12  servicing files that's in the debtors' possession, custody,

13  or control by April 17th.

14         The data and -- the data information is listed in

15  a December -- no, in a work plan that was affixed to the

16  stipulation that the Court entered, so that's also the

17  guidelines that we're using in connection with providing them

18  with those documents.

19         In addition, we have also agreed to provide

20  certain cooperation to them in connection with a 2004 motion

21  that they have pending against AmEx.

22         THE COURT:  Okay.  And that was in the redline to

23  the confirmation order that came in --

24         MS. ARTHUR:  This morning?

25         THE COURT:  -- at some point earlier today.

1           MS. ARTHUR:  I believe --

2           THE COURT:  Got it.

3           MS. ARTHUR:  Perfect.

4           THE COURT:  Okay.  So then that --

5           MS. ARTHUR:  Then that's -- so we're --

6           THE COURT:  Okay.  I'm with you, I'm with you that

7    far.

8           MS. ARTHUR:  Okay.  Great.  Thank you, Your Honor.

9           And then I want to make a -- make some following

10   statements for the record for the hearing in the Chapter 11

11   cases.

12           For the first point:  As provided for and set

13   forth more fully in the plan, the allowed Reserve Bank claim

14   is comprised of an estimated principal amount in the debtors'

15   liquidation analysis.  It was estimated as of the conversion

16   date in a PPP transfer scenario as approximately 427.4

17   million, including, among other things, accrued and unpaid

18   interest, as well as additional expected costs and expenses

19   to be determined, which we satisfied through proceeds of the

20   pledged PPPLF collateral.  And adequate protection collateral

21   and any deficiency amounts will be afforded priority status.

22           Your Honor, this is only further -- I wouldn't say

23   the word "clarifying," but it's a further point that Ms.

24   Deborah Paganis also made in her declaration.

25           I would also note for the record in these cases,

1  as well, that the debtors have been working cooperatively

2  with the Reserve Bank on transfer of servicing of the pledged

3  PPPLF loans, and the Reserve Bank has been cooperatively

4  working with the debtors to identify an alternative servicer

5  since early on in these Chapter 11 cases.

6        Among other things, the debtors and the Reserve

7  Bank are working on a plan for the orderly and efficient

8  transfer of servicing or related loan documents, based on the

9  statement of work and the feedback from the Reserve Bank,

10  which the debtors envision to be an iterative and evolving

11  process.  And the parties will continue to work together in

12  good faith to finalize a mutually agreeable transition plan.

13        Finally, the debtors refer to the transition

14  parties as a whole, I think, in a lot of our papers.  I do

15  want to note specifically that the Reserve Bank is supporting

16  the plan and they have been and continue to work very

17  cooperatively with the debtors.

18        I think another point to note in connection with

19  the Reserve Bank is that we are working with them to agree to

20  a cash collateral budget for the period after March 31st

21  through the effective date, so the parties are working on

22  that currently, Your Honor.

23        We also have been successful in reaching an

24  agreement in principle with Customers Bank that will resolve

25  both their plan objection or the joinder that they filed

1  today, as well as their pending 2004 motion against the

2  debtors.  The precise language will be reflected in the 2004

3  motion.  But I think, for the record, and given the impact it

4  has on their plan objection, it would be prudent to just

5  provide you with some of the guardrails of that, as well.

6           The debtors have agreed that they will provide,

7  similar in nature to what has been agreed to with Cross River

8  Bank, they will provide Customers Bank with the documents and

9  information that they have in their possession, custody, or

10 control as described in the statement of work that the bank

11 received on or about March 8th or 9th.  And then they will do

12 so by a date certain, as well.

13           The -- any recourse that Customers Bank has in

14 connection with these -- with the debtors' efforts to provide

15 the information by a certain date is expressly limited to

16 specific performance.

17           We have also agreed with Customers Bank that, in

18 connection with their efforts to transition certain of the

19 billing, payment, and invoicing features that American

20 Express may have either control over or be involved with,

21 that we're going to facilitate them, working with American

22 Express to partition their particular loans in connection

23 with their particular invoicing procedures, so long as it

24 doesn't either impact the other transfer parties or in other

25 way -- otherwise impact the transfer process as a whole.  We

1   want to make sure that it doesn't impede or delay it or

2   there's no costs that are incurred because AmEx is doing

3   something particularly for one party, versus all of the

4   parties.

5          We have also agreed, similar to Cross River, that

6   we were going to facilitate their efforts in connection with

7   the 2004 motion that they filed against American Express and

8   file a statement in support, in connection with that -- those

9   efforts, as well.  The language is very similar in that

10  particular paragraph.  And again, noting, of course, that the

11  debtors are not going to incur, in connection with their

12  cooperation, any costs that are material or out of the

13  ordinary course in connection with those cooperation efforts.

14         They are also working with Customers Bank in

15  connection with sending, I think what we'll call, I think,

16  the "goodbye letter" to borrowers, just to make sure that

17  they have noticing time of any of the transition that happens

18  in connection with ACH or any of the electronic payment

19  functions and things of that nature, in connection with the

20  transfer.

21         I'm going to look around, just to make sure that I

22  think I captured all of the statements and resolutions to

23  date.  I believe so.

24         So, Your Honor, that's going to conclude the

25  introductory remarks.

1          Subject to the Court having another way that you

2    would like for the hearing to progress, we are going to admit

3    the declarations into evidence, of course give any parties

4    who may be remaining the option to cross.  And then we can

5    move forward with providing the Court with, I think, I guess

6    whatever is left for the balance of the hearing.  It's a good

7    day to be confirmed, so we'll do so.

8          (Laughter)

9          THE COURT:  I think it does make sense for you to

10   go ahead and get the evidence in --

11          MS. ARTHUR:  Sure.

12          THE COURT:  -- and then we'll see where we are.

13          MS. ARTHUR:  Okay.  I will cede the podium to my

14   partner Ted Tsekerides to do so.

15          THE COURT:  Okay.  Thank you, Ms. Arthur.

16          Mr. Tsekerides.

17          MR. TSEKERIDES:  Good afternoon, Your Honor.  Ted

18   Tsekerides from Weil Gotshal for the debtors.

19          Pretty simple, we have four declarations:

20          Laquisha Milner, the CEO, is at Docket 636.  I'll

21   just do them in order, then we can do them en masse, if

22   that's okay.

23          Salim Kafiti is the Deputy General Counsel, he's

24   at Document 633.

25          Deborah Paganis, Managing Director at

1   AlixPartners, Docket 634.

2              And Kim Steverson from Omni Agent Solutions at

3   Document 635.

4              We ask that those be admitted into evidence.

5              THE COURT:  Is there any party-in-interest that

6   would like to be heard with respect to the admission into

7   evidence of the four declarations that Mr. Tsekerides just

8   mentioned?

9         (No verbal response)

10             THE COURT:  Seeing no one would like to be heard,

11   those will be admitted without objection.

12        (Milner Declaration received in evidence)

13        (Kafiti Declaration received in evidence)

14        (Rieger-Paganis Declaration received in evidence)

15        (Steverson Declaration received in evidence)

16             MR. TSEKERIDES:  Okay.  And the witnesses are here

17   or are on screen if anyone has any questions; otherwise,

18   that's it.

19             THE COURT:  Let me see.  Is there any party-in-

20   interest that would like the opportunity to cross-examine any

21   of the witnesses?

22             MS. SIERRA-FOX:  Yes, Your Honor.  Rosa Sierra-Fox

23   on behalf of the U.S. Trustee.

24             THE COURT:  Okay.  I'd like to cross-examine Mr.

25   Kafiti, I believe is the name, the General Counsel.

1    MR. TSEKERIDES:  Okay.  What was her objection, on

2    the releases?  I guess we'll see what questions they ask, but

3    I'll reserve my objections.

4    THE COURT:  Okay.

5    MR. TSEKERIDES:  Okay.  Mister --

6    THE COURT:  Very well.  So if you can call the

7    witness to the stand.

