**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| **KABBAGE, INC. d/b/a KSERVICING,** *et al.*, | Case No. 22-10951 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| | **RE: D.I. 622** |
| | **Objection Deadline**: March 15, 2023, at 4:00 p.m. (ET) |

**OBJECTION OF AMERICAN EXPRESS TO**
**JOINT MOTION OF CROSS RIVER BANK AND CUSTOMERS BANK**
**FOR AN ORDER AUTHORIZING RULE 2004 EXAMINATION**

American Express Kabbage Inc. and American Express Travel Related Services Company, Inc. (collectively, "American Express") hereby file this objection (the "Objection") to the joint motion (the "Joint Motion") of Cross River Bank ("CRB") and Customers Bank (each, a "Movant," and together, "Movants"), which unnecessarily and prematurely seeks to compel American Express to produce certain loan files to Movants pursuant to Bankruptcy Rule 2004—a production which American Express always has been willing to make and already has started working on voluntarily, absent a court order and in coordination with Debtors and Movants.[2]   Certain facts supporting this Objection are set forth in the concurrently filed

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: Kabbage, Inc. d/b/a KServicing (3937) ("Kabbage"); Kabbage Canada Holdings, LLC (N/A); Kabbage Asset Securitization LLC (N/A); Kabbage Asset Funding 2017-A LLC (4803); Kabbage Asset Funding 2019-A LLC (8973); and Kabbage Diameter, LLC (N/A). Kabbage is a trademark of American Express used under license; Kabbage, Inc. d/b/a KServicing is not affiliated with American Express.  The Debtors' mailing and service address is 925B Peachtree Street NE, Suite 383, Atlanta, GA 30309.

[2]   Capitalized terms not defined herein are defined in the Joint Motion.

*Declaration of Regina Sorin* (the "Sorin Declaration") and *Declaration of Amanda Flug Davidoff* (the "Davidoff Declaration"). Because there is no cause, much less good cause, to order a Rule 2004 examination, the Court should deny the Joint Motion.

## PRELIMINARY STATEMENT

1.     When it acquired certain assets of Kabbage in 2020, American Express and Kabbage entered into a Transition Services Agreement ("TSA") under which American Express gave Kabbage access to a lending platform, data, other support and certain American Express personnel for a limited period of time, so that Kabbage could service its loan portfolio and the portfolios owned by Movants and other third parties (the "Partner Banks"). The TSA contemplated a migration from the services that American Express provided; it would be in place only until Kabbage had set up the systems and data needed to independently service loans (either directly or using third-party vendors). Since the TSA took effect, American Express has complied with its obligations and more, including by extending the original time periods during which American Express would make its personnel available to Kabbage and providing additional services not covered by the original TSA to support Kabbage's servicing activities.

2.     Debtors declared bankruptcy on October 3, 2022. In December 2022, Debtors approached American Express for the first time to discuss seeking assistance from American Express to transition servicing of Kabbage's and Partner Banks' loan portfolios to third-party servicers (or to the Partner Banks themselves). From that time until February 28, 2023, Debtors told American Express that they were not sure whether American Express would be asked to (1) continue to host Kabbage's and the Partner Banks' loan files (the "Loan Files") on its systems and support servicing by new servicers, or (2) extract and transfer the Loan Files to new servicers so that American Express would no longer be involved. As is likely evident, the technical and detailed data work needed for each of those projects is very different, and

either would be time- and resource-consuming.  American Express, therefore, told Debtors that it would wait for further guidance and information from Debtors before proceeding with any potential path.  On a February 28, 2023 call, Debtors informed American Express for the first time that they had chosen the second path.  American Express promptly confirmed that it was willing to extract the Loan Files and transfer them to the Partner Banks or relevant third-party servicers, and that work and dialogue should begin to align with the Partner Banks (or third-party servicers) on the protocol and terms of the transfer.

