```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 22-10951 (CTG)
 4   KABBAGE, INC., d/b/a         .
     KSERVICING, et al.,          .  (Jointly Administered)
 5                                .
                                  .  Courtroom No. 7
 6                                .  824 Market Street
                        Debtors.  .  Wilmington, Delaware 19801
 7                                .
                                  .  Monday, March 20, 2023
 8   . . . . . . . . . . . . . . .  10:00 a.m.

 9                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE CRAIG T. GOLDBLATT
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Zachary I. Shapiro, Esquire
                                RICHARDS, LAYTON & FINGER, PA
13                              One Rodney Square
                                920 North King Street
14                              Wilmington, Delaware 19801

15                              -and-

16                              Theodore E. Tsekerides, Esquire
                                Richard W. Slack, Esquire
17                              WEIL, GOTSHAL & MANGES, LLP
                                767 Fifth Avenue
18                              New York, New York 10153

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Theresa Mistretta, ECRO

21   Transcription Company:    Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For Customers Bank:        Jeremy M. Sternberg, Esquire
                              HOLLAND & KNIGHT, LLP
3                             10 St. James Avenue
                              11th Floor
4                             Boston, Massachusetts 02116

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    <u>MOTIONS</u>:                                            <u>PAGE</u>

3    Agenda
     Item 3:   Motion of Debtors for Entry of an Order       12
4              Enforcing the Settlement Order and the
               Settlement Agreement Between KServicing
5              and Customers Bank
               [Docket No. 340 – filed December 7, 2022]
6
               Court's Ruling:                              195
7

8    Agenda
     Item 4:   Interim Fee Applications                       12
9
               Court's Ruling:                                12
10

11

12   WITNESSES CALLED
     BY THE DEBTORS:                                       <u>PAGE</u>
13

14        <u>TAMICA M. WILLIAMS</u>

15        Direct examination by declaration               --

16        Cross-examination by Mr. Sternberg               18

17        Redirect examination by Mr. Tsekerides           63

18

19        <u>DONNA R. EVANS</u>

20        Direct examination by declaration               --

21        Cross-examination by Mr. Sternberg               72

22        Redirect examination by Mr. Tsekerides           86

23        Recross-examination Mr. Sternberg                89

24

25

1                                    INDEX

2    WITNESSES CALLED
     BY CUSTOMERS BANK:                                      PAGE
3

4        ALYSSA WHITE

5        Direct examination by Mr. Sternberg              99

6        Cross-examination by Mr. Slack                  120

7        Redirect examination by Mr. Sternberg           169

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBITS

2    DEBTORS' EXHIBITS:                                        PAGE

3    1 - Settlement and Release Agreement, dated October 27,     14
           2022 (including all exhibits thereto)
4          [Docket No. 232-1 - filed November 9, 2022]

5
     2 - Motion of Debtors for Entry of an Order Enforcing       14
6          the Settlement Order and the Settlement Agreement
           Between KServicing and Customers Bank
7          [Docket No. 340 - filed December 7, 2022]

8
     3 - Declaration of Tamica M. Williams in Support of         14
9          Motion of Debtors for Entry of an Order Enforcing
           the Settlement Order and the Settlement Agreement
10         Between KServicing and Customers Bank
           [Docket No. 341 - filed December 7, 2022]
11         (FILED UNDER SEAL)

12
     4 - Exhibit 1 to the Declaration of Tamica M. Williams      14
13         in Support of Motion of Debtors for Entry of an
           Order Enforcing the Settlement Order and the
14         Settlement Agreement Between KServicing and
           Customers Bank
15         [Docket No. 341-1 - filed December 7, 2022]
           (FILED UNDER SEAL)
16

17   5 - Exhibit 2 to the Declaration of Tamica M. Williams      14
           in Support of Motion of Debtors for Entry of an
18         Order Enforcing the Settlement Order and the
           Settlement Agreement Between KServicing and
19         Customers Bank
           [Docket No. 341-2-filed December 7, 2022]
20         (FILED UNDER SEAL)

21
     6 - Exhibit 3 to the Declaration of Tamica M. Williams      14
22         in Support of Motion of Debtors for Entry of an
           Order Enforcing the Settlement Order and the
23         Settlement Agreement Between KServicing and
           Customers Bank
24         [Docket No. 341-3 - filed December 7, 2022]
           (FILED UNDER SEAL)
25

1                              EXHIBITS

2   DEBTORS' EXHIBITS:                                    PAGE

3   7 - Exhibit 4 to the Declaration of Tamica M. Williams      14
        in Support of Motion of Debtors for Entry of an
4       Order Enforcing the Settlement Order and the
        Settlement Agreement Between KServicing and
5       Customers Bank
        [Docket No. 341-4 - filed December 7, 2022]
6       (FILED UNDER SEAL)

7
    8 - Exhibit 5 to the Declaration of Tamica M. Williams      14
8       in Support of Motion of Debtors for Entry of an
        Order Enforcing the Settlement Order and the
9       Settlement Agreement Between KServicing and
        Customers Bank
10      [Docket No. 341-5 - filed December 7, 2022]
        (FILED UNDER SEAL)
11

12  9 - Declaration of Donna R. Evans in Support of Motion      14
        of Debtors for Entry of an Order Enforcing the
13      Settlement Order and the Settlement Agreement
        Between KServicing and Customers Bank
14      [Docket No. 342 - filed December 7, 2022]
        (FILED UNDER SEAL)
15

16  10- Exhibit 1 to the Declaration of Donna R. Evans in       14
        Support of Motion of Debtors for Entry of an Order
17      Enforcing the Settlement Order and the Settlement
        Agreement Between KServicing and Customers Bank
18      [Docket No. 342-1 - filed December 7, 2022]
        (FILED UNDER SEAL)
19

20  11- Exhibit 2 to the Declaration of Donna R. Evans in       14
        Support of Motion of Debtors for Entry of an Order
21      Enforcing the Settlement Order and the Settlement
        Agreement Between KServicing and Customers Bank
22      [Docket No. 342-2 - filed December 7, 2022]
        (FILED UNDER SEAL)
23

24

25

1                              EXHIBITS

2    DEBTORS' EXHIBITS:                                          PAGE

3    12- Exhibit 3 to the Declaration of Donna R. Evans in       14
         Support of Motion of Debtors for Entry of an Order
4        Enforcing the Settlement Order and the Settlement
         Agreement Between KServicing and Customers Bank
5        [Docket No. 342-3 - filed December 7, 2022]
         (FILED UNDER SEAL)
6

7    13- Exhibit 4 to the Declaration of Donna R. Evans in       14
         Support of Motion of Debtors for Entry of an Order
8        Enforcing the Settlement Order and the Settlement
         Agreement Between KServicing and Customers Bank
9        [Docket No. 342-4- filed December 7, 2022]
         (FILED UNDER SEAL)
10

11   14- Exhibit 5 to the Declaration of Donna R. Evans in       14
         Support of Motion of Debtors for Entry of an Order
12       Enforcing the Settlement Order and the Settlement
         Agreement Between KServicing and Customers Bank
13       [Docket No. 342-5 - filed December 7, 2022]
         (FILED UNDER SEAL)
14

15   15- Exhibit 6 to the Declaration of Donna R. Evans in       14
         Support of Motion of Debtors for Entry of an Order
16       Enforcing the Settlement Order and the Settlement
         Agreement Between KServicing and Customers Bank
17       [Docket No. 342-6- filed December 7, 2022]
         (FILED UNDER SEAL)
18

19   16- Exhibit 7 to the Declaration of Donna R. Evans in       14
         Support of Motion of Debtors for Entry of an Order
20       Enforcing the Settlement Order and the Settlement
         Agreement Between KServicing and Customers Bank
21       [Docket No. 342-7 - filed December 7, 2022]
         (FILED UNDER SEAL)
22

23   17- Opposition of Customers Bank to Debtors' Motion for     14
         Entry of an Order Enforcing the Settlement Order and
24       the Settlement Agreement Between KServicing and
         Customers Bank
25       [Docket No. 356 - filed December 21, 2022]

1                            EXHIBITS

2   <u>DEBTORS' EXHIBITS</u>:                                    PAGE

3   18- Declaration of Alyssa White in Support of Opposition    14
        of Customers Bank to Debtors' Motion for Entry of an
4       Order Enforcing the Settlement Order and the
        Settlement Agreement Between KServicing and
5       Customers Bank
        [Docket No. 358 -filed December 21, 2022]
6       (FILED UNDER SEAL)

7
    19- Exhibits 1-10 to the Declaration of Alyssa White in     14
8       Support of Opposition of Customers Bank to Debtors'
        Motion for Entry of an Order Enforcing the Settlement
9       Order and the Settlement Agreement Between KServicing
        and Customers Bank
10      [Docket No. 358-1- filed December 21, 2022]
        (FILED UNDER SEAL)

11
    20- Debtors' Reply in Further Support of Motion of          14
12      Debtors for Entry of an Order Enforcing the
        Settlement Order and the Settlement Agreement
13      Between KServicing and Customers Bank
        [Docket No. 670 - filed March 13, 2023]
14

15
    21- Declaration of Tamica M. Williams in Further            14
16      Support of Debtors' Reply in Support of Motion
        of Debtors for Entry of an Order Enforcing the
17      Settlement Order and the Settlement A1rreement
        Between KServicing and Customers Bank
18      [Docket No. 671 - filed March 13, 2023], including
        Exhibits A-D
19

20  22- Exhibit A to the Declaration of Tamica M. Williams      14
        in Further Support of Debtors' Reply in Support of
21      Motion of Debtors for Entry of an Order Enforcing
        the Settlement Order and the Settlement Agreement
22      Between KServicing and Customers Bank
        [Docket No. 671-1 - filed March 13, 2023]
23

24

25

1                           EXHIBITS

2    DEBTORS' EXHIBITS:                                    PAGE

3    23- Exhibit B to the Declaration of Tamica M. Williams    14
         in Further Support of Debtors' Reply in Support of
4        Motion of Debtors for Entry of an Order Enforcing
         the Settlement Order and the Settlement Agreement
5        Between KServicing and Customers Bank
         [Docket No. 671-2-filed March 13, 2023]
6

7    24- Exhibit C to the Declaration of Tamica M. Williams    14
         in Further Support of Debtors' Reply in Support of
8        Motion of Debtors for Entry of an Order Enforcing
         the Settlement Order and the Settlement Agreement
9        Between KServicing and Customers Bank
         [Docket No. 671-3 - filed March 13, 2023]
10

11   25- Exhibit D to the Declaration of Tamica M. Williams    14
         in Further Support of Debtors' Reply in Support of
12       Motion of Debtors for Entry of an Order Enforcing
         the Settlement Order and the Settlement Agreement
13       Between KServicing and Customers Bank
         [Docket No. 671-4-filed March 13, 2023]
14

15   26- Declaration of Donna R. Evans in Further Support of   14
         Debtors' Reply in Support of Motion of Debtors for
16       Entry of an Order Enforcing the Settlement Order and
         the Settlement Agreement Between KServicing and
17       Customers Bank
         [Docket No. 672 - filed March 13, 2023]
18

19   27- Synovus account analysis l 1.4.22 (excel spreadsheet)  14

20

21   28- Customers Bank remittance file KService              14
         10.03.22_1 l.4.22 (excel spreadsheet)
22

23   29- CUBI payment details 10212020 (excel spreadsheet)    14

24

25

1                                    EXHIBITS

2    CUSTOMERS BANK'S EXHIBITS:                              PAGE

3    1 - Reconciliation Summary provided by Customers Bank        99
         to KServicing representing Customers Bank's
4        calculation of the Settlement Payment at the end
         of the reconciliation period, or November 9, 2022
5

6    3 - Email from Donna Evans, dated November 4, 2022 re        74
         KServicing Update # 3, includes Synovus bank
7        statements

8
     14- Email from Donna Evans dated November 9, 2022           81
9        attaching Trial Balance

10

11   DECLARATIONS:                                          PAGE

12   1) Declarations of Tamica M. Williams                       13

13   2) Declarations of Donna R. Evans                           71

14   3) Declaration of Alyssa White                              98

15   Transcriptionists' Certificate                             197

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:00 a.m.)

2                THE COURT:  Be seated.

3          (Participants confer)

4                THE COURT:  So good morning.  We are here in In Re

5    Kabbage, Inc., which is Case Number 22-10951.

6                Mr. Shapiro.

7                MR. SHAPIRO:  Good morning.  For the record, Zach

8    Shapiro, Richards, Layton & Finger, on behalf of the debtors.

9                I will just walk Your Honor through the agenda

10   very quickly and then turn it over to Mr. Tsekerides.

11               THE COURT:  Okay.

12               MR. SHAPIRO:  Item Number 2 was listed as an

13   uncontested matter.  We are still working to resolve that and

14   we should -- it should be resolved.  It's not going to go

15   forward today.

16               In the unlikely event that we have -- we need Your

17   Honor's guidance, we know how to reach out.

18               THE COURT:  Got it.  Okay.  That makes good sense.

19   This is as to the 2004 exam.

20               MR. SHAPIRO:  Correct.

21               THE COURT:  And you're going to endeavor to submit

22   an agreed order; and, if not, you'll let me know.

23               MR. SHAPIRO:  Yes.

24               THE COURT:  Perfect.

25               MR. SHAPIRO:  And then, skipping ahead, Item

1  Number 4 were interim fee applications for which we submitted

2  an order under COC.

3          THE COURT:  Right.

4          MR. SHAPIRO:  I enter the -- I understand Your

5  Honor is still looking at this --

6          THE COURT:  Right.

7          MR. SHAPIRO:  -- and will --

8          THE COURT:  We'll do our --

9          MR. SHAPIRO:  -- let us know --

10          THE COURT:  -- best to get those done as promptly

11  as we can.  In the event we were to run into an issue, we'd

12  reach out, but -- to set a hearing.  But assuming we get

13  through them and nothing jumps out at us, we'll get those

14  orders entered as quickly as we can.

15          MR. SHAPIRO:  Thank you.

16          So, with that, I will turn the podium over.

17          THE COURT:  Okay.  Mr. Tsekerides.

18          MR. TSEKERIDES:  Yes.  Good morning, Your Honor.

19  Ted Tsekerides from Weil Gotshal for the debtors.

20          So I'd like to lay out what the plan is for today

21  and see if it's agreeable.  This is on the motion we filed, I

22  think back in December, on the settlement agreement dispute,

23  on how much money we thought was owed.  We've narrowed the

24  issue down to just one issue on what we call "borrower

25  remittances," and the amount at issue is about 1.5 million.

1          The way we'd like to proceed, we have two

2   witnesses; the other side has one witness.  I'd like to move

3   in the two declarations of our first witness.  I'd propose

4   that counsel for the adversary cross her, then put the other

5   one in and do it that way, then they can put theirs in, if

6   that's okay with the Court.

7          THE COURT:  Is that agreeable on your side?

8          MR. STERNBERG:  That is agreeable, Your Honor.

9   Jeremy Sternberg on behalf of Customers Bank.

10          THE COURT:  Okay.  Then, certainly, we can -- if

11   the parties agree, I'm not going to get in the way --

12          MR. TSEKERIDES:  Okay.

13          THE COURT:  -- so you can certainly proceed --

14          MR. TSEKERIDES:  So let me --

15          THE COURT:  -- that way.

16          MR. TSEKERIDES:  Let me dispense with some of

17   those formalities.

18          So I'd like to move first in the two declarations

19   from the company's corporate controller, Tamica Williams.

20   That's at Docket 341 and 671, with the company exhibits.

21          THE COURT:  Any objection?

22          MR. STERNBERG:  No objection.

23          THE COURT:  Okay.  They will be admitted.

24        (Williams Declarations received in evidence)

25          MR. TSEKERIDES:  Okay.  And then I hope Your Honor

1  has a binder or some materials that we submitted with

2  exhibits.

3            THE COURT:  I've got the electronic versions --

4            MR. TSEKERIDES:  Okay.

5            THE COURT:  -- of those materials --

6            MR. TSEKERIDES:  So, for --

7            THE COURT:  -- yes.

8            MR. TSEKERIDES:  For now, I'd like to move in

9  Exhibits 1 through 29 of the debtors' exhibits.

10            THE COURT:  Hold on.  Exhibits 1 through 29.  Any

11  objection?

12        (Participants confer)

13            MR. STERNBERG:  No objection to those.

14            THE COURT:  Okay.  They will be admitted.

15        (Debtors' Exhibits 1 through 29 received in evidence)

16            MR. TSEKERIDES:  There were a few more, I think 30

17  through 36.  Those address some disputes we had about some

18  discovery points that relate to this.  Mr. Slack might take

19  that up, depending on what happens with their witness.  But

20  in order to avoid any skirmishes at the beginning here, let's

21  just table that for later.

22            THE COURT:  That's agreeable here.

23            MR. TSEKERIDES:  Okay.  So, with that, with our

24  declarations in -- and I do want to make one point I forgot.

25            On the Williams declaration -- and this will also

1  apply to the other one, too -- obviously, the parties have

2  talked since those -- the first one was filed.  There might

3  be some paragraphs that aren't directly relevant any longer.

4  Rather than going through and try to piece out individual

5  paragraphs, since it's not a jury trial, I think you --

6  unless the Court wants us to, we'll just leave --

7            THE COURT:  No.

8            MR. TSEKERIDES:  -- them the --

9            THE COURT:  There's other --

10           MR. TSEKERIDES:  -- way they are.

11           THE COURT:  -- things that are admitted that have

12  become rendered obsolete --

13           MR. TSEKERIDES:  Exactly.

14           THE COURT:  -- by virtue of the issues narrowing.

15  Having them admitted, unless there's -- someone has an issue

16  with it, I don't think it -- see there being any harm in

17  there being extraneous material in the record.

18           MR. TSEKERIDES:  I just wanted to reference that

19  for the Court.

20           THE COURT:  Okay.  No, I appreciate that.

21           And just before we go on, just to make sure that

22  we're all rowing together, Mr. Sternberg, you agree with what

23  Mr. Tsekerides said about the issues narrowing and that we've

24  got this dispute about the $1.5 million in the -- what is

25  referred to as the "disputed remittances."  Is -- are we on

1  the same page there?

2              MR. STERNBERG:  We are.

3              THE COURT:  Okay.  Just so that I'm focused

4  correctly on what the parties --

5              MR. TSEKERIDES:  Yeah.

6              THE COURT:  -- actually -- where they agree and --

7              MR. TSEKERIDES:  That's actually --

8              THE COURT:  -- disagree.

9              MR. TSEKERIDES:  -- good to know, in case

10 something happened.  Yeah.

11             THE COURT:  Okay.

12             MR. TSEKERIDES:  Okay.  So --

13             THE COURT:  Very well.  I appreciate that.

14             MR. TSEKERIDES:  So, with that, it's in.

15 Ms. Williams is here in the courtroom, available to be

16 crossed.

17             THE COURT:  Okay.  And do you wish to cross-

18 examine Ms. Williams?

19             MR. STERNBERG:  I do, Your Honor.

20             And before we start that cross-examination, I'd

21 like to ask the Court to invoke the role on sequestration of

22 witnesses and to have Ms. Evans outside the courtroom --

23             THE COURT:  Okay.

24             MR. STERNBERG:  -- and, in turn, also the

25 Customers Bank witness who's here, Ms. White, in fairness,

1  should also be outside the courtroom.

2          THE COURT:  Okay.  Very well.  So, if --

3          MR. TSEKERIDES:  Yeah, as long as Ms. White is

4  also not here.

5          THE COURT:  Okay.

6          MR. TSEKERIDES:  That's fine.

7          THE COURT:  So both of the --

8          MR. TSEKERIDES:  Yeah.

9          THE COURT:  Both fact witnesses who are not yet

10  testifying should leave the courtroom.

11      (Participants confer)

12          THE COURT:  Certainly.  If you can resolve this

13  while you're there, that would be great.

14      (Laughter)

15      (Participants confer)

16      MR. STERNBERG:  Your Honor, if I might, I'll put a

17  binder on Ms. Williams' desk.

18          THE COURT:  Certainly.

19      (Participants confer)

20      MR. STERNBERG:  I'd like to call Ms. Williams for

21  cross-examination.

22          THE COURT:  Okay.  Ms. Williams, if you can take

23  the stand.

24          And Ms. Barksdale, if you could swear the witness.

25          THE COURT OFFICER:  Raise your right hand.

1      TAMICA WILLIAMS, WITNESS FOR THE DEBTORS, AFFIRMED

2           THE COURT OFFICER:  Please state your full name

3   and spell your last name for the record.

4           THE WITNESS:  Tamica Williams, W-I-l-l-I-a-m-s.

5           THE COURT OFFICER:  Thank you.  You may be seated.

6           THE COURT:  Okay.  You can proceed.

7           MR. STERNBERG:  Thank you, Your Honor.

8                          CROSS-EXAMINATION

9   BY MR. STERNBERG:

10  Q     Ms. Williams, I won't belabor the background since your

11  declaration has now gone in.

12        You joined Kabbage in November 2021.  Is that correct?

13  A     That is correct.

14  Q     And that's about a year and four months after the

15  Kabbage/Customers Bank relationship had been established?

16  A     That is correct.

17  Q     Okay.  Now, Ms. Williams, you understand that Kabbage

18  and Customers Bank reached a settlement agreement in this

19  case that the Court entered on November 9th, 2022?

20  A     Yes.

21  Q     In that settlement agreement, do you understand that

22  there was a process called for called "reconciliation"?

23  A     Yes.

24  Q     The reconciliation was limited by time, correct?

25  A     Not that I'm aware of.

1    MR. STERNBERG:  Okay.  Your Honor, may I --

2  Q    Well, Ms. Williams, you have two binders on your desk.

3  A    Yes.

4  Q    Once is a Customers Bank exhibit binder and then one is

5  a binder from your counsel.

6    If you could turn to the binder from your counsel, it's

7  the thicker of the two binders, it's called "Debtors' Hearing

8  Exhibit Binder."

9    Take a look at the first tab, it's called "Settlement

10  Agreement and Release."

11  A    The first tab.

12  Q    Do you see a document called "Settlement Agreement"?

13  A    Yes, I do.

14  Q    If you could turn to Paragraph 3, it's on Page 5 of

15  that agreement.

16  A    Okay.

17  Q    Do you see there's a paragraph that's entitled

18  "Reconciliation"?

19  A    Yes, I do see that.

20  Q    And that paragraph reads as follows:

21    "Following the execution of this agreement through

22  the effective date, the parties shall work together in good

23  faith to promptly reconcile the amount of the disputed case

24  servicing fee holdback."

25    Did I read that correctly?

1  A      Yes.

2  Q      And do you see, right above Paragraph 3, there's a

3  Paragraph 2 that's called "Effective Date"?

4  A      Yes.

5  Q      Yes.  And do you see that "effective date" is defined

6  as:

7            "The agreement shall be effective on the date on

8  which the Bankruptcy Court approves this agreement, pursuant

9  to Paragraph 5."

10  A      I do see that.

11  Q      Do you understand that the Court, the Bankruptcy Court,

12  approved the settlement agreement on November 9th, 2022?

13  A      Yes, I see that.

14  Q      So do you understand that the reconciliation period ran

15  from roughly October 27th, 2022 -- which is the date the

16  parties signed it -- to November 9th, 2022?

17            MR. TSEKERIDES:  Your Honor, I object to the

18  extent that it calls for a legal conclusion.  If she has an

19  understanding on her own, I think that's fair, but if he's

20  asking her to interpret the document, I think that's

21  objectionable.

22            THE COURT:  To the extent you have knowledge of

23  the question, you can answer.

24            THE WITNESS:  Can you ask me that question again,

25  please?

1           MR. STERNBERG:   Sure.

2   BY MR. STERNBERG:

3   Q     Do you understand that the reconciliation period, by

4   the terms of the agreement, ran from October 27th, 2022 to

5   November 9th, 2022?

6   A     I -- I can't say that I understand that.

7   Q     Did you understand something different about the

8   reconciliation period?

9   A     I understood that we were continuing to reconcile until

10  some type of resolution was reached.

11  Q     If you'd turn further in the settlement agreement that

12  we're both looking at to Page 9, there's a paragraph called

13  "Entire Agreement," Paragraph 12.

14  A     I see that.

15          (Participants confer)

16  Q     Are you aware of whether the parties entered into any

17  written agreement to amend the reconciliation period?

18  A     I am not aware of that.

19  Q     Now the reconciliation period -- or strike that.

20          During the reconciliation, Kabbage provided certain

21  information to Customers Bank, correct?

22  A     That is correct.

23  Q     Some of that information was uniquely within Kabbage's

24  control, correct?

25  A     "Uniquely" in Kabbage's control?

1  Q     Sure.  As servicer, Kabbage collected funds from

2  borrowers on Customers Bank's behalf, correct?

3  A     Correct.

4  Q     As servicer, Kabbage had those funds deposited into a

5  bank account that Kabbage controlled, correct?

6  A     That is correct.

7  Q     As servicer, Kabbage was responsible for reporting to

8  Customers Bank, on a loan-level basis, all the payments that

9  had been received.

10 A     That is correct.

11 Q     As servicer, Kabbage was responsible for turning over

12 the borrower payments to Customers Bank.

13 A     That would be correct.

14 Q     As servicer, Kabbage maintained a bank account to hold

15 those borrower remittances on behalf of Customers Bank,

16 correct?

17 A     Yes.

18 Q     And the information about that bank account was

19 uniquely within Kabbage's control.

20 A     Kabbage did have control of the bank account.

21 Q     In other words, Customers Bank, prior to October 3rd,

22 2022, could not log into some portal or call the bank and get

23 bank account information, could it?

24 A     Not that I'm aware of.

25 Q     At some point, Kabbage started withholding borrower

1  payments from Customers Bank?

2  A      I understand that to be true.

3  Q      And as a result of Kabbage's withholding of these

4  borrower -- what we call "borrower remittances" or borrower

5  payments, was one of the reconciliation items called for by

6  the settlement agreement to reconcile the amount of the

7  borrower payments that had been withheld from Customers Bank?

8  A      Can you repeat that question?

9  Q      Sure.

10        Did you understand that one of the items to be

11 reconciled as part of the settlement agreement was the amount

12 of borrower payments that Kabbage had withheld from Customers

13 Bank?

14 A      Yes, that was to be reconciled.

15 Q      And those borrower payments were made to an account at

16 a bank called Synovus?

17 A      At a certain point in time, yes.  There was -- at a

18 certain point in time, yes.

19 Q      The payments to be reconciled were payments that had

20 been made to a Synovus bank account.

21 A      Not necessarily.  There were -- the Synovus bank

22 account originated post the relationship between Customers

23 Bank and KServicing.

24 Q      So, in the course of the reconciliation process, did

25 Kabbage provide information to Customers Bank to reconcile

1   borrower payments for any bank account other than the Synovus

2   account?

3   A     Can you repeat that question?  I'm sorry.

4   Q     As part of the reconciliation, did Kabbage provide

5   information to Customers Bank about borrower remittances to

6   any account other than the Synovus account?

7   A     As part of the reconciliation process, yes.

8   Q     So Kabbage provided bank statements, for example, for

9   bank accounts other than the Synovus account?

