```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3   IN RE:                        .  Chapter 11
                                  .
4   KABBAGE, INC. d/b/a           .  Case No. 22-10951 (CTG)
    KSERVICING, et al.,           .
5                                 .  (Jointly Administered)
                                  .
6                                 .
                                  .  Courtroom No. 7
7                                 .  824 North King Street
                  Debtors.        .  Wilmington, Delaware 19801
8                                 .
                                  .  Wednesday, March 22, 2023
9   . . . . . . . . . . . . . . .    2:00 p.m.

10                  TRANSCRIPT OF BENCH RULING HEARING
                  BEFORE THE HONORABLE CRAIG T. GOLDBLATT
11                 UNITED STATES BANKRUPTCY JUDGE

12  APPEARANCES:

13  For the Debtors:           Daniel J. DeFranceschi, Esquire
                               Amanda R. Steele, Esquire
14                             Zachary I. Shapiro, Esquire
                               Matthew P. Milana, Esquire
15                             RICHARDS, LAYTON & FINGER, P.A.
                               One Rodney Square
16                             920 North King Street
                               Wilmington, Delaware 19801
17

18

19
    Audio Operator:            Donna Capell
20

21  Transcription Company:     Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1

INDEX

2

BENCH RULING:                                                    PAGE

3

Agenda

4   Item 1:   Motion of Debtors for Entry of an Order              3
                Enforcing the Settlement Order and the

5               Settlement Agreement Between KServicing
                and Customers Bank

6               [Docket No. 340; Filed December 7, 2022]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 2:00 p.m.)

2           THE COURT:  Good afternoon.  This is Judge

3  Goldblatt.  We're on the record in *In Re Kabbage, Inc.*, which

4  is Case No. 22-10951.

5           We are here for the purpose of my announcing a

6  decision in the matter that was heard in the evidentiary

7  hearing on Monday.  So, thanks to all for gathering.  Here it

8  goes:

9           We are here on the debtors' motion to enforce a

10 settlement agreement reached at the early stages of this

11 bankruptcy case with Customers Bank and approved by this

12 Court.  The debtor contends that Customers Bank's settlement

13 payments, which totaled approximately $20.5 million, was

14 $1,555,656 less then Customers Bank was required to pay under

15 the terms of the settlement agreement.

16          The Court conducted an evidentiary hearing on this

17 motion on March 20th, 2023.  The Court heard the testimony of

18 three witnesses: Tameka Williams and Donna Evans from the

19 debtor KServicing, and Alyssa White from Customers Bank.  The

20 Court also admitted into evidence a number of exhibits which

21 the Court has reviewed.

22          At the outset, I want to say that I fully

23 understand why this is a dispute that the parties needed to

24 bring to the Court for a judicial resolution.  I found all of

25 the witnesses to be entirely credible.  This is a

1  circumstance in which both sides have genuine reason to

2  believe in their positions.  I view this as a close case.

3        To start with the punchline, my review of the

4  evidence leads me to conclude that the debtor has carried its

5  burden of showing, by a preponderance of the evidence, that

6  it is entitled to the additional $1.56 million that it seeks.

7  While there is certainly some evidence pointing in the other

8  directions, for the reasons I will explain, my factual

9  finding is that the debtor has carried its burden even if

10 only narrowly.

11        A few procedural niceties.  This dispute is within

12 the Court's subject matter jurisdiction under 28 U.S.C.

13 Section 1334(b) as a dispute over a post-petition agreement

14 that had been agreed by the Court. It is a core matter under

15 Section 157(b) such that this Court may enter final judgment.

16        As a technical matter this action seeks money

17 damages so case can be made that such a money judgment may

18 only be issued in connection with an adversary proceeding

19 under Bankruptcy Rule 7001, but even if that is the case

20 those procedural protections are certainly waivable and it is

21 common practice to seek to enforce a settlement agreement

22 that is approved by the Court through motions practice.

23        Here, no party has taken issue with proceeding by

24 way of motion and the Court is entirely comfortable resolving

25 the dispute in the posture in which it has been presented by

1  the parties.  Accordingly, pursuant to Bankruptcy Rule 7052

2  and 9014, I am now setting forth my findings of fact and

3  conclusions of law.

4          The settlement agreement, itself, was admitted

5  into evidence. That agreement, of course, is attached to the

6  Court's order authorizing the debtor to enter into the

7  agreement which is docketed at D.I. 232.  By way of context,

8  the debtor, KServicing, was a servicer of loans issued under

9  the payment protection program.  Customers Bank owned some

10  number of those PPP loans.  Under prepetition agreements

11  KServicing was entitled to a fee for servicing those loans

12  and was, otherwise, required to remit to Customers Bank the

13  amount it collected on those loans.

