## EXHIBIT B

**Benjamin Declaration**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| KABBAGE, INC. d/b/a KSERVICING, *et al.*, | ) | |
| | ) | Case No. 22-10951 (CTG) |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## DECLARATION OF MICHAEL BENJAMIN

I, Michael Benjamin, hereby declare and state as follows:

1.      I am over eighteen years old and am competent to testify to the facts and matters set forth in this declaration.  All facts and matters set forth herein are based upon my personal knowledge or my review of records maintained in the ordinary course of business.  If called as a witness, I would testify consistently with the facts and matters set forth herein.

2.      I am Chief Financial Officer of Biz2Credit Inc. ("**Biz2Credit**").  This declaration is being submitted in support of Biz2Credit's Application for Allowance and Payment of Administrative Expense Claim.

3.      Biz2Credit and Kabbage, Inc. d/b/a KServicing (the "**Debtor**") are parties to a Software License Agreement dated as of April 28, 2021 (as amended by a First Amendment to Software License Agreement dated as of October 3, 2022, the "**Platform Agreement**").  A true and complete copy of the Platform Agreement is attached hereto as **Exhibit 1**.

4.      Pursuant to the terms of the Platform Agreement, Biz2Credit licensed to the Debtor its proprietary platform for management of Paycheck Protection Program loan forgiveness applications (the "**PPP Platform**").

5.      During the period from October 3, 2022 (the date of the Debtor's bankruptcy filing) through June 20, 2023 (the Effective Date of the *Amended Joint Chapter 11 Plan of Liquidation*

*of Kabbage, Inc. d/b/a KServicing and its Affiliated Debtors* confirmed on March 15, 2023),

Biz2Credit kept the PPP Platform operational and otherwise fully complied with its obligations

under the Platform Agreement.

6.     The amount owed to Biz2Credit under the Platform Agreement for the period from

October 3, 2022 through June 20, 2023, and which remains outstanding as of the date of this

declaration, is $371,570.69.  True and correct copies of invoices for the months of October 2022

through June 2023 are attached hereto collectively as **Exhibit 2**.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on July __24__, 2023

_____

Michael Benjamin

# Exhibit 1



# SOFTWARE LICENSE AGREEMENT

This SOFTWARE LICENSE AGREEMENT (this "**Agreement**") is entered into as of _____ (the "**Effective Date**") by and between **Kabbage, Inc. d/b/a KServicing**, located at 730 Peachtree Street. Suite 1100, Atlanta Georgia 30308 ("**K-SERVICING**") and **Biz2Credit Inc.**, a Delaware corporation located at One Penn Plaza, Suite 4530, New York, NY 10119 ("**Compan**y" or "**B2C**").

*[handwritten: 4/28/2021]*

A. K-SERVICING is a commercial lender that provides services to small business customers ("**Customers**"), including through under the Paycheck Protection Program or any successor or affiliated Small Business Administration ("**SBA**") 7(a) guaranteed loan program (the "**PPP**", and such loans, "**PPP Loans**").

B. Company provides financial and technical services to companies and institutions involved in small business financing, including its proprietary Biz2X® PPP platform (the "**Platform**"), as further described in the Statement of Work attached hereto as <u>Exhibit A</u> (the "**SOW**").

C. K-SERVICING desires to license the Platform from B2C, and B2C desires to license the Platform to K-SERVICING, on the terms and conditions set out herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

**1.    <u>The Platform; Dashboard</u>**.

(a) <u>License</u>. B2C hereby licenses the Platform and the Dashboard (as defined below) to K-SERVICING for its use and access during the Term (as defined) for the purposes described in this Agreement, on the terms and conditions hereof (the "**License**"). The Platform will have the functionality set forth below and as set out on <u>Exhibit A</u>.

(b) <u>Platform and Dashboard</u>. B2C will host the Platform (the "**Platform**") on Amazon Web Services, Inc. ("**AWS**") or other nationally recognized cloud hosting provider. K-SERVICING, and/or Customers as designated by K-SERVICING, but subject to the terms and conditions of this Agreement, shall have access to the Platform via a dedicated Dashboard linked to the Platform (the "**Dashboard**", and together with the Platform, the "**Licensed Materials**"). The Platform is a fully digital white label platform to manage the PPP loan forgiveness application submission by Customers, review data for verification, and submit to SBA for decisioning, in accordance with the specifications set forth in <u>Exhibit A</u>.

**2.    <u>License Terms</u>**.

(a)    <u>Customer Terms and Conditions</u>. K-SERVICING's written instructions to Customers for the uploading application onto the Platform will state that their right to use the Platform is strictly limited to the uploading of applications by them directly and no one else.

(b)    <u>Licensed Use</u>. K-SERVICING agrees that it:

(i)    will not use the Licensed Materials for any purpose other than implementing PPP

applications for new and existing Customers and in furtherance of the purposes specified under this Agreement.

(ii)  may not, and will not, assign or sublicense the Licensed Materials or any portion or component thereof without Company's prior written consent, other than the limited grant of access, use, and permissions to Customers in furtherance of the purposes specified above; K-SERVICING further agrees that any purported assignment or sublicense in derogation of this provision shall be null and void *ab initio*;

(iii) will not modify, disassemble, decompile, reverse engineer or make any other attempt to discover or obtain the source code of any Licensed Materials or any component thereof;

(iv) It will notify Company in writing of each Customer using the Dashboard and/or Platform (including contact and other information as may be reasonably be requested by Company);

(v) will cause each of its employees receiving access to the Platform to comply with all provisions of this paragraph (b), and shall be responsible for the acts and omissions of any such employee in connection with the Platform; and

(vi)without limiting the foregoing, K-SERVICING will advise each such employee of their obligations under this Agreement, including without limitation the prohibitions on assignment, reverse engineering or use of the Platform other than pursuant to this Agreement.

(c) <u>Non-Exclusivity</u>. This Agreement is non-exclusive, and (i) B2C shall be free to enter into similar licenses of the Platform and/or Licensed Materials (or any component thereof) and (ii) K-SERVICING shall be free to enter into similar license transactions with other parties, including in each case with competitors of the other party, both during and after the Term.

**3.   Services and Support**.

(a)     <u>Services</u>. Company will provide all services needed for K-SERVICING and/or its Customers to use the Platform, Dashboard and Platform, as applicable, as provided in this Agreement (collectively, the "<u>Services</u>").  Company will meet the standards set forth on <u>Exhibit C</u> in delivering the Services.

(b)     <u>Support</u>. Company will provide to K-SERVICING only (for avoidance of doubt, Customers must seek support through K-SERVICING) customer support via email during normal business hours (9AM-6PM EST Monday – Friday).

