# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KSERVICING WIND DOWN CORP., *et al.*,[1] | Case No. 22-10951 (CTG) |
| Post-Confirmation Debtors. | (Jointly Administered) |
| KSERVICING WIND DOWN CORP. (f/k/a Kabbage, Inc.), | |
| Plaintiff, | Adversary Proceeding No. 25-_____ |
| v. | |
| AMERICAN EXPRESS KABBAGE INC. (f/k/a Alpha Kabbage, Inc.) and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | |
| Defendants. | |

## <u>ORIGINAL COMPLAINT</u>

---

[1] The post-confirmation Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable are: KServicing Wind Down Corp. (f/k/a Kabbage, Inc. d/b/a KServicing) (3937); KServicing Wind Down Canada Holdings LLC (f/k/a Kabbage Canada Holdings, LLC) (N/A); KServicing Wind Down Asset Securitization LLC (f/k/a Kabbage Asset Securitization LLC) (N/A); KServicing Wind Down Asset Funding 2017-A LLC (f/k/a Kabbage Asset Funding 2017-A LLC) (4803); KServicing Wind Down Asset Funding 2019-A LLC (f/k/a Kabbage Asset Funding 2019-A LLC) (8973); and KServicing Wind Down Diameter LLC (f/k/a Kabbage Diameter, LLC) (N/A). The Debtors' mailing and service address is KServicing Wind Down Corp. c/o Resolute Commercial Services, 6750 E. Camelback Road, Suite 103, Scottsdale, AZ 85251.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................. 1

PARTIES AND RELEVANT NON-PARTIES ........................................ 14

A.  Parties ................................................................................................ 14

B.  Relevant Non-Parties ....................................................................... 14

JURISDICTION AND VENUE ............................................................... 17

FACTUAL BACKGROUND ................................................................... 17

A.  Kabbage Nearly Collapses from the COVID-19 Pandemic, but Rebounds by Shifting to PPP Lending. .......................................... 17

    1.  Kabbage Builds Its Business by Making Risky and Repeated Small Business Loans with Automated Underwriting. ................ 18

    2.  Kabbage Shifts to PPP Lending to Save the Company ............ 21

B.  In Rushing to Retrofit Its Lending Platform for the PPP, Kabbage Ignores Known Issues Posing Major Compliance and Legal Risks. .......................................................... 23

    1.  Kabbage Knows Its BSA/AML Compliance Program Is Woefully Insufficient for the PPP. ........................................... 23

    2.  Kabbage's Small Compliance Team Cannot Handle the PPP Applications Flooding Its Lending Platform. .......................... 26

    3.  Kabbage Identifies but Ignores Issues with Its Lending Platform Resulting in Thousands of Borrowers Receiving Inflated Loans. .............................. 29

C.  After Receiving a Lowball Offer from American Express, Frohwein Decides to Use PPP-Generated Cash to Drive Up the Sale Price. ..................................... 34

    1.  Kabbage Touts Its PPP Customers and Revenue as Leverage to Increase American Express's Offer. .................................... 35

    2.  American Express Seeks to "Orphan" Kabbage's PPP Portfolio as Part of an Asset Sale. .......................................... 37

    3.  Frohwein Leverages PPP Cash to Get to an Acceptable Final Offer from American Express. ................................................ 38

D.  During Negotiations with American Express, Kabbage Ignores Repeated Signs of Fraud in Its PPP Portfolio. ............................... 39

1.    Obviously Fraudulent PPP Applications Are So Prevalent, They Become a Running Joke Among Kabbage Employees. ....................................... 40

2.    Wells Fargo Terminates Its Relationship with Kabbage. .................................... 46

3.    Whistleblower Identifies Major Gaps in Kabbage's Fraud Controls................... 47

E.    Kabbage and American Express Execute the Merger Agreement, But Only After Building in Massive Protections from Litigation Risk. ..................................... 56

1.    Kabbage Management, Kabbage Shareholders, and American Express Recognize that Kabbage Faced Massive Litigation Risk....................... 56

2.    Kabbage Struggles to Find a Firm Willing to Offer a Solvency Opinion. ........... 61

3.    Kabbage Announces Its Deal with American Express, Which Promises to Leave the Legacy Company Hopelessly Insolvent.............................................. 66

4.    The Sale to American Express Closes and Kabbage Transfers Its Valuable Assets to AmEx Kabbage. .................................................................................. 72

F.    Kabbage Is Leveled with a Series of Legal and Regulatory Actions. ............................. 74

CAUSES OF ACTION ........................................................................................................... 78

COUNT I ................................................................................................................................ 78

Avoidance and Recovery of the October 13, 2020 Transfer as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a) (Against AmEx Kabbage and American Express)

COUNT II ............................................................................................................................... 82

Avoidance and Recovery of the October 13, 2020 Transfer as a Constructive Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(B) & 550(a) (Against AmEx Kabbage and American Express)

COUNT III.............................................................................................................................. 83

Avoidance and Recovery of the October 13, 2020 Transfer as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a) (Against AmEx Kabbage and American Express)

COUNT IV.............................................................................................................................. 84

Avoidance and Recovery of the October 13, 2020 Transfer as a Constructive Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a) (Against AmEx Kabbage and American Express)

COUNT V ................................................................................................................ 85

    Avoidance of Waiver and Release Rights Under Merger Agreement as an Actual
    Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a)
    (Against AmEx Kabbage and American Express)

COUNT VI ............................................................................................................... 86

    Avoidance of Indemnification Rights Under Merger Agreement as an Actual
    Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a)
    (Against AmEx Kabbage and American Express)

COUNT VII .............................................................................................................. 87

    Avoidance of Waiver and Release Rights under Merger Agreement as an Actual
    Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a)
    (Against AmEx Kabbage and American Express)

COUNT VIII ............................................................................................................. 88

    Avoidance of Indemnification Rights under Merger Agreement as an Actual
    Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a)
    (Against AmEx Kabbage and American Express)

COUNT IX ............................................................................................................... 90

    Equitable Subordination of Indemnification Rights Pursuant to 11 U.S.C. § 510(c)
    (Against AmEx Kabbage and American Express)

COUNT X ................................................................................................................ 91

    Disallowance of Claims Under 11 U.S.C. § 502(d)
    (Against AmEx Kabbage and American Express)

PRAYER FOR RELIEF ........................................................................................... 91

KServicing Wind Down Corp. (f/k/a Kabbage, Inc.) ("Kabbage") hereby files this Original Complaint against American Express Kabbage Inc. ("AmEx Kabbage") and American Express Travel Related Services Company, Inc. ("American Express") (collectively, "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action to recover over $746 million from a fraudulent transfer made by Kabbage to its sole shareholder, AmEx Kabbage.  The fraudulent transfer provided no value whatsoever to Kabbage because it was a one-way distribution of all Kabbage's valuable assets. This distribution left Kabbage hopelessly insolvent with hundreds of millions of dollars in liabilities, including substantial liabilities to the United States Department of Justice ("DOJ"), the Small Business Administration ("SBA"), and the Federal Reserve System.

2.     These liabilities arose from Kabbage's role as the second largest lender by volume in the Paycheck Protection Program ("PPP"), which Congress designed to provide potentially forgivable loans to businesses struggling to make payroll during the COVID-19 pandemic. Kabbage made approximately $7 billion of PPP loans to nearly 300,000 separate borrowers. Kabbage was only able to outpace larger institutional lenders by turning a blind eye to a massive amount of fraudulent and otherwise defective PPP loan applications.

3.     Around the same time that Kabbage's misconduct was becoming apparent to the DOJ and other government investigators, the company entered into a merger agreement with American Express.  As part of this agreement, immediately prior to the merger, Kabbage transferred its most valuable assets—including $120 million in cash earned from the PPP—to its sole shareholder, AmEx Kabbage.  American Express then purchased AmEx Kabbage by merging an American Express subsidiary into AmEx Kabbage.  Kabbage, however, did not receive any of

1

the merger consideration; instead, American Express paid the vast majority of this consideration, over $730 million, to Kabbage's former shareholders.  Kabbage insiders, meanwhile, made off with more than $80 million in bonuses and other consideration from the deal.

4.      As a result of the merger, the principal assets and liabilities left at Kabbage were those connected to the PPP.  This was by design.  American Express just wanted a head start in moving "beyond the card" by acquiring ready-made product lines for small business customers.  It did not want responsibility for Kabbage's PPP or other loan portfolios, which American Express came to understand were likely to result in massive legal exposure, damages awards, fines, and penalties.  In fact, American Express helped Kabbage orchestrate and implement the various steps of the merger agreement, including the pre-merger transfer of its valuable assets to AmEx Kabbage with the intention of "orphaning" its toxic PPP loans and liabilities at Kabbage.

5.      Prior to the COVID-19 pandemic, Kabbage's revenue was largely based on offering risky, high-interest loans to small businesses through a proprietary online lending platform.  As described by one employee, Kabbage essentially operated as "a pay-day lender for eBay sellers." By the start of 2020, Kabbage was already experiencing a liquidity shortfall and was hoping to sell its lending platform to a strategic buyer looking to expand its small business lending.  But the onset of the pandemic wrecked Kabbage's already dubious business model.  Commerce ground to a halt and credit markets evaporated overnight.  By the end of March 2020, Kabbage had ceased lending and furloughed the bulk of its workforce, and the company faced an existential crisis.

6.      On March 27, 2020, however, Congress created the PPP by enacting the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act").  The government ran the program through the SBA, which allowed private lenders to offer loans to qualifying borrowers. The SBA would later forgive a PPP loan if the borrower used the funds for payroll and other

eligible expenses.  In exchange for disbursing and servicing PPP loans, the SBA paid lenders a processing fee based on a percentage of the loan amount.  The SBA also provided lenders a guarantee by indemnifying unforgiven or defaulted loans so long as the lenders adhered to the program's requirements.  Failure by a lender to comply with the SBA's requirements, on the other hand, could result in the SBA determining that the loan was not eligible for a guaranty and seeking repayment of the lender's processing fee.

7.     Kabbage management immediately recognized the PPP as a financial lifeline to resuscitate their plan to sell the company.  If they could quickly retrofit Kabbage's online platform for use in the PPP and beat other lenders to the market, they could turn the PPP into what one Kabbage executive gleefully described as a "money making machine!"  The influx of cash would give the company enough runway to complete a transaction.

8.     Several regulatory hurdles stood in the way of Kabbage's plan.  Most importantly, Kabbage was not an SBA-recognized Section 7(a) lender.  To become one and participate in the PPP, the SBA required non-bank lenders like Kabbage to have a Bank Secrecy Act ("BSA") and anti-money laundering ("AML") compliance program "equivalent to that of a comparable federally regulated institution" before making loans.[2]  But Kabbage management already knew that the company's compliance program was severely lacking, which compromised the company's ability to prevent, detect, report, and respond to potentially suspicious or illegal activity.  Indeed, a November 2019 independent testing of Kabbage's BSA/AML compliance program found that Kabbage had not addressed issues raised in the 2018 testing, and that its BSA/AML program was "an important weakness that require[d] prioritization by the Company."

---

[2] 85 Fed. Reg. 20811, 20815.

9.      Moreover, the SBA made clear that all PPP lenders "are expected to perform a good-faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll costs."[3]   But Kabbage's entire business model was built around its automated platform tolerating a certain amount of fraud, and the company had just furloughed the few employees who were responsible for manually reviewing suspect loan applications.

10.      Desperate to curry the interest of American Express and other potential buyers, Kabbage executives ignored these glaring deficiencies in favor of churning out as many PPP loans as possible.   Only two days after passage of the PPP, Kabbage Co-Founder, CEO, and Chairman of the Board of Directors Robert Frohwein texted American Express Managing Director Harshul Sanghi that "Kabbage is positioned to make many billions ($) of loans under the [PPP]."  Frohwein and the rest of Kabbage's Board of Directors (the "Board") knew that maximizing PPP revenue would increase Kabbage's leverage and make a deal with American Express far more attractive to its shareholders.  Frohwein made clear to Kabbage's senior management that the expectations he set with American Express needed to be met as soon as possible.

11.      On April 9, 2020 (six days after the PPP opened for lending), Kabbage Strategy and Operations Manager Kristel Adler sent a Slack message to the small cadre of Kabbage employees chosen by Frohwein to work on the American Express deal that "rob [was] f-ing panicking" that the PPP funds would be disbursed before Kabbage ramped up its lending program. Two days later, Adler told her team that she wanted "$1bn in loan calc ready to go" immediately to satisfy Frohwein.

---

[3] SBA PPP FAQ #1 (Apr. 3, 2020).

12.     While eager to drive as many PPP applications as possible, Kabbage management did not show the same drive in fixing known issues with its lending platform, BSA/AML program, and fraud mitigation controls.  Although Kabbage begrudgingly re-hired some of its furloughed employees to investigate applications with indicia of fraud, the small team had little experience in reviewing applications for fraud and was woefully inadequate to handle the volume of PPP loans now flooding in daily.  Moreover, Kabbage management discouraged the reviewers from actually classifying suspicious applications as fraudulent.  Instead, the directive given to reviewers was to quickly process as many applications as they possibly could, and to approve applications, even highly suspicious ones, unless they had definitive proof of fraud.

13.     Kabbage's efforts to retrofit its lending platform to the parameters of the PPP were as ineffective as its fraud controls.  For instance, the statute authorizing the PPP excluded from the definition of eligible payroll costs "the compensation of an individual employee in excess of an annual salary of $100,000."[4]  Yet Kabbage's lending platform did not limit borrowers from including such compensation in calculating their loan amounts.  And since Kabbage's platform was designed to be largely automated, there was obviously no "good faith review . . . of the borrower's calculations and supporting documents" to confirm these loan amounts.  Kabbage's platform similarly allowed borrowers to double count employees' state and local tax ("SALT") withholdings in determining average monthly payroll, thus further inflating borrowers' loan calculations.  The DOJ estimated that these and other errors increased at least 55,866 borrowers' loans by at least $233,712,993.

---

[4] 15 U.S.C. § 636(a)(36)(A)(viii)(II)(aa).

14.     These systematic issues came to the explicit attention of senior Kabbage executives—including Frohwein and Kabbage Co-Founder Kathryn Petralia—as early as April 2020, yet nobody at Kabbage addressed them.  Kabbage Head of Lending Strategy mused on Slack (the internal messaging system used by Kabbage employees) that he "can't get anyone to take this seriously," adding "we gave out millions of extra $ and are just gonna yolo it lol."[5]  He noted that he brought the issue to Kabbage's Head of Strategy, Spencer Robinson, but he was "pretty sure [Robinson was] just drunk lolz."  Frohwein, Petralia, Robinson, and other Kabbage executives had good reason to ignore these errors.  The amount of Kabbage's fees was based on the size and volume of its loans.  And because Kabbage executives operated on the unreasonable and unsupportable assumption that the SBA would take on all risk posed by deficiencies in Kabbage's lending platform and BSA/AML compliance program, they knew that inflated and fraudulent loans sent dollars directly to Kabbage's bottom line.

15.     Infused with cash from the PPP, Kabbage now had sufficient runway to negotiate with American Express, which submitted an initial offer of $450 million on April 20, 2020.  But in the event of a sale, Kabbage's largest preferred shareholders, Softbank and Reverence Capital Partners ("RCP"), were entitled to massive liquidation preferences that would consume nearly all of American Express's initial offer.  Frohwein estimated that he could not win Board approval for any deal less than $750 million.  Frohwein developed a two-part plan to address the gap.  First, Frohwein would negotiate American Express's number as high as possible by touting, in part, all the new customers (and potential American Express customers) Kabbage would obtain through the PPP.  Second, Frohwein would redouble Kabbage's efforts to issue as many PPP loans as

---

[5] "YOLO" is an online acronym for "you only live once."

possible, thus maximizing cash on hand that Kabbage could "sell" to American Express dollar for dollar.

16.     Notably, American Express's offer was framed as an asset purchase in order to exclude from the sale both Kabbage's PPP and legacy loan portfolios.  Although doing so exposed the proceeds of the sale to double taxation—both at the corporate level and then again when distributed to Kabbage shareholders—it also posed the potential benefit of Kabbage's leadership and shareholders being able to shed their exposure to Kabbage's toxic loan portfolio and all future servicing obligations.

17.     Kabbage thus proposed a complex structure adopting American Express's desire to orphan its loan portfolio while capturing the tax benefits of a stock purchase.  Specifically, Kabbage would create a new parent company—AmEx Kabbage—to which Kabbage would gratuitously transfer the assets being sold to American Express.  Kabbage's shareholders would receive corresponding shares in AmEx Kabbage, which would merge into an American Express subsidiary.  Finally, Kabbage shareholders would receive cash from American Express in exchange for cancellation of their shares in AmEx Kabbage.  Meanwhile, Kabbage would remain with only enough cash (at least theoretically) to service the remaining loan portfolios.  As one Kabbage executive marveled, "basically we can say bye felicia to our outstanding bad debt."[6]

18.     While Kabbage and American Express schemed how to leave the PPP portfolio on the side of the road, further warning signs emerged demonstrating the volume of fraudulent loans that bypassed Kabbage's almost non-existent fraud controls.  First, Kabbage employees began noticing a tremendous number of suspicious applications.  The problem became so prevalent that

---

[6] "Bye Felicia" is a quote from the 1995 film "Friday," which has become online shorthand for a dismissive farewell.

Kabbage analysts openly joked about the amount and brazen nature of the fraud making its way through Kabbage's lending platform, exchanging internet memes like the following:



19.    Second, Kabbage's corporate bank, Wells Fargo, began identifying Kabbage loans that borrowers deposited into accounts that had seen little or no activity prior to the loan disbursement.    Wells Fargo's concern about the increasing instances of fraud—as well as Kabbage's fundamental shift to focusing entirely on its PPP lending as a source for revenue— contributed to Wells Fargo's decision to terminate its relationship with Kabbage.