8    (Participants confer)

9    THE COURT:  So apologies.  Which --

10    MR. TSEKERIDES:  That is 633, Docket --

11    THE COURT:  Thank you.

12    THE COURT:  Mister -- okay.  So, Mr. Kafiti, if

13    you could take the stand.  I apologize.  Is it Kafiti?

14    THE WITNESS:  Kafiti.

15    THE COURT:  Okay.  Apologies.  If you could -- Ms.

16    Barksdale, if you could swear the witness.

17    THE COURT OFFICER:  Raise your right hand.

18    SALIM KAFITI, WITNESS FOR THE DEBTORS, AFFIRMED

19    THE COURT OFFICER:  Please state your full name,

20    and spelling your last name for the record.

21    THE WITNESS:  Salim Kafiti, K-a-f-i-t-I.

22    THE COURT OFFICER:  Thank you.  You may be seated.

23    THE COURT:  Ms. Sierra-Fox, you can proceed.

24    //

25    //

1                     CROSS-EXAMINATION

2  BY MS. SIERRA-FOX:

3  Q     Good morning, Mr. Kafiti.  I'm Rosa Sierra-Fox on

4  behalf of the U.S. Trustee.  I just have a few questions.

5        You're aware of your declaration filed at Docket Entry

6  633?

7  A     Yes.

8  Q     In support of the confirmation of the plan?

9  A     Yes, I am.

10 Q     Okay.  Do you have that declaration in front of you?

11 A     I do not.

12 Q     Okay.  You can let me know if you need it, but I'm

13 going to be --

14         MR. TSEKERIDES:  I'd prefer that the witness have

15 it then, Your Honor --

16         MS. SIERRA-FOX:  Okay.

17         MR. TSEKERIDES:  -- if that's okay.

18         THE COURT:  Very well.

19         MS. SIERRA-FOX:  Okay.

20         MR. TSEKERIDES:  May I approach?

21         THE COURT:  You may.

22         THE WITNESS:  Thank you.

23 BY MS. SIERRA-FOX:

24 Q     Mr. Kafiti, my question is going to be about Paragraph

25 30.

1  A       Okay.

2  Q       Which I -- it's on Page 14, it's under the subheading

3  "Injunction Provision."

4          (Pause in proceedings)

5  A       Okay.

6  Q       Okay.  Mr. Kafiti, you're familiar with the injunction

7  provision in the plan, correct?

8  A       I am.

9  Q       Okay.  And to the best of your understanding, can you

10 summarize it, what --

11 A       Yeah.  I -- I think the injunction provision in the --

12 in the plan prevents claimants from bringing claims against

13 the wind-down officer, the debtors, and other parties-in-

14 interest in the amended plan, to the extent that they were

15 performing duties, you know, in implementing the plan itself.

16 Q       Okay.  So it's your understanding that the injunction

17 provision limits claims against those entities only to the

18 extent that they're prevent -- performing duties in

19 furtherance of the plan?

20 A       I think it also covers claims that were resolved by the

21 plan itself.

22 Q       Okay.

23 A       And that's important in this case because it's not

24 going to be a liquidating trust.  Kabbage, Inc. will continue

25 on in its own name.

1   Q     Okay.  So let me ask you a few questions about that.

2         What is the "wind-down estate," to your understanding;

3   what does that mean?

4   A     The wind-down estate will commence upon effectiveness

5   of the plan.

6   Q     Okay.  And what is the "wind-down officer"?

7   A     The wind-down officer is appointed -- has been

8   appointed and chosen and is described in some of the plan

9   supplement documents that were submitted within the last

10  couple of days, I guess it was.

11  Q     Okay.  And the debtor.  Is the debtor distinct,

12  legally, from the wind-down estates and the wind-down

13  officer?

14        MR. TSEKERIDES:  Your Honor, I object.  It calls

15  for a legal conclusion.  I'm fine with her asking about

16  facts.  At the end of the day, the legal implications of

17  whatever the documents or their authority over people are,

18  it's really not appropriate for this witness.

19        THE COURT:  I think, if -- the pure legal question

20  is a legal question, so I'll sustain the objection to that

21  extent.

22        To the extent that there is a way of getting at

23  the information by asking about the facts, rather than the

24  law, I'll give you the opportunity to do that.

25        MS. SIERRA-FOX:  Okay.

1    THE COURT:  And I -- it -- the question, for what

2  it's worth, is one that I'm interested in.  So, at some

3  point, if it's a legal question, I'm happy to hear from the

4  lawyers about it.

5    MR. TSEKERIDES:  Right.  And we can have argument

6  about this --

7    THE COURT:  Understood.

8    MR. TSEKERIDES:  -- at some point.  Yeah.

9    THE COURT:  So there we are.

10 BY MS. SIERRA-FOX:

11 Q    Mr. Kafiti, is the debtor different from the wind-down

12 officer?

13 A    Than the wind-down officer --

14 Q    Yes.

15 A    -- or the wind-down estate?

16 Q    Officer is my first question.

17 A    The debtor is a corporate entity; the wind-down officer

18 is a person, so I would say yes.

19 Q    Okay.  And on whose behalf does the wind-down officer

20 act or are -- who is it authorized to act on behalf of, the

21 wind-down officer?

22 A    Until the plan goes effective, no one.

23 Q    After the plan goes effective?

24 A    I -- I'd have to look at those documents I referenced

25 that were filed.  Again, I've -- I've seen them, but I -- I

1  don't recall as I sit here what it says.

2  Q    Okay.  Is the debtor different from the wind-down

3  estates?

4  A    I don't believe they are different.

5  Q    You don't believe they are different.

6  A    No, I -- the debtor -- debtors have a certificate of

7  incorporation, they're a corporation.  There are some

8  corporate governance provisions in the documents that were

9  submitted to the Court.  But to my knowledge, the

10  certificates of -- the debtors will continue on in their

11  corporate form.

12  Q    The debtors will continue on in their corporate form?

13  Is that what you just said?

14  A    Without changes to those documents, I -- that -- that

15  is my understanding without having the documents in front of

16  me.

17  Q    Okay.

18        MR. TSEKERIDES:  Your Honor, this is my whole

19  point.  We can argue about this, but I don't know what we

20  need a witness on here to have him guess as to what the legal

21  implications are.

22        THE COURT:  Yeah.  So, the extent there are actual

23  factual questions, I'll give you the opportunity to get those

24  out.  To the extent we're having a conversation about the

25  consequence of what the documents say, I think we can do

1  that, you know --

2          MS. SIERRA-FOX:  Okay.

3          THE COURT:  -- as counsel.

4          MS. SIERRA-FOX:  Okay.  Here's -- I have a factual

5  question, Your Honor.

6  BY MS. SIERRA-FOX:

7  Q    Mr. Kafiti, in your declaration at Paragraph 30, you

8  state that:

9          "The injunction provision is essential to protect

10 the assets of the debtors from potential litigation from pre-

11 petition creditors on or after the effective date."

12      Do you have an example of what that litigation -- what

13 pre-petition litigation, potential litigation you're

14 referring to in that paragraph?

15 A    I -- I can think of some hypotheticals.

16 Q    Well, you have -- can you explain those?

17          MR. TSEKERIDES:  Well, Your Honor, I don't think a

18 fact witness should be giving hypotheticals.  If he's talking

19 about -- if it's meant for a reason, that's fine.  But I

20 mean, you know --

21          THE COURT:  I think --

22          MR. TSEKERIDES:  -- we are getting somewhat --

23          THE COURT:  I think the question is fair, to the

24 extent the question is -- he did testify that it's designed

25 to protect them.  And if the question is protect them from

1  what, I think that that's a fair question.

2          MR. TSEKERIDES:  Okay.  Thank you.

3  BY MS. SIERRA FOX:

4  Q    Mr. Kafiti, so to restate my question:  What are you

5  referring to there, that the wind-down estates and the debtor

6  and the wind-down officer need protection from through the

7  injunction provision?