        3.    This work is currently in progress.  American Express has been cooperating diligently with Debtors, Movants, and other third parties to ensure that the Loan Files, including those pertaining to Movants' loans (the "Partner Bank Files"), are provided efficiently and in a format usable and sufficient for all parties taking over Debtors' loan-servicing activities.  For example, on March 6, 2023, American Express proposed times to Debtors for initial calls with Movants.  Nevertheless, two days later, without contacting American Express or its counsel directly regarding their requests or providing any prior notice, Movants filed their motion to compel Rule 2004 discovery of American Express to obtain the Partner Bank Files.  The Joint Motion is entirely unnecessary, given American Express's ongoing efforts and discussions *with Movants* to provide the Partner Bank Files voluntarily. The Joint Motion only serves to waste the time and resources of the Court, American Express, Debtors and Movants, who should be focused on transitioning Debtors' loan-servicing activities rather than creating unnecessary disputes.  Moreover, in violation of Local Rule 2004-1, Movants never conferred with American Express about the Joint Motion before filing it, other than to ask for agreement on shortened notice.  Movants have therefore failed to take the steps necessary to seek Rule 2004 discovery of American Express, and the Joint Motion is premature.

4.    For these reasons, the Joint Motion should be denied.

## JURISDICTION

5.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  The Joint Motion against which this Objection is directed is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.    Kabbage was an online loan-servicing company founded in 2008 that sold many of its operating assets to affiliates of American Express in October 2020 (the "Acquisition").  Disclosure Statement at 3 (D.I. 467); Sorin Decl. Ex. 1 at 1.  Post-Acquisition, Kabbage retained servicing obligations for Kabbage's loan portfolio and the portfolios of the Partner Banks, which were not included in the Acquisition.  *See* Disclosure Statement at 3, 30; Sorin Decl. Ex. 1 at 1.  Kabbage's loan portfolio consisted primarily of small business loans issued under the Paycheck Protection Program ("PPP") in 2020 (before the Acquisition) with an aggregate outstanding principal amount of approximately $1.3 billion as of October 3, 2022, as well as other loans originated by Kabbage prior to the Acquisition.  Disclosure Statement at 3.

7.    As part of the Acquisition, Kabbage and American Express entered into the TSA to govern the services and data American Express would make accessible to Kabbage as Kabbage transitioned servicing to itself or third-party vendors.  Sorin Decl. at ¶ 4.  The TSA gave Kabbage the right to access materials, records and legacy software Kabbage needed to service the loans in Kabbage's and the Partner Banks' loan portfolios.  Disclosure Statement at 35.  American Express has fulfilled all of its obligations under the TSA, and much more.[3]  For

---

[3]    American Express expressly "disagree[d] with the Debtors' characterization of AmEx" in

example, American Express agreed to amend the TSA to expand the scope of services so that Kabbage could originate, process and service second draw PPP loans (including for Movants) and completed over 20 change orders to either extend the time period for existing services or provide additional services that were not required under the terms of the original TSA.  Sorin Decl. at ¶ 4.  As recently as December 2022, at the request of Movant CRB, and for Debtors to fulfill their contractual obligations to CRB, American Express expended significant resources to complete an external audit of the lending platform that Kabbage licenses from American Express to perform loan servicing.  *Id*.  This was done voluntarily in the interest of cooperation.

8.      Debtors declared bankruptcy on October 3, 2022.  Nearly three months later, on December 14, 2022, Debtors first approached American Express's in-house counsel to raise the issue of how Kabbage's loan servicing might change as a result of the bankruptcy.  *See* Sorin Decl. ¶ 5; Ex. 2 at 1.  Debtors indicated that they were working with their counsel from Weil, Gotshal & Manges LLP ("Weil") to assess how to transition loan servicing to Movants and other Partner Banks,[4] and specifically whether the underlying data would (1) stay with American Express and be accessible to Movants and others, or (2) be migrated to third-party servicers' systems  (or directly to the systems of the Partner Banks).  *See id*. ¶ 6.  Debtors indicated that they had not yet decided on their preferred approach.  *Id.*  American Express asked that Debtors prepare a description of the transition options being considered, which Debtors agreed on December 19, 2023 to provide "to kickstart some discussion about future servicing options."  *Id.* ¶¶ 6, 7; Ex. 3 at 1.  In response, American Express suggested that further

---

the Disclosure Statement concerning "lack of cooperation or delay" in providing data pursuant to the TSA.  Disclosure Statement at 35.

[4]      The Federal Reserve Bank will also be taking over servicing of some of Debtors' PPP loans.  Disclosure Statement at 5.

discussions about the servicing transition take place between Debtors' counsel at Weil and American Express's outside counsel, Sullivan & Cromwell ("S&C").  *Id.* Ex. 3 at 1.