10  A     We did provide a bank statement that I'm aware of as

11  part of the declarations that I believe Customers Bank has

12  access to that was not a Synovus account.

13  Q     When did Kabbage start withholding payments from

14  Customers Bank?

15  A     I'm not exactly certain of that.  That -- my

16  understanding is that payments were being withheld when I

17  started with KServicing in November of 2021.

18  Q     The Synovus bank account was formed in November 2020,

19  correct?

20  A     I believe it was, yes.

21  Q     Were bank -- were payments being withheld from

22  Customers Bank before November 2020?

23  A     Not that I'm aware of.  I -- I can't speak to that.

24  Q     You weren't there at the time.

25  A     No, I was not.

1   Q      Was the account that Kabbage established at Synovus

2   Bank called the CUBI -- C-U-B-I -- PPP account?

3   A      Was it called that?  It was referred to that by --

4   we -- KServicing has referred to that account as the "CUBI

5   account."

6   Q      Take a look, if you would, Ms. Williams, at the binder

7   on your desk called "Exhibits of Customers Bank."  It's the

8   thinner of the two binders.

9         MR. STERNBERG:  Your Honor, I have a binder for

10   the Court, if that would be helpful.

11        THE COURT:  I'm -- I think I'm happy to look at

12   it -- actually, you know what?  That would be helpful.  Thank

13   you.

14       (Participants confer)

15   BY MR. STERNBERG:

16   Q      Ms. Williams, if you would --

17        THE COURT:  Thank you.

18   Q      -- turn to Tab 3 of that binder you'll see a cover

19   email.  And then, if you turn the page, you'll see a Synovus

20   bank account statement from November 2020.

21   A      Yes.

22   Q      And do you see that the beginning balance on the

23   account was zero, and then there were a series of deposits

24   made starting in mid-November of 2020?

25   A      Yes, I see that.

1  Q      And do you see that the account is called "Kabbage,

2  Inc. PPP Payments CUBI"?

3  A      Yes, I see that.

4  Q      Do you understand that "CUBI" is a shorthand for

5  Customers Bank?

6  A      Yes, I do.

7  Q      Now, up until Kabbage filed for bankruptcy, is it fair

8  to say that Customers Bank had no visibility into this bank

9  account, correct?

10 A      I'm not certain of that.

11 Q      Did Customers Bank have any control over this account

12 at any time?

13 A      Not that I'm aware of.

14 Q      And is it fair to say that Customers Bank relied on

15 Kabbage to provide whatever information Kabbage was willing

16 to provide about this Synovus bank account?

17         MR. TSEKERIDES:  Object to the form, Your Honor.

18 How is she going to know what Customers Bank was relying on?

19 It's an inappropriate question.

20         THE COURT:  Is there a response?

21         MR. STERNBERG:  I'm going to rephrase, Your Honor.

22 BY MR. STERNBERG:

23 Q      Is it your understanding that any information prior to

24 October 3rd, 2022 that Customers Bank received about the

25 Synovus account it received from Customers Bank?

1  A      I'm sorry.  Can you repeat that for me?

2  Q      Yes.

3      Is it your understanding that, prior to October 3rd,

4  2022, any information that Customers Bank received about this

5  Synovus bank account, it received from Kabbage?

6  A      I'm not -- I can't speak to everything that they may

7  have received for this -- from this bank account.

8  Q      You know that the parties' contractual relationship, as

9  we already talked about, started in April 2020.

10  A      I'm not aware of the start date of the contractual

11  relationship.  I know that it was prior to my employment with

12  KServicing.

13  Q      At the time that this Synovus bank account was

14  established, had Kabbage already been servicing thousands of

15  loans for Customers Bank?

16  A      I -- I can't speak to what -- the number of loans that

17  were being serviced in 2020.

18  Q      Were there servicing -- was Kabbage servicing any loans

19  for Customers Bank prior to November 2020?

20  A      Prior to November 2020.  It is my understanding that

21  they were.

22  Q      What steps did you take as part of the reconciliation

23  process to account for all of the borrower remittances that

24  had been received into this Synovus account that we're

25  looking at in Tab 3?

1  A      Can you repeat that question?  I'm sorry.

2  Q      What did you do to reconcile all of the borrower

3  remittances that had been received into this Synovus bank

4  account.  When I say "this," the one that's depicted in

5  Tab 3.

6  A      Well, I inherited the borrower remittances tracking

7  file from our prior CFO, and I established a process to

8  reconcile the current listing of the remittance file to the

9  liability due to -- to CUBI.

10 Q      Which bank accounts did you look at in order to do

11 that?

12 A      I used the Synovus bank account activity from the date

13 that I received the file from the prior CFO, which would have

14 been late April 2022.

15 Q      As part of your effort to reconcile the amount of

16 borrower remittances into the Synovus bank account as part of

17 the settlement agreement reconciliation process, did you

18 consult with anyone from AlixPartners?

19 A      No, I did not.

20 Q      Did you do all that work within the four walls, to

21 speak, of Kabbage?

22 A      Within the four walls of Kabbage.  Yes.  Yes, I did.

23 Q      Okay.  Ms. Williams, would you agree to me -- with me

24 that, at its core, the job of a loan servicers is to collect

25 money from borrowers and apply it to their loans?

1   A       I would agree that that is a part of servicing.

2   Q       Would you agree with me that another core part of

3   servicing is that, in addition to collecting the money and

4   applying it to the loans, is to account for those payments

5   and those applications to the bank?

6   A       Is to -- can you repeat that last part?  I -- I didn't

7   hear the word before "bank."  I'm sorry.

8   Q       Is one of the important functions of a loan servicer,

9   not only to collect the money and apply it to the borrower's

10  loans, but to account for those payments and collections to

11  the bank?

12  A       When you say, "to the bank," which bank are you

13  referring to?

14  Q       Let's talk about Customers Bank.

15          So, if Customers Bank loaned $100 to a PPP borrower and

16  Kabbage was the servicers, and Kabbage received $10 in the

17  month of November 2020, was it Kabbage's job to collect that

18  money into the Synovus account, apply it to the borrower

19  balance, and tell Customers Bank that it had done so?

20  A       Yes.

21  Q       And if, after November 2020, a borrower had sent money

22  in payment of a loan, a PPP loan, a Customers Bank borrower,

23  that money would have been received into the Synovus bank

24  account?

25  A       After the establishment of the Synovus bank account,

1  yes.

2  Q    And when Kabbage received that money into the Synovus

3  bank account after November 2020, fair to say that Kabbage

4  would make an entry into its account to reduce that balance

5  of that loan by whatever the amount of the payment was?

6  A    That is correct.

7  Q    And did Kabbage create a running document that showed

8  every payment that was made and every application to the

9  borrower's balance?

10 A    That running document was created, but it was not

11 limited to after November 2020.

12 Q    Fair point.  I mean, it's the job of a servicer to do

13 that before 2020, after 2020.  That's a core job of a

14 servicer, right?

15 A    Correct.

16 Q    I'm just focusing now on the period after 2020.

17      Is it fair to say, after November 2020, any money that

18 came into Synovus account, Kabbage made an effort to account

19 for it and report that accounting to Customers Bank?

20 A    If it were a Customers Bank customer payment, yes.

21 Q    What's a trial balance?

22 A    My understanding of a trial balance as a finance

23 professional is a balance of general ledger accounts at a

24 period of time.

25 Q    At a very high level, do you understand that a trial

1  balance shows at least the following information:  The amount

2  of money that the bank has laid out to borrowers and the

3  amount of the balance remaining to be collected?

4  A    That's not my understanding of a trial balance.  My --

5  my understanding of a trial balance as a finance professional

6  consists of general ledger account balances at a period in

7  time.

8  Q    So your understanding of a trial balance has nothing to

9  do with PPP loan programs?

10  A    My understanding of a trial balance would not entail

11  individual PPP loan balances.

12  Q    How about at the aggregate level, does your

13  understanding of a trial balance include that, at the

14  aggregate level, if Customers Bank has loaned out

15  $100 million in total to thousands of borrowers, and those

16  thousands of borrowers have paid back $20,000, do those two

17  data points constitute part of a trial balance in your

18  lexicon?

19  A    No, they do not.

20  Q    Okay.  Whatever we call it -- let's not call it a

21  "trial balance."  Let's just refer to what the data is.

22        As of the date of the bankruptcy petition, October 3rd,

23  2022, did Kabbage have an accurate accounting of how much

24  money had been loaned and how much money it had collected on

25  those loans?

1  A      On October 3rd.  On October 3rd, Kabbage did have an

2  account of amounts that had been loaned and the amount of

3  money collected on those loans.

4  Q      My question had another modifier in it.

5         Did it have an accurate account of those two figures?

6  A      Accurate, to the best of our knowledge, yes.

7  Q      Is it your understanding that the data that Kabbage had

8  on October 3rd, 2022 was actually accurate?

9  A      Is it my understanding it was actually accurate?

10 Q      You said it was accurate to the best of your ability or

11 understanding.  Is that different from whether it was

12 actually accurate --

13 A      Well, it --

14 Q      -- based on --

15 A      -- would be --

16 Q      -- the real --

17 A      It would --

18 Q      -- numbers?

19 A      -- be accurate to the best of information that we would

20 have had at the time.

21 Q      Well, isn't the information entirely within Kabbage's

22 control?

23 A      Not necessarily.  There's information that we receive

24 from the SBA.

25 Q      Is there any information that Kabbage needed, but

1  didn't have, as of October 3rd, 2022, in order to accurately

2  portray the amount of loans made and the amount of loan --

3  borrower payments on those loans?

4  A    I am not aware of the exact status of information that

5  may have been outstanding with the SBA at that time.

6  Q    During the reconciliation process, did anyone from

7  Kabbage provide Customers Bank with information about what

8  Kabbage thought the settlement payment should be?

9  A    If it -- repeat that for me one more time, please.

10  Q    During the reconciliation process, did anyone from

11  Kabbage provide Customers Bank with any data or information

12  about what Kabbage thought the settlement payment should be?

13  A    During the time of the reconciliation, I did not.  I'm

14  not sure if anyone else provided.  I -- I did not provide

15  Customers Bank.

16  Q    To your knowledge, did Kabbage supply a series of data

17  and information and bank account statements and other

18  information in order to allow Customers Bank to calculate the

19  settlement payment?

20  A    I understand that there was information provided to

21  Customers Bank.  I do not know whether or not it was for the

22  purposes of them calculating a settlement payment.

23  Q    Do you know whether it was for the purposes of the

24  reconciliation called for by the settlement agreement?

25  A    No, I do not know if it was that purpose.  I was not

1  involved in the process when -- when those -- when that

2  information was provided.

3  Q     Did you get involved in the process after Customers

4  Bank had made the settlement payment?

5  A     On what date did Customers Bank make the settlement

6  payment?

7  A     On or about November 14th, 2022.

8  Q     I did become involved before November 14th.

9  Q     What date did you become involved?

10  A     November 7th.

11  Q     Take a look, if you would, Ms. Williams, at Tab 3 in

12  the smaller of your two binders.

13  A     Tab 3.

14  Q     Do you see an email dated November 4th, 2022, at

15  7:48 p.m. from Donna Evans to a group of -- excuse me -- a

16  group of people?

17  A     I do see that email.

18  Q     Have you seen this email before?

19  A     I have seen this email printed as part of the exhibits

20  before, yes.

21  Q     And do you see that the email from Ms. Evans to the

22  group of people, including Alyssa White, talks about a

23  Synovus account analysis?

24  A     I do see that, yes.

25  Q     And Ms. Evans says that KServicing -- "KServicing" is

1  another word for Kabbage?

2  A      Generally, yes.

3  Q      Do you understand, if I use "Kabbage" and "KServicing,"

4  I'm referring to your employer?

5  A      Yes, I -- I do.

6  Q      It says:

7              "KServicing has performed an analysis of the

8  activity in the Synovus account from inception to

9  October 3rd, 2022."

10         Do you see that?

11 A      I do see that.

12 Q      And is that your understanding of what Kabbage was

13 doing during the reconciliation process to provide

14 information about the Synovus account to Customers Bank?

15 A      Can you repeat that question?

16 Q      Sure.

17         Did you understand that, during the reconciliation

18 process, Kabbage was performing an analysis of the Synovus

19 bank account?

20 A      I -- I was not aware of that at this time.  I -- I was

21 not involved at this time.

22 Q      Do you see that Ms. Evans further says that:

23              "The analysis  was reconciling that activity in

24 that account to our remittances files."

25 A      I do see where that is stated here.

1  Q     And "that account," as you read this, refers to the

2  Synovus account?

3  A     Yes.

4  Q     What are "remittances files"?

5  A     The remittance file is a listing of customer payments

6  made by Customers Bank customers, along with customer refunds

7  made to Customers Bank customers and any payments to the SBA

8  on behalf of Customers Bank.

9  Q     So, basically, a way of informing with Kabbage

10 informing Customers Bank on a monthly basis how much money

11 had been collected and borrowed?

12 A     Yes.

13 Q     If you turn to Tab 4, of the smaller binder, you will

14 see something called "KServicing Synovus borrower repayment

15 account analysis."

16 A     Yes.

17 Q     Have you seen that document before?

18 A     Yes, I have.

19        MR. TSEKERIDES:  Your Honor, we did have one

20 objection to that document that we raised earlier that it

21 wasn't complete, that there is a missing page at the end.

22        THE COURT:  Okay.  So, you're talking about

23 Exhibit 4?

24        MR. TSEKERIDES:  This is Customers Bank Exhibit 4,

25 which appears, I think, in our Exhibit 22.  We had raised

1  that with counsel earlier.

2          THE COURT:  All right.  So, let me make sure I

3  understand.  So, its Customers Bank Exhibit 4 and you have

4  got a version of the same document that is your Exhibit 22.

5          MR. TSEKERIDES:  Right, that has the complete

6  document.

7          THE COURT:  And you've got -- there's an

8  additional page in your version that is absent in your

9  version?

10          MR. TSEKERIDES:  Correct.

11          MR. STERNBERG:  I'm happy to use the entire --

12          MR. TSEKERIDES:  That was the suggestion that we

13  had.

14          MR. STERNBERG:  -- version.  I am only focused on

15  this one page, but if counsel wants it to be a complete

16  exhibit that's fine with us.

17          THE COURT:  All right.  So, I take it, Mr.

18  Tsekerides, for the purposes of this examination you're fine

19  using their version because they are going to use a page that

20  is in both versions.

21          MR. TSEKERIDES:  Exactly.

22          THE COURT:  Okay.  You can proceed.

23  BY MR. STERNBERG:

24  Q    Ms. Williams, did you have any role in preparing what's

25  under Tab 4?

1   A      I did not.

2   Q      Do you see that its entitled a Synovus borrower

3   repayment account analysis?

4   A      I do see that.

5   Q      Have you ever seen something called a Wells Fargo

6   borrower repayment account analysis?

7   A      I have not.

8   Q      Ms. Williams, you submitted two declarations in this

9   case?

10  A      Yes.

11  Q      Do you have them both in front of you?

12  A      They should be in the notebook here.

13          MR. STERNBERG:  If I may approach, Your Honor.

14          THE COURT:  You may.

15  BY MR. STERNBERG:

16  Q      I am going to show you or I'm going to hand you up,

17  Ms. Williams, your two declarations.  I think they are in

18  that large binder, but this may be --

19  A      All right.

20  Q      The one at the bottom right corner is dated

21  December 7th, 2022.  Do you see that?

22  A      I do.

23  Q      And the other one in the bottom right corner is dated

24  March 13th, 2023.

25  A      Yes.

1  Q     I will try to refer to them by date, but I also may

2  call them first and second declaration if that works for you.

3           THE COURT:  So, my apologies.  So that I have the

4  right documents in front of me, do you happen to have those

5  by docket item number?

6           MR. STERNBERG:  Yes, Your Honor.  The first one is

7  Docket No. 341.  The second is Docket --

8           MR. TSEKERIDES:  671, the second one.

9           MR. STERNBERG:  Thank you.

10           THE COURT:  Okay.  So, I've got both of those in

11  front of me.

12           MR. STERNBERG:  Would you like hard copies?

13           THE COURT:  No, I don't need a hard copy. I'm

14  good.  Thank you.

15  BY MR. STERNBERG:

16  Q     Ms. Williams, let's start with the first one, the one

17  dated December 7th, 2022.  I take it you prepared both of

18  these with care and signed them after reading them

19  thoroughly.  Is that correct?

20  A     That is correct.

21  Q     You were satisfied that they were entirely accurate and

22  truthful when you signed them?

23  A     Yes.

24  Q     And you personally read each word and looked at each

25  exhibit?

1  A    I did.

2  Q    The first one, dated December 7th, 2022, says that you

3  supervised all accounting and financial functions of Kabbage.

4  That is Paragraph 1, do you see that?

5  A    Yes.

6  Q    You did that -- obviously, you couldn't do that before

7  you started at Kabbage.  You did that starting in November

8  2021 forward.

9  A    Correct.

10  Q    When you started did you go back and do a

11  reconciliation of analysis of all the things that had

12  happened before you got there?

13  A    No, I did not.

14  Q    You started and then looked forward.

15  A    I did, unless there was reason to go back and look at

16  the period before I got there.

17  Q    Paragraph 5 of your first declaration says that the

18  current dispute, the one we're here today discussing arises

19  from Customers Bank's failure to pay KServicing the full

20  amount owed under the settlement agreement.  Fair to say, I

21  think, as we talked about earlier, during the reconciliation

22  process you are not aware that anyone from Kabbage told

23  Customers Bank what Kabbage thought was owed as a settlement

24  payment, correct?

25  A    Prior to the -- I'm sorry, can you --

1  Q    During the reconciliation process no one from Kabbage

2  told Customers Bank here is what we think the settlement

3  payment should be.

4  A    During the reconciliation process, at some point during

5  the reconciliation process.

6  Q    Let me ask it a different way.  Before midnight on

7  November 9th did anyone from Kabbage tell anyone at Customers

8  Bank here is what we think, we at Kabbage think the

9  settlement payment should be.

10 A    I can't speak to that. I don't know of anyone before

11 November 9th.

12 Q    You say in Paragraph 7 of the same affidavit, your

13 December 7th, 2022 affidavit, that it was your expectation,

14 Kabbage's expectation, that the settlement payment would be

15 $23.2 million.  Do you see that?

16 A    Let me see.  I see that.

17 Q    And you used the word "approximately" to modify

18 $23.2 million, correct?

19 A    Yes.

20 Q    And you understood that the goal of the reconciliation

21 process that was embedded in the settlement agreement was to

22 find out what the actual number was.

23 A    The goal of the reconciliation process embedded in the

24 settlement agreement.

25 Q    We looked at the settlement agreement earlier today.

1  And do you recall that we looked at Paragraph 3 that was

2  called reconciliation?

3  A     Yes.

4  Q     And one of the goals of that reconciliation paragraph

5  was to figure out the exact amount of the disputed KServicing

6  holdbacks, correct?

7  A     That is correct.

8  Q     So, the goal of the reconciliation process was to find

9  out exactly how much money was Kabbage holding in borrower

10 payments that it had not remitted to Customers Bank.

11 A     That was the goal, yes.

12 Q     And what the settlement agreement recited were

13 estimates that parties thought it was approximately this or

14 that, but the reconciliation process was going to define it

15 to the penny, correct?

16 A     The reconciliation process, yes.

17 Q     And as to the main aspect of this reconciliation,

18 figuring out the amount of borrower repayments that Kabbage

19 collected but not remitted over to Customers Bank that was

20 information that was uniquely within Kabbage's possession.

21 A     Can you repeat that for me?

22 Q     Sure.  The amount of borrower payments that had been

23 made to the Synovus Bank account, held by Kabbage, and not

24 paid over to Customers Bank that was information that was

25 uniquely within Kabbage's possession.

1  A     That is not true.

2  Q     So, Customers Bank, prior to October 3rd, 2022, had

3  access to the Synovus Bank accounts?

4  A     No, but they had remittance files each month prior to

5  October that showed what might be due.  And there had been --

6  they had remittance files each month prior to October 3rd.

7  Q     The remittance files were summary files of amounts that

8  Kabbage had collected but not paid over to Customers Bank,

9  correct?

10 A     They were.  The remittance files were summary files.

11 Q     The real proof of every dollar that was paid was in the

12 bank account, correct?

13 A     Not necessarily.  The CUBIs loans were serviced prior

14 to November 2020 and the Synovus Bank account didn't exist

15 until November 2020.

16 Q     Ms. Williams, from November 2020 on --

17 A     Yes.

18 Q     -- Kabbage collected borrower payments on behalf of

19 Customers Bank in the Synovus Bank account, correct?

20 A     It is my understanding that they did from November

21 2020.

22 Q     And that bank account information was uniquely within

23 Kabbage's possession prior to October 3rd, 2022.

24 A     I am not aware of any access that CUBI would have had

25 to the bank account prior to that date.

1  Q    You seem to be fighting me on the concept of whether

2  the bank account information was in Kabbage's possession. Is

3  there a reason for that?

4           MR. TSEKERIDES:  Your Honor, he doesn't have to

5  characterize whether the witness is fighting him or not. It's

6  not necessary.

7           THE COURT:  Can you -- I guess my question is what

8  is your question to the witness?

9           MR. STERNBERG:  I will withdraw the question, Your

10  Honor.

11           THE COURT:  Okay.

12  BY MR. STERNBERG:

13  Q    Going onto Paragraph 11 of your December 7th

14  declaration, Ms. Williams --

15  A    Okay.

16  Q    -- you say that KServicing has determined that the full

17  amount owed by Customers Bank to KServicing under the

18  settlement agreement is $23.7 odd million dollars. Is that

19  correct?

20  A    That is correct at that time.

21  Q    That is not a true statement today, is it?

22  A    That is correct.

23  Q    Based on information that you have learned over the

24  last several months about $2 million that you claim was owed,

25  based on canceled loans, you have withdrawn, correct?

1  A     $2 million that was owed based on canceled loans -- can

2  you ask that question again, please.

3  Q     Sure.  In Paragraph 11 of your December 7th, 2022

4  declaration you say under oath that KServicing is determined

5  that the full amount owed by Customers Bank to KServicing is

6  more than $23.7 million.

7  A     Yes.

8  Q     And the reason that is not a true statement anymore is

9  you have come to realize that everything you said in this

10  declaration about $1.94 odd million owed, based on canceled

11  loans, is not correct.

12  A     Well we continued to reconcile after this declaration

13  was filed.  And we did discover that the original number of

14  canceled loans, which was about $3 million, was the correct

15  number of canceled loans.

16  Q     Is that a long way of saying that you agree with me

17  that what you asserted, including Paragraph 18 of your

18  declaration, that the amount of canceled loans should have

19  been $1.6 million is not correct; it should be about

20  $3.6 million.

21  A     That's correct.

22  Q     So, when you talk about resolving that issue there was

23  no compromise, you just accepted what Customers Bank told you

24  and your counsel.

25  A     We did not just accept that.  My understanding that

1  there was additional research done by Donna Evans and the

2  team.

3  Q     In Paragraph 27 of the same declaration you say that

4  you put you and many of your colleagues at KServicing put

5  many days into reconciling all of the available data sources

6  and other sources of information.  You are confident that

7  these calculations are correct.  Do you see that?

8  A     Yes.

9  Q     Your confidence was misplaced as to that nearly $2

10 million on the canceled loan issue, correct?

11 A     Well the confidence was based on the information that I

12 had available at the time.  And after Donna and team

13 continued to research the canceled loan I obtained better

14 information.

15 Q     Ms. Williams, have you looked at the Synovus account

16 statements from November 2020 onward?

17 A     I cannot say that I have looked at every single

18 statement each month from November 2020 onward.

19 Q     Have you looked at them enough to understand that

20 month, after month, after month there were millions of

21 dollars in deposits and sometimes millions of dollars in

22 withdrawals?

23 A     I am not sure -- I cannot speak to the amount each

24 month, but I realized that there would be deposits and

25 withdrawals each month.

1   Q      And Kabbage was serving thousands, tens of thousands of

2   loans for Customers Bank?

3   A      I am not aware of the number of loans --

4   Q      You don't --

5   A      -- that were serviced at any time.

6   Q      Do you know that the maximum size of the portfolio is

7   about 98,000 loans?

8   A      I do not know the count.

9   Q      What is your best estimate of how many loans Kabbage

10  serviced for Customers Bank?

11  A      I couldn't guess. I am not on the operations side.  I

12  have not taken note of the number of loans that would be in

13  service.

14  Q      Are you aware that there were millions of dollars

15  flowing through the Synovus bank account?

16  A      I have seen, in particular months, millions of dollars

17  in deposits.

18  Q      After Kabbage started withholding the borrower

19  remittances from Customers Bank did Kabbage just keep the

20  borrower remittances in the Synovus account or did it use the

21  money for some other purposes?

22  A      I was not with KServicing when withholdings were

23  stopped -- not withholdings, when remittances were -- when

24  remittances to Customers Bank stopped and we were holding,

25  KServicing was holding the customer payments.

1  Q     Did you -- were you ever called upon to account for

2  monies that Kabbage used from the account we just looked at,

3  the Synovus CUBI PPP account.  Were you ever called upon to

4  account for Kabbage's use of those funds for purposes other

5  than paying Customers Bank?

6  A     There were payments to the SBA from those accounts on

7  behalf of Customers Bank and there were payments to Customers

8  on behalf of Customers Bank.

9  Q     So, take three parties out of the equation, the SBA,

10  customers, and Customers Bank, were you ever called upon to

11  account for any payments made to anyone else; payments for

12  rent, payments for employee bonuses, payments for

13  electricity?

14  A     No.

15  Q     Ms. Williams, if you could turn back to your

16  declaration, the December 7th, 2022 declaration, and look at

17  Paragraph 19.  In Paragraph 19 you refer to a former CFO of

18  the company.  Do you see that?

19  A     Yes.

20  Q     Is that referenced to a man named Daniel Eidson?

21  A     Yes.  That refers to Daniel.

22  Q     When you came to Kabbage was Daniel Eidson still the

23  CFO?

24  A     He was.

25  Q     And then during the time you worked for Kabbage he left

1    for another job?

2    A      Correct.

3    Q      And have you stayed in touch with him after he left?

4    A      I have not.

5    Q      Have you ever spoken to him?

6    A      I have not.

7    Q      In Paragraph 20 of your declaration, the December 7th

8    declaration, you say that Customers Bank erroneously relied

9    on what you call "preliminary data."  You say CB used

10   preliminary data provided by KServicing on November 4th.