14          Disputes arose between the parties which led

15  KServicing to stop remitting payments to Customers Bank and

16  to file a lawsuit in the District Court for the Northern

17  District of Georgia.  Those disputes were settled in

18  connection with the settlement agreement at issue here.

19          Paragraph 8 of the agreement provides that within

20  three business days of the effective date Customers Bank

21  shall pay to KServicing an amount equal to the settlement

22  payment.  The effective date is defined as the date on which

23  the Court enters the order approving the agreement which was

24  November 9th, 2022.

25          The settlement payment is defined as the

1  settlement amount which is separately defined as $58 million

2  less the amount of the disputed KServicing holdbacks as of

3  the petition date.  Disputed KServicing holdbacks is also a

4  defined term and means collectively the disputed KServicing

5  fee holdback and the disputed KServicing remittance holdback.

6       Both of those items were originally contested

7  between the parties, but over the course of the litigation

8  the dispute narrowed so that by the time we reached the

9  evidentiary hearing the only area of disagreement was the

10  amount of the KServicing remittance holdback.  That term is,

11  of course, also defined in the agreement.  As relevant here,

12  it means the amount collected from borrowers that KServicing

13  is required to remit to Customers Bank under the terms of the

14  parties prepetition agreements.

15       Now the settlement agreement also set out a

16  mechanism by which the parties would endeavor to reconcile

17  how much needed to be paid.  Paragraph 3 of the agreement

18  provided that the parties would work together in good faith

19  between the execution date and the effective date which was

20  the date on which the Court entered the order approving the

21  settlement to determine what the amount of the holdback would

22  be.

23       Before getting into the specifics of how the

24  parties endeavor to reconcile the amount of the KServicing

25  remittance holdback it bears mention that the record made

1  clear that throughout the parties relationship there were

2  regular and recurring issues with respect to the accuracy and

3  the integrity of the data.  Over the nearly 100,000 PPP loans

4  that KServicing serviced for Customers Bank, the record

5  suggests that many thousands of these loans were subject to

6  discrepancies in the accounting data and that in the ordinary

7  course of business the parties met regularly in an effort to

8  reconcile those discrepancies.

9         For the purpose of this dispute, the point of that

10  finding is not to criticize either party.  It is simply a

11  recognition of the fact that both parties and now this Court

12  were left to do the best they could do with information that

13  everyone appreciated was imperfect.

14         I will also add that, perhaps related to the prior

15  point, the parties had a variety of other disputes that

16  cropped along the way including disputes about canceled loans

17  and the payment of interest.  During the evidentiary hearing

18  the parties spent a fair amount of time pointing out the

19  issues on which it turned out that one side was right and the

20  other was wrong perhaps with the intent of persuading this

21  Court that the fact that a party made a mistake about some

22  different issue meant either that they were a bad actor or

23  that it was likely that they also made a mistake about this

24  issue.

25         To be clear, I am drawing no such inference.  I am

1  satisfied that both parties were acting in good faith.  Yes,

2  there were mistakes.  That is a function of the fact that

3  capable, but imperfect humans were working with even more

4  imperfect data.  There is nothing at all surprising or

5  remarkable that various other mistakes were made and it is to

6  the parties credit that when they realized there was  mistake

7  they corrected it and/or dropped the issue.

8         I am not, otherwise, addressing the facts relating

9  to those "other" since resolved disputes which I consider

10  irrelevant to the remaining dispute that is now before me.

11         The evidence shows that on November 4th, 2022

12  KServicing sent Customers Bank a spreadsheet, referred to as

13  the Synovus repayment file, which was a listing of

14  transactions relating to individual PPP loans identifying

15  amounts paid to KServicing that KServicing was required to

16  remit to Customers Bank.  It appears that this file was

17  derived from information related to KServicing's account at

18  Synovus Bank.  That account was opened in November 2020 after

19  the sale of the debtors' principal assets to American Express

20  at close.

21         The evidence further shows that Customers Bank

22  used this information in determining the amount of the

23  disputed KServicing remittance holdback and made its

24  settlement payment based on that information.  Just to be

25  clear about this, the inclusion of an amount within the

1  KServicing remittance holdback operated to reduce the amount

2  that Customers Bank paid to KServicing.  That makes sense

3  because these were amounts that KServicing owed to Customers

4  Bank, but in substance including an amount within this

5  remittance holdback and reducing the settlement payment by

6  that amount was a mechanism by which Customers Bank,

7  effectively, paid itself amounts that were due to it from

8  KServicing.

9       It bears note that the evidence also shows that

10  Customers Bank was comfortable that this amount was correct

11  because the amount it generated turned out to be within about

12  $1,500 of the amount in its trial loan balance analysis which

13  was Customers Bank's own accounting of the amounts

14  outstanding on the various loans.