**4.   Customer Information**.

(a)     K-SERVICING shall own all Customer information and other K-SERVICING financial and business data that is uploaded onto the Platform (collectively, "**Customer Information**"). K-

2

SERVICING grants to Company the limited, non-transferable, non-sublicensable, non-exclusive right to use, access, receive, store, and process (but not sell, distribute, or otherwise transfer to third parties) Customer Information during the Term solely as specifically required to provide the Platform and related services to K-SERVICING. Company may not use Customer Information for any other purpose, or distribute or provide access to Customer Information to any third party, except as mutually agreed by the parties in a separate executed writing. Nothing herein shall be construed as any sale, assignment, or other transfer of any proprietary right in or to Customer Information, and K-SERVICING reserves all rights to Customer Information not expressly granted herein. Company agrees that it will not commingle Customer Information into its systems except as required to complete the forgiveness process.

(b)    Information Security.    Notwithstanding and in addition to the other confidentiality obligations set forth in this Agreement, Company agrees that it will maintain appropriate technical and organizational measures to comply with industry standard practices and all applicable laws and regulations, including without limitation all laws and regulations governing data privacy, information security, and consumer protection, with respect to its use, processing, transmission, handling, security, storage, and disclosure of all Customer Information.  Such measures shall include, at a minimum, adherence to the procedures and specifications set forth in the Information Protection Contract Requirements document attached hereto as Exhibit D and incorporated by reference.

5.    **Company Fees**.

In consideration of the Services, K-SERVICING will pay to B2C the fees set forth on Exhibit B (collectively, the "**Fees**") in accordance with the payment terms specified therein.  K-SERVICING may withhold any Fees or other amounts set forth in an invoice which are subject to its good faith dispute by providing notice of such dispute to Company in reasonable detail prior to the date on which the applicable invoice first becomes due.  Company shall be responsible for determining the applicability of any sales, use, excise, or similar taxes, which may be applicable to the provision of Licensed Materials and performance of Services hereunder (if any).  Company shall identify any applicable taxes on each invoice as separate line items.  K-SERVICING shall have no responsibility or liability for any tax or other duty assessed against Company's income, employment policies, or other internal business operations.

6.    **Term and Termination**.

(a)    This Agreement shall have an initial term of twelve (12) months that will commence on the Effective Date hereof (the "**Initial Term**"). Following the expiration of the Initial Term, this Agreement shall automatically renew for one (1) period of six (6) months (the "**First Renewal Period**"), commencing on the first anniversary of the Effective Date, unless K-SERVICING gives Company notice of its intent not to renew the Agreement at least thirty (30) days prior to the expiration of the Initial Term.  Following the expiration of the First Renewal Period, this Agreement will automatically renew for the remainder of the calendar month containing the date of such expiration, and subsequent renewal periods of one (1) month thereafter each commencing on the first day of the applicable successive calendar month (each a "**Subsequent Renewal Period**"), unless K-SERVICING gives Company notice of its intent not to renew the Agreement prior to the end of the First Renewal Period or

3

applicable Subsequent Renewal Period.  The Initial Term, together with the First Renewal Period (if applicable) and any applicable Subsequent Renewal Period, constitutes the "**Term**" of this Agreement.

(b) Either party may terminate this Agreement upon written notice to the other party in the event of the other party's material breach of its representations, warranties, or other obligations hereunder, if said breach remains uncured for thirty (30) days following the breaching party's receipt of notice of said breach from the non-breaching party. Notwithstanding the foregoing, if K-SERVICING materially breaches the License terms in Section 2(a) or (b), B2C may suspend access to the applicable Licensed Material, effective immediately on written notice to K-SERVICING.

(c)  Upon the termination or expiration of this Agreement for any reason, Company shall provide to K-SERVICING, upon K-SERVICING's written request, such reasonable transition Services as may be required to effect a transition of the Services set forth hereunder to K-SERVICING, its affiliate, or other third-party contractor.  Except as otherwise expressly agreed by the parties in writing, such transition Services shall be provided pursuant to the Fee rates set forth in Exhibit B.

## 7.    Intellectual Property Rights.

K-SERVICING acknowledges and agrees that B2C owns all intellectual property rights (including, without limitation, copyright, trademark and patent rights) in and to the Licensed Materials (excluding, for avoidance of doubt, any Customer Information or other information or intellectual property of K-SERVICING, including without limitation K-SERVICING Marks (defined below), used in connection with the Platform and other Licensed Materials), and that K-SERVICING will not have any rights by virtue of this Agreement or use of any such Licensed Materials, other than the limited use rights as specified herein during the Term.

Solely to the extent required for Company's provision of the Platform as described in Exhibit A, K-SERVICING grants to Company the limited, non-exclusive, non-transferable, non-sublicensable, revocable license to use K-SERVICING's name and current trademark logo (collectively, "**Marks**") for the branding or co-branding of the Platform and related features made accessible to Customers. As between the Parties, K-SERVICING shall be the sole owner of all Marks, and nothing herein shall be construed as any sale, assignment, or transfer of any proprietary interest in or to Marks. All goodwill generated from the use of Marks shall accrue and inure solely to the benefit of K-SERVICING. Company agrees not to use or register (or attempt to use or register) any trademark that is the same as or confusingly similar to the Marks in any jurisdiction, or engage in any activity that causes or is reasonably likely to cause consumer confusion as to the origin of either party's respective products or services. Company shall promptly notify K-SERVICING in writing of any infringement, or other violation of the Marks of which it becomes aware.

## 8.    Representations and Warranties; Disclaimer of Warranty.

(a) Each party hereby makes the following representations and warranties to the other party that it: (i) has full authority to execute and perform this Agreement; (ii) is an entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation; and (iii) will reasonably cooperate with the other party in connection with this Agreement and the transactions contemplated thereby.

(b)    Company further represents and warrants to K-SERVICING that: (i) it owns all intellectual property rights in and to the Licensed Materials; (ii) the use of the Licensed Materials by K-SERVICING or any Authorized Agent will not violate the intellectual property rights of any third party; (iii) the Platform will function in accordance with all specifications set forth hereunder and industry standards to deliver the functionality described herein and in <u>Exhibit A</u>; (iv) support and other Services set forth in Section 3 shall be performed in a prompt, professional, and workmanlike manner, consistent with industry standards for similar services; (v) the Licensed Materials are provided to K-SERVICING free and clear of any virus, malware, worm, Trojan horse, disabling device, or other harmful or malicious script, code, or tool; and (vi) Company will perform its respective obligations hereunder in compliance with all applicable laws and regulations.

(c)    K-SERVICING agrees that it will not, directly or indirectly: (i) assign, sublicense the Platform or any portion or component thereof without the express prior written approval of Biz2Credit, except as permitted by Section 15(c); or (ii) split out, decompile or reverse engineer the Platform or any component thereof.

(d)    EXCEPT AS EXPRESSLY SET FORTH HEREIN, COMPANY HEREBY DISCLAIMS ANY WARRANTY ASSOCIATED WITH THE SERVICES OR LICENSED MATERIALS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OR WARRANTY OF FITNESS FOR PURPOSE.