20.    Only days after Wells Fargo notified Kabbage of the termination, Kabbage received a risk assessment report (the "Risk Assessment Report") of Kabbage's PPP portfolio conducted

by Alvarez & Marsal ("A&M").  A&M conducted a limited review—assessing a sample of only ten loans, or 0.007% of Kabbage's PPP loans to date—yet nevertheless found numerous major deficiencies with Kabbage's fraud controls and policies.  Moreover, the Risk Assessment Report found its way to Kabbage Legal Analyst Paul Pietschner, who had recently returned from being furloughed to help with collections efforts related to Kabbage's loan portfolios.  In response, Pietschner conducted a survey of several members of Kabbage's operations team to investigate concerns about Kabbage's compliance with SBA's BSA/AML requirements.  Pietschner identified many more issues missed by A&M, including widespread gaps in Kabbage's fraud controls, and documented dozens of examples of fraudulent loans that Kabbage approved.

21.    To draw attention to the issue, Pietschner named his survey the "Kutworm Report" in reference to a "leaf-eating caterpillar that ravages cabbage crops if left untreated."  Pietschner provided his report to his supervisors, Kabbage's legal department, as well as several Kabbage executives.  It took nearly two months for anyone from Kabbage's management team to actually respond to the report, and even then, their only response was to sweep the report under the rug and leave Pietschner with the impression he would be terminated for relaying these concerns.  In fact, rather than address the issues raised in the A&M report at all, Frohwein instructed his team to "punch [A&M] in the fucking face to update [the] report and pull it back" so it wouldn't "kill our amex deal."

22.    Meanwhile, on June 23, American Express increased its offer to $625 million, which together with the cash that Kabbage accumulated from its PPP fees, was enough for Frohwein to secure approval from the Board (which included representatives from several major shareholders, including Softbank and RCP).

23.     The deal was still uncertain, however, in no small part because of the profound concern regarding Kabbage's BSA/AML compliance and fraud controls that American Express independently developed without having seen A&M's Risk Assessment Report.  As Frohwein himself explained to several Kabbage executives, "the thing that worries [American Express] legally is *any liability flowing from fraudulent applicants, anything that would give the government, applicants and others suing them*."[7]  Importantly, American Express's concerns were not borne from a failure to understand Kabbage's processes.  Indeed, American Express spent months studying these processes before concluding that Kabbage's "compliance program lacks clear inventory of controls, consistent evidence of internal oversight, and detail on process for or output of regular risk assessments."  Given these profound concerns, American Express concluded that "historical liability" from Kabbage's compliance program "cannot be precisely assessed."

24.     Even before the transaction, American Express knew that merely disassociating itself from Kabbage's toxic loan portfolios was insufficient to shield itself from liability.  But American Express was desperate to push forward with its effort to expand its small-business capabilities.  Thus, rather than scrap the deal, American Express instead demanded that $37.5 million of the shareholders' proceeds from the contemplated transaction be held in escrow. American Express also insisted on wide ranging indemnification and limitations on liability not only from Kabbage's shareholders, but also Kabbage itself, which stood to receive no consideration from the deal.

25.     Before the deal could close, Kabbage also had to determine the bare minimum needed to leave behind for servicing obligations and contingent liabilities.  To do so, Kabbage had

---

[7] Unless otherwise stated herein, emphasis has been added to quotes from documents.

to obtain a solvency opinion for the legacy company.  Kabbage first turned to Houlihan Lokey, Inc. ("Houlihan"), which was already working on a valuation of Kabbage's assets for tax reporting purposes.  As part of the solvency engagement, Kabbage insisted that Houlihan treat the liabilities associated with its legacy loan portfolio as "non-recourse" debt to Kabbage.  Thus, Houlihan would "be instructed to carve out the Non-Recourse [debt] (and associated assets) for purposes of the" solvency analysis.  Kabbage also insisted that Houlihan assume that Kabbage's PPP loans were "fully guaranteed by the US Govt."

26.    Houlihan determined that it could only make such assumptions after conducting diligence on the loans in question, which was something even Kabbage never did with any rigor. Unable to do its own diligence in Kabbage's desired timeline—and expressing skepticism that it could ever be comfortable issuing a solvency opinion—Houlihan's executive committee declined to approve the engagement.

27.    Kabbage ultimately obtained a solvency opinion from Duff & Phelps Corporation ("Duff & Phelps"), which charged above-market rates to account for the inordinate risk of the assignment.  Kabbage worked quickly with Duff & Phelps to determine how much retained cash Kabbage needed to service the company's loan portfolio, cover all of the company's various liabilities, and fund the company's wind-down activities.  Notably, with regard to liability stemming from potential litigation in the coming years (including both cost of defense and settlement), Kabbage management told Duff & Phelps to reserve *only $1 million*, even though Kabbage's own General Counsel, Scott Askins, noted internally that "the defense costs alone for outside litigation counsel have been *higher than $1M annually*."  Even Kabbage's own counsel, Goodwin Procter LLP ("Goodwin") mused that Duff & Phelps was "dumb for issuing the solvency opinion" in light of potential litigation risks.

28.     The parties signed the governing Agreement and Plan of Merger (the "Merger Agreement") on August 16, 2020.  Exhibit K of the Merger Agreement called for a convoluted series of steps needed to accomplish the tax-beneficial structure devised by Kabbage.  On October 13, 2020, Kabbage transferred virtually all of the company's valuable assets (including those of its wholly owned subsidiaries) to AmEx Kabbage, including $120 million in cash earned from the PPP.  Now doing business as "KServicing" because the "Kabbage" trademark was included in the transfer, Kabbage was left with approximately $17 million to both service its existing loan portfolios and cover all of the company's liabilities, including contingent liabilities and necessary wind-down activities.  Kabbage executives, Kabbage shareholders, and Kabbage employees down to low-level analysts—not to mention American Express itself—knew that this amount fell far short of what was needed to both service its remaining loans and account for the company's massive litigation risk.

29.     One internet meme shared by a Kabbage employee with his coworkers cynically captured the brazen nature of the transaction:



30.    Barely a month after the transaction closed, a whistleblower filed an action against Kabbage under the federal False Claims Act (the "FCA"), which alleged (correctly) that the company knowingly submitted inflated and fraudulent PPP loans.  Then, in February 2021, Pietschner—whose concerns had been consistently brushed aside by his superiors at Kabbage— filed another whistleblower action alleging (again, correctly) that Kabbage falsely certified compliance with SBA requirements, including having a BSA/AML compliance program that was commensurate with a similarly situated federally regulated financial institution.

31.    Given Kabbage's significant failings, FCA actions were inevitable and predictable. Indeed, as early as June 2020, the DOJ stated that it "will make it a priority to use the [FCA] to combat fraud in the [PPP]" and noted that "borrowers and lenders are required to abide by the programs' requirements, including various eligibility requirements."[8]

32.    Kabbage spent many millions of dollars in legal fees on these actions and other investigations, and it agreed to $212 million in settlements with both the DOJ and the SBA stemming from its PPP loans.  This legal exposure was not only foreseeable, it was actually foreseen by those involved on both sides of Kabbage's deal with American Express.  Tellingly, several Kabbage officers—including CEO Robert Frohwein, Co-Founder Kathryn Petralia, and Head of Strategy Spencer Robinson—pleaded the Fifth Amendment to questioning from the DOJ regarding Kabbage's involvement in the PPP.

33.    Kabbage now brings this action to recover the value of the assets transferred to AmEx Kabbage and subsequently transferred to American Express.

---

[8] *Principal Deputy Assistant Attorney General Ethan P. Davis delivers remarks on the False Claims Act at the U.S. Chamber of Commerce's Institute for Legal Reform*, DEPT. OF JUST. (June 26, 2020), *available at* https://bit.ly/3yg1LmU.

## PARTIES AND RELEVANT NON-PARTIES

### A.    Parties

34.    Plaintiff Kabbage is a Delaware corporation.  On October 3, 2022, Kabbage and its various subsidiaries filed the above-captioned bankruptcy case in this Court.  On March 15, 2023, the Court confirmed the *Amended Joint Chapter 11 Plan of Liquidation of Kabbage, Inc. (d/b/a KServicing) and Its Affiliated Debtors* [Dkt. No. 627] (the "Chapter 11 Plan").  Pursuant to the Chapter 11 Plan, Kabbage, as a post-confirmation debtor, retained certain claims and causes of action belonging to the company, including the claims asserted in this action.

35.    Defendant AmEx Kabbage is a Delaware corporation formed on August 10, 2020.  It maintained its principal offices at 730 Peachtree Street, NE, Suite 1100, Atlanta, Georgia 30308.  It may be served through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

36.    Defendant American Express is a New York corporation, and it is registered to do business in the State of Delaware.  It maintains its principal offices at 111 Eighth Avenue, New York, New York 10011.  It may be served through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

### B.    Relevant Non-Parties

37.    Robert Frohwein was Kabbage's Chief Executive Officer, Co-Founder, and Chairman of the Board.  Frohwein also became AmEx Kabbage's Chief Executive Officer, Co-Founder, and Chairman of the Board upon its formation on August 10, 2020.  Frohwein personally received $19,096,038 from the merger and his affiliated entities received another $10,847,965, for a total merger consideration of $29,944,003.[9]  In addition to those substantial payouts, Frohwein

---

[9] All merger consideration amounts are rounded to the nearest dollar.

received a retention bonus of $13,320,000. Following the merger, Frohwein remained as a senior Vice President at AmEx Kabbage until approximately December 2021.

38.     Kathryn Petralia was Kabbage's President and Co-Founder. Petralia also became AmEx Kabbage's President and Co-Founder upon its formation on August 10, 2020. Petralia personally received $12,010,415 from the merger, as well as a retention bonus of $13,320,000. Following the merger, Petralia remained as a senior Vice President at AmEx Kabbage until approximately May 2022.

39.     L. Scott Askins was Kabbage's General Counsel and Chief Compliance Officer. Askins also became AmEx Kabbage's General Counsel and Chief Compliance Officer upon its formation on August 10, 2020. Askins personally received $1,213,872 from the merger, as well as a retention bonus of $900,000. Following the merger, Askins remained as a Vice President at AmEx Kabbage until approximately December 2022.

40.     Oneal Bhambani was Kabbage's interim Chief Financial Officer beginning in June 2020 until he was appointed Chief Financial Officer effective July 31, 2020. Bhambani also became AmEx Kabbage's Chief Financial Officer and Head of Capital Markets Business upon its formation on August 10, 2020. Following the merger, Bhambani received a retention bonus of $150,000 and remained as a finance Vice President at AmEx Kabbage until approximately May 2022.

41.     Spencer Robinson was Kabbage's Head of Strategy. Robinson also became AmEx Kabbage's Head of Architecture and Security upon its formation on August 10, 2020. Robinson personally received $1,494,714 from the merger, as well as a retention bonus of $2,400,000. Following the merger, Robinson remained as a Vice President at AmEx Kabbage. Robinson later

served as Chief Credit Officer for Commercial Non-Card Lending at American Express from 2021 to 2023.

42.     Kristel Adler was Kabbage's Strategy and Operations Manager.  Adler also became AmEx Kabbage's Head of New Products upon its formation on August 10, 2020.  Following the merger, Adler became a Vice President and business head at AmEx Kabbage.

43.     Sam Taussig was Kabbage's Head of Policy.  Taussig personally received $61,486 from the merger, as well as a retention bonus of $425,000.  Following the merger, Taussig became Vice President of Product Development, Public Policy, Innovation, and Operations at AmEx Kabbage until approximately September 2022.

44.     Azba Habib was Kabbage's Assistant General Counsel and BSA/AML Officer until June 5, 2020, when she left the company.

45.     Nicole Hill was Kabbage's Head of Fraud from approximately January 1, 2020, until approximately April 17, 2020, when she resigned.

46.     Amit Kesarwani was a policy underwriter in Kabbage's Risk Department until he was appointed as the acting Head of Fraud on or around April 17, 2020.  Following the merger, Kesarwani became Director of Risk and Analytics at AmEx Kabbage.

47.     Paul Pietschner was a Legal Analyst at Kabbage.  On or around March 30, 2020, Kabbage furloughed Pietschner.  On or around June 1, 2020, Kabbage re-hired Pietschner in the same position of Legal Analyst.  On July 7, 2020, Pietschner circulated a whistleblower report internally, which identified numerous issues related to Kabbage's PPP lending.  On February 5, 2021, Pietschner filed a *qui tam* action pursuant to the FCA related to the issues he identified in his internal whistleblower report.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over this action under 28 U.S.C. §§ 157(a) and 1334(b) because it asserts causes of action arising under the Bankruptcy Code and/or relating to the above-captioned bankruptcy case.

49.     This action is a "core proceeding" under 28 U.S.C. § 157(b)(2).

50.     Venue is proper in the District of Delaware under 28 U.S.C. § 1409(a) because the above-captioned bankruptcy case is pending in this district.

51.     This Court has personal jurisdiction over Defendants in this action because they have filed proofs of claim in the above-captioned bankruptcy case and/or otherwise have sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004.

52.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Kabbage consents to this Court's entry of final orders or judgments with regard to any claim in this action if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

**A.    Kabbage Nearly Collapses from the COVID-19 Pandemic, but Rebounds by Shifting to PPP Lending.**

53.     Founded by Robert Frohwein and Kathryn Petralia in 2009, Kabbage was a "balance sheet lender" that offered high-interest, short-term loans to small businesses through a proprietary lending platform.  Kabbage developed a business model relying on automated underwriting, high volume, and a significantly higher tolerance for fraud than reputable financial

institutions. Given the COVID-19 pandemic's effect on small businesses, Kabbage almost went bankrupt at the very outset of the pandemic. But the company found new life as a PPP lender.

> **1.      Kabbage Builds Its Business by Making Risky and Repeated Small Business Loans with Automated Underwriting.**

54.      For most of its existence, Kabbage partnered with Celtic Bank as originator for lines of credit approved by Kabbage's online platform. After origination, Kabbage would purchase the loan receivables from Celtic Bank and securitize the receivables in non-recourse entities, which would then fund Kabbage's ongoing lending program. Often described as a "rent-a-bank" scheme, Kabbage's business model drew criticism from industry analysts—as well as a customer class-action lawsuit—describing the model as an end-run around stringent state usury laws.

55.      Kabbage customers accepted extremely high interest rates because they were typically unable to obtain loans from banks and other financial institutions. Kabbage customers returned repeatedly to borrow more money—with the average Kabbage customer obtaining twenty-two different loans over four years—often ending in the borrower's default. And unlike many banks and reputable institutional lenders, Kabbage allowed its clients to become serial borrowers who repeatedly took out new loans from Kabbage to pay off existing Kabbage loans. One Kabbage employee derisively described the business as a "pay-day lender for eBay sellers."

56.      Given its reputation as a source of loans for applicants that would otherwise be rejected by an established financial institution, Kabbage's automated underwriting platform was a magnet for fraudulent applications. But high reported fraud rates had the potential to negatively impact both Kabbage's ability to securitize its loan receivables and the ratings of its securitization program. As a result, Kabbage promoted a culture of ignoring potential fraud in its loan portfolio.

57.      The company's lax approach to fraud controls, however, became impossible for Kabbage's management to ignore entirely. In 2018, as a requirement of Softbank's initial equity

financing, Kabbage retained Treliant, LLC ("Treliant") to conduct an independent "risk-based" testing of the design and effectiveness of its BSA/AML compliance program.  The 2018 Treliant testing found multiple issues, including with Kabbage's Know Your Customer ("KYC"), Know Your Business ("KYB"), and Customer Risk Review ("CRR") processes.

58.     Instead of addressing these issues, a follow-up Treliant testing in November 2019 made clear that Kabbage's issues were getting worse.  Treliant found that Kabbage was failing to properly track and implement remediations, leading to recurring problems with KYC/KYB/CRR processes, including failing to assign risk ratings to all of its customers.  Treliant's 2019 testing concluded that Kabbage's operational procedures underlying its BSA/AML compliance program were "an important weakness that require[d] prioritization by the Company."  Treliant further noted that "this weakness affects testing of CIP [Customer Identification Program] . . . [and other] controls and is considered a systemic gap."

59.     Kabbage hired a new Head of Fraud, Nicole Hill, in January 2020, and she soon identified several fraud rings operating in Kabbage's lending platform (that she estimated resulted in approximately $8 million in previously unidentified fraud losses).  Upon reporting the fraud rings to her superiors, however, she was told "we do not have fraud" and was instructed "***not to impair investors by classifying fraud***."  Kabbage expended little or no substantive effort to shore up the deficiencies with its BSA/AML compliance program identified by Treliant.

60.     The growing issues with Kabbage's BSA/AML compliance program started to show in the company's loan portfolio metrics.  In a February 25, 2020 presentation to the Board, Kabbage management noted that "underwriting changes over the last ~18 months have resulted in materially underperforming cohorts" in the company's loan portfolio.  The presentation noted that "changes" and "new models" were needed to address the issue.

61.     By this time, recognizing that monoline "small business" lenders like Kabbage were struggling to turn a profit, Kabbage contemplated a more comprehensive business model—termed "cash flow as a service" (or "CFaaS")—that would provide small businesses with a host of tools related to money management.  Kabbage hoped to monetize its customer base, having accumulated massive numbers of customers (56,000 in 2019 alone), which Kabbage saw as a source of future business for its ancillary products.  Kabbage management hoped that this pivot would not only drive revenue but also draw attention from potential purchasers of the company. The most notable potential buyer was American Express, which had already explored a partnership or purchase of Kabbage in order to get a head start in developing its own CFaaS model for small business customers.

62.     But any potential sale of the company was seemingly crippled by the onset of the COVID-19 pandemic.  With the entire country quarantined in their homes, commerce flatlined. This took a particular toll on small businesses, which were Kabbage's target customer.  As a result, Kabbage had to essentially shutter all but its most basic operations and watch as its revenue streams cratered.  By late March 2020, Kabbage had ceased its lending program, curtailed its marketing, terminated all non-essential vendors, and furloughed massive numbers of employees, including the small handful of employees dedicated to manually investigating potentially fraudulent applications and performing collection efforts on defaulting loans.