8  A    Any claimant who wants to bring a claim against the

9  estate, that would have had their claim, you know, barred or

10 otherwise, who would -- would bring a claim against Kabbage,

11 Inc. or any of the other debtors who are continuing to

12 operate in name as those entities after the effective date.

13         MS. SIERRA-FOX:  Okay.  Thank you, Your Honor.  No

14 further questions.

15         THE COURT:  Okay.  Any redirect?

16         MR. TSEKERIDES:  No redirect.  Thank you.

17         THE COURT:  Okay.  Mr. Kafiti, thank you for your

18 testimony.  You can step down.  Oh, I said -- before I said

19 you can step down.  Let me take that back.

20         Is there any other party-in-interest that would

21 like the opportunity to cross-examine.

22         UNIDENTIFIED:  No, we're just letting her back in.

23    (Laughter)

24         THE COURT:  Fair enough.

25         Then let me go back to where I was.  Mr. Kafiti,

1  thank you for your testimony.  You can step down.

2        (Witness excused)

3              MR. TSEKERIDES:  I think that's it, unless you

4  want to ask if anybody -- you know, on the other witnesses.

5  I think the answer was no, but --

6              THE COURT:  Let's just --

7              MR. TSEKERIDES:  -- I want to make sure --

8              THE COURT:  Yes.

9              MR. TSEKERIDES:  -- we're good.

10             THE COURT:  Yes, let's just get a clear record.

11             MR. TSEKERIDES:  Yeah.

12             THE COURT:  Is there any party-in-interest,

13 including anyone who's here by Zoom and, therefore,

14 presumably can't cross-examine witnesses, who would like the

15 opportunity to cross-examine any of the other witnesses whose

16 declarations were admitted into evidence?

17       (No verbal response)

18             THE COURT:  Okay.  Seeing no one.

19             Any further evidence?

20             MR. TSEKERIDES:  That's it.  Thank you, Your

21 Honor.

22             THE COURT:  Thank you, Mr. Tsekerides.

23             Ms. Arthur.

24             MS. ARTHUR:  Thank you, Your Honor.

25             I think we can proceed now with -- I know there

 1  are some parties who wanted to make statements in connection

 2  with some of the resolutions I noted.  We can give them a

 3  moment to do so.  And then perhaps we can ask the U.S.

 4  Trustee to come back and we can do the legal argument --

 5          THE COURT:  All right.  Just to make sure we've

 6  got a clear record, I take it there's no other party-in-

 7  interest that wishes to put on evidence in connection with

 8  the confirmation hearing.

 9      (No verbal response)

10          THE COURT:  Okay.  Seeing none.

11          Then, Ms. Arthur, I think you're right.  To the

12  extent there's anyone who wants --

13          MS. ARTHUR:  To make --

14          THE COURT:  -- to be heard --

15          MS. ARTHUR:  -- a statement --

16          THE COURT:  -- in general --

17          MR. TSEKERIDES:  May I ask Ms. Arthur a quick

18  question?

19          MS. ARTHUR:  Sure.

20          THE COURT:  Certainly.

21      (Participants confer)

22          MR. TSEKERIDES:  Thank you, Your Honor.

23          THE COURT:  To the extent it makes sense to

24  have -- to the extent there are resolutions that you have all

25  worked hard to iron out and you think it would be helpful to

1  put that on the record --

2           MS. ARTHUR:  Yes, Your Honor.

3           THE COURT:  -- that seems entirely --

4           MS. ARTHUR:  That's part --

5           THE COURT:  -- appropriate.

6           MS. ARTHUR:  -- of my conditions.  They have to

7  come and say something to you.

8      (Laughter)

9           THE COURT:  I understand.

10          MS. ARTHUR:  All right.

11          THE COURT:  So I'm --

12          MS. ARTHUR:  Thank you --

13          THE COURT:  -- happy to --

14          MS. ARTHUR:  -- Your Honor.

15          THE COURT:  -- hear from anyone who --

16          MS. ARTHUR:  Sure.

17          THE COURT:  -- would like to be heard.

18          MR. SCHECK:  Good afternoon, Your Honor.  Matthew

19 Scheck from Quinn Emanuel for Cross River Bank.

20          I'll keep this brief.  We just wanted to confirm

21 what Ms. Arthur said.  We are going to withdraw our

22 objection.  We have not yet, but we will certainly get to it.

23          And we are in support of confirmation of the plan

24 based on the resolution that's set forth in the documents

25 that were filed earlier.  And that's it, unless Your Honor

1  has any questions.

2          THE COURT:  No.  Appreciate that.  Thank you.

3          MR. SCHECK:  Thank you.

4          MS. SCHWEITZER:  Your Honor, Lisa Schweitzer from

5  Cleary Gottlieb for the Federal Reserve Bank of San

6  Francisco.  I realize we're not an objecting party, but now

7  is as good of a time as any to jump up and be a proponent.

8          Your Honor, you're aware that, since the beginning

9  of the cases, the Federal Reserve Bank has been focused on

10  ensuring that the debtors are continuing to service the PPP

11  loans that are pledged as collateral under the PPP liquidity

12  facility with the Federal Reserve Bank in the ordinary

13  course.  And we've been working with the debtors on

14  consensual cash collateral arrangements to further the goal.

15          We've also been keenly focused on the orderly

16  transfer of servicing to another servicer that's acceptable

17  to the Reserve Bank, including the transfer of relevant

18  records to enable servicing to continue.

19          The cash collateral order specifically provided,

20  among other things, that there would be cooperation and

21  reasonable assistance by the debtors in the transfer of

22  servicing.

23          And while it's not a facial issue that's been

24  raised today as the focus of a dispute at the hearing, it's

25  important to note that the Federal Reserve bank also wants to

1   ensure that other estate assets, particularly including

2   potential causes of action against third parties, are

3   properly preserved and available as a source of value from

4   paid creditors in these cases, and that's an important

5   provision of the plan as part of the collective plan.

6            On the transfer of servicing, the Reserve Bank and

7   the debtors have been engaged in regular dialogue on these

8   issues.  As Your Honor probably has seen in the submissions

9   and in the orders, Section 9.1(g) of the plan provides that

10  the transfer of servicing of the pledged PPP loans that

11  constitute the PPPLF collateral to a third party must be

12  completed to the satisfaction of the Reserve Bank as a

13  condition to the plan effective date.

14           And that requirement was included as part of the

15  comprehensive plan terms, where the Reserve Bank has agreed

16  to allow its pledged collateral to continue to be serviced

17  following the plan effective date and to bear the up-front

18  costs of the alternative servicing which will be a component

19  of its allowed claim, in order to further the orderly

20  liquidation of the collateral and mitigate the size of any

21  deficiency claim that may be a priority claim against the

22  debtors and further the likelihood that assets are available

23  for distribution to other creditors that are unsecured

24  creditors of the debtors.

25           The debtors and the Reserve Bank, as you've heard

1  from Ms. Arthur, are -- have been working regularly together

2  over the last several weeks and throughout the course of the

3  case to identify alternative servicing options, exchange

4  information, and work through details to further the transfer

5  of the servicing.

6            Those efforts have already resulted in the

7  identification and preliminary transfer of certain loan

8  information.  The process is time-intensive and ongoing and

9  the parties are continuing to work through the remaining

10 issues.

11           In particular, the debtors and the Reserve Bank

12 will need the cooperation of AmEx with respect to the

13 transfer of certain information.  And we continue to work

14 with the debtors and American Express on those issues, as

15 well.  There's -- while there's still real work to be done,

16 the Reserve Bank is hopeful that the debtors and American

17 Express will be cooperative and responsive in completing the

18 transfer of servicing efficiently and to preserve estate

19 resources and to work towards a plan effective date in the

20 coming weeks.

21           As noted, the -- it is an important feature that

22 the plan does provide for the preservation of various causes

23 of action relating to Kabbage's 2020 divestiture of its non-

24 PPP related business operations.  The Reserve Bank has been

25 working diligently with the debtors on these issues.