9.      On January 4, 2023, S&C emailed Weil to discuss "options for ongoing loan servicing following bankruptcy."  *See* Davidoff Decl. ¶ 2; Ex. 1 at 1.  During a January 6, 2023 call, Weil indicated that Debtors' Partner Banks (including Movants) were requesting information such as "know your customer" ("KYC") and "know your business" ("KYB") records related to their PPP loans.  *Id.* ¶ 3.  Weil agreed to provide S&C with a detailed list of the information requested by the Partner Banks, as well as other information about the options being considered to transition servicing.  *Id.*

10.     Counsel for Movant CRB at Quinn Emanuel Urquhart & Sullivan LLP ("Quinn") later reached out to S&C for a direct phone call.[5]  On January 11, 2023, Quinn informed S&C that CRB had been unable to obtain information from Debtors needed to service CRB's loans.  Davidoff Decl. ¶ 4.  S&C explained that Weil had recently made S&C aware of a request for KYC- and KYB-related information, and that S&C had asked Weil to provide a list of third-party requests.  *Id.*  Quinn agreed that it would be most efficient for all requests to American Express for information to be funneled through Weil, given that multiple parties were seeking similar information.  *Id.*  Quinn and S&C did not discuss any specific CRB requests on this call or at any time thereafter.  *Id*.

11.     Movant Customers Bank has never contacted American Express about data needed to transition servicing.

---

[5]     Just as American Express suggested to Debtors that S&C and Weil should coordinate communications about requests to American Express related to the transition of servicing, American Express's in-house counsel also asked Movant CRB's in-house counsel to contact S&C about those topics.  Joint Motion ¶ 13.

12. On January 13, 2023, American Express received from Weil a letter attaching a set of requests (the "KServicing Requests") for extensive information about American Express's system architecture for storing Debtors' and the Partner Banks' loan data and records, documentation from Debtors' own PPP program that American Express does not have, documentation and descriptions of American Express's systems and processes that American Express would need to create, and proprietary intellectual property such as all of the "code from Amex system environment." *Id.* Ex. 3 at 1. The KServicing Requests sought data for thousands of individual loans but did not specify data fields or the format for the data transfer—basic information needed to move forward. The Requests also asked for extensive human capital support, such as a "[t]utorial of the full PPP data environment" and access to multiple experts at American Express, including a "Technical lead" and separate "point[s] of contact" for "support to database updates," "3rd-party audit & governance requirements and deliverables," "API management" issues, and work with Debtors' Help Desk on "provisioning and troubleshooting support" for certain systems. *Id.* at 2, 3. It was not clear why most of this information had been requested, particularly if Debtors were considering transitioning servicing entirely to other parties. Indeed, no party has pursued the most burdensome requests, such as documentation explaining *all* application connections among the American Express core platform processes. The letter accompanying the January 13 KServicing Requests asked American Express to confirm "by January 19, 2023 . . . that [American Express] is willing to provide the requested material, and that it will do so by February 17, 2023." *Id.* Ex 4 at 1.

13. On January 19, 2023, S&C notified Weil that "American Express is open to discussing its role in assisting KServicing with its transition plans, including the [KServicing Requests]," and that American Express "agree[s] that it is in the best interests of the parties to

work cooperatively and that it would be helpful to meet and confer on the requests." *Id.* ¶ 7; Ex. 5 at 1.  S&C explained that "American Express requires more information to understand what is being requested and the ultimate goal with respect to transitioning servicing," and "[s]ome of these requests may require weeks or months of development or other work to accomplish and so should be discussed" to develop a "more comprehensive transition plan[.]" *Id.* Ex. 5 at 1.  S&C noted that, "[i]n light of the steps required to scope and respond to the requests, at this time American Express cannot commit to providing all of the documentation, access, and resources requested by February 17, 2023 but is willing to discuss a realistic timeframe for assisting KServicing." *Id.*

14.     S&C received no response to this email until January 27, 2023, when Weil asked to schedule a call for February 2, 2023.  *See id.* Ex. 6 at 1.  On this call, Weil informed S&C that Debtors had decided to transition servicing away from Debtors completely, so that it would be run by Movants and other relevant parties, but Debtors did not know whether American Express would continue to host the Debtors' PPP loan data or would need to extract the data and send it to the new servicers. *Id.* ¶ 9.  Thus, even at this late date, there was no clear understanding of what was needed from American Express.  *Id*.  Weil agreed to arrange a comprehensive discussion among American Express, Movants, other relevant parties and their respective servicers about how to transition servicing away from Debtors.  *Id*. Following the call with Weil, American Express promptly started having internal discussions about how to efficiently transfer Debtors' data needed for loan servicing (should Debtors ultimately choose that path).  Sorin Decl. ¶ 12.