11   A      Yes.

12   Q      The email we looked at from November 4th, Tab 3 in your

13   small binder, can you take a look at that.  Do you see the

14   word "preliminary" in there?

15   A      I do not see the word "preliminary."

16   Q      In Paragraph 22 of your December 7th, 2022 declaration

17   you talk about a certain file that Daniel Eidson referred you

18   to.  Do you see that?

19   A      That he referred me to?

20   Q      Let's take it in steps.  In Paragraph 22 you say you

21   learned something from Daniel Eidson on November 10th, 2022?

22   A      I said we learned, collectively the company.

23   Q      Okay. Did Kabbage learn something from Mr. Eidson on

24   November 10th, 2022?

25   A      Yes.

1   Q      And would you agree with me that November 10th is after

2   November 9th?

3   A      It is after November 9th.

4   Q      Now does the fact that in two years earlier, October

5   2020, KServicing or Kabbage paid Customers Bank some money

6   from another account, a Wells Fargo account.  Does that bear

7   on how much Kabbage collected into the Synovus account in

8   November 2020 on?

9   A      Just that there to how much collected.  It does because

10  if monies were collected in the Wells Fargo account they

11  could not be collected in the Synovus account.

12  Q      Right.  So, if money was collected into the Synovus

13  account it has nothing to do with the Wells Fargo account?

14  A      The actual cash, no.

15  Q      You agree with me if a borrower paid money after

16  November 2020 into the Synovus account that same money that

17  was collected in the Synovus account couldn't be paid to the

18  Wells Fargo account.

19  A      Correct.  There would have been separate funds paid in

20  the Wells Fargo account versus funds -- separate funds

21  collected in the Wells Fargo account versus funds collected

22  in the Synovus account.

23  Q      And if Kabbage was doing things correctly shouldn't the

24  Synovus account only have included deposits made by Customers

25  Bank borrowers after November 2020?

1  A    I am not sure when the Wells Fargo account was closed
2  or not in use.
3  Q    I want you to assume with me that the Wells Fargo
4  account was closed in October 2020 as a result of the Amex
5  transaction.
6  A    Okay.
7  Q    Pickup with me on November -- in November 2020 when the
8  Synovus account was created. You with me so far?
9  A    Yes.
10  Q    From that point on, let's call it November 1st, 2020,
11  should all of the Customers Bank borrowers who made payments
12  on their loans, should all of that money have been deposited
13  into the Synovus account?
14  A    From that point forward it should be, yes.
15  Q    Paragraph 22, the one that we are still on, refers to a
16  loan return analysis dated February 1st, 2021.  Do you see
17  that?
18  A    Yes.
19  Q    And that includes data from January 2021, December
20  2020, November 2020, all the way leading up to February 1st,
21  2021?
22  A    That -- I can't attest to that.  My focus on this file,
23  the loan return analysis file, was a particular tab dated
24  October 2020.
25  Q    I understand that is your focus, but is the data in the

1  February 1st, 2021 file inclusive up to February 1st, 2021?

2  A    I don't know. I didn't look at the other data in the

3  file.  There are several tabs in the file.

4  Q    In Paragraph 22 you say that Mr. Eidson provided you

5  with a copy of this loan return analysis filed dated

6  February 1st, 2021.  Do you see that?

7  A    Well, I was provided with a copy of the file, not

8  directly by Mr. Eidson.

9  Q    You say in your declaration, Paragraph 22, a review of

10 Mr. Eidson's email also confirms that he sent a copy of that

11 file to Customers Bank on October 21st, 2020.  Do you see

12 that?

13 A    Yes.

14 Q    And that file that you are referring to is Exhibit 2,

15 2021 return analysis? I am just referring to what is in

16 Paragraph 22 of your affidavit.  You can look at whatever you

17 want, but you say that file --

18 A    Oh, yes.

19 Q    -- you are referring to --

20 A    Referring to, yes.

21 Q    How was Mr. Eidson able to send a file with

22 February 1st, 2021 data in October of 2020?

23 A    I am not -- the file that I was provided was titled

24 loan return analysis 2/1/21.  I am not sure if the file --

25 oh, I can see the name of the attachment on the email that

1  Mr. Eidson sent.

2  Q    Do you think it would have been possible for Mr. Eidson

3  to send information in October 2020 that was about things

4  that happened in November, December 2020, January 2021?

5  A    No.  The file name does not indicate that there was

6  data in the file from future months.  Like I said, I did not

7  look at all of the tabs in the file.  My focus was on a

8  particular tab dated October 2020.

9  Q    Ms. Williams, you can set aside your first declaration,

10  the one from December, and let's take a look at a more recent

11  one, one filed a week ago today.  This one you also prepared

12  with painstaking care.

13  A    To the best of my knowledge at the time, yes.

14  Q    You reviewed it before you signed it?

15  A    Yes.

16  Q    You made sure that each word and each exhibit were

17  truthful and accurate?

18  A    To the best of my ability, yes.

19  Q    Did the best of your ability include reading it

20  thoroughly?

21  A    Yes.

22  Q    Comparing exhibits to what is said in the declaration?

23  A    Yes.

24  Q    Now in this declaration you say you are knowledgeable,

25  I'm looking at Paragraph 2, about the disputed KServicing

1  remittance holdbacks.  Look at the top of Page 2, I am

2  knowledgeable about and familiar with KServicing's

3  calculation of the final settlement payment as well as the

4  disputed KServicing remittance holdback as defined in the

5  settlement agreement.

6  A     Yes.

7  Q     Fair to say, as we have discussed, you joined, in

8  November 2021, after the Synovus account had been

9  established, after the holdbacks started, correct?

10 A     Correct.

11 Q     And so did you take steps to go back in time and do

12 reconciliations and calculations about what had happened

13 before you joined?

14 A     Not unless there was reason to.

15 Q     Well, wasn't there reason to with this reconciliation?

16 A     There was and we did.

17 Q     Did you?

18 A     Well, once I obtained the spreadsheet from Danny, that

19 was prepared by Mr. Eidson, that showed payments returned to

20 Customers Bank, yes, I did go back to October.

21 Q     So, your efforts with respect to this reconciliation

22 process started November 10th after you spoke to Mr. Eidson?

23 A     No.  I started working with this on November 7th.

24 Q     What were you doing on November 7th?

25 A     On November 7th I assisted Donna with understanding of

1  the canceled loans, the $3 million by referencing a file that

2  was given to me or passed to me by Danny that had a listing

3  of canceled loans that made up the $3 million. I was asked

4  to, kind of, put numbers together that showed the settlement

5  calculation.

6  Q     So, your focus from November 7th to November 10th was

7  on the canceled loan issue?

8  A     It was on both.  The settlement calculation as a whole,

9  which included the canceled loan issue.

10  Q     During the period November 7th to November 10th did you

11  do any reconciliation of the Synovus account?

12  A     If I did any reconciliation of the Synovus account, I

13  didn't not.

14  Q     Ms. Williams, do you know what is meant by the

15  expression "money is fungible?"

16  A     Fungible.

17  Q     Do you know what that --

18  A     Can you define that for me?

19  Q     Let me try with an example.  If there are -- let's say

20  Customers Bank had two borrowers, they each had a $100 loan,

21  payable over, let's call it, 10 installments.  So, in the

22  first month $20 comes into the account, $10 from one

23  borrower, $10 from the other borrower.  Do you understand

24  that the practice by Kabbage was to aggregate all that money

25  into one account and then make the appropriate allocations of

1  the money?

2  A     Yes.

3  Q     And so it wasn't a situation where if I was a borrower

4  and I paid $10 it would go into a special Jeremy Sternberg

5  account.

6  A     That is correct, it came into one account and it would

7  be accounted for in the loan system applied to the proper

8  loan.

9  Q     And in a given month, I'm just going to make up a

10 number, let's say toward the beginning of the relationship,

11 before Kabbage was withholding money from Customers Bank if

12 $1 million in borrower remittances had come in and Kabbage

13 paid $1 million to Customers Bank, embedded in that

14 $1 million were the borrower payments for hundreds of

15 borrowers, correct?

16 A     Correct.

17 Q     The money was all pulled into one account and then

18 allocated as appropriate?

19 A     Correct.

20 Q     There was no special consideration given to my $10, or

21 your $10, or anyone's particular $10?

22 A     Other than applying it to your loan, no.

23 Q     So at the -- as we talked about, at the end of each

24 month or whenever the payment period was, Kabbage would pay

25 an aggregate amount to Customers Bank as opposed to a

1  thousand different checks or wire transfers for each of the

2  different borrowers?

3  A    If it were during a time that KServicing was remitting

4  funds to Customers Bank, yes, an aggregate amount would be

5  sent with the detail as to what that amount represented.

6  Q    Now Paragraph 8 of your more recent declaration, the

7  one from last week, you described a situation in which you

8  assert that Customers Bank was paid twice with respect to

9  five particular loans; once in October 2020 out of a Wells

10 Fargo account and then again as part of a settlement

11 reconciliation process, correct?

12 A    No. I don't assert that they were paid twice because

13 the -- I don't assert that they were paid twice. I do assert

14 that they were paid once from the Wells Fargo account.

15 Q    If we were to adopt the Customers Bank calculation of

16 the settlement payment what you're saying is, in effect,

17 Customers Bank would be paid twice on those five loans

18 amounting to about a million-five.

19 A    That is what I am saying, yes.

20 Q    Now if that was the case, if Customers Bank was paid

21 twice for these five loans totaling around a million-five,

22 wouldn't the trial balance for the entire portfolio be off by

23 a million-five?

24 A    The trial balance does not track what has been paid to

25 Customers Bank.

1  Q     Let me ask it a different way.  We had a definitional

2  problem with trial balance.

3  A     Yeah.

4  Q     If today, based on the payment that Customers Bank has

5  made, the amount of loans outstanding -- monies leant out,

6  the amount paid to date, and the amount still outstanding all

7  add up.  If we took a million-five out of that equation

8  wouldn't you agree with me that that would throw it out of

9  balance?

10  A     The reason that the issued loans less everything they

11  have been paid getting to an amount outstanding that

12  difference would represent monies collected or should

13  represent monies collected by KServicing on behalf of

14  Customers Bank's customers, but it would not indicate whether

15  or not any of that money had been paid to Customers Bank.

16  Q     Let me give you a scenario, Ms. Williams.  Let's say in

17  October 2020 there were five borrowers who had aggregate loan

18  payments of a million-five and then there were another five

19  borrowers who had made loan payments of a million-five. If

20  Kabbage had paid Customers Bank for one set of those

21  borrowers, but withheld the money for the other set you would

22  agree with me that there was no double payment, right?

23  A     Well, its two different sets of loans.

24  Q     Right.  What you can't say, as you sit here, because

25  you haven't done a reconciliation of the Wells Fargo account,

1  is whether Kabbage overpaid, underpaid, or paid exactly the

2  right amount that it should have to Customers Bank from the

3  Wells Fargo account in respect of Customers Bank remittances.

4  A    I have seen a detailed listing of the dollar amount

5  that made up what was paid to Customers Bank from the Wells

6  Fargo account.  That detailed listing has loan numbers in

7  amounts so I know what made up that payment.

8  Q    If you wanted to do a loan-by-loan analysis all

9  borrower remittances and all payments made by Kabbage to

10  Customers Bank wouldn't we have to go back to the beginning

11  of time here to April 2020?

12  A    If I wanted to see all of them, I would have to go back

13  to the beginning.

14  Q    And Kabbage hasn't done that.

15  A    I don't see that it was necessary to do that.

16  Q    I am not asking you whether it was necessary or not,

17  I'm just -- as a factual matter, Kabbage didn't do a loan by

18  loan reconciliation of all accounts, Wells Fargo, Synovus,

19  and any others from the beginning of the relationship?

20  A    I don't know. I have not.

21  Q    And the five loans that you are talking about were paid

22  into a Wells Fargo account on or before October 2020,

23  correct?

24  A    That is correct.

25  Q    Before the Synovus account was setup?

1   A      That is correct.

2   Q      And there were thousands of borrowers who made millions

3   of dollars of payments into that Wells Fargo account?

4   A      Oh, I thought that was a statement. I'm sorry, was that

5   a question?

6   Q      It is.

7   A      I can't say how many borrowers would have, but

8   numerous, yes.

9   Q      Numerous borrowers with numerous payments, correct?

10  A      Yes.

11  Q      And if we wanted to reconcile the Wells Fargo account

12  we would have to go back and add up all the borrower

13  remittances and all the payments to Customers Bank, correct?

14  A      To reconcile we would have to do that.

15  Q      And that wasn't done during the reconciliation process,

16  was it?

17  A      There was not a need to reconcile the Wells Fargo

18  account.

19  Q      Why would there be anything about transactions from a

20  Wells Fargo account in a Synovus account?

21  A      Why would there be anything about transactions -- there

22  aren't transactions from a Wells Fargo account in the Synovus

23  account.

24  Q      Did you understand that the goal of the -- one of the

25  goals of the reconciliation process was to figure out how

1 much money had been paid into the Synovus account and

2 withheld from Customers Bank?

3 A    That was one of the goals.

4 Q    If you look at Tab 4 in the smaller of the two binders

5 you have, what Kabbage told Customers Bank, I'm looking

6 toward the bottom of the page, the bold heading called "Per

7 CUBI remittance file."  Do you see that?

8 A    Yes.

9 Q    What Kabbage told Customers Bank is that the receipts

10 into the Synovus bank account were about $26.6 million?

11 A    No.  What Kabbage told Customers Bank was that the

12 remittance file showed $26.6 million.

13 Q    Okay.  And that remittance file should have been just

14 about the Synovus bank account.

15 A    Not necessarily. The remittance file, as I understand,

16 was being manually tracked prior to the Synovus bank account.

17 Q    There is also a variance that is mentioned there,

18 $497,900.  Why would there be a variance that large?

19 A    I am not sure.  I didn't prepare this file.  I am not

20 sure why there would be a variance that large –

21 Q    Did you prepare the --

22 A    -- or small.

23 Q    I'm sorry, I didn't mean to cut you off.

24 A    I wouldn't consider that large. Its irrelative.

25 Q    You didn't prepare the CUBI remittance file, did you?

1  A      No, I didn't prepare this particular Synovus borrower

2  repayment account analysis.

3  Q      Did you prepare any CUBI remittance files?

4  A      I maintained the CUBI remittance file after April 2022.

5  Q      So, did you send CUBI a remittance file showing that

6  there were $26,608,962 in borrower remittances?

7  A      I did not send it, but the file was obtained and sent,

8  yes.

9  Q      You prepared it and someone else sent it?

10 A      I was responsible for the file.  One of the accountants

11 under me prepared it, but I was responsible for the file,

12 yes.

13 Q      In everything that you have seen about the

14 reconciliation process from October 27th, 2022 through

15 midnight November 9th, 2022 have you seen any information

16 conveyed to Customers Bank about a Wells Fargo account?

17 A      To November 9th?

18 Q      Yes.

19 A      I have not seen any information conveyed about a Wells

20 Fargo account.

21         MR. STERNBERG:  Your Honor, may I have a moment to

22 confer with Mr. Monohan?

23         THE COURT:  Certainly.

24     (Pause)

25         MR. STERNBERG:  Your Honor, Ms. Williams, that is

1  all the questions I have for now.

2        THE COURT:  Okay.  Any redirect?

3        MR. TSEKERIDES:  Yes, Your Honor.

4        We have been going a little over an hour, is the

5  witness okay.  Do you want to take five?

6        THE WITNESS:  No, I'm fine.

7        MR. TSEKERIDES:  Okay.

8                    REDIRECT EXAMINATION

9  BY MR. TSEKERIDES:

10  Q    Good morning, Ms. Williams.  Again, for the record, Ted

11  Tsekerides from Weil for the debtors.

12       There were numerous borrowers and numerous payments,

13  but how many loans are we talking about in this dispute?

14  A    Five.

15  Q    You were asked a lot of questions about Synovus

16  accounts, but if a payment was made to Kabbage on account of

17  a CUBI loan prior to November 2020 where would that money go?

18  A    That would have gone into the operating account at  the

19  time which was a Wells Fargo account.

20  Q    So, was Kabbage collecting money on account of CUBI

21  loans prior to November 2020?

22  A    Yes, they were.

23  Q    And they could still do that even though they didn't

24  have a Synovus account, right?

25  A    Correct.

1  Q    You have your declaration up there?

2  A    Yes.

3  Q    Why don't you take a look at the December 7th one.  You

4  were asked some questions about a Mr. Eidson.  He was the

5  former CFO, I believe, you said?

6  A    Yes.

7  Q    How did it come about that you were even looking for

8  Mr. Eidson's file?

9  A    When preparing the preliminary settlement calculation I

10  had a discussion with the interim CFO at the time, David

11  Walker, and he asked if I was aware of any payments that had

12  been made to Customers Bank.  I said that no payments have

13  been made that I'm aware of since I have been with the

14  company, but I'm not sure if the prior CFO had been making

15  payments to Customers Bank.

16  Q    And what happened next?

17  A    Mr. Walker wondered if the company should reach out to

18  Mr. Eidson to inquire as to whether or not he had made any

19  payments to Customers Bank.

20  Q    And then, from your perspective, what do you know

21  happened next?

22  A    My boss at the time, David Walker, the interim CFO,

23  informed me that there had been a conversation with

24  Mr. Eidson and that there was a file that Mr. Eidson had in

25  which showed a number of loans for which he had paid CUBI the

1  funds.

2  Q    Okay.  So, let's take a look at that declaration.  This

3  is the 12/7 declaration.  There's an Exhibit 3 that is

4  attached to that.  Let me know when you are there.

5  A    Yes.

6  Q    What does that document show?

7  A    This is an email that Mr. Eidson sent to employees at

8  Customers Bank on October 21st of 2020.

9  Q    Okay.  If you flip to the end is the attachment also

10  included in this exhibit?

11  A    Yes.  This is the attachment that was with the email.

12  Q    If you look at the top of the email it says: "Attached,

13  CUBI payment detail 10/21/20."  Right?

14  A    It does.

15  Q    And you remember you were asked some questions about

16  loans of 2021.  Do you remember that questioning?

17  A    Yes.

18  Q    This file is 2020, right?

19  A    It was.

20  Q    And what do the items on the attachment refer to?

21  A    What items on the attachment?

22  Q    The spreadsheet.  What do those refer to?

23  A    These are loans for which Customers Bank were paid

24  funds from the Wells Fargo account.

25  Q    So, this is money that Kabbage sent to Customers Bank?

1    A      Yes, it is.

2    Q      Now when you looked at this document, the attachment

3    from Mr. Eidson, what did you do with it?

4    A      When I looked at this document I compared it to the

5    remittance file to see if there were any loans and payments

6    on the remittance file that were on this document as having

7    already been paid to Customers Bank.

8    Q      And when you say the remittance file what are you

9    referring to there?

10   A      I am referring to the remittance file showing the

11   tracking of Customer payments collected for Customers Bank.

12   Q      So, if you take a look at what was Customers Bank

13   Exhibit 4, and I am going to focus on that first page that

14   counsel referred to as well.  Let me know when you are there.

15   A      Customers 4?

16   Q      Right.  This is the -- it might say CUBI or Customers

17   Bank on it.  It's the thinner binder.

18   A      Yes.

19   Q      You have it?

20   A      Yes.

21   Q      Exhibit 4 is in front of you?

22   A      Yes.

23   Q      Okay.  You see where it says: "Per CUBI remittance

24   file?"

25   A      Yes.

1  Q     Okay.  Is that the same remittance file that you are

2  talking about that you compared Mr. Eidson's file to?

3  A     Yes, it is.

4  Q     And what did you find out when you compared those two?

5  A     When I compared the two, I found that there were five

6  loans with related payments in the remittance file that were

7  also on the file of Mr. Eidson's that showed payments already

8  sent to Customers Bank.

9  Q     Okay.  And you were asked some questions about the goal

10  of the settlement reconciliation.  Do you remember that?

11  A     Yes.

12  Q     Wasn't one of the goals to determine how much money was

13  actually withheld from Customers Bank and how much was

14  actually paid to Customers Bank?

15  A     Yes, it was.

16  Q     Okay.  So, what did you determine whether or not these

17  five loans that were also on the remittance were already

18  paid.  What did that conclude for you?

19  A     That concluded for me that the amount on the remittance

20  file, as owed, was really less than the actual -- the actual

21  amount owed was really less then what was on the remittance

22  file.

23  Q     So, if those five loans were already paid shouldn't

24  they have been on the remittance file?

25  A     No.  They should not have been.

1    Q     And having them come out of the remittance file what

2    would that do to the settlement calculation?

3    A     It would indicate that Customers Bank owed us an

4    additional $1.5 million.

5    Q     Why is that?

6    A     Because Customers Bank had already been paid that

7    $1.5 million and in their settlement calculation they were

8    including that $1.5 million as owed.

9    Q     Did you prepare an updated settlement calculation?

10   A     I did prepare an updated settlement calculation.

11   Q     Can you turn to what's in the bigger binder,

12   Exhibit 25?

13   A     Exhibit 25.

14   Q     I entered a lot of tabs in there, it should just be a

15   25 with no lettering or anything.

16   A     Okay.

17   Q     Are you there?

18   A     I am.

19   Q     Okay.  What is this document?

20   A     This is the updated settlement calculation.

21   Q     And who prepared this?

22   A     I prepared this.

23   Q     Where on this will we see -- strike that.

24         Did you make an adjustment to account for the

25   remittance updated information that you found from Mr.

1  Eidson's file?

2  A     I did make an adjustment to account for that.

3  Q     Where do we see that on this document?

4  A     You see that on the borrowed principal repayments and

5  returns for remittance file.

6  Q     Is that the one that CUBI has as $27.1 roughly and you

7  have as $25.5?

8  A     The totals, yes.

9  Q     And is that delta roughly the one-five-five number?

10  A     It is.

11  Q     Did you understand that the reconciliation was to stop

12  on November 9th?

13  A     I did not.

14  Q     Did you understand that the reconciliation was to stop

15  even if the numbers were completely wrong?

16        MR. STERNBERG:  Your Honor, I object.  The

17  reconciliation period, kind of further to Mr. Tsekerides

18  objection during my examination, is defined in the settlement

19  agreement.  The witness's understanding of it is --

20        THE COURT:  Yeah, I understand.  What is the

21  relevance of the witness's understanding of --

22        MR. TSEKERIDES:  He asked her questions about it

23  stopping and I'm asking her if she had an understanding.  So,

24  he solicited testimony about her understanding.

25        THE COURT:  All right. I think that's fair to

1   follow-up. I will allow you to solicit an answer.

2            MR. TSEKERIDES:  Thank you.

3   BY MR. TSEKERIDES:

4   Q    Ms. Williams, the question was did you have an

5   understanding if the reconciliation was supposed to stop on

6   November 9th?

7   A    No.  My understanding was that we were reconciling

8   until we got to the right number.

9            MR. TSEKERIDES:  Can I have one moment, Your

10  Honor?

11           THE COURT:  You may.

12       (Pause)

13           MR. TSEKERIDES:  This is the last question.

14  BY MR. TSEKERIDES:

15  Q    What is the total amount that the debtors believe that

16  Customers Bank owes on the settlement payment?

17  A    $1,555,656.

18           MR. TSEKERIDES:  Thank you.  I have no further

19  questions, Your Honor.

20           THE COURT:  Thank you.  Recross?

21           MR. STERNBERG:  Nothing further, Your Honor.

22           THE COURT:  Thank you, Ms. Williams.  You can step

23  down.

24           THE WITNESS:  Thank you.

25       (Witness excused)

1                THE COURT:  Mr. Tsekerides, whereto from here?

2                MR. TSEKERIDES:  Yeah, so I think from here we

3    will go with Ms. Evans, who I believe is outside.

4                THE COURT:  Okay.

5                MR. TSEKERIDES:  We already moved those in, so

6    cross.

7                THE COURT:  Okay.  So, you're retrieving

8    Ms. Evans.

9                MR. TSEKERIDES:  While they're retrieving her I

10   did want to move in those declarations for Ms. Evans.

11               THE COURT:  Okay.

12               MR. TSEKERIDES:  I don't think I did that earlier.

13   These would be Docket 342 and Docket 672.

14               THE COURT:  Give me one second.  I'm sorry, you

15   just said this, but its Docket Items 342 and --

16               MR. TSEKERIDES:  342 and accompanying exhibits,

17   and Docket 672.

18               THE COURT:  Any objection?

19               MR. STERNBERG:  No objection.

20               THE COURT:  They will be admitted.

21          (Evans Declarations received into evidence)

22               THE COURT:  So, Ms. Evans, if you could take the

23   stand.

24               Ms. Barksdale, if you wouldn't mind swearing the

25   witness.

1                 DONNA EVANS, WITNESS FOR DEBTORS, SWORN

2                 THE CLERK:  Please state your full name and spell

3    your last name for the record.

4                 THE WITNESS:  Donna Robinson Evans, R-O-B-I-N-S-O-

5    N, E-V-A-N-S.

6                 THE CLERK:  You may be seated.

7                 MR. STERNBERG:  May I proceed, Your Honor?

8                 THE COURT:  You may.

9                         CROSS-EXAMINATION

10   BY MR. STERNBERG:

11   Q     Good morning, Ms. Evans.

12   A     Good morning.

13   Q     You have submitted, at least, two declarations in this

14   matter?

15   A     Yes.

16   Q     One was in December of last year, one was a week ago.

17   A     Yes.

18   Q     The one in December of last year criticized Customers

19   Bank for using a figure for the canceled loan amount aspect

20   of the settlement reconciliation process which you claim that

21   Customers Bank was off by about $2 million, correct?

22   A     Yes.

23   Q     And you since have abandoned that?

24   A     That is not part of today's -- I mean it's not a point

25   that I know we're discussing today.

1  Q     You agree with Customers Bank the calculation of that

2  issue?

3  A     No.  After the document that Ms. White filed in

4  December I went back and we did additional research, and we

5  actually learned that the data points on the initial list of

6  $3.6 million is actually the list of canceled loans, and that

7  is the correct number.

8  Q     So, Ms. White's declaration was correct?

9  A     If she stated it was $3.6 million, which her feedback

10 was that it was $1.6 million.  So, we had done additional

11 research.

12 Q     Have you read Ms. White's declaration?

13 A     Yes.

14 Q     The most recent declaration you filed was a week ago?

15 A     Yes.

16 Q     And that one is primarily about the trial balance

17 document that Ms. White prepared and that has been shared

18 with you and the Customers Bank team?

19 A     Yes.

20 Q     Before we get to that declaration there are two binders

21 on that desk, one is thicker, one is thinner.  If you could

22 look at the thinner one and please turn to Tab 3.