15       Thereafter, however, KServicing determined that

16  five of the loans included in the remittance file as loans

17  for which KServicing had collected funds from borrowers, but

18  had not yet remitted to Customers were improperly included in

19  the file.  The reason that their inclusion was incorrect was

20  that KServicing demonstrated that in 2020 it had, in fact,

21  made payments to customers in the amount of the disputed

22  $1.56 million on account of those loans.

23       Those payments were made not out of the Synovus

24  Bank account, which the debtor opened after the closing of

25  the American Express transaction, but out of a prior account

1   at Wells Fargo Bank that presumably was transferred to

2   American Express as part of the transaction.  The evidence

3   that these loans were included in the disputed KServicing

4   remittance holdback and that the same loans had been paid in

5   2020 is clear and specific.

6           The circumstances were articulated with fair

7   precision in Paragraphs 9 to 18 of Ms. Williams declaration,

8   that is at D.I. 671, which was admitted into evidence and was

9   not materially disputed. The net result of that is that in

10  substance KServicing has paid that $1.56 million to Customers

11  Bank twice; first in October 2020 when those amounts were

12  paid, and again in November 2022 when those amounts were

13  deducted from the settlement payment.

14          Customers Bank makes, essentially, three responses

15  to this showing; one is legal, the second is factual, and the

16  third is one that I will describe as equitable.  I will

17  describe each of these three responses.

18          While I find that the legal argument fails as a

19  matter of ordinary contract principals, the factual and

20  equitable arguments have some real force.  But at the end of

21  the day neither can quite overcome the clear and simple

22  factual showing that the debtor has made.

23          The legal argument that Customers Bank makes is

24  that Paragraph 3 of the settlement agreement says that the

25  parties had worked together in good faith from the time the

1 agreement was executed until it became effective when

2 approved by this Court to reconcile the amount of the

3 holdbacks and to determine the amount of the settlement

4 payment which was due three days thereafter.  Customers

5 position is that it was entitled to and did, in fact, rely on

6 the information that KServicing provided to it and that

7 Paragraph 3 operates to estop KServicing from coming in after

8 the effective date with new data showing that the amount paid

9 was incorrect.

10        I do not think that that is correct as a matter of

11 contractual construction.  That is not to say a contract

12 cannot be written to operate that way.  Parties

13 sometimes do that, but when that is what a party intends one

14 would expect it to be reflected in clear contractual language

15 that so specifies.  But a provision that says that the

16 parties will work hard to share information and try to get it

17 right by date X should not be read to mean that if it turns

18 out that there was just a mistake the party is barred from

19 recovering the amount to which it is, in fact, entitled under

20 the terms of the agreement.

21        Paragraph 20 of the settlement agreement provides

22 that it is governed by Pennsylvania law, and Pennsylvania

23 case law strongly supports this reading of the contract.

24 Acme Markets v. Federal Armored Express, Inc., 648 A.2d 1218,

25 Superior Court of Pennsylvania (1994), is a good example.

1  The case notes that Pennsylvania law generally enforces

2  contracts according to their language.  It adds, however,

3  that: "Pennsylvania law abhors forfeitures and penalties,

4  and enforces them with the greatest reluctance;" *Id.* at 1221.

5          The point is that while it is possible to

6  construct an enforceable contract that sets up a procedural

7  rule that if a party fails to comply will bar the party from

8  recovering an amount to which they are, in fact, entitled

9  such an outcome is a disfavored one.  If the parties want to

10  establish such a mechanism they certainly need to be express

11  about it.  And there is nothing in Paragraph 3 of this

12  settlement agreement to suggest it should be so construed.

13          The second argument that Customers Bank makes is a

14  factual argument.  It contends that it was comfortable with

15  the settlement amount it paid because it turned out to be

16  within $1,500 or so of its trial balance analysis that it

17  kept across the entire portfolio for PPP loans that were

18  serviced by KServicing.

19          Alyssa White testified about the trial balance

20  analysis in some detail.  She explained that this analysis

21  was the basis for Customers own financial reporting and that

22  she believed that it accurately stated the amounts due on the

23  portfolio PPP loans.  In view of the flaws with KServicing

24  data over the course of the relationship, if there was $1.56

25  million for which KServicing was paid twice it necessarily

1  followed, Customers Bank argued, that there was some

2  offsetting error somewhere else in the oceans of data.