**9.    Limitation of Liability**. Other than in connection with a material breach of a party's obligations under Sections 4 (Customer Information), 7 (Intellectual Property), 10 (Confidentiality) and 11 (Indemnification), in any claim, suit, or other proceeding brought between the parties in connection with the subject matter of this Agreement, neither party shall: (a) be responsible for, or claim against the other party, any special, indirect, exemplary, consequential or punitive damages; or  (b) be liable for any damages which, in the aggregate, exceed the total amount of Fees paid and/or payable to Company under this Agreement.

**10.    Confidentiality**.

In connection with its performance of its respective obligations hereunder, a Party (the "**Disclosing Party**") may disclose or make available to the other Party (the "**Receiving Party**") its Confidential Information. "Confidential Information" means information in any form or medium (whether oral, written, electronic or other) that is confidential or proprietary to Disclosing Party, whether or not marked or labeled as "confidential" or "proprietary;" including all non-public information disclosed pursuant to or in connection with this Agreement that is customarily considered confidential or proprietary. "**Confidential Information**" does not include information that: (a) was rightfully known to Receiving Party without restriction on use or disclosure prior to receipt of such information from Disclosing Party; (b) becomes generally known by the public without the breach, negligence, or other wrongdoing of Receiving Party; (c) is rightfully received by Receiving Party by a third party which is under no obligation of confidentiality with respect to such information; or (d) was independently developed by Receiving Party without reference to or use of any portion of Confidential Information, as demonstrated by Receiving Party's written records.

Receiving Party may use Confidential Information of Disclosing Party solely in connection with the performance of its obligations and exercise of its rights under the Agreement. Receiving Party will exercise at least the same standard of care to prevent unauthorized disclosure or use of Confidential Information as it employs with respect to its own information of a like nature, but in any event no less than a reasonable standard of care. Receiving Party may permit access to Confidential Information only to its employees, officers, and professional advisors who have a need to know Confidential Information in furtherance of Receiving Party's rights and obligations hereunder, and who have agreed to be bound by confidentiality restrictions with respect thereto at least as stringent as those set forth hereunder; provided that in any event Receiving Party shall be responsible for any breach of this Section by such individuals.

If Receiving Party is ordered, as part of an administrative or judicial proceeding of competent jurisdiction or other operation of applicable law, to disclose any of Disclosing Party's Confidential Information, Receiving Party will, to the extent permitted by applicable law: (i) notify Disclosing Party of such request as promptly as practicable; (ii) cooperate with Disclosing Party, at Disclosing Party's reasonable request and sole expense, in its efforts to contest the disclosure or secure a protective order or similar confidential treatment for such Confidential Information; and (iii) disclose only those portions of Confidential Information strictly required for compliance with said order or law.

Following the termination or expiration of this Agreement for any reason, or otherwise upon the written request of Disclosing Party at any time, Receiving Party shall, at Disclosing Party's option, either: (i) return all Confidential Information in its possession or control in any tangible or intangible medium, including any copies or derivations thereof, to Disclosing Party, or (ii) destroy all Confidential Information in its possession or control in any tangible or intangible medium, including any copies or derivations thereof, and deliver a written certification of such destruction to Disclosing Party, excluding routing computer backups as part of Disclosing Party's document retention (provided that any such backups shall be used solely for internal, nonpublic compliance and/or archival purposes and shall remain subject to the confidentiality provisions of this Section for as long as they are so maintained).

The Parties acknowledge that the breach of Receiving Party's confidentiality obligations under this Section may cause Disclosing Party to suffer irreparable harm in an amount not readily calculable as money damages. Accordingly, the Parties agree that in the event of any such breach, whether threatened or actual, Disclosing Party shall have the right to seek preliminary and/or final injunctive relief therefor, without the necessity of posting bond or other security, in addition and without prejudice to any other remedy available to Disclosing Party at law or in equity.

**11.** **Indemnification**. Each party shall indemnify, defend and hold harmless the other party and the other party's affiliates and its and their respective successors, assignees, officers, directors, employees and agents (each an "**Indemnitee**" and collectively "**Indemnitees**"), from and against all losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, including interest, penalties and reasonable attorneys' fees, that they shall incur or suffer, which arise from any third-party claims, demands,  actions, or proceedings (each a "**Indemnifiable Claim**") relating to: (i) any breach of this Agreement by the indemnifying party or failure by the indemnifying party to perform any of its representations, warranties, covenants or agreements in this Agreement; or (ii) the indemnifying party's gross negligence, willful misconduct, or violation of applicable law or regulation.  Upon an Indemnitee's receipt of an Indemnifiable Claim, the indemnified party shall notify the indemnifying party in writing

6

of such receipt, provided that any failure by the indemnified party to so notify shall not relieve the indemnifying party of any of its indemnification obligations hereunder except to the extent that the indemnifying party is materially prejudiced by such failure. The indemnifying party will have the right to assume the defense of any such Indemnifiable Claim at its own cost and expense by giving written notice to the indemnified party of its intention to assume such defense within thirty (30) days of receipt of such notification. The indemnified party shall reasonably cooperate with the indemnifying party in connection with its defense and investigation of the Indemnifiable Claim. The indemnifying party must obtain the prior written approval of the indemnified party prior to entering into any settlement of any Indemnifiable Claim hereunder which involves the admission of any guilt, liability, or wrongdoing on behalf of the indemnified party. Notwithstanding the foregoing, the indemnified party (or any Indemnitee, as applicable) may at any time assume control of the defense of any Indemnifiable Claim at its own cost and expense upon written notice to the indemnifying party.

**14.** **Notices**. All notices, requests, demands, consents, approvals and/or other communications hereunder shall be in writing to the email addresses set out on the signature page hereof.

**15.** **Miscellaneous.**

(a) <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and agreement between the parties relating to the subject matter hereof and supersedes all prior agreements (whether written or oral), and may be amended only by mutually executed written agreement.

(b) <u>Choice of Law; Venue; Legal Fees</u>. This Agreement shall be governed by New York law without reference to choice of law principles. Any legal action under this Agreement will be brought exclusively in state or federal courts located in the State of New York, New York County. The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction and proper venue of such courts. In the event of any action for the collection of amounts due and payable under this Agreement, the prevailing party in such collection action shall be entitled to recoup its reasonable legal fees, court costs and related expenses from the other party.

(c) <u>Assignment</u>. This Agreement may not be assigned by either party without prior consent of the other party, and any such purported assignment shall be void; provided, however, that either party shall have the right (upon written notice to Company and at no additional charge) to transfer its rights under this Agreement in whole (and not in part) to (i) an affiliate under common control and/or (ii) any person or entity that has acquired the rights of such party under this Agreement pursuant to a transfer, sale, spin-off, divestiture, or other disposition by such party, provided that such acquirer agrees in writing to assume such party's obligations hereunder.