63.     While perhaps inescapable given the economic crisis, the cessation of Kabbage's core lending business had dramatic consequences.  The resulting performance and borrowing base deficiencies in Kabbage's securitization facilities threatened to trigger rapid amortization events, which would shut off Kabbage's access to funds that it would have needed to restart its lending program.  This, in turn, would trigger an event of default under Kabbage's corporate debt facility

with Macquarie Investments U.S. Inc. ("Macquarie"), requiring Kabbage to seek forbearance or pay $50 million to cover its debt.  It was unlikely that Kabbage would have been able to raise sufficient capital to pay down its debt in the midst of one of the most acutely distressed credit markets in history.  In the short term, Kabbage faced the prospect that a "going concern" qualification would be included within its next audited financial statements.  In the medium term, Kabbage faced either a fire sale of its assets or bankruptcy.

64.    In sum, the COVID-19 pandemic not only hindered Kabbage's ability to pursue a sale transaction, but also threatened to sink the entire company.

### 2.    Kabbage Shifts to PPP Lending to Save the Company.

65.    The economic risk that the pandemic posed to the U.S. economy was immediately apparent.  The country braced for widespread bankruptcies in every sector of the economy.  Small businesses without substantial liquidity to pay their employees began laying people off within weeks, and unemployment spiked to 15%.  Congress thus scrambled to put together a massive stimulus bill to bail out everything from airlines to small businesses and everything in between.

66.    Congress passed the CARES Act on March 27, 2020, which contemplated approximately $2.2 trillion in stimulus spending.  One of the largest components of the bill was the PPP, which Congress intended as a financial incentive for small-sized businesses to keep workers on their payroll.  Although the SBA administered the PPP, it did not make loans directly. Instead, it deputized private lenders that agreed to comply with the program's requirements.  The lenders in turn received a processing fee based on a percentage of the size of the loan.

67.    Even before the CARES Act passed, Frohwein recognized the opportunity for his company.  In a March 25, 2020 presentation to Kabbage's Board, Frohwein touted the possibility to "use our tech to facilitate lending for banks with balance sheets that can be rapidly deployed."

He also pushed his staff to have the company's landing page ready for the first wave of PPP pre-registrants.

68.     As Kabbage's management team dug in, they universally viewed the PPP as a potential cash cow.  Kristel Adler described it to another Kabbage manager as a "fire hose."  That manager agreed, characterizing the program as a "money making machine!," adding (incorrectly) that there was "no risk of loss."  Spencer Robinson told his Operations team that "we're looking at a legitimate opportunity of hundreds of millions of dollars of revenue," noting "you've seen [Kabbage's] liquidity . . . we could definitely use a few hundred million."

69.     For his part, Frohwein viewed the PPP not only as a stopgap to address the impending default of the company's securitization and debt facilities, but also as a means to rekindle the interest of American Express.  On March 29, 2020, Frohwein texted American Express Managing Director Harshul Sanghi that "Kabbage is positioned to make many billions ($) of loans under the [PPP]."  He then invited American Express to participate in funding Kabbage's PPP efforts and suggested that it may be an opportunity to reopen discussions on a larger transaction. By April 1, 2020, Frohwein and Petralia held a kick-off conversation with American Express Head of Global Commercial M&A Todd Manning to discuss the contours of a potential deal.  Two days later, American Express signed a Non-Disclosure Agreement so that it could commence due diligence.

70.     That same day, Frohwein texted a "select team" to advise that "Amex is interested in acquiring us and we are entering into DD [due diligence]."  This team (which would spend the next six months focused on the deal) included Frohwein and Petralia, along with Spencer Robinson, Kristel Adler, Scott Askins, and Chief Technology Officer David McGowan.

22

71.     Frohwein also updated the Kabbage Board on American Express's interest.   He reported that the company was going live with PPP applications, noting "we had over 12,000 pre-registrations and now that it is open, so much is flooding in."   He concluded, "it's the absolute craziest thing that I've ever been involved in or could have ever imagined."   Frohwein told friends and business partners alike that the PPP saved his company.

72.     On April 8, 2020, Kabbage retained Financial Technology Partners LP ("FT Partners") to serve as the company's financial advisor for the anticipated sale to American Express.

**B.     In Rushing to Retrofit Its Lending Platform for the PPP, Kabbage Ignores Known Issues Posing Major Compliance and Legal Risks.**

73.     Kabbage's management knew that, without a successful launch of its PPP lending program, a deal with American Express would be impossible.   But Congress established the PPP under Section 7(a) of the Small Business Act, which imposes heightened regulations on lenders and borrowers for which Kabbage's existing platform did not account.   Quickly transforming its lending platform from one that issued high-interest loans to unsavory borrowers to one that complied with requirements for SBA's 7(a) Loan Guaranty Program posed enormous challenges.

**1.     Kabbage Knows Its BSA/AML Compliance Program Is Woefully Insufficient for the PPP.**

74.     For a non-bank lender like Kabbage to become a qualified PPP lender, it had to submit SBA Form 3507 attesting, among other things, that it would:

- "assume all obligations, responsibilities, and requirements associated with delegated processing of covered loans made under the [PPP]";

- "[be] responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan"; and

- "certif[y] that it is in compliance and will maintain compliance with all applicable requirements of the [PPP] and PPP Loan Program Requirements."

75.     By submitting this form, non-bank lenders were expected to "establish [a BSA/AML] compliance program equivalent to that of a comparable federally regulated institution" "prior to engaging in PPP lending activities."[10]  Federally regulated institutions, in turn, were expected to, among other things, have a BSA Officer and an adequately staffed compliance team. Such institutions were likewise required to have and enforce both a written CIP and customer due diligence policy for the purpose of verifying customer identity,[11] and  AML procedures designed to detect fraudulent activity and assess risk of accounts.[12]  A lender that failed to adhere to these requirements would lose their lender processing fees and may also lose the SBA's guaranty of PPP loans that defaulted.

76.     Kabbage management was already aware from the November 2019 Treliant audit that its BSA/AML program was a "systemic gap," and knew from its culture and business model that the company's existing loan portfolio was shot through with fraud.  Acting as Kabbage's BSA Officer, Azba Habib flagged the resulting risk internally when discussing whether the company should "push[] existing Kabbage Funding customers through the [PPP] app w/o doing KYB/KYC."  She noted that "there might be folks in our portfolio who have (a) never been KYB/KYC'd or (b) have not been KYB/KYC'd in years."  According to Habib, this could mean "*see[ing] a lot of fraud (probably after the $ has left the door)* and [Kabbage] hav[ing] to ultimately take the fraud hit."

77.     Habib also knew that, because Kabbage's lending program with Celtic Bank was on hiatus in the wake of the pandemic, Kabbage would have to find new bank lending partners to

---

[10] 85 Fed. Reg. 20811, 20815.

[11] *See* C.F.R. § 1020.220(a)(1)–(5).

[12] *See* C.F.R. §§ 1010.610(a), 1010.620(a).

fund the PPP loans.  Habib warned that Kabbage's new lending partners "will be shocked if folks haven't gone through KYB/KYC at all."  She concluded:

> I would be remiss if I didn't flag this risk.  The question is are we willing to take it?  We could also get customers onboarded and then run KYB/KYC behind the scenes so we have results prior to disbursement which is going to take a hot min b/c we don't have a bank right now funding these?  ***I don't want to slow our roll but I am concerned this could become a big issue esp if we later discover fraud (which we would have caught if we did KYB/KYC) and lose SBA guarantee on loans***.

78.    But this grave warning did not "slow Kabbage's roll."  Kabbage submitted its application to the SBA as a non-depository financing provider in the PPP on April 9, 2020.  By the time of Habib's departure in early June 2020, Kabbage had not even fully addressed the compliance concerns identified in the 2019 Treliant audit, let alone adequately expanded its BSA/AML compliance efforts to meet the SBA's requirements for all PPP lenders.

79.    Nevertheless, in the SBA Form 3507 attached to its application, Scott Askins certified that Kabbage "is in compliance and will maintain compliance with all applicable requirements of the [PPP] and [PPP] Loan Program Requirements."  The SBA approved Kabbage's application on April 13, 2020.  While the application was pending, Kristel Adler told her operations team that she "wants ~$1bn in loan calc ready to go."

80.    Kabbage contracted with Customers Bankcorp Inc. ("CUBI") and Cross River Bank ("CRB").  Under these arrangements, Kabbage sourced loans through its platform, and the partner banks would transfer the principal to Kabbage's account at Wells Fargo.  Kabbage transferred the funds to PPP borrowers, and Kabbage assumed the obligation to process and service the loans on the partner banks' behalf.  Kabbage would then take an agreed portion of the SBA processing fee.  Kabbage's contracts with CUBI and CRB required Kabbage to repurchase PPP loans in the event that, among other things, the SBA refused to guarantee a PPP loan because of Kabbage's non-compliance with program requirements.

81.     By the end of April 2020, the SBA also approved Kabbage as a direct lender.  As an approved PPP lender, Kabbage was able to participate in the PPP Liquidity Facility ("PPPLF") and borrow funds from the Federal Reserve Bank of San Francisco (the "Reserve Bank").  Kabbage could draw on funds from the PPPLF, and it would then pass the funds directly to its borrowers without the need of a partner bank.  Although this arrangement was more profitable than sourcing and funding PPP loans through its partner banks, Kabbage's access to the PPPLF was limited by its defaulted credit agreement with Macquarie, which had to approve Kabbage taking on any additional debt.

82.     Just like its partnership with CUBI and CRB, Kabbage earned a fee from loans sourced from the PPPLF based, in part, on the size of each loan.  Also just like its partnership with CUBI and CRB, Kabbage was obligated to immediately repay the Reserve Bank the amount of a PPP loan and the associated interest in the event that SBA denied forgiveness or a guaranty of the loan.

## 2.     Kabbage's Small Compliance Team Cannot Handle the PPP Applications Flooding Its Lending Platform.

83.     Part of Azba Habib's concerns about Kabbage's BSA/AML controls that she raised with management included her belief that the company's compliance team was woefully understaffed.

84.     In late March 2020, as its lending operations ceased, Kabbage furloughed hundreds of employees in the United States, including most of Habib's compliance team and the account review team that took the lead in reviewing suspicious loan applications.  With tens of thousands of pre-registrations for PPP loans arriving in the first week of April alone, it soon became apparent that Kabbage needed to call back at least some of its furloughed employees.

85.     But even though applications were coming in at a much faster pace than pre-pandemic, Kabbage decided to only bring back a skeleton crew.  Nicole Hill asked for the return of 6 employees to help with assessing fraud risk.  Kabbage's Head of HR suggested "maybe we start with 1," and she insisted that the sole employee be "working round the clock and need the additional bandwidth" before adding any others.  Kathryn Petralia agreed, noting that they need "to be damn sure they are working their faces off."

86.     Meanwhile, Hill was growing increasingly frustrated.  After previously being told to ignore fraud in Kabbage's legacy portfolio, she was now stripped of most of her team.  On April 16, Spencer Robinson also stripped Hill of the title "Head of Fraud" and demoted Hill to a nebulous role underneath Habib in compliance.  This proved to be the last straw.  The next day, Hill sent a letter to Scott Askins to "inform [her] of several concerns" regarding Kabbage.  In addition to informing Askins about being told to ignore fraud in Kabbage's loan portfolio, Hill noted that fraud controls she developed were derided as "stupid" and not used.  She further complained that she "justifiably stated the need for additional fraud resources in the US and have been told no."

87.     Hill soon resigned, and Kabbage did not bother to hire a permanent replacement.  Instead, Kabbage appointed its Director of Risk Management, Amit Kesarwani, as acting Head of Fraud despite his scant relevant experience.  It was not until August 2020 (after the PPP ended) that Kabbage finally posted a listing for a new Head of Fraud, but only to "cover [its] bases" for the American Express transaction.  Robinson privately conceded that this important position should have been filled as soon as Hill left.

88.     By May 27, 2020, Kabbage's account review team—which had only expanded to seven members acting without a permanent supervisor—was facing a backlog of 35,000 applications flagged as potentially fraudulent and requiring further review.  Even though Kabbage

was required to have such processes in place before commencing PPP activities, Kabbage's new acting Head of Fraud was predictably struggling to "define a set process for KYC/KYB/Fraud cases."

89.     Understaffed, overworked, and unguided, the team sought ways to "automate more of the process."  Not surprisingly, this automation resulted in Kabbage opening the door even wider for fraudulent applications.  For instance, Kabbage had long used a fraud-detection third-party called ThreatMetrix, which specialized in fraud management through applicant device identification.  With the dramatic increase in application volume because of the PPP, Kabbage's costs to use ThreatMetrix "skyrocketed" in April 2020.  Rather than treat the additional cost as part of its program to prevent and detect fraud, Kabbage looked for ways to reduce use of the service and control costs.

90.     Kabbage reviewers also openly complained about the company's automated text recognition software, which ostensibly was designed to detect fraud without the need for human review.  The reviewers knew that this software was letting many fraudulent applicants through, with one reviewer noting that "all you need to do is send in a piece of chewed up gum and an old shoe" in order to get approved for a PPP loan from Kabbage.

91.     Understanding that they were the last line of defense, the review team circulated sarcastic memes and jokes about the futility of their efforts to check the failings of Kabbage's lending platform, including:



92.     Hiring more staff to help the beleaguered review team and their ineffective automated tools was not on management's agenda.  In fact, Kabbage used its lack of compliance staffing on PPP as a selling point to American Express, boasting that it was the "4th largest PPP provider by count after JPM, WFC and BofA," while having "1/700th of the employees."  Kabbage added that this was only possible because "75% of [PPP] applications were completely automated, requiring no human touch to process."

**3.      Kabbage Identifies but Ignores Issues with Its Lending Platform Resulting in Thousands of Borrowers Receiving Inflated Loans.**

93.     BSA/AML compliance and fraud detection were not the only issues facing Kabbage's PPP program.  Before submitting a PPP loan for approval to the SBA, lenders had "to perform a ***good faith review***, in a reasonable time, of the borrower's calculations and supporting

documents concerning average monthly payroll cost."[13]   Through this review, lenders were required to "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year" of the borrower.[14]   Yet even before the SBA approved Kabbage's PPP lender application, Kabbage management learned that its lending platform allowed applicants to apply for and receive loans in excess of what the PPP allowed.

94.     For instance, the size of a PPP loan was calculated using the borrower's average monthly payroll.  Employers typically report their combined employee income to the Internal Revenue Service ("IRS") on a Form W-3.  To calculate a borrower's average monthly payroll, Kabbage's lending platform asked the borrower to add reported wages from the Form W-3 to the borrower's SALT withholdings, which are already included in wages.  As a result, thousands of Kabbage borrowers double counted SALT withholdings in calculating their average monthly payroll.

95.     Kabbage identified the SALT issue before the SBA even approved Kabbage as a PPP lender.  First, Kabbage's communications director notified Spencer Robinson, Kristel Adler, and a host of other senior Kabbage executives of "feedback from Twittersphere suggesting we're doubling up on the same data points," and pasted a link to the following tweet:

---

[13] SBA PPP FAQ #1 (Apr. 3, 2020).
[14] 85 Fed. Reg. 20811, 20815.



By late April, this "glaring error" was likewise brought directly to the attention of both Frohwein and Petralia. Despite being shown the issue both internally and publicly, Kabbage never corrected the platform. As a result, the platform ensured the double counting of SALT withholdings any time borrowers entered all of the numbers solicited by the platform. This continued through the end of the first round of PPP loans in August 2020. During a later investigation of Kabbage's misconduct, the DOJ estimated that the SALT error resulted in at least 53,111 loans being inflated by at least $111 million.

96.    In addition, PPP excluded from the definition of eligible payroll costs "the compensation of an individual employee in excess of [an annual salary of] $100,000."[15]  As early as April 27, 2020, Kabbage's operations team reported to Petralia, Robinson, Adler, and others that Kabbage was "***not capping sole props/single LLCs to the appropriate $100K***."  The lack of any cap led to absurd results that Kabbage employees observed in real time. In one instance, a Kabbage employee in New Product Strategy mused in Slack, "dude we got a guy whose payroll was 25,978.00. Someone put in 2597800.00. Homie got submitted for a $2mm loan." A strategy

---

[15] 15 U.S.C. § 636(a)(36)(A)(viii)(II)(aa).

analyst asked how Kabbage validated the amount, to which the employee responded "cause we removed the cap."

97.     Just like the SALT issue, despite senior management's knowledge of the failure to cap payroll costs at $100,000, Kabbage did nothing to address the issue.  The DOJ estimated that these $100,000-cap errors, which were known to Kabbage, including its management team, resulted in at least 1,972 loans being inflated by $108,488,540.27.

98.     In yet another example of systemic errors leading to inflated PPP loans, Kabbage's lending platform allowed borrowers to include data from Box 4 of their IRS Form 940 in calculating their average monthly payroll.  Portions of this amount were duplicative of payroll costs reflected in W-3 wages, and some of the amounts included in Box 4 were not eligible payroll costs at all.  As with other errors in the platform, Kabbage employees noticed discrepancies between borrower inputs and Kabbage calculations that included Box 4.  Robinson himself identified the issue, noticing that a borrower's tax forms "seem[] contradictory to our formulas." He rightly added, "I'm worried about our calcs."

99.     Kabbage apparently conducted no further investigation into the issue, and its platform continued to include amounts from Form 940's Box 4 in payroll calculations through the end of the first round of the PPP.  The DOJ estimated this error resulted in at least 783 loans being inflated by at least $14,224,452.72.

100.    Kabbage employees openly discussed management's complete disinterest in addressing the host of issues leading to the approval of a vast number of inflated loans:



101.    The message was clear to every level of Kabbage employee that maximizing Kabbage's revenue from PPP took priority over providing any "good faith" review of borrowers' applications and supporting documentation.    In a Slack thread with all of Kabbage's senior

management, Robinson summarized Kabbage's "plan" for dealing with inflated PPP loans succinctly: "[W]e just did a poor job verifying [PPP loan amounts]. . . . [It] only becomes an issue in an audit or guarantee scenario. . . . [M]aybe they'll be auto forgiven 😬 ." Kabbage's strategy to avoid massive liability to the SBA, the Reserve Bank, and its partner banks was clear: hope that Kabbage's failures would not be discovered.