1           And with respect to the further plan supplement

2  documents that attend to the wind-down estate, including the

3  negotiation of a wind-down agreement, agreement on a wind-

4  down budget, and the selection of a wind-down officer that

5  would administer the debtors, as opposed to merchant's

6  estate, including the pursuit of litigation.  And of

7  particular importance to the Reserve Bank is ensuring the

8  wind-down budget provides for adequate funding to preserve

9  and pursue the remaining litigation claims for the benefit of

10 creditors.

11          As reflected in filings last week, the wind-down

12 officer has now been named and we expect that the debtors

13 will work with the proposed wind-down officer to provide him

14 background, position him to be able to hit the ground running

15 on the effective date.

16          The Reserve Bank will also work with the debtors,

17 as Ms. Arthur noted, on a budget for the period past March

18 under the cash collateral order and on these other issues, to

19 further a smooth exit from these cases in these coming weeks.

20          The Reserve Bank has voted in favor of the plan as

21 it provides contours for an orderly liquidation, the transfer

22 of the PPPLF collateral in a prompt and orderly way, and for

23 the preservation and pursuit of available litigation claims

24 for the benefit of all creditors, among other things.

25          The Reserve Bank intends to continue working with

1  the debtors on the loan and servicing transfer agreement

2  issues and support confirmation of the plan, to the extent

3  that it helps to pave the way for the debtors to expediently

4  effectuate the transfer of servicing and the wind down of

5  their estates.

6           I realize we're not resolving an objection today.

7  But we wanted to give context for our support of the plan and

8  the various issues the parties have been working through.

9  We're hopeful that it will all continue on a consensual basis

10  and an expeditious basis.  But we feel it's helpful for you

11  to have a roadmap of the larger issues behind the case.

12           THE COURT:  Got it.

13           MS. SCHWEITZER:  Thank you.

14           THE COURT:  Thank you, Ms. Schweitzer.

15           MS. SCHWEITZER:  Thank you, Your Honor.

16           THE COURT:  Anyone else?

17           MR. MONAGHAN:  Your Honor, good afternoon.  John

18  Monaghan, Holland and Knight, counsel to Customers Bank.

19           As was reported by debtors' counsel, in fact a

20  resolution to the Customers Bank joinder and objection have

21  been reached.  Miss -- excuse me.  Debtors counsel did

22  accurately recite what those provisions with the -- the

23  general provisions of that agreement is.

24           There was one reference to a date certain.  I just

25  wanted to be clear that that date certain for the time in

1  which the documents that were referenced would be produced is

2  April 17th.  It's not a date certain to be determined in the

3  future.  And with that qualification, Your Honor, Customers

4  Bank does withdraw its objection and does support

5  confirmation of the plan of reorganization.

6              THE COURT:  Okay.

7              MR. MONAGHAN:  Thank you.

8              THE COURT:  Thank you, Mr. Monaghan.

9              I think that's everyone from whom I've heard

10  objections, other than the U.S. Trustee.

11              Is there -- but just so there's a clear record, is

12  there any other party that would like to be heard, other than

13  the U.S. Trustee with whom -- to whom we'll get to, with

14  respect to confirmation?

15              MR. BROMLEY:  Your Honor, can you hear me?

16              THE COURT:  I can.

17              MR. BROMLEY:  Your Honor, this is Jim Bromley of

18  Sullivan & Cromwell on behalf of American Express Kabbage,

19  Inc.  May I be heard?

20              THE COURT:  You may.

21              MR. BROMLEY:  Thank you, Your Honor.

22              There's been references today to American Express,

23  and the entity that we're talking about, in particular, is

24  American Express Kabbage, Inc.

25              We have not been a party to any of these

1  conversations between the debtors or any of the banking

2  institutions with respect to resolutions or what exactly is

3  being agreed to.  So, to the extent that American Express is

4  going to participate in any of this, obviously, we reserve

5  our rights.

6          We don't know what the agreements are.  We don't

7  know what is being asked of American Express.  We can't stand

8  here and say whether or not we can accommodate those

9  requests.

10         We, frankly, are disappointed because this has

11 been generally the way that the communications have been

12 going with American Express throughout this case.  Things

13 have been happening, accusations have been made, and we have

14 simply not been involved.  And so we reserve all of our

15 rights with respect to what has been agreed to, what might be

16 moving forward, what is being requested of American Express.

17         I will note, Your Honor, that the plan, it

18 provides for the rejection of the transition services

19 agreement as of the effective date.  To the extent that any

20 requests are being made of American Express that are outside

21 of the four corners of the transition services agreement or

22 go beyond the date of the rejection, American Express

23 reserves its right to seek to file administrative expense

24 claims against the estate with respect to any services that

25 need to be provided that are not already encompassed by the

1   TSA or go beyond the termination of the TSA.

2          With that, Your Honor, and that reservation of

3   rights, I just wanted to let you know that's the state of

4   play.  It's very nice to see everybody so happy and

5   accommodating.  We wish that they would have treated us the

6   same way.  We look forward to working on a constructive basis

7   going forward.

8          THE COURT:  Okay.  Thank you, Mr. Bromley.

9          Is there any other party in interest that would

10  like the opportunity to be heard?

11         Ms. Arthur?

12         MS. ARTHUR:  So, Your Honor, just briefly in

13  connection with some of the statements that were just made,

14  we do not oppose the reservation of rights that American

15  Express has stated.  I'm not going to address the

16  mischaracterizations that were stated on the record or

17  references to the administrative expense claim that they may

18  seek to attempt to assert against the debtors, but I do want

19  to make clear that we don't oppose the reservation rights

20  that they have.

21         THE COURT:  Okay.  So, where I understand we are,

22  is that American Express isn't objecting to confirmation of

23  the plan but reserves all of its other rights thereafter and

24  so do you as against they, and I think that is what it is.

25         MS. ARTHUR:  I agree with it, Your Honor.

1           THE COURT:  Okay.

2           MS. ARTHUR:  There was a (indiscernible).

3           MS. HWANGPO:  Your Honor, apologies.  Natasha

4  Hwangpo on behalf of the debtors.

5           We were actually going to lead in with a couple of

6  color points as to our resolution with the SBA.

7           THE COURT:  Okay.

8           MS. HWANGPO:  So, just in terms of how we want to

9  conduct the hearing, should we start with Ms. Sierra-Fox and

10  then we'll go into the resolution with the SBA.  There are no

11  outstanding items, so just some additional color for the

12  record.

13           THE COURT:  I don't have a preference.  If it's

14  helpful to hear the resolution --

15           MS. HWANGPO:  Sure, we can start with that.

16           THE COURT:  -- with the SBA while we're talking --

17  while we're all mostly talking about areas in which we

18  agree --

19           MS. HWANGPO:  Sure, absolutely.

20           THE COURT:  -- why don't we do that.

21           MS. HWANGPO:  With respect to the SBA, Your Honor,

22  we're happy to report, again, no outstanding issues for

23  today, and before turning the podium over to Mr. Gesmundo, I

24  wanted to provide the Court with just a little bit of color.

25           So, we've been working cooperatively with the SBA

1  throughout these Chapter 11 cases and as evidenced in the

2  latest changes in the plan and confirmation, ahead of today's

3  hearing, there was a little bit of discussions as between the

4  two parties.  The SBA raised that they do not believe that

5  they have an obligation to pay for any kind of costs

6  associated with servicing of the transfer of their specific

7  loan portfolio.

8            I think in that vein, the debtors have reflected

9  language in the order that provides us with a little bit of

10  flexibility, and I think it states in the case of the SBA,

11  such fees, costs, and expenses -- expenses, excuse me, shall

12  be subject to finalization.  The parties have agreed that for

13  today's purposes, there are no disputes and the parties have

14  agreed that notwithstanding the parties' differing views on

15  whose payment obligations these may become, that they will

16  work together on resolving when and if any of these issues

17  come about.