15.     When Weil still had not scheduled the requested transition calls after two weeks—and instead sent an email suggesting that American Express was supposed to have been

providing some data to Movant CRB[6]—on February 17, 2023, S&C reminded Weil that they were supposed to be scheduling calls with Movants and other relevant parties to discuss exactly what was needed from American Express.  Davidoff Decl. ¶ 10; Ex. 7 at 1.  At the same time, S&C provided some readily available PPP-related data requested by Debtors.[7]  *Id.* Ex. 7 at 1.

16.    On a February 28, 2023 call between S&C and Weil, more than a month after S&C responded to Weil's January 13 letter, Weil informed S&C for the first time how Debtors planned to proceed with the servicing transition:  Debtors wanted American Express to extract and transfer Debtors' PPP loan data to Movants, other relevant parties and their servicers—who then would not rely on American Express to continue to host such data.  Davidoff Decl. ¶ 11.  This was, at last, a clear request that American Express could act upon.  At S&C's request, Weil *again* agreed to arrange calls with each of Movants, other relevant parties, and their respective servicers to discuss the data and information needed by each entity to transition servicing.  *Id.*

17.    On March 6, 2023, American Express proposed times to Weil for calls with Movants and others to discuss transitioning servicing.  Weil coordinated calls with Movants and others for March 10, 2023.  *Id.* ¶ 12.  Additional calls have occurred and been

---

[6]    This apparently referred to a separate request from Debtors to American Express's in-house counsel made by phone on January 31, 2023.  On that call, Debtors asked for American Express's permission for Debtors to provide Movant CRB with PPP loan files and other PPP-related loan data to which Debtors had access.  Sorin Decl. ¶ 9.  On February 2, 2023, American Express consented and indicated it would agree to the same disclosures for Customers Bank.  *Id.* Ex. 5 at 1.  S&C reminded Weil of this consent in the February 17 email:  "For the broader data requests [from CRB], American Express gave signoff to [Debtors] at the beginning of the month to provide CRB with the data dealt with in [Debtors'] request of January 31."  Davidoff Decl. Ex. 7 at 1; Sorin Decl. ¶ 10.

[7]    As S&C noted in the email, some of the requested information had already been provided by American Express to Debtors months earlier.  Davidoff Decl. ¶ 10; Ex. 7 at 1.

scheduled since then, and more will be set among American Express and Movants to discuss the data transfer.  *Id.*

## ARGUMENT

18.    Movants' request for an examination under Bankruptcy Rule 2004 and Local Rule 2004-1 should be denied because there is absolutely no need for such relief.  As soon as Debtors told American Express what they actually wanted—for American Express to extract the relevant Loan Files and send them to Movants and other third parties—American Express started working on that exercise, which is in progress.  The Movants themselves skipped the prerequisite step of conferring with American Express before filing this Motion, perhaps because they knew American Express was *already* working to transfer the data they are seeking.  The Movants thus have failed to demonstrate the good cause needed for the Court to grant this discretionary relief, and the Motion should be denied.

19.    Bankruptcy Rule 2004 enables a court to "order the examination of any entity" when requested by a party in interest.  Fed. R. Bankr. P. 2004(a).  No party has an absolute right to invoke the Rule: "[T]he granting of a Rule 2004 examination is dependent on the discretion of the court."  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016).  In exercising its discretion, the court must balance "the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *Id.* (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991)).  Rule 2004 cannot be used simply to deal with a litigant's "special problems." *Millennium Lab*, 562 B.R. at 626–27 (quoting *In re J&R Trucking, Inc.*, 431 B.R. 818, 821 (Bankr. N.D. Ind. 2010)).

20.    While the scope of Rule 2004 is "broader than discovery under the Federal Rules of Civil Procedure," Joint Motion ¶ 20, it is far from limitless.  "The party

seeking to conduct a 2004 examination has the burden of showing good cause for the examination." *Millennium Lab*, 562 B.R. at 627. "Good cause" generally requires the movant to demonstrate that "the . . . examination is necessary to establish the claim of the party seeking the examination, or [that] denial of such request would *cause the examiner undue hardship or injustice*." *See id.* (quoting *In re Metiom, Inc.*, 318 B.R. 263, 268 (Bankr. S.D.N.Y. 2004) (emphasis added)).