23 A     Yes.

24 Q     Do you see there, Ms. Evans, an email from you to

25 Alyssa White and others dated November 4th, 2022?

1   A     Yes.

2   Q     During the reconciliation process did you understand

3   the settlement agreement called for a reconciliation of

4   certain items including the amount of money that Kabbage had

5   held back in borrower payments from Customers Bank?

6   A     I do understand that, yes.

7   Q     And you were a key figure in the reconciliation

8   process?  You shared information that is here in Tab 3 and

9   other information with Customers Bank during that process?

10  A     Yes.

11  Q     And among the information you shared was information

12  about the Synovus bank account, correct?

13  A     Yes.

14          MR. STERNBERG:  I may get to this during Ms.

15  White's examination, Your Honor, but just since we're on it I

16  move into evidence Tab 3.

17          THE COURT:  Any objection?

18          MR. TSEKERIDES:  No objection.

19          THE COURT:  It will be admitted.

20      (Customers Bank's Exhibit 3 received into evidence)

21  BY MR. STERNBERG:

22  Q     Take a look at your email, Ms. Evans, starting off

23  Alyssa, Michele.  That is to Alyssa White and Michele

24  Vervlied?

25  A     Correct.

1  Q    Those are both employees at Customers Bank?

2  A    Correct.

3  Q    People you have worked with for a long time?

4  A    Yes.

5  Q    You say Synovus account analysis, correct?

6  A    Correct.

7  Q    You understood that during the reconciliation process

8  one of the tasks was to reconcile the borrower payments into

9  the Synovus account, yes?

10 A    Yes, those were the tasks.

11 Q    During the reconciliation process did you send any

12 information to Ms. White, Ms. Vervlied, or anyone at

13 Customers Bank about a Wells Fargo account analysis?

14 A    I did not.

15 Q    In the body of your email that is now Exhibit 3 you

16 say:

17      "KServicing has performed an analysis of the activity

18 in the Synovus account from inception to October 3rd, 2022

19 reconciling the activity in that account to our remittances

20 file."

21      Did I read that correctly?

22 A    You did.

23 Q    When you say "that account" you are talking about the

24 Synovus account, yes?

25 A    Yes.

1  Q     So, the analysis that you understood was happening for

2  the reconciliation was solely of the Synovus account?

3  A     My understanding is that the analysis included the

4  Synovus account and this is the information that was provided

5  to us by the acting CFO at the time.

6  Q     Acting CFO of Kabbage?

7  A     Yes.

8  Q     And when we talk about this information we're talking

9  about Synovus account analysis, correct?

10 A     Correct.

11 Q     And we're talking about Synovus bank account

12 statements?

13 A     Correct.

14 Q     And particularly the bank statements.  Those were

15 uniquely within the Kabbage control?

16 A     Correct.

17 Q     Take a look if you would at Tab 4 of the same binder.

18        MR. STERNBERG:  Your Honor, if it's okay with you

19 and Mr. Tsekerides I will refer to this as Exhibit 22 since

20 we are going to have that as a complete exhibit.

21        MR. TSEKERIDES:  That's fine.

22        THE COURT:  Okay.

23 BY MR. STERNBERG:

24 Q     Ms. Evans, let us know when you have had a chance to

25 read just that one page of Exhibit 22?

1  A     I've had a chance.

2  Q     Who prepared this cover page, this -- what is called

3  KServicing, Synovus borrower repayment account analysis

4  October 3rd, 2022.

5  A     My understanding is our accounting team.

6  Q     Kabbage accounting team?

7  A     Kabbage, yeah.

8  Q     The title of the document is Synovus borrower repayment

9  account analysis, correct?

10  A     Correct.

11  Q     During the reconciliation process did you see a

12  document called Wells Fargo borrower repayment account

13  analysis?

14  A     I did not.

15  Q     Did you ask anyone to prepare such a document, a Wells

16  Fargo account analysis?

17  A     I did not.

18  Q     According to this front page of Exhibit 22 the entry

19  entitled "Borrower repayments per remittances file" is

20  $26,608,962, is that correct?

21  A     Correct.

22  Q     And is that what Kabbage communicated to Customers Bank

23  is the amount of withheld borrower remittances in the Synovus

24  account?

25  A     Yes.  This is what was sent on November 4th.

1  Q      There's also an entry, if you will, called remaining

2  variants to be resolved. Its nearly $500,000.  What is that?

3  A      Our accounting team can speak in more detail about

4  that, but that was an amount that needed to be reconciled.

5  That is my understanding at that point.

6  Q      Is it your understanding that there were monies that

7  had come in from Customers Bank borrowers after the

8  remittances file had gone out that needed to be added to the

9  $26.6 million?

10 A      That is not my -- I mean I can't say yes or no

11 definitively.

12 Q      Do you just not know what this half a million dollars

13 is?

14 A      Right.  That is part of the calculation that our

15 accounting team was working through.

16 Q      Going back to what is now Exhibit 3, Tab 3 in your

17 binder, you understood that this email, your November 4th

18 email to Ms. White and others was conveying important

19 information for the reconciliation process?

20 A      I do understand that.

21 Q      And did you understand that Customers Bank was relying

22 on that information?

23 A      I understood they were relying on this information.  I

24 did not know if they were relying on other information.

25 Q      Fair point.  You didn't know the entirety of what

1 Customers Bank was relying on, but you knew that this was

2 information that you and your team were providing during the

3 reconciliation was information that Customers Bank would be

4 relying on?

5 A    Yes.

6 Q    In this email, that is Exhibit 3, do you use the word

7 "preliminary?"

8 A    I do not.

9 Q    Do you convey in any way to Customers Bank that the

10 information is not reliable?

11 A    I do not.

12 Q    I want to go to your most recent declaration, the one

13 from a week ago.  I take it you read that and were satisfied

14 it was accurate before you signed it?

15 A    Yes.

16 Q    And in doing so -- strike that.

17      In your most recent declaration you criticize the

18 accuracy of the trial balance that Alyssa White used to

19 create her trial balance analysis?

20 A    The details in the declaration focuses on a specific

21 data point that I believe Customers Bank uses for the trial

22 balance.  That is one of the outputs from the American

23 Express systems.

24 Q    Customers Bank had no independent relationship with

25 American Express during Customers Bank relationship with

1  Kabbage, correct?

2  A      Not that I am aware of.

3  Q      American Express came to the party because Kabbage did

4  a transaction with American Express?

5  A      That is my understanding.

6  Q      In a sense, American Express was introduced to the

7  relationship in that manner?

8  A      That is my understanding.

9  Q      After American Express acquired whatever assets it

10  acquired of Kabbage's, did American Express take over certain

11  financial reporting functions a part of the servicing that

12  Kabbage was doing.

13  A      They provided automated reports, but I would not call

14  that the financial reporting for the KServicing business.

15  Q      What automated reports?

16  A      A report -- my understanding that was created prior to

17  the acquisition that created an output of data points

18  regarding a portfolio that was automatically delivered into

19  the Customers Bank data environment via an asset TP

20  connection each day.

21  Q      Its one of the sources of many meetings, many

22  conversations that you have had with the Customers Bank team

23  a desire by the Customers Bank team to harmonize the

24  information it was getting from Kabbage and American Express?

25  A      That's accurate.

1  Q    Were there frequently differences between what was
2  being reported by Kabbage and what was being reported by
3  American Express?
4  A    There were discrepancies.
5  Q    Ms. Evans, fair to say you know which trial balance Ms.
6  White used to construct her total portfolio analysis?
7  A    I do.  I don't know how it was created, but I know the
8  file.
9  Q    I file that  your colleague, Tim Keith, sent to Alyssa
10 White on November 9th?
11 A    That was a list of transaction data, correct?
12 Q    Just so we're singing off the same sheet of music,
13 could you take a look at Exhibit 14 in the small binder?
14 A    Correct.
15 Q    Is that the email by which your colleague, Tim Keith,
16 communicated to Ms. White the trial balance data?
17 A    Yes.  Following a meeting we had to review that data
18 with the Customers Bank team.
19          MR. STERNBERG:  Your Honor, I offer Exhibit 14.
20          THE COURT:  Any objection?
21          MR. TSEKERIDES:  No objection, Your Honor.
22          THE COURT:  It will be admitted.
23      (Customers Bank's Exhibit 14 received into evidence)
24 BY MR. STERNBERG:
25 Q    Ms. White, in your declaration, which is all of three

1  and a half pages, you don't point to any particular error

2  that you say Ms. White made in her total trial balance

3  analysis, do you?

4  A    I do not.

5  Q    You just say you think relying on whatever she relied

6  on would be inherently inaccurate and unreliable, correct?

7  A    Correct; although, I was not aware until now that this

8  was the document she used to create the Customers Bank trial

9  balance.

10  Q    I take it you would have a different -- knowing that

11  now are you satisfied that the data points she used was

12  reliable?

13  A    I'd have to understand the different data points that

14  were used within the Customers Bank team outside of the

15  KServicing data to create the trial balance. So, I can't

16  answer that definitively.

17  Q    So, fair to say you can't now definitively say that

18  what she relied on was inherently inaccurate and unreliable?

19  A    I can't say yes or no either way until I have more

20  information.

21  Q    So, would you want to withdraw that part of your

22  declaration?

23  A    Not without further understanding of how the document

24  was created and built.

25  Q    You just said don't know one way or the other as you

1  sit here now?

2  A     Correct. I need to look at more data.

3  Q     In your declaration from last week, March 13th, 2023,

4  you don't proffer an alternative total trial balance

5  analysis, do you?

6  A     I did not.

7  Q     And you don't proffer your own version of how this

8  total trial balance analysis meshes with the settlement

9  payment made by Customers Bank?

10 A     I do not.

11 Q     Is that because you haven't done that -- when I say

12 "you" Kabbage hasn't done that analysis?

13 A     I haven't done that.

14 Q     Do you know whether anyone on the Kabbage team has done

15 that?

16 A     Other members of our team have done analysis.

17 Q     Let me be specific about the analysis I am asking

18 about.  Has anyone from Kabbage, to your knowledge, prepared

19 a total trial balance analysis of the entire Customers Bank

20 portfolio and analyzed it in terms of the settlement payment

21 that Customers Bank made to Kabbage?

22 A     At the current time not in one document, in different

23 pieces, but not as you described it.

24 Q     Would you agree with me that the job of a servicer, the

25 basic core job of a servicer, is to keep track of all the

1   money its collecting on behalf of its client?

2   A     I would agree with that.

3   Q     And that job -- do you know how many loans

4   approximately in the portfolio that Kabbage is servicing for

5   Customers Bank?

6   A     99,365.

7   Q     And of that 99,365 loans the obligation would be to all

8   99,365 to accurately track all the loans?

9   A     I agree with that.

10  Q     It wouldn't be just to pick out five particular loans

11  and do an analysis based on those?

12  A     No.

13  Q     Ms. Evans, for many months during your tenure at

14  Kabbage have you participated in weekly and monthly meetings

15  with the Customers Bank team including Alyssa White, Michel

16  Vervlied and others?

17  A     Correct.

18  Q     Was one of the issues that was discussed regularly at

19  those meetings discrepancies between what Kabbage was showing

20  at borrower balances and what Customers Bank's internal

21  analysis showed?

22  A     That is accurate.

23  Q     And at one point in time, toward the end of September,

24  early October 2022 were there approximately 13,000 loans that

25  had discrepant balances?

1   A      I don't recall the number.

2   Q      Do you recall that there were thousands of loans with

3   discrepancies?

4   A      I recall there were discrepancies with a number of

5   loans, a large number.  We are working to resolve them.

6   Q      And your declaration doesn't provide any information on

7   any effort by Kabbage to reconcile the thousands of loans and

8   millions of dollars paid into the Wells Fargo account,

9   correct?

10  A      It does not.

11  Q      To your knowledge no one at Kabbage has done that?

12  A      Can you repeat the question again?

13  Q      Sure.  To your knowledge has anyone at Kabbage gone

14  back in time and reconciled all of the payments made into the

15  Wells Fargo account and all of the payments made out to

16  Customers Bank?

17  A      Not that I am aware of.

18           MR. STERNBERG:  May I have a moment, Your Honor?

19           THE COURT:  You may.

20       (Pause)

21           MR. STERNBERG:  Your Honor, Ms. Evans, nothing

22  further.

23           THE COURT:  Okay.  Redirect, Mr. Tsekerides.

24  //

25  //

REDIRECT EXAMINATION

BY MR. TSEKERIDES:

Q     Ms. Evans, do you have the shorter -- Ted Tsekerides
from Weil for the debtors.

      Do you have the smaller binder?

A     Yes.

Q     You were asked -- let me get the three in front of you,
please.

A     Yes.

Q     This was an email you referred to, its dated
November 4th.  Do you see that?

A     Yes.

Q     Why did you send this over to Customers Bank on
November 4th?

A     After the settlement was signed the week of the 31st we
had a number of meetings, different meetings, with the
Customers Bank team to work on reconciliation efforts.  On
the morning of that Friday, the 4th, when this email was sent
there was a meeting with Andrew Sachs and Michele, and Sal
Cafeti [phonetic] from the KServicing team and myself where
there was a request to deliver all files available at the
current stage they were in by end of day, as soon as
possible.

Q     Was KServicing done with its analysis when you sent
this?

1  A      We were not.

2  Q      On November 4th was KServicing aware of a file that

3  that Danny Eidson had referred Ms. Williams and others to?

4  A      No.

5  Q      On November 4th was Kabbage aware of payments that had

6  been made to Customers Bank from a Wells Fargo account?

7  A      No.

8  Q      Was one of the purposes of the reconciliation to

9  determine how much was withheld and/or paid to CUBI on

10 various loans?

11 A      Yes.

12 Q      Take a look at Exhibit 22, it's in the bigger binder.

13 Let me know when you're there?

14 A      Yes, I'm here.

15 Q      You were shown, the first page has a box with a bunch

16 of numbers in it.

17 A      Yes.

18 Q      Okay.  Under per CUBI remittance file what does that

19 refer to?

20 A      The amount of money that had been held back by

21 KServicing that was owed to the Customers Bank team.

22 Q      And you were asked a lot of questions about thousands

23 of loans and it would be hard to reconcile all these loans.

24 Were there specific loans identified in the remittance file?

25 A      Correct.

1  Q     And were those the loans that were going to be looked

2  at for purposes of deciding what the settlement amount was?

3  A     Yes.  Our team did a loan-by-loan level analysis.

4  Q     And if loans that were in that remittance file had

5  already been paid should they have been in the remittance

6  file?

7  A     No.

8  Q     Now you have testified you've had a lot of

9  conversations with people from Customers Bank?

10  A     Yes.

11  Q     Okay.  Did they ever tell you in any of those

12  conversations that this reconciliation had to be done by

13  November 9th?

14  A     No.

15  Q     Did they ever say anything to you that would make you

16  believe that it didn't have to be done by November 9th?

17  A     No.

18  Q     Did they say anything to you that the reconciliation

19  process would continue even past November 9th?

20  A     They did.  There was a call on November 9th, the same

21  call where we discussed the exhibit that we just looked at.

22  And the call ended with Andrew Sachs from the Customers Bank

23  team highlighting to those on the call, which was myself,

24  Sal, Andrew Sachs, Albert Merkin, Alyssa White, and Michele

25  from the Customers Bank team, that we had through the weekend

1  to continue working on reconciliation.

2  Q     Would the weekend take you past November 9th?

3  A     Yes.

4         MR. TSEKERIDES:  One moment, Your Honor.

5         THE COURT:  Certainly.

6         MR. TSEKERIDES:  No further questions, Your Honor.

7         THE COURT:  Okay.  Any recross?

8         MR. STERNBERG:  I do have some recross, Your

9  Honor.

10        THE COURT:  Okay.  You can proceed.

11                    RECROSS-EXAMINATION

12 BY MR. STERNBERG:

13 Q     Ms. Evans, forgive my memory on this, were you here on

14 November 7th for the hearing on entering the settlement

15 agreement?

16 A     Here in the room?

17 Q     Or zooming in?

18 A     I was not.

19 Q     Were you part of that hearing?

20 A     I was not.

21 Q     Were you aware that there was a hearing on November 7th

22 on Kabbage's motion to enter the settlement agreement?

23 A     I am aware of that.

24 Q     And so November 4th, when you sent Exhibit 3 and other

25 emails that evening that was a Friday night, correct?

1  A      It was Friday night.

2  Q      And the hearing was the following Monday morning?

3  A      Correct.

4  Q      And was it your understanding that the Court could have

5  entered the settlement order that day?

6  A      I don't have an understanding either way.

7  Q      Did you have an understanding that there was some

8  urgency on Friday night because if the settlement order

9  entered on Monday that would be the effective date?

10 A      That is not my understanding on the urgency.  My

11 understanding on the urgency was resolve the issues and get

12 to the right number as quickly as possible. I did not have

13 clarity it was tied to the settlement.

14 Q      Are you aware of any written amendment to the

15 settlement agreement that extended the reconciliation period?

16 A      I am not aware of that.

17          MR. STERNBERG:  Nothing else, Your Honor.

18          THE COURT:  Okay.

19          MR. TSEKERIDES:  Nothing further.

20          THE COURT:  Ms. Evans, thank you for your

21 testimony. You can step down.

22      (Witness excused)

23          THE COURT:  Mr. Tsekerides, whereto from here?

24          MR. TSEKERIDES:  I'm sorry, Your Honor, one

25 moment.

1          THE COURT:  Certainly.

2      (Pause)

3          MR. TSEKERIDES:  Those are the witnesses that the

4  debtors have.  We do have some collateral disputes on the

5  Ms. White declaration and exhibits, but I think that is the

6  next step that they would move in their own witness's

7  declaration.  Mr. Slack is going to handle that. It will be a

8  couple of paragraphs there, but I will leave that to them,

9  but that is the next step in the process.

10          THE COURT:  Okay.  So, in terms of the debtor's

11  affirmative case, on an evidentiary basis, you are now done?

12          MR. TSEKERIDES:  Correct.

13          THE COURT:  Okay.  Thank you, Mr. Tsekerides.

14          Can I ask you this, about how long do you think we

15  are -- I am just trying to figure out what is a sensible time

16  to break. I am pretty flexible, but I want to be courteous to

17  others.

18          MR. STERNBERG:  Your Honor, our plan is to move in

19  Ms. White's December 7th, 2022 declaration and exhibits;

20  although, I think only three of those exhibits are germane to

21  the dispute today.  Then I have got a very short live direct

22  of her to bring us from December 7th to today.  Then tender

23  her for cross-examination.

24          THE COURT:  Okay.  Any reason we shouldn't, at

25  least, begin that process?  Mr. Slack.

1          MR. SLACK:  You know, Your Honor, I would expect

2    maybe about half hour, 45 minutes of cross-examination, you

3    know, depending on what the direct, I haven't heard yet,

4    looks like.  So, that is, I think, where we are.

5          THE COURT:  Okay.  Given where we are in time what

6    do the parties think about doing the direct, seeing where we

7    are, and then having a conversation then about whether to go

8    directly into cross or to take a break at that point.

9          MR. SLACK:  That sounds fine.  My only request,

10   Your Honor, is maybe a five minute or 10 minute break for

11   nature.

12         THE COURT:  Certainly.  Should we do that at this

13   point?

14         MR. SLACK:  Yeah, that's what I would suggest.

15         THE COURT:  Okay.  Fair enough.  So, why don't we

16   recess for seven minutes and come back at -- actually, why

17   don't we resume at noon.  We will do the moving into

18   evidence, the direct, and then we will see where we are.

19         So, with that we are in recess until 12 o'clock.

20      (Recess taken at 11:48 a.m.)

21      (Proceedings resumed at 12:00 p.m.)

22         THE CLERK:  All rise.

23         THE COURT:  Please be seated.

24         MR. STERNBERG:  Your Honor, may I call Ms. White?

25         THE COURT:  Certainly.

1          MR. STERNBERG:  While Ms. White is taking the

2   stand I would like to offer her December 7th, 2021

3   declaration and Exhibits 1, 3 and what's 3-A to her

4   declaration, but its already in evidence as 22.

5          THE COURT:  Okay.  So, let's slow down.  So, first

6   you have moved in her declaration which is, if you don't

7   mind, are you able to identify that by docket number that

8   would be super helpful.

9          MR. STERNBERG:  It is -- may I approach Ms. White?

10  I think it's on the declaration.

11         THE COURT:  Certainly.  Oh, I see, is it 337?

12         MR. STERNBERG:  I think that's an earlier one.

13         THE COURT:  Oh, I see, 358.  All right.  So, you

14  moved into evidence the declaration that is at D.I. 358.

15         Mr. Slack, it looks like you have --

16         MR. SLACK:  Yes.  We have a limited objection to

17  the declaration and one of the exhibits.  So, our objection

18  is to Paragraphs 23 and 24 of the declaration which relate to

19  a trial balance analysis.  Then we also object to the

20  admission of --

21         THE COURT:  All right.  Let's take the declaration

22  first.  Let's go one paragraph at a time so that I get each

23  issue.

24         MR. SLACK:  Okay.

25         THE COURT:  That way I'm less likely to get it

1  wrong if we do it, sort of -- if we isolate the moving parts.

2          MR. SLACK:  I would say that they are related,

3  Your Honor.

4          THE COURT:  Okay.

5          MR. SLACK:  But that is fine.  Your Honor, 23 and

6  24 relate to a trial balance analysis and we have two

7  objections to it.  Number one, the settlement payment and the

8  calculation of the settlement payment that was submitted by

9  Customers Bank was not based on any kind of trial balance

10  analysis. It was based on a very different analysis related

11  to the remittance file and that is set forth in their own

12  exhibit.

13          More importantly, Your Honor, as soon as we

14  received the declaration we asked Customers Bank for all the

15  backup to the trial balance analysis.  Your Honor, this was

16  the exhibits that we have on our exhibit list which is

17  Exhibits 30 through 36.  There was an objection to those, but

18  they relate to this objection that we have to Ms. White's

19  declaration at 23, 24.

20          What the proffer of these exhibits show is that

21  right after we received the declaration we asked Customers

22  Bank for all of the documents that relate, all of the work

23  product, the spreadsheets so that our clients could analyze

24  and do whatever, and we recreate, and understand whatever

25  work was done.  We received a letter, that is our Exhibit 30,

1  back saying, no, that was the answer to that.  Interestingly

2  enough, what we were told is that while much of the

3  information was information we received it was clear, based

4  on that letter, because it said much of it that was, in fact,

5  and as the Court would know, that there, obviously, was work

6  that was done on this trial balance analysis that we never

7  received.

8          So, we wrote back and we said, look, we need this

9  and we were, again, told no, but we will give you a one page

10  analysis.  So, they gave us a one page analysis which is now

11  they're Exhibit 13.  They still have not given us any of the

12  work product, any of the background.  They haven't, you know,

13  tied A to B or given -- there's information in that one sheet

14  that says that they used, for example, Customers Bank's

15  general ledger.  We haven't received any of that.  We don't

16  know what they used, what they didn't, how they did their

17  calculations.

18          Ms. White, in her declaration, for example, says

19  there was a series of people who did work.  We don't know

20  what work they did.  We don't know what instructions they

21  had.  We know none of that.

22          THE COURT:  So, the basis for your objection is

23  they're putting this forward and you were deprived of the

24  opportunity, in discovery, to test it?

25          MR. SLACK:  Exactly, Your Honor.  We said, look,

1  you want us to make this a formal request.  They said we

2  don't need a formal request, we are just saying no.  So, we

3  told them, in our letters, that we were going to raise this

4  issue that if we didn't get any of the background we didn't

5  think it was fair, you know, to put on an analysis that we

6  have literally had no opportunity to have any information on

7  whatsoever, zero.

8          THE COURT:  Okay.  What is your response?

9          MR. STERNBERG:  Your Honor, if we're talking about

10 fairness Ms. White's -- first of all, I hope the Court will

11 hear from Ms. White the total trial balance analysis that she

12 did was very much part of the settlement reconciliation.  It

13 was the bank's way of doing a belts and suspenders analysis.

14 So, its highly relevant and it was done contemporaneously.

15         THE COURT:  What is your response to the question

16 that he asked you for the backup so he could understand it,

17 and you didn't produce it, and you shouldn't be allowed to

18 come forward with information without giving your opponent a

19 chance to test it.

20         MR. STERNBERG:  We have given -- this is the

21 document.  Exhibit 13 is what Ms. White prepared and in it,

22 it shows each input.  They have it all and we told them they

23 have it all.  What is curious about this is if they thought

24 there was a discovery issue make a motion.

25         THE COURT:  I understand.  All right, here is what

1  I am going to: I am going to take this -- I am going to allow

2  you to proceed, I am going to bracket the disputed portion,

3  and I will look at that -- I think I will make a smarter

4  decision once I've heard it and thought about it then I would

5  if I make a decision now.  So, I am going to proceed, sort

6  of, without prejudice and then consider the question at the

7  end.

8            MR. STERNBERG:  If I might, Your Honor, I'd add

9  one piece to what I have already said.  We provided the

10  document that Ms. White prepared.  She can talk about math.

11  I mean, I don't know that anybody needs the backup math.  But

12  each component of it is described and it's something that

13  Kabbage provided to Customers Bank.  We offered as recently,

14  I think, of last week if they had any questions, Ms. White

15  would be happy to answer them.  Here we are, I suppose in a

16  sense she is going to answer some of those questions now.

17            MR. SLACK:  I have to say that that just didn't

18  happen.

19            THE COURT:  All right, well --

20            MR. SLACK:  You know, in fact, there was a

21  statement by counsel that said we would have a meeting where

22  we would go over it.  We had that meeting and they got off

23  the phone without doing it.  So, that just never happened.

24            THE COURT:  Look, I understand the parties'

25  positions on this. I am going to allow the evidence to

1  proceed and will resolve the questions of the admissibility

2  after I understand more about the lay of the land.  So, with

3  that you can proceed.

4          Oh, I'm sorry, Ms. Barksdale, if you could swear

5  the witness. And thank you for letting me know that I made a

6  mistake.

7          MR. STERNBERG:  Your Honor, have you received Ms.

8  White's declaration and the exhibits?

9          THE COURT:  What I have done is the parts that are

10 unobjected to are admitted.  The parts that are subject to

11 Mr. Slack's objection are lodged, let's call it, and we will

12 address the question of their admissibility when I understand

13 it better.

14      (White Declaration received into evidence)

15         MR. STERNBERG:  Very well. I think what we are

16 talking about there is Paragraphs 23 and 24, and our

17 Exhibit 13.

18         THE COURT:  Right.  I take it have you moved other

19 exhibits into evidence?