3          Much of the cross-examination of Ms. White was

4  dedicated to litigating a discovery dispute.  KServicing

5  contends that it asked for the information that underlies the

6  trial balance analysis over the course of discovery and did

7  not receive it.  Customers Bank's response was that most of

8  the underlying information was exchanged between the parties

9  in the ordinary course of their relationship such that

10  KServicing had access to it without the need for it to be

11  produced in the litigation.

12          In any event Customers Bank says that if it failed

13  to produce information requested by KServicing in discovery

14  it was incumbent upon KServicing to file a motion to compel.

15  KServicing now askes that the information be excluded from

16  evidence because it was not provided in discovery or, at

17  least, the basis for testing the information was not provided

18  in discovery.

19          I will admit into evidence the material that

20  Customers Bank has proffered. In the end, my conclusion is

21  that even considering that evidence and appreciating the

22  points that Customers Bank has made about the trial loan

23  balance analysis I nevertheless conclude that the

24  preponderance of the entire body of evidence is that

25  KServicing is entitled to the disputed $1.56 million.

1         That said, I am satisfied that the evidence that

2   Customers Bank has proffered about the trial loan balance

3   analysis should properly be included in the record for the

4   purpose of permitting a reviewing court to assess whether

5   that factual finding is clearly erroneous.

6         My finding, however, is that the evidence that I

7   do have about the trial loan balance analysis, while entitled

8   to some weight, is insufficient to overcome the specific

9   showing that the debtors have made.  I am by no means

10  rejecting Ms. White's testimony about the trial loan balance

11  analysis.  The problem is that there is something that is

12  necessarily conclusory about it.

13        According to the evidence that was presented the

14  trial loan balance analysis is a function of countless

15  individual debits and credits. And it is only as good as each

16  of the underlying inputs.  To accept Customers Bank's

17  argument would require the Court to accept largely, on faith,

18  the proposition that there must be some countervailing error

19  somewhere in the course of the relationship to balance out

20  the specific showing about the $1.56 million that the debtors

21  have made.

22        It is by no means impossible that Customers Bank

23  is right about this, but in a world of imperfect information

24  my task is to do my best to make findings of fact based on

25  the evidence that the parties put in front of me.  My finding

1   is that the specificity of the evidence that the debtor has

2   provided outweighs the more general and somewhat conclusory

3   evidence that Customers Bank has presented based on the trial

4   loan balance analysis.

5            As I have said, this is a close call.  Maybe its

6   55/45, but may finding of fact is that the preponderance of

7   the evidence supports the conclusion that the debtors are

8   entitled to the disputed $1.56 million.

9            The final point that Customers Bank makes is what

10  I call an equitable argument.  It argues that KServicing

11  bears the responsibility for the poor quality of the data.

12  Customers Bank contends that in a world in which errors are

13  abundant, this ruling, essentially, permits KServicing to

14  cherry-pick one error from a vast field of problematic data

15  when that is convenient for KServicing, and that it is

16  fundamentally unjust to permit KServicing to benefit in this

17  manner from a problem that was of its own making.

18            I do understand that point and, as I have said, it

19  is not entirely without force.  That said, notwithstanding

20  what is often said about bankruptcy courts being courts of

21  equity, this is a contract dispute which is a legal rather

22  then an equitable matter.  And my task is, therefore, to do

23  my best to weigh the evidence of objectively and reach the

24  judgment that is dictated by the law and the facts.

25            My conclusion, based on that review of the

1  evidence presented, is that the debtors have a legal

2  entitlement to recover the disputed $1.56 million from

3  Customers Bank.  I do not believe that any principal of

4  equity, even accepting the points that Customers Bank is

5  making, would permit this Court to reach a different outcome

6  in light of those findings and conclusions.

7          So, that is my ruling.  The parties are directed

8  to settle an order consistent therewith.

9          Is there any other matter that the parties believe

10  the Court should address why we are here?

11      (No verbal response)

12          THE COURT:  All right.  Seeing none, I thank the

13  parties for the superb manner in which this complex dispute

14  was presented.

15          With that we are adjourned.  Thank you.

16      (Proceedings concluded at 2:21 p.m.)

17

18

19

20

21

22

23

24

25

1

<u>CERTIFICATION</u>

2   I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of my

5 knowledge and ability.

6

7 <u>/s/ Mary Zajaczkowski</u>     <u>March 22, 2023</u>

8 Mary Zajaczkowski, CET-531

9 Certified Court Transcriptionist

10 For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25