(d) <u>Independent Contractors</u>. The parties are each independent contractors and no partnership, joint venture, agency, employment or any other such relationship is created or contemplated hereby.

(e) <u>No Waiver; Severability</u>. Failure by either party to enforce any of its rights under the contract shall not be deemed a waiver of such rights or any present or future breach. If any provision of this Agreement is rendered invalid or unenforceable due to court order or other operation of applicable law, such provision shall be deemed severed from the Agreement, and the remainder shall continue in full force and effect to the maximum extent permitted under applicable law.

(f)    <u>Survival</u>. Sections 4(b) and (c), 7, 9, 10, 11, 14, 15, and the obligation to pay Fees set forth in <u>Exhibit B</u> for Services performed during the Term, together with such other provisions of this Agreement which expressly by their terms or should be their nature survive, will survive the termination or expiration of this Agreement for any reason.

(f)    <u>Counterparts; Interpretation</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  Headings and captions contained in this Agreement are for reference purposes only and shall not affect the construction or interpretation of any material term hereof.

(g)    <u>Consent to Electronic Transactions</u>. Each party consents to electronic transactions for all components of this Project or in connection with this Agreement, including without limitation e-mail and e-signature.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

**BIZ2CREDIT INC.**

By: _____

      Name: Darren Hecht

      Title:  SVP, Sales

      Email: darren.hecht@biz2credit.com,

      with a copy to: jonathan.gitlin@biz2credit.com

**Kabbage, Inc. d/b/a KSERVICING**

By: _____

      Name: Laquisha Milner

         Title:  CEO

         Email: Lmilner@Kservicing.com

9

**Exhibit A**

**Statement of Work**

Scope Statement:
Fully digital white label Platform to enable K-SERVICING to manage the PPP loan forgiveness application submission by customers, review data as a verifier & checker and submit to SBA for decisioning.

Full Digital white label platform:
The white label platforms will include:
1. A customer-facing internet platform (will be termed as customer portal hereafter)
2. An intranet platform (will be termed as backend portal hereafter), accessible to K-SERVICING employees to review loan and loan forgiveness information, and submit loan forgiveness applications to SBA.

Customer portal:
1. Sign-on
2. Dashboard for Customers to create, manage and access:
   a. forgiveness loan applications
   b. upload required documents and download loan documents
   c. manage loan forgiveness applicant accounts (update contact information, password resets, etc.)
   d. view loan forgiveness processing status
   e. ability to upload the AICPA calculator and read it automatically

Backend portal:
1. Dashboard for K-SERVICING to view the loans with status mapping
2. Batch upload of available customer data and existing forgiveness applications
3. Loan forgiveness application management system for K-SERVICING to review the loan applications
4. Underwriting Dashboard module for verifier and checker to
   a. View third-party data
   b. View, download/ upload customer documents.
   c. Send notifications to other backend users and customers by email (Reassign loans based on complexity)
   d. K-servicing statement analyzer for business K-servicing statements for data received via Yodlee and K-servicing statement parsing for rent analysis
   e. Notes and Activities section to serve as audit trail
6. Ability for K-SERVICING to change customer data
7. Ability for K-SERVICING verifier and checker to communicate with customers within the Platform
8. Verifier and checker procedure to manage approvals
9. K-SERVICING submission to SBA of loan forgiveness application and related materials
10. Pipeline report to provide all the information of the loans and will be available in the system to download

10

DocuSign Envelope ID: F78D3D00-472B-4462-979D-DF3A9C286457

<u>Third party Integrations</u>
1. Yodlee
2. DocuSign
3. SBA forgiveness API (if applicable)

Other Agreements:
1. Customer and backend portals will include "Powered by Biz2X®", or some similar version as mutually agreed by the parties in a legible manner that is subordinate to, and less prominent than K-SERVICING's trademarks and logos.

11

DocuSign Envelope ID: F78D3D00-472D-4462-970D-DE3A0C286457

**Exhibit B**

**Pricing**

A. **Setup & Integration: $0**

B. **Minimum Fees:** There will be a Minimum Fee of **$100,000** for the Term, 50% payable in advance, and the remaining 50% payable on the platform go-live date. Company will provide an invoice on signing.

C. **Transaction Fees:**

   $50 dollars per submitted application to the SBA.

D. **Transaction Fees:** If the aggregate Transaction Fees do not exceed the minimum fees set, no additional Transaction Fees are due and payable to Company. If the Transaction Fees are in excess of the Minimum Fees paid, then the Transaction Fees in excess of the Minimum Fees paid are due monthly and payable to Company not later than thirty (30) days from receipt of the invoice.

E. **Third Party Fees:** Any third-party fees will be charged per actuals and will be included in the monthly Transaction Fees invoices.

F. **Hourly Fees:** If additional work is requested will be done in accordance with separate statements of work as mutually agreed. Absent such agreement, Company will perform the required work on an hourly basis at the rate of $150 per hour.

G. **Other Fees:** Fees for other features, products or integrations will be as mutually agreed between the Parties as per separate Statements of Work.

**NOTE: All fees under this Agreement will be exclusive of sales tax, VAT or other similar state, local or federal tax.**

# Exhibit C
## SLA Terms

**Hosted Services.** Company will maintain the availability of the hosted services for the Platform ("**Hosted Services**") so as to meet the following service levels:

| Service Level Name | Description | Minimum Service Level |
|---|---|---|
| Operational Hours | Hours for which the Hosted Services will be available to K-servicing | 24 hours per day, 365 days a year |
| Hosted Services Availability | The percentage time that the Hosted Services is in service and fully available to K-servicing | 99.8% |

**"Scheduled Downtime"** means, for any period, (i) regularly scheduled maintenance from 12:01 A.M. to 3:00 A.M. Pacific Standard time (PST) each Sunday; and (ii) other times during which Company will perform routine systems maintenance, provided, Company has obtained the prior written approval of K-Servicing for such routine systems' maintenance.

**"Scheduled Uptime"** means, for any period, all times (i.e., 24 hours a day, 7 days a week) other than Scheduled Downtime and Excluded Downtime (as defined).

**"Hosted Services Availability"** is calculated as follows: for a single month, the aggregate amount of Actual Uptime expressed as a percentage of the Scheduled Uptime (i.e., Actual Uptime / Scheduled Uptime, excluding Scheduled Downtime).

Any downtime that is due to: (i) a systemic or region-wide failure; (ii) unavailability of third party services, (iii) any other cause not under the control of Company; or (iv) outside the scope of the Platform architecture shall be excluded from Scheduled Uptime (collectively, "**Excluded Downtime**"). As used in this Agreement, "**Excluded Event**" means any event described directly above that would constitute Excluded Downtime.