102.     Rather than focusing on improving the lending platform and ensuring these errors were corrected, Frohwein was focused on the effect PPP would have on the potential deal with American Express.  For instance, immediately after texting extensively with fellow Board member Laurie Hodrick about American Express's earnings report and how they could use it to leverage a deal weeks after the start of the PPP, Hodrick asked Frohwein whether he had "information on the Kabbage website for our [small-business] customers about best practices for PPP such as opening a separate bank account and developing a good audit trail, documenting expenses and tracking what is and what is not forgivable."  Frohwein responded "prob not right this second.  Triaging here as best we can."

**C.     After Receiving a Lowball Offer from American Express, Frohwein Decides to Use PPP-Generated Cash to Drive Up the Sale Price.**

103.     As Kabbage's lending platform went live and fees started rolling in from the PPP, American Express began conducting due diligence in earnest.  American Express sent an Indication of Interest ("IOI") on April 20, 2020, offering a purchase price of $450 million.  The size and structure of the offer, however, suggested that major hurdles stood in the way of a potential deal.

1.    **Kabbage Touts Its PPP Customers and Revenue as Leverage to Increase American Express's Offer.**

104.    Kabbage's largest investor and owner of the company's Series F shares, Softbank, invested in Kabbage in mid-2017 at an implied valuation far greater than American Express's offer.  Softbank's preferred shares gave it a representative on the Board (Yanni Pipilis) and veto rights over any deal that would sell substantially all of Kabbage's assets.  It also gave Softbank liquidation preferences that would entitle it to recoup its initial investment in the event of a sale of substantially all of Kabbage's assets.  Similarly, RCP owned the company's Series E shares, had a seat on the Board (Alex Chulack), and was likewise entitled to massive liquidation preferences.  Together, these liquidation preferences would largely wipe out American Express's initial offer.  Frohwein estimated that American Express would have to increase its offer to $750 million in order to secure approval from the other members of the Board and the company's common shareholders.

105.    During negotiations, Kabbage emphasized how its participation in the PPP drove value to American Express.  In particular, Kabbage emphasized that the PPP had nearly doubled its customer base—a customer base that Kabbage would be handing over to American Express.  Internally, American Express executives recognized this dynamic, noting that while the "PPP book and servicing are being left behind in the entity we are not purchasing, . . . we will have the ability to market to those customers."  Kabbage also underscored how its additional customers from the PPP differentiated the company from competitors like OnDeck (another monoline lender), which had recently been valued for far less than Kabbage hoped to get from American Express.  As Board member Bryan Stolle summarized it, Kabbage used the PPP to "nearly double[] [its] marketable customer base (that's taken almost a decade to build) in less than a month, for zero CAC [customer

acquisition cost], and add[] 185,000 data-rich leads [Kabbage] didn't have to pay for." He concluded, "Let's hope these lemons do indeed turn into sweet Georgia lemonade!"

106.   In addition to touting the value that PPP customers might drive to American Express, Frohwein informed the Board that his goal was to "sweep most PPP funds" and "potentially carve further PPP funds out of a transaction" to increase the purchase price. Frohwein bluntly stated to Kabbage CFO Oneal Bhambani that "there is no chance we are going to distribute cash to shareholders" in lieu of laundering the cash through American Express. In a text exchange with Board members Laurie Hodrick and Jonathan Ebinger, Frohwein explained that maximizing PPP cash would also allow Kabbage to pay down its debt to Macquarie, allowing Kabbage greater access to the PPPLF (and consequently more PPP revenue). The Board saw PPP as a "windfall."

107.   Given the PPP's importance to the deal, Frohwein was singularly focused on driving PPP applications. On April 25, 2020, Frohwein reported to the Board that he was "good with the pace [of PPP applications] as we want to get the PPP loan processing going to increase our leverage" with American Express. But Frohwein still wasn't satisfied, complaining to Robinson, "our numbers are just not budging. Feels like the team is not focused on driving more completed apps. I know we're still getting slow approvals, but it would be a shame not to keep the pressure going." Indeed, Frohwein sent constant text updates to his management team about PPP application volumes, pressing them whenever he felt the pace of submitted applications started to lag.

108.   Frohwein described the immediate goal for Kabbage's PPP program as raising the "top of the funnel"—*i.e.*, attracting a broader spectrum of PPP applicants—even while acknowledging that, by mid-summer, Kabbage was "scraping the bottom of the can" of the applicant pool.

2.      **American Express Seeks to "Orphan" Kabbage's PPP Portfolio as Part of an Asset Sale.**

109.    In addition to being too low, American Express's offer also posed structural challenges.  Rather than proposing a purchase of Kabbage's stock, American Express structured its IOI as an asset sale.  It did so explicitly because it had no interest in purchasing either Kabbage's toxic legacy loan portfolio or its newly expanding (and even more toxic) PPP portfolio.

110.    On April 29, 2020, Larry Chu from Goodwin—whom Kabbage would eventually retain as deal counsel—talked with Scott Askins about creating a workable structure for the deal since "an asset deal seems unworkable from our side."  During the conversation, Chu and Askins "did a brainstorm . . . on a spin out structure where we could possibly take the loan book and any unwanted assets and spin them out so that buyer could acquire the legal entity."

111.    Meanwhile, American Express conducted initial diligence regarding the PPP portfolio.  On May 1, it hosted a call with the subject "Fraud Risk Deep Dive" with Frohwein, Petralia, Robinson, and other members of Kabbage's senior management.  During the call, the Kabbage team had a running text exchange in which they complained about "painful" questioning from the "freaking Amex fraud guys."  Given his deep knowledge of the massive fraud risk posed by the PPP portfolio, Robinson concluded that "it's a difficult spot for me to push back on the questions."

112.    Management soon grew convinced that the structure originally proposed by Chu to "orphan" the PPP portfolio was the best solution.  For Kabbage, such a structure actually solved multiple problems.  Not only would it allow American Express to separate itself from Kabbage's loan portfolio, but it would also allow Kabbage to dodge American Express's persistent questions about, as Frohwein put it, "how we handle customers that have gone bad or are in the portfolio that we are jettisoning, [or] the ongoing liability re PPP."  Under Chu's contemplated structure, the

"liability re PPP" would all reside in an entity that neither American Express nor Kabbage's shareholders cared about. As Kabbage's Head of Data Science marveled to Frohwein, "basically we can say bye felicia to our outstanding bad debt."

113.    For its part, American Express's initial diligence certainly did not change its mind regarding whether to take on Kabbage's loan portfolios as part of the deal. Thus, American Express and Kabbage agreed very early during negotiations to pursue a plan to abandon Kabbage's loan portfolios.

### 3.    Frohwein Leverages PPP Cash to Get to an Acceptable Final Offer from American Express.

114.    On June 3, 2020, American Express increased its offer to $550 million. But again, the offer still was not enough to get Board and shareholder approval. Frohwein and the rest of the Board considered various options—including requesting that the holders of the company's preferred shares reduce their liquidation preferences. Frohwein and the rest of the Board agreed, however, that including cash earned from the PPP was critical to bridging the gap. As Frohwein saw it, if he could convince American Express to raise its offer to $625 million, coupled with the expected cash from the PPP (thus raising the offer to approximately $750 million), he would be able to win approval of the deal from Softbank, RCP, and the full Board.

115.    In the meantime, Goodwin began sketching out the details of its proposed "straw-man structure" that "contemplate[d] how [Kabbage would] separate the assets that [American Express] does not want . . . while attempting to maintain the servicing relationships [for Kabbage's loan portfolio] with the current legal entity so as to avoid having to transfer to another servicer." Frohwein planned to incorporate the new structure into a counteroffer to American Express.

116.    On June 9, 2020, the Kabbage Board met for an update on the negotiations with American Express. Frohwein started the meeting by advising the Board that a sale to American

Express would "***mitigate [the] risk of law suites*** [sic] ***around PPP***."  Frohwein recommended to the Board that Kabbage counter at $685 million, while insisting both on the structure developed by Goodwin, and further insisting that all cash (other than what the legacy company would need to service Kabbage's loan portfolio) would be "sold" and added to the purchase price.  For its part, RCP (and its appointed Board member, Alex Chulack) opposed any counter in fear that it would make American Express walk.  Chulack noted that he would prefer to just get his money out for no gain if it meant "[no] PPP tails" and "some kind of release and indemnity."  Nevertheless, the Board approved Frohwein's strategy.

117.    On June 22, 2020, American Express countered at $625 million.  Critically, in its revised IOI, American Express confirmed that the purchase price would be increased by cash held at Kabbage other than what was needed to serve the loan portfolio, which meant that, with enough cash from incoming PPP applications, the offer would effectively meet Frohwein's $750 million target.  American Express insisted, however, that some proceeds of the sale be placed into escrow to account for litigation risk and other contingent liabilities.  The IOI stated that American Express could not propose a size of the escrow until it completed its due diligence and determined whether and to what extent it would seek representation and warranty ("R&W") insurance—a step that American Express had never undertaken in any previous acquisition.

118.    With a number in hand that was likely to be approved by the Board and shareholders, on June 24, 2020, Kabbage gave American Express a 30-day exclusivity letter, which allowed for final due diligence and preparation of the governing loan documents.

**D.    During Negotiations with American Express, Kabbage Ignores Repeated Signs of Fraud in Its PPP Portfolio.**

119.    As set out in section A, Kabbage management was well aware of deficiencies in its BSA/AML compliance program that pre-dated the start of the PPP.  As applications began rolling

in and negotiations with American Express intensified, both internal and external sources raised massive red flags indicating that fraudsters were exploiting the "systemic gap" in Kabbage's compliance program.  Kabbage's senior management consistently ignored these red flags rather than risk slowing down the "fire hose" of PPP applications or threatening Kabbage's contemplated deal with American Express.

### 1.    Obviously Fraudulent PPP Applications Are So Prevalent, They Become a Running Joke Among Kabbage Employees.

120.    From the very start of the PPP program, Kabbage employees began identifying disturbing patterns indicating widespread fraudulent applications in Kabbage's portfolio.  For instance, as noted above, the PPP limited the payroll costs of a sole proprietor or single member LLC without employees to $100,000.  Because the PPP capped loans at 2.5 times monthly payroll costs, such businesses could not obtain a loan above $20,833 ($100,000/12 = $8,333, $8,333 x 2.5 = $20,833).

121.    Kabbage immediately began identifying applications targeting the maximum-sized loan.  On April 30, 2020, a Kabbage Manager noted that "one guy['s] prepared 1040 sch C revenue is 100,000.00 . . . on the fucking dot.  I am like yea ok.  But we have to put it down right[?]"  Kabbage's Head of Lending Strategy responded, "lolzzz dopeeee yep yep."  Ultimately, 12.9% of Kabbage's PPP loans under $150,000 were for exactly $20,833, nearly double the average across all lenders.  Kabbage had such an inordinate number of loans in that exact amount—eventually totaling over 23,000 such loans—that Kabbage's fraud reviewers openly exchanged memes about how easy it was to game Kabbage's platform:



122.    Another common scheme identified by Kabbage early in the PPP involved phony or fraudulent Certified Public Accountants ("CPAs") or other individuals that submitted multiple applications—often hundreds of them—on behalf of fictitious borrowers or borrowers that did not even know they were applying for a loan.  Kabbage employees quickly identified the scheme.  For instance, on May 10, 2020, a Kabbage Risk Manager circulated a number of applications filed by the same device seeking similar amounts, describing the applications as "Fraud af [as fuck]."

123.    While Kabbage reviewers identified and blocked some of these fraud rings, Kabbage's platform allowed applicants to use unfiled IRS forms as documentation to support their applications.  One risk analyst reported to Amit Kesarwani and her Risk Manager that she was "not comfortable passing almost all of the people I have to pass."  She added, "*I feel like the level of fraud we're reviewing is wildly underestimated*," and voiced her concerns about "the number of suspicious apps we see and that are meeting all the procedure requirements yet have 600+ matching devices, and the amount of sole props claiming 100K + a year."  Her Risk Manager responded that, so long as they "upload all the docs we provide, and they pass our inscribe and visual checks, then we should clear it."  When the analyst continued to express concern, the Manager reasoned that the review process was fine because "*the risk here is not ours – it is SBAs*

*risk*." After the Manager told the analyst that the Slack chain was discoverable in an audit, the risk analyst jokingly proclaimed, "Dear Secret Service, Please make sure my dog goes to a good home before I end up in prison."

124.    When another fraud analyst reported similar concerns to Spencer Robinson and Amit Kesarwani on July 9, 2020, they instructed the analyst to turn a blind-eye to fraud because Kabbage could still claim it did its "due diligence" and just blame the borrower "for lying."  She emphasized that even when the fraud is so "obvious," "like a janitor who made 200k and cannot provide bank statements showing more than $500 in his bank account ever," Robinson and Kesarwani said they "gotta let em through."

125.    Since the PPP ended, efforts by Kabbage's bankruptcy estate and government investigators have uncovered vast numbers of obviously fraudulent applications that made it through Kabbage's automated platform and received federal dollars.  Despite the fact that most of these loans received no human review at all, many of them came to the direct attention of Kabbage management.

126.    For instance, on June 10, 2020, Kesarwani emailed Spencer Robinson, Sam Taussig, and several other executives to inform them that Capital One had reported three suspicious loan recipients, none of which "hit [Kabbage's] fraud triggers" and "therefore they were auto-approved."  The first account belonged to 114 Macon LLC, an alleged property management company, for which Kabbage relied only on a Form 940 "form filled pdf" that "could be fake" to approve a $1,904,593 loan.  The second account belonged to a company called Gods Anointed Youth Ministry, which received a loan in the amount of $1,253,112 even though the applicant submitted a "[h]andwritten W3," the "TIN on the app does not match TIN on W3," and the "[b]usiness is a youth ministry but google search for address brings up an apartment complex."

Despite these obvious red flags (and Taussig's admission that this was "very fishy"), Kabbage protocol required even "more evidence to confirm these as fraud" before starting the recovery process.

127.    These two million-plus-dollar loans were far from the only "very fishy" loans approved via Kabbage's automated review platform.  In early May 2020, a Kabbage analyst told Kesarwani that he was "seeing some apps that look suspicious to me but didn't meet any of our fraud rules," and asked, "what should we do[?]  They have already taken the funds."  Kesarwani responded that the analyst should simply "put them in the list of suspicious" applications, to be dealt with at a future time.

128.    This attitude of "approve first, ask questions later" was repeatedly emphasized by Kabbage management as fraud reviewers continuously encountered already approved, and often disbursed, fraudulent loans.

129.    For example, on July 2, 2020, two Kabbage fraud analysts identified a $600,000 loan to Glamher Boutique USA as likely fraudulent, lamenting that Kabbage "should have requested more docs" before approving the loan because the applicant's W-3 indicated that "they are inflating their wages."  Even worse, the analysts noted, "her biz [business] is closed and the bank has no record of her new biz she put on file w[ith] us."  Later, in August 2020, the DOJ sent Kabbage a subpoena for more information on Glamher Boutique USA.  Kabbage's legal team, including Askins, received these subpoenas from the DOJ.

130.    Likewise, on July 7, 2020, a loan applicant called Kabbage's customer service line asking *how to return* a $503,311 loan deposited in her bank account, which she dubiously claimed she did not initiate (despite being associated with more than two dozen other questionable loan applications).  Neither the customer service reps nor the fraud reviewers had any idea what process

to follow to get the loan money back.  The issue was elevated to the Finance Operations and Customer Service team leads, who decided *not* to issue a recall of the loan because the recall process "is really meant for fraud [and] they are not a fraudster," despite the clear indicators that the loan was fraudulent.

131.    In yet another example, in mid-July 2020, Kabbage fraud reviewers identified another pattern of fraudulent applicants "sending in the same Schedule c for a bunch of customers[,] all Principal Businesses say 'Electronic Shopping – Wigs, Hair Extensions, Lashes' and all made exactly $922,667."  As Kesarwani observed, the people involved in this "wigs fraud ring" had "discovered a new way to fraud PPP."  On July 22, 2020, the development team was instructed to implement a new rule that "[i]f [m]ore than 2 applications have exact same w3 or 1040C amount and same city or IP or Device" to "flag them using 'SBA Manual verification failed.'"  But this control was too little too late.

132.    By September 2, 2020, one fraud reviewer had identified "811 accounts of wigs people" belonging to the wigs fraud ring, which "got close to 5 million dollars" in fraudulent PPP loans from Kabbage.  Still discussing the "wigs people," one of the reviewers mused: "Do you think someone will make a documentary on all of this PPP fraud? . . . [W]e could be 5 minute famous and talk about how much fraud we saw and tried to stop."

133.    As Kabbage's Fraud Risk team waded through the thousands of applicants from the fraud rings they were able to identify, Kabbage's Risk Manager concluded "***we should not have gone so fucking fast***."  He added, "maybe the banks"—which participated in the PPP program far more cautiously than Kabbage, only lending to existing known customers—"know something we don't lol."  What the banks realized (and Kabbage ignored) was the inherent difficulty of meeting

BSA/AML requirements for new customers on the scale and at the pace that Kabbage sought to approve PPP loans.

134.    This rampant fraud did not escape the attention of Kabbage's most senior executives.  As early as May 8, 2020, Petralia emailed the entire C-Suite an article warning of fraudsters trying to game the PPP, commenting "Duh.  And yikes."  Petralia had an up-close view of PPP fraud since, from the early days of the program, fake "CPAs" and fraudulent borrowers would reach out directly to Frohwein and Petralia to ask about their applications.  Such direct contact with the CEO became so frequent that, again, Kabbage employees openly joked about it:



135.    Senior management piled on with jokes of their own.  On July 17, 2020, when Wells Fargo notified Kabbage of yet another fraudulent loan that made it through Kabbage's platform, Scott Askins mocked the ridiculous name of the applicant, emailing her team, "OK you got me it was me—I'm behind little piglet soap company."  (The actual woman behind the Little Piglet Soap Company was sentenced to 41 months in federal prison after fraudulently obtaining nearly $2 million in PPP loans.)