18            So, I think Mr. Gesmundo wanted to say a couple of

19  things on the record, but to the extent that the parties, you

20  know, can't get to a consensual resolution, we may be before

21  the Court again, but for today's purposes, I think we are

22  aligned.

23            THE COURT:  Okay.  That sounds like a technical

24  way of saying "we've all agreed to kick the can down the

25  road."

1          Is that pretty much where we are?

2          MS. HWANGPO:  That's correct, Your Honor.

3      (Laughter)

4          MS. HWANGPO:  You've said it in a much more

5  succinct way than I did.

6          THE COURT:  Okay.  Very well.  Thank you.

7          MR. GESMUNDO:  Good afternoon, Your Honor.

8  Alastair Gesmundo on behalf of the United States.

9          So, I'll just make the record clear.  The SBA's

10  loan program requirements, in particular, 13 CFR 120.1010 and

11  13 CFR 120.535(d) require that the debtor and Amex transfer

12  the loan records to the SBA at the SBA's request.  So these

13  regulations contain no *proviso* for reimbursement of a

14  lender's costs.  The program's expectation and norms are that

15  the lender bear these costs, and so the SBA's position is

16  that if the debtor and Amex do not transfer the loans at the

17  SBA's request, the SBA will pursue all appropriate actions to

18  enforce its loan program requirements.

19          The other point I'll make is that the

20  Antideficiency Act, that's 31 U.S.C. 1341(a), prohibits

21  federal agencies from obligating or expending federal funds

22  in advance or in excess of an appropriation.  And with that,

23  the only other thing I'll add is as debtors' counsel has

24  reflected, the objections that weren't SBA-specific, but more

25  so the United States that were filed in our limited objection

1  have been resolved by the language that's in, among other

2  places, paragraph 32 of the confirmation order.  So, thank

3  you, Your Honor.

4              THE COURT:  Okay.  Thank you very much.

5              Okay.  Ms. Arthur, do you think there's anything

6  else, other than addressing the U.S. Trustee issue?

7              MS. ARTHUR:  (Indiscernible.)

8              THE COURT:  Okay.  So, I'm happy to proceed in

9  whatever manner is most helpful.  Actually, Ms. Arthur, can

10 we start with you?

11             MS. ARTHUR:  I'm definitely going to start with

12 Ms. Hwangpo, but yes.

13         (Laughter)

14             THE COURT:  So, because I want to make sure I

15 understand how the plan works and what's going on here.

16             MS. HWANGPO:  Certainly.

17             THE COURT:  Okay.  So, I get that the wind-down

18 estate essentially succeeds to the legal entity that was the

19 prepetition debtor and exists post-confirmation, post-

20 effective date.

21             MS. HWANGPO:  Post-effective date.

22             THE COURT:  Okay.  Now, I saw -- I just want to

23 get -- I saw in connection with one of the declarations, a

24 series of budgets for what the world looks like post-

25 effective date, and I think there were two and I didn't

1  understand how they fit together.  And so, I just want to

2  understand factually, based on the documents in front of me,

3  what's happening after the effective date.

4          MS. HWANGPO:  I see.  So I think --

5          THE COURT:  Does that question make any sense?

6          MS. HWANGPO:  Yes.  I think I understand the

7  question and I wish I had the budgets with me, but I think

8  can recall from memory that I believe when we submitted the

9  budgets with respect to the plan supplement, that we

10  submitted a PPP transfer-related budget and then a post-

11  effective date PPP servicing budget.  So, we wanted to

12  provide ourselves a little bit of flexibility in terms of if

13  we go down one road, what does the budget look like,

14  especially given the plan supplement was filed in advance of

15  the voting deadline.

16          THE COURT:  Okay.

17          MS. HWANGPO:  We wanted to make sure that everyone

18  had, you know, the information as to -- at that point, we

19  just weren't clear as to what road we were going down.

20          THE COURT:  Let me ask my question in a simpler

21  way, then.  You now have agreements --

22          MS. HWANGPO:  Yes.

23          THE COURT:  -- right, that as I understand there

24  is sort of coloring that has to happen within the lines to

25  give effect to all of it, but you've got agreements in

1  principle about how you do a transition.  And I confess it's

2  not crystal clear to me whether you become effective after

3  that transition or if some of the transition happens after

4  the effective date.  I'm not sure I need to know the answer

5  to that for this purpose.

6          The things that are in the wind-down estate after

7  the effective date, I get that it has whatever causes of

8  action there may be, and to the extent there are ongoing

9  obligations to transfer servicing that haven't already

10  happened, it has to do that.

11          What else is in the wind-down estate?

12          MS. HWANGPO:  Your Honor, honestly, not much more.

13  I would say that the causes of action are the main source of

14  what will go into the wind-down and saved in terms of assets.

15  I think there's going to be whatever cash on hand is there.

16  I think you've seen in the budgets that we are doing separate

17  reserves, but beyond that --

18          THE COURT:  Right.  So, there's a few million

19  dollars that --

20          MS. HWANGPO:  Correct, yes.

21          THE COURT:  Right.  And it's the wind-down estate

22  that then, does the, to the extent there are distributions to

23  unsecured creditors, the wind-down estate effectuates that.

24          MS. HWANGPO:  Correct, Your Honor.  So they're

25  going to be doing the rest of the liquidation of the estates

1 | doing claims reconciliation, as well as the subsequent

2 | distributions, if any.

3 |         THE COURT:  And so how long the wind-down estate

4 | is open, I take it, depends mostly on how long it takes to

5 | pursue the causes of action and distribute the proceeds to

6 | creditors; is that all we're really talking about?

7 |         MS. HWANGPO:  That's correct, Your Honor.

8 |         THE COURT:  And that's -- I appreciate that all of

9 | this has been intensely negotiated and I'm not at all trying

10 | to suggest re-doing anything, but if that was done in a,

11 | right, post-liquidating trust that took the assets free and

12 | clear, you wouldn't have this problem, right.  I take it

13 | there's a good reason --  I don't even need to know what it

14 | is -- but I take it there's a good reason why it's being left

15 | in the debtor, such that we do have this problem.

16 |         MS. HWANGPO:  Yes, Your Honor.

17 |         THE COURT:  Okay.

18 |         MS. HWANGPO:  I can also -- I can't go into it too

19 | deeply I can provide a reason if that's helpful.

20 |         THE COURT:  Forty thousand feet without giving

21 | away anything that will be value destructive.

22 |         MS. HWANGPO:  I don't think I can do that.  I

23 | think it mostly that it was a tax-driven reason.

24 |         THE COURT:  Fine.

25 |     (Laughter)

1           THE COURT:  That's good enough.

2           So, let me ask this question.  Let me just

3    preview, and Ms. Sierra-Fox, you should, when you get here,

4    you should just tell me if you see this differently, the way

5    I understand the prohibition on the discharge of a

6    liquidating debtor, what its intent -- the reason for that

7    prohibition is essentially to prevent the traffic in

8    corporate shells.  That once the entity is just a shell, has

9    no assets, we don't want it discharged because you've got

10   something with no assets and no liabilities that can be put

11   to some other purpose.

12          And as I understand what you're telling me is the

13   reason you need this entity, the wind-down estates protected,

14   is that it's not a corporate shell.  And so, my next question

15   to you is once it is it a corporate shell and it's done what

16   it's needed to do, do you need it protected thereafter?

17          MS. HWANGPO:  Standing here today, I do not

18   believe that we would need to have it protected.

19          THE COURT:  Okay.  Because it seems to me the

20   problem you have is that you're asking for a permanent,

21   rather than a temporary injunction against claims against the

22   wind-down estates and that you might solve Ms. Sierra-Fox's

23   problem if, instead of granting it a permanent injunction

24   against the assertion of claims, it were temporary to end no

25   later than, say, the day the cases close, then it's not a

1  discharge in disguise.