21.    Here, Movants have not met their burden of showing that Rule 2004 examination "is necessary to . . . [avoid] undue hardship or injustice," not only on the underlying merits but because American Express has *already agreed* to provide the information being sought. While Movants claim to have "been trying to obtain copies of [their] Servicing Files" from Debtors for "over a year," Joint Motion ¶ 1, no requests related to the servicing transition were made *by anyone* to American Express until January 2023, and no actionable proposal was presented until February 28, 2023. Davidoff Decl. ¶¶ 6, 9, 11. During an initial discussion with Debtors on January 6, 2023, American Express asked for a list of specific requests from Movants and a clear understanding of what assistance Debtors wanted from American Express to transfer servicing to Movants and other relevant servicers. *See Id.* ¶ 3. Specifically, American Express needed to know whether Debtors were asking it to (1) continue to host the Loan Files and support new servicers, or (2) extract the Loan Files and deliver them to third parties. As soon as Debtors informed American Express that it was taking the latter route—which did not occur until February 28 (*id.* ¶ 11)—American Express sprang into action and began planning for the data transfer.

22.    In light of these facts, Movants do not meet their burden under Rule 2004 to show "good cause." Rule 2004 examination is not "necessary" to save them from "undue

hardship or injustice," including because a voluntary process to deliver the information Movants seek is already underway.  *See Millennium Lab*, 562 B.R. at 627; *see also In the Matter of Onatah Farms, LLC et al.*, No. 21-10091, 2021 WL 2809902, at *2 (Bankr. N.D. Ind. Apr. 29, 2021) ("Resort to Rule 2004 is only necessary where the target of any inquiry will not voluntarily cooperate."); *J & R Trucking*, 431 B.R. at 822 ("Ideally, those with knowledge [relevant to the bankruptcy proceeding] will voluntarily cooperate," but because "that is not always the case . . . Rule 2004 provides a vehicle by which the [movant] can compel that 'cooperation.'").  Accordingly, "good cause" is missing here.

23.    Nor can Movants demonstrate compliance with Local Rule 2004-1.  This Rule requires a movant, "[p]rior to filing a motion for examination . . . under Fed. R. Bankr. P. 2004," to "attempt to confer . . . with the proposed examinee . . . to arrange for a mutually agreeable date, time, place and scope of an examination or production."  Movant CRB approached American Express about obtaining information from Debtors only once, on January 11, 2023.  Davidoff Decl. ¶ 4.  CRB *agreed* that its specific requests should go through Debtors' counsel—and made no further approach to American Express.  *Id.*; Joint Motion ¶ 13. Movant Customers Bank has never communicated with American Express about its requests. Davidoff Decl. ¶ 5.  And neither Movant sought to meet and confer with American Express about the Joint Motion specifically, other than to seek consent for shortened notice.  To the extent CRB asserts that its January 11 phone call with counsel for American Express satisfies the conference requirement, it plainly does not.  That phone call did not include discussion of any specific requests for production, *see* Davidoff Decl. ¶ 4, and, in any event, since then, Movants and American Express have been proceeding with a "mutually agreeable" plan for production, which, under Local Rule 2004-1, expressly obviates the need for Rule 2004 relief.

Movants' surprising response to this ongoing, voluntary process was to file this Joint Motion,

knowing calls were scheduled with American Express for the very week Movants filed it.

Movants have not satisfied a prerequisite to the compulsory process sought by the Joint Motion.

## CONCLUSION

For the reasons stated above, American Express respectfully requests that the

Court deny the Joint Motion.

Dated: March 15, 2023          Respectfully, submitted,
       Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL
LLP**

*/s/ Jonathan M. Weyand*
Derek C. Abbott (No. 3376)
Jonathan M. Weyand (No. 6959)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
      jweyand@morrisnichols.com

-and-

**SULLIVAN & CROMWELL LLP**

James L. Bromley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Email: bromleyj@sullcrom.com

Amanda Flug Davidoff (admitted *pro hac vice*)
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500
Email: davidoffa@sullcrom.com

*Counsel to American Express*