20         MR. STERNBERG:  Two of them are already in. I am

21 moving Exhibit 1 into evidence as well from Ms. White's

22 declaration.  I think it's the one exhibit that remains not

23 in the evidence as part of --

24         THE COURT:  Okay.  I'm sorry, its Exhibit 1 of her

25 declaration or Exhibit 1 from your binder?

1        MR. STERNBERG:  Both.

2        THE COURT:  Okay. It's the same thing.

3        Mr. Slack, any objection to the introduction into

4   evidence of Exhibit 1?

5        MR. SLACK:  That is the calculation.  I have no

6   objection.

7        THE COURT:  So, that will be admitted.  Whatever

8   was already admitted remains admitted.

9      (Customers Bank's Exhibit 1 received into evidence)

10       THE COURT:  Are there any other evidentiary

11  matters before you turn to your testimony?

12       MR. STERNBERG:  There are not.

13       THE COURT:  So, Ms. Barksdale, if you could swear

14  the witness.

15      ALYSSA WHITE, CUSTOMERS BANK'S WITNESS, SWORN

16       THE CLERK:  Please state your full name and spell

17  your last name for the record.

18       THE WITNESS:  Alyssa Anne White, W-H-I-T-E.

19                    DIRECT EXAMINATION

20  BY MR. STERNBERG:

21  Q    Good afternoon, Ms. White.

22       Could you briefly introduce yourself to the Court by

23  telling us where you work and what you do?

24  A    I work for Customers Bank.  I am the senior vice

25  president of our digital operations.  I am responsible for

1  the governance and oversight of all of the FinTech partners

2  that we use for that product, as well as general

3  responsibility for the oversight of the portfolio itself.

4  Q    Does your oversight responsibility extend to the

5  paycheck protection program loans?

6  A    It does.

7  Q    And if I call that PPP we will understand each other?

8  A    Yes.

9  Q    In the course of your work for Customers Bank on PPP

10 did you have occasion to work with Kabbage?

11 A    I have.

12 Q    Can you tell us, just in broad terms, about your work

13 with Kabbage?

14 A    I work with them.  We meet typically several times a

15 week to discuss the status of the portfolio relative to

16 balances, other servicing activities that they perform on

17 behalf of Customers Bank for that portfolio.

18 Q    More recently, and what I mean by more recently is over

19 the last year or so, did you have occasion to have regular

20 interactions with Ms. Williams and Ms. Evans?

21 A    Yes.  Ms. Evans more so than Ms. Williams.

22 Q    And how about before Ms. Evans arrived at Kabbage who

23 was your primary contact?

24 A    Danny Eidson.

25 Q    And Mr. Eidson was the CFO of Kabbage?

1  A     Correct.

2  Q     Over the course of your work with Kabbage have you met

3  weekly, monthly with Kabbage team and the Customers Bank team

4  on a variety of issues?

5  A     Yes.

6  Q     Can you tell us what kinds of issues you interacted

7  with Kabbage on?

8  A     We would have regular meeting cadences.  Prior to this

9  settlement, in October of 2022, we would meet on a weekly

10 basis to review reconciliation of the data that they provide.

11 We, obviously, rely heavily on the data that they provide for

12 our accounting and financial matters.  So, we would often

13 meet about discrepancies in the reporting information that

14 was provided.

15 Q     What kinds of discrepancies?

16 A     Borrower trial balances, where remittance payments

17 weren't appropriately reflected on the borrower's trial

18 balance, or the trial balance couldn't be validated because

19 it appeared that there was a payment, but there was no

20 history in the remittance report.  So, those two reports kind

21 of depend, really go hand in hand.

22 Q     Based on your experience with working with the Kabbage

23 team how did you find the accuracy and completeness of

24 Kabbage's financial reporting?

25 A     Very poor data integrity.  We just consistently

1  received information from Amex and then when KServicing was

2  developed after they sold to American Express then we

3  continued to get reporting from them that conflicted even

4  there were issues with reports they would send us an entirely

5  new report that didn't reconcile to the other report. It was

6  just consistent errors across all the reporting.

7  Q    Ms. White, you've used this term a couple of times

8  "trial balance."  What is a trial balance?

9  A    A trial balance itemizes all of the loans in the

10  portfolio, the original amount that was disbursed in the

11  loan, and then the balance of that loan at a specific point

12  in time.

13  Q    Why is a complete and accurate trial balance an

14  important document in the banking lending industry?

15  A    It's a financial -- its used for financial and

16  accounting records.  From a regulatory standpoint and a

17  publicly traded company that's a critical document that

18  validates our financials as a bank and allows us to track the

19  funds that we have lent out to borrowers.

20  Q    Have you used trial balance in your daily work at

21  Customers Bank?

22  A    Operational decisions are made to be able to monitor

23  the health of that portfolio, to be able to predict our

24  financials as a bank on our receivables.  If borrowers are

25  delinquent on loans, just in general it's a critical --

1   Q      Ms. White, are you aware of a settlement agreement

2   between Kabbage and Customers Bank?

3   A      I am.

4   Q      And you have seen the settlement agreement between the

5   parties?

6   A      I have.

7   Q      Were you involved in the reconciliation process that is

8   called for by that settlement agreement?

9   A      I was.

10  Q      What was your role in the reconciliation process?

11  A      I helped coordinate it on behalf of Customers Bank and

12  interacted with Kabbage in gathering the information.

13  Q      What information in particular did you request from

14  Kabbage as part of the reconciliation process?

15  A      We requested the remittance report that would reflect

16  the amount that was held back, an accurate trial balance as

17  of the date of settlement, and the Synovus bank accounts.

18  Q      I probably should have done this already.  You said,

19  "remittance report of the amount held back."

20         Did you understand that one of the things being

21  reconciled was the amount of borrower payments that Kabbage

22  was holding and it had not yet paid to Customers Bank?

23  A      Correct.

24  Q      You mentioned you received the final remittance report,

25  a trial balance and Synovus bank statements?

1  A      That's what we requested.

2  Q      Why do you want bank statements?

3  A      We had -- because we had no visibility of borrower

4  payments.  The only way we could see that a borrower had made

5  a payment is by the reduction in the trial balance.  So, to

6  validate that the trial balance was accurate, that borrowers

7  had an inaccurate balance on their loan, and to validate that

8  the payments that were reflected in the remittance report

9  were accurate, we wanted some type of independent source to

10 be able to validate that remittance report was supported by

11 all of the funds that borrowers had deposited to and paid to

12 Kabbage.

13 Q      And did you, indeed, get bank statements from Kabbage?

14 A      We did.

15 Q      Who sent them to you?

16 A      Donna Evans.

17 Q      Take a look, please, at the smaller binder that you've

18 got there, Tab 3, please, Exhibit 3.

19 A      Okay.

20 Q      Is Exhibit 3 an email that you received late in the day

21 on Friday, November 4th, from Donna Evans?

22 A      Yes.

23 Q      And what was contained, what was attached to Exhibit 3?

24 A      There were three zip files containing the actual bank

25 statements, as well as a reconciliation that Kabbage had done

1  of those bank statements, which tied to the remittance

2  report.

3  Q     Based on anything contained in the email that's

4  Exhibit 3 or anything that anyone from Kabbage told you, did

5  you understand that the information and data you were

6  receiving was preliminary in any way?

7  A     No.

8  Q     Did you understand that you were not to rely on it?

9  A     No.

10  Q     One of the attachments that's noted on Exhibit 3 is

11  something called "Synovus account analysis."

12  Do you see that?

13  A     I do.

14  Q     If you turn to what's Tab 4 in your binder of

15  Exhibit 22 in evidence in this matter, do you see something

16  called "KServicing-Synovus borrower repayment account

17  analysis"?

18  A     I do.

19  Q     Is that something that you received from Ms. Evans

20  attached to the email we were just looking at?

21  A     Yes.

22  Q     Toward the bottom of the page or middle of the page, it

23  says, "Per CUBI remittance file" and then there's some -- it

24  says, "borrower or repayments per remittance file" and then

25  there's a $26.6-odd-million number?

1  A      Yes.

2  Q      What did you understand that number to represent?

3  A      The actual payments that borrowers made to Kabbage into

4  this bank account.

5  Q      Did you understand that figure represented monies that

6  had not been paid over yet to Customers Bank?

7  A      Yes.

8  Q      Did the remittance files, the Synovus bank remittance

9  files that Kabbage sent to Customers Bank, reflect borrower

10 payments of $26,608,962?

11 A      Yes.

12 Q      At the bottom of the page there's an entry called

13 "remaining variance to be resolved."

14        Do you see that?

15 A      I do.

16 Q      Did you have an understanding of what that $497,900

17 number represented?

18 A      My understanding was that was money that was deposited

19 into the Synovus bank account and when they did the

20 reconciliation amongst their remittance report, they did not

21 have that reflected in the remittance report because they

22 couldn't, at that time, identify what loans they were

23 attributed to.

24 Q      Did you understand that the reconciliation that you

25 were jointly engaged in with Kabbage was of the Synovus bank

1 account?

2 A    Yes.

3        MR. SLACK:  Objection, Your Honor; leading.

4        THE COURT:  Overruled.  I don't think that that

5 question indicated the answer, so --

6        MR. SLACK:  I would just say he could ask that as,

7 What was your understanding, as opposed to, Did you

8 understand and have --

9        THE COURT:  I've overruled the objection.

10        You can proceed.

11 BY MR. STERNBERG:

12 Q    What account, what bank account is identified at the

13 top of the page on Exhibit 22 that's Tab 4 in your small

14 binder?

15 A    Synovus bank account.

16 Q    During the reconciliation, did Kabbage provide you with

17 any reconciliation information about a Wells Fargo account?

18 A    No.

19        MR. SLACK:  Objection, Your Honor; leading.

20        THE COURT:  What's your response?

21        MR. STERNBERG:  I can rephrase, Your Honor.

22        THE COURT:  Okay.

23 BY MR. STERNBERG:

24 Q    Ms. White, during the reconciliation process, what, if

25 any, accounts, other than the Synovus account did Kabbage

1  provide you information on?

2  A     They did not provide anything.

3  Q     What do the two numbers at the bottom of Exhibit 22,

4  Tab 4 in your small binder, add up to?

5  A     $27,106,862.

6  Q     Take a look at Exhibit 1 in evidence, it's also Tab 1

7  in your binder.  Please tell us how you used that $27.1-

8  million-dollar-and-change figure in the settlement account

9  reconciliation summary that you've prepared.

10  A     In that second section, we took the principal amount

11  and the interest, as well as the 497,900 that we talked

12  about, so that added up to the 27 million.  That was the

13  total amount that they had represented had been deposited

14  into the Synovus bank account, which was, from my

15  understanding, the only account that they had used once they

16  stopped withholding funds from us to collect borrower

17  payments.  That amount represents the amount that they had

18  told us that they had withheld from us and with which we

19  verified, based on their information, was deposited into that

20  Synovus account.

21  Q     We were looking at a figure of $26.608 million, but the

22  account -- the settlement reconciliation summary that you

23  prepared that's Exhibit 1 has two different figures for

24  borrower collections:  there's an interest figure and a

25  principal figure.

1  A      Yeah, the combination, the 26 was a combination of the

2  principal and interest.

3  Q      Going back to Exhibit 22, Tab 4 in your binder, at the

4  top of the page, the first maybe two-thirds of it is under a

5  heading called "Per Synovus bank statement activity."

6  A      Yes.

7  Q      And then there's some calculations and entries there.

8         Do you see that?

9  A      I do.

10 Q      Did you or anyone on your team audit these entries?

11 A      Other than the math that they did here, that was it.

12 Q      In other words, you checked the math on the cover of

13 the page, but did you go to the actual entries to verify or

14 audit any of these entries?

15 A      No.

16 Q      Do you know any reason why a Synovus bank account

17 analysis would contain information from a separate bank

18 account at Wells Fargo?

19 A      I do not.

20 Q      Do you know why a Synovus bank account reconciliation

21 would include information that predated the opening of that

22 account?

23 A      I do not.

24 Q      Ms. White, you mentioned maybe five minutes ago that

25 you had regular meetings with the Kabbage team about various

1  discrepancies and loan balances and the borrower payments and

2  so on.

3  A    Yes.

4  Q    At one of the more recent meetings or one of the

5  meetings that was close in time to the bankruptcy petition,

6  approximately how many loans were there discrepant balances

7  on?

8  A    Our October month-end reconciliation, which was prior

9  to all of this settlement analysis, there were 13,000 loans

10  that had reconciliation errors, which represented

11  $53 million.  We're showing $53 million less on their trial

12  balance than we had in our GL balance.

13  Q    So, based on your experience with these frequent

14  discrepancies, what did you do assure yourself that the

15  reconciliation of the specific items called for by the

16  settlement agreement also made sense on a total-portfolio

17  basis?

18  A    It was pretty simple math.  We had agreed on the

19  total --

20  Q    Who's the "we" in that sentence?  Sorry to interrupt

21  you.

22  A    "We," meaning Kabbage and Customers Bank, through the

23  reconciliations that we -- that I discussed that we would

24  typically do as part of our daily operations.  We had agreed

25  on a population of loans that were funded that were in the

1  portfolio.  So, we knew the loans, loan-by-loan.  We knew

2  what had been disbursed, so that was our starting point.

3       What we were trying to do is kind of an independent

4  validation of the settlement amount to make sure that we were

5  accounting for all of the funds that Customers Bank had

6  disbursed to borrowers was.

7       We looked at all the funds that we had received through

8  the SBA and from Kabbage, prior to them holding funds back,

9  which got us to our outstanding balance within the portfolio,

10 compared that to their trial balance, which they provided to

11 us as part of the settlement.  The difference between those

12 should be the amount of the holdbacks.

13      So, basically, we were saying, we show this much money

14 outstanding in the portfolio.  You're reporting to us that

15 you see this money.  You're seeing that they should be

16 showing a lower balance because they've been collected

17 remittances from the borrower that hadn't been provided to

18 us, and that should help us back into the amount of

19 remittance that they were holding.

20      So, we did that type of an analysis to validate the

21 information and then we looked at the inverse of it and said,

22 Well, if we looked at the trial balance that they're

23 recording --

24 Q    "They" being Kabbage?

25 A    "They" being Kabbage, and we just plugged in the amount

1  that they told us that they owed us, would we get to the

2  same -- once we applied those payments, will our trial

3  balance or our GL match with what they're reporting?

4       And we were able to, in both scenarios, reconcile

5  within $1300.  So, we felt that was, in addition to the bank

6  account, all of that reconciliation, that supported all of

7  the funds, that analysis to be able to account for our entire

8  portfolio, we felt that that was a fair assessment and

9  independent assessment to validate.

10  Q    Ms. White, did you prepare a document that summarized

11  the analysis that you just described?

12  A    Yes.

13  Q    Is that document Tab 13 in your binder?

14  A    It is.

15  Q    Is Tab 13 an analysis that --

16  A    Yes.

17  Q    -- you prepared as you just described?

18  A    Yes.

19           MR. STERNBERG:  Your Honor, subject to the

20  protocols that you identified, I'll offer Exhibit 13.

21           THE COURT:  Okay.  So, I'm going to let you

22  examine the witness about this and I'll reserve judgment

23  about its admissibility when we get to the end.

24  BY MR. STERNBERG:

25  Q    So, what does it mean, Ms. White, for the analysis that

1  you just described and that you also depicted in Exhibit 13,

2  to get within 1300 or so dollars on a total-portfolio basis?

3  A     It means that at the aggregate level, not a loan-by-

4  loan level, but at the aggregate level, starting from the

5  top, Customers Bank disbursed $2.5 billion of funds.  Less

6  the funds that had been returned to us, we were showing an

7  outstanding balance of $202 million.  That is what we were

8  showing as should be the outstanding balance, which should,

9  in theory, equal the trial balance that Kabbage was

10  responsible for maintaining on our behalf.

11       Because of this holdback, we obviously have this

12  discrepancy.  So, in the middle section are all of the

13  amounts that in scenario one that Kabbage had provided to us

14  as part of settlement of what they were saying they had been

15  holding back to us --

16  Q     I'm just going to pause you there for a moment.

17       You have six or eight entries that say, "KS provided."

18  What does that mean?

19  A     That means those are the reports that we received from

20  Kabbage during settlement to calculate the settlement

21  payment.

22  Q     You got a series of emails from Donna Evans on

23  November 4th --

24  A     Yes.

25  Q     -- Friday, November 4th, correct?

1  A      Yes.

2  Q      And you identified them by number here, Number 2,

3  Number 5, Number 4, et cetera.

4  A      That corresponds to the email subject that Donna had

5  sent, or Ms. Evans had sent the material.

6  Q      Just as an example, if we look at Exhibit 3, it says

7  "KServicing Update #3."

8  A      Correct, yeah.

9  Q      So, you're at -- the numbers correspond to the subject

10 line of different emails you got from Donna Evans on

11 November 4th, 2022?

12 A      Correct.

13 Q      What would happen to this trial-balance analysis if

14 Customers Bank had to pay an additional $1.5 million to

15 Kabbage?

16 A      It would mean there's $1.5 million missing on other

17 loans.

18 Q      What do you mean?

19 A      So, if you reduce -- that would be, basically, saying

20 you'd be reducing that $28.1 million total.  They're saying,

21 We didn't really owe you that; we owed you one and a half

22 million less.  If you take that out, now this reconciliation

23 doesn't work, but it would tell me that they're missing a

24 million and a half of our funds that we had disbursed that

25 they were responsible for tracking.

1    So, just looking at five loans out of the 98,000 loan

2 portfolio would not be an accurate analysis.  You need to

3 look at the entire -- you either need to look at all 98,000

4 loans to understand where the gives-and-takes, or you need to

5 look at it at the aggregate level.

6 Q    And you looked at it at the aggregate level?

7 A    Correct.

8 Q    Are you aware of whether anyone at Kabbage looked at it

9 either at the 98,000-loan level or at the aggregate level?

10 A    I don't believe that happened.

11 Q    I want to make sure I understand one of the figures in

12 Exhibit 13.  Next to the words "remittance collected/not

13 received" there's a figure of $25,578,634 -- let me say that

14 again -- $25,578,634.

15    Do you see that?

16 A    Yes.

17 Q    Why have you used that figure and not the 26.6 million?

18 A    This analysis is strictly on principal.  We did not

19 track interest.  We relied solely on what Kabbage calculated

20 at the interest level.  So, just to be as clean as we

21 possibly can, we wanted to just look strictly at a pure-

22 principal analysis.

23 Q    Have you had a chance to review Ms. Evans' declaration

24 from about a week ago?

25 A    I have.

1  Q      In it there's a suggestion that you used a faulty

2  American Express trial balance as the basis for your work

3  that's depicted in Exhibit 13.  Can you address that.

4  A      I did not.  The trial balance that we used was provided

5  and it's indicated here, the KS loan trial 10/3/2022.  We had

6  various conversations with KServicing during the settlement,

7  and when we had asked for an accurate trial balance, because

8  we knew of these errors.  They were aware of the errors.  We

9  had discussions around how can we get to the point where we

10 have an accurate trial balance that we can use to get to

11 closure on the settlement?

12      They had suggested they wanted to create a new trial

13 balance that came directly from KServicing, using their data.

14 They felt their data was more accurate, so they provided that

15 report specifically for this analysis.  There were

16 adjustments that needed to be made to that trial.  They

17 weren't able to apply guaranty payments, which would have

18 overstated the trial balance that we were aware of, so we

19 made those adjustments once they sent that report to us.

20      And we did another validation where we could see they

21 didn't apply forgiveness payments or other payments that

22 would have come from the SBA    at the loan-level detail, so

23 we did that validation and applied those and that's indicated

24 in the footnote that's on this document.  But this document

25 did not use the Amex trial balance.

1  Q      Ms. White, during the reconciliation period, did anyone

2  from KServicing explain anything to you about its position

3  that there were five loans totaling $1.5 million that had

4  been paid in October of 2020 that were in this notice account

5  analysis?

6  A      No.

7  Q      Did anyone from KServicing ever present you or any one

8  of your colleagues with an assertion of what the settlement

9  payment should have been from Kabbage's perspective?

10 A      No, they only provided the documents.

11 Q      To this day, has KServicing presented to Customers Bank

12 its view of how the settlement payment meshes with the total

13 trial-balance analysis?

14 A      No.

15 Q      Why can't you look at five loans out of a portfolio of

16 99,000 or so and conclude that if there was a payment on

17 those five loans in October 2020 and it shows up on a Synovus

18 account reconciliation that Customers Bank has been paid

19 twice?

20 A      Well, I mean, it kind of goes back to the monthly

21 reconciliations that I talked about earlier.  I mean, we knew

22 there were errors at the loan level of 13 -- of over 13,000

23 loans that equated to $53 million and at the net, $53 million

24 that indicated they had collected, but didn't pay to us.

25 Now, there were -- that was attributable to various root

1   causes, but the aggregate level showed $53 million.

2       Now, if you're going to say, Well, you owe us 1.5,

3   well, then, there's going to be, I know of ones, I mean, we

4   experienced them all the time, ones where there would be

5   amounts that are due to us in the inverse.  So, where that

6   all nets out, you either got to do all 98,000 loans and

7   figure out what are the gives-and-takes, or you've got to do

8   it at the aggregate level.  You can't just take a small,

9   like, five loans that were, you know, to your advantage.

10  That just wouldn't be an accurate assessment.

11          MR. STERNBERG:  Your Honor, may I have a moment?

12          THE COURT:  You may.

13      (Pause)

14          MR. STERNBERG:  That's all the questions I had,

15  Your Honor.

16          THE COURT:  Okay.  Mr. Slack, you would like to go

17  into cross or is this a sensible time to break for lunch?

18  Whatever the parties' reference is, in that regard.

19          MR. SLACK:  This is probably a sensible time to

20  break for lunch.

21          THE COURT:  Okay.  How long would folks like?

22  It's about 12:30.

23          UNIDENTIFIED SPEAKER:  45 minutes.

24          MR. SLACK:  What's that?

25          UNIDENTIFIED SPEAKER:  45 minutes.

1        MR. SLACK:  Yeah, 45 minutes.

2        THE COURT:  Okay.  So, we'll come back at, say,

3   1:20; is that agreeable on your side?

4        MR. STERNBERG:  It is, Your Honor.  We're just as

5   happy to press forward, but if that's the desire of the

6   group --

7        MR. SLACK:  And, Your Honor, I just want to make

8   sure that everybody is aware that the rule is still in

9   effect.

10        THE COURT:  So, Ms. White, you remain on the

11   stand, so you shouldn't discuss your testimony with anyone

12   during lunch.

13        THE WITNESS:  Yes, understood.

14        THE COURT:  Mr. Slack, does that admonition

15   satisfy your concern?

16        MR. SLACK:  It does, indeed.  Thank you.

17        THE COURT:  Okay.  So, we will break.  We'll take

18   45 minutes and come back at 1:20.  With that, we're in

19   recess.  Thank you.

20      (Recess taken at 12:35 p.m.)

21      (Proceedings resumed at 1:26 p.m.)

22        THE COURT:  Be seated.

23        I want to start off by apologizing for running

24   behind.  I try to make a point of actually being on time, so

25   sorry about that.  I just -- I wish I had a better excuse; I

1  just started working on something else and lost track of

2  time.  So, I wish I had a better excuse, but thank you for

3  your patience.

4            And, Mr. Slack, I guess we should recall the

5  witness to the stand.

6     ALYSSA WHITE, CUSTOMERS BANK'S WITNESS, PREVIOUSLY SWORN,

7                         RESUMES STAND

8            THE COURT:  Okay.  And you remain under oath.

9            And, Mr. Slack, you can proceed.

10                        CROSS-EXAMINATION

11  BY MR. SLACK:

12  Q    Ms. White, my name is Richard Slack.  I'm from Weil

13  Gotshal and I'm going to ask you a couple questions.

14        So, on your direct testimony, you indicated that you're

15  familiar with the settlement agreement, correct?

16  A    Correct.

17  Q    And you understand that the settlement agreement

18  defines the settlement payment as the settlement amount of

19  58 million, less the amount of what's referred to as the

20  disputed KServicing holdbacks as of the petition date, right?

21  A    Correct.

22  Q    And the disputed KServicing holdbacks is the sum of two

23  things:  one, the disputed KServicing fee holdback and the

24  disputed KServicing remittance holdback, correct?

25  A    Yes, I think there was a third portion of canceled or

1  returned loans.

2  Q      Excuse me?

3  A      I think there was a third portion of canceled or

4  returned loans, as well.

5  Q      And the point, though, is that the parties have agreed

6  to the fee holdback, correct?  The parties agreed to the

7  eight million three hundred and seventeen amount of the fee

8  holdback, correct?

9  A      Oh, in the settlement, yes.

10  Q      Yeah, in the settlement, that's right.

11         And so the only holdback category in dispute is the

12  disputed KServicing remittance holdback amount, right?

13  A      That's correct.

14  Q      Now, borrower remittances, and I know you talked about

15  this on your direct, are the funds collected from borrowers

16  that KServicing is required to remit to Customers Bank under

17  the parties' prepetition agreements, correct?

18  A      Correct.

19  Q      And so, the idea is that if KServicing collected money

20  that it has already paid to Customers Bank, it shouldn't be

21  on the remittance list, correct?

22  A      Well, it depends on what you say, because KServicing is

23  responsible for the entire trial balance of loans, and so if

24  money is collected at an aggregate level, they're responsible

25  for that, that whole balance, so accounting for it and then

1  returning those funds to us.

2  Q    So, let's try to take it on a granular level.

3       Certainly, the remittance list is a loan-by-loan list,

4  correct?  There's a remittance file that's a loan-by-loan

5  file, correct?

6  A    It's a transaction.  It's a transaction-based list.

7  Q    And that --

8  A    And there could be multiple line items for loans and

9  it's like a -- it's not a comprehensive list.  It depends on

10 the time and the scope that it's created.

11 Q    And so what -- let's take a look at your calculation,

12 maybe that'll help us here.  So, your calculation, which is

13 Exhibit 1, can you look at that.

14 A    Yep.

15 Q    And this sets forth Customers Bank's calculation of the

16 settlement amount that have paid, correct?

17 A    Yes.

18 Q    And it sets forth the methodology that it used in

19 calculating the settlement payment, correct?

20 A    Yeah, the only thing I would just maybe tweak a little

21 bit, I don't know that we set the methodology; the

22 methodology was per the settlement agreement.

23 Q    I'm sorry, the --

24 A    You said we set forth the methodology that we used, but

25 we didn't define the methodology.  We went according to the

1  settlement.

2  Q    Okay.  And so, for example, in your sheet, there's a

3  section that's labeled "total borrower remittance payments";

4  do you see that?