Any downtime due to DoS/DDoS attack in excess of 1GBps shall also be excluded from Scheduled Downtime. This limit can be revised based on the DDoS protection purchased, as mutually agreed. The Parties will conduct annual dry drill testing of protections against DoS/DDoS or similar types of attacks.

Company will measure its compliance with the Service Levels and provide K-servicing a monthly report for the first three months and then quarterly report thereafter, detailing its actual performance with respect to each Service Level, Company will also provide such information to K-servicing: (i) if there is a shortfall in agreed Service Levels; or (ii) as L-servicing may reasonably request.

(a) **Notification of Scheduled Downtime**. Company will notify K-servicing at least three (3) business days in advance of any Scheduled Downtime periods.

(b)    **Defects.** Any defects, interruptions to Hosting Services, or failures to comply with specifications and requirements of the Platform will be classified by K-servicing as a Severity Level 1, Severity Level 2 or Severity Level 3 Defect, in accordance with the provisions below.

(i)    "**Severity Level 1 Defect**" means: (i) a defect that, in the reasonable judgment of K-servicing, renders the Hosted Services / Platform inoperable or is causing a serious adverse impact to K-servicing's business operations; or (ii) any material defect preventing or adversely impacting Borrowers from utilizing the Services applicable to Borrowers.

(ii)    "**Severity Level 2 Defect**" means a defect that materially impairs the Hosted Services and Platform performance, with the consequence that K-servicing's business can be performed but in a restricted or inefficient manner; or (ii) any defect that restricts or affects the efficiency of the provision of Services applicable to Borrowers; that is otherwise not a Severity Level 1 Defect.

(iii)    "**Severity Level 3 Defect**" means a defect that does not significantly affect K-servicing's current day-to-day business operations; but the performance or efficiency of K-servicing's business operations might improve if the Severity Level 3 defect were to be corrected, and that is otherwise not a Severity Level 1 Defect or a Severity Level 2 Defect.

(c)    **Responding to and Correcting Defects.** Company will: (i) initiate diagnostic and remedial measures in a manner appropriate for the priority of defect specified by K-servicing by telephonic, electronic or other notification; and (ii) correct any such defects in accordance with the following:

| Severity Level | Response Times | Resolution Times |
|---|---|---|
| **Severity Level 1 Defect** | 60 minutes Notification: First update: within 1 hour. Subsequent updates: Hourly until resolved | Use Commercially Reasonable Efforts to provide a workaround within four (4) hours of receiving the Enquiry. |
| **Severity Level 2 Defect** | 4 hours Notification: First update: within 4 hours. Subsequent updates: every 4 Hours until resolved | Use Commercially Reasonable Efforts to (i) provide a workaround within twelve (12) hours of receiving the Enquiry; and (ii) ensure that a permanent fix is provided as soon as reasonably possible. |
| **Severity Level 3 Defect** | 2 Business Days Communication and updates only sent if requested by the K-servicing | Company will (i) open and address the issues raised in the Enquiry within seventy-two (72) |

14

|  |  | hours of receipt and provide the Designated Contact with a status update and an estimated fix time; and (ii) use Commercially Reasonable Efforts to ensure that a permanent fix is provided as soon as reasonably possible. |
| --- | --- | --- |

Once Company has commenced corrective measures, Company will work continuously and diligently until the defect has been remedied. Company will provide periodic reports to K-servicing with regard to the progress of the resolution of the defects. Within 3 working days after resolution of any defect, Company will deliver a report specifying the defect, time of outage (if applicable), time to remedy such defect, and a root cause analysis.

**(d)     Support Hours & Escalation Process.** Standard support hours are 8 am to 8 pm EST (Mon – Fri) ("**Standard Hours**").  Company can provide support outside of the Standard Hours for an additional fee as mutually agreed by Company and K-servicing.  For support, K-servicing will submit the request using Company support portal or connect using a direct support phone number.

Once the request is logged in, a unique Service Request Number will be created and routed to a resolution team for handling.

Company's Resolution team will assign or update priority to this Service Request and provides resolution within the agreed timelines above.

At any point of time, K-servicing can escalate the ticket using the following escalation matrix:

(i) Escalation Level 1 - Dedicated Account Manager: Jagadeeswara Konikanti, Project Manager: Phone: 646-979-3411 Email: jkonikanti@biz2credit.com.

(ii) Escalation Level 2 - VP - Technology, Anupam Saha: Phone: 646-518-3419 / 631-546-8614. Email: Anupam.saha@biz2credit.com.

(iii) Escalation Level 3- CTO Vineet Tyagi, Phone: Phone: 646-568-7570 / +91 9313102111. Email: vineet.tyagi@biz2credit.com.

The Support Portal credentials and dedicated Account Manager Contact details will be provide to K-servicing team during implementation phase.

**Exhibit D**
**INFORMATION PROTECTION CONTRACT REQUIREMENTS ("IPCR")**

This Exhibit D is attached to and made part of the Software License Agreement between Company and Kabbage, Inc. and sets forth additional data privacy and information security obligations of Company with respect to its provision of Licensed Materials and Services, and its handling of Customer Information. Capitalized terms used but not otherwise defined in this Exhibit D shall have the meanings given to them in the Agreement.

## 1. DEFINITIONS

"**Applicable Data Processing Laws**" means all applicable laws, regulations, rules and guidance pertaining to privacy, data processing, data protection, information systems and data security, encryption, data retention, data localization and confidentiality.

"**Information Systems**" means the discrete set of electronic information resources organized by Company for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information that are used by Company or its Contractors (defined below) to collect, access, use, store, transmit or otherwise process Customer Information, or to interface, integrate, or otherwise connect with K-SERVICING's systems, or to perform Company's other obligations under the Agreement.

"**Industry Standards**" means all security standards and practices for the protection of confidential, personal or proprietary information that are generally followed by Company's leading competitors, or any alternate standards and practices that are no less rigorous, but in no event may such security standards and practices be less protective of the Customer Information and the Company Information Systems than the standards and practices of Company that may be identified by K-SERVICING in the course of Company's performance of the Agreement, including but not limited to information identified by K-SERVICING in connection with any on-site inspection or any Company self-assessment conducted in accordance with the Agreement.

"**Security Incident**" means: (i) any personal data breach (as defined in Applicable Data Processing Laws); (ii) any security incident which is reportable under Applicable Data Processing Laws; (iii) any accidental, unauthorized or unlawful processing, loss, modification or other compromise of Customer Information, or (iv) any unauthorized access or use of Company Information Systems which results in, or is reasonably likely to directly or indirectly cause, any of the foregoing items (i) through (iii).

## 2. DATA SECURITY OBLIGATIONS.

2.1 **Data Security Program**.