136.    Similarly, when a rival PPP lender sent an article about PPP fraud to Sam Taussig, he forwarded it to various Kabbage executives, asking for "bets on when Spencer [Robinson] and

I *have to 'turn state witness'*?"   Unsurprised, Askins quipped, "did he apply with us too?"  Robinson has since been deposed regarding his role in the PPP and pleaded the Fifth Amendment in response to nearly all of the DOJ's questions.  To date, he has not yet turned State's witness.

137.    Frohwein even sought to use the fraud to Kabbage's advantage.  In late June, Askins was negotiating with Macquarie for a discount on paying down the company's $50 million debt in the lead up to the deal with American Express.  Frohwein instructed Askins to "start with a $7.5m reduction, paid by end of July.  I would scare them a bit about the lawsuits coming in and explain it will be hard for us to settle down the road if we have *a bunch of liability coming out from the PPP program*."  Around the same time, Frohwein floated the idea of donating "$10 million of our PPP fees to some cause," thinking it "might be helpful if we're ever under the microscope on the PPP program."  Taussig noted that "it won't help . . . DOJ/OIG isn't political like that."  He added, however, that "we'll know if Congress is coming at us from a mile, and then donations help."

138.    Ultimately, both Congress and the DOJ came for Kabbage.  The DOJ sent its first request for documents in connection with its investigation of Kabbage and its principals in January 2021.  Kabbage received its first request for information and documents from Congress four months later.  Not surprisingly, Frohwein has pleaded the Fifth Amendment in response to questioning from the DOJ about rampant fraud in Kabbage's PPP platform.

### 2.    Wells Fargo Terminates Its Relationship with Kabbage.

139.    Kabbage had used Wells Fargo as its corporate bank since 2014.  From the outset of Kabbage's PPP lending, the company routed funds from its lending partners through its account at Wells Fargo before the funds were distributed to the borrower's account.

140.    By mid-May 2020, Wells Fargo's fraud controls began flagging numerous disbursements to Kabbage's borrowers because of little or no activity in the receiving account prior to disbursement of the loan.  A Kabbage Risk Manager expressed confusion why Wells Fargo—

which itself was one of the largest PPP lenders—would bother to review the Kabbage loans being passed through the bank "so diligently."  He further questioned whether they should even bother issuing a recall for potentially fraudulent loans because, according to him, "the SBA takes the liability of first party fraud."

141.    As one of the largest PPP lenders in its own right, however, Wells Fargo knew that the SBA would not forgive or guaranty fraudulent loans if Kabbage's fraud protections were insufficient or if Kabbage did not review the loan amounts in good faith.  Given this ongoing risk, when Kabbage had to inform Wells Fargo on July 16, 2020, of yet another raft of fraudulent loans disbursed to Wells Fargo accounts, Wells Fargo insisted that Kabbage provide the bank with its due diligence process, a description of controls in place to identify fraudulent transactions, and the "key drivers" of the influx of fraud.

142.    In the face of growing concerns about Kabbage's deficient fraud controls—as well as lingering concerns about defaults in Kabbage's legacy loan portfolio—on or around June 5, 2020, Wells Fargo informed Kabbage that it was terminating its commercial relationship with Kabbage altogether.  Wells Fargo's relationship manager explained the reasoning for its decision with Frohwein personally on or around June 10.

143.    Because Wells Fargo offered Kabbage several months to transition its accounts to another bank, however, Wells Fargo's termination would not stand in the way of Kabbage's contemplated transaction with American Express.

### 3.    Whistleblower Identifies Major Gaps in Kabbage's Fraud Controls.

144.    As discussed in section B.1, by mid-May, Kabbage BSA Officer and Assistant General Counsel Azba Habib expressed serious concerns about the risk posed by the company's lax fraud controls.  On May 15, Habib emailed Frohwein for approval to retain A&M to conduct a risk assessment of Kabbage's PPP loans.  Habib explained what Frohwein knew or should have

known from the outset of the PPP: "We are required to have a BSA/AML program as a PPP lender[.]  The Program requires a risk assessment *on the front end* and independent testing on the back end, [and] . . . [g]iven we have very limited resources in compliance right now, we need the help even more."  Although the Risk Assessment Report was required "at the front end" of the program, Kabbage had already submitted billions of dollars in PPP applications before it was even ordered.

145.    Habib's message to Frohwein concluded that she "[j]ust want[ed] to make sure we have our ducks in a row so we don't have issues down the road, including losing guarantees from the SBA if they perceive we didn't have a fulsome program in place."  Frohwein responded via text, "go for it."  This portentous act proved to be one of Habib's final acts at Kabbage, as she departed the company as of June 5, 2020.  Kabbage did not hire a new dedicated BSA Officer, even though having someone in that role is one of the pillars of an effective compliance program. When pressed by both A&M and later American Express, General Counsel Scott Askins purported to take on the role of BSA Officer herself, despite having no dedicated BSA compliance staff and little relevant experience.

146.    Kabbage intentionally limited the scope of A&M's assignment.  Kabbage agreed to pay A&M only $70,600 for its review of Kabbage's PPP policies and procedures, which obviously reduced the amount of time and effort that A&M would spend on the project.  In fact, A&M would select a woefully inadequate sample of only ten loans to review as part of its report. Further, even though these ten loans raised multiple questions about Kabbage's review and approval process for PPP applications, A&M did not increase the size of the sample of loans it reviewed.

147.     Remarkably, several of the documents that Kabbage provided to A&M were not documents that Kabbage actually used to track fraudulent or suspicious PPP applications.  For instance, Kabbage employees created an Excel file called "Fraud Suspect List" that showed approximately 250 cases of suspected frauds as of May 2020.  A&M's initial Risk Assessment Report stated that Kabbage "leverage[d]" this workbook to "track suspicious activity and instances of fraud."  But Kabbage executives knew this statement was false.  Not only was that workbook not used by Kabbage to track instances of fraud, the actual population of loans flagged for fraud— both disbursed and under review—was significantly higher.  Regardless, it does not appear that any additional testing was ever done on any of the applications identified in the Fraud Suspect List.

148.     A&M issued its initial Risk Assessment Report on June 11.  Even though A&M's analysis was a cursory and unreasonably narrow assessment of Kabbage's program, A&M nevertheless found critical weaknesses in Kabbage's policies and procedures.  Specifically, the report set out several categories of risk, and characterized whether Kabbage's management of such risk was "Strong," "Satisfactory," or "Needs Improvement."  The "Needs Improvement" classification indicated that "substantial gaps exist[ed]" in Kabbage's risk management systems, and that "board and executive management participation may be insufficient."

149.     A&M classified several categories of Kabbage's risk as "Needs Improvement," including:

- **Kabbage knew or should have known it was transmitting fraudulent information to the SBA.**  In response, A&M recommended that Kabbage "require [the] Fraud Review Team to clear an application's suspected fraud flag(s) prior to submission to the SBA for loan approval.  Current procedure appears to allow for application to proceed to the SBA prior to flag review."

- **Kabbage does not have a process in place to identify and report unusual activity.**  In response, A&M recommended that Kabbage develop "SAR

[Suspicious Activity Report] procedures that include escalation of suspicious activity and how to complete a SAR."

- **<u>Suspicious activity is not tracked and monitored</u>.** In response, A&M recommended that "Kabbage should consider creating a formalized suspicious activity tracking document that details" various fraudulent markers of fraudulent activity.

150.    A week later, in-house counsel Elizabeth Maiellaro circulated the report to multiple members of Kabbage's senior management, fraud team, and compliance department, including Robinson and Askins.  On June 23, Maiellaro sent the report to Legal Analyst Paul Pietschner, noting "please review/comment as you like."  Having been among the hundreds of Kabbage employees furloughed at the outset of the pandemic, Pietschner was asked to return on or around June 1, 2020, in part to help the beleaguered company with collections efforts and other work related to the massive backlog of potentially fraudulent applications.  Pietschner immediately noticed a high volume of suspicious applications.  Having heard that Kabbage commissioned the Risk Assessment Report, he specifically requested to review the report and give his thoughts.

151.    The Risk Assessment Report confirmed Pietschner's suspicions, and he set out to interview several Kabbage employees on the front line of what constituted Kabbage's "fraud controls."  What he found not only confirmed the concerns raised by A&M, but it also indicated that the gaps in Kabbage's fraud controls ran even deeper than the Risk Assessment Report identified.

152.    Pietschner determined that the best way to draw senior management's attention to the issue was to record his concerns in a formal report.  He coined the document the "Kutworm Report," named for a "leaf-eating caterpillar that ravages cabbage crops if left untreated."  The Executive Summary of the Kutworm Report stated its purpose and conclusions bluntly:

> **Kutworm-- Executive Summary**
>
> A survey to investigate and validate concerns raised by several members of various Kabbage operations teams regarding the PPP application process revealed areas of uncertain but tangible risk regarding our verification and validation processes. This includes our identity verification, business validation, loan calculation, and general eligibility processes, in which numerous seemingly nontrivial verification issues are identified in surveyed accounts, which appeared to be out of step with our stated policies, SBA guidance, and BSA/AML best practices.

The Executive Summary went on to note the inherent legal risk facing the company, including "the traditional lender's burden of uncollectable accounts, accompanied by SBA fee clawbacks for ineligible loans, and/or requests for indemnification, refund, or return from our lending partners."

153.    The body of the Kutworm Report echoes many of the concerns raised by A&M. But it also called into question many of the risk categories that A&M classified as "satisfactory" or "strong."

154.    For instance, A&M classified Kabbage's staffing levels as "satisfactory." But the Kutworm Report noted that there were important "gaps in [Kabbage's] organizational structure that have been essentially unfilled for years." As a result, the report advised that Kabbage had "been unable to respond to suspicious activity reports that representatives might have otherwise raised had there not been a massive crunch in attempting to manually verify account information." The report added that, while Kabbage did retain URS Tech Solutions to help with the review of suspicious applications, such reviews occurred "post-hoc, rather than pre-submission, and [URS Tech Solutions did] not have a direct line of communications to customer-facing Kabbage teams." Moreover, A&M's conclusion regarding staffing levels was suspect given that it did not even mention that Kabbage also was hiring high-school students to review PPP loans. Kabbage had some of these "interns" review payroll data and even fraud flags.

155.    Similarly, A&M classified Kabbage's ability to identify fraudulent loans through its Customer Identification Program ("CIP") as "Satisfactory."  The Kutworm Report, however, identified "numerous nontrivial verification issues with many applications that indicate [Kabbage's] CIP program may not be as well refined as we might hope."

156.    A&M likewise classified Kabbage's KYC process as "Strong."  But the Kutworm Report found "no strong indication that [KYC] reviews are being undertaken in a systemic way" at all.  In fact, the Kutworm Report goes on to provide numerous examples of applications where no social security number ("SSN") or ultimate beneficial owner ("UBO") checks had been performed.

157.    Finally, the Kutworm Report took exception with A&M's conclusion that Kabbage had adequate protections to identify "insufficient, or fictitious documentation."  In particular, the Kutworm Report noted deep concerns that Kabbage accepted "unfiled taxes and other documents that are available to anyone via the IRS website.  Such documents would appear genuine as they are indeed filled out IRS forms, but they are not reflected in bank statements, or in a realistic look at [the] customer's financial state or claimed business concern."

158.    On July 7, 2020, Pietschner sent the Kutworm Report to Elizabeth Maiellaro—who had sent Pietschner the Risk Assessment Report two weeks earlier—while adding, "please provide this to [Sam Taussig] if you believe it appropriate."  But rather than springing to action to address the deficiencies found by both A&M and Pietschner, Kabbage's legal team instead set out to pressure A&M to downgrade its negative findings.  As Maiellaro stated in an email on July 27, 2020, "[w]e've not done anything with [the Risk Assessment Report] but internally find several issues that we can rebut and A&M is aware that we want to have that conversation and rewrite report."  Maiellaro added that Kabbage hadn't even "start[ed] the review process."

159.    Pietschner followed up several times with Maiellaro but heard nothing.  Growing increasingly distressed that his report was being ignored, Pietschner began circulating both the report (and evidence backing up the report) more widely, including to Kristel Adler and nearly a dozen members of Kabbage's Operations and Risk teams.

160.    On August 24, Pietschner sent the report directly to Taussig, copying Maiellaro. For the first time since he initially sent the report, this seemed to get the attention of Kabbage management.  But rather than ask Pietschner about his findings and recommendations, Taussig and Maiellaro instead pressured Pietschner to disclose his sources and whether Pietschner had "a team" to help him conduct his review.

161.    Recognizing that his report might turn over management's "ashcan," Pietschner declined to name names.  The next day, Pietschner emailed Taussig and Maiellaro that he was "kind of getting a weird vibe from this line of questioning," and asked, "*Am I gonna get fired or something for this*?"  Neither Taussig nor Maiellaro responded.  Pietschner was terminated at the closing of the American Express transaction.

162.    The failure to escalate Pietschner's concerns was not simply due to inattention or negligence.  Rather, Kabbage's management intentionally created a culture at the company to try to silence concerns about fraudulent loans and to protect themselves from having direct knowledge of issues with the amount of fraud in Kabbage's PPP loan portfolio.  Spencer Robinson served as one of the lead figures in suppressing, or at least intentionally ignoring, such concerns.  As Pietschner and others recognized, Robinson was part of the "information barrier" at the company:

Likewise, in a discussion with Adler, Pietschner commented:



163.    If Kabbage had proper compliance policies and procedures in place, Pietschner's

concerns, as outlined in the Kutworm Report and accompanying documents, would have been

reported further up the chain, including to the company's BSA Officer (which by June did not

exist), the company's General Counsel (who openly joked about rampant fraud in Kabbage's PPP

portfolio), and Frohwein (who was only concerned with using PPP cash to leverage American

Express).  Although management was obviously unlikely to do anything about the report even if it did land on their desk, Kabbage should also have had policies and procedures in place to ensure that such concerns reached the Board's Audit Committee.

164.    Regardless, Taussig, and Maiellaro's lack of response to Pietschner's well-founded concerns—not to mention their apparent intimidation of Pietschner as a potential whistleblower— ran counter to best practices, industry standards, the FCA's anti-retaliation provisions, and various other federal statutes that bar retaliation for reporting misconduct.

165.    Meanwhile, by late July, American Express had independently developed deep suspicions about Kabbage's compliance issues.  Thus, when American Express learned of the Risk Assessment Report, it asked for a copy in its due diligence process.  Before the report could go to American Express, Frohwein reviewed the report himself for the first time.  He immediately texted Spencer Robinson and Sam Taussig in a rage, complaining "that fucking report is going to kill our amex deal."  Even though the report was a requirement to be a PPP lender—and was approved by Frohwein himself—he now viewed the report as "self inflicted and way out of scope."  When Robinson tried to suggest it might not be a problem, Frohwein shot back, "if you read the report, you'll see the problems.  They're all in red – literally.  We're sending fraudulent data to the SBA. We aren't performing calculations correctly and on and on and on."  Rather than address the issues raised by A&M's report, Frohwein's message to his team was to bury it: "[G]et with [General Counsel Scott Askins] – keep it attorney client privileged and *punch them in the fucking face to update that report and pull it back*."

166.    Accordingly, Maiellaro and the rest of Kabbage's legal team pushed A&M to downgrade the deficiencies that it had found.  Management did not, of course, tell A&M about the Kutworm Report, but instead argued to A&M that it had "remediated" the identified deficiencies.

Kabbage had done no such thing.  In fact, on August 10, 2020, nearly two months after receiving the report and only days before the American Express deal was signed, Maiellaro told Scott Askins, "I haven't been able to focus on [the Risk Assessment Report]."

167.    Kabbage's verbal assurances nevertheless convinced A&M to downgrade the noted deficiencies and issue a final report after the American Express deal was executed.  Kabbage was thus able to accomplish its cynical goal of shelving the report before the American Express transaction closed.  Notably, several of the fraudulent borrowers flagged by Pietschner's response to the A&M report have since faced criminal charges for defrauding the PPP.  Still more loans identified by Pietschner were obtained by IP addresses linked to other fraudulent borrowers that likewise faced criminal charges.

**E.     Kabbage and American Express Execute the Merger Agreement, But Only After Building in Massive Protections from Litigation Risk.**

168.    As the deal with American Express lurched forward, and the risk of massive legal exposure became clear to all involved, Kabbage had to offer an increasing number of concessions to protect American Express from ensuing litigation and government inquiries.

**1.     Kabbage Management, Kabbage Shareholders, and American Express Recognize that Kabbage Faced Massive Litigation Risk.**

169.    Although the parties had agreed in principle on a number—and further agreed that they would structure the deal in a manner that would isolate the risk posed by Kabbage's PPP loans—American Express harbored great reservations about its own potential liability should it move forward with the deal.  Accordingly, much of American Express's final diligence leading up to close was focused on issues related to the PPP.

170.    On July 15, American Express's Credit Risk team provided a series of new diligence questions in a document named "fraud risk session side by side."   FT Partners emphasized that questions asked by the Credit Risk team would have "weight when it comes to

final decisions." Among other things, American Express asked about the "key drivers to [Kabbage's] fraud loss since 2015," and about Kabbage's "process to combat fraud."

171.    Frustrated, Frohwein told American Express that he was "about done with [due diligence] and that we need to reconsider moving forward. This is all such bullshit." Oneal Bhambani texted Frohwein and Petralia that perhaps American Express might look at unforgiven loans as an opportunity, noting that "what doesn't get forgiven flips into a yield/income play on PPP vs. SMB." Petralia responded that, while potentially true, "I have this ominous feeling that a lot of what isn't forgiven is fraud." Frohwein added that what could possibly be collected from unforgiven loans is "peanuts for amex so I don't think they'll care much about that."

172.    On July 17, Frohwein and Robinson had a call with American Express's Credit Risk team regarding fraud risk. During the call, American Express asked pointed questions about Kabbage's fraud controls. Fully aware of the issues facing Kabbage's PPP portfolio, Robinson noted to Frohwein that "***the fraud questions are bad . . . in that I don't disagree with them***. We might be better off acknowledging that we could use some help from amex there."

173.    Frohwein tacitly conceded Robinson's point, but rationalized Kabbage's lax attitude toward fraud:

> I think one of the things on fraud is that [American Express is] set up to catch each instance. We are set up to manage a tolerable amount of fraud, right? We are a volume shop[.] Our fraud approach needs to be reasonable under these circumstances. You can cut [out] 100% of the fraud and 100% of the opp. Also, we work with much smaller loan sizes. We have (at times) applied more fraud controls to larger ticket sizes[.] Am I completely off base here?