2          Do you see where I'm going?

3          MS. HWANGPO:  Yes.  Your Honor, are you alleviated

4  by any means to the fact that once all of the (indiscernible)

5  down estates are actually wound down, that they would then

6  dissolve as corporate entities?

7          THE COURT:  No, because then we still have a

8  corporate shell.  Well, you may or may not have a corporate

9  shell, but in any event, I don't think if we had a Chapter 7

10  case, you could grant a discharge, so long as the trustee

11  promised to dissolve the debtor, and so it seems to me the

12  same principle applies here.  So, it seems to me the more

13  appropriate response.

14          So, the problem is to say the injunction against

15  the assertion of claims, against the wind-down estates, which

16  is the entity that was the prepetition debtor goes away upon

17  the closing of the bankruptcy case, then -- so, the question

18  I have is, is there any reason in terms of how this plan

19  works, where that causes a problem?

20          MS. HWANGPO:  Your Honor, if I may just confer?

21          THE COURT:  Certainly.

22          MS. HWANGPO:  (Indiscernible.)

23      (Pause)

24          THE COURT:  And I say, if you all think I've lost

25  my mind and you need a few minutes to explain to me why, you

 1  can just ask for that and I'm --

 2        (Pause)

 3            MS. HWANGPO:  Your Honor, we're going to do a tag-

 4  team effort if that's okay?

 5            THE COURT:  Absolutely.  I'm happy to hear anyone

 6  who will help me get it right, I will hear from.

 7            MS. HWANGPO:  I will be right back.

 8            THE COURT:  Mr. Shapiro?

 9            MR. SHAPIRO:  For the record, Zach Shapiro from

10  Richards, Layton & Finger.  So, I guess going back to the

11  question that you were asking, I think it's a little more

12  nuanced than on the date that the cases closes, the

13  injunction could then be modified, because there are plenty

14  of circumstances where the entity will continue to hold funds

15  for whatever reason and distribute them later.

16            THE COURT:  After the case closes, okay.  So that

17  may not be the right date.  I'm more concerned about the

18  concept than the precise words.

19            MR. SHAPIRO:  Right.

20            THE COURT:  To me, what -- okay.  Look, the U.S.

21  Trustee says this is, in substance, a discharge, because it's

22  essentially a permanent injunction against the assertion of

23  claims against the entity and that runs up against the policy

24  concerns that underlie 1141(d) and 727.

25            MR. SHAPIRO:  Right.

1    THE COURT:  It seems to me those policy concerns

2  aren't things that are your problem, and so the question I'm

3  asking is, is there a way to effectuate the purposes of the

4  Code --

5    MR. SHAPIRO:  Right.

6    THE COURT:  -- and give you the relief that you

7  want.

8    MR. SHAPIRO:  Yeah, so I just don't think there

9  needs to be.  So, we -- so, we have a plan, right, and we

10  designed it in a way that will protect estate assets, right.

11  We have creditors, all of whom had an opportunity to object.

12  All of them had an opportunity to -- and, actually, some of

13  them did, right; we had three parties object to the

14  injunction.  We resolved all of those objections.

15    THE COURT:  I understand, but the Bankruptcy Code

16  says the United States Trustee is standing to appear and be

17  heard on all of that.

18    MR. SHAPIRO:  But remember, I guess what I'm

19  saying is, there are provisions that can be disputed, right.

20    THE COURT:  Uh-huh.

21    MR. SHAPIRO:  And I don't think that anyone in

22  this courtroom would say that an injunction to protect estate

23  assets, one that has been improved in countless cases before,

24  the one that we have here today, that's a mirror off of

25  injunctions from other plans, is prohibited by law, right.

1            So, at what point does it become a disputed

2    provision?  As of right now, all of the creditors who had an

3    opportunity to review it decided that, either I have an issue

4    with it, which we resolved, or they didn't have an issue with

5    it.  So, whose interests are we protecting here?

6            THE COURT:  I understand.  Look, I get it and I --

7    I think that the fact that all of the -- everyone who has

8    skin in the game is onboard is certainly a consideration

9    and -- look, but I do have an objection from a party that, at

10   least has a statutory matter, has standing to be heard.

11           MR. SHAPIRO:  Certainly.  Right.

12           THE COURT:  And the question that I'm asking

13   you -- I understand that there are some cases that do this.

14           MR. SHAPIRO:  Yeah.

15           THE COURT:  I'll tell you that the snippets of

16   transcripts that were cited in the brief I find to be a

17   personal representative aggressive and muscular use of the

18   bankruptcy power.  And I'm not saying that I would never do

19   that, but I would do it only as a last resort.

20           MR. SHAPIRO:  Okay.

21           THE COURT:  And it does seem to me you need to

22   come to me with a good reason why it's necessary to do that

23   if there's a more narrowly tailored solution that gets you

24   what you need.

25           MR. SHAPIRO:  Well, I mean, I guess where I would

 1 start is, I think that where we began the conversation was

 2 there's something different here about what you normally see,

 3 right.  A lot of times, we see assets vest in a trust, free

 4 and clear, and we have a debtor entity that's a shell.  And

 5 in a lot of those instances, we will resolve those objections

 6 to the extent the U.S. Trustee raises it.  And we will

 7 resolve that because we can craft careful language to make

 8 sure that the actual shell entity is not getting the benefit

 9 of the injunction or getting the benefit of the injunction in

10 such a way that results in a *de facto* discharge.

11         But here, we can't do that.  And what our concern

12 is that crafting language now to allow the injunction to be

13 automatically lifted, I don't know how we do that.

14         THE COURT:  Let me give you another solution.

15 We're going to put in a temporary stay without prejudice to

16 extending it and we can come back periodically, hopefully not

17 very often, and where there's a reason to continue to extend

18 it, we'll continue to extend it.  And when someone at the

19 podium runs out of reasons why it should be extended, then

20 we'll stop extending it.

21         MS. HWANGPO:  Your Honor, so we have been, as you

22 can probably see, discussing with different stakeholders who

23 have skin in the game, as you referred to it earlier, as we

24 talked about there are real world repercussions for immediate

25 purposes if we don't provide an extension or, sorry, extend

1  the plan injunction to the wind-down estates.

2          THE COURT:  Oh, we're certainly going to -- look,

3  I'm not talking about lifting --

4          MS. HWANGPO:  Absolutely.

5          THE COURT:  I'm 100 percent talking about

6  protecting the assets, as long as there's anything there.

7  The only question is, once everything is gone, is there any

8  reason why the injunction can't then be lifted?

9          MS. HWANGPO:  Your Honor, I think we're aligned.

10 I think what we would propose, and obviously we would have to

11 speak to Ms. Sierra-Fox about this, but what we would propose

12 as an initial matter is extending the plan injunction until

13 distributions have been made, there are no assets left

14 remaining in the corporate forms, and then just giving

15 ourselves a little bit of flexibility so, to the extent that

16 the wind-down officer sees, for some unforeseen reason that

17 that needs to be continued to extend, we'll do that.

18         THE COURT:  Whatever we would do would be without

19 prejudice to anyone's rights to come in earlier and ask that

20 it be ended or your rights to come in and ask that it be

21 extended.  And I'll tell you now, if someone wants it ended

22 while there are assets there, they've got a tough road to

23 hoe.  But it seems to me like any injunction, this seems to

24 me what Section 105 is made for, which is the purpose of the

25 Code is to avoid the creation of a freestanding shell entity

1  and the risk of trafficking shell entities, which is the way

2  Colliers describes the reason why we have 1141(d) and 727.

3          Here, we're not talking about any concern about

4  the trafficking in a shell entity, as long as the wind-down

5  estates have assets.  Once they do, the concern is present.

6  So, to me, to use the supplemental interstitial authority to

7  give effect to the purpose, allow the plan to work, serve the

8  purposes of the Code, while still respecting the letter, that

9  we're not giving a discharge or the functional equivalent of

10  a discharge, seems to me to be a solution that would both,

11  allow the estate to do what it needs to do and respect

12  bankruptcy law.