5  A    Yep.

6  Q    And that's 27,106,862, correct?

7  A    Correct.

8  Q    And Customers Bank broke that up into three different

9  figures, correct?

10  A    Correct.

11  Q    And the first one of those is the borrower principal

12  payments and returns; do you see that?

13  A    I do.

14  Q    And Customers Bank's specifically said that was per the

15  remittance file, correct?

16  A    Correct.

17  Q    And the next one was interest collected; do you see

18  that?

19  A    I do.

20  Q    And even though it doesn't say it, isn't it a fact that

21  the interest collected was also taken directly from the

22  remittance file?

23  A    Yes.

24  Q    And then the third is the reported remittance account

25  variance, correct?

1  A      From the Synovus accountant analysis, yes.

2  Q      Now, Customers Bank still stands by this calculation,

3  correct?

4  A      Yes, because we were able to reconcile it to the

5  Synovus bank account.  So this amount was, a portion of it

6  was represented in the remittance report, but the total

7  amount was validated with the Synovus bank statements and the

8  reconciliation report that was provided by KServicing.

9  Q      But the answer is yes, this is still your calculation,

10 correct?

11 A      It is, yes.

12 Q      As set forth in that sheet, correct?

13 A      In what sheet?

14 Q      Exhibit 1 to -- Exhibit 1?

15 A      Oh, Exhibit 1, yes.

16 Q      And, in fact, the numbers in Exhibit 1 do not come from

17 a trial-balance analysis, correct?

18 A      They --

19 Q      The actual numbers do not come there a trial-balance

20 analysis, correct?

21 A      They came from the Synovus bank account analysis

22 reconciliation.

23 Q      Well, they came from where they said; for example, the

24 borrower principal repayment and returns came from the

25 remittance file, correct?

1  A     Which was in, also in the Synovus bank account

2  analysis.

3  Q     Could you determine the borrower principal repayment

4  and returns and the interest collected without looking at the

5  remittance file?

6  A     With the Synovus bank account statements, yes.

7  Q     And did you, in fact, do that?  Did you look at the

8  remittance file to get that or did you look at the Synovus

9  bank account files to get that?

10 A     We were at -- we relied mostly on the Synovus bank

11 account because we had no way to validate the information

12 that was provided in the remittance report and had concerns

13 with the data integrity, so we really used the Synovus bank

14 reconciliation account.

15 Q     So, can you tell me how you went about taking the --

16 well, let's do this.  Let's take a look at the Synovus

17 borrower account, which is Exhibit 22.

18 A     Is that Exhibit 3 or 4?

19 Q     And it has all three tabs in it.

20       Can you take the Court through however you need to, to

21 show how you calculated the borrower principal repayments and

22 returns and the interest collected numbers in your settlement

23 calculation from that sheet.

24 A     Can you just tell me where you're looking -- where I

25 should be looking at?

1  Q    All right.  So, Exhibit 22, that's the Synovus account

2  analysis, right?

3  A    I don't have an Exhibit 22.

4  Q    Do you have --

5  A    Is it in here?

6  Q    It's in the big binder, not the small binder.  I'm now

7  talking about the KServicing exhibits.

8  A    Okay.

9  Q    All right.  Do you have Exhibit 22?

10 A    I do.

11 Q    You've seen Exhibit 22 before, correct?

12 A    I have.

13 Q    That is the Synovus account analysis that you were

14 referring to, correct?

15 A    Correct.

16 Q    So, can you walk the Court through, in whatever way you

17 need to, to show the Court how you calculated the 25,578,633

18 borrower principal repayment and returns from that

19 spreadsheet?

20 A    So, the twenty-seven one oh six, which is Row 15 on

21 Exhibit 22, ties to the, under Exhibit 1, the total borrower

22 remittance payments P&I, twenty-seven one oh six eight sixty-

23 two.

24 Q    I'm sorry, tell me, again, where you're looking.

25 A    On Exhibit 22 --

1  Q      Yes.

2  A      -- Row 15, you'll see twenty-seven one oh six eight

3  sixty-two --

4  Q      Yes.

5  A      -- so, that's the total amount of the Synovus bank

6  account --

7  Q      Right.

8  A      -- reconciliation of payments that have been collected.

9  Q      Right.

10  A      And then that was used on Exhibit 1, where it says,

11  total borrower remittance payments P&I, twenty-seven one oh

12  six eight sixty-two.

13  Q      Right.  So, I do -- I get that number, but I asked a

14  different question.  I asked the question, can you show me

15  how you would calculate the actual borrower repayment number,

16  which is 25,578,633 from that spreadsheet.

17  A      So, the four-ninety -- so, on Exhibit 2, Row 20 less

18  out the four-ninety seven nine hundred that's used in

19  Exhibit 1, reported remittance account variance four-ninety

20  seven nine hundred.

21  Q      Yes.

22  A      And then the twenty-five five seventy eight six thirty-

23  three and the 1,030,328 was a breakdown of the P&I that came

24  from the remittance report, but it all tied back to the

25  twenty-seven one oh six.  So, it all is -- it's all

1  reconciled to the Synovus bank account.

2  Q     Right.  So, the point is that the two numbers that I

3  pointed out that you said, per the remittance file, the

4  twenty-five five seventy eight six thirty-three came from the

5  remittance file, not from the Synovus account, correct?

6  A     It came, well, I mean it all starts with the Synovus

7  bank account.  A borrower makes one payment into the Synovus

8  bank account and then that gets itemized.

9        MR. SLACK:  Your Honor, I just wish I could get an

10 answer to my question.  I'm, you know, not really getting an

11 answer, yes or no, to my question.  And, obviously, if the

12 witness needs to explain this, counsel can -- her counsel can

13 cross or redirect.

14       MR. STERNBERG:  Your Honor, my sense is Ms. White

15 is answering the question; perhaps, not in a way Mr. Slack

16 wants to hear it.  She's engaging with his question and

17 giving a response.

18       THE COURT:  So, I don't think it's nonresponsive.

19       I'll let you continue cross --

20       MR. SLACK:  Okay.

21       THE COURT:  -- and we'll see where we go.

22 BY MR. SLACK:

23 Q     So, the twenty-five five seventy eight six thirty-three

24 could only be derived from the remittance file, correct?

25 A     Yes.

1    Q      And the interest collected, the 1,030,328 could only be

2    calculated from the remittance file, correct?

3    A      Yes.

4    Q      Okay.  Now, I'd like you to take a look at Debtors'

5    Exhibit 8.  It's also in the big binder.  And this is a

6    summary document of the five loans that KServicing contends

7    had payments made by borrowers, but that the money was

8    already paid back to Customers Bank.

9           Do you recognize those loans as the five loans that are

10   at issue?

11   A      I must be looking at the wrong thing.  You said

12   Exhibit 8?  I'm seeing an email.

13   Q      It's Exhibit 8 in the big binder.

14   A      Yeah, I'm seeing an email.

15   Q      There's a tab that says Exhibit 8.  There's some tabs

16   that just say 1 through 8, but there's Exhibit 8.

17   A      Yeah, I'm on Exhibit 8 is a -- oh, wait.  Yeah --

18   Q      It should be a one-page exhibit.

19   A      It's an email from November 14th from Donna Evans.

20   Q      I'm sorry, just the one that's the number 8?

21   A      Oh, just the number 8, okay.  When I go to Tab 8, it

22   shows me Exhibit 5.

23   Q      I see.

24   A      Okay.

25   Q      I thought I had this --

1  A      I see it.  I think I'm on the right page.

2            UNIDENTIFIED SPEAKER:  A lot of numbers are on the

3  top.

4            THE WITNESS:  Okay.

5  BY MR. SLACK:

6  Q      All right.  Do we have it now, the one page with the

7  five loans?

8  A      Yep.

9  Q      Do you recognize these as the five loans that are at

10 issue in this hearing?

11 A      I suppose.

12 Q      Well, I'm just asking whether you recognize those.  I

13 mean, after you got -- received KServicing's papers, did you

14 look at the five loans that KServicing had said had payments

15 that had been made by borrowers and then KServicing had

16 already paid to CUBI?

17 A      In Tamica Williams' declaration, she had four loans

18 identified.

19 Q      So, do you recognize these as the loans that are at

20 issue?

21 A      I don't recognize -- I mean, I don't recognize them.

22 Q      Okay.

23 A      I mean, I guess when you say "recognize" as --

24 Q      Well, so, let me ask it --

25 A      -- I'm not familiar with them.

1  Q      Let me ask it a different way.

2         Putting aside whatever loans they are, after you

3  received KServicing's papers, with respect to the loans that

4  are at issue, did you go back and look to see whether, in

5  fact, they were on the remittance file?

6  A      Did I?  No.

7  Q      So, you did not go and look to see whether they were on

8  the remittance file?

9  A      I found four of them, I believe.  I could not find of

10 them.

11 Q      So you found four of them.

12        Didn't one of them have two payments?

13 A      That may be the case.

14 Q      Okay.

15 A      I didn't --

16 Q      And did you also go to look to see whether -- and you

17 don't deny as you sit here today, that those loans, in fact,

18 were on the remittance file, correct?

19 A      I can't say whether they were or not.  I cannot.

20 Q      I'm sorry, what?

21 A      I can't say whether they were or not.

22 Q      So, did you go back and actually -- you have the

23 remittance file, right?  You have the remittance file?

24 A      I do.

25 Q      And so, did you go back and check to see whether they

1  were on the remittance file?

2  A    I looked at the four that were in Ms. Williams'.  I

3  could find those on the Synovus bank account trial

4  reconciliation, but I did not look at the remittance report,

5  no.

6  Q    Okay.  Did you go back to look and see whether those

7  loans had payments that were made to CUBI?

8  A    I did not.

9  Q    Did anyone at Customers Bank, to your knowledge, go and

10  look to see whether those loans were on the remittance file?

11  A    Not to my knowledge.

12  Q    So, you can't, as you sit here today, you don't deny

13  that those loans were actually on the remittance file,

14  correct?

15  A    I cannot say whether they were or weren't.

16  Q    And to your knowledge, nobody at Customers Bank has

17  gone to look to see whether they're on the remittance file?

18  A    No, because it was not a relevant piece of information.

19  As I said before, looking at only five loans amongst 98,000

20  was not a relevant data point.

21  Q    And you didn't -- and nobody at Customers Bank, to your

22  knowledge, went to go look and see whether those loans that

23  had money paid with respect to them, correct?

24  A    I did not, not that I recall, that I am familiar with.

25  Q    Now, if you -- now, earlier you, in your testimony, you

1  had said that the remittance report that you received was

2  somehow related to the Synovus bank account.

3       Do you recall, generally, that testimony?

4  A    Yes.

5  Q    As you sit here today, is it your testimony that all of

6  the loans that were contained in the remittance file were

7  from transactions that were made in the Synovus bank account?

8  A    That's my understanding.

9  Q    Okay.  Well, let's take a look.  You received the

10 remittance file from Ms. Evans, correct?

11 A    Yes.

12 Q    And that was on November 4th, correct?

13 A    Yes.

14 Q    All right.  So, let's take a look at --

15            MR. SLACK:  Your Honor, what I'd like to do

16 because I think it's easier is to use a native file so that I

17 can actually have any colleague just highlight some --

18            THE COURT:  You may.

19            MR. SLACK:  Thank you.

20            THE COURT:  So, how do you propose to display it?

21            MR. SLACK:  Well, what I was told is that we are

22 going to do it by Zoom.

23            THE COURT:  Perfect.  Okay.  And you'll share your

24 screen -- your colleague will share their screen and --

25            MR. SLACK:  Exactly.  And hopefully, we'll have

1  some coordination where this will work.

2            THE COURT:  Okay.

3            MR. SLACK:  I do need my glasses for this.

4  BY MR. SLACK:

5  Q    So, let's take a look at some of the loans that are on

6  the remittance file.  The first thing --

7            MR. STERNBERG:  What number of exhibit are we

8  looking at?

9            MR. SLACK:  Yes.  So, I am looking at KServicing's

10 Exhibit -- 28 is the native and the non-native is 22 --

11 not 22 -- 23.

12 BY MR. SLACK:

13 Q    And you'd agree with me that the remittance file is, as

14 you said, a transaction-by-transaction analysis, correct?

15 A    Yes.  Not necessarily comprehensive -- it changes

16 month-to-month on what we get.  I can't recall if this file

17 just showed what they owed us or if it had -- I believe it

18 did include everything that was returned.

19 Q    I just asked for a moment, it is a transaction-by-

20 transaction analysis, correct?

21 A    Yes, but just to clarify, not every single transaction

22 across the portfolio.

23 Q    And you've seen -- you, again, you've seen this

24 document before, correct?

25 A    I have.

1   Q    And if you look down, the first loan on the list of

2   five is SBA    loan ID 8634997301 and we see that in Row

3   18411.  We'll get that in a second.

4        Do you see that loan there?

5   A    I do.

6   Q    And what is your understanding of the Column I, which

7   has post time?

8   A    I don't know.  That's been one of the questions that

9   we've had outstanding.  It's not consistently used in the

10  reporting that they've provided to us.

11  Q    But this shows that this was posted on 9/18/2020,

12  correct?

13  A    Yes, and there's a lot -- but I mean those dates --

14  again, I don't know what that post time means, because if you

15  look at it across the entire remittance report, you'll see

16  post times for returns that happened months later.  So,

17  you'll see current transactions with a post time from the

18  original amount.

19  Q    But we can agree, at least right now, that that post

20  time predates the beginning of the Synovus account, correct?

21  A    Yeah, but I don't know what it means.  It doesn't

22  necessarily mean that that was a payment made on 9/18/2020.

23  Q    But whatever it means, somebody wrote that this was --

24  had a post time prior to the Synovus account, correct?

25  A    Somebody wrote that, but that is not a reliable data

1  point.

2  Q    And that is one of the loans that's at issue in this

3  hearing, correct?

4  A    If you filter -- if you go to the right, there's a

5  column that says "status"; it'll say "owed" and "returned."

6  And if you filter on that, you can see all of the post times,

7  that it doesn't necessarily -- is not an indicator that --

8  what account it came from.

9  Q    All right.  What I asked was slightly different.

10  I asked whether this loan was one of the loans that's at

11  issue in this hearing?

12  A    It is on this list.

13  Q    Okay.  And it's showing in the remittance file that

14  Customers Bank used when it said, "per remittance file,"

15  correct?

16  A    Yes.

17  Q    Okay.  And do you have any doubt that if we went to the

18  other loans that they would also be in the remittance file?

19  A    I suspect you've checked it.

20  Q    Have you taken a look at Ms. Williams' declaration, the

21  second declaration?

22  A    I have.

23  Q    And Ms. Williams' declaration talks about how these

24  loans are in the remittance file, correct?

25  A    How they are, did you say that?

1  Q    That the loans that are at issue today --

2  A    Yes.

3  Q    -- are in the remittance file, correct?

4  A    Yes, that's my recollection.

5  Q    And as you sit here today, you don't have any

6  information that would say that those loans are not in the

7  remittance file, correct?

8  A    Correct.

9  Q    Okay.  Now, I'd also like you to take a look at, again,

10  the summary page to the Synovus spreadsheet, which is

11  Exhibit 22.

12        Do you see that?

13  A    I do.

14  Q    Now, do you have that first summary page of Exhibit 22

15  in front of you?

16  A    I do.

17  Q    And the first part that you're counsel asked you about

18  was the per-Synovus bank statement activity.

19        Do you see that?

20  A    I do.

21  Q    And all the per-Synovus bank statement activity, and

22  there's a number of columns, that has a subtotal of

23  25,438,210, correct?

24  A    I see that.

25  Q    And then there's a column that says, "researched items

1  resolved."

2       Do you see that?

3  A    I do.

4  Q    What was your understanding of what "researched items

5  resolved" meant?

6  A    I have no idea.

7  Q    But you'd agree with me that the research items

8  resolved was added to the Synovus bank statement activity to

9  get to the 27,107,862, correct?

10 A    It is a line item added, yes.

11 Q    And you had to add, in other words, you took the

12 Synovus account activity and then there was an addition of

13 the money million six eight six five one that was the

14 research items resolved, correct?

15 A    I did not, no.  This was --

16 Q    But you see that that was there, correct?

17 A    I can see it, but just to be clear, I didn't do this;

18 this was done by KServicing and presented as a reconciliation

19 of Synovus account.

20 Q    Well, maybe it's better said that the number that you

21 then took into your analysis was the 27,107,862, correct?

22 A    Yes, it validated the Synovus account.

23 Q    So, I'll ask it slightly different.

24       That was comprised of the subtotal of the Synovus bank

25 account plus the researched items resolved, correct?

1  A      I don't know what those researched items were in the

2  Synovus account.  My understanding was this is a

3  representation of all of the money that was in the Synovus

4  bank account.  I don't know where that 1668 came from.  I

5  can't say whether it was, because I didn't do this, so I

6  can't -- I couldn't accurately say that.

7  Q      I'm asking just a slightly different question.  So,

8  I'll try again, because maybe I'm not being clear.

9        You used, did you not, in your calculation, the

10 27,106,862 number, correct?

11 A      We did.

12 Q      And that was comprised of the twenty-five four three

13 eight two ten plus this one six six eight six five one as a

14 mathematical matter, correct?

15 A      As a mathematical; yes, that's accurate.

16 Q      And so in order to get to the 27,106,862 number, you

17 had to add this researched items resolved column as a matter

18 of math, correct?

19 A      That is what was presented, yes.

20 Q      Okay.  And have you ever gone and looked at what

21 comprised the researched items resolved?

22 A      You mean within the workbook that was presented?  I

23 have.

24 Q      Have you looked at the workbook --

25 A      Yes.

1  Q     -- at the items that comprise the researched items

2  resolved?

3  A     I have.

4  Q     Okay.  And when's the last time you did that?

5  A     Maybe a week or two ago.

6  Q     Okay.  And that was after KServicing had filed its

7  papers, its reply papers, correct, and after KServicing had

8  filed this motion, correct?

9  A     I believe so.

10  Q     And you were aware, were you not, of the five loans or

11  the four loans with two payments that KServicing contends

12  were already paid to Customers Bank, correct?

13  A     You said that they contend that?

14  Q     That's what I said.

15  A     Yes, that's accurate.

16  Q     That's for the judge to decide.

17        The -- so, let's take a look at, in Exhibit 22, let's

18  take a look at the last tab.  This is the tab that was left

19  off the Customers Bank exhibit and is on our exhibit.

20        And if you take a look at the items there, there's a

21  handful of items that are listed there.  Do you see those?

22  A     I do.

23  Q     Isn't it true that the two biggest loans that are on

24  this list are two of the loans that KServicing contends were

25  already paid to Customers Bank, correct?

1  A      I would have to do a comparison of those.

2  Q      All right.  Well, let's do that.

3  A      Okay.

4  Q      Let's, in particular, you know, whatever's easiest for

5  you.  It may be for you to go to that Exhibit 8 which has the

6  summary of those and looking at the loan ID and the amounts.

7         So, for example, if you take a look at the loan that's

8  a million two, five five one seven five, that's ID number

9  8634997301, correct?

10 A      I see on Exhibit 22, the 1.255 is on the -- yes.  Yes,

11 I see it.

12 Q      You can see it, right?

13 A      Yes, I see it.

14 Q      And take a look two down, the loan that has the ID

15 9351437302, that also is a loan that KServicing has now said

16 was actually paid back to Customers Bank, correct?

17 A      I see that, yes.

18 Q      So, you would agree with me, would you not, that if

19 those, just as a matter of math, if those loans were actually

20 paid back to Customers Bank and you reduced, as a result, the

21 1668651 by those two loans, that would be approximately, just

22 those two loans alone, would be a decrease in the Synovus

23 bank statement activity on the summary page of about

24 1.5 million, correct?

25 A      So, you're saying those weren't part of the Synovus

1  reconciliation?  I'm sorry, I'm not following.

2      Can you just repeat that.

3  Q    Well, we'll try this again.  In other words, the

4  27,106,862, correct, was a number that you used in the

5  calculation of the settlement payment, correct?

6  A    Yes, per the --

7  Q    And as a matter of math, it included the Synovus

8  activity, plus this 1668651, correct?

9  A    Yes.

10  Q    And we just looked at that 16768651 is, in part,

11  comprised of two loans that are at issue today of

12  approximately $1.5 million, correct?

13  A    Correct.

14  Q    And so if those items were, in fact, improperly

15  reviewed as being resolved at that time, when, in fact,

16  they'd been paid to Customers Bank, this number, the

17  27,106,862 would be a million and a half less, correct?

18  A    Correct.

19  Q    Now, Ms. White, on October -- on November 14th,

20  Customers Bank paid KServicing a settlement payment of

21  approximately 19.47 million, correct?

22  A    Yes.

23  Q    And you agree that that 19.47 million number was in

24  error, correct?

25  A    I think you're referring to the interest that was later

1  added on.

2  Q    What I'm saying is that number was incorrect, right?

3  A    I'd have to go back and look at the (indiscernible).

4  The only reason that it would be what the exact amount was,

5  we later came back and added on interest, so I think that's

6  what you're referring to.

7  Q    Customers Bank paid a million thirty thousand more,

8  correct?

9  A    Later on for the interest.

10 Q    So the initial number was wrong, correct?

11 A    It was only principal, so we only factored in

12 principal.  We realized later that interest needed to be

13 added in.

14 Q    Was the 19.47 million number that was paid the correct

15 number?

16 A    Of principal, yes.

17 Q    Was it the total correct number?

18 A    It was the correct number of principal and then we

19 later on added the interest.

20 Q    So, it's your view that the 19.47 payment was the

21 correct number.  That's at final, that's the correct number?

22 A    No, I think I said it was the correct principal amount

23 and we later on added --

24 Q    But I get to ask the questions.

25 A    -- in interest.

1        Because you're framing it as incorrect and I don't

2   think it was incorrect.

3   Q     Okay.

4   A     I think we later on realized that we didn't include

5   interest.

6   Q     Well, in fact, what you had done in your initial

7   payment was you had double-counted the interest, correct?

8   A     I would have to go back.  I really don't recall all

9   that detail.  I do know that we initially did not include

10  interest and when we realized that error, we made a payment

11  later for that interest error.

12            MR. SLACK:  Can I -- I have an exhibit.  It's not

13  on the exhibit list, but may I approach, Your Honor?

14            THE COURT:  You may.

15            Thank you.

16            THE WITNESS:  Thank you.

17  BY MR. SLACK:

18  Q     Ms. White, do you recognize this email?

19  A     Yes.

20  Q     And this is an email sent by Mr. Sachs to KServicing on

21  November 14th?

22  A     Yes.

23  Q     And if you look at the calculation of the settlement

24  payment on page 2, do you see that?

25  A     I do.

1   Q     It has a calculation of 19.4, correct?

2   A     Yes.

3   Q     And that calculation was wrong, correct?

4   A     That was accurate, but there was a missing interest

5   amount that we later paid.

6   Q     Well, let's try this.  So, if you take a look at the --

7   it has an interest amount, right, if you look at interest

8   collected, the 1030328?

9   A     Yes.

10  Q     That interest number is correct, isn't it?

11  A     But that's on the interest, yes.

12  Q     And what happened was the borrower principal repayments

13  returns, per the remittance file, of 26,608,962, that number

14  is incorrect, correct?

15  A     I'm sorry, you're right; it double-counted the

16  interest, yes.  I knew it had something to do with interest.

17  Q     Now, ultimately, Customers Bank used the correct number

18  for the borrower principal repayments and returns per the

19  remittance file, correct?

20          MR. STERNBERG:  Your Honor, at this point, I

21  object.  We've been through this a number of times and it's

22  wholly irrelevant to anything that's in dispute right now.

23          THE COURT:  Mr. Slack?

24          MR. SLACK:  I don't see how this is irrelevant in

25  any way.

1    THE COURT:  I'll let you continue.  I think I -- I

2  mean, there'll come a point when -- the issue isn't, to me,

3  relevant as much as it is that I think much of this has been

4  covered, but I'll let you continue.  And bear in mind that

5  I'm doing my best to keep track of what you've asked already

6  and you don't need to do it repeatedly.

7  BY MR. SLACK:

8  Q    All right.  Now, your counsel asked you about what I'll

9  call the "reconciliation process," correct?

10  A    I'm sorry, could you repeat that?

11  Q    Your counsel asked you questions and you talked about

12  what your counsel talked about as a "reconciliation process"

13  for the settlement payment, correct?

14  A    Yes.

15  Q    And you were personally involved in the reconciliation

16  process, correct?

17  A    I was.

18  Q    And you agree that it was important for you to

19  understand what the settlement agreement provided with

20  respect to the reconciliation process for you to participate

21  in that process, correct?

22  A    Yes.

23  Q    And under the settlement agreement, following the

24  execution of the settlement agreement through the effective

25  date, Customers Bank and KServicing were required to work

1   together in good faith to promptly reconcile the amounts of

2   the disputed KServicing fee holdback and the disputed

3   KServicing fee remittance holdback as of the petition date to

4   determine the appropriate amount of the settlement payment,

5   correct?

6   A     Yes.

7   Q     And so the agreement had a mandatory requirement under

8   the settlement agreement for the parties to work

9   cooperatively to reconcile the settlement payment calculation

10  up through the effective date, correct?

11  A     Yes.

12  Q     And there's nothing in the settlement agreement,

13  however, that presented the parties from working

14  cooperatively in good faith after the effective date to

15  continue to reconcile the settlement payment calculation,

16  correct?

17          MR. STERNBERG:  I object.  We're now veering into

18  legal conclusions and something that's -- that is actually,

19  clearly, prohibited by the settlement agreement in the

20  integration clause.

21          MR. SLACK:  Your Honor, I don't think that's an

22  appropriate objection with a question.

23          THE COURT:  So given the testimony already

24  elicited about the parties' understanding of what the

25  expectations were, I'll permit the witness to answer the

1  question to the extent it's focused on her understanding of

2  the agreement at the time that she was engaged in the

3  process.

4            So, with that, you can answer the question.

5            THE WITNESS:  My understanding was that the

6  settle -- the reconciliation was up until the settlement

7  agreement date and then we were not going to continue to do

8  that -- any further reconciliation of the payment.

9  BY MR. SLACK:

10 Q    And what did you understand in the settlement agreement

11 actually prevented the parties from continuing to work

12 together cooperatively outside of the mandatory provision

13 that was in the settlement agreement?

14           MR. STERNBERG:  Same objection.

15           THE COURT:  I'll overrule the objection, and she

16 can answer to the extent of her understanding.

17           THE WITNESS:  I could not make that analysis or

18 interpretation.