2.1.1.   Minimum Requirements. Company shall only process Customer Information in compliance with this IPCR, Applicable Data Processing Laws and Industry Standards,

16

and maintain, monitor and enforce a comprehensive written data security program. Company shall use its data security program to maintain, monitor and enforce reasonable organizational, administrative, technical and physical safeguards, at levels appropriate to the applicable risk, to protect the security, integrity, confidentiality and availability of Customer Information and Company Information Systems, including to protect against: (a) any anticipated threats or hazards, and (b) any Security Incident. Company's data security program shall include: (a) security principles of "segregation of duties" and "least privilege" with respect to Customer Information and Company Information Systems, a process by which employee and contractor user accounts may only be created with proper leadership approval and are timely deleted, an auditable history of changes, and an annual review and remediation for excess access authorization; (b) retention policies applicable to Customer Information and Company Information Systems for all reports, logs, audit trails and other documentation that provides evidence of data security, systems, and audit processes and procedures; (c) policies applicable to Customer Information and Company Information Systems documenting the consequences for violations of data security policies; (d) a vulnerability management program that deploys security patches to all Company Information Systems that process Customer Information as necessary to comply with this IPCR and Applicable Data Processing Laws; (e) at the choice of K-SERVICING, securely returning or providing written confirmation of secure disposal of all Customer Information once Company no longer needs Customer Information, including upon Agreement termination, except if retention is required for Company to comply with Applicable Data Processing Laws, in which case this IPCR survives the Agreement and continues to apply to the extent and for the duration of such retention; (f) a periodic risk assessment process, to be conducted at least annually, designed to review technological developments and evolving threats in light of the particular risks of the Company's business operations and the effectiveness of the controls to protect Personal Information and Information Systems and requirements describing how identified risks will be mitigated or accepted based on the Company's risk assessment; and (g) a process to evaluate new and emerging cybersecurity risks, including a review of cyber threat intelligence information, to modify and enhance Company's written data security program.

2.1.2.  Data Loss Prevention Program. Company shall maintain, monitor and enforce a data loss prevention automated program designed to detect and block data transfers of Customer Information containing social security numbers, national insurance numbers, K-SERVICING card holder account numbers, and other K-SERVICING customer financial account information, if such transfers do not comply with the Agreement.

2.1.3.  Standards. If Company processes Customer Information containing card holder or other financial account data under the Agreement, then Company shall certify that Company's data security program complies with Payment Card Industry Data Security Standard ("PCI DSS").

17

2.2. **Security Incidents**.

2.2.1. Security Incident Notice to K-SERVICING. Company shall provide K-SERVICING notice promptly and in any event within 24 hours of any Security Incident by phone (1-888-732-3750 or 1-602-537-3021) and in writing to EIRP@aexp.com, with reasonable detail concerning the Security Incident as it becomes available, including as required under Applicable Data Processing Laws. Upon such notification, Company agrees to conduct meetings with appropriate K-SERVICING representatives on a periodic basis, no less frequently than daily or as otherwise reasonably agreed to by the Parties, to provide status updates of the investigation. Company agrees to provide to K-SERVICING a forensic report and information relative to the remediation efforts undertaken following a Security Incident. Company will promptly contain, control and remediate any Security Incident and make reasonable efforts to retain documentation and audit trails related to the investigation and Security Incident.

2.2.2. Notifications. K-SERVICING acknowledges that Company may have separate notification duties under Applicable Data Processing Laws. Subject to such duties: (a) Company shall not make any public or other announcements or admissions of liability regarding the Security Incident, to the extent affecting K-SERVICING or its customers (including any common customers), employees or individual contractors ("**K-SERVICING Individuals**"), without the prior written consent of K-SERVICING, and (b) the provision of Security Incident notifications to K-SERVICING Individuals, and to applicable governmental authorities regarding such affected K-SERVICING Individuals, including the content, shall be at the reasonable discretion and reasonable direction of K-SERVICING. If Company determines that it must provide any such K-SERVICING Individual or government notifications under Applicable Data Processing Laws, Company shall provide K-SERVICING with reasonable prior notice of such notifications. Despite any Agreement confidentiality duty, K-SERVICING may disclose Security Incidents per Applicable Data Processing Laws and to mitigate risks of fraud or other harm.

2.2.3. Remediation. For the avoidance of doubt, K-SERVICING shall be entitled to reimbursement by Company for reasonable costs, expenses, fines, penalties, and/or other assessments, each to the extent incurred by K-SERVICING in connection with a Security Incident, including those incurred by K-SERVICING related to investigation, remediation, monitoring and notification of affected individuals, including where such activities are mandated by applicable law or the order of government authorities.

2.4 **Material Modifications**. Company shall provide K-SERVICING with 90 days' prior notice (or such shorter period as K-SERVICING shall agree) of any material modification to the Company Information Systems or to the process or method by which Customer Information is processed. If K-SERVICING reasonably determines and notifies Company that such modification could materially degrade security of Company Information Systems or Customer Information, then Company shall not make such modification.

2.5 **Encryption**. Company shall use strong encryption measures in accordance with Industry Standards to encrypt Customer Information in compliance with Applicable Data Processing Laws and in the following circumstances: (a) the processing of Customer Information on any

mobile device or mobile storage or removable media, including laptop computers, smart phones, USB devices ("thumb drives") and tapes/DVDs; (b) electronic transfers of Customer Information by Company outside of its network; and (c) while Customer Information is at rest.

**2.6. Authentication Controls**. Company shall use multi-factor authentication to protect against unauthorized access to Company Information Systems or Customer Information in compliance with Applicable Data Processing Laws and to control access to Company's internal networks from an external network. Company shall promptly notify K-SERVICING of any incident on Company's network that could reasonably be expected to affect K-SERVICING's network.

**2.7. Vulnerability Scanning Assessment and Pen Testing**. Company shall conduct regular monitoring and testing to assess the ongoing effectiveness of its data security program and promptly use reasonable efforts to remediate any vulnerabilities detected in the course of such monitoring and testing. Company agrees to conduct no less than annual penetration testing ("**Pen Testing**") on Company Information Systems by a reputable vendor to be agreed by the parties in advance. Prior to such Pen Testing, the Parties shall agree on the scope and objectives of the Pen Testing and Company shall have the third party performing the Pen Testing complete an K-SERVICING Pen Testing questionnaire and provide a copy of the unredacted Pen Testing results upon completion.

**2.8. Validation: Policies and Procedures, Correspondence, Third Party Assessments**. Company shall document and promptly provide to K-SERVICING: (a) copies of any privacy, data processing, data protection, data security, encryption, and confidentiality-related (i) Company policies, procedures, and standards (including escalation procedures for non-compliance and training materials) and (ii) third party assessments, test results, audits, and reviews (e.g., SSAE 18, SOC reports, SysTrust, WebTrust, or perimeter certifications), and other equivalent evaluations in its possession or control; (b) copies of correspondence containing individuals' requests regarding Company's privacy, data processing, and data protection practices in connection with Company Information Systems or Customer Information (and Company shall assist K-SERVICING with responding to the same); and (c) any other information requested by K-SERVICING to comply with Applicable Data Processing Laws or K-SERVICING auditing requirements. Company shall comply with all security standards that it has identified in the course of responding to K-SERVICING security questionnaires or provided to K-SERVICING pursuant to this Section.