Robinson responded, "you're right[.] We've consistently looked at what tighter fraud rules would have 'cost' vs what we 'lost' due to the fraud and we've come out ahead."

174.    Implicit in Frohwein and Robinson's discussion is that the cost of Kabbage's compliance with PPP guidelines was too great to bear given their assumption that the government

would bear the loss.  Notably, American Express reached the opposite conclusion with regard to its own processes for submission of PPP applications.  In stark contrast to Kabbage's volume-driven decision to ignore fraud missed by its automated processes, American Express "worked with all stakeholders to better understand all the checks that were needed.  Once [American Express] had that, [it] designed manual processes or demonstrated that alternate systems were just as good for some of the checks, and [it] could get to the same outcome.  90% of [American Express's] work was around creating manual processes."

175.   By comparison, American Express concluded that Kabbage's own PPP processes were woefully deficient.  By late July, American Express prepared a "Final Readout" summarizing its findings from months of diligence.  American Express reached several damning conclusions about Kabbage's compliance program, including:

- "Basic policies and operations are in place, but program is not well-documented or monitored.  Many processes are manual, rudimentary, and appear to not be scalable."

- "[Kabbage] staffing size and expertise may affect ability to strengthen controls."

- "External reviews highlight significant weaknesses in key processes."

- "Any [American Express] role in program management for back [loan] book will likely include compliance-related functions and extend beyond tracking payments and managing customer contact.  PPP processes, esp[ecially] not-yet-defined forgiveness flows, heighten risks and uncertainty involved with back book servicing."

- "Significant lack of documented processes, business testing/controls, and established oversight procedures need[] to be addressed."

- "Significant reliance on third parties . . . with minimal oversight and lack of clarity of controls."

Because of these and other issues with Kabbage's compliance program, American Express concluded that "historic liability [from Kabbage's loan books] cannot be precisely assessed

because of complex roles/responsibilities with partners, limited process documentation, and lack of historical evidence of compliance process effectiveness."

176. Nevertheless, desperate to advance its CFaaS model for small businesses, American Express decided that regulatory and reputational risks stemming from Kabbage's compliance deficiencies were tolerable as long as American Express would have no role in servicing Kabbage's loan portfolios going forward or "take on [any] actual credit risk for the loans (PPP or any other)."

177. But compliance concerns did cause American Express to second guess its agreement to include cash from the PPP in the purchase price. After a July 26 call with American Express executive Todd Manning, Frohwein informed his team that "they *[American Express] are concerned that the burden to prove that enough money was left in [the] legacy co[mpany] shifts to [American Express] if they push our cash from PPP through the transaction*." Because American Express was concerned about its potential future liability on a fraudulent-transfer claim by a bankrupt legacy Kabbage, Bhambani suggested that Kabbage should offer a solvency opinion.

178. While American Express took Kabbage up on the offer of a solvency opinion, its concerns about Kabbage's fraud controls persisted. One way that American Express sought to protect itself was by increasing the size of the escrow contemplated by its latest IOI. By the end of July, American Express was insisting that a remarkable $37.5 million of the sale proceeds be placed into the escrow as a backstop. On August 4, Frohwein had yet another call with Manning focused on the solvency of legacy Kabbage as a result of PPP liabilities, during which Manning "explained that [Kabbage's PPP program] is much larger than it used to be, they perceive more risk, yada yada."

59

179.    As a result, Manning told Frohwein that American Express wanted to increase the size of the escrow to an astounding $62 million, noting that it would actually be a favor to Kabbage because "they're bringing it through the sale and not making [Kabbage] put all that money in legacy."  At this point, Frohwein drew a line in the sand, noting that American Express's concerns regarding the PPP represented only "one side of the benefit/risk continuum" given that their efforts on PPP created "tens of thousands" more potential customers for American Express.  In other words, Frohwein saw the risk posed by PPP, but suggested it was counterbalanced by value driven to American Express.  Frohwein apparently did not care about counterbalancing the risk posed to the SBA, the Reserve Bank, and Kabbage's other creditors.

180.    Given that Kabbage's PPP customers represented the core of Kabbage's business, some at Kabbage actually questioned why American Express would want to "abandon" them when it comes to actually servicing the PPP loans.  Frohwein responded bluntly that American Express is "very worried about legal liability," adding that "***the thing that worries them legally is any liability flowing from fraudulent applicants, anything that would give the government, applicants and others suing them***."  When Bhambani noted that it may be cheaper for American Express to be more closely involved in servicing PPP loans, Frohwein noted that "[American Express is] not going to love that answer.  They're worried about PPP. . . . This is not about them saving us money.  ***It's about separating legal liability***."

181.    Frohwein was similarly blunt with the other members of Kabbage's Board, telling them that American Express was washing its hands of the PPP portfolio because of "litigation risk."  The major shareholders that had seats on the Board were likewise concerned about litigation risk.  For instance, in conversations with Kabbage's counsel, Board member Alex Chulack, who was appointed by RCP, advised that RCP wanted nothing to do with ownership interest in the

legacy Kabbage entity after the deal.  Counsel passed this request along to Frohwein, noting "This is 'Amex syndrome'—they are paranoid about having some other liability."

182.    Ultimately, American Express got comfortable enough with its risk to move forward with the deal, but only after Kabbage agreed to an unusual amount of concessions designed to shield American Express (but not Kabbage's creditors) from government investigations and other litigation, including (i) a solvency opinion for Kabbage post-transaction; (ii) an R&W insurance policy paid in part from the sale proceeds (an unusual step that American Express had never before taken in previous acquisitions); (iii) a $37.5 million escrow that would serve as additional insurance for American Express in the event of, among other things, litigation related to the PPP; and (iv) broad indemnification rights against both Kabbage shareholders and Kabbage itself (which received none of the sale proceeds).

## 2.    Kabbage Struggles to Find a Firm Willing to Offer a Solvency Opinion.

183.    Wanting to close the deal as soon as possible, Kabbage determined they needed to obtain a draft of the solvency opinion promised to American Express by August 7.  A month earlier, Kabbage had retained Houlihan to conduct a valuation of Kabbage's loan portfolio for tax reporting purposes.  Given that Houlihan had already begun its work on the valuation, Kabbage thought Houlihan would be a natural fit to perform the solvency opinion, as well.

184.    Critical to a solvency opinion in this deal, of course, was proving that the value of Kabbage's assets exceeded the value of its liabilities, and that Kabbage had the ability to pay its debts as they came due.  To this end, Kabbage instructed Houlihan to make two key assumptions.

185.    First, Kabbage insisted that Houlihan treat the liabilities associated with its legacy bankruptcy-remote, asset-backed security receivables as "non-recourse" to Kabbage.   In Kabbage's view, their non-recourse character meant the fair value of these liabilities would be less

than their book value—meaning the legacy company could pass the Delaware LLC solvency test requiring the fair value of liabilities not to exceed the fair value of assets.  Thus, Houlihan was "instructed to carve out the Non-Recourse [debt] (and associated assets) for purposes of the" solvency analysis.

186.   Second, Kabbage instructed Houlihan to assume that all of the PPP loans in Kabbage's portfolio—which Kabbage already knew was riven with fraud—would be forgiven by the SBA.  Accordingly, on July 28, Oneal Bhambani set up a call with Houlihan to discuss the opinion, noting that "as part of the solvency, we would like to get a sense of [Houlihan's] familiarity with the PPP program and particularly the latest ongoings about blanket forgiveness of loans which would directly be related to the cash capital needs of the company."

187.   From the start, Houlihan was concerned by Kabbage's insistence that the non-recourse assets and liabilities be excluded from the solvency analysis.  After all, Kabbage's assets included non-recourse, asset-backed securities with a fair value of $654 million, while the funding costs for those assets saddled Kabbage with a $695 million book value of related liabilities.  Though Kabbage repeatedly emphasized that its "funding debt does not need to be repaid at book value as it's non-recourse," that was an untested assumption Kabbage made to avoid having to retain massive amounts of cash to repay the full funding cost of the debt.

188.   In a discussion with Bhambani on or around July 30, Houlihan conveyed its hesitancy to provide a formal solvency opinion given that, absent Kabbage's assumption about the non-recourse assets and liabilities, the fair market value of Kabbage's assets (as recently marked by Houlihan's valuation team) was, on its face, less than the book value of its debt liabilities.

189.   On the PPP front, Houlihan discussed internally that there had "been some discussion that smaller PPP loans ($125-150k) could just be forgiven by Congress," but noted that

"there is nothing official."  Houlihan recognized that there were still a "lot of questions around: what the level would be for 100% forgiveness, if it would apply to larger loans as well, if there is a demonstrated need based on lost revenue, when it would happen, etc."  Houlihan was concerned enough by Kabbage's insistence that it assume away all non-recourse debt without any analysis, and being asked to ignore the possibility of contingent liabilities for Kabbage's PPP obligations did not improve its comfort levels.

190.    Houlihan nevertheless presented the engagement to its pricing committee while considering the assumptions it had been asked to make, as reflected in the resulting draft engagement letter:

> The Company has advised and instructed us, and ***we will assume, without independent verification***, that the Non-Recourse Assets and Non-Recourse Debt, to be identified to us in writing, should be excluded from our analyses and our Opinion.  The Company acknowledges and understands that if the Non-Recourse Assets and Non-Recourse Debt were to be included in the assets and stated liabilities of the Company, respectively, ***such inclusion would lead to a materially different outcome***.  Further, the Company has advised and instructed us, and ***we will assume, without independent verification***, that the PPP loans have the full backing of the United States Government and if a borrower under that program were to default, the U.S. Government would forgive the loan.

191.    Ultimately, Houlihan was so uncomfortable with the massive assumptions imposed by Kabbage that it declined the solvency engagement, obviating the need to seriously consider the added risk of assuming "blanket forgiveness" of billions of dollars of PPP loans.  Houlihan particularly bristled at making a material assumption that it had spent no time assessing.  Further, given that Kabbage needed a solvency opinion in less than a week, Houlihan advised Kabbage on August 1 that it would be unable to take the engagement.

192.    Kabbage scrambled to find a replacement firm.  Bhambani lamented to Frohwein, other Kabbage executives, and Goodwin that "the solvency firms have a view that the opinion has

an element of risk to it." He noted that Houlihan turned it down because of that risk, and further noted that A&M—which got a front-row view of Kabbage's fraud controls—might turn it down for the same reasons.

193. Kabbage thus focused its efforts on Duff & Phelps because they were willing to go along with Kabbage's assumptions regarding the non-recourse liabilities and "blanket forgiveness" of PPP loans, as well as the risk that such assumptions would entail. Bhambani noted that, with this risk, Duff & Phelps would charge an exorbitant rate. He further noted that, "because of the perceived risk profile, [Duff & Phelps] may model in a higher excess cash buffer than management expects."

194. On August 2, Duff & Phelps agreed to provide a draft of its solvency opinion by August 7, although a formal engagement was not even signed until August 5. Unlike Houlihan, Duff & Phelps was willing to enter the engagement with the explicit agreement that "Non-Recourse Liabilities" would be excluded from its solvency calculation.

195. Kabbage thus proceeded to work with Duff & Phelps to determine the bare minimum amount of cash that would need to be left in Kabbage to satisfy both its servicing obligations as well as to satisfy what American Express termed in the Merger Agreement as "liabilities to third-parties that are known by [Kabbage] or are reasonably likely to exist." Rather than take a good faith approach to determining that number, Kabbage viewed it as a "deal within a deal," wherein Kabbage pressured Duff & Phelps to require as low a number as possible. American Express fully understood Kabbage's efforts, noting internally that Kabbage was seeking to "put whatever they can" in Amex Kabbage "less some leftover that will remain to operate Legacy [Kabbage]."

196.    Notably, the model on which Kabbage based its anticipated $15 million in servicing costs did not accurately reflect the cost of servicing PPP loans, which in some respects involved more obligations than even the SBA's 7(a) Loan Guaranty Program.  In fact, Kabbage executives did not even bother to comprehensively understand those servicing obligations until after the solvency opinion was complete.

197.    Kabbage's ill-informed attempt at a servicing model was not even the most glaring issue with the solvency opinion.  On August 3, Goodwin reminded Bhambani that whatever cash is left with Kabbage is supposed to include "what we expect to be contingent liabilities left at [Kabbage] too."    But Goodwin had no expectation that Kabbage would seriously value its contingent liabilities.  In response to Bhambani saying that Kabbage intended to reserve $1 million "for litigation," Larry Chu from Goodwin responded that would be fine "*as long as there is something*, and it takes into account legal spend and potential settlement cost."

198.    Scott Askins rightly questioned the $1 million reserve.  Bhambani brushed these concerns away, claiming that legal expenses are "not something one can estimate."    Askins responded that "the defense costs alone for outside litigation counsel have been higher than $1M annually in the past."    In fact, Askins estimated that expected filing fees for *existing* litigation could be as much as $442,150.  No Kabbage executive otherwise proposed reserving a significant amount for potential litigation exposure related to Kabbage's deficient lending platform or the risk that Kabbage's PPP loans might not be forgiven or guaranteed.

199.    In its August 11 opinion, Duff & Phelps set out the extraordinary assumptions it was making at the direction of Kabbage management, including only $1 million reserved for litigation costs.  In addition, the solvency opinion noted that "Management has assumed that lenders will be able to shield themselves from any liability relying on the SBA's 'good faith'

clauses with respect to actions it took reviewing borrower documents when originating and servicing loans":



200.    Even the "sensitivity case" set out in the Duff & Phelps opinion—which was intended to represent "reasonable downside scenario projections"—contemplated only $949,000 of "PPP Put Back" liability to account for PPP loans that Kabbage would be contractually obligated to buy back from either the PPPLF or its partner banks because of its shoddy review of PPP applications.  This represented less than 0.014% of the more than $7 billion in PPP loans processed by Kabbage.

201.    Goodwin even mused internally that Frohwein was "skimping" on funding Kabbage's litigation risk.  Indeed, because of that risk, one Goodwin attorney concluded that Duff & Phelps "is dumb for issuing the solvency opinion."

**3.    Kabbage Announces Its Deal with American Express, Which Promises to Leave the Legacy Company Hopelessly Insolvent.**

202.    On August 11, 2020, the Kabbage Board met to discuss both the Duff & Phelps solvency opinion and the proposed deal with American Express.  On August 13, Kabbage's Board approved the finalized Merger Agreement.  That same day, holders of a majority of Kabbage's

shares (as well as each class of its preferred shares) signed a written consent approving the Merger Agreement.

203.    Pursuant to the "straw man" structure devised by Kabbage's general and outside counsel, Exhibit K of the proposed Merger Agreement set out six steps that the parties had to undertake for the deal to close:

- **Step One:** Kabbage forms a wholly-owned subsidiary, Alpha Kabbage, Inc. (which later becomes Defendant AmEx Kabbage).  AmEx Kabbage, in turn, creates a wholly-owned subsidiary, Merger Sub, LLC.

- **Step Two:** Three days prior to closing, Kabbage merges into Merger Sub, LLC. As a result, Kabbage becomes a wholly-owned subsidiary of AmEx Kabbage, with Kabbage equityholders receiving identical securities in AmEx Kabbage.

- **Step Three:** On the same day as Step Two, Kabbage converts from a Delaware corporation to a Delaware limited liability company in order to qualify as an "F" reorganization for income tax purposes and therefore not trigger income tax liability.

- **Step Four:** Kabbage transfers the assets being acquired by American Express to AmEx Kabbage (the "October 13, 2020 Transfer").[16]

- **Step Five:** A day after Step Four, Kabbage converts back to a Delaware corporation.

- **Step Six:** AmEx Kabbage merges into an American Express subsidiary, Green Acquisition Merger Sub, Inc. ("Green Acquisition"), with AmEx Kabbage surviving.  Each of AmEx Kabbage's equityholders receives the applicable per share purchase price, and in exchange, their shares are cancelled.  Each equityholder (other than RCP and holders of Series F preferred shares) receives a proportional share of common stock of Kabbage.

204.    As alleged above, these steps represented a cynical attempt to make off with PPP cash and leave Kabbage with all the risk and barely any resources.  Specifically, following the

---

[16] Specifically, as set forth in an exhibit to Merger Agreement, the "Transferred Assets" were "all right, title and interest in and to any and all tangible and intangible property, rights, privileges, powers and franchises, and any and all other assets or interests, of [Kabbage] except the Excluded Assets."  The "Excluded Assets" included Kabbage's PPP loan portfolio and its legacy loan portfolio.

second step of the transaction, Kabbage's shareholders owned AmEx Kabbage and, indirectly, Kabbage, because Kabbage was a wholly owned subsidiary of AmEx Kabbage. At this time, the value of the shareholders' interests in the Kabbage enterprise was equal to the value of Kabbage's assets minus all of its liabilities, including its PPP-related liabilities. This is because all assets and liabilities were held by Kabbage, the wholly owned subsidiary of AmEx Kabbage.

205. But when Kabbage transferred its assets to AmEx Kabbage, the value of the shareholders' interests in the Kabbage enterprise materially increased because the transfer separated Kabbage's principal assets from its massive liabilities, leaving Kabbage—but not AmEx Kabbage—hopelessly insolvent. Not surprisingly, even years after the transaction, Kabbage and American Express maintained strict, "need-to-know" control over Exhibit K.