13          And while I'm not saying that one would never run

14  over bankruptcy law, it seems to me my broader lesson is that

15  should be a last resort, not the first resort.

16          MS. HWANGPO:  Certainly, Your Honor.  We are

17  agreed there.

18          THE COURT:  So, let me -- I guess I -- I'm not

19  saying this is okay with Ms. Sierra-Fox.  I want to give her

20  the opportunity to be heard to say, Judge, you've lost your

21  mind.

22          MS. HWANGPO:  Sure.

23          THE COURT:  So, Ms. Sierra-Fox, let me give you a

24  chance to be heard.

25          MS. SIERRA-FOX:  Good afternoon, Your Honor.  Rosa

1  Sierra-Fox, on behalf of the United States Trustee.

2          THE COURT:  Okay.  Needless to say, you should

3  begin on the assumption that I'm inclined to agree with you

4  that something that is the functional equivalent of a

5  discharge is as prohibited by 1140(d) -- 1141(d) as an actual

6  discharge, and something that uses the word "discharge" in

7  it, seems to me to be the functional equivalent of a

8  discharge.

9          So, what we're talking about -- so, I start out

10 that you've persuaded me with that.  I understand Mr.

11 Shapiro's point about the U.S. Trustee's, you know, interest

12 in a world where all the creditors agree.  Let's hold that

13 aside for the moment, and I guess I'm interested in if I were

14 to enter a temporary injunction that were extendable that was

15 going to have an end and the end would occur at some point

16 when the, what are now the wind-down estates no longer had

17 any assets and was a shell entity, whether your office would

18 have a problem with that.

19         MS. SIERRA-FOX:  Your Honor, I think that that

20 solves part of the issue.

21         THE COURT:  Okay.  And what part doesn't it solve?

22         MS. SIERRA-FOX:  So, I think as written, the

23 injunction provision -- so, assuming all it did was -- let me

24 back up.

25         The purpose is to protect estate assets, to

1 protect the property.  As I understand it, it's supposed to

2 be to protect the property that's going to be hopefully

3 distributed under the plan.

4             THE COURT:  Correct.

5             MS. SIERRA-FOX:  As written --

6             THE COURT:  Take out the word "discharge" from --

7             MS. SIERRA-FOX:  Yes.

8             THE COURT:  -- 11(f) or (c), I think it is, right?

9 Let me dig it up.  It's 11.3; is that right?

10             MS. SIERRA-FOX:  It's 10.3, Your Honor.

11             THE COURT:  Oh, I'm sorry.

12             MS. SIERRA-FOX:  I might have an old version of it

13 at this point.

14             THE COURT:  Right.  So, where it says,

15 "permanently enjoined on and after the effective date," et

16 cetera, and there's a language that says it's discharged, I

17 think that's in.

18             UNIDENTIFIED SPEAKER:  75(3)(c) (phonetic).

19             THE COURT:  Right.  By accepting distributions --

20 well, so I have no problem with if you accept a distribution

21 on account of your claim -- no, I guess it's not discharged.

22 To the extent you've got a deficiency, that still exists,

23 it's going to be stayed as long as the wind-down estates have

24 any assets.

25             But I think the notion would be that if you

1  receive -- whether or not you receive a distribution,

2  everyone is stayed from proceeding against the wind-down

3  estates and whatever other entities need to be protected --

4          MS. SIERRA-FOX:  Right.

5          THE COURT:  -- for as long as there are assets in

6  the wind-down estate.  And I don't purport to be the

7  draftsperson, but I don't think this concept is that

8  complicated, and it would be for a period that is open-ended

9  and extendable or shortenable, you know, under the

10  circumstances.

11          MS. SIERRA-FOX:  Your Honor, yes, I think the way

12  we presented this objection was that it went beyond --

13          THE COURT:  You said it was a discharge in

14  disguise and you were right.

15          MS. SIERRA-FOX:  Yeah, right.  It went beyond.

16          With respect to the underlying claims or actions

17  so to speak that it's enjoining, went beyond doing that,

18  which was necessary to effectuate the distribution of

19  property or whatnot.  So, I do think that a tailoring of this

20  injunction provision to state that its purpose is to protect

21  the wind-down estates and the wind-down officer, and I think

22  Mr. Kafiti began describing it in this way --

23          THE COURT:  Right.

24          MS. SIERRA-FOX:  -- to do the things they need to

25  do in order to get, you know --

1          THE COURT:  So, just so we're on the same page,

2   Ms. Sierra-Fox, to the extent the wind-down estate finds

3   itself with some cash or holds a cause of action or has, you

4   know, any assets, right --

5          MS. SIERRA-FOX:  Uh-huh.

6          THE COURT:  -- and under this plan, that's an

7   asset that's supposed to be distributed, according to the

8   plan, right, the waterfall established by the plan and the

9   Code, you don't disagree that it's appropriate for us to

10  enter an order that says no one else gets that while the

11  wind-down estate has it?

12         MS. SIERRA-FOX:  We don't disagree -- the U.S.

13  Trustee does not disagree with that.

14         THE COURT:  Okay.  It seems to me with that, there

15  ought to be a way to come up with language that accomplishes

16  the purpose.  And I'm not sure you need me to be the

17  draftsperson, actually, I'm quite sure you don't want me to

18  be the draftsperson, but Ms. Arthur, does that give you

19  enough to work with?

20         MS. ARTHUR:  We'll get there, Your Honor.  Yes, it

21  does.

22         THE COURT:  Look, if there's a dispute about

23  implementing this, I'm available, but it seems to me this

24  concept shouldn't be that hard, and it seems to be a

25  reasonably obvious way to give effect to the purposes of the

1  Code while -- the prohibition on discharging a liquidating

2  debtor while, at the same time, protecting the estate in this

3  case.

4              MS. SIERRA-FOX:  Your Honor, and one

5  (indiscernible) just since we have the benefit of being in

6  front of you right now, I think one of the issues that --

7              THE COURT:  That's a kind way of putting it.

8              MS. SIERRA-FOX:  One of the issues that tripped us

9  up is the inclusion of the actual debtors.  I mean, I

10  understand that -- so, the plan defines a wind-down estate

11  separately -- not separately -- it's a separate definition,

12  but in essence, it's the debtors posed --

13             THE COURT:  Right.  It's the same legal entity.

14             MS. SIERRA-FOX:  Right.  I mean, I'm not sure what

15  the significance of having the debtors included in that,

16  but --

17             THE COURT:  It seems to me that as long as it's

18  temporary --

19             MS. SIERRA-FOX:  Okay.

20             THE COURT:  -- and will ultimately end, there's no

21  harm in being overinclusive.  There's certainly much more

22  risk of being underinclusive than there is of being

23  overinclusive.

24             MS. SIERRA-FOX:  Okay.  I'm willing to work

25  with --

1              MS. ARTHUR:  We'll work with her on that, Your

2    Honor.

3              THE COURT:  Okay.

4              MS. SIERRA-FOX:  Okay.

5              THE COURT:  So, how do we proceed from here?

6              MS. ARTHUR:  I think that's the confirmation

7    order.

8              MR. BENTLEY:  Your Honor, Chase Bentley, Weil

9    Gotshal, on behalf of the debtors.

10             Your Honor, I believe that my colleague Ms. Arthur

11   already brought up to you the revised plan, which hasn't been

12   filed on the docket yet, but we would intend to file it after

13   the hearing once we've --

14             THE COURT:  Okay.  And, presumably, there will be

15   further changes to --

16             MR. BENTLEY:  Yes, to reflect our conversations.

17             THE COURT:  -- reflect this issue.

18             MR. BENTLEY:  Right.  And, likewise, she also

19   brought up to comments to the wind-down agreement, which had

20   been filed as part of the plan supplement.

21             If Your Honor has any questions about that, I

22   think that those have already been discussed at length

23   between the parties, but I'm happy to walk you through those.