19 BY MR. SLACK:

20 Q    Now, if you take a look at the settlement agreement,

21 which is KS -- which is our Exhibit 18 -- no, that's your

22 declaration, sorry -- sorry, our Exhibit 1, it provides at

23 paragraph 8, and I'll do the reading that:

24      Within three business days following the effective

25 date, CB shall pay to KServicing in immediately available

1   funds in an equal -- an amount equal to the settlement

2   payment.

3       Do you see that?

4   A   I do.

5   Q   And then, of course, the settlement payment we went

6   through is defined, in turn, correct?

7   A   Yes.

8   Q   And it was your understanding that there was nothing in

9   the settlement agreement that made it so that Customers Bank

10  could pay KServicing an inaccurate amount of the settlement

11  payment, correct?

12  A   I'm not sure I'm following what you're saying.

13  Q   Well, in other words, the settlement agreement actually

14  requires that the correct amount be paid to KServicing,

15  correct?

16  A   Of course.

17  Q   And you don't -- just because the reconciliation period

18  ended did absolve Customers Bank of the obligation to pay the

19  accurate and correct amount of the settlement payment,

20  correct?

21  A   I don't know.  I'm not a lawyer.  I couldn't make that

22  determination.

23  Q   Now, you were, again, you said, personally involved in

24  the communications with KServicing during this mandatory

25  reconciliation period provided in the settlement agreement,

1 | correct?

2 | A    Yes.

3 | Q    And you and your colleagues at Customers Bank exchanged

4 | numerous emails with KServicing during this mandatory

5 | reconciliation period, correct?

6 | A    Yes.

7 | Q    And isn't it the case that you also participated in

8 | virtual meetings with KServicing during this mandatory

9 | reconciliation period; is that correct?

10 | A    It is.

11 | Q    So, you I want to fast-forward during that time to

12 | November 9th, and November 9th was the effective date of the

13 | settlement agreement, correct?

14 | A    Yes.

15 | Q    And do you recall on that day that there was a

16 | telephone call between representatives of Customers Bank and

17 | KServicing regarding the settlement payment?

18 | A    I don't recall.  I mean --

19 | Q    You don't recall that conversation?

20 | A    I have a lot of calls.  I mean, I'm on calls constantly

21 | during the day.  I can't remember what -- if you tell me what

22 | it was about, perhaps I could --

23 | Q    Well, do you recall a conversation in or around that

24 | time where Mr. Sachs informed representatives of KServicing

25 | that the parties would have, again, in substance, the ability

1  to continue reconciling through the weekend?

2  A     Perhaps.  I don't recall, though.

3  Q     Did you take a look at Ms. Evans' declaration?

4  A     I did.

5  Q     Did you see that part of her testimony included a

6  conversation where she testified that Mr. Sachs, on the

7  effective date said, We can continue to reconcile through the

8  weekend.

9        Do you recall that?

10 A     Okay.  Do I recall reading it?  Yes.

11 Q     And do you deny that that conversation took place?

12 A     Again, I don't recall that exact conversation.  I don't

13 recall whether that was said or not.

14 Q     But in your declaration, you certainly didn't deny that

15 that conversation took place, correct?

16 A     I -- if it was in -- perhaps.  I don't know.  It's all

17 kind of muddy at this point.

18 Q     And isn't it true that you also, at that time, on

19 November 9th, were planning on continuing to reconcile past

20 the effective date; isn't that correct?

21 A     I don't believe so.  I don't think that that was ever

22 discussed.

23 Q     Will so, let's take a look at KServicing Exhibit 12,

24 which is an email, and if you look at page 4 of 5, depending

25 how, I guess, depending how it's printed, but do you see that

1  you emailed Ms. Evans at 4:02 p.m.

2       Do you see that email?

3  A    Yes.  Yes.

4  Q    And this is on November 9th, correct?

5  A    It is.

6  Q    And that's the effective date, correct?

7  A    I guess.  I'm really confused.  I'd have to see, like,

8  a timeline of all the dates and the settlement report, but

9  I'm relying that you are accurate.

10 Q    And what you tell Ms. Evans is, quote:

11          "Just checking in to be sure you are still sending

12 over the file.  Friday is a bank holiday for us so we'd like

13 to have time to provide feedback by the end of the day

14 tomorrow."

15      Do you see that?

16 A    I do.

17 Q    And the "end of the day tomorrow" would have been after

18 the effective date, correct?

19 A    I guess.

20 Q    And so it's fair to say that as of November 9th at

21 4:02, you were expecting to continue to reconcile past the

22 effective date, correct?

23 A    Well, the payment was made on November 14, so I'm just

24 trying to, like, figure out the timeline here.  So the

25 effective date was the 9th and then we had to put together

1  the payment, and it looks like the payment was sent on

2  the 14th, so that makes sense.

3  Q    Now, did there come a time, at or about this time,

4  shortly after this email, where Customers Bank stopped

5  communicating with KServicing concerning their

6  reconciliation?

7  A    I think that once we made the payment over, there were

8  probably some (inaudible).

9  Q    Before the payment, but after this time.  After the

10  time of your email that we just looked at, did there come a

11  time when you stopped talking to KServicing about the

12  reconciliation process?

13  A    I don't know that it was intentional.  I think at that

14  point, we had all of the data that we needed and we were

15  putting all of the bits and pieces together to be able to

16  determine a payment amount.  I don't think there was an

17  intentional stop having any conversation with them, if that's

18  what you're implying.

19  Q    So, if your view, the reconciliation process could go

20  past the effective date, correct?

21  A    No.  Again, I couldn't make that determination from,

22  legally, what the settlement discussion was (indiscernible)

23  that was not really something that I was involved in.

24  Q    Did anyone ever tell you in words or substance to stop

25  talking with KServicing about the settlement payment?

1  A      No.

2  Q      After November 9th, did you, in fact, stop talking with

3  KServicing about the settlement payment?

4  A      Again, I don't remember every conversation.  I mean, we

5  had -- we continued to interact with KServicing and whether

6  this topic was brought up, but I do know that we -- again, I

7  think going back, it sounds like we're referencing some

8  holidays here, so we probably were trying to get all the

9  information because we knew we had this deadline to make a

10  payment.  I do recall that it was a clear, we need to get the

11  payment to them.  We need to get the data.  We need to do the

12  reconciliation to be able to come together to agree on that

13  analysis.

14  Q      So prior to Customers Bank paying the amount that we

15  showed Mr. Sachs, you know, sent in his email, which was

16  incorrect, did Customers Bank provide KServicing with a draft

17  calculation of the amounts it intended to pay?

18  A      I was not involved in the conversations between

19  (inaudible).

20  Q      So, you're not aware of any communication where the

21  amounts that Customers Bank was intending to pay were sent to

22  KServicing?

23  A      I was not involved in that.

24  Q      And are you aware that, at any time, whether Customers

25  Bank shared any kind of trial-balance analysis with

1  KServicing prior to paying the amounts that were due?

2  A    We had a lot of discussion about the trial balance as

3  part of the reconciliation process.  That was a pretty heavy

4  discussion, especially early on because that was one of the

5  key data elements into determining the reconciliation amount,

6  which we determined the remittance payments that were due

7  without not factoring in (indiscernible) balance.

8  Q    All right.  So in your declaration, in paragraphs 23

9  and 24, you set out a, what you say is a trial-balance

10  analysis.

11      Do you recall that testimony in your direct?

12  A    Yes.

13  Q    Did you disclose any of that at any time to KServicing

14  prior to making the settlement payment?

15  A    No.

16  Q    So, Ms. White, I'd like to go through the half-page

17  analysis, which is Customers Bank Exhibit 13, and Ms. White,

18  did you personally create this one page?

19  A    I did.

20  Q    Did anyone at Customers Bank assist you in creating

21  this one page?

22  A    I mean, there were other resources that provided data

23  inputs to it and yes.

24  Q    And who else provided data inputs?

25  A    Our accounting department.

1  Q     And what data inputs were provided by the accounting

2  department?

3  A     The current balance, the -- I should say that also came

4  from our data team.  So, it was a compilation of

5  reconciliation that we had done across on a monthly basis.

6  It was pulling in what was our balance on our GL.  What were

7  we showing as the trial balance at the time.  So, that was

8  provided by both, our accounting, and then validated by our

9  data team in what we have used on a monthly basis for our

10  reconciliation.

11  Q     Were those sent to you by email?

12  A     Probably discussions over a call, but I mean those are

13  somewhat items that we publish month over month and have

14  discussed with Kabbage, like what our trial balance is versus

15  what they have.

16  Q     So, you had said just a minute ago that there were a

17  number of people on the financial team that were doing a

18  certain amount of reconciliation; do you recall that?

19      Can you explain what reconciliation they were doing.

20  A     Yeah.  Every month when we close our books, we use the

21  trial balance from our servicers in conjunction with the

22  remittance report to be able to tie out our financials and

23  for reporting.  So, it basically tells us, of this portfolio,

24  here's how much is remaining, per the servicer, that needs to

25  be paid back.

1      We compare that with the cash that has flowed in

2   through the servicers to be able to say, Does our GL balance,

3   which is really kind of a shadow trial balance reconcile and

4   tie out to what the servicer has, and we do that every month

5   and we would provide those results to Kabbage every month

6   where there were discrepancies to work through and resolve

7   those.

8   Q      And that was work for this trial-balance analysis that

9   you described in 23 and 24 of your declaration that was done

10  by the financial team, correct?

11  A      Financial and data team.

12  Q      Yeah.  And have you -- did you personally provide any

13  of that information, any of the work that had been done by

14  either the data team or the financial team to KServicing?

15  A      Well, I mean, they've seen the results, but it's our GL

16  balance.  It's from our -- I mean, there's really not work to

17  show.  It's a GL balance.

18  Q      Well, let's take that.  If you look at the one-page

19  worksheet --

20  A      Uh-huh.

21  Q      -- there's something that says "CBGL."

22         Do you see that?

23  A      Yes, I do.

24  Q      CB is Customers Bank?

25  A      It is.

1  Q      And GL is general ledger, right?

2  A      Right, uh-huh.

3  Q      And what you're saying is there's a bunch of

4  reconciliation work that goes into that CB ledger, correct?

5  A      Well, it's a running balance from our financial system

6  of what is in a trial, but it's not like a loan-level detail

7  that would have any meaning to provide to Kabbage.

8  Q      Yeah.  And you didn't provide that general ledger work

9  or reconciliation to KServicing, correct?

10  A      Well, no.  I mean every month we would provide that

11  information.  We would say, Here's what we show the trial

12  balance.  Here's what we have in our trial balance or GL,

13  which is really one in the same.  Here's what you're showing.

14  So, we -- they were very familiar with that information.

15  Q      Right.  But with respect to whatever you were using for

16  this particular analysis, you didn't provide any of the work

17  that had been done by your teams that did work for you with

18  respect to the general ledger, correct?

19  A      We did.  Again, when we started the reconciliation, we

20  discussed what the starting point of the loan portfolio

21  because, initially, we wanted to set out to do a loan-by-loan

22  reconciliation.  So, we talked very early on about what is

23  the original loan population, what are the balances.  We

24  provided to them where we saw inaccuracies in theirs based on

25  what we were showing as the current balance.  So, we

1  absolutely did have those conversations.

2  Q     Right.  And did you -- but did you show the work that

3  you did and your teams did -- you said your teams did work

4  and that they sent emails -- did you show any of that work or

5  analysis to KServicing?

6  A     Yes, I believe we did.

7  Q     And when you say you did, you actually gave KServicing

8  the emails that you got when you prepared this?

9  A     So, again, just the line item here is just a GL

10  balance.  But we did on calls, walked through our, what we

11  had seen as discrepancies.  We showed them examples.  We,

12  literally, in meetings, in many a meetings, walked through

13  those with them where we saw, this is what we're seeing and

14  this is what you're seeing.

15  Q     Right.  So, there are a bunch of discrepancies.  Did

16  you actually share how you resolved those discrepancies for

17  purposes of this particular analysis?

18  A     No, we -- there are no -- the discrepancies were on

19  their end.  That is where we later on said, we realized we

20  couldn't use any of the trial balances and that's where they

21  said, Okay, well, we'll give you a new trial balance.

22  Q     Well, in fact, what KServicing did is did a

23  supplemental report, correct?

24  A     They -- yes, they created a new report for us.

25  Q     And then Customers Bank would take that supplemental

1  report and somehow combine it with whatever it had in its own

2  files, correct?

3  A    No.

4  Q    So, what did Customers Bank do with the supplemental

5  report?

6  A    The supplemental report that they created specifically

7  for this settlement, when they handed it to us they said, It

8  does not reflect guaranty payments.  So, we said, Okay,

9  we'll -- we can -- they wouldn't do it, so we said, Okay, we

10 can do that math and we will adjust it for the guaranty

11 payments.  And then we also did a validation and found that

12 there were some forgiveness payments that were missing.

13 Q    And when you say you did a valuation -- a validation

14 and there were payments that were missing, did you provide

15 that to KServicing?

16 A    No, because our analysis showed that we agreed with

17 what their settlement payment was.  So, at this point, there

18 was really no value.  We really weren't disputing what they

19 were telling us was the amount of holdbacks.

20 Q    So, let's take a look at the two scenarios that you

21 have.  You have scenario one and scenario two in this one

22 page here.

23       Do you see that?

24 A    I do.

25 Q    And scenario one is what?  How would you describe

1  scenario one?

2  A    It's hard to tell here, but the color-coding in the two

3  scenarios, we started with our outstanding GL balance for the

4  whole portfolio.  And in scenario one, we plugged in the

5  amount that Kabbage told us was the holdback.  So, when you

6  subtract what we had in our GL balance and then we reduced

7  that balance by the 28 million that they told us that they

8  owed us, that basically resulted in a trial balance of

9  174 million.

10       So, what we're trying to show here is in a much simpler

11  term, if I gave them a hundred dollars and they gave me 50

12  back, do I see $50 remaining on my trial balance?  So, we're

13  just trying to do simple math at the aggregate level to

14  account for all of those funds.

15       So, we plugged in the amount that they told us they

16  owed us and we said, Okay, well, that means that our trial

17  balance should be this.  When we looked at the trial balance

18  that they created for us we said, That's within $1300 of what

19  they told us the trial balance is.  That's pretty darn close.

20  We felt comfortable with that.

21       We did the inverse in scenario two where we plugged in

22  the trial balance amount and said, Okay, if this is the trial

23  balance amount, how much would that mean you would owe us in

24  holdbacks?  And, again, when we did that math, it was within

25  $1300.  So, that was like a just a final data point since we

1  didn't have any other validation, other than the Synovus

2  accounts to ensure that all the funds were accurately

3  transferred over to us and applied to the account balances.

4  Q    In scenario two, there's a line that says, "total

5  principal remittance returns due to Customers Bank."  And

6  there's, in scenario two, it's 28,154,347.

7        Do you see that?

8  A    Yes.

9  Q    What work had to be done to derive that number?

10 A    If you take the 202 and you subtract the one fifty-four

11 six forty-two and then you --

12 Q    I'm sorry, you subtract -- what do you subtract from

13 that?

14 A    The 202.

15       And I don't have my spreadsheet in front of me to know

16 the actual math in here so I'm at a little bit of a

17 disadvantage, but, basically, the 202 minus their trial

18 balance, which is the one seventy-four six forty-two, when

19 you subtract that, you get the twenty-eight one fifty-four.

20 Q    Okay.  And so, how -- what did you have to do to reach

21 the one seventy-four six four two?

22 A    That was the trial balance that they had provided to us

23 as part of settlement.  And then, as I mentioned earlier,

24 that guaranty payment needed to be removed from it.

25 Q    So that's just a plug number?

1  A      Yes.  Yep.  That is actually, literally what they

2  provided us and then there's the footnote there.

3  Q      And then the -- and then there's a footnote, right,

4  down here that talks about excluding guaranty payments and

5  then also, it says, Comparing the amount of forgiveness

6  received at the loan level and compared to the balance change

7  per Kabbage report at the level.

8         Did you provide KServicing with any of that analysis or

9  backup that you did there?

10  A      So, this is what I had mentioned earlier.  So, when

11  we -- they provided us this special trial report as part of

12  settlement.  When they gave it to us, they said, We can't

13  remove the guaranty payment, so we know this is currently

14  overstated, because it doesn't take into account guaranty

15  payments.  So, that was the best that they could do, so we

16  used that, and we subtracted the guaranty payments from the

17  trial, and that's what this footnote says on --

18  Q      And how did you go about calculating the guaranty

19  payments?

20  A      That's data that comes directly from the SBA that --

21  Q      I'm sorry, what's that?

22  A      Data that comes directly from the SBA that both, we and

23  KServicing has.

24  Q      And did you have a separate calculation for that?

25  A      For the amount of guaranty payments?

1  Q      Yes.

2  A      It's just a report that comes from the SBA.  But,

3  again, it's all information that KServicing has.

4  Q      And the number in scenario one didn't include any

5  interest, correct?

6  A      This is strictly principal.

7  Q      Strictly principal.  So, it didn't include the interest

8  in the payment at all, correct?

9  A      That's correct.

10 Q      And in this analysis that you did, did you start with

11 the Synovus account or did you start with information that

12 went earlier than that, that would be captured by the Wells

13 Fargo account?

14 A      We did not factor in any bank information here; this

15 was strictly an accounting of all of the portfolio funds.

16 This was looking at all of the funds.  So, it doesn't matter

17 whether it was Wells -- I mean, some of this would have been

18 Wells Fargo.

19        So, we started with $2.5 billion and our outstanding

20 balance was $202 million.  So, some of that money that had

21 been returned to us presumably was from Wells Fargo.

22 Q      Now, I didn't ask this, but when did -- when was this

23 spreadsheet that was provided, the one-page document, when

24 was that created?

25 A      As before we made the final payment, when we were doing

1  our just kind of a check to say, Okay, does this make sense?

2  Do we feel like we are accounting for, financially?  Are we

3  doing the right thing and are we getting all the money?  Can

4  we account for all of those funds that were disbursed?

5  Q     Were there any drafts of that or was this the first

6  crack?

7  A     I think there were drafts, I believe.

8  Q     And what were the changes in the drafts that were done?

9  A     We did the same analysis using the loan schedule RA.

10 We used their supplemental.  We looked at why their balances

11 were different.  We saw the loan scheduled RA, which we had

12 talked to them previously.  That's why we were saying there

13 were errors in the trial balances and that's how we got to

14 getting this accurate trial balance from them.

15 Q     And none of those drafts, you didn't provide any of

16 those drafts to KServicing, correct?

17 A     We did -- well, we went back and talked to them about

18 it, like, we said we needed an accurate trial balance.  There

19 were errors in those.  So, we did talk about the errors, but

20 we realized the guaranty --

21 Q     Let's see if you got my question.  You did drafts.  Did

22 you provide any of those drafts to KServicing?

23 A     It wasn't a -- it was more of a we found the errors.  I

24 don't know that there was a final draft or anything that

25 would be --

1  Q     I didn't ask about final drafts.  And, again, just,

2  maybe it's me, I'm sorry, but did you provide any drafts of

3  your trial-balance analysis to KServicing, yes or no?

4  A     I would say, yeah, we provided those results to them,

5  absolutely.

6  Q     You did.

7        So, did you ever provide -- you testified you didn't

8  even provide the trial balance to KServicing prior to making

9  the payment.  So, is it now your testimony that you provided

10  the drafts of that analysis?

11  A     So, just to be clear, they own the trial balance.  We

12  don't.  It's their trial balance.

13  Q     If -- you know, if you had done this analysis back at

14  the time of making the payment, why didn't you put this in

15  your declaration?

16  A     I'm sorry, I'm not following what your point is.

17  Q     This wasn't in your -- this one page wasn't in your

18  declaration.  Why wasn't this analysis, if it was done at the

19  time that you made your payment, why didn't you put this in

20  your testimony?

21  A     For what?  For today?

22  Q     No.  You remember putting in a declaration in this case

23  in this matter?

24  A     There were several.  I'm sorry, I'm not clear what

25  you're --

1  Q    But in connection with this motion, you did a

2  declaration, correct?

3  A    Yes.

4  Q    And you didn't include this one page here, correct?

5  A    Okay.

6  Q    Why not?

7  A    I think the one that we submitted today, we did.

8  Q    You believe that you put in a declaration today?

9  A    Like, honestly, like, I'm not sure.  I'm not sure what

10 you're asking.  I thought that we had provided this

11 previously.

12 Q    So, is your declaration in front of you?

13 A    I actually don't think -- no, I have this one.  Is this

14 the one?

15 Q    Okay.  Is the one page here, do you include the one

16 page in your declaration, yes or no?

17 A    This one, originally, no.

18 Q    Why not?

19 A    I don't think it was -- it wasn't relevant, I guess, to

20 the conversation.  I'm not sure.

21          MR. SLACK:  Can you give me a few minutes, Your

22 Honor?

23          THE COURT:  Certainly.

24      (Pause)

25 //

1  BY MR. SLACK:

2  Q    So I do have one last question for you.  Do you

3  remember the email that I showed you that wasn't an exhibit

4  that was Mr. Sachs' email with the calculation of the first

5  payment?

6  A    Yes.

7  Q    Do you have that in front of you?

8  A    Yes.

9  Q    And it shows a nineteen four six nine three five five

10  payment; is that correct?

11  A    Yes.

12  Q    And you said that you had done the trial balance before

13  the payment was made, correct?

14  A    Done the trial balance?

15  Q    You said you had done your trial-balance analysis,

16  that's that one page here --

17  A    The scenario.

18  Q    -- prior to the time that you made -- that Customers

19  Bank made the payment, correct?

20  A    Yes.

21  Q    And so, did the trial-balance analysis at that time

22  show a deviation of more than a million dollars at that time

23  from the settlement payment?

24  A    Say that again.  Did the --

25  Q    So, you said you had done a trial-balance analysis at

1  the time and the first payment that was made was nineteen

2  four.  You made -- ultimately, you paid a million dollars

3  more than that, correct?

4  A    Uh-huh.

5  Q    So, did the trial-balance analysis that you originally

6  did show a deviation of more than a million dollars at the

7  time that you made the initial payment?

8  A    No, it only showed the thirteen eighty-two.

9  Q    And so even though that your payment here was a million

10 dollars less, you're saying the trial balance stayed the

11 same?

12 A    Yeah, because we weren't factoring in interest.

13 Q    Because, I'm sorry?

14 A    We were just looking at principal.

15 Q    And so the fact that you double-counted interest

16 wouldn't have mattered?

17 A    No.

18          MR. SLACK:  All right.  Thank you.

19          No more questions.

20          THE COURT:  Okay.  Redirect?

21                  REDIRECT EXAMINATION

22 BY MR. STERNBERG:

23 Q    Ms. White, you understood that the reconciliation

24 period started on a date certain, the date the settlement

25 agreement was signed, but ended on a date that was in flux,

1 the date that this Court would enter the settlement

2 agreement, correct?

3 A      Yes.

4 Q      And you didn't know exactly which date the Court would

5 enter the settlement agreement, did you?

6 A      No.

7 Q      You did know that late in the day on Friday,

8 November 4th, that there was a hearing in this court on

9 Monday, November 7th where Kabbage was moving the Court to

10 enter that settlement agreement, correct?

11 A      That's my recollection.

12 Q      And you also understood that there was some urgency

13 once the settlement agreement was entered because then

14 Customers Bank had three business days in order to make a

15 payment?

16 A      Yes, I did.

17 Q      Did you know what time of day Judge Goldblatt entered

18 the settlement agreement on November 9th?

19 A      No, I just knew we had a deadline that we had to meet.

20 Q      Do you have a recollection of what time of day on

21 November 9th or when you found out that the settlement

22 agreement had been entered?

23 A      I don't.

24 Q      But you do have a memory of there being some urgency to

25 make the payment once you found out about the settlement

1  agreement?

2  A     Yes.

3  Q     Mr. Slack asked you a couple of questions that began as

4  a matter of math and then he would ask a question off of

5  that.  If you would open up your thin booklet to what is in

6  evidence as Exhibit 22, and it's Tab 4 of your booklet.

7        As a matter of math, can we get to $27.1 million two

8  different ways in this document --

9  A     Yes.

10  Q    -- both with the math at the top of the page and the

11  math at the bottom of the page?

12  A     Yes.

13  Q     And from your perspective, did you use the bottom of

14  the page for your analysis, the CUBI remittance file, plus

15  the variance?

16  A     We did.

17            MR. STERNBERG:  That's all the questions I've got,

18  Your Honor.

19            THE COURT:  Okay.

20            MR. SLACK:  I have nothing else.

21            THE COURT:  Okay.  Mr. Sternberg, any other

22  evidence?

23            MR. STERNBERG:  Not from Customers Bank.

24            THE COURT:  Mr. Tsekerides?

25            MR. TSEKERIDES:  Oh, the witness can be excused.

1            THE COURT:  So thank you very much for your

2    testimony.  You can step down.

3        (Witness excused)

4            MR. TSEKERIDES:  I didn't know if you wanted to

5    take a short break, if you wanted to go to closing argument,

6    if you wanted to hear argument.

7            THE COURT:  So, I do want to hear argument.

8    You'll be stunned to hear I have some questions for both of

9    you.

10            MR. TSEKERIDES:  Okay.

11            THE COURT:  Would it be helpful to you to take

12    five minutes before launching?

13            MR. TSEKERIDES:  I mean, I'm ready to go now.

14            MR. STERNBERG:  I wouldn't mind a short break,

15    Your Honor.

16            THE COURT:  All right.  Why don't we take five

17    minutes.  We'll come back -- it's now about a quarter of --

18    we'll come back and this time I'll be on time, I promise.

19    We'll be back on at 10 of, so just five minutes.

20            MR. STERNBERG:  Great.

21            MR. TSEKERIDES:  Thank you.

22            THE COURT:  And we're in recess, thank you.

23        (Recess taken at 2:45 p.m.)

24        (Proceedings resumed at 2:51 p.m.)

25            THE COURT:  Mr. Tsekerides, you can proceed.

1          MR. TSEKERIDES:  So, Your Honor, first, I'd like

2    to do the closing first for the debtors if that's all right.

3    I have -- we can put up on the screen, but I'm kind of old

4    school, so I do have a small handout, if I can hand that up?

5          THE COURT:  That's fine.  Whatever will help me

6    get it right, I'll take it in any form.

7          MR. TSEKERIDES:  So, if you look at the first

8    page, you know, I think it lays out that we have a discrete

9    issue here and I think you heard from both parties that

10   there's a formula in the settlement agreement that had

11   $58 million and then you're supposed to deduct certain

12   things, and those things are the fee holdback, which you

13   might have heard about, the $8.3 million, and then broken

14   out, and I think this is what Ms. White was talking about

15   when she said there are three components, there's the

16   canceled loans, which we had a dispute about, but we don't

17   anymore, and so it's just about the funds collected from

18   borrowers.  You take the 58, you minus those, you get the

19   settlement payment.