**2.9. K-SERVICING Identified Vulnerabilities and Security Threats**. If K-SERVICING provides Company written documentation of a vulnerability, potential vulnerability or security threat that does or could impact Company's Information Systems or Customer Information, Company shall (a) determine if the vulnerability or security threat is present in or could impact Company's Information Systems and, if so, assign a severity level and timeline for remediation in accordance with Company's written data security program, (b) mitigate any such actual or potential vulnerabilities or security threats in accordance with Company's written data security program, and (c) provide K-SERVICING an estimated timeline for remediation and confirmation once such vulnerability or threat is remediated. If Company hosts an internet-facing application, K-SERVICING or its designee may perform internet-facing scans from time-to-time of such application. Upon Company's written notice, K-SERVICING shall provide its summary findings to Company of any material vulnerabilities uncovered in such scans.

19

2.10. **K-SERVICING Inspections**. Company shall reasonably cooperate with K-SERVICING, its designees and supervisory authorities or regulators, in connection with inspections of Company Information Systems, and Company and its Contractors processing of Customer Information, on-site or by phone, and with self-assessment security compliance reviews (including inspections and reviews for privacy, data processing, data protection, data security, encryption or confidentiality-related compliance). On-site inspections will be performed upon reasonable advance notice during Company's regular business hours.

2.11. **Training**. Company shall provide privacy, data processing, data protection, data security, encryption, and confidentiality awareness training annually to all individuals authorized by Company to access Company Information Systems or process Customer Information. Training shall occur before such individuals access such systems or process Customer Information, and such individuals shall repeat such training annually.

2.12. **Affiliates and Subcontractors**. If Company permitted third-party subcontractors or affiliates ("**Contractors**") access Company Information Systems or process Customer Information on behalf of Company per K-SERVICING's express approval (subject to any requirements covered elsewhere in the Agreement), Company shall ensure that any Contractors are bound by terms the same as or no less protective than the Agreement. In particular, Company shall ensure that either (a) each Contractor acts as a user under Company's written data security program, or (b) each Contractor's written data security program complies with this IPCR via sufficient diligence and oversight. Company shall be responsible for the acts and omissions of Contractors and all Company employees as if their acts and omissions were made by Company.

<u>Information Protection Contract Requirements</u>

**FIRST AMENDMENT**
**To**
**Software License Agreement**

THIS FIRST AMENDMENT ("**First Amendment**"), effective as of the _10/3/2022_, ("**First Amendment Effective Date**") amends the Software License Agreement, effective as of April 28, 2021, as amended (the "**Agreement**"), by and between Kabbage, Inc. d/b/a K-Servicing ("**K-Servicing**"), with offices located at 730 Peachtree Street, Suite 1100, Atlanta Georgia 30308 and Biz2Credit, Inc., ("**Licensor**"), with offices located at One Penn Plaza, Suite 3101, New York, NY 10119.  All other provisions of the Agreement not specifically revised herein shall remain in full force and effect.  In the event of any inconsistency between this First Amendment and the Agreement, as amended, the terms and conditions of this First Amendment shall control.

**WHEREAS**, K-Servicing and Licensor desire to amend the Agreement as set forth herein to extend the Term of the Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises stated herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound to such amendments, covenant and agree as follows:

1.     **Section 6 Term** shall be deleted and replaced in its entirety with the following:

(a) This Agreement shall have a term of twelve (12) months that will commence on the First Amendment Effective Date hereof.

In witness whereof the parties have caused this Amendment to be signed by their duly authorized representations for and on behalf of them:

**K-Servicing**

_____10/3/2022_____
Signature

_Laquisha Milner_____
Printed Name

_CEO_____
Title

**Biz2Credit Inc.**

_____9/30/2022_____
Signature

_Darren Hecht_____
Printed Name

_SVP, Sales_____
Title

# **<u>Exhibit 2</u>**



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV100978**

10/31/2022

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
| --- |
| **$36,297.24** |
| **Due Date: 11/30/2022** |

| PO # | Terms | Due Date |
| --- | --- | --- |
| | Net 30 | 11/30/2022 |

| Quantity | Description | Rate | Amount (USD) |
| --- | --- | --- | --- |
| 634 | Total Licensing-October'22 Submitted to SBA 634apps@$50=$31,700 | $50.00 | $31,700.00 |
| 1 | AWS-October'22 | $6,768.83 | $2,338.24 |
| 1,121 | Docusign | $2.00 | $2,242.00 |
| 17 | Bank Statement Parsing | $1.00 | $17.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
| | Wire Instructions<br>Beneficiary Name: Biz2X LLC<br>Bank Name: HSBC Bank USA<br>Account#: 038021595<br>Routing#: 021001088<br>Swift Code: MRMDUS33<br>Our wiring details have changed. | | |

| | |
| --- | --- |
| **Total (USD)** | $36,297.24 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $34,568.80 |
| **Balance Due** | $1,728.44 |



INV100978

1 of 1



# Invoice

**Biz2X LLC**
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101005**

11/30/2022

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
|---|
| **$156,277.53** |
| **Due Date: 12/30/2022** |

| PO # | Terms | Due Date |
|---|---|---|
| | Net 30 | 12/30/2022 |

| Quantity | Description | Rate | Amount (USD) |
|---|---|---|---|
| 3,043 | Total Licensing-November'22 Submitted to SBA 3043apps@$50=$152,500 | $50.00 | $152,150.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-Nov'22 | $2,017.53 | $2,017.53 |
| 1,041 | Docusign | $2.00 | $2,082.00 |
| 21 | Bank Statement Parsing | $1.00 | $21.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 1 | Payroll Parsing | $7.00 | $7.00 |
| | Wire Instructions<br>Beneficiary Name: Biz2X LLC<br>Bank Name: HSBC Bank USA<br>Account#: 038021595<br>Routing#: 021001088<br>Swift Code: MRMDUS33<br>Our wiring details have changed. | | |

| | |
|---|---|
| **Total (USD)** | $156,277.53 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $156,277.53 |


INV101005



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101041**

12/30/2022

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
|---|
| **$60,483.85** |
| **Due Date: 1/29/2023** |

| PO # | Terms | Due Date |
|---|---|---|
| | Net 30 | 1/29/2023 |

| Quantity | Description | Rate | Amount (USD) |
|---|---|---|---|
| 1,131 | Total Licensing-December'22 Submitted to SBA 1131apps@$50=$56,550 | $50.00 | $56,550.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-Dec'22 | $2,143.85 | $2,143.85 |
| 888 | Docusign | $2.00 | $1,776.00 |
| 14 | Bank Statement Parsing | $1.00 | $14.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
| | Wire Instructions<br>Beneficiary Name: Biz2X LLC<br>Bank Name: HSBC Bank USA<br>Account#: 038021595<br>Routing#: 021001088<br>Swift Code: MRMDUS33<br>Our wiring details have changed. | | |

| | |
|---|---|
| **Total (USD)** | $60,483.85 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $60,483.85 |