206. Kabbage created AmEx Kabbage on August 10. In addition to appointing the same Board, AmEx Kabbage appointed many of the same officers as Kabbage, including Rob Frohwein as CEO, Kathryn Petralia as President, Scott Askins as General Counsel, Oneal Bhambani as Chief Financial Officer, Spencer Robinson as Head of Architecture and Security, David McGowan as Head of Technology, Laura Goldberg as Chief Revenue Officer, Catherine Lynn as Head of Product and User Experience, Kristel Adler as Head of New Products, and Sam Taussig as Vice President of Product Development, Public Policy, Innovation, and Operations. Pursuant to the proposed Merger Agreement, many of these officers would be given generous retention bonuses to leave Kabbage for AmEx Kabbage as it integrated with American Express, including the following:

| Kabbage Insider | Retention Bonus |
|---|---|
| Robert Frohwein | $13,320,000 |
| Kathryn Petralia | $13,320,000 |
| Spencer Robinson | $2,400,000 |
| David McGowan | $2,400,000 |
| Laura Goldberg | $1,600,000 |
| Scott Askins | $900,000 |
| Catherine Lynn | $750,000 |
| Sam Taussig | $425,000 |

207.    In addition, those Kabbage officers stood to receive significant compensation as merger consideration, including the following:

| Kabbage Insider | Merger Consideration[17] |
|---|---|
| Robert Frohwein | $29,944,003 |
| Kathryn Petralia | $12,010,415 |
| Spencer Robinson | $1,494,714 |
| Scott Askins | $1,213,872 |
| David McGowan | $429,781 |
| Laura Goldberg | $145,846 |
| Catherine Lynn | $77,602 |
| Sam Taussig | $61,486 |

---

[17] Merger Consideration includes consideration paid to entities affiliated with these individuals, as well as amounts held in the escrow established by the Merger Agreement that, under the terms of the Merger Agreement, may have been, at least in part, distributed to these officers or their affiliated entities.

208.     Kabbage and American Express executed the Merger Agreement on August 16, 2020.

209.     Between August 16 and the October 16 target closing date, Kabbage scrambled to set up the legacy staff that would stay behind to service Kabbage's loan portfolios.  Paul Pietschner, who had previously drafted the Kutworm Report, was tasked with developing how Kabbage would go about servicing its loans.  Pietschner quickly discovered that Kabbage's management had not considered the scope of Kabbage's servicing obligations—either under the agreements with Kabbage's lending partners or their obligations under Section 7(a) of the Small Business Act.  Even days before the Merger Agreement closed, Pietschner struggled to get any answers from management regarding what servicing duties fell to Kabbage.

210.     By now, Pietschner had seen enough to conclude that Kabbage management had intentionally ignored issues with its lending platform in order to facilitate a deal with American Express.  He brought his concerns (including the information contained in his Kutworm Report) directly to the SBA.  But the SBA's investigators did not move on Pietschner's concerns in time to affect the deal.

211.     The DOJ, however, was ramping up its efforts to crack down on PPP fraud.  Unsurprisingly, many suspected fraudulent borrowers had received loans through Kabbage, and Kabbage was hit with what Maiellaro deemed a "subpoena tornado!"  On September 10, Maiellaro asked a legal team member, "How many grand jury subpoenas do we have?"  The employee answered, "Like 50.  We have probably received 15 in the last few days alone.  It's insane."  Maiellaro mused, "I guess the volume of subpoenas is reflective of the amount of fraud in the program and I guess it could reveal something Kabbage has not done perfectly."

212.    Journalists had come to the same conclusion as Maiellaro.  On September 8, 2020, Kabbage's Head of Communications forwarded Frohwein, Petralia, Askins, and Taussig questions from a Miami Herald reporter, noting that the newspaper "was poking around Kabbage's PPP data with the story we let in more fraud than most" and that "Kabbage was a 'go-to' for fraudsters." Frohwein flippantly replied, "We need to crush this BS story obviously."  But Kabbage management could not deny that the Miami Herald was onto something.  For instance, Kabbage's draft response to the reporter noted that Kabbage only rejected 0.2% of applications due to eligibility or fraud concerns—much lower than the 11% average rejection rate across PPP lenders. Askins commented, "did we only reject 0.2% v 11% avg – that seems like we let stuff through?" American Express also reviewed Kabbage's comments and objected to the inclusion of the ".2% fraud stat."  Kabbage did not disclose this figure to the reporter.

213.    The article was published on September 10, with the headline, "Quickie lender Kabbage doled out billions in PPP loans.  A number of borrowers raised red flags."  The article identified 75 companies that received loans of $150,000 or more from the PPP program even though they appeared not to exist before the spring of 2020 or appeared otherwise ineligible.  Of those 75 companies, 20% got their loans from Kabbage, even though Kabbage processed fewer than 1% of all loans included in the analysis.

214.    Frohwein circulated the article to Kabbage leadership, calling it "a Doozy."  He asked how many of the 15 specific loans noted in the article actually got funded by Kabbage and asked the group to reply all to "keep this attorney client privileged."  Kabbage's Head of Communications replied, "4 were not funded.  1 didn't return a relevant account[.] 10 were funded, 6 of which do not have fraud flags."  Clearly, the story was not "BS," and Kabbage was not able to "crush" it.

215.    Nevertheless, the deal with American Express moved forward unchanged. American Express knew about the Miami Herald article before it was published, but told Kabbage they would "take a 'no comment' stance and do not want to get in the middle of a story for a company they don't yet own and for a product they aren't buying."  An American Express executive noted in response to Frohwein's message about the article, "it is not an ideal story, but could be worse.  Silver lining—we should be grateful it hit today and not yesterday when the Small Business Committee held a hearing demanding more transparency in fintech related small business lending."  But perhaps because of the results of their due diligence, American Express concluded internally that "[t]here's little doubt that Kabbage's name will keep getting mentioned in any story about PPP and PPP fraud.  We have our talking points but it's worth reflecting on whether we could do anything else here to manage any knock on reputational risk."

216.    American Express thus coordinated closely with Kabbage to respond to media inquiries on Kabbage and PPP fraud.  On September 21, a Bloomberg reporter approached Kabbage with questions similar to the Miami Herald's, but this time based on DOJ complaints where the fraud had actually been verified.  Kabbage and American Express coordinated to spin the responses to questions about Kabbage's fraud protocols to focus on how Kabbage provided loans to small, marginalized businesses and saved jobs.

**4.    The Sale to American Express Closes and Kabbage Transfers Its Valuable Assets to AmEx Kabbage.**

217.    On October 13, Kabbage converted to a limited liability company and transferred substantially all of its assets and liabilities to AmEx Kabbage.  This transfer, of course, did not include Kabbage's PPP loan portfolio and its attendant liabilities.  It did, however, include $120 million in cash that Kabbage earned through the PPP.  This money was paid by SBA to support the costs of servicing the PPP loans, but unlike the money, those obligations stayed with Kabbage.

218.   On October 15, Duff & Phelps issued its "bring down" opinion, which contemplated leaving only $17 million in Kabbage.   Just like Duff & Phelps's initial solvency opinion, this number reflected only $1 million reserved for potential legal fees and settlements, and only increased the "put back liability" to $1,058,000.   At this point, of course, both Kabbage management and American Express had repeatedly recognized that this liability—as well as the litigation risk posed by Kabbage's PPP loans more generally—was much greater.   As a result, when the inevitable raft of investigations and litigation arrived, Kabbage was doomed to bankruptcy with Kabbage's creditors left holding the bag.

219.   One of Kabbage's creditors, CRB, recognized this risk and tried to stop the deal at the last moment.   On the evening of October 15, CRB advised that it believed the Duff & Phelps solvency opinion failed to account for Kabbage's contractual liabilities to CRB, both known and unknown, including liabilities related to non-conforming loans, servicing defaults, and loans that did not meet loan program guidelines.   CRB asserted that Kabbage would not be sufficiently capitalized to fulfill these obligations, which were "not hypothetical, as Kabbage has actually made payments to CRB for same in connection with the PPP program."   Accordingly, CRB said it would not consent to the transaction.

220.   CRB's email caused an instant crisis among Kabbage's senior leadership. But after Goodwin and American Express's lawyers determined CRB did not have consent rights to the deal, management decided to ignore CRB like it ignored every other red flag pertaining to Kabbage's PPP portfolio.   CRB would now be legacy Kabbage's problem, and management, in Frohwein's words, could close the deal and "Drink ourselves to death."

221.   On October 16, the Merger Agreement closed, and AmEx Kabbage merged into Green Acquisition with AmEx Kabbage surviving as a wholly-owned subsidiary of American

Express.  Shortly thereafter, AmEx Kabbage transferred $120,000,000 of the cash that Kabbage earned from the PPP to American Express.

**F.     Kabbage Is Leveled with a Series of Legal and Regulatory Actions.**

222.    Just as American Express, Kabbage management, and everyone else familiar with Kabbage's PPP program saw coming, Kabbage quickly became the subject of numerous legal, regulatory, and investigative actions related to its PPP loans.

223.    Barely more than a month after the deal closed, on November 25, 2020, a whistleblower filed the first action against Kabbage under the FCA in the United States District Court for the District of Massachusetts (the "Massachusetts Action").  The FCA is an anti-fraud statute that allows private citizens to bring actions on behalf of the government.  The FCA provides that any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990,"[18] plus three times the amount of damages which the Government sustains because of the act of that person.[19]

224.    The Massachusetts Action alleged (correctly) that Kabbage knowingly submitted inflated PPP loan applications for approval, and falsely certified that it reviewed the amount of such loans in good faith.  This included loans inflated because of Kabbage's failure to cap payroll costs at $100,000, its double-counting of SALT withholdings, and its inclusion of certain non-qualifying costs reflected in Box 4 of IRS Form 940.

---

[18] 28 U.S.C. § 2461 note; Public Law 104-410.

[19] 31 U.S.C. § 3729(a)(1).

225.     On February 5, 2021, Pietschner filed a second action under the FCA in the United States District Court for the Eastern District of Texas (the "Texas Action").  As Pietschner set out in the Kutworm Report, his complaint alleged (again, correctly) that Kabbage repeatedly and falsely certified its compliance with the SBA's rules and regulations implementing the PPP, including complying with necessary BSA/AML fraud controls, and further submitted false claims for processing fees and forgiveness and guaranty payments from the SBA despite its noncompliance.

226.     With only $1 million left behind for legal expenses, the legal fees from just these two actions would have quickly thrown the company into bankruptcy if it were not for the government's decision to extend the PPP in early 2021.  As Kabbage (now doing business as "KServicing") was already an approved lender, it stood to continue in that role and spent the first weeks of 2021 gearing up for "Round 2" of PPP lending.  On or around February 8, 2021, however, the SBA advised Kabbage that it was suspending its certification as a PPP direct lender on account of its platform's allowance of double-counting SALT withholdings.  Although Kabbage was able to still earn fees by reallocating its direct customers to partner banks, it was barred from the more lucrative direct-lender participation for the remaining application period of the PPP.

227.     On October 22, 2021, the SBA and Kabbage entered into a settlement agreement pursuant to which Kabbage agreed to pay the SBA $30 million *for just the SALT issue*, which Kabbage was only able to pay because of additional fees earned through the extension of the PPP. The agreement specifically reserved the government's claims against Kabbage under the FCA.

228.     Meanwhile, Kabbage became the subject of still more investigations from both Congress and the Federal Trade Commission.  On May 27, 2021, the Chairman of the Congressional Select Subcommittee on the Coronavirus Crisis sent letters to Kabbage and other

fintech firms and partner banks that the Subcommittee contended were linked to a disproportionate number of fraudulent PPP loans seeking documents and information related to their handling of PPP loans.   As legal fees mounted from these investigations, as well as work related to the Massachusetts and Texas Actions, the company ran out of cash to continue servicing its loans.   On October 3, 2022, Kabbage filed its bankruptcy case in the United States Bankruptcy Court for the District of Delaware.

229.    Various private and governmental entities asserted claims in Kabbage's bankruptcy case, either through scheduled or filed claims, for harm caused by Kabbage's role in the PPP, including:

| Claimant | Amount |
|----------|--------|
| District of Massachusetts | $ 450,182,913.00 |
| District of Texas | $ 346,157,724.00 |
| SBA | $ 720,218,115.31 |
| Federal Reserve System | $ 536,450,941.00 |
| CRB | $ 572,128,254.92 |

230.    Kabbage conducted an extensive investigation into these claims.

231.    It was a difficult, multi-step process for Kabbage, acting through its Wind Down Officer, to contest and reduce the claims asserted against the estate.   At that time, the SBA was refusing to make guaranty payments to CRB on loans affected by the SALT, $100K, and IRS Form 940 issues, more than 16,000 loans that Kabbage and CRB had flagged as potentially fraudulent. If the SBA ultimately refused to guaranty a loan or provide a forgiveness payment to CRB based on Kabbage's conduct in originating the loans, CRB had a contractual claim against Kabbage to repurchase, or "put back," the non-guaranteed and non-forgiven loans.   Further, if the SBA elected

to re-assess a loan that was already forgiven, then CRB (and ultimately Kabbage) was potentially on the hook for that loan amount as well.  The SBA was also threatening to withhold or delay payment on future loans submitted for forgiveness if they had flagged issues.  Kabbage had similar direct liability for loans it held on its own behalf, loans it originated for CUBI, and loans pledged to the Reserve Bank.  In total, these affected loan balances exceeded hundreds of millions of dollars.

232.   Because of Kabbage's "put-back" obligations with CRB, Kabbage had little defense against CRB's claim.  CRB's claim could only be reduced and resolved if the SBA released the guaranty payments and made appropriate forgiveness payments to CRB.  But the SBA would not resolve its claim against Kabbage until Kabbage settled the DOJ actions and resolved each of the fraud flags through an enormous, expensive loan-by-loan review.  Even after such a review, Kabbage might still be liable for loans with fraud flags that could not be cleared.

233.   Thus, Kabbage first focused on its negotiations with the DOJ.  During an August 2023 meeting, the DOJ presented its case, including a preliminary calculation of the damages and penalties it would seek should Kabbage object to its claim and force litigation.  Following its presentation, the DOJ offered to settle its claims for approximately $212 million.  Kabbage countered, continued negotiations, and ultimately convinced the DOJ to reduce its FCA claims against Kabbage—including the claims related to fraudulent loans and loans inflated by the SALT, $100K, and Form 940 issues—to a total of $120 million.

234.   Specifically, on May 7, 2024, Kabbage settled the Massachusetts Action for an allowed claim of $63,294,270.43 in its bankruptcy case.  Also on May 7, 2024, Kabbage settled the Texas Action for an allowed claim of $56,705,729.57 in its bankruptcy case.

235.    After settling the DOJ claims, Kabbage was finally able to get traction in negotiations with the SBA to resolve its enormous claim.  Ultimately, Kabbage was able to do so for a fraction of what the SBA originally sought in its proof of claim, giving the SBA an allowed claim of $92 million that would unlock guaranty payments to CRB for both excess loans and the more than 16,000 loans with fraud flags.  This drastically reduced CRB's claim against the estate, leaving CRB with a claim largely comprising contractual interest on delayed guaranty payments, legal fees, and other expenses.  Kabbage was thus ultimately able to settle CRB's claim for $30 million based on contractual accrued interest, cost of servicing loans that were transitioned back to CRB as a result of the bankruptcy, and attorney fees.

236.    As of the date of this Complaint, Kabbage estimates that it has total allowed claims of at least $270 million in its bankruptcy case.

## CAUSES OF ACTION

### COUNT I
**Avoidance and Recovery of the October 13, 2020 Transfer as an
Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a)
(Against AmEx Kabbage and American Express)**

237.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

238.    The October 13, 2020 Transfer constituted a transfer of Kabbage's interests in property.

239.    The October 13, 2020 Transfer was made within two years before the petition date in Kabbage's bankruptcy case.

240.    The October 13, 2020 Transfer was made with actual intent to hinder, delay, or defraud Kabbage's creditors within the meaning of 11 U.S.C. § 548(a)(1)(A).  Kabbage's management, Kabbage's Board of Directors, and Kabbage's shareholders knew that: (a) Kabbage

was likely to be subject to extensive litigation, legal fees, fines, penalties, and other expenses arising from its PPP loans; (b) Kabbage would remain subject to these liabilities as "Excluded Liabilities" under the Merger Agreement; (c) Kabbage would have "Retained Cash" under the Merger Agreement that was insufficient to pay these liabilities and to service its loan portfolios; and (d) Kabbage would be rendered insolvent by the October 13, 2020 Transfer.

241.    Indeed, Kabbage's management team and controlling shareholders were incentivized to turn a blind eye to the known and knowable PPP-related liabilities. Simply put, the more money left at Kabbage to deal with such liabilities, the less these shareholders would have received. Moreover, if Kabbage's management expressly acknowledged the known and knowable PPP-related liabilities, it would have threatened the deal with American Express. Not only did Kabbage's management receive more than $45,377,000[20] from the merger, they also collectively received more than $35,000,000 in retention bonuses from AmEx Kabbage, as reflected below:

| Kabbage Insider | Retention Bonus | Merger Consideration | Total |
|---|---|---|---|
| Co-Founder, CEO, and Director Robert Frohwein | $13,320,000 | $29,944,003 | $43,264,003 |
| Co-Founder and President Kathryn Petralia | $13,320,000 | $12,010,415 | $25,330,415 |
| Head of Strategy Spencer Robinson | $2,400,000 | $1,494,714 | $3,894,714 |
| Chief Technology Officer David McGowan | $2,400,000 | $429,781 | $2,829,781 |

---

[20] This includes amounts that were held in the escrow established by the Merger Agreement, which may have been, at least in part, distributed to these officers or their affiliated entities.

| | | | |
|---|---|---|---|
| General Counsel and Chief Compliance Officer Scott Askins | $900,000 | $1,213,872 | $2,113,872 |
| Chief Revenue Officer Laura Goldberg | $1,600,000 | $145,846 | $1,745,846 |
| Head of Product and User Experience Catherine Lynn | $750,000 | $77,602 | $827,602 |
| Head of Global Policy Sam Taussig | $425,000 | $61,486 | $486,486 |
| **Total** | **$35,115,000** | **$45,377,719** | **$80,492,719** |

242.    Pleading in the alternative, solely to the extent that the intent of Kabbage's management, Kabbage's Board of Directors, Kabbage's shareholders, and many of Kabbage's employees is insufficient by itself to establish the requisite intent to hinder, delay, or defraud creditors within the meaning of 11 U.S.C. § 548(a)(1)(A), Kabbage further alleges that such intent is established through the confluence of multiple badges of fraud, including those set forth below.