24             THE COURT:  Okay.  So, anything that was forwarded

25   to chambers while you were all talking, I've read, and I

1  think I understand.

2          MR. BENTLEY:  Yeah.

3          THE COURT:  If there's anything that I haven't

4  seen, then I don't understand it.

5      (Laughter)

6          THE COURT:  And I am -- if there are points that

7  you think for the record you should put on the record, I

8  certainly want to give you that opportunity, but don't feel

9  the need to humor me.  If there's something that just needs

10 to be submitted, I'm happy to look at it and in the highly

11 unlikely event that everyone agrees and I'm the problem, I'll

12 reach out, but I try not to be that kind of judge.

13         MR. BENTLEY:  Your Honor, insofar as -- certainly,

14 insofar as the plan and the wind-down agreement go, I think

15 those are very straightforward and they've been brought up to

16 you.  They haven't been filed yet, but I don't think that we

17 need to walk through those.

18         As for the proposed confirmation order, we filed a

19 redline last night at Docket 655 and then emailed it to

20 you --

21         THE COURT:  Yes.

22         MR. BENTLEY:  -- to your chambers, just ahead of

23 the hearing.  And, likewise, I think that my colleagues, and

24 as well as the other parties in interest have discussed those

25 at length at the hearing, while some of the changes are, I

1  wouldn't stay "extensive," but they're certainly material, I

2  don't know that we need to walk through them because I think

3  the high-level negotiations and settlements that were

4  discussed by the parties already cover the gist of it.

5        THE COURT:  Okay.  Can I just offer maybe just

6  one, but I'll keep going and maybe more than one comment just

7  of my own on the confirmation order.

8        MR. BENTLEY:  Of course.

9        THE COURT:  Paragraph R, which in the version I've

10  got is -- it's on page 10 of 28 of the document that's D.I.

11  655, says this confirmation order constitutes a final order.

12  I've said this a handful of times.  I tend to be -- if you

13  could change that to "this confirmation order is intended to

14  be a final order," just so that I'm not ruling on the

15  jurisdiction of the District Court who gets to decide what

16  order is final, because it triggers the District Court's

17  jurisdiction.  I'm just -- I'm annoying about that.

18        I think the language in the earlier paragraph that

19  said that the injunctions are appropriate, I think if we --

20  once we revise the injunctions as discussed, then that will

21  be fine and I think -- just give me a second to flip through

22  it -- okay, and the only other trivial point is that what is

23  on the fifth page, where you say, "and for the reasons stated

24  by the Court at the confirmation hearing," I think I've now

25  stated reasons for what we're doing, so I think that's okay.

1 I might just add a few words in writing just on this last

2 point, so if you can add words to say, you know, "as may be

3 supplemented in a memorandum opinion," just to the extent I

4 add a few words to flush out my thinking on these issues.

5           MR. BENTLEY:  Okay.  Thank you, Your Honor.  We'll

6 certainly add those.

7           THE COURT:  Okay.  But none of that, of course,

8 affects the finality of this order which is intended to be a

9 final order.  So, I take it, it seems to me what would make

10 the most sense -- look, well, it is to give the parties a

11 chance to work on language that gives effect to this, and if

12 that comes in under certification, I'll happy to enter that

13 order.

14           I take it you're not talking about going effective

15 for another couple of weeks, in any event, right, so this is

16 not a "house on fire" situation?

17           MS. ARTHUR:  I agree, Your Honor.

18           THE COURT:  Is that right?

19           MS. ARTHUR:  Yes.

20           THE COURT:  Okay.  Mr. Bentley, anything else I

21 can do to be helpful?

22           MR. BENTLEY:  No, that's all, Your Honor.  We'll

23 submit a revised, proposed order.

24           THE COURT:  Okay.

25           MR. BENTLEY:  Thank you.

1        THE COURT:  Thank you.

2        MS. ARTHUR:  Hi, Your Honor, for the record,

3  again, Candace Arthur.  I'm only standing up to see if you

4  wanted to take a few moments to give me a final ruling or not

5  or what you wanted next.  (Indiscernible.)

6        THE COURT:  So, look, I'm -- let me say the

7  following, and if you need --

8        MS. ARTHUR:  Please.

9        THE COURT:  -- me to say more, I will.  But I

10  think the findings and conclusions in what will be the

11  confirmation order will be sufficient for the record to have

12  reflected the satisfaction of the elements of confirmation

13  and the propriety of the plan.  I'll say having, you know,

14  spent some of the weekend reading the declarations and the

15  like, I am satisfied that but for -- let me take this in

16  order.

17        First, you know, I appreciate that a ton of work

18  was done, some of it, you know, today, to resolve objections.

19  And Ms. Arthur, you said earlier in the hearing that this was

20  the bankruptcy process working the way it should, and I just

21  wanted to underscore that observation.  The work that all of

22  you did so that this was 99.5 percent consensual is really in

23  the best traditions of the profession and you're all to be

24  congratulated for that.

25        You know, many of you have heard me say that the

1  more you do to prevent me from deciding issues, the less

2  likely I am to make a mistake, and I really do appreciate all

3  of the good work of the parties (indiscernible) consensus and

4  thought that where you've all landed was imminently sensible

5  and to have good effect.

6         Look, I appreciate that this case, you know, even

7  as messy cases go, is messy and the work of all of the

8  professionals on all sides to bring this to this point, even

9  if there's -- you know, we're not at the end of the tunnel

10  yet -- but to get to this point really is remarkable and

11  everyone has my thanks and my congratulations for all of that

12  terrific work.

13         Having reviewed all of the declarations and in

14  light of the resolution of all of the disputes, save for one,

15  I am 100 percent satisfied that the requirements for

16  confirmation are met and that this plan is appropriately

17  confirmed.  As I said, I meant to say a few more words about,

18  my view is that the injunctive language that was permanent

19  was -- look, I don't need to rule definitively that it was --

20         MS. ARTHUR:  We're resolving that.  You don't need

21  to rule definitively.

22         THE COURT:  Right.  Exactly.  I think that issue

23  is going to be resolved in a way that will obviate my

24  concerns and I think that the resolution will -- is an

25  appropriate one.

1          And so, that's all I've got and subject to the

2   parties coming up with language, I'm delighted to enter the

3   confirmation order and appreciate everyone's good work.

4          MS. ARTHUR:  Thank you very much, Your Honor.

5          THE COURT:  So, is there any -- while we're

6   here -- so, let me just ask this question.  So, I have on the

7   calendar a hearing next week on sort of a reconciliation

8   dispute.  Is that still on?  While peace has broken out, that

9   hasn't --

10          MS. ARTHUR:  No, I don't have a check yet, so no,

11   it has not.  It's still pending, Your Honor.

12          THE COURT:  Okay.  That's fine.

13          MS. ARTHUR:  But we did clear up the other, the

14   2004, I think was also on that date, too, so your calendar is

15   a little lighter, for sure.

16          THE COURT:  Okay.  No worries.  I just wanted to

17   understand where we were.

18          Mr. Werkheiser?

19          MR. WERKHEISER:  Good afternoon, Your Honor.

20          I just, while we were touching on the calendar for

21   next week, I did just want to remind Your Honor that the

22   Cross River Bank 2004 motion is still scheduled to go forward

23   I believe on the 22nd at 1 o'clock.

24          THE COURT:  Got it.  Okay.

25          MR. WERKHEISER:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          While we're here, is there any other way in which

3  the Court can be helpful to any of the parties in interest?

4      (No verbal response)

5          THE COURT:  Okay.  So, anything else from the

6  debtor, Ms. Arthur?

7          MS. ARTHUR:  That's all, Your Honor.  We'll rest

8  today.

9          THE COURT:  Okay.  Thanks to everyone.

10          And with that, we're adjourned.  Thank you.

11          COUNSEL:  Thank you, Your Honor.

12      (Proceedings concluded at 2:06 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 13, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Coleen Rand                           March 13, 2023

13   Coleen Rand, CET-341

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25