20         The next page reflects what that calculation is

21   from the debtors' perspective.  On the left-hand side is what

22   CUBI had originally and on the right-hand side, everything is

23   held constant, except for the borrower remittances, and

24   that's where the one five five comes in.  And I think we've

25   heard from everyone that the goal was to try to find the

1  right number.

2  Now, you've heard testimony that, you know, there

3  was a deadline or whatever, but at the end of the day, and

4  even CUBI says in its papers, and I'll get to that at the

5  back end, that they wanted to get to the right number.  So,

6  what went into the number?  We've heard from all the

7  witnesses, undisputed, that the remittance file was a key

8  component for both parties and they both used it in their

9  calculation.  You've also heard that the remittance file had

10  loans on it that had payments already made.

11  These weren't people going out to try to find some

12  loans, you know, 90,000 loans and you isolated five.  That's

13  not what happened.  What happened was there was a file that

14  had loans on it that supposedly were money received from

15  Kabbage from customers that were supposed to go to CUBI.

16  That's what's on that file.

17  Ms. Williams discovered, after getting a file from

18  Mr. Eidson the former CFO -- he left -- that there were five

19  loans on that list, not some random loans they plucked out of

20  thin air -- from that list that were already paid to CUBI.

21  You didn't hear a word today that they didn't get that money.

22  You didn't hear a word today, Oh, that came from a different

23  bank account so it doesn't count.  They got paid for loans

24  that were on the list that they said were not already paid.

25  Really, at the end of the day, that's what we're saying

1 supports why we're entitled to the one five five.

2          Now, if you go through the next document that I

3 put in the slide is the email from Mr. Eidson, October 21st,

4 2020, sent to Patricia Curtis.  Now, presumably, whether she

5 works there or not, I don't know, but they could have checked

6 to see if they got paid the amounts that are reflected there.

7 It's an easy checkable thing.

8          THE COURT:  So, Mr. Tsekerides, can I stop you?

9          MR. TSEKERIDES:  Yes, please.

10          THE COURT:  So, the challenge of this motion is

11 that we live in an imperfect world --

12          MR. TSEKERIDES:  Agreed.

13          THE COURT:  -- and it appears, and probably for

14 good and sound reason, that no one has done a complete,

15 forensic accounting of every penny of the history of the

16 relationship.  So, what we've got are what we've got and the

17 task that I've got is to do the best I can to get it right,

18 given information that's the best that we have.  Okay.

19 That's -- you know, you can complain about that if you want,

20 but that's life.

21          MR. TSEKERIDES:  I agree.

22          THE COURT:  So, let's assume for this purpose that

23 you persuaded me that there's a million and a half dollars

24 that you had paid before that was not accounted for in the

25 original remittance file, and if it had been accounted for,

1  they would have owed you a million and a half dollars more,

2  but let's assume that that is correct.  Their argument is,

3  like, I'm cartooning it, but it's sort of like, whatever,

4  because we've looked at this and from a global perspective,

5  it looks to us like the aggregate math of their revised

6  calculation was correct, and so maybe you're right that there

7  was a million and a half dollars wrong here, but it must

8  necessarily follow, if that's true, there's an offsetting

9  million-and-a-half-dollar mistake somewhere else.

10            MR. TSEKERIDES:  I have two responses.

11            THE COURT:  Okay.

12            MR. TSEKERIDES:  So, the first response is, that's

13  nice, but it's not "whatever."  We agreed to a process and

14  you used, for your calculation, you used the remittance file.

15  That's what you used.  I didn't make you use that.  You asked

16  for it, I sent it to you, you used it, and we found out later

17  that you actually got paid before.  I agree everything's

18  imperfect, but we agreed that this remittance file --

19            THE COURT:  Right.  Can I ask a more specific

20  question?

21            MR. TSEKERIDES:  Sure, please.

22            THE COURT:  In a world where you get to point to

23  the one and a half million dollars and say, Look, I can show

24  you five loans, it's a precise number.  You were getting paid

25  this amount twice this way, that's not right.

1          MR. TSEKERIDES:  Okay.

2          THE COURT:  Assume you're right about that, why do

3   you also get to do that and collect this $497,000 remaining

4   variance, you have to be resolved amount?

5          MR. TSEKERIDES:  We're not collecting that, Your

6   Honor.  We're not collecting that.

7          If you look at this breakdown --

8          THE COURT:  Uh-huh.

9          MR. TSEKERIDES:  -- if you look at the breakdown,

10  which is I think the second page, the one that has the

11  calculation --

12         THE COURT:  Right.

13         MR. TSEKERIDES:  -- all of these are already

14  accounted for.  These are what everyone is agreeing to in

15  terms of what the numbers are that are going in.  We've all

16  agreed to these except for the remittance payments.  I'm not

17  keeping anything extra.  The parties have gone through and

18  said, You know, there's some red, there's some blue on here,

19  credits were given.  This was the analysis that the parties

20  agreed to.

21         And what we're saying is that number, the

22  27,106,862 should really be 25,551,205.  That's all we're

23  saying.

24         THE COURT:  I see.

25         MR. TSEKERIDES:  We're saying we paid you.

1   Everything else, we're taking from their calculation.

2            THE COURT:  Okay.

3            MR. TSEKERIDES:  The other point I think that I

4   make, so you have a loan-by-loan analysis, using a file that

5   everyone was using, and on the other side, you have,

6   respectfully, a black box.  When we heard about a shadow

7   file, black boxes and shadow files are not substitutes for a

8   loan-by-loan analysis, which is what we did.  I still don't

9   know exactly what they did.  Maybe you do, but I don't.

10           What I do know is that we heard testimony from Ms.

11  Williams that the remittance file, and even from CUBI, that

12  the remittance file was for money not paid yet to CUBI.  But

13  we know that there were at least five loans that they were.

14  At its basic core, that is our position.  For the materials

15  that the parties agreed to use, this is the outcome; that's

16  why we think we're entitled to the one five five.

17           THE COURT:  Okay.

18           MR. TSEKERIDES:  I mean, that's really it in the

19  nutshell, Judge.

20           THE COURT:  I understand your position.

21           MR. TSEKERIDES:  Okay.

22           THE COURT:  Mr. Sternberg?

23           MR. STERNBERG:  Your Honor, I'd like to start with

24  a timing issue, because I think the timing really matters

25  here in ways that are broader than perhaps what the witness

1  testimony was.  The reconciliation period was defined by two

2  dates.  The end date happened to be November 9th, because

3  that's the date that you entered the settlement agreement.

4          THE COURT:  So, can I ask you this question about

5  that?  So, your argument on this question, it's almost as if

6  you're suggesting when we read the document, providing the

7  information within the period is essentially like a condition

8  precedent to being able to get credit for those payments.

9          Is that essentially what you're saying?

10          MR. STERNBERG:  It's slightly different than that.

11  Let me back up.

12          We were obligated to make a payment that was going

13  to fund this bankruptcy --

14          THE COURT:  Oh, I understand.

15          MR. STERNBERG:  -- three days from the date you

16  entered the settlement agreement.

17          THE COURT:  Right.

18          MR. STERNBERG:  The hearing was scheduled for

19  Monday morning.  Friday night, we're still waiting for

20  information.

21          THE COURT:  Right.

22          MR. STERNBERG:  Important, critical information is

23  coming in at 7:48 p.m. Friday night.  The bank is intent on

24  fulfilling its obligations under the settlement agreement.

25  It has to rely on the information it's getting on the bank

1  account.

2          THE COURT:  So, I understand that, okay.  I get

3  there was a hurry and I get the parties agreed, you know,

4  there's an urgency here.  We need the cash -- I was here --

5  and so we set up a process in which you all need to kill

6  yourselves to do the best you can to get it as ready as you

7  can get it as quickly as you can do.  That's what everyone

8  committed to.  Your position is, and if it turns out that in

9  that rush there's something we got wrong, we're done.

10          And my question is, what in the documents says

11  that?

12          MR. STERNBERG:  The document doesn't specifically

13  say that.

14          THE COURT:  Right.  Why should I draw that

15  inference, particularly, because given all of the principles

16  of contract law that would counsel against finding,

17  essentially, a forfeiture of money to which you're actually

18  entitled based on a foot fault, why would I read this to

19  create, essentially, that consequence as a matter of ordinary

20  contract interpretation?

21          MR. STERNBERG:  Because the party in the bank's

22  shoes here was obligated to make a 20-plus-million-dollar

23  payment.  It's got to do whatever it can to make sure that

24  that's correct, and so it does two things.  It begs and

25  pleads for Kabbage to give it bank account information,

1  remittance information -- it gets it late in the day

2  Friday -- and then it does a belt-and-suspenders.  It tries

3  to look at the information it's gotten, and you described the

4  world isn't perfect and I agree with you.

5          They do a total trial balance reconciliation and

6  get within $1300.  They're now comfortable that cutting a

7  check for $20 and a half million is the right thing to do and

8  they're obligated to do it on November 14th and they do it.

9          The principles of forfeiture I don't think really

10  apply here because we're relying on information that we're

11  entitled to rely on.  They didn't tell us, Hang on, you don't

12  have to pay us the money three days from the entry, because

13  this is preliminary; we're still working on it.  Let's amend

14  the agreement and work it through.

15          None of that happened.  They wanted the money in

16  order to fund the bankruptcy and we were obliged to pay it.

17  We did the best we could.

18          And you're right, no one -- we certainly couldn't,

19  and they didn't go back and do a reconciliation of 99,365

20  loans.  It is improper, incorrect, inappropriate to pluck

21  five loans out of that portfolio, particularly when we've

22  heard evidence that there were monthly meetings where there

23  were 13,000 loans that had discrepancies in the amount of

24  $53 million.  You can't just look at one bank statement and

25  say, Ah ha, later on we found out these five may have been

1  overfunded.

2          THE COURT:  But doesn't -- if that's true, and

3  let's assume for this purpose that it is, right, that the

4  information, there were all sorts of problems with the

5  data -- it is what it is, right.  We all wish we had perfect

6  data and no one had it.  Okay, so the data is imperfect.

7          They point, however, to one and a half million

8  dollars in which it does seem like you're getting paid twice.

9  How is it appropriate to respond to that by using these

10  aggregate figures that are just a function of all of the

11  original flaws that you've pointed to?

12          MR. STERNBERG:  Because getting paid twice, there

13  were billions of dollars that flowed through this

14  relationship for months on end.

15          THE COURT:  I understand.  If anyone had -- look,

16  I understand that doing a perfect accounting of this would

17  have cost more than is at stake, so I'm not really faulting

18  anyone for the decision to say, We're going to do the best we

19  can in a world in which resources are finite.

20          But in a world in which you didn't undertake to do

21  that, and, again, that could very well have been an eminently

22  sensible judgment, but in a world in which they can show

23  concretely, we're paying twice for this, and you haven't

24  responded by saying, Yes, and here's where that

25  countervailing error is, why isn't that -- why doesn't that

1  mean that the consequence of the imperfection falls on you?

2          MR. STERNBERG:  Because the consequence of the

3  imperfection shouldn't fall on the party that has shown you

4  that everything balances out.  They've made no effort to do

5  either of two things.

6          THE COURT:  Well, first of all, you haven't shown

7  me.  You showed me that it comes close enough for government

8  work, right, that's what, at best, you've shown me.

9          MR. STERNBERG:  Thirteen-hundred dollars on a two-

10 and-a-half-billion-dollar portfolio I'd submit is more than

11 respectably close.

12          THE COURT:  Okay.  And the other side's

13 opportunity to take discovery into the basis for that, into

14 how you can make that judgment, you've not been as

15 forthcoming as you might be, right?

16          MR. STERNBERG:  I disagree.  Every piece of

17 information that goes into that analysis has been provided to

18 them.

19          THE COURT:  Okay.

20          MR. STERNBERG:  So, you come back to the party

21 seeking the money, the Movant, has done neither, a full

22 reconciliation of everything that went into the Wells Fargo

23 account and the Synovus account, nor a portfolio-wide

24 analysis.  We can't do a loan-by-loan analysis because we

25 don't have the information.  We could do, and did do, a

1  portfolio-wide.

2        And it ought to matter that the information we got

3  was not told to be preliminary, not said don't rely on it.

4  It said Synovus account reconciliation.  It was reasonable to

5  rely on it and the bank did rely on it.

6        THE COURT:  No, I understand you relied on it, but

7  it turns out you relied on it -- I mean, if -- it seems to me

8  that if you want to set up a system by contract in which you

9  say, This day is the last day -- and contracts do this,

10  right, like, any information provided hereafter will be

11  ignored, where everyone is on notice.  But this basically

12  sets a formula for figuring out what's owed and it uses, sort

13  of objective criteria, and if the evidence of what's provided

14  is incorrect, it doesn't say, And if you discover later you

15  made a mistake, too bad, you're stuck with what you sent us,

16  right, it seems -- it would seem to me surprising that if

17  there was -- we set up a process that was rushed.  We did

18  that on purpose.  We did it for good reason.

19        The question is, what happens?  What does the

20  contract do if, despite everyone's best efforts, there's

21  information that was incomplete?  Do we get it right or do we

22  say, Look, you're stuck with where we are?

23        MR. STERNBERG:  I think there are two responses to

24  that.  One is the Movant hasn't shown that they've gotten it

25  right.  What they've pointed to are five loans that for some

1   reason are sitting in this Synovus account reconciliation.

2   Who knows why they're there?  It seems highly improper that

3   they are there.  They're from a different account from before

4   that Synovus account was even set up.

5           And it conflicts with the -- there are a bunch of

6   numbers going on here.  One is $26.6 million.  That's what

7   they said was the CUBI remittance file amount.  And then

8   there's this variance of half a million dollars.  Those are

9   their numbers.  The best we can do to verify is what

10  Ms. White testified to:  get the bank statements and look at

11  it.  That's the independent evidence, and she did and then

12  took it a step farther.

13          THE COURT:  But it's not surprising, right, if

14  there were loans on which payments were remitted earlier and

15  that were also in those statements, it's not surprising,

16  then, that what is in the bank statements would therefore be

17  incorrect.

18          MR. STERNBERG:  It would be odd for a Synovus bank

19  statement to have a Wells Fargo payment in it.

20          THE COURT:  It doesn't.  It has the loan in it as

21  to which the payment was made earlier, so it should have been

22  reduced from what was reflected.

23          MR. STERNBERG:  Yes, and it appears that on those

24  five loans, there were payments made back in October, but who

25  knows on the other 99,360, whether there was a million five

1  missing from those.

2        THE COURT:  Oh, I understand that your argument,

3  but you haven't shown me where that million five -- they've

4  shown me where this million five is and you haven't shown me

5  where the other million five is.  That's where I think I am.

6        MR. STERNBERG:  We've shown you that if we're

7  ordered to pay them a million five, we're out a million five.

8  We're missing a million five in our trial balance.  It's a

9  net loss to the bank.

10        And this reconciliation process was bounded by

11  time.  It was bounded by time, as you point out, for good

12  reasons and it shouldn't be the bank that holds the risk for

13  getting suspect information that it didn't have time to go

14  back and check out on a loan-by-loan basis, or even the

15  ability to check out, when it then made a prompt payment on

16  time to fund the bankruptcy.

17        There is -- if we had said, Okay, let's -- we're

18  going to take our time.  We're going to have an effective

19  date of February 1st, the company -- there wouldn't be -- we

20  wouldn't be here.

21        THE COURT:  Oh, I understand that.

22        MR. STERNBERG:  And that might have given us the

23  time to do a loan-by-loan lookback analysis, but we wouldn't

24  be here now.  We'd be all fighting about other things.

25        THE COURT:  No, I understand that, but in the

1 period between the time you made the payment and the time

2 we're here to adjudicate the question of who owes what under

3 the contract, there's no longer an emergency.

4          MR. STERNBERG:  There's no longer an emergency,

5 but how do we go back and do that?  We don't have the Wells

6 Fargo --

7          THE COURT:  You have access to the discovery.

8          MR. STERNBERG:  We do have access to discovery,

9 that is true.  But it's, as the Movant, it's their obligation

10 to show you that --

11          THE COURT:  No, I understand, but they've shown me

12 the 1.5.

13          MR. STERNBERG:  And we've shown you that if we

14 have to pay a million five, we're short.

15          THE COURT:  You've shown me that you think that

16 based on the trial loan balance, which is, you know, less

17 than crystal clear exactly what that is -- and I'm not saying

18 it's nothing.  I'm not saying -- and, look, you might be

19 right.  The problem is that's the question on which I think

20 we've got uncertainty.

21          And that's -- look, I'm not -- I'm, to some

22 extent, struggling because I do feel like in a perfect world,

23 we'd, you know, boil the ocean and get all of it perfect.  It

24 understand that that game isn't worth a candle and the

25 question is, how do we do the best we can, given finite

1  resources, and I find that to be candidly challenging.  And I

2  think the answer is, I've got to do the best I can with the

3  record I've got in front of me.

4          MR. STERNBERG:  Fair enough.

5          I think the record in front of you is one that

6  shows five loans out of a massive population that are in a

7  remittance file.  The record in front of you also shows a

8  total trial balance that makes sense from two directions.

9  Ms. White testified she plugged one number in and did it with

10  the trial balance figure and then plugged the payment and got

11  it the opposite way.

12          In the context of a relationship that was fraught

13  with discrepancies, errors, miscalculations, misapplications

14  on the Kabbage side, it would be unfair to the bank to reward

15  that in a sense by this *post hoc* seeking of a million five

16  when the total trial balance balances out as of today.

17          THE COURT:  Okay.  I understand your position.

18          Mr. Tsekerides?  And let me ask you when you get

19  to the podium to respond to --

20          MR. TSEKERIDES:  Why don't you go first.

21          THE COURT:  -- respond to the fair point that --

22  look, let me say this, as someone who's spent 27 years

23  involved in bankruptcy cases, this isn't the first or last

24  time I've had a case in which the debtors' financial

25  information has been imperfect, okay.  That's -- there are --

1  that's sort of the nature of the beast.

2          And part of the problem we have is we're all doing

3  the best we can, right.  By the time, you know, anyone in

4  this room got involved, it was what it was, okay.  Here we

5  are.  But the information is imperfect.

6          And how do you respond to the point that,

7  essentially, the debtor arguably is essentially taking

8  advantage of this because it pointed to these particular

9  errors that count against it when it's certainly possible

10  that in the, you know, enormity of the data here, there could

11  very well be countervailing errors.

12          MR. TSEKERIDES:  Yeah, I understand.

13          THE COURT:  It's sort of cherry-picking in a world

14  of imperfections.

15          MR. TSEKERIDES:  I understand that's their

16  position and my response to that is it's not cherry-picking.

17  I'll go back to what I said before.  There was a file, a

18  remittance file that both parties agreed -- it doesn't have

19  90,000 loans on it; it has a finite number of loans on it --

20  the parties agreed to use that.

21          When Ms. Williams got Mr. Eidson's file to see

22  what was paid, five of those loans -- she looked, she

23  compared the two lists.  It wasn't like she was looking for a

24  specific thing.  She looked at the two lists.  Oh, there's

25  something on here on this remittance file that we already

1  paid, okay.

2        And it's important enough to break out.  They like

3  to say the Synovus bank account.  The remittance file is not

4  the Synovus bank account.  That has other things in it.  The

5  Synovus bank account is the Synovus bank account.  So, the

6  remittance file and the Synovus account -- two different

7  things.

8        So, my response is, Hey, look, we agreed to a

9  process and we agreed to these numbers in terms of the, like,

10 the remittance file.  It's in their calculation.  In it's our

11 calculation.  We found out, and they should know.  My

12 response is, I'm not pulling one over on you.  You got paid

13 already.  You got paid in October 2020.  I'm not pulling one

14 over on you; you're pulling one over on me, is my response.

15       THE COURT:  And what is your response to the

16 testimony that -- and I understand the evidentiary point,

17 which I'll sort out in connection with resolving this -- but

18 just from a rough justice perspective, what's your response

19 to the point that they say, Look, we got comfortable with

20 this because it kind of all made sense.  It came awfully darn

21 close to the numbers that we were using at a macro level and

22 what we know for sure is that if we pay you another million

23 and a half dollars, then our -- from our macro analysis, it

24 looks like it's now wrong when it was before right.

25       MR. TSEKERIDES:  Ultimately, your job.  My

1  response to that is, I didn't hear anything that would tell

2  me.  Other than a black box, I don't know exactly what they

3  did.  Maybe the million five, there's some other numbers in

4  there that are wrong for other reasons, I don't know, but I

5  really don't care.  We agreed to a process that had a file,

6  okay.  So, the fact that there might be some other loans

7  someplace else of 90,000, I don't know what you did.

8           THE COURT:  So, can I ask you about that answer?

9           MR. TSEKERIDES:  Yeah.

10          THE COURT:  When I look at the actual contract,

11 right --

12          MR. TSEKERIDES:  Which contract?

13          THE COURT:  If you look at the actual agreement

14 and the obligation to pay the settlement amount --

15          MR. TSEKERIDES:  Are we talking about the

16 settlement agreement?

17          THE COURT:  Yeah, the settlement agreement, I'm

18 sorry.

19          The actual obligation to make -- so in paragraph,

20 I guess it is paragraph -- it's actually paragraph 8, it

21 says:

22          Within three business days following the effective

23 date, CB shall pay KServicing in immediately available funds,

24 an amount equal to the settlement payment.

25          Right?

1          MR. TSEKERIDES:  Okay.

2          THE COURT:  Settlement payment is a defined term.

3          MR. TSEKERIDES:  Right.

4          THE COURT:  And what settlement payment is, is

5   it's the amount of a settlement amount, less the KServicing

6   holdbacks.  That, itself, is a defined term.

7          MR. TSEKERIDES:  It's that box that I showed you

8   earlier.

9          THE COURT:  Right, that's got those different

10  components.  And the relevant issue here is that KServicing's

11  remittance holdback, which means the amount that constituted

12  the funds collected from borrowers that KServicing is

13  required to remit to Customers Bank under the original

14  agreements.

15          So, nothing in that contract that defines what it

16  was that they were required to pay you is an agreement to

17  follow any particular process to getting to the number.

18          MR. TSEKERIDES:  And what I'm saying is the

19  parties followed a process.  We have their -- it was

20  Exhibit 1, I think it was their Exhibit 1 that showed they

21  took it from the remittance file, right.  They did agree to

22  the process (indiscernible) the borrow of remittances, that

23  is clear 58 million minus these three things.  One of those

24  three things is borrower remittances.

25          They used the remittance file that we had --

1                THE COURT:  But their argument is, We agreed to do

2       it that way because when we looked at what you've done, it

3       all kind of made sense to us and now you're coming back in a

4       way in which it no longer makes any sense to us, so why don't

5       we get to go back and just enforce the agreement, as written?

6                MR. TSEKERIDES:  Well, where does it say in what

7       they did, they used the trial balance in what they sent us --

8                THE COURT:  Oh, it doesn't.

9                MR. TSEKERIDES:  They can't change.  I mean, I

10      would say, then they're trying to snooker us by putting one

11      over on us later when they gave us something.

12                And, look, they made a payment of $19 million.  I

13      know they said they were rushed.  Well, a few days later, or

14      next day, they paid 20 or another million.

15                THE COURT:  Oh, I understand that.

16                MR. TSEKERIDES:  Okay.

17                THE COURT:  I mean, this doesn't give anything

18      away, I'm not overly moved by any of the arguments that hold

19      anyone forever to what they did when they were rushed.

20      Everyone was rushed and was doing the best they can.  And I

21      don't read this agreement to say where, like sometimes you'll

22      do in an arbitration where it's like, Look, this is what

23      we're going to do and we're going to do it quickly and we're

24      going to do our best, and if we get it wrong, too bad, so

25      sad, this is what we've agreed to.  I don't read this

1  document that way, so --

2           MR. TSEKERIDES:  And the other point I would leave

3  the Court with --

4           THE COURT:  No, go ahead.

5           MR. TSEKERIDES:  You know, I wasn't involved in

6  the 9019, but it's not like this was a charity, like counsel

7  said that they funded the case.  I mean, we thought they owed

8  her $65 million, right, so this wasn't a charitable, you

9  know --

10           THE COURT:  And, look, we are where we are.

11           MR. TSEKERIDES:  Yeah, exactly.

12           THE COURT:  These are sophisticated parties.  They

13  agreed to this document.  They wrote it down and it's on

14  paper, and to me, my job is to read it and enforce it.  And

15  I'm stuck with, I think, notwithstanding the terrific work

16  everyone has done, look, if this was a dispute over

17  $1.5 billion, instead of $1.5 million, we might have done the

18  accounting and bottomed it out, but I'm not faulting --

19  again, it's good that you didn't.  But the question, then,

20  is, okay, now what do I do when I've got information that is

21  what it is?

22           MR. TSEKERIDES:  No, you wear the robe.

23           THE COURT:  Yeah, so it appears.

24           Okay.  So, look, this has been very helpful.  I

25  think I understand where folks are.  You've all given me

1  things to think about.  I don't -- I want to -- I know that

2  I'm not going to get it perfect, because I've got what I've

3  got, but what I propose to do is at least give it a little

4  bit of thought and, perhaps, gather folks by Zoom to read

5  something into the record on where I'm landing.  What I

6  propose to do is to do that.

7          It appears that your Wednesday afternoon hearing

8  has gone away, so --

9          MR. TSEKERIDES:  That's my understanding.

10          THE COURT:  -- why don't we just take that time,

11  that 1 o'clock on Wednesday and I will -- and if there's

12  anyone who can't make it, like, there's no reason why people

13  need to listen to me read.

14          MR. TSEKERIDES:  I might be able to meet an

15  astronaut that day, so if you don't mind --

16      (Laughter)

17          THE COURT:  You should do that instead of

18  listening to me read.  You know, there'll be a transcript,

19  you all will see what I said.  You'll have every opportunity

20  to tell the Court across the street I got it wrong, but I

21  will do my best to get it right and to come on the bench at

22  1 o'clock on Wednesday and give a ruling.

23          MR. TSEKERIDES:  Great.  Very good.  Thank you,

24  Your Honor.

25          THE COURT:  Thanks to all the counsel.

1          Is there anything else that I can do to be helpful

2   to the parties while we're here?

3          (No verbal response)

4          THE COURT:  Okay.  If not, thank you all and we're

5   adjourned.  Thank you.

6          (Proceedings concluded at 3:20 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 21, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Coleen Rand                           March 21, 2023

13   Coleen Rand, CET-341

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     March 21, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25