INV101041



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101086**

1/31/2023

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
| --- |
| **$32,846.09** |
| **Due Date: 3/2/2023** |

| PO # | Terms | Due Date |
| --- | --- | --- |
|  | Net 30 | 3/2/2023 |

| Quantity | Description | Rate | Amount (USD) |
| --- | --- | --- | --- |
| 588 | Total Licensing-Jan'23 Submitted to SBA 588apps@$50=$29,400 | $50.00 | $29,400.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-Jan'23 | $2,168.09 | $2,168.09 |
| 636 | Docusign | $2.00 | $1,272.00 |
| 6 | Bank Statement Parsing | $1.00 | $6.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
|  | Wire Instructions Beneficiary Name: Biz2X LLC Bank Name: HSBC Bank USA Account#: 038021595 Routing#: 021001088 Swift Code: MRMDUS33 Our wiring details have changed. |  |  |

| | |
| --- | --- |
| **Total (USD)** | $32,846.09 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $32,846.09 |


INV101086

1 of 1



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101097**

2/28/2023

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
| :-- |
| **$59,728.00** |
| **Due Date: 3/30/2023** |

| PO # | Terms | Due Date |
| --- | --- | --- |
| | Net 30 | 3/30/2023 |

| Quantity | Description | Rate | Amount (USD) |
| --- | --- | ---: | ---: |
| 1,113 | Total Licensing- Feb'23<br>Submitted to SBA<br>1113 apps@$50=$55,650 | $50.00 | $55,650.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-Feb'23 | $2,062.00 | $2,062.00 |
| 955 | Docusign | $2.00 | $1,910.00 |
| 106 | Bank Statement Parsing | $1.00 | $106.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
| | Wire Instructions<br>Beneficiary Name: Biz2X LLC<br>Bank Name: HSBC Bank USA<br>Account#: 038021595<br>Routing#: 021001088<br>Swift Code: MRMDUS33<br>Our wiring details have changed. | | |

| | |
| :-- | --: |
| **Total (USD)** | $59,728.00 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $59,728.00 |



INV101097



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101140**

3/31/2023

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
|---|
| **$48,410.86** |
| **Due Date: 4/30/2023** |

| PO # | Terms | Due Date |
|---|---|---|
|  | Net 30 | 4/30/2023 |

| Quantity | Description | Rate | Amount (USD) |
|---|---|---|---|
| 898 | Total Licensing- March'23<br>Submitted to SBA<br>898 apps@$50=$44,900 | $50.00 | $44,900.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-March '23 | $2,364.86 | $2,364.86 |
| 573 | Docusign | $2.00 | $1,146.00 |
| 0 | Bank Statement Parsing | $1.00 | $0.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
|  | Wire Instructions<br>Beneficiary Name: Biz2X LLC<br>Bank Name: HSBC Bank USA<br>Account#: 038021595<br>Routing#: 021001088<br>Swift Code: MRMDUS33<br>Our wiring details have changed. |  |  |

| | |
|---|---|
| **Total (USD)** | $48,410.86 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $48,410.86 |



INV101140

1 of 1



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

#INV101170

4/10/2023

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
| --- |
| **$8,254.68** |
| Due Date: **5/10/2023** |

| PO # | Terms | Due Date |
| --- | --- | --- |
| | Net 30 | 5/10/2023 |

| Quantity | Description | Rate | Amount (USD) |
| --- | --- | --- | --- |
| 103 | Total Licensing- April'23 Submitted to SBA 103 apps@$50=$5150 | $50.00 | $5,150.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-April '23 | $2,854.68 | $2,854.68 |
| 125 | Docusign | $2.00 | $250.00 |
| 0 | Bank Statement Parsing | $1.00 | $0.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
| | Wire Instructions Beneficiary Name: Biz2X LLC Bank Name: HSBC Bank USA Account#: 038021595 Routing#: 021001088 Swift Code: MRMDUS33 Our wiring details have changed. | | |

| | |
| --- | --- |
| **Total (USD)** | $8,254.68 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $8,254.68 |


INV101170



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101184**

5/31/2023

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
|---|
| **$2,306.20** |
| Due Date: **6/30/2023** |

| PO # | Terms | Due Date |
|---|---|---|
| | Net 30 | 6/30/2023 |

| Quantity | Description | Rate | Amount (USD) |
|---|---|---|---|
| 0 | Total Licensing- May'23<br>Submitted to SBA<br>0 apps@$50=$0 | $50.00 | $0.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-May'23 | $2,284.20 | $2,284.20 |
| 11 | Docusign | $2.00 | $22.00 |
| 0 | Bank Statement Parsing | $1.00 | $0.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |
| | Wire Instructions<br>Beneficiary Name: Biz2X LLC<br>Bank Name: HSBC Bank USA<br>Account#: 038021595<br>Routing#: 021001088<br>Swift Code: MRMDUS33<br>Our wiring details have changed. | | |

| | |
|---|---|
| **Total (USD)** | $2,306.20 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $2,306.20 |


INV101184



# Invoice

Biz2X LLC
One Penn Plaza,
Suite 3101
New York NY 10119
United States

**#INV101230**

6/30/2023

**Bill To**

K-Servicing
730 Peachtree Street
Suite 1100
Atlanta GA 30308
United States

| TOTAL (USD) |
|---|
| **$1,535.04** |
| Due Date: **7/30/2023** |

| PO # | Terms | Due Date |
|---|---|---|
|  | Net 30 | 7/30/2023 |

| Quantity | Description | Rate | Amount (USD) |
|---|---|---|---|
| 0 | Total Licensing- Jun'23<br>Submitted to SBA<br>0 apps@$50=$0 | $50.00 | $0.00 |
| 1 | AWS Cloud Hosting- Monthly Data Usage Fee-Jun'23 | $1,533.04 | $1,533.04 |
| 1 | Docusign | $2.00 | $2.00 |
| 0 | Bank Statement Parsing | $1.00 | $0.00 |
| 0 | Yodlee | $1.00 | $0.00 |
| 0 | Payroll Parsing | $7.00 | $0.00 |

Wire Instructions
Beneficiary Name: Biz2X LLC
Bank Name: HSBC Bank USA
Account#: 038021595
Routing#: 021001088
Swift Code: MRMDUS33
Our wiring details have changed.

| | |
|---|---|
| **Total (USD)** | $1,535.04 |
| **Tax Total (0%)** | $0.00 |
| **Amount Paid** | $0.00 |
| **Balance Due** | $1,535.04 |


INV101230

1 of 1