243.    First, the October 13, 2020 Transfer constituted substantially all of Kabbage's valuable assets.

244.    Second, the October 13, 2020 Transfer did not provide reasonably equivalent value to Kabbage.  In fact, the transfer provided no value whatsoever.

245.    Third, the October 13, 2020 Transfer rendered Kabbage insolvent.  As a result of the transfer, the fair value of Kabbage's liabilities, including its massive liabilities to the DOJ and SBA, greatly exceeded the fair value of Kabbage's assets.

246.    Fourth, the October 13, 2020 Transfer directly benefited several Kabbage insiders. These Kabbage insiders received massive retention bonuses and payouts from American Express as a direct result of the October 13, 2020 Transfer.

247.    Fifth, the October 13, 2020 Transfer occurred shortly after Kabbage incurred massive legal obligations stemming from its PPP portfolio.  In fact, Kabbage began paying legal fees related to these liabilities only two months after the October 13, 2020 Transfer.

248.    Sixth, the cumulative effect of the October 13, 2020 Transfer and each of its related transactions was to "orphan" the PPP loan portfolio and shield the recipients of substantially all of Kabbage's assets from the significant liabilities arising from that portfolio.   The natural consequence of doing so was to frustrate governmental investigators and law enforcement from imposing liability on Kabbage for its misconduct.

249.    Kabbage, therefore, may avoid the October 13, 2020 Transfer as an actual fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(A) and may recover the value of the October 13, 2020 Transfer from AmEx Kabbage as the initial transferee pursuant to 11 U.S.C. § 550(a)(1).

250.    Moreover, Kabbage may recover the value of the October 13, 2020 Transfer from American Express as a subsequent transferee pursuant 11 U.S.C. § 550(a)(2).  Within only days after the October 13, 2020 Transfer, AmEx Kabbage merged into a subsidiary of American Express, and from that point forward was under the full control of American Express.  Between October 16 and October 19, 2020, American Express caused AmEx Kabbage to transfer certain proceeds of the October 13, 2020 Transfer to American Express, including $120 million in cash.

251.    American Express had knowledge of the voidability of the October 13, 2020 Transfer and did not receive the proceeds from the October 13, 2020 Transfer in good faith; nor did American Express provide any value to AmEx Kabbage in exchange for the distribution from AmEx Kabbage.

## COUNT II
### Avoidance and Recovery of the October 13, 2020 Transfer as a
### Constructive Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(B) & 550(a)
### (Against AmEx Kabbage and American Express)

252.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

253.    The October 13, 2020 Transfer constituted a transfer of Kabbage's interests in property.

254.    The October 13, 2020 Transfer was made within two years before the petition date in Kabbage's bankruptcy case.

255.    The October 13, 2020 Transfer did not provide reasonably equivalent value to Kabbage.  In fact, the transfer provided no value whatsoever.

256.    The October 13, 2020 Transfer rendered Kabbage insolvent.  As a result of the transfer, the fair value of Kabbage's liabilities, including its massive liabilities to the DOJ and SBA, greatly exceeded the fair value of Kabbage's assets.  The October 13, 2020 Transfer likewise left Kabbage with unreasonably small capital to continue servicing its loan portfolios.

257.    Kabbage, therefore, may avoid the October 13, 2020 Transfer as a constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B) and may recover the value of the October 13, 2020 Transfer from AmEx Kabbage as the initial transferee pursuant to 11 U.S.C. § 550(a)(1).

258.    Kabbage, moreover, may recover the value of the October 13, 2020 Transfer from American Express as a subsequent transferee pursuant 11 U.S.C. § 550(a)(2).  Within only days after the October 13, 2020 Transfer, AmEx Kabbage merged into a subsidiary of American Express, and from that point forward was under the full control of American Express.  Between October 16 and October 19, 2020, American Express caused AmEx Kabbage to transfer certain proceeds of the October 13, 2020 Transfer to American Express, including $120 million in cash.

259.     American Express had knowledge of the voidability of the October 13, 2020 Transfer and did not receive the proceeds from the October 13, 2020 Transfer in good faith; nor did American Express provide any value to AmEx Kabbage in exchange for the distribution from AmEx Kabbage.

## COUNT III
### Avoidance and Recovery of the October 13, 2020 Transfer as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a) (Against AmEx Kabbage and American Express)

260.     Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

261.     At all times relevant to this dispute, there have been one or more creditors, including, without limitation, the DOJ and the SBA, which have held and still hold unsecured claims against Kabbage that are allowable under 11 U.S.C. § 502.

262.     These creditors have claims under applicable state and federal law to avoid the October 13, 2020 Transfer as an actual fraudulent transfer.  As more fully alleged in Count I above, Kabbage made the October 13, 2020 Transfer with the requisite actual intent to hinder, delay, or defraud Kabbage's creditors, including the DOJ and the SBA.  Accordingly, Kabbage's creditors have a claim to avoid the October 13, 2020 Transfer under Delaware law (6 Del. C. § 1304(a)(1)), Georgia law (Ga. Code § 18-2-74(a)(1)), and/or other applicable state fraudulent-transfer law.  In addition, the DOJ and the SBA have claims to avoid the October 13, 2020 Transfer under the Federal Debt Collections Procedures Act, 28 U.S.C. § 3304(b)(A).

263.     Kabbage, therefore, may avoid the October 13, 2020 Transfer as an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b)(1) and may recover the value of the October 13, 2020 Transfer from AmEx Kabbage as the initial transferee pursuant to 11 U.S.C. § 550(a)(1).

264.    As more fully alleged in Count I, because AmEx Kabbage transferred at least $120 million to American Express, Kabbage also may recover from American Express as a subsequent transferee pursuant to 11 U.S.C. § 550(a)(2).

## COUNT IV
### Avoidance and Recovery of the October 13, 2020 Transfer as a Constructive Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a) (Against AmEx Kabbage and American Express)

265.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

266.    At all times relevant to this dispute, Kabbage's creditors, including the DOJ and the SBA, have held and still hold unsecured claims against Kabbage that are allowable under 11 U.S.C. § 502.  These creditors have claims under applicable law to avoid the October 13, 2020 Transfer.

267.    As more fully alleged in Count II above, Kabbage did not receive reasonably equivalent value in exchange for the October 13, 2020 Transfer.  Moreover, Kabbage was rendered insolvent by the October 13, 2020 Transfer.  Accordingly, Kabbage's creditors have a claim to avoid the October 13, 2020 Transfer under Delaware law (6 Del. C. § 1304(a)(2)), Georgia law (Ga. Code § 18-2-74(a)(2)), and/or other applicable state fraudulent-transfer law.  In addition, the DOJ and the SBA have claims to avoid the October 13, 2020 Transfer under 28 U.S.C. § 3304(b)(B).

268.    Kabbage, therefore, may avoid the October 13, 2020 Transfer as a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b)(1) and may recover the value of the October 13, 2020 Transfer from AmEx Kabbage as the initial transferee pursuant to 11 U.S.C. § 550(a)(1).

269.    As more fully alleged in Count II, because AmEx Kabbage transferred at least $120 million to American Express, Kabbage also may recover from American Express as a subsequent transferee pursuant to 11 U.S.C. § 550(a)(2).

## COUNT V
### Avoidance of Waiver and Release Rights Under Merger Agreement as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a)
### (Against AmEx Kabbage and American Express)

270.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

271.    As more fully alleged above, Kabbage and American Express were both aware that Kabbage faced massive litigation risk in connection with its PPP portfolio.  Thus, American Express insisted that the Merger Agreement contain an agreement to waive and/or release Kabbage's claims against Defendants.

272.    Moreover, American Express knew that Kabbage intended to only leave sufficient cash in Kabbage to service its existing loan portfolios, and it was not leaving sufficient cash to pay for Kabbage's impending litigation risk.

273.    The natural consequence of these actions was that Kabbage's creditors, including without limitation the DOJ and the SBA, would be without recourse after the transaction closed on October 16, 2020.

274.    Kabbage, therefore, agreed to the waiver and/or release rights in the Merger Agreement with the requisite actual intent to hinder, delay, or defraud Kabbage's creditors, including the DOJ and the SBA.

275.    Accordingly, Kabbage may avoid its agreement to such waiver and/or release rights as an actual fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(A).

276. Further, to the extent that any value was transferred by Kabbage to AmEx Kabbage and/or American Express in connection with the waiver and/or release rights of the Merger Agreement, Kabbage may recover of such transfers under 11 U.S.C. § 550(a).

**COUNT VI**
**Avoidance of Indemnification Rights Under Merger Agreement as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a)**
**(Against AmEx Kabbage and American Express)**

277. Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

278. As more fully alleged above, Kabbage and American Express were both aware that Kabbage faced massive litigation risk in connection with its PPP portfolio. Thus, American Express insisted that the Merger Agreement contain broad indemnification rights related to all liabilities arising from the PPP portfolio.

279. Moreover, American Express knew that Kabbage intended to only leave sufficient cash in Kabbage to service its existing loan portfolios, and it was not leaving sufficient cash to pay for Kabbage's impending litigation risk.

280. The natural consequence of these actions was that Kabbage's creditors, including without limitation the DOJ and the SBA, would be without recourse after the transaction closed on October 16, 2020.

281. Kabbage, therefore, agreed to the indemnification obligations in the Merger Agreement with the requisite actual intent to hinder, delay, or defraud Kabbage's creditors, including the DOJ and the SBA.

282. Accordingly, Kabbage may avoid its indemnification obligations as an actual fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(A).

283.     Further, to the extent that any value was transferred by Kabbage to AmEx Kabbage and/or American Express in connection with the indemnification rights of the Merger Agreement, Kabbage may recover of such transfers under 11 U.S.C. § 550(a).

**COUNT VII**
**Avoidance of Waiver and Release Rights under Merger Agreement as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a)**
**(Against AmEx Kabbage and American Express)**

284.     Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

285.     At all times relevant to this dispute, there have been one or more creditors, including, without limitation, the DOJ and the SBA, which have held and still hold unsecured claims against Kabbage that are allowable under 11 U.S.C. § 502.  These creditors have claims under applicable law to avoid Kabbage's agreement to waive and/or release claims against American Express and AmEx Kabbage.  Because the DOJ and the SBA hold claims representing debts to the United States, these creditors have claims to avoid Defendants' waiver and/or release rights pursuant to 28 U.S.C. § 3304(b)(A).

286.     As more fully alleged above, Kabbage and American Express were both aware that Kabbage faced massive litigation risk in connection with its PPP portfolio.  Accordingly, American Express insisted that the Merger Agreement contain an agreement to waive and/or release Kabbage's claims against Defendants.

287.     Moreover, American Express knew that Kabbage intended to only leave sufficient cash in Kabbage to service its existing loan portfolios, and it was not leaving sufficient cash to pay for Kabbage's impending litigation risk.

288.     The natural consequence of these actions was that Kabbage's creditors, including the DOJ and the SBA, would be without recourse after the transaction closed on October 16, 2020.

289.    Kabbage, therefore, agreed to the waiver and/or release rights in the Merger Agreement with the requisite actual intent to hinder, delay, or defraud Kabbage's creditors, including the DOJ and the SBA.  The DOJ and the SBA (along with Kabbage's other creditors) thus have a claim under Delaware law, Georgia law, and/or other applicable state fraudulent-transfer law, to avoid such waiver and/or release rights.  In addition, the DOJ and the SBA have claims to avoid Defendants' waiver and/or release rights under 28 U.S.C. § 3304(b)(B).

290.    Accordingly, Kabbage may avoid its agreement to such waiver and/or release rights as an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b)(1).

291.    Further, to the extent that any value was transferred by Kabbage to AmEx Kabbage and/or American Express in connection with the waiver and/or release rights of the Merger Agreement, Kabbage may recover of such transfers under 11 U.S.C. § 550(a).

## COUNT VIII
### Avoidance of Indemnification Rights under Merger Agreement as an Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b)(1) & 550(a) (Against AmEx Kabbage and American Express)

292.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

293.    At all times relevant to this dispute, there have been one or more creditors, including, without limitation, the DOJ and the SBA, which have held and still hold unsecured claims against Kabbage that are allowable under 11 U.S.C. § 502.  These creditors have claims under applicable law to avoid Kabbage's indemnification obligations.  Because the DOJ and the SBA hold claims representing debts to the United States, these creditors have claims to avoid Kabbage's indemnification obligations pursuant to 28 U.S.C. § 3304(b)(A).

294.    As more fully alleged above, Kabbage and American Express were both aware that Kabbage faced massive litigation risk in connection with its PPP portfolio.  Accordingly, American

Express insisted that the Merger Agreement contain broad indemnification rights related to all liabilities arising from the PPP portfolio.

295.    Moreover, American Express knew that Kabbage intended to only leave sufficient cash in Kabbage to service its existing loan portfolios, and it was not leaving sufficient cash to pay for Kabbage's impending litigation risk.

296.    The natural consequence of these actions was that Kabbage's creditors, including without limitation the DOJ and the SBA, would be without recourse after the transaction closed on October 16, 2020.

297.    Kabbage, therefore, agreed to the indemnification obligations in the Merger Agreement with the requisite actual intent to hinder, delay, or defraud Kabbage's creditors, including the DOJ and the SBA.  The DOJ and the SBA (along with Kabbage's other creditors) thus have a claim under Delaware, Georgia, or other applicable state law to avoid Kabbage's indemnification obligations to American Express and AmEx Kabbage. In addition, DOJ and the SBA have claims to avoid Kabbage's indemnification obligations pursuant to 28 U.S.C. § 3304(b)(A).

298.    Accordingly, Kabbage may avoid its indemnification obligations as an actual fraudulent transfer pursuant to 11 U.S.C. § 544(b)(1).

299.    Further, to the extent that any value was transferred by Kabbage to AmEx Kabbage and/or American Express in connection with the indemnification rights of the Merger Agreement, Kabbage may recover of such transfers under 11 U.S.C. § 550(a).

## COUNT IX

**Equitable Subordination of Indemnification Rights**
**Pursuant to 11 U.S.C. § 510(c)**
**(Against AmEx Kabbage and American Express)**

300.     Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

301.     As more fully alleged above, Kabbage and American Express were both aware that Kabbage faced massive litigation risk in connection with its PPP portfolio.  Moreover, American Express knew that Kabbage intended to only leave sufficient cash in Kabbage to service its existing loan portfolios, and it was not leaving sufficient cash to pay for Kabbage's impending litigation risk.  American Express thus insisted on broad indemnification rights in the Merger Agreement for the benefit of itself and AmEx Kabbage.

302.     The natural consequence of these actions was that Kabbage's creditors would be without recourse after the transaction closed on October 16, 2020.

303.     These actions resulted in injury to Kabbage and its creditors, and they conferred an unfair advantage to Defendants.

304.     Under such circumstances, it would be unfair and inequitable to allow Defendants to seek to assert any claim against the Debtors, including but not limited to any claim for indemnification rights, *pari passu* with other creditors.

305.     Accordingly, each of Defendants' claims should be equitably subordinated to all claims pursuant to 11 U.S.C. § 510(c) to the extent necessary to undo or offset the effect of Defendants' misconduct.

## COUNT X
### Disallowance of Claims Under 11 U.S.C. § 502(d)
### (Against AmEx Kabbage and American Express)

306.    Kabbage repeats, re-alleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

307.    AmEx Kabbage filed claim numbers 131, 256, and 259 in the Debtors' bankruptcy cases.

308.    Moreover, both American Express and AmEx Kabbage may seek to file or otherwise assert a claim for indemnification against Debtors.

309.    Because property of AmEx Kabbage and American Express is recoverable under 11 U.S.C. § 550, their claims should be disallowed under 11 U.S.C. § 502(d) until they have paid the amount for which they are liable.

## PRAYER FOR RELIEF

WHEREFORE, Kabbage respectfully requests that judgment and order be entered in its favor and against Defendants as follows:

a.    Entering judgment in favor of Kabbage against Defendants;

b.    Avoiding the October 13, 2020 Transfer and awarding recovery (or other appropriate relief) in the amount of that transfer, to the extent received, against AmEx Kabbage and American Express;

c.    Avoiding Defendants' waiver and/or release rights under the Merger Agreement;

d.    Avoiding Defendants' indemnification rights under the Merger Agreement;

e.    To the extent not avoided, equitably subordinating Defendants' indemnification rights under the Merger Agreement;

f.    Disallowing claims asserted by Defendants against the Debtors in their bankruptcy cases until they have paid the amount they are liable under 11 U.S.C. § 550;

g.      Awarding Plaintiff its reasonable attorneys' fees and costs incurred in the prosecution of this action to the extent allowed by law or equity;

h.      Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity; and

i.      Granting such other relief as the Court deems just and proper.

Dated:  October 16, 2025
Wilmington, Delaware

**REID COLLINS & TSAI LLP**

*/s/ Jessica Zeldin*
Jessica Zeldin (DE Bar No. 3558)
Alexander J. Rigby (DE Bar No. 7257)
300 Delaware Ave., Suite 770
Wilmington, DE 19801
T: (302) 467-1765
jzeldin@reidcollins.com
arigby@reidcollins.com

Eric D. Madden (*Pro Hac Vice to be Filed*)
Brian J. Bah (*Pro Hac Vice to be Filed*)
1601 Elm Street, Suite 4200
Dallas, Texas 75201
T : (214) 420-8900
emadden@reidcollins.com
bbah@reidcollins.com

Joshua J. Bruckerhoff (*Pro Hac Vice to be Filed*)
Jeremy H. Wells (*Pro Hac Vice to be Filed*)
Morgan M. Menchaca (*Pro Hac Vice to be Filed*)
Emma Culotta (*Pro Hac Vice to be Filed*)
1301 S. Capital of Texas Highway, Suite C-300
Austin, Texas 78746
T: (512) 647-6100
jbruckerhoff@reidcollins.com
jwells@reidcollins.com
mmenchaca@reidcollins.com
eculotta@reidcollins.com

-and-

**MORRIS JAMES LLP**

Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Tara C. Pakrouh (DE Bar No. 6192)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
T: (302) 888-6800
emonzo@morrisjames.com
bkeilson@morrisjames.com
tpakrouh@morrisjames.com

*Counsel for KServicing Wind
Down Corp. (f/k/a Kabbage, Inc.)*